UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
MADISON SQUARE GARDEN, L.P.,       )
                                   )
            Plaintiff,             )  No. 07 CIV. 8455 (LAP)
                                   )
            v.                     )
                                   )
NATIONAL HOCKEY LEAGUE, NATIONAL   )
HOCKEY LEAGUE ENTERPRISES, L.P.,   )
NATIONAL HOCKEY LEAGUE INTERACTIVE )
CYBERENTERPRISES, L.L.C., NHL      )
ENTERPRISES CANADA, L.P., and NHL  )
ENTERPRISES, B.V.,                 )
                                   )
            Defendants.            )
------------------------------------------------------------ X

**DECLARATION OF STEVE MILLS IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, STEVE MILLS, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the President and Chief Operating Officer of MSG Sports. As such, I am responsible for the overall operations of MSG's sports teams, including the New York Rangers hockey team (the "Rangers"), the New York Knicks men's basketball team, and the New York Liberty women's basketball team. I also represent MSG on the Board of Governors for the National Hockey League ("NHL" or "League"). I submit this declaration in support of MSG's motion for a preliminary injunction in the above-captioned action, and I have personal knowledge of the facts stated below.

The Rangers' Development of a Unique, Valuable "Luxury" Mark

2. MSG has been assiduous in protecting and assuring the quality of the goods and services associated with the Rangers' trademark, including the "content" distributed

on any website produced by or on behalf of the Rangers – *i.e.*, the video clips, commentary, articles, analysis, photos, statistics, promotions, and any number of other forms of communication directed to and consumed by the team's fans and potential customers.

3. The Rangers have invested significant time, money and efforts over the years to develop one of the truly premium brands within the NHL, and to ensure that its mark remains a "luxury" mark among sports franchises.

4. For example, it is my belief that hockey is different than many other sports in that, among other reasons, hockey fans, once they make the decision to support a team, tend to be concerned largely and many times solely with their chosen team and have little interest in following hockey in the generic sense. Fans in many other sports, by contrast, are much more likely to watch games involving teams other than their favorite team. MSG also recognizes that Rangers fans are fiercely loyal to their team. MSG has therefore undertaken extraordinary efforts and expense to design and promote Rangers hockey and the Rangers marks, along with products and services, including the Rangers website, associated with those marks, in light of the importance of developing and maintaining fan support. Indeed, MSG's strategy for Rangers hockey is built on MSG's recognition that Rangers fans care about the team – far more than the League as a whole. MSG derives substantial revenue from activities such as ticket and merchandise sales, all as the result of capitalizing on this marketing strategy.

5. Also as a result of years of devoted work and expense by MSG to establish strong and high quality marks, Rangers fans have developed high expectations of the quality of the products and services associated with the Rangers' mark. Through the Rangers' extraordinary efforts and expense, a certain but unquantifiable goodwill and reputation has developed between the Rangers and its fans, sponsors and advertisers. That goodwill and

reputation leads to increased revenues in ticket sales, merchandise sales, sponsorship and advertising.

The NHL's New Media Strategy

6. In or about June 2006, the NHL adopted what it called a "New Media Strategy," which describes the League's initiatives in several areas generally relating to the use of the Internet and websites, video and audio streaming and wireless applications. The Rangers voted against the adoption of the New Media Strategy at the Board of Governors' meeting.

7. Since the adoption of that strategy in June 2006, the League has attempted to assert increased control over the individual teams' new media businesses, including taking over and standardizing the teams' individual websites and exerting control over all commercial aspects of those sites.

The NHL Cracks Down on MSG's New Media Initiatives

8. Toward the end of the last season, after learning that MSG was contemplating pursuing antitrust claims against the League for its anticompetitive restrictions related to, among other things, the New Media Strategy, NHL Commissioner Gary Bettman met with various MSG officials, including me. The Commissioner indicated that the NHL was open to addressing MSG's concerns. At that meeting, we discussed the Rangers moving ahead with certain modest new media initiatives. The Rangers subsequently launched an online merchandise store that offered a convenient, online ordering process for fans and potential fans who wanted to purchase Rangers tickets, thereby making it unnecessary for Rangers fans to go through the cumbersome process of having to download a paper copy of the team's catalog. The Rangers continued streaming over a broadband network its television production of Rangers games. This broadband streaming over the Internet was properly "gated," *i.e.*, the games were

streamed only within the Rangers' permitted "home territory" and only to households that already were subscribers to MSG's regional cable television network.

9. In addition, on April 17, 2007, the Rangers launched another new initiative, that we had discussed with the Commissioner in the meeting, using for the first time virtual signage technology to superimpose ads in an unintrusive manner during the television broadcast of Game 3 of the first round of the Stanley Cup playoffs against the Atlanta Thrashers, which was the Rangers first home game in that series.

