JUDGE PRESKA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 8455**

---------------------------------------------------- x

MADISON SQUARE GARDEN, L.P., )
        Plaintiff, )
        v. )
NATIONAL HOCKEY LEAGUE, )
NATIONAL HOCKEY LEAGUE )
ENTERPRISES, L.P., NHL INTERACTIVE )
CYBERENTERPRISES, LLC., NHL )
ENTERPRISES CANADA, L.P., and NHL )
ENTERPRISES, B.V., )
        Defendants. )
        )
        )
        )
        )

No. 07 CIV. _____

COMPLAINT FOR INJUNCTIVE
RELIEF

SEP 28 2007
U.S.D.C. S.D. N.Y.
CASHIERS

---------------------------------------------------- x

      Plaintiff MADISON SQUARE GARDEN, L.P. ("MSG"), by and through its attorneys, files this Complaint against defendants and alleges as follows:

## I.   <u>PRELIMINARY STATEMENT</u>

    1.   MSG owns the New York Rangers, a major league men's professional ice hockey team, and one of the "original six" members of the National Hockey League ("NHL"). Rangers fans are among the most intense and loyal fans of any NHL team, indeed of any team in professional sports, and the Rangers have gone to great lengths to enhance fan experience by offering a wide range of information, products, and services in competition with other NHL teams.

A.    __The NHL Has Become An Illegal Cartel__.

2.    The New York Rangers are proud to be among the oldest members of the NHL, a joint venture that provides the means for its member clubs to compete on the ice and thus to generate fan interest and excitement in major league men's professional ice hockey contests.  In recent years, however, the NHL has taken steps to eliminate, restrict and prevent "off-ice" competition between the NHL and the member clubs, as well as between and among the member clubs themselves, in ways that are not necessary to the provision of major league men's professional ice hockey contests.  MSG has objected to these steps, and consistently tried to persuade NHL management that eliminating and preventing off-ice competition between and among the NHL member clubs was unnecessary and, when carried too far, illegal.  MSG has made every effort to avoid seeking outside help through the legal process, preferring instead to pursue every means possible to resolve its differences with the NHL in order to avoid the inevitable effect of litigation on relations with the League and among the member clubs.  Because the NHL has not only refused to adjust its anticompetitive behavior, but has threatened and imposed abusive and outrageous fines unless the Rangers and MSG capitulate to the League's illegal demands, no choice remains but for MSG to bring suit to restrain the NHL from continuing to eliminate, restrict and prevent the independent competitive activities of the League's members in violation of federal and state antitrust laws.

3.    It became clear last week that MSG had no choice except litigation, when the NHL threatened to impose a $100,000 per day fine on MSG beginning on Friday, September 28, unless MSG transferred to the League virtually complete control over the Rangers independently-produced website, including the valuable "nyrangers.com" address, which the League then planned to convert into one of 30 "cookie-cutter" club websites housed on "nhl.com" and controlled by the NHL.  MSG has spent years developing its website as a means

of marketing Rangers hockey in competition with other NHL teams. Fans who visit that site are now able to read the latest news about the Rangers and its players, watch video clips of game highlights and historical Rangers footage at MSG's "Rangers on Demand" offering, purchase Rangers merchandise, apparel and game tickets, and interact with the site by posting Rangers-themed personal photos. The NHL has no competitive justification for seizing the Rangers website, which MSG today uses as a competitive tool to generate and maintain fan interest in the Rangers in competition with other NHL teams. By seizing the Rangers website, the NHL will suppress or eliminate competition that currently exists between and among the NHL and NHL teams, as well as hinder individual team innovation and harm consumers. The elimination of such off-ice competition is not necessary to the functioning of the NHL, and can only be explained as another example of the NHL's insistence on absorbing into League control efforts by individual teams, acting on their own, to offer competitively attractive products and services to their fans. Indeed, in threatening to fine MSG, the NHL stated not only that MSG must turn over the Rangers website to the NHL, but that MSG cannot thereafter "operate [any other site] outside of the common League platform" or else it "will be deemed to be in violation of" the NHL's anticompetitive rules and, MSG expects, fined again.

4.      At the onset of the 2007 Stanley Cup playoffs, MSG took three modest but important steps to increase its competitive offerings. MSG made Rangers-branded merchandise available through a convenient, online ordering process on the Rangers website (rather than through the existing, more cumbersome process of downloading a website catalog), and it made Rangers games (already available to cable subscribers) available solely to certain of those same subscribers who are within the Rangers' designated local broadcast territory by an additional means – gated, broadband distribution. In addition, MSG sought to increase revenue from non-

fan sources by selling unintrusive virtual advertising to advertisers on MSG's television broadcasts of Rangers home games. Instead of welcoming these enhancements, which would have increased consumer choice and had other pro-competitive effects, the NHL immediately imposed on MSG an arbitrary penalty of $100,000 per day. This, in turn, forced MSG to shut down these innovations and sent the unmistakable message that future efforts at competition would also be harshly punished. After MSG complied with the League's demands, but refused to pay what MSG asserted was an unlawful fine, the NHL withheld $200,000 from third-party payments otherwise due MSG.

5.      MSG capitulated to the NHL's threats because MSG did not want to distract attention from the NHL playoffs and, in addition, because MSG continued to hope that further discussion would persuade the NHL that its insistence on eliminating or otherwise restraining all competition relating to the NHL was unwise and illegal. That hope was in vain.

6.      The NHL's imposition of, and its threats to impose, fines on MSG for communicating with Rangers fans, offering choices to consumers, and competing through the Rangers website are merely the latest examples of anticompetitive conduct by a legitimate joint venture that has veered into unlawful behavior. The NHL began as a legitimate joint venture producing a product – major league men's professional ice hockey competition – that no one club can produce alone. MSG and the Rangers have always been loyal members of the NHL, supporting joint initiatives in appropriate areas, such as in the area of collective bargaining with the NHL's players. But by seeking to control the competitive activities of independent businesses in ways that are not necessary to the functioning of that legitimate joint venture, the NHL has become an illegal cartel. Having failed to persuade the NHL that its competitive restraints are inappropriate as a business matter and illegal as an antitrust matter, MSG

reluctantly is forced to turn to the courts to protect its interests and the interests of Rangers fans everywhere.

