**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| **MADISON SQUARE GARDEN, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | No. 07 CIV. 8455 (LAP) |
| | ) | |
| v. | ) | |
| | ) | |
| **NATIONAL HOCKEY LEAGUE, NATIONAL** | ) | |
| **HOCKEY LEAGUE ENTERPRISES, L.P.,** | ) | |
| **NATIONAL HOCKEY LEAGUE INTERACTIVE** | ) | |
| **CYBERENTERPRISES, L.L.C., NHL** | ) | |
| **ENTERPRISES CANADA, L.P., and NHL** | ) | |
| **ENTERPRISES, B.V.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

------------------------------------------------------------------ x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

**JONES DAY**
**222 East 41st Street**
**New York, NY  10017**
**(212) 326-3939**

*Attorneys for Plaintiff Madison Square Garden, L.P.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................. 1

BACKGROUND ............................................................................... 4

    A.    The League's Anticompetitive "New Media Strategy" ............................ 5

    B.    The League's Coercive Enforcement Of Its Anticompetitive Rules ......... 6

    C.    The League's Suppression Of Website Competition And Expropriation Of The Rangers' Website Content....................................... 7

ARGUMENT.................................................................................... 8

    I.    MSG WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO.............. 9

        A.    The Harm Resulting From The Rangers' Indefinite Loss Of Unique And Perishable Business Opportunities Would Be Irreparable ............................................................................ 9

        B.    MSG Will Be Irreparably Harmed By Being Deprived Of Its Right To Control the Quality Of Its Own Trademarked Web Site And Related Products ...................................................................... 12

        C.    MSG Will Be Irreparably Harmed By The Disclosure of Its Customer Lists To Its Competitors – The NHL And Other Member Clubs ................................................................................ 15

    II.    MSG HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OR, AT A MINIMUM, SERIOUS QUESTIONS GOING TO THE MERITS ................................................................................ 15

    III.    THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING THE REQUESTED INJUNCTIVE RELIEF....................................... 18

CONCLUSION................................................................................ 20

**TABLE OF AUTHORITIES**

Page

## CASES

*Advance Magazine Publishers Inc. v. Vogue International*, 123 F. Supp. 2d 790 (D.N.J. 2000)..................................................................14, 18

*Bruce v. Martin*, 680 F. Supp. 616 (S.D.N.Y. 1988) ....................................................16

*Budget Rent A Car System, Inc. v. Miles*, No. C2-04-CV-1205, 2006 WL 2373255 (S.D. Ohio Aug. 14, 2006) .......................................................................13

*Cartier v. Symbolix, Inc.*, 386 F. Supp. 2d 354 (S.D.N.Y. 2005) .................................13

*Davila Pena v. Morgan*, 149 F. Supp. 2d 91 (S.D.N.Y. 2001)......................................16

*F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) ................................4, 17

*Fraser v. Major League Soccer*, 284 F.3d 47 (1st Cir 2002).........................................17

*Garber Brothers Inc. v. Evlek*, 122 F. Supp. 2d 375 (E.D.N.Y. 2000)...........................13

*Global Switching Inc. v. Kasper*, No. CV 06 412, 2006 WL 1800001 (E.D.N.Y. June 28, 2006) ....................................................................................................15

*Gridiron.com, Inc. v. National Football League Player's Association, Inc.*, 106 F. Supp. 2d 1309 (S.D. Fla. 2000).....................................................................11

*Helene Curtis v. National Wholesale Liquidators, Inc.*, 890 F. Supp. 152 (E.D.N.Y. 1995) ....................................................................................................12

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ..................9

*Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F. Supp. 564 (S.D.N.Y. 1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977)......................................................................16

*Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977) ..................12

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp.*, 908 F. Supp. 1180 (W.D.N.Y. 1995) ...........................................................................16

*Lilly v. Smith*, No. 22800-02, 2005 WL 2470786 (Sup. Ct. Queens Co. Oct. 6, 2005)................14

*Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2006 WL 3616983 (N.D. Tex. Dec. 12, 2006)................................................................................11, 18

*Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984)................................................................................17

*Montana Prof'l Sports, LLC v. Leisure Sports Management, Inc.*, 422 F. Supp. 2d 1271 (M.D. Fla. 2006) ................................................................................18

TABLE OF AUTHORITIES
(continued)

Page

*NBA Properties v. Untertainment Records LLC*, No. 99 CIV. 2933, 1999 WL 335147 (S.D.N.Y. May 26, 1999) ................................................................................................18

*NCAA v. Board of Regents*, 468 U.S. 85 (1984) ..............................................2, 4, 16,17

*National Communications Association v. AT & T*, 813 F. Supp. 259 (S.D.N.Y. 1993) ................................................................................................3, 10, 13

*National Social of Prof'l Engineers v. U.S.*, 435 U.S. 679 (1978) ....................................17

*North American Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir. 1982) ....................................................................................................................17

*Oxford House, Inc. v. City of Albany*, 819 F. Supp. 1168 (N.D.N.Y. 1993) ................16

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ......................................15

*Reuters Ltd. v. United Press International*, 903 F.2d 904 (2d Cir. 1990) ....................13

*Smith v. Pro Football, Inc.*, 579 F.2d 126 (D.C. Cir. 1978) ..........................................17

*Stafford v. New York.com Operating Co., Inc.*, No. 02 Civ. 7100, 2003 WL 30413 (S.D.N.Y. Jan. 3, 2003) ..........................................................................................12

