**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,

               :

          Plaintiff,          No. 07 CIV. 8455 (LAP)

               :

      v.

               :

NATIONAL HOCKEY LEAGUE,     ELECTRONICALLY FILED
NATIONAL HOCKEY LEAGUE
ENTERPRISES, L.P., NATIONAL HOCKEY  :
LEAGUE INTERACTIVE
CYBERENTERPRISES, L.L.C., NHL     :
ENTERPRISES CANADA, L.P., and NHL
ENTERPRISES, B.V.,          :

               :

         Defendants.

               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**SKADDEN, ARPS, SLATE, MEAGHER**
**& FLOM LLP**
**4 TIMES SQUARE**
**NEW YORK, NEW YORK 10036**
**TEL:  (212) 735-3000**
**FAX:  (212) 735-2000**
*Attorneys for Defendants National Hockey League et al.*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................ 4

ARGUMENT ................................................................................................................. 6

    I.      MSG CANNOT SHOW IRREPARABLE HARM ............................................ 6

          A.     MSG's Conduct Precludes a Finding of Irreparable Harm......................... 6

                1.     MSG Knew by June 2006 that It Opposed the Website Migration Plan ............................................................................................. 7

                2.     MSG Knew It Would Be Fined Under the NHL's Agreed-Upon Policies ........................................................................................ 8

                3.     MSG Strategically Manufactured the "Harm" in This Case To Try To Avoid the Fines ................................................................. 9

          B.     MSG's Real Gripe Is the Money ............................................................. 10

    II.     MSG'S LIKELIHOOD OF SUCCESS ON THE MERITS IS NIL ...................... 11

          A.     MSG's Assertion that the Joint Venture's Off-Ice Internal Business Decisions Are "Naked" Restraints Is Unsupportable ............................... 11

          B.     The NHL Is Best Understood as a "Single Entity," Including for Purposes of Its New Media Strategy and Website Migration Plan .......... 12

          C.     If Section 1 Even Applies, MSG Cannot Prove an Unreasonable Restraint of Trade .................................................................................. 14

                1.     The NHL's New Media Strategy and Website Plan Are "Core" Activities of a Legitimate Joint Venture Under Dagher ............... 14

                2.     In Any Event, MSG's Section 1 Claim Would Fail  Under a Full Rule of Reason Analysis ............................................................. 16

                      (a)     MSG Cannot Prove Actual Market-Wide Effects in a Relevant Market ............................................................... 16

                      (b)     The NHL's Website Plan Has Clear Procompetitive Objectives and Effects ....................................................... 17

          D.     MSG Is Attempting To Protect Itself, Not Competition or Consumers.... 18

    III.    THE BALANCE OF THE HARDSHIPS DOES NOT TIP DECIDEDLY IN MSG'S FAVOR .................................................................................................... 19

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                                    <u>**Page(s)**</u>

<u>American Needle, Inc. v. New Orleans Louisiana. Saints</u>, 496 F. Supp. 2d
941 (N.D. Ill. 2007) ............................................................................. 3, 13, 14, 17

<u>American Needle v. New Orleans Louisiana Saints</u>, 385 F. Supp. 2d 687
(N.D. Ill. 2005) ............................................................................................... 12

<u>Belfiore v. New York Times Co.</u>, 826 F.2d 177 (2d Cir. 1987) ....................... 16

<u>Blanksteen v. New York Mercantile Exch.</u>, 879 F. Supp. 363 (S.D.N.Y. 1995) ............... 9

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477 (1977) .............................. 18

<u>Capital Imaging Associates, PC v. Mohawk Valley Medical Associates, Inc.</u>,
996 F.2d 537 (2d Cir. 1993) ....................................................................... 16, 19

<u>Caplan v. Fellheimer Eichen Braverman & Kaskey</u>, 68 F.3d 828 (3d Cir. 1995) .............. 6

<u>Carell v. Shubert Organization, Inc.</u>, 104 F. Supp. 2d 236 (S.D.N.Y. 2000) ................... 16

<u>Charles O. Finley & Co. v. Kuhn</u>, 569 F.2d 527 (7th Cir. 1978) ...................................... 20

<u>Chicago Professional Sports LP v. NBA</u>, 95 F.3d 593
(7th Cir. 1996) .............................................................. 11, 12, 13, 14, 15, 16, 17

<u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752 (1984) ........................... 13

<u>Crouch v. NASCAR</u>, 845 F.2d 397 (2d Cir. 1988) ........................................................ 20

<u>Disenos Artisticos E. Industriales, SA v. Work</u>, 714 F. Supp. 46 (E.D.N.Y. 1989) ......... 16

<u>Dotster, Inc. v. ICANN</u>, 296 F. Supp. 2d 1159 (C.D. Cal. 2003) ................................. 6, 10

<u>FIBA Leasing Co. v. Airdyne Industrial</u>, 826 F. Supp. 38 (D. Mass. 1993) ..................... 6

<u>Fraser v. Major League Soccer, LLC</u>, 284 F.3d 47 (1st Cir. 2002) ................................. 12

<u>Frito-Lay, Inc. v. Bachman Co.</u>, 659 F. Supp. 1129 (S.D.N.Y. 1986) ............................. 16

<u>Global Discount Travel Services, LLC v. TWA</u>, 960 F. Supp. 701 (S.D.N.Y. 1997) ...... 16

<u>Hanson Trust PLC v. SCM Corp.</u>, 774 F.2d 47 (2d Cir. 1985) ......................................... 6

Hirschfeld v. Board of Elections, 984 F.2d 35 (2d Cir. 1993) ........................................... 6

Hockey Club Lokomotiv Yaroslavl v. NHL, No. 06 Civ 9421 (LAP)
(S.D.N.Y. Nov. 15, 2006) ............................................................................ 7, 10, 15

L.A. Mem'l Coliseum Commission v. NFL, 726 F.2d 1381 (9th Cir. 1984) ................... 12

MLB Properties, Inc. v. Salvino, Inc., 420 F. Supp. 2d 212 (S.D.N.Y. 2005)............ 12, 17

Mackey v. NFL, 543 F.2d 606 (8th Cir.1976) .................................................................. 12

Mid-South Grizzlies v. NFL, 720 F.2d 772 (3d Cir. 1983).............................................. 12

Morris Commc'ns Corp. v. PGA Tour, Inc., 364  F.3d 1288 (11th Cir. 2004) ................ 20

NASL v. NFL, 670 F.2d 1249 (2d Cir. 1982)................................................................... 12

