UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,

                              Plaintiff,

                - against -

NATIONAL HOCKEY LEAGUE, NA-
TIONAL HOCKEY LEAGUE ENTER-
PRISES, L.P., NATIONAL HOCKEY
LEAGUE INTERACTIVE CYBERENTER-
PRISES, L.L.C., NHL ENTERPRISES CAN-
ADA, L.P., and NHL ENTERPRISES, B.V.,

                           Defendants.

                                          No. 07 CIV. 8455 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ROBERT HAWKINS

      I, ROBERT HAWKINS, declare under penalty of perjury pursuant to 28 U.S.C. §
1746 that the following is true and correct:

      1.     I am Group Vice President, General Counsel, NHL Media of NHL Enter-
prises, L.P. ("NHLE"), and have been employed at NHLE since April 1998.  I am responsible for
all media-related legal matters, including legal matters involving NHL Interactive CyberEnter-
prises, LLC, NHL.com, the NHL.com network, and the League's internet regulations.  I submit
this declaration in opposition to the motion of Madison Square Garden ("MSG") for a prelimi-
nary injunction in the above-captioned matter.  I have personal knowledge of the facts stated be-
low.

      2.     For more than a year – since June 2006 – it has been the mandate of the
Board of Governors of the National Hockey League (the "NHL" or "League") that, as part of the

League's new media and technology strategy, the League and the thirty NHL Member Clubs should take a collective approach to the programming and monetization of the League's and NHL Member Clubs' websites. In that regard, the Board of Governors has decided that the individual NHL Member Club websites will all reside on a common technology platform, centrally serviced by a single content management system ("CMS"), and will utilize a standardized template with a common horizontal navigation bar to facilitate ease of navigation and familiarity with website layout for fans across the League's and all of the NHL Member Clubs' websites. Integral to that decision is the understanding that the individual NHL Member Clubs would retain both the responsibility to program the local content of their individual websites and the opportunity to sell most of the advertising inventory space for themselves. One purpose of this website initiative is to create greater connectivity among the individual NHL Member Club websites – which have until now been unconnected by a common technology platform and therefore unable to communicate effectively among their various CMSs – so that content may be shared among NHL Member Clubs as an aid to their local promotional and marketing activities. The League and the NHL Member Clubs expect that this website initiative will greatly enhance the NHL's national and international brand identity and make the NHL more competitive with other sports leagues and sports and entertainment properties that have successfully built such national and international brands.

3.     During the summer of 2007, I participated in a number of meetings between the NHL and MSG concerning the migration of the Rangers' website to the NHL's common technology platform. Throughout these meetings, I was always aware that the Board of Governors' mandate was to migrate the individual NHL Member Clubs' websites to the common technology platform. I also understood – and made clear to MSG at the meetings – that the

League would not permit two Rangers' websites to exist simultaneously. Furthermore, from my perspective, the purpose of the meetings with MSG was to discuss the Rangers' website needs and expectations for purposes of trying to accommodate those needs and expectations in the design of the NHL's common technology platform and template and customize the template to meet the Club's particular needs.

4.     The MSG representatives were reluctant to address MSG's specific technology or formatting concerns, and, rather, insisted on discussing the fundamental business question of whether the Rangers' website would migrate to the NHL common technology platform and CMS or would continue to reside on its existing platform using a different CMS. While we were willing to explore various alternatives to accommodate MSG, I was not optimistic that we could reach an accommodation while MSG continued to resist the migration of the Rangers' website to the NHL.com platform.

5.     In their moving papers, MSG suggests that I encouraged MSG to believe otherwise. Specifically, Daniel David asserts that, at one of these summer meetings, I "suggested that the parties meet again after Labor Day to talk about how the League could feed content through MSG's platform so that the League would have the ability to post content and advertising on the Rangers' website." (David Decl. ¶ 8) Similarly, Scott Richman asserts that I "suggested a continuation of the talks after Labor Day to allow the parties to discuss how MSG could accommodate the League's interest in posting content and advertising on the Rangers website." (Richman Decl. ¶ 5)

6.     These assertions are not accurate. I did not propose that we "talk about how the League could feed content through MSG's platform so that the League would have the ability to post content and advertising on the Rangers' website." Rather, the MSG representa-

tives suggested that MSG would try to find a way of accommodating the League's "look and feel" and the League's content on the Club's website on its own technology platform. I acknowledged that they had made that proposal, but did not agree that the League would consent to any accommodation that was in any way different from the Rangers' website residing on the League's common platform and using the NHL's CMS.

7.    One suggestion that was discussed at a meeting on August 27, 2007, involved the question of whether translation software could be interposed between the Rangers' website and the CMS of the party on whose platform the website did not reside. I did not have the technical knowledge to assess the effectiveness of such translation software, so I agreed to inquire about that possibility with the League's technical personnel. I knew, however, that, unless the use of such translation software would be equivalent in all respects to the migration of the Rangers' website to the NHL platform, the League would insist that MSG complete the migration of the Rangers' website to that platform.

8.    The League's technical staff determined that the use of translation software would be unduly cumbersome and expensive. Such software would require constant maintenance and upgrading as each of the CMSs between which it was translating were continuously modified and upgraded. Moreover, the use of translation software did not address other reasons for the migration of all of the NHL Member Clubs' websites to a common platform, including the League's need to be able to repair an NHL Member Club's website if it experienced technology problems and became inaccessible to fans. Finally, to load translation software on the NHL.com network to communicate with the Rangers' website residing on a separate platform and using a different CMS would likely cause other NHL Member Clubs to insist on the same treatment, resulting in a United Nations-like set of translators mounted on the NHL.com network,

4

each of which would be communicating with a different NHL Member Club's CMS.  In that event, the potential technology complications of this outcome grow exponentially, and are too many and too cumbersome to accept.  They would threaten the whole website initiative.

        9.     At the August 27 meeting, we scheduled a telephone conference call between the League and MSG for as soon as possible thereafter, which, because of MSG's schedules, was September 4, 2007.  On that call, we informed MSG that, because the unwieldiness and cost of maintaining and upgrading one or more multiple translation software programs on the NHL.com platform would defeat the seamless connectivity and navigation, as well as the substantial cost savings, anticipated from the website initiative, we could not load a translator software program on the NHL.com network.  We therefore insisted that MSG migrate the Rangers' website to the NHL.com platform.  At the same time, we suggested several methods by which MSG could share the Rangers content it had loaded onto the migrated Rangers' website, though the MSG representatives did not appear particularly interested in those suggestions.

        10.    In conclusion, at all times during our meetings and discussions with MSG, MSG insisted that it would not migrate the Rangers' website to the NHL's common technology platform and that the Rangers' website would have to remain on the MSG platform.  It is important to the achievement of the cost-saving, efficiency-enhancing, and scale-building objectives of the website initiative that the websites of all thirty NHL Member Clubs reside on the common platform, use a single CMS, and employ the standardized (though customizable) template.  Permitting one (or more) of the NHL Member Clubs to continue to utilize a different technology platform and template defeats those objectives and severely impedes the NHL's ability to enhance its national brand identity and to sell advertising on a scale attractive to national sponsors.

Without MSG's participation, the NHL's ability to compete effectively with other sports leagues and sports and entertainment properties on a national basis will be significantly impaired.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 1C, 2007.

Robert Hawkins

6