UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MADISON SQUARE GARDEN, L.P.,          :

         Plaintiff,          :

   - against -          :    No. 07 CIV. 8455 (LAP)

                        :
NATIONAL HOCKEY LEAGUE, NATIONAL HOCKEY LEAGUE ENTERPRISES, L.P., NATIONAL HOCKEY LEAGUE INTERACTIVE CYBERENTERPRISES, L.L.C., NHL ENTERPRISES CANADA, L.P., and NHL ENTERPRISES, B.V.,          :

         Defendants.          :

                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ROBERT O. NAEGELE, JR.

      I, ROBERT O. NAEGELE, JR., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

      1.    I am Chairman of Minnesota Sports & Entertainment ("MSE"), the owner of the Minnesota Wild professional hockey Club, one of the thirty member Clubs of the National Hockey League (the "NHL" or "League"). I am also a member of the Executive Committee of the NHL Board of Governors. I have personal knowledge of the facts stated below.

      2.    Since joining the League in 2000, as one of four expansion franchises granted during the NHL's last round of expansion, the Minnesota Wild has quickly become one of the most popular Clubs in the League. Like Madison Square Garden ("MSG"), MSE owns and operates a variety of sports and entertainment properties. In addition to the Wild, MSE owns 80% of the Houston Aeros (a minor league professional hockey franchise operating in the

1

American Hockey League), and the Saint Paul Arena Company, which operates the Xcel Energy Center (the Wild's home arena), the Saint Paul River Centre and the legendary Roy Wilkins Auditorium. MSE also recently launched the Minnesota Swarm, an expansion franchise in the National Lacrosse League.

3. On June 2, 2006, I attended an NHL Executive Committee meeting at the League Office in New York City. At that meeting, the League Office staff took us through a Report on "Media Strategy and Recommendations" that had been prepared by a committee of owners formed for the purpose of exploring possible new media strategies and developing a strategic plan that would enable the NHL to: (a) deliver quality content via all existing and future media platforms, (b) maximize revenue from all media, (c) service existing NHL fans, and (d) cultivate new fans (the "Report"). One of the recommendations made in the Report proposed that the League and all thirty Clubs should take a common approach to the programming and monetization of the League and Club websites. The Report proposed that the League develop a common technology platform with a single content management system. The Report further proposed that the individual Clubs would continue to program the local editorial elements of their websites, and the League would establish a common template and "look" for the Clubs' websites, program basic elements of the websites and hire additional staff to sell advertising inventory, or space, across the NHL.com network. In addition, the Report recommended that the individual Clubs retain advertising inventory for themselves in the same manner as had been permitted traditionally.

4. At the time, the Wild had been successful in creating and developing an effective and attractive website that the Club used as an efficient tool in reaching out to and communicating with the local community and fans. We had spent a great deal of time, effort and

money to understand hockey fans throughout Minnesota and to cultivate a relationship with them through a brand that resonated with them.  We believed that the solution to optimizing new media technologies would be found in a combined effort which valued local market knowledge and preserved certain marketing-related opportunities for teams while also affording the League the chance to utilize tools on a national level in ways that the individual Clubs could not.  Our concerns with the New Media Committee's recommendations revolved around preserving the Clubs' ability to manage their individual brands; assuring that Clubs would have control of local marketing strategy, and protecting inventory, exclusivity for and revenue from certain Club sponsors. We were concerned that, if pursued, the New Media Committee's proposals, especially the adoption of a common technology platform, might negatively impact our website and reduce our connectivity with our local fans and sponsors.  We were also skeptical that the League could develop a common "look" that would be as attractive as the look we had already developed for the Wild's website, so we were very reluctant to agree to the concept of a standardized website template.

5. Subsequently, at the June 21, 2006, meeting of the Board of Governors, and as a result of these concerns, the Wild was one of three NHL Clubs that voted against proceeding with New Media Committee's recommendations.  Despite the Wild's opposition to approval of the New Media Committee's recommendations, however, the Board of Governors voted to proceed with those recommendations by a vote of 25 for, 3 against, 1 abstention and 1 absent.  A subsequent motion by the New York Rangers to defer proceeding with the recommendations until a more formal business plan had been prepared, which motion the Wild supported, was defeated.

6. The Wild was naturally disappointed that it had been unsuccessful in persuading its League partners to defer proceeding with the development of a common technology

platform and standardized template for the Clubs' websites. We respected the deliberations and views of the Board of Governors, however, and, following the vote at the June 21, 2006, meeting, the Wild participated in and cooperated fully with the Board's directive to transition the Wild's website to a common League platform.

7. The League Office technical personnel were accommodating to the concerns of the Wild as the content management system and website template were developed. The Club's webmaster participated in numerous conference calls and meetings over the course of the development process, and we are pleased with the resulting network of NHL Club websites.

8. Each of our concerns has been addressed on the new technology platform. The Wild has retained control and management of its individual brands, the Club has retained control over its local marketing strategy and we have been able to maintain inventory and exclusivity for and revenue from our local Club sponsors. The NHL's common platform and template include features that are the "best of breed," and we have been very pleased with the state-of-the-art innovations the League has made available to the Wild. We continue to control the local content of the website and our fan feedback has been excellent. Indeed, our ability to communicate with our fans through our website is better now than ever before. In addition, we are also pleased with the customized interconnectivity tools the League has provided to our website which allows Wild fans to link easily to all of MSE's other sports and entertainment properties, including our arena, our other professional sports franchises and our theater and concert venues.

9. The migration of our Club website to the NHL.com platform has not adversely impacted the business of MSE or the Minnesota Wild Hockey Club at all and, in fact, we believe will be a positive business initiative for our Club and for the League as a whole.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 11, 2007.

_____
Robert O. Naegele, Jr.