IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Madison Square Garden, L.P., | ) |
| | ) |
| Plaintiff, | )   Civil Action No. 07-CIV-8455 (LAP) |
| | )   Judge Loretta A. Preska |
| v. | ) |
| | ) |
| National Hockey League, | ) |
| National Hockey League | ) |
| Enterprises, L.P., NHL Interactive | ) |
| CyberEnterprises, LLC., NHL | ) |
| Enterprises Canada, L.P., and NHL | ) |
| Enterprises, B.V., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF FRANKLIN M. FISHER

I.    **BACKGROUND**

     A.    **Qualifications**

1.    I am the Jane Berkowitz Carlton and Dennis William Carlton Professor of

Microeconomics at the Massachusetts Institute of Technology, where I

taught for forty-four years. I am also a director of the National Bureau of

Economic Research and past President of the Econometric Society; for

nine years, I was the editor of that society's journal, *Econometrica*. I am a

member of the American Economic Association, from which, in 1973, I

received the John Bates Clark Award, awarded biennially to the American

economist under the age of forty credited with making a significant

contribution to economic thought and knowledge. I received my A.B., *summa cum laude*, from Harvard University in 1956 and my Ph.D. in Economics from Harvard University in 1960. In 2001, I received an honorary doctorate from the Hebrew University of Jerusalem.

2.    My fields of specialization within economics are industrial organization, microeconomics and econometrics. I am the author or senior co-author of seventeen books and well over one hundred and fifty articles. In the course of my scholarly research and my consulting work, I have studied issues relating to alleged violations of the antitrust laws in a large number of cases. I have written and testified extensively in the areas of antitrust and sports-related matters.[1,2] I have provided expert consultation and testimony in numerous cases on other subjects as well and have testified at trial, in deposition, or by affidavit in more than forty cases in the last ten years. These cases are listed in my curriculum vitae, which is attached as Exhibit 1 to this report.

---

[1] See Franklin M. Fisher, Christopher Maxwell and Evan Sue Schouten, "The Economics of Sports Leagues – The Chicago Bulls Case," *Marquette Sports Law Journal*, Vol. 10, No. 1, fall 1999, pp. 1–22; Franklin M. Fisher, Christopher Maxwell and Evan Sue Schouten, "The Economics of Sports Leagues and the Relocation of Teams: The Case of the St. Louis Rams," *Marquette Sports Law Journal*, Vol. 10, No. 2, spring 2000, pp. 193–218; Franklin M. Fisher, Christopher Maxwell and Evan Sue Schouten, "The Relocation of the Los Angeles Rams to St. Louis," in *The Antitrust Revolution: Economics, Competition, and Policy*, 4E, J. Kwoka, Jr., and L. White, eds., Oxford University Press, 2003 and Franklin M. Fisher, Christopher F. Noe and Evan Sue Schouten, "The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S–Corporations, Treatment of Personal Taxes, and Implications for Litigation," *Stanford Journal of Law, Business, & Finance*, spring 2005.

[2] See Chicago Professional Sports Limited Partnership and WGN Continental Broadcasting Company v. National Basketball Association, No. 90 C 6247 (F.D. Chicago); St. Louis Convention and Visitors Commission v. National Football League et al., 4:95 Civ. 02443 (E.D.MO); National Football League v. Los Angeles Raiders, No. 95 Civ. 5885 (C.D.Cal.); NBA Properties, Inc. v. Salvino, Inc. et al., No. 99 Civ. 11799 (S.D.N.Y.); Major League Baseball Properties, Inc. v. Salvino, Inc., No. 00 Civ. 4153 (S.D.N.Y.); The Hamilton County Board of Commissioners v. The National Football League et al., No. 03 Civ. 355 (S.D.OH), and American Needle, Inc. v. New Orleans Saints, et al., No. 04 Civ 7806 (N.D. Ill., Eastern Div.).

3.    On several different occasions, I have been asked to evaluate whether the members of a professional sports league and their commonly controlled affiliates function as a single economic entity with regard to licensing and marketing of their intellectual property.  I have undertaken such analyses on behalf of the National Basketball Association, National Basketball Association Properties, Inc., Major League Baseball Properties, the National Football League, and National Football League Properties.  I have also written extensively on questions of market definition[3] and, in the case of sports leagues, the circumstances under which related entities constitute a single economic enterprise. [4]

**B.    Nature of Retention**

4.    I have been asked by counsel for the National Hockey League (NHL) to address five principal questions in this matter:

a.    As an economic matter, does the NHL function as a single economic enterprise for purposes of producing on-ice professional hockey entertainment ("NHL Hockey") and establishing distribution mechanisms such as "new media" or website services to exploit the economic value of trademarks, trade dress, service marks, word

---

[3] See, for example, "Market Definition: A User's Guide," Workshop on Market Definition: Compilation of Papers, the 4th Nordic Competition Policy Conference, Helsinki, Finland, Finnish Competition Authority, 2002, pp. 38–54; "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, Vol. 19, No. 2, summer 1979; *Folded, Spindled, and Mutilated: Economic Analysis and U.S. v. IBM* (with J. McGowan and J. Greenwood) Cambridge, MA: MIT Press, 1983, pp. 31-43, 43-97; "Economic Analysis and 'Bright-Line Tests," *Journal of Competition Law and Economics*, special issue on "Forensic Economics in Competition Law Enforcement" (forthcoming); and "Detecting Market Power," Chapter XX in *Issues in Competition Law and Policy* (W.D. Collins, ed.), American Bar Association, Antitrust Section (forthcoming).

[4] See the papers cited in note 1, above.

marks, logos, and other intellectual property created by the NHL and its member teams (collectively "NHL Intellectual Property")?

b.    Can the NHL, acting as a single enterprise, be distinguished as an economic matter from what plaintiffs, in effect, allege is a cartel among competitors, and, if so, how?

c.    What is the relevant market in which the NHL.com network competes to distribute and exploit the economic value of NHL Intellectual Property, and does the NHL possess market power in that relevant market?

d.    Are there procompetitive economic benefits to the arrangements under which the NHL alone, rather than individual member teams, exploits the economic value of NHL Intellectual Property, and are there any anticompetitive effects from those same arrangements?

e.    In the specific context of the NHL's adoption of its "New Media Strategy", are there procompetitive benefits that flow from the NHL's using its NHL.com network platform as a common distribution mechanism for exploiting the economic value of NHL Intellectual Property, and do there exist anticompetitive effects from this collectivization as alleged by Madison Square Garden (MSG)?

