# Exhibit A

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   NON-COMMERCIAL PARTNERSHIP
     HOCKEY CLUB LOKOMOTIV
 4   YAROSLAVL,

 5                  Plaintiff,

 6         v.                              06 CV 9421 (LAP)

 7   NATIONAL HOCKEY LEAGUE,
     CALGARY FLAMES LIMITED
 8   PARTNERSHIP D/B/A CALGARY
     FLAMES, AND EDMONTON INVESTORS
 9   GROUP LTD. D/B/A/ EDMONTON
     OILERS,
10
                Defendants.
11
     ------------------------------x
12        and
     ------------------------------x
13
     ANO HOCKEY CLUB METALLURG
14   MAGNITOGORSK,

15                  Plaintiff,

16         v.                              06 CV 9936 (LAP)

17   NATIONAL HOCKEY LEAGUE AND
     LEMIEUX GROUP L.P. D/B/A
18   PITTSBURGH PENGUINS,

19              Defendants.

20   ------------------------------x
                                           New York, N.Y.
21                                         November 15, 2006
                                           2:30 p.m.
22
     Before:
23
                    HON. LORETTA A. PRESKA,
24
                                           District Judge
25
```

6BF3YARH                    Hearing

1   APPEARANCES

2

    ALEXANDER BERKOVICH
3        Attorney for Plaintiffs

4   PROSKAUER ROSE
         Attorneys for Defendants
5   BY:  BRADLEY I. RUSKIN
         SCOTT A. EGGERS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  Counsel, thank you for your
2    arguments and papers.  This has been nothing other than a
3    complete treat to have you here.
4          We all at least agree that on a motion for a
5    preliminary injunction, the movant must establish that one,
6    absent such relief it will suffer irreparable injury; and two,
7    either, A, a likelihood of success on the merits, or B,
8    sufficiently serious questions going to the merits and a
9    balance of hardships tipping decidedly toward the moving party.
10         For the moment, I do not address the enhanced standard
11   required when one is interfering with the status quo.
12         With respect to irreparable injury, if an injury can
13   be appropriately compensated by an award of monetary damages,
14   then an adequate remedy at law exists and no irreparable
15   injury may be found to justify the specific relief.
16   <u>Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir.
17   2004).</u>
18         "A showing that the movant will suffer irreparable
19   harm if the preliminary injunction is not granted is the most
20   important prerequisite for the issuance of a preliminary
21   injunction."  <u>Transperfect Translations International, Inc., v.
22   Merill Corp, Number 2004 WL 2725032 at *4 (S.D.N.Y.,
23   November 30, 2004)</u> (Quoting Bell & Howell: <u>Mamiya, Co. v. Masel
24   Supply, Co., 719 F.2d 42, 45 (2d Cir. 1983)</u>) "A party's delay
25   in moving for preliminary injunctive relief undercuts the sense

1  of urgency that typically accompanies such a motion."

2  <u>Transperfect 2004 WL 2725032 at *4</u>   (Citing <u>Tough Traveler Ltd.</u>

3  <u>v. Outbound Products, 660 F.3d 964, 968 (2d Cir. 1995)</u>

4         As the plaintiffs point out here, the contracts

5  between the plaintiffs and the players acknowledge that the

6  players' services are unique, and a loss of those services

7  cannot be compensated by money damages.  Indeed, that is the

8  general rule in personal services contracts, including those

9  involving professional athletes.

10        The unique facts of these cases, however, persuade me

11 that plaintiffs are unlikely to be able to prove that they

12 cannot be compensated by money damages.  Put more plainly,

13 these cases were always about money, the only issue is how

14 much.

15        As the parties have laid out in detail in their

16 papers, particularly in the declaration of William L. Daly,

17 deputy commissioner of the NHL, for many years the NHL and the

18 IIHF had been parties to comprehensive agreements that

19 governed, among other things, the transfer of players to the

20 NHL from the IIHF sanctioned hockey leagues in their home

21 countries, and the member federations of the IIHF.

22        Broadly speaking, the purpose of this NHL IIHF

23 agreement was to create an orderly and efficient time framework

24 to facilitate the transfer of players from the IIHF member

25 federations to the NHL, and to provide monetary assistance to

1  those federations to help support the growth and development of
2  ice hockey in IIHF member countries.
3        For example, the current version of the NHL IIHF
