**PUBLIC VERSION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,

                Plaintiff,

      - against -

NATIONAL HOCKEY LEAGUE, NA-
TIONAL HOCKEY LEAGUE ENTER-
PRISES, L.P., NATIONAL HOCKEY
LEAGUE INTERACTIVE CYBERENTER-
PRISES, L.L.C., NHL ENTERPRISES CAN-
ADA, L.P., and NHL ENTERPRISES, B.V.,

                Defendants.

:
:
:
:
:
:
:
:
:
:

No. 07 CIV. 8455 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF WILLIAM L. DALY

      I, WILLIAM L. DALY, declare under penalty of perjury pursuant to 28

U.S.C. § 1746 that the following is true and correct:

      1.      I am the Deputy Commissioner of the National Hockey League

("NHL"), a position I have held since 2005. I have been employed continuously by the

NHL since 1997, when I was hired as the League's senior ranking legal officer. I submit

this declaration in opposition to the motion of Madison Square Garden ("MSG") for a

preliminary injunction in the above-captioned matter. The facts stated herein are based

on my own personal knowledge.

## THE BUSINESS OF PROFESSIONAL HOCKEY

### The Organization of the National Hockey League

2.      The NHL is an unincorporated association, organized as a joint venture to operate a League consisting of thirty Member Clubs, including the New York Rangers (the "Rangers"). Each club operates a professional hockey team in North America. The NHL teams are located in a diverse group of cities throughout the United States and Canada. The NHL League Office is located in New York City, but the League also has offices in Toronto and Montreal, Canada.

3.      All the NHL Member Clubs, including the Rangers, are signatories to the Constitution of the NHL, and "have duly executed [the] Constitution, signifying their acceptance and ratification thereof." (A copy of the Constitution of the NHL is attached hereto as Exhibit A.) The NHL Constitution provides that by executing the Constitution of the NHL, each NHL Member Club "accepts and agrees to abide by the foregoing Constitution and each and every alteration, amendment and repeal thereof duly made." In addition, the NHL Constitution declares that the "Member Clubs agree to conform to and be bound by the By-Laws." Accordingly, the right of each NHL Member Club to regulate its own affairs is expressly subject to the provisions of the NHL Constitution and By-Laws. (A copy of the consent agreement MSG executed in 1995 agreeing to be bound by the NHL Constitution is attached hereto as Exhibit B.)

4.      Under the NHL Constitution, the affairs of the NHL are governed by the NHL Board of Governors, which is comprised of one representative from each of the thirty Member Clubs. The Board of Governors is charged with upholding the NHL Constitution, By-Laws and other NHL rules.

5.      Pursuant to the NHL Constitution, the Board of Governors from time to time passes resolutions addressing the business of the League, including, but not limited to, matters relating to broadcasting, promotions, marketing, and merchandising. Under the NHL Constitution, the voting percentage required for approval of any particular resolution varies depending upon the subject matter of the resolution. Some major changes, such as amendments to certain articles of the NHL Constitution, require the unanimous consent of all members of the League present and voting. Other specifically delineated official acts require either a three-fourths majority vote or a two-thirds majority vote for approval. Unless the proposed action falls within the exceptions for which a greater vote is required, only a simple majority vote of the Member Clubs present and voting is required for approval. (Exhibit A, Article 5.16(a).)

**The NHL Commissioner's Role and Responsibilities**

6.      The NHL Commissioner serves as the Chief Executive Officer of the League. (Exhibit A, Article 6.1.) He is expressly charged with protecting the integrity of the game of professional hockey and preserving public confidence in the League. He has the responsibility for the general supervision and direction of all business and affairs of the League, including the setting of agendas to be considered by the Board of Governors at League meetings. The Constitution grants the Commissioner all powers as may be necessary or appropriate to fulfill his responsibilities. (Exhibit A, Article 6.3(a).)

7.      The Commissioner's role is to maximize the collective value of the entire League, rather than to promote the interests of any individual Club. Cablevision, which is the ultimate parent company of both the Rangers and the New York Knicks of the National Basketball Association (the "NBA"), acknowledged this basic principle in its most recent Form 10-K: "The governing bodies of the NBA and the NHL have the

3

power and authority to take certain actions that they deem to be in the best interest of their respective leagues, which may not necessarily be consistent with maximizing the professional sport teams' results of operations." (Cablevision Systems Corp., Annual Report (Form 10-K), at 46 (Feb. 28, 2007).)

8.    The NHL Constitution grants the Commissioner the authority to interpret the provisions of the Constitution, By-Laws, and League rules and resolutions, and their application and enforcement. The Commissioner's determinations with respect to such matters are final and binding and not subject to review. (Exhibit A, Article 6.3(d).)

9.    The NHL Constitution also grants the Commissioner the "full and complete authority" to discipline persons connected with the League, including Member Clubs, for violations of League rules. (Exhibit A, Article 6.3(j).) The permitted forms of discipline include "expelling or suspending the person" and "imposing a fine on the person not exceeding One Million dollars ($1,000,000) or such greater amount as may be prescribed by any League rule or By-Law." (Id.)

10.    The NHL Constitution also designates the Commissioner as the arbiter of League disputes. In any dispute involving two or more Member Clubs, the Commissioner has "full and exclusive jurisdiction and authority to arbitrate and resolve" the dispute. (Exhibit A, Article 6.3(b).)

**The NHL Is a Legitimate Joint Venture**

11.    The NHL Member Clubs jointly produce a product called NHL Hockey. No single team can produce this product. The NHL seeks to promote attendance at and fan interest in professional hockey games, and to create and market professional hockey entertainment events in competition with other sports leagues and with

4

other producers and marketers of sports and entertainment products (e.g., MLB, NBA, NFL, PGA, NASCAR), including other sports and entertainment websites (e.g., MLB.com, NBA.com, NFL.com, ESPN.com, CBS.Sportsline.com, yahoo.com, you-tube.com).

12.    The breadth of the League's core mission, including the promotion of the League as a whole and the sport of hockey itself, as well as the significant role that different forms of media play in achieving those objectives, are expressly incorporated into the NHL Constitution.   Article 2.1 of the NHL Constitution lists the League's "purposes and objects," which include:

- The promotion of the common interests of the members of the League, each member being an owner of a professional hockey club located in the United States or Canada.

- The education of the public, through advertising, radio and other media, to the end that professional hockey, as played according to the standards of the League, may gain popular support and acceptance as a wholesome entertainment.

13.    MSG argues in its preliminary injunction motion that the Rangers compete against the League and the other twenty-nine NHL Member Clubs.  Of course, the Rangers do not actually compete against the League; it is a co-owner of the League, along with the other twenty-nine NHL Member Clubs, as well as a member of the NHL Board of Governors.

