# Exhibit J



MINUTES OF THE ANNUAL MEETING OF THE
BOARD OF GOVERNORS OF THE NATIONAL HOCKEY LEAGUE
HELD AT THE WESTIN NEW YORK HOTEL AT TIMES SQUARE,
NEW YORK CITY, NEW YORK ON JUNE 21, 2006

    The annual meeting of the Board of Governors of the National Hockey League was held at The Westin New York Hotel at Times Square, in New York City, New York on June 21, 2006. The meeting convened at 10:00 a.m. Commissioner Gary B. Bettman presided.

    In attendance from the League Office staff were Deputy Commissioner Bill Daly, Senior Executive Vice President and Director of Hockey Operations Colin Campbell, Senior Executive Vice President and Chief Financial Officer Craig Harnett, Executive Vice President and General Counsel David Zimmerman, Executive Vice President, Finance Joseph DeSousa, Executive Vice President, Media Doug Perlman, and President, NHL Enterprises Edward Horne. Also in attendance was Shep Goldfein of Skadden Arps, Slate, Meagher & Flom LLP.

Board Members in attendance were:

| | |
|---|---|
| Anaheim | -Brian Burke |
| Atlanta | -Bruce Levenson, Bernie Mullin and Don Waddell |
| Boston | -Jeremy Jacobs, Harry Sinden and Charles Jacobs |
| Buffalo | -Tom Golisano and Larry Quinn |
| Calgary | -Harley Hotchkiss and Ken King |
| Carolina | -Peter Karmanos, Jason Karmanos and Mike Amendola |
| Chicago | -Bill Wirtz, Peter Wirtz, Bob Pulford and John Ziegler |
| Colorado | -Francois Giguere |
| Columbus | -Mike Priest |
| Dallas | -Tom Hicks, Jim Lites, Tom Hicks, Jr. and Doug Armstrong |
| Detroit | -Michael Ilitch, Jim Devellano and Ken Holland |
| Florida | -Bill Torrey and Michael Yormark |
| Los Angeles | -Philip Anschutz and Tim Leiweke |
| Minnesota | -Bob Naegele and Jac Sperling |
| Montreal | -George Gillett, Pierre Boivin and Bob Gainey |
| Nashville | -Craig Leipold and Ed Lang |
| New Jersey | -Jeff Vanderbeek, Michael Gilfillan and Lou Lamoriello |
| NY Islanders | -Charles Wang and Neil Smith |
| NY Rangers | -Jim Dolan, Hank Ratner, Steve Mills and Glen Sather |
| Ottawa | -Roy Mlakar and Sheldon Plener |
| Philadelphia | -Peter Luukko and Phil Weinberg |
| Phoenix | -Steve Ellman and Doug Moss |
| Pittsburgh | -Kenneth Sawyer |
| St. Louis | -Brent Karasiuk |
| San Jose | -Greg Jamison |
| Tampa Bay | -Tom Wilson and Ron Campbell |
| Toronto | -Larry Tanenbaum, Ivan Fecan, Richard Peddie and John Ferguson, Jr. |
| Vancouver | -Francesco Aquilini and Melvin Wheaton |
| Washington | -Ted Leonsis and Dick Patrick |
| | |
| Edmonton | -Did not attend |

### 3. REPORT ON NEW MEDIA.

Commissioner Bettman stated that the League is operated in accordance with the will of the Board of Governors and that the Commissioner bore the responsibility for providing to the Board leadership and vision, for building consensus where necessary and appropriate and, ultimately, for executing the will of the Board. He further stated that within that construct, the extent of a Club's rights and obligations and the corresponding extent to which Clubs are free to act, or are restricted from acting, as well as the rights that are exercised at the League level on behalf of and for the benefit of the Clubs collectively and the League as a whole, in any particular context, are governed by the League's rules and regulations as adopted by the Board of Governors. In addition, to the extent the Board decides to modify a Board resolution or a ruling or an interpretation of a League rule by the Commissioner, that is a prerogative of the Board in accordance with the required vote. Commissioner Bettman further stated that pursuant to League rules there are a limited number of "property rights" which Clubs have been granted and which are protected by a unanimous vote rule, such that, no League rule or amendment can have the effect of depriving a Club of such "property rights," other than by the unanimous vote of the Board, and that, beyond those limited "property rights," changes affecting a Club's and the League's rights may generally (although not always) be accomplished by way of a vote of the majority.

