**PUBLIC VERSION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,

     Plaintiff,

  - against -

NATIONAL HOCKEY LEAGUE, NA-
TIONAL HOCKEY LEAGUE ENTER-
PRISES, L.P., NATIONAL HOCKEY
LEAGUE INTERACTIVE CYBERENTER-
PRISES, L.L.C., NHL ENTERPRISES CAN-
ADA, L.P., and NHL ENTERPRISES, B.V.,

     Defendants.

        :

No. 07 CIV. 8455 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF KEITH RITTER

  I, KEITH RITTER, declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 that the following is true and correct:

  1.  I am President of NHL Interactive CyberEnterprises, LLC ("NHL

ICE"), and have been employed at NHL ICE since February 2001. I am responsible for,

among other things, overseeing the digital operations of the League, including NHL.com,

the NHL.com network, and NHL Wireless, and for enforcing League Rules with respect

to the internet and new media. I submit this declaration in opposition to the motion of

Madison Square Garden ("MSG") for a preliminary injunction in the above-captioned

matter, in which MSG has requested the Court to enjoin the National Hockey League (the

"NHL" or "League") from enforcing that portion of its new media regulations that would

require the New York Rangers hockey Club to migrate its website from its current plat-

form to the common platform developed for all of the NHL Clubs' websites. I have read

the declarations submitted in support of MSG's motion, and I have personal knowledge

of the facts stated below.

### NHL.com and the Individual Club Websites Prior to 2007

2.        Since at least 2000, the NHL and its thirty Member Clubs have in-

dependently developed individual websites on the internet. The development of those

individual Club websites was subject to the League's internet regulations, which provided,

among other things, that up to 35% of each Club's advertising inventory, or space, in-

cluding the banner across the top of each website, was reserved for the League, acting

through NHL ICE, to sell to national advertisers. The regulations permitted each Club to

protect up to two sponsor categories, in which categories the League could not sell to ad-

vertisers that would conflict with the Club sponsor. (This reservation of 35% of the ad-

vertising space on each Club's website and the protection of two sponsor categories re-

main unchanged today and apply to each Club's website as it resides on the NHL.com

common technology platform.).

3.        It should also be noted that, prior to 2007, the NHL provided vari-

ous League content to each of the Clubs for posting on their individual websites. For ex-

ample, the League made available to each Club for its website the feed of the League's

real time scoring system, as well as live radio streams of the Club's games. The League's

public relations department likewise made all League media releases and statements

available to the Clubs for their websites. Some Clubs spent the time and money to in-

clude historic and current rosters, player statistics, and other information on their web-

sites; others did not. Moreover, among those Clubs that did employ content supplied by the League, the scope and manner in which that content was used varied from Club to Club.

   4. The individual Club websites developed since 2000 were supported by a variety of internet service providers and contained an array of features, which were of widely divergent quality and for which the League and each of the Clubs had paid differing amounts of money. Each of these individual Club websites was serviced by a third-party internet service provider that installed its own proprietary content management system ("CMS"), which is the digital platform or "language" in which the website operates. All substantive content must be written for a given CMS and then loaded onto that platform. The CMS of one provider cannot readily communicate with the CMS of another. Consequently, the different technology platforms on which the Clubs' websites historically have resided caused communication problems among them and content could not move easily among the websites. In fact, sharing content among websites was costly and so cumbersome that most Clubs did not bother to share content with each other, although some Clubs did from time to time link to particular content on other Clubs' websites or on NHL.com. Moreover, individual websites experienced varied technical problems, resulting in one or more websites sometimes being inaccessible for relatively long periods of time. The League's Board of Governors ultimately determined that this patchwork collection of individual Club websites operating without a common technology platform was an impediment to the development of fan interest in the game, to the NHL's growth of its national brand identity, and to the maximization of the League's na-

tional sponsorship and advertising revenue, which is shared per capita by each of the member Clubs.

