UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
MADISON SQUARE GARDEN, L.P.,          )   No. 07 Civ. 8455 (LAP)
                                      )
        Plaintiff,                    )
                                      )
        -against-                     )
                                      )
NATIONAL HOCKEY LEAGUE,               )
NATIONAL HOCKEY LEAGUE                )
ENTERPRISES, L.P., NATIONAL           )
HOCKEY LEAGUE INTERACTIVE             )
CYBERENTERPRISES, L.L.C., NHL         )
ENTERPRISES CANADA, L.P., and NHL     )
ENTERPRISES, B.V.,                    )
                                      )
        Defendant.                    )
------------------------------------------------------------- x

### REPLY DECLARATION OF STEVE MILLS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, STEVE MILLS, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am President and Chief Operating Officer of MSG Sports. I submit this Reply Declaration in further support of MSG's motion for a preliminary injunction in the above-captioned action and to respond to certain of the declarations that defendants have submitted in opposition to MSG's motion. I have personal knowledge of the facts stated below.

    **A.    The League's Assertion That It Is Not Trying To Take Over The Rangers Website**

2. I will address below some of the specifics in the declarations of League officials about the course of dealings between MSG and the League. But, at the outset, it should be noted that in its entirety Mr. Keith Ritter's declaration, and the other League declarations, are based on the fundamentally incorrect premise that the National Hockey League is not attempting to

eliminate the Rangers independently operated website. For example, after devoting pages of text to technical euphemisms such as "migrat[ing] to a common technology platform, centrally serviced by a common CMS" (Ritter Dec. ¶ 12),[1] Mr. Ritter declares:

> In conclusion, there is no truth to MSG's contention that the League is "taking over" the Rangers website or preventing the Club from communicating directly with its fans.

(Ritter Dec. ¶ 38.)

3.      That is simply not true. Contrary to Mr. Ritter's assertion, the elimination of a competitive Rangers website is precisely what the League demanded. As I described in my initial declaration, when NHL Deputy Commissioner William Daly wrote to me on September 20, 2007, he explicitly demanded – without technical euphemisms – that MSG "transfer to the League the domain name registration for newyorkrangers.com, as well as any other "newyorkrangers" domain name registrations with other extensions (*e.g.* ".net," ".org," ".us"). (Mills Dec. Ex. C.)

4.      Nor was Mr. Daly unambiguous about the League's demand that MSG eliminate any and all Rangers websites and, further, that MSG agree not to operate any competitive Rangers websites in the future. He explicitly demanded that MSG shut down, permanently, all Rangers websites. Mr. Daly wrote:

> Please be advised that if the Rangers current site (newyorkrangers.com) or any other successor site continues to be operated outside of the common League platform after September 28, the Rangers will be in violation of the Internet Regulations promulgated by the League . . .

(*Id.*)

---

[1] *See also e.g.* Ritter Dec. ¶ 1 ("migrate its current platform to the common platform developed for all the NHL Clubs' websites); (NHL "began to build the new CMS and the new template in preparation for migrating the individual Club websites to the common technology platform on which they would reside"); ¶ 17 ("The build-out process required each Club to transfer its website content to the new CMS, where we would perform the necessary program coding to enable the Club's content to be accessible on the new platform; ¶ 38 ("all of that content will be

5. And Mr. Daly made clear that the League was prepared to use brute economic force on MSG if it failed to comply with his demand that MSG surrender its website to the League and not operate any other Rangers website. He wrote:

> Without waiving any of the NHL's rights at law or equity, in addition I have no choice but to put you on notice that, effective beginning September 28, for each day on which your organization operates a Rangers website outside the common League platform, the organization will be fined a total of $100,000 . . . .

(*Id.*) This fine, of course, would total $36,500,000 per year and was obviously designed to cripple MSG's ability to run a viable Rangers website.

