UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

MADISON SQUARE GARDEN, L.P.,      )
                             )
      Plaintiff,         )   No. 07 CIV. 8455 (LAP)
                             )
      v.         )
                             )
NATIONAL HOCKEY LEAGUE, NATIONAL  )
HOCKEY LEAGUE ENTERPRISES, L.P.,  )
NATIONAL HOCKEY LEAGUE INTERACTIVE  )
CYBERENTERPRISES, L.L.C., NHL  )
ENTERPRISES CANADA, L.P., and NHL  )
ENTERPRISES, B.V.,  )
                             )
      Defendants.   )

----------------------------------------------------------------- X

### REPLY DECLARATION OF DANIEL DAVID IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, DANIEL DAVID, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am the Manager, Interactive Programming for Madison Square Garden, L.P. ("MSG"). Formerly, I was the Manager, Internet Marketing and Development for the New York Rangers (the "Rangers"), a professional hockey team owned by MSG. I am responsible for the design, operation and maintenance of MSG's websites for the Rangers, the New York Knicks basketball team, and the New York Liberty women's basketball team, all of which are owned by MSG. I submit this reply affidavit in further support of MSG's motion for preliminary injunction in the above-captioned action, and I have personal knowledge of the facts stated below. In this regard, I have reviewed the declarations submitted by Keith Ritter, John Collins and Robert Hawkins in this litigation, and I provide this declaration to address a few of the

specific issues discussed in their submissions. This declaration is not intended as a detailed

refutation of all the inaccuracies in their submissions.

2.      The League personnel who supplied declarations are wrong in their claims

that MSG supposedly failed to cooperate with the League in its efforts to launch its new website.

I described in my original declaration our numerous, detailed discussions with League

representatives, including Mr. Ritter, on how best to coordinate and integrate the Rangers site

with the NHL's new site. We participated in those discussions in good faith and we tried to

work out our differences with the League in an effort to accomplish our respective goals, but we

were unable to reach agreement due to our fundamental differences as to who should control

team websites. While we did at one point decline to provide artwork to the League, that was

because to do so would have suggested that we agreed with the League's confiscation of our site.

3.      Throughout these discussions, we made clear that we could not agree to

the League's attempt to take control over the Rangers website, which is MSG's property. Thus,

we refused (i) to relinquish control over our site or the newyorkrangers.com URL, (ii) to publish

the Rangers site through the League's Content Management System, (iii) to allow our site to

reside on the NHL's servers, or (iv) to point our team's URL to the League's servers rather than

to our own. We have always been consistent in these positions. It is for this reason that I

declined to participate in the NHL's Content Management System training; because to do so in

our view would have suggested incorrectly that we were willing to allow our site to be published

though the NHL's server. We did, however, try to accommodate the League by suggesting it

either build and operate its own Rangers site using a different URL, which it could then add to

NHL.com, or to include on its NHL.com site a link to the Rangers' existing website, or some

combination of the two.

NYI-4033030v1                                    -2-

4.    The League's declarants are also incorrect in their claims that MSG supposedly has been unwilling to share content with other teams. The Rangers have always been willing to share content with other teams, and we have never refused any reasonable request to do so. As I said in my initial declaration, we routinely share with other teams photos and other content. We have done this for years and have a very good working relationship with the other NHL teams in this regard.

5.    Mr. Ritter's effort to justify the League's New Media Strategy is also inaccurate. First, in paragraphs 6-8 of his declaration, he mischaracterizes a January 2006 survey conducted by the NHL and the Rangers' response to that survey (to which I contributed). He fails to mention that this survey was conducted under misleading circumstances. Specifically, the Rangers were not told why the League was conducting the survey or for what purpose it would use the teams' responses. In other words, we were never told that the League would use those responses to try to justify the NHL's taking over control of team websites. As for the Rangers' response, which Mr. Ritter quotes in part, we were commenting upon the NHL's ineffectiveness in running its own website and the League's lack of cooperation with teams that were running their own sites. Contrary to Mr. Ritter's suggestion, we were not expressing a desire for collaboration in the sense of suggesting that the NHL assume greater control over this aspect of the teams' businesses. We were noting the League's refusal or inability to communicate with the teams and to coordinate the efforts of the individual clubs.

