UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

| | | |
|---|---|---|
| MADISON SQUARE GARDEN, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 CIV. 8455 (LAP) |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL HOCKEY LEAGUE, NATIONAL | ) | |
| HOCKEY LEAGUE ENTERPRISES, L.P., | ) | |
| NATIONAL HOCKEY LEAGUE INTERACTIVE | ) | |
| CYBERENTERPRISES, L.L.C., NHL | ) | |
| ENTERPRISES CANADA, L.P., and NHL | ) | |
| ENTERPRISES, B.V., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

------------------------------------------------------------------- x

### PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT
### OF ITS MOTION FOR PRELIMINARY INJUNCTION

**JONES DAY**
**222 East 41st St.**
**New York, NY  10017**
**(212) 326-3939**

*Attorneys for Plaintiff Madison Square Garden, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .......................................................................................................................... 2

    I.     MSG'S SHOWING OF IRREPARABLE HARM STANDS
           UNREBUTTED           2

    II.    MSG HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS    4

          A.     The NHL's Argument That Its Actions Are Exempt From Antitrust
                 Scrutiny Lacks Any Legal Basis .................................................................... 4

          B.     The NHL's Purportedly "Procompetitive" Justifications Are
                 Transparently Inadequate Under Either Quick-Look Or Rule of
                 Reason Scrutiny ............................................................................................ 8

    III.   THE BALANCE OF HARDSHIPS CLEARLY FAVORS MSG        10

CONCLUSION ...................................................................................................................... 10

**TABLE OF AUTHORITIES**

## CASES

*American Needle Inc. v. New Orleans Louisiana Saints*, 496 F. Supp. 2d 941 (N.D. Ill. 2007) ...................................................................................................................5

*Arizona v. Maricopa Cty. Medical Social*, 457 U.S. 332 (1982) ...............................................6, 7

*Capital Imaging Associates v. Mohawk Valley Medical Associates*, 996 F.2d 537 (2d Cir. 1993) ...................................................................................................................9

*Chicago Prof'l Sports LP v. NBA*, 95 F.3d 593 (7th Cir. 1996)...................................................5, 8

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) ..........................................................6, 7

*FTC v. Ind. Federation of Dentists*, 476 U.S. 447 (1986) ..............................................................2

*Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984)..................................................................................................5

*MLB Properties Inc. v. Salvino Inc.*, 420 F. Supp. 2d 212 (S.D.N.Y. 2005)..................................8

*Merrill Lynch Investment Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003) ....................3

*Moltan Co. v. Eagle-Picher Industrial, Inc.*, 55 F.3d 1171 (6th Cir. 1995) ...................................3

*N. America Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir. 1982) ...............1

*NCAA v. Board of Regents*, 468 U.S. 85 (1984) ...............................................................5, 6, 7, 8, 9

*National Society of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) .......................................9

*National Hockey League Players' Association v. Plymouth Whalers*, 419 F.3d 462 (6th Cir. 2005) ...............................................................................................................5

*Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005) ...................................................4

*Polygram Holding Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005)...............................................2, 6, 9

*Six West Retail Acquisition Inc. v. Sony Theater Management Corp.*, 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004), *aff'd*, 124 Fed. App'x 73 (2d Cir. 2005)...................................9

*Smith v. Pro Football, Inc.*, 579 F.2d 126 (D.C. Cir. 1978) ...........................................................5

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994)................................................................................5

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .............................................................................1, 6, 7

*United States v. Phila. National Bank*, 374 U.S. 321 (1963).........................................................9

NYI-4033728v1

**TABLE OF AUTHORITIES**
**(continued)**

-iii-

*United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) ......................................................6, 7

*Volvo North America Corp. v. Men's International Prof'l Tennis Council*, 857 F.2d 55
    (2d Cir. 1988)............................................................................................................5

**OTHER**

Areeda & Hovencamp, VII Antitrust Law (2007 App.) ...................................................................6

NYI-4033728v1

## PRELIMINARY STATEMENT

The NHL's position on this motion is both disingenuous and wrong. The NHL admits that it is changing the long-standing status quo by eliminating independent competition by its teams with each other and the NHL. Yet it claims that no procompetitive justification is required for this conceded restraint on competition, because as a sports league it is immune from antitrust scrutiny. This argument is breathtaking, and indefensible.

