UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------X
MADISON SQUARE GARDEN, L.P.,       : 07 CV 8455 (LAP)
                                   :
                 Plaintiff,        :
                                   : MEMORANDUM AND ORDER
       vs.                         :
                                   :
NATIONAL HOCKEY LEAGUE, NATIONAL   :
HOCKEY LEAGUE ENTERPRISES, L.P.,   :
NATIONAL HOCKEY LEAGUE INTERACTIVE :
CYBERENTERPRISES, L.L.C., NHL      :
ENTERPRISES, L.L.C., NHL           :
ENTERPRISES CANADA, L.P., and NHL  :
ENTERPRISES, B.V.,                 :
                                   :
                 Defendants.       :
----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

Madison Square Garden, L.P. ("MSG") moves for a preliminary injunction against what it alleges are anticompetitive practices on the part of the National Hockey League and affiliated entities (collectively "NHL" or "the League") relating to the NHL's New Media Strategy, primarily the transfer of the MSG-owned New York Rangers (the "Rangers") team website, see The Official Site of the New York Rangers, http://newyorkrangers.com (last visited Nov. 2, 2007), to the League-operated server. For the reasons discussed below, the motion is denied.

I.    <u>Factual Background</u>

    A. <u>The NHL Organizational Structure</u>

The NHL is an unincorporated association of thirty Member Clubs organized as a joint venture. <u>See</u> Complaint for Injunctive Relief ("Compl.") ¶ 7; Declaration of William L. Daly ("Daly Decl.") ¶ 2.  Member clubs are independent and separate businesses, but all have signed and ratified the NHL Constitution and By-laws, and, as such, the clubs' internal affairs are subject to the provisions of those agreements. <u>See</u> Daly Decl. ¶ 3; <u>see also</u> Compl. ¶¶ 7-9.  The Constitution delineates the joint venture's purposes and objects, which include:  (i) the promotion of the common interests of the members of the League, and (ii) the promulgation of rules governing the relationships between Member Clubs and the League and between the Member Clubs and other hockey clubs. <u>See</u> Daly Decl. Ex. A (NHL Const.) at 1.

The League's Commissioner serves as the Chief Executive Officer of the League and is charged with acting in the best interest of the League as a whole. <u>See</u> Daly Decl. ¶ 7.  The Commissioner has the power to interpret the provisions of the Constitution, By-Laws, League rules and

resolutions; he also has "full and complete authority" to discipline Member Clubs for violations of League rules. See id. ¶¶ 8, 9.

    B. <u>The League Efforts to Create a National Brand</u>

    Insofar as it is a provider of sports entertainment, the NHL competes with other sports that attract a national audience, such as baseball and football.  One problem that the NHL has had is bridging fan support for local teams with interest in the sport as a whole. <u>See</u> Declaration of John Collins ("Collins Decl.") ¶ 5.  Hockey fans, for example, are less likely to watch the playoffs once "their team" is eliminated than are fans of other sports.  In order to grow hockey in competition with other sports and entertainment offerings, the NHL has decided to take steps to improve the strength of the League brand. <u>See</u> Daly Decl. ¶ 21.[1]  The League wants to provide fans with more multi-dimensional hockey coverage that emphasizes the importance of other League games and news. <u>See</u> Collins Decl. ¶ 7.  In its view, the NHL website, <u>see</u> NHL.com, http://www.nhl.com

---

[1] The League's Deputy Commissioner candidly acknowledges efforts in this regard:  "The more we can translate the passion of fans for their local teams into League-wide support, and the more fans we can get to follow the NHL playoffs and the Stanley Cub Final . . . the more value we can generate for the NHL . . . ." Daly Decl. ¶ 25.

(last visited Nov. 2, 2007), is a critical element of this national brand-building strategy because it encourages and facilitates traffic by fans among the various NHL Member Clubs' websites. <u>See</u> Collins Decl. ¶ 11.

