UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

MADISON SQUARE GARDEN, L.P.,    )     No. 07 CIV. 8455 (LAP)

       Plaintiff,        )

          v.           )     FIRST AMENDED COMPLAINT FOR
                              )     INJUNCTIVE RELIEF

NATIONAL HOCKEY LEAGUE,    )
NATIONAL HOCKEY LEAGUE     )
ENTERPRISES, L.P., NHL INTERACTIVE  )
CYBERENTERPRISES, LLC., NHL   )
ENTERPRISES CANADA, L.P., and NHL  )
ENTERPRISES, B.V.,        )

       Defendants.      )

------------------------------------------------- x

Plaintiff MADISON SQUARE GARDEN, L.P. ("MSG"), by and through its attorneys,

files this First Amended Complaint against defendants and alleges as follows:

## I.    PRELIMINARY STATEMENT

1.    MSG owns the New York Rangers, a major league men's professional ice hockey

team, and one of the "original six" members of the National Hockey League ("NHL"). Rangers

fans are among the most intense and loyal fans of any NHL team, indeed of any team in

professional sports, and the Rangers have gone to great lengths to enhance fan experience by

offering a wide range of information, products, and services in competition with other NHL

teams.

**A.**    **The NHL Has Become An Illegal Cartel.**

2.    The New York Rangers are proud to be among the oldest members of the NHL, a limited purpose joint venture of legally separate and independent ice hockey clubs. The NHL joint venture was created to provide the means for its member clubs to compete on the ice and thus to generate fan interest and excitement in major league men's professional ice hockey contests. The teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice, which is necessary for the venture's success. But the amount of off-the-ice cooperation reasonably required for the success of the venture is limited, and in fact, the NHL member clubs compete vigorously in various ways off the ice, especially in metropolitan areas (such as in the New York area) where there are multiple NHL clubs. For example, the member clubs of the NHL independently set the prices of tickets for attending games in person; compete for contracting with players and in hiring coaches; create and manage their individual marketing and promotional programs, including the sale of advertising opportunities and merchandise; and develop, license and market their respective trademarks for various purposes. While the NHL member clubs may choose to cooperate in various ways off the ice, the vast majority of such activity is not reasonably necessary to the success of the NHL joint venture.

3.    Over the years, and increasingly in recent years, the NHL member clubs, acting collusively as the League and through the Commissioner, have taken steps to eliminate, restrict and prevent off-the-ice competition between and among the member clubs as well as between the NHL itself and the member clubs, in numerous areas – including licensing, merchandise sales, advertising, broadcasting, and new media – and in ways that are not necessary to the purpose of the NHL joint venture, i.e., the provision of major league men's professional ice hockey contests. As these activities have accelerated, MSG has objected to these steps, and has tried to persuade the NHL member clubs and the League Office that eliminating and preventing off-the-ice

competition between and among the NHL member clubs and/or the NHL was both unnecessary to the success of the NHL joint venture and, when carried too far, illegal. MSG's efforts have been unsuccessful. Accordingly, MSG brings this suit to restrain the NHL member clubs, acting collusively as the League and through the Commissioner, from continuing to eliminate, restrict and prevent the independent competitive activities of the NHL's members in violation of federal and state antitrust laws.

4.      The NHL has recently engaged in a pattern of rapidly-increasing anticompetitive behavior. At the onset of the 2007 Stanley Cup playoffs, MSG took three modest but important steps to increase its competitive offerings. MSG made Rangers-branded merchandise available locally through a convenient, online ordering process on its Rangers website (rather than through the existing, more cumbersome process of downloading a website catalog). MSG also made Rangers games available to local cable subscribers of those games by an additional means – i.e., broadband distribution that was gated and therefore limited to the Rangers' local area . In addition, MSG sought to increase revenue by selling non-intrusive virtual advertising to advertisers on MSG's television broadcasts of Rangers home games. Instead of welcoming these enhancements, which would have increased consumer choice and led to other pro-competitive effects, the NHL immediately imposed on MSG an arbitrary penalty of $100,000 per day. This, in turn, forced MSG to shut down these innovations and sent the unmistakable message that future efforts at competition would also be harshly punished. After MSG complied with the League's demands, but refused to pay what MSG asserted was an unlawful fine, the NHL withheld $200,000 from third-party payments otherwise due MSG.

5.      MSG capitulated to the NHL's threats because the exorbitant size of the fines would have made absorbing the fines economically suicidal; because MSG did not want to

distract attention from the NHL playoffs; and, in addition, because MSG continued to hope that further discussion would persuade the NHL that its insistence on eliminating or otherwise restraining all competition between and among the member clubs as well as between the NHL itself and the member clubs was unwise and illegal. At the start of the 2007-08 season, however, the NHL again threatened the imposition of extortionate fines to enforce its suppression of competition, this time requiring MSG to "migrate" its independent nyrangers.com website – which MSG had been using as a competitive tool to generate and maintain fan interest in the Rangers in competition with the other NHL clubs – to a "common technology platform" under NHL control and subject to new NHL rules dictating the layout and significant parts of the content of the site; and further, prohibiting MSG from operating any competitive Rangers website independent of the NHL common platform.

6.    The NHL's imposition of, and its threats to impose, fines on MSG for communicating with Rangers fans, offering choices to consumers, and competing through the Rangers website are merely the latest examples of anticompetitive conduct by a legitimate joint venture that has veered into unlawful behavior. The NHL began as a legitimate joint venture producing a product – major league men's professional ice hockey competition – that no one club can produce alone. MSG and the Rangers have always been loyal members of the NHL, supporting joint initiatives in appropriate areas, including revenue sharing and collective bargaining with the NHL's players. But by seeking to control the competitive activities of independent businesses in ways that are not reasonably necessary to the functioning of that legitimate joint venture or to any other legitimate procompetitive purpose, the NHL has become an illegal cartel.

