UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,

                           :

              Plaintiff,

                           :

        - against -                No. 07 CIV. 8455 (LAP)

                           :

NATIONAL HOCKEY LEAGUE,        <u>ELECTRONICALLY FILED</u>
NATIONAL HOCKEY LEAGUE        :
ENTERPRISES, L.P., NHL INTERACTIVE
CYBERENTERPRISES, LLC, NHL       :
ENTERPRISES CANADA, L.P., and NHL
ENTERPRISES, B.V.,               :

             Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Shepard Goldfein
James A. Keyte
Paul M. Eckles
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522

*Attorneys for Defendants National Hockey
    League et al.*

Dated:  June 2, 2008

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

I.  MSG'S ALLEGATIONS AND MSG'S CONSENT AGREEMENTS ............................ 5

    A.  The NHL Is an Economically Interdependent Venture That Engages in Collective Efforts to Market and Sell NHL Hockey and Related Products ............ 5

    B.  MSG Concedes That It Is Bound by the NHL Constitution and By-Laws ............. 6

        1.  MSG Agreed to Exclusive Territories, Including for Broadcasting .......... 7

        2.  MSG Agreed to Collectively Exploit Its Intellectual Property ................... 8

        3.  MSG Agreed to Collectively Exploit New Media ..................................... 9

        4.  MSG Agreed to In-Arena Advertising Regulations ................................. 10

    C.  The Consent Agreements and Releases .............................................................. 11

    D.  MSG Seeks to Avoid the NHL Lex Scripta and the Consent Agreements .......... 11

ARGUMENT ............................................................................................................... 13

II.  THE MEMBER CLUBS ARE A "SINGLE ENTITY" WHEN DECIDING HOW TO MAKE AND SELL WHAT ONLY THE VENTURE CAN CREATE ................... 13

    A.  The Reasoning of Copperweld Mandates Single Entity Treatment of the NHL Venture's Decisions at Issue in This Case ................................................. 13

        1.  Copperweld Is the Controlling Authority ................................................. 13

        2.  Copperweld and Its Guiding Principles ................................................... 14

            (a)  The Alleged Restraints Do Not Represent a "Sudden Joining of Two Independent Sources of Economic Power" ......... 15

            (b)  The NHL Functions as a Single Entity in Deciding How to Make, Market and Sell the Jointly Created NHL Products ........... 18

            (c)  MSG Concedes That Ultimate "Control" of the Jointly Created Venture Products Rests with the Collective Members ...................................................................................... 20

    B.  The Underlying Rationale of Dagher Applies with Even Greater Force to the Output Decisions of Professional Sports Leagues ......................................... 22

III. IN ANY EVENT, THE AMENDED COMPLAINT DOES NOT ADEQUATELY
ALLEGE A SECTION 1 VIOLATION ........................................................................ 25

    A.    As a Matter of Law, None of the Alleged Misconduct Can Violate
Section 1 ...................................................................................................... 25

        1.    All of the Conduct Challenged by MSG Is "Core" Venture Activity
Under Dagher .............................................................................. 25

        2.    The Various Forms of "Exclusivity" Alleged by MSG Are
Reasonable as a Matter of Law ................................................ 27

    B.    MSG'S Alleged Harm Is Not an "Antitrust Injury" as a Matter of Law .............. 28

        1.    MSG's Alleged Injury Is to Itself, Not to Consumers ............................. 29

        2.    MSG's Conclusory Allegations of an "Output" Reduction Are
Insufficient as a Matter of Law ................................................ 31

IV. NEARLY ALL OF THE CLAIMS IN MSG'S AMENDED COMPLAINT HAVE
BEEN RELEASED OR ARE BARRED BY LACHES OR JUDICIAL
ESTOPPEL ............................................................................................................ 33

    A.    MSG's Consent Agreements and Releases Preclude Its Challenge to the
NHL's Exclusive Territories and Marketing Arrangements in Existence as
of 2005 ........................................................................................................ 33

    B.    The Doctrine of Laches Also Bars the Bulk of MSG's Claims ............................ 35

    C.    MSG's Successful Defense in Kingray Bars Its Exclusive Broadcasting
Allegations, and This Court Should Take Judicial Notice of MSG's Other
Inconsistent Positions in That Case ................................................................ 37

        1.    MSG Is Judicially Estopped from Challenging the NHL's
Exclusive Broadcast Territories ................................................ 37

        2.    This Court Should Take Judicial Notice of MSG's Other Positions
in Kingray ................................................................................ 39

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

Alaska Rent-a-Car, Inc. v. Cendant Corp., No. 3:03-cv-00029-TMB, 2007 WL 2206784
(D. Alaska July 27, 2007) ................................................... 17, 18

America Needle, Inc. v. New Orleans Louisiana Saints, 496 F. Supp. 2d 941
(N.D. Ill. 2007) ............................................................ 16, 18, 19

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994)................................... 28, 31

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)............................ 33

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) .................. 28, 29

Carell v. Shubert Organization, Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000)............. 40

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 (1986) .................... 28, 29

Chicago Professional Sports Limited Partnership v. National Basketball Association,
95 F.3d 593 (7th Cir. 1996)...............................................14, 15, 16, 27

City of Mt. Pleasant v. Associated Electric Cooperative, Inc., 838 F.2d 268
(8th Cir. 1988) ............................................................ 16, 17, 19

Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187 (2d Cir. 1996) ..................... 36, 37

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)................. passim

Creative Trading Co. v. Larkin-Pluznick-Larkin, Inc., 523 N.Y.S.2d 102
(App. Div. 1988)............................................................. 40

Electrics Communications Corp. v. Toshiba America Consumer Products, Inc.,
129 F.3d 240 (2d Cir. 1997)................................................29, 30, 32, 33

E & L Consulting, Ltd. v. Doman Industries Ltd., 472 F.3d 23 (2d Cir. 2006),
cert. denied, 128 S. Ct. 97 (2007)........................................... 30

Fraser v. Major League Soccer, L.L.C., 284 F.3d 47 (1st Cir. 2002)................ 14

Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ......... 40

Hunter Douglas, Inc. v. Comfortex Corp., No. 98-CV-0479 (LEK/DNH),
1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999)............................ 34

Ivani Contracting Corp. v. City of New York, 103 F.3d 257 (2d Cir. 1997)..............................36

Jones v. Ceramco, Inc., 387 F. Supp. 940 (E.D.N.Y.), aff'd mem., 526 F.2d 585
(2d Cir. 1975) .........................................................................................................36

K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d 123
(2d Cir. 1995) .........................................................................................................31

Kingray, Inc. v. National Basketball Association, Inc., 188 F. Supp. 2d 1177
(S.D. Cal. 2002)...........................................................................................30, 32, 38

Kingray, Inc. v. NHL Enterprises, Inc., No. 00-CV-1544-L (BEN)
(S.D. Cal. July 2, 2002) .................................................................................... passim

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991).......................................39

MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 161 F.3d 443 (7th Cir. 1998)........34

Mitchell v. Washingtonville Central School District, 190 F.3d 1 (2d Cir. 1999) ........................37

National Football League v. North American Soccer League, 459 U.S. 1074 (1982)...............14

New Hampshire v. Maine, 532 U.S. 742 (2001) ........................................................37

Non-Commercial Partnership Hockey Club Lokomotiv Yaroslavl v. National Hockey
League, No. 06 Civ 9421 (LAP) (S.D.N.Y. Nov. 15, 2006).....................................25

North American Soccer League v. National Football League, 670 F.2d 1249
(2d Cir. 1982) ..................................................................................................2, 13, 14

Paycom Billing Services, Inc. v. Mastercard International, Inc., 467 F.3d 283
(2d Cir. 2006) .........................................................................................................29

PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243 (S.D.N.Y. 2000),
aff'd, 315 F.3d 101 (2d Cir. 2002) ...........................................................................40

Polk Brothers, Inc. v. Forest City Enterprises, Inc., 776 F.2d 185 (7th Cir. 1985)......................27

Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117 (2d Cir. 2007)..................33

Record Club of America, Inc. v. United Artists Records, Inc., 611 F. Supp. 211
(S.D.N.Y. 1985)......................................................................................................34

Richard's Lumber & Supply Co. v. U.S. Gypsum Co., 545 F.2d 18 (7th Cir. 1976) ..................34

Rock TV Entertainment, Inc. v. Time Warner, Inc., No. 97 Civ. 0161,
1998 U.S. Dist. LEXIS 799 (S.D.N.Y. Jan. 29, 1998) ........................................... 28, 29

Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C. Cir. 1986) ............... 27

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ...................................................... 39

Ruffo v. Gulf Oil Corp., No. 74 C 1615, 1978 U.S. Dist. LEXIS 19083
(E.D.N.Y. Mar. 13, 1978) ............................................................................ 34

Santana Products Inc. v. Bobrick Washroom Equipment, Inc., 401 F.3d 123
(3d Cir. 2005) ........................................................................................ 36

Schnall v. Marine Midland Bank, 225 F.3d 263 (2d Cir. 2000).......................................... 6

Seabury Management, Inc. v. Professional Golfers' Association of America, Inc.,
878 F. Supp. 771 (D. Md. 1994), aff'd in part, rev'd in part on other grounds,
52 F.3d 322 (4th Cir. 1995).......................................................................... 21, 22

Solow Building Co. v. Nine West Group, Inc., No. 00 Civ. 7685 (DC), 2001 WL 736794
(S.D.N.Y. June 29, 2001), aff'd, 48 F. App'x 15 (2d Cir. 2002) ...................................... 36

Texaco Inc. v. Dagher, 547 U.S. 1 (2006) ...................................................... passim

Three Rivers Motor Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir. 1975) ................................ 34

United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898),
aff'd in part, modified in part on other grounds, 175 U.S. 211 (1899) ............................... 27

United States v. Penn-Olin Chemical Co., 378 U.S. 158 (1964) ....................................... 27

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398
(2004)................................................................................................ 24

Volvo North America Corp. v. Men's International Professional Tennis Council,
857 F.2d 55 (2d Cir. 1988)........................................................................... 14

Williams v. I.B. Fischer Nevada, 999 F.2d 445 (9th Cir. 1993) ...................................... 18

Willsea v. Theis, No. 98 Civ 6773 (BSJ), 1999 U.S. Dist. LEXIS 22471
(S.D.N.Y. Aug. 5, 1999) ............................................................................. 34

## STATUTES

15 U.S.C. § 1 ........................................................................................ 2

15 U.S.C. § 15(a) ......................................................................................... 36

15 U.S.C. § 15b ........................................................................................... 36

N.Y. Gen. Bus. Law § 340 ............................................................................ 40

**OTHER AUTHORITIES**

7 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> (2d ed. 2003) ............................ 24, 26

Gregory J. Werden, <u>The Ancillary Restraints Doctrine After Dagher</u>,
8 Sedona Conf. J. 17 (2007) ........................................................................ 26

## PRELIMINARY STATEMENT

This case began as a dispute between MSG and its fellow NHL Member Clubs concerning the NHL's collective efforts to market and sell NHL hockey and related products over the Internet and related technology.  Having lost its motion for a preliminary injunction to prevent migration of the Rangers' website to the NHL's common technology platform, MSG with its First Amended Complaint has now decided to attack the long-standing economic structure of the League itself, which – like all other major sports leagues – is built upon the award of exclusive territories (with limited rights defined by the League) to its Member Clubs, including the Rangers.

