# Exhibit 1

```
   6BF3YARH              Hearing
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   NON-COMMERCIAL PARTNERSHIP
 3   HOCKEY CLUB LOKOMOTIV
 4   YAROSLAVL,
 4
 5          Plaintiff,
 5
 6       v.                06 CV 9421 (LAP)
 6
 7   NATIONAL HOCKEY LEAGUE,
 7   CALGARY FLAMES LIMITED
 8   PARTNERSHIP D/B/A CALGARY
 8   FLAMES, AND EDMONTON INVESTORS
 9   GROUP LTD. D/B/A/ EDMONTON
 9   OILERS,
10
10          Defendants.
11
11   ------------------------------x
12       and
12   ------------------------------x
13
13   ANO HOCKEY CLUB METALLURG
14   MAGNITOGORSK,
14
15          Plaintiff,
15
16       v.                06 CV 9936 (LAP)
16
17   NATIONAL HOCKEY LEAGUE AND
17   LEMIEUX GROUP L.P. D/B/A
18   PITTSBURGH PENGUINS,
18
19          Defendants.
19
20   ------------------------------x
20                       New York, N.Y.
21                       November 15, 2006
21                       2:30 p.m.
22
22   Before:
23
```

```
23          HON. LORETTA A. PRESKA,
24
24                District Judge
25
25
          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
```

```
                          2
     6BF3YARH          Hearing
 1   APPEARANCES
 2
 2   ALEXANDER BERKOVICH
 3      Attorney for Plaintiffs
 3
 4   PROSKAUER ROSE
 4      Attorneys for Defendants
 5   BY: BRADLEY I. RUSKIN
 5        SCOTT A. EGGERS
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT: All right. Counsel, thank you for your
2   arguments and papers. This has been nothing other than a
3   complete treat to have you here.
4       We all at least agree that on a motion for a
5   preliminary injunction, the movant must establish that one,
6   absent such relief it will suffer irreparable injury; and two,
7   either, A, a likelihood of success on the merits, or B,
8   sufficiently serious questions going to the merits and a
9   balance of hardships tipping decidedly toward the moving party.
10      For the moment, I do not address the enhanced standard
11  required when one is interfering with the status quo.
12      With respect to irreparable injury, if an injury can
13  be appropriately compensated by an award of monetary damages,
14  then an adequate remedy at law exists and no irreparable
15  injury may be found to justify the specific relief.
16  Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir.
17  2004).
18      "A showing that the movant will suffer irreparable
19  harm if the preliminary injunction is not granted is the most
20  important prerequisite for the issuance of a preliminary
21  injunction." Transperfect Translations International, Inc., v.
22  Merill Corp, Number 2004 WL 2725032 at *4 (S.D.N.Y.,
23  November 30, 2004) (Quoting Bell & Howell: Mamiya, Co. v. Masel
24  Supply, Co., 719 F.2d 42, 45 (2d Cir. 1983)) "A party's delay
25  in moving for preliminary injunctive relief undercuts the sense

74

6BF3YARH                Hearing

1  of urgency that typically accompanies such a motion."
2  Transperfect 2004 WL 2725032 at *4 (Citing Tough Traveler Ltd.
3  v. Outbound Products, 660 F.3d 964, 968 (2d Cir. 1995)
4        As the plaintiffs point out here, the contracts
5  between the plaintiffs and the players acknowledge that the
6  players' services are unique, and a loss of those services
7  cannot be compensated by money damages. Indeed, that is the
8  general rule in personal services contracts, including those
9  involving professional athletes.
10       The unique facts of these cases, however, persuade me
11 that plaintiffs are unlikely to be able to prove that they
12 cannot be compensated by money damages. Put more plainly,
13 these cases were always about money, the only issue is how
14 much.
15       As the parties have laid out in detail in their
16 papers, particularly in the declaration of William L. Daly,
17 deputy commissioner of the NHL, for many years the NHL and the
18 IIHF had been parties to comprehensive agreements that
19 governed, among other things, the transfer of players to the
20 NHL from the IIHF sanctioned hockey leagues in their home
21 countries, and the member federations of the IIHF.
22       Broadly speaking, the purpose of this NHL IIHF
23 agreement was to create an orderly and efficient time framework
24 to facilitate the transfer of players from the IIHF member
25 federations to the NHL, and to provide monetary assistance to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                              75
        6BF3YARH              Hearing
1    those federations to help support the growth and development of
2    ice hockey in IIHF member countries.
