# Exhibit 2



U.S. District Court
Southern District of California
880 Front Street, Room 4290
San Diego, CA 92101-8900

FAX-IN-TIME   NOTICE
This fax is an official communication of the
U.S. District Court for the Southern District
of California. Please be aware that these are
the only copies of these documents that you
will receive unless specifically requested.

To: Lary Rappaport                                    Date 07/09/02
From: Clerk U.S. District Court                       Page 1 of 19

Fax queued: 07/09/02 at 09:32:07                      CASE: 001544-CV #00150

CONFIDENTAL
Any questions about missing pages or unreadable copy, please call (619)
557-7667. The information contained in this facsimile message is attorney
privileged and confidential. It is intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any dissemination,
distribution or copying is strictly prohibited. If you have received this
communication in error, please call us immediately. Thank you.

IMAGES OF CASE FILINGS NOW AVAILABLE ON THE INTERNET!

Web PACER provides users with browser access to dockets and scanned images
of filed documents without leaving the comfort of their office/home.
Document copies can now be obtained more quickly and without making a trip
to the Clerk's Office.  Users with a PACER account can visit
http://pacer.casd.uscourts.gov/index.php via user i.d. and password for
immediate Web PACER access to the Southern District of CA's docket and case
filings.  Links to other courts' Web PACER sites can be found at
http://pacer.psc.uscourts.gov/cgi-bin/links.pl. An access fee of $.07 per
page viewed will be assessed.  Those interested in establishing a PACER
account can contact the PACER Service Center at (800) 676 6856 or register
on line at www.pacer.psc.uscourts.gov.

Mail & fax related issues, such as incomplete or illegible pages, should be
directed to
(619)557-7667.

FILED

02 JUL -3 AM 10: 11

[signature] DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KINGRAY, INC. dba THE BEER HUNTER, a California corporation, et al., <br><br>   Plaintiffs, <br><br> v. <br><br> NHL ENTERPRISES, INC., a Delaware corporation dba THE NATIONAL HOCKEY LEAGUE, et al., <br><br>   Defendants. | Case No. 00-CV-1544-L(BEN) <br><br> ORDER (1) GRANTING DEFENDANT DIRECTV'S MOTION TO DISMISS AND (2) GRANTING THE NHL DEFENDANTS' MOTION TO DISMISS <br><br> [Doc. Nos. 120, 137] |

This matter comes before the Court on Defendant DirecTV, Inc.'s and the NHL Defendants' motions to dismiss Plaintiffs' First Amended Complaint ("FAC") for failure to state a claim upon which relief may be granted. Plaintiffs oppose. The Court finds the matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1.d.1.

I. **Factual Background**

Plaintiffs, individuals and commercial establishments, have filed this lawsuit on behalf of commercial and residential purchasers of "NHL Center Ice," the broadcast of a bundled package of National Hockey League ("NHL") games. Plaintiffs purchased this subscription through Defendant DirecTV, Inc., a satellite television provider. Plaintiffs allege that NHL Center Ice violates federal and state antitrust laws and California's Cartwright Act and Unfair Competition Law. Defendants are DirecTV, Inc., NHL Enterprises, L.P. and several

professional hockey organizations. These organizations are New York Islanders Hockey Club, L.P., dba New York Islanders; Madison Square Garden, L.P., dba New York Rangers; Chicago Blackhawks Hockey Team, Inc., dba Chicago Blackhawks; Mighty Ducks Hockey Club, Inc., dba Mighty Ducks of Anaheim; Los Angeles Kings Hockey Club, L.P., dba Los Angeles Kings; and San Jose Sharks, L.P, dba San Jose Sharks (collectively, "the NHL Defendants").

Prior to the enactment of the Sports Broadcasting Act ("SBA"), collective agreements between professional sports leagues and broadcast television providers were considered horizontal agreements in violation of the Sherman Antitrust Act. After the Eastern District of Pennsylvania's decision in *United States v. National Football League*,[1] professional sports leagues successfully lobbied for the SBA, which carves out an exemption for a clearly delineated class of such agreements. Under the SBA, antitrust laws "shall not apply to any joint agreement [concerning] organized professional team sports of football, baseball, basketball or hockey ... in the sponsored telecasting of the games of football, baseball, basketball or hockey." 15 U.S.C. § 1291. "Sponsored telecasting" within the meaning of the SBA pertains only to network broadcast television and does not apply to non-exempt channels of distribution such as cable television, pay-per-view and satellite television networks.

