Exhibit 20

<u>CONSENT AGREEMENT</u>

THIS CONSENT AGREEMENT is made this 8th day of April, 2005 by and among the following parties:

(i)    NATIONAL HOCKEY LEAGUE, a joint venture organized as an unincorporated association not-for-profit (the "<u>NHL</u>");

(ii)    MADISON SQUARE GARDEN, L.P., a Delaware limited partnership ("<u>MSG</u>");

(iii)    CABLEVISION SYSTEMS CORPORATION ("<u>CVC</u>") and the other parties listed on Schedule A hereto (collectively with CVC and MSG, the "<u>Cablevision Parties</u>"); and

(iv)    FOX ENTERTAINMENT GROUP, INC. ("<u>FEG</u>") and the other parties listed on Schedule B hereto (collectively with FEG, the "<u>Fox Parties</u>").

Each of the parties hereto, other than the NHL, is sometimes referred to in this Consent Agreement individually as a "<u>Transaction Party</u>" and, collectively with the parties other than the NHL, as the "<u>Transaction Parties</u>".

<u>Background</u>

A.    Rainbow Regional Holdings LLC (the "<u>CVC Partner</u>"), an indirect, wholly-owned subsidiary of CVC, and Fox Sports RPP Holdings, Inc. (the "<u>Fox Partner</u>"), an indirect, wholly-owned subsidiary of FEG, directly own 60% and 40% interests, respectively, in Regional Programming Partners ("<u>RPP</u>"), which indirectly owns 100% of MSG, which in turn owns all of the assets comprising the New York Rangers hockey club (the "<u>Rangers</u>").

B.    (i)    Pursuant to an Agreement of Merger dated February 5, 2003 and a Certificate of Merger filed on February 6, 2003, Rainbow Media Group, LLC ("<u>RMG</u>") was merged into Rainbow Media Holdings, Inc., an indirect wholly-owned subsidiary of CVC which, immediately prior to such merger, directly owned 100% of the membership interests of RMG (the "<u>Merger</u>"). Rainbow Media Holdings, Inc. was subsequently converted into a limited liability company named Rainbow Media Holdings, LLC.

(ii)    Pursuant to a Distribution and Transfer Agreement, dated as of February 18, 2005, by and among certain Cablevision Parties and Fox Parties:

(a)    Rainbow Media Holdings, LLC proposes to contribute $100,000 in cash to RPP in exchange for a 0.1% general partnership interest in RPP;

(b)    RPP proposes to redeem the Fox Partner's 40% interest in RPP in exchange for interests in certain regional sports programming networks; and

(c)    the Fox Partner proposes to release and terminate its 40% equity (0% voting) interest in MSG Flight Operations, LLC ("<u>MSGFO</u>"), which operates the

team plane used to transport the Rangers and MSG's other sports teams, and, thereafter, MSGFO will be an indirect, wholly-owned subsidiary of CVC (the transactions described in clauses (a)-(c), the "Redemption" and, together with the Merger, the "Proposed Transactions").

C.    Upon the consummation of the Proposed Transactions, CVC will indirectly own 100% of the equity interests in MSG and the Rangers, none of the Fox Parties will own any direct or indirect interest in MSG or the Rangers, and the direct and indirect ownership interests in the Rangers will be owned as set forth on Schedule C.

D.    The Proposed Transactions require the approval of the NHL.

E.    The Transaction Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transactions, a complete list of which is provided on Schedule D (the "Transaction Documents").

F.    The NHL has approved the Proposed Transactions, subject to the terms and conditions of this Consent Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, the parties hereto hereby agree as follows:

1.    NHL Consent.  Subject to the terms and conditions set forth in this Consent Agreement, the NHL hereby consents to the Proposed Transactions.  The consent granted herein is limited to the Proposed Transactions as described in paragraph B of the Background section of this Consent Agreement and does not extend to any other transfer, sale, assignment, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG or the Rangers, whether or not the same may be contemplated by the Transaction Documents.

2.    Performance of Agreements.  Subject to the terms of this Consent Agreement, each Transaction Party covenants with the NHL that it shall perform in all material respects all of the terms and conditions required of it under the Transaction Documents to which it is a party.

3.    NHL Constitution, Bylaws and Agreements.

(a)    Notwithstanding anything contained to the contrary in any of the Transaction Documents, for so long as it owns a direct or indirect ownership interest in MSG, and should it cease to own such interest, subject to such disposition being effectuated in accordance with the NHL Constitution and Agreements including, without limitation the execution and delivery of documents in a form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined infra) in a manner substantially similar to the release and indemnification provisions of Section 10 of this Consent Agreement, each of the Cablevision Parties agrees for itself and each of its affiliates and subsidiaries over which it has, or at the time of reference can, exercise control (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties"), as follows:

2

(i)     that it shall, and shall cause its Related Parties to, be bound by and comply with: (A) the NHL Constitution, (B) the NHL By-laws, (C) the governing documents of each of the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc., Intra-Continental Ensurers, Limited, any entity that may be formed by the NHL member clubs (the "Member Clubs") generally after the date of this Consent Agreement, and each of their respective affiliates and subsidiaries (together with the NHL, the "NHL Entities"), (D) the rules, regulations, memoranda, resolutions, policies, procedures, interpretations and directives of the governing body of each of the NHL Entities (including, without limitation, the NHL Board of Governors) and the NHL Commissioner (the "Commissioner"), (E) this Consent Agreement and each Prior Consent Agreement (as defined in Section 8), and (F) any agreements and arrangements to which the Member Clubs generally or any of the NHL Entities are (or after the date of this Consent Agreement may become) subject or by which they or their assets are (or after the date of this Consent Agreement may become) bound, including, without limitation, the current and/or future collective bargaining agreements between the NHL and the National Hockey League Players' Association and between the NHL and the National Hockey League Officials' Association and all other agreements, consent agreements, decrees, cooperation agreements and settlement agreements presently or hereafter in effect between or among the NHL Entities, the Member Clubs and/or third parties (including, without limitation, this Consent Agreement); in each case as they may be amended or adopted from time to time and including the Commissioner's interpretation thereof and the custom and practice thereunder (collectively, the "NHL Constitution and Agreements");

