Exhibit 22

## CONSENT AGREEMENT

THIS CONSENT AGREEMENT is made as of July 15, 1999 by and among the following parties:

(i)    NATIONAL HOCKEY LEAGUE, a joint venture organized as an unincorporated association not-for-profit (the "NHL");

(ii)    MADISON SQUARE GARDEN, L.P., a Delaware limited partnership ("MSG");

(iii)    NEWS PUBLISHING AUSTRALIA LIMITED ("NPAL"), FOX ENTERTAINMENT GROUP, INC. ("FEG") and the other parties listed on schedule 1A (collectively with NPAL and FEG, the "Fox Parties"); and

(iv)    LIBERTY MEDIA CORPORATION ("LMC") and the other parties listed on schedule 1B (collectively with LMC, the "Liberty Parties").

Each of the parties listed above, other than the NHL, is sometimes referred to in this Consent Agreement individually as a "Transaction Party" and collectively with the parties other than the NHL as the "Transaction Parties".

### Background

(a)    Fox/Liberty Networks LLC ("F/LN") indirectly owns a 40% limited partnership interest in MSG, which in turn owns all of the assets comprising the New York Rangers hockey club (the "Rangers").

(b)    Certain of the Fox Parties and Liberty Parties have entered into an Agreement and Plan of Merger dated July 15, 1999 that, among other things, provides for the acquisition by NPAL of a 50% membership interest in F/LN beneficially owned by LMC (the "Interest") in exchange for shares of The News Corporation Limited ("News Corp.") that will result in LMC's beneficially owning approximately 8% of News Corp.'s outstanding shares (after giving effect to LMC's contemporaneous acquisition of beneficial ownership of certain additional News Corp. shares).

(c)    Immediately following that acquisition, the Interest acquired by NPAL will be contributed to FEG, which currently owns the remaining 50% membership interest on F/LN (this transaction and the transactions described in paragraph (b) are collectively referred to as the "Proposed Transactions").

(d)    The Proposed Transactions require the approval of the NHL.

-2-

(e)     The Transaction Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transactions, a complete list of which is provided on Schedule 1E (the "Transaction Documents").

(f)     The NHL has approved the Proposed Transactions, subject to the terms and conditions of this Consent Agreement.

(g)     The parties acknowledge that certain of the Transaction Parties are also parties to the Prior Consent Agreements (as defined in Section 8) with the NHL, which remain in full force and effect.  Accordingly, these parties have been excluded from certain provisions of this Consent Agreement to the extent they are already bound by the similar provisions of the Prior Consent Agreements.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, it is agreed as follows:

1.     NHL Consent.  Subject to the terms and conditions set forth in this Consent Agreement, the NHL hereby consents to the Proposed Transactions.  The consent granted herein is limited to the Proposed Transactions as described in this Consent Agreement and does not extend to any other transfer, sale, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG, or the ownership by any Transaction Party of any direct or indirect interest in any other Member Club, whether or not the same may be contemplated by the Transaction Documents.  Without limiting the preceding sentence, the NHL's consent specifically does not extend to any public offering of interests in, or spin-off or reorganization of, MSG or any of its direct or indirect owners (other than the Proposed Transactions), or any transfer resulting from the exercise of any right of first refusal, right of first negotiation, option, right to make additional capital contributions other than in accordance with current interests (except for changes of less than 5% in the aggregate that do not result in a change of effective control of any Transaction Party and that are otherwise in compliance with the NHL Constitution and Agreements, including conflicts of interest rules), or similar right that may be set forth in the Transaction Documents, other than as provided in connection with the Prior Consent Agreements.

2.     Performance of Agreements.  Subject to the terms of this Consent Agreement, each Transaction Party covenants with the NHL that it shall perform in all material respects all of the terms and conditions required of it under the Transaction Documents to which it is a party.

-3-

3.    NHL Constitution, Bylaws and Agreements.

(a)    Notwithstanding anything contained to the contrary in any of the Transaction Documents, for so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in a form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined in Section 10) from all Losses (as defined in Section 10) arising out of or relating to its former direct and indirect ownership interest in MSG, each of the Transaction Parties agrees for itself and each of its affiliates and subsidiaries over which it has or at the time of reference can exercise control (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties"), as follows:

(i)    that it shall, and shall cause its Related Parties to, be bound by and comply with (A) the NHL Constitution, (B) the NHL Bylaws, (C) all other rules, regulations, policies, resolutions and governing documents of the NHL and NHL Enterprises (as defined in Section 10(a)) and their respective affiliates and subsidiaries, (D) any other agreements and arrangements to which the Member Clubs generally are or may become subject or by which they or their assets are or may become bound, including the current and future Collective Bargaining Agreements between the NHL and the National Hockey League Players' Association, and all consent decrees and settlement agreements presently or hereafter in effect or entered into between or among the NHL and its Member Clubs or the  NHL and other persons in furtherance of NHL business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner or the NHL Constitution or Bylaws, and (E) the NHL Commissioner's interpretation of any of the foregoing, all as may be adopted, amended or modified from time to time and including the custom and practice thereunder (collectively, the "NHL Constitution and Agreements");

(ii)    that it shall not, and shall cause its Related Parties not to, take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs; and

(iii)    that it shall not, and shall cause its Related Parties not to, challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)    Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Transaction Party agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not materially adversely affect the Franchise (as defined in Section 4(a)) or the operations or financial condition of the Rangers and shall not

-4-

in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

4.    Location and Territory of Franchise.

(a)    Except as contemplated by the Prior Consent Agreements, each Transaction Party warrants and represents to the NHL that it has received no representation, commitment, promise or assurance from the NHL with respect to any future transfer of ownership or change in location of the NHL franchise known as the New York Rangers (the "Franchise").

