Exhibit 24

## CONSENT AGREEMENT

THIS CONSENT AGREEMENT is made this 22nd day of May, 1998 by and among the following parties:

(i)    NATIONAL HOCKEY LEAGUE, a joint venture organized as an unincorporated association not-for-profit (the "NHL");

(ii)    MADISON SQUARE GARDEN, L.P., a Delaware limited partnership ("MSG"); and

(iii)    STARWOOD HOTELS & RESORTS WORLDWIDE, INC., a Maryland corporation ("Starwood Corp"), STARWOOD HOTELS & RESORTS, a Maryland real estate investment trust ("Starwood Trust" and together with Starwood Corp, the "Starwood Entities"), ITT MSG INC., a Delaware corporation ("ITT MSG"), ITT SHERATON CORPORATION, a Delaware corporation, and ITT CORPORATION, a Nevada corporation ("ITT") (collectively, including the Starwood Entities, the "Starwood Parties").

Each of the parties listed above, other than the NHL, is sometimes referred to in this Consent Agreement individually as an "Owner" and collectively with the parties other than the NHL as the "Owners".

### Background

(a)    On November 12, 1997, certain of the Starwood Parties entered into an Amended and Restated Agreement and Plan of Merger (the "Merger Agreement") pursuant to which a corporation wholly owned by the Starwood Entities was merged with and into ITT and ITT became a direct wholly-owned subsidiary of Starwood Corp (the "Proposed Transaction").

(b)    ITT MSG, an indirect wholly-owned subsidiary of ITT, directly owns an approximately 7.8% limited partnership interest in MSG, which in turn owns all of the assets comprising the New York Rangers hockey club (the "Rangers").

(c)    The Proposed Transaction requires the approval of the NHL Executive Committee.

(d)    The Starwood Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transaction, a complete list of which is provided on schedule 1 (the "Transaction Documents").

(e)    On April __, 1998, the NHL Executive Committee approved the Proposed Transaction, subject to the terms and conditions of this Consent Agreement, which is executed by the NHL in accordance with the authority granted by the Executive Committee.

-2-

(f)    The parties acknowledge that certain of the Owners are also parties to the Prior Consent Agreements (as defined in Section 8) with the NHL, which remain in full force and effect. Accordingly, these parties have been excluded from certain provisions of this Consent Agreement to the extent they are already bound by the similar provisions of the Prior Consent Agreements.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, it is agreed as follows:

1.    NHL Consent.  Subject to the terms and conditions set forth in this Consent Agreement, the NHL hereby consents to the Proposed Transaction.  The consent granted herein is limited to the Proposed Transaction as described in this Consent Agreement and does not extend to any other transfer, sale, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG, whether or not the same may be contemplated by the Transaction Documents, and specifically does not extend to any public offering of interests in, or spin-off or reorganization of, any of the Owners.

2.    Performance of Agreements.    Subject to the terms of this Consent Agreement, each Owner covenants with the NHL that it shall perform all of the terms and conditions required of it under the Transaction Documents to which it is a party.

3.    NHL Constitution, Bylaws and Agreements.

(a)    Notwithstanding anything contained to the contrary in any of the Transaction Documents, for so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in a form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined in Section 9) from all Losses (as defined in Section 9) arising out of or relating to its former direct and indirect ownership interest in MSG, each of the Starwood Parties agrees for itself and each of its affiliates and subsidiaries over which it has or at the time of reference can exercise control (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties"), as follows:

(i)    that it shall, and shall cause its Related Parties to, be bound by and comply with (A) the NHL Constitution, (B) the NHL Bylaws, (C) all other rules, regulations, policies, resolutions and governing documents of the NHL and NHL Enterprises (as defined in Section 9(a)) and their respective affiliates and subsidiaries, (D) any other agreements and arrangements to which the Member Clubs generally are or may become subject or by which they or their assets are or may become bound, including the current and future Collective Bargaining Agreements between the NHL and the National

-3-

Hockey League Players' Association, and all consent decrees and settlement agreements presently or hereafter in effect or entered into between or among the NHL and its Member Clubs or the NHL and other persons in furtherance of NHL business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the Commissioner of the NHL (the "Commissioner") or the NHL Constitution or Bylaws, and (E) the Commissioner's interpretation of any of the foregoing, all as may be adopted, amended or modified from time to time and including the custom and practice thereunder (collectively, the "NHL Constitution and Agreements");

   (ii) that it shall not, and shall cause its Related Parties not to, take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs; and

   (iii) that it shall not, and shall cause its Related Parties not to, challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

   (b) Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Owner agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not materially adversely affect the Franchise (as defined in Section 4(a)) or the operations or financial condition of the Rangers and shall not in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

   4. Location and Territory of Franchise.

   (a) Except as contemplated by the Prior Consent Agreements, each Owner warrants and represents to the NHL that it has received no representation, commitment, promise or assurance from the NHL with respect to any future transfer of ownership or change in location of the NHL franchise known as the New York Rangers (the "Franchise").

