Exhibit 25

9

## CONSENT AGREEMENT

**THIS CONSENT AGREEMENT** is made this 4th day of March, 1998 by and among the following parties:

(i)    **NATIONAL HOCKEY LEAGUE**, a joint venture organized as an unincorporated association not-for-profit (the "NHL");

(ii)    **MADISON SQUARE GARDEN, L.P.**, a Delaware limited partnership ("MSG"), and its general partner MSG EDEN CORPORATION, a Delaware corporation ("Eden") (collectively, the "MSG Parties");

(iii)    **RAINBOW GARDEN CORP.**, a Delaware corporation ("Rainbow Garden"), RAINBOW MEDIA HOLDINGS, INC., a Delaware corporation ("Rainbow Media"), RAINBOW REGIONAL HOLDINGS, L.L.C., a Delaware limited liability company ("Rainbow Regional"), RAINBOW MEDIA SPORTS HOLDINGS, INC., a Delaware corporation ("Rainbow Sports"), REGIONAL PROGRAMMING PARTNERS, a New York general partnership ("RPP"), REGIONAL MSG HOLDINGS, L.L.C., a Delaware limited liability company ("Regional MSG"), CABLEVISION PROGRAMMING INCORPORATED, a Delaware corporation ("CPI"), CABLEVISION SYSTEMS CORPORATION, a Delaware corporation that, following consummation of the Proposed Transactions (as defined below), will be renamed CSC Holdings, Inc. and CSC PARENT CORPORATION, a Delaware corporation that, following consummation of the Proposed Transactions, will be renamed Cablevision Systems Corporation (collectively, the "Rainbow Parties"); and

(iv)    the parties listed on schedule 1A (collectively, the "TCI Parties").

Each of the parties listed above, other than the NHL, is sometimes referred to in this Consent Agreement individually as a "Transaction Party" and collectively with the parties other than the NHL as the "Transaction Parties".

## Background

(a)    In 1997, Cablevision Systems Corporation ("CSC") formed a wholly-owned Delaware subsidiary, CSC Parent Corporation ("Parent"), which in turn formed a wholly-owned Delaware subsidiary known as CSC Merger Corporation ("Merger Sub").

(b)    CSC, Parent and Merger Sub are parties to an Amended and Restated Contribution and Merger Agreement dated as of June 6, 1997 (the "Merger Agreement") with TCI Communications, Inc. ("TCIC"), a Delaware corporation that is a wholly-owned subsidiary of Tele-Communications, Inc., a Delaware corporation ("TCI").

-2-

(c)     Pursuant to the Merger Agreement, the parties thereto intend to consummate the following transactions:

(i)     Merger Sub will be merged with and into CSC, with CSC being the surviving corporation. The common stock of CSC will be converted into common stock of Parent and the common stock of Merger Sub will be converted into common stock of CSC, which will result in CSC becoming a wholly-owned subsidiary of Parent and the common stockholders of CSC becoming the stockholders of Parent. Parent will then change its name to "Cablevision Systems Corporation" and CSC will change its name to "CSC Holdings, Inc." Subject to the provisions of clause (iii), CSC will continue to own all of the shares of Rainbow Media that it currently holds.

(ii)     TCIC will contribute (or cause to be contributed) to Parent all of the assets constituting or, in certain cases, all of the capital stock or other ownership interests in subsidiaries owning certain cable television systems serving approximately 820,000 subscribers in New York and New Jersey in exchange for an aggregate of 12,235,543 shares (subject to adjustment) of Parent's Class A Common Stock, which shares will be owned by the TCI Parties listed on schedule 1A in the amounts set forth next to their respective names. Parent will also assume approximately $669 million of indebtedness.

(iii)     Following the Effective Time (as defined in the Merger Agreement), Parent may, subject to the provisions of the Merger Agreement, transfer or cause to be transferred all or part of the cable television properties contributed by TCIC to CSC and CSC may transfer all of its interests in Rainbow Media to Parent. Following consummation of these transactions, (x) Parent (hereinafter referred to as "Cablevision") will own all of the outstanding shares of CSC and will own directly the shares of Rainbow Media formerly held by CSC, (y) Rainbow Media will continue to own an indirect interest in MSG as set forth on schedule 3(b)-1, and (z) CSC will have no direct or indirect interest in MSG but will directly or indirectly own all of the cable television systems of Parent.

(iv)     Following the Effective Time, Cablevision may issue to TCIC (or its affiliates) up to an additional 1,500,000 shares (subject to customary anti-dilution adjustments) of Class A Common Stock (or another class of stock with voting rights not greater than the Class A Common Stock) in exchange for certain assets and properties of TCIC or its affiliates, which shall be comprised largely of cable television systems in Connecticut (the "Connecticut Transaction"). Such shares shall constitute an approximately 4% interest in Cablevision's outstanding capital stock, and an approximately 1.6% interest in MSG.

(v)     Contemporaneously with the Merger, the approximately 2% of the outstanding limited partnership interests held by certain limited partners in Rainbow Programming Enterprises, L.P. ("RPE") will be contributed to Cablevision or a direct or indirect wholly-owned subsidiary of Cablevision, in exchange for approximately 52,000 shares of Cablevision Class A

-3-

Common Stock and approximately $2.8 million in cash.  (The transactions described in clauses (i)–(v) are collectively referred to as the "Proposed Transactions").

(d)    Pursuant to a Consent Agreement dated December 18, 1997, the NHL approved the ownership by TCI and certain of the other TCI Parties of an indirect ownership interest in the New York Rangers hockey club (the "Rangers"), as well as the contemporaneous ownership by those parties (and/or certain of their Related Parties) of (i) an indirect interest in the Time Warner, Inc. subsidiary that, subject to its satisfaction of each of the conditions set forth in an Expansion Agreement dated June 25, 1997 and its compliance with certain related agreements, will have the right to operate an NHL Member Club in Atlanta, Georgia beginning in the 1999-00 NHL season, and (ii) an interest in a subsidiary of Ascent Entertainment Group, Inc. ("Ascent") that, subject to execution and delivery of a Consent Agreement relating thereto, will entitle it to certain rights with respect to the Colorado Avalanche.  The Proposed Transactions will result in additional Related Parties of TCI having ownership interests in an NHL club and will increase the aggregate multiple NHL ownership position of TCI and its Related Parties (the interest of such parties and the increase in such position being the "Potential Conflicts of Interest").

(e)    The Proposed Transactions and the Potential Conflicts of Interest each require the approval of the NHL Board of Governors.

(f)    The Transaction Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transactions and to the ownership, right to transfer any direct or indirect interest in, and right to manage MSG that will be in effect from and after consummation of the Proposed Transactions, a complete list of which is provided on Schedule 1B (the "Transaction Documents").

(g)    On December 2, 1997, the NHL Board of Governors approved the Proposed Transactions and the Potential Conflicts of Interest, subject to the terms and conditions of this Consent Agreement, which is executed by the NHL in accordance with the authority granted by the Board of Governors.

(h)    The parties acknowledge that certain of the Rainbow Parties and the MSG Parties are also parties to the Prior Consent Agreements (as defined in Section 10) with the NHL, which remain in full force and effect.  Accordingly, these parties have been excluded from certain provisions of this Consent Agreement to the extent they are already bound by the similar provisions of the Prior Consent Agreements.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, it is agreed as follows:

-4-

1. **NHL Consent.** Subject to the terms and conditions set forth in this Consent Agreement, the NHL hereby consents to the Proposed Transactions and the Potential Conflicts of Interest. The consent granted herein is limited to the Proposed Transactions and the Potential Conflicts of Interest as described in this Consent Agreement and does not extend to any other transfer, sale, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG, or the ownership by any Transaction Party of any direct or indirect interest in any other Member Club, whether or not the same may be contemplated by the Transaction Document, except that, in addition to the rights described under paragraph (c)(iv) of the Background section, Cablevision shall have the right to issue up to an additional 500,000 shares (subject to customary anti-dilution adjustments) of its Class A Common Stock (or another class of stock with voting rights not greater than the Class A Common Stock) to TCIC or its affiliates pursuant to the Connecticut Transaction without any further approval of the NHL. Without limiting the preceding sentence, the NHL's consent specifically does not extend to any public offering of interests in, or spin-off or reorganization of, MSG, Rainbow, RPP or any TCI Party or any transfer resulting from the exercise of any right of first refusal, right of first negotiation, option, right to make additional capital contributions other than in accordance with current interests (except for changes of less than 5% in the aggregate that do not result in a change of effective control of any Transaction Party and that are otherwise in compliance with the NHL Constitution and Agreements, including conflicts of interest rules), or similar right that may be set forth in the Transaction Documents, other than as provided in connection with the Prior Consent Agreements or as described in clause (c)(iii) of the Background section.

2. **Performance of Agreements.** Subject to the terms of this Consent Agreement, each Transaction Party covenants with the NHL that it shall perform in all material respects all of the terms and conditions required of it under the Transaction Documents to which it is a party.

3. **NHL Constitution, Bylaws and Agreements.**

(a)     Notwithstanding anything contained to the contrary in any of the Transaction Documents, for so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in a form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined in Section 13) from all Losses (as defined in Section 13) arising out of or relating to its former direct and indirect ownership interest in MSG, each of the TCI Parties agrees for itself and each of its affiliates and subsidiaries over which it has or at the time of reference can exercise control (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties"), as follows:

(i)     that it shall, and shall cause its Related Parties to, be bound by and comply with (A) the NHL Constitution, (B) the NHL Bylaws, (C) all other rules,

-5-

regulations, policies, resolutions and governing documents of the NHL and NHL Enterprises (as defined in Section 13(a)) and their respective affiliates and subsidiaries, (D) any other agreements and arrangements to which the Member Clubs generally are or may become subject or by which they or their assets are or may become bound, including the current and future Collective Bargaining Agreements between the NHL and the National Hockey League Players' Association, and all consent decrees and settlement agreements presently or hereafter in effect or entered into between or among the NHL and its Member Clubs or the NHL and other persons in furtherance of NHL business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner or the NHL Constitution or Bylaws, and (E) the NHL Commissioner's interpretation of any of the foregoing, all as may be adopted, amended or modified from time to time and including the custom and practice thereunder (collectively, the "NHL Constitution and Agreements");

(ii)    that it shall not, and shall cause its Related Parties not to, take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs; and

(iii)    that it shall not, and shall cause its Related Parties not to, challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)    Each of the Rainbow Parties that is not a party to a Prior Consent Agreement shall be bound by and conduct itself in accordance with the NHL Constitution and Agreements to the same extent as the Rainbow Parties that are so bound pursuant to the Prior Consent Agreements.

(c)    Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Transaction Party that is an MSG Party or a Rainbow Party agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not materially adversely affect the Franchise (as defined in Section 4(a)) or the operations or financial condition of the Rangers and shall not in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

-6-

4.    Location and Territory of Franchise.

(a)    Except as contemplated by the Prior Consent Agreements, each Transaction Party warrants and represents to the NHL that it has received no representation, commitment, promise or assurance from the NHL with respect to any future transfer of ownership or change in location of the NHL franchise known as the New York Rangers (the "Franchise").

