# Exhibit 26

## CONSENT AGREEMENT

THIS CONSENT AGREEMENT is made this 18th day of December, 1997 by and among the following parties:

(i) NATIONAL HOCKEY LEAGUE, a joint venture organized as an unincorporated association not-for-profit (the "NHL");

(ii) MADISON SQUARE GARDEN, L.P., a Delaware limited partnership ("MSG"), and its general partner MSG EDEN CORPORATION, a Delaware corporation ("Eden") (collectively, the "MSG Parties");

(iii) RAINBOW GARDEN CORP., a Delaware corporation ("Rainbow Garden"), RAINBOW MEDIA HOLDINGS, INC., a Delaware corporation ("Rainbow Media"), RAINBOW REGIONAL HOLDINGS, L.L.C., a Delaware limited liability company ("Rainbow Regional"), RAINBOW MEDIA SPORTS HOLDINGS, INC., a Delaware corporation ("Rainbow Sports"), REGIONAL PROGRAMMING PARTNERS, a New York general partnership ("RPP"), REGIONAL MSG HOLDINGS, L.L.C., a Delaware limited liability company ("Regional MSG"), CABLEVISION PROGRAMMING INCORPORATED, a Delaware corporation ("CPI") and CABLEVISION SYSTEMS CORPORATION, a Delaware corporation ("Cablevision"), (collectively, the "Rainbow Parties");

(iv) the parties listed on schedule 1A (collectively, the "Fox Parties");

(v) the parties listed on schedule 1B (collectively, the "Liberty Parties"); and

(vi) the parties listed on schedule 1C (collectively, the "Fox/Liberty Parties").

Each of the parties listed above, other than the NHL, is sometimes referred to in this Consent Agreement individually as a "Transaction Party" and collectively with the parties other than the NHL as the "Transaction Parties". The Transaction Parties other than the MSG Parties and the Rainbow Parties are sometimes referred to in this Consent Agreement individually as an "Acquiring Party" and collectively as the "Acquiring Parties".

## Background

(a) On June 22, 1997, certain of the Rainbow Parties and Fox/Liberty Parties entered into a Formation Agreement and agreed to a form of General Partnership Agreement of RPP that, among other things, provides for (i) the formation of RPP, (ii) the contribution to RPP by the Rainbow Parties of certain assets, including the .4% general partner interest and the 89.4% limited partner interest they currently hold in MSG, which in turn owns all of the assets comprising the New York Rangers hockey club (the "Rangers"), in exchange for a 60% general partner interest in RPP, (iii) the contribution to RPP by the Fox/Liberty Parties of $850 million

-2-

in cash in exchange for a 40% interest in RPP, and (iv) the designation of Rainbow Regional as managing partner of RPP, subject to certain exceptions set forth in the General Partnership Agreement of RPP. These transactions are collectively referred to in this Consent Agreement as the "Proposed Transactions".

(b)     The Proposed Transactions will result in certain of the Liberty Parties having a direct or indirect ownership interest in more than one NHL team because, through their direct or indirect ownership of certain capital stock of Time Warner, Inc. ("Time Warner"), those Liberty Parties will have an indirect interest in the Time Warner subsidiary that, subject to its satisfaction of each of the conditions set forth in an Expansion Agreement dated June 25, 1997 and its compliance with certain related agreements, will have the right to operate an NHL Member Club in Atlanta, Georgia beginning in the 1999-00 NHL season, and because a Related Party (as defined below) of the Liberty Parties will have an interest in a subsidiary of Ascent Entertainment Group, Inc. ("Ascent") that entitles it to certain rights with respect to the Colorado Avalanche (the "Potential Conflicts of Interest").

(c)     The Proposed Transactions and the Potential Conflicts of Interest each require the approval of the NHL Board of Governors. The Related Transactions (as defined below) do not require NHL approval.

(d)     The Transaction Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transactions and to the ownership, right to transfer any direct or indirect interest in, and right to manage MSG that will be in effect from and after consummation of the Proposed Transactions, a complete list of which is provided on Schedule 1E (the "Transaction Documents").

(e)     On December 2, 1997, the NHL Board of Governors approved the Proposed Transactions and the Potential Conflicts of Interest, subject to the terms and conditions of this Consent Agreement, which is executed by the NHL in accordance with the authority granted by the Board of Governors.

(f)     The parties acknowledge that certain of the Rainbow Parties and the MSG Parties are also parties to the Prior Consent Agreements (as defined in Section 10) with the NHL, which remain in full force and effect. Accordingly, these parties have been excluded from certain provisions of this Consent Agreement to the extent they are already bound by the similar provisions of the Prior Consent Agreements.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, it is agreed as follows:

-3-

1.    NHL Consent.    Subject to the terms and conditions set forth in this Consent Agreement, the NHL hereby consents to the Proposed Transactions and the Potential Conflicts of Interest.    The consent granted herein is limited to the Proposed Transactions and the Potential Conflicts of Interest as described in this Consent Agreement and does not extend to any other transfer, sale, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG, or the ownership by any Transaction Party of any direct or indirect interest in any other Member Club, whether or not the same may be contemplated by the Transaction Documents. Without limiting the preceding sentence, the NHL's consent specifically does not extend to any public offering of interests in, or spin-off or reorganization of, MSG, Rainbow, RPP or any Fox/Liberty Party or any transfer resulting from the exercise of any right of first refusal, right of first negotiation, option, right to make additional capital contributions other than in accordance with current interests (except for changes of less than 5% in the aggregate that do not result in a change of effective control of any Transaction Party and that are otherwise in compliance with the NHL Constitution and Agreements, including conflicts of interest rules), or similar right that may be set forth in the Transaction Documents, other than as provided in connection with the Prior Consent Agreements.

2.    Performance of Agreements.    Subject to the terms of this Consent Agreement, each Transaction Party covenants with the NHL that it shall perform in all material respects all of the terms and conditions required of it under the Transaction Documents to which it is a party.

3.    NHL Constitution, Bylaws and Agreements.

(a)    Notwithstanding anything contained to the contrary in any of the Transaction Documents, for so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in a form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined in Section 13) from all Losses (as defined in Section 13) arising out of or relating to its former direct and indirect ownership interest in MSG, each of the Acquiring Parties agrees for itself and each of its affiliates and subsidiaries over which it has or at the time of reference can exercise control (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties"), as follows:

(i)    that it shall, and shall cause its Related Parties to, be bound by and comply with (A) the NHL Constitution, (B) the NHL Bylaws, (C) all other rules, regulations, policies, resolutions and governing documents of the NHL and NHL Enterprises (as defined in Section 13(a)) and their respective affiliates and subsidiaries, (D) any other agreements and arrangements to which the Member Clubs generally are or may become subject or by which they or their assets are or may become bound, including the current and future Collective Bargaining Agreements between the NHL and the National

-4-

Hockey League Players' Association, and all consent decrees and settlement agreements presently or hereafter in effect or entered into between or among the NHL and its Member Clubs or the  NHL and other persons in furtherance of NHL business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner or the NHL Constitution or Bylaws, and (E) the NHL Commissioner's interpretation of any of the foregoing, all as may be adopted, amended or modified from time to time and including the custom and practice thereunder (collectively, the "NHL Constitution and Agreements");

(ii)    that it shall not, and shall cause its Related Parties not to, take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs; and

(iii)    that it shall not, and shall cause its Related Parties not to, challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)    Rainbow Regional, Rainbow Sports, Regional MSG, CPI and RPP shall each be bound by and conduct itself in accordance with the NHL Constitution and Agreements to the same extent as the other Rainbow Parties are so bound pursuant to the Prior Consent Agreements.

(c)    Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Transaction Party that is an MSG Party or a Rainbow Party agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not materially adversely affect the Franchise (as defined in Section 4(a)) or the operations or financial condition of the Rangers and shall not in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

4.    Location and Territory of Franchise.

(a)    Except as contemplated by the Prior Consent Agreements, each Transaction Party warrants and represents to the NHL that it has received no representation, commitment, promise or assurance from the NHL with respect to any future transfer of ownership or change in location of the NHL franchise known as the New York Rangers (the "Franchise").

-5-

(b)    Each of the Transaction Parties warrants and represents to the NHL that the acquisition or retention of its interest in the Rangers is for the purpose of owning and/or operating the Franchise. Each Transaction Party that is an MSG Party or a Rainbow Party hereby agrees to operate the Franchise and to play the Rangers' schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements. The territorial definition of the Franchise shall be as provided for in the NHL Constitution and Agreements. The Transaction Parties and the Rangers hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described on Exhibit A hereto and each further represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

5.    Post Transaction Capital Structure and Other Conditions.  The NHL's consent granted in Section 1 hereof is subject to (a) consummation of the Proposed Transactions on the date hereof in all material respects in accordance with the Transaction Documents, and the consummation of the other transactions contemplated by the Formation Agreement and the General Partnership Agreements of the National Advertising Partnership and the National Sports Partnership (the "Related Transactions") on or before the 15th calendar day after the date hereof in all material respects in accordance with the terms of the relevant agreements furnished to the NHL, including the payment, contribution or exchange of all consideration required thereunder, and (b) after giving effect to the consummation of the Proposed Transactions, the direct and indirect ownership of the Rangers being in accordance with Schedule 5. If any of the requirements set forth in the preceding sentence has not been satisfied as of the applicable date, the consent of the NHL set forth in this Consent Agreement (but not the representations, warranties and obligations of the Transaction Parties hereunder) shall be void ab initio, and the Commissioner of the NHL (the "Commissioner") shall have the power, both in his capacity as Commissioner acting independently or in his capacity as arbitrator (if his jurisdiction as arbitrator is invoked by any party having the right to do so), to order rescission of any transaction consummated (or purportedly consummated) in violation of this Consent Agreement or the NHL Constitution and Agreements (other than changes in ownership at the Cablevision, TCI or News Corp. levels), as well as the right to order such other relief or remedy as may be within his powers under the NHL Constitution and Agreements.  Except as permitted by the Prior Consent Agreements, the agreement with the NHL dated June 17, 1997 with respect to the facilities provided pursuant to the Credit Agreement dated as of June 6, 1997 among MSG, The Chase Manhattan Bank, as agent, and the lending institutions that are parties thereto (the "Lender Letter Agreement") and the agreement with the NHL dated March 10, 1995 with respect to facilities provided to Rainbow by Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent (the "Toronto-Dominion Pledge Letter"), none of the Transaction Parties has pledged the Franchise, its direct or indirect interest therein or any other hockey-related assets of MSG to secure any debt obligation nor shall any of them grant such a pledge without the NHL's prior written consent or otherwise in accordance with the NHL Constitution and Agreements.