10. The very next evening, on April 18, 2007, approximately one hour before the start of Game 4 of the playoffs (also a Rangers home game), MSG received a fax from the NHL's Deputy Commissioner, William L. Daly, imposing an immediate fine of $100,000 per day for the Rangers' business innovations, *i.e.*, the virtual signage, the on-line catalog and the broadband streaming (which, as the League knew, had been ongoing for months). (A copy of the letter from William L. Daly to Steve Mills, dated April 18, 2007, is attached hereto as Exhibit A.) On information and belief, the purpose of the NHL's threatened, draconian fines, carried out so bluntly, was to force MSG to abandon its individual competitive initiatives, which threatened the League's efforts to usurp and centralize control of such innovations, new products and potential revenue streams.

11. In the face of potentially crippling fines, and to avoid disrupting its fans' enjoyment of the playoffs, the Rangers were forced to suspend their efforts to bring these new products and services to their fans. (A copy of the letter from Steve Mills to William L. Daly, dated April 20, 2007, is attached hereto as Exhibit B). The Rangers discontinued the use of virtual signage during broadcasts, took down their online merchandise store by April 20, and suspended the broadband streaming of games to cable subscribers within the team's home

territory. The League, nonetheless, fined the Rangers a total of $200,000 for the use of these innovations, by withholding funds from the League due to the Rangers.

12. In addition, to avoid stirring up controversy for their fans or for the NHL during the Stanley Cup playoffs, and in the hope that further conversations would persuade the League not to interfere with MSG's competitive efforts, MSG held off filing this antitrust lawsuit against the NHL.

The NHL Attempts to Coerce MSG Into Relinquishing Its Website to the NHL

13. This past season, the Rangers made it to the second round of the playoffs and thus had a much more successful season than in recent years. The Rangers' success in the 2006-07 playoffs presents a unique opportunity over the next few years for the team to recruit new fans. This opportunity was enhanced when, in the off-season, MSG invested in the acquisition of superstars Chris Drury and Scott Gomez, which should dramatically increase the Rangers' chances of contending for the NHL Stanley Cup Championship in 2007-08 and present an enormous opportunity for MSG to cultivate additional excitement about the Rangers, increase the Rangers' fan base and grow the traffic to the Rangers website.

14. In short, if properly handled, the Rangers now have great opportunities to use the Rangers website both to strengthen existing fan support and to recruit the next generation of fans. When sports teams acquire new talent and have playoff success, it can result in significant growth in the addition of new fans, increased ticket sales and revenues from trademarked products and services, and larger advertising and sponsorship profits. This is exactly what the Rangers have been experiencing in the wake of their playoff success during the 2006-07 season and the subsequent additions of superstars Gomez and Drury as Rangers.

15.  The business of using websites to promote professional sports is still in the early stages of commercial development and is a ripe and perishable opportunity that MSG desires to rightfully exploit, especially in light of what I have described above. The Internet will continue to evolve into an increasingly important tool that sports teams can use to (i) communicate with and attract fans, (ii) distribute team products and services, including the games themselves; (iii) provide sponsors and advertisers access to new opportunities, and (iv) generate revenue. MSG has been ahead of the curve in recognizing the importance of a team-focused website as a competitive tool, and has already devoted substantial efforts and expense to establishing the Rangers website as a special and well-branded distribution channel for MSG to reach out to established and new Rangers fans. Fans that MSG attracts and secures through the Rangers website often go on to, among other things, purchase tickets, memorabilia, and promotional content. If the Rangers are forced to relinquish their website to the NHL, these and other such perishable opportunities may be irretrievably lost.

16.  However, at this critical juncture, the NHL demanded that the Rangers relinquish control over the content, format, design and operation of the team's website, as part of its overall effort to control all of the NHL clubs' websites and administer and operate them on the League's own website and server. Over the past few months, the NHL has been attempting to implement this plan, which it insisted must be completed before the start of the 2007-08 season on or about September 29, 2007.

17.  In response to MSG's concerns regarding the League's threat to take over the Rangers website, the NHL agreed to meet with officials from MSG on July 26, 2007. I attended that meeting along with Lucinda Treat, Marc Schoenfeld and Scott Richman from MSG and William Daly, Keith Ritter, Suzanne Pincus and Robert Hawkins from the NHL. At that

meeting, MSG stated its concerns with respect to the Rangers losing their ability to control the content and quality of their website. I thought the meeting went well with both parties indicating their intent to find a way to co-exist. The parties agreed to meet again and involve the appropriate technical personnel in the discussions.

18. I understand that, over the course of the summer, representatives from the NHL and MSG, including technical personnel, met and communicated a number of times on the issue of the League's attempting to take away the Rangers website. I was informed that the meetings during the summer generally went well. However, despite MSG's offering of numerous ways to accommodate the League by, among other things, running parallel websites, linked to each other, and even offering to cooperate in supplying content to the League site, the League ultimately insisted there could only be one Rangers website, it had to be under League control, it had to be linked to the "newyorkrangers.com" website address, and it had to be operated on the NHL's servers instead of servers owned or operated by MSG. The Rangers are unable to agree to this unreasonable demand.