       7.      Through this Complaint, MSG seeks to establish the appropriate bounds of the NHL's conduct as a joint venture of independently owned and operated member clubs, to prevent the NHL from anticompetitive overreaching, and once again to permit competition between and among the NHL member clubs and the NHL that has been restrained by the NHL's anticompetitive rules and policies and that threatens to become restrained to an even greater extent absent this Court's intervention.

**B.**      **<u>The NHL Has Extended Its Collective Activities Beyond What Is Legally Permissible</u>.**

       8.      The NHL is a joint venture of legally separate and independent men's professional ice hockey clubs.  It was created by the individual member teams in order to assist them in producing a product – major league men's professional ice hockey contests – that no one team could produce.  Now consisting of 30 member clubs located throughout the United States and Canada, the NHL is engaged in a variety of legitimate collective activities.  These legitimate activities include negotiating labor agreements with the players, negotiating national television broadcasting arrangements, promulgating and enforcing agreed rules of play, and scheduling ice hockey contests, including playoff and championship competitions.  While MSG sometimes has differed with the NHL on strategy and tactics in some of these areas, particularly in the area of national television, MSG generally accepts and supports these activities, which are important to the success of the NHL and do not unnecessarily limit the independent competitive activities of individual clubs.

       9.      Notwithstanding these valuable and appropriate collective activities, the member clubs remain independently owned and operated businesses, capable of competing – and actually

competing – with each other in various ways.  The clubs are not simply an extension of the NHL; rather, the NHL is a creature of its member clubs.  Each club, as an independent and separate business, is individually responsible for all of its business affairs that have not been properly and lawfully delegated by the clubs to the NHL.  Notwithstanding this basic principle – *i.e.,* that the League serves the clubs, not vice versa – the NHL over the years has asserted an increasing amount of control over the clubs' activities and sought increasingly to aggrandize the League at the expense of the clubs.  This conduct has eliminated competition among the clubs in their independent competitive activities.  Indeed, at a 2006 meeting of the NHL's owners, NHL Commissioner Gary Bettman took the extreme position that the NHL has "granted" the individual clubs only a limited number of property rights and that all other rights are subject to the will of a majority of the club owners, each of whom has a vote on the NHL Board of Governors.

10.     Such broad collective control over the competitive activities of independent businesses is inconsistent with federal and New York state antitrust laws.  The NHL is seeking to take what does not belong to it, and to control independent assets and entities that otherwise would compete with each other and with the NHL.  In so doing, the NHL crosses the line and becomes an illegal cartel, constraining MSG's ability to compete with other NHL member clubs and with the NHL itself.  The NHL's stiff fines against MSG, and its threats of further fines, imposed solely because MSG has sought and continues to seek to compete in very modest ways with the NHL and other NHL clubs, establish that the NHL has moved beyond the operation of a legitimate joint venture and into illegal cartel behavior.  The Rangers have complained about, objected to, and withheld their approval of, this behavior for several years, to no avail.

C.    <u>**The NHL Seeks To Eliminate And Prevent Competitive Activities**</u>.

11.    The New York Rangers, along with the Montreal Canadiens, the Toronto Maple Leafs, the Boston Bruins, the Detroit Red Wings and the Chicago Blackhawks, are known as the NHL's "Original Six" teams – essentially its founding members.  The Rangers have won the Stanley Cup four times, most recently in 1994.  Players as memorable as Vic Hadfield, Eddie Giacomin, Rod Gilbert, Mike Richter, Mark Messier and Wayne Gretzky have played for the New York Rangers, and stars such as Jaromir Jagr and Brendan Shanahan now play for the Rangers.  Gretzky, the game's greatest player, retired as a New York Ranger.

12.    Over the years, MSG has developed, reinforced and encouraged fan interest in the Rangers, making substantial investments in the Rangers franchise as it seeks to compete with other NHL teams, including but not limited to the two other NHL teams in the New York metropolitan area.  MSG, for example, has spent significant sums to attract to its team established international hockey stars such as Jagr and Shanahan (the former Red Wings star), and, most recently, young American stars such as Scott Gomez and Chris Drury, all in an effort to generate "True Blue" excitement at Rangers games at Madison Square Garden and elsewhere.  MSG, in addition, has consistently spent significant sums to market the New York Rangers, and the Rangers' following extends well beyond the New York area.  Hockey fans across the country (and indeed the world) identify with the New York Rangers, and seek the opportunity to experience the Rangers wherever they can, including by attending games or by viewing live or recorded games or game highlights, buying Rangers-branded apparel and merchandise, and viewing and interacting with the Rangers robust website, "nyrangers.com."

13.    As part of their legitimate and independent business efforts, the individual member clubs comprising the NHL, including the Rangers, have ownership rights in, and have registered, various copyrights, trademarks, trade dress and trade names (collectively, "marks") in

logos and designs relating to their teams.  Individual NHL member clubs, including the Rangers,

have undertaken substantial efforts over the years to develop and enhance the value of their

marks and the image of their teams as they compete with each other for fan interest.

14.    MSG's efforts and the loyalty of Rangers fans have created value for the New

York Rangers brand and marks.  MSG's aggressive efforts have created and increased consumer

demand for products and services, including information, merchandise, apparel and memorabilia,

containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers

games or game highlights.  There remains great unexploited potential in this brand and these

marks, and MSG intends and desires to exploit them further, in competition with the other clubs,

to generate income from on-line, video and licensing opportunities and to generate and maintain

fan interest in New York Rangers hockey.

15.    The NHL, however, seeks to expropriate these competitive opportunities for

itself.  Such excessive centralization and aggrandizement of the NHL at the expense of the

member clubs is not reasonably necessary for the success of the NHL venture, and because of

that it is not permissible under state and federal antitrust law.  Yet that is the course the NHL has

taken.  In addition, and notwithstanding the strenuous objections of MSG (and occasionally other

clubs), the NHL has chosen to enforce its anticompetitive regime through oppressive daily fines.