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994) ............................................................17

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995) ...............10

*U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626, 523 N.Y.S.2d 869 (2d Dep't 1988) ..........................................................................................................................10

*Vanlines.com LLC v. Net-Marketing Group Inc.*, 486 F. Supp. 2d 292 (S.D.N.Y. 2007) .............12

*Volvo North America Corp. v. Men's International Prof'l Tennis Council*, 857 F.2d 55 (2d Cir. 1988) ....................................................................................................12

*Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332, 2007 WL 1933932 (S.D.N.Y. July 2, 2007) ....................................................................................................................12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

MADISON SQUARE GARDEN, L.P.,                )
                                            )
            Plaintiff,                      )          No. 07 CIV. 8455 (LAP)
                                            )
      v.                                    )
                                            )
NATIONAL HOCKEY LEAGUE, NATIONAL            )
HOCKEY LEAGUE ENTERPRISES, L.P.,            )
NATIONAL HOCKEY LEAGUE INTERACTIVE          )
CYBERENTERPRISES, L.L.C., NHL               )
ENTERPRISES CANADA, L.P., and NHL           )
ENTERPRISES, B.V.,                          )
                                            )
            Defendants.                     )
                                            )
------------------------------------------------------------------ x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Madison Square Garden, L.P. ("MSG") respectfully submits this memorandum

of law in support of its motion for a preliminary injunction enjoining Defendants, the National

Hockey League and four affiliated entities (collectively, the "NHL," "League" or "Defendants"),

from acting to force MSG to cease operating an independent New York Rangers website.

**PRELIMINARY STATEMENT**

The NHL has decided that it should run the websites of every team in the League and has

ordered the Rangers to shut down their existing site on pain of fines of $100,000 per day. After

making this threat, the NHL put up a purported Rangers site linked to its *nhl.com* website (falsely

labeled the "OFFICIAL SITE" of the Rangers) using in large part materials copied from the

Rangers' real website—including even material posted by fans on *newyorkrangers.com*—

without consent by the Rangers. This motion seeks a preliminary injunction to restore the *status*

*quo ante*, prevent the misappropriation of Rangers content and marks, and preserve both the real Rangers website and the independent competition that it provides.

The NHL is seeking to enforce against the Rangers its new policy prohibiting professional hockey teams from operating independent websites in competition with each other or with League-controlled team sites. This new policy is not necessary to any valid League objective; it is a "naked restraint" of competition, eliminating the innovation and independent competition that would otherwise come from the Rangers and other teams. The Rangers have filed this antitrust suit, challenging this and other anticompetitive NHL policies, but the League has informed the Rangers that they will be fined $100,000 a day until they shut down their independent and popular website. Absent an order from this Court preserving the *status quo*, the Rangers will be forced to abandon their site, comply with the NHL's anticompetitive demands, and suffer irreparable harm.

Blatant suppression of competition among team websites is only the most recent and pressing example of the League's apparent determination to stifle all off-ice competition among its teams, in violation of the antitrust laws. It is well-settled that sports leagues "have no immunity from the antitrust laws," *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984), and that teams must act as independent competitors except with respect to restraints that are necessary "if the product is to be available at all"—such as rules dictating "the size of the field, [or] the number of players on a team." *Id.* at 101. The NHL, however, has increasingly operated as if centralized control were the rule and independent competition the rare exception. Commissioner Gary Bettman has taken the position that all team rights are subject to collective control except for those that the League has "granted" to the individual clubs. (Complaint ¶ 9) The NHL's dictates that eliminate competition among its teams include, among other things:

- Reserving to the League the right to license team marks for use on team jerseys and other popular items, and prohibiting individual teams from licensing such marks;

- Restricting teams' ability to sell merchandise produced by licensees in competition with League-selected licensees;

- Prohibiting teams from selling merchandise on the Internet except through a single, League-controlled store;

- Prohibiting consumer-friendly online versions of teams' mail-order catalogs;

- Prohibiting teams from distributing games on team websites or other Internet sites; and

- Prohibiting teams from independently marketing highlights and footage of their games.[1]

All of these actions violate the antitrust laws, but the present motion seeks relief only with respect to the League's efforts to seize control of the Rangers' website and ban the Rangers from operating a competing site.  The Rangers are clearly entitled to this relief, since it is inarguable they will suffer irreparable harm absent the requested relief.  If forced to abandon their well-known and popular website for the duration of this litigation, the Rangers are certain to lose unique and perishable website business opportunities, marketing opportunities, customer goodwill, opportunities to control and strengthen their brand, and opportunities to attract new Rangers fans, none of which can be recovered after the fact, and none of which can realistically be compensated by money damages.  *See, e.g., Nat'l Communications Ass'n v. AT & T*, 813 F. Supp. 259, 265 (S.D.N.Y. 1993) (Preska, J.) (finding irreparable harm due to loss of goodwill and difficulty of determining causes of any loss of customers).  The harm is magnified by the fact that the NHL is already falsely passing off its "Rangers" website as "THE OFFICIAL SITE

---

[1]       MSG respectfully refers the Court to MSG's Complaint (a copy of which is submitted herewith as Exhibit A to the Declaration of Robert W. Gaffey, dated September 30, 2007 ("Gaffey Decl.")) for a detailed recitation of the antitrust violations committed by the NHL.