NBA v. SDC Basketball Club Inc., 815 F.2d 562 (9th Cir. 1987).................................... 12

NCAA v. Board of Regents, 468 U.S. 85 (1984).............................................................. 11

NHLPA v. Plymouth Whalers Hockey Club, 419 F.3d 462 (6th Cir. 2005) .................... 12

Oakland Raiders v. NFL, 113 Cal. Rptr. 2d 255 (Ct. App. 2001).................................... 20

PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243 (S.D.N.Y. 2000),
aff'd 315 F.3d 101 (2d Cir. 2002)........................................................................ 16

Prof'l Hockey Corp. v. World Hockey Association, 1191 Cal. Rptr. 773
(Ct. App. 1983).................................................................................................... 20

Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004) ........................................ 10

San Francisco Real Estate Investors v. Real Estate Investment Trust of America,
692 F.2d 814 (1st Cir. 1982) ................................................................................ 6

Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499
(LAP), 2004 U.S. Dist. LEXIS 5411 (S.D.N.Y. Mar. 30, 2004), aff'd 124 Fed. Appx.
73 (2d Cir. 2005) ................................................................................................. 19

Sullivan v. NFL, 34 F.3d 1091 (1st Cir. 1994) ................................................................ 12

Texaco Inc. v. Dagher, 547 U.S. 1 (2006) .................................................. 3, 12, 13, 14, 15

Transperfect Translations Int'l, Inc. v. Merrill Corp., No. 03 Civ 10146 (LAP),
2004 U.S. Dist. LEXIS 24014 (S.D.N.Y. Nov. 29, 2004), aff'd 159 Fed. Appx. 313
(2d Cir. 2005) ..................................................................................................... 6

United Magazine Co. v. Murdoch Magazine Distribution, Inc., 146 F. Supp. 2d 385
(S.D.N.Y. 2001) ................................................................................................... 16

Yager v. Carey, Civ.A. No. 93-1054 (RCL), 1993 U.S. Dist. LEXIS 17801
(D.D.C. June 29, 1993) ....................................................................................... 20

Defendants National Hockey League ("NHL" or "League") and various of its affiliates respectfully submit this memorandum of law and accompanying declarations[1] in opposition to Plaintiff Madison Square Garden, L.P.'s ("MSG") motion to preliminarily enjoin the NHL from purportedly acting "to force MSG to cease operating an independent New York Rangers website." <u>See</u> Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction ("Pl. Mem.") at 1.

## PRELIMINARY STATEMENT

This case arises from the sour grapes of one disgruntled NHL team owner – MSG – who lost a League-wide vote <u>more than a year ago</u> concerning a fundamental internal business strategy of the NHL and its Member Clubs.  In June 2006, the 30 Member Clubs of the NHL voted 25-3 (with one absence and one abstention) in favor of a New Media Strategy aimed at growing the NHL fan base and increasing revenues through maximizing the distribution of NHL content through new media vehicles (such as the NHL Network) and utilizing new media platforms such as the Internet and wireless handheld devices.

Part of the New Media Strategy approved by the NHL Member Clubs in June 2006 included taking a more collective approach to programming and monetizing Club websites.  Based on the recommendation of a committee of owners, the Member Clubs voted in favor of a plan to migrate all Club websites to a common technology platform, serviced by a single content management system ("CMS"), through which the League would provide technological efficiencies and certain programming elements (rosters, schedules, statistics, etc.), while the Clubs would provide local content of their

---

[1] <u>See</u> Declarations of Shepard Goldfein, Esq. ("Goldfein Decl."); William L. Daly, Deputy Commissioner of the NHL ("Daly Decl."); John Collins, Senior Executive Vice President, Business and Media, of NHLE ("Collins Decl."); Keith Ritter, President of NHL ICE ("Ritter Decl."); Robert Hawkins, Group Vice President, General Counsel, NHL Media of NHLE ("Hawkins Decl."); Ted Leonsis, Chairman and Majority Owner of the Washington Capitals ("Leonsis Decl."); Robert Naegele, Chairman of the Minnesota Wild ("Naegele Decl."); Ken Sawyer, CEO of the Pittsburgh Penguins ("Sawyer Decl."); and Dr. Franklin M. Fisher, Carlton Professor of Microeconomics at the Massachusetts Institute of Technology ("Fisher Decl.").

choosing to further their local objectives.  (Daly Decl. ¶¶ 47-59.)  As to website format, the Member

Clubs – to the NHL Commissioner's surprise – voted in favor of a more uniform look and feel.  (Leonsis

Decl. ¶ 4.)  As it turns out, the new common technology platform and the new League and Member Club

websites have been praised by both Clubs and fans alike.  (Sawyer Decl. ¶¶ 2-3, 7-8; Ritter Decl. ¶¶ 26-

29; Daly Decl. ¶¶ 68-72.)

       MSG's requested preliminary injunctive relief should be denied for several independent

reasons.  <u>First</u>, MSG's own conduct in this dispute precludes any finding of irreparable harm.  MSG

objected to the website migration plan in June 2006, and has since steadfastly refused to take any steps

necessary to execute the plan in time for the 2007-08 hockey season.  Further, MSG's purported harm in

relation to the League's fine is "self-inflicted":  MSG long ago agreed to be subject to such fines – and in

fact was fined in April 2007 for violations of League rules, including rules relating to New Media –

<u>without seeking emergency (or any other) relief from this Court</u>.  (e.g., Daly Decl. ¶¶ 76-83.)  Finally,

and most egregiously, MSG's claimed harm relating to the purported "differences" between the NHL

and MSG versions of the Rangers website was strategically manufactured by MSG itself.  Had MSG

cooperated with the League to support the new NHL common technology platform over the last several

months, as every other NHL Member Club has done, there would be no differences at all: MSG could

have done virtually everything on the NHL technology platform that it is now claiming it desires to do

on the Rangers website.  (Naegele Decl. ¶¶ 3-9; Ritter Decl. ¶¶ 30-38.)  Indeed, the fact that MSG's

website for its NBA team – the New York Knicks – <u>is on the NBA common technology platform</u>,

NBA.com, belies MSG's claim of harm here.  Ultimately, MSG's real gripe is with the duly authorized

fine:  MSG can keep the Rangers independent website during the pendency of the litigation simply by

incurring that <u>monetary fine</u>, which MSG certainly can afford and is reparable if MSG wins on the

merits.