5.    Applying my training and experience as an economist, I have reviewed the Complaint, briefs submitted by counsel to MSG, declarations from fact witnesses proffered by both the NHL and MSG, and certain ordinary course-of-business documents from the NHL including presentations and discussions of its "New Media Strategy" to create a common network platform and content management system for Member Club websites.  In addition, I have interviewed senior executives of the NHL, including Keith

Ritter, the President of NHL Interactive CyberEnterprises (NHL ICE). The material I have reviewed is listed in Exhibit 2.

6.      My study of materials relevant to this matter is ongoing.  I reserve the right to supplement this report with any opinions or conclusions that I reach after further study, particularly if new or additional relevant information becomes available.

**C.    Summary of Opinions**

7.      From my analysis, I have reached the following conclusions regarding the questions that I have been asked to consider:

   a.   As an economic matter, the NHL functions as a single economic enterprise for purposes of producing on-ice professional hockey entertainment and establishing the means by which the League exploits the economic value of NHL Intellectual Property on behalf of its member teams.

   b.   The NHL is clearly distinguishable from a cartel among competitors by the highly integrated and interdependent character of its constituent parts, namely its member teams.

   c.   As an economic matter, NHL Hockey competes with myriad other products in a broad sports and other entertainment market and, similarly, NHL Intellectual Property competes with other sports and entertainment-related intellectual property licensed by numerous other entities; therefore, NHL League and Club websites acting as a distribution mechanism for NHL Intellectual Property do not constitute an economically appropriate market within which to assess competitive effects in this matter.

   d.   There are many procompetitive economic benefits to the arrange- ments under which NHL alone, rather than individual member

5

teams, engages in the licensing and exploitation of NHL Intellectual Property; in contrast, I do not perceive any anticompetitive effects from those arrangements.

e.    With respect specifically to the allegations levied by MSG regarding the NHL's New Media Strategy, the highly integrated and interdependent nature of teams' contributions to creating NHL Hockey and Intellectual Property implies that the fruits necessarily belong to the joint venture members collectively, and the terms under which these fruits are exploited are most efficiently attained by the NHL acting alone.

f.    In particular, there are strong economic reasons to believe that operating the NHL.com network with a standardized format, common technology platform, and single content management system is likely to be an efficient distribution mechanism for building national fan support and enthusiasm that will allow the NHL to further its core mission of producing on-ice professional hockey entertainment while also allowing the League to exploit its Intellectual Property through national advertising and sponsorship.

## II.    ECONOMIC ANALYSIS OF THE NHL

### A.    Single Economic Enterprise

8.    The NHL and its Member Clubs collectively produce an entertainment product — NHL Hockey — that no individual Club could produce on its own.[5]  NHL Hockey consists of an interrelated series of over twelve hundred professional ice hockey games per year played by the 30 NHL

---

[5] MSG acknowledges this fundamental economic point, stating that the NHL "was created by the individual member teams in order to assist them in producing a product – major league men's professional ice hockey contests – that no one team could produce."  Complaint for Injunctive Relief, Madison Square Gardens, L.P. v. National Hockey League, National Hockey League Enterprises, L.P., NHL Interactive CyberEnterprises, LLC, NHL Enterprises Canada, L.P., and NHL Enterprises, B.V., No. 07 CIV 8455 (LAP), ¶8.

teams, leading to a series of playoff games and culminating each season with the Stanley Cup Finals between the champion teams from the Eastern and Western Conferences.

9.     NHL Hockey can be produced only by the League as a whole, and could not be produced by any one individual team (or even a few teams).  While different squads of a single team could play each other, the organization of the teams into a nationwide league with geographic diversity and a common championship goal, pursued in a structured manner employing uniform rules of play, has created a vastly different and more marketable product than scrimmaging between squads of a single team — or even *ad hoc* "barnstorming" between squads of several teams outside a league structure — could create.  The economic value of an individual NHL team, therefore, derives from its joint participation in the production of NHL Hockey.

10.     The on-ice product produced by the cooperation and collective efforts of the NHL as a whole — NHL Hockey — is an entertainment product that competes with numerous other entertainment products, including, but not limited to: college and junior hockey, professional and college basketball, professional and college football, professional baseball, auto racing, wrestling, boxing, golf, tennis, the Olympics, motion pictures, television programming, and a host of other entertainment products.

11.     In order to produce an entertainment product that can compete effectively against the many other available entertainment products, a sports league

must adopt an organizational structure that allows it to produce its product efficiently. While many structures are possible, there are sound economic reasons why most major sports leagues, including the NHL, are organized as joint ventures. This form of organization, however, necessarily requires a league to adopt rules to prevent individual members of the joint venture from behaving in ways that may advance their own narrow self-interest while imposing costs on their joint venture partners, the other teams.

12.    As a matter of economics, it is certainly possible to organize a sports league as a single, centrally controlled corporation, with branches in different cities. It is difficult, however, for a league organized in this way to be viewed as offering more than a series of exhibition games. Fan perception of genuine competition is essential to the production of NHL Hockey. The excitement of a true league season and championship competition will be missing if fans perceive that the entire affair is controlled at the center with no real independent decision-making at the team level. Additionally, this organizational form would not take advantage of the specific knowledge of local conditions that locally-based teams possess.

13.    In general, the efficient organizational structure of a sports league should provide for some decision-making and control at the team level, so as to enable the league to better compete at the local level. However, that organization should not provide incentives for teams to take actions incompatible with the league's interests.

14.    These economic considerations favor organizing leagues such as the NHL

as a joint venture rather than a single corporation.  Still, the NHL is

different from most joint ventures found in other industries because no

single team is capable of producing output outside of the joint venture.

NHL teams are not, and could not be, economic competitors in the sale of

hockey games or the sale of an NHL season.

15.    Regardless of its actual legal structure, from an economic point of view,

the NHL necessarily operates as if it were a single enterprise.  The

League's control of economic decisions that affect the overall product is

necessary in order to ensure that each team's actions are in the best interest

of the League as a whole.

16.    Absent League rules to the contrary, an NHL team might well engage in

independent action that might benefit that individual team to the detriment

of both the League and the entertainment product it has created and

produces jointly with the League and all the other member teams.  This

could happen when a team fails to consider (or intentionally disregards)

the extent to which its independent actions will harm the other teams or

the League as a whole.  This type of phenomenon is known to economists

as a negative "externality".  Untreated, externalities lead to economically

undesirable, or inefficient, outcomes.