4  agreement provides that the NHL pay a "development fee" of
5  $200,000 for each player from a IIHF league who transferred to
6  an NHL club, requesting "in exchange the NHL receives right to
7  sign the players to play in the NHL, despite their having
8  effective contracts in their home countries."
9        The IIHF and its members determine distribution of the
10  amounts paid by the NHL, but Mr. Daly opines that those funds
11  go primarily to the home teams of the transferred players.
12        As also set out in Daly declaration, the RIHF, a
13  member of the IIHF, declined to join the current NHL IIHF
14  agreement.  In negotiations leading up to the RIHF's decision
15  to opt out of the current agreement, the primary question from
16  the RIHF was how much money it would receive in compensation
17  for each player.  This is of course according to Mr. Daly.
18        Although the NHL indicated that more compensation
19  might be available, the parties were unable to reach an
20  agreement that satisfied the RIHF's monetary demands.
21        As Mr. Daly recounts in his declaration, during the
22  course of these negotiations, including a May 2006 meeting in
23  Riga, Latvia, and a June 2006 meeting in New York, the
24  principal issue was money, and at the June meeting, the issue
25  was specifically the amount of compensation that plaintiff

1   Metallurg would receive for the transfer of Mr. Malkin.
2          Mr. Daly details that on June 29, 2006, he received an
3   e-mail from Sergey Arutyunyan, general director of the RIHF,
4   demanding the payment of one million dollars as compensation
5   for the transfer of Mr. Malkin to the Pittsburgh Penguins.  In
6   response, Mr. Daly e-mailed Mr. Arutyunyan, noting that under
7   the NHL IIHF agreement, if the transferred player signs an NHL
8   contract, but instead of playing for the NHL, he plays
9   primarily for a minor league team, the NHL pays additional fees
10  referred to as minor league assignment fees to the IIHF.
11         It was Mr. Daly's contention that the pooling of such
12  minor league assignment fees together with the $200,000
13  transfer fee would amount to approximately a million dollars
14  being paid by the NHL for the transfer of Mr. Malkin.
15         In a July 2006 meeting in Chicago, Mr. Tretiak,
16  president of the RIHF, is said by Mr. Daly to have told him
17  that if Mr. Tretiak could secure a million dollars for transfer
18  of Mr. Malkin, Mr. Tretiak was confident that he would receive
19  the approval of the plaintiffs for the transfer.
20         In response, in July, and again in August of 2006,
21  Mr. Daly agreed to structure the transfer fee and the minor
22  league assignment fees so as to total one million dollars for
23  the transfer of Mr. Malkin.
24         During the latter part of July, however, Mr. Daly
25  learned that the RIHF was then demanding a million dollars in

addition to the $800,000 in minor league assignment fees for the transfer of Mr. Malkin. Mr. Daly refused.

Indeed, the plaintiffs' true intent was confirmed as late as October 4, 2006, in Mr. Berkovich's letter to Messrs Ruskin, Daly and Shero, the last the general manager of the Pittsburgh Penguins. In that letter, Mr. Berkovich concluded by demanding that the NHL and the Pittsburgh Penguins not use Mr. Malkin in the 2006/2007 season, but "to the extent that the Pittsburgh Penguins nevertheless is interested in obtaining the services of Mr. Malkin for the 2006/2007 hockey season, you should contact me with your proposal."

At oral argument, as we've heard, I did ask counsel what the latter part of that sentence could possibly mean if it was not money, and did not get a satisfactory response.

I also note that plaintiffs have themselves characterized themselves as "sellers" of the services of hockey players.

I also note that Ted Saskin, executive director and general counsel of the NHLPA, confirms Mr. Daly's conclusion that the negotiations to persuade the RIHF to sign the current NHL IIHF agreement were unsuccessful "primarily because of the monetary demands that the RIHF made regarding Malkin and his imminent transfer to the Pittsburgh Penguins." He also confirms Mr. Daly's summary that the principal discussion at the June 2006 New York meeting was the amount of money

1    Mr. Malkin's Russian club would receive for his transfer.
2               I note that there are no affidavits in the record
3    specifically refuting or contradicting the focus on money that
4    has been detailed at length by Mr. Daly, Mr. Saskin and others.