14.    The professional hockey season of the NHL is a structured schedule of athletic competitions in which each NHL Member Club competes on the ice to establish that it is the best team among the thirty Member Clubs in the NHL.  To increase the attractiveness of its entertainment product, the NHL's Member Clubs are divided into divisions and conferences based primarily on geography and historical rivalries.  These

divisions and conferences create additional "title" races and seek to promote and perpetu-

ate long-standing rivalries, furthering the NHL's commercial appeal.  For example, the

Rangers play in the Atlantic Division along with its local rivals, the New York Islanders

and the New Jersey Devils, as well as two other historical rivals, the Philadelphia Flyers

and the Pittsburgh Penguins.  The rivalries among these Clubs foster public interest in

professional hockey and the NHL as well as in the Clubs themselves.

   15. In its motion, MSG emphasizes the popularity of the Rangers, in-

cluding its history and tradition.  But MSG ignores the interdependent aspects of both the

games it plays on the ice, as well as the Rangers' own off-ice business.  The Rangers'

popularity is derived from being a Member Club in the NHL.  The Rangers became popu-

lar not by playing random exhibition games, but rather by playing in the NHL against

other NHL Member Clubs, developing rivalries with other NHL Member Clubs, and

competing for the Stanley Cup Championship with other NHL Member Clubs.  The

Rangers could not do any of those things without the League and the other NHL Member

Clubs.  The economic value of an individual NHL Member Club, including the Rangers,

therefore, derives from its joint participation in the league and in the production of NHL

Hockey.  If the Rangers were not a Member Club of the NHL, its team and its team-

related trademarks would be essentially worthless, and would have virtually no economic

value.

   16. The Rangers' economic value also derives from the nearly six dec-

ades of joint efforts by the various predecessor owners of the Rangers, all of whom, with

their League partners, the other Member Clubs, contributed to establishing the NHL as

one of the four major professional sports leagues in North America and establishing the Rangers as one of the NHL's most valuable franchises.

17.     MSG also emphasizes in its papers the popularity of some of its past and present players.  For example, the Rangers take pride in the fact that Wayne Gretzky finished his legendary career with the Rangers.  But Wayne Gretzky became the legendary and popular player that he was while playing for other NHL Member Clubs.  When the Rangers acquired Gretzky, it unquestionably benefited in selling tickets from the fame and popularity that Gretzky had attained while playing for other NHL Member Clubs.  MSG also discusses the excitement generated by its off-season acquisitions of Chris Drury and Scott Gomez.  Again, both Drury and Gomez became popular players while playing for other Member Clubs in the NHL.

18.     In producing and marketing their joint product, the League and the NHL Member Clubs are not business competitors, but instead are co-producers and co-sellers operating as a single integrated enterprise.  As addressed below, the NHL Member Clubs have agreed to market and sell on a joint basis many of their most valuable rights, including national broadcasting and merchandising rights.  The League's efforts to market and sell NHL Hockey in the form of tickets, broadcasting rights, sponsorships and advertising, and merchandising rights, go to the very core of the NHL business.  As described more fully below, the NHL's "New Media Strategy," which includes the creation of the NHL.com common technology platform, represents a major element of the business strategy that the League has recently developed in furtherance of its mission.

19.     No Member Club in the NHL wants to see another Member Club fail or for that matter be so weakened financially that it cannot compete on the ice.  Ac-

cordingly, to the extent the joint efforts among the NHL Member Clubs can strengthen all NHL Member Clubs and the League as a whole (e.g., through the sale of national sponsorships and advertising or cable or merchandising rights, the revenues from which are divided equally among the thirty NHL Member Clubs), those efforts are in the best interests of all the NHL Member Clubs.

20.     Over the course of its history, the Board of Governors has made the business judgment that professional hockey is best promoted and marketed by balancing the promoting and marketing of the collective interest of all NHL Member Clubs with the interest of each individual NHL Member Club in building its own fan base and selling tickets and local broadcasting, marketing, and sponsorship rights.  As set forth more fully below, the League and its Member Clubs engaged in just this sort of balancing with respect to the development and subsequent approval of its "New Media Strategy," including in their analysis and determination to require the migration of Club websites to the League's common platform and content management system ("CMS"), which is the subject of MSG's motion.

**The Success of the League Depends on Developing League-Wide Fan Interest**

21.     MSG argues in its papers that hockey fans tend to follow specific teams, rather than the NHL itself.  In a sense, that is true, and because sports fans are generally "tribal" by nature, that is the tendency in all sports leagues.  But in order to continue to grow the sport in competition with other sports and entertainment offerings, the League must continue to take steps to improve the strength of the League brand and generate more national interest in NHL games.  Indeed, that goal is at the core of the League's purposes and objectives as set forth in the NHL Constitution.

22.    The overall financial health and competitive success of a major sports league depends in large part on not only cultivating local fans for each team (something the NHL has traditionally done as well or better than most other sports leagues), but also in developing interest in NHL Hockey generally and in the League itself. The NFL, Major League Baseball, and the NBA have all realized a considerable amount of success and have generated incremental revenues by expending significant resources to develop a national "league brand." For example, Monday Night Football has been one of the highest rated programs on television for several decades. Similarly, the Super Bowl is annually the highest rated event on television. Most NFL fans watch Monday Night Football and the Super Bowl regardless of whether their local team is playing. The success those leagues have had in building league-wide fan interest has translated into lucrative national television contracts, sponsorships, advertising, and merchandise sales, all of which inure to the benefit of every team in those leagues. They have also led to higher franchise values for all teams in those leagues.

23.    In attempting to compete against other forms of entertainment, including other sports leagues, all of the Member Clubs in the NHL will necessarily benefit from enhancing the popularity of the League itself, its teams, and its players. For example, when consumers in Los Angeles decide to watch a national broadcast of a game between the New York Rangers and the Pittsburgh Penguins, the entire League benefits. When the Rangers play on the road, the opposing team has an interest in being able to market the fact that Chris Drury and Scott Gomez will be playing in its arena. Similarly, the Rangers unquestionably benefit from playing in the same division as (and, therefore, eight regular season games against) the Pittsburgh Penguins, who have one of the most

9

popular young stars in the League in Sidney Crosby, last season's NHL Most Valuable Player.

24.     Currently, the League plays an "unbalanced schedule" meaning that not every NHL Member Club will play every other NHL Member Club during the regular season. Many Clubs view more regular visits from a wider variety of teams as an indispensable tool for the marketing of their teams and for the growth of the League generally. The exposure of our younger generation of star players, such as Sidney Crosby, to more fans in more places is considered critical to our ability to grow the League's business. To that end, at the upcoming November League meeting, the Commissioner intends to further explore with the Board of Governors the adoption of a new scheduling format to help all Clubs benefit from being able to exhibit to their fans a wider variety of player talent and teams.