Commissioner Bettman reported that during the course of the past few days, the League had received correspondence from a Club expressing that particular Club's understanding as to the exclusive rights it believes it possesses to exploit games in its home territory, that another Club had requested that the Commissioner remove certain previously properly noticed agenda items from the agenda for the meeting, and that there existed prospects of lawsuits against the League from those Clubs based upon

certain matters that were on the agenda for discussion with the Board and as to which the Commissioner declined to remove from said agenda.

Commissioner Bettman reiterated that it is not properly within the purview of one or two Clubs to interfere with the Board's consideration of any particular issue; rather, it is the will of the Board as a whole that will determine whether and how the League proceeds on any particular matter and that, as Commissioner, it is his responsibility and intention to implement and enforce the will of the Board, as a whole.

Commissioner Bettman and Doug Perlman then reported on the League's proposed strategies relating to new media and digital technology and the NHL Network, including an overview of the report and recommendations of the New Media Committee, a committee appointed by the Commissioner to explore possible new media strategies and to develop a strategic plan to exploit new media opportunities.

Commissioner Bettman then reiterated that as a matter of corporate governance, the authority granted to the Commissioner pursuant to the June 1996 Board Resolution relating to Internet and new media rights, which had been reconfirmed by unanimous vote of the Board in a June 2000 Board Resolution, expressly granted to the Commissioner the right to promulgate new regulations relating to the exploitation of the Internet and new media rights, and that, pursuant to those resolutions, no further vote of the Board was required on these matters. Nevertheless, as previously discussed, the Board was free, by majority vote, to change the approach in this area. He advised that notwithstanding the authority previously granted he was seeking a consensus of the Clubs as to whether to move forward with implementing the Committee's recommended new media initiatives.

Commissioner Bettman reported on the formation, operation and role of the New Media Committee. He reported that: (i) the Committee had been established in January, following the report to the Board at its December meeting that the Executive Committee had instructed the League Office to undertake to develop for the Board's further review, potential alternative business models for the League's digital media businesses, with particular focus on a model that would provide for greater centralization and integration of digital media rights and that would capitalize on new technologies, while preserving and protecting the League's core businesses; (ii) the League Office had circulated a "new media survey" to the Clubs on January 24, which survey was intended to review the Clubs' new media activities and to determine the revenues and expenses associated therewith, and which invited each Club to comment about its website and other digital businesses, as well as opportunities for the League as a whole; (iii) the Committee had met on March 6, at which time it reviewed potential strategies for the League's new media business and discussed, among other things, how best to proceed to position the League's media businesses for maximum growth, the changes that would be necessary to effectuate such growth and potential new sources of revenue; (iv) a draft Committee report was prepared by the League Office, and distributed to, and reviewed and commented on, by the Committee, and with the Committee's comments and issues incorporated therein, its report, as so revised, was then approved by the Committee in May; (v) the Audit/Finance Committee and the Executive Committee had reviewed and endorsed the report and recommendations of the Committee at their June 1st and June 2nd meetings, respectively; and (vi) the League Office had circulated to the Clubs a copy of the report and recommendations of the New Media Committee, with the agenda for the Board meeting, with two (2) weeks advance notice in order to give the Clubs time to review the Committee's report and recommendations and to follow-up with the League on any preliminary questions.