5.     Professional hockey competes with other sports, including professional football, baseball, basketball, golf, auto racing, tennis, and college athletics, as well as with numerous other sports and entertainment properties for the fans' attention, time, and disposable entertainment dollars. In addition, in the digital space specifically, the websites of the League and its member Clubs compete for advertisers with other digital sources of hockey and sports news and information, including, for example, NFL.com, NBA.com, MLB.com, ESPN.com, SI.com, Yahoo! Sports, AOL Sports, CBS.com, Fox.com, Deadspin.com, and many others. The impediment caused by the patchwork collection of individual Club websites operating without a common technology platform severely retarded the NHL's ability to compete both against other major sports and entertainment properties with strong national brand identity and against other digital sources of hockey and sports information generally. Indeed, a club-by-club survey conducted by the League in connection with the development of the new media strategy adopted by the Board of Governors demonstrated that the NHL and its member Clubs – including the New York Rangers – were barely competing in the digital space at all.

### *The Development of the New Media Strategy*

6.     In December 2005, the Executive Committee of the NHL Board of Governors directed the League Office to undertake a study and review of the NHL's new media businesses with the objective of developing a comprehensive plan to maximize revenue and exposure for the League and its Clubs. Pursuant to that direction, in January and February 2006, I assisted in the preparation of a new media survey designed to col-

lect information about the then-current state of the Clubs' development and use of their websites. A copy of that survey is attached hereto as Exhibit A. The results of the survey were summarized and a copy of the new media survey summary is attached hereto as Exhibit B. That summary showed that the Clubs' use of their websites as marketing and sales promotion tools had met with mixed success. Many Clubs were not using their websites as marketing or sales promotion tools at all, and many of the websites were neither utilizing best practices nor making up-to-date technologies available to their users. While, as a whole, the twenty-nine Clubs that originally responded to the survey had generated approximately $5.5 million in new media revenue, they had collectively spent approximately $5.75 million in expenses. Financial results varied among the Clubs from a League high profit of $389,213 to a League low loss of $278,950. Moreover, the summary showed that most Clubs had not actually monetized their websites; most of the revenue attributed to the Clubs' websites was allocated from broader sponsorship deals – signage, for example – and was not directly earned for website advertising or sponsorships. Finally, the survey confirmed the wide array of technologies, service providers and features associated with the individual Clubs' websites.

7.      The Rangers responded to the survey, and I have attached a copy of its response as Exhibit C. The Rangers' response indicated that the Club had not fully monetized its website. The Club had only one employee working on the organization's new media business and, in 2005-06, had sustained a loss of more than $100,000 on its new media business, including its website. The only revenue the Club had realized from its website was allocated from broader sponsorship deals, and the Club had earned no revenue from direct website sponsorship, advertising, subscriptions, ticket service pro-

viders, mailing list rental or otherwise.  Significantly, in response to the League Office's

invitation for the Club to share additional thoughts about its website and other digital

businesses, as well as opportunities for the League as a whole, the Rangers wrote:

> It is our experience that the league could do a much better job of communicating with individual team sites, particularly when it comes to e-commerce regulations (which have not been formally updated since 2001-02).  Also NHL.com could benefit from sending out regular e-mails to the site webmasters notifying them of content they can use on their own sites (assuming this is permitted) and perhaps having group projects that team webmasters can participate in to build a better sense of online community among the 30 clubs.  From the perspective of a team site, it seems as if NHL.com is operating in something of a vacuum (as if it were a self-contained news organization) without making much effort to build relationships between the league office and webmasters who are also providing for the team sites.
>
> We see the potential for growth in our own site, but it would be helpful if NHL.com was sending out a newsletter or something to draw attention to successful initiatives by other teams.  This would encourage collaboration, as webmasters who liked one team's idea might seek out their colleagues for advice.

(Exhibit C at 12) (emphasis added)

        8.    The Rangers therefore expressed a clear desire for collaboration

among Club webmasters and for coordination by the NHL to facilitate the Clubs' ability

to obtain content and to share website ideas among themselves and with the League.