6. Thus, contrary to Mr. Ritter's assertion (and similar assertions made by Mr. Daly), the League has, indeed, attempted to take over the Rangers website, demanding that MSG shut down its Rangers website and turn over the Rangers' web address and content to the League. Not only that, but to the extent that MSG does not surrender to the League's demands, the League is seeking to impose upon MSG a $36,500,000 annual cost for operating a Rangers website on MSG servers. There simply is no other way to interpret Deputy Commissioner Daly's demands and threats.

### B. The League's Assertion MSG Refused To Participate In The New Media Strategy Is Not True

7. In his declaration, Mr. Ritter contends that MSG has refused to participate in the New Media Strategy or to cooperate with the League in implementing it. (*See e.g.* Ritter Dec. ¶ 8 [describing the "position of isolationism the Rangers now seem to assert on this motion -- that is, that the Club be permitted to develop its website entirely independently of the League and other Clubs, and that the Club has no interest in sharing the Rangers content with other Clubs or

---

(continued…)

centrally serviced by a single CMS on a common technology platform using a standardized (yet customizable) template")

vice versa through the NHL's CMS"].) Messrs. Daly (Daly Dec. ¶¶ 84-90) and Hawkins (Hawkins Dec. ¶¶ 3-9) make similar allegations.

8. Again, this is not so. Even Mr. Ritter's declaration shows that the Rangers have cooperated with the League and have been far from "isolationist." For example, the Rangers have responded to League surveys about Internet use and even offered suggestions for improving the NHL's website, including ways to make it less League-oriented and more useful to individual clubs. (Ritter Dec. ¶ 7.) The Rangers also participated in meetings about the League's proposed template for club websites. (Ritter Dec. ¶ 16.) And, as Mr. Ritter acknowledges, the Rangers at one point provided content to the League for use on a Rangers-oriented page within the NHL website. (Ritter Dec. ¶ 18.)

9. In addition, as described in my prior Declaration (and the declarations of Scott Richman and Dan David), I and other MSG representatives met numerous times with League representatives to try to find common ground that would allow the League to proceed with its proposed 30-team website, while also avoiding the elimination of the Rangers' official website from MSG's servers. (*See* Mills Dec. ¶¶ 17-18; Richman Dec. ¶¶ 2-7; David Dec. ¶¶ 7-10; *see also* Ritter Dec. ¶ 21 [referring to "a number of meetings and telephone conference calls between MSG and NHL representatives . . . ."]). Those efforts to reach common ground failed because the League continued to insist that MSG could not operate its Rangers website and MSG could not agree to relinquish the Rangers site to League control, on a League server.

**C. The League's Assertions That MSG Seeks To Deprive The NHL Of A Rangers Website Are Not True**

10. Mr. Ritter states that MSG seeks to prevent the NHL from having a Rangers page on NHL.com. This, too, is wrong. The League could continue to do what it had been doing for years, *i.e.*, establishing "hyperlinks" from NHL.com to MSG's Rangers website at

newyorkrangers.com. This would accommodate the needs of the League and the Rangers. Alternatively, as MSG indicated in meetings with the League, MSG would have been willing to permit the League to run a parallel Rangers site on NHL.com, as long as MSG could keep newyorkrangers.com.

11. Nor, as Mr. Ritter appears to suggest, is it MSG's position that it will not share content with other Clubs or with the League. As Dan David explained in his initial declaration on this motion, we have always cooperated with other clubs in sharing content where appropriate. (David Dec. ¶ 10.)

### D. MSG Should Not Be Required to Turn Its Rangers Website Over To The League

12. The two points on which we have not been willing to agree with the League are that (i) MSG should not be forced to shut down its website and hand over its valuable domain name www.newyorkrangers.com to the League; and (ii) if, instead of linking to MSG's Rangers site, the League decides to run a separate Rangers website, the League should not be allowed to call it the "official" site of the Rangers or to incorporate content from the Rangers website without MSG's permission.

13. MSG has sound reasons for declining to hand the League its website. The League has encroached upon individual Clubs' rights and property in recent years, and MSG would lose the ability to stop further League encroachments upon the Rangers website if MSG were to hand over control of the Rangers website to the League's servers.