6.    Mr. Ritter is inaccurate in his assertion that the NHL's new website scheme does not take "any more advertising space for national advertising than had historically been permitted before the new media initiative." (Ritter Decl. ¶ 27) He fails to mention the 300 x 250 ad space on the right side of the teams' home pages that the League has taken as part

of its New Media initiative, the revenue from which purportedly is to be used to pay for the development of the new NHL website. This is perhaps the second most valuable location on the team sites (aside from the banner space that the League has always controlled), and teams are now precluded from making any revenue from this important space, in competition with each other. In addition, under the New Media initiative, the NHL has taken over other locations of the home pages of team sites for the League's own use (*i.e.*, for schedules, statistics and news headlines), and that space is also no longer available for the teams to use or sell.

7.      Mr. Ritter is also inaccurate in his statements about the NHL not being able to access customer information under the NHL's planned website takeover scheme. If the NHL implements its plan to take over the Rangers website, meaning that all traffic to the Rangers site is forced to flow through the League's servers, the NHL easily would be able to learn the usage patterns of all Rangers website visitors and, in addition, to track the traffic on the Rangers site, which is valuable confidential information we use in competing for advertisers. Although the NHL might not be able to learn the names and addresses of site users, it will easily be able to determine their patterns of movement around the site, the frequency with which they click on particular links, and certain demographic data.

8.      In addition, if the NHL were to control the Rangers site, developments or improvements we might want to make to our site would have to be run past and approved by League employees. We would lose flexibility and be restricted in our ability to respond rapidly to the needs and desires of our fans. In short, control over the servers translates into control over the site. That does not mean we cannot link our site to the NHL's website. We have done that for years. The NHL refused to agree to this.

9.      In that regard, I have reviewed the declaration of Robert Hawkins, an attorney for the NHL who participated in our recent discussions on this issue. Among other things, Mr. Hawkins denies suggesting that the NHL might consider ways in which the League's plan could be implemented by posting content and advertising on the Rangers website; a suggestion he made and that encouraged those of us from MSG who heard it. His assertion now that he did not make this statement and that he always espoused the League's policy of having all team sites reside on the League's servers does not accurately reflect what he said at the meeting. To the contrary, the statements that he made to me and others from MSG during the meeting are as I described them in paragraph 8 of my prior declaration. Indeed, I remember that when Mr. Hawkins made such a suggestion, Keith Ritter turned to him and jokingly said "if Peter and his team [NHL technical personnel] heard you saying that right now, they would want to strangle you." For that reason as well, I believe that Mr. Ritter knew and understood exactly what Mr. Hawkins had suggested to MSG.

10.     Finally, the comparison that the NHL is trying to draw between MSG's refusal to allow its Rangers site to operate on the NHL's servers and the operation of the Knicks site on the NBA's servers is also misleading. The Knicks site was placed on the NBA's servers at a very early stage in the use of the Internet by sports teams as a way of promoting their products and certainly well before the Rangers learned how best to use its website to increase revenues and communicate with fans. Not only that, but the NBA puts far fewer restrictions on what teams can do than what the NHL is proposing to do. Unlike the NHL, the NBA offers multiple templates that teams can use to customize their sites, which avoids the cookie cutter approach adopted by the NHL. Teams are free to develop their own customized site architecture if they so desire. The NBA also does not require that its content be displayed on team home

pages. Thus, the NBA has exhibited far more flexibility in allowing teams to design and customize their sites to appeal to their own fans. While Mr. Ritter asserts that the NHL opted for its single template approach because it is more user friendly, that is not what the NHL previously told the teams, which was that the League felt it was too complicated and expensive to offer multiple templates in its initial release of the Content Management System software.

11.    In addition, the NBA, unlike the NHL, does not confiscate the revenue that teams are able to generate from their websites. Team employees are used for team sites, and the revenue those employees generate are for the teams to keep. The NBA does not take over any of the ad space on team home pages. The teams instead retain the right to sell 100% of that valuable ad space. The NHL, in contrast, takes considerable ad space from the teams and forces the teams' employees to generate content and provide support for the League's site.

12.    Indeed, the NBA model only makes MSG's point. The NHL, unlike the NBA, has taken no account of the need for teams to retain control over, and flexibility to utilize, the key channel through which they communicate with their fans. Mr. Ritter states that "[i]t was difficult to ascertain precisely what MSG's real concerns were." Our real concerns have always been with controlling the means through which we are able to speak with our fans. While the NHL appears to want to change our fans (and make them less "tribal"), restraining competition in the process, MSG appreciates that it is this very aspect of their nature that makes them loyal to the Rangers and that MSG, through a vibrant and exciting website, wants to reinforce in order to ensure that they remain long-term fans.

Dated:   New York, New York
         October 17, 2007

_____
                DANIEL DAVID