The NHL's protestations about the "efficiencies" of its common technology platform, moreover, are a calculated distraction. MSG does not object to the NHL's operation of a website that includes all 30 teams on that common platform. So all of the NHL's effort to justify its operations is beside the point, since MSG is not trying to eliminate these. All MSG seeks is an injunction against the NHL's effort to eliminate MSG's website as an independent competitor.

The NHL's papers offer only three inadequate defenses of that conduct.

- The NHL is entirely unconstrained by the antitrust laws in prohibiting competition among its teams with respect to promotion or marketing activities, either because it is a "single entity" or because the recent *Dagher* case purportedly revolutionized "joint venture" law. (Br. 12-15).

- NHL fans are too "tribal," and the NHL's conduct is necessary to ensure that the "broader, more multi-dimensional coverage" preferred by the NHL replaces "the provincial approach currently employed in most markets." Collins Decl. ¶ 7; *see generally id.* ¶¶ 5-11.

- "The ability to provide sponsors with . . . access to the largest group of unique visitors possible" is "critical to the monetization of" the NHL's online business and the "Rangers' fans represent an important demographic group" in "an anchor market for any national advertising campaign." Leonsis Decl. ¶¶ 5, 14.

These purported justifications ignore or reject established antitrust law. <u>First</u>, the Second Circuit, like the overwhelming majority of courts, has long rejected the argument that sports leagues are "single entities," *see N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1257 (2d Cir. 1982) ("*NASL*"), and the NHL's portrayal of *Dagher* as *sub silentio* overruling decades of antitrust precedent (including cases cited with approval in *Dagher* itself) is not a

- 1 -

plausible legal position.  Second, the notion that it is procompetitive to suppress "provincial" website competition so that fans may be educated to be less "tribal" is simply wrong; the NHL "is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 462 (1986). Third, the argument that the NHL can better "monetize" its websites if not forced to compete with the Rangers for Rangers fans, is, as the D.C. Circuit recently observed in an analogous context, "nothing less than a frontal assault on the basic policy of the Sherman Act."  *Polygram Holding Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005) (internal quotation marks omitted).

The argument that MSG has not shown irreparable harm is even weaker.  MSG cannot be faulted for trying to resolve its disagreements with the NHL and for invoking the judicial process only when forced to choose between crippling fines and the loss of its website.  The NHL's own submission establishes that MSG could not "cooperate" without simply capitulating, since the NHL's goal is to replace "provincial" approaches like the Rangers' with its own "non-tribal" approach.  Finally, this is not about money.  The Rangers merely seek an injunction against the NHL enforcing its rule prohibiting competition; the NHL's choice of draconian fines ($36.5 million annually) as its means of enforcement does not exempt it from injunctive relief.

## ARGUMENT

### I.    MSG'S SHOWING OF IRREPARABLE HARM STANDS UNREBUTTED.

The NHL barely challenges MSG's showing of irreparable harm, arguing principally that MSG is disqualified from claiming such harm.  This argument borders on the frivolous.

The NHL's primary claim is one of laches:  that MSG was aware of the NHL's website strategy and its own objections no later than June 2007, and "could have sought relief from this

NYI-4033728v1

Court without the urgency it now claims." Br. 7.[1] In essence, the NHL contends that seeking to find a solution out of court means that MSG is foreclosed from seeking judicial assistance when discussion proves fruitless. Unsurprisingly, this contention finds no support in the case law.

For example, in *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003), the Second Circuit affirmed a preliminary injunction restraining an arbitration proceeding despite a claim of delay. The court noted that a party making such a claim must show that "the plaintiff has *inexcusably* slept on its rights," *id.* at 132 (emphasis added), and held the defense inapplicable where the plaintiff first sought to resolve its objections without litigation and filed suit only when it became clear that arbitration was imminent. *Id.*; *see also, e.g., Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (movant will not be "penalize[d]" for first "attempting to use other avenues to resolve th[e] dispute").

The NHL's argument that MSG's harm is "self-inflicted" because it "agree[d] to the enforcement mechanisms under the NHL Constitution," Br. 8-9, is wrong on the facts and unsupported by authority. MSG did *not* agree to the use of those "enforcement mechanisms" in violation of the antitrust laws, and membership in an organization that has enforcement mechanisms does not, *ipso facto*, waive the right to injunctive relief against the illegal use of those mechanisms.