### C. <u>Early League Efforts to Exploit Intellectual Property</u>

Like other major sports leagues, the Member Clubs of the NHL have determined that they can best maximize the value of many of their intellectual property rights, like Club trademarks, by assigning them to the League to market on a collective basis. <u>See</u> Daly Decl. ¶¶ 28, 29.  In January 1994, the Member Clubs, with the Rangers' vote, granted the League exclusive worldwide rights to use or license team trademarks for various marketing purposes, such as advertising and the sale and distribution of "products and services . . . of any nature." <u>Id.</u> ¶ 30.  In June 1996, the League entered into an alliance with IBM (later known as NHL ICE) for the purpose of developing an NHL website.  During the course of this project's development, the Clubs agreed that the right to develop and exploit the internet as a marketing tool resided in the

League itself. See id. ¶ 36.[2]  The Member Clubs also granted
the Commissioner broad discretion to carry out the League's
objectives relating to the exploitation of the Member
Clubs' intellectual property on the internet by NHL ICE,
including the authority to make directives regarding
advertising and merchandising rights. See id. ¶ 37.  Thus,
since 1996, all Member Clubs have been subject to certain
advertising, sponsorship, and merchandising restrictions.
See id. ¶¶ 39, 40.

During a June 2000 meeting, the Member Clubs revisited
their internet strategy.  Changing their approach somewhat,
they concluded that the optimal business model was a hybrid
model, wherein the League's and Clubs' websites would be
part of an integrated network, with certain elements
available on the Clubs' sites and others available on
NHL.com. See id. ¶ 42.  Again at this meeting, the Board
unanimously reaffirmed that rights to exploit the Member
Clubs' intellectual property on the internet belong to the

---

[2]  The unanimous resolution "confirm[ed] the grant to the
League . . . [of] the exclusive worldwide right to use or
license all of its intellectual property rights . . . for
all purposes relating to the further development of a
presence for the League and the Member Clubs on the
Internet's World Wide Web and the exploitation of any and
all opportunities utilizing comparable computer and
telecast technology, including, without limitation, any
network-centric, online or other interactive technologies."
Daly Decl. ¶ 36; see Daly Decl. Ex. E (Minutes of the NHL
Board of Governors Annual Meeting, June 26, 1996) at 10.

League and that the Commissioner has the authority to
promulgate rules and regulations to carry out this mandate.
See id. ¶ 43.  Pursuant to this authority, the Commissioner
promulgated internet regulations, including rules for the
operation of Club websites.  These regulations included,
inter alia, setting aside a portion of each team site as an
"NHL Area" for League content and reserving to the League
the right to control thirty-five percent of all advertising
on each Club's website. See id. ¶ 45; Declaration of Keith
Ritter ("Ritter Decl.") ¶ 2.  The rules also required all
merchandise sales to be made through the League store. See
Daly Decl. ¶ 47.

     Under the 2000 regime, Member Club websites were
supported by a variety of internet service providers. See
Ritter Decl. ¶ 4.  This technological regime had several
undesirable qualities, including divergent levels of
quality, problems sharing content between sites, and other
technical problems. See id. ¶ 4.  At no point did the
Rangers object to the League's governing Internet
Regulations, and they never contended that such regulations
constituted a violation of the antitrust laws. See Daly
Decl. ¶ 48.

D. <u>The Genesis of the New Media Strategy</u>

In December 2005, the Executive Committee of the Board of Governors instructed the League Office to consider potential alternative business models for the NHL's "new media business," with particular attention to be given to the benefits of greater centralization and integration of the League's media rights. <u>See</u> <u>id.</u> ¶ 49.  Pursuant to this directive, the Commissioner formed a committee comprised of ten Member Clubs to develop a plan to maximize new media revenues (the "New Media Committee"). <u>See</u> <u>id.</u> ¶ 50.[3]  The Committee surveyed the new media strategies of the Member Clubs.  It found that many clubs were not using their websites as marketing or sales promotions tools at all; were not utilizing best practices or up-to-date technologies; and that most Clubs had not adequately monetized their websites. <u>See</u> Ritter Decl. ¶ 6.[4]

The New Media Committee analyzed the approaches taken by other sports leagues and concluded that the best approach for the NHL would be to migrate each team's site onto a common technology platform, serviced by a single

---

[3] MSG's Chairman, James Dolan, was invited to be on the committee but declined due to a scheduling conflict. <u>See</u> Daly Decl. ¶ 52.

[4] The Rangers, for example, sustained a loss of over $100,000 on its new media business in 2005-06. <u>See</u> Ritter Decl. ¶ 7.

content management system ("CMS"), where the individual clubs would be responsible for supplying local content and advertising while the League would retain space for national advertising and League news. See id. ¶ 12.  The plan did not allocate any more space for national advertising than what was permitted under previous League Internet regulations. See id. ¶ 27.