7.      Through this Complaint, MSG seeks to establish the appropriate bounds, under the antitrust laws, of the conduct of the NHL's member clubs, acting collusively through the League and/or the Commissioner.  The NHL is a joint venture of independently owned and operated member clubs; the antitrust laws prohibit those clubs, like the members of any joint venture, from restricting the individual competitive activities of the individual members of the venture, except where any such restriction is shown to be reasonably necessary to the success of the League or the achievement of some other legitimate procompetitive purpose.  The goal of this lawsuit is to restore and protect from unlawful restraint the competition between and among the NHL member clubs and the NHL that increasingly has been eliminated and restrained by the NHL's anticompetitive rules and policies and that threatens to become restrained to an even greater extent absent this Court's intervention.

**B.      The NHL Has Extended Its Collective Activities Beyond What Is Legally Permissible**.

8.      The NHL is a joint venture of legally separate and independent men's professional ice hockey clubs.  It was created by the individual member teams for a specific limited purpose, i.e., to assist them in producing a product – major league men's professional ice hockey contests – that no one team could produce alone.  Now consisting of 30 member clubs located throughout the United States and Canada, the NHL is engaged in a variety of legitimate collective activities.  These legitimate activities include negotiating labor agreements with the players, negotiating national television broadcasting arrangements, promulgating and enforcing agreed rules of play, and scheduling ice hockey contests, including playoff and championship competitions.  While MSG sometimes has differed with its fellow Member Clubs and the League Office on strategy and tactics in some of these areas, particularly in the area of national television, MSG generally accepts and supports these activities, to the extent they are necessary

- 5 -

to the success of the NHL and do not unnecessarily limit the independent competitive activities of the individual member clubs.

9.      Notwithstanding these valuable and appropriate collective activities, the member clubs remain independently owned and operated businesses, fully capable of competing – and actually competing – with each other in various ways.  The clubs are not simply an extension of the NHL; rather, the NHL is an artificial creation of its member clubs and subject to their collective control.  Each club, as an independent and separate business, is individually responsible for all of its business affairs that have not been properly and lawfully delegated by the clubs to the NHL.  Notwithstanding this basic principle – *i.e.,* that the League serves the clubs, not vice versa – the League over the years, with the support or acquiescence of many of the NHL member clubs, has asserted an increasing amount of control over the independent clubs' activities and sought increasingly to aggrandize the centralized, collective activities of the League while restricting independent competition by and among the clubs.  Indeed, at a 2006 meeting of the NHL's owners, NHL Commissioner Gary Bettman took the extreme position that the NHL has "granted" the individual clubs only a limited number of property rights and that all other rights are subject to the will of a majority of the club owners, each of whom has a vote on the NHL Board of Governors.

10.      Such broad collective control over the competitive activities of independent businesses is unlawful under federal and New York state antitrust laws.  The NHL joint venture is seeking to take what does not belong to it, and to control, without any cognizable procompetitive justification, independent assets and entities that otherwise would compete with each other and with the NHL.  In so doing, the NHL crosses the line and becomes an illegal cartel, constraining MSG's ability to compete with other NHL member clubs and with the NHL

itself. The joint venture's stiff fines against MSG, and its threats of further fines, imposed solely because MSG has sought and continues to seek to compete in very modest ways with the NHL and other NHL clubs, establish that the NHL has moved beyond the operation of a legitimate joint venture and into illegal cartel behavior. The Rangers have complained about, objected to, and withheld their approval of, this behavior for several years, to no avail.

**C.    The NHL Seeks To Eliminate And Prevent Competitive Activities.**

11.    The New York Rangers, along with the Montreal Canadiens, the Toronto Maple Leafs, the Boston Bruins, the Detroit Red Wings and the Chicago Blackhawks, are known as the NHL's "Original Six" teams – essentially its founding members. The Rangers have won the Stanley Cup four times, most recently in 1994. Players as memorable as Vic Hadfield, Eddie Giacomin, Rod Gilbert, Mike Richter, Mark Messier and Wayne Gretzky have played for the New York Rangers, and stars such as Jaromir Jagr and Brendan Shanahan now play for the Rangers. Gretzky, the game's greatest player, retired as a New York Ranger.

12.    Over the years, MSG has developed, reinforced and encouraged fan interest in the Rangers, making substantial investments in the Rangers franchise as it seeks to compete with other NHL teams, including but not limited to the two other NHL teams in the New York metropolitan area. MSG, for example, has spent significant sums to attract to its team established international hockey stars such as Jagr and Shanahan (the former Red Wings star), and, most recently, young American stars such as Scott Gomez and Chris Drury, all in an effort to generate "True Blue" excitement at Rangers games at Madison Square Garden and elsewhere. MSG, in addition, has consistently spent significant sums to market the New York Rangers, and the Rangers' following extends well beyond the New York area. Hockey fans across the country (and indeed the world) identify with the New York Rangers, and seek the opportunity to experience the Rangers wherever they can, including by attending games or by viewing live or

recorded games or game highlights, as well as by buying Rangers-branded apparel and merchandise.

13.    As part of their legitimate and independent business efforts, the individual member clubs comprising the NHL, including the Rangers, have ownership rights in, and have registered, various copyrights, trademarks, trade dress and trade names (collectively, "marks") in logos and designs relating to their teams.  Individual NHL member clubs, including the Rangers, have undertaken substantial efforts over the years to develop and enhance the value of their marks and the image of their teams as they compete with each other for fan interest.

14.    MSG's efforts and the loyalty of Rangers fans have created value for the New York Rangers brand and marks.  MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel and memorabilia, containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games or game highlights.  There remains great unexploited potential in this brand and these marks, and MSG intends and desires to exploit them further, in competition with the other clubs, to generate income from on-line, video and licensing opportunities and to generate and maintain fan interest in New York Rangers hockey.

15.    The NHL, however, seeks to ban independent competition in these areas by and among the individual clubs and to expropriate these competitive opportunities for itself.  Such excessive centralization and aggrandizement of the NHL at the expense of the member clubs is not reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose, and because of that it is not permissible under state and federal antitrust law.  Yet that is the course the NHL has taken.  In addition, and notwithstanding the strenuous

- 8 -

objections of MSG (and occasionally other clubs), the NHL has chosen to enforce its anticompetitive regime through oppressive daily fines.