The new tactic is specious.  When Cablevision purchased MSG in 1995, MSG explicitly accepted and agreed to be bound by the NHL Constitution, By-laws and Board of Governors' Resolutions that created the Rangers' value in the first place, including provisions defining the Rangers' rights within its very attractive exclusive territory centered in New York City.  Further, at the time of the Cablevision purchase, MSG, in consideration of the opportunity for Cablevision's acquisition of MSG and the Rangers, signed an NHL Consent Agreement in which, inter alia, MSG agreed that the Rangers would honor all of the NHL Clubs' exclusive territories and released any claims (including for equitable relief) that it could possibly have against the NHL or other Member Clubs.  Since that time, MSG has signed several additional Consent Agreements with these same provisions, the last one in 2005.

Further, in two prior federal antitrust cases, MSG sought and obtained favorable antitrust rulings upholding exclusive broadcast territories for its NHL Rangers and NBA Knicks franchises – exclusive territories that MSG now claims make the NHL a walking "cartel."  In short, with its Amended Complaint MSG has crossed the line into the realm of legal chicanery,

1

calling into sharp focus the need to assess how the antitrust laws should apply – if at all – to the basic internal operations of professional sports leagues such as the NHL or to a venture member that has both released the claim it now asserts and affirmatively benefited from prior court rulings that upheld the very venture practices it now seeks to enjoin.

As set forth in detail below, MSG's Achilles heel in this broad-based antitrust attack on the NHL is its stark admission that no single Club, including the Rangers, can make NHL hockey by itself. (Am. Compl. ¶ 8.) This concession confirms that the Rangers cannot offer "NHL hockey" as an "independent" competitor. It also means that the intellectual property or merchandise of any single Club is worthless as an "NHL" item without such Club's participation in the NHL enterprise. These indisputable economic realities, together with other concessions plainly stated or incorporated into MSG's Amended Complaint, provide several independent reasons to dismiss this case with prejudice.

First, with respect to the internal NHL agreements MSG challenges in this case, the League is best viewed as a single entity not subject to Section 1 of the Sherman Act. See 15 U.S.C. § 1. Under Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), a case decided after NASL,[1] and controlling here, the NHL's award of exclusive territories and collective marketing and sales decisions, as a matter of law: (1) cannot represent the "sudden joining of two independent sources of economic power previously pursuing separate interests," id. at 771 (emphasis added); (2) do not deprive the "marketplace of the independent centers of decisionmaking that competition assumes and demands," id. at 769 (emphasis added); and (3) reflect the economic reality that the collective NHL enterprise can at any time "assert full control" over the Rangers if it fails to act in the best interests of the venture. Id. at 771-72

---

[1]    N. Am. Soccer League v. Nat'l Football League, 670 F.2d 1249 (2d Cir. 1982).

(emphasis added). Each of these guiding Copperweld principles compels single-entity treatment of the NHL's basic structure (exclusive territories for making, broadcasting, marketing and selling NHL hockey and related products) as well as the venture's other output decisions challenged in this case.

Similarly, the internal venture decisions of the Member Clubs should be viewed as those of a single entity under the reasoning of the Supreme Court's decision in Texaco Inc. v. Dagher, 547 U.S. 1 (2006). MSG's Amended Complaint concedes that no Club can create any of the products at issue in this case by itself – i.e., prior to the creation of the NHL venture (the legality of which is not challenged), the Clubs could not possibly have been viewed as "competing entities" selling "competing products." Id. at 6. This unalterable economic reality in turn precludes any rationale for treating individual Clubs as "independent" antitrust competitors in assessing the venture's ongoing operations, including with respect to the NHL's exclusive territories and the marketing and sale of the very products that only can be created collectively by the venture.

Second, even if Section 1 does apply, as a matter of law none of the conduct alleged in the Amended Complaint can constitute "cartel" behavior or an unreasonable restraint of trade. Under Dagher, there is nothing more "core" to the NHL (and all professional sports leagues) than both the award of exclusive territories to Member Clubs and the venture's collective marketing and sales decisions over the products only it can create. See Dagher, 547 U.S. at 7-8. In any event, as a matter of law, it is perfectly permissible for NHL Member Clubs to be awarded exclusive territories and also to agree to give the collective venture "exclusivity" for certain marketing and sales arrangements, even if it would preclude individual members from "competing" with the venture or other Clubs. Further, MSG's Amended Complaint does not allege an "antitrust injury," instead blithely alleging that MSG could do a better job "exploiting"

3

the Rangers value if it were free to ignore both the other Clubs' exclusive territories and the existing allocation of marketing and sales opportunities agreed to among the Clubs. MSG, however, is fully aware (having prevailed on the issue in prior litigation) that where the collective distribution decisions of a sports league do not reduce overall output, there can be no antitrust injury as a matter of law; the Amended Complaint's conclusory allegations to the contrary cannot mask this fatal defect.

Finally, this Court should dismiss nearly all of MSG's Amended Complaint for several additional reasons. In 2005, MSG once again signed a Consent Agreement expressly releasing any claims of any type that it may have had against the NHL or other Member Clubs. This necessarily included several NHL practices alleged in the Amended Complaint to violate the antitrust laws: exclusive broadcast territories; the Clubs' unanimous agreement in 1994 to assign to the League (again, with defined exceptions) all intellectual property rights any Club may have had at that time; and the 2000 Internet Regulations that govern the Clubs' new media activities. Similarly, to the extent that MSG's Amended Complaint is based on events that occurred prior to September 2003 (four years prior to the filing of this action), as a matter of law the allegations should be dismissed under the equitable doctrine of laches. All that could possibly remain in this case are any allegations uniquely related to new media decisions in 2006 or later (which should be dismissed for the reasons stated above).

Likewise, MSG is judicially estopped from challenging the Clubs' exclusive broadcast territories under the antitrust laws where, as here, they have sought and obtained judicial relief defending these very restraints. See Kingray, Inc. v. NHL Enters., Inc., No. 00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002) (Goldfein Decl. Ex. 2). This Court also should take judicial notice of MSG's answer in Kingray in which it affirmatively alleged that exclusive broadcast territories are reasonable as a matter of law, that the collective output decisions of the

4

NHL cannot harm competition, and that the NHL and its Member Clubs compete in a broad entertainment market in which they have no market power.

In sum, MSG is and remains little more than a disgruntled member of a professional sports league that now asks this Court to use the antitrust laws to gut the fundamental economic structure of the NHL and judicially mandate how a sports-league enterprise can market and sell the very products that can only be created by the venture's collective efforts. While MSG certainly is free to use appropriate fora to pursue any contractual or other potential claims it may have with its fellow Member Clubs, these internal venture arrangements cannot violate Section 1 of the Sherman Act as a matter of law. Accordingly, the Amended Complaint should be dismissed with prejudice; alternatively, at a minimum, summary judgment should be granted on all allegations challenging venture agreements that were in place as of the 2005 Release.

## I.  MSG'S ALLEGATIONS AND MSG'S CONSENT AGREEMENTS

### A.  The NHL Is an Economically Interdependent Venture That Engages in Collective Efforts to Market and Sell NHL Hockey and Related Products

According to MSG's Amended Complaint, the NHL is a "legitimate joint venture" that produces major league ice hockey competition – a product "that no one club can produce alone." (Am. Compl. ¶¶ 6, 8 (emphasis added).) In antitrust parlance, this necessarily means that all members of the NHL venture are economically interdependent. Likewise, it necessarily means that the value of any Rangers products it licenses or merchandises derives fundamentally from the collective efforts of the NHL and its Member Clubs to produce and market NHL hockey.

According to the Amended Complaint, NHL Member Clubs "may choose to cooperate in various ways off the ice." (Id. ¶ 2.) In this respect, Article II of the NHL

Constitution broadly defines the "Purposes and Objects" for which the League is organized, including "[t]o perpetuate hockey as one of the <u>national</u> games of the United States and Canada" and "[t]he promotion of the <u>common interests</u> of the members of the League." (Goldfein Decl. Ex. 4, §§ 2.1(a), 2.1(b) (emphasis added).)[2]

Notwithstanding its rhetoric, MSG concedes that the venture's legitimate scope extends well beyond the playing of the game of hockey itself. For example, the Amended Complaint affirmatively alleges that "[m]edia revenues are critical to any professional sports franchise, and [that] one of the core activities of a professional sports league is to develop and negotiate a national television contract." (Am. Compl. ¶ 16C; <u>see also id.</u> ¶ 8.) The Amended Complaint otherwise is predictably silent on what the Member Clubs may determine is in their "common interests" in the creation, marketing and sale of NHL hockey and products derived from NHL hockey.

### B.    <u>MSG Concedes That It Is Bound by the NHL Constitution and By-Laws</u>

MSG does not challenge the legality of the NHL venture itself. Moreover, MSG readily concedes that it "is subject to the NHL's Constitution and By-laws" and that MSG is required to comply with the joint decisions of the Member Clubs regarding the alleged restraints at issue in the case. (Am. Compl. ¶¶ 17, 41.) Indeed, MSG concedes that, pursuant to the terms of its contract with the League and other Member Clubs, it may be expelled from the League for violating League rules. (<u>Id.</u>)

---

[2]    Because MSG incorporates the NHL Constitution, By-laws and League Rules into its Amended Complaint, the NHL Constitution, By-laws and Resolutions that comprise the NHL "Lex Scripta" may be relied on by this Court in deciding the present motion. <u>See, e.g., Schnall v. Marine Midland Bank</u>, 225 F.3d 263, 266 (2d Cir. 2000) (affirming dismissal of complaint in part in reliance on plaintiff's "Cardholder Agreement, account history and monthly statements because they [were] integral to his claims"). Excerpts of the Lex Scripta and the relevant Resolutions are attached to the Declaration of Shepard Goldfein ("Goldfein Decl."), filed herewith.

**1.    MSG Agreed to Exclusive Territories, Including for Broadcasting**

Article IV of the NHL Constitution addresses certain territorial rights of the

League and Member Clubs as follows:

4.1.  Definitions.  For the purposes of this Article:  . . . .

(c)  "Home territory" . . . means . . . exclusive territorial rights in the city in which it is located and within fifty miles of that city's corporate limits."