3          For example, the current version of the NHL IIHF
4    agreement provides that the NHL pay a "development fee" of
5    $200,000 for each player from a IIHF league who transferred to
6    an NHL club, requesting "in exchange the NHL receives right to
7    sign the players to play in the NHL, despite their having
8    effective contracts in their home countries."
9          The IIHF and its members determine distribution of the
10   amounts paid by the NHL, but Mr. Daly opines that those funds
11   go primarily to the home teams of the transferred players.
12         As also set out in Daly declaration, the RIHF, a
13   member of the IIHF, declined to join the current NHL IIHF
14   agreement. In negotiations leading up to the RIHF's decision
15   to opt out of the current agreement, the primary question from
16   the RIHF was how much money it would receive in compensation
17   for each player. This is of course according to Mr. Daly.
18         Although the NHL indicated that more compensation
19   might be available, the parties were unable to reach an
20   agreement that satisfied the RIHF's monetary demands.
21         As Mr. Daly recounts in his declaration, during the
22   course of these negotiations, including a May 2006 meeting in
23   Riga, Latvia, and a June 2006 meeting in New York, the
24   principal issue was money, and at the June meeting, the issue
25   was specifically the amount of compensation that plaintiff
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

6BF3YARH           Hearing

1  Metallurg would receive for the transfer of Mr. Malkin.
2      Mr. Daly details that on June 29, 2006, he received an
3  e-mail from Sergey Arutyunyan, general director of the RIHF,
4  demanding the payment of one million dollars as compensation
5  for the transfer of Mr. Malkin to the Pittsburgh Penguins.  In
6  response, Mr. Daly e-mailed Mr. Arutyunyan, noting that under
7  the NHL IIHF agreement, if the transferred player signs an NHL
8  contract, but instead of playing for the NHL, he plays
9  primarily for a minor league team, the NHL pays additional fees
10 referred to as minor league assignment fees to the IIHF.
11     It was Mr. Daly's contention that the pooling of such
12 minor league assignment fees together with the $200,000
13 transfer fee would amount to approximately a million dollars
14 being paid by the NHL for the transfer of Mr. Malkin.
15     In a July 2006 meeting in Chicago, Mr. Tretiak,
16 president of the RIHF, is said by Mr. Daly to have told him
17 that if Mr. Tretiak could secure a million dollars for transfer
18 of Mr. Malkin, Mr. Tretiak was confident that he would receive
19 the approval of the plaintiffs for the transfer.
20     In response, in July, and again in August of 2006,
21 Mr. Daly agreed to structure the transfer fee and the minor
22 league assignment fees so as to total one million dollars for
23 the transfer of Mr. Malkin.
24     During the latter part of July, however, Mr. Daly
25 learned that the RIHF was then demanding a million dollars in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77
6BF3YARH          Hearing

1  addition to the $800,000 in minor league assignment fees for
2  the transfer of Mr. Malkin. Mr. Daly refused.
3           Indeed, the plaintiffs' true intent was confirmed as
4  late as October 4, 2006, in Mr. Berkovich's letter to Messrs
5  Ruskin, Daly and Shero, the last the general manager of the
6  Pittsburgh Penguins. In that letter, Mr. Berkovich concluded
7  by demanding that the NHL and the Pittsburgh Penguins not use
8  Mr. Malkin in the 2006/2007 season, but "to the extent that the
9  Pittsburgh Penguins nevertheless is interested in obtaining the
10 services of Mr. Malkin for the 2006/2007 hockey season, you
11 should contact me with your proposal."
12          At oral argument, as we've heard, I did ask counsel
13 what the latter part of that sentence could possibly mean if it
14 was not money, and did not get a satisfactory response.
15          I also note that plaintiffs have themselves
16 characterized themselves as "sellers" of the services of hockey
17 players.