The NHL is comprised of thirty independently owned and operated professional hockey teams that have joined the NHL to compete in its professional hockey league. Each team is franchised by the NHL and is an independent business entity. The teams compete with each other for the acquisition of players, coaches and management personnel. Each team derives separate revenue from local television and radio, parking, concessions and box seating. The teams do not share their expenses, profits or losses.

The teams have authorized the NHL to contract on their behalf for the live video telecasting of certain regular season and post-season games. Each team has agreed with the other teams and with the NHL not to compete in the sale of rights for the live video telecasting of regular season games. Pursuant to the SBA, the teams have jointly agreed to sell the rights to other selected regular season games to sell to television networks for over-the-air

---

[1] 196 F.Supp. 445 (E.D. Pa. 1961).

1  broadcasting. They have also jointly agreed to sell the rights to other NHL games to the
2  TNT or TBS television stations for national cable broadcasting. Prior to the 1994-95 season,
3  with the exception of the games sold to TNT and TBS, the teams agreed that the regular season
4  games could be broadcast only within each team's protected geographical territory ("in-market
5  games"). With few specified exceptions, the agreement among the teams forbids the broadcast
6  of any NHL game in any geographic market except those licensed by the NHL team in that
7  geographical market ("out-of-market games").

        Beginning in the 1994-95 season, the NHL Defendants agreed jointly to sell their broadcast rights at what Plaintiffs argue is an artificially inflated price. Plaintiffs allege that the NHL Defendants conspired with DirecTV for the broadcast of a bundled package of NHL out-of-market hockey games, agreeing to restrict output of those games according to geographical market, price and quantity. Defendants made available a fixed-price package to residential and commercial satellite dish owners of up to thirty-five out-of-market regular season NHL games per week. This package is called "NHL Center Ice." Defendants have agreed that NHL Center Ice is the exclusive means by which out-of-market games may be licensed for satellite viewing by individual consumers and/or commercial establishments. They have further agreed that these games will not be distributed via sponsored telecasts.

        Defendants have therefore agreed to "black out" the re-broadcast of NHL games shown on regional sports networks, except for those games shown within the designated territory of the NHL teams involved in each particular game. Plaintiffs claim that the agreement to restrain the sale of rights to any NHL game outside of a team's assigned geographic territory except through NHL Center Ice is not reasonably necessary to achieve any legitimate business objective. According to Plaintiffs, the system of exclusive geographic territories is not necessary to preserve the viability of any NHL team in attracting fans to live games, but only serves to artificially increase prices and reduce output. Plaintiffs further contend that the system of exclusive territories is not necessary to preserve the quality and attractiveness of NHL games by promoting competitive balance among NHL teams, as this concern could be addressed by a revenue sharing system, as seen in Major League Baseball. Plaintiffs allege

that the terms of the Defendants' agreements constitute a conspiracy "to fix, raise, stabilize and maintain prices for the rights to, and to restrict the output of, video broadcasts of NHL games." FAC ¶ 40.

## II. Procedural Background

Plaintiffs Kingray, Inc., Danray, Inc., Rayban, Inc., Bobray, Inc., Hugh Dykes and Arturo Levin (collectively, "Plaintiffs") bring this action on their individual behalf and on behalf of all persons and entities who have purchased the NHL Center Ice package from DirecTV in a jurisdiction subject to the laws of the United States. Plaintiffs also bring this action on their individual behalf and on behalf of all persons and entities who purchased the NHL Center Ice package from DirecTV in a jurisdiction subject to the laws of the state of California. Plaintiffs allege that beginning in 1994 and to the present, Defendants have engaged in a continuing contract, combination and conspiracy that unreasonably restrains trade and commerce in violation of Section 1 of the Sherman Act. Plaintiffs allege that Defendants' conduct also violates California's Cartwright and Unfair Competition Acts.

Defendants challenged the original complaint with a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, a motion to compel arbitration. While these motions were under submission with the Court, Plaintiffs moved to amend the complaint. By order dated September 18, 2001 the Court (1) granted in part and denied in part Plaintiffs' motion to amend the complaint, (2) granted in part and denied in part DirecTV's motion to dismiss, (3) denied DirecTV's motion to compel arbitration and (4) dismissed Plaintiff Kingray, Inc. without prejudice. On October 1, 2001 Plaintiffs filed the FAC that is the subject of the instant motions to dismiss pursuant to Rule 12(b)(6).