(ii)     that it shall not, and shall cause its Related Parties not to, take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs; and

(iii)     that it shall not, and shall cause its Related Parties not to, challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)     Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Transaction Party agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not materially adversely affect the NHL membership known as the New York Rangers (the "Membership") or the operations or financial condition of the Rangers and shall not in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

4.     Merger.  The Cablevision Parties jointly and severally represent and warrant to the NHL that: (a) on or about March 10, 2005, MSG first advised the NHL that the Merger was consummated on February 6, 2003, and (b) at all times since February 6, 2003, Rainbow Media Holdings, LLC (f/k/a Rainbow Media Holdings, Inc.) has directly owned all of the membership interests in RRH I, LLC and RRH II, LLC.  The Cablevision Parties

acknowledge and agree that: (i) the Merger required NHL approval under the Prior Consent Agreements and the NHL Constitution and Agreements (as defined therein) prior to the consummation thereof, and (ii) any such Merger in the absence of such approval constitutes a breach of the Prior Consent Agreements and a violation of the NHL Constitution and Agreements.

5.    Post Transaction Capital Structure and Other Conditions. The NHL's consent granted in Section 1 hereof is subject to: (a) consummation of the Proposed Transactions in all material respects in accordance with the Transaction Documents, including the payment, contribution or exchange of all consideration required thereunder, and (b) after giving effect to the consummation of the Proposed Transactions, the direct and indirect ownership of the Rangers being in accordance with Schedule C. If any of the requirements set forth in the preceding sentence has not been satisfied as of the applicable date, the consent of the NHL set forth in this Consent Agreement (but not the representations, warranties and obligations of the Transaction Parties hereunder) shall be void ab initio, and the Commissioner shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order rescission of any transaction consummated (or purportedly consummated) in violation of this Consent Agreement or the NHL Constitution and Agreements (other than changes in ownership at the CVC, FEG or News Corporation ("News Corp.") levels), as well as the right to order such other relief or remedy as may be within his powers under the NHL Constitution and Agreements. None of the Transaction Parties has pledged the Membership, its direct or indirect interest therein or any other hockey-related assets of MSG to secure any debt obligation nor shall any of them grant such a pledge without the NHL's prior written consent or otherwise in accordance with the NHL Constitution and Agreements.

6.    Ownership, Control, Change in Documents.

(a)    Each Transaction Party acknowledges to and agrees with the NHL that, notwithstanding any provision of any document or instrument to the contrary:

(i)    The ownership of the Membership, any proposed transfer of the location of the Membership and any proposed sale, pledge or other transfer of the assets comprising the Rangers, or any direct or indirect ownership interest in MSG, are subject to the NHL Constitution and Agreements, including this Consent Agreement and each of the Prior Consent Agreements. Without limiting the foregoing, any sale, pledge, or other transfer of the assets comprising the Rangers, or a direct or indirect ownership interest in, MSG shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5 of the NHL Constitution, unless otherwise provided in the NHL Constitution and Agreements.

(ii)    No Transaction Document shall be rescinded, canceled, terminated or amended in any respect which may or will materially change the terms of the Proposed Transactions, materially affect the conditions, rights, obligations or duties of the parties under the Transaction Documents, this Consent Agreement or the NHL Constitution and Agreements, or adversely affect the interests of the NHL, without the prior written approval of the NHL. The NHL shall be promptly notified in writing, pursuant to Section 11(c) hereof, of any proposed

4

change in the Transaction Documents that has any material impact on the ownership or operation of the Rangers, whether or not the NHL has consent rights with respect to the change.

(b)    Without limiting the provisions of Sections 6(a)(i) and (ii) above, each Cablevision Party acknowledges and agrees that each of the below listed actions are subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall subject the Cablevision Parties and the Membership to all remedies and rights which may be enforced by the NHL or its Member Clubs:

(i)    any change in the jurisdiction of formation or the form of entity of any of the Cablevision Parties, including, without limitation, a change by MSG in its status as a Delaware limited partnership;

(ii)    a liquidation, dissolution or transfer of a substantial part of the assets of MSG to another entity, if such assets include an interest in the Membership; and

(iii)    a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG.

7.    Representations and Warranties.

(a)    Each Transaction Party hereby severally, but jointly and severally: (x) in the case of any Cablevision Party, with each other Cablevision Party and (y) in the case of any Fox Party, with each other Fox Party, represents and warrants as of the date hereof to the NHL as follows:

(i)    If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business. If it is a limited partnership or limited liability company, it is a limited partnership or limited liability company validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.

(ii)    Such Transaction Party has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(iii)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Transaction Party enforceable against it in accordance with its terms.

(iv)    All balance sheets, income statements and other financial statements previously furnished by such Transaction Party to the NHL in connection with the application for approval of the Proposed Transactions have been prepared in accordance with generally accepted accounting principles (as in effect in the jurisdiction indicated, "GAAP") applied on a consistent basis and fairly present the financial position and results of operations of the relevant entity as of the dates and for the periods indicated. All other information furnished by such Transaction Party to the NHL in connection with the request for approval of the

4297/54115-109 NYLIB2/1105401v2

Proposed Transactions is true and correct in all material respects and has not omitted any material statement which would make such information not misleading.

(v)    Other than as disclosed on Schedule E hereto:

(A)    there is no action, suit, or proceeding pending against such Transaction Party or, in the case of MSG, against the Rangers, which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established in accordance with GAAP and which is reasonably likely to result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Transaction Party or, in the case of MSG, the Rangers, or which is reasonably likely to prevent or impede the consummation of the transactions contemplated by this Consent Agreement; and

(B)    there is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Transaction Party, requested by, any court or governmental agency which has resulted or is reasonably likely to result in any material adverse change in the business, properties or assets, or in the condition (financial or otherwise) (a "Material Adverse Change") of such Transaction Party, or which is reasonably likely to prevent or impede the consummation of this Consent Agreement or the Proposed Transactions.