(b)    Each of the Transaction Parties warrants and represents to the NHL that the acquisition or retention of its interest in the Rangers is for the purpose of owning and/or operating the Franchise.  MSG hereby agrees to operate the Franchise and to play the Rangers' schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements.  The Transaction Parties and the Rangers hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described in the Prior Consent Agreements, and each further represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

5.    Post Transaction Capital Structure and Other Conditions.  The NHL's consent granted in Section 1 hereof is subject to (a) consummation of the Proposed Transactions in all material respects in accordance with the Transaction Documents, including the payment, contribution or exchange of all consideration required thereunder, and (b) after giving effect to the consummation of the Proposed Transactions, the direct and indirect ownership of the Rangers being in accordance with Schedule 5.  If any of the requirements set forth in the preceding sentence has not been satisfied as of the applicable date, the consent of the NHL set forth in this Consent Agreement (but not the representations, warranties and obligations of the Transaction Parties hereunder) shall be void ab initio, and the Commissioner of the NHL (the "Commissioner") shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order rescission of any transaction consummated (or purportedly consummated) in violation of this Consent Agreement or the NHL Constitution and Agreements (other than changes in ownership at the FEG, News Corp. or AT&T Corp. levels), as well as the right to order such other relief or remedy as may be within his powers under the NHL Constitution and Agreements.  Except as permitted by the Prior Consent Agreements, the agreement with the NHL dated June 17, 1997 with respect to the facilities provided pursuant to the Credit Agreement dated as of June 6, 1997 among MSG, The Chase Manhattan Bank, as agent, and the lending institutions that are parties thereto (the "Lender Letter Agreement") and the agreement with the NHL dated March 10, 1995 with respect to facilities provided to Rainbow by Toronto-Dominion (Texas) Inc.,

-5-

as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent (the "Toronto-Dominion Pledge Letter"), none of the Transaction Parties has pledged the Franchise, its direct or indirect interest therein or any other hockey-related assets of MSG to secure any debt obligation nor shall any of them grant such a pledge without the NHL's prior written consent or otherwise in accordance with the NHL Constitution and Agreements.

      6.    <u>Ownership, Control, Change in Documents</u>.

      (a)    Each Transaction Party acknowledges to and agrees with the NHL that, notwithstanding any provision of any document or instrument (other than the Prior Consent Agreements to the extent applicable) to the contrary:

      (i)    The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed sale, pledge or other transfer of the assets comprising the Rangers, or any direct or indirect ownership interest in, MSG are subject to the NHL Constitution and Agreements, this Consent Agreement and, as applicable, the Prior Consent Agreements, the Lender Letter Agreement and the Toronto-Dominion Pledge Letter. Without limiting the foregoing, any sale, pledge, or other transfer of the assets comprising the Rangers, or a direct or indirect ownership interest in, MSG shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5, unless otherwise provided in the NHL Constitution and Agreements or the Prior Consent Agreements.

      (ii)    No Transaction Document shall be rescinded, canceled, terminated or amended in any respect which may or will materially change the terms of the Proposed Transactions, materially affect the conditions, rights, obligations or duties of the parties under the Transaction Documents, this Consent Agreement or the NHL Constitution and Agreements, or adversely affect the interests of the NHL, without the prior written approval of the NHL. The NHL shall be promptly notified in writing, pursuant to Section 11(c) hereof, of any proposed change in the Transaction Documents that has any material impact on the ownership or operation of the Rangers, whether or not the NHL has consent rights with respect to the change.

      (iii)    Without limiting the provisions of subsections (i) and (ii) above, each Transaction Party acknowledges and agrees that each of the below listed actions is subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall subject the Transaction Parties and the Franchise to all remedies and rights which may be enforced by the NHL or its Member Clubs:

      (A)    Subject to Section 6(b)(i) below, any change in the jurisdiction of formation or the form of entity of any of the Transaction Parties, including, without limitation, a change by MSG in its status as a Delaware limited partnership;

-6-

(B)     a liquidation, dissolution or transfer of a substantial part of the assets of MSG to another entity, if such assets include an interest in the Franchise; and

(C)     a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG.

(b)     (i)     Notwithstanding the provisions of Section 6(a)(i), the consent of the NHL shall not be required for any reorganization or transfer of any of the Fox Parties if, following such reorganization or transfer, News Corp. continues to own, directly or indirectly, all of the ownership and voting interests in the reorganized or transferred entity and News Corp. causes such reorganized or transferred entity to agree to be a "Fox Party" for purposes of the Consent Agreement.