   (b) Each of the Owners warrants and represents to the NHL that the acquisition or retention of its interest in the Rangers is for the purpose of owning and/or operating the Franchise and hereby agrees to operate the Franchise and to play the Rangers' schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements. The territorial definition of the Franchise shall be as provided for in the NHL Constitution and Agreements. The Owners hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described on Exhibit A hereto and each further

-4-

represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

5.    <u>Post Transaction Capital Structure and Other Conditions</u>.    The NHL's consent granted in Section 1 hereof is subject to (a) consummation of the Proposed Transaction having been in all material respects in accordance with the Transaction Documents, and (b) after giving effect to the consummation of the Proposed Transaction, the direct and indirect ownership of the Rangers being in accordance with schedules 7(b)-1 and 7(c)-1.  If any of the requirements set forth in the preceding sentence has not been satisfied, the consent of the NHL set forth in this Consent Agreement (but not the representations, warranties and obligations of the Owners hereunder) shall be void <u>ab initio</u>, and the Commissioner shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order such relief or remedy as may be within his powers under the NHL Constitution and Agreements.  Except as permitted by the Prior Consent Agreements, the agreement with the NHL dated June 17, 1997 with respect to the facilities provided pursuant to the Credit Agreement dated as of June 6, 1997 among MSG, The Chase Manhattan Bank, as agent, and the lending institutions that are parties thereto (the "Lender Letter Agreement") and the agreement with the NHL dated March 10, 1995 with respect to facilities provided to Rainbow Media Holdings, Inc. by Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent (the "Toronto-Dominion Pledge Letter"), and except as set forth on schedule 5, none of the Owners has pledged the Franchise, its direct or indirect interest therein or any other hockey-related assets of MSG to secure any debt obligation nor shall any of them grant such a pledge without the NHL's prior written consent.

6.    <u>Ownership, Control, Change in Documents</u>.

Each Owner acknowledges to and agrees with the NHL that, notwithstanding any provision of any document or instrument (other than the Prior Consent Agreements to the extent applicable) to the contrary:

(i)    The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed sale, pledge or other transfer of the assets comprising the Rangers, or any direct or indirect ownership interest in, MSG are subject to the NHL Constitution and Agreements, this Consent Agreement, the Prior Consent Agreements, the Lender Letter Agreement and the Toronto-Dominion Pledge Letter.  Without limiting the foregoing, any sale, pledge, or other transfer of the assets comprising the Rangers, or a direct or indirect ownership interest in, MSG shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5, unless otherwise provided in the NHL Constitution and Agreements or the Prior Consent Agreements.

-5-

(ii)     No Transaction Document to which such Owner is a party (including, without limitation, the Merger Agreement) shall be rescinded, canceled, terminated or amended in any respect which may or will materially change the terms of the Proposed Transaction, materially affect the conditions, rights, obligations or duties of the parties under the Transaction Document, this Consent Agreement or the NHL Constitution and Agreements, or adversely affect the interests of the NHL, without the prior written approval of the NHL. The NHL shall be promptly notified in writing, pursuant to Section 11(c) hereof, of any proposed change, whether or not the NHL has consent rights with respect to the change.

(iii)     Without limiting the provisions of subsections (i) and (ii) above, each Owner acknowledges and agrees that each of the below listed actions are subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall subject the Owners and the Franchise to all remedies and rights which may be enforced by the NHL or its Member Clubs:

(A)     any change in the jurisdiction of formation or the form of entity of any of the Owners, including, without limitation, a change by MSG in its status as a Delaware limited partnership;

(B)     a liquidation, dissolution or transfer of a substantial part of the assets of any Owner to another entity, if such assets include a direct or indirect interest in the Franchise;

(C)     a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG; and

(D)     except as may otherwise be specifically authorized by the Prior Consent Agreements, any transaction that will result in a change, directly or indirectly, in the ownership of any Owner, to the extent such change would constitute a transfer of a membership or ownership interest in a Member Club under Article 3.5 of the NHL Constitution. The Owners acknowledge and agree that any transfer of a direct ownership interest in the Starwood Entities is subject to compliance with the NHL Constitution and Agreements and that to the extent required by the NHL Constitution and Agreements they shall use reasonable efforts to obtain the NHL's prior approval of such transactions whenever practicable. The Owners agree to be bound by any decision of the NHL and its Member Clubs, and any actions taken by

-6-

the NHL or its Member Clubs, in connection with the exercise of the NHL's rights and remedies as contemplated by this Section in respect of such decision not to approve any person or entity to whom any direct ownership interest in the Starwood Entities is transferred without the NHL's written consent (if such consent is required under the NHL Constitution and Agreements) (a "Transferee") as a holder of an ownership interest in a Member Club. The Affiliated NHL Parties shall be entitled to indemnification in accordance with Section 9 hereof with respect to all Losses arising out of any claim by a Transferee, any Owner or any affiliate of an Owner with respect to the NHL's and its Member Clubs' decision not to approve such Transferee as a holder of an ownership interest in a Member Club or any actions taken by the NHL or its Member Clubs in connection with the exercise of its remedies contemplated by this Section in respect of such decision not to approve such Transferee. The parties hereto agree that the failure to obtain the approval of the NHL and/or its Member Clubs for any transfer described in this paragraph will not in and of itself affect the ability of the transferor to convey good title to the shares transferred. The NHL further agrees that it shall not seek to enjoin any sale of shares of the Starwood Entities, provided that the NHL may seek injunctive or other relief to prevent such transferee from exercising dominion or control directly or indirectly over MSG or the assets of the Rangers.