(b)    Each of the Transaction Parties warrants and represents to the NHL that the acquisition or retention of its interest in the Rangers is for the purpose of owning and/or operating the Franchise. Each Transaction Party that is an MSG Party or a Rainbow Party hereby agrees to operate the Franchise and to play the Rangers' schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements. The territorial definition of the Franchise shall be as provided for in the NHL Constitution and Agreements. The Transaction Parties and the Rangers hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described on Exhibit A hereto and each further represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

5.    Post Transaction Capital Structure and Other Conditions.    The NHL's consent granted in Section 1 hereof is subject to (a) consummation of the Proposed Transactions in all material respects in accordance with the Transaction Documents, including the payment, contribution or exchange of all consideration required thereunder, on the date hereof (or, in the case of the Proposed Transactions described in clauses (iii) and (iv) of paragraph (c) of the Background section, within eighteen months after the date hereof) (the date on which the later of those two transactions is consummated being the "Final Closing Date"), provided that the Transaction Parties have complied with all of their obligations under this Consent Agreement), and (b) after giving effect to the consummation of the Proposed Transactions, the direct and indirect ownership of the Rangers being in accordance with Schedule 5. If any of the requirements set forth in the preceding sentence has not been satisfied as of the applicable date, the consent of the NHL set forth in this Consent Agreement (but not the representations, warranties and obligations of the Transaction Parties hereunder) shall be void ab initio, and the Commissioner of the NHL (the "Commissioner") shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order rescission of any transaction consummated (or purportedly consummated) in violation of this Consent Agreement or the NHL Constitution and Agreements (other than changes in ownership at the Cablevision, TCI or News Corp. levels), as well as the right to order such other relief or remedy as may be within his powers under the NHL Constitution and Agreements. The Transaction Parties shall give prompt notice of the consummation (or abandonment or termination) of the Proposed Transactions described in clauses (iii) and (iv) of paragraph (c) of the Background section and, in the case of consummation, shall confirm that such transactions are subject to this Consent Agreement. Except as permitted by the Prior Consent Agreements, the agreement with the NHL dated June 17, 1997 with respect to the

-7-

facilities provided pursuant to the Credit Agreement dated as of June 6, 1997 among MSG, The Chase Manhattan Bank, as agent, and the lending institutions that are parties thereto (the "Lender Agreement") and the agreement with the NHL dated March 10, 1995 with respect to facilities provided to Rainbow by Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent (the "Toronto-Dominion Pledge Letter"), none of the Transaction Parties has pledged the Franchise, its direct or indirect interest therein or any other hockey-related assets of MSG to secure any debt obligation nor shall any of them grant such a pledge without the NHL's prior written consent or otherwise in accordance with the NHL Constitution and Agreements.

6.    **Ownership. Control. Change in Documents.**

(a)    Each of the Transaction Parties that is an MSG Party or a Rainbow Party represents and warrants to the NHL that the President of Eden as of the date hereof is Marc Lustgarten. Mr. Lustgarten is responsible for and has the authority to manage the business and affairs of Eden and MSG, subject to certain prior approvals of the board of directors of Eden as required by law. The General Manager of the Rangers is Neil Smith. Mr. Smith is responsible for and has the authority to manage the business and affairs of the Rangers, subject to certain prior approvals of the board of directors of MSG as required by law.

(b)    Notwithstanding any provision in any other agreement which may be to the contrary, the NHL and NHL Member Clubs also may rely upon any action of Charles F. Dolan or James Dolan as binding upon the Rangers, MSG and Eden with respect to any communication, agreement, understanding, action, consent or other transaction with or concerning the NHL or its Member Clubs until such authority is rescinded by a notice from MSG to the Commissioner in accordance with Section 15(c). No such notice shall be effective, however, unless at least one other individual continues to have the authority to so bind the Rangers, MSG or Eden with respect to such matters. Such persons may be designated by a notice from MSG to the Commissioner given either prior to or contemporaneously with the notice rescinding the authority of Charles F. Dolan or James Dolan, as the case may be.

(c)    Each Transaction Party acknowledges to and agrees with the NHL that, notwithstanding any provision of any document or instrument (other than the Prior Consent Agreements to the extent applicable) to the contrary:

(i)    The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed sale, pledge or other transfer of the assets comprising the Rangers, or any direct or indirect ownership interest in, MSG are subject to the NHL Constitution and Agreements, this Consent Agreement and, in the case of the Transaction Parties that are parties thereto, the Prior Consent Agreements, the Lender Letter Agreement and the Toronto-Dominion Pledge Letter. Without limiting the foregoing, any sale, pledge, or other transfer of the assets comprising the Rangers, or a direct or indirect ownership interest in, MSG

ay-27-2008  12:02    From-NATIONAL HOCKEY LEAGUE              212-789-2050        T-182  P.068/069  F-641

-9-

presently provided in the General Partnership Agreement of RPP; and

(E)    any increase in the number of directors of Cablevision that may be appointed by the TCI Parties or any material increase in the management or voting rights of the TCI Parties with respect to Cablevision or the other Rainbow Parties.

(d)    (i)    Notwithstanding the provisions of Section 6(c)(i), the consent of the NHL shall not be required for any reorganization or transfer of any of the TCI Parties if, following such reorganization or transfer, TCI or Liberty Media Corporation ("Liberty") continues to own, directly or indirectly, all of the ownership and voting interests in the reorganized or transferred entity and TCI or Liberty causes such reorganized or transferred entity to agree to be a "TCI Party" for purposes of the Consent Agreement.

(ii)    The Transaction Parties acknowledge and agree that any transfer of a direct ownership interest in Cablevision or TCI is subject to compliance with the NHL Constitution and Agreements and that to the extent required by the NHL Constitution and Agreements they shall use reasonable efforts to obtain the NHL's prior approval of such transactions whenever practicable; provided, however, that, notwithstanding anything to the contrary contained in this Consent Agreement, any such transfer effectuated without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements), and for which such consent is not granted within 30 days after such transfer by the NHL, will subject MSG and the Franchise, as the NHL's sole remedy against the Transaction Parties, to any and all rights and remedies that the NHL may have against MSG and/or the Franchise in connection with a material breach by any Transaction Party of the NHL Constitution and Agreements, including without limitation, those enumerated in Section 15(h) below.  The Transaction Parties agree to be bound by any decision of the NHL and its Member Clubs, and any actions taken by the NHL or its Member Clubs, in connection with the exercise of the NHL's rights and remedies as contemplated by this Section 6(d)(ii) in respect of any decision by the NHL not to approve any person or entity to whom any direct ownership interest in Cablevision or TCI is transferred (a "Transferee") without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements).  The Affiliated NHL Parties shall be entitled to indemnification in accordance with Section 13 hereof with respect to all Losses arising out of any claim by a Transferee, any Transaction Party or any affiliate of a Transaction Party or Transferee with respect to the NHL's and its Member Clubs' decision not to approve such Transferee as a holder of an ownership interest in a Member Club or any actions taken by the NHL or its Member Clubs in connection with the exercise of its remedies contemplated by this Section 6(d)(ii) in respect of such decision not to approve such Transferee.  The parties hereto agree that the failure to obtain the approval of the NHL and/or its Member Clubs for any transfer described in this Section 6(d)(ii) will not in and of itself affect the ability of the transferor to convey good title to

0433/53755-003 NYLIB2/484506 v3

-10-

the shares transferred.  The NHL further agrees that it shall not seek to enjoin any sale of stock of Cablevision, TCI or Liberty (to the extent the stock is publicly traded), provided that the NHL may seek injunctive or other relief to prevent such transferee from exercising dominion or control directly or indirectly over RPP, MSG or the assets of the Rangers.

(e)    Each of the Transaction Parties (other than Rainbow Media and any entity whose shares currently are publicly traded) agrees that its stock or partnership certificate or other document evidencing ownership in such entity, if any, will bear a legend substantially as follows:

"The transfer, pledge or other disposition of [this limited partnership interest] [the stock reflected by this certificate] is subject to the approval and consent of the National Hockey League pursuant to the NHL Constitution and Bylaws and a certain Consent Agreement dated _____, 1997 with the NHL."

7.    Working Capital, Guaranties and Capital Contributions.  Without limiting the generality of section 10, the parties confirm that section 7 of the Prior Consent Agreement dated December 18, 1997 remains in full force and effect and has not been amended or modified by the terms of this Consent Agreement.

8.    Representations and Warranties.    (a) Subject to section 15(g), each Transaction Party hereby severally represents and warrants as of the date hereof to the NHL as follows:

(i)    If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.  If it is a limited partnership or limited liability company, it is a limited partnership or limited liability company validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.

(ii)    Such Transaction Party has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(iii)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Transaction Party enforceable against it in accordance with its terms.

(iv)    All balance sheets, income statements and other financial statements previously furnished by such Transaction Party to the NHL in connection with the application for approval of the Proposed Transactions and the Potential Conflicts of Interest have been prepared in accordance with generally accepted accounting principles (as in effect in the jurisdiction

May-27-2008  11:56    From-NATIONAL HOCKEY LEAGUE                    212-789-2050        T-182  P.027/069  F-841

-8-

shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5, unless otherwise provided in the NHL Constitution and Agreements or the Prior Consent Agreements.

(ii)    No Transaction Document (including, without limitation, the Merger Agreement) shall be rescinded, canceled, terminated or amended in any respect which may or will materially change the terms of the Proposed Transactions, materially affect the conditions, rights, obligations or duties of the parties under the Transaction Documents, this Consent Agreement or the NHL Constitution and Agreements, or adversely affect the interests of the NHL, without the prior written approval of the NHL.  The NHL shall be promptly notified in writing, pursuant to Section 15(c) hereof, of any proposed change in the Transaction Documents that has any material impact on the ownership or operation of the Rangers, whether or not the NHL has consent rights with respect to the change.

(iii)    Without limiting the provisions of subsections (i) and (ii) above, each Transaction Party acknowledges and agrees that each of the below listed actions are subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall subject the Transaction Parties and the Franchise to all remedies and rights which may be enforced by the NHL or its Member Clubs:

(A)    Subject to Section 6(d)(i) below, any change in the jurisdiction of formation or the form of entity of any of the Transaction Parties, including, without limitation, a change by MSG in its status as a Delaware limited partnership or Garden Holdings, Rainbow Garden, Rainbow Media or Rainbow Sports in their respective statuses as Delaware corporations;

(B)    a liquidation, dissolution or transfer of a substantial part of the assets of MSG, Garden Holdings, Rainbow Garden, or Rainbow Media to another entity, if such assets include an interest in the Franchise;

(C)    a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG; and

(D)    a change in Rainbow Regional's status as the sole managing partner of RPP, any material diminution of the management authority of Rainbow Regional, any material increase in the management, voting, or information rights with respect to MSG of any partner in RPP other than Rainbow Regional, any other change in effective control of RPP, whether or not

-11-

indicated, "GAAP") applied on a consistent basis and fairly present the financial position and results of operations of the relevant entity as of the dates and for the periods indicated. All other information furnished by such Transaction Party to the NHL in connection with the request for approval of the Proposed Transactions is true and correct in all material respects and has not omitted any material statement which would make such information not misleading.

(v)    There is no action, suit, or proceeding pending against such Transaction Party or, in the case of each Transaction Party that is a Rainbow Party or an MSG Party, against the Rangers, which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established in accordance with GAAP and which is reasonably likely to result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Transaction Party or, in the case of each such Transaction Party that is a Rainbow Party or an MSG Party, MSG, or which is reasonably likely to prevent or impede the consummation of the transactions contemplated by this Consent Agreement. There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Transaction Party, requested by, any court or governmental agency which has resulted or is reasonably likely to result in any material adverse change in the business, properties or assets, or in the condition (financial or otherwise) (a "Material Adverse Change") of such Transaction Party, or which is reasonably likely to prevent or impede the consummation of this Consent Agreement.

(vi)    To the best of the knowledge and belief of each such Transaction Party that is a Rainbow Party or MSG Party, except as set forth on schedule 8 hereto, each of the MSG Parties is in compliance in all material respects with all laws, regulations and orders, federal or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to an MSG Party or have a material adverse effect on the ability of the MSG Parties to conduct their businesses as currently conducted.

(vii)    All filings, if any, required to be made by such Transaction Party or any of its affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, have been made and all applicable waiting periods with respect to those filings, if any, have expired, and there are no outstanding requests for additional information under that act or any other law that has not been complied with. To the best knowledge of such Transaction Party, all other material consents, waivers, approvals, orders and authorizations of any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities) that are required to be obtained by such Transaction Party or any of its affiliates in connection with the Proposed Transactions have been obtained (or made) and are in full force and effect.

(viii)    Such Transaction Party has performed in all material respects all obligations required to be performed by such Transaction Party to date with respect to the

-12-

Proposed Transactions and, except as disclosed in any schedules hereto, such Transaction Party is not in default under any material contract, agreement, lease, or other instrument relating to the Proposed Transactions to which such Transaction Party is a party or by which such Transaction Party is bound, except for defaults that individually or collectively, would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on such Transaction Party's ability to perform its obligations with respect to the Proposed Transactions. All of the Transaction Documents are listed on Schedule 1B; true and complete copies of each of those Transaction Documents have been delivered to the NHL. Except as provided in the Transaction Documents and for the agreements referred to in the Prior Consent Agreements, there are no other arrangements, agreements or understandings to which such Transaction Party or any of its affiliates is a party, whether written or oral, with respect to the ownership, control, right to transfer direct or indirect interests in, or financing or management of MSG and the Rangers. Each of the Transaction Documents constitutes a valid and binding obligation enforceable against each of the parties thereto in accordance with its terms.