-6-

6.    <u>Ownership, Control, Change in Documents</u>.

(a)    Each of the Transaction Parties that is an MSG Party or a Rainbow Party represents and warrants to the NHL that the President of Eden as of the date hereof is Marc Lustgarten. Mr. Lustgarten is responsible for and has the authority to manage the business and affairs of Eden and MSG, subject to certain prior approvals of the board of directors of Eden as required by law. The General Manager of the Rangers is Neil Smith. Mr. Smith is responsible for and has the authority to manage the business and affairs of the Rangers, subject to certain prior approvals of the board of directors of MSG as required by law.

(b)    Notwithstanding any provision in any other agreement which may be to the contrary, the NHL and NHL Member Clubs also may rely upon any action of Charles F. Dolan or James Dolan as binding upon the Rangers, MSG and Eden with respect to any communication, agreement, understanding, action, consent or other transaction with or concerning the NHL or its Member Clubs until such authority is rescinded by a notice from MSG to the Commissioner in accordance with Section 15(c). No such notice shall be effective, however, unless at least one other individual continues to have the authority to so bind the Rangers, MSG or Eden with respect to such matters. Such persons may be designated by a notice from MSG to the Commissioner given either prior to or contemporaneously with the notice rescinding the authority of Charles F. Dolan or James Dolan, as the case may be.

(c)    Each Transaction Party acknowledges to and agrees with the NHL that, notwithstanding any provision of any document or instrument (other than the Prior Consent Agreements to the extent applicable) to the contrary:

(i)    The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed sale, pledge or other transfer of the assets comprising the Rangers, or any direct or indirect ownership interest in, MSG are subject to the NHL Constitution and Agreements, this Consent Agreement and, in the case of transactions involving the Rainbow Parties, the Prior Consent Agreements, the Lender Letter Agreement and the Toronto-Dominion Pledge Letter. Without limiting the foregoing, any sale, pledge, or other transfer of the assets comprising the Rangers, or a direct or indirect ownership interest in, MSG shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5, unless otherwise provided in the NHL Constitution and Agreements or the Prior Consent Agreements.

(ii)    No Transaction Document (including, without limitation, the Formation Agreement and the General Partnership Agreement of RPP) shall be rescinded, canceled, terminated or amended in any respect which may or will materially change the terms of the Proposed Transactions, materially affect the conditions, rights, obligations or duties of the parties under the Transaction Documents, this Consent Agreement or the NHL Constitution and Agreements, or adversely affect the interests of the NHL, without the prior written approval of the NHL. The NHL shall be promptly notified in writing, pursuant to Section 15(c) hereof, of

-7-

any proposed change in the Transaction Documents that has any material impact on the ownership or operation of the Rangers, whether or not the NHL has consent rights with respect to the change.

        (iii)    Without limiting the provisions of subsections (i) and (ii) above, each Transaction Party acknowledges and agrees that each of the below listed actions are subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall subject the Transaction Parties and the Franchise to all remedies and rights which may be enforced by the NHL or its Member Clubs:

    (A)    Subject to Section 6(d)(i) below, any change in the jurisdiction of formation or the form of entity of any of the Transaction Parties, including, without limitation, a change by MSG in its status as a Delaware limited partnership or Garden Holdings, Rainbow Garden, Rainbow Media or Rainbow Sports in their respective statuses as Delaware corporations;

    (B)    a liquidation, dissolution or transfer of a substantial part of the assets of MSG, Garden Holdings, Rainbow Garden, or Rainbow Media to another entity, if such assets include an interest in the Franchise;

    (C)    a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG; and

    (D)    a change in Rainbow Regional's status as the sole managing partner of RPP, any material diminution of the management authority of Rainbow Regional, any material increase in the management, voting, or information rights with respect to MSG of any partner in RPP other than Rainbow Regional, any other change in effective control of RPP, whether or not presently provided in the General Partnership Agreement of RPP.

    (d)    (i)    Notwithstanding the provisions of Section 6(c)(i), the consent of the NHL shall not be required for any reorganization or transfer of any of the (x) Fox Parties if, following such reorganization or transfer, News Corp. continues to own, directly or indirectly, all of the ownership and voting interests in the reorganized or transferred entity and News Corp. causes such reorganized or transferred entity to agree to be a "Fox Party" for purposes of the Consent Agreement, (y) Liberty Parties if, following such reorganization or transfer, TCI or Liberty continues to own, directly or indirectly, all of the ownership and voting interests in the

-8-

reorganized or transferred entity and TCI (or Liberty) causes such reorganized or transferred entity to agree to be a "Liberty Party" for purposes of the Consent Agreement, or (z) Fox/Liberty Parties if, following such reorganization or transfer, wholly-owned subsidiaries of News Corp., on the one hand, and TCI or Liberty, on the other hand, each own, directly or indirectly, 50% of all of the ownership and voting interests in the reorganized or transferred entity and News Corp. and TCI (or Liberty) cause such entity to agree to be a "Fox/Liberty Party" for purposes of the Consent Agreement.

(ii) The Transaction Parties acknowledge and agree that any transfer of a direct ownership interest in Cablevision, TCI or News Corp. is subject to compliance with the NHL Constitution and Agreements and that to the extent required by the NHL Constitution and Agreements they shall use reasonable efforts to obtain the NHL's prior approval of such transactions whenever practicable; provided, however, that, notwithstanding anything to the contrary contained in this Consent Agreement, any such transfer effectuated without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements), and for which such consent is not granted within 30 days after such transfer by the NHL, will subject MSG and the Franchise, as the NHL's sole remedy against the Transaction Parties, to any and all rights and remedies that the NHL may have against MSG and/or the Franchise in connection with a material breach by any Transaction Party of the NHL Constitution and Agreements, including without limitation, those enumerated in Section 15(h) below. The Transaction Parties agree to be bound by any decision of the NHL and its Member Clubs, and any actions taken by the NHL or its Member Clubs, in connection with the exercise of the NHL's rights and remedies as contemplated by this Section 6(d)(ii) in respect of any decision by the NHL not to approve any person or entity to whom any direct ownership interest in Cablevision, TCI or News Corp. is transferred (a "Transferee") without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements). The Affiliated NHL Parties shall be entitled to indemnification in accordance with Section 13 hereof with respect to all Losses arising out of any claim by a Transferee, any Transaction Party or any affiliate of a Transaction Party or Transferee with respect to the NHL's and its Member Clubs' decision not to approve such Transferee as a holder of an ownership interest in a Member Club or any actions taken by the NHL or its Member Clubs in connection with the exercise of its remedies contemplated by this Section 6(d)(ii) in respect of such decision not to approve such Transferee. The parties hereto agree that the failure to obtain the approval of the NHL and/or its Member Clubs for any transfer described in this Section 6(d)(ii) will not in and of itself affect the ability of the transferor to convey good title to the shares transferred. The NHL further agrees that it shall not seek to enjoin any sale of stock of Cablevision, TCI, Liberty (to the extent the stock is publicly traded) or News Corp., provided that the NHL may seek injunctive or other relief to prevent such transferee from exercising dominion or control directly or indirectly over RPP, MSG or the assets of the Rangers.

(e)       Each of the Transaction Parties (other than Rainbow Media and any entity whose shares currently are publicly traded) agrees that its stock or partnership certificate

-9-

or other document evidencing ownership in such entity, if any, will bear a legend substantially as follows:

> "The transfer, pledge or other disposition of [this limited partnership interest] [the stock reflected by this certificate] is subject to the approval and consent of the National Hockey League pursuant to the NHL Constitution and Bylaws and a certain Consent Agreement dated _____, 1997 with the NHL."

7.    Working Capital, Guaranties and Capital Contributions.

(a)    MSG agrees that at all times it shall pay in the ordinary course and in a timely fashion all of the Operating Expenses and shall maintain Net Working Capital solely for the use in the operations of the Franchise in an amount equal to not less than $15.0 million. The obligation of MSG to maintain the Net Working Capital for each annual period shall be deemed to be satisfied so long as:

(i)    MSG has entered into a working capital line of credit with a commercial bank making available to MSG an amount at all times equal to or exceeding the required amount of Net Working Capital; provided, that, except as set forth in subparagraph (b) below, such line of credit is not terminable by such bank absent an event of default during each of the respective annual periods that the Net Working Capital is being determined (i.e., the annual periods being from the date of this Consent Agreement to December 31, 1997 and thereafter from each January 1 through the following December 31), or

(ii)    MSG has agreed in writing to make a line of credit available to the Rangers in an available amount at all times equal to or exceeding the required amount of Net Working Capital; provided, that, any such line of credit shall be on terms satisfactory to the NHL; provided, further, that if MSG makes any such line of credit available, it shall be obligated at all times to keep an amount available to be drawn under the Credit Facility, or a substitute credit facility, for on-lending to the Rangers, which is sufficient to maintain a minimum of $15.0 million Net Working Capital in the Rangers.