19. MSG will be severely harmed if the NHL is permitted to expropriate to itself the Rangers website and, in particular, the "newyorkrangers.com" website address, or url. MSG has designed an exciting, Rangers-focused site that is regularly visited by hundreds of thousands of fans and potential fans and where MSG endeavors to build an emotional attachment between the Rangers hockey team and its fans. At that site, for example, MSG enhances the image of Rangers hockey by providing many opportunities for visitors to learn about the Rangers, their players, their history and many other things focused on the team. MSG's Rangers website thus reinforces the Rangers experience by offering ways for fans to interact with the team and with other visitors to the site, through such activities as posting Rangers-themed photos and

participating in a message board, and utilizing a "Rangers-on-Demand" feature to watch video clips of game-day activities, game highlights and historical Rangers footage. These creative and exciting features have allowed MSG to increase steadily the number of visitors to its website and the frequency of their visits. The League, if it is allowed to expropriate this investment, could suppress or dilute much of this Ranger-focused content, to the detriment of the Ranger brand and all that MSG has been trying to accomplish through the Ranger website. In addition, if it controlled the newyorkrangers.com web address, the League would be able to divert to the League's website the thousands of visitors that currently visit the Rangers website as the result of the significant investment the Rangers have made in that site over the years. Once these visitors are diverted from MSG to the League-controlled site, it would be very difficult and costly to re-build that base of visitors, even assuming that the League would allow MSG to invest in a second Rangers website, which the League has already refused to permit.

20. On September 20, 2007, I received a letter from the League stating that the League intended to launch a Rangers website on the "common League platform" on September 28, 2007 "with or without [the Rangers'] cooperation." (A copy of the letter to Steve Mills from William L. Daly, dated September 20, 2007, is attached hereto as Exhibit C.) Further, the NHL threatened to fine the Rangers $100,000 for each day, starting on September 29, 2007, that the Rangers continue to operate their own website on MSG's server.

21. On September 27, 2007, the League reiterated its threat. Deputy Commissioner Daly sent an e-mail to me, stating:

> Further to my letter dated September 20, 2007, this will confirm
> that NHL ICE will be launching the New York Rangers website on
> the common League platform as of 12:01 p.m. tomorrow afternoon.
> To the extent the Rangers' current site (newyorkrangers.com), or
> any successor site, is found to be operating outside the common
> League platform as of 12:01 a.m. on Saturday, September 29, the

sanctions specified in my September 20 letter will become applicable and will be fully enforced.

(A copy of the e-mail to Steve Mills from William Daly, copied to NHL Commissioner Bettman, dated September 27, 2007, is attached hereto as Exhibit D.)

22. On September 28, 2007, at approximately noon, the League carried out its threat. It eliminated from its website, NHL.com, a link to the Rangers website and, instead, posted a "Rangers" website of its own, which it falsely describes as "The Official Site of the New York Rangers."

23. The League launched this so-called "official" Rangers site without MSG's consent. Moreover, when it launched its own "Rangers" site, I understand the League expropriated whole sections from MSG's genuine official Rangers site. The net effect of the "Rangers" site the League now transmits from NHL.com is to dilute the focus on the Rangers that our fans have come to expect of newyorkrangers.com with a mishmash of League-oriented content, content about other teams, some materials misappropriated from MSG's real Rangers website, and some features the League has apparently designed itself.

24. Fostering even further the confusion the League's site will cause, the League has set out across the bottom of its home page the following claim:

> rangers.nhl.com is the official website of the New York Rangers. New York Rangers is a trademark of Madison Square Garden, L.P. NHL and the image of the Stanley Cup are registered trademarks and the NHL Shield, word mark Stanley Cup and NHL Conference logos are trademarks of the National Hockey League. All NHL logos and marks and NHL team logos and marks as well as all other proprietary materials depicted herein are the property of the NHL and the respective NHL teams and their unauthorized use without the prior written consent of NHL Enterprises, L.P., is prohibited. Copyright® 2007 New York Rangers and the National Hockey League. All Rights Reserved.

25. Finally, the League has continued in its efforts to coerce MSG into abandoning the truly official site of the Rangers, with its purported imposition of fines of $100,000 per day for each day starting September 29 that MSG continues to operate its own Rangers website.

26. Given the League's actions, and the draconian sanctions the League has purported to impose, MSG had no choice but to bring this lawsuit and this motion for preliminary injunction to protect its rights.

Dated: New York, New York
       September 30, 2007

_____
STEVE MILLS

**CERTIFICATE OF SERVICE**

I declare that on October 4, 2007, I caused the attached, DECLARATION OF STEVE MILLS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, and attached exhibits, to be served by hand-delivery on the following counsel:

Shepard Goldfein
James A. Keyte
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000/1

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York         JONES DAY
       October 4, 2007

                                  By: /s/ Robert W. Gaffey
                                      Robert W. Gaffey  (RG-4004)
                                      Meir Feder  (MF-2574)
                                      William J. Hine (WH-6766)
                                      Tracy V. Schaffer (TS-4952)
                                      222 East 41st Street
                                      New York, NY  10017
                                      Telephone:  (212) 326-3939
                                      Facsimile:  (212) 755-7306

                                  *Attorneys for Plaintiff*

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

NYI-4029246v1