16.    Defendants have inappropriately and illegally claimed and usurped more and

more control over what have been and should be the independent competitive activities of the

individual clubs, eliminating competition in a number of ways, including the following:

A.    Excessive League control of all "new media" activities.  The NHL adopted

a "new media" policy at a June 2006 meeting following a vote by the NHL member clubs from

which MSG and certain other member clubs dissented.  Pursuant to this policy, the NHL is

taking exclusive control of individual team websites and various other "new media" activities such as the distribution of games and highlights through handheld technologies. The League's new media activities go well beyond any legitimate need to ensure the basic appearance and quality of individual clubs' websites or the clubs' other new media activities, are not reasonably necessary for the success of the NHL venture, and eliminate competition among individual clubs. The NHL, in particular, is forcing each team to turn over its individual site to a League-controlled site using the NHL's standard format and is now attempting to impose a $100,000 per day fine to coerce MSG into complying with that demand. In so doing, the NHL is unreasonably restricting the ability of teams such as the Rangers even to continue to operate their own websites, let alone use those websites in unique and creative ways to communicate with existing fans, to develop new fans, and generally to compete for fans with other NHL clubs. These NHL activities are the latest in a series of efforts to require the individual member clubs to cede to the NHL the right of each club to use various new media tools in competition with other member clubs to reach and communicate with current and new fans in ways that each club best sees fit.

      B.    <u>Excessive League control over the licensing of NHL club marks and the</u> <u>marketing of club-branded apparel, merchandise and memorabilia</u>. The NHL asserts the power to control the licensing of individual NHL team marks for virtually all commercial purposes and to constrain the ability of individual teams to market apparel, merchandise and memorabilia both within and beyond the team's local area, imposing restrictions on sales through retailers and prohibiting sales of team-related video/DVD products. The NHL also claims the right to prohibit the sale of apparel, merchandise and memorabilia through online team stores, fining MSG for competing in that way, even though the League permits MSG to offer to consumers on its website the less efficient, time-consuming option of downloading the team's mail order catalog.

In addition, MSG faces significant NHL-imposed restrictions even in the sale of Rangers jerseys outside Madison Square Garden itself. This centralized control eliminates competition among individual clubs and is not reasonably necessary for the success of the NHL venture. Each member club should be able to exploit its own intellectual property, including its marks and logos, and each individual club should be able to decide whether and to what extent it will authorize the NHL to act as a non-exclusive licensing agent in any particular instance in the marketing and promotion of club-branded apparel, merchandise and memorabilia.

C.    <u>Excessive League restrictions on individual teams' relationships with advertisers and sponsors</u>. The NHL claims the almost unlimited right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs' abilities to sell advertising or sponsorship arrangements, even in the clubs' local home arenas. For example, the NHL is now requiring each hockey arena to display League-sponsored advertising on the center-hung screen in connection with League-provided, same-day, "out-of-town" highlights of other NHL games, denying that space to the local team for its own advertising. In addition, the NHL claims the right to restrict the individual clubs from using virtual signage, *i.e.*, signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not block or substitute for existing in-arena signage. By doing so, the NHL prohibits an innovative means of expanding advertisers' access to interested consumers.

D.    <u>Excessive League control over local television and radio opportunities</u>. Media revenues are critical to any professional sports franchise. One of the core activities of a professional sports league is to develop and negotiate a national television contract. In most professional sports, national television revenues are an important means of balancing revenues between and among individual teams. The NHL, however, has been unsuccessful to date in its

efforts to obtain significant national television revenues.  At the same time, the League has engaged in unnecessary and disproportionate incursions into the local broadcasting, rebroadcasting and other distribution rights of individual teams that are and otherwise would be competing with each other.  In particular, the NHL has restrained MSG's ability to license the rights to broadcast Rangers games over cable to an extent well beyond what is reasonably necessary to the success of the NHL joint venture, eliminating competition and causing MSG to lose cable broadcasting revenues.  In addition, the NHL has unreasonably restricted a team's ability to distribute its own live games through the team's website and/or the website of its local television rightsholder, as well as rebroadcasts of its games on a "video-on-demand" basis, even when such distribution is limited to its designated local broadcast territory.  The NHL also claims the right to control all broadcasting and other distribution rights (including international rights) outside each club's local area, as defined by the NHL.  These restraints on individual teams' competitive activities are not protected by the limited antitrust immunity afforded by the Sports Broadcasting Act.

17.    The NHL's anticompetitive activities intensified following decisions made and initiatives announced at two meetings in 2006.  In June 2006, a majority of the clubs purportedly agreed (over MSG's strenuous objection) to extend for another ten years various exclusive license agreements held by the NHL and to grant to the NHL the exclusive ability to exploit various new media rights.  The NHL construes these votes as authorizing the NHL to continue to control the rights of even the dissenting clubs, including the Rangers.  Armed with this "authority," the NHL, in a second meeting in July 2006, further explained its new media plan, including its intention to standardize the look and feel of team websites and to exert control over virtually all commercial aspects of those sites.  Defendants have also proposed to further reduce

competition in advertising sales by forcing teams to give the League more ad inventory on team home pages, irrespective of the adverse effect on the teams' ability to sell advertising and sponsorships in competition with each other and with the NHL.  Further, the NHL is also restricting competition among NHL clubs by controlling the distribution of live games over the internet and through wireless devices, as well as the distribution of condensed and classic games over the internet.  All of these activities have been taken over the strenuous objections of the Rangers and MSG, and none of these activities is reasonably necessary to the success of the NHL joint venture.  For example, clearly less competitively restrictive alternatives exist to the extent the NHL seeks to maintain certain minimum quality standards on team websites.  In addition, the League could have offered an optional, "opt-in" program for teams desiring, or needing, League support for team website design without eliminating competition among the clubs.