OF THE NEW YORK RANGERS" and misappropriating proprietary content from the Rangers'

own site. (Declaration of Steve Mills, dated September 30, 2007 ("Mills Decl.") ¶¶ 21-24)

The Rangers are likely to succeed on the merits because the League's overt ban on

currently competing team websites, backed up by its threats, is precisely the sort of "naked

restriction" on competition, *NCAA*, 468 U.S. at 109, that the courts have condemned without

"any great difficulty," *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986), and

without need of "elaborate industry analysis," *NCAA*, 468 U.S. at 109 (internal quotation marks

omitted).

The balance of equities also overwhelmingly favors the Rangers. The NHL can point to

no cognizable harm from merely being required to continue with a *status quo* under which it has

operated for years. Indeed, the Rangers do not seek to enjoin the League's operation of its own

sites, including a League-controlled "Rangers" site (so long as it is not mislabeled and does not

include Rangers proprietary content without the Rangers' permission). The League is free to

compete for the attention of Rangers fans; the Rangers seek only protection against being

compelled to surrender control of their own site, something that will cause the League no injury.

In short, the relief is narrow, the equities are clear, and the antitrust issues are substantial.

The Rangers are entitled to the injunction they seek.

## BACKGROUND

The New York Rangers are one of the "original six" members of the National Hockey

League and one of the best known names in hockey. That did not just happen. MSG and the

Rangers have invested heavily in making the Rangers a premium brand, and have succeeded in

developing an intense and loyal fan base. (Mills Decl. ¶¶ 2-3) A very important part of that

effort has been the distinctive *newyorkrangers.com* website, which has become a key tool for the

Rangers to connect with existing fans, attract new ones, and enhance the value of the New York

Rangers mark and franchise. (*See* Declaration of Daniel David, dated September 30, 2007 ("David Decl.") ¶¶ 17-19)

MSG has constructed an exciting, Rangers-focused site. (David Decl. ¶¶ 20-23) It is regularly visited by hundreds of thousands of fans and potential fans and is building an emotional attachment with those fans. The content and features of the site are designed to engage fans in ways that attach them to the site and the Rangers. (*Id.*) For example, there is detailed content about the team's players and history, and other Rangers news. (*Id.* ¶ 26) There are ways for fans to interact with the team and other fans, through such activities as posting Rangers-themed photos, participating in a message board, and utilizing a "Rangers-on-Demand" feature to watch video clips of team practices and other activities, game highlights, promotional materials, and historical Rangers footage. (*Id.* ¶¶ 27-32) The result has been a steady increase in the number of visitors and increased frequency of visits. *newyorkrangers.com* is a critical part of the Rangers' marketing and promotional efforts, and a key link between the Rangers and their fans.

## A.    The League's Anticompetitive "New Media Strategy"

The Rangers have long been concerned about the NHL's strategy of increased restrictions on the ability of individual teams to compete off-ice in licensing and merchandising. This strategy reached a culmination in June 2006, when the League adopted its so-called "New Media Strategy." (Mills Decl. ¶¶ 6-7; David Decl. ¶¶ 2-3) This "new" strategy was to eliminate all team competition involving the Internet, team websites, and related technologies, and to instead create one League-operated and controlled revenue opportunity. (David Decl. ¶¶ 4-6) One major step was a League takeover of all team websites, imposition of a single format, and League control of virtually all design, content and commercial aspects of those sites. (*See* David Decl. ¶¶ 4-6) No team would be allowed to have its own competing website. (*Id.* ¶ 2-3) The net

effect is to force each team to give up control of its public face on the Internet and its communications with its own fans, and to deprive fans of the innovation and variety that go hand-in-hand with free competition.

As a first step, the NHL required teams to cede control over the sale of banner ads at the top of, and in the primary box on, team websites, and it has indicated its intention to take over even more advertising space. (David Decl. ¶ 5) In addition, the League has banned individual teams from streaming live games, and from distributing condensed and classic games, over the Internet. (*See* Mills ¶¶ 8, 10) The NHL has also stated its intention to create an NHL-controlled "hockey factory" with the exclusive power to exploit highlights and other game footage over the Internet and wireless technologies. (David Decl. ¶ 6) The teams, by contrast, cannot license or distribute their own game footage for use over the Internet or wireless technologies. (*See* Mills ¶¶ 8, 10)

### B.    The League's Coercive Enforcement Of Its Anticompetitive Rules

The League has been forceful and categorical in asserting its monopoly. During the 2007 Stanley Cup playoffs, the Rangers tried to innovate and offer fans additional Rangers options: they made Rangers-branded merchandise available on their website, and they made Rangers playoff telecasts available to certain broadband subscribers within the Rangers' broadcast territory. (Complaint ¶ 4; Mills Decl. ¶¶ 8-9) At the same time, MSG added a non-fan source of revenue by selling unobtrusive virtual advertising on telecasts of home Rangers playoff games. (*Id.*) Rather than welcoming these pro-competitive, pro-consumer innovations, the NHL swiftly imposed exorbitant fines of $100,000 per day to ensure that these departures from anticompetitive League policies were immediately shut down. (Mills Decl. ¶ 10) To avoid disrupting the playoffs with the distraction of a contentious litigation, the Rangers were forced to

submit; the Rangers lost revenues and the fans lost the benefits of online ordering of merchandise and broadband distribution of games. (*Id.* ¶¶ 11-12)[2]