Second, MSG has virtually no chance of success on the merits of its underlying Section 1 conspiracy claim, which is premised on the outlandish and legally baseless argument that all "off-ice" agreements among NHL Clubs – save a limited national broadcasting agreement and labor agreement – are the "naked" restraints of a "cartel." The settled law relating to sports-league joint ventures, however, is that leagues are best viewed as "single entities" with respect to joint marketing decisions like the NHL's New Media Strategy. The Rangers cannot put on hockey contests by itself, and any value created by League play is value that all Member Clubs create jointly and can choose to exploit as they wish. See, e.g., American Needle, Inc. v. New Orleans Louisiana. Saints, 496 F. Supp. 2d 941, 942-44 (N.D. Ill. 2007). (See also Fisher Decl. ¶¶ 8-33, 65, 73-74.)

Even if Section 1 of the Sherman Act did apply, the Supreme Court in Texaco Inc. v. Dagher recently explained that the "core" business decisions of legitimate joint ventures (like the NHL here) cannot be unreasonable restraints of trade as a matter of law, and certainly cannot be subject to "per se" or "quick look" scrutiny. 547 U.S. 1, 7-8 & n.3 (2006). There is nothing more "core" to any sports-league joint venture than cooperation among its clubs as to how they will sell the valuable intellectual property and other rights that only their joint effort can create. In any event, MSG does not even attempt to mount a full rule of reason argument under which it would have to prove a relevant antitrust market (none is claimed); market-wide anticompetitive effects (none are identified); and a challenge to the obvious procompetitive benefits and efficiencies of the NHL's website strategy (all are ignored). Similarly, MSG offers no evidence that this case has been brought to redress injury to the competitive process or consumers as opposed to itself.

Finally, to the extent relevant, the balance of the hardships in no way tips in MSG's favor. Absent the requested relief, MSG's choice would be either to keep its website as is and pay the duly authorized fine or, alternatively, avoid the fine by orderly migrating its website (for which the Rangers would provide local content) to the NHL's common technology platform, which could easily be

3

migrated back to the MSG platform should MSG prevail. The choice is MSG's, and neither option results in any hardship.

By contrast, granting the injunctive relief would result in serious hardship to the other NHL Member Clubs, third-party sponsors and advertisers, and to the NHL itself. It would deprive other Member Clubs of the significant efficiencies and brand-building opportunities that only can be generated by having all thirty Clubs on the NHL common technology platform (Collins Decl. ¶¶ 4-13; Leonsis Decl. ¶ 5-14.). Moreover, a preliminary injunction would have a direct negative impact on NHL sponsors and advertisers that wish to take advantage of the transactional efficiencies offered by the NHL's common technology platform. Finally, a preliminary injunction that strips the League of its only mechanism – fines and penalties – short of expulsion to require Member Clubs to follow agreed-upon policies and business strategies would, in practical terms, invite chaos into the fundamental governance of the NHL as an ongoing joint venture. (Daly Decl. ¶¶ 94-96.)

## BACKGROUND

In 1996, and again in 2000, MSG voted along with every other NHL Member Club to assign the Clubs' intellectual property rights to the NHL for purposes of the League's exploitation of the Internet. The Board's 1996 resolution and 2000 confirmatory vote granted the Commissioner the authority to promulgate such rules and regulations which, in his discretion, would best advance those purposes. Exercising that authority, the Commissioner issued "Internet Regulations" to the Clubs in 2000, and could have promulgated the website migration plan on his own authority in 2006 had he chosen to do so. Instead, the Commissioner formed a committee of Clubs to develop the League's New Media Strategy, and then introduced and discussed the initiative with the Board of Governors, which discussion ultimately led to a consensus-building referendum. In June 2006, the Board overwhelmingly voted in favor of this New Media Strategy, one element of which required the migration of the Clubs'

websites to a new League-wide common technology platform.  MSG voted against proceeding with the League's New Media Strategy initiative.  (Daly Decl. ¶¶ 30-59.)

In April 2007, the Rangers undertook three actions (virtual advertising, streaming of its live games in-market and creation of its own online merchandising store) that violated League rules, including the Internet Regulations and aspects of the New Media Strategy.  Pursuant to the NHL Constitution,[2] MSG was fined $100,000 per day for these violations.  The NHL collected the fine from MSG, which "reserved" its rights but sought no judicial relief.  (Daly Decl. ¶¶ 80-83.)

In the months following the Board's approval of the New Media Strategy, the League commenced its efforts to migrate all the NHL Member Club websites to the League's new common technology platform with the goal that all Club websites would be migrated by August 1, 2007, sufficiently in advance of the start of the NHL season on September 29, 2007.  (Ritter Decl. ¶¶13-17, 26.) In June 2007, and subsequently in July 2007, Rangers' staff informed the NHL that MSG's senior management would not permit them to cooperate with respect to the migration of the Rangers website – including the preparation of art work, and the supply of current content and databases – or submit any of its personnel to CMS training.  (Ritter Decl. ¶¶ 18-25; Hawkins Decl. ¶¶3-4.)  Thereafter, during the course of discussions with League representatives in the summer of 2007, MSG continued in its absolute refusal to consider the migration of the Rangers website to the NHL's common technology platform.  (Hawkins Decl. ¶ 4-10; Daly Decl. ¶¶ 80-93; Ritter Decl. ¶¶ 18-25.)  MSG waited until October 1, 2007, to file its injunction motion.[3]

---

[2] All Member Clubs, including MSG when it purchased the Rangers in 1994, have agreed to abide by and comply with the NHL Constitution.

[3] Though not a subject of this motion, MSG's Complaint also challenges the NHL's website advertising and sponsorship policies.  (E.g., Compl. ¶¶ 16, 32, 42.)  However, since 2000, the NHL has been advertising on an "NHL Area" of every Club's website under the Internet Regulations that expressly reserved to the League the right to place advertising on up to 35% of each Club's site.  (Daly Decl. ¶ 45.)

*(cont'd)*

## ARGUMENT

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies" and "'should not be routinely granted.'" Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985) (citation omitted). MSG's burden of proof is well settled, see Transperfect Translations Int'l, Inc. v. Merrill Corp., No. 03 Civ 10146 (LAP), 2004 U.S. Dist. LEXIS 24014, at *14-15 (S.D.N.Y. Nov. 29, 2004) (Preska, J.), aff'd 159 Fed. Appx. 313 (2d Cir. 2005), and is not met here.

I.     MSG CANNOT SHOW IRREPARABLE HARM

MSG cannot establish irreparable harm because its own conduct precludes such a finding and, in any event, its claimed harm is reparable and speculative.