17.    "Free-riding" is a well-known example of an externality.  In the context of

the NHL, free-riding would occur if a team benefited disproportionately

from the actions of the League, its member teams and players, without

appropriately compensating the League and its members. Free-riding would lead to inefficient outcomes because the League, its member teams, or its players would not have the appropriate incentive to invest in the promotion and development of the product if an individual team alone were allowed disproportionately to capture the benefits from those efforts.

18. The development of many of the rules of the NHL occurred in order to attempt to internalize externalities. The amateur draft, the salary cap, expansion policy, team territories, and the relocation rules serve such a purpose. These rules provide incentives for teams to behave in ways that are value-enhancing to the League as a whole, and in the fans' best interest. Through the enforcement of these rules, the League creates a superior product, one that competes more effectively in the entertainment market.

19. To help market NHL Hockey in competition with other sports and entertainment products, and to fully reap the rewards of the NHL Hockey teams' joint activities, the NHL and its teams have generated a valuable brand (the "NHL Brand") and its accompanying intellectual property, including trademarks, trade dress, service marks, word marks, logos, and other intellectual property, which I refer to collectively as "NHL Intellectual Property." The creation of a common website platform is one of the distribution mechanisms whereby the League seeks both to exploit the economic value of its Intellectual Property investments and to further

the NHL's core mission of producing professional on-ice hockey entertainment by building fan support and enthusiasm for the League.

20.    NHL Intellectual Property derives its value entirely from the value of NHL Hockey as an entertainment product created jointly by the League and its member teams.  To the extent that a particular team becomes or remains popular, its popularity arises from its membership in the NHL, including in particular its on-ice success in the context of the NHL format and the significant marketing efforts of the League.  The economic value of its marks, correspondingly, derives from the team's membership in the NHL, its on-ice success in the context of League play and the League's marketing efforts.  The individual trademarks, trade dress, service marks, word marks, logos and other intellectual property that make up NHL Intellectual Property would have little or no value in the absence of their association with the NHL Hockey product.

21.    From an economic perspective, the NHL operates as a single entity with respect to the use and exploitation of NHL Intellectual Property.  The constituent parts of this entity — the 30 Member Clubs that collectively comprise the NHL — are highly economically integrated and interdependent not only with respect to the production of NHL Hockey, but also with respect to the creation and exploitation of NHL Intellectual Property, the principal purpose of which is to promote NHL Hockey.  The NHL's control over NHL Intellectual Property extends to almost every aspect of League and Club operations that relates to intellectual property,

including the distribution and exploitation of that property via team websites. Even where the Clubs retain certain rights to use their marks in local marketing efforts, such activities are still subject to NHL control and must be consistent with the NHL's own licensing activities.[6] As a matter of economic analysis, this collectivized control of NHL Intellectual Property by the League benefits both NHL teams and NHL Hockey fans for reasons that I will address below.

**B.    The NHL is Not a Cartel**

22.    Coordination among constituent parts of a single entity — whether they be business units, divisions of a company, members of a board of directors, affiliates, or, as in this case, the 30 Member Clubs that collectively comprise the NHL — is not regarded by economists as a cartel unless those constituent parts would otherwise be independent and competing sources of economic power with respect to the business of the entity.

23.    As members of a professional sports league, the NHL Clubs are not independent sources of economic power. Rather, they are highly interdependent. Any economic power they may have depends, and has always depended, on their membership in the League and on their cooperation in producing a joint entertainment product, NHL Hockey.

---

[6] On June 26, 1996, the NHL's Board of Governors adopted a resolution stating that Member Clubs "individually confirm[ed] the grant to the League … of [their] intellectual property rights … for all purposes relating to the further development of a presence for the League and the Member Clubs on the Internet's World Wide Web and the exploitation of any and all opportunities using comparable computer and telecast technology." The Board unanimously reaffirmed this policy statement on June 20, 2000. Letter from Gary B. Bettman, NHL Commissioner to Mr. Lawrence M. Tanenbaum, Chairman, Maple Leaf Sports & Entertainment Ltd., April 18, 2006, attached as part of Appendix A to "Memorandum on Media Strategy & Recommendations", June 8, 2006. The memorandum is Exhibit 3 to this declaration.

24.    The difference between a single economic entity comprised of constituent parts, on the one hand, and a cartel among competitors, on the other hand, flows at least in part from the degree of economic integration and interdependence among the constituent parts.  Where, as here, the constituent parts are highly integrated and interdependent, it is appropriate to view them as a single economic entity and not as a cartel.

25.    The fact that individual NHL Clubs compete with one another on the ice is irrelevant to whether the NHL functions as a single economic entity for the purpose of producing NHL Hockey or creating and exploiting NHL Intellectual Property.  Similarly, the fact that League members may harbor differing views on particular League policies is irrelevant to the question of whether the NHL should be viewed as a single economic entity or, instead, as a cartel.  A single entity may contain competing and differing interests.  Partners in a law firm, for example, may disagree over the firm's compensation formula, but such conflicts do not mean that law firms are economic cartels.

26.    Another important difference between a single economic enterprise comprised of constituent parts and a cartel among competitors is the level of efficiencies created by the joint activity of the participants.  Where the joint activity of the organization's constituent members leads to economic efficiencies that could not be achieved by individual action, it is appropriate to view the organization as a single economic enterprise.

27.     In this case, collectivized NHL control over the mechanisms by which

NHL Intellectual Property is exploited leads to important economic

efficiencies, as I describe in more detail below.  These efficiencies, which

enable the NHL to compete more effectively in relevant markets described

below, could not be achieved without the degree of integration currently

practiced by the NHL.

**C.     Collectivized Exploitation of Economic Value**

28.     By collectively establishing a common mechanism to distribute NHL

Intellectual Property, the NHL is able to distribute and promote a product

that would not otherwise be economically viable — namely, a complete

package of NHL Intellectual Property, including intellectual property of

the League and each of its member NHL Clubs.  No individual Club could

create or efficiently exploit such a product, since no Club owns enough

intellectual property rights individually to satisfy the demands of

licensees.  In the specific context of new media, efficient exploitation of

the economic value created by NHL fan enthusiasm and viewers similarly

requires a common distribution mechanism to provide national sponsors

and advertisers with sufficient scale when accessing those fans and

viewers.