5               Thus, despite the general case law, and despite the
6    acknowledgment in the players' contracts, the evidence in the
7    record persuades me that plaintiffs can be adequately
8    compensated by money damages.  The only question is, and always
9    has been, how much.
10              Continuing on the irreparable injury issue, I look to
11   the delay that is evident in plaintiffs proceeding here.  And I
12   find that plaintiffs' delay severely undercuts that sense of
13   urgency that typically accompanies a motion for preliminary
14   injunction.
15              I note in passing that in the year 2000, Mr. Mikhnov
16   participated in and was chosen in that year's NHL draft.
17   Mr. Taratukhin was also selected in the 2001 NHL draft.  And as
18   we know, in 2004, Mr. Malkin came to the United States to
19   participate in the NHL draft and was drafted in the first
20   round, second overall, by the Pittsburgh Penguins.
21              On June 30 of 2006, two of the three players submitted
22   their two week termination notices to their respective teams,
23   Messrs Mikhnov and Taratukhin.  On August -- actually, I think
24   all three did on August 30.  Am I right on that, counsel?
25              MR. RUSKIN:  Yes, your Honor.

1            THE COURT:  Thank you, counsel.  On August 7
2   Mr. Malkin signed the new one year contract with plaintiff
3   Metallurg.  On August 13 of this year, Mr. Malkin submitted his
4   two week termination notice as to the August 7 contract.  On
5   September 1, Mr. Taratukhin signed his contract with the
6   Flames.  On September 5, Mr. Malkin signed his contract with
7   the Penguins.  In mid-September the players all reported to
8   their respective team training camps.  On October 3 of this
9   year, Mr. Mikhnov signed his contract with the Oilers.  On
10  October 4, the NHL 2006/2007 season began.  And these actions
11  were commenced on October 18 and 19.
12           Based on these facts, it appears that plaintiffs will
13  be unable to show irreparable injury required to justify the
14  issuing of a preliminary injunction because of their delay in
15  seeking such relief.
16           First, putting aside for a moment the players' earlier
17  expresses of interest in playing in the NHL, and their
18  participation in the NHL draft, plaintiffs slept on their
19  rights for months following the players June 2006 giving of
20  their two week termination notices.
21           At the risk of mixing metaphors, plaintiffs hid in the
22  tall grass while the players terminated their Russian
23  contracts, signed the NHL contracts, joined their NHL teams,
24  began practicing with the teams, and the NHL season began.
25           It was only after the players were engaged in the NHL

season playing with their respective teams that plaintiffs came forward to seek relief at the time of maximum inconvenience to the defendants.

While in some circumstances the delay from the June giving of the notices of termination to the mid-October request for relief might not necessarily constitute fatal delay, here the fact that the players trained with their new teams and actually commenced playing with them during the regular NHL season makes the delay unconscionable.

Second, when the facts of the delay are read together with the facts concerning plaintiffs' constant demands for more money for the transfer of players to the NHL, it becomes clear that the delay was in an effort to obtain more money. Thus, further undercutting any claim of irreparable injury.

Accordingly, I find that plaintiffs are unlikely to be able to demonstrate irreparable injury.

I also note in passing plaintiffs' apparent concession, at least with respect to the antitrust claim, that the alleged harm is monetary. Plaintiffs' reply brief at 10, they say "There is a direct causal connection between an antitrust violation here and the alleged harm suffered by plaintiffs.... Indeed, the scheme prohibiting NHL clubs from negotiating with and <u>compensating</u> Russian hockey clubs for the services of Russian hockey players has no legitimate procompetitive justification (and defendants provided none)."

1  Emphasis added.
2           Moving briefly to the likelihood of success on the
3  merits.  I will not deal with misappropriation.  Plaintiffs
4  have cited no case law in support of this cause of action.
5  Defendants point out that it is a common law doctrine
6  concerning improper taking of property rights or other
7  intellectual property rights.  It does not appear to apply