25.     As discussed in more detail in the Declaration of John Collins, the NHL Board of Governors has elected to endorse a strategy designed to emphasize and enhance the NHL's national brand identity, with the intention of positioning the League in such a way as to compete more effectively against other sports and entertainment properties. The more we can translate the passion of fans for their local teams into League-wide support, and the more fans we can get to follow the NHL Playoffs and the Stanley Cup Final (regardless of whether their local team is participating), the more value we can generate for the NHL's national broadcasting rights, and the larger the number of incremental revenue opportunities we can generate from sponsorships, advertising, and merchandise sales. Greater League-wide support and interest should also translate into higher franchise values for all thirty NHL Member Clubs.

26.     The NHL.com website initiative is a critical element of this national brand building strategy.  Contrary to the suggestion in MSG's papers, however, the League's focus is not on diminishing the interest of fans in their local Clubs, but rather on building upon the passion fans have for their local teams by offering them a greater and more varied League-wide experience.  One important way to enhance a fan's League-wide experience is to encourage and facilitate traffic by fans among the various NHL Member Clubs' websites.  The NHL Member Clubs' ability to share highlights, news, pictures, and other content more efficiently among the thirty-one websites will give fans greater League-wide access and, hopefully, build local passion into a broader interest in and passion for the NHL itself.

27.     This new website strategy is designed to benefit the entire League, including the Rangers.  The expectation is that the online integration of League and Club sites will attract a greater number of sponsors and advertisers looking for a "national buy," which would give them uniform exposure across the NHL and all of its local markets.

**THE MEMBER CLUBS, INCLUDING THE RANGERS, HAVE GRANTED THE LEAGUE THE RIGHT TO USE THEIR INTELLECTUAL PROPERTY RIGHTS**

28.     MSG argues in its preliminary injunction papers that by requiring the Rangers to participate in the NHL's website initiative the League has somehow "misappropriated" the Rangers' trademarks.  But the League cannot "misappropriate" what it has already been authorized to utilize.

29.     Like the other major sports leagues, the Member Clubs of the NHL have previously (and repeatedly) determined that they can best maximize the value of many of their rights by assigning them to the League to market on a collective basis.  Al-

11

lowing the League to market these rights jointly is not only less costly and more efficient, but it also serves to better promote the League brand.  Among those rights that the NHL Member Clubs have previously (and repeatedly) expressly granted to the League are those that the Rangers now claim the League has "misappropriated."

30.    For example, the Rangers voted to grant the League the right to use and market its trademarks well over a decade ago.  At a January 21, 1994 Board of Governors meeting, each NHL Member Club granted the League "the exclusive worldwide right to use or license its team's trademarks, including the team's logos, symbols, emblems, designs, uniforms . . . and other identifying indicia . . . (i) in connection with the advertising, merchandising, promotion, manufacture, sale and distribution of products and services . . . of any nature; and (ii) to promote or generate interest in the NHL and, collectively, its Member Clubs . . . ."  The Resolution passed by a vote of 24-2, with the Rangers voting in favor.  (Excerpts of the Minutes of the January 21, 1994 Board of Governors Meeting is attached hereto as Exhibit C.)

31.    In 1996, the NHL Member Clubs, including the Rangers, all executed a License Agreement wherein they granted to NHL Enterprises, L.P., an exclusive license to use each NHL Member Club's intellectual property (subject to a reservation of rights with respect to certain local uses of the rights).  In the License Agreement, the NHL Member Clubs affirmed they had determined that their rights should be granted to NHL Enterprises "in order to efficiently and effectively provide for the commercial exploitation of such properties . . . "  (A copy of the July 1, 1996 License Agreement is attached hereto as Exhibit D.)

32.    In June 2006, the Board of Governors voted 29-1 to renew the assignment of the NHL Member Clubs' intellectual property to NHL Enterprises for ten years and authorized the Commissioner to execute license agreements in conformity with the Board's resolution.  The Rangers were the sole Club to vote against the resolution. The Rangers do not contend that the Board's vote was in any way invalid or ineffective under the voting guidelines set forth in the NHL Constitution.

33.    Prior to the filing of MSG's lawsuit, all of the thirty NHL Member Clubs, including the Rangers, have abided by their agreements to convey their intellectual property rights to NHL Enterprises.  If the Rangers believed that the joint marketing and selling of the teams' intellectual property rights constituted a violation of the antitrust laws, they could have sought judicial relief in either 1994 or 1996, or even in June 2006. Instead, the Rangers have willingly accepted each year its pro rata share of the revenues generated by the League's efforts to exploit the League's and Clubs' intellectual property, including its share of NHL Enterprises revenue used to defer League expenses after June 2006.

**THE NHL'S EARLY EFFORTS TO EXPLOIT NEW MEDIA RIGHTS**

34.    MSG argues in its preliminary injunction papers that the League is attempting to "seize" Internet rights from the Clubs.  Again, MSG is wrong.  With respect to new media rights, including rights pertaining to the Internet, the Member Clubs have followed the same decision-making pattern as they have previously with respect to other forms of media and merchandising rights.  As described below, all of the NHL's Member Clubs, including the Rangers, have repeatedly voted to confirm that new media rights belong to the League itself and should be administered by the League for the collective benefit of all thirty Member Clubs.  The NHL's Member Clubs, including the Rangers,

13

have also repeatedly agreed to the types of restrictions (e.g., advertising, merchandising) on Club websites that MSG now complains about in its preliminary injunction papers.

**The Member Clubs Ceded Internet Rights to the League and Agreed to Many of the Restrictions at Issue in 1996**

35.     On June 26, 1996, the Member Clubs discussed how best to utilize the Internet for the benefit of the Members Clubs and the League as a whole.  The Board of Governors decided to enter into an alliance with IBM (which later became known as NHL ICE) that included the development of an NHL website.  The general premise underlying the League's Internet strategy was similar to the League's approach to national and international broadcasting, in that the League would exploit, on behalf of all Clubs, the distribution of League and Club rights over the Internet on a worldwide basis.  (Excerpts of the Minutes of the June 26, 1996 Board of Governors Meeting is attached hereto as Exhibit E.)

36.     At the meeting, the Board of Governors unanimously voted to confirm that the right to develop and exploit the Internet resided in the League itself.  The Board's resolutions were extremely broad and specifically included conveyance of the intellectual property rights of the Clubs:  "the Member Clubs individually confirm the grant to the League . . . [of] the exclusive worldwide right to use or license all of its intellectual property rights . . . for all purposes relating to the further development of a presence for the League and the Member Clubs on the Internet's World Wide Web and the exploitation of any and all opportunities utilizing comparable computer and telecast technology, including, without limitation, any network-centric, on-line or other interactive technologies . . . "  (Exhibit E at 10.)