Commissioner Bettman then stated that, in contemplating a new strategy for the League's new media businesses, the League was not intending to disrupt the Clubs' local television broadcast rights by bringing potentially competing broadcasts of Clubs' games back into their local markets, and he reiterated that Clubs' long-term rights in that regard would ultimately be governed by the Board by majority vote.

Commissioner Bettman stated that the issue facing the League and the Clubs in this context was the tension, which is a constant in all sports leagues, of striking a successful balance between the rights that Clubs are permitted to exercise within their respective local territories and the rights that the League may exercise, both within Club territories and otherwise on a national basis, on behalf of and for the benefit of all of the Clubs and the League as a whole.

Commissioner Bettman stated that a second matter to be considered by the Board later in the meeting related to approving a renewal of NHL Enterprises' existing organic documents for a ten (10) year term (which had been amended by the Commissioner in response to Club concerns from the initial proposal contained in the Board agenda providing for an open-ended renewal). For purposes of clarity, the Commissioner acknowledged that some Clubs apparently misunderstood that this resolution somehow related to the League's new media initiatives. He reiterated that the proposed renewal of the NHLE license agreements was entirely unrelated to the proposed new media initiatives being considered by the Board. He further stated that NHLE had existed in its current form since about the 1970's, with a change in structure in 1996, which had been implemented solely for tax purposes, and which had not altered the substantive rights held by the League and the Clubs. Commissioner Bettman stated that a Club had taken the position that if it voted against, and did not execute, the proposed renewal, it would not be bound thereby. Commissioner Bettman stated that that position was erroneous and, as he had previously advised, the will of the Board in this matter, as determined by a majority vote, would govern and be binding on all Clubs; thus he concluded that if a majority of the Clubs voted to renew NHLE's existing organic documents on identical terms for a ten (10) year term, all Clubs would be bound by those agreements regardless of whether a particular Club voted in favor thereof and regardless of whether a particular Club executed the agreement.

Mr. Perlman reviewed the process followed by the Committee in developing its report and recommendations, and he summarized the objectives of the Committee, which included developing a strategic plan that would enable the League and all Clubs to: (i) deliver quality content via all existing and future media platforms, (ii) maximize revenues from all media, (iii) service existing NHL fans, (iv) cultivate new fans, and (v) capitalize on emerging trends and seek to best position the League for future opportunities.

Mr. Perlman then discussed trends in the media industry and potential opportunities for the NHL to capitalize on those trends, including the increase in available bandwidth which allows for greater programming choice on television and online, "on-demand" viewing options for consumers, the proliferation of wireless and portable devices that allow for mobile consumption of content, and the migration of advertising dollars from traditional media outlets to new media platforms.

Mr. Perlman next reviewed the League's current approach to its new media business, including that the League is responsible for programming and monetizing NHL.com and each Club is responsible for programming and monetizing its own website, with a common navigation bar that includes League-controlled advertising inventory running across all websites.

Mr. Perlman discussed generally the results of the "new media survey", which he stated were directional as opposed to precise, including that the Clubs' responses indicated, and the consensus of both the New Media Committee and the Executive Committee was, that currently the League's and Clubs' new media businesses were operating at a suboptimal level and delivering suboptimal results. As a result, the Committee's discussions focused on how the League and Clubs could benefit from a more collective approach to their websites through a common League-wide template, while still preserving the ability for Clubs to directly communicate with their fans and to provide local content on their respective websites, retain inventory for their local business partners, and sell tickets.

Mr. Perlman reported that in connection with the Committee's deliberations, League Office personnel had spoken with the other major sports leagues concerning, and that the Committee had reviewed, the approaches taken by the other major sports leagues with respect to their new media businesses. He stated that the Committee had spent considerable time discussing the approach taken by Major League Baseball in its formation and operation of Major League Baseball Advanced Media ("MLBAM"), as MLBAM has generated significant traffic, revenue, asset value and publicity. Mr. Perlman noted that Tom Hicks, a member of the New Media Committee, also sits on the Board of Directors of MLBAM.