These expressed desires are plainly inconsistent with the position of isolationism the

Rangers now seem to assert on this motion – that is, that the Club be permitted to develop

its website entirely independently of the League and the other Clubs, and that the Club

has no interest in sharing the Rangers' content with other Clubs or vice versa through the

NHL's CMS.  It should be noted that on the League's common platform, no Club is re-

quired to share its content with other Clubs; each Club is free to choose whether to share

any particular local content.

9.    Following the collection and distillation of the new media survey results, my staff and I prepared a PowerPoint presentation entitled "New Media – Strategy for Growth," which was presented to the NHL's New Media Committee at a meeting on March 6, 2006.  A copy of the presentation is attached hereto as Exhibit D.  Among the information included in the presentation was a comparison of the approaches that each of the other major sports leagues – the National Football League ("NFL"), the National Basketball Association ("NBA"), Major League Baseball ("MLB"), Major League Soccer ("MLS") – and NASCAR have taken with respect to their respective websites. We found that MLB and the NBA each program the content of their individual member club websites on a common technology platform with a single CMS, and that each has a common navigation bar running on the league and individual club websites.

10.    We found that the NBA permits its clubs to insert some local content on their individual websites and to select the look and feel of the website from among several standardized NBA templates.  Thus, the website of the New York Knicks (the NBA club owned by MSG) participates on the NBA.com common platform and uses the NBA's CMS with all of the other clubs in the NBA.

11.    We also found that the individual MLB clubs do not supply local content to their individual websites at all; rather, all of the content for the MLB clubs' websites is supplied by Major League Baseball Advanced Media ("MLBAM"), an entity in which each baseball club has a 1/30 ownership interest and to which each club has contributed its digital intellectual property rights.  I understand that MLBAM employs and assigns to each baseball club a writer who travels with the club and creates the local

content for the club's website.  MLBAM supplies league-wide statistics and other infor-

mation, and sells all advertising and sponsorships on each MLB club's website.

12.    After analyzing the approaches taken by other sports leagues, the

New Media Committee determined that the thirty NHL Member Club websites should be

migrated to a common technology platform, centrally serviced by a single CMS, while

the individual Clubs would still be responsible for supplying local content and would still

retain opportunities for local sponsorships and advertising.  The New Media Committee

concluded that the League as a whole could thereby ensure quality standards and efficient

production across all websites, provide "best of breed" technology and best practices to

all thirty Clubs, allow greater interconnectivity among Club websites for the sharing of

local content to enhance each Club's local marketing efforts, and create cost savings of

up to $2 million per year on a League-wide basis, while preserving the local voice and

priorities of the individual Club websites and permitting the individual Clubs to retain

their local advertising revenue.  Information common to the League website and individ-

ual Club websites could be gathered once and published to all Club websites through the

deployment of a single CMS.  At the same time, the number of internet service providers

and related personnel could be substantially reduced.

### *The Adoption and Implementation of the New Media Strategy*

13.    On June 21, 2006, the NHL Board of Governors voted to proceed

with the recommendations made by the New Media Committee with respect to a League-

wide strategy to exploit new media and technology.  One of the recommendations ap-

proved by the Board proposed that the League and all thirty Clubs should take a common,

cooperative approach to the programming and monetization of the League and Club web-

sites. The report and recommendations included the proposal that the League develop a common technology platform, centrally serviced by a single CMS. The recommendations further proposed that the League establish a common template and "look" for the Club websites, program basic elements of the site with League-wide content, such as game statistics and NHL news, and hire additional staff to sell advertising inventory, or space, across the NHL.com network. The Committee recommended the use of a single template, rather than the multiple template approach the NBA uses, based on the AOL experience that a single template is more user-friendly. The Committee further recommended that the individual Clubs maintain control over the programming of the local editorial elements of their websites and retain advertising inventory for themselves consistent with prior practices and the existing NHL internet regulations.