14. As described in its complaint, and in the other papers MSG submitted on this motion, the NHL has for several years engaged in increasingly aggressive collectivism, to the detriment of individual Clubs. The League has purported to exercise more and more control over new media activities.

15. For these reasons, MSG simply could not agree (even temporarily) to hand over its website to the League. We would not be able to repair the harm that would occur while this case is pending. Specifically, if the League had control of the Rangers site, the League (and not MSG) ultimately could control how much and where Rangers-based content appears to fans in the Rangers website, and could deny MSG the ability to program its site in the way that MSG determined was the best way for communicating with fans and potential fans. If this were to happen, MSG would suffer immeasurably in its efforts to use the Internet to market Rangers hockey. As I described in my initial declaration, the Rangers are well positioned now to make use of the Internet to generate fan excitement about the team. (Mills Dec. ¶¶ 13-16.) A recovery of the Rangers website only at the end of this litigation would be too late to recover this perishable marketing opportunity.

16. The League's own submissions demonstrate the unrestricted power the League would have, and is likely to use, if it confiscates the right to operate the Rangers site. For example, Deputy Commissioner Daly describes a series of League resolutions, ratifications and license agreements that, in his view, bestow upon the League the unfettered right to take over virtually any Club property, especially media property, that the League wants to take. The resolutions and ratification upon which the League relies, however, were adopted in the context of allowing Clubs to run their own websites. For example, the minutes of the June 26, 1996 meeting at which one of the resolutions was passed reflect that Steve Solomon, the NHL Senior Vice President and Chief Operating Officer described the following as "key components" of the League's Internet strategy:

> "Each Club will have a unique, individual website within the League website with its own Club address that will permit direct access to the Club site."; and

> "Alternatively, *a Club may design its own pages* subject to format and content guidelines and serve them from the IBM server *or a local server (at the Club's expense)*"

(Daly Dec. Ex. E at 7-8).

17. Moreover, annexed as Exhibit 1 is a true and correct copy of the Minutes of a meeting of the NHL Board of Governors on August 2, 2000, in which Commissioner Bettman stated, for example, that the business model the League should use for its Internet strategy was a "hybrid" model that contemplated the Clubs running their own websites "to empower[ ] and create[ ] incentives for Clubs to function on a local level and directly interact with their fans, which they are best suited to do." Similarly, annexed as Exhibit 2 is a true and correct copy of a presentation made by NHL ICE in June 2000, in which, among other things, the League identified as flaws in a "centralized" Internet program, without independent team websites, (i) "limited incentives for team innovation"; (ii) "limited incentives for building local revenues"; and (iii) "teams unable to leverage local market expertise." (Ex. 2 at p. 30.)

18. As a practical matter, if the League is given total control of MSG's Rangers website, the League will be able to impose its own expansive view of League power during the pendency of this action, before the Court can rule on the legality of the League's actions.

19. This risk is real, even as the League tries to downplay it. Mr. Daly, for example, contends that "[t]he only changes in League rules identified by MSG in its papers are that now (a) the Club websites will be hosted on a common league platform using a League-wide CMS, and (b) the Club websites will be built using a standardized (though customizable) template." (Daly Dec. ¶ 63). According to Mr. Daly "nothing else has really changed." (*Id.* ¶ 66).

20. Even if that were so, and it is not, this would be an enormous change. Translated into plain English, Mr. Daly's statement means that previously independent Club websites, run on Club servers, and designed by the Clubs (subject to certain League standards), will now be

controlled by the League, run on League servers, and the League will be the final arbiter of all content the sites can contain and all commercial activities in which they can be used to engage.

21.  Such an outcome would represent a fundamental shift in rights.  Specifically, it would constitute a complete departure from the hybrid model for the ownership and operation of websites that has existed for years in the NHL, a model that addressed League-wide interests while still preserving the clubs' independence and property rights.  Until the introduction of the New Media Strategy, with its mandatory "migration" of club websites to a League server, teams had the right to operate their own websites, on their own servers, with the League having certain rights to set minimum quality standards and to use certain defined areas of team sites for League purposes.  Commissioner Bettman himself has described this hybrid approach as the "optimal business model," because it "allow[ed] the League to attain . . . a valuable national media presence, while empowering and creating incentives for Clubs to function on a local level, and directly to interact with their fans, which they are best suited to do."  (*See* Daly Dec. Ex. F at 7-8; *see also* Ex. 1, describing statements of Commissioner Bettman at August 2, 2000 Board of Governors meeting.)