The claim that MSG "strategically manufactured" its irreparable harm by "obstinately refusing to cooperate" with the NHL depends on the transparently false premise that this dispute arises out of mere obstinacy and not profound business and legal differences. Br. 9-10. As the NHL's Collins Declaration makes clear, the NHL intends to use its control over websites to

---

[1] The NHL also claims that MSG long ago "gave up" all its intellectual property rights to the League, particularly with respect to the Internet. Br. 7. The NHL does not indicate how this contention is relevant to its claim that MSG delayed in suing in 2007, and in any event any contention that MSG has granted the League the authority to eliminate independent team websites is wrong. *See* Mills Decl. ¶¶ 16-17; Daly Decl. Ex. F, at 8 (Commissioner Bettman describing "hybrid" model employing club-controlled websites as "optimal").

NYI-4033728v1

eliminate the "provincial" focus of sites like the Rangers' and substitute the "non-tribal"

approach the NHL prefers. Collins Decl. ¶¶ 5-11. As explained in the Rangers' opening brief

and its declarations, this fundamental shift away from cultivating the Rangers' relationship with

their fans is precisely what is *most* harmful about the NHL's plan.[2] Deighton Decl. *passim*;

David Decl. ¶¶ 12-22; Hausman Decl. *passim*.

Finally, the claim that the Rangers' dispute is merely "about money" and therefore

reparable by damages is disingenuous. The NHL imposed a vastly disproportionate fine—

amounting to $36.5 million annually, dwarfing the entire *League*'s $5.5 million in website

revenues (and net loss), *see* Ritter Aff. Ex. F, at 23—precisely to leave the Rangers with no

choice but to shutter their website. The  relevant question is whether, as a practical matter,

"irreparable harm will result if the relief is not granted," *Nechis v. Oxford Health Plans, Inc.*, 421

F.3d 96, 103 (2d Cir. 2005), and absent relief the Rangers will be forced to shutter their website.

This shutdown and loss of competition present irreparable consequences for the Rangers, and are

a paradigm of irreparable harm.

## II.    MSG HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

The NHL's arguments on the merits all rest on the premise that the NHL may forbid

competition among its members whenever it believes the NHL would be better served without

such competition. This premise has been resoundingly rejected by the courts.

### A.    The NHL's Argument That Its Actions Are Exempt From Antitrust Scrutiny Lacks Any Legal Basis

The NHL's lead argument, that as a sports league it is a "single entity" that is not even

*subject* to Section 1 of the Sherman Act with respect to "exploitation" of the "entertainment

value" of its product (Br. 12-13), would allow the NHL to fix everything from ticket prices to

---

[2] The NHL's suggestion that this harm is undercut by the fact the Knicks' website is on a central NBA platform, Br. 2, is specious, due to numerous differences between the two leagues' sites and approaches. David Reply Decl. ¶¶ 10-12; Richman Reply Decl. ¶ 7.

NYI-4033728v1

arena staff salaries.  This argument has routinely been rejected, including by the Second Circuit,

which stated that a single-entity "loophole" for sports leagues would eliminate "antitrust

responsibility for any restraint . . . that would benefit the[] league . . . even though the benefit

would be outweighed by its anticompetitive effects."  *NASL*, 670 F.2d at 1257.  The teams

remain independent economic entities for a broad range of purposes, and as such they can

compete and conspire.  *See also Volvo North America Corp. v. Men's Int'l Prof'l Tennis Council*,

857 F.2d 55, 74 (2d Cir. 1988) ("[S]ince joint ventures—including sports leagues and other such

associations—consist of multiple entities, they can violate § 1 of the Sherman Act."); *NCAA v.*

*Bd. of Regents*, 468 U.S. 85, 113 (1984) (a sports league, like other joint ventures, has "no

immunity from the antitrust laws").

The NHL, oddly, relies on *Chicago Prof'l Sports LP v. NBA*, 95 F.3d 593 (7th Cir. 1996),

but that case *rejected* the NBA's argument that "it necessarily is one [entity], for every purpose."