The New Media Committee identified several reasons for the transition, including:  ensuring minimum quality standards across team sites; enabling greater interconnectivity; facilitating the sharing of local content; and the creation of a $2 million savings. See id. ¶ 12.  The plan would also help attract national sponsors by selling inventory across all club websites, thereby achieving the mass so critical to advertisers and reducing transaction costs involved with negotiating for advertising space, because sponsors would only have to contract with the NHL. See id. ¶ 15; Declaration of Franklin M. Fisher ("Fisher Decl.") ¶¶ 28-29; Declaration of Ken Sawyer ("Sawyer Decl.") ¶ 3.  The New Media Committee's recommendations (the "New Media Strategy") were circulated and placed on the agenda for the scheduled League meeting of June 21, 2006. See Daly Decl. ¶ 55; see also id. Ex. H (Memorandum to NHL Board of Governors, June 8, 2006).

E. <u>MSG Votes Against the New Media Report's Proposals</u>

After receiving the recommendations, MSG objected to the consideration of the New Media Strategy at the scheduled June 21, 2006 meeting. <u>See</u> Daly Decl. ¶ 56. Hoping to assuage MSG's concerns, the Commissioner and the Deputy Commissioner met with MSG's representatives (including Mr. Dolan) on June 20, the day before the planned meeting. <u>See</u> <u>id.</u> ¶ 57.  Failing to reach an accommodation, the meeting went forward, and Mr. Dolan expressed his concerns about the proposed New Media Strategy. <u>See</u> <u>id.</u> ¶ 60.  In his view, the plan would benefit small market teams at the expense of large market teams, amounting to "revenue sharing," which the Rangers did not support. <u>See</u> <u>id.</u> ¶ 57.

On June 21, 2006, the League Executive Vice President of Media summarized the New Media Strategy.  After hearing Mr. Dolan's objections to the Strategy, the League nevertheless voted to proceed with it as set forth in the Committee's report, to extend for another ten years the license agreements held by the NHL and to grant to the NHL the exclusive ability to exploit various new media rights. <u>See</u> <u>id.</u> ¶¶ 60-61; <u>id.</u> Ex. J (Minutes of the NHL Board of

Governors Annual Meeting, June 1, 2006); see also Compl.
¶ 17.

### F. MSG Refuses to Migrate Newyorkrangers.com and is Fined

In February 2007, the League and the Rangers met to
discuss "differences of opinion on a variety of issues,"
including the League's Internet Regulations. Daly Decl.
¶¶ 78, 80.  After failing to reach an agreement, the
Rangers launched three initiatives violating league rules:
setting up an "Internet store" for selling Rangers
merchandise, inserting "virtual advertising and signage"
into the broadcast of Ranger home games, and streaming live
broadcasts of Rangers games to Internet subscribers in the
team's local broadcast territory. Id. ¶ 80.  In response to
the violations, Deputy Commissioner Daly sent the team a
cease and desist letter on April 18, 2007, indicating that
the team would be fined $100,000 a day for the violations.
The Rangers remained in violation for two days and were
fined $200,000. See id. ¶ 83.

In June 2007, the Rangers notified the League that
they would not go forward with the migration of the Club's
website onto the new League platform, as required by the
New Media Strategy.  Rangers staff were instructed not to

provide the League with any content that would help the League set up the Rangers site on NHL.com. See id. ¶¶ 85-86.  The League met with team officials again on July 26, 2007 in an attempt to resolve any differences. See Mills Decl. ¶ 17.  While the meeting appeared productive at first, with parties resolving to find a solution to their disagreement, the relationship deteriorated once again. See id. ¶¶ 17-18.

Representatives from both sides met over the course of the summer to work through the technicalities of any compromise.  The League attempted to incorporate MSG's suggestions into the new site.  For example, the League agreed to construct a section of the website about the Rangers's history; not to have any stories about the Rangers' local rivals, the Islanders and the Devils, on the new page; and to move local advertising to a more prominent position on the home page. See Ritter Decl. ¶ 22.  Ultimately, however, negotiations broke down over whether the Rangers, like every other team, would have to migrate their site to a single CMS. See Mills Decl. ¶ 18.  While the Rangers were open to running parallel sites, the team insisted on operating newyorkrangers.com from its own server. See id. ¶ 18.  This was unacceptable to the League, which saw a single CMS as an essential part of the New

11

Media Strategy because of, among other things, its role in ensuring minimum quality standards and facilitating fan navigation. See Ritter Decl. at ¶ 27.