16.     Defendants have inappropriately and illegally claimed and usurped more and more centralized control over what have been and should be the independent competitive activities of the individual clubs, eliminating competition in a number of ways, including the following:

A.     Excessive League control over the licensing of NHL club marks and the marketing of club-branded apparel, merchandise and memorabilia.  The NHL member clubs, acting collusively as the League and through the Commissioner, assert the power to control the licensing of individual NHL team marks for virtually all commercial purposes and to constrain the ability of individual teams to market apparel, merchandise and memorabilia both within and beyond the team's local area, imposing restrictions on sales through retailers and prohibiting sales of team-related video/DVD products.  The NHL member clubs, acting collusively as the League and through the Commissioner, also claim the right to prohibit the sale of apparel, merchandise and memorabilia through online team stores, fining MSG for competing in that way, and permitting MSG to offer to consumers on its website only the inefficient, time-consuming option of downloading the team's mail order catalog.  In addition, MSG faces significant NHL-imposed restrictions even in the sale of Rangers jerseys outside Madison Square Garden itself.  This centralized control eliminates competition among individual clubs and is not reasonably necessary for any cognizable procompetitive purpose.  Each member club is legally entitled to exploit its own intellectual property, including its marks and logos, and each individual club is legally required to decide independently whether and to what extent it will

authorize the NHL to act as a non-exclusive licensing agent in any particular instance in the marketing and promotion of club-branded apparel, merchandise and memorabilia.

        B.    <u>Excessive League restrictions on individual teams' relationships with advertisers and sponsors</u>.  The NHL member clubs, acting collusively as the NHL and the Commissioner, claim the almost unlimited right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs' abilities to sell advertising or sponsorship arrangements, even in the clubs' local home arenas.  In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have eliminated competition for advertising sales between home and away clubs by prohibiting individual clubs from using virtual signage, *i.e.*, signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not block or substitute for existing in-arena signage.  By doing so, the NHL prohibits an innovative means of expanding advertisers' access to interested consumers.  This prohibition is not reasonably necessary for the success of the NHL venture.

        C.    <u>Excessive League control over individual club broadcasting and other distribution opportunities</u>.  Media revenues are critical to any professional sports franchise, and one of the core activities of a professional sports league is to develop and negotiate a national television contract.  In most professional sports, national television revenues are an important means of balancing revenues between and among individual teams.  The NHL, however, has been unsuccessful to date in its efforts to obtain significant national television revenues.  At the same time, the NHL member clubs, acting collusively as the League and through the Commissioner, have restrained the individual clubs' broadcasting and other distribution opportunities, and in so doing eliminated competition among the clubs in ways that are not

reasonably necessary for the success of the NHL venture or for any other legitimate procompetitive purpose. In particular, the NHL member clubs, acting collusively as the League and through the Commissioner, claim the right to control jointly all broadcasting and other distribution rights, both inside and outside each club's local area, as well as internationally. In asserting this control, the League has acknowledged that it has allocated the geography of virtually all of North America among the various member clubs. By doing so, the League has illegally eliminated the ability of a club to broadcast its games into areas allocated to the other clubs, in competition with those clubs, except where multiple clubs are located in the same metropolitan area such as in the New York area. The League also unreasonably limits the extent to and terms on which a club can broadcast its games even in the area allocated to that club. In addition, the NHL member clubs, acting collusively as the League and through the Commissioner, have unreasonably restricted a team's ability to distribute its own live games through that team's website and/or the website of its local television rightsholder or through wireless devices, as well as rebroadcasts of its games over the internet or on a "video-on-demand" basis. These restraints on individual teams' competitive activities are clearly anticompetitive, not reasonably necessary to the success of the NHL joint venture or to any other legitimate procompetitive purpose, and far exceed the limited antitrust immunity afforded by the Sports Broadcasting Act.

        D.     <u>Excessive League control of all "new media" activities</u>. The NHL member clubs, acting collusively as the League and through the Commissioner, have taken exclusive control of various "new media" activities and banned the individual clubs from competing independently in this area. As one example, the NHL has forced each team to turn over that team's individual website to the League, which now controls those sites through the

only League permitted website – "nhl.com." The League's elimination of independent competition between and among club websites goes well beyond any legitimate need to ensure the basic appearance and quality of individual clubs' websites or the clubs' other new media activities, and is not reasonably necessary for any legitimate procompetitive purpose. By banning teams from operating additional, independent websites, the NHL has unreasonably restricted the ability of teams such as the Rangers to use websites in unique and creative ways to communicate with existing fans, to develop new fans, and generally to compete for fans with other NHL clubs. Indeed, defendants have openly conceded their intention to eliminate what they viewed as the overly "tribal" nature of the various team websites – i.e., to eliminate the purported over-emphasis on team-against-team competition produced by independent competitors responding to consumer preferences and other market forces – and instead to use the League's centralized control to make the various team websites more League-centered and less "tribal." Pursuant to its "new media" policy, the NHL has also forced teams to give the League more attractive ad inventory on team home pages, irrespective of the adverse effect on the teams' ability to sell advertising and sponsorships in competition with each other and with the NHL, and has otherwise restrained the distribution of games and highlights through handheld technologies.

17.    The NHL is the only provider of major league men's professional ice hockey contests in the United States, and MSG is subject to the NHL's Constitution and By-laws. Those League rules purport to require MSG to comply with the joint decisions of the member clubs and with decisions of the Commissioner, including decisions imposing the above-described restraints. League rules adopted by the NHL member clubs also give the Commissioner extraordinary and unregulated power to enforce the joint elimination of competition through massive monetary fines, and even possible expulsion from the NHL pursuant to provisions of the

- 12 -

NHL Constitution permitting the "involuntary termination" of member clubs that violate League rules. Such a termination would prevent MSG from continuing to provide major league men's professional ice hockey contests to its fans. Indeed, as explained above, the NHL sent a letter to MSG on April 18, 2007, fining MSG $100,000 per day for what the League described as conduct in "clear and blatant" violation of the NHL's anticompetitive rules and policies. Although MSG disagreed with the NHL's position in that letter, the NHL's anticompetitive demand that MSG cease competing on pain of a $100,000 per day fine left MSG with no choice but to comply even as MSG continued to try to find a way to resolve its differences with the NHL short of litigation. The NHL's subsequent letter, threatening MSG with further fines of $100,000 per day beginning on September 28, 2007 for continuing to operate a Rangers website outside of League control, reflects a continuation of the NHL's anticompetitive overreaching.