. . . .

4.2.  Territorial Rights of League.  The League shall have exclusive control of the playing of hockey games by Member Clubs in the home territory of each member, subject to the rights hereinafter granted to members. . . .

4.3.  Territorial Rights of Members.  Each member shall have exclusive control of the playing of hockey games within its home territory including . . . the playing in such home territory of hockey games by any teams . . . or by other members of the League. . . .

4.4.  Property Rights of Home Club.  Each member hereby irrevocably conveys . . . all the right, title and interest . . . to each hockey game . . . as a visiting club and in the news of said game . . . to the member in whose home territory said game is played.  (Goldfein Decl. Ex. 5 (emphasis added in part).)

Thus, under the NHL Constitution, MSG does not even own the right to broadcast its away

games, as suggested in the Amended Complaint.[3]

Further, while never materially changing the Clubs' basic exclusive territories and

the right to broadcast their home games, the NHL and its Member Clubs have periodically

clarified their agreements regarding exclusive broadcast rights within each Member Club's

exclusive territory.  For example, as early as 1984, the Clubs outlined by Board Resolution how

they would define each Club's "Home Territory" and "Sphere of Influence" for purposes of

determining where Member Clubs could broadcast their games through various means and

---

[3]    The NHL Member Clubs have agreed by Board Resolution, however, that a Club may broadcast its away games back to its Home Territory, Sphere of Influence, and Outer Market only.  (Goldfein Decl. Ex. 6.)

technologies.  (See id. Ex. 6.)  Since the Modified Member Club Agreement of March 7, 1988

(id. Ex. 7), the Member Clubs have been limited to distributing their home and away games to

within their respective exclusive broadcast territories.[4]

### 2.    MSG Agreed to Collectively Exploit Its Intellectual Property

MSG also concedes that all of the team marks and intellectual property – with

certain exceptions related to their exclusive territories – were assigned to the League long ago.

(Am. Compl. ¶ 38.)  Thus, MSG alleges that, during the 1980s – prior to its purchase of the

Rangers – the Member Clubs through a series of agreements granted the League or League-

affiliated entities the "'exclusive' right to control for virtually all commercial purposes the

individual clubs' marks and licensing opportunities," and that those rights have been exercised by

the Defendants. (Id.)  In fact, MSG affirmatively alleges that it is a "partner and beneficiary" of

the NHL, NHLE, NHL ICE, NHLE Canada and NHLE International – all entities that the

Member Clubs created to license League and team marks.  (See id. ¶¶ 22-28.)

Further, in 1994, again before MSG's purchase of the Rangers, the NHL Board of

Governors resolved that each Club would grant the League exclusive marketing rights as follows:

> RESOLVED, that each Member Club hereby grants to the League the exclusive
> worldwide right to use or license its team's trademarks, including the team's logos,
> symbols, emblems, designs, uniforms (including a picture of a player in the team's
> uniform) and other identifying indicia (collectively, "Trademarks"):  (i) in
> connection with the advertising, merchandising, promotion, manufacture, sale and
> distribution of products and services ("Commercial Purposes") of any nature; and
> (ii) to promote or generate interest in the NHL and, collectively its Member Clubs
> ("Promotional Purposes"), provided that each Member Club retains the non-
> exclusive right to: (w) perform under its existing local licensing contracts in

---

[4]    The Modified Member Club Agreement also codified each Club's Outer Market territory
as those areas outside of the Home Territory or Sphere of Influence in which the Club had been
broadcasting its home games as of that date and those areas that are "substantially contiguous" to
the Club's Sphere of Influence.  For broadcast purposes, the Outer Market territory defines the
outermost boundary in which a Club may broadcast its games, a boundary that MSG challenges
in its Amended Complaint.  (Id.)

accordance with their provisions during their defined terms, without permitting
(to the extent possible) any renewal or extension thereof unless that agreement is
limited in scope consistent with the terms of this Resolution; (x) <u>use, within its
home arena and its Team stores located within a 75-mile radius of its home arena,
it own Trademarks</u> in connection with the normal operation and promotion of the
team and for Commercial Purposes; (y) <u>publish and distribute direct-mail
catalogues outside the local territories, provided that 65 percent of the products
offered in the direct-mail solicitation are produced by NHLE licensees</u>; and (z)
solely for purposes of this Resolution and without effect upon or expansion of a
Club's broadcasting rights, use its own Trademarks outside of its home arena for
team-specific Promotional Purposes within its local broadcast territory; and
provided, further, that the reservation of local rights granted to the Member Clubs
in this Resolution excludes jersey or sweater replicas, hockey trading cards and
outerwear (exclusive of hats), and provided, further, that a Member Club's rights
to use its Trademarks as specified above may in turn be licensed by the Member
Club to third parties (<u>e.g.</u>, sponsors and licensees) for uses consistent with this
Resolution . . . .  (Goldfein Decl. Ex. 8.)

The 1996 and 2006 License Agreements cited by MSG (<u>see</u> Am. Compl. ¶¶ 38, 39) continued

this grant of rights from the Clubs to the League in substantively the same form.  (<u>See</u> <u>id.</u> ¶ 39.)

### 3.    MSG Agreed to Collectively Exploit New Media

Pursuant to 1996 Resolutions of the NHL Board of Governors, the Member Clubs

agreed that the League would exploit, on behalf of all Clubs, the distribution of League and Club

rights over the Internet and through similar new media.  (Goldfein Decl. Ex. 9.)  The Resolutions

specifically included conveyance of any related intellectual property rights of the Clubs:

[T]he Member Clubs individually confirm the grant to the League . . . of the
exclusive worldwide right to use or license all of its intellectual property rights . . .
for all purposes relating to the further development of a presence for the League
and the Member Clubs on the Internet's World Wide Web and the exploitation of
any and all opportunities utilizing comparable computer and telecast technology,
including, without limitation, any network-centric, on-line or other interactive
technologies . . . ."  (<u>Id.</u>)

The Resolutions also granted the Commissioner broad discretion to carry out the League's

objectives relating to exploitation of new media, including the authority to make directives

regarding the very rights (e.g., advertising, merchandising) that are the subject of MSG's

Amended Complaint.  (<u>Id.</u>)

In June 2000, the Board unanimously adopted a Resolution reaffirming and ratifying that the rights to exploit the Internet are held by the League, and that the Commissioner has the power "to promulgate such rules and regulations and take such acts he deem[s] appropriate, including with respect to what rights might, at any particular time, be exercised by the Clubs." (Id. Ex. 10.)  Thereafter, on October 25, 2000, the Commissioner promulgated the NHL Internet Regulations (id. Ex. 11), which have been amended on an ongoing basis.[5]

### 4.    MSG Agreed to In-Arena Advertising Regulations

The Member Clubs have operated under in-arena advertising rules – approved by Resolutions of the Board of Governors – in various forms since the late 1970s.  (Goldfein Decl. Ex. 12.)  These rules include the Board Advertising Regulations (id. Ex. 13), which are applicable to the dasherboards around the ice surface.[6]  Further, in September 1991, the Board of Governors resolved that the same advertising restrictions that applied to dasherboards would apply to in-ice advertising as well.  (Id. Ex. 16.)  Subsequently, specific In-Ice Logo Guidelines were approved by Resolution on March 14, 1997.  (Id. Exs. 17, 18.)  In addition, on March 24, 1994, the Board of Governors resolved that no Club or Club broadcaster may use virtual signage or advertising.  (Id. Ex. 19.)

---

[5]    While the written Regulations focus on the Internet, they are "intended to cover all types of existing and future interactive media including digital cable, satellite, broadband and wireless applications."  (Id.)

[6]    The Board Advertising Regulations were amended in December 1993 (id. Ex. 13, ¶ 11), June 1996 (id. Ex. 14), and September 2006.  (Id. Ex. 15.)  The 2006 amendment, however, merely increased the total number of advertising panels on the dasherboards, but did not increase the number of panels reserved for League branding and promotional purposes or otherwise substantively alter the previous Regulations.  (Id.)

## C.    <u>The Consent Agreements and Releases</u>

At the time the Rangers were purchased in 1995 – and again most recently in 2005 – MSG entered into a Consent Agreement with the NHL in which it agreed, <u>inter</u> <u>alia</u>, to be bound by the NHL Constitution, By-laws, and all League Rules and Regulations (Goldfein Decl. Ex. 20, § 3(a); Ex. 28, § 3(a)), and to honor the League's territorial allocations and restrictions (<u>Id.</u> Ex. 28, § 4(b)), including as they relate to MSG's cable operations.  (<u>Id.</u> § 9(a)(ii).)

The Consent Agreements also contained a "Release and Limitation of Liability." (<u>Id.</u> Ex. 20, § 10(a); Ex. 28, § 13(a).)  Specifically, the 2005 Agreement provided:

> As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties . . . hereby forever releases and discharges the NHL, each of the other NHL Entities, [and] all of the Member Clubs . . . <u>from any and all claims</u>, demands, causes of action, and liabilities of any kind whatsoever (<u>upon any legal or equitable theory</u>, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise) . . . , which, to the best knowledge of such Transaction Party, <u>exist as of the date of execution</u> of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, <u>relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game</u> or hockey exhibition or in respect of the Proposed Transactions . . . .  (<u>Id.</u> Ex. 20, § 10(a) (emphasis added).)

## D.    <u>MSG Seeks to Avoid the NHL Lex Scripta and the Consent Agreements</u>

In the face of the NHL Constitution and the Consent Agreements and related Releases, MSG nevertheless now alleges that the antitrust laws give it the <u>unfettered right</u> to broadcast the Rangers home and away games, anywhere, at any time and through any means – including in other Member Clubs' exclusive broadcast territories and in conflict with exclusive League-wide national broadcast and cable agreements and other Clubs' local broadcast and cable agreements:

- "[T]he League has acknowledged that it has allocated the geography of virtually all of North America among the various member clubs.  <u>By doing so, the League has illegally eliminated the ability of a club to broadcast its games into areas allocated to the other clubs.</u>"  (Am. Compl. ¶ 16C.)

- "[D]efendants have unreasonably restrained the broadcasting and other distribution rights of individual clubs by allocating the geography of virtually all of North America among the members clubs and prohibiting each club from transmitting its games, on television or over the internet, into territories allocated to other clubs or outside North America." (Id. ¶ 40C.)

- "MSG [is] unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base throughout the country and abroad." (Id. ¶ 47D.)

Moreover, notwithstanding the venture agreements among the Member Clubs with respect to licensing of the Clubs' intellectual property – again, readily accepted and released from any claims by MSG on multiple occasions and as late as 2005 – MSG's Amended Complaint asks this Court to invoke the Sherman Act to rewrite the NHL Constitution and Resolutions relating to the collective efforts to market and sell NHL hockey and related products. Thus, MSG alleges that each Club is not only "legally entitled to exploit its own intellectual property," but also that each club is "legally required to decide independently whether and to what extent it will authorize the NHL" to market and promote club merchandise. (Id. ¶ 16A.)