18          I also note that Ted Saskin, executive director and
19 general counsel of the NHLPA, confirms Mr. Daly's conclusion
20 that the negotiations to persuade the RIHF to sign the current
21 NHL IIHF agreement were unsuccessful "primarily because of the
22 monetary demands that the RIHF made regarding Malkin and his
23 imminent transfer to the Pittsburgh Penguins." He also
24 confirms Mr. Daly's summary that the principal discussion at
25 the June 2006 New York meeting was the amount of money

                            78
        6BF3YARH              Hearing
 1   Mr. Malkin's Russian club would receive for his transfer.
 2          I note that there are no affidavits in the record
 3   specifically refuting or contradicting the focus on money that
 4   has been detailed at length by Mr. Daly, Mr. Saskin and others.
 5          Thus, despite the general case law, and despite the
 6   acknowledgment in the players' contracts, the evidence in the
 7   record persuades me that plaintiffs can be adequately
 8   compensated by money damages. The only question is, and always
 9   has been, how much.
10          Continuing on the irreparable injury issue, I look to
11   the delay that is evident in plaintiffs proceeding here. And I
12   find that plaintiffs' delay severely undercuts that sense of
13   urgency that typically accompanies a motion for preliminary
14   injunction.
15          I note in passing that in the year 2000, Mr. Mikhnov
16   participated in and was chosen in that year's NHL draft.
17   Mr. Taratukhin was also selected in the 2001 NHL draft. And as
18   we know, in 2004, Mr. Malkin came to the United States to
19   participate in the NHL draft and was drafted in the first
20   round, second overall, by the Pittsburgh Penguins.
21          On June 30 of 2006, two of the three players submitted
22   their two week termination notices to their respective teams,
23   Messrs Mikhnov and Taratukhin. On August -- actually, I think
24   all three did on August 30. Am I right on that, counsel?
25          MR. RUSKIN: Yes, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

79

6BF3YARH                Hearing

1           THE COURT: Thank you, counsel. On August 7
2    Mr. Malkin signed the new one year contract with plaintiff
3    Metallurg. On August 13 of this year, Mr. Malkin submitted his
4    two week termination notice as to the August 7 contract. On
5    September 1, Mr. Taratukhin signed his contract with the
6    Flames. On September 5, Mr. Malkin signed his contract with
7    the Penguins. In mid-September the players all reported to
8    their respective team training camps. On October 3 of this
9    year, Mr. Mikhnov signed his contract with the Oilers. On
10   October 4, the NHL 2006/2007 season began. And these actions
11   were commenced on October 18 and 19.
12          Based on these facts, it appears that plaintiffs will
13   be unable to show irreparable injury required to justify the
14   issuing of a preliminary injunction because of their delay in
15   seeking such relief.
16          First, putting aside for a moment the players' earlier
17   expresses of interest in playing in the NHL, and their
18   participation in the NHL draft, plaintiffs slept on their
19   rights for months following the players June 2006 giving of
20   their two week termination notices.
21          At the risk of mixing metaphors, plaintiffs hid in the
22   tall grass while the players terminated their Russian
23   contracts, signed the NHL contracts, joined their NHL teams,
24   began practicing with the teams, and the NHL season began.
25          It was only after the players were engaged in the NHL

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                       80
    6BF3YARH                Hearing
1  season playing with their respective teams that plaintiffs came
2  forward to seek relief at the time of maximum inconvenience to
3  the defendants.
4        While in some circumstances the delay from the June
5  giving of the notices of termination to the mid-October request
6  for relief might not necessarily constitute fatal delay, here
7  the fact that the players trained with their new teams and
8  actually commenced playing with them during the regular NHL
9  season makes the delay unconscionable.
10       Second, when the facts of the delay are read together
11  with the facts concerning plaintiffs' constant demands for more
12  money for the transfer of players to the NHL, it becomes clear
13  that the delay was in an effort to obtain more money. Thus,
14  further undercutting any claim of irreparable injury.
15       Accordingly, I find that plaintiffs are unlikely to be
16  able to demonstrate irreparable injury.
17       I also note in passing plaintiffs' apparent
18  concession, at least with respect to the antitrust claim, that
19  the alleged harm is monetary. Plaintiffs' reply brief at 10,
20  they say "There is a direct causal connection between an
21  antitrust violation here and the alleged harm suffered by
22  plaintiffs.... Indeed, the scheme prohibiting NHL clubs from
23  negotiating with and compensating Russian hockey clubs for the
24  services of Russian hockey players has no legitimate
25  procompetitive justification (and defendants provided none)."