## III. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Navarro, 250 F.3d at 732. Dismissal is warranted under Rule 12(b)(6) where

-4-

the complaint lacks a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). Alternatively, a complaint may be dismissed where it presents a cognizable legal theory but fails to plead essential facts in support of that theory. *Robertson*, 749 F.2d at 534.

In ruling on a Rule 12(b)(6) motion, the court must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *See Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). To aid in its determination, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court may properly take judicial notice. *See Parrino v. FHP, Inc.* 146 F.3d 699, 705-06 (9th Cir. 1998). In addition, the court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint." *Id.* at 706.

IV. **Discussion**

    A.    **Plaintiffs' Sherman Act Claims**

Defendants first argue that Plaintiffs' FAC does not cure the fatal deficiencies the Court found incipient in the original complaint. In analyzing the sufficiency of the FAC's antitrust allegations, the Court is mindful that generally, "courts are hesitant to dismiss antitrust actions before the parties have had opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv., Inc. v. Supervalu, Inc.* 136 F.3d 554, 560 (8th Cir. 1998). Nonetheless, the essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to defeat a motion to dismiss. *Id.* at 558. If the alleged facts "do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th

Cir. 1987) (internal quotations omitted). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1024 (10th Cir. 1992). Further, "whether specific conduct is anticompetitive is a question of law." *Smilecare Dental Group v. Delta Dental Plan of California*, 858 F.Supp. 1035, 1037 (C.D. Cal. 1994) (citing *Oahu Gas Serv., Inc. v. Pacific Res., Inc.* 838 F.2d 360, 368 (9th Cir. 1988)). Unless a plaintiff can allege facts which, if true, would constitute an antitrust offense, dismissal is appropriate. *See Rutman*, 829 F.2d at 735.

Section 1 of the Sherman Act "prohibits conspiracies and agreements that unreasonably restrain trade." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989); *see also* 15 U.S.C. § 1. "A section 1 plaintiff must prove an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal under section 1." *Levine v. Central Florida Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). However, not every agreement that restrains competition violates the Sherman Act; rather, to be unlawful, the agreement must *unreasonably* restrain competition. *See McDaniel v. Appraisal Inst.*, 117 F.3d 421, 422 (9th Cir. 1997) (emphasis supplied). Unreasonableness is analyzed under either a *per se* rule of illegality or a rule of reason test. *Id.* The *per se* rule applies only where the practice at issue "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984) ("*NCAA*"); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1091 (9th Cir. 2000). "*Per se* violations are 'naked restraints of trade with no purpose except stifling of competition,' and have been characterized as 'so plainly anti-competitive' and lacking 'any redeeming virtue' that they are presumed illegal under § 1." *United States v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000) (internal citations omitted); *see also NCAA*, 468 U.S. at 100 (holding that a practice that facially appears to restrict competition "is presumed unreasonable without inquiry into the particular market context in which it is found."). Some practices, such as horizontal price-fixing, are subject to a *per se* analysis. *NCAA*, 468 U.S. at 101.

1 | Agreements that are not presumed unreasonable under the *per se* category are analyzed under the rule of reason test. *See Levine*, 72 F.3d at 1546. Under the rule of reason analysis, the plaintiff must show "(1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition." *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988). "An essential element of a Section 1 violation under the rule of reason is injury to competition in the relevant market." *Alliance Shippers, Inc. v. Southern Pac. Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988). Thus, the antitrust violation must harm competition, not just competitors. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811-12 (9th Cir. 1988).

In the September 18, 2001 Order, the Court held that Plaintiffs failed to state a viable Section 1 claim under any of the following theories of liability: vertical price fixing, restricted output, exclusive distributorship or horizontal conspiracy. Defendants contend that Plaintiffs' FAC continues to fail to state a claim upon which relief may be granted. The Court will address each theory of liability in turn.