The Cablevision Parties jointly and severally represent and warrant to the NHL that the information disclosed on Schedule E is true and correct in all material respects and that Schedule E does not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Nothing in this Subsection 7(a)(v) shall be interpreted as a concession by any Transaction Party that any of the matters disclosed on Schedule E is reasonably likely to result in a Material Adverse Change or reasonably likely to prevent or impede the consummation of the transactions contemplated by this Consent Agreement.

(vi)    To the best of the knowledge and belief of such Transaction Party, such Transaction Party is in compliance in all material respects with all laws, regulations and orders, federal or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on the ability of such Transaction Party to conduct its business as currently conducted.

(vii)    All filings, if any, required to be made by such Transaction Party or any of its affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, have been made and all applicable waiting periods with respect to those filings, if any, have expired, and there are no outstanding requests for additional information under that act or any other law that have not been complied with.  All filings, if any, required to be made by such Transaction Party or any of its affiliates with the Federal Communications Commission (the "FCC") have been made, all material consents, waivers, approvals, orders and authorizations in connection therewith have been obtained, and there are no outstanding requests for additional information from the FCC that have not been complied with.  To the best knowledge of such Transaction Party, all other material consents, waivers, approvals, orders and authorizations of

4297/54115-109 NYLIB2/1105401v2

any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities), including, but not limited to, the Securities and Exchange Commission and all applicable exchanges and state securities commissions, that are required to be obtained by such Transaction Party or any of its affiliates in connection with the Proposed Transactions have been obtained (or made) and are in full force and effect.

(viii)    Such Transaction Party has performed in all material respects all obligations required to be performed by such Transaction Party to date with respect to the Proposed Transactions and, except as disclosed in any schedules hereto, such Transaction Party is not in default under any material contract, agreement, lease, or other instrument relating to the Proposed Transactions to which such Transaction Party is a party or by which such Transaction Party is bound, except for defaults that individually or collectively, would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on such Transaction Party's ability to perform its obligations with respect to the Proposed Transactions. Except as provided in the Transaction Documents and the agreements referred to in the Prior Consent Agreements, there are no other arrangements, agreements or understandings to which such Transaction Party or any of its affiliates is a party, whether written or oral, with respect to the ownership, control, right to transfer direct or indirect interests in, or financing or management of MSG or the Rangers.

(ix)    The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Transaction Party, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Transaction Party's properties or assets (except as contemplated or disclosed herein or the schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Transaction Party is a party or by which such Transaction Party is bound, except for conflicts, breaches, terminations or defaults that individually or collectively would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party.

(x)    The Proposed Transactions have been consummated in accordance with the terms of the Transaction Documents. Schedule D contains a true and complete list of all Transaction Documents, true and complete copies of which have heretofore been delivered to the NHL.

(xi)    To the best of its knowledge, except as expressly excluded from Section 10(a), such Transaction Party has no Claims (as defined in Section 10(a)) against any of the Affiliated NHL Parties.

(b)    The Cablevision Parties jointly and severally represent, warrant and agree as follows:

(i)    Except for options, stock appreciation rights and restricted stock of CVC that represent a direct or indirect interest, whether equity or otherwise, of less than five percent (5%) of the Rangers, there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, debt instruments or other economic rights in any Cablevision Party nor does any

7

Cablevision Party have any obligation to issue any such options, warrants, rights or securities. No Cablevision Party presently has any intention of selling or otherwise transferring any of its direct or indirect interest in the Rangers or any of the assets of the Rangers.

(ii)     No Cablevision Party has pledged the assets constituting the Rangers or its direct or indirect ownership interest in the Rangers to secure indebtedness of any person or entity and each Cablevision Party acknowledges that any such pledge is subject to the NHL Constitution and Agreements.

(iii)     None of the Cablevision Parties is holding its direct or indirect interest in MSG for the benefit of any other person or entity.

(iv)     Schedule C contains a true and complete list, after giving effect to the Proposed Transactions, of each person or entity (other than shareholders of CVC) that directly or indirectly owns an interest in MSG or the Rangers, and the direct or indirect percentage interest of such person or entity in MSG or the Rangers and each intermediate entity. MSG directly owns the Membership and the Rangers.

(v)     Schedule F contains a true and complete list of each person or entity that, to the best knowledge of the Cablevision Parties, and as of the date indicated with respect to each such person or entity, directly or indirectly owns of record or beneficially 5% or more of the outstanding capital stock or voting power of CVC, and the percentage interest of such person or entity in CVC.

(c)     The Fox Parties jointly and severally represent, warrant and agree as follows:

(i)     After giving effect to the Proposed Transactions, none of the Fox Parties nor any other direct or indirect subsidiary or affiliate of News Corp. will own any direct or indirect interest in MSG or the Rangers.

(ii)     Schedule G contains a true and complete list, prior to giving effect to the Proposed Transactions, of each person or entity that directly or indirectly owns an interest in the Fox Partner. Prior to giving effect to the Proposed Transactions, the Fox Partner directly owned a 40% general partnership interest in RPP.

8.     Confirmation of Agreements. The Transaction Parties and the NHL confirm that the Consent Agreement dated as of June 17, 1997 (the "1997 Agreement"), the Consent Agreement dated as of March 29, 2001 (the "2001 Agreement"), the Consent Agreement dated as of December 5, 2002 (the "2002 Agreement") and any other Consent Agreement at any time executed by any of the Transaction Parties with the NHL (collectively, including the 1997 Agreement, the 2001 Agreement and the 2002 Agreement, the "Prior Consent Agreements"), have not been amended or modified by this Consent Agreement and remain in full force and effect. Nothing in this Consent Agreement shall be construed to amend or modify any of the agreements in favor of the NHL given by Charles F. Dolan, James Dolan or trusts for the benefit of members of their families, including the agreement of Charles F. Dolan dated June 17, 1997 and the agreement of such trusts dated March 10, 1995, all of which remain in full force and effect.