(ii)     The Transaction Parties acknowledge and agree that any transfer of a direct ownership interest in News Corp., FEG or AT&T Corp. is subject to compliance with the NHL Constitution and Agreements. The Transaction Parties agree to be bound by any decision of the NHL and its Member Clubs, and any actions taken by the NHL or its Member Clubs, in connection with the exercise of the NHL's rights and remedies as contemplated by this Section 6(b)(ii) in respect of any decision by the NHL not to approve any person or entity to whom any direct ownership interest in FEG, News Corp. or AT&T Corp. is transferred (a "Transferee") without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements). The Affiliated NHL Parties shall be entitled to indemnification in accordance with Section 10 hereof with respect to all Losses arising out of any claim by a Transferee, any Transaction Party or any affiliate of a Transaction Party or Transferee with respect to the NHL's and its Member Clubs' decision not to approve such Transferee as a holder of an ownership interest in a Member Club or any actions taken by the NHL or its Member Clubs in connection with the exercise of its remedies contemplated by this Section 6(b)(ii) in respect of such decision not to approve such Transferee. The parties hereto agree that the failure to obtain the approval of the NHL and/or its Member Clubs for any transfer described in this Section 6(b)(ii) will not in and of itself affect the ability of the transferor to convey good title to the shares transferred. The NHL further agrees that it shall not seek to enjoin any sale of stock of FEG, News Corp. or AT&T Corp., provided that the NHL may seek injunctive or other relief to prevent such transferee from exercising dominion or control directly or indirectly over MSG or the assets of the Rangers.

(c)     Each of the Transaction Parties (other than News Corp., FEG and LMC) agrees that its stock or partnership certificate or other document evidencing ownership in such entity, if any, will bear a legend substantially as follows:

-7-

"The transfer, pledge or other disposition of [this limited partnership interest] [the stock reflected by this certificate] is subject to the approval and consent of the National Hockey League pursuant to the NHL Constitution and Bylaws and a certain Consent Agreement dated _____, 199__ with the NHL."

7.    Representations and Warranties.    (a) Subject to section 11(g), each Transaction Party hereby severally represents and warrants as of the date hereof to the NHL as follows:

(i)    If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.  If it is a limited partnership or limited liability company, it is a limited partnership or limited liability company validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.

(ii)    Such Transaction Party has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(iii)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Transaction Party enforceable against it in accordance with its terms.

(iv)    All balance sheets, income statements and other financial statements previously furnished by such Transaction Party to the NHL in connection with the application for approval of the Proposed Transactions have been prepared in accordance with generally accepted accounting principles (as in effect in the jurisdiction indicated, "GAAP") applied on a consistent basis and fairly present the financial position and results of operations of the relevant entity as of the dates and for the periods indicated.  All other information furnished by such Transaction Party to the NHL in connection with the request for approval of the Proposed Transactions is true and correct in all material respects and has not omitted any material statement which would make such information not misleading.

(v)    There is no action, suit, or proceeding pending against such Transaction Party or, in the case of MSG, against the Rangers, which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established in accordance with GAAP and which is reasonably likely to result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Transaction Party or, in the case of MSG, the Rangers, or which is reasonably likely to prevent or impede the consummation of the transactions contemplated by this Consent Agreement.  There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Transaction Party, requested by, any court or governmental agency

-8-

which has resulted or is reasonably likely to result in any material adverse change in the business, properties or assets, or in the condition (financial or otherwise) (a "Material Adverse Change") of such Transaction Party, or which is reasonably likely to prevent or impede the consummation of this Consent Agreement or the Proposed Transactions.

(vi)    To the best of the knowledge and belief of each such Transaction Party, such Transaction Party is in compliance in all material respects with all laws, regulations and orders, federal or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on the ability of such Transaction Party to conduct its business as currently conducted.

(vii)    All filings, if any, required to be made by such Transaction Party or any of its affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, have been made and all applicable waiting periods with respect to those filings, if any, have expired, and there are no outstanding requests for additional information under that act or any other law that has not been complied with. To the best knowledge of such Transaction Party, all other material consents, waivers, approvals, orders and authorizations of any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities), including, but not limited to, the Securities and Exchange Commission and all applicable exchanges and securities commissions, that are required to be obtained by such Transaction Party or any of its affiliates in connection with the Proposed Transactions have been obtained (or made) and are in full force and effect.

(viii)    Such Transaction Party has performed in all material respects all obligations required to be performed by such Transaction Party to date with respect to the Proposed Transactions and, except as disclosed in any schedules hereto, such Transaction Party is not in default under any material contract, agreement, lease, or other instrument relating to the Proposed Transactions to which such Transaction Party is a party or by which such Transaction Party is bound, except for defaults that individually or collectively, would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on such Transaction Party's ability to perform its obligations with respect to the Proposed Transactions. Except as provided in the Transaction Documents and the agreements referred to in the Prior Consent Agreements, there are no other arrangements, agreements or understandings to which such Transaction Party or any of its affiliates is a party, whether written or oral, with respect to the ownership, control, right to transfer direct or indirect interests in, or financing or management of MSG and the Rangers.

(ix)    The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Transaction Party, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Transaction Party's

-9-

properties or assets (except as contemplated or disclosed herein or the Schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Transaction Party is a party or by which such Transaction Party is bound, except for conflicts, breaches, terminations or defaults that individually or collectively would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party.