7.     Representations and Warranties.  (a) Subject to Section 11(g), each Owner hereby severally represents and warrants as of the date hereof to the NHL as follows:

(i)     If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its formation, and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its business. If it is a limited partnership or limited liability company, it is a limited partnership or limited liability company validly existing and in good standing under the laws of the state of its formation, and has all requisite partnership or limited liability company power and authority to own, operate and lease its properties and to carry on its business. The Starwood Trust is a real estate investment trust duly organized, validly excising and in good standing under the law of the state of Maryland, and has all requisite trust power and authority to own, operate and lease its properties and to carry on its business.

-7-

(ii)    Such Owner has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(iii)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Owner enforceable against it in accordance with its terms.

(iv)    All balance sheets, income statements and other financial statements previously furnished by such Owner to the NHL in connection with the application for approval of the Proposed Transaction have been prepared in accordance with generally accepted accounting principles (as in effect in the jurisdiction indicated, "GAAP") applied on a consistent basis and fairly present the financial position and results of operations of the relevant entity as of the dates and for the periods indicated subject, in the case of unaudited financial statements, to normal year-end adjustments and the absence of footnotes.  All other information furnished by such Owner to the NHL in connection with the request for approval of the Proposed Transaction is true and correct in all material respects and has not omitted any material statement which would make such information not misleading.

(v)    There is no action, suit, or proceeding pending against such Owner or, in the case of MSG, against the Rangers, which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established in accordance with GAAP and which is reasonably likely to result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Owner or which is reasonably likely to prevent or impede the consummation of the Proposed Transaction.  There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Owner, requested by, any court or governmental agency which has resulted or is reasonably likely to result in any material adverse change in the business, properties or assets, or in the condition (financial or otherwise) (a "Material Adverse Change") of such Owner.

(vi)    To the best of the knowledge and belief of each such Owner, such Owner is in compliance in all material respects with all laws, regulations and orders, federal or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to such Owner or have a material adverse effect on the ability of such Owner to conduct its business as currently conducted.

(vii)    All filings, if any, required to be made by such Owner or any of its affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, have been made and all applicable waiting periods with respect to those filings, if any, have expired, and there are no outstanding requests for additional information under that act or any other law that has not been complied with.  To the best knowledge of such Owner, all other consents,

-8-

waivers, approvals, orders and authorizations (together, "Consents") of any governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities), and all material Consents of any other persons or entities, that are required to be obtained by such Owner or any of its affiliates in connection with the Proposed Transaction have been obtained (or made) and are in full force and effect.

(viii)   Such Owner has performed in all material respects all obligations required to be performed by such Owner to date with respect to the Proposed Transaction and, except as disclosed in any schedules hereto, such Owner is not in default under any material contract, agreement, lease, or other instrument relating to the Proposed Transaction to which such Owner is a party or by which such Owner is bound, except for defaults that individually or collectively, would not be reasonably likely to result in a Material Adverse Change with respect to such Owner or have a material adverse effect on such Owner's ability to perform its obligations with respect to the Proposed Transaction.  Except as provided in the Transaction Documents and the agreements referred to in the Prior Consent Agreements, there are no other arrangements, agreements or understandings to which such Owner or any of its affiliates is a party, whether written or oral, with respect to the ownership, control, right to transfer direct or indirect interests in, or financing or management of MSG and the Rangers.

(ix)   The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Owner, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Owner's properties or assets (except as contemplated or disclosed herein or the schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Owner is a party or by which such Owner is bound, except for conflicts, breaches, terminations or defaults that individually or collectively would not be reasonably likely to result in a Material Adverse Change with respect to such Owner.

(x)   Except as described in the Prior Consent Agreements and in Section 7(c)(iv) of this Consent Agreement, there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, debt instruments or other economic rights in such Owner (but, in the case of the Starwood Entities, only to the extent such acquisition would result in any person or entity owning 5% or more of the shares or other economic rights or voting power of any of the Starwood Entities) nor does such Owner have any obligation to issue any such options, warrants, rights or securities.  Such Owner presently has no intention of selling or otherwise transferring any of its direct or indirect interest in the Rangers or any of the assets of the Rangers, except (x) in connection with the Proposed Transaction, (y) as described in the preceding sentence or (z) for transactions that would not require NHL approval pursuant to the NHL Constitution and Agreements because they involve publicly traded shares representing an interest of less than 5% in the Rangers.