(ix)    The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Transaction Party, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Transaction Party's properties or assets (except as contemplated or disclosed herein or the Schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Transaction Party is a party or by which such Transaction Party is bound, except for conflicts, breaches, terminations or defaults that individually or collectively would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party.

(x)    Except as described in the Prior Consent Agreements and the Transaction Documents and, if such Owner is a TCI Party, except for options, warrants, rights or convertible securities to purchase shares of TCI, none of which options, warrants, rights, or convertible securities, if exercised or converted with respect to TCI would require NHL approval under the NHL Constitution and Agreements (because upon exercise or conversion they will constitute publicly traded shares representing an interest of less than 5% in the Rangers), there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, debt instruments or other economic rights in such Transaction Party nor does such Transaction Party or, in the case of the Rainbow Parties or MSG Parties, MSG have any obligation to issue any such options, warrants, rights or securities. Such Transaction Party presently has no intention of selling or otherwise transferring any of its direct or indirect interest in the Rangers or any of the assets of the Rangers, except (x) in connection with the Proposed Transactions, (y) as described in the preceding sentence or (z) for transactions that would not require NHL approval pursuant to the NHL Constitution and Agreements because they involve publicly traded shares representing an interest of less than 5% in the Rangers.

-13-

(xi)     Except as set forth in the agreements with the NHL dated June 13, 1997 with respect to the Credit Agreement dated June 6, 1997 between MSG and Chase Manhattan, as agent, and March 10, 1995, with respect to facilities provided to Rainbow Media by Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent, such Transaction Party has not pledged the assets constituting the Rangers or its direct or indirect ownership interest in the Rangers to secure indebtedness of any person or entity and each Transaction Party (including the TCI Parties) acknowledges that any such pledge is subject to the NHL Constitutions and Agreements.

(xii)     The Proposed Transactions (other than those described in clauses (iii) and (iv) of paragraph (c) of the Background Section) have been consummated today in accordance with the terms of the Transaction Documents.

(xiii)     To the best of its knowledge, except as excluded from Section 13(a), such Transaction Party has no Claims (as defined in Section 13(a)) against any of the Affiliated NHL Parties (as defined in Section 13(a)).

(b)     Each of the Transaction Parties represent and warrant as to itself and its subsidiaries that (i) schedule 8(b)-1 contains a true and complete list, after giving effect to the Proposed Transactions, of each person or entity (other than shareholders of Cablevision, TCI, ITT Corporation and General Electric Company) that directly or indirectly owns an interest in MSG or the Rangers, and the direct or indirect percentage interest of such person or entity in MSG or the Rangers and each intermediate entity and (ii) schedule 8(b)-2 contains a true and complete list of each person or entity that, to the best knowledge of Cablevision or TCI, as the case may be, and as of the date or dates indicated, directly or indirectly owns of record or beneficially 5% or more of the outstanding capital stock or voting power of any of Cablevision or TCI, respectively, and the percentage interest of such person or entity in that public company's capital stock and voting power; provided, however, that the representation and warranty of the TCI Parties in this clause (ii) with respect to the interest of the TCI Parties (and their Related Parties) in Cablevision is made as of the date of this Consent Agreement (after giving effect to the Proposed Transactions).

(c)     Each of the Rainbow Parties represents and warrants that neither it nor any other Related Party of Cablevision owns any direct or indirect ownership interest in MSG or the Rangers other than as set forth on schedule 8(b)-1, or any ownership interest in any other Club.

(d)     Each of the TCI Parties represents and warrants that neither it nor any other Related Party of TCI owns any direct or indirect ownership interest in MSG or the Rangers other than as set forth on schedule 8(b) or any ownership interest in any other Club other than as set forth in paragraph (d) of the "Background" section to this Consent Agreement.

-14-

9.    **Cable Agreements.**

(a)    The MSG Parties represent, warrant and covenant that, although MSG is considering numerous alternatives with respect to the MSG Network (including with respect to the level of carriage on cable television systems, e.g. basic, premium), MSG has no current intention and has made no decisions relating to the implementation of cablecasting Rangers games on a premium cable service, except to the extent consistent with current practice.

(b)    At all times, the Rainbow Parties and the MSG Parties shall cause feeds with respect to the Rangers to be made available on the terms and conditions and in accordance with the NHL Constitution and Agreements.

10.    **Confirmation of Agreements.**  The Rainbow Parties and the NHL confirm that the Consent Agreement dated December 18, 1997, the Consent Agreement dated June 17, 1997 and, subject to section 10 of the June 17, 1997 Consent Agreement, the Consent Agreement dated March 10, 1995 (collectively, the "Prior Consent Agreements"), have not been amended or modified by this Consent Agreement and remain in full force and effect.  The TCI Parties also confirm that the Consent Agreement dated December 18, 1997 has not been amended or modified by this Consent Agreement and remains in full force and effect.  Nothing in this Consent Agreement shall be construed to amend or modify the Lender Letter Agreement or the Toronto-Dominion Pledge Agreement, or any agreements in favor of the NHL given by Charles F. Dolan, James Dolan or trusts for the benefit of members of their families, including the agreement of Charles F. Dolan dated June 17, 1997 and the agreement of such trusts dated March 10, 1995. As applied to the Rainbow Parties and MSG Parties the term "NHL Constitution and Agreements" when used in this Consent Agreement shall have the meaning given to such term in the Prior Consent Agreement.

11.    **Distributions.**  Notwithstanding anything set forth in any Transaction Document or any other agreement, there will be no payment or distribution to the partners of MSG in any year, if such payment or distribution would reduce the amount of the Net Working Capital below the amount required to be maintained by MSG as set forth in this Consent Agreement.

12.    **Financing Statements.**  The Rangers and the Transaction Parties agree to execute any and all financing statements requested by the NHL which the NHL reasonably deems necessary to notify creditors of the Rangers and the TCI Parties of the existence of Article III of the NHL Constitution and Agreements and this Consent Agreement provided that, in the case of Cablevision, Rainbow Media and TCI, such financing statement shall be subject to the consent of the secured lenders, which will not be unreasonably withheld.

r-28-2008  15:28    From-NATIONAL HOCKEY LEAGUE                212-789-2050              T-187  P.002/002  F-649

-15-

13.    Release and Limitation of Liability.

        (a)    As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties on their own behalf and on behalf of their successors and assigns, but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever releases and discharges the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc. (collectively, but excluding the NHL, "NHL Enterprises"), all of the NHL's Member Clubs (except the Rangers) and each of their successors and assigns and any of their respective past, present or future owners, directors, officers, agents, trustees or employees in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), which, to the best knowledge of such Transaction Party and MSG, exist as of the date of execution of this Consent Agreement (or, if later, as of the Final Closing Date) by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any NHL operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Transaction Parties of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on Schedule 13, or (ii) any amounts due to any of the Transaction Parties from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Transaction Party then the release contained in this paragraph shall not prohibit such Transaction Party from asserting a defense or counterclaim to that claim. The NHL will consider in good faith any amendments to Schedule 13 that the Transaction Parties wish to propose at the time of the Final Closing Date.

        (b)    The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

        (c)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims,

0438/83795-008  NYLIB2/484806 v3

RY 28 2008  11:45 ...

best knowledge of such Transaction Party and MSG, exist as of the date of execution of this Consent Agreement (or, if later, as of the Final Closing Date) by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any NHL operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Transaction Parties of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on Schedule 13, or (ii) any amounts due to any of the Transaction Parties from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Transaction Party then the release contained in this paragraph shall not prohibit such Transaction Party from asserting a defense or counterclaim to that claim. The NHL will consider in good faith any amendments to Schedule 13 that the Transaction Parties wish to propose at the time of the Final Closing Date.

        (b)     The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

        (c)     Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims,

-16-

liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with the Affiliated NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to legal actions against any Affiliated NHL Party (other than any action by any Transaction Party against any Affiliated NHL Party) with respect to the Proposed Transactions or the other transactions contemplated by the Transaction Documents. The NHL agrees (i) that it will give the indemnifying parties under this paragraph notice of any claim as to which it reasonably expects to seek indemnification under this paragraph and that each of the indemnifying parties will have the right to participate in such defense, settlement or response at its own expense, and (ii) that those indemnifying parties will be consulted on a reasonable basis concerning the defense, settlement, or other response to any claim for which indemnification is sought. The indemnifying parties under this paragraph agree that they shall have no right to control the defense or other response to such a claim and that they will fully cooperate with the NHL, its designated counsel and other representatives.

    (d)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

    (i)    subject to the provisions of this Consent Agreement, the Transaction Parties (other than the TCI Parties) jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties of the Transaction Parties (other than the TCI Parties) (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission of any of the Transaction Parties (other than the TCI Parties), or in each case any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such; and

    (ii)    subject to the provisions of this Consent Agreement, the TCI Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to (x) any liability or obligation to the Affiliated NHL Parties of any of the TCI Parties (including, without limitation, all obligations set forth in this Consent Agreement) or any wrongful act or omission of any of the TCI Parties, or in each case any of their respective subsidiaries or controlled affiliates, and any of their respective direct shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such.

    (e)    Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Rangers or any other entity or (ii) to defer or off-set any distribution to the Rangers. Nothing in this Consent

0438/53755-003 NYLIB2/484506 v3

-17-

Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Transaction Party or any other party.

(f)     No Affiliated NHL Party other than the NHL or NHL Enterprises shall be entitled to indemnification under this Section 13 unless the Commissioner determines that such indemnification is reasonable and appropriate and, in the case of Losses suffered by any Owner or Member Club for which indemnification is sought pursuant to Section 13(d), such Losses relate to the business of the NHL or NHL Enterprises or other entities owned by the Clubs generally or the game of NHL hockey. Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under the Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure. No claim against either an individual Member Club or which is based primarily on an act or omission of the Rangers for which indemnification is sought under this paragraph will be settled without the consent of the indemnifying parties, such consent not to be unreasonably withheld.

14.    Special Provisions.

(a)     Without limiting the generality of section 10, the parties confirm that section 14 of the Prior Consent Agreement dated December 18, 1997 remains in full force and effect and has not been amended or modified by this Consent Agreement. In addition, each of the TCI Parties that was not a party to that Prior Consent Agreement shall be bound by the provisions of such Section 14 to the same extent as if it had been a "Liberty Party" for purposes of the Prior Consent Agreement dated December 18, 1997.

(b)     Notwithstanding any other provision of this Consent Agreement, any of the TCI Parties may pledge, or grant security interests in, its interests in stock of Cablevision to secure bona fide obligations to one or more banks, investment banking firms or other entities engaged, in the ordinary course or business, in lending or otherwise providing financing to third parties, without prior approval of the NHL; provided, however, that to the extent that any such pledge or grant would, but for the preceding clause, require prior approval by the NHL, (i) the pledgee or grantee shall agree in a written instrument, a copy of which will be provided to the Commissioner, that any action to enforce such pledge or grant (including any foreclosure or similar action) will be subject to applicable provisions of the NHL Constitution and Agreements regarding transfers of interests in Clubs, (ii) the proceeds of any such borrowing are not used to increase the aggregate direct or indirect ownership interest of the TCI Parties and their Related Parties in the New York Rangers or any other club, and (iii) the TCI Parties and their Related Parties shall not have the right to grant such pledges or security interests unless the book value of

-18-

the assets and gross revenues of the New York Rangers at the end of or for the fiscal year most recently ended represented 5% or less of the book value of the assets and gross revenues, respectively, of Cablevision in such fiscal year on a consolidated basis, or unless the consent of the NHL would not otherwise be required.

15.    Additional Provisions.

(a)    The Transaction Parties agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Franchise and shall be the obligation thereof.

(b)    This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred. This Consent Agreement may not be assigned except as set forth herein or with the written consent of the NHL. Any dispute between the parties hereunder relating to the subject matter hereof which is subject to Section 6.3 of the NHL Constitution shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner of the NHL shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to this provision. Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL or NHL Enterprises and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.

(c)    All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows:

If to the NHL:            National Hockey League
                          1251 Avenue of the Americas
                          New York, New York  10020-1198
                          Attention:  General Counsel

0438/53765-003 NYLIB2/484506 v3

-19-

with a copy to:

Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Attention: Joseph M. Leccese, Esq.