(b)    For purposes of this Consent Agreement, "Net Working Capital" means (i) the amount of current assets as determined in accordance with generally accepted accounting principles in effect from time to time in the United States ("GAAP") and the unused portion of any line of credit entered into by MSG in accordance with paragraph (a) (i) or paragraph (a)(ii) above (provided that, with respect to paragraph (a) (i) above, such line of credit is not terminable during the forthcoming NHL season for which Net Working Capital is being determined and, with respect to paragraph (a) (ii) above, neither the intercompany line of credit nor MSG's line of credit is terminable during the forthcoming NHL season for which Net Working Capital is being determined), less (ii) current liabilities as determined in accordance with GAAP. The computation and determination of Net Working Capital shall not take into account as an asset

-10-

any monies, deposits or receipts with respect to advance ticket sales or, as a liability, a reserve or equivalent account in respect of such advance ticket sales. All other current assets and current liabilities, determined in accordance with GAAP, shall be taken into account in making such working capital computation. Notwithstanding anything contained in this Consent Agreement to the contrary, for purposes of this paragraph (b) and paragraph (a) of this section 7, a line of credit shall not be deemed to be terminable in the annual period or the forthcoming season if its term is to expire prior to the start of the NHL regular season, provided that MSG has received a written commitment letter from a bank satisfactory to the NHL at least 30 days prior to the expiration of the then existing line of credit to extend or replace the line of credit through, at least, the next following 12-month period from the expiration date and provided further that the NHL receives notification that the replacement line of credit has in fact been timely issued and is available to MSG.

(c)     For purposes of this Consent Agreement, "Operating Expenses" includes all expenses incurred in the operation of the Franchise; all obligations incurred by the Rangers in the operation of any minor league club; dues and assessments payable to the NHL; any sum required to cure defaults in the payment of salaries, bonuses, deferred compensation, or other sums due to any player on the NHL reserve list of the Franchise and any sums required to take all necessary steps so that, at the close of the applicable NHL season, the Franchise shall hold valid, enforceable and transferable player contracts for all of its players that were under contract during the prior season, except as may be changed in connection with trades and transfers in the ordinary course of business; the payment of salary, bonus, pension contribution and other compensation earned by any and all such players, including but not limited to, withholding taxes and unemployment taxes payable with respect to such compensation, and the payment of premiums on insurance to cover in the customary manner the appropriate compensation which may be due or become due to such players in the event the player becomes disabled and unable to perform his duties in the course of his employment pursuant to the collective bargaining agreement between the NHL and the National Hockey League Players' Association then in effect, or any applicable collective bargaining agreement with a minor league's players' association.

(d)     Notwithstanding anything to the contrary contained in this Consent Agreement or in any other document or agreement:

(i)     Cablevision, News Corp. and TCI jointly and severally agree to and do hereby guaranty, to and for the benefit of the NHL, to provide to the Rangers or MSG as the case may be from time to time such amounts as from time to time may be necessary for MSG to fully and punctually pay, perform and discharge, all Operating Expenses in the ordinary course and in a timely fashion; provided, however, that the aggregate liability of each of News Corp. and TCI for any Operating Expenses for which payment is due under this provision shall not exceed the product of the amount of such Operating Expenses and the direct and indirect percentage ownership interest in the Rangers that it may then have.

-11-

(ii) In the event that the NHL shall have the exclusive and unrestricted right under Paragraph 7(b) of the Lender Letter Agreement to select the purchaser to whom the Club Collateral (as defined in the Lender Letter Agreement) shall be sold pursuant to such Paragraph, Cablevision hereby agrees, upon the request of the NHL, to purchase the Club Collateral from MSG at the purchase price specified in Paragraph 7 (b)(iii)(A) of the Lender Letter Agreement (and upon such other reasonable terms and conditions as may be agreed to by Cablevision and the NHL), which purchase price shall be paid to the Collateral Agent in cash at closing (in full release of the lien of the Collateral Agent on the Club Collateral), all in accordance with the applicable terms and conditions of Paragraph 7 of the Lender Letter Agreement and to assume all Operating Expenses. If the NHL requests Cablevision to make such purchase, the Fox Parties, the Liberty Parties and the Fox/Liberty Parties may, if the NHL determines in accordance with the NHL Constitution and Agreements that they remain suitable owners, participate in such purchase to the extent of their interests in RPP, provided that the terms of their ownership interest are equivalent to those set forth in the Transaction Documents. This provision is intended to be a "last resort" provision and does not, and shall not be deemed to, give Cablevision or any of the other Transaction Parties any right of first refusal in the event the NHL has located another purchaser.

(e) The Transaction Parties acknowledge and agree that the NHL is a third party beneficiary of the agreements set forth in Section 7(d) and that the NHL's provision of the consent contained herein has been conditioned upon the provision of such agreements. The NHL shall have the right to require that the agreements set forth in Section 7(d) hereof be enforced in accordance with their terms.

(f) MSG and the Rainbow Parties shall furnish to the NHL, within 90 days of the end of each fiscal year of the Rangers, true and complete financial statements for the Rangers, consistent with past practice. MSG and the Rainbow Parties will give the NHL access, at the NHL's request on reasonable notice, to MSG's books and records pertaining or relevant to the Rangers in order to verify the accuracy of the foregoing financial statements or any other financial information provided to the NHL.

(g) In addition to the financial statements described above, each Transaction Party shall deliver to the NHL such other publicly available financial information with respect to it as the NHL may reasonably request from time to time.

(h) MSG, upon the NHL's request, shall (i) promptly deliver to the NHL a confirmation, in such form and substance as the NHL may reasonably request, that MSG then currently maintains the required level of Net Working Capital and (ii) provide the NHL (or its representatives) access to MSG's books and records pertaining or relevant to the Rangers in order that the NHL may confirm the same is true and correct. The NHL agrees, on behalf of itself and all of its officers and agents, to hold all information furnished by the Transaction Parties to the NHL confidential and not to disclose any of such information to any person or entity without the

-12-

prior written consent of MSG, except as otherwise disclosed pursuant to prior practice or as generally applicable to all Member Clubs.

8. <u>Representations and Warranties</u>.  (a) Subject to section 15(g), each Transaction Party hereby severally represents and warrants as of the date hereof to the NHL as follows:

(i)    If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business. If it is a limited partnership or limited liability company, it is a limited partnership or limited liability company validly existing and in good standing under the laws of the state of its formation, and has the power and authority to own, operate and lease its properties and to carry on its business.

(ii)    Such Transaction Party has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(iii)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Transaction Party enforceable against it in accordance with its terms.

(iv)    All balance sheets, income statements and other financial statements previously furnished by such Transaction Party to the NHL in connection with the application for approval of the Proposed Transactions, and the Potential Conflicts of Interest have been prepared in accordance with generally accepted accounting principles (as in effect in the jurisdiction indicated, "GAAP") applied on a consistent basis and fairly present the financial position and results of operations of the relevant entity as of the dates and for the periods indicated. All other information furnished by such Transaction Party to the NHL in connection with the request for approval of the Proposed Transactions is true and correct in all material respects and has not omitted any material statement which would make such information not misleading.

(v)    There is no action, suit, or proceeding pending against such Transaction Party or, in the case of each Transaction Party that is a Rainbow Party or an MSG Party, against the Rangers, which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established in accordance with GAAP and which is reasonably likely to result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Transaction Party or, in the case of each such Transaction Party that is a Rainbow Party or an MSG Party, MSG, or which is reasonably likely to prevent or impede the consummation of the transactions contemplated by this Consent Agreement. There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Transaction Party, requested by, any court or governmental agency which has resulted or is reasonably likely to result in any material adverse

-13-

change in the business, properties or assets, or in the condition (financial or otherwise) (a "Material Adverse Change") of such Transaction Party, or which is reasonably likely to prevent or impede the consummation of this Consent Agreement.

(vi)    To the best of the knowledge and belief of each such Transaction Party that is a Rainbow Party or MSG Party, except as set forth on schedule 8 hereto, each of the MSG Parties is in compliance in all material respects with all laws, regulations and orders, federal or otherwise, except where the failure to be in compliance (individually or collectively) would not be reasonably likely to result in a Material Adverse Change with respect to an MSG Party or have a material adverse effect on the ability of the MSG Parties to conduct their businesses as currently conducted.

(vii)    All filings, if any, required to be made by such Transaction Party or any of its affiliates under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, have been made and all applicable waiting periods with respect to those filings, if any, have expired, and there are no outstanding requests for additional information under that act or any other law that has not been complied with.  To the best knowledge of such Transaction Party, all other material consents, waivers, approvals, orders and authorizations of any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities) that are required to be obtained by such Transaction Party or any of its affiliates in connection with the Proposed Transactions have been obtained (or made) and are in full force and effect.