18.     The NHL instead has ignored MSG's warnings that it was violating federal and state antitrust laws, and now seeks even to prevent MSG from operating a competitive website altogether, making that clear in a September 20, 2007 letter that threatens to fine MSG $100,000 per day beginning on September 28 unless MSG stops competing with the other NHL clubs and instead allows the NHL to seize the Rangers website.  The NHL sent this letter despite MSG's efforts in a series of meetings with the NHL in recent weeks to reach an accommodation that would have allowed the NHL to develop and operate a Rangers-themed website on a common platform with the sites of the other NHL clubs.  Such an accommodation would have permitted the NHL to do whatever the League wanted to do on that site, but still would have allowed MSG to compete by continuing to operate the "nyrangers.com" site in which MSG invested substantially over the years and which today serves as a key tool for communicating with

existing Rangers fans and for developing new Rangers fans.  MSG alternatively suggested that it would be willing to consider accommodating significant portions of the NHL-designed home page as long as MSG could continue to operate the website itself (rather than cede operational control to the NHL) and as long as MSG could continue to own the "nyrangers.com" name that MSG spent significant sums to develop over the years and that substantial numbers of fans currently associate with the Rangers.  The NHL has rejected all efforts that would have allowed MSG to compete through "nyrangers.com," demanding instead to take the "nyrangers.com" name for itself.  By doing so, the NHL will be able to shift to itself the substantial numbers of fans that currently visit MSG's Rangers website only because of MSG's substantial investment over the years in building a Rangers-focused destination for its fans and potential fans.  What the NHL wants is not a better product for existing or future Rangers fans, or higher quality services, but simply the elimination of the Rangers as a competitor to the NHL in offering internet content to hockey fans.  There is no legitimate justification for this clearly illegal conduct.

19.     Such blatant expropriations of team assets enable the NHL to eliminate competition by transforming otherwise competitive activities into joint activities, making it necessary for MSG to protect its legitimate rights through this action.  MSG has tried to convince the NHL and the other member clubs to end these competitive restraints, to no avail.  The NHL is the only provider of major league men's professional ice hockey contests in the United States, and MSG is subject to the NHL's Constitution and By-laws.  Those League rules purport to require MSG to comply with the joint decisions of the member clubs and with decisions of the Commissioner, including decisions imposing the above-described restraints.  League rules also give the Commissioner extraordinary and unregulated power to enforce the joint elimination of competition through massive monetary fines, and even possible expulsion from the NHL

pursuant to provisions of the NHL Constitution permitting the "involuntary termination" of member clubs that violate League rules. Such a termination would prevent MSG from continuing to provide major league men's professional ice hockey contests to its fans. Indeed, as explained above, the NHL sent a letter to MSG on April 18, fining MSG $100,000 per day for what the League described as conduct in "clear and blatant" violation of the NHL's anticompetitive rules and policies. Although MSG disagreed with the NHL's position in that letter, the NHL's anticompetitive demand that MSG cease competing on pain of a $100,000 per day fine left MSG with no choice but to comply even as MSG continued to try to find a way to resolve its differences with the NHL short of litigation. The NHL's September 20 letter, threatening MSG with further fines of $100,000 per day for continuing to operate a Rangers website outside of League control, reflects the NHL's latest anticompetitive overreaching.

20. The NHL's coercive decision to fine MSG, for the second time this year, now requires MSG to pursue this action in order to protect its investment in its marks and its efforts to compete in the marketplace. MSG's only goal is to end agreements that restrain and adversely affect competition among teams in areas where team cooperation is not reasonably necessary to produce major league men's professional ice hockey contests. MSG therefore seeks no money damages, but only injunctive relief to restrain and prevent the NHL's continuing violations of federal and state antitrust laws.

## II.   NATURE OF CLAIMS, JURISDICTION AND VENUE

21. MSG brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337. MSG also brings this action pursuant to New York General Business Law § 340. This Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction.

22.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.  The NHL, National Hockey League Enterprises, L.P. ("NHLE"), and NHL Interactive CyberEnterprises, LLC ("NHL ICE"), transact business, maintain their principal offices and are found in this district, and a substantial part of the events or omissions giving rise to MSG's claims occurred in this district.  NHL Enterprises Canada, L.P. ("NHLE Canada"), and NHL Enterprises, B.V. ("NHLE International"), transact business in New York and are subject to personal jurisdiction in this district.

23.     Jurisdiction over all defendants comports with the United States Constitution.

### III.   PARTIES

24.     MSG is a Delaware limited partnership with its principal offices at Two Pennsylvania Plaza, New York, New York 10121-0091.  MSG owns the New York Rangers men's professional ice hockey club and the mark "New York Rangers," a federally registered trademark, as well as various registered and unregistered trademarks and trade names derived from, and copyrights and trade dress in the form of logos associated with, that mark.  MSG also owns Madison Square Garden, as well as two programming services, MSG Network and FSN New York, which license the right to distribute Rangers games, as well as games of the New York Islanders, New Jersey Devils and Buffalo Sabres NHL hockey clubs.  MSG is a member or partner and beneficiary of the NHL, NHLE and NHL ICE, as well as related entities, including NHLE Canada and NHLE International.

25.     Defendant NHL is an unincorporated association of the 30 major league men's professional ice hockey teams in the United States and Canada, and is the dominant provider of major league men's professional ice hockey contests in the world.  The NHL has its headquarters at 1251 Avenue of the Americas, New York, New York 10020-1198.  The NHL owns valuable marks relating to ice hockey and acts to facilitate the provision of major league men's

professional ice hockey contests.  The NHL transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of marks relating to that business.  It also enters into contracts in this district.

26.     Each team, or club, that is a member of the NHL is a separate and independent business with a separate and independent owner and significant autonomy in its business operations.  The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice.  But the clubs compete off the ice in their businesses.  For example, the NHL does not set the price of tickets for attending games in person; the clubs do.  Similarly, the clubs compete in areas such as in contracting with players, in hiring coaches, and in developing, licensing and marketing their respective marks for various purposes.  The NHL and its member clubs are independent entities that are capable of conspiring (and, in fact, have done so, as alleged in this Complaint) in the licensing of their respective marks and in other competitive areas not necessary for the provision of major league men's professional ice hockey competition.