### C.     The League's Suppression Of Website Competition And Expropriation Of The Rangers' Website Content

The NHL, in seeking to confiscate *newyorkrangers.com*, is now acting to accomplish the critical step in its New Media Strategy. It has demanded that the Rangers and all other NHL teams give the League complete control over the content, format, design and operation of their team websites and "transition" control of URLs like *newyorkrangers.com* to the League. The Rangers have proposed several ways to accommodate the League without abandoning an independent Rangers website—including offering to have parallel websites, offering to link *newyorkrangers.com* to the NHL Rangers site, and even offering to make Rangers proprietary content available to the League site and help program it. (*See* Declaration of Scott Richman, dated September 30, 2007 ("Richman Decl.") ¶¶ 3-5) But the League has been adamant: it has insisted that there be no independent Rangers site; that there be only a single Rangers site, under League control and operated on the NHL's servers; and that the Rangers must surrender to the League their valuable *newyorkrangers.com* website address, or URL. (Richman Decl. ¶¶ 6-7)

On September 20, 2007, the Rangers received a letter from NHL Deputy Commissioner William Daly stating that the League intended to launch a Rangers website on the "common League platform" on September 28, 2007 "with or without [the Rangers'] cooperation." (Mills Decl. ¶ 20, Ex. C) The NHL also threatened to fine the Rangers $100,000 "for each day on which your organization operates a Rangers' website" independently. (*Id.*) The League reiterated this threat in a September 27 email from Daly, stating that the League would launch its Rangers website at 12:01 p.m. on September 28, and that continued operation of "the Rangers'

---

[2]     The Rangers refused to pay what they viewed as an illegal fine, and the NHL nevertheless deducted $200,000 from monies legitimately owed the Rangers by the League. (Mills Decl. ¶ 11)

current site (*newyorkrangers.com*), or any successor site . . . outside the common League platform as of 12:01 a.m. on Saturday, September 29" would trigger "the sanctions specified in my September 20 letter." (Mills Decl. ¶ 21, Ex. D)

On September 28, 2007, at approximately noon, the League posted its "Rangers" website, which is prominently and falsely described at the top of the home page as the "OFFICIAL SITE OF THE NEW YORK RANGERS." (Mills Decl. ¶ 22) In addition to this false and misleading description, the site expropriates entire sections from *newyorkrangers.com*, while at the same time confusing, diluting and harming the focus on the Rangers by displaying League-oriented content and content about other teams. (*Id.* ¶ 23)

These anticompetitive actions come at a particularly critical time for the Rangers. The team's success in the 2006-07 season and playoffs has created unique prospects for recruiting new fans (David Decl. ¶ 12)—prospects that were significantly enhanced during the off-season when MSG invested in the acquisition of two highly-sought free agents, Chris Drury and Scott Gomez. (Mills Decl. ¶¶ 13-14) These acquisitions made the Rangers a strong contender for the 2007-08 Stanley Cup Championship, creating enormous opportunities to increase traffic to the Rangers website, as well as to use the Rangers website to cultivate fan excitement, attract new fans, and enhance the Rangers' businesses. (*Id.*) Such opportunities are inherently time-sensitive and not easily, if ever, recaptured, and the League's actions on the eve of a new season threaten to seriously and irreparably undermine the Rangers' ability to capitalize on them.

## ARGUMENT

The Rangers seek only to preserve the *status quo*, and under the case law in this Circuit and this Court, the Rangers are entitled to preliminary injunctive relief to preserve it. The standard is that the movant must show (1) irreparable harm, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair

ground for litigation, and a balance of hardships tipping decidedly toward the movant. *See, e.g.*, *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

In the absence of the relief they seek, the Rangers will lose property, customers and goodwill under circumstances that make recouping any of them unlikely. On the merits, the NHL's naked suppression of competition, without any possibility of proving that it is necessary to the functioning of the League, makes it very likely that MSG will succeed in showing that this conduct violates the antitrust laws. At a bare minimum, it is a fair ground for litigation. Finally, the serious hardship with which the Rangers are faced far outweighs the nonexistent hardship the NHL would suffer from merely continuing the *status quo* during the course of this litigation.

## I. MSG WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO

### A. The Harm Resulting From The Rangers' Indefinite Loss Of Unique And Perishable Business Opportunities Would Be Irreparable

Based on the affidavits before the Court, it is incontrovertible that the Rangers' website and its URL are critical parts of the Rangers' marketing, and very successful ones. Use of the site has helped to maximize Ranger fans' connection with the Rangers and the Rangers' unique competitive advantages, and thereby to build loyalty, attract new fans, increase revenues, and make the site an essential source and attraction for Rangers' fans. (*See* Mills Decl. ¶¶ 14-15, 19; David Decl. ¶¶ 18-23) An NHL-operated "cookie cutter" website that has different objectives, and is not designed to maximize the Rangers' particular strengths, is certain to be less effective in achieving the Rangers' objectives. (Richman Decl. ¶¶ 12-14; David Decl. ¶¶ 25-32) Thus, during this litigation, if the League is allowed to have the only "Rangers" website, designed to promote the league first and the Rangers second, the Rangers will inevitably lose fans, advertiser relationships and revenue, goodwill, and other business opportunities that cannot be repaired, and cannot be remedied by money damages. (Richman Decl. ¶¶ 12-14; *see also*

- 9 -

Mills Decl. ¶¶ 13-15, 19)  The opportunity to capture a particular fan, or to build fans' habit of visiting the Rangers' website, once lost, cannot be recaptured.