A.     MSG's Conduct Precludes a Finding of Irreparable Harm

MSG cannot establish irreparable harm if: (1) MSG unduly delayed in seeking injunctive relief with respect to the NHL's website migration plan;[4] (2) MSG's claimed harm is "self-inflicted" – e.g., it had contractually authorized the "harm" it now seeks to enjoin,[5] or (3) MSG "hid in the tall grass" for some strategic advantage.[6] Injunctive relief should be denied if any one of these principles was violated; MSG violates all three.

_____

*(cont'd from previous page)*

MSG also challenges, but does not seek relief with respect to, the use of the Rangers website to carry League supplied content that has been provided to Club sites since at least 2000. (Daly Decl. ¶ 46.)

[4] See, e.g., San Francisco Real Estate Investors v. Real Estate Inv. Trust of America, 692 F.2d 814, 817-18 (1st Cir. 1982) (Breyer, J.) (failure to act created a "largely self-inflicted" harm that was "entirely avoidable"); Transperfect Translations, 2004 U.S. Dist. LEXIS 24014, at *16-17 (eight month delay precluded preliminary relief).

[5] See, e.g., Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995) ("defendants have acted to permit the outcome which they find unacceptable"); Dotster, Inc. v. ICANN, 296 F. Supp. 2d 1159, 1163 (C.D. Cal. 2003) ("If Plaintiffs entered a disadvantageous contract, they must suffer the consequences."); FIBA Leasing Co. v. Airdyne Indus., 826 F. Supp. 38, 39 (D. Mass. 1993) (plaintiff's own lack of compliance with lease terms is a self-inflicted harm).

[6] See, e.g., Hirschfeld v. Bd. of Elections, 984 F.2d 35, 37-39 (2d Cir. 1993) (denying preliminary relief because the applicant had misused judicial process by tactically delaying appeal and its stay motion for

*(cont'd)*

1.   <u>MSG Knew by June 2006 that It Opposed the Website Migration Plan</u>

As more fully set forth in the Declaration of NHL Deputy Commissioner William L. Daly, MSG gave up the very intellectual property rights it now complains are being "misappropriated" about as far back as 1994, when it voted in favor of granting the NHL the right to market the Club's trademarks.  (Daly Decl. ¶ 29.)  Subsequently, in 1996 and again in 2000, the Rangers (and all other Clubs) granted the NHL an exclusive license to exploit their intellectual property, including the "right to develop and exploit the Internet" – also giving the Commissioner broad discretionary authority to carry out the NHL's Internet-related objectives.  (Daly Decl. ¶¶ 34-45)  In June 2006 – and for the first time over MSG's objection[7] – the NHL updated its New Media Strategy, including Board approval of a plan to migrate all Club websites to a common technology platform.  (Daly Decl. ¶¶ 42-60)  At least by June 2007, however, MSG instructed the Rangers effectively to stonewall the NHL in any attempts to migrate the Rangers website to the NHL's common technology platform, which MSG personnel carried out, for example, by refusing to participate in CMS training for the NHL's common technology platform.[8] (Ritter Decl. ¶¶ 18-25)  Thus, by June 2006 – when it objected to the very website policy at issue here – and certainly no later than June 2007, MSG had decided not to execute the NHL's website migration plan, and could have sought relief from this Court without the urgency it now claims.

---

*(cont'd from previous page)*
four weeks to force candidate off the ballot); <u>Hockey Club Lokomotiv Yaroslavl v. NHL</u>, No. 06 Civ 9421 (LAP), Tr. of Record at 79 (S.D.N.Y. Nov. 15, 2006) (Preska, J.) ("<u>Yaroslavl</u>") (finding tactical delay "unconscionable" and denying preliminary relief) (attached as Exhibit A to the Goldfein Decl.).

[7]  MSG, of course, has always known, and has publicly acknowledged, that "[t]he governing bodies of the NBA and the NHL have the power and authority to take certain actions that they deem to be in the best interest of their respective leagues, which may not necessarily be consistent with maximizing our professional teams' results of operations."  (Cablevision Systems Corp., Annual Report (Form 10-K), at 46 (Feb. 28, 2007) (attached as Exhibit B to the Goldfein Decl.).)

[8] MSG took this position notwithstanding operating the Knicks website on the NBA's common technology platform (NBA.com) for the last six years.  (Ritter Decl. ¶¶ 10, 21.)

2.     <u>MSG Knew It Would Be Fined Under the NHL's Agreed-Upon Policies</u>

While MSG touts the Rangers as one of the "Original Six," the current ownership did not purchase its interest in the Club until 1994. With that purchase, MSG inherited all of the rights <u>and obligations</u> of Member-Club ownership in the NHL, which had functioned as a collective group for over seventy-five years. Also at that time, MSG expressly consented to the NHL's Constitution and By-Laws, which "grant the Commissioner the authority to interpret the provisions of the Constitution, By-Laws, and League rules and resolutions, and their application and enforcement." And, in 1994, 1996, and 2000, MSG ratified the NHL's broad authority to exploit the Clubs' intellectual property, including through the use of new media. (Daly Decl. ¶¶ 29-48.) Pursuant to those agreements, MSG (and all the other Club owners) granted the Commissioner "the full and complete authority" to enforce League policies, including through the use of fines. (Daly Decl. ¶ 9.)

In April 2007, MSG violated League rules, including its Internet Regulations, by selling merchandise through an unauthorized website store, streaming its live games without authorization, and inserting virtual advertising into its local broadcasts. (Daly Decl. ¶ 78-83) The League informed MSG in April 2007 that if it persisted in its conduct, it would be fined $100,000 per day for these violations. (Daly Decl. ¶ 82) After two days of fines, MSG ceased its violations. That $200,000 fine was collected by the NHL, and MSG sought no judicial relief for the fine (preliminary or otherwise). (Daly Decl. ¶ 83)

By August 1, 2007, all of the Clubs, except for the Rangers, had migrated their websites to the NHL's common technology platform in accordance with the agreed-upon migration plan. (Daly Decl. ¶ 91) After numerous attempts to encourage MSG to move the Rangers website had failed (Hawkins Decl. ¶ 3-10), on September 20, 2007, the League informed MSG that as of September 28, it would be subject to a $100,000 fine for every day MSG continued to refuse to migrate its website to the NHL common technology platform. (Daly Decl. ¶¶ 91-93.)