29.     A common distribution mechanism reduces transaction costs and increases

benefits to advertisers, sponsors and NHL Hockey fans.  For example, as I

will explain in greater detail in Section IV.A, the centralized NHL.com

network platform affords potential advertisers and sponsors the

opportunity to reach the largest group of unique visitors possible, greatly

reducing their transaction costs.  A common distribution mechanism also

permits the NHL to centralize supervision of quality control at potentially

far lower cost than would prevail under a more decentralized regime.

NHL Hockey fans also benefit from the platform's common "look and

feel" that likely facilitates navigating member team websites and locating

content.

30.    More generally, collectivized exploitation of NHL Intellectual Property

creates efficiencies because it promotes NHL investments in marketing

and distributing the NHL Brand.  The NHL regards these investments as

essential to its ability to compete successfully for the goodwill of fans and,

by so doing, achieve economies of scale that are necessary to attract

national advertisers and sponsors.[7]

31.    Centralization permits the NHL to invest in numerous economic activities

that enhance the value of the NHL Brand and other NHL Intellectual

Property.  These efforts, in turn, serve to increase the popularity and value

of the NHL's core product, NHL Hockey.  The effectiveness of these

efforts, however, could easily be undermined if individual NHL members

were permitted to exploit NHL Intellectual Property independently of the

collectivized efforts of the NHL itself.  Granting individual members free

rein to exploit NHL Intellectual Property would almost certainly lead to

"free riding" externalities in which individual teams attempted to extract

---

[7] Declaration of William L. Daly ("Daly Decl.), ¶25 and Declaration of Ted Leonis ("Leonis Decl."), ¶5.

benefits derived from the actions of the League, its other member teams and players, without appropriately compensating the League and its other members.

32.    For example, this type of free-riding could occur if teams that are temporarily strong and in favor were permitted to cash in on that popularity through independent licensing.  Such teams gain popularity through the joint efforts of all the teams in the League.  Such efforts are rewarded by the division of various revenues, including the licensing revenues of the NHL.  But all the teams must be rewarded for those efforts if such efforts are to continue with the same intensity.

33.    In addition, the restrictions on the ability of individual teams to license or otherwise exploit their intellectual property separately from the NHL are intended to ensure that products bearing NHL Intellectual Property satisfy the interest of the League and its member teams in consistent quality and an appropriate reflection of the image of NHL Hockey.  For instance, while it might be profitable for an individual team, while that team is temporarily strong and popular, to license its intellectual property for use on low-quality merchandise, such a use of NHL Intellectual Property might have an adverse economic impact on the value and popularity of the NHL Brand and NHL Hockey in the long term.  It is within this context that the League's New Media policies on team websites should be viewed when undertaking an economic analysis.  The NHL wants to insure that its teams, particularly its most popular teams, utilize their websites so as to

promote NHL Hockey and to enhance the value of NHL Intellectual
Property rather than solely or primarily to pursue the Clubs' own narrow
economic interests.

## III.    ECONOMIC ANALYSIS OF MARKET DEFINITION

### A.    Economic Principles of Market Definition

34.    For an economist, market definition involves determining the set of
competitive constraints under which a firm (or group of firms) alleged to
be engaged in anticompetitive behavior operates.[8]

35.    In the most general economic terms, these constraints are imposed by
demand substitutability and supply substitutability.  Demand
substitutability is provided by those products to which buyers can easily
turn in the event that a firm raises price in an attempt to earn supra-normal
profits.  Supply substitutability is provided by firms that do not already
make substitutable products but could easily do so in the event that an
anticompetitive price increase was attempted.  In the present case, there is
no need to consider supply substitutability, since the appropriate
conclusion follows from a consideration of demand substitutability alone
and would only be strengthened by consideration of supply
substitutability.

36.    Thus, the relevant product market in an economic analysis includes all
products that are reasonably interchangeable or substitutable for one
another in the minds of buyers.  In order for two products to be included

---

[8] See the papers cited in note 3, above.

17

within the same product market, however, they do *not* need to be identical or perfect substitutes for all potential buyers. For instance, various models of automobiles are in the same product market. Even though each model may have a different price and different features and thus a different attractiveness to individual buyers, if the manufacturer of one particular model attempted to raise its price for that model above a competitive level, it would likely lose a sufficient number of buyers to make the attempted supracompetitive price increase unprofitable.

37. A further important economic consideration is that not all products in the relevant market need impose the *same degree* of constraint on the behavior of the alleged antitrust violator. Nor is it necessary for any *single* product within the relevant market to completely constrain the firm under study. The relevant market is defined by the set of constraints that *collectively* render the firm unable to profitably maintain supracompetitive prices.

**B.    NHL League and Team Websites Are Not A Relevant Product Market**

38. Application of these economic principles enables me to address the relevant market in which the NHL.com network platform competes to distribute and exploit NHL Intellectual Property.

39. My analysis of this issue leads me to conclude that the distribution and exploitation of NHL Intellectual Property via League and member team websites cannot constitute an economically appropriate market within which to assess competitive effects in this matter.

18

40.     To begin, as explained earlier in my report, NHL Hockey is an

entertainment product that competes for consumers' attention and

disposable income with myriad other entertainment products, including,

but not limited to, college and junior hockey, professional and college

basketball, professional and college football, professional baseball, auto

racing, wrestling, boxing, golf, tennis, the Olympics, television

programming, motion pictures, and a host of other entertainment

products.[9]

41.     As I also noted earlier, to help market NHL Hockey in competition with

these other sports and entertainment products, the NHL and its teams have

created valuable intellectual property, including trademarks, trade dress,

service marks, word marks, and logos.  NHL Intellectual Property

competes with numerous other licensors of intellectual property,

including, but not limited to, other sports leagues and event sponsors,

entertainment companies, and even fashion designers.

42.     One way among many that the NHL and its member teams have chosen to

distribute and exploit the economic value of NHL Intellectual Property is

through the display of that property via League and team websites that

present game highlights, news stories, feature footage, and other content to

consumers.  These "new media" services help build interest and

excitement in the League's core on-ice operations (which in turn generate

---

[9] In this connection, it is worth noting that the NHL compares its media success with that of other professional sports leagues.  See, for example, "Approaches to New Media: NHL and Other Leagues," attached as part of Appendix B to "Memorandum on Media Strategy & Recommendations", June 8, 2006.

box-office receipts and advertising revenue for member teams) and
produce revenue through the sale of banner ads and other website space to
advertisers and sponsors that wish to reach a national (or potentially
worldwide) set of viewers.