8  here.  And there doesn't seem to be much argument in the briefs
9  to the contrary.
10          Also, with respect to unjust enrichment, it doesn't
11 seem anybody talks about this claim much, so I won't either.
12          With respect to tortious interference, I note
13 preliminarily at this stage, without making a final finding,
14 that it does not appear likely that plaintiffs will be able to
15 prove that there were contracts in existence.  This is based
16 first on the Russian law experts.  And again, without making a
17 final finding on this, under Rule 44.1, at this point in time,
18 it appears that Ms. Beliakova's declaration is more persuasive.
19 This is particularly because of not only her explanation, but
20 her attachment of the actual statutes that she relies on.
21          It also appears that the labor law, including the
22 provision for the Article 80 notice prevails over other
23 inconsistent statutes.
24          So preliminarily on the law as stated by the experts,
25 it does not appear plaintiffs will be able to show the

1    existence of contracts at the time.
2             In addition, however, we have the admissions made by
3    the various individuals negotiating on behalf of plaintiffs,
4    with respect to the IIHF NHL agreement.  All of those
5    statements, which I will not reiterate here, are to the effect
6    that the two week termination provision of Article 80 remains
7    in effect, particularly Mr. Tretiak, the proposer of the
8    legislation to close this supposed loop hole, urged others to
9    work to move now because the loop hole was going to change, and
10   the like.
11            The statements and conduct of those negotiating these
12   agreements, together with the conduct of Metallurg in inducing
13   Mr. Malkin to sign a new contract after he had exercised his
14   termination rights under the prior contract, also appeared to
15   concede the point.
16            Thus, it appears unlikely that plaintiffs will be able
17   to demonstrate the existence of a contract at the relevant
18   time.
19            In addition, on the facts in the record at this time,
20   it does not appear that plaintiffs will be able to satisfy the
21   but for requirement in showing that but for defendants'
22   actions, the players would not have defected.  The players'
23   affidavits make clear that they always wanted to play in the
24   NHL, everyone agrees here that the NHL is the premiere hockey
25   league in the world.  The players had participated in the NHL

1   draft, as I mentioned, some years ago.
2           And thus, it seems unlikely that plaintiffs will be
3   able to show that but for defendants' conduct, the players
4   would still be playing for the plaintiffs.
5           With respect to aiding and abetting a breach of
6   fiduciary duty, the parties dispute the governing law.
7   Plaintiffs cite Maryland state law for the proposition that
8   employment contracts contain an implied duty that an employee
9   must act solely for the benefit of his or her employer with
10  respect to all matters falling within the scope of his
11  employment.  I am not entirely sure why we would be looking at
12  Delaware law.
13          Defendants contend that there was no aiding and
14  abetting a breach of fiduciary duty because the Russian players
15  did not owe their teams any duty under Russian law.  Plaintiff
16  does not respond to this in the reply papers that I can recall.
17          Aside from why we would rely on Maryland law,
18  defendants' expert persuades me that it is unlikely that
19  plaintiffs will be able to show that the players had any
20  fiduciary duty to the plaintiffs at all.
21          With respect to tortious interference with business
22  relations, of course everyone seems to agree that unlawful or
23  wrongful means are required here.  Defendants contend that
24  there was no tortious interference with business relationships
25  because there are no allegation of any wrongful means to

1  achieve the alleged interference.  Rather, the defendants
2  contend that they were pursuing their legitimate business
3  objectives of securing assets for their respective teams.
4           Plaintiffs respond that signing the Russian players
5  "with full knowledge of plaintiffs' contracts" constitutes
6  theft and was authorized by the NHL's August 2, 2006, memo, as
7  a result of its desire to punish the players for the RIHF's
8  refusal to join the latest NHL IIHF agreement.