37.    The Resolutions also granted the Commissioner broad discretion to carry out the League's objectives relating to exploitation of the Internet, including the authority to make directives regarding the very rights (e.g., advertising, merchandising) that are the subject of MSG's motion:

- "that League directives addressing the specific means of establishing and operating the Alliance, including . . . the operation of web sites by Member Clubs and the sale of advertising, sponsorships and merchandise by the Member Clubs shall be promulgated from time-to-time by the Commissioner (or his designees)."

- that the officers of the League are authorized to "do such other acts and things, and to execute and cause to be executed in the name and on behalf of each Member Club [and] the League . . . such other documents or instruments, as any such officer may approve as necessary or desirable in order to carry out and fulfill the full intent and purposes of the above Resolutions[;] . . .[and that such officers'] action . . . [is deemed] to be conclusive evidence . . . of the approval and authorization of the Board of Governors and each of the Member Clubs."  (Exhibit E at 11.)

This Board of Governors resolution should negate any claim by the Rangers that:  (a) the NHL has misappropriated any of the Rangers intellectual property, and (b) the NHL did not have the right to launch its own Rangers website on September 29, 2007.  Indeed, the League's acts should be deemed in accordance with the resolution, to have been done with the "approval and authorization of the Board of Governors and each of the Member Clubs."

38.    Although I understand that MSG now complains that the League is taking "too much control" over Club-specific websites, many of the specific restrictions MSG complains about have been in place since the League adopted its initial Internet strategy in 1996.  For example, with respect to MSG's complaints about being required to

comply with a specific format for its website, under the strategy put in place in 1996, IBM/ICE designed and provided the basic website template for all of the Clubs.

39.     With respect to MSG's complaints about the League purportedly taking control over Internet advertising, all NHL Clubs, including the Rangers, have been subject to advertising and sponsorship restrictions since 1996. In fact, under our initial regulations, the Clubs were prohibited from placing on the home page of their Club-specific websites any advertising that conflicted with League national/worldwide sponsors.

40.     With respect to MSG's complaints about merchandising rights and being required to use the League store, merchandising restrictions also have been in place since 1996. At that time, the Clubs determined that merchandising should be conducted through a single "Cyberstore" on the League's website. Although Clubs were allowed to offer locally licensed merchandise on their websites, just as they may today, the sales had to be through the Cyberstore and the local offerings could be no more than thirty-five percent of the total NHL and Club-licensed merchandise offered on each Club's home page.

41.     The Rangers have never sought preliminary or permanent injunctive relief of any of these long-standing policies and practices.

**The NHL Clubs Again Confirmed that Internet Rights Reside in the League in 2000**

42.     The Member Clubs revisited their basic Internet strategy at a League meeting on June 20, 2000. Based on an analysis conducted by Morgan Stanley, addressing how best to maximize the value of the League's interactive assets, the League concluded that the optimal business model was a hybrid model, wherein the League's and

Clubs' websites would be part of an integrated network, with certain elements available on Clubs' sites and others available on NHL.com.

43.    During the June 20, 2000 meeting, the Board unanimously adopted a resolution reaffirming that, because the Internet is a worldwide medium, the rights to exploit the Internet are held by the League, and that the Commissioner has the power to promulgate such rules and regulations and take such acts as he deems appropriate, including with respect to what rights might, at any particular time, be exercised by the Clubs. (Excerpts of the Minutes of the June 20, 2000 Board of Governors meeting is attached hereto as Exhibit F.)

44.    At a subsequent Board of Governors meeting on September 6, 2000, Commissioner Bettman reported on the development of regulations that would provide more definitive guidance on the operating issues relating to the League's Internet-related business initiatives.  In developing these regulations, the Commissioner solicited input from more than twenty Clubs in individual meetings.  Commissioner Bettman reported that there had been no objections raised during those meetings (or at any other time) to the business model that was being developed for the League's interactive business.

45.    On October 25, 2000, the Commissioner promulgated the NHL Internet Regulations, which included rules for the operation of Club websites.  (A copy of the Internet Regulations is attached hereto as Exhibit G.)  Many of the complaints set forth in MSG's preliminary injunction motion relate to rules that were specifically established and promulgated when the Commissioner issued the Internet Regulations in 2000. For example, MSG now complains about the NHL placing content on the Rangers' web-

site.  But under the Internet Regulations promulgated in 2000, the NHL was made responsible for programming a portion of each Club's website, which was referred to as the "NHL Area."  The NHL Area was in the same place on every Club's website and included themed links, content, and promotions.  The Regulations also included guidelines as to the type of local content each Club was required to include on its website.  Thus, pursuant to the Internet Regulations, the League has, in fact, been supplying content for a portion of the Rangers' website for the last seven years.

46.    With respect to advertising, the NHL has been placing advertisements on the NHL Area of every Club's website since 2000.  Further, in the Internet Regulations, the League also expressly reserved the right to control thirty-five percent of all of the advertising on each Club's website.

47.    With respect to merchandising, the Internet Regulations continued the League's policy of requiring that all sales be made through the League store.  Each page of a Club website that references the availability for sale of licensed merchandise was required to include a link to the League store.  The League made further changes to its on-line merchandising program in 2001 and 2005.  While all merchandise still had to be sold through the League store, the number of locally licensed products NHL Member Clubs were now permitted to include was increased to seventy-five, as long as those products were not duplicative of products offered by the League's national vendor.

48.    Until the development of the League's new media strategy in 2006, the Rangers neither objected to the League's Internet Regulations, nor did it ever contend that they (or any portion of the Regulations) somehow constituted a violation of the anti-trust laws.

## THE LEAGUE'S EFFORTS IN 2006 TO UPDATE ITS NEW MEDIA STRATEGY

49.     Following a year-long labor dispute that resulted in the cancellation of the 2004-05 NHL Season, the League re-launched its business with a focus on renewing its efforts to promote and create increased interest in the overall NHL brand. The Internet was immediately identified as a key driver of that effort. In December 2005, the Executive Committee of the Board of Governors instructed the League Office to study and develop for the Board's consideration potential alternative business models for the development of its new media business, with direction that particular attention be given to the benefits of greater centralization and integration of the League's media rights. The results of the study, including a survey that was sent to the Clubs, are described in Keith Ritter's Declaration.