Mr. Perlman then discussed the Committee's recommendations for the development of a central content creation facility known as the "Hockey Factory", which would serve to create quality content for all media platforms, and the proposal for the formation and operation thereof, as well as the benefits derived therefrom.

Mr. Perlman next discussed the Committee's recommendations for: (i) expanding and improving the content on NHL.com and (ii) the continued integration of online advertising sales with the League's Corporate Marketing Department, and he described the benefits that could be derived therefrom.

Mr. Perlman next stated that the Committee considered how best to proceed in terms of the structuring, programming and monetizing of Club websites, in order to maximize revenues, to best serve fans, and to permit Clubs to provide local content, serve local sponsors and maintain a local presence. He stated that the Committee had concluded that while each of the other league models had certain beneficial elements, there was no existing model which best suited the particular needs of the League and the Clubs. Thus, the Committee had conceptualized its own "hybrid" model for the League's and Clubs' new media business, utilizing in part the "best practices" of the other leagues, and creating other elements to best meet the objectives of the Committee as well as the needs of the Clubs and League. The Committee recommended taking a collective approach to the programming and monetization of Club websites, including that the League and all Club websites would operate on a common technology platform that would be built by the League to provide each website with a common "look", that the League would program certain basic elements of the League's and each Club's website (e.g., rosters, schedules, scores and game recaps), and that Clubs would program certain portions of their website with local content of their choosing, and could continue to sell tickets and some advertising inventory on their respective websites. He then discussed the benefits of such a collective approach, including that all Club websites would be programmed with "best of breed" tools which would enhance the quality of their content, that it would allow the League to sell advertising and sponsorships on a national basis across the League's and all Clubs' websites, and that it would be more efficient and cost-effective for the League to invest in the necessary technology and

infrastructure, rather than each of the thirty (30) Clubs and the League doing so on their own.

Mr. Perlman then elaborated on the Committee's recommendations for the sale of advertising and sponsorships across all Club websites. He stated that the League would retain the right to sell select advertising and sponsorship inventory across the League and all Clubs' websites and each Club would retain the right to protect two (2) sponsors from competitors sold by the League (as is the current rule) and to sell the remaining inventory to their partners. Mr. Perlman noted that the benefits of such an approach would allow, among other things, for the League and Clubs to capitalize on national sales and marketing opportunities and on the migration of advertising dollars to new media platforms.

Mr. Perlman then discussed the Committee's recommendations for the organizational structure of the League's new media business, stating that the Committee had determined that the best approach involved centralized management of the new media business, integrated as appropriate with other League operations, and reporting to the Commissioner. Mr. Perlman noted that MLBAM had been created as an independently-governed entity, reporting to a Board of Directors as opposed to the Commissioner, to hold all digital, interactive and new media rights of Major League Baseball and its thirty (30) teams. He reported that the Committee had concluded that an independently operated and managed approach was not optimal for the NHL, and he discussed the reasons therefor.

Mr. Perlman then discussed the Committee's recommendations for launching the NHL Network in the United States, including that the launching of the NHL Network would be an opportunity to establish a promotional platform for the League in the United States, as well as creating a potential source of new revenue and possibly significant asset value. He then discussed proposed arrangements with the NHL Network in Canada for the right to utilize the Canadian network feed in the United States, which would avoid duplication of effort between the two (2) networks and would provide an extensive amount of programming at an efficient cost. Mr. Perlman then reported on the status of the League's negotiations with cable and satellite operators in the United States for carriage of the NHL Network.

Mr. Hicks then discussed generally the formation, evolution, operation and economic results of MLBAM and his views on applying certain aspects of the MLBAM model to the League's new media business.

Ted Leonsis (Vice Chairman of AOL), also a member of the Committee, then expressed his support for the Committee's recommendations, and in that context discussed generally his views on the current status and the future of the Internet and new media, expressing his view as to the importance of aggregating traffic and both of having the ability to sell and market across all Clubs' and the League's websites in a uniform way and of employing a common technology platform to create a collective network with a common "look" in order to be competitive in the Internet and new media marketplace.