14.     On July 19, 2006, I traveled to Montreal to participate in a presentation to the individual Clubs' webmasters. The League Office had prepared an initial template for the Club websites and a presentation for the Clubs' webmasters, which compared the websites of all thirty Clubs. I have attached a copy of that template and presentation hereto as Exhibit E. We determined that, from a technology platform perspective, 90% of the websites looked sufficiently alike such that the project of creating a common platform and template would be easier than we at first had anticipated. In addition, at the Clubs' request, we prepared a mockup website using the template, which we disseminated to the Clubs via a collaborative website, called a "Wiki", that enabled each Club's webmaster to log in and explore the functionality and format of the template, ask questions and provide comments and suggestions for improvement.

15.    On July 25, 2006, we presented a 5-year business plan for the new media initiative to the Board of Governors ("5-Year Business Plan").  A copy of the plan is attached hereto as Exhibit F.  With respect to content programming and advertising sales on individual Club websites, the plan made the following points:

- To ensure the highest level of content quality and technical functionality, NHL.com and all Club websites would be published on a common technology platform.  Club websites would be published using a standardized template that would feature the Club's colors, logo, players etc.

- The League would program basic elements of the Club websites such as rosters, schedules, scores, game recaps etc.  As it is more efficient for the League to invest in technology and infrastructure once (for 31) than for 30 Clubs and the League to do so on their own, Club websites will have enhanced features that could be cost prohibitive for an individual Club to secure.  As a result, Club websites will feature "best of breed" tools to, among other things, enhance podcasting, enable community building and increase video integration capabilities.  Clubs would also be positioned to capitalize on new technologies that may emerge.

- Each Club would program a portion of its website with local content of its choosing.  This would ensure a local voice for Clubs to promote their players, community initiatives, ticket sales etc.

- According to the survey of the Clubs' new media businesses conducted in January (the "Survey"), Clubs spend, in the aggregate, $5.8 million to program and operate their websites.  The plan contemplates an annual average operating expense, before depreciation, of $3.7 million.  Clubs would be able to save their technical costs (an estimated $3.7 million per year on average in the aggregate) plus related technical staff costs while retaining only those individuals that would create local content.  The result is dramatically improved Club websites at a decreased cost.

*        *        *

- The League would have the ability to sell inventory across all Club websites, thereby achieving the mass that is so critical to this business. . . .

- Under the proposed approach, the League would only seek to monetize Club website inventory not being fully exploited by the

Clubs. Thus the approach would ensure that Clubs have sufficient inventory to continue an online presence in all current and future partner and sponsor deals, while the League could drive the incremental revenue included in the projections.

- As the business evolves, the inventory sold by the Club and League could be adjusted in order to ensure that, in the aggregate, we are maximizing revenues. If, as some Clubs expect, local opportunities in this area increase significantly in the coming years, this model would ensure that they could be pursued.

- As is the case today (and has been for 6 years) with respect to advertising in the NHL.com Network navigation bar, each Club would have the ability to protect two sponsors from competitors appearing on their websites.

- In addition to the sale of advertising inventory, the plan contemplates a deal with a national search provider (e.g. Google, AOL, Yahoo or MSN) to give them a presence on every page of the Network in exchange for an upfront fee and a share of advertising revenues generated. These arrangements could also provide for the inclusion of tools such as maps and blog search functionality. . . .

(Exhibit F at 16-17)

      16.    Between October 2006 and February 2007, we conducted a series of individual conference calls with each of the Clubs to explore further with them the functionality and formats they were using on their websites, who their service providers were, whether their advertising was served or hard-coded, and a host of other information in an effort to modify the template design to better serve the Clubs' needs and expectations. In light of the Board's discussion about the preservation of each Club's local voice and perspective on its website, we have been mindful to preserve each individual Club's prerogative to customize its website within the parameters of the standardized template. A set of early directions to the Clubs, including the Rangers, clearly explained the possible customization of the individual websites. (*See* Exhibit G) As we modified the template, we posted several versions of it on the Wiki and invited the Clubs to comment on

the various versions. On January 19, 2007, when we felt we had a final version of the template, we hosted a conference call in which we walked each of the Clubs through the template on a line-by-line basis. The Rangers participated in this call and did not raise any objection to the website initiative. The final template provided the Clubs with more Club local content space than had been shown previously in the templates prepared for the New Media Committee and the 5-Year Business Plan.