22.  There is every reason to believe that the League's desire to take over individual Clubs' property will not abate once it has taken control of Clubs' websites.  For example, in the "Media Strategy & Recommendations" of the New Media Committee, upon which the League has based its New Media Strategy, the Committee purported to conclude that "it did not make sense to approach on-line ticket sales collectively."  That limitation only exists for now, however.  The Committee made sure to note that at least one member "asked that the Committee revisit the potential" for taking over this critical club function "at a later date."  (Daly Dec. Ex. H at p.16.)  So just as it now wants to abandon the carefully calibrated hybrid model Commissioner

Bettman once described as "optimal," if the League takes over control of a club's website, it could easily take over ticket sales, too, at any time it chose to do so.

23. Similarly, Mr. Ritter spends considerable effort in his Declaration trying to allay any concerns about the League's intention to take control over club-related content on team websites. For example, Mr. Ritter claims that, in the League's "5-Year business plan," each "club would program a portion of its website with local content of its own choosing" to "ensure a local voice for Clubs to promote their players, community initiatives, ticket sales, etc." (Ritter Dec. ¶ 15.) But there is no reason to believe this would be the case if the League were to have control of club sites on its own server. For example, the New Media Committee, in its "Media Strategy & Recommendations," made sure to note that under Major League Baseball's website program, which the NHL used as a model for its own program, content writers for individual teams are employed by a League-controlled entity (MLBAM) and "[t]eams cannot program any portion of their site but may provide story suggestions to MLBAM." (Daly Dec. Ex. H at 4.) There is no reason to believe that the NHL would not impose this same restriction once it were to absorb club websites onto its own servers.

24. In yet another example, Mr. Ritter attempts to assure the Court that "on the League's common platform, no Club is required to share its content with other Clubs; each Club is free to choose whether to share any particular local content." (Ritter Dec. ¶ 8.) Again, however, even if this is so, the surrender of club sites to League control will cause further erosion of Club rights. In the same declaration, Mr. Ritter expressly leaves the door open for the League to change its policy about this, too, once its centralized Content Management System (i.e., "CMS") runs all the team sites. Thus, Mr. Ritter complains in the same declaration about the Rangers' resistance to "migration to a common platform" because "it would undermine the

interconnectivity goals of the single [Content Management System] by impeding other Clubs' ability to obtain Rangers content for purposes of marketing in their local markets." (Ritter Dec. ¶ 23.) This desire to give the League the ability to take content, according to Mr. Ritter, was one of the reasons the League "insisted that the Rangers' website migrate to the League CMS . . . ." (*Id.* ¶ 24.)

### E.  The League's Assertion That MSG Will Suffer No Harm If The Injunction Is Denied

25.  I am informed that the League has argued that the "balance of hardships in no way tips in MSG's favor "because all MSG has to do if it wishes to keep its own website operating is "pay the duly authorized fine" of $100,000 per day, *i.e.*, $36,500,000 per year, until this Court resolves MSG's antitrust claims. This, of course, is far more than the incremental revenue the League has ever suggested it could make were the League to take over the Rangers website.

26.  The injunction MSG requests would cause the League no harm at all. Specifically, the League could still proceed with 29 League-controlled websites, instead of 30. Indeed, the League could also – as it insists it wants to do – have a full 30 team site. MSG has always agreed that (i) the League can link its website to MSG's official Ranger website, newyorkrangers.com, and (ii) the League can even operate its own "Rangers" site, instead, as long as it obtains MSG's permission to use Rangers content.

Dated:  New York, New York
        October 18, 2007

_____
STEVE MILLS