95 F.3d at 599.  Indeed, the quotation cited in the NHL's brief (Br. 13) appears to be the court's

description of the NBA's argument, *not* a holding of the court, *id.* at 597-98.  *See also id.* at 599

(recognizing that "[m]ost courts . . . have preferred the joint venture characterization" of sports

leagues).  More significantly, even if that case supported a "single entity" approach, it would not

overcome the binding Second Circuit authority rejecting the argument.[3]  The same is true of the

district court decision in *American Needle Inc. v. New Orleans Louisiana Saints*, 496 F. Supp. 2d

941 (N.D. Ill. 2007).

---

[3]    The overwhelming weight of authority is in accord with the Second Circuit.  *See, e.g.*, *National Hockey League Players' Association v. Plymouth Whalers*, 419 F.3d 462 (6th Cir. 2005) (rejecting claimed single-entity status of the Ontario Hockey League, an NHL affiliate); *Sullivan v. NFL,* 34 F.3d 1091 (1st Cir. 1994) (rejecting single-entity defense because "it is well established that NFL clubs also compete with each other, both on and off the field, for things like fan support, players, coaches, ticket sales, local broadcast revenues, and the sale of team paraphernalia"); *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984) (rejecting single-entity defense and invalidating a prohibition on the relocation of the Raiders franchise); *Smith v. Pro Football, Inc.*, 579 F.2d 126 (D.C. Cir. 1978) (invalidating NFL draft under the rule of reason).

The NHL also claims immunity from antitrust scrutiny based on an extraordinary, opportunistically aggressive reading of *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). The NHL claims that *Dagher* overthrows *sub silentio* the well-established rule that restraints on competition imposed by a joint venture must be justified as procompetitive, *see, e.g., NCAA*, 468 U.S. at 101; *Polygram Holding*, 416 F.3d at 33-35, with a broad new rule that "internal joint venture restraints" of any "legitimate joint venture" need no justification. Br. 14-15 & n.14. This reading of *Dagher* is not merely a stretch, it is a distortion.

*First*, *Dagher* addresses only a fully integrated joint venture in which the participants had combined *all* their relevant assets into a corporate entity through which they then shared *all* profits and losses. This venture was thus effectively a merger of previously independent businesses, a fact which the Supreme Court treated as critical to its decision. *See* 547 U.S. at 5-6 (emphasizing integration of venture and quoting language from *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 336 (1982), distinguishing structurally integrated from less integrated joint ventures). Given that, the Supreme Court had no difficulty unanimously concluding that setting the price for the venture's undifferentiated product was simply "a business . . . setting a price for its goods and services" that required no extended antitrust analysis. *Id.* at 8. As the leading antitrust treatise has noted, "one should not overread the opinion" beyond those unique facts. Areeda & Hovencamp, VII Antitrust Law (2007 App.) ¶ 2132, at 469.[4] There is no hint in *Dagher* that the Supreme Court intended to overrule *NCAA* and other established joint venture cases, *see id.* ¶ 2132, at 468-69, especially since those cases were cited with approval. *See* 547 U.S. at 5-7 (citing *NCAA*, *Maricopa Cty.*, *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), and *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969)).

---

[4]     It is ironic that the NHL attempts to distinguish *NCAA* based on differences in the degree of integration of the two sports associations, while relying on *Dagher*, which involves a vastly different joint venture that was effectively a merger between the two companies.

- 6 -

*Second*, *Dagher* simply did not address restraints that eliminate competition that would otherwise exist. One of the critical facts in *Dagher* was that the participants did not otherwise "compete with one another in the relevant market." *Id.* at 5. Accordingly, the pricing policy was not an "agreement between competing entities with respect to their competing products," and raised no antitrust issues. *Id.* at 6. By contrast, where there *is* some competition among the venture participants, as in *NCAA*, *Indiana Federation of Dentists*, *Topco*, *Citizens Publ'g*, and *Maricopa Cty.*—and here—a restriction of that competition *is* clearly subject to antitrust review.