Having failed to reach a deal, Deputy Commissioner Daly sent the Rangers a letter on September 20, 2007 informing the team that starting September 29 (the first day of the season), the team would be fined $100,000 each day that it operated its website outside of the League platform. See Daly Decl. ¶ 91. The Rangers filed a complaint for injunctive relief on September 28, 2007.

As set out in the New Media Strategy and Recommendations of the New Media Committee, see id. Ex. H, and the minutes of the June 21, 2006 League meeting, see id. Ex. J, Mr. Ritter summarizes,

> It is important to emphasize that [under the New Media Strategy] the individual Club websites remain the Clubs' websites, and the responsibility and opportunity for populating the content of those websites with local stories and information about local players and games and community involvement with fan activities remain, as they have always been, with the individual Clubs. The NHL has not

taken the Rangers' website away from
the Club, as MSG asserts.[5]

Ritter Decl. ¶27.

    G. <u>The Complaint</u>

The complaint alleges that the NHL has become an
"illegal cartel" in its attempts to prevent off-ice
competition between and among the NHL member clubs. <u>See</u>
Compl. ¶ 2.  Regarding the New Media Strategy, in
particular, the Rangers alleged that there is no
competitive justification for "seizing" the Rangers website

---

[5] Thus, the Rangers' claims that the League plans "to take
over" the Rangers website, <u>see</u> Mills. Decl. ¶ 6;
Declaration of Scott Richman ("Richman Decl.") ¶ 2, or to
"take control" of the Rangers website, <u>see</u> Reply
Declaration of Daniel David ("David Reply Decl.") ¶ 3, or
to require the Rangers to "hand over its website" to the
League, <u>see</u> Reply Declaration of Robert Gaffey ("Gaffey
Reply Decl.") ¶ 15, or "to force the Rangers' unique,
individual website into the NHL's league-oriented
homogeneous template," <u>see</u> Richman Decl. ¶ 9, are all
without support in the record.  It is also undisputed that,
under the New Media Strategy, the Rangers will retain the
responsibility and opportunity for populating its website
with local stories and information about local players and
games, <u>see</u> Ritter Decl. ¶ 27, and that a visitor who clicks
on newyorkrangers.com will go directly to the Rangers' home
page, that is, its page containing local content, not to
the NHL home page. <u>See</u> Tr. of Oral Argument at 55 (Oct. 23,
2007).  Thus, the Rangers' "analysis" of the harms the team
will sustain as a result of the actions complained of are
wholly irrelevant; they are based entirely on the
assumption that the NHL will "take over" the Rangers'
website and that the Rangers will lose control of the
content therein.  Those are not the facts of this case.
Accordingly, the Rangers' declarations are largely
irrelevant to the facts presented.

other than to suppress or eliminate competition. See id.
¶ 3.  Though it concedes that the NHL is a legitimate joint
venture, see id. ¶ 8, MSG argues that the New Media
Strategy violates antitrust laws because it is not
"reasonably necessary for the success of the NHL venture,"
id. ¶ 16A, and constitutes a "naked horizontal restraint in
the absence of a competitive justification." Plaintiff's
Memorandum of Law in Support of its Motion for Preliminary
Injunction ("Pl's Mem.") at 17.


II.  Standard for a Preliminary Injunction

     To prevail on a motion for a preliminary injunction,
the movant must establish that (1) absent such relief, it
will suffer irreparable injury; and (2) either (a) a
likelihood of success on the merits, or (b) sufficiently
serious questions going to the merits and a balance of
hardships tipping decidedly toward the moving party. See,
e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596
F.2d 70, 72 (2d Cir. 1979).


III.  MSG Has Failed to Demonstrate a Likelihood of Success
      on the Merits or a Sufficiently Serious Question Going
      to the Merits

     The Rangers have a litany of complaints with NHL
management's "anticompetitive approach" to producing the

14

(competitive) sport of professional hockey. <u>See</u> Pl's Mem.
at 2-3 (enumerating "[t]he NHL's dictates that eliminate
competition among its teams").  Properly before the Court,
however, is a narrower question:  whether the NHL may
sanction the Rangers for refusing to migrate the Rangers
website to the League-run CMS or for operating a rival site
without running afoul of the antitrust laws.