18.    The NHL's coercive actions require MSG to pursue this lawsuit in order to protect its investment in its marks and its efforts to compete in the marketplace. MSG's only goal is to end agreements that restrain and adversely affect competition among teams in areas where the elimination of independent competition is not reasonably necessary to produce major league men's professional ice hockey contests or to the achievement of any other cognizable procompetitive purpose. MSG therefore seeks no money damages, but only injunctive relief to restrain and prevent the NHL's continuing violations of federal and state antitrust laws.

## II.    NATURE OF CLAIMS, JURISDICTION AND VENUE

19.    MSG brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337. MSG also brings this action pursuant to New York General Business Law § 340. This Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction.

CLI-1435955v31

20.    Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.  The NHL, National Hockey League Enterprises, L.P. ("NHLE"), and NHL Interactive CyberEnterprises, LLC ("NHL ICE"), transact business, maintain their principal offices and are found in this district, and a substantial part of the events or omissions giving rise to MSG's claims occurred in this district.  NHL Enterprises Canada, L.P. ("NHLE Canada"), and NHL Enterprises, B.V. ("NHLE International"), transact business in New York and are subject to personal jurisdiction in this district.

21.    Jurisdiction over all defendants comports with the United States Constitution.

### III.    PARTIES

22.    MSG is a Delaware limited partnership with its principal offices at Two Pennsylvania Plaza, New York, New York 10121-0091.  MSG owns the New York Rangers men's professional ice hockey club and the mark "New York Rangers," a federally registered trademark, as well as various registered and unregistered trademarks and trade names derived from, and copyrights and trade dress in the form of logos associated with, that mark.  MSG also owns Madison Square Garden, as well as two programming services, MSG Network and FSN New York, which license the right to distribute Rangers games, as well as games of the New York Islanders, New Jersey Devils and Buffalo Sabres NHL hockey clubs.  MSG is a member or partner and beneficiary of the NHL, NHLE and NHL ICE, as well as related entities, including NHLE Canada and NHLE International.

23.    Defendant NHL is an unincorporated association of the 30 major league men's professional ice hockey teams in the United States and Canada, and is the dominant provider of major league men's professional ice hockey contests in the world.  The NHL has its headquarters at 1251 Avenue of the Americas, New York, New York 10020-1198.  The NHL owns valuable marks relating to ice hockey and acts to facilitate the provision of major league men's

- 14 -

professional ice hockey contests. The NHL transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of marks relating to that business. It also enters into contracts in this district.

24.    Each team, or club, that is a member of the NHL is a separate and independent business with a separate and independent owner and significant autonomy in its business operations. The NHL and its member clubs are independent entities that are capable of conspiring (and, in fact, have done so, as alleged in this Complaint) in the licensing of their respective marks and in other competitive areas not necessary for the provision of major league men's professional ice hockey competition.

25.    Defendant NHLE is a Delaware limited partnership with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198. NHLE is a limited partnership, the beneficial owners of which are the 30 NHL clubs or entities under their control. NHLE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. It also enters into contracts in this district.

26.    Defendant NHL ICE is a Delaware limited liability company with its principal place of business at 1251 Avenue of the Americas, New York, New York 10020-1198. NHL ICE is a subsidiary of NHLE. NHL ICE transacts business in the Southern District of New York by engaging in activities there relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. It

also enters into contracts and manages the online sale of NHLE-licensed products for the NHL.com website in this district.

27.    Defendant NHLE Canada is a Canada limited partnership with its principal place of business in Ontario, Canada. NHLE Canada is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL. NHLE Canada primarily conducts trade or commerce in Canada, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. Its conduct of trade or commerce in Canada, however, has had and continues to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE Canada transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by the NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

28.    Defendant NHLE International is a Netherlands private limited liability company with its principal place of business at Polakweg 14, 2288GG, Rijswijk, The Netherlands. NHLE International is owned equally, directly or indirectly, by the owners of the 30 member clubs that constitute the NHL. NHLE International primarily conducts trade or commerce outside North America, relating to the business of major league men's professional ice hockey contests and the licensing of NHL and individual team marks relating to that business. Its conduct of trade or commerce outside North America, however, has had and continues to have direct, substantial and

reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. NHLE International transacts business in New York by licensing marks owned by member clubs located in New York, by licensing marks owned by NHL and/or NHLE, by remitting monies to New York member clubs, as well as to the NHL and/or NHLE, by remitting monies to all member clubs by means of accounts managed in New York by the NHL and/or NHLE, by engaging in joint advertising and marketing efforts with the NHL and NHLE, by frequent and regular contacts with the NHL and NHLE in this district, including contacts relating to contractual negotiations, and by engaging in other similar activities.

## IV.    TRADE AND COMMERCE

29.    There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities. So, too, the copyrights, trademarks, trade names, trade dress and logos of the major league men's professional ice hockey clubs have no reasonably close substitutes. There is a separate demand, and hence a relevant market, for the licensing of those marks to licensees for various uses. Also, arenas when used for major league men's professional ice hockey contests provide an outlet for or involving advertising to hockey fans for which there is a separate demand and no close substitutes.

30.    There is a relevant product or service market for the licensing of the trademarks, trade names, trade dress and copyrights (including logos) owned by the NHL clubs and the NHL itself. This market is comprised of several smaller segments that themselves constitute relevant markets or submarkets, including:

A.    A market or submarket for the licensing of NHL and NHL club marks for use on apparel, merchandise and memorabilia.

B.    A market or submarket for the sale of NHL-branded and NHL club-branded apparel, merchandise and memorabilia.

C.    A market or submarket for the licensing of NHL and NHL club marks for use in corporate advertising and sponsorships.