Further, despite the 1996 and 2000 Board Resolutions, MSG's Amended Complaint challenges the Member Clubs' collective exploitation of new media rights. (Id. ¶ 16D.) Many of the particular new media rules about which MSG complains were specifically established and promulgated when the Commissioner issued the Internet Regulations in 2000 and when they were amended in 2001 – i.e., prior to MSG's 2005 Consent Agreement and Release. These include rules regarding online sales of merchandise (id. ¶ 16A), online audio and video distribution of games and highlights (id. ¶¶ 16C, 16D), and advertising on Club websites. (Id. ¶ 16D.)

Finally, MSG ignores the numerous Resolutions and Regulations recounted in the Lex Scripta – all of which were in existence at the time of MSG's most recent Consent Agreement – in alleging that the Member Clubs have collusively restricted an individual Club's

ability to sell dasherboard and "in-ice" advertising in violation of Section 1.  (Id. ¶¶ 16B, 40D.)
MSG also has released its claim that Defendants have limited output of advertising by
prohibiting teams from using virtual signage.  (Id.)

**ARGUMENT**

MSG's Amended Complaint rests on the premise that the antitrust laws preclude
the NHL and its Member Clubs from agreeing to internal venture activities that are in their
"common interest" whenever MSG unilaterally decides that the agreement among the Clubs
unduly restricts its "individual competitive activities."  (Id. ¶ 7.)  As a matter of law that position
is indefensible.

**II.    THE MEMBER CLUBS ARE A "SINGLE ENTITY" WHEN DECIDING HOW
        TO MAKE AND SELL WHAT ONLY THE VENTURE CAN CREATE**

> **A.    The Reasoning of Copperweld Mandates Single Entity Treatment of the
>        NHL Venture's Decisions at Issue in This Case**

>> **1.    Copperweld Is the Controlling Authority**

No doubt this Court will hear from MSG that the "single entity" issue for
professional sports leagues was unalterably decided by the Second Circuit in North American
Soccer League v. National Football League, 670 F.2d 1249 (2d Cir. 1982) (hereinafter, "NASL"),
and that the Court lacks the authority to reach any contrary conclusion.  That position is baseless.

NASL is a pre-Copperweld "intra-enterprise" decision in which the form of an
enterprise's organization mattered more than the economic substance of the relationship among
the entities.  See NASL, 670 F.2d at 1252 (finding that teams were separately owned, that profits
varied from team to team, and that this made them "separate economic entities engaged in a joint
venture").  While the NASL court observed that no single owner could produce NFL football by
itself and that the ultimate goal of the venture was to sell NFL football to fans and advertisers,
see id. at 1251, the "intra-enterprise" doctrine's emphasis on form discounted the importance of

13

these facts to the analysis.[7]  As described below, the Court in Copperweld rejected the intra-enterprise doctrine relied on by the NASL court and fundamentally changed the analytical framework for assessing the single entity issue.  Moreover, no Second Circuit decision has applied Copperweld to the alleged restraints of a professional sports league.[8]

Equally important, NASL involved a restriction on a team's non-venture activities – a "cross-ownership" rule that prohibited an owner from investing in other professional sports leagues.  670 F.2d at 1250.  Here, by contrast, MSG is challenging pure venture activities – i.e., the very exclusive territories that form the venture as well as the collective decisions as to how to market and sell the venture's products.  Thus, NASL is both legally and factually irrelevant to a Copperweld assessment of the particular restraints at issue in this case.

### 2.    Copperweld and Its Guiding Principles

In Copperweld, the Supreme Court used the context of a wholly-owned subsidiary's relationship to its parent corporation to reject the so-called "intra-enterprise conspiracy doctrine," which "gives undue significance to the fact that a subsidiary is separately incorporated and thereby treats as the concerted activity of two entities what is really unilateral behavior flowing from decisions of a single enterprise."  See 467 U.S. at 766-67, 777.  Noting its

---

[7]    Indeed, in a presage to Copperweld – if not Chicago Professional Sports Limited Partnership v. National Basketball Association, 95 F.3d 593 (7th Cir. 1996), and Dagher – Justice Rehnquist's dissent from denial of certiorari in NASL argued that the NFL should be viewed as a single entity for its output precisely because a team could not offer the product to fans and advertisers independently of the NFL.  See Nat'l Football League v. N. Am. Soccer League, 459 U.S. 1074, 1077 (1982) (Rehnquist, J., dissenting).

[8]    While the Second Circuit's decision in Volvo North America Corp. v. Men's International Professional Tennis Council, 857 F.2d 55 (2d Cir. 1988), makes passing reference to NASL, see 857 F.2d at 71, Volvo did not involve the collective output of the interdependent members of a sports-league venture.  Likewise, no circuit court outside the Second Circuit has cited NASL in a case involving restrictions on the output of the venture's own products.  See, e.g., Fraser v. Major League Soccer, L.L.C., 284 F.3d 47 (1st Cir. 2002) (player restraint case).

earlier holding that the Sherman Act "is aimed at substance rather than form," id. at 760 (internal

quotation marks and citation omitted), the Copperweld Court held that a parent and its wholly-

owned subsidiary, as a matter of law, could not conspire under Section 1 of the Sherman Act.  Id.

at 777.  More importantly, the Court set forth several distinct but interrelated principles to guide

lower courts in assessing the single entity issue in other contexts.  In particular, the Court

explained that Section 1 conspiratorial capacity is absent where the agreement or coordination at

issue:

- "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests," id. at 771;

- does not deprive "the marketplace of the independent centers of decisionmaking that competition assumes and demands," id. at 769; or

- reflects the reality that "the parent may assert full control" if the affiliate "fails to act in the parent's best interests."  Id. at 771-72.

These are the guiding principles that mandate dismissal of MSG's entire Amended Complaint in

this case.

>           (a)       **The Alleged Restraints Do Not Represent a "Sudden Joining of Two Independent Sources of Economic Power"**

              In considering how Copperweld should apply to this case, there is no more

analogous case than Chicago Professional Sports Limited Partnership v. National Basketball

Association, 95 F.3d 593 (7th Cir. 1996) (hereinafter "Bulls II").  There, as here, plaintiff was a

popular professional sports team (the Chicago Bulls won four of six NBA championships during

the litigation), and there, as here, the Bulls alleged that the league's broadcast restrictions

(limiting the Bulls' ability to expand "superstation" broadcasts) constituted a Section 1 violation.

See Bulls II, 95 F.3d at 595-97.  While not a holding because of the procedural context before it,

Judge Easterbrook's opinion went out of its way to explain precisely why agreements within the

NBA venture, at least in relation to what the teams collectively make and sell, cannot constitute

the "sudden joining of . . . independent sources of economic power." Copperweld, 467 U.S. at

770-71.   Indeed, the Bulls II court found that in the context of a professional sports league's

output, there is only one source of economic power:

> Unlike the colleges and universities that belong to the National Collegiate
> Athletic Association, which the Supreme Court treated as a joint venture . . . , the
> NBA has no existence independent of sports.  It makes professional basketball;
> only it can make "NBA Basketball" games; and unlike the NCAA the NBA also
> "makes" teams. . . .  From the perspective of fans and advertisers (who use sports
> telecasts to reach fans), "NBA Basketball" is one product from a single
> source . . . .

Bulls II, 95 F.3d at 599 (emphasis added);[9] see also Am. Needle, Inc. v. New Orleans Louisiana

Saints, 496 F. Supp. 2d 941, 943-44 (N.D. Ill. 2007) (citing Copperweld and Bulls II, and

holding that NFL teams are not independent sources of economic power pursuing separate

interests when jointly deciding how to market and sell NFL-related merchandise).  Apart from

these two decisions, no court has addressed the application of Copperweld to a sports league's

collective decisions regarding how to market and sell the venture's products.

 Moreover, under this Copperweld principle, it matters not that one or more

members of an enterprise disagree with the decisions made collectively; the single source of the

economic activity remains the same.  The Eighth Circuit's decision in City of Mt. Pleasant v.

Associated Electric Cooperative, Inc., 838 F.2d 268 (8th Cir. 1988), is instructive.  There, a

purchaser of electricity alleged a price-squeezing conspiracy among members of a rural electric

cooperative – i.e., charging higher prices to plaintiff than to their own retail-distribution

members.  Id. at 270.   It was not in dispute that the cooperative members were "autonomous"

---

[9] Thus, while Judge Easterbrook in Bulls II recognized that the Copperweld Court
observed that a parent and its wholly-owned subsidiary have a "'complete unity of interest,'" the
phrase, he said, was a "statement of fact about the parent-subsidiary relation, not . . . a
proposition of law about the limits of permissible cooperation.  As a proposition of law, it would
be silly." Bulls II, 95 F.3d at 598 (emphasis added).

businesses, set their own rates, managed their own profits and on several occasions had

conflicting economic interests about the cooperative's strategies, including over pricing.  See id.

at 271-72, 276-77.

      Nevertheless, applying Copperweld, the Eighth Circuit held that no member was

an independent source of economic power and, hence, Section 1 did not apply:

> It will always be true that separate companies, in one enterprise, that are located in separate areas and serve separate customers, will have varying interests.  This case, considering the disputes among the defendants on the issue of municipal sales, is a perfect example.  Coalitions will come and go according to changing conditions and the interests of the various factions.
>
> But is this a sufficient basis from which to draw a reasonable inference that their coordination is a "joining of two independent sources of economic power previously pursuing separate interests"?  In this case, we think not.  Even though the cooperatives may quarrel among themselves on how to divide the spoils of their economic power, it cannot reasonably be said that they are independent sources of that power.  Their power depends, and has always depended, on the cooperation among themselves.  They are interdependent, not independent.  The disagreements we have described are more like those among the board members of a single enterprise, than those among enterprises which are themselves separate and independent.

Id. at 277 (emphasis added in part).

      Applying Copperweld to this case is quite straightforward, especially when asking

whether MSG has alleged facts to show that the NHL Member Clubs are independent sources of

economic power with respect to exclusive territorial restrictions or marketing and selling NHL-

related products.  As in Bulls II and American Needle, MSG affirmatively concedes in its

Amended Complaint that the Rangers cannot create NHL hockey by itself.  Thus, as a matter of

law, the NHL enterprise is the one and only source of any value or "economic power" that comes

with MSG's (and every other Club's) franchise and exclusive territory in the League.  See, e.g.,

Alaska Rent-a-Car, Inc. v. Cendant Corp., No. 3:03-cv-00029-TMB, 2007 WL 2206784, at *23-

26 (D. Alaska July 27, 2007) (exclusive territories or customer allocations flowing from a

17

franchisor that limit "competition" among franchisees fall within Copperweld).  Likewise,

Rangers-related merchandise and purported intellectual property has no value apart from its one

source – the NHL as a collective venture.  See Am. Needle, 496 F. Supp. 2d at 943-44.  A proper

application of Copperweld to the particular restraints at issue in this case therefore compels

single-entity treatment of the NHL as a matter of law.