            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

```
                                 81
     6BF3YARH              Hearing
 1   Emphasis added.
 2         Moving briefly to the likelihood of success on the
 3   merits. I will not deal with misappropriation. Plaintiffs
 4   have cited no case law in support of this cause of action.
 5   Defendants point out that it is a common law doctrine
 6   concerning improper taking of property rights or other
 7   intellectual property rights. It does not appear to apply
 8   here. And there doesn't seem to be much argument in the briefs
 9   to the contrary.
10         Also, with respect to unjust enrichment, it doesn't
11   seem anybody talks about this claim much, so I won't either.
12         With respect to tortious interference, I note
13   preliminarily at this stage, without making a final finding,
14   that it does not appear likely that plaintiffs will be able to
15   prove that there were contracts in existence. This is based
16   first on the Russian law experts. And again, without making a
17   final finding on this, under Rule 44.1, at this point in time,
18   it appears that Ms. Beliakova's declaration is more persuasive.
19   This is particularly because of not only her explanation, but
20   her attachment of the actual statutes that she relies on.
21         It also appears that the labor law, including the
22   provision for the Article 80 notice prevails over other
23   inconsistent statutes.
24         So preliminarily on the law as stated by the experts,
25   it does not appear plaintiffs will be able to show the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

6BF3YARH     Hearing

1 existence of contracts at the time.
2    In addition, however, we have the admissions made by
3 the various individuals negotiating on behalf of plaintiffs,
4 with respect to the IIHF NHL agreement. All of those
5 statements, which I will not reiterate here, are to the effect
6 that the two week termination provision of Article 80 remains
7 in effect, particularly Mr. Tretiak, the proposer of the
8 legislation to close this supposed loop hole, urged others to
9 work to move now because the loop hole was going to change, and
10 the like.
11    The statements and conduct of those negotiating these
12 agreements, together with the conduct of Metallurg in inducing
13 Mr. Malkin to sign a new contract after he had exercised his
14 termination rights under the prior contract, also appeared to
15 concede the point.
16    Thus, it appears unlikely that plaintiffs will be able
17 to demonstrate the existence of a contract at the relevant
18 time.
19    In addition, on the facts in the record at this time,
20 it does not appear that plaintiffs will be able to satisfy the
21 but for requirement in showing that but for defendants'
22 actions, the players would not have defected. The players'
23 affidavits make clear that they always wanted to play in the
24 NHL, everyone agrees here that the NHL is the premiere hockey
25 league in the world. The players had participated in the NHL

                                      83
       6BF3YARH              Hearing
1    draft, as I mentioned, some years ago.
2           And thus, it seems unlikely that plaintiffs will be
3    able to show that but for defendants' conduct, the players
4    would still be playing for the plaintiffs.
5           With respect to aiding and abetting a breach of
6    fiduciary duty, the parties dispute the governing law.
7    Plaintiffs cite Maryland state law for the proposition that
8    employment contracts contain an implied duty that an employee
9    must act solely for the benefit of his or her employer with
10   respect to all matters falling within the scope of his
11   employment. I am not entirely sure why we would be looking at
12   Delaware law.
13          Defendants contend that there was no aiding and
14   abetting a breach of fiduciary duty because the Russian players
15   did not owe their teams any duty under Russian law. Plaintiff
16   does not respond to this in the reply papers that I can recall.
17          Aside from why we would rely on Maryland law,
18   defendants' expert persuades me that it is unlikely that
19   plaintiffs will be able to show that the players had any
20   fiduciary duty to the plaintiffs at all.
21          With respect to tortious interference with business
22   relations, of course everyone seems to agree that unlawful or
23   wrongful means are required here. Defendants contend that
24   there was no tortious interference with business relationships
25   because there are no allegation of any wrongful means to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

84
6BF3YARH                Hearing

1   achieve the alleged interference.  Rather, the defendants
2   contend that they were pursuing their legitimate business
3   objectives of securing assets for their respective teams.
4          Plaintiffs respond that signing the Russian players
5   "with full knowledge of plaintiffs' contracts" constitutes
6   theft and was authorized by the NHL's August 2, 2006, memo, as
7   a result of its desire to punish the players for the RIHF's
8   refusal to join the latest NHL IIHF agreement.
9          Again, as I've noted, it does not seem that there was
10  any wrongful means employed by the defendants on this record.