### 1. Price Fixing

Vertical price fixing occurs when a supplier attempts to fix the prices charged by those who resell its products. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988); *General Cinema Corp. v. Buena Vista Distrib. Co.*, 681 F.2d 594, 597 (9th Cir. 1982). "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Elecs.*, 485 U.S. at 730. A vertical price fixing scheme setting minimum prices is generally subject to a *per se* analysis. *Id.* at 725-27. Vertical agreements fixing maximum resale prices and vertical restraints not involving price fixing are generally analyzed under the rule of reason test. *See Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 243 (2nd Cir. 1997). Vertical price fixing is not present when the supplier only dictates the wholesale price. *Mesrow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 344 (9th Cir. 1983). Further, "it is a longstanding

-7-

00CV1544

antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." *49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1468 (9th Cir. 1986).

In dismissing Plaintiffs' vertical price fixing claim as alleged in the original complaint, the Court found that the pleadings were ambiguous with respect to DirecTV's role in the alleged price fixing scheme. *See Order Re: DirecTV, Inc.'s Motion to Dismiss or in the Alternative, Motion to Compel Arbitration; and Plaintiffs' Motion to Amend the Complaint* (September 18, 2001) at 11-14 (hereinafter, "September 18, 2001 Order"). In particular, some of the allegations contended that DirecTV was involved in a conspiracy to fix prices, whereas other allegations indicated that the NHL Defendants acted alone. *See id.* at 11. The Court granted Plaintiffs leave to amend the complaint "to add factual allegations clarifying DirecTV's role in an alleged vertical price fixing scheme." *Id.* at 14.

The FAC alleges that one of the terms of the Defendants' alleged contract, combination and conspiracy was to "fix, raise, stabilize, and maintain prices for the rights to ... live video satellite and cable television broadcasts of NHL professional hockey games through non-exempt channels of distribution." *FAC* ¶ 73. To effectuate this contract term, Defendants allegedly '[c]ontracted, conspired, and agreed to set the prices of the 'NHL Center Ice' at artificially inflated and fixed levels, using a vertical price-fixing scheme setting minimum prices[.]" *Id.* ¶ 74(d). As a result, "[c]onsumer prices have been raised, fixed, maintained, and stabilized at artificially high and non-competitive levels[.]" *Id.* ¶ 75(b).

Defendants contend the FAC's vertical price fixing allegations fail to state a claim because they do not contain sufficient factual support, but rather are as conclusory as those found wanting in the original complaint. Defendants further argue that the terms of the contract between DirecTV and the NHL Defendants provide that DirecTV has sole discretion to set the price for the NHL Center Ice package, and Plaintiffs' price fixing allegations therefore fail as a matter of law. Regarding the sufficiency of their allegations, Plaintiffs counter that federal notice pleading does not require them to provide specific facts to support their price fixing theory.

- 8 -

00CV1544

Having carefully reviewed the FAC, the Court finds that Plaintiffs fail to state a claim for vertical price fixing. The Court's September 18, 2001 Order and the applicable pleading standards do not require Plaintiffs to plead detailed evidentiary facts in support of their claims. However, the facts alleged must be sufficient to describe an agreement to fix prices. *See Les Shockley Racing, Inc. v. National Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989) (a plaintiff "must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail"). Plaintiffs argue that they "have *specifically alleged* an agreement to fix prices vertically." Pls.' Opp'n at 8 (emphasis in original). However, contrary to Plaintiffs' assertion, conclusory statements that Defendants violated antitrust laws are insufficient. "Although the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant antitrust language to state a claim for relief." *TV Communications*, 964 F.2d at 1024. Rather, "[a] plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id.* Other than alleging the existence of an unlawful agreement to fix prices at an artificially high level -- an allegation too conclusory to sustain a Section 1 claim -- the only facts alleged in the FAC to support such an agreement are that Defendants "us[ed] a vertical price fixing scheme setting minimum prices[.]" *FAC* ¶ 74(d).