9.      [Intentionally Omitted.]

10.     Release and Limitation of Liability.

(a)     As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties on its own behalf and on behalf of its successors and assigns, but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever releases and discharges the NHL, each of the other NHL Entities, all of the Member Clubs (except MSG, but including all future Member Clubs), and each of their respective predecessors, affiliates, successors and assigns, and any of their respective past, present or future, direct or indirect, owners, partners, shareholders, members, managers, directors, officers, agents, trustees, employees and governors in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise) (collectively, "Claims"), which, to the best knowledge of such Transaction Party, exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided, that nothing in this Section 10(a) shall be construed or interpreted as a release and discharge by any of the Transaction Parties of any amounts due to any of the Transaction Parties from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Transaction Party then the release contained in this Section 10(a) shall not prohibit such Transaction Party from asserting a defense or counterclaim to that claim.

(b)     The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

(c)     Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with any of the Affiliated NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to legal actions, proceedings or investigations against any Affiliated NHL Party (other than any action by any Transaction Party against any Affiliated NHL Party) with respect to the Proposed Transactions or the other transactions contemplated by the Transaction Documents.

(d)     Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

(i)     subject to the provisions of this Consent Agreement, the Cablevision Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission, of any of the Cablevision Parties, any of their respective subsidiaries or affiliates, or any of their respective past, present or future, direct or indirect, owners, partners, shareholders, members, managers, directors, officers, agents, trustees, employees, governors and representatives, in their respective capacities as such; and

(ii)     subject to the provisions of this Consent Agreement, the Fox Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission, of any of the Fox Parties, any of their respective subsidiaries or affiliates, or any of their respective past, present or future, direct or indirect, owners, partners, shareholders, members, managers, directors, officers, agents, trustees, employees, governors and representatives, in their respective capacities as such.

(c)     Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights: (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by MSG, the Rangers or any other entity or (ii) to defer or off-set any distribution to MSG or the Rangers. Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Transaction Party or any other party.

(f)     No Affiliated NHL Party other than the NHL Entities shall be entitled to indemnification under this Section 10 unless the Commissioner determines that such indemnification is reasonable and appropriate and, in the case of Losses suffered by any Member Club or any owner thereof for which indemnification is sought pursuant to Section 10(d), such Losses relate to the business of the NHL Entities or other entities owned by the Member Clubs generally or the game of NHL hockey. Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under this Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure. No claim against either an individual Member Club or which is based primarily on an act or omission of MSG or the Rangers for which indemnification is sought under this Section 10(f) will be settled without the consent of the indemnifying parties, such consent not to be unreasonably withheld.

11.    <u>Additional Provisions</u>.

(a)    The Transaction Parties agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Membership and shall be the obligation thereof.

(b)    This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred, in each case in accordance with the NHL Constitution and Agreements. No Transaction Party may assign any of its rights or delegate any of its duties under this Consent Agreement without the prior written consent of the NHL. Notwithstanding anything in any Transaction Document to the contrary, any dispute between or among the parties hereunder relating to the subject matter hereof shall be deemed to be a dispute which shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to that provision. Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right: (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL Entities and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.

(c)    Any notice or other communication under this Agreement shall be in writing and shall be considered given when delivered personally or sent by facsimile (with a copy by any other means permitted for the giving of notices under this section), one (1) day after being sent by a reputable overnight courier, or three (3) days after being mailed by registered or certified mail, postage prepaid, return receipt requested, as follows:

If to the NHL or
the Commissioner:

National Hockey League
1251 Avenue of the Americas
New York, New York 10020-1198
Attention: General Counsel
Facsimile: (212) 789-2050

with a copy to:

Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Attention: Wayne D. Katz, Esq.
Facsimile: (212) 969-2900

4297/54115-109 NYLIB2/1105401v2

|  |  |
|---|---|
| If to MSG or any of<br>the Cablevision Parties: | Two Penn Plaza<br>14th Floor<br>New York, New York  10121<br>Attention:  General Counsel<br>Facsimile:  (212) 465-6011 |
| If to any of the<br>Fox Parties: | Fox Entertainment Group, Inc.<br>1211 Avenue of the Americas<br>New York, New York  10036<br>Attention:  General Counsel<br>Facsimile:  (212) 852-7896 |

or to such other addresses as a party hereto shall designate from time to time by like notice.

(d)     This Consent Agreement, and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the Proposed Transactions.  This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York applicable to agreements made and to be performed entirely in New York.  It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this Consent Agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the NHL shall, in addition to any other remedy available to it at law or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(c)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security.  The Transaction Parties also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Transaction Parties or their respective affiliates or subsidiaries may result in the exercise of rights and remedies against MSG or the Membership, including, but not limited to, the involuntary termination of the Membership.  This Consent Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)     This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)     No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy under this Consent Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.  No waiver by any party of another party's compliance with the provisions of this Agreement shall be effective unless set forth in a writing signed by the party granting such waiver, and no waiver of any provision on any one

12

occasion shall constitute a waiver of such provision or any other provision on any subsequent occasion.

(g)    Except as expressly provided in this Consent Agreement, the representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL.  Accordingly, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party.  By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. Notwithstanding the preceding provisions of this Section 11(g), absent an express provision to the contrary, (i) the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Parties by each of the Cablevision Parties shall be joint and several with the other Cablevision Parties and (ii) the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Parties by each of the Fox Parties shall be joint and several with the other Fox Parties.

(h)    The parties hereto acknowledge and agree that the failure by any of the Transaction Parties to comply in a material respect with any of the provisions of this Consent Agreement shall constitute a material breach of this Consent Agreement which entitles the NHL to take action permitted by the NHL Constitution and Agreements and/or this Consent Agreement.  Said action includes, in addition to any and all other rights to which the NHL shall be entitled under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that if, in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by a Transaction Party, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Transaction Party notice of and such opportunity to cure the default as the NHL deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner.  No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)    All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control as between any of the Affiliated NHL Parties, on the one hand, and any of the Transaction Parties, on the other hand; the foregoing shall not, however, modify any obligations of any of the Transaction Parties to any of the other Transaction Parties.