(x)    Except as described in the Prior Consent Agreements, and (A) if such Transaction Party is a Liberty Party, except for options, warrants, rights or convertible securities to purchase shares of AT&T Corp., or (B) if such Transaction Party is a Fox Party, except for options, warrants, rights or convertible securities to purchase shares of FEG or News Corp., none of which options, warrants, rights, or convertible securities, if exercised or converted with respect to AT&T, FEG or News Corp., as the case may be, would require NHL approval under the NHL Constitution and Agreements (because upon exercise or conversion they will constitute publicly traded shares representing an interest of less than 5% in the Rangers), there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, debt instruments or other economic rights in such Transaction Party nor does such Transaction Party have any obligation to issue any such options, warrants, rights or securities. Such Transaction Party presently has no intention of selling or otherwise transferring any of its direct or indirect interest in the Rangers or any of the assets of the Rangers, except (x) in connection with the Proposed Transactions, (y) as described in the preceding sentence or (z) for transactions that would not require NHL approval pursuant to the NHL Constitution and Agreements because they involve publicly traded shares representing an interest of less than 5% in the Rangers.

(xi)    Except as set forth in the Lender Letter Agreement and the Toronto-Dominion Pledge Letter, such Transaction Party has not pledged the assets constituting the Rangers or its direct or indirect ownership interest in the Rangers to secure indebtedness of any person or entity and each Transaction Party (including the Fox Parties) acknowledges that any such pledge is subject to the NHL Constitutions and Agreements.

(xii)    To the best of its knowledge, except as excluded from Section 10(a), such Transaction Party has no Claims (as defined in Section 10(a)) against any of the Affiliated NHL Parties (as defined in Section 10(a)).

(xiii)    Except for the ownership transfers described in the Recitals to this Agreement, the Proposed Transactions will have no effect on the ownership, management or control of MSG or the Rangers; and none of the agreements affecting the ownership, management or control of MSG or the Rangers are being amended, terminated or supplemented in connection with the Proposed Transactions.

(b)    MSG represents and warrants that schedule 5 contains a true and complete list, after giving effect to the Proposed Transactions, of each person or entity (other than

-10-

shareholders of Cablevision, AT&T Corp., News Corp., FEG and General Electric Company) that directly or indirectly owns an interest in MSG or the Rangers, and the direct or indirect percentage interest of such person or entity in MSG or the Rangers and each intermediate entity, and (ii) MSG has outstanding indebtedness for borrowed money of not more than $400 million.

(c)     The Fox Parties jointly and severally represent, warrant and agree that:

(i)     After giving effect to the Proposed Transactions, none of the Fox Parties nor any other subsidiary or affiliate of News Corp. owns any direct or indirect interest in MSG or the Rangers other than as set forth on schedule 1A.

(ii)     Schedule 7(c) contains a true and complete list of each person or entity that, to the best knowledge of the Fox Parties, and as of the date or dates indicated after giving effect to the Proposed Transactions, directly or indirectly owns of record or beneficially 5% or more of the outstanding capital stock or voting power of News Corp. or FEG, respectively, and the percentage interest of such person or entity in that public company.

(iii)     None of the Fox Parties nor any of their respective affiliates owns any direct, indirect, contingent or convertible interest in any Member Club other than MSG. All of the rights of the Fox Parties and their affiliates with respect to the Los Angeles Kings have been terminated without any exchange of consideration pursuant to the letter agreement dated July 15, 1999 among News America Incorporated, The Los Angeles Kings Hockey Club, L.P. (the "Kings") and the NHL, a copy of which is attached (the "Kings Letter Agreement"). The Kings Letter Agreement remains in full force and effect and there are no other agreements, arrangements or understandings, whether written or oral, among any of the Fox Parties or their affiliates and the Kings or its affiliates relating to the direct or indirect ownership, control, management or financing of the Kings. The Fox Parties acknowledge and agree that the Kings Letter Agreement shall not be amended, supplemented or waived in any respect, and that none of the Fox Parties nor any of their affiliates shall enter into any new agreement, arrangement or understanding with the Kings or any of its affiliates relating to the direct or indirect ownership, control, management or financing of the Kings, without obtaining the prior written approval of the NHL. The Fox Parties further acknowledge and agree that the acquisition of any direct, indirect, contingent or convertible interest in the Kings would be conditioned upon obtaining the prior approval of the NHL under the NHL Constitution and Agreements and that such acquisition would be expressly prohibited by the NHL's current rules regarding ownership conflicts.

(iv)     None of the Fox Parties is holding its interest in MSG for the benefit of any other person or entity, and none of the Fox Parties has any present intention of selling or otherwise transferring any of such interest.

(d)     The Liberty Parties jointly and severally represent, warrant and agree that, after giving effect to the Proposed Transactions, except through ownership of News Corp.'s stock

-11-

(as described in Recital (b) of this Consent Agreement), none of the Liberty Parties or any of their Related Parties, nor, to the knowledge of the Liberty Parties, any other subsidiary or affiliate of AT&T Corp., owns any direct or indirect, contingent or convertible interest in MSG, the Rangers or any other Member Club other than as set forth on schedule 7(d).

       (e)    The Fox Parties and the Liberty Parties jointly and severally represent, warrant and agree that:

       (i)    All of the Transaction Documents are listed on Schedule 1E; true and complete copies of each of those Transaction Documents have been delivered to the NHL.

       (ii)    Each of the Transaction Documents constitutes a valid and binding obligation enforceable against each of the parties thereto in accordance with its terms.

       (iii)    The Proposed Transactions have been consummated in accordance with the terms of the Transaction Documents.