-9-

(xi)    Except as set forth in the Lender Letter Agreement and the Toronto-Dominion Pledge Letter, and on schedule 5, such Owner has not pledged the assets constituting the Rangers or its direct or indirect ownership interest in the Rangers to secure indebtedness of any person or entity and each Owner (including the Starwood Parties) acknowledges that any such pledge is subject to the NHL Constitutions and Agreements.

(xii)    To the best of its knowledge, except as excluded from Section 9(a), such Owner has no Claims (as defined in Section 9(a)) against any of the Affiliated NHL Parties.

(b)    MSG represents and warrants that schedule 7(b)-1 contains a true and complete list, after giving effect to the Proposed Transaction, of each person or entity (other than shareholders of Cablevision Systems Corporation, Tele-Communications, Inc., News Corp., the Starwood Entities and General Electric Company) that directly or indirectly owns an interest in MSG or the Rangers, and the direct or indirect percentage interest of such person or entity in MSG or the Rangers and each intermediate entity, and (ii) MSG has outstanding indebtedness for borrowed money of not more than $400 million.

(c)    The Starwood Parties represent and warrant that:

(i)    Starwood Corp directly owns all of the outstanding shares of capital stock of ITT, ITT directly owns all of the outstanding shares of capital stock of ITT Sheraton Corporation, ITT Sheraton Corporation directly owns all of the outstanding shares of capital stock of ITT MSG and ITT MSG directly owns a 7.8% limited partnership interest in MSG;

(ii)    except as described in the preceding clause (i), none of the Starwood Parties nor any of their Related Parties owns any direct or indirect interest in MSG or the Rangers, or any interest in any other Member Club;

(iii)    schedule 7(c)-1 contains a true and complete list of each person or entity that, to the best knowledge of the Starwood Parties, and as of the date or dates indicated after giving effect to the Proposed Transaction and the recent transaction with Westin Worldwide, directly or indirectly owns of record or beneficially 5% or more of the outstanding shares of capital stock of Starwood Corp or beneficial interests in Starwood Trust, or voting power of either of them, and the percentage interest of such person or entity in the Starwood Entity;

(iv)    except as set forth on schedule 7(c)-2, to the best of the knowledge of the Starwood Parties, there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, or the exercise of which would result in any person or entity owning, 5% or more of the shares, partnership interests, debt instruments or other economic rights or voting power in any of the Starwood Parties or any of their subsidiaries, nor does such Starwood Party or subsidiary have any obligation to issue any such options, warrants, rights or securities;

-10-

(v)    none of the hotels or other properties owned (in whole or in part) or controlled by any of the Starwood Parties or their Related Parties, or which any of the Starwood Parties or their Related Parties have agreed to acquire ownership or control of, accepts wagering on NHL games;

(vi)    all of the Transaction Documents are listed on schedule 1; true and complete copies of each of those Transaction Documents have been delivered to the NHL;

(vii)    each of the Transaction Documents constitutes a valid and binding obligation enforceable against each of the parties thereto in accordance with its terms; and

(viii)    the Proposed Transaction has been consummated in accordance with the terms of the Transaction Documents.

8.    Confirmation of Agreements.  The Owners and the NHL confirm that all prior Consent Agreements entered into with the NHL regarding the Rangers, including, (a) the Consent Agreement dated June 17, 1997, (b) subject to section 10 of the June 17, 1997 Consent Agreement, the Consent Agreement dated March 10, 1995, and (c) the Consent Agreement dated December 18, 1997 (collectively, the "Prior Consent Agreements"), and any other agreements or documents executed or delivered in connection with, or referred to in, the Prior Consent Agreements, have not been amended or modified by this Consent Agreement and remain in full force and effect.  Nothing in this Consent Agreement shall be construed to amend or modify the Lender Letter Agreement or the Toronto-Dominion Pledge Agreement, or any agreements in favor of the NHL given by Charles F. Dolan, James Dolan or trusts for the benefit of members of their families, including the agreement of Charles F. Dolan dated June 17, 1997 and the agreement of such trusts dated March 10, 1995.

9.    Release and Limitation of Liability.

(a)    As partial consideration for the NHL providing the consents contained herein, each of the Owners on their own behalf and on behalf of their successors and assigns, but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever releases and discharges the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc. (collectively, but excluding the NHL, "NHL Enterprises"), all of the NHL's Member Clubs and each of their successors and assigns and any of their respective past, present or future owners, directors, officers, agents, trustees or employees in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), known or unknown, which (in the case of MSG, to the best knowledge of MSG) exist as of the date of execution of this Consent Agreement by reason

-11-

of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any NHL operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transaction; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Owners of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on schedule 9, or (ii) any amounts due to any of the Owners from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Owner then the release contained in this paragraph shall not prohibit such Owner from asserting a defense or counterclaim to that claim.

(b)    The Owners hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Owners on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

(c)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

(i)    the Owners hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with the Affiliated NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to (A) legal actions against any Affiliated NHL Party with respect to the Proposed Transaction or the other transactions contemplated by the Transaction Documents, or (B) any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission, of any of the Starwood Parties, or any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such; and

(ii)    MSG agrees to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful act or omission, of MSG, or any of its

-12-

subsidiaries or affiliates, and any of its owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such.