If to any of the
MSG Parties:

Two Penn Plaza
14th Floor
New York, New York 10121
Attention: General Counsel

If to any of the
Rainbow Parties other
than Cablevision:

150 Crossways Park West
Woodbury, New York 11797
Attention: General Counsel

If to Cablevision:

One Media Crossways
Woodbury, New York 11797
Attention: General Counsel

If to the TCI
Parties:

c/o Tele-Communications, Inc.
5619 DTC Parkway
Denver, Colorado 80011
Attention: Legal Department

with a copy to:

Sherman & Howard, L.L.C.
1633 Seventeenth Street
Suite 3000
Denver, Colorado 80202
Attention: Charles Tanabe

or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

(d)     Subject to Section 10, this Consent Agreement, and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the Proposed Transactions. This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof. It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the NHL shall in addition to any other remedy available to it at law

-20-

or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(d)(ii)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. The Transaction Parties also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Transaction Parties or their respective affiliates or subsidiaries may result in the exercise of rights and remedies against MSG or the Franchise, including, but not limited to, the involuntary termination of the Franchise. This agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule or construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)    This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)    No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)    The representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL. Accordingly, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party. By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. Notwithstanding the preceding provisions of this Section 15(g), absent an express provision to the contrary, the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Entities by (i) each of the Rainbow Parties and the MSG Parties shall be joint and several with the other Rainbow Parties and (ii) the MSG Parties and each of the TCI Parties shall be joint and several with the other TCI Parties.

(h)    The parties hereto acknowledge and agree that the failure by any of the Transaction Parties to comply in a material respect with any of the provisions of this Consent Agreement, shall constitute a material breach of this Consent Agreement which entitles the NHL

May-27-2008  11:58    From-NATIONAL HOCKEY LEAGUE                    212-789-2050        T-182  P.038/069  F-641

-21-

to take action permitted by the NHL Constitution and/or this Consent Agreement. Said action includes, in addition to any and all other rights to which the NHL shall be entitled to under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that if, in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by a Transaction Party, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Transaction Party notice of and such opportunity to cure the default as the NHL deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner. No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)    All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control as between any of the Affiliated NHL Parties, on the one hand, and any of the Transaction Parties, on the other hand; the foregoing shall not, however, modify any obligations of any of the Transaction Parties to any of the other Transaction Parties. The TCI Parties agree that any violation of the NHL Constitution and Agreements and certain prior agreements by the Rainbow Parties or by Dolan shall be deemed for all purposes of this Consent Agreement to be a violation by Dolan, the Rainbow Parties and MSG of the NHL Constitution and Agreements which shall entitle the NHL to exercise all rights and remedies in respect thereof against Dolan, the Rainbow Parties and MSG under this Consent Agreement and the NHL Constitution and Agreements as the NHL may have under this Consent Agreement and NHL Constitution and Agreements, including a requirement that Garden Holdings, Rainbow Garden, Eden and MSG divest themselves all of their ownership interests in the Franchise at the direction of the Commissioner.

(j)    The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

0438/53755-003  NYLIB2/484506 v3

May-27-2008  11:58    From-NATIONAL HOCKEY LEAGUE                212-789-2050        T-192  P.039/069  F-641

-22-

      IN WITNESS WHEREOF, this Consent Agreement has been executed this $2nd$ day of March, 1998.

**NATIONAL HOCKEY LEAGUE**

By: _____
     Name:  David Zimmerman
     Title:    Vice President, General Counsel

0438/53755-003 NYLIB2/484505 v3

-23-

## MSG PARTIES

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
     its General Partner

By: _____

MSG EDEN CORPORATION

By: _____

0438/53755-003 NYLB2/484506 v3

-24-

<u>**RAINBOW PARTIES**</u>

**CABLEVISION SYSTEMS CORPORATION**

By: _____

DD    MARC A. LUSTGARTEN
      VICE CHAIRMAN

**RAINBOW MEDIA HOLDINGS, INC.**

By: _____

DD

**RAINBOW MEDIA SPORTS HOLDINGS, INC.**

By: _____

DD            LUSTGARTEN

**RAINBOW GARDEN CORP.**

By: _____

DD

**RAINBOW REGIONAL HOLDINGS, L.L.C.**

By: _____

DD

0498/53756-003  NYLIB2/484508 v3

-25-

REGIONAL PROGRAMMING PARTNERS

By: _____

(x)    MARC A. LUSTGARTEN
       VICE CHAIRMAN

CABLEVISION PROGRAMMING INCORPORATED

By: _____

(x)

REGIONAL MSG HOLDINGS, L.L.C.

By: _____

(x)

CSC PARENT CORPORATION

By: _____

(x)

0428/63755-003  NYLIB2/484508 v3

May-27-2008  11:59    From-NATIONAL HOCKEY LEAGUE                    212-789-2050            T-182   P.043/089   F-641

FEB-27-98  18:51                                                    P.03      R-845     Job-611
FEB-27-98  17:54   From:SHERMAN & HOWARD                                      T-385  P.03/83  Job-859

By: _____
Name: Stephen M. Brett
Title: Executive Vice President of each of the foregoing entities

CCC Sub, Inc.
Country Cable III, Inc.
Country Cable Co.
General Communications and Entertainment
   Company, Inc.
Heritage Cablevision of South East
   Massachusetts, Inc.
Heritage Cablevision, Inc.
Heritage Cablevue, Inc.
Heritage Communications, Inc.
Heritage Investments, Inc.
LCNI, Inc.
Liberty Cable Partner, Inc.
Liberty Cable, Inc.
Liberty Capital Corp.
Liberty Holdings, Inc.
Liberty Michigan, Inc.
Liberty of Paterson, Inc.
Liberty of South Dakota, Inc.
Liberty of Greenwich, Inc.
TCI Atlantic, Inc.
TCI Cable Investments, Inc.
TCI Cablevision of St. Bernard, Inc.
TCI Cablevision Associates, Inc.
TCI Cablevision of New Mexico, Inc.
TCI Central, Inc.
TCI CSC II, Inc.
TCI CSC III, Inc.

TCI CSC IV, Inc.
TCI CSC V, Inc.
TCI CSC VI, Inc.
TCI CSC VII, Inc.
TCI CSC VIII, Inc.
TCI CSC IX, Inc.
TCI CSC X, Inc.
TCI CSC XI, Inc.
TCI Development Corporation
TCI East, Inc.
TCI Holdings, Inc.
TCI North Central, Inc.
TCI of Council Bluffs, Inc.
TCI of Northern New Jersey, Inc.
TCI of Iowa, Inc.
TCI of New Jersey, Inc.
TCI of Virginia, Inc.
UA-Columbia Cablevision of Massachusetts, Inc.
UA-Columbia Cablevision of New Jersey, Inc.
United Artists Cable Holdings, Inc.
United Artists Cablesystems Corporation
United Artists Entertainment Company
United Artists Holdings, Inc.
United Cable Television of Sarpy County, Inc.
United Cable Television Corporation
United Cable Television of Scottsdale, Inc.
Wentronics, Inc.

By: _____
Name: Stephen M. Brett
Title: Vice President of each of the foregoing entities

May-27-2008  11:59    From-NATIONAL HOCKEY LEAGUE                212-789-2050            T-192  P.044/069  F-641

## SCHEDULES

The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein, except as expressly set forth in the consent agreement to which they are appended.

0438/53755-003  NYLIB2/484506 v3

## SCHEDULE 1A
## TCI PARTIES[1]

Tele-Communications, Inc.
    TCI Communications, Inc.
        Heritage Communications, Inc.
            Heritage Cablevision, Inc.
                Heritage Cablevue, Inc.
                    TCI CSC VI, Inc. - 24,432 CSC shares
                    Heritage Cablevision of South East Massachusetts, Inc.
                        TCI CSC V, Inc. - 8,394 CSC shares
                Heritage Investments, Inc.
                    TCI of Council Bluffs, Inc. (78%)
                        TCI CSC IV, Inc. - 5,013 CSC shares
    TCI Holdings, Inc.
        Liberty of Paterson, Inc.
            TCI CSC III, Inc. - 183,644 CSC shares
        TCI East, Inc.
            TCI of Virginia, Inc.
                TCI CSC VIII, Inc. - 18,909 CSC shares
        TCI North Central, Inc.
            TCI of Iowa, Inc.
                TCI of Council Bluffs, Inc. (22%)
                    TCI CSC IV, Inc. - 5,013 CSC shares
    United Artists Entertainment Company
        United Artists Holdings, Inc.
            United Artists Cablesystems Corporation
            TCI of Northern New Jersey, Inc.
                TCI CSC II, Inc. (Formerly Brookhaven Cable TV, Inc.) (99.2%) - 6,698,538 CSC shares
                UA-Columbia Cablevision of New Jersey, Inc.
                    TCI CSC II, Inc. (Formerly Brookhaven Cable TV, Inc.) (.8%) - 6,698,538 CSC shares
                UA-Columbia Cablevision of Massachusetts, Inc.
                  TCI CSC IX, Inc. - 7,275 CSC shares
        United Cable Television Corporation
            General Communications and Entertainment Company, Inc.
            Wentronics, Inc.
                United Cable Television of Sarpy County, Inc.
                  TCI CSC X, Inc. - 9,881 CSC shares
            TCI Cablevision of St. Bernard, Inc.
                TCI CSC VII, Inc. - 5,810 CSC shares
            United Cable Television of Scottsdale, Inc.
                TCI CSC XI, Inc. - 25,866 CSC shares
    TCI Cable Investments, Inc.
        Liberty Holdings, Inc.
            Liberty Cable, Inc.
                Country Cable Co.
                    CCC Sub, Inc. - 768,275 CSC shares
                TCI Atlantic, Inc.
                    Country Cable III, Inc. - 4,479,506 CSC shares

---

[1] 100% of the common stock of each subsidiary, representing 100% of the voting power relative to such subsidiary, is owned directly or indirectly by Tele-Communications, Inc.

May-27-2008  11:59    From-NATIONAL HOCKEY LEAGUE    212-789-2050    T-182  P.046/060  F-641

## NOTE TO SCHEDULE 1A

Except as specifically noted above and as generally described below, 100% of the common equity and voting power of each corporation that is a TCI Party is owned by its immediate parent corporation. The following corporations, all of which are wholly owned, directly or indirectly, by either TCI Communications, Inc. or by TCI Cable Investments, Inc., are included as TCI Parties because they have a direct or indirect ownership interest in TCI Holdings, Inc., but for purposes of calculating the direct or indirect ownership in Cablevision, TCI Holdings, Inc. is treated as being wholly owned by TCI Communications, Inc.:

TCI Development Corporation
Liberty Cable Partner, Inc.
TCI of New Jersey, Inc.
TCI Central, Inc.
TCI Cablevision of New Mexico, Inc.
United Artists Cable Holdings, Inc.
TCI Cablevision Associates, Inc.
Liberty Michigan, Inc.
Liberty Capital Corp.
Liberty of Greenwich, Inc.
LCNI, Inc.
Liberty of South Dakota, Inc.

# TCI PARTIES' OWNERSHIP OF CSC PARENT CORPORATION

| TCI Party | Class A Common Shares* |
|---|---|
| Country Cable III, Inc. | |
| CCC Sub, Inc. | 4,479,506 |
| TCI CSC II, Inc. | 768,275 |
| TCI CSC III, Inc. | 6,698,538 |
| TCI CSC IV, Inc. | 183,644 |
| TCI CSC V, Inc. | 5,013 |
| TCI CSC VI, Inc. | 8,394 |
| TCI CSC VII, Inc. | 24,432 |
| TCI CSC VIII, Inc. | 5,810 |
| TCI CSC IX, Inc. | 18,909 |
| TCI CSC X, Inc. | 7,275 |
| TCI CSC XI, Inc. | 9,881 |
| | 25,866 |
| Total Cablevision (formerly CSC Parent Corporation) shares issued | 12,235,543 |

---

*Share amounts do not reflect additional shares issuable pursuant to a 2-for-1 stock split to be effective after the Effective Time. Also, Liberty Media Corporation holds 260,100 shares of Cablevision Class A common stock acquired in transactions separate from the Proposed Transactions.

# SCHEDULE  1 B

## TRANSACTION DOCUMENTS

1. Amended and Restated Contribution and Merger Agreement dated as of June 6, 1997, among Cablevision Systems Corporation, CSC Parent Corporation, CSC Merger Corporation, and TCI Communications, Inc.