(viii)    Such Transaction Party has performed in all material respects all obligations required to be performed by such Transaction Party to date with respect to the Proposed Transactions and, except as disclosed in any schedules hereto, such Transaction Party is not in default under any material contract, agreement, lease, or other instrument relating to the Proposed Transactions to which such Transaction Party is a party or by which such Transaction Party is bound, except for defaults that individually or collectively, would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party or have a material adverse effect on such Transaction Party's ability to perform its obligations with respect to the Proposed Transactions.  All of the Transaction Documents are listed on Schedule 1E; true and complete copies of each of those Transaction Documents have been delivered to the NHL.  Except as provided in the Transaction Documents, the agreements referred to in the Prior Consent Agreements and the Amended and Restated Contribution and Merger Agreement dated as of June 6, 1997, to which Cablevision and Tele-Communications, Inc. ("TCI") are parties, together with the other agreements to be entered into pursuant thereto (collectively, the "TCI/Cablevision Transaction Documents") (which transactions shall not be considered approved by the NHL until execution and delivery by the applicable parties of a separate Consent Agreement with respect thereto), there are no other arrangements, agreements or understandings to which such Transaction Party or any of its affiliates is a party, whether written or oral, with respect to the ownership, control, right to transfer direct or indirect interests in, or financing or management of MSG and

-14-

the Rangers. Each of the Transaction Documents constitutes a valid and binding obligation enforceable against each of the parties thereto in accordance with its terms.

(ix)    The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Transaction Party, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Transaction Party's properties or assets (except as contemplated or disclosed herein or the Schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Transaction Party is a party or by which such Transaction Party is bound, except for conflicts, breaches, terminations or defaults that individually or collectively would not be reasonably likely to result in a Material Adverse Change with respect to such Transaction Party.

(x)    Except as described in the Prior Consent Agreements, the Transaction Documents and the TCI/Cablevision Transaction Documents, and (A) if such Owner is a Liberty Party, except for options, warrants, rights or convertible securities to purchase shares of TCI, or (B) if such Owner is a Fox Party, except for options, warrants, rights or convertible securities to purchase shares of The News Corporation Limited ("News Corp."), none of which options, warrants, rights, or convertible securities, if exercised or converted with respect to TCI or News Corp., as the case may be, would require NHL approval under the NHL Constitution and Agreements (because upon exercise or conversion they will constitute publicly traded shares representing an interest of less than 5% in the Rangers), there are no options, warrants, rights or convertible securities of any kind entitling any person or entity to acquire, directly or indirectly, any shares, partnership interests, debt instruments or other economic rights in such Transaction Party nor does such Transaction Party or, in the case of the Rainbow Parties or MSG Parties, MSG have any obligation to issue any such options, warrants, rights or securities. Such Transaction Party presently has no intention of selling or otherwise transferring any of its direct or indirect interest in the Rangers or any of the assets of the Rangers, except (x) in connection with the Proposed Transactions, (y) as described in the preceding sentence or (z) for transactions that would not require NHL approval pursuant to the NHL Constitution and Agreements because they involve publicly traded shares representing an interest of less than 5% in the Rangers.

(xi)    Except as set forth in the agreements with the NHL dated June 13, 1997 with respect to the Credit Agreement dated June 6, 1997 between MSG and Chase Manhattan, as agent, and March 10, 1995, with respect to facilities provided to Rainbow Media by Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent, such Transaction Party has not pledged the assets constituting the Rangers or its direct or indirect ownership interest in the Rangers to secure indebtedness of any person or entity and each Transaction Party (including the Fox Parties, Liberty Parties and Fox/Liberty Parties) acknowledges that any such pledge is subject to the NHL Constitutions and Agreements.

-15-

(xii)    The Proposed Transactions have been consummated today in accordance with the terms of the Transaction Documents, and the Related Transactions have been consummated today (or will be consummated not later than 15 calendar days after the date hereof) in all material respects in accordance with the terms of those agreements.

(xiii)    To the best of its knowledge, except as excluded from Section 13(a), such Transaction Party has no Claims (as defined in Section 13(a)) against any of the Affiliated NHL Parties (as defined in Section 13(a)).

(b)    Each of the Transaction Parties represent and warrant as to itself and its subsidiaries that (i) schedule 8(b)-1 contains a true and complete list, after giving effect to the Proposed Transactions, of each person or entity (other than shareholders of Cablevision, TCI, News Corp., ITT Corporation and General Electric Company) that directly or indirectly owns an interest in MSG or the Rangers, and the direct or indirect percentage interest of such person or entity in MSG or the Rangers and each intermediate entity, (ii) schedule 8(b)-2 contains a true and complete list of each person or entity that, to the best knowledge of Cablevision, TCI or News Corp., as the case may be, and as of the date or dates indicated, directly or indirectly owns of record or beneficially 5% or more of the outstanding capital stock or voting power of any of Cablevision, TCI or News Corp., respectively, and the percentage interest of such person or entity in that public company, (iii) prior to giving effect to the Proposed Transactions, MSG will have outstanding indebtedness for borrowed money of approximately $796 million, and (iv) after giving effect to the Proposed Transactions and the application of the capital contribution to be made by the Fox/Liberty Parties, MSG will have outstanding indebtedness for borrowed money of not more than $400 million.

(c)    Each of the Rainbow Parties represents and warrants that neither it nor any other Related Party of Cablevision owns any direct or indirect ownership interest in MSG or the Rangers other than as set forth on schedule 8(b)-1, or any ownership interest in any other Club.

(d)    Each of the Fox Parties represents and warrants that neither it nor any other Related Party of News Corp. owns any direct or indirect ownership interest in MSG or the Rangers other than as set forth on schedule 8(b)-1, or any ownership interest in any other Club.

(e)    Each of the Liberty Parties represents and warrants that neither it nor any other Related Party of TCI owns any direct or indirect ownership interest in MSG or the Rangers other than as set forth on schedule 8(b) or any ownership interest in any other Club other than as set forth in paragraph (b) of the "Background" section to this Consent Agreement.

-16-

9. Cable Agreements.

(a) The MSG Parties represent, warrant and covenant that, although MSG is considering numerous alternatives with respect to the MSG Network (including with respect to the level of carriage on cable television systems, e.g. basic, premium), MSG has no current intention and has made no decisions relating to the implementation of cablecasting Rangers games on a premium cable service, except to the extent consistent with current practice.

(b) At all times, the Rainbow Parties and the MSG Parties shall cause feeds with respect to the Rangers to be made available on the terms and conditions and in accordance with the NHL Constitution and Agreements.

10. Confirmation of Agreements. The Rainbow Parties and the NHL confirm that the Consent Agreement dated June 17, 1997 and, subject to section 10 of the June 17, 1997 Consent Agreement, the Consent Agreement dated March 10, 1995 (collectively, the "Prior Consent Agreements"), have not been amended or modified by this Consent Agreement and remain in full force and effect. Nothing in this Consent Agreement shall be construed to amend or modify the Lender Letter Agreement or the Toronto-Dominion Pledge Agreement, or any agreements in favor of the NHL given by Charles F. Dolan, James Dolan or trusts for the benefit of members of their families, including the agreement of Charles F. Dolan dated June 17, 1997 and the agreement of such trusts dated March 10, 1995. As applied to the Rainbow Parties and MSG Parties the term "NHL Constitution and Agreements" when used in this Consent Agreement shall have the meaning given to such term in the Prior Consent Agreement.

11. Distributions. Notwithstanding anything set forth in any Transaction Document or any other agreement, there will be no payment or distribution to the partners of MSG in any year, if such payment or distribution would reduce the amount of the Net Working Capital below the amount required to be maintained by MSG as set forth in this Consent Agreement.

12. Financing Statements. The Rangers and the Transaction Parties agree to execute any and all financing statements requested by the NHL which the NHL reasonably deems necessary to notify creditors of the Rangers and the Acquiring Parties of the existence of Article III of the NHL Constitution and Agreements and this Consent Agreement provided that, in the case of Cablevision, Rainbow Media, News Corp. and TCI, such financing statement shall be subject to the consent of the secured lenders, which will not be unreasonably withheld.

13. Release and Limitation of Liability.

(a) As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties on their own behalf and on behalf of their successors and assigns, but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever releases and

-17-

discharges the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc. (collectively, but excluding the NHL, "NHL Enterprises"), all of the NHL's Member Clubs (except the Rangers) and each of their successors and assigns and any of their respective past, present or future owners, directors, officers, agents, trustees or employees in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), which, to the best knowledge of such Transaction Party and MSG, exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any NHL operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Transaction Parties of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on Schedule 13, or (ii) any amounts due to any of the Transaction Parties from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions). To the extent any Affiliated NHL Party asserts a claim against any Transaction Party then the release contained in this paragraph shall not prohibit such Transaction Party from asserting a defense or counterclaim to that claim.

(b)    The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

(c)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with the Affiliated NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to legal actions against any Affiliated NHL Party (other than any action by any Transaction Party against any Affiliated NHL Party) with respect to the Proposed Transactions, the Related Transactions or the other transactions contemplated by the Transaction Documents. The NHL agrees (i) that it will give the indemnifying parties under this paragraph notice of any claim as to which it reasonably expects to seek indemnification under this

-18-

paragraph and that each of the indemnifying parties will have the right to participate in such defense, settlement or response at its own expense, and (ii) that those indemnifying parties will be consulted on a reasonable basis concerning the defense, settlement, or other response to any claim for which indemnification is sought. The indemnifying parties under this paragraph agree that they shall have no right to control the defense or other response to such a claim and that they will fully cooperate with the NHL, its designated counsel and other representatives.