27.     Defendant NHLE is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198.  NHLE is a limited partnership, the beneficial owners of which are the 30 NHL clubs or entities under their control.  NHLE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business.  It also enters into contracts in this district.

28.     Defendant NHL ICE is a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198.  NHL

ICE is a subsidiary of NHLE. NHL ICE transacts business in the Southern District of New York

by engaging in activities there relating to the business of major league men's professional ice

hockey contests and the licensing of NHL and individual team marks relating to that business. It

also enters into contracts and manages the online sale of NHLE-licensed products for the

NHL.com website in this district.

29.    Defendant NHLE Canada is a Canada limited partnership with its principal place

of business in Ontario, Canada. NHLE Canada is owned equally, directly or indirectly, by the

owners of the 30 member clubs that constitute the NHL. NHLE Canada primarily conducts trade

or commerce in Canada, relating to the business of major league men's professional ice hockey

contests and the licensing of NHL and individual team marks relating to that business. Its

conduct of trade or commerce in Canada, however, has had and continues to have direct,

substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways

that give rise to MSG's claims. NHLE Canada transacts business in New York by licensing

marks owned by member clubs located in New York, by licensing marks owned by the NHL

and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or

NHLE, by remitting monies to all member clubs by means of accounts managed in New York by

the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and

NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including

contacts relating to contractual negotiations, and by engaging in other similar activities.

30.    Defendant NHLE International is a Netherlands private limited liability company

with its principal place of business at Polakweg 14, 2288GG, Rijswijk, The Netherlands. NHLE

International is owned equally, directly or indirectly, by the owners of the 30 member clubs that

constitute the NHL. NHLE International primarily conducts trade or commerce outside North

America, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. Its conduct of trade or commerce outside North America, however, has had and continues to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE International transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

## IV.    TRADE AND COMMERCE

31.    There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities. So, too, the copyrights, trademarks, trade names, trade dress and logos of the major league men's professional ice hockey clubs have no reasonably close substitutes. There is a separate demand, and hence a relevant market, for the licensing of those marks to licensees for various uses. Also, arenas when used for major league men's professional ice hockey contests provide an outlet for or involving advertising to hockey fans for which there is a separate demand and no close substitutes.

32.    There is a relevant product or service market for the licensing of the trademarks, trade names, trade dress and copyrights (including logos) owned by the NHL clubs and the NHL

itself.  This market is comprised of several smaller segments that themselves constitute relevant markets or submarkets, including:

A.    A market or submarket for the licensing of NHL and NHL club marks for use on apparel, merchandise and memorabilia.

B.    A market or submarket for the sale of NHL-branded and NHL club-branded apparel, merchandise and memorabilia.

C.    A market or submarket for the licensing of NHL and NHL club marks for use in corporate advertising and sponsorships.

D.    Markets or submarkets for the licensing of broadcasting, rebroadcasting or other distribution rights to NHL games, either live or recorded, as well as game highlights, footage and related ancillary programming, over media such as cable and satellite television, the internet and wireless handheld devices, either by licensing those rights to content aggregators or by offering programming directly to consumers.

There is also a relevant product or service market consisting of the sale of advertising at or involving venues when used as the setting for major league men's professional ice hockey contests.

33.    At competitive prices, the rights to license or use the marks of the NHL and NHL clubs for these various purposes, the rights to broadcast, rebroadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving venues when used as the setting for NHL hockey contests, are not reasonably interchangeable with any other products, services or rights.  Defendants have the power to raise or maintain prices above the competitive level as a result of: (i) the various restraints imposed by the NHL and the other defendants on the ability of

the individual clubs to exploit their individual marks, as well as apparel, merchandise and memorabilia displaying those marks, for virtually all commercial purposes, and the various broadcasting and other distribution restraints; (ii) the power to restrain the ability of individual clubs to promote and market their teams in competition with other teams through individual team websites; and (iii) the power to control the amount and type of advertising at or involving venues when exhibiting major league men's professional ice hockey contests.

34.     There is also a relevant product or service market defined as the provision of major league men's professional ice hockey contests in North America.  This market is characterized by high barriers to entry.  The NHL is the only significant, and therefore the dominant, provider of this product or service, and has market power.  As a result, MSG has had no choice but to comply with the competitive restraints that are the subject of this Complaint or face the risk of adverse consequences as described in this Complaint, but even its efforts to comply with the NHL's competitive restraints have not prevented the League from fining MSG for activities that the League has described as "clear and blatant" violations of the NHL's anticompetitive rules and policies.  The NHL, acting through and in combination with the separate and independent clubs that own the NHL, also exercises market power through the exclusive license agreements and the other unnecessary and unjustified restraints on each club's competitive activities that are the subject of this Complaint.

35.     The relevant geographic market consists of North America, including the United States.  Various geographic submarkets also may exist.

36.     Defendants' conduct complained of herein has taken place in and affected, and directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce of the United States, and the effects in foreign trade and commerce have had and continue to

have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. The referenced licensing, marketing and advertising activities have taken place and continue to take place in such trade and commerce. The products and services containing, using or referencing the marks of the NHL and NHL clubs are also sold and/or licensed in such trade and commerce.

## V.    FACTS RELEVANT TO MSG'S CLAIMS

### A.    Licensing And Other Forms Of Competition.

37.    The Rangers and the NHL's other member clubs must cooperate to schedule and produce major league men's professional ice hockey contests.  That limited cooperation is fully consistent with the antitrust laws.  But there has not been a complete integration of the member clubs, which continue to exist as separate businesses with separate owners that retain significant degrees of autonomy in their operations.  In these operations, the clubs compete in businesses that are separate and distinct from the production of ice hockey contests.  One such area of competition is the sale of tickets to attend live major league men's professional ice hockey games.  MSG, for example, sells tickets to Rangers home games in competition with other NHL member clubs – including, but not limited to, the other two NHL teams in the New York area – that also seek to sell tickets to their teams' home games.