This adverse effect promises to be even more significant now because the Rangers' recent success on the ice and the off-season acquisition of top-notch talent has created a unique, but perishable, opportunity to strengthen existing fan support and recruit new Rangers fans. When a team attracts increased attention and interest, there is disproportionate growth in the addition of new fans, increased ticket sales and revenues from trademarked products, larger advertising and sponsorship revenues, and increased game viewership.  (David Decl. ¶ 16)  The Rangers are seeing this impact now, given their playoff success and the Drury and Gomez acquisitions.  Website traffic from unique users is up, as are postings on the fan message boards at *newyorkrangers.com.*  (*Id.*)  In the absence of preliminary injunctive relief, this opportune moment for the Rangers likely will be irretrievably lost.  (*Id.*)  Courts frequently grant preliminary injunctive relief to preserve such unique business opportunities, in large part because damages would not readily be ascertainable after the fact.  *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (opportunity to become major publisher of children's books was unique and damages would be largely indeterminate if opportunity was lost); *U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626, 627, 523 N.Y.S.2d 869, 871 (2d Dep't 1988) ("[I]nterference with an ongoing business, particularly one involving a unique product ... risks irreparable injury and is enjoinable").

As this Court has recognized, the loss of particular customers often cannot be traced with any precision to a particular cause.  *Nat'l Communications Ass'n v. AT & T*, 813 F. Supp. 259, 265 (S.D.N.Y. 1993).  That principle is true, *a fortiori*, here, since there is no reliable way even to determine how the Rangers' connections with fans or potential fans have been injured or how

many fans or potential fans have been lost, let alone to determine the harm to the other MSG-affiliated businesses that cross-market on the Rangers' website.[3]  The dynamic effects of this cross-marketing are difficult to quantify, but potentially significant, given the revenue base that the Knicks, the Liberty, Radio City Music Hall and the most famous arena in the world, Madison Square Garden, represent.   (Richman Decl. ¶ 9)  The extent of this lost revenue from advertisers and sponsors will also be difficult to track with any certainty.  (*Id.* ¶ 10)  *See, e.g., Gridiron.com, Inc. v. Nat'l Football League Player's Ass'n, Inc.*, 106 F. Supp. 2d 1309, 1316 (S.D. Fla. 2000) ("Irreparable harm can be found through loss of advertising revenue and goodwill."); *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2006 WL 3616983, at *5 (N.D. Tex. Dec. 12, 2006) (loss of ability to sell sponsorships or advertisements on the basis that one is the exclusive source of certain sports webcasts constituted irreparable harm).  The problem of tracing specific lost sales to reduced website "hits" would provide an added layer of indeterminacy, as will any attempt to quantify the long-term harm to the Rangers' relationships with sponsors, advertisers, distributors, and customers.  (Richman Decl. ¶¶ 10-11; David Decl. ¶¶ 10-11)  On top of problems of estimation that can at least begin with numbers, the loss of emotional connections to existing and new Rangers fans is both highly likely and completely incommensurable from a damages perspective.  (*Id.*; Richman Decl. ¶¶ 12-14)

---

[3]        Among other properties, MSG also owns the New York Knicks, the New York Liberty, Radio City Music Hall, the Beacon Theatre, the WaMu Theatre at Madison Square Garden, as well as the Madison Square Garden arena itself, which hosts numerous concerts, prize fights, rodeos, circuses and other entertainment events, and two regional sports cable television networks, and has linked the websites of its various entertainment offerings to cross-promote them.  (Richman Decl. ¶ 9)  Shoehorning the Rangers' individualized website into the NHL's homogenous template would sharply constrain or eliminate these easily accessible links to other MSG offerings.  (*Id.*)  This damage, while demonstrable, is also not subject to remedy by money damages alone, since its precise measurement will be extremely difficult or impossible.  (*Id.* ¶ 10)

**B.    MSG Will Be Irreparably Harmed By Being Deprived Of Its Right To Control the Quality Of Its Own Trademarked Web Site And Related Products**

The Rangers will also be irreparably harmed if they lose control over a principal tool for

defining and presenting their brand and trademarks.  This harm is aggravated by any League

indication that its site is the Rangers "official" site.  One of the most important protections

afforded trademark holders is the "right to control the quality of the goods manufactured and

sold under the holder's trademark." *Helene Curtis v. Nat'l Wholesale Liquidators, Inc.*, 890 F.

Supp. 152, 157 (E.D.N.Y. 1995) (quotations omitted).  Moreover, "the actual quality of the

goods is irrelevant; it is the *control of quality* that a trademark owner is entitled to maintain." *Id.*

(quotations omitted; emphasis added); *see also Zino Davidoff SA v. CVS Corp.*, No. 06-CV-

15332, 2007 WL 1933932, at *7  (S.D.N.Y. July 2, 2007) (granting motion to enjoin the sale of

"gray-market" goods because plaintiff has "the right to control [the] quality" of goods bearing its

name).  Indeed, in *Stafford v. New York.com Operating Co., Inc.*, No. 02 Civ. 7100, 2003 WL

30413, at *2 (S.D.N.Y. Jan. 3, 2003), the court granted a preliminary injunction barring the

defendant from doing exactly what the NHL wants to do here, *i.e.*, operating plaintiff's Internet

website, *id.* at *1, noting there was "little question" that a party can be "irreparably harmed if it

is deprived of its right to control its Internet site."[4]