In short, by agreeing to the enforcement mechanisms under the NHL Constitution, MSG's asserted harm on this motion is "self-inflicted" and cannot support a claim of irreparable harm.  The fact that MSG now has to choose between paying the fine and keeping its website on MSG's platform, or instead migrating its website to the League's common technology platform to avoid the fine, cannot constitute irreparable harm.  Cf. Blanksteen v. New York Mercantile Exch., 879 F. Supp. 363, 371-72 (S.D.N.Y. 1995) (denying relief where member rule provided plaintiff with the choice between deriving revenue by leasing her seat and not voting, or foregoing such revenue and voting).

        3.        MSG Strategically Manufactured the "Harm" in This Case To Try To Avoid the Fines

Finally, it is indisputable that Rangers personnel were ordered by senior management to withhold artwork and other information needed to migrate to the NHL common technology platform and to otherwise not cooperate with the required migration.  (Ritter Decl. ¶¶ 18-25; Ritter Ex. I.)  Further, during the 2007 so-called "solution" discussions, MSG made it clear that it would not, under any circumstance, agree to migrate the Rangers website to the NHL technology platform.  The NHL was just as adamant that the Rangers website would be required to migrate to the NHL's platform.  By obstinately refusing to cooperate with the League to accommodate its concerns, as every other Club has done,[9] MSG was able to execute a strategy to create a fictional website comparison for this Court in which it boasts that its version of the Rangers website is a "Rolls Royce" and the NHL's version is some sort of Yugo.  On the contrary, a Club-supported Rangers site on the NHL's common technology platform would contain virtually every feature that MSG currently has on its Rangers website.  (Naegele Decl. ¶¶ 3-9; Ritter Decl. ¶¶ 30-38; Ritter Exs. K & L (comparing MSG's Rangers current website with a fully supported Rangers website on NHL.com where Rangers' features are available).  MSG's tactical behavior before this Court is precisely the type of inequitable conduct that precludes a finding of

---

[9] (See Ritter Decl. ¶¶ 26-38; Naegele Decl. ¶ 3-9; Leonis Decl. ¶ 15; Sawyer Decl. ¶¶2, 4.)

irreparable harm.  This Court should not entertain a claimed "harm" concocted by MSG to avoid the very fines it authorized in the first instance.

      B.     <u>MSG's Real Gripe Is the Money</u>

          In reality, the "urgency" behind this motion is MSG's desire to avoid a duly authorized fine assessed for not implementing the League's website migration plan.  But a dispute ultimately about money is inappropriate for preliminary injunctive relief.  <u>See</u> <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004); <u>Yaroslavl</u>, Tr. of Record at 74-78 (challenge to NHL's agreement with international federation ultimately was an issue of money).  Here, both the fine and any purported perishable "business opportunity" clearly is reparable, and MSG's asserted loss of "goodwill" (itself premised on the fictional "Rolls Royce" comparison) is rank speculation.  <u>See</u> <u>Dotster</u>, 296 F. Supp. 2d at 1163-64 (loss of potential Internet traffic revenue could be calculated, and any loss of "goodwill and reputation" was speculative). [10]

          Finally, it would be particularly disingenuous for MSG to assert that it could not afford to incur the monetary penalty pending the outcome of this case.  Cablevision (the parent company of MSG) reported 2006 net operating revenues of $5,927,462,000 and profits (before taxes and depreciation) of $3,219,494,000, of which MSG accounted for roughly 14% of revenues ($854,040,000) and $247,474,000 in gross profit.  (<u>See</u> Cablevision Systems Corp., Annual Report (Form 10-K), at 38, 46, 65 (Feb. 28, 2007); Amended Annual Report (Form 10-KA), at 22 (Apr. 30, 2007).)  The fine at issue here amounts to a small fraction of these revenues and profits.  For all of the foregoing reasons, this Court should deny MSG's motion without even reaching the merits of MSG's antitrust claims.

---

[10] By contrast, the cases cited by MSG on irreparable harm are trademark and copyright cases involving <u>actual</u> misappropriation or infringement that <u>in fact</u> threatened the ongoing business operations of the rights holders.  (<u>See</u> Pl. Mem. at 9-15.)  These cases are irrelevant because MSG has already granted the NHL exclusive worldwide rights to use or license all of the Club's intellectual property (Daly Decl. ¶¶ 27-32), and neither MSG nor the Rangers are at any risk of failing.

II.    MSG'S LIKELIHOOD OF SUCCESS ON THE MERITS IS NIL

        MSG is asking this Court to make the revolutionary finding that a professional sports league is a walking "cartel" for any activity other than scheduling games, negotiating labor agreements and (quite inconsistently) contracting for limited national broadcasting rights.  MSG's antitrust theory is meritless and does not even constitute a fair ground for litigation.

    A.    MSG's Assertion that the Joint Venture's Off-Ice Internal Business Decisions Are "Naked" Restraints Is Unsupportable

        MSG dedicates two-and-a-half pages to the antitrust merits to support what in essence is a frontal attack on the fundamental activities of all sports leagues.  MSG does so without relying on any sports league cases, instead baldly labeling all "off the ice" venture activities as "naked" restraints condemnable as per se violations or on a "quick look" basis.[11]  (See Pl. Mem. at 16-17.)  For support, MSG relies on NCAA v. Board of Regents, 468 U.S. 85 (1984), for the propositions that a "quick look" is the standard for assessing the internal restraints of sports leagues and that any "unnecessary" restraints are "cartel" activity.  (See Pl. Mem. at 16-17.)  The NCAA Court, however, simply explained that the broadcasting restraints of the NCAA (an unintegrated association of colleges), as opposed to an integrated sports league, can be subject to "quick look" analysis, see NCAA, 468 U.S. at 98-106; in no way did it suggest that professional sports leagues could only cooperate on matters "necessary" to produce the product.

        The relevant law is that per se or "quick look" analysis does not apply at all to the output and marketing agreements among member clubs of a sports league.  This was precisely the holding in Chicago Professional Sports LP v. NBA, 95 F.3d 593 (7th Cir. 1996) (Easterbrook, J.) ("Bulls II").  As Judge Easterbrook explained in rejecting the "quick look" paradigm:

---

[11]  The best MSG could do was to footnote a few cases for the unremarkable proposition that sports leagues have no "immunity" from the antitrust laws.  (Pl. Mem. at 17 n.7)

[W]e are satisfied that the NBA is sufficiently integrated that its superstation rules may not be condemned without analysis under the full Rule of Reason. . . . [W]hen acting in the broadcast market the NBA is closer to a single firm than to a group of independent firms.