43.     Just as NHL Hockey and NHL Intellectual Property compete in broad
product markets, respectively, NHL League and member team websites in
particular compete for consumers' attention and advertisers' patronage and
sponsorship with numerous other digital media providers offering sports-
related content including, but not limited to, ESPN.com, CBSSports.com,
FoxSports.com, Deadspin.com, and HockeyBuzz.com (to name only a
few), as well as with entertainment-oriented websites such as TMZ,
E! Online, ET Online, and many others.

44.     MSG contends that a relevant market exists for "the licensing of the
trademarks, trade names, trade dress and copyrights (including logos)
owned by the NHL Clubs and the NHL itself".  MSG further alleges that a
relevant market or submarket can be defined as the licensing of this
intellectual property for distribution over the internet and other media.
Neither contention is supportable as a matter of economic analysis.

45.     Consumer goods featuring the intellectual property of other licensors
compete directly with, and therefore are reasonably interchangeable or
economic substitutes for, consumer goods featuring NHL Intellectual
Property.  Similarly, internet (and other) media displaying NHL
Intellectual Property compete directly with, and therefore are reasonably

interchangeable or economic substitutes for, other sports and entertainment websites, as well as for other mechanisms for the display and distribution of intellectual property. These conclusions necessarily imply that NHL League and team websites cannot constitute a properly defined product market for economic analysis.

**C.    The NHL and its Member Teams Cannot Exercise Market Power in Any Relevant Market**

46.    Within the context of properly defined product markets within which NHL Intellectual Property and NHL League and team websites compete, it then becomes possible to address the subsidiary economic question of whether the NHL possesses market power in that relevant market.

47.    Economists define market power as the power profitably to maintain prices above a competitive level (or, equivalently, maintain quality below a competitive level).[10]  Applying that definition here, my analysis indicates that the NHL and its member teams lack market power in the market for the distribution and exploitation of intellectual property.

48.    This economic conclusion is readily understood by considering the following hypothetical scenario.  If the NHL attempted to raise the fees that it charges for website space to advertisers or sponsors above the competitive level, those entities would be able quickly to turn to digital media alternatives and thereby avoid paying supracompetitive fees.

---

[10] See, for example, Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.), Boston, Addison-Wesley, 2005, pp. 642-643. and Franklin M. Fisher, "Detecting Market Power," op. cit. p. 2.

49.     Nor, contrary to MSG's allegation, could the NHL exercise market power
by purposely degrading the quality of its website offering.  Setting aside
the obvious but important observation that the League has no economic
*incentive* to take actions that would degrade the value of NHL Intellectual
Property (because doing so would only serve to reduce the revenues that
could be generated on behalf of member teams and would also degrade the
value of the League's core product, namely NHL Hockey), the League
also lacks any *ability* to exercise market power given consumers'
willingness to substitute to one or more of the numerous reasonably
interchangeable intellectual property providers.

50.     More generally, the NHL — like other owners of intellectual property —
has a procompetitive incentive to make NHL Intellectual Property special
(i.e., high quality) and therefore desirable to consumers, advertisers and
sponsors.  By investing in the development of a common technology
platform, with standardized, user-friendly formats, easy-to-use navigation
tools, and cross-team linkages that enhance the website visitor's
experience; by consolidating certain functions to achieve cost savings
from economies of scale; and by promoting the development and diffusion
of best practices among team webmasters, the League makes NHL
Intellectual Property even more valuable.  This allows the League to
realize efficiencies and collect additional licensing revenues or additional
revenues from the sale of advertising space and the sale of NHL team
merchandise promoted on the websites.

51.    Very importantly, these greater revenues do not indicate the exercise of
market power in any relevant market.  The exercise of market power
involves a *restriction* of output that forces buyers to move along a (fixed)
demand curve by raising the market price, thereby inducing consumers to
buy less of the good or service.  In contrast, actions taken by the League to
enhance the value of NHL Intellectual Property lead to an *outward shift* of
the demand curve for those goods and services.

52.    Economists typically examine a firm's market share in the relevant market
as a proxy for its market power in that market.  Although imprecise,
market share information gives economists a basic estimation of a firm's
relative size within the relevant market, and permits economists to assess
the level of concentration in a relevant market.  Generally speaking, the
more unconcentrated a relevant market is — that is, the more competitors
of relatively equal size that compete in that market — and the smaller the
market share of the firm or firms in question, the less likely it is that the
firm or firms in question possess any degree of market power in the
relevant market or that the conduct of the firms in question will result in a
substantial lessening of competition.

53.    The available evidence indicates that the NHL websites do not have a
large share of the relevant market.  While I have not attempted to collect
and analyze data on all likely participants in the relevant market, as a very
conservative approach I have assessed data on visitor traffic to sports-
oriented websites, which would be an unduly narrow hypothetical market.

As an economic matter, this approach is very conservative because — as earlier noted — the relevant market within which the NHL websites compete is substantially broader than only sports-oriented websites and, at a minimum, also includes many entertainment websites as well as, more generally, other media products and services through which intellectual property is distributed and exploited.

54.    According to one source that tracks website traffic in many different lines of industry, ComScore, the NHL.com network was only the twelfth ranked sports-related website in the U.S. in a recent month.  In April 2007 — presumably a month of relatively high interest in NHL Hockey as it coincided with the end of the NHL regular season and the beginning of the Stanley Cup playoffs — the NHL.com network attracted less than 3% of the combined U.S. visitor traffic of the top 20 sports websites.  Among the online sports networks that were more popular than the NHL.com network in that month were ESPN.com (more than six times the number of U.S. visitors), FOX Sports on MSN (more than five times the number of U.S. visitors), MLB.com (more than four times the number of U.S. visitors), NFL.com (nearly three times the number of U.S. visitors), CSTV.com (more than one and a half times as many U.S. visitors) and CBS Sportsline (also more than one and a half times as many U.S. visitors).[11]  For reasons noted in the preceding paragraph, even this very small share — which is

---

[11]  Memorandum from Mark Erlichson and Eric Dwyer (National Hockey League), "NHL NETWORK and NHL.COM – April 2007 comScore Traffic Analysis."  Exhibit 4.

insufficient to confer market power — overstates the share that the NHL.com network would hold in a properly defined product market.