9           Again, as I've noted, it does not seem that there was
10 any wrongful means employed by the defendants on this record.
11 On this record, it's clear that the players wanted desperately
12 to play for the NHL, and took all steps to do so.  That
13 defendants had knowledge of the plaintiffs' contracts does not
14 seem to be relevant here.
15          And as was noted during oral argument, the NHL's
16 August 2, 2006, memorandum is virtually the same memorandum,
17 although as counsel points out without the bold typing, but is
18 virtually the same memorandum that had been in effect for some
19 years.
20          Accordingly, it seems that plaintiffs will be unlikely
21 to prevail on the merits of this claim.
22          Plaintiffs also assert a claim for conversion and do
23 not seem to dispute that New York law governs the standard
24 here.  Under New York law, a conversion claim requires "one who
25 owns and has a right to possession of personal property to

prove that the property is in the unauthorized possession of another, who has acted to exclude the rights of the owner." Key Bank v. Grossi, 227 A.D.2d 841, 843 (3d Dep't 1996).

Defendants of course assert that the services of these players are not personal property and thus that plaintiffs cannot prove up a claim for conversion.  Plaintiffs do not respond that I recall in their papers, and accordingly it seems unlikely that they will prevail on this point.

Finally, with respect to the alleged Section 1 claim, Section 1 of the Sherman Act prohibits "every contract, combination... or conspiracy in restraint of trade."  Although the plain language of the act would suggest that every contract in restraint of trade violates the antitrust laws, the Supreme Court has long held that the Sherman Act prohibits only unreasonable restraints of trade.

Thus, in order to prevail, "a plaintiff claiming a Section 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities unilateral conduct on the part of a single person or enterprise falls outside the purview of this provision in the antitrust law." Capital Imaging Associates v. Mohawk Valley Medical Associates, 996 F.2d 537, 542, (2d Cir. 1993).

The Court also recognized that certain conduct is immune from the scrutiny of the antitrust laws.  "It has long

1  been recognized that in order to accommodate the collective

2  bargaining process, certain concerted activity must be held to

3  be beyond the reach of the antitrust laws." Clarett v. NFL,

4  369 F.3d 124, 142 (2d Cir. 2005).

5           Here defendants contend that there is no cognizable

6  claim under Section 1 of the Sherman Act because the NHL policy

7  on transfer fees and restraint of trade falls within the

8  purview of the collective bargaining agreement, and is thus

9  immune from antitrust scrutiny under the non-statutory labor

10 exception. Clarett 369 F.3d, 140.

11          As counsels pointed out in the papers, it seems likely

12 that defendants will be able to demonstrate that in fact this

13 policy on transfer fees has been a mandatory subject of the

14 collective bargaining agreements.

15          In addition, there seem to be various other problems

16 with the antitrust claim. First, there does not seem to be any

17 antitrust injury here, thus no injury to competition. Also it

18 appears, as we noted during oral argument, that plaintiff does

19 not appear to be market participants in the market which they

20 defined. And finally, the activities here at issue seem to be

21 included within the meaning of the Supreme Court's recent

22 Texaco case as the core activities of a joint venture. And

23 thus, would not constitute a combination in restraint of trade.

24          For all of these reasons, it appears that plaintiffs

25 are unlikely to prevail on the merits of the claim. And for

1   all of the reasons stated above, the requests for the
2   preliminary injunctions are denied.
3           Counsel, have I forgotten anything first of all at
4   this moment?  Counsel?  Anybody?
5           MR. RUSKIN:  No, your Honor.
6           THE COURT:  Hearing nothing, would you folks confer,
7   and after you've had a chance to talk with your clients, let me
8   know in the next day or two how you would like to proceed
9   please.
10          MR. RUSKIN:  Yes, your Honor.
11          THE COURT:  Anything else?
12          MR. BERKOVICH:  No, your Honor.
13          THE COURT:  Thank you, gentlemen.  Good afternoon.  It
14  was a pleasure having you.
15          MR. RUSKIN:  Thank you, your Honor.
16                            o0o