50.     Pursuant to the Executive Committee's directive to formulate and propose a comprehensive new media strategy, in January 2006, the Commissioner formed a New Media Committee made up of representatives from ten Member Clubs to assist the League in developing a strategic plan that would enable the NHL to maximize revenues from all media, serve existing NHL fans, and cultivate new fans. The Committee included representatives from the Dallas Stars, Calgary Flames, Boston Bruins, Carolina Hurricanes, Nashville Predators, Washington Capitals, Anaheim Ducks, Philadelphia Flyers, Toronto Maple Leafs, and New York Islanders. The members were selected primarily on the basis of past or present expertise and experience in various areas of the "new media" business. For example, Tom Hicks of the Dallas Stars (also the owner of the Texas Rangers of MLB) was a principal architect of MLBAM, and was hence very familiar with the history and thought process that underlied MLB's success in new media

ventures. Ted Leonsis of the Washington Capitals was the Vice Chairman of AOL and also a minority owner in the Washington Wizards and was therefore extremely knowledgeable about the on-line landscape generally, as well as how other sports leagues, including the NBA, had chosen to approach the business. Other members of the Committee had similarly beneficial experience and backgrounds.

51.     The Commissioner invited James Dolan, the Chairman of MSG, to participate on the Committee on behalf of the Rangers, seeking to draw on Mr. Dolan's experience in the media business and in the cable industry in particular. But when the Committee meeting date was set for March 6, 2006, Mr. Dolan declined to attend, citing a scheduling conflict. Hank Ratner, Vice Chairman of MSG, was then invited to participate in place of Mr. Dolan, but he too declined due to the same scheduling conflict.

**The New Media Committee's Report**

52.     The New Media Committee met on March 6, 2006, and thereafter prepared a formal report to the Board of Governors addressing the Committee's conclusions and recommendations. (A copy of the New Media Committee's June 8, 2006 Memorandum to the Board of Governors is attached hereto as Exhibit H.) After examining the various approaches to the new media business that had been taken by other sports leagues, the Committee concluded "that the goal of the League should be to adopt 'best practices' (i.e. take the most effective elements of each approach to create the best model for our businesses)." (Exhibit H at 3.)

53.     One of the Committee's principal recommendations was that the League and all thirty NHL Member Clubs should take a collective approach to the programming and monetization of the League and Club websites. Specifically, the Committee recommended that the League develop a common technology platform, with a single

CMS, so that, among other benefits, content could easily and efficiently be shared among all of the websites on the common platform. Further, it was recommended that the League establish a common template and "look" for each of the Club sites, program basic elements of the sites and hire additional staff to sell advertisements across the NHL.com network. Significantly, the recommended approach allowed for Clubs to continue to program local editorial elements of their sites and sell sponsorships and advertisements to their local partners. (Exhibit H at 21.)

54.    The Committee believed that its recommended approach would ensure quality standards and efficient production across all websites, provide greater interconnectivity among Club websites for the sharing of local content to enhance each Club's local marketing efforts, and create cost savings for the network as a whole of up to $2 million annually, while still allowing the Clubs to preserve their local voice in communicating with their fans.

**The Member Clubs' Decision To Adopt the New Media Committee's Recommendations at the June 21, 2006 Board of Governors Meeting**

55.    The New Media Committee's recommendations were placed on the agenda for a Board of Governors meeting scheduled for June 21, 2006. In advance of the meeting, the League sent each Club the Board agenda and related materials, which included the New Media Committee's report and recommendations. Although the League normally sends Clubs agenda materials one week in advance of a scheduled meeting (as is provided for in the League Constitution), we sent the agenda materials for the June 21 meeting a full two weeks in advance, in order to give Clubs additional time to review and consider the New Media Committee's report and to evaluate its recommendations.

56.     On June 14, 2006, the Commissioner received a letter from Steve Mills from MSG requesting that consideration of the New Media Committee's report be removed from the Board of Governors agenda.  On June 19, 2006, I sent Mr. Mills a letter noting the Commissioner had the <u>exclusive authority</u> to formulate the agenda for League meetings, and that we did not consider it appropriate to remove an agenda item based solely on the request of a single Club.  (A copy of my June 19, 2006 letter is attached hereto as <u>Exhibit I</u>.)

57.     On June 20, 2006, Commissioner Bettman and I met with representatives of MSG, including James Dolan, Hank Ratner, Steve Mills, Glen Sather, and MSG's outside counsel.  The MSG representatives attempted to explain to us their concerns and reiterated their request that the League defer the Board's consideration of the New Media Committee's recommendations to a later time.  Mr. Dolan stated that he believed that the proposed new media strategy would benefit small market teams at the expense of large market teams, such as the Rangers, and that it would be tantamount to additional methods of "revenue sharing," which the Rangers did not support.  Commissioner Bettman said that the strategy was not intended to divert revenues from large market teams to small market teams, but rather to benefit the League as a whole, and to increase the franchise values of all the Clubs.  At no time during this meeting did Mr. Dolan or his counsel express an opinion that the new media strategy adversely affected the Rangers' ability to "compete" against its NHL Member Club partners.

58.     The following day, at the June 21, 2006, meeting of the Board of Governors, Commissioner Bettman described the issue facing the League and the Clubs as one of resolving the tension, which existed in all sports leagues, of striking a success-

ful balance between the rights that Clubs are permitted to exercise within their respective local territories and the rights that the League may exercise, both within Club territories and otherwise on a national basis, on behalf of and for the benefit of all of the Clubs and the League as a whole. (Excerpts of the Minutes of the June 21, 2006 Board of Governors Meeting is attached hereto as Exhibit J.) (Exhibit J at 4.)

59.    Commissioner Bettman also made clear that, although the June 1996 and June 2000 Board Resolutions had granted him the right to promulgate regulations relating to the exploitation of the Internet, the Board was free, by majority vote, to change the League's authority in this area at any time. He advised that, notwithstanding the authority previously granted by the Board to formulate and adopt a strategy on behalf of the Board, he was nonetheless seeking a consensus of the Clubs as to whether to move forward with implementing the New Media Committee's recommended initiatives, including the integrated website initiative. (Exhibit J at 3.)

60.    Doug Perlman, the League's Executive Vice President of Media, then made a presentation to the Board summarizing the New Media Committee's report and recommendations. This presentation is described in detail in the Board minutes. (Exhibit J at 5.) Following Mr. Perlman's presentation, Mr. Dolan was given the opportunity to make his own presentation, in which he expressed his concerns about and opposition to the recommended new strategy. In response, the Commissioner reiterated his support for each of the Committee's recommendations. He expressed his view that the League's and Clubs' new media businesses were not at that time meaningful businesses, and that, in his view, it was essential for the League immediately to begin to upgrade its digital technology infrastructure in order to remain competitive with other sports and en-

tertainment offerings. He also reiterated that the League was not seeking to disrupt or in any way diminish the value of the Clubs' local television broadcast rights, nor was it intending to usurp a Club's ability to provide local content and flavor on its website.

61.    Following a full and frank discussion of the Committee's recommendations, the Board voted that the League should proceed with the recommendations set forth in the New Media Committee's Report. Twenty-five teams voted in favor; three teams (including the Rangers) voted against; one team abstained; and one team was absent.