In response to a Club's inquiry, Commissioner Bettman stated that pursuant to the new CBA, in calculating Hockey Related Revenues, revenues received by the League from the NHL Networks were net of Direct Costs, including, without limitation, development and carriage costs in the United States, up to a specified limit, thus the League had an opportunity to defray start-up costs involved in the development of the

NHL Networks prior to revenues therefrom being included as part of the Players' Share of Hockey Related Revenues.

Jim Dolan discussed the NY Rangers' concerns with the Committee's recommendations, including that, in his view, the Committee's recommended approach: (i) would have the League take over Clubs' websites and new media businesses, program them and sell their inventory nationally, thereby precluding Clubs from exploiting these rights, (ii) would not work and would result in substantial financial losses, based upon the aggregate cost of the Hockey Factory, the proposed infrastructure and other changes to the websites and all of the other elements of the Committee's proposal, (iii) would not adequately account for or make up potential lost local revenues and (iv) would adversely impact the Clubs' ability to relate to their fans and sponsors. Mr. Dolan reported that he had received a letter from FOX Sports Network President Bob Thompson, which holds the local broadcast rights to eleven NHL Clubs, expressing a concern that the Committee's recommendations could potentially result in reduced value for Clubs' local broadcasting rights (which letter was distributed to the Board). Mr. Dolan asked that the League not be permitted to take any action on the Committee's recommendations, including taking steps related to creation and activation of the Hockey Factory, until such time as all Clubs had the opportunity to more fully review and understand the proposed business plan, the implications of the proposed plan and any other possible alternatives to the Committee's recommendations, and to again meet to discuss and ask questions about the Committee's report. In that connection, Mr. Dolan proposed that all budgeted expenditures related to new media initiatives be deferred until at least the December Board meeting.

Commissioner Bettman responded that while he was seeing Mr. Dolan's presentation for the first time, he nonetheless would attempt to briefly respond to some of the concerns expressed by Mr. Dolan. The Commissioner reiterated his support for each of the Committee's recommendations. He stated that, in his view, the League had fallen behind the other sports leagues in recent years as a result of the economic issues the League had faced during that period of time, and the League's resulting inability to invest in its new media businesses. As a result, he expressed the view that the League's and Clubs' new media businesses currently are not meaningful businesses, and that the League and the Clubs risked losing "major league" status in those businesses, and thus that, in his view, it was essential for the League immediately to begin to upgrade its digital technology infrastructure in order to remain competitive in the business of creating and distributing vibrant digital content. He reiterated that the League was not seeking to disrupt or in any way diminish the value of the Clubs' local television broadcast rights by bringing a Club's games back into its local territory on a digital platform, nor was it intending to usurp a Club's ability on its website to provide local content and flavor so that Clubs can maintain their connection and bond with local fans or sell tickets to fans or inventory to local sponsors. In that context, Commissioner Bettman addressed some of the aspects of Mr. Dolan's presentation with which he disagreed. Commissioner Bettman advised that, in his view, it was important that the Clubs consider the Committee's recommendations in the context of recognizing the fact that the League and the Clubs had, by reason of economic necessity, not upgraded their technology infrastructure, and in the context of taking steps to maximize the value of the League's and Clubs' new media businesses and to provide for the most efficient and effective method for the League and the Clubs to service the needs of their fans, increase and enhance the League's and Clubs' visibility and generate revenues.

Commissioner Bettman further reported that the League Office had spoken to Mr. Thompson, who advised the League that Cablevision had first requested FOX to speak at the Board meeting and, when FOX declined, had requested that FOX write the letter.

Commissioner Bettman further reported that when League Office personnel had explained to Mr. Thompson what the New Media Committee was in fact recommending, Mr. Thompson responded that FOX did not have any issue with the League proceeding in that manner. Mr. Thompson's only concern, which was reflected in the letter, was the manner in which the League intended to distribute the local rights in local territories, an issue which was not specifically addressed by the proposed strategy but which, in any event, would be an issue which exists regardless of whether the New Media Committee's recommendations were implemented.