17.    Beginning in February 2007, using the template we had developed with the Clubs' input during the previous six months, we began to build the new CMS and the new template in preparation for migrating the individual Club websites to the common technology platform on which they would reside. Migration was a fifteen-step process. (*See* Exhibit H) The build-out process required each Club to transfer its website content to the new CMS, where we would perform the necessary program coding to enable the Club's content to be accessible on the new platform. During the course of this process, we made many accommodations to individual Clubs with regard to the appearance of their websites. For example, several Clubs requested the creation of Splash pages – pages that appear before the visitor sees the home page – and we created those for the Clubs that asked for them. Other Clubs asked that their customized historical player databases be imported into the NHL CMS, and we devised a technical solution to accommodate this request. Likewise, after one Club made a request with respect to its own website, the League incorporated "infuzer" calendar software into the common platform for the use of all Clubs at their option on their own websites.

### *MSG's Refusal to Participate in the New Media Strategy*

18.    In or around March 23, 2007, the Rangers provided some of its content to us so that we could begin the process of migrating the Rangers' website to the new NHL.com platform.  Other Clubs also provided their content and, one by one, as the Clubs completed the transfer of their content databases to us for migration to the new common platform, Clubs had their web addresses directed to the new platform servers and their migration was completed.  By August 8, 2007, all of the Clubs other than the Rangers had migrated their websites onto the new platform.

19.    In the weeks and months following the initial transfer of certain of its content in April 2007, MSG declined to provide any further content or information to complete the migration of the Rangers' website and, in June 2007, informed the League that it was not going to complete the migration of the Club's website to the new platform. In an email to me on June 27, 2007, a member of my staff informed me:

> I just got a call from Jeanie Baumgartner at the Rangers.  She told me that since Senior Management at NYR [the Rangers] is opposed to the centralization of the sites, that they are not allowed to give us anything that will help us "take away" their site.  She said that if we want to build their site without them, we can but that they are not planning on sending us anything to help us.

(Exhibit I)

20.    Two days later, on June 29, I spoke with Steve Mills at MSG by telephone.  Notwithstanding the Rangers' refusal to help us to build its website on the new platform, Mr. Mills inquired about the website initiative and requested a copy of the material we had prepared to assist the Clubs in their migration of their websites to the new platform.  The Rangers had had these materials for several months, but I readily sent Mr. Mills another set.  Then, two weeks later, on July 11, Dan David informed us that he

could not participate in CMS training sessions the League had scheduled for the Rangers. We offered to reschedule the training sessions to a time convenient for the Rangers, but we did not receive any response to that offer. Instead, one week later, on July 17, Steve Mills requested that the parties meet to try to find a common ground with respect to the website initiative.

21.     Thereafter, I participated in a number of meetings and telephone conference calls between MSG and NHL representatives in which we sought to address MSG's concerns. After all, the Club had responded to the January 2006 survey by saying that it wanted the League and the other Clubs to cooperate in the sharing of content and best practices. And MSG, which owns the New York Knicks, already participates on the common NBA.com platform. Nevertheless, when we asked MSG why it objected to the NHL initiative while apparently having participated in the NBA website network for years, MSG refused to discuss its relationship with the NBA.