*Third*, the notion that a limited purpose joint venture can, at anytime and for any reason, redefine its reach to sweep in previously independent competitive activities without antitrust scrutiny is found nowhere in *Dagher*. In *Dagher*, the pricing of a product that was *only* sold by the venture was, logically, a core activity of the venture and not subject to antitrust attack. Here, the joint venture is obviously not fully integrated; the members remain very substantial independent competitive entities with separate corporate existence and activities; and the NHL cannot credibly argue that eliminating their existing competition is part of the "core" of a venture that has existed without such a ban for decades. Compare the restraint in *NCAA*, which concerned broadcasting of games by a venture created specifically to promote, regulate, and produce those games. The Supreme Court did not view that restraint as a "core" function of the venture exempt from scrutiny, *see* 468 U.S. at 114. *A fortiori*, the elimination of all pre-existing online competition between the member clubs of the NHL certainly is not immune.

In short, the antitrust laws require the NHL to rebut the presumptively anticompetitive nature of its attempt to eliminate competition. The NHL's attempt to change that law, and drop that burden, simply cannot overcome the strength of the Rangers' showing of likelihood of success under the traditional case law in this Circuit.

NYI-4033728v1

**B.      The NHL's Purportedly "Procompetitive" Justifications Are Transparently Inadequate Under Either Quick-Look Or Rule of Reason Scrutiny**

If the NHL is not immune, it must demonstrate some procompetitive justification for its overt ban on website competition.  "[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate [its] anticompetitive character."  *NCAA*, 468 U.S. at 109 (internal quotation marks omitted).  Accordingly, a "'naked restriction on price or output'" "'requires some competitive justification even in the absence of a detailed market analysis.'"  *Ind. Fed'n*, 476 U.S. at 460 (quoting *NCAA*, 468 U.S. at 109-110). [5] The NHL never takes on the burden of showing that its ban benefits competition, and not just the NHL.  Nor does it ever argue that there can be no common website without the ban, only that the ban can make the NHL's own website more profitable.

Indeed, the "justifications" in the NHL's brief focus exclusively on the benefits of a joint platform, not on any justification for eliminating competing sites.  *See* Br. 17-18 (discussing benefits of a "common technology platform," "increased online scale," and "standardized layout").  But MSG does not seek to prevent the NHL from operating its joint platform, so these arguments are beside the point.  What the NHL must justify is its attempt to eliminate competition, and its brief makes no effort at any such justification.

The NHL's declarations support the MSG claims, not the NHL's defenses.  The Collins Declaration claims that the NHL must suppress independent team websites because those sites are excessively "tribal," and the NHL believes it will benefit from "broader, more multi-dimensional coverage."  Collins Decl. ¶ 7.  But suppressing local competition because the NHL disapproves of (and hopes to change) its consumers' "tribal" tastes is exactly the kind of conduct

---

[5]      The NHL's claim that quick-look analysis is inapplicable to sports leagues' "output and marketing" restrictions, Br. 11-12, is contrary to *NCAA* and completely unsupported by the NHL's cited cases, which articulate no such categorical rule.  Both *Chicago Professional Sports* and *MLB Properties Inc. v. Salvino Inc.*, 420 F. Supp. 2d 212 (S.D.N.Y. 2005), simply found quick-look analysis inapplicable to the particular restraints before them.

that the Sherman Act forbids.  The NHL "is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand." *Ind. Fed'n*, 476 U.S. at 462.[6]  Moreover, the argument that one may reduce competition in one market (here, local markets) to aid competition somewhere else has been squarely rejected by the Supreme Court.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963).

Similarly, the Leonsis Declaration simply asserts that the NHL will make more money if other competition is eliminated.  This may be true, but every cartel benefits from eliminating competition.  *See, e.g., NCAA*, 468 U.S. at 117 ("The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.") (internal quotation marks omitted)); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("[P]etitioner's attempt to [justify a restraint] on the basis of the potential threat that competition poses to . . . its profession is nothing less than a frontal assault on the basic policy of the Sherman Act.").[7]

Finally, whether the approach is "quick look" or the Rule of Reason, MSG can prevail without showing that the NHL has market power in a relevant market.  Br. 16-17.  As *Indiana Federation* makes clear, even where "quick look" does not apply, "detailed market analysis" is not essential to a "finding of a violation of the Rule of Reason. . . .  '[P]roof of actual detrimental effects, such as a reduction in output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"  476 U.S. at 460-61; *accord Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546 (2d Cir. 1993).