    A. <u>The NHL Regulations Are Not a Naked Restraint</u>

    MSG does not contend that the League's Internet
Regulations constitute a per se violation of the Sherman
Act. <u>See</u> <u>generally</u> Pl's Mem.  Instead it argues that the
League's directive to migrate newyorkrangers.com is
"blatantly anticompetitive" and a "naked" horizontal
restraint by virtue of its being "an agreement among
competitors on the way in which they will compete with each
other." <u>NCAA v. Bd. of Regents</u>, 468 U.S. 85, 99 (1984).
Therefore, according to MSG, this Court should declare the
NHL restraint unlawful under <u>NCAA</u> without need of
"elaborate industry analysis" or "proof of market power."
<u>Id.</u> at 109.  MSG's position is that in the context of a
sports league joint venture, only those restraints that are
necessary for the product to be made available at all, such
as rules dictating the size of the field or the number of

players on the team, are permissible. <u>See</u> Pl's Mem. at 2.
On this basis, MSG submits that the burden of proving an
actual adverse effect on competition in the relevant
market, ordinarily belonging to the Plaintiff under a rule
of reason analysis,[6] should be dispensed with in this case.
In their words, "the shoe is on the other foot." Tr. of
Oral Arg. at 80.

This is an unduly narrow reading of the caselaw. A
truncated rule of reason analysis, a "quick look," would
indeed relieve the Plaintiff of its initial burden of
identifying a relevant market and showing an actual adverse
effect on competition. <u>See, e.g.</u>, <u>Major League Baseball</u>
<u>Properties Inc. v. Salvino</u>, 420 F.Supp.2d 212, 220
(S.D.N.Y. 2005). However, a quick look analysis is
appropriate only when the anticompetitive effects of the
restraint are obvious, where an observer with even a
rudimentary understanding of economics "could conclude that
the arrangements in question would have an anticompetitive
effect on customers and markets." <u>Cal. Dental Ass'n v. Fed.</u>
<u>Trade Comm'n</u>, 526 U.S. 756, 770 (1999).

It is far from obvious that this restraint has no
redeeming value. Like Judge Casey in <u>Salvino</u>, I find that

---

[6] <u>See, e.g.</u>, <u>Geneva Pharms. Tech. Corp. v. Barr Labs Inc.</u>,
386 F.3d 485, 506-07 (2d Cir. 2004).

the Defendants have established, without contradiction,
several procompetitive effects of the New Media Strategy.
See 420 F.Supp.2d at 220.  The increased online scale and
standardized layout will attract national sponsors and
advertisers interested in uniform exposure across the
NHL.com network, which is a key element of the League's new
growth strategy to enhance the NHL's "national brand" and
to compete better against other sports and entertainment
products and their websites.  The common technology
platform also will enable these sponsors and advertisers to
reduce transaction costs by negotiating centrally with the
League -- an "obvious advantage[] of one-stop exploitation
of the intellectual properties of the [thirty] teams."
American Needle, Inc. v. New Orleans Louisiana, Saints, 496
F.Supp.2d 941, 943-44 (N.D. Ill. 2007).  The New Media
Strategy will also assure minimum quality standards across
team websites; increase the interconnectivity across the
NHL.com network; facilitate the sharing of team content;
and reduce the costs of operating thirty "back office"
website operations, among other reasons. See Declaration of
Ted Leonis ("Leonis Decl.") ¶¶ 11-14; Sawyer Decl. ¶¶ 5-
8; Daly Decl. ¶¶ 24-26, 52-53, 64, 70-72, 95; Collins Decl.
¶¶ 4-13; Ritter Decl. ¶¶ 12, 26-38.  Based on this record,
these effects would increase competition between the NHL

17

and other sports entertainment providers which, as indicated below in Section III(B), is the only relevant market identified on this motion.  I conclude, therefore, that the quick look doctrine is inappropriate because the casual observer could not summarily conclude that this arrangement has an anticompetitive effect on customers.  <u>See</u> <u>Salvino</u>, 420 F.Supp.2d at 220.