D.    Markets or submarkets for the licensing of broadcasting, rebroadcasting or other distribution rights to NHL games, either live or recorded, as well as game highlights, footage and related ancillary programming, over media such as cable and satellite television, the internet and wireless handheld devices, either by licensing those rights to content aggregators or by offering programming directly to consumers.

There is also a relevant product or service market consisting of the sale of advertising at or involving venues when used as the setting for major league men's professional ice hockey contests.

31.    At competitive prices, the rights to license or use the marks of the NHL and NHL clubs for these various purposes, the rights to broadcast, rebroadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving venues when used as the setting for NHL hockey contests, are not reasonably interchangeable with any other products, services or rights. Defendants have the power to raise or maintain prices above the competitive level as a result of: (i) the various restraints imposed by the NHL and the other defendants on the ability of the individual clubs to exploit their individual marks, as well as apparel, merchandise and memorabilia displaying those marks, for virtually all commercial purposes, and the various

CLI-1435955v31

broadcasting and other distribution restraints; (ii) the power to restrain the ability of individual clubs to promote and market their teams in competition with other teams through individual team websites; and (iii) the power to control the amount and type of advertising at or involving venues when exhibiting major league men's professional ice hockey contests.

32.     There is also a relevant product or service market defined as the provision of major league men's professional ice hockey contests in North America.  This market is characterized by high barriers to entry.  The NHL is the only significant, and therefore the dominant, provider of this product or service, and has market power.  As a result, MSG has had no choice but to comply with the competitive restraints that are the subject of this Complaint or face the risk of adverse consequences as described in this Complaint, but even its efforts to comply with the NHL's competitive restraints have not prevented the League from fining MSG for activities that the League has described as "clear and blatant" violations of the NHL's anticompetitive rules and policies.  The NHL, acting through and in combination with the separate and independent clubs that own the NHL, also exercises market power through the exclusive agreements and the other unnecessary and unjustified restraints on each club's competitive activities that are the subject of this Complaint.

33.     The relevant geographic market consists of North America, including the United States.  Various geographic submarkets also may exist.

34.     Defendants' conduct complained of herein has taken place in and affected, and directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce of the United States, and the effects in foreign trade and commerce have had and continue to have direct, substantial and reasonably foreseeable effects on U.S. domestic and export commerce in ways that give rise to MSG's claims. The referenced licensing, marketing and

advertising activities have taken place and continue to take place in such trade and commerce. The products and services containing, using or referencing the marks of the NHL and NHL clubs are also sold and/or licensed in such trade and commerce.

## V.    FACTS RELEVANT TO MSG'S CLAIMS

### A.    Licensing And Other Forms Of Competition.

35.    The Rangers and the NHL's other member clubs must cooperate to schedule and produce major league men's professional ice hockey contests. That limited cooperation is fully consistent with the antitrust laws. But there has not been a complete integration of the member clubs, which continue to exist as separate businesses with separate owners that retain significant degrees of autonomy in their operations. In these operations, the clubs compete in businesses that are separate and distinct from the production of ice hockey contests. One such area of competition is the sale of tickets to attend live major league men's professional ice hockey games. MSG, for example, sells tickets to Rangers home games in competition with other NHL member clubs – including, but not limited to, the other two NHL teams in the New York area – that also seek to sell tickets to their teams' home games.

36.    There are other areas where the Rangers can and do compete with the other NHL clubs and with the NHL, including in the licensing of individual team marks and in the operation of an independent Rangers website for communicating with its fans and potential fans. There is also a significant demand for the broadcasting, rebroadcasting and other distribution of live and recorded Rangers games, as well as game highlights and game footage, through various media. By satisfying that demand, MSG can generate and increase fan interest in Rangers hockey in competition with other NHL teams, reinforcing the marketing activities that MSG is undertaking through its website, and enabling marketing and licensing opportunities in other areas, including opportunities that would take place in the absence of the NHL's competitive restraints.

37.     In short, MSG has sought to compete with the 29 other teams and the NHL to the limited extent permitted by the exclusive agreements challenged in this Complaint. In a fully competitive marketplace, the Rangers could and would compete to an even greater extent. In particular, by licensing the Rangers marks in creative ways and at lower costs, as well as by freely selling team-branded apparel and merchandise, by increasing the opportunity to view Rangers games throughout the country, whether through cable, satellite or on the internet (including on its own website, rather than on a website controlled by the NHL), and by exploiting the Rangers marks and engaging in other marketing efforts through the Rangers website, MSG would be able to generate and increase fan interest and excitement in Rangers hockey and Rangers-themed products, all in competition with the other NHL teams.

**B.     The Anticompetitive Exclusive Agreements.**

38.     Pursuant to a series of agreements beginning in the 1980s, and renewed several times since then, defendants purported to obtain the "exclusive" right to control for virtually all commercial purposes the individual clubs' marks and licensing opportunities. Defendants have exercised and enforced those rights in ways that have significantly restrained the competitive activities of the member clubs on a continuous basis since then.

39.     In June 2006, and over the objection of MSG and certain other clubs, the member clubs purportedly renewed and extended the "exclusive" agreements until 2016, which further eliminates competition and continues to injure MSG's ability to compete in the marketplace. Also over objection, the clubs additionally purported to grant defendants the exclusive opportunity to exploit team websites and other new media opportunities, eliminating competition among the teams and restraining one of the most effective competitive tools used by the Rangers in recent years to compete in the marketplace.

CLI-1435955v31

40.    These "exclusive" agreements, adopted by agreement between the independent

member clubs of the NHL, place entirely – and illegally – in defendants' hands a wide range of

otherwise competitive business activities where team cooperation is not reasonably necessary to

produce major league men's professional ice hockey contests or to achieve any other cognizable

procompetitive purpose, usurping the rights of the individual clubs to conduct their businesses

independently and eliminating competition among the clubs and with the NHL in areas such as

the following:

A.    Defendants assert the exclusive worldwide right to license team marks for

use on team jerseys, practice wear, winter outerwear, products containing the player's name,

number or image, and player photos, allowing each team to enter into licenses only for other, less

lucrative products and only for sales within their arenas.  This necessarily eliminates competition

that would otherwise exist among teams and between teams and the NHL.