> **(b)** **The NHL Functions as a Single Entity in Deciding How to**
> **Make, Market and Sell the Jointly Created NHL Products**

Separate and apart from the fact that no NHL club is an independent source of

economic power for venture-related products, it is equally clear on the face of MSG's Amended

Complaint that Member Clubs are not "independent centers of decision-making" with respect to

the alleged output restraints in this case.

As a threshold matter, with respect to exclusive territories, there is no dispute in

the Amended Complaint that the Member Clubs chose to structure the League so as to have only

one center of decision-making – the NHL Board of Governors – determining the exclusive

territory of each team, the scope of the particular rights granted to each team, and what degree

and type of exclusivity would attach to their franchises.  See supra pp. 6-10.  Thus, when the

Member Clubs chose to collectively market NHL hockey and related products through exclusive

territories, it was nothing more than the organizational decision of a single enterprise regarding

how it would operate.  See, e.g., Alaska Rent-a-Car, 2007 WL 2206784, at *23-24; Williams v.

I.B. Fischer Nevada, 999 F.2d 445, 447-48 (9th Cir. 1993) (per curiam) (applying this principle

and finding that agreement among franchisor and franchisees limiting competition for managers

was not subject to Section 1).

Likewise, the Member Clubs' decisions about how to market and sell NHL

products (whether broadcasts, merchandise, or new media) are jointly made – i.e., they do not

flow from independent centers of decision-making.  The court's analysis in American Needle, 496 F. Supp. 2d 941, is instructive.  There, a former licensor of NFL team logos challenged the NFL's group licensing arrangements as Section 1 violations.  Plaintiffs asserted that the NFL, NFL Properties and the member clubs could not, through NFL Properties, grant an exclusive license for the use of team marks, and that such an action constituted an illegal conspiracy in restraint of trade.  Id. at 942.  The court applied Copperweld and Bulls II to the issue of "whether or not the 32 teams can agree on designating a common actor to exploit their various intellectual property rights, and on being bound by the decisions of that common actor."  Id. at 942-43.

Finding that the separate ownership of teams and intellectual property "had no economic significance in and of itself," id. at 944, the court concluded that the teams and the NFL "act as a single entity in licensing their intellectual property."  Id.

> Delegated decision-making does not deprive the marketplace of independent centers of decision-making. . . .  NFL Properties has been making decisions unilaterally or jointly since 1963. . . .  For this facet, in answering Copperweld's functional question, we believe cooperative marketing does serve to promote NFL football and falls on the "unilateral" action side of the line.

Id. at 943-44 (citing Dagher, 547 U.S. 1 (2006)); see also City of Mt. Pleasant, 838 F.2d at 274 (Copperweld confirms that a "conglomeration of two or more legally distinct entities cannot conspire among themselves if they 'pursue[] the common interests of the whole rather than interests separate from those of the [group] itself'") (alterations in original) (quoting Copperweld, 467 U.S. at 770-71).

On the issues relating to licensing and merchandising, American Needle is compelling.  MSG's Amended Complaint concedes, as it must, that for many years prior to this suit – indeed, long before MSG's purchase of the Rangers – the NHL and its Member Clubs have been functioning as a single enterprise in their cooperative marketing efforts, including making collective decisions as to what marketing matters may be reserved for individual Clubs.  (See

Am. Compl. ¶¶ 6, 8.)  From <u>Copperweld</u>'s functional perspective, this is precisely the type of enterprise-level decision-making that mandates single entity treatment.

**(c)    MSG Concedes That Ultimate "Control" of the Jointly Created Venture Products Rests with the Collective Members**

Finally, it is indisputable on the face of the Amended Complaint that the NHL and its Member Clubs have the ultimate power to assert full control over MSG with respect to the Clubs' exclusive territories and to the collective marketing and sales decisions that MSG now claims constitute a walking "cartel."

<u>Copperweld</u> was quite clear that it makes no difference that individual venture members may develop divergent interests or preferences.  The whole premise of this <u>Copperweld</u> principle is that single entity treatment will apply where the enterprise has ultimate power to reign in a related entity that wishes to pursue its own divergent interests:

> [A parent and subsidiary's] objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.  They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. . . .
>
> . . . [They] <u>always</u> have a "unity of purpose or a common design."  They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; <u>the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interest</u>.

<u>Copperweld</u>, 467 U.S. at 771-72 (emphasis added).[10]  Likewise, where this ultimate power to assert full control is present, it matters not what corporate form the enterprise chooses; the

---

[10]    MSG's 2006 votes against renewing the 1996 License Agreements and the New Media Strategy confirm this analysis.  Even though MSG voted against these measures, under the NHL Constitution and its Consent Agreements, it remains bound by these Board of Governors Resolutions.  Under <u>Copperweld</u>, a dissenting vote within the internal process of League governance is perfectly consistent with the venture possessing ultimate control of the venture's structure and output.

20

factors "that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition." Id. at 772 (emphasis added).

Lower courts have applied this principle to the context of a member organization that retains ultimate control over its participants through collective board votes, including on the issue of exclusive territories. For example, in Seabury Management, Inc. v. Professional Golfers' Association of America, Inc., 878 F. Supp. 771 (D. Md. 1994), aff'd in part, rev'd in part on other grounds, 52 F.3d 322 (4th Cir. 1995), the court considered the application of Copperweld to a claim that the PGA's exclusive marketing territories among its member "sections" could constitute a Section 1 violation. There was no dispute in that case that the individual sections were independent in both form and in many economic matters; each had its own by-laws and separate revenues, and each conducted programs to benefit members of that section only. However, there also was no dispute that the "PGA always had ultimate control over the section[s], which could not function as [sections] independent of the PGA." Id. at 778 n.6.

In applying Copperweld's "functional inquiry," the court held that the PGA's ultimate ability to approve and control a section's actions, especially if they conflicted with those of the organization as a whole, were dispositive as a matter of law. The court found that the sections were governed by the PGA Constitution, policies adopted by the PGA at annual or PGA board meetings, and policy documents such as trademark licensing agreements. These facts, the court found, confirmed that the PGA possessed "ultimate control over the actions of individual sections." Seabury Mgmt., 878 F. Supp. at 777. The court also held that it was legally irrelevant to the single entity question that a section might wish to pursue its own interests in conflict with the PGA:

> The section's actions . . . must be approved by the PGA to ensure that they are in
> the best interests of the organization as a whole. For example, when [a section]
> sought to enter into a credit card program for its membership, the PGA vetoed it

21

> because it conflicted with a program the PGA had in place to benefit the
> organization as a whole.  More importantly, when the [section] sought to enter
> into the Contract with [plaintiff], the PGA had to approve [those] actions.  This
> type of "ability to control" is perhaps the determinative factor in the <u>Copperweld</u>
> analysis.

<u>Id.</u> at 778 (footnote omitted).

Here, MSG readily concedes in its Amended Complaint that it is bound by the NHL Constitution, By-laws and related Resolutions, which in turn give the NHL (through its internal processes) ultimate control over MSG should it pursue interests that are in conflict with those of the NHL venture with respect to exclusive territories or marketing and sales.  Indeed, MSG's gripe with respect to every alleged "restraint" in this case is precisely that ultimate control over these venture activities rests with the collective voting processes of the Member Clubs.  Accordingly, under the "ultimate control" principle of <u>Copperweld</u>, the Amended Complaint must be dismissed.

### B.    The Underlying Rationale of <u>Dagher</u> Applies with Even Greater Force to the Output Decisions of Professional Sports Leagues

Separate and apart from <u>Copperweld</u>, the Supreme Court's recent decision in <u>Dagher</u>, 547 U.S. 1, cannot be ignored in assessing whether the NHL should be treated as a single entity with respect to the particular venture restraints at issue in this case.  While <u>Dagher</u> Court did not have the single entity question squarely before it, <u>see id.</u> at 5-6 & n.1, the unanimous Court explained the circumstances under which Section 1 should not apply to the ongoing operations of legitimate joint ventures.  The Court focused on whether the firms in the venture were competitors prior to venture formation and whether they would remain independent competitors after creating or joining the venture.  Concluding that the venture members in the case before it would no longer compete with one another as a result of forming the venture, the Court explained:

> Texaco and Shell Oil did not compete with one another in the relevant market . . . but instead <u>participated in that market jointly through their investments in [the venture]</u>.  In other words, <u>the pricing policy</u> challenged here <u>amounts to little more than price setting by a single entity</u> – albeit within the context of a joint venture – <u>and not a pricing agreement between competing entities with respect to their competing products</u>.

<u>Id.</u> at 5-6 (emphasis added); <u>see also</u> <u>Copperweld</u>, 467 U.S. at 768-69.

Under the reasoning of <u>Dagher</u>, the key to whether Section 1 should apply to members of a legitimate venture is whether (1) prior to venture formation, the venture members were "competing entities" with respect to "competing products," and (2) whether after joining the venture, the venture members would remain <u>independent</u> competitors – i.e., <u>capable of offering "competing products" separate and apart from participation in the venture</u>.  <u>See</u> <u>Dagher</u>, 547 U.S. at 5-6 (emphasis added).  In <u>Dagher</u> itself, both venture members competed with each other in the sale of gasoline prior to venture formation.  However, because all of the assets that would enable the members to compete on their own were placed in the venture, they no longer could participate in the gasoline market as independent competitors following venture formation – i.e., they now would only participate in the market through their participation in the venture.

The logic of <u>Dagher</u> applies to professional sports leagues such as the NHL with even greater force.  In sharp contrast to <u>Dagher</u> itself, the Member Clubs are not – indeed, cannot be – "competing entities with respect to their competing products," <u>id.</u> at 6, prior to venture formation (or, in the case of MSG, joining the venture).  (<u>See</u> Am. Compl. ¶ 8 (conceding that no one team can produce major league professional hockey alone).)  Hence, the entire premise of the application of Section 1 to entities that form or join sports leagues is absent:  there is no <u>pre-existing</u> competition among venture members that might form the predicate for the potential independent competition following venture formation.