11  On this record, it's clear that the players wanted desperately
12  to play for the NHL, and took all steps to do so.  That
13  defendants had knowledge of the plaintiffs' contracts does not
14  seem to be relevant here.
15         And as was noted during oral argument, the NHL's
16  August 2, 2006, memorandum is virtually the same memorandum,
17  although as counsel points out without the bold typing, but is
18  virtually the same memorandum that had been in effect for some
19  years.
20         Accordingly, it seems that plaintiffs will be unlikely
21  to prevail on the merits of this claim.
22         Plaintiffs also assert a claim for conversion and do
23  not seem to dispute that New York law governs the standard
24  here.  Under New York law, a conversion claim requires "one who
25  owns and has a right to possession of personal property to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85
6BF3YARH                Hearing
1   prove that the property is in the unauthorized possession of
2   another, who has acted to exclude the rights of the owner."
3   Key Bank v. Grossi, 227 A.D.2d 841, 843 (3d Dep't 1996).
4           Defendants of course assert that the services of these
5   players are not personal property and thus that plaintiffs
6   cannot prove up a claim for conversion. Plaintiffs do not
7   respond that I recall in their papers, and accordingly it seems
8   unlikely that they will prevail on this point.
9           Finally, with respect to the alleged Section 1 claim,
10  Section 1 of the Sherman Act prohibits "every contract,
11  combination... or conspiracy in restraint of trade." Although
12  the plain language of the act would suggest that every contract
13  in restraint of trade violates the antitrust laws, the Supreme
14  Court has long held that the Sherman Act prohibits only
15  unreasonable restraints of trade.
16          Thus, in order to prevail, "a plaintiff claiming a
17  Section 1 violation must first establish a combination or some
18  form of concerted action between at least two legally distinct
19  economic entities unilateral conduct on the part of a single
20  person or enterprise falls outside the purview of this
21  provision in the antitrust law." Capital Imaging Associates v.
22  Mohawk Valley Medical Associates, 996 F.2d 537, 542, (2d Cir.
23  1993).
24          The Court also recognized that certain conduct is
25  immune from the scrutiny of the antitrust laws. "It has long

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                    86
         6BF3YARH            Hearing
1    been recognized that in order to accommodate the collective
2    bargaining process, certain concerted activity must be held to
3    be beyond the reach of the antitrust laws." Clarett v. NFL,
4    369 F.3d 124, 142 (2d Cir. 2005).
5            Here defendants contend that there is no cognizable
6    claim under Section 1 of the Sherman Act because the NHL policy
7    on transfer fees and restraint of trade falls within the
8    purview of the collective bargaining agreement, and is thus
9    immune from antitrust scrutiny under the non-statutory labor
10   exception. Clarett 369 F.3d, 140.
11           As counsels pointed out in the papers, it seems likely
12   that defendants will be able to demonstrate that in fact this
13   policy on transfer fees has been a mandatory subject of the
14   collective bargaining agreements.
15           In addition, there seem to be various other problems
16   with the antitrust claim. First, there does not seem to be any
17   antitrust injury here, thus no injury to competition. Also it
18   appears, as we noted during oral argument, that plaintiff does
19   not appear to be market participants in the market which they
20   defined. And finally, the activities here at issue seem to be
21   included within the meaning of the Supreme Court's recent
22   Texaco case as the core activities of a joint venture. And
23   thus, would not constitute a combination in restraint of trade.
24           For all of these reasons, it appears that plaintiffs
25   are unlikely to prevail on the merits of the claim. And for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
                                    87
        6BF3YARH              Hearing
   1    all of the reasons stated above, the requests for the
   2    preliminary injunctions are denied.
   3           Counsel, have I forgotten anything first of all at
   4    this moment? Counsel? Anybody?
   5           MR. RUSKIN: No, your Honor.
   6           THE COURT: Hearing nothing, would you folks confer,
   7    and after you've had a chance to talk with your clients, let me
   8    know in the next day or two how you would like to proceed
   9    please.
  10           MR. RUSKIN: Yes, your Honor.
  11           THE COURT: Anything else?
  12           MR. BERKOVICH: No, your Honor.
  13           THE COURT: Thank you, gentlemen. Good afternoon. It
  14    was a pleasure having you.
  15           MR. RUSKIN: Thank you, your Honor.
  16                           oOo
  17
  18
  19
  20
  21
  22
  23
  24
  25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```