Plaintiffs allege that the prices set by Defendants (the "Suggested Retail Price") "have in reality been the prices charged to consumers." *FAC* ¶ 23(d). Although the FAC does not attach a copy of the NHL-DirecTV contract nor specifically cite to it, the discussion of Suggested Retail Price is a direct reference to the contract, which this Court may consider on a motion to dismiss. *See Parrino*, 146 F.3d at 706 (holding that a court may consider "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint"). As discussed in the NHL-DirecTV contract, the Suggested Retail Price refers to the NHL's responsibility to establish suggested prices for NHL Center Ice. However, pursuant to the contract, DirecTV has the sole discretion to set the actual price charged to consumers. The contract provides, "NHL shall establish a suggested retail rate for residential and commercial [packages] ... DirecTV shall determine the retail rates charged to residential and commercial

subscribers for the Package regardless of the Suggested Retail Price established by NHL." *Rappaport Decl.* Exh. A at 11. Defendants correctly contend that setting a suggested retail price does not violate antitrust laws. Vertical price fixing occurs when a supplier attempts to fix the prices charged by those who resell its products. *See General Cinema Corp.*, 681 F.2d at 596. This is not the case here. Plaintiffs do not dispute that the contract gives DirecTV sole discretion to set the price of NHL Center Ice. Instead, they maintain in their opposition that in reality there was an agreement among Defendants to fix prices. To support this contention, Plaintiffs reference the following allegations from the FAC: that Defendants conspired to fix prices using a vertical price fixing scheme, they intended to harm or restrain competition, and that competition was in fact harmed or restrained. *See FAC* ¶¶ 74(d-f), 75. However, the FAC does not allege that, notwithstanding the terms of the NHL-DirecTV contract, there existed a separate conspiracy or contract pursuant to which Defendants agreed to fix prices. Rather, the FAC's discussion of the Suggested Retail Price suggests that the pleading alleges that the contract itself is the illegal agreement entered into by Defendants. Further, Plaintiffs cannot now add allegations that there existed an agreement among Defendants separate from the written contract to survive the instant motions to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("The 'new' allegations contained in the [plaintiff's] opposition motion ... are irrelevant for Rule 12(b)(6) purposes."). In light of the conclusory nature of the FAC's allegations and because the NHL-DirecTV contract shows that the NHL Defendants did not attempt to fix the price of NHL Center Ice, the Court concludes that the FAC fails to state a claim for vertical price fixing.

2.  **Restricted Output**

In dismissing Plaintiffs' original complaint, the Court found that because the pleading was unclear as to DirecTV's role in the alleged conspiracy, it failed to state a Section 1 claim based on restricting output. *See* September 18, 2001 Order at 14. However, the Court granted leave to amend these allegations. *Id.* at 14-15. The FAC alleges that one of the terms of Defendants' contract, combination and conspiracy was to restrict the output of live video satellite and cable television broadcasts of NHL games through nonexempt channels of

distribution. *FAC* ¶ 81. Defendants allegedly

> agreed to "black out" the rebroadcast of certain NHL games to maintain "protected territories" of certain NHL teams. Furthermore, specifically with respect to NHL Center Ice, these conspirators have also agreed to black out games publicly advertised as included in the NHL Center Ice even when those games are outside of the above-referenced "protected territories."

*FAC* ¶ 57.

Defendants first argue that the FAC fails to state a claim based on restricted output because the "black out" provision does not actually restrict output. Specifically, Defendants assert that the "black out" provision's effect is to prevent a given NHL game from being aired simultaneously on local television and on NHL Center Ice, and that output is therefore not restricted because the game is already being shown on local television. The Court finds that the "black out" provision does not restrict output. Defendants' evidence shows that the NHL contracted with local television stations to air certain games; thus, DirecTV's agreement not to compete by rebroadcasting those same games on NHL Center Ice does not constitute an agreement to restrict output -- it merely prevents a double broadcast.

Next, Defendants contend that, because the Sports Broadcasting Act mandated that no regular season games could be shown out-of-market, NHL Center Ice actually increases output by making it possible for consumers to view out-of-market games. Plaintiffs, relying on *NCAA*, counter that it is immaterial that output is higher now than it was before and that the proper measurement is whether output is lower than it otherwise would be absent Defendants' conduct. The Court agrees with Defendants that as alleged, the FAC fails to allege how the "black outs" could restrict output. The Court finds Plaintiffs' reliance on *NCAA* unpersuasive. In that case, the National Collegiate Athletic Association ("NCAA") adopted a plan for televising college football games of its member institutions. *NCAA*, 468 U.S. at 90-91. The plan stated its purpose was to reduce the adverse effect of live television upon football game attendance. *Id.* at 91. To that end, the plan limited the total amount of televised intercollegiate football games and the number of games that any one college could televise, and prohibited any member of the NCAA from selling television rights except in accordance with the plan.