(j)    The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

(k)    This Agreement does not create, and shall not be construed as creating, any rights enforceable by any person not a party to this Agreement (except for the NHL Entities and as provided in Section 10).

(l)    If any provision of this Agreement shall be deemed invalid or unenforceable by a court having jurisdiction, the balance of this Agreement shall remain in effect and shall be enforced to the maximum extent permitted by law.

(m)    As used in this Agreement, the term "affiliate" means, with respect to a specified person or entity: (i) any other person or entity directly or indirectly controlled by, controlling, or under common control with the specified person or entity, and (ii) any family member of the specified person or trust for the benefit of one or more family members of the specified person.

(n)    Subject to the third sentence of Section 11(b), the courts of New York State located in New York County and the United States District Court for the Southern District of New York located in New York County shall have exclusive jurisdiction over the parties (and the subject matter) with respect to any dispute or controversy arising under or in connection with this Consent Agreement, and by execution of this Consent Agreement, each Transaction Party submits to and accepts the exclusive jurisdiction of those courts and irrevocably agrees to be bound by any final judgment rendered thereby in connection with this Agreement or any matter affecting MSG or the Rangers, in general. A summons or complaint in any such action or proceeding may be served in accordance with Section 11(c). Each Transaction Party irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it or he may now or hereafter have to the bringing of any such action or proceeding in any such jurisdiction.

(o)    Whenever the context may require, any pronoun shall include the corresponding masculine and feminine forms.

4297/54115-109  NYLIB2/1105401v2

04-06-2005  14:06  From-NATIONAL HOCKEY LEAGUE          212-789-2050        T-875  P.002/002  F-500

IN WITNESS WHEREOF, this Consent Agreement has been executed as of the date first written above.

NATIONAL HOCKEY LEAGUE

By: _____

    Name: David Zimmerman
    Title:  Senior Vice President & General Counsel

CABLEVISION PARTIES:

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation, its General Partner

By: _____
    Name:
    Title:

MSG EDEN CORPORATION

By: _____
    Name:
    Title:

RAINBOW GARDEN CORP.

By: _____
    Name:
    Title:

15

4297/54115-109 NYLIB2/1105401v2

IN WITNESS WHEREOF, this Consent Agreement has been executed as of the date first written above.

NATIONAL HOCKEY LEAGUE

By: _____
    Name: David Zimmerman
    Title:  Senior Vice President & General Counsel

**CABLEVISION PARTIES:**

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation, its General Partner

By: _____
    Name:
    Title:

MSG EDEN CORPORATION

By: _____
    Name:
    Title:

RAINBOW GARDEN CORP.

By: _____
    Name:
    Title:

15

04/07/2005 14:02 FAX  2124656011          MSGLEGAL                      ☑ 003/007
   APR-07-2005 THU 03:11 PM              FAX NO.                       P. 03
   04/07/2005 12:09 FAX: 2124658011      NSSLEGAL                      ☑ 003/007

**REGIONAL PROGRAMMING PARTNERS**

By: Rainbow Regional Holdings, LLC, general partner

By: _____
    Name:
    Title:

**REGIONAL MSG HOLDINGS LLC**

By: _____
    Name:
    Title:

**RAINBOW REGIONAL HOLDINGS, L.L.C.**

By: _____
    Name:
    Title:

**RRII I, L.L.C.**

By: _____
    Name:
    Title:

**RRII II, L.L.C.**

By: _____
    Name:
    Title:

16

428776113-103  NYLIB2/1105401v2

04/07/2005 14:02 FAX 2124656011         MSGLEGAL                                  ☑ 004/007
APR-07-2005 THU 03:11 PM                              FAX NO.                          P. 04
   04/07/2005 12:09 FAX 2124656011       MSGLEGAL                                    ☑ 004/001

RAINBOW MEDIA HOLDINGS LLC

By: _____

   Name:
   Title:


CSC HOLDINGS, INC.

By: _____

   Name:
   Title:


CABLEVISION SYSTEMS CORPORATION

By: _____

   Name:
   Title:

17

4287754115-109  NYLIB2/1105401v2

**FOX PARTIES:**

FOX SPORTS RPP HOLDINGS, INC.

By:
Name:
Title:
        Rita L. Tuzon
        Executive Vice President
        and General Counsel

FOX CABLE RPP HOLDINGS, INC.

By:
Name:
Title:
        Rita L. Tuzon
        Executive Vice President
        and General Counsel

FOX REGIONAL SPORTS MEMBER II, INC.

By:
Name:
Title:
        Rita L. Tuzon
        Executive Vice President
        and General Counsel

FOX CABLE NETWORKS, INC.

By:
Name:
Title:
        Rita L. Tuzon
        Executive Vice President
        and General Counsel

FOX SPORTS NET FINANCING, INC.

By:
Name:
Title:
        Rita L. Tuzon
        Executive Vice President
        and General Counsel

18

FOX REGIONAL SPORTS HOLDINGS, INC.

By:

Name:

Title:

Rita L. Tuxon
Executive Vice President
and General Counsel

FOX ENTERTAINMENT GROUP, INC.

By:

    Name:

    Title:

FEG HOLDINGS, INC.

By:

    Name:

    Title:

NEWS AMERICA INCORPORATED

By:

    Name:

    Title:

NEWS PUBLISHING AUSTRALIA LIMITED

By:

    Name:

    Title:

19

FOX REGIONAL SPORTS HOLDINGS, INC.

By:_____
    Name:
    Title:


FOX ENTERTAINMENT GROUP, INC.

By:_____
    Name:    Lawrence A. Jacobs
    Title:    Senior Executive Vice
              President


FEG HOLDINGS, INC.

By:_____
    Name:
    Title:


NEWS AMERICA INCORPORATED

By:_____
    Name:
    Title:


NEWS PUBLISHING AUSTRALIA LIMITED

By:_____
    Name:
    Title:

19

FOX REGIONAL SPORTS HOLDINGS, INC.