      8.    <u>Confirmation of Agreements</u>. The Transaction Parties and the NHL confirm that (a) the Consent Agreement dated June 17, 1997, (b) subject to section 10 of the June 17, 1997 Consent Agreement, the Consent Agreement dated March 10, 1995, (c) the Consent Agreement dated December 18, 1997, (d) the Consent Agreement dated March 4, 1998, (e) the Consent Agreement dated May 22, 1998, (f) the Consent Agreement dated November 16, 1998, and (g) the Consent Agreement relating to the merger of AT&T Corp. and Tele-Communications, Inc. (collectively, the "Prior Consent Agreements"), have not been amended or modified by this Consent Agreement and remain in full force and effect. Each of the Fox Parties that is not a party to the December 18, 1997 Consent Agreement agrees to be bound by all of the terms and provisions of that agreement applicable to the "Fox Parties" referred to therein. Nothing in this Consent Agreement shall be construed to amend or modify the Lender Letter Agreement or the Toronto-Dominion Pledge Agreement, or any agreements in favor of the NHL given by Charles F. Dolan, James Dolan or trusts for the benefit of members of their families, including the agreement of Charles F. Dolan dated June 17, 1997 and the agreement of such trusts dated March 10, 1995. As applied to MSG the term "NHL Constitution and Agreements" when used in this Consent Agreement shall have the meaning given to such term in the Prior Consent Agreements.

      9.    <u>Financing Statements</u>. The Rangers and the Transaction Parties agree to execute any and all financing statements requested by the NHL which the NHL reasonably deems necessary to notify creditors of the Rangers and the Transaction Parties of the existence of Article III of the NHL Constitution and Agreements and this Consent Agreement provided that, in the case of News Corp., FEG and LMC, such financing statement shall be subject to the consent of the secured lenders, which will not be unreasonably withheld.

-12-

10.    Release and Limitation of Liability.

(a)    As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties on its own behalf and on behalf of its successors and assigns, but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever releases and discharges the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc. (collectively, but excluding the NHL, "NHL Enterprises"), all of the NHL's Member Clubs (except the Rangers) and each of their successors and assigns and any of their respective past, present or future owners, directors, officers, agents, trustees or employees in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), which, to the best knowledge of such Transaction Party, exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any NHL operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Transaction Parties of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on Schedule 10, or (ii) any amounts due to any of the Transaction Parties from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Transaction Party then the release contained in this paragraph shall not prohibit such Transaction Party from asserting a defense or counterclaim to that claim.

(b)    The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

(c)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with the Affiliated

-13-

NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to legal actions, proceedings or investigations against any Affiliated NHL Party (other than any action by any Transaction Party against any Affiliated NHL Party) with respect to the Proposed Transactions or the other transactions contemplated by the Transaction Documents.

(d)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

(i)    subject to the provisions of this Consent Agreement, MSG agrees to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission, of MSG or any of its subsidiaries or affiliates, and any of its owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such;

(ii)    subject to the provisions of this Consent Agreement, the Fox Parties and MSG jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful act or omission, of any of the Fox Parties, or in each case any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such; and

(iii)    subject to the provisions of this Consent Agreement, the Liberty Parties and MSG jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful act or omission, of any of the Liberty Parties, or in each case any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such.

(e)    Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Rangers or any other entity or (ii) to defer or off-set any distribution to the Rangers. Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of

-14-

its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Transaction Party or any other party.

(f)     No Affiliated NHL Party other than the NHL or NHL Enterprises shall be entitled to indemnification under this Section 10 unless the Commissioner determines that such indemnification is reasonable and appropriate and, in the case of Losses suffered by any Owner or Member Club for which indemnification is sought pursuant to Section 10(d), such Losses relate to the business of the NHL or NHL Enterprises or other entities owned by the Clubs generally or the game of NHL hockey. Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under the Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure. No claim against either an individual Member Club or which is based primarily on an act or omission of the Rangers for which indemnification is sought under this paragraph will be settled without the consent of the indemnifying parties, such consent not to be unreasonably withheld.

11.    Additional Provisions.

(a)     The Transaction Parties agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Franchise and shall be the obligation thereof.

(b)     This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred. This Consent Agreement may not be assigned except as set forth herein or with the written consent of the NHL. Any dispute between the parties hereunder relating to the subject matter hereof which is subject to Section 6.3 of the NHL Constitution shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner of the NHL shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to this provision. Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL or NHL Enterprises and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the

-15-

actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.

(c)    All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows:

If to the NHL:                National Hockey League
                             1251 Avenue of the Americas
                             New York, New York 10020-1198
                             Attention: General Counsel


with a copy to:               Proskauer Rose LLP
                             1585 Broadway
                             New York, NY 10036
                             Attention: Joseph M. Leccese, Esq.


If to MSG:                    Two Penn Plaza
                             14th Floor
                             New York, New York 10121
                             Attention: General Counsel


If to any of the              Fox Entertainment Group, Inc.
Fox Parties:                 1211 Avenue of the Americas
                             New York, New York 10036
                             Attention: Arthur M. Siskind, Esq.
                                        Senior Executive Vice President
                                        and General Counsel


If to any of the              c/o Liberty Media Corporation
Liberty Parties:             9197 South Peoria Street
                             Englewood, Colorado 80112
                             Attention: Charles Y. Tanabe, Esq.


or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

-16-

(d)    Subject to Section 8, this Consent Agreement, and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the Proposed Transactions. This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof. It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the NHL shall in addition to any other remedy available to it at law or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(b)(ii)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. The Transaction Parties also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Transaction Parties or their respective affiliates or subsidiaries may result in the exercise of rights and remedies against MSG or the Franchise, including, but not limited to, the involuntary termination of the Franchise. This agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule or construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)    This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)    No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)    The representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL. Accordingly, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party. By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. Notwithstanding the preceding provisions of this Section 11(g), absent

-17-

an express provision to the contrary, the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Entities by each of the Fox Parties shall be joint and several with the other Fox Parties, and by each of the Liberty Parties shall be joint and several with the other Liberty Parties.