(d)     Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Rangers or any other entity or (ii) to defer or off-set any distribution to the Rangers.  Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Owner or any other party.

(e)     None of the Member Clubs or their Related Parties shall be entitled to bring an indemnification claim under this Section 9 unless the Commissioner determines that such indemnification is reasonable and appropriate and, in the case of Losses suffered by any Owner or Member Club for which indemnification is sought against MSG pursuant to Section 9(c)(i)(B) or 9(c)(ii), such Losses relate to the business of the NHL or NHL Enterprises or other entities owned by the Clubs generally or the game of NHL hockey.

(f)     Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under the Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure.  The indemnifying parties agree that they shall have no right to control the defense or other response to such a claim and that they will fully cooperate with the NHL Affiliated Party, its designated counsel and other representatives, provided that no claim against either an individual Member Club or which is based primarily on an act or omission of the Rangers, and for which (in either case) indemnification is sought against MSG under this section, will be settled without the consent of MSG, such consent not to be unreasonably withheld.

10.     Gaming.  Without limiting the generality of Sections 3 and 7(c)(v) of this Consent Agreement, each Starwood Party agrees that it shall not, and shall cause its Related Parties not to, at any time (a) carry on or be involved in, or enter into any loan, agreement or other transaction (including on an intercompany basis) with, any business engaged in or associated with the operation of a gambling casino or the acceptance of bets on professional or amateur sporting events (other than the ownership of less than five percent (5%) of any class of securities of any such business that has been registered under section 12(g) of the Securities Exchange Act of 1934, as amended), provided however, that the restrictions of this clause (a) do not apply to any relationship, agreement or transaction in which the compensation to be paid or benefits to be realized by such Starwood Party or its Related Parties do not depend in whole or in part, directly

-13-

or indirectly, on proceeds from wagering on NHL games; (b) induce or, to the extent within its control, permit or allow any player, coach, or other employee of the Rangers, MSG or any other Member Club, or any other person directly involved or identified with the Rangers or any other Member Club, to promote or otherwise be in any way associated or affiliated with any gaming venture, gambling activity or business associated with a gaming venture or gambling activity (a "Gaming Entity"), or agree to any such promotion, association or affiliation; (c) use, agree that any other person or entity may use or, to the extent within its control, permit any other person or entity to use, the name, insignia or other intellectual property of the NHL, the Rangers or any other Member Club in connection with any Gaming Entity; or (d) permit wagering on NHL games upon any premises owned, leased or otherwise managed or controlled by such Starwood Party or its Related Parties. Each Starwood Party further agrees that, unless the NHL's prior written consent is obtained (which consent may be withheld in the NHL's sole discretion), no person may serve as an officer or director the Rangers, MSG or the general partner of MSG if such person also serves as an officer or director of any Gaming Entity.

11.    Additional Provisions.

(a)    The Owners agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Franchise and shall be the obligation thereof.

(b)    This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred. This Consent Agreement may not be assigned except as set forth herein or with the written consent of the NHL. Any dispute between the parties hereunder relating to the subject matter hereof which is subject to Section 6.3 of the NHL Constitution shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to this provision. Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL or NHL Enterprises and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.

(c)    All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date

-14-

of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows;

|  |  |
|---|---|
| If to the NHL: | National Hockey League<br>1251 Avenue of the Americas<br>New York, New York  10020-1198<br>Attention:  General Counsel |
| with a copy to: | Proskauer Rose LLP<br>1585 Broadway<br>New York, NY 10036<br>Attention:  Joseph M. Leccese, Esq. |
| If to MSG: | Two Penn Plaza<br>14th Floor<br>New York, New York  10121<br>Attention:  General Counsel |
| If to any of the<br>Starwood Parties: | c/o Starwood Hotels & Resorts Worldwide, Inc.<br>2231 East Camelback Road<br>Suite 400<br>Phoenix, AZ 85016 |
|  | with a copy to: |
|  | Sidley & Austin<br>555 W. Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Sherwin L. Samuels, Esq. |

or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

         (d)       Subject to Section 8, this Consent Agreement, and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement between the Owners, on the one hand, and the NHL, on the other hand, with respect to the Proposed Transaction. This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof.  It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the

-15-

NHL shall in addition to any other remedy available to it at law or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(a)(iii)(D)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. The Owners also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Owners or their respective affiliates or subsidiaries may result in the exercise of rights and remedies against MSG or the Franchise, including, but not limited to, the involuntary termination of the Franchise. This agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule or construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)    This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)    No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)    The representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL. Accordingly, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party. By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. Notwithstanding the preceding provisions of this Section 11(g), absent an express provision to the contrary, the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Entities by each of the Starwood Parties shall be joint and several with the other Starwood Parties.