2. Voting Agreement dated as of November 21, 1997, by and among TCI Communications, Inc., Cablevision Systems Corporation, CSC Parent Corporation and the Class B Entities (as defined in the Voting Agreement).

3. Stockholders Agreement, dated as of March 4, 1998, by and among Cablevision Systems Corporation, Tele-Communications, Inc. and the Class B Entities (as defined in the Stockholders Agreement), in the form of Exhibit B to the Amended and Restated Contribution and Merger Agreement.

4. Letter Agreement, dated as of January 22, 1998, between TCI Communications, Inc. and Cablevision Systems Corporation.

5. Partnership Contribution Agreement, dated as of January 20, 1998, by and among CSC Parent Corporation, Rainbow Program Enterprises (RPE) and the limited partners of RPE identified therein.

## SCHEDULE 5

## OWNERSHIP OF THE RANGERS

### Fox Party

| | Ownership Interest in Rangers | |
|---|---|---|
| Fox Regional Sports Member, Inc. | 0.18% | indirect interest |
| Fox Regional Sports Holdings, Inc. | 11.2% | indirect interest |
| FXM Networks, Inc. | 11.2% | indirect interest |
| Twentieth Holdings Corporation | 11.2% | indirect interest |
| Fox, Inc. | 11.2% | indirect interest |
| News America Publishing Incorporated | 11.2% | indirect interest |
| News America Holdings Incorporated | 11.2% | indirect interest |
| News Publishing Australia Limited | 18.1% | indirect interest |
| News International plc | 14.5% | indirect interest |
| Newscorp Investments Limited | 3.6% | indirect interest |
| The News Corporation Limited | 3.6% | indirect interest |
| | 18.1% | indirect interest |

### TCI Party[2]

| | Ownership Interest in Rangers | |
|---|---|---|
| Tele-Communications, Inc. | 32.53% | indirect interest |
| TCI Communications, Inc. | 7.27% | indirect interest |
| Heritage Communications, Inc. | 0.04% | indirect interest |
| Heritage Cablevision, Inc. | 0.03% | indirect interest |
| Heritage Cablevue, Inc. | 0.03% | indirect interest |
| TCI CSC VI, Inc. | 0.03% | indirect interest |
| Heritage Cablevision of South East Massachusetts, Inc. | 0.01% | indirect interest |
| TCI CSC V, Inc. | 0.01% | indirect interest |
| Heritage Investments, Inc. | 0.004% | indirect interest |
| TCI of Council Bluffs, Inc. | 0.01% | indirect interest |
| TCI CSC IV, Inc. | 0.01% | indirect interest |
| TCI Holdings, Inc. | 0.21% | indirect interest |
| Liberty of Paterson, Inc. | 0.19% | indirect interest |
| TCI CSC III, Inc. | 0.19% | indirect interest |
| TCI East, Inc. | 0.02% | indirect interest |
| TCI of Virginia, Inc. | 0.02% | indirect interest |
| TCI CSC VIII, Inc. | 0.02% | indirect interest |
| TCI North Central, Inc. | 0.001% | indirect interest |
| TCI of Iowa, Inc. | 0.001% | indirect interest |
| United Artists Entertainment Company | 7.02% | indirect interest |
| United Artists Holdings, Inc. | 7.02% | indirect interest |

---

[2]Ownership of TCI Parties assumes completion of the Proposed Transactions in which they will receive shares of Cablevision (formerly CSC Parent Corporation) stock, including 1,500,000 shares to be issued to indirect subsidiaries of TCI in the Connecticut Transaction, which are included only in the ownership of TCI. Percentage calculations of ownership through ownership of Cablevision stock are based on the number of shares of Cablevision stock reported by Cablevision as outstanding on January 6, 1998, plus 1,500,000 shares that will be issued in the Connecticut Transaction.

| | | |
|---|---|---|
| United Artists Cablesystems Corporation | | |
| TCI of Northern New Jersey, Inc. | 6.98% | indirect interest |
| TCI CSC II, Inc. (Formerly Brookhaven Cable TV, Inc.) | 6.98% | indirect interest |
| UA-Columbia Cablevision of New Jersey, Inc. | 6.97% | indirect interest |
| UA-Columbia Cablevision of Massachusetts, Inc. | 0.06% | indirect interest |
| TCI CSC IX, Inc. | 0.01% | indirect interest |
| United Cable Television Corporation | 0.01% | indirect interest |
| General Communications and Entertainment Company, Inc. | 0.04% | indirect interest |
| Wentronics, Inc. | 0.01% | indirect interest |
| United Cable Television of Sarpy County, Inc. | 0.01% | indirect interest |
| TCI CSC X, Inc. | 0.01% | indirect interest |
| TCI Cablevision of St. Bernard, Inc. | 0.01% | indirect interest |
| TCI CSC VII, Inc. | 0.01% | indirect interest |
| United Cable Television of Scottsdale, Inc. | 0.01% | indirect interest |
| TCI CSC XI, Inc. | 0.01% | indirect interest |
| TCI Cable Investments, Inc. | 0.03% | indirect interest |
| Liberty Holdings, Inc. | 5.46% | indirect interest |
| Liberty Cable, Inc. | 5.46% | indirect interest |
| Country Cable Co. | 5.46% | indirect interest |
| CCC Sub, Inc. | 5.46% | indirect interest |
| TCI Atlantic, Inc. | 0.80% | indirect interest |
| Country Cable III, Inc. | 4.66% | indirect interest |
| Liberty Media Corporation | 4.66% | indirect interest |
| Liberty Sports, Inc. | 18.23% | indirect interest |
| Intermediate Subsidiaries | 17.96% | indirect interest |
|    Liberty Sports Sales, Inc. | | indirect interest |
|    LMC Prime Sports Northwest, Inc. | 0.002% | indirect interest |
|    LSI Nostalgic Sports, Inc. | 0.002% | indirect interest |
|    LSI Facilities, Inc. | 0.002% | indirect interest |
|    Prime Sports Events, Inc. | 0.002% | indirect interest |
|    TCI Prime Sports, Inc. | 0.002% | indirect interest |
|    LMC International, Inc. | 0.002% | indirect interest |
|    Rocky Mountain Sports | 0.002% | indirect interest |
|      & Lifestyle Channel, Inc. | | |
|    LSI Showcase, Inc. | 0.15% | indirect interest |
|    LMC Utah Sports, Inc. | 0.25% | indirect interest |
|    KBL Sports Network, Inc. | 0.51% | indirect interest |
|    LMC Northwest Cable Sports, Inc. | 1.23% | indirect interest |
|    LMC Bay Area Sports, Inc. | 0.59% | indirect interest |
|    LMC Upper Midwest Sports, Inc. | 0.91% | indirect interest |
|    LMC Chicago Sports, Inc. | 0.04% | indirect interest |
|    LMC Regional Sports, Inc. | 2.77% | indirect interest |
|    CVN, Inc. | 5.28% | indirect interest |
| LMC Newco U.S., Inc. | 3.83% | indirect interest |
| Liberty Sports Member, Inc. | 17.96% | indirect interest |
| Liberty/Fox Sports Financing LLC | 0.18% | indirect interest |
| Fox/Liberty Networks, LLC | 13.62% | indirect interest |
| Fox Sports RPP Holdings, LLC | 35.56% | indirect interest |
| | 35.92% | indirect interest |

May-27-2008  12:00    From-NATIONAL HOCKEY LEAGUE                    212-789-2050        T-182  P.051/069  F-641

# SCHEDULE 8

## COMPLIANCE WITH LAWS

### NONE

Schedule 8(b)-1 (cont.)
Schedule 5 (NHL)

## MADISON SQUARE GARDEN, L.P. OWNERSHIP

| | |
|---|---|
| Cablevision Systems Corporation (formerly CSC Parent Corporation) | |
| CSC Holdings, Inc. (formerly Cablevision Systems Corporation) Cablevision Systems Corporation | 100% |
| National Broadcasting Company, Inc. NBC Cable Holding, Inc. | 100% |
| Rainbow Media Holdings, Inc. CSC Holdings, Inc. NBC Cable Holding, Inc. | 75% 25% |
| Rainbow Media Sports Holdings, Inc. Rainbow Media Holdings, Inc. ("RMH") | 100% |
| Rainbow Program Enterprises, L.P. General Partner RMH Limited Partners Class A | 5.0% |
| Class C RMH Cablevision Systems Corporation | 30.0% |
| Cablevision Programming Incorporated (100% owned by RMH) (may be merged into RMH post closing) | 62.985% 2.015.0% |
| Regional Holdings LLC Rainbow Media Sports Holdings, Inc. Rainbow Program Enterprises, L.P. [Sports Channel Ohio Holdings Corporation] [SportsChannel Cincinnati Holding Corporation] [Sports Channel Bay Area Holding Corporation] | 95.21% 4.79 3.16]* 2.15]* 5.10]* |

• Each of these entities is a wholly-owned subsidiary of Rainbow Media Holdings, Inc. and is being merged with and into Rainbow Media Holdings, Inc. Following the completion of these merger transactions, Rainbow Media Sports Holdings, Inc. bringing its ownership to the indicated 95.21%, and will contribute these interests to Rainbow

NYLIB5:697011

May-27-2008  12:00    From-NATIONAL HOCKEY LEAGUE    212-789-2050    T-182  P.053/060  F-641



NY1:1503:627115

ITT Corp.
ITT MSO, Inc.

Fox Sports RPP Holdings, LLC
Fox/Liberty Networks LLC

Regional MSG Holdings LLC
Regional Programming Partners

Rainbow Garden Corp.
Regional Programming Partners

MSG Eden Corporation
Rainbow Garden Corp.

Madison Square Garden, L.P.
General Partner
MSG Eden Corporation

Limited Partners
Regional MSG Holdings, L.L.C.

ITT MSO, Inc.

New York Rangers Enterprises Company
Madison Square Garden, L.P.

Regional Programming Partners
Rainbow Regional Holdings, LLC
Fox Sports RPP Holdings, LLC

100%

100%

7.8% (pre-plane contribution)
96.1% (post-plane contribution)
9.6% (post-plane contribution)

91.9% (pre-plane contribution)
96.1% (post-plane contribution)

0.3%

100%

100%

100%

100%

60%
40%

-2-

MAY 27 2008 10:18 FR PROSKAUER ROSE LLP 222 969 2986 TO *0CC05+5411587*7  P

# SCHEDULE 8(b)-1

# OWNERSHIP OF MSG

| Fox Party | Ownership Interest in MSG | |
|---|---|---|
| Fox Regional Sports Member, Inc. | .18% | indirect interest |
| Fox Regional Sports Holdings, Inc. | 11.2% | indirect interest |
| FXM Networks, Inc. | 11.2% | indirect interest |
| Twentieth Holdings Corporation | 11.2% | indirect interest |
| Fox, Inc. | 11.2% | indirect interest |
| News America Publishing Incorporated | 11.2% | indirect interest |
| News America Holdings Incorporated | 11.2% | indirect interest |
| News Publishing Australia Limited | 18.1% | indirect interest |
| News International plc | 14.5% | indirect interest |
| Newscorp Investments Limited | 3.6% | indirect interest |
| The News Corporation Limited | 3.6% | indirect interest |
|  | 18.1% | indirect interest |

| TCI Party[1] | Ownership Interest in MSG | |
|---|---|---|
| Tele-Communications, Inc. | 32.53% | indirect interest |
| Country Cable III, Inc. | 4.66% | indirect interest |
| CCC Sub, Inc. | 0.80% | indirect interest |
| TCI CSC II, Inc. | 6.97% | indirect interest |
| TCI CSC III, Inc. | 0.19% | indirect interest |
| TCI CSC IV, Inc. | 0.01% | indirect interest |
| TCI CSC V, Inc. | 0.01% | indirect interest |
| TCI CSC VI, Inc. | 0.03% | indirect interest |
| TCI CSC VII, Inc. | 0.01% | indirect interest |
| TCI CSC VIII, Inc. | 0.02% | indirect interest |
| TCI CSC IX, Inc. | 0.01% | indirect interest |
| TCI CSC X, Inc. | 0.01% | indirect interest |
| TCI CSC XI, Inc. | 0.03% | indirect interest |
| Liberty Media Corporation | 18.23% | indirect interest |
| Liberty Sports, Inc. | 17.96% | indirect interest |
| Intermediate Subsidiaries | | |
|     Liberty Sports Sales, Inc. | 0.002% | indirect interest |
|     LMC Prime Sports Northwest, Inc. | 0.002% | indirect interest |
|     LSI Nostalgic Sports, Inc. | 0.002% | indirect interest |
|     LSI Facilities, Inc. | 0.002% | indirect interest |
|     Prime Sports Events, Inc. | 0.002% | indirect interest |
|     TCI Prime Sports, Inc. | 0.002% | indirect interest |
|     LMC International, Inc. | 0.002% | indirect interest |