(d)    Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

(i)    subject to the provisions of this Consent Agreement, the Transaction Parties (other than the Fox Parties, the Liberty Parties and the Fox/Liberty Parties) jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties of the Transaction Parties (other than the Fox Parties, the Liberty Parties and the Fox/Liberty Parties) (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful or allegedly wrongful act or omission of any of the Transaction Parties (other than the Fox Parties, the Liberty Parties and the Fox/Liberty Parties), or in each case any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such;

(ii)    subject to the provisions of this Consent Agreement, the Fox Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties of the Fox Parties or any of the Fox/Liberty Parties (including, without limitation, all obligations set forth in this Consent Agreement), or any wrongful act or omission of any of the Fox Parties or any of the Fox/Liberty Parties, or in each case any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such; and

(iii)    subject to the provisions of this Consent Agreement, the Liberty Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to (x) any liability or obligation to the Affiliated NHL Parties of any of the Liberty Parties or any of the Fox/Liberty Parties (including, without limitation, all obligations set forth in this Consent Agreement) or any wrongful act or omission of any of the Liberty Parties or any of the Fox/Liberty Parties, or in each case any of their respective subsidiaries or controlled affiliates, and any of their respective direct shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such.

-19-

(e)    Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Rangers or any other entity or (ii) to defer or off-set any distribution to the Rangers. Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of ·its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Transaction Party or any other party.

(f)    No Affiliated NHL Party other than the NHL or NHL Enterprises shall be entitled to indemnification under this Section 13 unless the Commissioner determines that such indemnification is reasonable and appropriate and, in the case of Losses suffered by any Owner or Member Club for which indemnification is sought pursuant to Section 13(d), such Losses relate to the business of the NHL or NHL Enterprises or other entities owned by the Clubs generally or the game of NHL hockey. Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under the Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure. No claim against either an individual Member Club or which is based primarily on an act or omission of the Rangers for which indemnification is sought under this paragraph will be settled without the consent of the indemnifying parties, such consent not to be unreasonably withheld.

14.    Special Provisions. The Transaction Parties acknowledge that the consummation of both the Proposed Transactions and the Related Transactions, together with their other interests in regional sports networks ("RSN") and the interests of certain Transaction Parties in other Member Clubs, could create potential conflicts of interest that could adversely affect the NHL's public image and reputation. Accordingly, as further consideration to induce the NHL to approve the Proposed Transactions and the Potential Conflicts of Interest, the Transaction Parties have agreed as follows:

(a)    Except pursuant to its rights under section 1 of this Consent Agreement with respect to the making of additional capital contributions to RPP, none of the Transaction Parties may increase or enter into negotiations to increase the percentage of its ownership in the Rangers or any other Member Club in which it currently has an ownership interest, and shall not acquire or enter into negotiations to acquire an ownership interest in any other Member Club, without in each case first giving a written notice of its intentions to the Commissioner (who shall have the right to consult with the NHL Executive Committee with respect to such matter).

-20-

(b)      For so long as any of them has effective control of the Rangers, none of the Rainbow Parties or MSG Parties shall hold any direct or indirect ownership interest in any of the material assets or revenue streams of any other Member Club (other than through arrangements in the ordinary course of business with RSNs in which they have a direct or indirect ownership interest) or in any other Member Club, except as permitted by provisions of the NHL Constitution and Agreements relating to the ownership of interests in multiple Member Clubs by controlling owners. If any entity in which any of the Rainbow Parties or MSG Parties has an interest, but over which none of them has control, enters into a transaction that results in the MSG Parties or the Rainbow Parties having an interest in another Member Club in violation of the NHL Constitution and Agreements, the applicable Rainbow Parties and/or MSG Parties shall have a reasonable time (which shall not exceed 180 days, except to the extent necessary to allow such parties to comply with any applicable law, regulatory requirement or governmental or judicial order that they are using reasonable commercial efforts to comply with) to divest or otherwise modify the nature of such interest to the extent necessary to be in compliance with the NHL Constitution and Agreements. During such period, the applicable Rainbow Parties and/or MSG Parties shall comply with any restrictions with respect to such interest as the Commissioner shall impose (including, for example, restrictions on voting such interest on NHL-related matters).

(c)      Except as set forth on schedule 14(c)(ii), none of the Transaction Parties shall act as a lender to or guarantor or surety for (i) any Member Club other than a Member Club in which it owns an interest that has been approved by the NHL, or (ii) any player for or direct or indirect owner of any other Member Club unless, in the case of loans to indirect owners, the Commissioner is advised of such arrangement prior to its consummation and determines that it is not material to the owner or the Member Club. All lending, guaranty and surety arrangements with respect to a Member Club in which a Transaction Party owns such an approved interest shall be subject to the NHL Constitution and Agreements. In addition, all lending, guaranty · or surety arrangements by the Fox Parties, the Liberty Parties or the Fox/Liberty Parties with respect to RPP, MSG or the Rangers, or any player for the Rangers, shall require the prior approval of the Commissioner of the NHL (who shall have the right to disapprove any such lending, guaranty or surety arrangement in his sole discretion), whether or not such approval is otherwise required under the NHL Constitution and Agreements; provided, however, that (i) as long as any of the Acquiring Parties holds a direct or indirect interest in the Rangers through RPP it may make loans to RPP if any of the Rainbow Parties (or any other parties of RPP not affiliated with any of the Acquiring Parties) fails to satisfy its pro rata share of any capital call made on the parties of RPP, provided that the aggregate outstanding principal amount of such loan at any time does not exceed $50,000,000 and such loans are made in accordance with the current form of RPP Partnership Agreement, and (ii) each Transaction Party may make a loan to any other Transaction Party that is its Related Party provided that such Transaction Party and Related Party are owned, directly or indirectly, in substantially the same proportions (with any difference in direct or indirect ownership not to exceed an aggregate of 5%). The NHL acknowledges that the obligation of Liberty/Fox Sports Financing, LLC with respect to a $243.6 million note payable to a Related Party of the Liberty Parties shall not constitute a violation of this

-21-

Consent Agreement or the NHL Constitution and Agreements or require any further approval by the NHL.

(d)    None of the Transaction Parties may enter into negotiations, or permit any of its Related Parties or their respective employees, representatives or agents to enter into negotiations with a Member Club on behalf of an RSN with respect to the material terms of any telecast or broadcast rights agreement, or any other agreement or series of related agreements that would involve the payment of $250,000 or more per year or $1,000,000 or more over the term of the agreement (including, without limitation, any extension or material modification of any existing agreement), without providing a notice to the Commissioner advising of such negotiations and identifying the persons who will be conducting the negotiations on behalf of the RSN.

(e)    None of the Transaction Parties shall communicate with, or permit any of its Related Parties or their respective employees, representatives or agents to communicate with, any Member Club with which any of them has an RSN agreement with respect to (i) any matter that is (or is reasonably likely to be) subject to a vote by the NHL Board of Governors (a "League Matter"), unless the Commissioner has received prior notice of and has consented to such communications, or (ii) the employment, offer or termination of employment or compensation of any particular player by such Member Club (including, for example, communications with respect to trades, free agent signings, or the exercise of draft rights or rights with respect to free agents) (collectively, "Player-Related Matters"); provided, however, that (x) this provision shall not apply to communications in connection with bona fide negotiations to acquire a direct or indirect ownership interest in such Member Club in accordance with the NHL Constitution and Agreements and this Consent Agreement, or during open discussions at meetings of the NHL Board of Governors (or committees thereof), (y) clause (ii) of this provision shall not apply to communications by senior management of Cablevision that have been disclosed in a prior notice to the Commissioner and consented to by him or to communications by any person employed solely by the MSG Parties, and (z) clause (i) of this provision shall not apply to any communications with respect to matters that could reasonably be expected to affect an RSN's or Member Club's rights and obligations under their RSN agreement, provided that such RSN agreement has been filed with and approved by the NHL, that the Commissioner receives prior notice of such communication and consents to such communication (except that such consent shall not be required if the communications are conducted solely by persons employed exclusively by the RSN that is party to such RSN agreement), that such communications occur with the Member Club on an individual basis, and that such communications are limited solely to the impact the particular matter at issue will have on the individual Member Club's RSN agreement. In the case of any matter for which notice is required under clauses (i) or clauses (y) or (z) of the proviso of the preceding sentence, the Commissioner shall withhold his consent only if he reasonably determines that the matter disclosed in the notice could create an appearance of impropriety or conflict of interest. Nothing in this clause (e) shall be construed to permit any conduct that otherwise would violate the NHL Constitution and Agreements, including, without limitation, the provisions of any collective bargaining agreement. For so long as any of the Rainbow Parties

-22-

(other than RPP) has effective control of the Rangers, the Governor and Alternate Governors of the Rangers shall be directors, officers or authorized employees of such Rainbow Parties (other than RPP) or the MSG Parties provided that such persons are not also owners, directors, officers or authorized employees of the Fox Parties, the Liberty Parties or the Fox/Liberty Parties.

(f)    Without limiting the Transaction Parties' obligations to comply with the NHL Constitution and Agreements, the Transaction Parties acknowledge that the Commissioner has the power to declare player transactions null and void pursuant to various provisions of the NHL Constitution and Agreements, including, without limitation, Article 6 of the Constitution, Section 12.5 of the By-Laws and provisions of the Collective Bargaining Agreement with the National Hockey League Players Association.