38.    There are other areas where the Rangers can and do compete with the other NHL clubs and with the NHL, including in the licensing of individual team marks and in the operation of an independent Rangers website for communicating with its fans and potential fans.  There is also a significant demand for the broadcasting, rebroadcasting and other distribution of live and recorded Rangers games, as well as game highlights and game footage, through various media. By satisfying that demand, MSG can generate and increase fan interest in Rangers hockey in competition with other NHL teams, reinforcing the marketing activities that MSG is undertaking

through its website, and enabling marketing and licensing opportunities in other areas, including opportunities that would take place in the absence of the NHL's competitive restraints.

39.     In short, MSG has sought to compete with the 29 other teams and the NHL to the limited extent permitted by the exclusive license agreements challenged in this Complaint. In a fully competitive marketplace, the Rangers could and would compete to an even greater extent. In particular, by licensing the Rangers marks in creative ways and at lower costs, as well as by freely selling team-branded apparel and merchandise, by increasing the opportunity to view Rangers games, whether through cable, satellite or on the internet (including on the Rangers website), and by exploiting the Rangers marks and engaging in other marketing efforts through the Rangers website, MSG would be able to generate and increase fan interest and excitement in Rangers hockey, all in competition with the other NHL teams.

**B.      The Anticompetitive Exclusive License Agreements.**

40.     Pursuant to a series of agreements beginning in the 1980s, and renewed several times since then, defendants obtained the exclusive right to control for virtually all commercial purposes the individual clubs' marks and licensing opportunities. Defendants have exercised and enforced those rights in ways that have restrained the competitive activities of the member clubs on a continuous basis since then.

41.     In June 2006, and over the objection of MSG and certain other clubs, the member clubs purportedly renewed and extended the exclusive license agreements until 2016, which further eliminates competition and continues to injure MSG's ability to compete in the marketplace. Also over objection, the clubs additionally purported to grant defendants the exclusive opportunity to exploit team websites and other new media opportunities, eliminating competition among the teams and restraining one of the most effective competitive tools used by the Rangers in recent years to compete in the marketplace.

42.     These exclusive agreements place entirely in defendants' hands a wide range of otherwise competitive business activities where team cooperation is not reasonably necessary to produce major league men's professional ice hockey contests, usurping the rights of the individual clubs to conduct their businesses independently and eliminating competition among the clubs and with the NHL in areas such as the following:

A.     Defendants are seeking to control, and increasingly have controlled, the design and exploitation of teams' individual websites, including products and services that can be offered on those sites.  Defendants want to take over virtually the entire operation of individual team websites, in effect seizing one of the teams' best branding, competitive and outreach opportunities, converting individual team sites into standardized sites that will necessarily lack the originality and creativity of the team-generated sites, forcing teams to accept content that does not promote that team's efforts to market itself and restraining the ability of individual teams to use their sites to market and promote their teams in competition with each other.  Defendants already have reduced competition in the sale of advertising by taking control of the sale of banner ads at the top of, and in the primary box of, team websites, and have further sought to take over an even greater percentage of the advertising space on team websites, especially on the inside pages where consumers are directed to visit and experience team-focused content.

B.     Defendants assert the exclusive worldwide right to license team marks for use on team jerseys, practice wear, winter outerwear, products containing the player's name, number or image, and player photos, allowing each team to enter into licenses only for other, less lucrative products and only for sales within their arenas.

C.    Defendants assert the right to control the sale of team apparel and merchandise, including through each team's direct-mail catalogs, requiring that 65% of the products offered through team catalogs must be produced by licensees selected by defendants and effectively prohibiting teams from offering for sale locally-licensed products through any outlet beyond, or in any catalog distributed outside of an area within, 75 miles of the team's home arena.  Defendants have prevented teams from selling team merchandise on the internet other than through an NHL-controlled store and even when a team restricts such internet sales to consumers residing within a 75-mile radius of the team's arena.  Defendants have also banned teams' efforts to create consumer-friendly online versions of their mail order catalog, even though the League has otherwise permitted mail order catalogs as long as the merchandise in the catalogs comply with the League's additional anticompetitive requirement that no team seek lower costs or better quality from alternative, non-NHL selected manufacturers.  Banning a more efficient, online version of a team's mail order catalog makes it more difficult for a team such as the Rangers to compete in the sale of team merchandise, apparel and memorabilia even to the limited extent permitted by the NHL.

D.    Defendants assert the right to control the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage in media such as cable and satellite television, the radio, "video-on-demand," the internet and handheld technologies.  For example, defendants impose game blackouts while the NHL's broadcasters are providing nationwide coverage of an NHL game, precluding the blacked-out teams from broadcasting or otherwise distributing their own games through other outlets.  Defendants also have the exclusive right to license cable games for distribution in large parts of the country, including in the many areas and to the many fans where the NHL's broadcasting agreements either do not provide

coverage at all or provide only inadequate viewing opportunities. Defendants exercise that exclusive right by selling only packages of all NHL games. Further, in those areas beyond the teams' traditional "sphere of influence," where defendants do allow the clubs to license their games for distribution on cable, defendants permit that competition in a limited geography and, in many cases, only for a limited number of games. So, too, defendants have unreasonably restrained the ability of teams to distribute games on team websites or on other internet sites and via "video-on-demand," even when such distribution has been "gated" and limited to the team's designated local broadcast territory. Defendants have also restricted output by limiting the ability of teams to license rebroadcasts of their games, permitting such rebroadcasts only within 48 hours of game endings and prohibiting teams altogether from licensing the rebroadcasts of historic games. Restraints also exist with respect to game highlights and footage. Defendants, and not the individual teams, claim the exclusive right to market for commercial purposes all highlights and footage of NHL games, and defendants have stated their intention to create an NHL-controlled "hockey factory" to ensure that the offering of NHL highlights and game footage over the internet and wireless technologies is controlled through the NHL. The teams, by contrast, are only permitted to use short segments of game highlights or game footage on team websites. Recently, defendants have even proposed to remove free radio feeds from team and radio station websites. In short, defendants have restrained and threatened to restrain competition in the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage, seeking to control the delivery of content through all existing and future media platforms in ways that go well beyond what is reasonably necessary to the success of the NHL.