Where trademarks are involved, the courts have recognized that interference with unique

and well-established methods of distribution can cause irreparable harm to intangible goodwill

with customers who have come to rely on that distribution channel.  *See, e.g., Jacobson & Co.,*

*Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir. 1977) (enjoining defendant from

---

[4]        Cases involving important trademarks and copyrights often presume irreparable injury with little showing required by the movant. *See, e.g., Helene Curtis*, 890 F. Supp. at 160; *Vanlines.com LLC v. Net-Marketing Group Inc.*, 486 F. Supp. 2d 292, 297 (S.D.N.Y. 2007) (irreparable injury presumed where copyright infringed "because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways") (citation omitted).

terminating plaintiff as a distributor where plaintiff showed "a threatened loss of goodwill and customers"); *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 907-908 (2d Cir. 1990) (finding irreparable harm where "terminating the delivery of a unique product to a distributor whose customers expect and rely on [it] almost inevitably creates irreparable damage to the goodwill of the distributor").[5]

Here, losses of crucial control over its own premium brand will be worse if MSG's customers are subjected to a lower-quality website experience. (Richman Decl. ¶¶ 12-14; David Decl. ¶¶ 20-32; *see also* Mills Decl. ¶ 19) A significant portion of the home page, the most valuable portion of the website, will be occupied by League content and promotions, and League-generated advertisements, rather than Rangers content. (Richman Decl. ¶ 13) In addition, the NHL's homogenized format lacks the originality, imagination and fan interaction opportunities of the Rangers site. (David Decl. ¶¶ 24-32; Richman Decl. ¶ 14) Indeed, the NHL's one-size-fits-all website design is expressly premised on promoting uniformity among the member clubs and how they present themselves to fans. (Richman Decl. ¶ 14) In short, what the League demands is tantamount to taking a luxury brand and distributing it under a generic label, and threatens irreparable dilution of the premium Rangers brand. (*Id.*) This alone warrants injunctive relief. *See Cartier v. Symbolix, Inc.*, 386 F. Supp. 2d 354, 361 (S.D.N.Y. 2005) (enjoining defendant jeweler from altering plaintiff's genuine stainless steel product where plaintiff faced loss of goodwill once consumers perceived the "'cheapening' and dilution of the

---

[5]      Even outside the trademark context, injury to a business's goodwill and reputation has readily been found irreparable because damages resulting therefrom are difficult, if not impossible, to quantify. *See Nat'l Communications*, 813 F. Supp. at 265 (damages for loss of goodwill "cannot reasonably be measured"); *Budget Rent A Car System, Inc. v. Miles*, No. C2-04-CV-1205, 2006 WL 2373255, at *3 (S.D. Ohio Aug. 14, 2006) ("a loss of customer goodwill and reputation can amount to irreparable injury because the damages flowing from such losses are difficult to compute"); *Garber Bros. Inc. v. Evlek*, 122 F. Supp. 2d 375, 384 n. 6 (E.D.N.Y. 2000) ("Numerous courts have held that harm to a company's operations, reputation, goodwill or customer relations is irreparable harm because money damages cannot provide adequate compensation for such injuries.") (citation omitted); *Reuters Ltd.*, 903 F.2d at 908 (injury to goodwill and reputation in industry "nearly impossible to value"). Here, when a significant part of the potential damage is reduced emotional connection by Rangers fans to the Rangers, the measurement issues are even more difficult.

brand"); *see also Lilly v. Smith*, No. 22800-02, 2005 WL 2470786, at *3 (Sup. Ct. Queens Co.

Oct. 6, 2005) ("The poor and distorted quality of the reproductions of the artwork displayed on

defendant's website risks a diminution of plaintiff's reputation in society as a professional

artist.")

  In addition, Rangers fans are likely to be alienated by seeing their team's site taken over

by the NHL. (David Decl. ¶¶ 21-23)  They have little (or at least less) interest in League-wide

promotions or news, or stories and content about other teams.  The fans themselves promote and

enjoy *rivalries* with other teams; they do not sign on to the Rangers website to see balanced

presentations about their rivals or League-wide content.  (*Id.*)  On a League-controlled site, a

Rangers fan could log on to his team's site and be presented with a headline about the Islanders,

Devils, or other rival teams.  This on its own is likely to drive away fans.  (*See* David Decl. ¶ 22)

*See also Advance Magazine Publishers Inc. v. Vogue Int'l*, 123 F. Supp. 2d 790, 801 (D.N.J.

2000) ("irreparable harm may occur to plaintiff because plaintiff will be unable to control the

communications from defendants to consumers who believe they are communicating with

[plaintiff]").

  The Rangers have designed their website around the notion that the emotions of Rangers

fans are connected to the team itself – not the League and not the game of hockey generally.

(*See* David Decl. ¶ 23)  The NHL website is deliberately antithetical to that understanding.