Id. at 600 (emphasis added); see also MLB Props., Inc. v. Salvino, Inc., 420 F. Supp. 2d 212, 218-19 (S.D.N.Y. 2005) (rejecting per se or quick look analysis for assessing plaintiff's licensing authority because its "role in licensing MLB intellectual property is not a naked restraint [but rather] facilitates the efficient protection and quality control of MLB intellectual property"), on appeal, No. 06-1867 (2d Cir. argued Jan. 23, 2007).[12]  Finally, in addition to ignoring Bulls II, MSG overlooks the Supreme Court's recent pronouncement in Dagher that per se and "quick look" analyses are inappropriate for assessing the internal restraints of legitimate joint ventures, which the NHL clearly is (and which MSG does not dispute).  547 U.S. at 7-8 & n.3.

Accordingly, because MSG intentionally placed all of its eggs in the per se or "quick look" basket, neither of which applies here, there is no basis to find any merit in its case under either version of the preliminary injunction standard.  See MLB Props., 420 F. Supp. 2d at 220-21.

B.    The NHL Is Best Understood as a "Single Entity," Including for Purposes of Its New Media Strategy and Website Migration Plan

Not only is per se or "quick look" analysis irrelevant in this case, professional sports leagues are best considered "single entities" under the antitrust laws when assessing the collective

---

[12]  Similar procompetitive benefits of the NHL's website migration plan exist here.  See infra pp. 17-18.  Moreover, virtually every activity of sports-league decision-making has been governed by rule of reason analysis.  See, e.g., NASL v. NFL, 670 F.2d 1249, 1258-59 (2d Cir. 1982) (cross-ownership rules); NHLPA v. Plymouth Whalers Hockey Club, 419 F.3d 462, 469 (6th Cir. 2005) (player eligibility rules); Fraser v. Major League Soccer, LLC, 284 F.3d 47, 59 (1st Cir. 2002) (centralized player employment policy); Sullivan v. NFL, 34 F.3d 1091, 1102-03 (1st Cir. 1994) (prohibition on public ownership of teams); NBA v. SDC Basketball Club Inc., 815 F.2d 562, 567 (9th Cir. 1987) (relocation rules); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1390-92 (9th Cir. 1984) (same); Mid-South Grizzlies v. NFL, 720 F.2d 772, 783 (3d Cir. 1983) (refusal to grant a team franchise); Mackey v. NFL, 543 F.2d 606, 620 (8th Cir.1976) (free agency rules); American Needle v. New Orleans Louisiana Saints, 385 F. Supp. 2d 687, 691-92 (N.D. Ill. 2005) (clubs' delegation to league of intellectual property rights).

exploitation of the entertainment value that only an integrated league can create. Thus, in Bulls II, Judge Easterbrook discussed in detail why sports leagues – even where clubs are independently owned and operated as distinct entities without a complete unity of interests – should be viewed as single entities for restraints among teams relating to the sale of their products and intellectual property:

> The point is that antitrust law permits, indeed encourages, cooperation inside a business organization the better to facilitate competition between that organization and other producers. To say that participants in an organization may cooperate is to say that they may control what they make and how they will sell it . . .

95 F.3d at 598 (emphasis added); see also Dagher, 547 U.S. at 6 (the price setting of two distinct brands within a joint venture "amounts to little more than price setting by a single entity – albeit within the context of a joint venture"). Basic economic theory relating to sports-league joint ventures supports this conclusion as well. (See Fisher Decl. ¶¶ 8-33)

The most applicable case – also ignored by MSG – is American Needle, in which a former licensor of NFL intellectual property claimed that the NFL violated the Sherman Act by collectively exploiting the teams' logos and marks. 496 F. Supp. at 942. American Needle addressed whether NFL teams could "agree on designating a common actor to exploit their various intellectual property rights, and on being bound by the decisions of that common actor." Id. at 942-43. Relying primarily on Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), and Bulls II, the court found that in the sports league context "[d]elegated decision-making does not deprive the marketplace of independent centers of decision-making." Id. at 943. The court also observed that it makes perfect sense for the NFL to cooperatively promote NFL intellectual property in order to compete against other leagues, promote competitive balance and facilitate the "obvious advantages of one-stop exploitation of the intellectual properties of the 32 teams." Id. at 943-44. Accordingly, the court held that, in answering Copperweld's "functional question," the NFL's cooperative marketing falls on the "unilateral" side of the line. Id. at 944 (citing Dagher, 547 U.S. 1).

American Needle is directly on point. All NHL Member Clubs long ago ceded their marks and logos to the League to market and exploit jointly for the benefit of all Clubs. (Daly Decl. ¶¶ 28-37.) And, as with the NFL, the NHL for many years has been developing and implementing League-wide business strategies, including nationwide sponsorship and advertising agreements, to exploit the Clubs' intellectual property as a whole. (Daly Decl. ¶¶ 37-46.) Indeed, the NHL's New Media Strategy, including its plan to migrate Club websites to a common technology platform, is just such a League-wide cooperative activity, no different in substance than the activities of NFL Properties, NBA Properties or MLB's Advanced Media. (Ritter Decl. ¶¶ 2-17.) As with all of the other sports leagues, any individual Club's intellectual property would be of no value absent membership in the League, which in turn justifies the collective exploitation of that value. See Bulls II, 95 F.3d at 596-99. (See also Fisher Decl. ¶8-33.)

In assessing the likelihood of success of MSG's claim, this Court should find that the NHL's New Media Strategy and its website migration requirement is the conduct of a "single entity," beyond the reach of Section 1 of the Sherman Act.

    C.    If Section 1 Even Applies, MSG Cannot Prove an Unreasonable Restraint of Trade

Even if Section 1 is deemed to apply, MSG's chance of success is in no way improved.

    1.    The NHL's New Media Strategy and Website Plan Are "Core" Activities of a Legitimate Joint Venture Under Dagher

As a threshold matter, even if MSG could escape the single entity line of cases – including Dagher[13] – it cannot escape Dagher's simple conclusion that the "core" activities of legitimate joint ventures cannot be viewed as unreasonable restraints of trade under Section 1 and are not subject to

---

[13] The Dagher Court did not squarely address the single entity question because the issue was not directly before it. 547 U.S. at 5-6 & n.1.