55.     This conclusion is further confirmed by analyzing data on television ratings for sports championship matches, which can be expected to correlate highly with the overall popularity of the entertainment products supplied by various sports leagues.  According to Nielsen ratings data for the most recent League championship events, the NHL Stanley Cup Finals attracted a far smaller U.S. television audience than the championship games or series of the other major professional sports.  Games 1 and 2 of the 2007 Stanley Cup finals, carried on the cable television channel Versus, attained ratings of less than a single Nielsen point, while games 3 through 5, broadcast over NBC, averaged a 1.6 rating.[12]  By contrast, games of the 2007 NBA Finals averaged a 6.2 rating on ABC, the 2006 Major League Baseball World Series averaged a 10.1 rating on FOX, and the 2007 NFL Super Bowl produced a 42.6 rating on CBS.[13]

56.     Even though market share is an imprecise measure of market power, and even though not all sports and entertainment websites compete with and constrain NHL team websites to an identical degree, the very small share

---

[12] "Hockey Overnight Ratings Rebound in Game 4," (http://sports.espn.go.com/espn/wire?section=nhl&id=2893943) and "Ratings for 2007 Finals Down 27 Percent from Last Year" (http://sports.espn.go.com/nba/playoffs2007/news/story?id=2905923), accessed on October 8, 2006.  Nielsen ratings are an estimate the fraction of all U.S. households viewing an event or program.

[13] "Ratings for 2007 Finals Down 27 Percent from Last Year" (http://sports.espn.go.com/nba/playoffs2007/news/story?id=2905923); "World Series TV Ratings" (http://www.baseball-almanac.com/ws/wstv.shtml); "CBS Scores with Super Bowl Ratings (http://money.cnn.com/2007/02/05/news/companies/superbowl_ratings/index.htm); all accessed on October 8, 2006.

of sports and entertainment website traffic that the NHL attracts compels

the conclusion that the NHL has not exercised and cannot exercise any

significant market power even in a hypothetical narrow market.

57.    MSG alleges that the League's control over NHL Intellectual Property will

lead consumers to be "harmed by the reduction of the website competition

that existed between and among the NHL member teams and the NHL

prior to the NHL's recent exercise of control over individual team

websites." As an economic matter, a reduction in competition could take

the form of one or more of the following outcomes: a reduction in market-

wide output; an increase in the market price; or a reduction in product

quality.

58.    Economic analysis indicates that none of these effects has occurred for the

simple but fundamental reason that the websites at issue, individually and

collectively, represent too small a fraction of overall website traffic in a

properly defined market and face too many reasonably interchangeable or

substitutable alternatives in the minds of buyers to be able to exercise

market power.

## IV.    ECONOMIC ANALYSIS OF THE NHL'S NEW MEDIA STRATEGY

### A.    The Economic Benefits of A Common Technology Platform

59.    From an economic perspective, the League's New Media Strategy offers

significant procompetitive efficiencies.  The creation of a common

technology platform, a central element in the NHL's New Media Strategy,

illustrates the economic value to both the League and its member teams in

collectively exploiting the intellectual property embedded in the League and Club websites.  This common platform enables the creation of new, enhanced features and functionality that neither the League nor any of its member teams would be able to provide independently.  The League's adoption of a standardized format or template, common technology platform, and single content management system ("CMS") leads to scale efficiencies and thereby contributes to greater collective profits by increasing revenues and reducing costs.  It also provides an effective enforcement mechanism to deter free-riding.  I discuss each of these economic benefits below.

60.    Achievement of economies of scale is critical to the League's success in developing and exploiting the NHL Brand and its accompanying intellectual property.  The NHL has explicitly recognized the importance of "Building League Scale" as a means to develop fans' interest and enthusiasm in ways that help "drive advertising and marketing dollars to the sport" and enable the NHL to exploit other valuable sources of revenue, including television rights.[14]

61.    Survey data indicate that ice hockey fans are more "tribal" than fans of other major sports.  They tend to be fans of their local or favorite team more so than fans of the sport.[15]  This tendency has an adverse impact on team and League revenues and costs by undermining efforts to achieve

---

[14] "Building League Scale To Drive Incremental Revenue," September 18, 2007, pp. 4 and 6.  Exhibit 5. See also Daly Decl. ¶25 and Leonsis Decl. ¶5.

[15] "Building League Scale To Drive Incremental Revenue," September 18, 2007, p. 15.

national economies of scale.[16]  Because hockey fans' viewership of nationally televised games depends heavily on whether their favorite team is playing, the value of national television contracts is diminished.  For example, among the four major sports, the NHL has the smallest increase in TV ratings from the regular season to the playoffs, and the likelihood of even avid hockey fans watching Stanley Cup games falls by almost 50% if their favorite team is not involved.[17]  The NHL is concerned that U.S. fans, in particular, are not being provided with "a league-wide experience" that would take them "inside and around the league."[18]

62.    The NHL believes that new media revenues of individual NHL Clubs are below their potential level that would be achieved if new media rights were aggregated across the League, thereby enabling the NHL to exploit more fully and effectively national economies of scale.[19]  As an economic matter, achieving these scale economies would allow the League to respond to consumer demand more efficiently and effectively.  To attain this potential, the NHL seeks to "[d]evelop a unified media strategy to achieve national scale" that will help the League "[d]efine and articulate a single NHL brand persona and voice across markets, properties and media

---

[16] As the NHL has noted in one recent business review, "This tribal, purely team-centric passion is not translating into national scale." See "Building League Scale To Drive Incremental Revenue," September 18, 2007, p. 15.

[17] "Building League Scale To Drive Incremental Revenue," September 18, 2007, pp. 15-20.

[18] "Building League Scale To Drive Incremental Revenue," September 18, 2007, p. 20.