## MSG'S COMPLAINTS LACK MERIT

### The Rangers' Complaints About the League's Internet Strategy Are Spurious

62.    As discussed above, as to all of MSG's complaints, the rights at issue were long ago granted to the League not only to market and sell on a collective basis, but also to exploit for the benefit of all Clubs Internet technology. The Rangers have voted in favor of resolutions granting the League these rights and voluntarily accepted the revenues generated by the agreements negotiated by the League pursuant to those resolutions. Moreover, none of the "restrictions" MSG is complaining about (e.g., merchandising, advertising, and content) is "new." The Rangers have been living under these rules, and in some cases more restrictive rules, for years.

63.    The only changes in League rules identified by MSG in its papers are that now: (a) the Club websites will be hosted on a common League platform using a League-wide CMS, and (b) the Club websites will be built using a standardized (though customizable) template. These are hardly the type of changes that warrant an application for the "emergency relief" the Rangers seek here.

24

64.     The New Media Committee's Report explained the obvious efficiencies in having all of the websites migrated to a common technology platform using a single CMS. As addressed more fully in the Declarations of Ted Leonsis and Keith Ritter, in addition to being less expensive to maintain, a common platform facilitates content sharing across the League, so that when the Rangers are scheduled to play the Penguins they can access content from the Penguins' website and vice-versa on a timely, cost-effective basis. This enhanced ability to share content will redound to the benefit of fans, as each Club populates its website with a richer array of content from around the League. Moreover, the aggregation of content – and website users – on a common NHL platform will create the "scale" the League needs to attract major sponsors. NHL sponsors will have not only the banner available to them, but also other places on the website that will be attractive and "saleable" to national sponsors. The incremental revenues generated by the NHL's common platform initiative should help the Clubs better monetize their web-sites, which the League's survey demonstrated most Clubs have not done effectively to date.

65.     With respect to the Rangers' complaint about being forced to use a League-developed template for its site, the New Media Committee specifically considered whether the Club sites should have a uniform look. The Committee's Report indicates that it was the view of the Committee Members, not the Commissioner, that the Club sites should have a uniform look. The Report also reflects the Committee's reasoning:

> "Mr. Leonsis commented that, based on his experience, the Club sites
> should have a uniform look and feel. He noted that AOL had experi-
> mented with different looks in different territories but has come to the
> conclusion that a single template works best. As it relates to the NHL.com

Network (i.e., the thirty one sites), fans would know where to find particular types of content regardless of which Club site they were on and sponsors interested in League-wide inventory could purchase a consistent element across all sites. Such an approach would also increase programming efficiencies and cost savings. The Commissioner expressed some surprise that the Clubs would advocate this more centralized approach but, after some discussion, it was the unanimous agreement of the Committee that a uniform format for all Club sites was the best approach." (Exhibit H at 15.)

66.     Under the League's new Internet strategy, nothing else has really changed. The Club sites continue to be operated by the individual Clubs, who continue to be responsible for providing the local content. Similarly, the new common platform will not only be able to accommodate innovative features on individual sites, but will make those features available for all Clubs.

67.     As discussed in detail in Keith Ritter's Declaration, because the League's standardized template can be customized to accommodate the Rangers' particular needs, the Rangers need not forego the features it currently has on its website. But the ability of the League to negotiate favorable agreements to provide enhanced features to all Clubs using the common platform and CMS vastly improves the NHL.com network for all Clubs, including the Rangers.

68.     From the League's perspective, what is particularly disappointing about the Rangers' refusal to abide by League rules by migrating the Club's website onto the common League platform is that the Rangers did not even give the new strategy a chance. As discussed in detail in the Declarations of Robert Hawkins and Keith Ritter, the Rangers stopped cooperating early in the process and never provided League staff with the materials and content they needed to develop a first-rate Rangers' website. The League was always ready, willing, and able to try to accommodate any concerns the

Rangers had relating to both content and format. But we were never given a legitimate opportunity to do so.

69.    Even though the Rangers were not the only Club that had reservations and concerns about the new strategy, the Club's attitude and lack of cooperation stands in marked contrast to that of the twenty-nine other Clubs in the League.

70.    In April 2006, during the period in which the New Media Committee's report was being prepared, the Toronto Maple Leafs raised concerns about whether the new League-wide strategy would infringe upon the territorial rights of the individual Clubs. On April 18, 2006, the Commissioner wrote to Larry Tanenbaum, Chairman of the Maple Leafs, to explain that the League's goals with respect to Internet rights mirrored and were virtually identical to those relating to its television rights, i.e., maximizing League revenues for the benefit of all Clubs. The Maple Leafs nonetheless remained skeptical and were one of just three teams that voted against proceeding with the recommendations set forth in the New Media Committee's Report at the June 21, 2006 Board of Governors meeting. The Maple Leafs also supported an unsuccessful motion by the Rangers to defer proceeding with the recommendations until a more formal business plan had been prepared by the League and shared with the Board. But once the matter was decided, the Maple Leafs accepted the direction of the Board, and worked cooperatively with the League to develop the local content that would be programmed onto their website.

71.    During the site migration process, the League Office's technical personnel worked diligently to accommodate the wishes of the Maple Leafs as the CMS and website template were developed. In the end, the League was able to address all of

27

the Maple Leafs' technical and content concerns, and the Maple Leafs now believe that the NHL's platform and template include features that are the "best of breed." On August 22, 2007, I received an email from Richard Peddie, President and Chief Executive Officer of the Maple Leafs, directed to several people in the League Office complimenting us on the work that had been done on creating the new NHL.com network platform: "I told some of you individually but wanted all of you to know that we think the work you are doing in the digital area is really market leading. It is also a nice blend between the league and the local team. We promise you that the Leafs will work closely with your teams as we want to be a leader in this area." (A copy of Mr. Peddie's email is attached hereto as Exhibit K.)

72.    The third Club that voted against proceeding with the New Media Committee's recommendations was the Minnesota Wild. Like the Maple Leafs, but unlike the Rangers, the Wild accepted the determination of the Board and worked closely and cooperatively with the League in migrating its website to the common League platform. The Wild's satisfaction with both the process and results of the transition are detailed in the accompanying Declaration of Robert O. Naegele.

**The League's Internet Strategy Will Not Harm Competition**

73.    MSG argues in its preliminary injunction papers that the League's Internet strategy will somehow interfere with its ability to compete against the New Jersey Devils and New York Islanders. As addressed above, the Devils and Islanders, and the other twenty-seven NHL Member Clubs, are actually partners with the Rangers in the NHL joint venture. They all share a common interest in promoting the NHL. The Rangers, Devils and Islanders all compete with other local sports teams and entertainment events for ticket sales, advertisers, and sponsors. As described in the Declaration of John

Collins and Keith Ritter, the League's new Internet strategy should actually enhance the ability of all three teams to compete in the local sports and entertainment market.