The Clubs then had a full and frank discussion with respect to the Committee's recommendations, including the concerns expressed by Mr. Dolan.

In response to a Club's inquiry, Commissioner Bettman stated that the budget for the initiatives recommended by the New Media Committee had been approved by the Audit/Finance Committee and the Executive Committee and would remain subject to the continuing review and approval of those Committees and the Board. Jeremy Jacobs, Chairman of the Audit/Finance Committee, stated that it was important that Clubs appreciated that certain recommended initiatives in the Committee's report, including the development of the "Hockey Factory" and the advanced scoring system, had uses of more universal and critical application to the League and Clubs than just to the League's and each Club's respective new media businesses and, as such, while the Committee supported the totality of the New Media Committee's recommendations and believed they should be implemented, it was his recommendation that the League move forward with development of the "Hockey Factory" and advanced scoring system initiatives regardless of the Board's ultimate decision with respect to the remainder of the New Media Committee's recommendations.

Commissioner Bettman reiterated that while the Board has previously granted the authority to implement the recommendations of the New Media Committee, he nonetheless was looking for guidance from the Board as to whether the consensus was in favor of endorsing the framework recommended by the Committee so that the League Office should proceed, including endorsing the Committee's philosophy of a more collective approach to certain elements of the business than currently exists. He further stated that the Board, by majority vote, has and would retain the right to modify the League's approach to its new media business at any time.

In response to a Club's inquiry, Commissioner Bettman reported that the League currently was engaged in discussions with Comcast seeking a modification to Comcast's exclusive right to "stream" NHL games in the United States, in order to allow the League the ability to begin exploiting and monetizing game content by means of "streaming" technology.

Following discussion, the Board voted that the League should proceed with the recommendations set forth in the New Media Committee's Report and Recommendations (25 yes, 3 no (Minnesota, NY Rangers and Toronto), 1 abstention (Detroit) and 1 absent (Edmonton)).

The NY Rangers made a motion, seconded by Toronto, that the report and recommendation of the New Media Committee regarding the League's strategies relating to new media and digital technology and the NHL Network should be tabled pending completion and distribution by the League of a detailed "Business Plan" and pro forma, which should be subject to further discussion and meetings of the Board of Governors, and that no action shall be taken by the League or the Clubs thereon, for three (3) months and until such discussion and meetings have been concluded.

Following discussion, the motion failed by a vote of 22 against, 7 in favor (Chicago, Detroit, Minnesota, NY Islanders, NY Rangers, Toronto and Vancouver) and 1 absent (Edmonton).

Commissioner Bettman advised that, based on the consensus and endorsement of the Board that the League should proceed to move forward with implementing the New Media Committee's recommendations, the League would proceed in that manner and he invited the Clubs to provide such further input as they desired to the League Office with respect thereto. He stated that the Committee would continue to provide oversight on the new media initiatives, and that the League Office committed to circulate to the Clubs a detailed budget and business plan consistent with the Committee's recommendations within the next month.

4.  **REPORT ON NHLE BUSINESS.**

Commissioner Bettman stated that, as he had discussed earlier, the League was proposing that the existing licensing agreements between the Clubs and the various NHL Enterprises' entities, a copy of which had been included with the agenda for the meeting, be renewed for another ten (10) year term, on terms and conditions identical to those currently in existence, and he discussed the reasons that such renewal would be appropriate. Commissioner Bettman reiterated that while the proposed resolutions set forth in the agenda contemplated an open-ended renewal of the licensing agreements, he was amending the resolutions to provide for such renewal to instead be for an identical ten (10) year term as had previously been authorized and entered into.