22.     It was difficult to ascertain precisely what MSG's real concerns were. For example, when it became clear that MSG wanted a section of the website to incorporate content regarding the history of the Club and its players, we agreed to construct such a section (though MSG failed to respond to any of our subsequent requests for the content necessary to do that construction). When MSG explained that it did not want any stories about the New York Islanders or the New Jersey Devils to appear in the League news box on the Rangers' home page, we said we could modify the League news box to mask such stories. When MSG asked that local advertising inventory be moved to a more prominent position on the Rangers' home page, we agreed that this could be done. And when MSG told us that it wanted the Rangers' website to be part of the MSG.com

network, we told MSG that the Rangers could have the MSG.com network navigational bar on its website just below the NHL.com network navigational bar. To my knowledge, we could have accommodated all of the technical and formatting concerns MSG expressed during those meetings because none of the concerns MSG expressed interfered with the League's goals of a common platform supporting seamless navigation and interconnectivity among Clubs and permitting the ready exchange of content and advertising across all Club websites at substantial cost savings to all members of the League.

23.    During one of our meetings, we discussed the concept of translation software that would facilitate communication with the Rangers' website. In a conference call on September 4, 2007, we told MSG that we had considered installing translation software on the NHL.com platform and translating the Rangers' website from the MSG CMS to the NHL.com CMS, but that such a proposal would not work for several reasons. First, it would be extremely expensive and unwieldy, requiring a full time employee to maintain the translation software and to keep it updated as the CMSs between which it was translating were themselves modified and upgraded. Second, it would undermine the efficiency goals of the common platform, as other Clubs that had agreed to migrate their websites to the NHL.com platform could ask for the same arrangements so that their Club website could reside on the same CMS as the websites of their affiliated entities. Third, the use of translation software did not address other reasons for the migration of all the Clubs' websites to a common platform, including the League's need to be able to repair a Club's website if it experienced technology problems and became inaccessible to fan. And fourth, it would undermine the interconnectivity goals of the single

CMS by impeding other Clubs' ability to obtain Rangers content for purposes of marketing in their local markets.

24.     We therefore insisted that the Rangers' website migrate to the League CMS, and suggested several means by which MSG could share content between the Rangers' website on the NHL platform and MSG's other affiliated websites. MSG did not appear to be interested in these suggestions. Indeed, ultimately, it became apparent that MSG simply did not want to migrate the Rangers' website to the NHL.com common platform and CMS. Even though it requested a number of "working group" meetings between the parties throughout the summer of 2007, since April 2007 MSG had been thwarting the League's efforts to migrate the Rangers' website by refusing: (a) to provide content and materials, (b) to schedule CMS training, or (c) to perform any of the other necessary preparatory work to ensure a smooth migration.

25.     MSG informed us that it did not care if it cost MSG more to maintain the Rangers' website separate from the League's common platform, and, by implication, that it did not care if it cost the other Clubs more as well. We told MSG that we intended to build the Rangers' website on the League's common platform, as we had built every other Club's website, whether or not the Rangers assisted by providing the local content for the Club's website.

### *The Launch of the NHL.com Network on the Common Platform*

26.     We had informed each of the Clubs that we intended to have all of their websites migrated to the common platform by the start of the 2007-08 season on September 29, 2007. As that date drew near and the Rangers continued to resist cooperating, it became necessary for the NHL to put content on the template for the Rangers'

website.  We formulated the Rangers' website with a minimum amount of local content and launched it on September 28, 2007.

27.    It is important to emphasize that the individual Club websites remain the Clubs' websites, and the responsibility and opportunity for populating the content of those websites with local stories and information about local players and games and community involvement and fan activities remain, as they have always been, with the individual Clubs.  The NHL has not taken the Rangers' website away from the Club, as MSG asserts.  The new Club websites do allocate space (in addition to the banner on each page) for national sponsorship advertising and for League news on the home page, but they do not allocate any more space for national advertising than had historically been permitted before the new media initiative, and even this space can be tailored to accommodate an individual Club's particular interests.  The only real difference between the new model and the one previously employed is that all the League and Club content is now centrally serviced by a common technology using a single CMS so that fan navigation and familiarity with each website's layout has been improved, and the Clubs can focus on developing content for the website and their fans, rather than on developing and maintaining separate and generally costly back office operations.