---

[6]    The NHL claims that consumer "preference cannot form the basis of proving harm to consumers or competition," Br. 19, citing *Six West Retail Acquisition Inc. v. Sony Theater Mgmt. Corp.*, 2004 WL 691680 (S.D.N.Y. Mar. 31, 2004) (Preska, J.), *aff'd*, 124 Fed. App'x 73 (2d Cir. 2005).  *Six West* says no such thing, and merely holds that antitrust law does not "compel Sony pictures to license its films to" particular theaters. *Id.* at *10.

[7]    This "greater profits" justification is precisely the one offered and rejected in *Polygram Holding*.  There, two companies that jointly produced and distributed a "Three Tenors" album agreed to suspend advertising and discounting of earlier "Three Tenors" albums that they marketed individually.  The court found this restriction unlawful, emphasizing that a joint venture may not suppress competition by members' individual products to increase the profitability of the joint product, *see* 416 F.3d at 31, and noting that "[a] restraint cannot be justified solely on the ground that it increases the profitability of the enterprise that introduces the new product, regardless whether that enterprise is a joint venture or a solo undertaking." *Id.*at 38.

NYI-4033728v1

Here, the NHL's own submission makes clear that one of the principal purposes of its website integration is to suppress "tribal," inter-club competition. Under settled law, that suppression of competition must be justified, and the NHL cannot justify it simply by raising questions about market definition. In any event, MSG's Complaint identifies several relevant markets, the dynamics and scope of which will be presented in depth at the appropriate point. The NHL's *assertion* that these markets are "implausible as a matter of law," Br. 16, is, at this stage of the litigation, as naked as the restraint on the Rangers and just as unattractive legally. In sum, based on the controlling case law in the Supreme Court, this Circuit, and elsewhere, a limited purpose joint venture cannot suppress competition among its members without compelling procompetitive justification. Here, there is none. Therefore, MSG has demonstrated a likelihood of success on the merits, and, *a fortiori*, a serious question going to the merits.

## III.    THE BALANCE OF HARDSHIPS CLEARLY FAVORS MSG

The NHL's argument that MSG will suffer no harm "by migrating to the NHL platform," Br. 19, is decisively rebutted by the NHL's own submission, which makes clear that the NHL will use its control to eliminate the "tribal" focus that is critical to the team's relationship with its fans. *See* Collins Decl. ¶¶ 5-11; Deighton Decl. *passim*.

Likewise, the NHL's argument that an injunction "would impact the very ability of the NHL to govern itself," Br. 20, is difficult to take seriously. The "enforcement mechanisms" of the NHL are only affected if they raise substantial questions of antitrust law and cause irreparable harm. Such an order would "impact" only the NHL's ability to enforce violations of federal law—a result that the NHL cannot seriously contend is a cognizable "hardship."

### CONCLUSION

For the reasons stated above, MSG respectfully requests that this Court grant MSG's motion for a preliminary injunction.

NYI-4033728v1

October 18, 2007                                    JONES DAY


                                                    By:  /s/ Robert W. Gaffey
                                                         Meir Feder  (MF-2574)
                                                         Thomas F. Cullen, Jr. (*pro hac vice)*
                                                         Robert W. Gaffey  (RG-4004)
                                                         222 East 41st Street
                                                         New York, NY  10017
                                                         Telephone:  (212) 326-3939
                                                         Facsimile:  (212) 755-7306


OF COUNSEL:

Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

NYI-4033728v1

## CERTIFICATE OF SERVICE

I declare that on October 18, 2007, I caused the foregoing PLAINTIFF'S REPLY

MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY

INJUNCTION and REPLY DECLARATION OF ROBERT W. GAFFEY with annexed

declarations to be served on the following counsel for defendants through the Court's CM/ECF

system and via hand-delivery:

Shepard Goldfein
James A. Keyte
Paul M. Eckles
Peter S. Julian
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000/1

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York          JONES DAY
       October 18, 2007


                  By: /s/ Sacha A. Boegem
                     Sacha A. Boegem (SB-2207)
                     222 East 41st Street
                     New York, NY  10017
                     Telephone:  (212) 326-3939
                     Facsimile:  (212) 755-7306

                     *Attorney for Plaintiff*

NYI-4033278v1