MSG's reliance on <u>NCAA</u> is misplaced.  There, the Supreme Court reviewed a finding that the NCAA's plan for limiting television coverage of college football games violated the antitrust laws.  After the benefit of a full trial, the District Court found the NCAA plan unreasonably restrained competition in the relevant market of live college football television in three ways:  (1) by fixing the price for particular telecasts; (2) by its exclusive contracts amounting to a group boycott of all other potential competitors; and (3) by placing an artificial limit on the production of televised college football.  <u>See</u> <u>NCAA</u>, 468 U.S. at 96.  The Supreme Court upheld the ruling of the trial court, finding the anticompetitive consequences of the NCAA arrangement were apparent, a "naked restraint on price and output," that required some competitive justification.  <u>Id.</u> at 110.  But the Court hastened to emphasize the limited nature of its decision:

the Court held only that "the record supports the District Court's conclusion." NCAA, 468 U.S. at 120.

The instant case is distinguishable on several grounds. First, there is no evidence that hockey fans "receive absolutely no benefit from the controls" as there was in NCAA. Id. at 108 n.34. In fact, the only evidence in the record suggests that fans prefer the websites under the New Media Strategy over the old. See Ritter Decl. ¶ 28. Second, the District Court in NCAA did not find any procompetitive efficiencies from the challenged restraint that enhanced the competitiveness of college football television rights, and, in fact, found that the NCAA could be marketed just as effectively without the television plan. See id. at 114. Here, the undisputed evidence is that the NHL, having a central management system is an integral part of its strategy to create a "League brand" to compete with other major sports entertainment providers. Given that the goal of perpetuating hockey as one of the national games of the United States and Canada is listed as the first "purpose and object" for which the NHL is organized, see Daly Decl. Ex. A (NHL Const.), this is a reasonable step in that direction. As noted above, the League has established several procompetitive

justifications for its New Media Strategy within the relevant market.

MSG's position, that a sports joint venture may only impose internal restraints that are "necessary" for the product to be available at all, is without support.  Indeed the "necessary" language, plucked out of NCAA, is used by the Court to explain why a per se analysis is inappropriate.  See NCAA, 468 U.S. at 101. Furthermore, such a result would be inconsistent with the line of cases upholding intrabrand restraints that foster interbrand competition.  See, e.g., K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 127-28 (2d Cir. 1995) (citations omitted).  It would also be inconsistent with those cases upholding agreements among parents of a joint venture not to compete in the market in which the joint venture operates.[7]

---

[7] See, e.g., 1 ABA Section of Antitrust Law, Antitrust Law Developments 470 (6th ed. 2007) ("Agreements among the parents not to compete with the joint venture in the market in which the joint venture operates generally have been upheld as reasonable ancillary restraints.").  To the extent that this general rule would not apply if the parents have market power in that market, MSG has failed to offer any evidence of what constitutes the relevant market. See id.; Plaintiff's Reply Memorandum of Law in Support of its Motion for Preliminary Injunction ("Pl's Repl. Mem.") at 10 (acknowledging that while MSG's Complaint identified "several relevant markets," it would prove the dynamics and scope of these markets "at the appropriate point.").  Given
(Continued)

Thus, because I find that the NHL's New Media Strategy is not a "naked restraint" and that it has procompetitive virtues, the quick look doctrine is inapplicable. Therefore, the rule of reason is the appropriate standard of review for MSG's claim. See, e.g., North Am. Soccer League v. Nat'l Football League, 670 F.2d 1249, 1259 (2d Cir. 1982) ("agreements between members of a joint venture . . . are subject to scrutiny under the rules of reason.").

B. MSG's Claims Fail Under the Rule of Reason

The two and a half pages in MSG's brief that it dedicates to the merits of the case argue that a quick look method of analysis is the appropriate standard of review because the NHL's actions are a naked horizontal restraint. See Pl's Mem. at 16-18. Because the Court fails to perceive the nudity, MSG bears the burden of "showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." K.M.B. Warehouse, 61 F.3d at 127. MSG has not carried this burden.

---

(Continued)
that the Court has found that the restraints imposed by the NHL are not "naked restraints" without any redeeming virtue, the appropriate point is now, and MSG has failed to meet that burden.

Although the Complaint identifies several potential relevant markets, MSG's moving papers provide no evidence on the complex question of defining the relevant market. This is Plaintiff's burden, see, e.g., Delta Kappa Epsilon (DKE) Alumni Corp. v. Colgate University, 492 F.Supp.2d 106, 114 (N.D.N.Y. 2007), and follows logically from the burden of showing an actual adverse effect on competition as a whole in the relevant market.  The only evidence submitted by MSG on this subject are two reply expert declarations.  Professor Hausman's declaration states (i) that having a common league website will reduce competition in the New York metropolitan area, and (ii) that he sees no reason to believe that the League can market itself better on a collective basis. See Declaration of Jerry A. Hausman ("Hausman Reply Decl.") ¶¶ 11, 14.  Professor Deighton's declaration discusses why a team website is an important marketing tool to the Rangers. See Declaration of John Deighton ("Deighton Decl.") ¶ 23.