B.    Defendants assert the right to control the sale of team apparel and

merchandise, including through each team's direct-mail catalogs, requiring that 65% of the

products offered through team catalogs must be produced by licensees selected by defendants

and effectively prohibiting teams from offering for sale locally-licensed products through any

outlet beyond, or in any catalog distributed outside of an area within, 75 miles of the team's

home arena.  Defendants have prevented teams from selling team merchandise on the internet

other than through an NHL-controlled store, even when a team restricts such internet sales to

consumers residing within a 75-mile radius of the team's arena.  Defendants have also banned

teams' efforts to create consumer-friendly online versions of their mail order catalogs, even

though the League has otherwise permitted mail order catalogs as long as the merchandise in the

catalogs complies with the League's additional anticompetitive requirement that no team seek

lower costs or better quality from alternative, non-NHL selected manufacturers. Banning a more efficient, online version of a team's mail order catalog makes it more difficult for a team such as the Rangers to compete in the sale of team merchandise, apparel and memorabilia even to the limited extent permitted by the NHL.

C.    Defendants assert the right to control the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage in media such as cable and satellite television, the radio, "video-on-demand," the internet and handheld technologies. Specifically, defendants have unreasonably restrained the broadcasting and other distribution rights of individual clubs by allocating the geography of virtually all of North America among the member clubs and prohibiting each club from transmitting its games, on television or over the internet, into territories allocated to other clubs or outside North America. The League keeps for itself the right to broadcast games into territories allocated to individual clubs, but the League exercises that right by selling only cable packages of all NHL games. Even in the area allocated to a club, defendants do not fully allow that club to distribute its games, (i) allowing cable distribution of only a limited number of that club's games in some portions of the area on a fee-for-subscriber basis established by the League, (ii) blacking out games while the NHL's broadcasters are providing nationwide coverage of an NHL game, precluding the blacked-out teams from broadcasting or otherwise distributing their own games through other outlets even locally on those occasions, and (iii) restraining the ability of a club to distribute its games on the club's website or on other internet sites and via "video-on-demand" even when such distribution has been gated and therefore limited to the area allocated to that club (although such a limitation itself is not permissible under the antitrust laws). All of these restraints are clearly more restrictive of competition than necessary to achieve any legitimate procompetitive purpose of the

NHL joint venture. Defendants have also restricted output by limiting the ability of teams to license rebroadcasts of their games, permitting such rebroadcasts only within 48 hours of game endings and prohibiting teams altogether from licensing the rebroadcasts of historic games. Restraints also exist with respect to game highlights and footage. Defendants, and not the individual teams, claim the exclusive right to market for commercial purposes all highlights and footage of NHL games, and defendants have stated their intention to create an NHL-controlled "hockey factory" to ensure that the offering of NHL highlights and game footage over the internet and wireless technologies is controlled through the NHL joint venture. The teams, by contrast, are only permitted to use short segments of game highlights or game footage on team websites. Recently, defendants have even proposed to remove free radio feeds from team and radio station websites. In short, defendants have restrained and threatened to restrain competition in the broadcasting, rebroadcasting and other distribution of games, game highlights and game footage, seeking to control the delivery of content through all existing and future media platforms in ways that go well beyond what is reasonably necessary to any legitimate procompetitive purpose.

        D.     Defendants have restricted the ability of teams to sell advertising space on dasherboards, *i.e.*, the low partitions erected around the ice itself, and in the ice during games, regulating the size and spacing of such advertising and controlling the most desirable dasherboard and "in-ice" space during nationally broadcast games. Defendants have increased their control of arena and "in-ice" advertising in recent years, in particular during the playoffs and championship games. Defendants, moreover, have claimed the right to limit the output of advertising by prohibiting teams from using new technologies to offer virtual signage that can be electronically superimposed during telecasts of a club's games, even when such signage does not

delete or substitute existing in-arena signage, and the NHL fined MSG in 2007 for its efforts to sell such virtual signage over its own broadcasts of Rangers games. The League is also requiring each hockey arena to display League-sponsored advertising in connection with League-provided, same-day, "out-of-town" highlights of other NHL games.

        E.     Defendants control the design, operation and exploitation of team websites, including products and services that can be offered on those sites. By doing so, defendants in effect have seized control of one of the teams' best branding, competitive and outreach opportunities, converting individual team sites into standardized sites that will necessarily lack the originality and creativity of fully independent team sites, forcing teams to accept content that does not promote that team's efforts to market itself and restraining the ability of individual teams to use their sites to market and promote their teams in competition with each other. Indeed, defendants concededly intend to eliminate what they deem overly "tribal" competition and instead to replace that competition with a League-centered focus that de-emphasizes competition among the independent clubs. Defendants already have reduced competition in the sale of advertising by taking control of the sale of banner ads at the top of, and in the primary box of, team websites, and have further sought to take over an even greater percentage of the advertising space on team websites, especially on the inside pages where consumers are directed to visit and experience team-focused content.

        41.     The NHL asserts the authority to sanction teams for engaging in independent activities in violation of the above-described agreements or otherwise in violation of rules that the NHL joint venture has developed over the years to implement these agreements. MSG's recent, coerced decisions to stop competing or face $100,000 per day fines prove that MSG has no choice but to accede to the NHL's dictates. Pursuant to the NHL Constitution and By-Laws,

MSG could be subject to additional, significant adverse consequences, including sanctions up to and including expulsion from the NHL, if MSG did not abide by the exclusive, anticompetitive agreements. MSG has invested significant sums in the Rangers, and no other major league men's professional ice hockey league exists in the United States for the Rangers to join. As a result, MSG is bound by these restraints on its ability to compete independently absent relief from this Court.