Any argument by MSG that <u>Dagher</u> requires "full integration" of all NHL Member Clubs in order to be treated as a "single entity" would ignore the underlying rationale of the Court:  it was only because each venture member in <u>Dagher</u> would otherwise be able to produce gasoline on its own that such integration was important to the analysis in that case.  <u>See</u> <u>Dagher</u>, 547 U.S. at 5-6.  But, unlike the competition for the sale of gasoline at issue in <u>Dagher</u>, <u>members of sports-league ventures are incapable of "competing" in the venture product or products independent of the venture</u>.  Again, MSG's Amended Complaint concedes as much; indeed, no NHL Member Club has had any ability to produce NHL hockey – or any NHL-derived products – by itself <u>at any time</u>.  In other words, Members of the NHL, as a matter of law, are incapable of the independent competition that <u>Dagher</u> requires as the predicate for treating a legitimate joint venture as anything other than a "single entity."  <u>See</u> <u>id.</u>

Finally, it is no answer that the Member Clubs should be viewed as "competing entities" <u>when marketing the collective output of the joint venture itself</u>, especially where, as here, it is not alleged that the "restraints" at issue are directed at a Member Club's non-venture activities.  The consequences of legitimate venture formation, together with the inability of venture members to compete independently, is clearly explained by the <u>Dagher</u> Court:  at that point, the competitive decisions concerning the venture's activities – in <u>Dagher</u>, pricing policies – are to be treated as those of a single entity "like any other firm."  <u>Id.</u> at 7; <u>see also</u> 7 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1478c, at 325 (2d ed. 2003) ("Once a venture is judged to have been lawful at its inception and currently, decisions that do not affect the behavior of the participants in their nonventure business should generally be regarded as those of a single entity rather than the parents' daily conspiracy.").  To suggest otherwise would be to invite judicial review of literally every internal decision of a legitimate venture.  <u>See generally</u> <u>Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 408 (2004)

24

(observing that antitrust courts "are ill suited" to "act as central planners, identifying the proper price, quantity and other terms of dealing" of a single firm).

Dagher is a decision that went out of its way to confirm that a legitimate joint venture should be treated as a single entity if and when the court can conclude that the venture members are not competing entities in "the antitrust sense" with respect to venture products. See 547 U.S. at 6. Here, on the face of MSG's Amended Complaint, those conditions are met.

## III.    IN ANY EVENT, THE AMENDED COMPLAINT DOES NOT ADEQUATELY ALLEGE A SECTION 1 VIOLATION

Even assuming, arguendo, that Section 1 could apply to the particular allegations of MSG's Amended Complaint, it is equally clear that nothing MSG alleges can violate Section 1 as a matter of law.

### A.    As a Matter of Law, None of the Alleged Misconduct Can Violate Section 1

#### 1.    All of the Conduct Challenged by MSG Is "Core" Venture Activity Under Dagher

The Dagher Court held that, even if Section 1 applies, the "ancillary restraints" doctrine does not apply to the "core" business practices of a legitimate joint venture. Dagher, 547 U.S. at 7-8. The doctrine properly applies only to a member's non-venture activities, focusing on whether the activity is related to the "legitimate and competitive purposes of the business association, and thus valid." Id. at 7 (emphasis added). The logical extension of Dagher is that core business practices of a legitimate venture are "valid" as a matter of law. Cf. Non-Commercial P'ship Hockey Club Lokomotiv Yaroslavl v. Nat'l Hockey League, No. 06 Civ. 9421 (LAP), Tr. of R. at 86 (S.D.N.Y. Nov. 15, 2006) (observing that the NHL's collective activities in procurement of foreign players "seem to be included within the meaning of [Dagher] as core activities of a joint venture [that] would not constitute a combination in restraint of trade")

25

(Goldfein Decl. Ex. 1).  As one commentator recently explained of the Supreme Court's

description in <u>Dagher</u> of "core" activities:

> <u>The Supreme Court's analysis recognizes that constraints joint venture</u>
> <u>participants place on the conduct of the venture itself, within the ambit of its</u>
> <u>operation, are quite different than constraints they place on their own conduct</u>
> <u>outside the venture</u>.  Participants in a manufacturing joint venture almost certainly
> determine, and hence limit, the products the venture produces, and they may agree
> to limit the geographic area in which the venture operates, the customers to which
> the venture sells, or the prices it charges.  <u>Such constraints are not collateral</u>
> <u>restraints; rather they are integral parts of the joint venture and cannot be</u>
> <u>separated from it</u>.

Gregory J. Werden, <u>The Ancillary Restraints Doctrine After Dagher</u>, 8 Sedona Conf. J. 17, 20

(2007) (emphasis added); <u>see also</u> 7 Areeda & Hovenkamp, <u>supra</u>, ¶ 1478b1, at 320 ("Because it

would be senseless for antitrust to take away with one hand what it gives with the other, approval

[of a venture's formation] means that the subsequent realization of that which was foreseeable

and judged reasonable at the time of creation <u>must also be legal</u>.") (emphasis added).

      Under <u>Dagher</u>, there is nothing more "core" to the NHL venture (and all

professional sports leagues) than the basic economic structure of the League, including exclusive

territories for teams around the country (and, for the NHL, in Canada).  As MSG was fully aware

when it purchased the Rangers, the fundamental structure of the League is based on the award of

exclusive territories.  (<u>See</u> Goldfein Decl. Ex. 5; Ex. 28, § 4(b).)  Thus, on the face of the

Amended Complaint, there is no question that exclusive territories are fundamental to the NHL

venture's operations and thus "core" activities under <u>Dagher</u>.

      Likewise, the marketing and sale of NHL hockey and related merchandise are no

less the "core" activities of the venture than the marketing and sales of gasoline under two

distinct brands in <u>Dagher</u>.  MSG concedes in its Amended Complaint that no Member Club can

produce NHL hockey – and, implicitly, NHL-related products – absent the collective efforts of

all venture members.  As a matter of law, therefore, the marketing and sales of NHL games and

26

Club merchandise should be viewed as core venture activity. See Bulls II, 95 F.3d at 598 ("To say that participants in an organization may cooperate is to say that they may control what they make and how they sell it.") (emphasis added).[11]  Accordingly, as a matter of law, this Court should find that MSG's Amended Complaint challenges only the core activities of a legitimate venture and therefore must be viewed as reasonable as a matter of law.

### 2.    The Various Forms of "Exclusivity" Alleged by MSG Are Reasonable as a Matter of Law

As this Court has recognized once before in this case, it is hornbook law that the "parents [of a joint venture] would not compete with their progeny [the venture itself]." United States v. Penn-Olin Chem. Co., 378 U.S. 158, 168 (1964); see also United States v. Addyston Pipe & Steel Co., 85 F. 271, 280 (6th Cir. 1898) (upholding such agreements not to compete because their objective is to secure each partner's "entire effort in the common enterprise"), aff'd in part, modified in part on other grounds, 175 U.S. 211 (1899); Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 221 (D.C. Cir. 1986); Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 190 (7th Cir. 1985).[12]  Accordingly, one of MSG's major premises is simply

---

[11]    It is no answer that the Amended Complaint asserts in various conclusory ways that the NHL should be viewed as a "limited purpose" venture whose narrow scope is to schedule games, negotiate a labor deal and (oddly) enter into non-exclusive national broadcasting agreements as long as there are no more than eight Rangers games.  The NHL Constitution – which is incorporated into the Amended Complaint and by which MSG concedes it is "bound" (see Am. Compl. ¶¶ 17, 41) – delineates the venture's purpose and objective as perpetuating NHL hockey as a "national" game in the U.S. and Canada and as promoting the "common interests" of the members of the League.  See supra pp. 5-6.  Thus, MSG's attempt to define the venture so narrowly as to place all collective marketing and sales decisions outside the venture should be rejected as a matter of law.

[12]    The potential exception to this principle is where the members have competed in the relevant market on their own prior to a venture formation that itself creates market power.  See, e.g., Addyston Pipe, 85 F. at 291-92.  However, that concept is inapplicable to the formation of the NHL as no "parent" could "compete" in a "market" for NHL hockey prior to the NHL's formation; nor does MSG challenge the NHL's formation.

27

wrong as a matter of law: contrary to MSG's allegations, the antitrust laws do not "prohibit . . . clubs, like the members of any joint venture, from restricting the individual competitive activities of the individual members of the venture." (Am. Compl. ¶ 7.) On the contrary, with respect to an individual Club's potential activities that overlap with the venture's business, this is precisely what the law permits.

This simple but fundamental antitrust principle is directly applicable to every aspect of MSG's allegations. On the face of the Amended Complaint, MSG admittedly seeks to "compete" against the venture and other Member Clubs in the very activities that the venture itself produces and sells – broadcasting, licensing, merchandising, advertising and new media. (See id. ¶¶ 42, 43.) Indeed, the whole premise of MSG's Amended Complaint is that the venture is preventing MSG from "independently" competing with the venture or other Member Clubs in the marketing and sale of products that only the venture itself can create. See supra pp. 5-6. Accordingly, as a matter of law, the principle that the NHL may preclude such "competition" from its individual members requires dismissal of the Amended Complaint.

### B.    MSG'S Alleged Harm Is Not an "Antitrust Injury" as a Matter of Law

It is a fundamental requirement of any Section 1 case, including for injunctive relief,[13] that a plaintiff adequately allege an "antitrust injury" – i.e., an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); accord Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). The requirement stems from the fundamental principle that "[t]he antitrust laws . . . were enacted for 'the protection of

---

[13]    See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 109-11 (1986); Rock TV Entm't, Inc. v. Time Warner, Inc., No. 97 Civ. 0161, 1998 U.S. Dist. LEXIS 799, at *6-7 (S.D.N.Y. Jan. 29, 1998).

competition, not <u>competitors</u>.'"  <u>Brunswick</u>, 429 U.S. at 488 (emphasis added) (citation omitted).

Thus, to avoid dismissal on antitrust injury grounds, a plaintiff must plead <u>specific facts</u> showing

that its injury is of a type protected by the antitrust laws <u>and</u> that the alleged restraints harmed

competition as whole, not just the plaintiff as a competitor.  <u>See</u> <u>Paycom Billing Servs., Inc. v.

Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006); <u>Elecs. Commc'ns Corp. v. Toshiba Am.

Consumer Prods., Inc.</u>, 129 F.3d 240, 245 (2d Cir. 1997).

 In this case, MSG's Amended Complaint has two separate and distinct flaws that

warrant dismissal:  (1) MSG, at bottom, is alleging harm to itself as a "competitor" (though not

one in any antitrust sense as discussed above) that allegedly can better "exploit" Rangers fans;

and (2) MSG has alleged no <u>facts</u> demonstrating that the alleged restraints have reduced market-

wide output.