*Id.* at 91-94. The plaintiffs were members of the NCAA as well as the College Football Association ("CFA"), which was organized to promote the interests of major football-playing colleges within the NCAA. *Id.* at 89, 94. CFA subsequently negotiated a contract with the National Broadcasting Company ("NBC") that would have allowed a more liberal number of television appearances for each college and would have increased the revenues realized by CFA members. *Id.* at 94-95. In response, the NCAA announced that it would take disciplinary action against any CFA member that complied with the CFA-NBC contract. *Id.* at 95. The plaintiffs obtained a preliminary injunction preventing the NCAA from initiating disciplinary proceedings or otherwise interfering with the contract. *Id.* The Supreme Court found that the NCAA's plan restricted output by limiting the quantity of television rights for sale. *Id.* at 99. Analyzing the plan as a horizontal output restriction, the Court found that the plan violated the Sherman Act by curtailing output and blunting the ability of member institutions to respond to consumer preference. *Id.* at 120.

*NCAA* noted that one of the anticompetitive consequences of the NCAA plan was that output was lower than it otherwise would be. *Id.* at 107. In their opposition, Plaintiffs cite this language, arguing that because of NHL Center Ice, output of NHL games is lower than it otherwise would be. The FAC's allegations, however, undermine this contention and distinguish it from the facts presented in *NCAA*. In particular, the FAC alleges that prior to the 1994-95 season, with few specified exceptions, out-of-market games were not available to the public. *FAC* ¶ 52. In contrast to the plan in *NCAA* which limited the number of broadcasts permitted, beginning with the 1994-95 season, NHL Center Ice has made available for purchase up to thirty-five regular season games per week, regardless of geographical territory. Accordingly, output of out-of-market NHL games has increased by virtue of NHL Center Ice, rather than decreased.

Insofar as Plaintiffs contend that output of out-of-market games could be increased if satellite users were not required to purchase the entire NHL Center Ice package on an all-or-nothing basis, Plaintiffs have already waived this argument in their opposition to Defendants' motion to dismiss the original complaint where they stated they were not alleging the bundled

- 12 -

00CV1544

nature of NHL Center Ice is an illegal tying arrangement. Further, Plaintiffs have not cited, nor is the Court aware of, any authority indicating that when a defendant offers a new product in a competitive manner (e.g., all out-of-market games via NHL Center Ice), a party can allege a Section 1 violation on the basis that the product is not being offered in the manner the Plaintiffs would prefer (out-of-market games in a non-bundled format). Antitrust laws ensure that competition is not unlawfully harmed; economic market forces will dictate whether the product will be successful. Moreover, Plaintiffs' contention that prior to the 1994-95 season the NHL Defendants artificially suppressed output is irrelevant to the issue of whether NHL Center Ice itself reduces output. Indeed, the FAC acknowledges that the NHL Defendants' agreements regarding broadcasts were made pursuant to the SBA.

Finally, Defendants argue that the FAC's allegations regarding restricted output are just as conclusory as those seen in the original complaint. The Court agrees that the majority of the FAC's allegations regarding output restrictions are conclusory, and only differ from the original complaint in that they now state that DirecTV was involved in a conspiracy to restrict output. "[Defendants] [a]greed, conspired, and/or contracted to restrict the output of the broadcasts of NHL professional hockey games in non-exempt channels of distribution." *FAC* ¶ 82(b). The only factual allegations added in the FAC are those relating to "black outs." As discussed above, Plaintiffs have failed to establish a viable restricted output theory on the basis of the "black outs." The Court concludes that because the FAC's allegations regarding output restrictions are conclusory and unsupported by factual allegations, this Section 1 theory fails to state a claim.

3.  **Exclusive Distributorship**

In its September 18, 2001 Order, the Court found that the original complaint failed to state an exclusive distributorship claim because Plaintiffs had not alleged any facts demonstrating an intent to harm competition or antitrust injury. *See* September 18, 2001 Order at 15. Defendants argue that the FAC's exclusive distributorship allegations are conclusory in that Plaintiffs have not alleged facts in support of the bare allegations. Defendants further argue that even if Plaintiffs have alleged sufficient facts, the claim must fail because they have

1  admitted that DirecTV did not have an exclusive distributorship for NHL Center Ice.