By: _____
    Name:
    Title:


FOX ENTERTAINMENT GROUP, INC.

By: _____
    Name: *Lawrence A Jacobs*
    Title: *Sr. Exec. Vice President*


FEG HOLDINGS, INC.

By: _____
    Name: *Preeila M. Wardynski*
    Title: *Vice President*


NEWS AMERICA INCORPORATED

By: _____
    Name: *Lawrence A. Jacobs*
    Title: *Sr. Exec. Vice President*


NEWS PUBLISHING AUSTRALIA LIMITED

By: _____
    Name: *Lawrence A Jacobs*
    Title: *Sr. Exec. Vice President*

FOX REGIONAL SPORTS HOLDINGS, INC.

By: _____
    Name:
    Title:

FOX ENTERTAINMENT GROUP, INC.

By: _____
    Name:
    Title:

FEG HOLDINGS, INC.

By: _____
    Name:
    Title:

NEWS AMERICA INCORPORATED

By: _____
    Name:
    Title:    Lawrence A. Jacobs
             Senior Executive Vice
             President

NEWS PUBLISHING AUSTRALIA LIMITED

By: _____
    Name:    Lawrence A. Jacobs
    Title:   Senior Executive Vice
             President

19

NEWS HOLDINGS LIMITED

By: _____

Name:

Title:    Lawrence A. Jacobs
          Director

NEWS AUSTRALIA HOLDINGS PTY LTD.

By: _____

Name:

Title:    Lawrence A. Jacobs
          Director

NEWS CORPORATION

By: _____

Name:

Title:    Lawrence A. Jacobs
          Senior Executive Vice
          President

20

Schedule A

Cablevision Parties


MADISON SQUARE GARDEN, L.P.
MSG EDEN CORPORATION
RAINBOW GARDEN CORP.
REGIONAL MSG HOLDINGS LLC
REGIONAL PROGRAMMING PARTNERS
RAINBOW REGIONAL HOLDINGS, L.L.C.
RRH I, L.L.C.
RRH II, L.L.C.
RAINBOW MEDIA HOLDINGS LLC
CSC HOLDINGS, INC.
CABLEVISION SYSTEMS CORPORATION

4297/54115-109  NYLIB2/1105401v2

Schedule B

Fox Parties


FOX SPORTS RPP HOLDINGS, INC.
FOX CABLE RPP HOLDINGS, INC.
FOX REGIONAL SPORTS MEMBER II, INC.
FOX CABLE NETWORKS, INC.
FOX SPORTS NET FINANCING, INC.
FOX REGIONAL SPORTS HOLDINGS, INC.
FOX ENTERTAINMENT GROUP, INC.
FEG HOLDINGS, INC.
NEWS AMERICA INCORPORATED
NEWS PUBLISHING AUSTRALIA LIMITED
NEWS HOLDINGS LIMITED (F/K/A THE NEWS CORPORATION LIMITED)
NEWS AUSTRALIA HOLDINGS PTY LTD.
NEWS CORPORATION

4297/54115-109  NYLIB2/1105401v2

Schedule C
Post-Restructuring Ownership of Madison Square Garden, L.P.

```
                    ┌─────────────────┐
                    │   Cablevision   │
                    │     Systems     │
                    │   Corporation   │
                    └─────────────────┘
                             │
                    ┌─────────────────┐
                    │      CSC        │
                    │    Holdings,    │
                    │      Inc.       │
                    └─────────────────┘
                             │
                    ┌─────────────────┐
                    │     Rainbow     │
                    │      Media      │
                    │  Holdings LLC   │
                    └─────────────────┘

    ┌───────────┐         ┌─────────────────┐         ┌───────────┐
    │ RRH I, LLC│         │     Rainbow     │         │RRH II, LLC│
    └───────────┘         │    Regional     │         └───────────┘
                          │  Holdings LLC   │
                          └─────────────────┘
                                   │  99.9%
                          ┌─────────────────┐
                   0.1%   │    Regional     │
                          │   Programming   │
                          │    Partners     │
                          └─────────────────┘

    ┌───────────────┐                    ┌─────────────────┐
    │ Regional MSG  │                    │     Rainbow      │
    │ Holdings LLC  │                    │     Garden       │
    └───────────────┘                    │   Corporation    │
                                         └─────────────────┘
                                                  │
                                         ┌─────────────────┐
                                         │    MSG Eden     │
                                         │   Corporation   │
                                         └─────────────────┘

            99.68%   ┌─────────────┐   0.32%
                     │   Madison   │
                     │   Square    │
                     │ Garden, L.P.│
                     └─────────────┘
```

NHL Consent Agreement
Schedule D

## TRANSACTION DOCUMENTS

1. Agreement of Merger dated February 5, 2003.

2. Distribution and Transfer Agreement, dated as of February 18, 2005, by and among Rainbow Regional Holdings LLC, Fox Sports RPP Holdings, Inc., Rainbow National Sports Holdings LLC, Fox Sports Nets National Network Holdings II, LLC, Rainbow Advertising Holdings LLC, Fox Sports Net National Ad Sales Holdings II, LLC, Rainbow Media Holdings, LLC, Fox Sports Net Bay Area Holdings, LLC, Regional Pacific Holdings II, LLC, Fox Sports Net Chicago Holdings, LLC and Fox Sports Net, Inc.

**Documents Delivered at Closing**

3. Contribution Agreement between Regional Programming Partners and Rainbow Media Holdings, LLC.

4. Distribution Agreement between Regional Programming Partners and Fox Sports RPP Holdings, Inc.

5. Assignment and Assumption Agreement between Fox Sports RPP Holdings, Inc. and Madison Square Garden, L.P.

6. Release executed by Rainbow Media Holdings LLC.

7. Release executed by Fox Sports Net, Inc.

NHL Consent Agreement
Schedule E

## LITIGATION AGAINST CABLEVISION PARTIES

CVC and CSC Holdings, Inc. (together, "the Company) is party to various lawsuits, some involving substantial amounts. Although the outcome of these matters cannot be predicted with certainty, management does not believe that the resolution of these lawsuits will have a material adverse effect on the financial position, results of operations or liquidity of the Company.