(h)  The parties hereto acknowledge and agree that the failure by any of the Transaction Parties to comply in a material respect with any of the provisions of this Consent Agreement shall constitute a material breach of this Consent Agreement which entitles the NHL to take action permitted by the NHL Constitution and/or this Consent Agreement.  Said action includes, in addition to any and all other rights to which the NHL shall be entitled to under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that if, in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by a Transaction Party, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Transaction Party notice of and such opportunity to cure the default as the NHL deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner.  No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)  All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents.  For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control as between any of the Affiliated NHL Parties, on the one hand, and any of the Transaction Parties, on the other hand; the foregoing shall not, however, modify any obligations of any of the Transaction Parties to any of the other Transaction Parties.

(j)  The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

PAGE.04

JUL 06 2000 16:37

** TOTAL PAGE.04 **

-18-

IN WITNESS WHEREOF, this Consent Agreement has been executed as of the date first written above.

NATIONAL HOCKEY LEAGUE

By: _____

    Name: David Zimmerman

    Title: Vice President, General Counsel

MADISON SQUARE GARDEN, L.P.

By: MSG Eden Corporation,

    its General Partner

By: _____

**FOX PARTIES**

FOX SPORTS RPP HOLDINGS, LLC

By: _____

    Name: _____

    Title: _____

FOX SPORTS NETWORKS, LLC

By: _____

    Name: _____

    Title: _____

212-465-6011  MSG LEGAL                    446 P02   JUL 06 '00  15:53

-18-

IN WITNESS WHEREOF, this Consent Agreement has been executed as of the date first written above.

NATIONAL HOCKEY LEAGUE

By:_____
     Name:   David Zimmerman
     Title:   Vice President, General Counsel


MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
     its General Partner

By:_____
     V.1. + Asst Sec'y


**FOX PARTIES**

FOX SPORTS RPP HOLDINGS, LLC

By:_____
     Name:
     Title:


FOX SPORTS NETWORKS, LLC

By:_____
     Name:
     Title:

-18-

IN WITNESS WHEREOF, this Consent Agreement has been executed as of the date first written above.

NATIONAL HOCKEY LEAGUE

By:_____
      Name:  David Zimmerman
      Title:    Vice President, General Counsel

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
     its General Partner

By:_____

**FOX PARTIES**

FOX SPORTS RPP HOLDINGS, LLC

By: _Raymond L. Parish_
    Name:
    Title:

FOX SPORTS NETWORKS, LLC

By: _Raymond L. Parish_
    Name:
    Title:

-19-

FOX REGIONAL SPORTS HOLDINGS, INC.

By: *Raymond L. Parrish*
    Name:
    Title:


FOX REGIONAL SPORTS HOLDINGS II, INC.

By: *Raymond L. Parrish*
    Name:
    Title:


FOX REGIONAL SPORTS MEMBER, INC.

By: *Raymond L. Parrish*
    Name:
    Title:


FOX REGIONAL SPORTS MEMBER II, INC.

By: *Raymond L. Parrish*
    Name:
    Title:


FOX SPORTS NET FINANCING, LLC

By: *Raymond L. Parrish*
    Name:
    Title:

-20-

FXM NETWORKS, INC.

By: _Raymond L. Parish_
Name:
Title:


FEG HOLDINGS, INC.

By: _____
Name:
Title:


FOX ENTERTAINMENT GROUP, INC.

By: _____
Name:
Title:


NEWS AMERICA INCORPORATED

By: _____
Name:
Title:


NEWS PUBLISHING AUSTRALIA LIMITED

By: _____
Name:
Title:

-21-

NEWS INTERNATIONAL PLC

By: _____
     Name: Peter Stehrenberger
     Title: Director

NEWSCORP INVESTMENTS LIMITED

By: _____
     Name: Peter Stehrenberger
     Title: Director

THE NEWS CORPORATION LIMITED

By: _____
     Name: Arthur M. Siskind
     Title: Director

**LIBERTY PARTIES**

LIBERTY MEDIA CORPORATION

By: _____
     Name:
     Title:

LMC CAPITAL LLC

By: _____
     Name:
     Title:

-21-

NEWS INTERNATIONAL PLC

By:_____
       Name:
       Title:


NEWSCORP INVESTMENTS LIMITED


By:_____
       Name:
       Title:


THE NEWS CORPORATION LIMITED

By:_____
       Name:
       Title:


**LIBERTY PARTIES**

LIBERTY MEDIA CORPORATION


By:_____
       Name:
       Title:


LMC CAPITAL LLC


By:_____
       Name:
       Title:

-21-

NEWS INTERNATIONAL PLC

By: _____
        Name:
        Title:

NEWSCORP INVESTMENTS LIMITED

By: _____
        Name:
        Title:

THE NEWS CORPORATION LIMITED

By: _____
        Name:
        Title:

**LIBERTY PARTIES**

LIBERTY MEDIA CORPORATION

By: _____
        Name: Gary S. Howard
        Title: Executive Vice President

LMC CAPITAL LLC
By: Liberty Media Corporation

By: _____
        Name: Gary S. Howard
        Title: Executive Vice President

-22-

LIBERTY SPORTS, INC.