(h)    The parties hereto acknowledge and agree that the failure by any of the Owners to comply in a material respect with any of the provisions of this Consent Agreement shall constitute a material breach of this Consent Agreement which entitles the NHL to take action

-16-

permitted by the NHL Constitution and/or this Consent Agreement. Said action includes, in addition to any and all other rights to which the NHL shall be entitled to under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that if, in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by an Owner, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Owner notice of and such opportunity to cure the default as the NHL deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner. No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)     All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control as between any of the Affiliated NHL Parties, on the one hand, and any of the Owners, on the other hand; the foregoing shall not, however, modify any obligations of any of the Owners to any of the other Owners.

(j)     The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

-17-

IN WITNESS WHEREOF, this Consent Agreement has been executed this _22nd_ day of May, 1998.

NATIONAL HOCKEY LEAGUE

By: _____

Name:  David Zimmerman

Title:    Vice President, General Counsel


MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
       its General Partner

By: _____


STARWOOD HOTELS & RESORTS WORLDWIDE, INC.

By: _____

Ronald C. Brown
Executive Vice President & CFO

STARWOOD HOTELS & RESORTS

By: _____

Steven R. Goldman
Executive Vice President

ITT CORPORATION

By: _____

-17-

IN WITNESS WHEREOF, this Consent Agreement has been executed this 27ᵗʰ day of May, 1998.

NATIONAL HOCKEY LEAGUE

By: _____  ___  _____

Name:  David Zimmerman

Title:  Vice President, General Counsel

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
     its General Partner

By: _____

STARWOOD HOTELS & RESORTS WORLDWIDE, INC.

By: _____   _____

STARWOOD HOTELS & RESORTS

By: _____   _____

ITT CORPORATION

By: _____   _____

0255/537SS-003  NYUB2/492675 v2

-17-

IN WITNESS WHEREOF, this Consent Agreement has been executed this 2nd day of May, 1998.

NATIONAL HOCKEY LEAGUE

By:_____
Name:  David Zimmerman
Title:   Vice President, General Counsel

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
       its General Partner

By:_____

STARWOOD HOTELS & RESORTS WORLDWIDE, INC.

By:_____
        Ronald C. Brown
        Executive Vice President & CFO

STARWOOD HOTELS & RESORTS

By:_____
        Steven R. Goldman
        Executive Vice President

ITT CORPORATION

By:_____

-18-

ITT SHERATON CORPORATION

By: _____

ITT MSG INC.

By: _____

<u>SCHEDULES</u>

The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein, except as expressly set forth in the Consent Agreement to which they are appended.

<u>INDEX OF SCHEDULES</u>

Schedule 1 - Transaction Documents
Schedule 5 - Secured Indebtedness
Schedule 7(b)-1 - Ownership of MSG
Schedule 7(c)-1 - Ownership of Starwood Parties
Schedule 7(c)-2 - Options, Warrants, etc.
Schedule 9 - Claims

# SCHEDULE 1 - MATERIAL DOCUMENTS

1.  Amended and Restated Agreement and Plan of Merger dated as of November 12, 1997, by and among Starwood Hotels & Resorts Worldwide, Inc., Starwood Hotels & Resorts, Chess Acquisition Corp. and ITT Corporation

# SCHEDULE 5

The NHL acknowledges that as of the date hereof, the stock of entities having a direct and indirect ownership interest in ITT MSG has been pledged to secure the indebtedness of certain of the Starwood Parties. The Starwood Parties shall use all reasonable efforts to cause their ownership interest (direct or indirect) in MSG and the Rangers to be free of such pledge (or any other pledge) by June 19, 1998 and in all events shall cause such ownership interest to be free of such pledge (or any other pledge) by June 30, 1998.

## MADISON SQUARE GARDEN, L.P. OWNERSHIP

Cablevision Systems Corporation (f/k/a CSC Parent Corporation)

CSC Holdings, Inc. (f/k/a Cablevision Systems Corporation)
    Cablevision Systems Corporation                100%

National Broadcasting Company, Inc.
    NBC Cable Holding, Inc.                    100%

Rainbow Media Holdings, Inc.
    CSC Holdings, Inc.                         75%
    NBC Cable Holding, Inc.                    25%

Rainbow Media Sports Holdings, Inc.
    Rainbow Media Holdings, Inc. ("RMHI")     100%

Rainbow Program Enterprises, L.P.
    General Partner
        RMHI                            5%
    Limited Partners
    Class A
        Cablevision Programming Incorporated   30.0%
        (100% owned by RMHI)
    Class C
        RMHI                       62.985%
        Cablevision Systems Corporation     2.015%

Rainbow Regional Holdings LLC
    Rainbow Media Sports Holdings, Inc.     95.21%
    Rainbow Program Enterprises L.P.       4.79%

    Regional Programming Partners
        Rainbow Regional Holdings LLC      60%
        Fox Sports RPP Holdings, LLC       40%