---

[1] Ownership of TCI Parties assumes completion of the Proposed Transactions in which they will receive shares of Cablevision (formerly CSC Parent Corporation) stock, including 1,500,000 shares to be issued to indirect subsidiaries of TCI in the Connection Transaction. Percentage calculations of ownership through ownership of Cablevision stock are based on the number of shares of Cablevision stock reported by Cablevision as outstanding on January 6, 1998, plus 1,500,000 shares to be issued in the Connecticut Transaction.

| | | |
|---|---|---|
| Rocky Mountain Sports & Lifestyle Channel, Inc. | 0.15% | indirect interest |
| LSI Showcase, Inc. | 0.25% | indirect interest |
| LMC Utah Sports, Inc. | 0.51% | indirect interest |
| KBL Sports Network, Inc. | 1.23% | indirect interest |
| LMC Northwest Cable Sports, Inc. | 0.59% | indirect interest |
| LMC Bay Area Sports, Inc. | 0.91% | indirect interest |
| LMC Upper Midwest Sports, Inc. | 0.04% | indirect interest |
| LMC Chicago Sports, Inc. | 2.77% | indirect interest |
| LMC Regional Sports, Inc. | 5.28% | indirect interest |
| CVN, Inc. | 3.83% | indirect interest |
| LMC Newco U.S., Inc. | 17.96% | indirect interest |
| Liberty Sports Member, Inc. | 0.18% | indirect interest |
| Liberty/Fox Sports Financing LLC | 13.62% | indirect interest |
| Fox/Liberty Networks, LLC | 35.56% | indirect interest |
| Fox Sports RPP Holdings, LLC | 35.92% | indirect interest |

# SCHEDULE 8(b)-1

# OWNERSHIP OF MSG

### Fox Party

| | Ownership Interest in MSG | |
|---|---|---|
| Fox Regional Sports Member, Inc. | 0.18% | indirect interest |
| Fox Regional Sports Holdings, Inc. | 11.2% | indirect interest |
| FXM Networks, Inc. | 11.2% | indirect interest |
| Twentieth Holdings Corporation 11.2% indirect interest | | |
| Fox, Inc. | 11.2% | indirect interest |
| News America Publishing Incorporated | 11.2% | indirect interest |
| News America Holdings Incorporated | 18.1% | indirect interest |
| News Publishing Australia Limited | 14.5% | indirect interest |
| News International plc | 3.6% | indirect interest |
| Newscorp Investments Limited | 3.6% | indirect interest |
| The News Corporation Limited | 18.1% | indirect interest |

### TCI Party[1]

| | Ownership Interest in MSG | |
|---|---|---|
| Tele-Communications, Inc. | 32.53% | indirect interest |
| TCI Communications, Inc. | 7.27% | indirect interest |
| Heritage Communications, Inc. | 0.04% | indirect interest |
| Heritage Cablevision, Inc. | 0.03% | indirect interest |
| Heritage Cablevue, Inc. | 0.03% | indirect interest |
| TCI CSC VI, Inc. | 0.03% | indirect interest |
| Heritage Cablevision of South East Massachusetts, Inc. | 0.01% | indirect interest |
| TCI CSC V, Inc. | 0.01% | indirect interest |
| Heritage Investments, Inc. | 0.004% | indirect interest |
| TCI of Council Bluffs, Inc. | 0.01% | indirect interest |
| TCI CSC IV, Inc. | 0.01% | indirect interest |
| TCI Holdings, Inc. | 0.21% | indirect interest |
| Liberty of Paterson, Inc. | 0.19% | indirect interest |
| TCI CSC III, Inc. | 0.19% | indirect interest |
| TCI East, Inc. | 0.02% | indirect interest |
| TCI of Virginia, Inc. | 0.02% | indirect interest |
| TCI CSC VIII, Inc. | 0.02% | indirect interest |
| TCI North Central, Inc. | 0.001% | indirect interest |
| TCI of Iowa, Inc. | 0.001% | indirect interest |
| United Artists Entertainment Company | 7.02% | indirect interest |
| United Artists Holdings, Inc. | 7.02% | indirect interest |

[1]Ownership of TCI Parties assumes completion of the Proposed Transactions in which they will receive shares of Cablevision (formerly CSC Parent Corporation) stock, including 1,500,000 shares to be issued to indirect subsidiaries of TCI in the Connecticut Transaction. Percentage calculations of ownership through ownership of Cablevision stock are based on the number of shares of Cablevision stock reported by Cablevision as outstanding on January 6, 1998, plus 1,500,000 shares to be issued in the Connecticut Transaction.

| | | |
|---|---|---|
| United Artists Cablesystems Corporation | | |
| TCI of Northern New Jersey, Inc. | 6.98% | indirect interest |
| TCI CSC II, Inc. (Formerly Brookhaven Cable TV, Inc.) | 6.98% | indirect interest |
| UA-Columbia Cablevision of New Jersey, Inc. | 6.97% | indirect interest |
| UA-Columbia Cablevision of Massachusetts, Inc. | 0.06% | indirect interest |
| TCI CSC IX, Inc. | 0.01% | indirect interest |
| United Cable Television Corporation | 0.01% | indirect interest |
| General Communications and Entertainment Company, Inc. | 0.04% | indirect interest |
| Wentronics, Inc. | 0.01% | indirect interest |
| United Cable Television of Sarpy County, Inc. | 0.01% | indirect interest |
| TCI CSC X, Inc. | 0.01% | indirect interest |
| TCI Cablevision of St. Bernard, Inc. | 0.01% | indirect interest |
| TCI CSC VII, Inc. | 0.01% | indirect interest |
| United Cable Television of Scottsdale, Inc. | 0.01% | indirect interest |
| TCI CSC XI, Inc. | 0.01% | indirect interest |
| TCI Cable Investments, Inc. | 0.03% | indirect interest |
| Liberty Holdings, Inc. | 5.46% | indirect interest |
| Liberty Cable, Inc. | 5.46% | indirect interest |
| Country Cable Co. | 5.46% | indirect interest |
| CCC Sub, Inc. | 5.46% | indirect interest |
| TCI Atlantic, Inc. | 0.80% | indirect interest |
| Country Cable III, Inc. | 4.66% | indirect interest |
| Liberty Media Corporation | 4.66% | indirect interest |
| Liberty Sports, Inc. | 18.23% | indirect interest |
| Intermediate Subsidiaries | 17.96% | indirect interest |
|     Liberty Sports Sales, Inc. | | |
|     LMC Prime Sports Northwest, Inc. | 0.002% | indirect interest |
|     LSI Nostalgic Sports, Inc. | 0.002% | indirect interest |
|     LSI Facilities, Inc. | 0.002% | indirect interest |
|     Prime Sports Events, Inc. | 0.002% | indirect interest |
|     TCI Prime Sports, Inc. | 0.002% | indirect interest |
|     LMC International, Inc. | 0.002% | indirect interest |
|     Rocky Mountain Sports | 0.002% | indirect interest |
|       & Lifestyle Channel, Inc. | | |
|     LSI Showcase, Inc. | 0.15% | indirect interest |
|     LMC Utah Sports, Inc. | 0.25% | indirect interest |
|     KBL Sports Network, Inc. | 0.51% | indirect interest |
|     LMC Northwest Cable Sports, Inc. | 1.23% | indirect interest |
|     LMC Bay Area Sports, Inc. | 0.59% | indirect interest |
|     LMC Upper Midwest Sports, Inc. | 0.91% | indirect interest |
|     LMC Chicago Sports, Inc. | 0.04% | indirect interest |
|     LMC Regional Sports, Inc. | 2.77% | indirect interest |
|     CVN, Inc. | 5.28% | indirect interest |
| LMC Newco U.S., Inc. | 3.83% | indirect interest |
| Liberty Sports Member, Inc. | 17.96% | indirect interest |
| Liberty/Fox Sports Financing LLC | 0.18% | indirect interest |
| Fox/Liberty Networks, LLC | 13.62% | indirect interest |
| Fox Sports RPP Holdings, LLC | 35.56% | indirect interest |
| | 35.92% | indirect interest |

May-27-2008  12:01    From-NATIONAL HOCKEY LEAGUE                    212-789-2050        T-192  P.058/069  F-641

## SCHEDULE 8(b)-2

## OWNERSHIP OF CABLEVISION AS OF THE DATE HEREOF

Tele-Communications, Inc.[1]

36.1% of outstanding common stock
10.1% of total voting power

---

[1] Percentage calculations are based on the number of shares of Cablevision stock reported by Cablevision as outstanding on January 6, 1998. Percentages shown reflect TCI's beneficial ownership after the closing of the merger and contribution contemplated by the Merger Agreement and assuming completion of the Connecticut Transaction as described in clause (iv) of paragraph C of the Recitals.

# OWNERSHIP OF TCI

| | |
|---|---|
| The Equitable Companies Incorporated[1] | 6.0% of outstanding common stock<br>2.9% of total voting power |
| The Capital Group Companies, Inc.[2] | 6.8% of outstanding common stock<br>3.3% of total voting power |
| John C. Malone[3,4] | 4.5% of outstanding common stock<br>24.74% of total voting power |
| Estate of Betsy Magness[4,5] | 1.3% of outstanding common stock<br>5.73% of total voting power |
| Estate of Bob Magness[4,6] | 3.2% of outstanding common stock<br>14.07% of total voting power |

---

[1]Information is based on a Schedule 13G, dated February 12, 1997, filed by The Equitable Companies Incorporated, which Schedule 13G indicates that said corporation owns 32,824,784 shares of Series A TCI Group Common Stock and 23,303,041 shares of Series A Liberty Media Group Common Stock. The Equitable Companies' percentage ownership and voting power are calculated based on the estimated number of shares of TCI capital stock outstanding as of March 1, 1997, after elimination of shares then held by TCI and its majority owned subsidiaries.

[2]Information is based on a Schedule 13G, dated February 14, 1997, filed by The Capital Group Companies, Inc., which Schedule 13G indicates that said corporation owns 34,799,410 shares of Series A TCI Group Common Stock and 28,902,435 shares of Series A Liberty Media Group Common Stock. The Capital Group Companies' percentage ownership and voting power are calculated based on the estimated number of shares of TCI capital stock outstanding as of March 1, 1997, after elimination of shares then held by TCI and its majority owned subsidiaries.

[3]As of February 10, 1998, John C. Malone owned (including shares owned by his spouse, as to which shares he disclaims ownership) the following outstanding shares: 146 shares of Series A TCI Group Common Stock; 21,971,891 shares of Series B TCI Group Common Stock; 12,807 shares of Series A Liberty Media Group Common Stock; 12,941,092 shares of Series B Liberty Media Group Common Stock; and 22,034,494 shares of Series B Ventures Group Stock. Mr. Malone also has the right to direct the vote of 1,684,775 shares of Series B TCI Group Common Stock and 1,721,360 shares of Series B Ventures Group Common Stock (representing 1.4% of the total voting of TCI voting stock). The percentage of voting power shown in the table for Mr. Malone includes those shares.

[4]Mr. Malone, the Estate of Betsy Magness, the Estate of Bob Magness and certain beneficiaries of those Estates have entered into a voting agreement that, in certain circumstances, will give Mr. Malone the right to direct the vote of shares of TCI common stock representing an additional 20.3% of the total voting power of TCI voting stock. The percentages of voting power shown in the table for Mr. Malone, the Estate of Betsy Magness and the Estate of Bob Magness do not give effect to the exercise of that right by Mr. Malone.

[5]As of February 10, 1998, the Estate of Betsy Magness owned the following outstanding shares: 5,539,818 shares of Series B TCI Group Common Stock; 2,374,156 shares of Series A Liberty Media Group Common Stock; 2,379,829 shares of Series B Liberty Media Group Common Stock; and 5,823,452 shares of Series B Ventures Group Stock.