(g)    Without limiting any other provision of this Consent Agreement, none of the Liberty Parties shall, or shall permit any of their Related Parties to, (w) increase their respective interests in Time Warner or the Atlanta expansion club (other than as the result of the repurchase or redemption by Time Warner of other shares of its capital stock, provided that such transaction is not effected pursuant to an agreement between Time Warner and any of the Liberty Parties or their Related Parties and the Liberty Parties' aggregate interest in Time Warner is not increased by 5% or more of the outstanding shares of all classes of Time Warner common stock as a result of such transaction), or in Ascent, except to the extent permitted by the NHL Constitution and Agreements, (x) change the nature or terms of those holdings in such a way as to materially increase its rights with respect to management or operational matters, or (y) exercise any management or voting rights with respect to matters directly relating to the Atlanta expansion club or the Colorado Avalanche. Notwithstanding any other provision of this Consent Agreement, any of the Liberty Parties may pledge, or grant security interests or similar interests in, their interests in Time Warner stock to secure bona fide obligations to one or more banks, investment banking firms or other entities engaged, in the ordinary course of business, in lending or otherwise providing financing to third parties without the prior approval of the NHL; provided, however, that to the extent that any such pledge or grant would, but for the preceding clause, require approval by the NHL, (i) the pledgee or grantee shall agree in a written instrument, a copy of which will be provided to the Commissioner, that any action to enforce such pledge or grant (including any foreclosure or similar action) will be subject to the applicable provisions of the NHL Constitution and Agreements regarding transfers of interest in Clubs, (ii) the proceeds of any such borrowing are not used to increase the aggregate direct or indirect ownership interest of the Liberty Parties and their Related Parties in the Atlanta Member Club, and (iii) the Liberty Parties and their Related Parties shall not have the right to grant such pledges or security interests unless the book value of the assets and gross revenues of the Atlanta Member Club at the end of or for the fiscal year most recently ended represented 5% or less of the assets and gross revenues, respectively, of Time Warner in such fiscal period on a consolidated basis, or unless NHL consent would not otherwise be required.

-23-

(h)    No Member Club in which any of the Transaction Parties has a direct or indirect ownership interest may enter into trade negotiations with any other team in which any of the Transaction Parties has a direct or indirect interest or with any Member Club that is party to an RSN agreement with any of the Transaction Parties (or their respective Related Parties) without first giving a notice of the negotiations to the Commissioner.

(i)    None of the Rainbow Parties, on the one hand, or the Fox Parties, the Liberty Parties and the Fox/Liberty Parties, on the other hand, shall communicate with each other or permit their employees to so communicate, with respect to any Player-Related Matters or any other League Matter, other than periodic reports by the Rainbow Parties of the overall profit and loss performance and business strategy of MSG.  The restrictions set forth in the preceding sentence with respect to League Matters shall not, however, prohibit the Transaction Parties from discussing the amount of a bid that the National Sports Partnership or any RSN wishes to make for NHL-related programming.

(j)    If at any time the Commissioner shall determine that any of the provisions of this Section 14 have been violated by any of the Transaction Parties or that any of the Transaction Parties has taken any action that has materially and adversely affected the NHL, the Commissioner shall have the right to exercise all rights and remedies available to him under the NHL Constitution and Agreements for a breach of any contractual obligation to the NHL or violation of a provision of the NHL Constitution and Agreements, including, without limitation, the right to require, pursuant to his expulsion power under Article 6.3(j) of the NHL Constitution, the divestiture of the Rangers or the direct or indirect interest in the Rangers held by the breaching party, subject to the appeal right of the applicable party under Article 6.3(j)(3).

(k)    Each of the Transaction Parties acknowledges that the Proposed Transactions have been approved by the NHL Board of Governors based on the current facts and on the undertakings set forth in this Consent Agreement and that such approval is not intended, and shall not be construed, as indicating that the NHL is willing to approve any other transaction involving multiple ownership, including any other transaction that may involve ownership interests similar in kind or amount to (or lesser in rights or amount than) the interest involved in the Proposed Transactions.

(l)    Upon receipt of any notice pursuant to clauses (d) or (h) of this section 14, the NHL shall maintain its confidentiality and shall not share such information with any other person (other than its counsel, who it shall advise of this confidentiality obligation) until it otherwise becomes publicly available or is required to be disclosed pursuant to legal process. Nothing in the preceding sentence shall, however, be construed to limit the NHL's ability to respond to media inquiries with respect to such information or to address the matters disclosed in the notice with those of its Member Clubs which may be involved in the negotiations or matters disclosed in the notice.

-24-

15.    <u>Additional Provisions</u>.

(a)    The Transaction Parties agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Franchise and shall be the obligation thereof.

(b)    This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred.  This Consent Agreement may not be assigned except as set forth herein or with the written consent of the NHL.  Any dispute between the parties hereunder relating to the subject matter hereof which is subject to Section 6.3 of the NHL Constitution shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner of the NHL shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to this provision.  Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL or NHL Enterprises and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.

(c)    All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows;

If to the NHL:         National Hockey League
                       1251 Avenue of the Americas
                       New York, New York  10020-1198
                       <u>Attention</u>:  General Counsel

-25-

with a copy to:

Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Attention:  Joseph M. Leccese, Esq.


If to any of the                     Two Penn Plaza
MSG Parties:                         14th Floor
                                     New York, New York  10121
                                     Attention:  General Counsel


If to any of the                     150 Crossways Park West
Rainbow Parties other                Woodbury, New York  11797
than Cablevision:                    Attention:  General Counsel


If to Cablevision:                   One Media Crossways
                                     Woodbury, New York  11797
                                     Attention:  General Counsel


If to the Fox                        As set forth on Schedule 15(c)
Parties, the Liberty Parties
or the Fox/Liberty Parties:


or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

(d)      Subject to Section 10, this Consent Agreement, and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the Proposed Transactions. This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof. It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the NHL shall in addition to any other remedy available to it at law or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(d)(ii)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. The Transaction Parties also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Transaction Parties or their respective affiliates or subsidiaries may result in the

-26-

exercise of rights and remedies against MSG or the Franchise, including, but not limited to, the involuntary termination of the Franchise. This agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule or construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)    This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)    No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)    Except for the provisions of Section 7, the representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL. Accordingly, except for the provisions of Section 7, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party. By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party. Notwithstanding the preceding provisions of this Section 15(g), absent an express provision to the contrary, the representations, warranties and covenants in this Consent Agreement in favor of the NHL and/or the Affiliated NHL Entities by (i) each of the Rainbow Parties and the MSG Parties shall be joint and several with the other Rainbow Parties and the MSG Parties, (ii) each of the Fox Parties shall be joint and several with the other Fox Parties, (iii) each of the Liberty Parties shall be joint and several with the other Liberty Parties, and (iv) each of the Fox/Liberty Parties shall be joint and several with the other Fox/Liberty Parties.

-27-

(h)    The parties hereto acknowledge and agree that the failure by any of the Transaction Parties to comply in a material respect with any of the provisions of this Consent Agreement, shall constitute a material breach of this Consent Agreement which entitles the NHL to take action permitted by the NHL Constitution and/or this Consent Agreement.  Said action includes, in addition to any and all other rights to which the NHL shall be entitled to under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that if, in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by a Transaction Party, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Transaction Party notice of and such opportunity to cure the default as the NHL deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner.  No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)    All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents.  For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control as between any of the Affiliated NHL Parties, on the one hand, and any of the Transaction Parties, on the other hand; the foregoing shall not, however, modify any obligations of any of the Transaction Parties to any of the other Transaction Parties.  The Acquiring Parties agree that any violation of the NHL Constitution and Agreements and certain prior agreements by the Rainbow Parties or by Dolan shall be deemed for all purposes of this Consent Agreement to be a violation by Dolan, the Rainbow Parties and MSG of the NHL Constitution and Agreements which shall entitle the NHL to exercise all rights and remedies in respect thereof against Dolan, the Rainbow Parties and MSG under this Consent Agreement and the NHL Constitution and Agreements as the NHL may have under this Consent Agreement and NHL Constitution and Agreements, including a requirement that Garden Holdings, Rainbow Garden, Eden and MSG divest themselves all of their ownership interests in the Franchise at the direction of the Commissioner.

-28-

(j)    The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

IN WITNESS WHEREOF, this Consent Agreement has been executed this 18th day of December, 1997.

NATIONAL HOCKEY LEAGUE

By: _David Z._____
    Name:  David Zimmerman
    Title:    Vice President, General Counsel

-29-

MSG PARTIES

MADISON SQUARE GARDEN, L.P.

By:  MSG Eden Corporation,
     its General Partner

By: _____

MSG EDEN CORPORATION

By: _____

-30-

**RAINBOW PARTIES**

CABLEVISION SYSTEMS CORPORATION

By: _____

MARC A. LUSTGARTEN
VICE CHAIRMAN

RAINBOW MEDIA HOLDINGS, INC.

By: _____

MARC A. LUSTGARTEN
VICE CHAIRMAN

RAINBOW MEDIA SPORTS HOLDINGS, INC.

By: _____

MARC A. LUSTGARTEN
VICE CHAIRMAN

RAINBOW GARDEN CORP.

By: _____

MARC A. LUSTGARTEN
VICE CHAIRMAN

RAINBOW REGIONAL HOLDINGS, L.L.C.

By: _____

MARC A. LUSTGARTEN
VICE CHAIRMAN

-31-

REGIONAL PROGRAMMING PARTNERS

By: _____

       MARC A. LUSTGARTEN
        VICE CHAIRMAN

CABLEVISION PROGRAMMING INCORPORATED

By: _____

       MARC A. LUSTGARTEN
        VICE CHAIRMAN

REGIONAL MSG HOLDINGS, L.L.C.