E.      Defendants have restricted the ability of teams to sell advertising space on dasherboards, *i.e.*, the low partitions erected around the ice itself, and in the ice during games, regulating the size and spacing of such advertising and controlling the most desirable dasherboard and "in-ice" space during nationally broadcast games.  Defendants have increased their control of arena and "in-ice" advertising in recent years, in particular during the playoffs and championship games.  Defendants, moreover, have claimed the right to limit the output of advertising by prohibiting teams from using new technologies to offer virtual signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not delete or substitute existing in-arena signage, and the NHL recently fined MSG for its efforts to sell such virtual signage over its own broadcasts of Rangers games.  The League is also requiring each hockey arena to display League-sponsored advertising in connection with League-provided, same-day, "out-of-town" highlights of other NHL games.

43.      The NHL contends it has the authority to sanction teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL has developed over the years to implement these agreements.  MSG's recent, coerced decision to stop competing or continue to face a $100,000 per day fine proves that MSG has no choice but to accede to the NHL's dictates.  Wielding its anticompetitive authority, the NHL is again threatening to impose $100,000 per day fines to stop competition.  Pursuant to the NHL Constitution and By-Laws, MSG could be subject to additional, significant adverse consequences, including sanctions up to and including expulsion from the NHL, if MSG did not abide by the exclusive, anticompetitive agreements.  MSG has invested significant sums in the Rangers, and no other major league men's professional ice hockey league exists in the United

States for the Rangers to join.  As a result, MSG is bound by these restraints on its ability to compete independently absent relief from this Court.

**C.    The Agreements Have Restrained Horizontal Competition And Have Had Anticompetitive Effects And Led To Consumer Harm.**

44.    The above-described agreements have restrained horizontal competition between and among the NHL clubs and the NHL, including in the commercial exploitation of their respective marks as well as in other areas where the member clubs could and would compete with each other and with the NHL.  In particular, in the absence of the exclusive licenses and other competitive restraints, NHL teams would compete with each other in the licensing of their teams' marks to a much greater extent than the limited opportunities that are now available and they also would compete with the NHL, which owns and licenses the NHL logo.  Further, they would compete in the sale of team-branded merchandise, apparel and memorabilia.  The teams also would compete with each other and with the NHL in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites. Moreover, the teams would compete with each other and with the NHL in the sale of advertising in arenas they own or lease during NHL ice hockey contests.

45.    The above-described agreements have adversely affected and substantially lessened competition in the relevant markets, in at least the following ways:

A.    Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the exclusive license agreements.  Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety, including consumer benefits in

the sale of products and services associated with NHL and individual team marks. Competition through the ability of individual teams to license their own marks would create greater incentives for individual teams to invest in and more fully exploit and maximize the value of their licensing activities, leading to greater levels of competition in the relevant markets and in the sale of NHL and NHL-club branded products and services, to the benefit of consumers.

B.      Prices for team-branded merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the exclusive license agreements. Consumer choice has been limited, and quality and availability of apparel, merchandise and memorabilia has suffered.

C.      Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in advertising and other sponsorships are higher, and output is lower, than they would be in the absence of the exclusive license agreements. Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety.

D.      Output of broadcasts and rebroadcasts of NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the exclusive license agreements. Adverse effects exist in distribution markets for licensing to content aggregators such as, but not limited to, MSG Network and FSNY, which license the rights to broadcast the Rangers, Islanders, Devils and Sabres ice hockey contests, as well as in end use markets for the sale of programming directly to consumers. Competition by individual clubs independently acting to exploit the broadcasting, rebroadcasting and other distribution of their teams' games would produce consumer benefits, such as an increase in the availability of broadcasts over a wider range of media, including cable, the internet and wireless devices.

E.    Defendants have restricted competition for the sale of advertising space at NHL hockey games.  MSG's ability to license advertisers and sponsors in Madison Square Garden has been restricted by the national licensing contracts negotiated by defendants, as well as by other unreasonable restraints imposed by defendants.  Local advertisers and sponsors have been denied access to valuable advertising space to the extent that defendants have exercised control and licensed the space only to national advertisers, and advertisers and sponsors have been forced to pay more than they would in the absence of the exclusive license agreements.

F.    The NHL's control of the design of team websites will lead to a standardized approach to team sites to the detriment of the creative and individualized approaches that otherwise would exist, limiting the ability of teams to communicate with, and compete for, fans in ways that the individual teams believe are most effective and in their best individual interests, reducing fan interest in the process.  In addition, NHL control of significant portions of the advertising on team websites will restrict the ability of individual teams to compete in the sale of such advertising.  An NHL-controlled approach to individual team websites likely will be less responsive to competitive opportunities available to individual teams, and consumers will be harmed by the reduction of the website competition that existed between and among the NHL member teams and the NHL prior to the NHL's recent exercise of control over individual team websites.

46.    Other adverse competitive effects exist as well.  The exclusive licenses have adversely affected, and will continue to adversely affect, the incentives of individual clubs to invest in, and exploit, their marks.  Individual team efforts are competitively significant because the NHL distributes the income from its own exploitation of team marks equally to each member club regardless of the club's contribution (if any) to the value of its marks, the club's efforts (if

any) to promote itself and its marks, and the club's investment (if any) in creating a positive association with its marks.  The result, again, is reduced output, diminished product quality, diminished choice and suppressed price competition.

47.    In the absence of the exclusive license agreements, the various clubs, including MSG, would increase their licensing output, offering licensing and broadcast opportunities that they are not now able to offer, increasing competition between and among the individual teams and the NHL, and leading to lower prices in the relevant markets.

48.    There are no legitimate, procompetitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

**D.    MSG Has Suffered Antitrust Injury.**

49.    MSG has been injured and threatened with loss or damage as a result of the anticompetitive effects of the challenged conduct, in at least the following ways:

A.    MSG has been denied the right to freely compete in the exploitation of the Rangers marks.  MSG has been unable to license the Rangers marks in ways that it believes are most likely to maximize the value of those marks and hence increase and strengthen fan interest and excitement in the Rangers hockey club.  MSG has lost and will continue to lose profits and sales, including in domestic and export commerce, as a result of its inability to fully exploit the Rangers marks within and outside the United States.