Absent the personalized connection afforded by the Rangers' website, fans will just as likely go

to the websites of other entities, like ESPN, to get their news and updates about the Rangers, and

be permanently lost to the Rangers as regular visitors to the Rangers website.  The loss of this

emotional connection is both immeasurable and likely irreparable.  (David Decl. ¶¶ 20-23; Mills

Decl. ¶¶ 4, 19)

###### C. MSG Will Be Irreparably Harmed By The Disclosure Of Its Customer Lists To Its Competitors – The NHL And Other Member Clubs

Customer lists are classic examples of protected intellectual property. In the absence of preliminary injunctive relief, the Rangers will effectively forfeit customer lists they have created through years of operation of their website. (Richman Decl. ¶ 15) These lists provide a distinct competitive edge, *i.e.*, the ability to identify potential future customers and fans, and to create newer and more complete customer lists based on identification information provided by visitors to the website. (*Id.*) The NHL has repeatedly tried to erase this competitive edge by demanding that MSG turn over Rangers customer lists, and MSG has rightfully refused. (*Id.*) Absent injunctive relief, the NHL will gain the technological capability to replicate the Rangers' existing lists and expand on those lists with data the Rangers will not receive (*id.*), meaning that the Rangers' customer lists will fall into the hands of their competitors, the NHL and other member clubs. This appropriation of customers, too, constitutes irreparable harm. *See Register.com, Inc. v. Verio*, Inc., 356 F.3d 393, 404-06 (2d Cir. 2004) (affirming preliminary injunction against competitor's usurpation of a web-based business's competitive information, in part because it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business") (quotations omitted); *Global Switching Inc. v. Kasper*, No. CV 06 412, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006) (enjoining defendant from competing with the joint venture where "loss of actual and potential clients through [defendant's] competition and use of confidential…customer lists and pricing information constitute[d] irreparable harm").

## II. MSG HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS OR, AT A MINIMUM, SERIOUS QUESTIONS GOING TO THE MERITS

To force the Rangers to close their website because it might compete with the League's is blatantly anti-competitive. The presumptive illegality of this sort of naked restraint is well

established. And it is not complicated. To establish this premise is to establish a likelihood of success on the merits. Establishing a "likelihood of success" for these purposes requires only an assessment that the movant is "more likely than not" to prevail. *See Davila Pena v. Morgan, 149 F. Supp. 2d 91, 94 (S.D.N.Y. 2001); Oxford House, Inc. v. City of Albany*, 819 F. Supp. 1168, 1175 (N.D.N.Y. 1993). Moreover, where the plaintiff can demonstrate that the balance of hardships weighs in its favor, it is unnecessary to demonstrate a likelihood of success; rather, the plaintiff need only demonstrate that its claim has enough merit to give rise to a "fair ground for litigation." *See Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F. Supp. 564, 569 (S.D.N.Y. 1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977). *See also Bruce v. Martin*, 680 F. Supp. 616, 622 (S.D.N.Y. 1988).[6]

As MSG has established in its declarations, its control of the website is significant to its ability compete off the ice with the League and other teams. (David Decl. ¶¶ 24-32; Richman Decl. ¶ 11) By offering its distinctive website content to fans, MSG has encouraged excitement in Rangers hockey, which in turn has increased MSG's ability to sell Rangers tickets and Rangers-branded products and services, as well as to generate other sources of revenue, in competition with other NHL clubs (David Decl. ¶¶ 18, 23; Mills Decl. ¶ 4)—particularly in New York, which is the home of three competing NHL teams.

To demand that the Rangers take the site down is "a horizontal restraint—an agreement among competitors on the way in which they will compete with each other." *NCAA v. Bd. of Regents*, 468 U.S. 85, 99 (1984). Such horizontal restraints are presumptively illegal under the

---

[6]    *See also Kamine/Besicorp Allegany L.P. v. Rochester Gas & Electric Corp.*, 908 F. Supp. 1180, 1182, 1192 (W.D.N.Y. 1995) (granting plaintiff's motion for temporary restraining order in antitrust action where "the balance of the hardships on this application tip[ped] decidedly in [plaintiff's] favor, and the issues raised in the complaint establish[ed] a number of serious questions which present a fair ground for litigation"); *Bruce v. Martin*, 680 F. Supp. 616, 622 (S.D.N.Y. 1988) (granting plaintiffs' motion for preliminary injunction even where "[i]t would be premature at this stage of the proceedings to offer any opinion on whether the plaintiffs have shown a likelihood of success on the merits" because "[i]t suffices to say that the pleadings of the plaintiffs have shown sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in their favor").

antitrust laws, *id.* at 100, and overt horizontal restraints like the one at issue here can be declared

unlawful without "any great difficulty," *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447,

459 (1986), and without need of "'elaborate industry analysis'" or "proof of market power,"

NCAA, 468 U.S. at 109 (quoting *Nat'l Soc. of Prof'l Engineers v. U.S.*, 435 U.S. 679, 692

(1978)).

This so-called "quick look" method of analysis is used to condemn a naked horizontal

restraint in the absence of a competitive justification.  Here, the NHL is unable to offer any

"countervailing pro-competitive virtue" for its overt restraint on web-based competition.  *Indiana*

*Federation*, 476 U.S. at 459 (quoting *Nat'l Soc. of Prof'l Engineers*, 435 U.S. at 692; *see also*

*NCAA*, 468 U.S. at 109 (no justification for "a naked restriction on price or output.").  The

explicit purpose of the restraint is to "limit consumer choice by impeding the 'ordinary give and

take of the market place,'" and is precisely the sort of horizontal restraint condemned by Section

1 of the Sherman Act.  *Indiana Federation*, 476 U.S. at 459 (quoting *Nat'l Soc. of Prof'l*

*Engineers*, 435 U.S. at 692).  It is not within the narrow group of horizontal restraints—such as,

for example, rules dictating the "the size of the field, [or] the number of players on a team—that

can be justified as necessary for a sports league "if the product is to be available at all." *NCAA*,