14

any "ancillary restraints" analysis. [14]  See 547 U.S. at 8 (while the venture's "pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense").  There can be no question here that such legitimate activities include how a sports league collectively decides to sell the very product and intellectual property that exist only because of the members' collective effort.  See Bulls II, 95 F.3d at 598; cf. Yaroslavl, Tr. of Record at 86 ("[T]he activities here at issue [the NHL's foreign-player acquisition rules] seem to be included within the meaning of the Supreme Court's recent [Dagher] case as the core activities of a joint venture, and thus would not constitute a combination in restraint of trade.").

MSG's implicit suggestion that the NHL and its Member Clubs have somehow limited the scope of their joint venture to scheduling games and agreeing on limited broadcast rights is absurd. As set forth in detail in Deputy Commissioner Daly's Declaration, the activities of the NHL venture are, among other things, to produce, promote and sell NHL hockey.  (Daly Decl. ¶¶ 11-19.)  Over the years, these venture activities, especially those relating to marketing, have evolved with the entertainment marketplace in which the NHL competes, including the advent of national television, cable and satellite broadcasts, the Internet, and most recently, new media platforms such as websites and various portable devices.  (Daly Decl. ¶¶ 24-26, 47-52, 62-63; Leonis Decl. ¶¶ 5-10.)  In fact, the future success of the NHL in this highly competitive environment is dependent in large part on the NHL, as a whole, building national scale in all new media channels to attract fans, advertisers and sponsors.  (Daly Decl. ¶¶ 26, 64, 95; Collins Decl. ¶¶ 4-13; Leonis Decl. ¶¶ 11-14.)

---

[14]  Some courts had permitted plaintiffs to argue that a legitimate venture's internal restraints must be "reasonably necessary" to the legitimate objectives of the venture to pass Section 1 scrutiny.  The Court in Dagher, however, squarely rejected this approach, holding that ancillary restraints analysis is inapplicable to internal joint venture restraints.  547 U.S. at 7-8.

15

2.    In Any Event, MSG's Section 1 Claim Would Fail
      Under a Full Rule of Reason Analysis

Should this Court need to address the full rule of reason, see Capital Imaging Assocs., PC v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993), it should find that MSG has abandoned that theory on this motion by offering no evidence to support it.  In any event, the indisputable facts show why such a theory would summarily fail.

(a)    MSG Cannot Prove Actual Market-Wide Effects in a Relevant Market

Under the full rule of reason, MSG would first have to prove a "relevant market."  Capital Imaging, 996 F.2d at 543.  In this Circuit, courts routinely reject, as a matter of law, patently implausible market definitions limited to discrete lines of distribution or single brands,[15] or those based on a purportedly unique consumer preference.[16]  MSG's apparent proposed market, limited to website competition for NHL or Rangers fans,[17] likewise is implausible as a matter of law.  See Bulls II, 95 F.3d at 600-01.  The NHL product – e.g., games, highlights and related intellectual property – competes in a highly competitive entertainment market, including through "new media" distribution channels in which

---

[15]  See, e.g., Belfiore v. New York Times Co., 826 F.2d 177, 180 (2d Cir. 1987) (rejecting market practically limited to the New York Times); PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243, 249-58 (S.D.N.Y. 2000) (Preska, J.) (rejecting market limited to fountain-dispensed soft drinks sold through independent foodservice distributors), aff'd 315 F.3d 101 (2d Cir. 2002); Disenos Artisticos E. Industriales, SA v. Work, 714 F. Supp. 46, 47-48 (E.D.N.Y. 1989) (rejecting market defined to include only Lladro figurines).

[16]  See United Magazine Co. v. Murdoch Magazine Distribution, Inc., 146 F. Supp. 2d 385, 399 (S.D.N.Y. 2001) (all magazines, not just "supertitles"); Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000) (Broadway shows, not just "Cats"); Global Disc. Travel Servs., LLC v. TWA, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (tickets on all airlines, not just TWA); Frito-Lay, Inc. v. Bachman Co., 659 F. Supp. 1129, 1137 (S.D.N.Y. 1986) (all salty snacks, not just corn chips).

[17]  While it is unclear what "market" MSG claims is restrained for purposes of this motion, it appears that MSG is claiming a restraint on "web-based competition" for Club marks, related products and distribution of NHL games over websites.  (Pl. Mem. at 17; Compl. ¶19)

the NHL competes against much larger players to achieve the "scale" – number of viewers – that is attractive to advertisers.  (Collins Decl. ¶¶ 4-13; Leonsis Decl. ¶ 11-14; Fisher Decl. ¶¶ 59-72.)

Similarly, any suggestion that the NHL and its Member Clubs possess "market power" – either directly or based on market share – would be frivolous.  The sale of NHL-licensed products would make up a small portion of any end-use marketplace in which those products compete (e.g., apparel, merchandise, memorabilia).  (Fisher Decl. ¶¶ 34-45.)  Nor, in such a competitive environment, could MSG ever prove market-wide adverse effects upon competition.  In the broad entertainment and advertising markets in which the NHL competes, the NHL's New Media Strategy and website plan are mere blips on the competitive landscape with no chance of harming market-wide output or consumers.  See Bulls II, 95 F.3d at 600-01.  (See also Fisher Decl. ¶¶ 46-58.)  MSG admits as much when it identifies ESPN's website as a competitor to MSG's website for Rangers fans.  (Pl. Mem. at 14.)  Thus, even accepting (hypothetically) a market for web-based competition involving sports, NHL.com accounts only for approximately 3% of "unique visitors" per year among the top twenty sports websites (e.g., individual league websites, ESPN.com, SI.com, FOX Sports, Yahoo! Sports, AOL Sports, CBS Sportsline, etc.).  (See Fisher Decl. ¶ 54.)

(b)    The NHL's Website Plan Has Clear Procompetitive Objectives and Effects

MSG asserts that the "NHL is unable to offer any countervailing pro-competitive virtue for its overt restraint on web-based competition."  (Pl. Mem. at 17 (internal quotations omitted).)  However, the procompetitive virtues of a professional sports league's cooperative efforts to market and sell its products are well-established.  See American Needle, 496 F. Supp. 2d 941; see also MLB Props., 420 F. Supp. 2d at 219.