[19] "Memorandum on Media Strategy & Recommendations", June 8, 2006, pp. 6-7.  The NHL recently surveyed its member Clubs and found that only 13 of 29 reporting Clubs had profitable website operations. "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 6.

channels".[20]  The League regards the NHL.com network as "a central platform for scale" as part of an overall strategy that will "build national scale and drive incremental revenue at League and Club levels".[21]

63.    The NHL's New Media Strategy provides a common technology platform and an infrastructure for content creation and management.[22]  The NHL regards this initiative as central to the League's efforts to compete more effectively for the goodwill of fans and a larger share of the dollars spent on internet advertising and sponsorships.[23]  The NHL also regards its New Media Strategy as central to promoting its core mission of producing entertainment in the form of on-ice professional hockey games by enabling the NHL to compete more effectively with other sports and entertainment websites and products.[24]

64.    The new NHL.com network platform will be more economically attractive to large national advertisers and sponsorships for two principal reasons. First, by aggregating the number of fans over what are now some 31 uncoordinated League and Club sites, the NHL.com network platform will significantly increase the exposure that advertisers and sponsors can realize.  Second, advertisers and sponsors will lower their transaction costs

---

[20] "Building League Scale To Drive Incremental Revenue," September 18, 2007, p. 21.

[21] "Building League Scale To Drive Incremental Revenue," September 18, 2007, pp. 21 and 30.

[22] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 14.  The NHL projects that adoption of its New Media Strategy could increase NHL Interactive CyberEnterprises' annual revenues from $10 million to $40 million in three years.  "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 19.

[23] Leonsis Decl., ¶5.

[24] Leonsis Decl., ¶¶10-11 and Declaration of Keith Ritter ("Ritter Decl."), ¶5.

by negotiating with a single entity and being able to deliver text or video ad copy to a centralized technology platform using a single CMS that is easily accessible at multiple sites in a common format to which users are accustomed.[25]

65.    None of the 30 Clubs alone is able to attain these economies of scale or attract large internet advertisers and sponsors seeking a national audience. As an economic matter, it is more efficient for the NHL on behalf of its member teams to bear the cost of the new technology and infrastructure than it is for each of the 30 Clubs as well as the League to do it on their own.  As a result, all team websites may benefit from "best-of–the-breed" tools, which will enhance both the technical functionality of the websites and the quantity and quality of their content.[26]

66.    An additional significant efficiency made possible by having all the Club websites use the same CMS is that this will facilitate the exchange of content and advertising among Club websites.  The NHL has cited its intention to "share highlights, news, pictures, and other content" among member websites in order to translate local enthusiasm by team fans into broader interest in the NHL itself.[27]  My understanding is that the NHL's early experience with having member teams host websites on different technology platforms caused communication problems and discouraged content-sharing because it was both technologically cumbersome and

---

[25] Leonsis Decl., ¶7.

[26] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 14.

[27] Daly Decl. ¶26.

costly.[28]  The adoption of a common CMS seeks to avoid these economic inefficiencies.

67.    There also are strong economic reasons why a common platform and CMS can be an efficient distribution mechanism to build enthusiasm for NHL Hockey, as distinct from local fan support for particular teams.  While the latter is, of course, an important input to creating economic value for the League, it is insufficient by itself for the reasons that I noted earlier — namely, no member team acting alone (or any subset of the League) can produce NHL Hockey and, therefore, no team or subset of teams acting alone can create national interest in NHL Hockey.

68.    In economic terms, a common platform and CMS enable the NHL to exploit positive externalities among its member teams and thereby build League-wide enthusiasm and support.[29]  As one example cited by the NHL, promoting star players on a visiting team can help build interest in upcoming games for the home team.[30]  The benefits from this increased fan interest redound not only to the particular teams engaged in the hockey match, but they also help build fan enthusiasm for NHL Hockey generally.  Adoption of a common distribution mechanism, such as the centralized NHL.com network platform, enables the League to capture these League-wide benefits or positive externalities.

---

[28] Ritter Decl. ¶4.

[29] As I explained earlier in the context of *negative* externalities, an externality is an effect of one economic agent's actions on another's well-being or profitability.

[30] Daly Decl. ¶24.

69.     Besides promoting the diffusion of website management best practices and
        enhancing content quality and technical functionality, the common
        platform is flexible enough to accommodate the heterogeneous
        preferences of league teams with regards website content and style.  It is
        my understanding that while the NHL seeks to have all of its teams adopt
        the common platform, Member Clubs themselves will continue to control
        local content and advertising.[31]

70.     Thus, the NHL's common platform policy for team websites does not
        appear to preclude member teams from exploiting their individual
        intellectual property in ways that are also consistent with broader League
        interests.  Member teams still have the ultimate say on team content,
        allowing teams (and the League) to take advantage of their insights about
        the types of content that might particularly appeal to their fans.  In this
        respect, the NHL's common platform policy takes full economic
        advantage of the general advantages inherent in organizing the League as
        a joint venture.

71.     The League, through the common platform design, assures that, consistent
        with League interests, all of its Member Clubs maintain websites that
        feature a high level of technical functionality capable of supporting a high
        level of content quality and that advance the League's efforts to promote
        NHL Hockey as an entertainment product.  Within this framework,
        individual teams can then customize website content to the needs of their

---

[31] Daly Decl. ¶74 and Ritter Decl. ¶¶25 and 29-32.

own fans, taking advantage of their presumably superior knowledge of local conditions and tastes. As an economic matter, it follows that nothing in the NHL's decision to adopt a common website platform constricts output, degrades quality, or increases prices.

72.     Other sports leagues that have adopted centralized new media strategies apparently have achieved considerable success. In the course of developing its New Media Strategy, the NHL studied the approach taken by and experience of other sports leagues, including Major League Baseball (MLB) and the National Basketball Association (NBA). The study found that "MLB and the NBA each program the content of their individual member club websites on a common technology program with a single CMS, and that each has a common navigation bar running on the league and individual club websites."[32] In addition, the NHL concluded that MLB's centralized approach "has generated significant revenue, asset value and publicity with its new media initiatives. It has also established an infrastructure which has resulted in 30 high quality team sites and the ability to produce and deliver content in multiple formats through numerous media outlets."[33]

**B.    Centralization Addresses Free-riding**

73.     The NHL's objective in adopting a common platform strategy for team websites is to align the format and capabilities of these websites in ways

---

[32] Ritter Decl. ¶9. In fact, the website of the New York Knicks, the NBA team owned by MSG, participates on the NBA.com common platform and uses the NBA's CMS with other NBA clubs. Ritter Decl., ¶10.

[33] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 4.

that serve to promote NHL Hockey as an entertainment product in competition with other sports and entertainment products. As a matter of economic organization, this objective cannot be achieved unless all NHL members pledge to adopt the common strategy. Otherwise, the strategy is likely to be undone by free-riding because each member may have powerful economic incentives to deviate from the common good.