74.    To the extent that the Rangers are in competition specifically with the Devils or Islanders in some areas of its business, the League's Internet strategy will not interfere with that competition at all.  As explained in the Declaration of Keith Ritter, the League's platform allows each Club to customize its website based on its particular needs and desires.  The Rangers' website remains the Rangers' website and, subject of course to limits to its rights imposed by intellectual property and other applicable law, the Rangers continue to have the ability to program that website with whatever content – video, articles, player profiles, fan promotions, local advertising, website links, and the like -- it wishes.

75.    In sum, the League's new Internet strategy does not change the relationship between the Rangers, Devils and Islanders at all.  There is no harm to competition whatsoever.  To the contrary, the changes are procompetitive.  The efficiencies created by the League's website initiative benefit all of the NHL Member Clubs and should assist the entire League in competing against other sports leagues and other forms of entertainment.

## THE LEAGUE'S DECISION TO FINE THE RANGERS

### The League Has Fined Other Teams for Violations of the Internet Regulations

76.    From the time I joined the NHL and until this lawsuit was filed, MSG has never objected to the League's authority to fine Clubs for violating League rules, including with respect to the NHL's Internet Regulations.  In 2001, the League Office became aware that a small number of Clubs from time to time were engaging in website practices that were in violation of the League's Internet Regulations.  The League

29

never hesitated to take prompt disciplinary action when it became aware of those in-
stances, including through the imposition of Club fines.  On July 5, 2001, I sent a memo-
randum to all the Member Clubs informing them of the League's intention to take disci-
plinary action in appropriate cases.  The memorandum served to put every Member Club
on notice that future violations would result in penalties, including the potential of sig-
nificant fines.  I also reminded the Clubs that applying League rules in a consistent man-
ner and requiring that all Clubs comply with the rules were matters of basic fairness.  (A
copy of my July 5, 2001 memorandum is attached hereto as Exhibit L.)

       77.     In response to my memorandum, MSG did not:  (i) object to the
fact that the League had disciplined Clubs (including through the imposition of Club
fines); (ii) state that they believed the Internet Regulations (or any portion thereof) were
somehow unlawful; or (iii) object to the statement that Clubs would be fined in the future
for violating the League's Internet Regulations.

**The Rangers Are Repeat Offenders**

       78.     Since the June 21, 2006 Board of Governors meeting, the League
has had a number of problems with the Rangers with respect to new media rights and
other issues.  On February 23, 2007, Commissioner Bettman and I met with James Dolan,
Hank Ratner and Steve Mills to discuss our differences of opinion on a variety of issues.
(Because this meeting was purportedly being held on an "off-the-record" basis at the re-
quest of the Rangers, and in response to a comment from Mr. Dolan, I discontinued tak-
ing notes of the meeting and subsequently destroyed the notes I had taken before Mr. Do-
lan's objection.)  In addition, we heard from the Rangers about their interest in imple-
menting various new features or initiatives, each of which was clearly and directly in vio-
lation of longstanding League rules and policy.

79.     One initiative in particular that I recall being discussed was the Rangers' interest in experimenting with the insertion of "virtual advertising and signage" into the local broadcasts of Rangers games.  Commissioner Bettman informed Mr. Dolan that the League might be willing to consider "re-thinking" existing rules relating to some of these practices, including the insertion of virtual advertising, but that we would need additional time and information to do so.  Specifically, as to virtual advertising, the Commissioner indicated that there was a concern with its adaptability to hockey broadcasts and that, at a minimum, we would need a demonstration of what it would look like on a hockey broadcast before we could consider altering existing rules.  At no time during this meeting did the Commissioner give any indication to the MSG representatives that MSG was free to "experiment" with practices otherwise in violation of existing League rules (especially during the Stanley Cup Playoffs), and at no later time was a proper request or application ever made by MSG or the Rangers for an exception to those rules.

80.     In April 2007, the League learned that, despite being informed and fairly warned (on numerous occasions) that League rules prohibited them from doing so, the Rangers had gone ahead with several of the initiatives that were discussed at the February 23, 2007 meeting.  Specifically, the Rangers had installed its own "Internet store" to sell team merchandise on the Internet.  MSG also publicly announced plans to insert "virtual advertising and signage" into the broadcast of the Rangers' upcoming home playoff games.  And finally, the Rangers were continuing a practice it had started earlier in the season (which the League immediately and had repeatedly objected to) of streaming live broadcasts of its games to Internet subscribers within its local broadcast territory.

31

81.    The combination of these unauthorized initiatives – which all were in blatant violation of existing and in some cases longstanding League rules – demonstrated that the Rangers' actions were calculated and deliberate.  (For example, when the League contacted the Rangers' website manager to request that he discontinue the Rangers' online store activities, he told us that while he knew that what the Rangers were doing was in violation of League rules, he had received direction from "upper level management" to maintain the store and to leave the League's concerns to management to address.)

82.    A decision was made at this time that something had to be done to uphold the integrity and relevance of League rules and the League structure the Rangers – and all other Member Clubs in the League – have subscribed to by contract.  Specifically, and in response to the Rangers' three distinct violations of League rules, I wrote the Rangers a cease and desist letter on April 18, 2007.  (A copy of my April 18, 2007 letter is attached hereto as Exhibit M.)  In the letter, I informed the Rangers that beginning that day and for every additional day the Rangers were in violation of the League rules implicated by these activities, the Rangers' organization would be fined $100,000.  The Rangers continued these practices in violation of League rules for two days before choosing to discontinue the violative activities.

83.    For the two days in which the Rangers remained in violation of League rules, the League assessed and collected $200,000 in fines.  If the Rangers believed that the League did not have the right to fine it for violating League rules, including the League's Internet Regulations – or that enforcement of those rules through the imposition of fines constituted a violation of the antitrust laws – the issue was ripe for

32

adjudication at least as early as April 2007 – if not earlier.  But MSG sought no judicial relief of any kind against imposition of the fine, much less preliminary injunctive relief.

**The Rangers Left the League No Choice**

84.     In March 2007, and apparently in furtherance of the League's web-site initiative, the Rangers provided the League staff some database material relating to the Rangers' website.  However, thereafter, cooperation between the Rangers' staff and the League staff with respect to the migration of the Rangers' website to the League plat-form came to a halt.  The Rangers refused to provide the other necessary material, such as artwork and local content, that the League staff needed to prepare for the launch of the Rangers' website on the League platform.

85.     In June 2007, the Rangers informed the League that it was not go-ing to complete the migration of the Club's website to the new platform.  On June 27, 2007, a member of the Rangers' staff, Jeanie Baumgartner, informed the League that be-cause Rangers Senior Management was opposed to the migration, she was not allowed to provide the League staff anything that would help the League "take away" the Rangers' website.