Mr. Daly then discussed the origin and evolution of NHLE and its licensing relationship with the League and the Clubs. Mr. Daly reiterated that the resolutions proposed for the Board's consideration authorized the proposed renewals for a ten (10) year term, on terms identical to those in the current agreements, and authorized the Commissioner to execute the proposed renewal agreements for and on behalf of each of the Clubs. Mr. Daly further reported that, pursuant to the NHL Constitution, the renewal of the NHLE licensing agreements required a majority vote of the Board. Mr. Daly noted further that the proposed licensing agreements specifically stated that such agreements would be subject to pre-existing League Rules and after-passed Board resolutions, and he discussed the reasons therefor.

Commissioner Bettman reported that, as he had discussed earlier, he had received a letter from outside counsel for the Toronto Maple Leafs, asserting the Maple Leafs' position that any extension of the NHLE licensing agreements that was without the explicit written consent of the Toronto franchise would not be binding upon the Maple Leafs. Commissioner Bettman advised the Board that Toronto's position was not correct and he further advised that, in the event such renewal was approved by majority vote of the Board, all thirty (30) Member Clubs would continue to be bound by the terms of such licensing agreements as renewed, regardless of whether any individual Club voted against such renewal or actually executed such agreements individually. Commissioner Bettman noted further that, pursuant to the NHLE licensing agreements, the terms and conditions of the NHLE licensing agreements could be amended or revoked at any time by a three-quarter (3/4) vote of the Board.

Following discussion, it was moved by Boston, and seconded by Los Angeles, that the following resolutions be adopted:

> **RESOLVED,** that the terms and conditions of: (i) the License Agreement (United States) by and between the Member Clubs of the National

Hockey League identified on the signature page thereof (the "Member Clubs") and NHL Enterprises, L.P. ("NHLE"), (ii) the License Agreement (Canada) by and between the Member Clubs and NHL Enterprises Canada, L.P. ("NHLEC") and (iii) the License Agreement (International) by and between the Member Clubs and NHL Enterprises B.V. ("NHLEBV"), all dated as of December 16, 1996 and effective as of July 1, 1996 (collectively referred to as the "Club License Agreements") are each hereby renewed for terms beginning July 1, 2006 and ending June 30, 2016; and be it further

**RESOLVED,** that the terms and conditions of: (i) the License Agreement (United States) by and between the National Hockey League (the "League") and NHLE, (ii) the License Agreement (Canada) by and between the League and NHLEC, and (iii) the License Agreement (International) by and between the League and NHLEBV, all dated as of December 16, 1996 and effective as of July 1, 1996 (collectively referred to as the "League License Agreements"), are hereby renewed for terms beginning July 1, 2006 and ending June 30, 2016; and be it further

**RESOLVED,** that all of the terms and conditions of the Club License Agreements and League License Agreements shall otherwise remain unchanged, except as may be required to conform with the renewal periods described above; and be it further

**RESOLVED,** that the Commissioner or his designee(s) be, and each of them individually hereby is: (i) appointed, authorized and directed by each Member Club to execute each renewal of the Club License Agreements and the League License Agreements for and on behalf of such Member Club, and (ii) authorized in the name and on behalf of the League and each Member Club to take or cause to be taken all such further actions and to institute or modify such rules, regulations and policies as the Commissioner determines may be necessary or appropriate to effectuate the foregoing resolutions and to execute and deliver or cause to be executed and delivered all such further agreements, documents, certificates and undertakings and to incur all such fees and expenses as in the Commissioner's or his designee(s)' judgment shall be necessary, appropriate or convenient to carry into effect the purpose and intent of the foregoing resolutions, the taking by any such person of any action and the execution or delivery by any such person of any agreements, documents, certificates and undertakings in connection with the foregoing resolutions to conclusively establish such person's authority therefor from the League and each Member Club, and the approval and ratification by the League and each respective Member Club, of the actions so taken and the documents so executed.

The motion carried 28 yes, 1 no (NY Rangers) and 1 absent (Edmonton).