28.    The League and the Clubs have received very positive feedback from fans about the new NHL.com network and the Clubs' websites.  Examples of the fan feedback have been collected in a presentation prepared for the Commissioner, a copy of which I have attached as Exhibit J.  The fan feedback includes, for instance, the following comments:

- About the Los Angeles Kings' website: "The new web design is a wonderful enhancement to your communications program and I'm

17

particularly happy with the new improved video streaming facility which finally allows me to watch the highlights on my computer . . ." and "Now this is a fabulous change to the website, easy to navigate, quick and full of great info . . ."

- About the St. Louis Blues' website: "This site is so much better than the old site. And the fan forum is more user friendly," and "This new site is truely [sic] a proffesionally [sic] done site."

- About the Pittsburgh Penguins' website: "Not as bad as I anticipated. I'm glad all NHL team sites aren't identical like other sports."

29.    In addition, while the fan feedback has been extremely positive, we continue to work with the individual Clubs to modify and improve the technology supporting the websites so as to improve and maximize each Club's fans' website experience. In that regard, I continue to participate in weekly conference calls with the Clubs' webmasters and technical personnel to discuss suggestions for such improvements.

### *MSG's Current Criticisms Lack Merit*

30.    In its moving papers, MSG has criticized the collective approach taken by the League and the other twenty-nine Clubs toward improving the websites of all of the Clubs, and has complained that the Rangers' website on the common platform is inferior to the Rangers' website running on its own platform. Most of MSG's functionality complaints are without merit; the Rangers' website, as run on the NHL.com platform, will have the same – indeed, even more – functionality than the Rangers' website as run on its own platform. I have attached as Exhibit K hereto a composite exhibit containing a screenshot of the Rangers' actual website home page and a mocked-up website home page as it might have looked had the Rangers cooperated in the migration of the Club's website to the NHL.com platform. Both the screenshot and the mockup are annotated to show that the League will accommodate the specific criticisms that the

18

Rangers have made. (The mocked-up portion of Exhibit K might have been even more impressive if the Rangers had cooperated with the League to provide its own art work and local content to customize the template.) The sole reason for any dissatisfaction the Rangers may have experienced with the look of the Club's website as of the date it was launched by the League was the Rangers' own refusal to assist in the migration and to provide its desired art work and local content as the Club was repeatedly invited to do. Having failed to provide the requested content, the Rangers can hardly be heard to complain that the website content is lacking or inferior.

      31.    MSG asserts a number of vague criticisms of the new website designs, some of which are new and are being raised for the first time in this lawsuit. (I note parenthetically that, if the Rangers had raised these concerns in our meetings this past summer, rather than for the first time in this lawsuit, we could have addressed and resolved them at that time.) MSG complains that the use of a standardized template on a common platform has resulted in the Clubs' websites appearing identical, or "cookie cutter." The several screenshot examples attached hereto as Exhibit L establish that this criticism is simply not true. The standardized template provides a commonality without sacrificing Club individuality. While one of the goals of the new media website initiative was to make the fan experience familiar from one website to another by adopting a common horizontal navigation bar, the drop-down menus below the navigation bar and the modules of the template allow for a wide diversity in presentation of content and permit the Clubs to customize their websites to communicate in their own way with their fans. Just as they did before the migration to the common technology platform, the Clubs continue to control all of their local content after the migration to the NHL.com platform.

32.    Moreover, not only may the home page of each website be custom-ized, but, as I have already described, several Clubs – the New York Islanders, the Los Angeles Kings, and the Detroit Red Wings, for instance – have added Splash pages ahead of the home page to allow fans the option to skip the home page and, for example, go di-rectly to the ticket purchasing or promotional schedule page of the website (in the case of the Islanders).  The common platform and template improve the seamless navigation and familiarity of website layout for fans, but they do not preclude the Clubs from controlling the local content message to those fans once they arrive on the website.