Neither these nor the declarations submitted by Rangers employees is sufficient to show an actual adverse effect either on competition in the relevant market[8] or

_____

[8] Indeed, MSG's declarations seem not to focus on harm to competition but rather to the harm MSG perceives to a competitor, viz., itself, in its ability to cross-market

(Continued)

market power.  MSG's assertion that migrating
newyorkrangers.com to the CMS constitutes a reduction of
"output" is not sufficient to carry its burden.  <u>See</u> Pl's
Reply Mem. at 9.  In the antitrust context, output does not
simply refer to the number of units produced, it also
involves a qualitative judgment.  <u>See, e.g.</u>, 11 Herbert
Hovenkamp, Antitrust Law:  An Analysis of Antitrust
Principles and Their Application ¶ 1901d, at 205-206 (2d
ed. 2005) (demonstrating how a reduction in output must
assess both quality and quantity).  Furthermore, as the
Supreme Court noted in <u>California Dental Association v.
Federal Trade Commission</u>, 526 U.S. 756, 774 (1999), making
a judgment about output requires an empirical, not an
<u>a priori</u>, analysis given the complexity of the market in
which the NHL operates.  Therefore, I find that MSG has
failed to carry its initial burden of showing a prima facie
case of an anticompetitive restraint.

---

(Continued)
its various businesses. <u>See, e.g.</u>, Richman Decl. ¶ 9;
Richman Reply Declaration ¶ 4.  However, "[t]he antitrust
laws were enacted for 'the protection of competition, not
competitors.'" <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>,
495 U.S. 328, 338 (1990) (quoting <u>Brown Shoe Co. v. United
States</u>, 370 U.S. 294, 320 (1962)).  Also, as set out <u>supra</u>
n.5, because MSG's declarations fail to address the facts
at issue, those declarations are insufficient to carry its
burden in any event.

In the alternative, even if MSG did carry its initial burden, as noted above, the League has shown offsetting procompetitive benefits. See, e.g., United States v. Visa U.S.A., Inc., 344 F.3d 229, 239 (2d Cir. 2003) (noting that the burden of production shifts to the defendants to provide a procompetitive justification for the challenged restraint). The burden then shifts back to MSG to prove either that the challenged restraint is not reasonably necessary to achieve the League's procompetitive justifications or that those objectives may be achieved in a manner less restrictive of free competition. See Visa U.S.A., 344 F.3d at 238. MSG has not met this burden either. I find that the goal of building a League brand is a legitimate, procompetitive aim of the NHL and that the restriction imposed by the joint venture -- of not operating a rival Rangers site -- serves the procompetitive purposes of having League uniformity, facilitating fan navigation, attracting advertisers due to larger mass, reducing transaction costs in advertisement negotiations, and preventing individual teams from free-riding off of the League efforts. See Fisher Decl. ¶¶ 31-33 (explaining how allowing individual teams "free rein to exploit NHL intellectual property" would lead to teams free-riding on the efforts of collective League action); see also Rothery

24

Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 223 (D.C. Cir. 1986) (upholding a restraint as necessary to counter the "menace" of free-riding in that case). This finding is bolstered by the fact that MSG has shown no harm whatsoever to consumers, especially in light of the facts that the team maintains control over most of the content of the new website and fans can still get access directly to the Rangers site through newyorkrangers.com. Accordingly, for all of the reasons set out above, MSG has failed to demonstrate a likelihood of success on the merits or a sufficiently serious question going to the merits.

In light of the result above, I do not reach the NHL's other arguments. Because MSG has failed to demonstrate a likelihood of success on the merits or a sufficiently serious question going to the merits, I do not reach the issues of whether the League's fine on the Rangers constitutes irreparable injury or whether the balance of hardships tips decidedly toward the team.

## CONCLUSION

For the aforementioned reasons, Plaintiff's motion for a preliminary injunction [dkt. no. 9] is denied.

SO ORDERED:

Dated:     New York, New York
           November 2, 2007


_____
LORETTA A. PRESKA, U.S.D.J.