**C.**       **The Agreements Have Restrained Horizontal Competition And Have Had Anticompetitive Effects And Led To Consumer Harm.**

42.    The above-described agreements between the member clubs of the NHL, acting collusively as the League and through the Commissioner, have restrained horizontal competition between and among the NHL clubs and the NHL in various areas where the member clubs could and would compete with each other and with the NHL. In particular, in the absence of the exclusive agreements and other competitive restraints, NHL teams would compete with each other in the licensing of their teams' marks to a much greater extent than the limited opportunities that are now available and they also would compete with the NHL, which owns and licenses the NHL logo. Further, they would compete in the sale of team-branded merchandise, apparel and memorabilia. The teams also would compete with each other and with the NHL in the broadcasting, rebroadcasting and other distribution of NHL games (apart from any national broadcasting contract), game highlights and game footage in a variety of media and, further, in the operation of their websites. Moreover, the teams would compete with each other and with the NHL in the sale of advertising in arenas they own or lease during NHL ice hockey contests.

43.    The above-described agreements have adversely affected and substantially lessened competition in the relevant markets, in at least the following ways:

CLI-1435955v31

A.    Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety, including consumer benefits in the sale of products and services associated with NHL and individual team marks. Competition through the ability of individual teams to license their own marks would create greater incentives for individual teams to invest in and more fully exploit and maximize the value of their licensing activities, leading to greater levels of competition in the relevant markets and in the sale of NHL and NHL-club branded products and services, to the benefit of consumers.

B.    Prices for team-branded merchandise, apparel and memorabilia are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Consumer choice has been limited, and quality and availability of apparel, merchandise and memorabilia has suffered.

C.    Prices for the licensing of NHL and NHL team marks, including the Rangers marks, for use in advertising and other sponsorships are higher, and output is lower, than they would be in the absence of the "exclusive" agreements. Competition through the ability of individual teams to license their marks for such purposes would produce consumer benefits, such as lower prices, higher quality and more variety.

D.    Output of broadcasts, rebroadcasts and internet and other distribution of NHL games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the "exclusive" agreements. Adverse effects exist in distribution markets for licensing to content aggregators such as, but not limited to, MSG

- 27 -

Network and FSNY, which license the rights to broadcast the Rangers, Islanders, Devils and Sabres ice hockey contests, as well as in end use markets for the sale of programming directly to consumers. Competition by individual clubs independently acting to exploit the broadcasting, rebroadcasting and other distribution of their teams' games would produce consumer benefits, such as an increase in the availability of broadcasts over a wider range of media, including cable, the internet and wireless devices.

        E.     Defendants have restricted competition for the sale of advertising space at NHL hockey games. MSG's ability to license advertisers and sponsors in Madison Square Garden has been restricted by the national licensing contracts negotiated by defendants, as well as by other unreasonable restraints imposed by defendants. Local advertisers and sponsors have been denied access to valuable advertising space to the extent that defendants have exercised control and licensed the space only to national advertisers, and advertisers and sponsors have been forced to pay more than they would in the absence of the exclusive agreements.

        F.     The NHL's prohibition of independent team websites has eliminated the independent competition that would exist but for these anticompetitive agreements among the NHL member clubs, acting collusively as the League and through the Commissioner. This has led to a standardized approach to team sites to the detriment of the creative and individualized approaches that otherwise would exist, limiting the ability of teams to communicate with, and compete for, fans in ways that the individual teams believe are most effective and in their best individual interests, reducing fan interest in the process. In addition, NHL control of significant portions of the advertising on team websites has restricted the ability of individual teams to compete in the sale of such advertising. An NHL-controlled approach to individual team websites will be less responsive to competitive opportunities available to individual teams, and

consumers will be harmed by the reduction of the website competition that existed between and among the NHL member teams and the NHL prior to the NHL's recent exercise of control over individual team websites, as well as by the elimination of website output and competition that would exist in the absence of the NHL's anticompetitive ban on independent team websites.

44.    Other adverse competitive effects exist as well.  The "exclusive" agreements have adversely affected, and will continue to adversely affect, the incentives of individual clubs to invest in, and exploit, their marks.  Individual team efforts are competitively significant because the NHL distributes the income from its own exploitation of team marks equally to each member club regardless of the club's contribution (if any) to the value of its marks, the club's efforts (if any) to promote itself and its marks, and the club's investment (if any) in creating a positive association with its marks.  The result, again, is reduced output, diminished product quality, diminished choice and suppressed price competition.

45.    In the absence of the "exclusive" agreements, the various clubs, including MSG, would increase their licensing output, offering licensing and broadcast opportunities that they are not now able to offer, increasing competition between and among the individual teams and the NHL, and leading to lower prices in the relevant markets.

46.    There are no legitimate, procompetitive justifications for these "exclusive" agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

## D.    **MSG Has Suffered Antitrust Injury**.

47.    MSG has been injured and threatened with loss or damage as a result of the anticompetitive effects of the challenged conduct, in at least the following ways:

A.    MSG has been denied the right to freely compete in the exploitation of the Rangers marks.  MSG has been unable to license the Rangers marks in ways that it believes are

most likely to maximize the value of those marks and hence increase and strengthen fan interest and excitement in the Rangers hockey club. MSG has lost and will continue to lose profits and sales, including in domestic and export commerce, as a result of its inability to fully exploit the Rangers marks within and outside the United States.

        B.     MSG is forced and will continue to be forced to overpay for League-licensed products. MSG has been restricted in its ability to offer Rangers-logoed apparel, merchandise and memorabilia on the Rangers website and elsewhere, and the products that MSG is able to offer on the Rangers site through an NHL-controlled store are available only at artificially-inflated prices. In addition, MSG has been restrained from offering products and services for sale to consumers through an online version of its team's mail order catalog.

        C.     MSG has been and will continue to be unduly restricted in its ability to design and enter into efficient and fan-responsive relationships with merchandisers, advertisers and sponsors that may want to associate themselves with the Rangers. MSG has been and will continue to be restrained from negotiating creative or other special relationships with sponsors and advertisers, in particular, across multiple advertising platforms, including the internet. Further, MSG is being threatened in its efforts fully to exploit recent and future technological opportunities that would allow MSG to offer sponsors in-game, on-air signage opportunities through the real-time, video insertion of computer-generated electronic images into broadcasts of Rangers and other NHL games. In the absence of the challenged agreements, MSG would be able to provide increased opportunities to sponsors with respect to in-arena signage.