### 1. <u>MSG's Alleged Injury Is to Itself, Not to Consumers</u>

 As with many antitrust cases, MSG's claim boils down to a purported

"competitor" attempting to masquerade harm to itself as harm to the competitive process and

consumers.  It is axiomatic, however, that an antitrust complaint must be dismissed if a plaintiff

alleges only harm to itself rather than facts supporting harm to competition.  <u>See</u> <u>Paycom</u>, 467

F.3d at 290; <u>see generally</u> <u>Cargill</u>, 479 U.S. at 115-17; <u>Brunswick</u>, 429 U.S. at 487-89.  Hence,

the factual allegations must demonstrate that the alleged misconduct had an anticompetitive

effect beyond loss of business to the plaintiff or even loss of a competitor in the market.  <u>See</u>

<u>Rock TV Entm't</u>, 1998 U.S. Dist. LEXIS 799, at *9-10.

 MSG's Amended Complaint, while silent on any facts demonstrating harm to

competition, is quite vocal on harm to itself.  For example, MSG alleges that:

- "There remains great unexploited potential in [the Rangers] brand and [its] marks, and MSG intends and desires to exploit them further" (Am. Compl. ¶ 14);

- "Each member club is legally entitled to exploit its own intellectual property" (id. ¶ 16A);

- "MSG  has been denied the right to freely compete in the exploitation of the Rangers marks . . . in ways that it believes are most likely to maximize the value of those marks" (id. ¶ 47A); and

- MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base."  (Id. ¶ 47D).

All of these are classic examples of a "competitor" asserting that it is being harmed by the alleged restrictions; they say nothing of harm to the marketplace or consumers.

Ultimately, this is a case in which MSG asks this Court to invoke the antitrust laws essentially to void the NHL's collective and "exclusive" marketing and distribution decisions regarding venture products (broadcast, licensing, and merchandise), and instead allow MSG to do as it pleases with respect to the distribution of any venture output that involves the Rangers.  The law in this Circuit (and elsewhere), however, is well established that a plaintiff's frustrated desire to obtain (or retain) a distribution relationship – even if it is harmed – is not the type of injury the antitrust laws were intended to prevent.  See, e.g., Kingray, Inc. v. NHL Enters., Inc., No. 00-CV-1544-L (BEN), slip op. at 11 (S.D. Cal. July 2, 2002) (Goldfein Decl. Ex. 2) (finding that the "exclusive" agreement for the NHL Center Ice broadcast package could not harm competition because the effect was only to replace one form of distribution with another); Kingray, Inc. v. Nat'l Basketball Ass'n, Inc., 188 F. Supp. 2d 1177, 1192-95 (S.D. Cal. 2002) (same).[14]

---

[14]    See also E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d  23, 27, 29 (2d Cir. 2006) (defendant's decision to terminate one distributor in favor of an exclusive arrangement with another could not harm competition; defendant obtained "no monopolistic benefit . . . that it [did] not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined"), cert. denied, 128 S. Ct. 97 (2007); Elecs. Commc'ns Corp., 129 F.3d at 244-46 (termination of distributor to appoint an exclusive distributor could not harm competition and was "presumptively legal"; the products would still be available and plaintiff had shown only harm to itself, not harm to "overall competition").

In sum, MSG's Amended Complaint makes clear that all of its claims are based on the assertion that it has suffered an antitrust injury because of the "exclusive" arrangements in broadcasting (Am. Compl. ¶ 47D), licensing and merchandising (id. ¶¶ 47A, 47B), advertising and sponsorships (id. ¶ 47C), and new media.  (Id. ¶¶ 47C-47E.)  As a matter of law, however, none of these "exclusives" can result in an antitrust injury to MSG.  Nor, as a matter of law, is it sufficient merely to allege that some consumers may prefer MSG as a distributor.  See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127-28 (2d Cir. 1995) (no adverse effect on competition where some customers merely preferred products and services of plaintiff over those of defendants).  From the perspective of the overall market, nothing has changed on account of the NHL's alleged exclusive arrangements.  See id. at 128; see also Balaklaw, 14 F.3d at 798-99 & n.11 (even where plaintiff cannot compete, "[f]rom the consumer's point of view, nothing about the market has changed").

## 2.    MSG's Conclusory Allegations of an "Output" Reduction Are Insufficient as a Matter of Law

MSG's Amended Complaint also rests on the bald assumption that the NHL's "exclusive" arrangements have reduced "output" by preventing MSG from distributing Rangers games and related Rangers merchandise as MSG sees fits.  MSG's conclusory allegations are insufficient as a matter of law.

The court's decision in Kingray, Inc. v. NHL Enterprises, Inc., No. 00-CV-1544-L (BEN), (S.D. Cal. July 2, 2002) (Goldfein Decl. Ex. 2) – in which MSG was a named defendant, see id., slip op. at 2 – is on point.  Plaintiffs, who were purchasers of the NHL "Center Ice" broadcast package, attacked the license for nationwide satellite and digital distribution of each team's game broadcasts outside its exclusive broadcast territory on the grounds that it was an illegal, exclusive arrangement among the NHL, its Member Clubs and DirecTV that artificially

31

restricted output and raised price. See id. at 2-4. Center Ice, a subscription package marketed by

DirecTV, provided consumers the ability to watch virtually every NHL game, so long as it was

broadcast locally by a particular team – i.e., there was a feed accessible to DirecTV. The

package included "black outs" for games that were already being distributed in particular

territories through other means. Id. at 3. Addressing the restricted output theory, the court held

that there could be no harm to competition where games would still be available to fans, even if

only on a local television channel:

> The Court finds that the "black out" provision does not restrict output.
> Defendants' evidence shows that the NHL contracted with local television stations
> to air certain games; thus, DirecTV's agreement not to compete by rebroadcasting
> those same games on NHL Center Ice does not constitute an agreement to restrict
> output – it merely prevents a double broadcast.

Id. at 11 (emphasis added); see also Kingray, Inc. v. Nat'l Basketball Ass'n, Inc., 188 F. Supp. 2d

1177, 1194 (S.D. Cal. 2002) ("[T]he NBA League Pass's black-out provision does not restrict

output; it only affects what channel the game is available on."). Under the sound reasoning of

Kingray, MSG has not alleged antitrust injury with respect to any of the alleged exclusive

arrangements to which it objects. Nowhere does MSG allege facts – nor could it – that Rangers

fans cannot view Rangers games, watch Rangers highlights or obtain Rangers merchandise from

some distribution source; whether such output comes from MSG or the NHL venture is of no

consequence under the antitrust laws.

      MSG cannot avoid these defects with conclusory allegations that output has been

reduced or market prices are higher than they otherwise would be. See Elecs. Commc'ns Corp.,

129 F.3d at 245 (plaintiff cannot substitute "conclusory statements" for "minimally sufficient

factual allegations" of market-wide harm to competition) (internal quotation marks and citation

omitted).[15]  MSG must allege <u>facts</u> from which one could conclude that the overall market has

been injured, not just plaintiff.  <u>See id.</u> at 245-46 (affirming dismissal of section 1 claim where

no facts were alleged to prove that output would be any different than that demanded by

consumers).  Here, MSG alleges <u>no facts</u> about how the alleged "markets" for various NHL

products are harmed as a result of the alleged illegal exclusive territories and marketing

arrangements.

> For all of these reasons, the Court should dismiss MSG's Amended Complaint

with prejudice for the failure to allege facts that can support the element of antitrust injury.

## IV.    NEARLY ALL OF THE CLAIMS IN MSG'S AMENDED COMPLAINT HAVE BEEN RELEASED OR ARE BARRED BY LACHES OR JUDICIAL ESTOPPEL

### A.    MSG's Consent Agreements and Releases Preclude Its Challenge to the NHL's Exclusive Territories and Marketing Arrangements in Existence as of 2005

> Perhaps the most egregious and perplexing addition to MSG's Amended

Complaint is its frontal attack on the NHL's long-standing exclusive territories for its franchises

– including exclusive broadcast rights – as well as any marketing arrangements agreed to among

NHL Member Clubs as of the time MSG purchased the Rangers.  <u>See supra</u> pp. 7-13.  According

to MSG's Amended Complaint, all of these agreements are little more than the "cartel" behavior

of "independent" competitors.  In addition to the facial invalidity of such a Section 1 conspiracy

claim (described above), MSG indisputably has released any claim that stems from alleged cartel

activities that existed at the time MSG signed its most recent Consent Agreement in 2005.

---

[15]    <u>See also</u> <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65 (2007) ("[P]laintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (alteration in original); <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 125-27 (2d Cir. 2007) (dismissing Section 2 refusal to deal claim because plaintiff failed to "plead further facts 'plausibly suggesting'" antitrust injury).

The law is not in question.  A party to a contract may forever release antitrust claims for past or current conduct, including any potential claim for injunctive relief.  See Richard's Lumber & Supply Co. v. U.S. Gypsum Co., 545 F.2d 18, 20 (7th Cir. 1976) ("A general release . . . is not ordinarily contrary to public policy simply because it involves antitrust claims."); Three Rivers Motor Co. v. Ford Motor Co., 522 F.2d 885, 891-92 (3d Cir. 1975) (recognizing public interest in private antitrust enforcement, but explaining that "this public interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation") (citations omitted); Hunter Douglas, Inc. v. Comfortex Corp., No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at *21-22 n.10 (N.D.N.Y. Mar. 11, 1999); Ruffo v. Gulf Oil Corp., No. 74 C 1615, 1978 U.S. Dist. LEXIS 19083, at *4 (E.D.N.Y. Mar. 13, 1978).

Moreover, a party may not avoid the preclusive effect of a release of potential antitrust claims by arguing that conduct, extant at the time of the release and continuing thereafter, creates a new cause of action not barred by the release.  See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 161 F.3d 443, 448 (7th Cir. 1998) (barring claim "based on alleged continued adherence" to agreement existing at the time of the release); Willsea v. Theis, No. 98 Civ. 6773 (BSJ), 1999 U.S. Dist. LEXIS 22471, at *38-40 (S.D.N.Y. Aug. 5, 1999) (rejecting as "nonsense" plaintiff's characterization of defendant's continued copyright enforcement as post-release misconduct); Hunter Douglas, 1999 U.S. Dist. LEXIS 10906, at *19-21 (plaintiff cannot challenge policy that existed when it signed release); Record Club of Am., Inc. v. United Artists Records, Inc., 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (where complaint alleged illegal conduct continuing past the date of release, but alleged harm flowed from conditions under which original lawsuit was settled, release barred antitrust claim).

Here, the existence, scope and application of the release are indisputable on the face of the Consent Agreement.  In terms of subject matter, the release covers any conduct

relating to NHL "operations" or "activity." (See Goldfein Ex. 20, § 10(a).) Further, the release

covers any potential claim, including for equitable relief. (Id.) Accordingly, the only issue for

this Court on the release is what conduct challenged in MSG's Amended Complaint was in

existence as of 2005 and has not materially changed as of the filing of the Amended Complaint.