2      The Court finds that Plaintiffs have not amended the complaint such that they allege facts demonstrating an intent to harm competition. Instead, they have amended their exclusive distributorship allegation merely by inserting the phrase "with an intent to harm or restrain competition, thereby driving up prices[.]" *FAC* ¶ 74(e). Plaintiffs further allege that the Defendants' agreement "limit[s] and restrict[s] competition at the consumer level," as consumers have been deprived of the benefit of free and open competition among satellite television providers. *Id.* These allegations are bare legal conclusions and thus are insufficient to withstand a motion to dismiss. *See Rutman*, 829 F.2d at 735. Further, the fact that other satellite providers are not authorized to broadcast NHL Center Ice does not, by itself, properly allege a violation of antitrust laws. "An exclusive distributorship is not, standing alone, a violation of antitrust laws." *Id.* To hold so would mean that exclusive distributorships could constitute a *per se* violation of Section 1.

14      Plaintiffs contend that *Rutman* is inapplicable because the facts are materially distinguishable. First, Plaintiffs argue that the NHL as a whole, rather than the individual teams, selected DirecTV as the satellite distributor of NHL Center Ice. Plaintiffs further argue that *Rutman* is inapposite because this case is price related. Plaintiffs cite no authority to support their claim that these facts render *Rutman*'s pleading requirements inapplicable. The Court finds that *Rutman*'s discussion of the necessary allegations to state an antitrust claim provide the legal framework for analyzing Plaintiffs' claims. "The allegation of specific intent ... to bring about harm to competition is conclusory in the absence of anticompetitive conduct from which such specific intent may be inferred ... a court must ask whether plaintiff could show any set of facts, consistent with the allegations of its complaint, that would constitute a violation of the antitrust laws." *Id.* (internal quotations omitted). Further, although Plaintiffs have alleged a vertical price fixing claim, they have also alleged antitrust violations based on an exclusive distributorship, and those allegations must be analyzed on their own merits. The Court concludes that the FAC's allegations that the NHL-DirecTV distributorship violates

Section 1 are conclusory and do not pass muster under *Rutman*, and therefore are dismissed."[2]

4. **NHL Defendants' Horizontal Conspiracy**

The FAC alleges that the NHL Defendants engaged in a conspiracy to divide the market and fix prices whereby each of the separately owned and operated NHL teams retains the right to license and broadcast the majority of its games within its designated home territory, but assigns the right to license its games outside of its designated home territory to a single seller. *FAC ¶¶ 49-51*. Plaintiff also argues that each NFL team agrees to forego any sale or broadcasting of its games into another team's designated territory. *Id. ¶ 52*. Absent these agreements, Plaintiffs maintain that rival teams would compete with one another and offer their out-of-market game broadcasts to consumers, placing downward pressure on the price of NHL Center Ice and result in increased output and greater choice for consumers. To the extent that Plaintiffs assert a horizontal conspiracy claim, the NHL Defendants challenge these allegations, arguing that because Plaintiffs are indirect purchasers of NHL Center Ice, they do not have standing to bring this claim.

Plaintiffs, as private individuals, seek to enforce Section 1 of the Sherman Act and obtain damages against Defendants through Section 4 of the Clayton Act. Section 4 authorizes private suits to recover damages for violations of the Sherman Act. "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). The Ninth Circuit has explained that "[d]espite the apparent breadth of the phrase 'any person,' the Supreme Court has held that Congress did not intend to afford a remedy to everyone injured by an antitrust violation simply on a showing of causation." *Knevelbaard*, 232 F.3d at 987. Instead, the plaintiff must have

---

[2] It is further questionable whether the NHL-DirecTV distributorship is in fact exclusive in light of the FAC's allegations that the NHL has also contracted with iN Demand to provide NHL Center Ice to cable subscribers on a pay-per-view basis. Plaintiffs argue that the relevant market is the NHL Center Ice package for satellite viewing, and that there is no real competition between satellite and cable. Because the FAC's allegations are conclusory, the Court need not determine whether the availability of NHL Center Ice through a cable provider renders the NHL-DirecTV contract non-exclusive.

"antitrust standing." *Id.* In determining whether a plaintiff has antitrust standing, courts must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983). Relevant factors in making this determination include "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999).