*At Home*

On April 25, 2001, At Home Corporation commenced a lawsuit in the Court of Chancery of the State of Delaware alleging that Cablevision had breached its obligations under certain agreements with At Home. The suit sought a variety of remedies including: rescission of the agreements between At Home and Cablevision and cancellation of all warrants held by Cablevision, damages, and/or an order prohibiting Cablevision from continuing to offer its Optimum Online service and requiring it to convert its Optimum Online customers to the Optimum@Home service and to roll out the Optimum@Home service. On September 28, 2001, At Home filed a petition for reorganization in federal bankruptcy court. In connection with the liquidation of At Home, the claims in this lawsuit, among others, were assigned to the General Unsecured Creditors Liquidated Trust ("GUCLT").

On June 26, 2003, the GUCLT initiated a separate action against Cablevision in the United States District Court for the Northern District of California. The California action stemmed from a May 1997 agreement between Cablevision and At Home that is no longer in effect. The GUCLT sought monetary damages due to the claimed failure by Cablevision to make alleged required payments to At Home during the 2001 calendar year.

On July 29, 2003, based on an agreed Stipulation filed jointly by Cablevision and the GUCLT, the Court dismissed the Delaware action with prejudice, other than solely with respect to the specific claims brought by the GUCLT in the California action. In December 2004, the parties reached a final settlement in the California action. A dismissal of all claims with prejudice was entered on December 17, 2004.

*YES Network*

On April 29, 2002, Yankees Entertainment & Sports Network, LLC (the "YES Network") filed a complaint and, on September 24, 2002, an amended complaint against the Company in the United States District Court, Southern District of New York. The lawsuit arose from the failure of the YES Network and the Company to reach agreement on the carriage of programming of the YES Network (primarily New York Yankees baseball games and New Jersey Nets basketball games) on the Company's cable

television systems. The amended complaint alleged a variety of anticompetitive acts and sought declaratory judgments as to violations of laws, treble damages and injunctive relief, including an injunction requiring the Company to carry the YES Network on its cable television systems. The Company believes that the claims set forth in the complaint were without merit. On June 28, 2004, a stipulated Order was entered dismissing all claims with prejudice.

On March 31, 2003, YES Network and Cablevision reached an agreement pursuant to which Cablevision began carrying programming of the YES Network. Under this agreement, Cablevision agreed to carry the YES Network programming for one year under interim arrangements while the parties sought to finalize the terms of a definitive long-term affiliation agreement and/or submitted the matter to arbitration. The matter was ultimately submitted to arbitration. The hearing before the arbitration panel ended in March 2004 and, through the arbitrators' decision and a new written agreement by the parties, established the terms for a definitive long-term affiliation agreement that is effective retroactively to March 31, 2003.

As part of the original March 31, 2003 agreement, Cablevision paid YES Network for certain revenue reductions that YES Network experienced while the interim agreement was in place, under the "most favored nations" provisions of YES Network's affiliation agreements with certain other distributors. On November 19, 2004, the parties entered into a subsequent agreement pursuant to which YES Network refunded to Cablevision approximately 60% of such prior payments and the parties provided each other with mutual releases with respect to the interim agreement.

*Tracking Stock Litigation*

In August 2002, purported class actions naming as defendants the Company and each of its directors were filed in the Delaware Chancery Court. The actions, which allege breach of fiduciary duties and breach of contract with respect to the exchange of the Rainbow Media Group tracking stock for Cablevision NY Group common stock, were purportedly brought on behalf of all holders of publicly traded shares of Rainbow Media Group tracking stock. The actions sought to (i) enjoin the exchange of Rainbow Media Group tracking stock for Cablevision NY Group common stock, (ii) enjoin any sales of "Rainbow Media Group assets," or, in the alternative, award rescissory damages, (iii) if the exchange is completed, rescind it or award rescissory damages, (iv) award compensatory damages, and (v) award costs and disbursements. The actions were consolidated into one action on September 17, 2002, and on October 3, 2002, the Company filed a motion to dismiss the consolidated action. The action was stayed by agreement of the parties pending resolution of a related action brought by one of the plaintiffs to compel the inspection of certain books and records of the Company. On October 26, 2004, the parties entered into a stipulation dismissing the related action, and providing for the Company's production of certain documents. On December 13, 2004, plaintiffs filed a consolidated amended complaint. The Company has filed a motion to dismiss the amended complaint, which is currently pending before the court.

In August 2003, a purported class action naming as defendants the Company, directors and officers of the Company and certain current and former officers and employees of the Company's Rainbow Media Holdings and American Movie Classics subsidiaries was filed in New York Supreme Court by the Teachers Retirement System of Louisiana. The actions relate to the August 2002 Rainbow Media Group tracking stock exchange and allege, among other things, that the exchange ratio was based upon a price of the Rainbow Media Group tracking stock that was artificially deflated as a result of the improper recognition of certain expenses at the national services division of Rainbow Media Holdings. The complaint alleges breaches by the individual defendants of fiduciary duties. The complaint also alleges breaches of contract and unjust enrichment by the Company. The complaint seeks monetary damages and such other relief as the court deems just and proper. On October 31, 2003, the Company and other defendants moved to stay the action in favor of the previously filed actions pending in Delaware or, in the alternative, to dismiss for failure to state a claim. On June 10, 2004, the court stayed the action on the basis of the previously filed action in Delaware. The Teachers Retirement System of Louisiana has filed a motion to vacate the stay in the New York action, and has simultaneously filed a motion to intervene in the Delaware action and to stay that action. The Company has opposed both motions. The Company believes the claims in both the Delaware action and the New York action are without merit and is contesting the lawsuits vigorously.