By: _____
      Name:   Gary S. Howard
      Title:    Executive Vice President

LMC REGIONAL SPORTS, INC.

By: _____
      Name:   Gary S. Howard
      Title:    Executive Vice President

LIBERTY NC, INC.

By: _____
      Name:   Gary S. Howard
      Title:    Executive Vice President

LIBERTY NC II, INC.

By: _____
      Name:   Gary S. Howard
      Title:    Executive Vice President

LMC BAY AREA SPORTS, INC.

By: _____
      Name:   Gary S. Howard
      Title:    Executive Vice President

Jul-06-2000  01:16pm  From-                                    T-307  P.005/021  F-472

-23-

LMC INTERNATIONAL, INC.

By:  _____

Name:  Gary S. Howard
Title:  Executive Vice President

<u>SCHEDULES</u>

The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein, except as expressly set forth in the consent agreement to which they are appended.

| | |
|---|---|
| Schedule 1A | Fox Parties |
| Schedule 1B | Liberty Parties |
| Schedule 1E | Transaction Documents |
| Schedule 5 | Ownership of Rangers |
| Schedule 7(c) | 5% Owners of FEG and News Corp. |
| Schedule 7(d) | Liberty Interests |
| Schedule 10 | Unreleased Claims |

07:51pm   From-

## SCHEDULE 1A - FOX PARTIES

| Owner | Type of Entity | Interest | Owned Entity |
|---|---|---|---|
| Fox Sports RPP Holdings, LLC ("Fox RPP Partner") | Delaware LLC | 40% partner | Regional Programming Partners ("RPP") |
| Fox Sports Networks, LLC ("Networks") (f/k/a Fox/ Liberty Networks, LLC) | Delaware LLC | 99% 99% | Fox Sports Net, LLC ("FSN") Fox RPP Partner |
| Fox Regional Sports Member, Inc. ("Fox Member") | Delaware corporation | .5% .5% | FSN Fox RPP Partner |
| Fox Regional Sports Member II, Inc. ("Fox Member II") | Delaware corporation | .5% .5% | FSN Fox RPP Partner |
| Fox Sports Net Financing LLC ("Financing LLC") (f/k/a Liberty/Fox Sports Financing, LLC) | Delaware LLC | 38.32% | Networks |
| Fox Regional Sports Holdings, Inc. ("Fox Holdings") | Delaware corporation | 50%[1] 30.84% 100% 100% | Financing LLC Networks Fox Member Fox Member II |
| Fox Regional Sports Holdings II, Inc ("Fox Holdings II") | Delaware corporation | 50% 30.84% | Financing LLC Networks |
| FXM Networks, Inc ("FX") | Delaware corporation | 100% | Fox Holdings |
| Fox Entertainment Group, Inc. ("FEG") | Delaware corporation | 100% 100% | FX Fox Holdings II |
| FEG Holdings, Inc. ("FEG Holdings") | Delaware corporation | 82.8% (97.8% voting interest) | FEG |
| News America Incorporated ("News America") | Delaware corporation | 100% | FEG Holdings |
| News Publishing Australia Limited ("News Publishing") | Delaware corporation | 80% | News America |

---

[1]   Interest formerly held by FEG, the indirect holder of 100% of the outstanding capital stock of Fox Holdings.

d7:52pm   From-                                                    1-115   r.04/05   r-0/t

| Owner | Type of Entity | Interest | Owned Entity |
|---|---|---|---|
| News International plc | England corporation | 20% | News America |
| Newscorp Investments Limited | England corporation | 100% | News International plc |
| The News Corporation Limited | South Australia corporation | 100% 100% | News Publishing Newscorp Investments Limited |

06-28-00    01:29pm    From-SHERMAN & HOWARD                    3032969362              T-645    P.28/30    F-021

## Schedule 1(b)

## Liberty Parties

Liberty Media Corporation
LMC Capital LLC
Liberty Sports, Inc.
LMC Regional Sports, Inc.
Liberty NC, Inc.
Liberty NC II, Inc.
LMC Bay Area Sports, Inc.
LMC International, Inc.

07:52pm   From-

# SCHEDULE 1E - TRANSACTION DOCUMENTS

1.  Agreement and Plan of Merger, dated as of July 15, 1999, by and among Liberty Media Corporation, LMC Newco U.S., Inc., New LMC KBL, Inc., New LMC Bay Area, Inc., New LMC Chicago, Inc., New LMC Northwest, Inc., New LMC Upper Midwest, Inc., The News Corporation Limited and News Publishing Australia Limited

2.  Parents' Agreement, dated as of July 15, 1999, by and among Liberty Media Corporation and The News Corporation Limited

3.  Subscription Agreement, dated as of July 15, 1999, by and between the News Corporation and Liberty NC III, Inc.

212-465-6011   MSG LEGAL                    399 P03    JUN 30 '00   10:24

Schedule 5 (NHL)
as of July 15, 1999

## MADISON SQUARE GARDEN, L.P. OWNERSHIP

<u>NBC Cable Holding, Inc.</u>
    National Broadcasting Company, Inc.          100%