Pluskmc/MSORNHL06/04/98/1

**The News Corporation Limited**
Fox, Inc. — 100%

**Tele-Communications, Inc.**
Liberty Media Corporation — 100%

**Fox/Liberty Networks LLC**
Fox, Inc. — 50%
Liberty Media Corporation — 50%

**Fox Sports RPP Holdings, LLC**
Fox/Liberty Networks LLC — 100%

**Regional MSG Holdings LLC**
Regional Programming Partners — 100%

**Rainbow Garden Corp.**
Regional Programming Partners — 100%

**MSG Eden Corporation**
Rainbow Garden Corp. — 100%

**Madison Square Garden, L.P.**
General Partner
MSG Eden Corporation — .34%
Limited Partners
Regional MSG Holdings, LLC — 91.85%
ITT/Starwood Entities — 7.81%

**New York Rangers**
Madison Square Garden, L.P. — 100%

Plaintons/MSORNHL06/04/98/2

Schedule 7(b)(1) (NHL)

Additional information concerning ownership by Fox and Liberty entities as provided by Fox and Liberty.

# SCHEDULE 5

## OWNERSHIP OF THE RANGERS

| Fox Party | Ownership Interest in Rangers | |
|---|---|---|
| Fox Regional Sports Member, Inc. | 0.18% | indirect interest |
| Fox Regional Sports Holdings, Inc. | 11.2% | indirect interest |
| FXM Networks, Inc. | 11.2% | indirect interest |
| Twentieth Holdings Corporation | 11.2% | indirect interest |
| Fox, Inc. | 11.2% | indirect interest |
| News America Publishing Incorporated | 11.2% | indirect interest |
| News America Holdings Incorporated | 18.1% | indirect interest |
| News Publishing Australia Limited | 14.5% | indirect interest |
| News International plc | 3.6% | indirect interest |
| Newscorp Investments Limited | 3.6% | indirect interest |
| The News Corporation Limited | 18.1% | indirect interest |

| TCI Party[2] | Ownership Interest in Rangers | |
|---|---|---|
| Tele-Communications, Inc. | 32.53% | indirect interest |
| TCI Communications, Inc. | 7.27% | indirect interest |
| Heritage Communications, Inc. | 0.04% | indirect interest |
| Heritage Cablevision, Inc. | 0.03% | indirect interest |
| Heritage Cablevue, Inc. | 0.03% | indirect interest |
| TCI CSC VI, Inc. | 0.03% | indirect interest |
| Heritage Cablevision of South East Massachusetts, Inc. | 0.01% | indirect interest |
| TCI CSC V, Inc. | 0.01% | indirect interest |
| Heritage Investments, Inc. | 0.004% | indirect interest |
| TCI of Council Bluffs, Inc. | 0.01% | indirect interest |
| TCI CSC IV, Inc. | 0.01% | indirect interest |
| TCI Holdings, Inc. | 0.21% | indirect interest |
| Liberty of Paterson, Inc. | 0.19% | indirect interest |
| TCI CSC III, Inc. | 0.19% | indirect interest |
| TCI East, Inc. | 0.02% | indirect interest |
| TCI of Virginia, Inc. | 0.02% | indirect interest |
| TCI CSC VIII, Inc. | 0.02% | indirect interest |
| TCI North Central, Inc. | 0.001% | indirect interest |
| TCI of Iowa, Inc. | 0.001% | indirect interest |
| United Artists Entertainment Company | 7.02% | indirect interest |
| United Artists Holdings, Inc. | 7.02% | indirect interest |

---

[2]Ownership of TCI Parties assumes completion of the Proposed Transactions in which they will receive shares of Cablevision (formerly CSC Parent Corporation) stock, including 1,500,000 shares to be issued to indirect subsidiaries of TCI in the Connecticut Transaction, which are included only in the ownership of TCI. Percentage calculations of ownership through ownership of Cablevision stock are based on the number of shares of Cablevision stock reported by Cablevision as outstanding on January 6, 1998, plus 1,500,000 shares that will be issued in the Connecticut Transaction.