[6]As of February 10, 1998, the Estate of Bob Magness owned the following outstanding shares: 10,171,345 shares of Series B TCI Group Common Stock; 6,726,505 shares of Series A Liberty Media Group Common Stock; 11,454,693 shares of Series B Liberty Media Group Common Stock; and 12,034,298 shares of Series B Ventures Group Stock.

May-27-2008  12:01    From-NATIONAL HOCKEY LEAGUE                    212-789-2050        T-182   P.060/069   F-641

# SCHEDULE 13

# UNRELEASED CLAIMS

**TCI Parties**

None with respect to the TCI Parties.

May-27-2008  12:01   From-NATIONAL HOCKEY LEAGUE                    212-789-2050         T-182  P.061/069  F-641

Schedule 8(b)-2

NHC

## OWNERSHIP OF CABLEVISION AND PARENT

Pursuant to the Cablevision By-Laws, the Board of Directors of Cablevision has fixed the time and date for the determination of stockholders entitled to notice of and to vote at the meeting as of the close of business on January 6, 1998. Accordingly, only holders of record of Cablevision Common Stock on such date and at such time will be entitled to vote at the meeting, notwithstanding any transfer of any stock on the books of Cablevision thereafter. On January 6, 1998, Cablevision had outstanding 13,983,496 shares of Cablevision Class A Common Stock, each of which entitled the holder to one vote, and 11,096,709 shares of Cablevision Class B Common Stock, each of which entitled the holder to ten votes. On such date, there were approximately 735 holders of record of Cablevision Common Stock.

In accordance with Cablevision's confidential voting policy, all shareholder proxies, ballots and voting materials will be confidentially inspected and tabulated by independent inspectors of election and will not be disclosed to Cablevision except under certain limited circumstances.

## Cablevision

The following table sets forth (i) the number and percent of shares of Cablevision Class A Common Stock and Cablevision Class B Common Stock owned of record and beneficially by each director and each executive officer of Cablevision and (ii) the name, address and the number and percent of shares of Cablevision Class A Common Stock and Cablevision Class B Common Stock owned of record and beneficially by persons beneficially owning more than five (5%) percent of any class.

| Names and Address | Class A Common Stock Beneficially Owned (1) | | Class B Common Stock Beneficially Owned (1) (2) | | Class A & Class B Common Stock Beneficially Owned (1)(2) | | Combined Voting Power of Class A & Class B Common Stock Beneficially Owned (1)(2) |
|---|---|---|---|---|---|---|---|
| Charles F. Dolan (3)(4) | 331,618 | 2.4% | 6,254,282 | 55.4% | 6,565,899 | 26.4% | 49.7% |
| The Capital Group Companies, Inc. (5) | 2,008,970 | 14.8% | — | — | 2,008,970 | 8.1% | 1.6% |
| Capital Research and Management Company (5) | | | | | | | |
| Capital Guardian Trust Company (5) 333 South Hope Street Los Angeles, CA 90071 | | | | | | | |
| The Equitable Companies, Incorporated (6) 787 Seventh Avenue New York, NY 10019 | 2,392,383 | 17.6% | — | — | 2,392,383 | 9.6% | 1.9% |
| Gabelli Funds, Inc. (7) GAMCO Investors, Inc. (7) One Corporate Center Rye, NY 10580 | 3,779,329 | 28.7% | — | — | 3,779,329 | 15.2% | 3.0% |
| John Tatta(8) | 20,000 | * | — | — | 20,000 | * | * |
| William J. Bell (9)(10) | 116,349 | * | — | — | 116,349 | * | * |
| Francis F. Randolph, Jr.(11) | 58,500 | * | — | — | 58,500 | * | * |
| Robert S. Lemle (9)(10) | 93,967 | * | — | — | 93,967 | * | * |
| Marc Lustgarten (9)(10) | 122,063 | * | — | — | 122,063 | * | * |
| Sheila A. Mahoney (10) | 21,337 | * | — | — | 21,337 | * | * |
| Robert P. May | 200 | * | — | — | 200 | * | * |
| Daniel T. Sweeney (10) | 31,351 | * | — | — | 31,351 | * | * |
| Charles D. Ferris (12) | 9,000 | * | — | — | 9,000 | * | * |
| Richard H. Hochman (12) | 10,094 | * | — | — | 10,094 | * | * |
| Victor Oristano (12)(13) | 9,000 | * | — | — | 9,000 | * | * |
| James L. Dolan (1)(14)(22)(23) | 14,686 | * | 745,241 | 6.6% | 759,929 | 3.0% | 5.9% |
| Patrick F. Dolan (10)(15)(20)(24) | 4,100 | * | 817,410 | 7.3% | 821,510 | 3.3% | 6.5% |

77

May-27-2008  12:01    From-NATIONAL HOCKEY LEAGUE                212-789-2050        T-182  P.062/069  F-641

Schedule 8(b)-2
NHL

## OWNERSHIP OF CABLEVISION AND PARENT

Pursuant to the Cablevision By-Laws, the Board of Directors of Cablevision has fixed the time and date for the determination of stockholders entitled to notice of and to vote at the meeting as of the close of business on January 6, 1998. Accordingly, only holders of record of Cablevision Common Stock on such date and at such time will be entitled to vote at the meeting, notwithstanding any transfer of any stock on the books of Cablevision thereafter. On January 6, 1998, Cablevision had outstanding 13,983,496 shares of Cablevision Class A Common Stock, each of which entitled the holder to one vote, and 11,096,709 shares of Cablevision Class B Common Stock, each of which entitled the holder to ten votes. On such date, there were approximately 735 holders of record of Cablevision Common Stock.

In accordance with Cablevision's confidential voting policy, all shareholder proxies, ballots and voting materials will be confidentially inspected and tabulated by independent inspectors of election and will not be disclosed to Cablevision except under certain limited circumstances.

**Cablevision**

The following table sets forth (i) the number and percent of shares of Cablevision Class A Common Stock and Cablevision Class B Common Stock owned of record and beneficially as of March 31, 1997 by each director and each executive officer of Cablevision and (ii) the name, address and the number and percent of shares of Cablevision Class A Common Stock and Cablevision Class B Common Stock owned of record and beneficially by persons beneficially owning more than five (5%) percent of any class.

| Name and Address | Class A Common Stock Beneficially Owned (1) | | Class B Common Stock Beneficially Owned (1) (2) | | Class A & Class B Common Stock Beneficially Owned (1)(2) | | Combined Voting Power of Class A & Class B Common Stock Beneficially Owned (1)(2) |
|---|---|---|---|---|---|---|---|
| Charles F. Dolan (3)(4) | 331,618 | 2.4% | 6,234,281 | 56.4% | 6,565,899 | 26.4% | 49.7% |
| One Media Crossways | | | | | | | |
| Woodbury, NY 11797 | | | | | | | |
| The Capital Group Companies, Inc. (5) | 2,008,970 | 14.3% | — | — | 2,008,970 | 8.1% | 1.6% |
| Capital Research and Management Company(5) | | | | | | | |
| Capital Guardian Trust Company (5) | | | | | | | |
| 333 South Hope Street | | | | | | | |
| Los Angeles, CA 90071 | | | | | | | |
| The Equitable Companies, Incorporated (6) | 2,392,383 | 17.6% | — | — | 2,392,383 | 9.6% | 1.9% |
| 787 Seventh Avenue | | | | | | | |
| New York, NY 10019 | | | | | | | |
| Gabelli Funds, Inc. (7) | | | | | | | |
| GAMCO Investors, Inc. (7) | 3,779,329 | 28.7% | — | — | 3,779,329 | 15.2% | 3.0% |
| One Corporate Center | | | | | | | |
| Rye, NY 10580 | | | | | | | |
| John Tatta(8) | | | | | | | |
| William J. Bell (9)(10) | 20,000 | * | — | — | 20,000 | * | |
| Francis F. Randolph, Jr.(11) | 116,349 | * | — | — | 116,349 | * | |
| Robert S. Lemle (9)(10) | 58,500 | * | — | — | 58,500 | * | |
| Marc Lustgarten (9)(10) | 93,957 | * | — | — | 93,957 | * | |
| Sheila A. Mahoney (10) | 122,063 | * | — | — | 122,063 | * | |
| Robert R May | 21,337 | * | — | — | 21,337 | * | |
| Daniel T. Sweeney (10) | 200 | * | — | — | 200 | * | |
| Charles D. Ferris (12) | 31,351 | * | — | — | 31,351 | * | |
| Richard H. Hochman (12) | 9,000 | * | — | — | 9,000 | * | |
| Victor Oristano (12)(13) | 10,094 | * | — | — | 10,094 | * | |
| James L. Dolan (1)(14)(22)(23) | 9,000 | * | — | — | 9,000 | * | |
| Patrick F. Dolan (10)(15)(20)(24) | 4,100 | * | 745,241 | 6.6% | 759,929 | 3.0% | 5.9% |
| | | | 817,410 | 7.3% | 821,510 | 3.3% | 6.5% |

77

May-27-2008  12:01    From-NATIONAL HOCKEY LEAGUE

212-789-2050    T-182  P.063/069  F-641

| Name and Address | Class A Common Stock Beneficially Owned (1) | | Class B Common Stock Beneficially Owned (1)(2) | | Class A & Class B Common Stock Beneficially Owned (1)(2) | | Combined Voting Power of Class A & Class B Common Stock Beneficially Owned (1)(2) |
|---|---|---|---|---|---|---|---|
| Thomas C. Dolan (10)(16)(21)(25)(26) .... | 4,017 | * | 663,686 | | 667,703 | 2.7% | |
| Vincent Tese (12) | 2,500 | | — | 5.9% | 2,500 | | 5.3% |
| All executive officers and directors as a group (20 persons) (3)(4)(8)(9)(10)(11) (12)(13)(14)(15)(16) (29)(21)(22)(23)(24)(25)(26) | | | | | | | |
| Paul J. Dolan (17)(22)(24)(25)(26) ..... 100 Corporate Place Suite 150 Chardon, OH 44024 | 902,287 1,700 | 6.4% * | 8,460,618 1,894,063 | 73.2% 16.6% | 9,362,905 1,895,763 | 37.1% 7.6% | 67.6% 15.0% |
| Kathleen M. Dolan (17)(23) .......... One Media Crossways Woodbury, NY 11797 | 1,000 | * | 716,741 | 6.4% | 717,741 | 2.9% | 5.7% |
| Mary S. Dolan (18)(20) .......... 300 So. Riverside Plaza Suite 1480 Chicago, IL 60606 | 2,500 | * | 597,401 | 5.3% | 599,901 | 2.4% | 4.7% |
| Deborah A. Dolan (18)(24) .......... One Media Crossways Woodbury, NY 11797 | 1,000 | * | 816,741 | 7.3% | 817,741 | 3.3% | 6.5% |
| Matthew J. Dolan (19)(21) .......... 231 Main Street Court House Annex Chardon, OH 44024 | 1,500 | * | 597,401 | 5.3% | 598,901 | 2.4% | 4.7% |
| Marianne E. Weber (19)(25)(26) .......... One Media Crossways Woodbury, NY 11797 | 1,000 | * | 654,855 | 5.9% | 655,855 | 2.6% | 5.2% |
| John MacPherson (27) .......... 21 Old Town Lane Halesite, NY 10009 | 43,000 | | 1,883,074 | 16.7% | 1,926,074 | 7.8% | 14.9% |

(1) Beneficial ownership of a security consists of sole or shared voting power (including the power to vote or direct the vote) and/or sole or shared investment power (including the power to dispose or direct the disposition) with respect to the security through any contract, arrangement, understanding, relationship or otherwise. Unless indicated, beneficial ownership disclosed consists of sole voting and investment power. Beneficial ownership of Cablevision Class A Common Stock that are issuable upon conversion of shares of Cablevision Class A Common Stock is exclusive of the shares of Cablevision Class B Common Stock.

(2) Cablevision Class B Common Stock is convertible into Cablevision Class A Common Stock at the option of the holder on a share for share basis. The holder of one share of Cablevision Class A Common Stock is entitled to one vote at a meeting of stockholders of Cablevision, and the holder of one share of Cablevision Class B Common Stock is entitled to ten votes at a meeting of stockholders of Cablevision except in the election of directors.