By: _____

       MARC A. LUSTGARTEN
        VICE CHAIRMAN

12/16/97  TUE 13:40 FAX                                                    ☒007
c-12-97 08:26P
DEC-12-1997 14:35    FROM JAY ITZKOWITZ            TO        912126976686  P.02    P.02

**FOX PARTIES**

Fox Regional Sports Holdings, Inc.

By: _____

Name:  Jay Itzkowitz

Title:   Senior Vice President


Fox Regional Sports Member, Inc.

By: _____

Name:  Jay Itzkowitz

Title:   Senior Vice President


FXM Networks, Inc.

By: _____

Name:  Jay Itzkowitz

Title:   Senior Vice President


Twentieth Holdings Corporation

By: _____

Name:  Jay Itzkowitz

Title:  Senior Vice President


Fox, Inc.

By: _____

Name:  Jay Itzkowitz

Title:   Senior Vice President


**[SIGNATURE PAGE FOR CONSENT AGREEMENT]**

News America Publishing Incorporated

By: _____

Name: Jay Itzkowitz

Title: Senior Vice President

News America Holdings Incorporated

By: _____

Name: Jay Itzkowitz

Title: Senior Vice President

News Publishing Australia Limited

By: _____

Name:

Title:

News International plc

By: _____

Name:

Title:

Newscorp Investments Limited

By: _____

Name:

Title: L. HINTON

The News Corporation Limited

By: _____

Name:

Title:

[SIGNATURE PAGE FOR CONSENT AGREEMENT]

IN WITNESS WHEREOF, the Liberty Parties have executed and delivered this
Consent Agreement, intending to be bound hereby, as of the date first written above.

TELE-COMMUNICATIONS, INC.

By: _____
Name: Robert R. Bennett
Title: EVP

LIBERTY MEDIA CORPORATION
LIBERTY SPORTS, INC.
LIBERTY SPORTS SALES, INC.
LMC PRIME SPORTS NORTHWEST, INC.
LB NOSTALGIC SPORTS, INC.
LB FACILITIES, INC.
PRIME SPORTS EVENTS, INC.
TCI PRIME SPORTS, INC.
LMC INTERNATIONAL, INC.
ROCKY MOUNTAIN SPORTS &
        LIFESTYLE CHANNEL, INC.
LB SHOWCASE, INC.
LMC UTAH SPORTS, INC. I
KBL SPORTS NETWORK, INC.
LMC NORTHWEST CABLE SPORTS, INC.
LMC BAY AREA SPORTS, INC.
LMC UPPER MIDWEST SPORTS, INC.
LMC CHICAGO SPORTS, INC.
LMC REGIONAL SPORTS, INC.
CVN, INC.
LMC NEWCO U.S., INC.
LIBERTY SPORTS MEMBER, INC.

By: _____
Name: Robert R. Bennett
Title: President of each of the foregoing
        entities

**FOX/LIBERTY PARTIES**

Fox Sports RPP Holdings, LLC

By:_____

Name: Jay Itzkowitz

Title:  Senior Vice President


Fox/Liberty Networks, LLC

By:_____

Name: Jay Itzkowitz

Title:  Senior Vice President


Liberty/Fox Sports Financing LLC

By:_____

Name:  Jay Itzkowitz

Title:  Senior Vice President


**[SIGNATURE PAGE FOR CONSENT AGREEMENT]**

## SCHEDULES

The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein, except as expressly set forth in the consent agreement to which they are appended.

## SCHEDULES

The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein, except as expressly set forth in the Consent Agreement to which they are appended.

## INDEX OF SCHEDULES

| | |
|---|---|
| Schedule 1A | Fox Parties |
| Schedule 1B | Liberty Parties |
| Schedule 1C | Fox/Liberty Parties |
| Schedule 1E | List of Transaction Documents |
| Schedule 5 | Ownership |
| Schedule 8 | Compliance with Laws |
| Schedule 8(b)-1 | Ownership of MSG |
| Schedule 8(b)-2 | Ownership of the News Corporation and TCI |
| Schedule 13 | Unreleased Claims. |

# SCHEDULE 1A

# FOX PARTIES

| Owner | Type of Entity | Interest | Owned Entity |
|---|---|---|---|
| Fox Regional Sports Holdings, Inc. ("Fox Holdings") | Delaware corporation | 30.84% | Fox/Liberty |
| Fox Regional Sports Member, Inc. | Delaware corporation | .5% .5% | FSN Fox/Liberty Partner |
| FXM Networks, Inc. ("FX") | Delaware corporation | 100% | Fox Holdings |
| Twentieth Holdings Corporation ("Twentieth Holdings") | Delaware corporation | 100% | FX |
| Fox, Inc. ("Fox") | Colorado corporation | 100% (76% voting controlled by Murdoch) | Twentieth Holdings |
| News America Publishing Incorporated ("News AP") | Delaware corporation | 100% | Fox |
| News America Holdings Incorporated ("News America") | Delaware corporation | 100% 50% | News AP Financing LLC |
| News Publishing Australia Limited ("News Publishing") | Delaware corporation | 80% | News America |
| News International plc | England corporation | 20% | News America |
| Newscorp Investments Limited | England corporation | 100% | News International plc |
| The News Corporation Limited | South Australia corporation | 100% 100% | News Publishing Newscorp Investments Limited |

# SCHEDULE 1B

## LIBERTY PARTIES

| Owner | Type of Entity | Interest | Owned Entity |
|---|---|---|---|
| Tele-Communications, Inc. | Delaware corporation | 100% | Liberty Media Corporation |
| Liberty Media Corporation | Delaware corporation | 100% | Liberty Sports, Inc. |
| Liberty Sports, Inc. | Colorado corporation | 100% 13.28% | [17 Subsidiaries] LMC Newco U.S., Inc. |
| Intermediate Subsidiaries | | [Collectively 86.72%] | LMC Newco U.S., Inc. |
| Liberty Sports Sales, Inc. | Colorado corporation | 0.01% | |
| LMC Prime Sports Northwest, Inc. | Colorado corporation | 0.01% | |
| LSI Nostalgic Sports, Inc. | Colorado corporation | 0.01% | |
| LSI Facilities, Inc. | Colorado corporation | 0.01% | |
| Prime Sports Events, Inc. | Colorado corporation | 0.01% | |
| TCI Prime Sports, Inc. | Colorado corporation | 0.01% | |
| LMC International, Inc. | Colorado corporation | 0.01% | |
| Rocky Mountain Sports & Lifestyle Channel, Inc. | Delaware corporation | 0.82% | |
| LSI Showcase, Inc. | Colorado corporation | 1.41% | |
| LMC Utah Sports, Inc. I | Colorado corporation | 2.82% | |
| KBL Sports Network, Inc. | Colorado corporation | 6.86% | |
| LMC Northwest Cable Sports, Inc. | Colorado corporation | 3.31% | |
| LMC Bay Area Sports, Inc. | Colorado corporation | 5.09% | |
| LMC Upper Midwest Sports, Inc. | Colorado corporation | 0.20% | |
| LMC Chicago Sports, Inc. | Wyoming corporation | 15.42% | |
| LMC Regional Sports, Inc. | Colorado corporation | 29.42% | |
| CVN, Inc. | California corporation | 21.30% | |
| LMC Newco U.S., Inc. | Delaware corporation | 100% | Liberty Sports Member, Inc. |
| | | 50.00% | Liberty/Fox Sports Financing, LLC |
| | | 30.84% | Fox/Liberty Networks, LLC |

| Liberty Sports Member, Inc. | Delaware corporation | 0.50% | Fox Sports Net, LLC |
| | | 0.50% | Fox Sports RPP Holdings, LLC |

# SCHEDULE 1C

# FOX/LIBERTY PARTIES

| Owner | Type of Entity | Interest | Owned Entity |
|---|---|---|---|
| Fox Sports RPP Holdings, LLC ("Fox/Liberty Partner") | Delaware LLC | 40% partner | Regional Programming Partners ("RPP") |
| Fox/Liberty Networks, LLC ("Fox/Liberty") | Delaware LLC | 99% | FSN |
| Liberty/Fox Sports Financing LLC ("Financing LLC") | Delaware LLC | 38.32% | Fox/Liberty |

## SCHEDULE 1E

## TRANSACTION DOCUMENTS

*Fox/Liberty Transaction Documents:*

1.  Formation and Contribution Agreement dated as of April 29, 1996, by and among News America Holdings Incorporated, Fox, Inc. and Liberty Media Corporation.

2.  Parents Agreement dated as of April 29, 1996, by and between Liberty Media Corporation and News America Holdings Incorporated.

3.  The First Amended and Restated Agreement Regarding Ownership Interests dated as of December 15, 1997, by and among Liberty Media Corporation, News America Holdings Incorporated, Fox Regional Sports Holdings, Inc., LMC Newco U.S., Inc. and Liberty/Fox Sports Financing LLC.

4.  The First Amended and Restated Operating Agreement of Fox/Liberty Networks, LLC (formerly, Liberty/Fox U.S. Sports LLC) dated as of December 15, 1997.