B.    MSG is forced and will continue to be forced to overpay for League-licensed products.  MSG has been restricted in its ability to offer Rangers-logoed apparel, merchandise and memorabilia on the Rangers website and elsewhere, and the products that MSG is able to offer on the Rangers site through an NHL-controlled store are available only at

artificially-inflated prices. In addition, MSG has been restrained from offering products and services for sale to consumers through an online version of its team's mail order catalog.

       C.      MSG has been and will continue to be unduly restricted in its ability to design and enter into efficient and fan-responsive relationships with merchandisers, advertisers and sponsors that may want to associate themselves with the Rangers. MSG has been and will continue to be restrained from negotiating creative or other special relationships with sponsors and advertisers, in particular, across multiple advertising platforms, including the internet. Further, MSG is being threatened in its efforts fully to exploit recent and future technological opportunities that would allow MSG to offer sponsors in-game, on-air signage opportunities through the real-time, video insertion of computer-generated electronic images into broadcasts of Rangers and other NHL games. In the absence of the challenged agreements, MSG would be able to provide increased opportunities to sponsors with respect to in-arena signage.

       D.      MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base throughout the country and abroad in order to generate fan interest and excitement in the Rangers. In addition, MSG, through MSG Network and FSNY, has lost licensing and other revenues as the result of its inability fully to exploit Rangers, Islanders, Devils and Sabres ice hockey contests.

       E.      MSG has been constrained and is being threatened still further in its ability to communicate with Rangers fans and potential fans on the Rangers website, and to market an individualized Rangers website that furthers MSG's ability to compete for fans and that generates fan excitement in the Rangers and the experience of Rangers games at Madison Square Garden, as well as Rangers game telecasts.

## COUNT ONE:  SECTION 1 OF THE SHERMAN ACT

50.     MSG incorporates the averments of paragraphs 1 through 49, above.

51.     Defendants along with the independent businesses that comprise the member clubs in the NHL have engaged in a contract, combination or conspiracy with the purpose, intent and effect of restraining horizontal competition among the NHL member clubs and between the clubs and the NHL, and, in addition, with the purpose, intent and effect of restraining trade and commerce in licensing activities in the relevant markets, in the distribution of NHL games, and in the sale of advertising at venues when used as the setting for major league men's professional ice hockey contests.

52.     The foregoing contract, combination or conspiracy has restrained competition between and among the NHL clubs and the NHL in violation of Section 1 of the Sherman Act.  It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

53.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to MSG's business and property, as set forth above.  MSG will continue to suffer antitrust injury and threatened loss or damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO:  NEW YORK GENERAL BUSINESS LAW § 340

54.     MSG incorporates the averments of paragraphs 1 through 53, above.

55.     Defendants have engaged in a contract, agreement, arrangement or combination that has restrained the free exercise of competition in the above-described markets in this state and elsewhere or that has otherwise resulted in a monopoly, all in violation of New York General Business Law § 340.

## VI.   **PRAYER**

**WHEREFORE**, MSG prays for judgment against defendants as follows:

1.      Preliminary and permanent injunctive and declaratory relief against those collective activities, policies and rules of the NHL that are not reasonably ancillary to the legitimate purpose and success of the NHL joint venture, including but not limited to an order:

A.   Prohibiting defendants from imposing or enforcing any restriction on the existence, content, format, or design of the Rangers website except to the extent necessary and appropriate to ensure reasonable minimum quality standards;

B.   Prohibiting defendants from licensing or otherwise making use of or exercising control over the Rangers marks without MSG's express consent;

C.   Prohibiting defendants from imposing or enforcing any restriction on the means by which MSG may distribute or sell apparel, merchandise, memorabilia, or any other items bearing a Rangers mark, including but not limited to (1) any restriction on MSG's choice of manufacturers for such apparel, merchandise, memorabilia or other items; (2) any geographic restriction; or (3) any restriction on sales through any outlet or by any means (including sales through the Rangers website);

D.   Prohibiting defendants from requiring MSG to participate in any joint effort relating to the internet or any other new media activities;

E.   Prohibiting defendants from imposing or enforcing any restriction on MSG's audio and/or video distribution of Rangers games, game footage or game highlights (including the sale of rights thereto), including over the internet or to wireless devices either within the Rangers' designated local broadcast territory or outside North America;

F.   Prohibiting defendants from entering into any agreement or arrangement for the audio and/or video distribution of Rangers games within the Rangers' designated local broadcast territory or outside North America without the express written agreement of MSG;

G.   Prohibiting defendants from entering into any distribution agreement other than one or more agreements for the national distribution of games of all NHL member teams that, in the aggregate,  permit the League-approved rightsholder(s) exclusive distribution of no more than eight Rangers games within the Rangers' designated local broadcast territory in any one season without the express written permission of the Rangers;

    H.   Prohibiting defendants from entering into any advertising or sponsorship agreement that overrides, conflicts with, or preempts any MSG or Rangers local sponsorship agreement;

    I.   Prohibiting defendants from imposing or enforcing any requirement that any in-arena or other advertising or sponsorship inventory be reserved for or provided to the League or its sponsors; and

    J.   Prohibiting defendants from sanctioning, penalizing, or otherwise taking adverse action against the Rangers or any individuals or entities affiliated with the Rangers for the filing and prosecution of this lawsuit or any actions related thereto, or for failing to comply with any of the illegal NHL rules or practices challenged herein.

2.    Such other relief as is necessary and appropriate to restore full and free competition in the relevant markets.

3.    Its attorneys fees and cost of suit, and such other and further relief as may be just and proper.

September 28, 2007                    JONES DAY

                                     By: _____
                                        Meir Feder  (MF-2574)
                                        Robert W. Gaffey  (RG-4004)
                                        William J. Hine (WH-6766)
                                        222 East 41st Street
                                        New York, NY  10017-6702
                                        Telephone:  (212) 326-3939
                                        Facsimile:  (212) 755-7306

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212