468 U.S. at 101 *see also id.* at 117.  And it is beyond argument that sports leagues like the NHL

"have no immunity from the antitrust laws."  *Id.* at 113.[7]

In short, the analysis of the NHL's horizontal restraint on web-based competition is not

"a matter of any great difficulty" when, as here, the restraint is conceded (indeed, demanded) by

the NHL.  *Indiana Federation*, 476 U.S. at 459.  Thus, MSG has established a likelihood of

---

[7]        *See also North American Soccer League v. Nat'l Football League*, 670 F.2d 1249 (2d Cir. 1982);
*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994); *Los Angeles Memorial Coliseum Commission v. Nat'l Football*
*League*, 726 F.2d 1381 (9th Cir. 1984); *Smith v. Pro Football, Inc.*, 579 F.2d 126 (D.C. Cir. 1978); *Fraser v. Major*
*League Soccer*, 284 F.3d 47 (1st Cir 2002); *Volvo North America Corp. v. Men's Int'l Prof'l Tennis Council*, 857
F.2d 55, 74 (2d Cir. 1988).

success on the merits of its antitrust claim, and *a fortiori* has demonstrated that there is at least a

fair ground for litigation of its claim.

## III.   THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING THE REQUESTED INJUNCTIVE RELIEF

No balancing of equities is necessary or possible here, since there are no NHL equities to

be balanced.  As described above, the NHL's illegal scheme, if allowed to continue, imposes

multiple forms of irreparable harm on MSG and the Rangers.  *See, e.g.*, *Advance Magazine*

*Publishers*, 123 F. Supp. 2d at 802 ("[T]he strong showing of irreparable injury to plaintiff

clearly outweighs any potential harm to defendants and thus tips the equities in its favor.").  In

addition to the loss of fans and business opportunities, the Rangers' inevitable loss of its

goodwill, reputation and emotional connection with Rangers fans weighs heavily in the balance.

*See Montana Prof'l Sports, LLC v. Leisure Sports Mgmt., Inc.*, 422 F. Supp. 2d 1271, 1282

(M.D. Fla. 2006) (balance of hardships favored plaintiff because goodwill associated with its

marks would be harmed if defendant were allowed to adopt and promote its team under

plaintiff's marks).  Once a mark is diluted, there is no getting back its luxury status.  *See NBA*

*Properties v. Untertainment Records LLC*, No. 99 CIV. 2933, 1999 WL 335147 at *6 (S.D.N.Y.

May 26, 1999) ("In a trademark dilution case, '[d]ilution is itself an injury which [cannot] be

recompensed by money damages.'")

The NHL has nothing cognizable to weigh in the balance.  An injunction would merely

maintain the *status quo*, allowing MSG to operate the Rangers website as it has been doing for

years and preventing the League from expropriating that site or its content pending the outcome

of this litigation.  *See Live Nation Motor Sports*, 2006 WL 3616983, at *5 (balance of hardships

tipped in plaintiff's favor where plaintiff would suffer irreparable harm through diminished

ability to market its copyright material and defendant would merely suffer some level of

commercial loss if enjoined from providing live webcasts of racing events). The NHL has been operating for years under a system in which teams have controlled their own websites. (David Decl. ¶ 33) The Rangers' continued operation of their own website will not even prevent the League from operating its website. (Richman Decl. ¶ 16; Mills Decl. ¶ 18; David Decl. ¶¶ 7-10) Indeed, MSG has no objection to the League designing its own, competitive Rangers site, so long as it is not passed off as the "official" Rangers site and it does not employ content expropriated from the Rangers' own site. (*See* Mills Decl. ¶ 18; David Decl. ¶¶ 7) Thus, the only conceivable "harm" that the NHL could offer would be its inability to obtain revenues from fans who are connected to the *newyorkrangers.com* site and content, and that "harm" – the right to revenues generated from illegal activity – is not cognizable.

Accordingly, the Court need not determine whether the Rangers have established a likelihood of success or merely a fair ground for litigation. In either case, because the balance of hardships tips decidedly in favor of the Rangers, the Rangers are entitled to a preliminary injunction.

## CONCLUSION

For the reasons stated above, MSG respectfully requests that this Court grant MSG's

motion for a preliminary injunction.

October 1, 2007                          JONES DAY

                                         By: _____
                                              Robert W. Gaffey  (RG-4004)
                                              Meir Feder  (MF-2574)
                                              William J. Hine (WH-6766)
                                              Tracy V. Schaffer (TS-4952)
                                              222 East 41st Street
                                              New York, NY  10017
                                              Telephone:  (212) 326-3939
                                              Facsimile:  (212) 755-7306

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

## <u>CERTIFICATE OF SERVICE</u>

I declare that on October 4, 2007, I caused the attached, PLAINTIFF'S

MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY

INJUNCTION, to be served by hand-delivery on the following counsel:

Shepard Goldfein
James A. Keyte
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000/1

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York                JONES DAY
       October 4, 2007


                                          By: /s/ Robert W. Gaffey
                                              Robert W. Gaffey  (RG-4004)
                                              Meir Feder  (MF-2574)
                                              William J. Hine (WH-6766)
                                              Tracy V. Schaffer (TS-4952)
                                              222 East 41st Street
                                              New York, NY  10017
                                              Telephone:  (212) 326-3939
                                              Facsimile:  (212) 755-7306

                                              *Attorneys for Plaintiff*

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190