Here, the procompetitive objectives and efficiencies of the NHL's website strategy are demonstrable and substantial.  As explained more fully in the accompanying declarations of several

Club owners and League executives,[18] as well as that of Dr. Frank Fisher (an established expert in the economics of sports leagues), the integration of the thirty separate Club websites and NHL.com onto a common technology platform, centrally serviced by a single CMS, will result in a number of procompetitive efficiencies and effects.  The increased online scale and standardized layout will attract national sponsors and advertisers interested in uniform exposure across the NHL.com network, which is a key element of the League's new growth strategy to enhance the NHL's "national brand" and to better compete against other sports and entertainment products and their websites.  The common technology platform also will enable these sponsors and advertisers to reduce transaction costs by negotiating centrally with the League.  Further, interconnectivity across the NHL.com network will provide the Clubs with "best of breed" functionality and applications, and will facilitate communication and content sharing, while a common navigational bar and the standardized (though customizable) template will promote familiarity with the NHL.com network and free-flowing web traffic among the thirty-one websites.  The NHL's common technology platform also will allow all teams to share in national content and advertising – without any loss of local content, audio or advertising revenue (while at the same time respecting any particular Club's privacy concerns).  And replacing the Clubs' thirty separate back office website operations with the League's technical staff should result in $2 million of cost-saving efficiencies annually and a more consistent, better quality servicing of the Club websites.

D.    <u>MSG Is Attempting To Protect Itself, Not Competition or Consumers</u>

Ultimately, MSG is attempting to invoke the antitrust laws for what it sees as its own benefit rather than for the benefit of consumers, all of whom have a multitude of entertainment choices, including websites for sports information and products.  It is axiomatic, however, that the antitrust laws were designed to protect competition in general rather than individual competitors.  <u>See</u> <u>Brunswick Corp.</u>

---

[18] (<u>See</u> Leonis Decl. ¶¶ 11-14; Sawyer Decl. ¶¶ 5-8; Daly Decl. ¶¶ 24-26, 52-53, 64, 70-72, 95; Collins Decl. ¶¶ 4-13; Ritter Decl. ¶¶ 12, 26-38.)

v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977); Capital Imaging, 996 F.2d at 543.  Thus, absent proof of market-wide harm in terms of output, price or quality, a plaintiff's purported harm to its own business is of no antitrust consequence.

Here, MSG can only speculate that a fan might prefer to obtain Rangers information or products on MSG's website rather than the NHL's (or ESPN's, etc.), and, as described above, there would be no functional difference for fans if the Rangers migrated to and supported a Rangers site on the NHL common technology platform.  (Ritter Decl. ¶¶ 30-38.)  But even if a Rangers fan did prefer MSG's independent site, that preference cannot form the basis of proving harm to consumers or competition.  See Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499 (LAP), 2004 U.S. Dist. LEXIS 5411 (S.D.N.Y. Mar. 30, 2004) (Preska, J.) (no harm to consumers where some moviegoers may prefer to see their choice of movie in one theater as opposed to another, despite asserted quality differences in the theaters), aff'd 124 Fed. Appx. 73 (2d Cir. 2005).

III.    THE BALANCE OF THE HARDSHIPS DOES NOT TIP DECIDEDLY IN MSG'S FAVOR

The balance of the hardships does not tip in MSG's favor, much less decidedly.  As to MSG, the hardships are none.  MSG can pay the fine (having agreed to be bound by the League's authority) and keep its website, or it can avoid the fine by migrating to the NHL platform (which would be easy to do).  (Ritter Decl. ¶ 17.)  MSG offers nothing but speculation to suggest that such a migration would in any way harm it or Rangers fans.[19]

By contrast, an injunction here would pose serious hardship to NHL Clubs, NHL sponsors and licensors, as well as the NHL itself as an ongoing venture.  An injunction would deprive the NHL and its Clubs of the operational and technological efficiencies of having all the Club websites on a common technological platform.  (See pp.17-18, supra.)  Further, the ongoing non-participation of

---

[19] All of the cases cited by MSG (Pl. Mem. at 18-19) on the balance of the hardships issue involve unmistakable copyright or trademark infringement and thus are wholly inapposite.

the Rangers on the NHL common technology platform will deprive other NHL Clubs of important content from the Rangers that would help generate overall fan interest in NHL hockey as well as in each individual Club.

An injunction here also would impact the very ability of the NHL to govern itself in accordance with policies and procedures agreed to among the Clubs, including the League's authority to impose fines.  See, e.g., Yager v. Carey, Civ.A. No. 93-1054 (RCL), 1993 U.S. Dist. LEXIS 17801, at *34 (D.D.C. June 29, 1993) (denying preliminary relief where it would have unduly interfered with defendant's "rights of self-governance").  As a matter of basic joint venture economics, these enforcement mechanisms are critical to achieving the operational and strategic objectives of the venture itself and to deter individual members from exploiting the venture's value for their own benefit – i.e., "free-riding."  (Fisher Decl. ¶ 16-17, 73-74.)  See generally Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295-96 (11th Cir. 2004) (preventing free-riding is a "valid business justification").[20] Absent the League's ability to exercise its disciplinary authority to execute business strategies agreed to among the Member Clubs, any disgruntled owner could seriously disrupt League operations and severely undermine core critical business strategies of the NHL venture and all sports leagues.[21]

For the foregoing reasons, Defendants respectfully request that MSG's motion be denied.

---

[20] See also Prof'l Hockey Corp. v. World Hockey Ass'n, 1191 Cal. Rptr. 773, 777 (Ct. App. 1983) (individual teams have a duty to the "league as a whole" and "not to act in their own self-interest when the interests of the corporation will be damaged thereby").

[21] For these reasons, courts generally avoid intervening in internal league affairs.  See, e.g., Charles O. Finley & Co. v. Kuhn, 569 F.2d 527, 533, 539 (7th Cir. 1978) (noting that MLB "clubs severally agreed to be bound by the decisions of the Commissioner and by the discipline imposed by him," and rejecting challenge to the Commissioner's discipline of a club because '[w]hether he was right or wrong is beyond the competence and the jurisdiction of this court to decide'"); see also Crouch v. NASCAR, 845 F.2d 397, 403 (2d Cir. 1988) (declining to become the "'super-scorer' for stock car racing disputes"); Oakland Raiders v. NFL, 113 Cal. Rptr. 2d 255, 262-64 (Ct. App. 2001) (courts should abstain from intervening in internal league disputes absent a plain violation of the league's own rules).

Dated:  October 12, 2007                      Respectfully submitted,


                                              _s/ Shepard Goldfein_____
                                              Shepard Goldfein
                                              James A. Keyte
                                              Paul M. Eckles
                                              Peter S. Julian
                                              SKADDEN, ARPS, SLATE,
                                                 MEAGHER & FLOM LLP
                                              Four Times Square
                                              New York, New York 10036-6522
                                              Telephone:  (212) 735-3000
                                              Facsimile:  (212) 735-2000
                                              *Attorneys for Defendants National Hockey
                                              League et al.*