74.    If every NHL Club but one were to adopt the common platform strategy, it is entirely conceivable that the thirtieth Club might find its interests best served by adopting a different strategy more narrowly tailored to its own, rather than League, interests. In so doing, it would free-ride on the willingness of the other members to promote NHL Hockey (and NHL Intellectual Property) at the expense of surrendering some individual autonomy over website design while bearing none of the (small) costs of surrendering such autonomy itself. The problem with allowing such defections from the common strategy is that every Club would want to be the sole defector and free-ride on the efforts of the other Member Clubs. Allowing each Club to decide on its own whether or not to adopt the common platform is therefore not a viable means of achieving the strategy's goals. A collectivized strategy, and a common commitment to the strategy by all 30 NHL Member Clubs, is required.

**C.    Necessity of an Enforcement Mechanism**

75.    Parties coming together for a common purpose have interests that are largely common but not identical. Indeed, there may be conflicts among

the parties with respects to some of their interests.  For a joint venture of numerous parties to be effective in achieving the goals of the enterprise, the partners must enter into an agreement that specifies these goals and sets forth rules and procedures for achieving them.  However, because the interests of the joint venture partners are not perfectly aligned, the agreement must also provide a mechanism for enforcing its terms.  This is to prevent some parties shirking their obligations and free-riding on the efforts of others, as discussed above.  In addition, there must be an enforcement mechanism, such as fines or sanctions, to deter individual parties from pursuing particular interests of theirs that conflict with the collective interests of the group and undermine the attainment of these common interests.

76.     A joint venture such as the NHL cannot be viable if any individual member team acting alone can "blow up" the procompetitive objectives of the joint venture by its shirking obligations to other joint venture partners or otherwise effectively exercising unilateral veto power because the Club disagrees with a collective decision regarding how best to exploit NHL Intellectual Property.  Moreover, lack of unanimity among the members about a collective decision does not transform the joint venture into a cartel or render behavior implementing or enforcing a joint decision an anticompetitive act.

V.      **PRELIMINARY INJUNCTION ISSUES**

A.      **MSG Will Not Suffer Irreparable Harm**

77.     MSG asserts that it will suffer irreparable harm if it is prevented from continuing to operate its website NewYorkRangers.com on the MSG platform.  MSG asserts that the NHL's New Media Strategy denies it the right to compete freely in the exploitation of New York Rangers marks.

78.     The League is implementing its New Media Strategy in ways that will help it reap the economic benefits from the specific knowledge of local conditions that locally-based teams possess.  In particular, my understanding, based on a review of NHL documents and declarations and my interview with senior League executives, is that individual member teams (including the New York Rangers) will continue to enjoy significant rights to determine website content and that all or virtually all such content currently offered on member sites will continue to appear on the Leagues' new websites.  Further, individual Clubs will retain responsibility to supply local content and continue to have opportunities for local sponsorships and advertising.[34]  A central element of the NHL's new technology platform is that its CMS will allow Clubs to post local content created by their own personnel (or local third-parties).

79.     This interpretation is supported by various NHL New Media Strategy documents that I have reviewed.  For example, according to internet media strategy recommendations presented to the NHL's Board of Governors,

---

[34] Ritter Decl., ¶12.

"[e]ach Club, in its discretion, could offer content intended to drive local branding, marketing, and public relations initiatives."[35]  This understanding was further supported in the interview that I conducted with NHL officials in preparation of my report.  Based on my review of the available information, the harms that MSG alleges would appear to be speculative.

**B.    The Balance of Hardships Weighs Against the Preliminary Injunction**

80.    Plaintiff asserts that granting "[a]n injunction would merely maintain the *status quo*" because MSG would continue to operate the NewYorkRangers.com website on the MSG platform and the other member teams would continue to operate their websites on the NHL.com platform.[36]  As an economic matter, MSG is applying an inappropriately static view of competition.  MSG's static view of how firms compete leads it to substantially under-appreciate the hardships that would be borne by the NHL and its 29 other teams in the event that MSG, in effect, could ignore policies and actions agreed upon by a majority of League teams.  Such free-riding would directly impair the joint venture's ability to respond effectively to consumer demand for NHL Intellectual Property as well as hindering its ability to promote the NHL's core product, on-ice professional hockey entertainment.

---

[35] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 14.

[36] Plaintiff's Memorandum of Law in Support of Its Motion for Preliminary Injunction, Sec. III.

81.    As I have explained in many of my writings, competition is an inherently *dynamic* process.[37]  This is no less true for the situation presented in this case.  The NHL studied trends in the online media industry and researched evolving opportunities for the League to capitalize on them by exploiting more fully NHL Intellectual property on behalf of Member Clubs.  The League's research found that "[c]onsumers of sports and entertainment content are coming to expect '*what* they want, *when* they want it, *where* they want it.'"[38]  However, under its present internet infrastructure, the NHL has concluded that it is "increasingly unable to meet the market demand for its content."[39]

82.    The NHL perceives that failure to respond in a timely manner to consumers' changing expectations and growing demands for enhanced online products and services will lead the NHL to fall still further behind other professional sports leagues in its efforts to build fan interest and loyalty.  Concomitantly, such delays will cause member teams to suffer the opportunity cost of foregoing significant economic value from exploiting the NHL Brand.

83.    An additional important consideration that must be weighed in the balance of hardships is that if MSG is granted an injunction, it will effectively stop *all 29 other member teams* from fully enjoying the fruits of their collective

---

[37] See, for example, *Folded, Spindled, and Mutilated: Economic Analysis and U.S. v. IBM*. With J. McGowan and J. Greenwood. Cambridge, MA: MIT Press, 1983, pp. 9 and 33-39;and "Diagnosing Monopoly," *Quarterly Review of Economics and Business*, Vol. 19, No. 2, summer 1979, pp. 10-12.

[38] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 2 (emphasis added).

[39] "Memorandum on Media Strategy & Recommendations", June 8, 2006, p. 8.

efforts to exploit NHL Intellectual Property by developing an enhanced website platform for the NHL Brand. The highly integrated and interdependent nature of teams' contributions to creating NHL intellectual property means that free-riding on those contributions by *any one* member would lead to *every other* member being injured. The result would be an extreme manifestation of what economists refer to as the "Tragedy of the Commons" — economic value is destroyed by the unchecked independent incentive of every member to free-ride on the efforts of other members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


*Franklin M. Fisher*
Franklin M. Fisher
October 11, 2007

39