86.     Thus, it became clear to me no later than June 2007, that the Rang-ers had made the decision that the Club was not going to comply with League rules by migrating its website to the common League platform.  If the Rangers really believed that the League's Internet rules were illegal or that enforcement of the rules would cause them irreparable harm, it could have, and should have, sought judicial relief at that time.

87.     I attended a meeting between League staff and Rangers staff on July 26, 2007.  Steve Mills from MSG also attended.  When asked why the Rangers ob-jected to migrating the Rangers website to the League platform, Mr. Mills stated that

33

MSG wanted the Rangers website to be on the MSG platform with the various other MSG properties. When I pointed out to Mr. Mills that my understanding was that the Knicks website resides on the NBA platform rather than the MSG platform, he had no response, other than to say that MSG's "issues" with the NBA were not properly our concern.

88.     Mr. Mills went on to state that the Rangers site was an "important piece" of MSG's web platform and strategy, and that for the same reasons the League wanted the site migrated to a common NHL platform, MSG wanted it to remain on its own platform. I informed Mr. Mills that perhaps unlike some of MSG's other properties, the Rangers were not a stand-alone asset, but rather an asset that MSG owned and controlled within a League construct, subject to League rules and other mandates. At no time did Mr. Mills say anything about the League platform or standardized template being inferior to the Rangers' current site, or that migration to the League platform would cause the Rangers irreparable harm (or any harm for that matter), or that it would negatively impact the Rangers' ability to "compete" with the League or with other NHL franchises.

89.     By the time I left the July 26 meeting, it was my clear impression that the Rangers had made a decision not to abide by its obligations under League rules, and that it had no intention of migrating the Rangers' website to the League platform. Nevertheless, I instructed our group to set up further meetings with the MSG technical staff to see if we could satisfy any functionality concerns they purportedly had with the new site, and to explore what Rangers' "content," if any, we would be comfortable in permitting MSG to "export" from the Rangers' site residing on our common platform to

the MSG platform. The goal (and the directive) was to exhaust all possible efforts in try-
ing to address MSG's concerns before having to resort to the imposition of the sanctions
provided for in the NHL Constitution.

90.    As explained more fully in the Declarations of Robert Hawkins
and Keith Ritter, there were several follow-up meetings and calls in August and early
September between League and MSG staff, during which League staff attempted to dem-
onstrate to the Rangers that their concerns were without basis, and that everything they
may have wanted to accomplish on their existing website could be accommodated on
their new site on the NHL platform.

91.    As time continued to pass and every Club other than the Rangers
had completed its migration to the League platform, it became clear that the Rangers
were not prepared willingly to migrate its website to the League platform in accordance
with the Board's direction. With the NHL season scheduled to begin on September 29,
2007, I sent the Rangers a letter on September 20, 2007, informing the team that it would
have until September 28 to migrate its website to the League platform, and that if it failed
to do so it would be deemed in violation of the Internet Regulations, as well as the June
21, 2006 Board of Governors Resolution. I also expressly put the Rangers on notice that
it would be fined a total of $100,000 for each day after September 28, on which its web-
site continued to operate outside the League platform. (A copy of my September 20,
2007 letter is attached hereto as Exhibit N.)

92.    Not having received a response from MSG, on September 27, 2007,
I sent Steve Mills an e-mail informing him that the sanctions specified in my September
20 letter would become applicable and would be fully enforced if the Rangers site was

35

still operating outside the League platform as of 12:01 am on September 29, the opening day of the NHL's regular season.

93.    The Rangers responded by filing the instant lawsuit on September 28, 2007.  Simultaneously with the filing of the lawsuit, the Rangers also sent letters to each of the other twenty-nine Clubs (failing to copy the League) purporting to explain its decision to file the lawsuit.  (A copy of the letter MSG sent to Philip Anshutz of the Los Angeles Kings is attached hereto as Exhibit O.)  The letter makes clear that MSG's real complaint is not that the League's actions will somehow harm competition, but rather that it simply disagrees with the business judgment made by the other twenty-nine Clubs in how best to exploit their new media rights:

> "We have repeatedly expressed our belief that individual clubs could achieve the same or better results by entering the new media business on their own terms, rather than being mandated to submit to a league-wide initiative. . . . Each of us has invested significant resources in our franchises and are best suited to create opportunities to grow our respective businesses, increase our attendance, bring new fans to the game and integrate marketing plans for our brands that incorporate our long-term vision both on and off the ice.  The League, on the other hand, is simply too far removed from day-to-day interaction with our customers and nuances with our fan bases, and too isolated from the financial consequences of its decision-making, to successfully exploit such valuable assets."

## THE RANGERS' REQUESTED RELIEF WOULD UNDERMINE THE LEAGUE'S ABILITY TO OPERATE IN AN ORDERLY FASHION

94.    The Commissioner's ability to enforce League rules by disciplining persons connected with the League, including Member Clubs, is essential to the operation of the League itself.  Without meaningful and enforceable rules, the NHL and its Member Clubs would be unable to offer their sports entertainment product or to effectively manage their business operations, including entering into television, radio and cable contracts and engaging in marketing, merchandising, and promotional activities.  A

36

precedent allowing any single Club to violate League rules without sanction – while the other Member Clubs all duly follow the rules – would invite other Clubs to ignore those rules with which they disagree and, as a result, undermine the very ability of the League to operate as a joint venture.  Similarly, allowing a team to ignore League rules that affect the League's relationship with its business partners, including sponsors, advertisers and licensees, would seriously injure those relationships, as well as the NHL's goodwill and the public's perception of the NHL.

95.    The Rangers' complaint amounts to an attack on the fundamental manner in which the League and every other professional sports league is organized and operates.  Every major sports league is in the business of building a "national brand" and collectively marketing and selling the rights to the brand.  For several decades, every major sports league has elected to market and sell their most valuable rights – national broadcasting, sponsorships and advertising, merchandising – on a collective basis.  Electing to market and sell rights on a collective basis is procompetitive and more efficient; it allows sports leagues to create a more attractive product to sell, reduces transaction costs, aids in quality control, and offers the type of "scale" that is sought after and valued by sponsors, advertisers, and licensees.  Indeed, much of the economic value of the joint products that sports leagues create and sell to the public is derived in substantial part from their being able to offer rights pertaining to all the teams in the league, rather than merely some.

96.    Significantly, there is no functional difference between the Member Clubs' decision to monetize the Internet on a collective basis and the countless decisions every major sports league has made to assign intellectual property rights, broadcast-

ing rights and other collective rights to their league to market and sell on a joint basis. Granting MSG its requested relief would strip the League of its essential and fundamental structure, and would severely injure its ability to compete effectively against other sports and entertainment properties.

   I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2007

             _____
               William L. Daly