33.    MSG also complains that the template does not permit the Rangers to utilize certain functionality that it claims to enjoy on its website that resides on MSG's platform, such as links to MSG's other websites or a feature called "Rangers on De-mand," a video playing feature purportedly loaded with Rangers historical footage, game highlights, player interviews and other Rangers-oriented content.  But MSG is again mis-taken.  Many of the screenshots attached as part of Exhibit L, including for example the Islanders screenshot, demonstrate that the Clubs may easily link to their related entities or, indeed, to any other website they wish.  And pursuant to the NHL's agreement with NeuLion, Inc. (coincidentally, the same video technology provider used by the Rangers), the NHL will provide an enhanced version of that same video technology for all of the Club websites, which can include for the Rangers' website the "Rangers on Demand" content.

34.    Indeed, each Club may now elect to have the League stream live on its website its games, properly "gated" to ensure that a Club's use of such live video remains within its own local market and outer market territories, as well as archival

20

games from the current season and non-game content.  The video player available to the Clubs through the NHL.com network is "best of breed" and was demonstrated to the Rangers in a presentation at the Board of Governors meeting on September 18, 2007.  It is curious why MSG's witnesses say in their declarations – filed after the September 18 Board meeting – that the video player is unavailable on the NHL.com network when they should know full well that it is available.  Although selection of the content to be deployed is the responsibility of the individual Clubs, the common platform and template provide the most updated video technology on which that content may be displayed to the fans.

35.    MSG also complains that the template will not permit the Rangers to have a fan chat room (a feature, incidentally, which is not currently deployed on the Rangers' website on the MSG platform).  The League is currently negotiating with third-party providers to supply a chat room functionality for availability across all Club websites for any Club that wishes to offer that functionality to its fans.

36.    MSG complains that several other features did not appear on its website when it was launched on the NHL.com platform.  The absence of these features is the result of the Rangers' refusal to cooperate with the NHL in the implementation of this website initiative.  Had the Rangers participated fully – like all of its League partners did – the Club's website, as incorporated on the new platform, would have had virtually all of the functionality it had on its own platform.

37.    Finally, MSG complains that the NHL will have access to the Rangers' customer lists once the Rangers' website is served by the NHL.com platform.  Like its other assertions, this claim is also wrong.  Each individual Club has the right and

ability to have its own website privacy policy, which describes to visitors how the Club will protect the privacy of personal information, such as email and mailing addresses, that the visitor supplies to the Club. The NHL has committed to respect those individual Club privacy policies, so that, if the Rangers do not wish to share the personal information of its fans with the League or the other member Clubs, that information will not be shared. There is simply no truth to the assertion that the Rangers are being forced to divulge their customer lists to anyone as a result of the migration of the Club's website to a common technology platform.

38.    In conclusion, there is no truth to MSG's contention that the League is "taking over" the Rangers' website or preventing the Club from communicating directly with its fans. The Rangers' website will remain the Rangers' website and, subject of course to the limits imposed by intellectual property and other applicable laws, the Rangers continue to have the opportunity to program that website with whatever content – video, articles, player profiles, fan promotions, local advertising, website links, and the like – they wish. The sole difference is that all of that content will be centrally serviced by a single CMS on a common technology platform using a standardized (yet customizable) template so that: (a) the fans' navigation from one website to another will be familiar, (b) Clubs can more easily share content among websites, and (c) advertisers can more efficiently purchase common space across all websites, thereby enhancing the value of the advertising inventory for all Clubs. The centralization of the CMS function saves the Clubs millions of dollars and refocuses their attention on the creation of content, where it should be, rather than on the development and maintenance of thirty separate back office operations. The efficiencies created by the League's website initiative benefit

all of the Clubs and the League by making professional hockey more competitive against other major sports and entertainment properties that have been able to capitalize on their national brand identity.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2007.

Keith Ritter