        D.     MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base throughout the country and abroad in

order to generate fan interest and excitement in the Rangers. In addition, MSG, through MSG Network and FSNY, has lost licensing and other revenues as the result of its inability fully to exploit Rangers, Islanders, Devils and Sabres ice hockey contests.

       E.    MSG has been constrained and is being threatened still further in its ability to communicate with Rangers fans and potential fans on the Rangers website, and to market an individualized Rangers website that furthers MSG's ability to compete for fans and that generates fan excitement in the Rangers and the experience of Rangers games at Madison Square Garden, as well as Rangers game telecasts.

## COUNT ONE: SECTION 1 OF THE SHERMAN ACT

48.    MSG incorporates the averments of paragraphs 1 through 47, above.

49.    Defendants and the independent businesses that comprise the member clubs in the NHL have engaged in a contract, combination or conspiracy with the purpose, intent and effect of restraining horizontal competition among the NHL member clubs and between the clubs and the NHL, and, in addition, with the purpose, intent and effect of restraining trade and commerce in licensing activities in the relevant markets, in the distribution of NHL games, and in the sale of advertising at venues when used as the setting for major league men's professional ice hockey contests.

50.    The foregoing contract, combination or conspiracy has restrained competition between and among the NHL clubs and the NHL in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

51.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to MSG's business and property, as set forth above. MSG

will continue to suffer antitrust injury and threatened loss or damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO:  NEW YORK GENERAL BUSINESS LAW § 340

52.    MSG incorporates the averments of paragraphs 1 through 51, above.

53.    Defendants have engaged in a contract, agreement, arrangement or combination that has restrained the free exercise of competition in the above-described markets in this state and elsewhere or that has otherwise resulted in a monopoly, all in violation of New York General Business Law § 340.

## VI.    PRAYER

**WHEREFORE**, MSG prays for judgment against defendants as follows:

1.    Preliminary and permanent injunctive and declaratory relief against those collective activities, policies and rules of the NHL that are not reasonably necessary to the success of the NHL joint venture.  Without in any way limiting the foregoing, such relief should include at least the following specific items of relief:

A.    Prohibiting defendants from (i) imposing or enforcing any restriction on MSG's use of the Rangers marks or the means, media or affiliations through which MSG promotes or markets the Rangers or otherwise exploits the Rangers marks, or (ii)  licensing or otherwise making use of or exercising control over the Rangers marks without MSG's express consent;

B.    Prohibiting defendants from imposing or enforcing any restriction on the means by which MSG may distribute or sell apparel, merchandise, memorabilia, or any other items bearing a Rangers mark, including but not limited to (1) any restriction on MSG's choice of manufacturers for such apparel, merchandise, memorabilia or other items; (2) any geographic restriction; or (3) any restriction on sales through any outlet or by any means (including sales through the Rangers website);

C.    Prohibiting defendants from imposing or enforcing any restriction on MSG's audio and/or video distribution of Rangers games, game footage or game highlights (including the sale of rights thereto) via any medium, now known or hereafter developed, including over-the-air broadcasting, cable,

- 32 -

satellite or broadband television, the internet or wireless devices, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies such as in the case of a national broadcasting agreement authorized by the Sports Broadcasting Act, 15 U.S.C. § 1291 *et seq.*;

D.      Prohibiting defendants from entering into any distribution agreement other than one or more agreements for the national distribution of games of all NHL member teams that, in the aggregate, permit the League-approved rightsholder(s) exclusive distribution of no more than eight Rangers games in any one season without the express written permission of the Rangers;

E.      Prohibiting defendants from entering into any advertising or sponsorship agreement that overrides, conflicts with, or preempts any MSG or Rangers local sponsorship agreement;

F.      Prohibiting defendants from imposing or enforcing any requirement that any in-arena or other advertising or sponsorship inventory be reserved for or provided to the League or its sponsors;

G.      Prohibiting defendants from imposing or enforcing any restriction on the existence, content, format, or design of an independent Rangers website except to the extent necessary and appropriate to ensure reasonable minimum quality standards;

H.      Prohibiting defendants from requiring MSG to participate in any joint effort relating to the internet or any other new media activities, except to the extent reasonably necessary to achieving cognizable procompetitive efficiencies through such joint efforts; and

I.      Prohibiting defendants from sanctioning, penalizing, or otherwise taking adverse action against the Rangers or any individuals or entities affiliated with the Rangers for the filing and prosecution of this lawsuit or any actions related thereto, or for failing to comply with any illegal NHL rules or practices.

2.      Such other relief as is necessary and appropriate to restore full and free competition in the relevant markets.

3.      Its attorneys fees and cost of suit, and such other and further relief as may be just and proper.

March 31, 2008

JONES DAY

By: _____
Meir Feder  (MF-2574)
Robert W. Gaffey  (RG-4004)
William J. Hine (WH-6766)
222 East 41st Street
New York, NY  10017-6702
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

CLI-1435955v31

## CERTIFICATE OF SERVICE

I declare that on March 31, 2008, I caused the attached FIRST AMENDED

COMPLAINT FOR INJUNCTIVE RELIEF to be served via U.S. Mail on the following counsel:

Shepard Goldfein
James A. Keyte
Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates
Four Times Square
New York, New York 10036
Tel. 212.735.3000
Fax. 212.735.2000

*Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York                     JONES DAY
           March 31, 2008

                                        By: _____
                                              Meir Feder  (MF-2574)
                                              Robert W. Gaffey  (RG-4004)
                                              William J. Hine (WH-6766)
                                              Tracy V. Schaffer (TS-4952)
                                              222 East 41st Street
                                              New York, NY  10017
                                              Telephone:  (212) 326-3939
                                              Facsimile:  (212) 755-7306

                                        *Attorneys for Plaintiff*

OF COUNSEL:

Thomas F. Cullen, Jr.
Joe Sims
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190