It is not a difficult inquiry. Almost all of the conduct challenged in MSG's

Amended Complaint existed as of 2005 and has not materially changed since that time.[16] Indeed,

the only specific activity identified in the Amended Complaint that arguably would not be

subject to MSG's Release is the migration of Club websites to the League's common technology

platform and content management system, which was new and unique as of 2006. To the extent

that the Amended Complaint is not dismissed in its entirety on other grounds, summary

judgment should be granted on all allegations other than those relating to website migration.

(And, of course, the website allegations should be dismissed for all of the substantive reasons

discussed above).

B.    **The Doctrine of Laches Also Bars the Bulk of MSG's Claims**

Similarly, all of MSG's allegations in this case – with the exception of new

conduct as of 2003 – are barred by the doctrine of laches. Where the doctrine's applicability, as

here, is clear from the Amended Complaint, it is appropriate to dismiss such allegations at the

pleading stage. Because the only new conduct since 2003 alleged in the Amended Complaint

relates to the Rangers website migration onto the NHL's common technology platform, all other

claims and allegations should be dismissed.

---

[16]    It is only MSG's attitude toward the relevant NHL business practices that has changed, as
reflected by its 2006 votes against renewing the 1996 License Agreements and the New Media
Strategy. The challenged practices themselves have not changed since 2005.

Laches is derived from the maxim "equity aids the vigilant, not those who sleep on their rights," and operates to bar equitable claims where (1) a plaintiff unreasonably and inexcusably delayed bringing suit to redress the complained-of injury, and (2) such delay resulted in prejudice to the defendant.  See Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks and citation omitted); see also Santana Prods. Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 138 (3d Cir. 2005).  Where the complained-of conduct occurred outside of the analogous statute of limitations period, the laches doctrine presumptively bars a plaintiff's claims absent a showing by the plaintiff that its delay was excusable and caused no prejudice to defendant.  See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996); Santana Prods., 401 F.3d at 138-40 & n.17.  Further, where these facts are evident on the face of a plaintiff's complaint, the allegations are properly dismissed on this Rule 12(b)(6) motion.  See Solow Bldg. Co. v. Nine W. Group, Inc., No. 00 Civ. 7685 (DC), 2001 WL 736794, at *6, *8 (S.D.N.Y. June 29, 2001) (granting motion to dismiss where "[l]aches is clear on the face of plaintiff's Complaint" and where it is "clear that plaintiff 'can prove no set of facts to avoid the insuperable bar'") (citation omitted), aff'd, 48 F. App'x 15 (2d Cir. 2002); see also Jones v. Ceramco, Inc., 387 F. Supp. 940, 942 (E.D.N.Y.), aff'd mem., 526 F.2d 585 (2d Cir. 1975).  The statute of limitations for private antitrust damages actions is four years.  See 15 U.S.C. §§ 15(a), 15b.  MSG first filed its Complaint on September 28, 2007.  Hence, any claims arising before September 28, 2003, are presumptively barred by laches.

As alleged in its Amended Complaint, MSG's claims, other than those relating to new media, arise from a "series of agreements beginning in the 1980s" in which all of the Member Clubs, including the Rangers, agreed to vest in the NHL various intellectual property, broadcasting, merchandising, and advertising rights on behalf of all the Member Clubs and the

36

League.  (See Am. Compl. ¶¶ 38, 40.)  MSG's Amended Complaint also makes clear that its delay has caused the NHL fundamental prejudice.  Apart from its new media allegations, MSG's Amended Complaint challenges agreements that establish the fundamental economic structure and operation of the League in terms of how it makes, markets and sells NHL hockey and related products.  The NHL, the Member Clubs and countless third parties who are involved with the NHL would fundamentally and necessarily be prejudiced by MSG's several-year delay in seeking a judicial restructuring of the NHL.  Cf. Conopco, 95 F.3d at 192-93.  Accordingly, these claims are barred by laches and should be dismissed.

**C.    MSG's Successful Defense in Kingray Bars Its Exclusive Broadcasting Allegations, and This Court Should Take Judicial Notice of MSG's Other Inconsistent Positions in That Case**

MSG's direct attack on the NHL's (and its own) territorial exclusivity defies logic not only because of the Consent Agreements, but also – most disingenuously – because MSG has sought and obtained judicial relief defending these very territorial restrictions against antitrust attack.  The doctrine of judicial estoppel precludes such duplicitous behavior before this Court.

**1.    MSG Is Judicially Estopped from Challenging the NHL's Exclusive Broadcast Territories**

Judicial estoppel operates to protect the integrity of the judicial system by precluding a party from taking legally inconsistent positions in different legal proceedings.  See New Hampshire v. Maine, 532 U.S. 742, 749-50, 756 (2001) (granting motion to dismiss on the basis of judicial estoppel).  This Court may apply judicial estoppel against a party who asserts a position that is "clearly inconsistent" with its position in a prior proceeding, when the party "succeeded in persuading a court to accept [its] earlier position."  Id. at 750-51; see also Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6-7 (2d Cir. 1999) (judicial estoppel applies

when "(1) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner.").

Here, MSG's Amended Complaint is an insult to the integrity of the judicial system, claiming as a violation precisely the type of "restraint" that it successfully defended in Kingray, Inc. v. NHL Enterprises, Inc., No. 00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002) (Goldfein Decl. Ex. 2), in which the Rangers were a named defendant.  In this case, MSG openly and notoriously alleges that the NHL's exclusive broadcast territories are Section 1 violations that preclude MSG from competing as it desires.  See supra pp. 11-12.  Yet, in Kingray, MSG just as openly and notoriously sought and obtained a ruling, as a matter of law, that these very exclusive broadcast territories could not violate Section 1.  There, plaintiffs were purchasers of the "Center Ice" package of games who alleged that it was a Section 1 violation for the NHL Clubs to agree to "exclusive geographic territories" that were the basis for requiring DirecTV to "black out" games to be shown on different channels through the exercise of a Club's exclusive broadcasting rights.  Kingray, No. 00-CV-1544-L (BEN), slip op. at 3.  The court held that such restrictions could not be Section 1 violations as a matter of law.  Id., slip op. at 10-11; see also Kingray, Inc. v. Nat'l Basketball Ass'n, Inc., 188 F. Supp. 2d 1177, 1194 (S.D. Cal. 2002) (upholding in same context exclusive broadcast territories for MSG's Knicks NBA team).

In other words, in the present case, MSG stands in the shoes of the plaintiffs in Kingray, arguing that the NHL's exclusive broadcast territories restrict "output" by limiting how and through whom NHL games may be distributed.  This is precisely the type of contradictory pleading that judicial estoppel is intended to prevent.  Accordingly, this Court should dismiss all allegations that directly or indirectly challenge the NHL's exclusive broadcast territories.

**2.    This Court Should Take Judicial Notice of MSG's Other Positions in Kingray**

On a motion to dismiss, the Court not only has the authority to consider documents "integral" to a complaint's allegations, see supra note 2, but also to take judicial notice of "public documents" (including documents filed in other courts), provided that the court need not accept the truth of the matters asserted in them.  See Rothman v. Gregor, 220 F.3d 81, 91-92 (2d Cir. 2000) (noting that courts may properly take "judicial notice of pleadings in other lawsuits attached to defendants' motion to dismiss") (citation omitted); Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir. 1991) (affirming grant of motion to dismiss where court took judicial notice of SEC filings).

While MSG attempted to avoid pressing a "single entity" argument in Kingray,[17] its Answer and Affirmative Defenses in Kingray may be of interest to this Court given the passion with which MSG asserts that the NHL's conduct in this case violates the Sherman Act. In Kingray, also a case challenging the NHL's collective output decisions, MSG affirmatively alleged that:

- the NHL's exclusive broadcast territories are "reasonably ancillary to a lawful joint venture and hence . . . lawful under federal . . . antitrust laws" (Goldfein Decl. Ex. 3, ¶ 79);

- the NHL's exclusive broadcast territories cannot cause "injury to competition" (id. ¶ 88);

- the NHL competes "with other sports and entertainment alternatives" (id. ¶ 79); and

---

[17]    The defendants, including MSG, filed a single Answer in Kingray (Goldfein Decl. Ex. 3), and the Third Affirmative Defense states:  "The NHL Defendants are not capable of conspiring with one another . . . with respect to the challenged conduct because they are a single economic enterprise."  (Id. ¶ 76.)  MSG never corrected this position with the court, although it apparently reached an agreement with counsel for the defendants that MSG would not participate in the pursuit of that particular defense.  For this reason, the Defendants do not ask the Court to take judicial notice of the single entity assertion in the defendants' joint Answer filed in the Kingray case.

- the NHL and the named Clubs "lack sufficient economic power in any properly defined market to enable them to restrain trade in any such market." (Id. ¶ 85.)[18]

This Court, of course, may do with these concessions as it wishes. But at a minimum, the

Defendants respectfully submit that the Court should take judicial notice that MSG's position is

that exclusive broadcast territories are reasonable as a matter of law (i.e., "core" venture conduct),

exist in a broad entertainment market, in which the NHL has no market power, and cannot harm

competition – reason alone to dismiss the Amended Complaint.[19]

---

[18]    In sharp contrast, MSG's Amended Complaint alleges relevant markets and related market power limited to NHL broadcasts and merchandise. MSG's Answer in Kingray demonstrates that these market definitions are indefensible and implausible on their face. Under such circumstances, the Amended Complaint may be dismissed on its face. See Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 265-66 (S.D.N.Y. 2000); cf. PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243, 258 (S.D.N.Y. 2000) (Preska, J.), aff'd, 315 F.3d 101 (2d Cir. 2002).

[19]    MSG also has alleged that Defendants' activities are unlawful under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340. (See Am. Compl. ¶¶ 52, 53.) The same requirements for pleading a Section 1 violation apply to pleading a Donnelly Act claim. Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 298 (S.D.N.Y. 1998) (Donnelly Act modeled on the Sherman Act and construed in light of federal precedent); Creative Trading Co. v. Larkin-Pluznick-Larkin, Inc., 523 N.Y.S.2d 102, 103 (App. Div. 1988). Thus, since MSG has failed to adequately allege a federal antitrust claim against Defendants, its Donnelly Act claim also must be dismissed. See Granite Partners, 17 F. Supp. 2d at 298.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that MSG's Amended

Complaint be dismissed with prejudice.  In the alternative, Defendants respectfully request that

summary judgment be granted with respect to any claim that arose prior to MSG's execution of

the 2005 Release.


Dated:  June 2, 2008                                    Respectfully submitted,



                                               s/ Shepard Goldfein
                                              Shepard Goldfein
                                              James A. Keyte
                                              Paul M. Eckles
                                              SKADDEN, ARPS, SLATE,
                                                  MEAGHER & FLOM LLP
                                              Four Times Square
                                              New York, New York 10036-6522
                                              Telephone:  (212) 735-3000
                                              Facsimile:  (212) 735-2000

                                              *Attorneys for Defendants National Hockey
                                              League et al.*