The Supreme Court analyzed Section 4 of the Clayton Act in *Illinois Brick Co. v. Illinois*.[3] The Court held that an indirect or remote purchaser lacks standing to seek damages against the manufacturer for alleged violations of federal antitrust laws. *Illinois Brick*, 431 U.S. at 728-29, 737-47. This rule "serves to avoid the complications of apportioning overcharges between direct and indirect purchasers and to eliminate multiple recoveries." *Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998). In addition, the *Illinois Brick* bar ensures antitrust laws are enforced by those purchasers who have been most directly injured by the antitrust violation. *Illinois Brick*, 431 U.S. at 731.

Plaintiffs allege that the NHL Defendants engaged in a horizontal market division and price fixing scheme pursuant to which they created NHL Center Ice. *FAC* ¶¶ 49-52. The FAC also alleges that DirecTV and iN Demand are distributors of NHL Center Ice. *FAC* ¶¶ 54, 64. Plaintiffs purchased NHL Center Ice from DirecTV and iN Demand. *FAC* ¶¶ 6, 7. The Court finds that Plaintiffs, therefore, are indirect purchasers of NHL Center Ice, and the *Illinois Brick* rule may bar their Sherman Act claim for a horizontal conspiracy by the NHL Defendants. Moreover, although Plaintiffs repeatedly refer to the NHL Defendants as "co-conspirators," Plaintiffs' claims do not fall under the co-conspirator exception to the *Illinois Brick* bar. This exception provides that the bar against indirect purchasers is "inapplicable to claims against

---

[3] 431 U.S. 720 (1977).

remote sellers when the plaintiffs allege that the sellers conspired with intermediaries in the distribution chain to fix the price at which the plaintiffs purchased." *State of Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984). Here, Plaintiffs' allegations of a vertical conspiracy are conclusory for the reasons discussed above. Further, insofar as Plaintiffs allege the NHL Defendants conspired with iN Demand, those allegations are also insufficient to put this case within the co-conspirator exception. In allegations that parallel those regarding the NHL-DirecTV contract, Plaintiffs contend that the NHL Defendants and iN Demand conspired to provide NHL Center Ice to residential cable subscribers at artificially inflated and fixed levels and to restrict output. *FAC* ¶ 68. Thus, those allegations are equally conclusory and fail to allege sufficient facts to support a vertical conspiracy theory.

Further, DirecTV and iN Demand could not engage in a horizontal conspiracy with the NHL Defendants. Horizontal price fixing occurs when competitors agree to set prices and thereby interfere with free market forces. *See Business Elecs.*, 485 U.S. at 730 ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."). DirecTV is a satellite television provider, and iN Demand is a pay-per-view cable television provider. The NHL Defendants, by contrast, govern and participate in a professional hockey league, and thus are not competitors with DirecTV and iN Demand, thereby negating Plaintiffs' horizontal conspiracy allegation. The Court therefore concludes that Plaintiffs lack standing to bring this claim. In sum, Plaintiffs have failed to state a viable Sherman Act claim on any of the alleged theories of liability. Accordingly, the Court GRANTS Defendants' motions to dismiss as to the first and second causes of action.

### B. Plaintiffs' Remaining State Law Claims

Because the Court grants Defendants' motions to dismiss Plaintiffs' Sherman Act claims, which formed the basis for the Court's jurisdiction over this case, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and hereby DISMISSES the third, fourth and fifth causes of action. *See* 28 U.S.C. § 1367(c) (federal court may decline to exercise supplemental jurisdiction over state law claims where it has

dismissed the claims on which its original jurisdiction was based).

## V. Conclusion

For the foregoing reasons, having carefully considered the parties' briefs, the applicable law, and for good cause appearing, IT IS HEREBY ORDERED:

1. DirecTV's motion to dismiss is **GRANTED**.
2. The NHL Defendants' motion to dismiss is **GRANTED**.
3. The first and second causes of action for violation of Section 1 of the Sherman Antitrust Act are **DISMISSED WITH PREJUDICE**.
4. The remaining state law causes of action under California's Cartwright and Unfair Competition Acts are **DISMISSED** pursuant to 28 U.S.C. 1367 without prejudice such that they may be re-filed in state court.

IT IS SO ORDERED.

Dated: 7/2/02

M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

COPY TO:

HON. ROGER BENITEZ
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES AND COUNSEL OF RECORD