*Time Warner Litigation*

On November 14, 2003, American Movie Classics filed an action against Time Warner Entertainment, L.P. in New York State Supreme Court for declaratory relief and damages caused by Time Warner's anticipatory repudiation of its cable television affiliation agreement with American Movie Classics. American Movie Classics filed that action as a result of Time Warner's notice purporting to terminate the contract based upon Time Warner's allegation that American Movie Classics had changed its programming. The Company believes the notice was improper. American Movie Classics is seeking a declaratory judgment that it is entitled to full performance of the agreement, and, at its option, is entitled to rescind the agreement and recover damages. Time Warner filed an answer and counterclaims in December 2003 seeking, among other things, a declaratory judgment as to its right to terminate the affiliation agreement, an injunction requiring American Movie Classics to deliver a classic films channel and damages for an alleged breach of contract. Trial is currently scheduled for May 2005. The Company believes that Time Warner's counterclaims are without merit and is contesting them vigorously.

*The Wiz Bankruptcy*

TW, Inc. (TW), a former subsidiary of the Company and operator of The Wiz consumer retail electronics business, is the subject of a Chapter 11 bankruptcy proceeding in the U.S. Bankruptcy Court for the District of Delaware. In February 2005, TW filed a complaint in the bankruptcy proceeding seeking recovery of alleged preferential transfers in the aggregate amount of $193,456,955. Also in February 2005, the Official Committee of Unsecured Creditors of TW, Inc. (the Committee) filed a

motion seeking authority to assume the prosecution of TW's alleged preference claims and to prosecute certain other causes of action. The bankruptcy court granted the Creditors Committees motion on or about March 10, 2005, thereby authorizing the Committee, on behalf of TW, to continue the preference suit and to assert other claims against the Company. On March 12, 2005, the Creditors Committee filed a complaint in the bankruptcy court against the Company, certain of its subsidiaries, and certain present and former officers and directors, asserting preferential transfer claims allegedly totaling $193,311,567 as well as various other claims. The Company believes that all the claims asserted by TW and the Committee are without merit and intends to contest them vigorously.

*Director Litigation*

Cablevision has been named as a nominal defendant in a purported shareholder derivative complaint filed in the Court of Chancery of the State of Delaware. The action is brought derivatively on behalf of Cablevision and names as additional defendants Charles F. Dolan, the Chairman of Cablevision, and Rand Araskog, Frank Biondi, John Malone and Leonard Tow, each of whom was appointed as a director on March 2, 2005 by Mr. Dolan and certain other holders of the Company's Class B Common Stock. The complaint alleges that Charles F. Dolan, as the controlling Class B shareholder of Cablevision, by purporting to remove three Cablevision Board members (William J. Bell, Sheila Mahony and Steven Rattner) and replace them with the four new directors, wrongfully interfered with the Board's role in managing the affairs of Cablevision and sought to substitute his judgment of how to proceed with the VOOM service of Cablevision's Rainbow DBS subsidiary above that of the Board. The action seeks, among other things, to preliminarily and permanently enjoin Charles F. Dolan from interfering with the managerial prerogatives of Cablevision's Board; rescinding the purported appointment of the new directors; rescinding the removal of Mr. Bell, Ms. Mahony and Mr. Rattner as directors and restoring them to their positions as directors and directing Charles F. Dolan to account to Cablevision for its damages.

*New York Jets Litigation*

On March 16, 2005, the New York Jets LLC and Jets Development LLC ("Jets") filed a complaint in the U.S. District Court for the Southern District of New York against Cablevision, CSC Holdings, Inc., and Madison Square Garden LP. The complaint relates to various actions allegedly taken by defendants in connection with a proposed football stadium for the Jets on the West Side of Manhattan. Specifically, the complaint alleges: (1) that Cablevision "possesses monopoly power in the markets for facility rental and ticket sales for large-scale events in enclosed spectator facilities and suite rentals in Manhattan" and has acted anti-competitively in violation of Section 2 of the Sherman Act; (2) that defendants have tortiously interfered with the Jets' prospective business relations by making a "sham bid" for the MTA land that is the site of the proposed stadium "to injure the Jets and deprive them of an advantageous existing and prospective business relationship"; (3) that defendants have tortiously interfered with the Jets' prospective business relations with networks carried on defendants' cable system; and

(4) that defendants have "engaged in deceptive and misleading conduct, including dissemination of deceptive and materially misleading advertising and preventing dissemination of accurate information," in violation of New York General Business Law Section 349. The Company believes that all these claims are without merit and intends to contest them vigorously.

*Accounting Related Investigations*

The Securities and Exchange Commission and the U.S. Attorney's Office for the Eastern District of New York continue to conduct investigations into matters related to the improper expense recognition previously reported by the Company. In July 2004, in connection with the Company's response to the comments of the staff of the Division of Corporation Finance of the Securities and Exchange Commission on the Company's filings under the Securities Exchange Act of 1934, the Company provided information with respect to certain of its previous restatement adjustments relating to the timing of recognition of launch support, marketing and other payments under affiliation agreements. The staff of the Division of Enforcement of the Securities and Exchange Commission has contacted the Company to ask for additional information on these launch support, marketing and other payments.

NHL Consent Agreement
Schedule F

**Five Percent Owners of Cablevision Systems Corporation Stock**

(based on shareholder information known to Cablevision as of the date indicated)

Charles Dolan (March 31, 2005)
(including affiliates, family members, and trusts)

Equity interest -- 24.0%
Overall Voting Power -- 75.1%

Gabelli Asset Management, Inc. and affiliates (February 11, 2004)

Equity interest -- 7.85%
Overall Voting Power -- 2.6%

Citigroup Inc. and affiliates (December 31, 2004)

Equity interest -- 9.71%
Overall Voting Power -- 3.2%

Capital Group International, Inc. and affiliates (December 31, 2004)

Equity interest --7.89%
Overall Voting Power -- 2.6%

Goldman Sachs Asset Management, L.P. and affiliates (December 31, 2004)

Equity interest --6.06%
Overall Voting Power -- 2.0%

# SCHEDULE G



Note: ⌐¬ = Non-Fox entity

IN LAW LIBRARY
Binder