<u>Cablevision Systems Corporation</u> (f/k/a CSC Parent Corporation)

    <u>CSC Holdings, Inc.</u> (f/k/a Cablevision Systems Corporation)
        Cablevision Systems Corporation          100%

        <u>Rainbow Media Holdings, Inc. ("RMHI")</u>
            CSC Holdings, Inc.          75%
            NBC Cable Holding, Inc.          25%

            <u>Rainbow Media Sports Holdings, Inc.</u>
                RMHI          100%

            <u>Rainbow Program Enterprises, L.P.</u>
                <u>General Partner</u>
                    RMHI
                <u>Limited Partners</u>          5%
                Class A
                    Cablevision Programming Incorporated          30.0%
                    (100% owned by RMHI)
                Class C
                    RMHI          62.985%
                    Cablevision Systems Corporation          2.015%

            <u>Rainbow Regional Holdings LLC</u>
                Rainbow Media Sports Holdings, Inc.          95.21%
                Rainbow Program Enterprises, L.P.          4.79%

                <u>Regional Programming Partners</u>
                    Rainbow Regional Holdings LLC          60%
                    Fox Sports RPP Holdings, LLC          40%

News America Incorporated
    News Publishing Australia Limited     80%
    News International plc     20%

FEG Holdings, Inc.
    News America Incorporated     100%

Fox Entertainment Group, Inc.
    FEG Holdings, Inc.     82.8%
         (97.8% voting)

Fox Sports Networks, LLC
    FEG Holdings, Inc.
    (intermediate ownership as disclosed by Fox)     100%

Fox Sports RPP Holdings, LLC
    Fox Sports Networks, LLC     100%

Regional MSG Holdings LLC ("Regional MSG")
    Regional Programming Partners     100%

Rainbow Garden Corp.
    Regional Programming Partners     100%

MSG Eden Corporation
    Rainbow Garden Corp.     100%

Madison Square Garden, L.P.
    General Partner
    MSG Eden Corporation     .32%
    Limited Partner
    Regional MSG     99.68%

Additional information concerning ownership of Fox entities as provided by Fox.

Schedule 7 (c)

## 5% OWNERS OF FEG AND NEWS CORPORATION

**Stock Ownership of Fox Entertainment Group, Inc.**

After the transactions with Liberty Media Corporation and the contribution of the acquired assets to Fox Entertainment Group, Inc. in exchange for shares of Class A Common Stock, all of the 547,500,000 outstanding shares of Class B Common Stock (entitled to 10 votes per share) and 51,759,834 of the outstanding shares of Class A Common Stock of Fox Entertainment Group are owned by FEG Holdings, Inc., a Delaware corporation. FEG Holdings, Inc. is an indirect wholly owned subsidiary of News Corporation. Such shares will entitle FEG Holdings, Inc. to approximately 97.8% of the voting power of FEG.

Mr. K. Rupert Murdoch owns all of the 7,600 outstanding shares of voting preferred stock of FEG's subsidiary, Fox Television Holdings, Inc., representing 76% of the voting power of such company.

**Stock Ownership of The New Corporation Limited (As of September 1, 1999)**

| Name | Percentage of Class |
|------|---------------------|
| Cruden Investments Pty. Limited | 20.7% (30.4% of voting stock) |
| K. Rupert Murdoch | 20.7% (30.4% of voting stock) |
| Capital Research and Management | 6.5% (7.0% of voting stock) |
| Liberty Media Corporation | 7.7% (0.0% of voting stock) |

Schedule 7(d)

(NHL Consent Agreement)

Liberty Interests

1.    Any indirect interest in MSG, the Rangers or any other Member Club held by any Liberty Party through its ownership of News Corp. stock.

2.    Any indirect interest in the Atlanta Thrashers or any other Member Club held by any Liberty Party through its ownership of stock in Time Warner, Inc.

3.    6.52% interest in Ascent Arena Company, LLC (includes a 6.52% profits interest related to the Avalanche) held by Liberty Denver Arena LLC, whose sole member is LMC Denver Arena, Inc., an indirect wholly owned subsidiary of Liberty Media Corporation.

<u>Schedule 10 - Unreleased Claims</u>

1.  Any and all claims that FSN Rocky Mountain may have against the Colorado Avalanche regarding the potential failure to provide telecast exclusivity to FSN RM beyond a 50-mile radius of Denver.

2.  Any and all claims that FSN South against Turner Broadcasting Systems (or its affiliates) or the Atlanta Thrashers regarding distribution of Thrasher's games on a Turner-owned regional cable network.

-17-

Club Acknowledgment


The undersigned acknowledges the foregoing Consent Agreement; confirms the accuracy of the representations and warranties of the Transaction Parties contained therein; acknowledges and agrees to the provisions of sections 3, 4, 5, 7, 8 and 9 and, to the extent applicable, to their application to this acknowledgment; releases the Affiliated NHL Parties to the same extent as if it were a Transaction Party for purposes of section 8; agrees to indemnify the Affiliated NHL Parties as provided in section 8; and agrees to be responsible to the Affiliated NHL Parties for any breach by any of the Transaction Parties of the terms thereof.


MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation, its
      general partner

By: _____