| | | |
|---|---|---|
| United Artists Cablesystems Corporation | 6.98% | indirect interest |
| TCI of Northern New Jersey, Inc. | 6.98% | indirect interest |
| TCI CSC II, Inc. (Formerly Brookhaven Cable TV, Inc.) | 6.97% | indirect interest |
| UA-Columbia Cablevision of New Jersey, Inc. | 0.06% | indirect interest |
| UA-Columbia Cablevision of Massachusetts, Inc. | 0.01% | indirect interest |
| TCI CSC IX, Inc. | 0.01% | indirect interest |
| United Cable Television Corporation | 0.04% | indirect interest |
| General Communications and Entertainment Company, Inc. | 0.01% | indirect interest |
| Wentronics, Inc. | 0.01% | indirect interest |
| United Cable Television of Sarpy County, Inc. | 0.01% | indirect interest |
| TCI CSC X, Inc. | 0.01% | indirect interest |
| TCI Cablevision of St. Bernard, Inc. | 0.01% | indirect interest |
| TCI CSC VII, Inc. | 0.01% | indirect interest |
| United Cable Television of Scottsdale, Inc. | 0.01% | indirect interest |
| TCI CSC XI, Inc. | 0.03% | indirect interest |
| TCI Cable Investments, Inc. | 5.46% | indirect interest |
| Liberty Holdings, Inc. | 5.46% | indirect interest |
| Liberty Cable, Inc. | 5.46% | indirect interest |
| Country Cable Co. | 5.46% | indirect interest |
| CCC Sub, Inc. | 0.80% | indirect interest |
| TCI Atlantic, Inc. | 4.66% | indirect interest |
| Country Cable III, Inc. | 4.66% | indirect interest |
| Liberty Media Corporation | 18.23% | indirect interest |
| Liberty Sports, Inc. | 17.96% | indirect interest |
| Intermediate Subsidiaries | | |
|     Liberty Sports Sales, Inc. | | |
|     LMC Prime Sports Northwest, Inc. | 0.002% | indirect interest |
|     LSI Nostalgic Sports, Inc. | 0.002% | indirect interest |
|     LSI Facilities, Inc. | 0.002% | indirect interest |
|     Prime Sports Events, Inc. | 0.002% | indirect interest |
|     TCI Prime Sports, Inc. | 0.002% | indirect interest |
|     LMC International, Inc. | 0.002% | indirect interest |
|     Rocky Mountain Sports | | |
|       & Lifestyle Channel, Inc. | 0.15% | indirect interest |
|     LSI Showcase, Inc. | 0.25% | indirect interest |
|     LMC Utah Sports, Inc. | 0.51% | indirect interest |
|     KBL Sports Network, Inc. | 1.23% | indirect interest |
|     LMC Northwest Cable Sports, Inc. | 0.59% | indirect interest |
|     LMC Bay Area Sports, Inc. | 0.91% | indirect interest |
|     LMC Upper Midwest Sports, Inc. | 0.04% | indirect interest |
|     LMC Chicago Sports, Inc. | 2.77% | indirect interest |
|     LMC Regional Sports, Inc. | 5.28% | indirect interest |
|     CVN, Inc. | 3.83% | indirect interest |
| LMC Newco U.S., Inc. | 17.96% | indirect interest |
| Liberty Sports Member, Inc. | 0.18% | indirect interest |
| Liberty/Fox Sports Financing LLC | 13.62% | indirect interest |
| Fox/Liberty Networks, LLC | 35.56% | indirect interest |
| Fox Sports RPP Holdings, LLC | 35.92% | indirect interest |

# SCHEDULE 7(C)-1 - BENEFICIAL OWNERSHIP

| | Name of Beneficial Owner | Amount Beneficially Owned | Percent of Class |
|---|---|---|---|
| 1. | FMR Corp. | 17,262,558(1)(2) | 9.25% |
| 2. | Starwood Capital Group, L.L.C. | 10,223,750(2)(3) | 5.48% |

(1)    Includes 6,589,082 shares of beneficial interest, $.01 par value per share, of Starwood Trust, and 6,589,082 shares of common stock, $.01 par value per share, of Starwood Corp. ("Paired Shares"), held by FMR Corp. and its affiliates and an estimated 10,673,476 Paired Shares estimated to be issued to FMR Corp. pursuant to the Proposed Transaction.

(2)    This information is based on filings made by these parties with the United States Securities and Exchange Commission and certain other information previously provided to the Starwood Parties.

(3)    Includes holdings of Starwood Capital Group, L.L.C. and its affiliates, including Barry S. Sternlicht.

FROM : SIDLEY&AUSTIN                215 896 6600              1998 05 13   21:20   #114 P.07/07

## SCHEDULE 7(C)-2 – OPTIONS, WARRANTS

| Name of Option Holder | Amount Beneficially Owned | Percent of Class |
|---|---|---|
| Starwood Capital Group, L.L.C. | 10,223,750(1)(2) | 5.48% |

(1) Includes 1,763,167 Paired Shares subject to presently exercisable options, limited partnership interest of SLT Realty Limited Partnership and SLC Operating Limited Partnership which are exchangeable for an aggregate of 3,470,585 Paired Shares, and shares of Class A Exchangeable Preferred Shares and Class B Exchangeable Preferred Shares of Starwood Trust that are exchangeable for an aggregate of 4,014,809 Paired Shares.

(2) This information is based on filings made by these parties with the United States Securities and Exchange Commission and certain other information previously provided to the Starwood Parties.

Schedule 90

## CLAIMS AND POTENTIAL CLAIMS
## AGAINST NHL AND NHL CLUBS

1.    Any claims arising out of or in connection with the Agreement dated May 5, 1972 between the New York Rangers and Nassau Sports (New York Islanders), as amended.

2.    Any claims arising out of or in connection with the Territorial and Broadcasting Rights Agreement with Meadowlanders (New Jersey Devils) dated as of June 19, 1982, and related documents, as amended.

3.    Any claims arising out of or in connection with the pension matters addressed in Bathgate v. National Hockey League Pension Society, et al. and any settlements arising out of that case.

4.    Any claims in connection with the case entitled Forbes v. Eaglecon, et al.

12/15/97