(3) Includes 267,475 shares of Cablevision Class A Common Stock owned by the Dolan Family Foundation, a New York not-for-profit corporation, the sole members of which are Charles Dolan and his wife, Helen A. Dolan. Neither Mr. Dolan nor Mrs. Dolan has an economic interest in such shares, but Mr. Dolan and his wife share the ultimate power to vote and dispose of such shares. Under certain rules of the Securities and Exchange Commission, so long as Mr. Dolan and his wife retain such powers, each of Mr. Dolan and his wife is deemed to have beneficial ownership thereof. Also includes 5,000 shares of Cablevision Class A Common Stock owned directly by Mrs. Dolan. (The number of shares held at indicated includes 67,138 shares resulting from the assumed conversion of 183,000 shares of Series I Preferred Stock (0.37070 shares of Common Stock for each share of Cablevision Series I Preferred Stock).

(4) Does not include an aggregate 4,981,928 shares of Cablevision Class B Common Stock held by trusts for the benefit of Dolan family interests (the "Dolan Family Trusts"). The Dolan Family Trusts also own an aggregate of 94,026 shares of Cablevision Series C Preferred Stock which, commencing on December 30, 1997, may be converted by Cablevision into shares of Cablevision Class B Common Stock in lieu of redeeming such shares for cash. All shares of Cablevision Series C Preferred Stock were redeemed for cash on January 2, 1998. Mr. Dolan disclaims beneficial ownership of the shares owned by the Dolan Family Trusts in that he has neither voting nor investment power with respect to such shares.

78

(5) Cablevision has been informed that certain operating subsidiaries of The Capital Group Companies, Inc. exercised investment discretion over various institutional accounts which hold as of December 31, 1996, 2,008,970 shares of Cablevision Class A Common Stock. Capital Guardian Trust Company, a bank, and one of such operating companies, exercised investment discretion over 751,220 of such shares. Capital Research and Management Company, a registered investment adviser, has investment discretion with respect to such shares. The number of shares held as indicated includes 549,370 shares resulting from the assumed conversion of 1,482,000 shares of Cablevision Series I Preferred Stock (8.37070 shares of common stock for each share of Cablevision Series I Preferred Stock).

(6) Cablevision has been informed that certain operating subsidiaries of The Equitable Companies Incorporated exercise sole investment discretion over various institutional accounts which own 2,392,383 shares of Cablevision Class A Common Stock, and that such operating subsidiaries exercise sole voting power with respect to 1,960,433 of such shares and sole dispositive power with respect to all of such shares. The number of shares held as indicated includes 538,063 shares resulting from the assumed conversion of 2,530,572 shares of Cablevision Series I Preferred Stock (8.37070 shares of common stock for each share of Cablevision Series I Preferred Stock).

(7) Cablevision has been informed that certain operating subsidiaries of Gabelli Funds, Inc. ("GFI") beneficially held, or exercise investment discretion over various institutional accounts which beneficially held as of March 7, 1997, an aggregate of 3,779,329 shares of Class A Common Stock, including approximately 24,745 shares of Cablevision Class A Common Stock that may be obtained upon conversion of shares of Series I Preferred Stock held by such entities on such date. Cablevision has been informed that GAMCO Investments, Inc., an investment adviser registered under the Investment Advisers Act of 1940 and a wholly-owned subsidiary of GFI, held sole dispositive power over 2,951,450 of such shares and sole voting power over 2,800,350 of such shares.

(8) Does not include 40,000 shares of Cablevision Class A Common Stock held by the Tata Family Group. The Tata Family Group is a New York limited partnership, the general partners of which are six trusts for the benefit of Tata family interests (the co-trustees of each of which are Stephen A. Carb, Esq. and either Deborah T. DiCoble or Lisa T. Crowley, each a daughter of John Tata who has been a director since 1985 and was the President of Cablevision from 1985 until 1991), and the limited partners of which are trusts for the benefit of Mr. Tata and Tata Family interests (the trustee of each of which is Stephen A. Carb, Esq.). Mr. Tata who, as of April 1, 1995, was the holder of 20,000 shares of Cablevision Class A Common Stock, disclaims beneficial ownership of the stock beneficially owned by trusts for the benefit of his family, in that he has neither voting nor investment power with respect to such shares.

(9) Includes shares owned by children of the individuals listed, which shares represent less than 1% of the outstanding Cablevision Class A Common Stock.

(10) Includes shares of Cablevision Common Stock issuable upon the exercise of options granted pursuant to Cablevision's First Amended and Restated 1996 Employee Stock Plan or its predecessor plans which on April 1, 1997 were unexercised but were exercisable within a period of 60 days from that date. These amounts include the following number of shares for the following individuals: Mr. James Dolan 13,688; Mr. Bell 116,028; Mr. Lemle 90,725; Mr. Lustgarten 121,650; Ms. Mahony 21,192; Mr. Sweeney 14,800; Mr. Patrick Dolan 2,200; Mr. Thomas Dolan 3,917; and all executive officers and directors as a group 422,264. Certain of these options held by Messrs. Bell, Lustgarten and Lemle may be exercised only when the Fair Market Value (as defined) of a share of Cablevision Class A Common Stock exceeds $61.89. These Options (which are included in the aggregate option amounts set forth above in this footnote(10)) are as follows: Mr. Bell 76,000; Mr. Lustgarten 80,000; and Mr. Lemle 60,000. Certain of these options held by Ms. Mahony, Mr. Patrick Dolan, Mr. Thomas Dolan and other executive officers, may be exercised only when the Fair Market Value (as defined) of a share of Cablevision Class A Common Stock exceeds $59.975. These options (which are included in the aggregate option amounts set forth above in this footnote (10)) are as follows: Ms. Mahony 2,500; Mr. Patrick Dolan 1,562; Mr. Thomas Dolan 1,375; all executive officers and directors as a group 18,373.

(11) Includes 500 shares of Cablevision Class A Common Stock held by The Utopia Fund and 500 shares of Cablevision Class A Common Stock held by The Sarah Todd Fund. The Utopia Fund and The Sarah Todd Fund are both private charitable trusts of which Mr. Randolph is the sole trustee. Mr. Randolph disclaims beneficial ownership of the shares of Cablevision Class A Common Stock held by The Utopia Fund and The Sarah Todd Fund in that neither Mr. Randolph nor any member of his immediate family has a vested interest in the income or corpus of such trusts.

(12) Includes shares of Cablevision Common Stock issuable upon the exercise of options granted pursuant to Cablevision's 1996 Stock Option Plan for Non-Employee Directors, which on April 1, 1997, were unexercised but were exercisable within a period of 60 days from that date. These amounts include the following number of shares for the following individuals: Mr. Ferris 8,000; Mr. Hochman 8,000; Mr. Oristano 8,000; and Mr. Tese 2,500.

(13) The shares listed are owned by Alda Investment Company, a Florida partnership consisting of members of the Oristano family.

(14) Includes 28,500 shares of Cablevision Class B Common Stock owned by trusts for minor children as to which James L. Dolan disclaims beneficial ownership. Also includes 716,741 shares of Cablevision Class B Common Stock held by two family trusts of which James L. Dolan is a contingent beneficiary and a co-trustee, as to which James L. Dolan disclaims beneficial ownership, which shares are also described in footnotes (22) and (23).

79

(15) Includes 3,500 shares of Cablevision Class B Common Stock owned by trust for a minor child as to which Patrick F. Dolan disclaims beneficial ownership. Also includes 607,970 shares of Cablevision Class B Common Stock held by two family trusts of which Patrick Dolan is a contingent beneficiary and a co-trustee, as to which Patrick F. Dolan disclaims beneficial ownership, which shares are also described in footnotes (20) and (24).

(16) Includes 603,696 shares of Cablevision Class B Common Stock held by three family trusts of which Thomas C. Dolan is a contingent beneficiary and a co-trustee, as to which Thomas C. Dolan disclaims beneficial ownership, which shares are also described in footnotes (21), (25) and (26).

(17) Includes 303,116 shares of Cablevision Class B Common Stock held by the DC Kathleen Trust, the co-trustees of which are Kathleen Dolan and Paul Dolan.

(18) Includes 303, 126 shares of Cablevision Class B Common Stock held by the DC Deborah Trust, the co-trustees of which are Deborah Dolan and Mary Dolan.

(19) Includes 294,285 shares of Cablevision Class B Common Stock held by the DC Marianne Trust, the co-trustees of which are Marianne E. Weber and Matthew Dolan.

(20) Includes 294,285 shares of Cablevision Class B Common Stock held by the DC Patrick Trust, the co-trustees of which are Patrick Dolan and Mary Dolan.

(21) Includes 303,116 shares of Cablevision Class B Common Stock held by the DC Thomas Trust, the co-trustees of which are Thomas Dolan and Matthew Dolan.

(22) Includes 303,116 shares of Cablevision Class B Common Stock held by the DC James Trust, the co-trustees of which are James Dolan and Paul Dolan.

(23) Includes 413,625 shares of Cablevision Class B Common Stock held by the Dolan Descendants Trust, the co-trustees of which are James Dolan and Kathleen Dolan and Paul Dolan.

(24) Includes 513,625 shares of Cablevision Class B Common Stock held by the Dolan Progeny Trust, the co-trustees of which are Patrick Dolan, Deborah Dolan and Paul Dolan.

(25) Includes 307,625 shares of Cablevision Class B Common Stock held by the Dolan Grandchildren Trust, the co-trustees of which are Thomas Dolan, Marianne E. Weber and Paul Dolan.

(26) Includes 52,945 shares of Cablevision Class B Common Stock held by the Dolan Spouse Trust, the co-trustees of which are Thomas Dolan, Marianne E. Weber and Paul Dolan.

(27) Includes aggregate of 1,883,174 shares of Cablevision Class B Common Stock held by various trusts for the benefit of family members of Charles F. Dolan's family for which Mr. MacPherson serves as Trustee and, in such capacity, exercises sole voting power and dispositive power with respect to such shares. Such trusts also own an aggregate of 38,724 shares of Cablevision Series C Preferred Stock. All shares of Cablevision Series C Preferred Stock were redeemed for cash on January 2, 1998.

The Dolan family interests (other than Dolan) have agreed with Cablevision that in the case of any sale or disposition by Dolan family interests (other than Dolan) of shares of Cablevision Class B Common Stock to a holder other than Dolan or Dolan family interests, such shares of Cablevision Class B Common Stock will be converted on the basis of one share of Cablevision Class B Common Stock for each share of Cablevision Class B Common Stock. This agreement will apply to Parent and the Parent Common Stock after the Merger.

Dolan and trusts for the benefit of members of his family, by virtue of their ownership of Cablevision Class B Common Stock, are able collectively to control stockholder decisions on matters in which holders of Cablevision Class A Common Stock and Cablevision Class B Common Stock vote together as a class, and to elect 75% of the Cablevision Board of Directors.

*Registration Rights.* Cablevision has granted to each of Dolan, certain Dolan family interests and the Dolan Family Foundation the right to require Cablevision to register, at any time prior to the death of both Dolan and his wife, the shares of Cablevision Class A Common Stock held by them provided that the shares requested to be registered shall have an aggregate market value of at least $3,000,000. There is no limitation on the number or frequency of the registrations that such parties can demand pursuant to the preceding sentence. After the death of both Dolan and his wife, such parties will be permitted one additional registration. In addition, Cablevision has granted such parties "piggy-back" rights pursuant to

# SCHEDULE 13

## UNRELEASED CLAIMS

**TCI Parties**

None with respect to the TCI Parties.

May-27-2008  12:02    From-NATIONAL HOCKEY LEAGUE                          212-799-2050              T-192   P.067/069   F-641

Schrodr 13

## CLAIMS AND POTENTIAL CLAIMS
## AGAINST NHL AND NHL CLUBS

1.     Any claims arising out of or in connection with the Agreement dated May 5, 1972 between the New York Rangers and Nassau Sports (New York Islanders), as amended.

2.     Any claims arising out of or in connection with the Territorial and Broadcasting Rights Agreement with Meadowlanders (New Jersey Devils) dated as of June 19, 1982, and related documents, as amended.

3.     Any claims arising out of or in connection with the pension matters addressed in Bathgate v. National Hockey League Pension Society, et al, and any settlements arising out of that case.

4.     Any claims in connection with the case entitled Forbes v. Eagleson, et al.

12/15/97