5.  Operating Agreement of Fox Sports RPP Holdings, LLC dated as of June 20, 1997.


**[Rainbow to provide relevant documents.]**

Schedule 1E

### Transaction Documents

Formation Agreement among Rainbow Media Sports Holdings, Inc. and Fox Sports Net, ✓
LLC dated as of June 22, 1997

General Partnership Agreement of Regional Programming Partners ✓

General Partnership Agreement of National Sports Partners ✓

Amendments to Second Amended and Restated General Partnership Agreements of
SportsChannel Chicago Associates

Form of Fox Sports Network License Agreement

Form of License Agreement for Cablevision Systems Corporation's Carriage of
SportsChannel Ohio

Form of License Agreement for Cablevision Systems Corporation's Carriage of
SportsChannel/MSG

Form of License Agreement for Cablevision Systems Corporation's Carriage of
SportsChannel New England

Form of License Agreement for TCI's Carriage of SportsChannel Cincinnati

Form of License Agreement for TCI's Carriage of SportsChannel New England

Form of License Agreement for TCI's Carriage of SportsChannel Chicago

Form of License Agreement for TCI's Carriage of SportsChannel New York/MSG

Side Letter dated January 1, 1997 confirmation of an agreement

Reimbursement Agreement

Form of National Advertising Sales Representation Agreement

Options Reimbursement Agreement

Side Letter dated June 22, 1997 between Rainbow Media Sports Holdings, Inc. and Fox Sports Net, LLC supplementing certain of the parties' agreements in the Formation Agreement.

Side Letter dated June 22, 1997 between Rainbow National Sports Holdings, Inc. and Fox Sports RPP Holdings LLC regarding the financial statements of Madison Square Garden, L.P. and SportsChannel New York Holding Partnership.

Side Letter dated June 22, 1997 between Rainbow Media Sports Holdings, Inc. and Fox Sports NSP Holdings, LLC and Fox Sports RPP Holdings LLC setting forth certain understandings regarding the transactions and other matters contemplated by the Partnership Agreements.

# SCHEDULE 5*

## RAINBOW PARTIES

| Owner | Type of Entity | Interest | Owned Entity |
|-------|---------------|----------|--------------|
| Regional Programming Partners ("RPP") | NY partnership | 89.4% LP .4% GP (10.2% owned by ITT Corporation) | Madison Square Garden L.P. ("MSG") |
| Rainbow Regional Holdings, Inc. ("Rainbow Partner") | DE corporation | 60% managing partner | RPP |
| Rainbow Media Sports Holdings, Inc. ("Rainbow Sports") | DE corporation | 100% | Rainbow Partner |
| Rainbow Media Holdings Inc. ("Rainbow") | DE corporation | 100% | Rainbow Sports |
| Cablevision Systems Corporation ("Cablevision") | DE corporation | 75% (25% owned by the National Broadcasting Company, Inc.) | Rainbow |

Note: Other ownership as per Schedules 1A, 1B and 1C
*To be completed by Rainbow

Schedule 8

Compliance With Laws

None

## MADISON SQUARE GARDEN, L.P. OWNERSHIP

| | |
|---|---|
| **Cablevision Systems Corporation** | |
| **National Broadcasting Company, Inc.** | |
|    NBC Cable Holding, Inc. | 100% |
| **Rainbow Media Holdings, Inc.** | |
|    Cablevision Systems Corporation | 75% |
|    NBC Cable Holding, Inc. | 25% |
| **Rainbow Media Sports Holdings, Inc.** | |
|    Rainbow Media Holdings, Inc. ("RMHI") | 100% |
| **Rainbow Program Enterprises, L.P.** | |
|    **General Partner** | |
|       RMHI | 5.0% |
|    **Limited Partners** | |
|       Class A | |
|          Cablevision Programming Incorporated (100% owned by RMHI) | 30.0% |
|          (may be merged into RMHI post closing) | |
|       Class C | |
|          RMHI | 62.985% |
|          Network Capital Company | 0.09945% |
|          Communications Resources Company | 1.60355% |
|          Programming Capital Company | 0.31200% |
| **Rainbow Regional Holdings LLC** | |
|    Rainbow Media Sports Holdings, Inc. | 95.21% |
|    Rainbow Program Enterprises, L.P. | 4.79 |
|    [SportsChannel Ohio Holding Corporation | 3.14]* |
|    [SportsChannel Cincinnati Holding Corporation | 2.13]* |
|    [SportsChannel Bay Area Holding Corporation | 5.10]* |
|    [SportsChannel Associates Holding Corporation | 6.67]* |

\* Each of these entities is a wholly-owned subsidiary of Rainbow Media Holdings, Inc. and is being merged with and into Rainbow Media Holdings, Inc. Following the completion of these merger transactions, Rainbow Media Holdings, Inc. will contribute these interests to Rainbow Media Sports Holdings, Inc., bringing its ownership to the indicated 95.21%.

NY1:23531:69271.2

**Regional Programming Partners**
Rainbow Regional Holdings, LLC — 60%
Fox Sports RPP Holdings, LLC — 40%

**Regional MSG Holdings LLC**
Regional Programming Partners — 100%

**Rainbow Garden Corp.**
Regional Programming Partners — 100%

**MSG Eden Corporation**
Rainbow Garden Corp. — 100%

**New York Rangers Enterprises Company**
Madison Square Garden, L.P. — 100%

**Fox Sports RPP Holdings, LLC**
Fox/Liberty Networks LLC — 100%

**ITT Corp.**
ITT MSG, Inc. — 100%

NY12533: 69271.2

-2-

*cc: Mr. Robinson*



Madison Square Garden, L.P.
New Structure

# SCHEDULE 8(b)-1

## OWNERSHIP OF MSG

| *Entity* | *Ownership Interest in MSG* |
| --- | --- |
| Fox Regional Sports Member, Inc. | .18% indirect interest |
| Fox Regional Sports Holdings, Inc. | 11.2% indirect interest |
| FXM Networks, Inc. | 11.2% indirect interest |
| Twentieth Holdings Corporation | 11.2% indirect interest |
| Fox, Inc. | 11.2% indirect interest |
| News America Publishing Incorporated | 11.2% indirect interest |
| News America Holdings Incorporated | 18.1% indirect interest |
| News Publishing Australia Limited | 14.5% indirect interest |
| News International plc | 3.6% indirect interest |
| Newscorp Investments Limited | 3.6% indirect interest |
| The News Corporation Limited | 18.1% indirect interest |

## SCHEDULE 8(b)-2

## OWNERSHIP OF THE NEWS CORPORATION LIMITED AS OF DECEMBER 5, 1997

| | |
|---|---|
| Cruden Investments Pty. Limited and controlled affiliates | 26% of outstanding capital stock<br>31% of total voting stock |
| Capital Research and Management Company | 5.9% of outstanding capital stock<br>7.2% of total voting stock |

## OWNERSHIP OF TCI

| | |
|---|---|
| The Equitable Companies Incorporated[1] | 6.0% of outstanding common stock<br>2.9% of total voting power |
| The Capital Group Companies, Inc.[2] | 6.8% of outstanding common stock<br>3.3% of total voting power |
| John C. Malone[3] | 4.2% of outstanding common stock<br>25.6% of total voting power |

---

[1]Information is based on a Schedule 13G, dated February 12, 1997, filed by The Equitable Companies Incorporated, which Schedule 13G indicates that said corporation owns 32,824,784 shares of Series A TCI Group Common Stock and 23,303,041 shares of Series A Liberty Media Group Common Stock. The Equitable Companies' percentage ownership and voting power are calculated based on the estimated number of shares of TCI capital stock outstanding as of March 1, 1997, after elimination of shares then held by TCI and its majority owned subsidiaries.

[2]Information is based on a Schedule 13G, dated February 14, 1997, filed by The Capital Group Companies, Inc., which Schedule 13G indicates that said corporation owns 34,799,410 shares of Series A TCI Group Common Stock and 28,902,435 shares of Series A Liberty Media Group Common Stock. The Capital Group Companies' percentage ownership and voting power are calculated based on the estimated number of shares of TCI capital stock outstanding as of March 1, 1997, after elimination of shares then held by TCI and its majority owned subsidiaries.

[3]Information is based on a Schedule 13D, dated October 30, 1997, filed by John C. Malone, which Schedule 13D indicates that Mr. Malone owns, excluding unexercised options and stock beneficially owned by Mr. Malone's spouse, of which Mr. Malone disclaims any beneficial ownership, the following stock: 112,348 shares of Series A TCI Group Common Stock; 20,789,780 shares of Series B TCI Group Common Stock; 61,018 shares of Series A Liberty Media Group Common Stock; 8,334,145 shares of Series B Liberty Media Group Common Stock; 266,700 shares of Series B Ventures Class B Preferred Stock; 49,939 shares of Series A Ventures Group Stock; and 10,620,627 shares of Series B Ventures Group Stock. Mr. Malone's percentage ownership and voting power are calculated based on the estimated number of shares of TCI capital stock outstanding as of July 31, 1997.

# SCHEDULE 13

## UNRELEASED CLAIMS

None with respect to the Liberty Parties.

**[Rainbow/MSG]**

## CLAIMS AND POTENTIAL CLAIMS
## AGAINST NHL AND NHL CLUBS

1.    Any claims arising out of or in connection with the Agreement dated May 5, 1972 between the New York Rangers and Nassau Sports (New York Islanders), as amended.

2.    Any claims arising out of or in connection with the Territorial and Broadcasting Rights Agreement with Meadowlanders (New Jersey Devils) dated as of June 19, 1982, and related documents, as amended.

3.    Any claims arising out of or in connection with the pension matters addressed in Bathgate v. National Hockey League Pension Society, et al. and any settlements arising out of that case.

4.    Any claims in connection with the case entitled Forbes v. Eagleson, et al.

12/15/97