Exhibit 27

## CONSENT AGREEMENT

THIS CONSENT AGREEMENT is made this 17th day of June, 1997 by and among the NATIONAL HOCKEY LEAGUE, a joint venture organized as an unincorporated association not-for-profit (the "NHL"), MADISON SQUARE GARDEN, L.P., a Delaware limited partnership ("MSG"), MSG EDEN CORPORATION, a Delaware corporation ("Eden"), ITT EDEN CORPORATION, a Delaware corporation ("ITT Eden"), ITT MSG INC., a Delaware corporation ("ITT MSG"), ITT SHERATON CORPORATION, a Delaware corporation ("ITT Sheraton"), ITT CORPORATION, a Nevada corporation ("ITT"), GARDEN L.P. HOLDING CORP., a Delaware corporation ("Garden Holdings"), RAINBOW GARDEN CORP., a Delaware corporation ("Rainbow Garden"), RAINBOW MEDIA HOLDINGS, INC, a Delaware corporation ("Rainbow Media"), CABLEVISION SYSTEMS CORPORATION, a Delaware corporation ("Cablevision"), NATIONAL BROADCASTING COMPANY HOLDINGS, INC., a Delaware corporation ("NBC Holdings") NATIONAL BROADCASTING COMPANY, INC., a Delaware corporation ("NBC"), and NBC CABLE HOLDING, INC., a Delaware corporation ("NBC Cable") (the foregoing partnership and corporations, excluding the NHL, are referred to collectively as the "Transaction Parties").

### Background

(a)     Pursuant to a Partnership Interest Transfer Agreement dated April 15, 1997 (the "ITT Transfer Agreement"), Rainbow Garden has agreed to acquire (or to cause Eden to redeem) all of ITT Eden's shares in Eden, the sole general partner of MSG, and Garden Holdings has agreed to acquire (or to cause MSG to redeem) from ITT MSG all or a portion of ITT MSG's limited partnership interest in MSG, which owns all of the assets comprising the New York Rangers hockey club (the "Rangers").

(b)     Pursuant to a SportsChannel Contribution Agreement dated April 15, 1997, Rainbow Media has agreed to cause to be contributed to MSG all of the partnership interests in SportsChannel Associates, which contribution will increase the limited partnership interest of Garden Holdings (or its affiliates) in MSG by 1.4% and provide the entities identified on Schedule 1A with direct and indirect limited partnership interests in MSG as set forth on Schedule 1A. (The transactions described in paragraphs (a) and (b) are referred to collectively as the "ITT Transfer" and ITT Eden, ITT MSG, ITT Sheraton and ITT are referred to collectively as the "ITT Parties".)

(c)     Pursuant to (i) an Aircraft Contribution Agreement dated as of April 15, 1997 (the "Aircraft Contribution Agreement"), ITT MSG may cause to be contributed as a capital contribution to MSG a certain aircraft used in the business of MSG, which capital contribution will, under certain circumstances, result in an increase in ITT MSG's limited partnership interest in MSG, and (ii) the ITT Transfer Agreement, ITT may exercise the First Put Option and the Second Put Option, and Cablevision may exercise the Change of Control Call Right or the Third Year Call Right (the transactions described in this paragraph are referred to collectively as the "Additional ITT Transfers").

-2-

(d)    Pursuant to a letter agreement dated March 31, 1997, as amended through the date of this Consent Agreement pursuant to written agreements furnished to the NHL (the "NBC Agreement"), subject to NHL approval, (i) Rainbow Programming Holdings, Inc. has merged into Rainbow Media and NBC Cable has acquired 2,500 shares of Class C Common Stock of Rainbow Media which, as of the date hereof, represent 25% of the outstanding shares of Rainbow Media, (ii) NBC has the right to acquire additional shares of the Common Stock of Rainbow that, together with its Class C shares, will represent approximately 27% of the outstanding shares of Rainbow Media, (iii) NBC has the right under certain circumstances to convert its non-voting shares of Rainbow Common Stock into voting shares of Rainbow Common Stock, and (iv) NBC Cable has the right to exercise the "Put Option" under (and in accordance with) Rainbow's Certificate of Incorporation (the "PIK Preferred Conversion"). (The transactions described in clause (i) of this paragraph are referred to collectively as the "NBC Transfer", the transactions described in clauses (ii) - (iv) are referred to collectively as the "Additional NBC Transfers", and NBC Holdings, NBC and NBC Cable are referred to collectively in this Consent Agreement as the "NBC Parties").

(e)    On the date hereof, after giving effect to the ITT Transfer and the NBC Transfer: (i) Eden, as sole general partner, directly owns a .4% partnership interest in MSG; (ii) ITT MSG, as a limited partner, directly owns an approximately 10.2% partnership interest in MSG; (iii) Garden Holdings, as a limited partner, directly owns an approximately 89.4% (or 88% in the event that the 1.4% interest is issued to the entities identified on Schedule 1A) partnership interest in MSG; (iv) all of the outstanding capital stock of Eden is directly owned by Rainbow Garden; (v) ITT MSG and ITT Eden are direct wholly-owned subsidiaries of ITT Sheraton; (vi) ITT Sheraton is a direct wholly-owned subsidiary of ITT; (vii) Garden Holdings and Rainbow Garden are direct wholly-owned subsidiaries of Rainbow Media; (viii) Cablevision directly owns 2,500 shares of the Class A Common Stock and 5,000 shares of the Class B Common Stock of Rainbow Media, representing 75% of the outstanding capital stock and, except as described below, 100% of the voting power of Rainbow Media; (ix) NBC Cable directly owns 2,500 shares of the Class C Common Stock, representing 25% of the outstanding capital stock and, except for the right to elect one director and otherwise as provided by law or in Rainbow Media's certificate of incorporation, no voting power of Rainbow Media; (x) NBC Cable is a direct wholly-owned subsidiary of NBC; (xi) NBC is a direct wholly-owned subsidiary of NBC Holdings, which in turn is a direct wholly-owned subsidiary of General Electric Company, a New York corporation ("GE"); (xii) each of the entities identified on Schedule 1A owns a direct or indirect partnership interest in MSG as set forth on Schedule 1A; and (xiii) except as set forth on Schedule 2A and in paragraph (g) below, to the knowledge of the applicable Transaction Party, no person or entity owns more than 5% of the capital stock of Cablevision, ITT or GE.

(f)    Rainbow Media entered into a $300 million, three year credit facility with Canadian Imperial Bank of Commerce and Toronto Dominion (Texas), Inc., as co-agents, which facility was to refinance and be the successor to Rainbow Programming Holdings, Inc.'s credit facility. The Rainbow Media facility (i) is secured by a pledge of Cablevision's stock in Rainbow

-3-

Media and is guaranteed by the subsidiaries of Rainbow Media, except that such facility is not secured by a pledge of the stock of Rainbow Garden, Garden Holdings or MSG, and (ii) is subject to the letter agreement dated March 10, 1995 between the NHL and Toronto-Dominion (Texas) Inc., as administrative agent and as co-agent, and Canadian Imperial Bank of Commerce, as co-agent (the "Toronto-Dominion Pledge Letter").

(g)     MSG entered into a Credit Agreement dated as of June 6, 1997 (the "Credit Agreement"), among MSG, the lending institutions parties thereto and The Chase Manhattan Bank, as agent, pursuant to which an $850 million credit facility (the "Credit Facility") will, subject to the terms and conditions thereof, be made available to MSG. The proceeds of the Credit Facility will be used to pay a portion of the purchase price under the ITT Transfer Agreement and to finance the working capital needs of MSG, including the Rangers. As security for the financing, MSG has agreed to grant to The Chase Manhattan Bank, as Collateral Agent, a security interest in substantially all of its assets, including the Rangers. The NHL has consented to the grant of that security interest pursuant to and subject to the terms of a separate letter agreement being executed by the NHL and The Chase Manhattan Bank, as agent, contemporaneously with the execution of this Consent Agreement (the "Lender Letter Agreement").

(h)     Charles F. Dolan ("Dolan") and his family and trusts for the benefit of members of his family (the "Family Trusts") collectively own a majority of the outstanding Class B Shares of Cablevision and, as a result thereof, have the right to elect 75% of the board of directors of Cablevision.

(i)     The consent of the NHL Board of Governors is required for the ITT Transfer, the NBC Transfer and the Additional ITT Transfers. (The ITT Transfer, the NBC Transfer, the Additional ITT Transfers and the Additional NBC Transfers are referred to collectively as the "Proposed Transactions.")

(j)     The Transaction Parties have furnished to the NHL true, complete and correct copies of all material documents relating to the Proposed Transactions, a complete list of which is provided on Schedule 3A (the "Transaction Documents").

(k)     On June ___, 1997, the NHL Board of Governors adopted a resolution (the "Resolution") approving the Proposed Transactions, subject to the terms and conditions of this Consent Agreement, which is executed by the NHL in accordance with the authority set forth in the Resolution.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth herein, and subject to the following terms and conditions, it is agreed as follows:

-4-

1.    NHL Consent.    Subject to the terms and conditions set forth in the Resolution and in this Consent Agreement, the NHL hereby consents to the Proposed Transactions. The consent granted herein is limited to the Proposed Transactions and does not extend to any other transfer, sale, foreclosure, liquidation, wind-up, dissolution, mortgage, hypothecation, pledge or other impairment or encumbrance of any assets of, or direct or indirect ownership interests in, MSG, whether or not the same may be contemplated by the Transaction Documents, and specifically does not extend to any public offering of interests in, or spin-off or reorganization of, MSG or Rainbow.

2.    Performance of Agreements.    Subject to the terms of this Consent Agreement, each Transaction Party agrees to perform all of the terms and conditions required of it under the Transaction Documents to which it is a party, including, without limitation, and as applicable, the ITT Transfer Agreement, the NBC Agreement and Rainbow's Certificate of Incorporation, true and complete copies of which have been delivered to the NHL.

3.    NHL Constitution, Bylaws and Agreements.

(a)    Notwithstanding anything contained to the contrary in any Transaction Document, but subject to the terms hereof:

(i)    For so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties (as defined in Section 13) from all Losses (as defined in Section 13) arising out of or relating to its former ownership interest in MSG, each Transaction Party agrees (and, subject to the limitations set forth in this Consent Agreement, each of the NBC Parties agrees to cause GE and its controlled affiliates and controlled subsidiaries (the controlled affiliates and controlled subsidiaries of any party being its "Related Parties")) to be bound by and comply with (A) the NHL Constitution, (B) the NHL Bylaws, (C) all other NHL rules, regulations, policies and resolutions, (D) the current and future Collective Bargaining Agreements between the NHL and the National Hockey League Players' Association and consent decrees and settlement agreements presently or hereafter in effect or entered into between or among the NHL and its Member Clubs or the NHL and other persons in furtherance of NHL business or interests or as otherwise authorized, directly or indirectly, by the NHL Board of Governors, the NHL Commissioner, the Constitution or the Bylaws, and (E) the NHL Commissioner's interpretation of any of the foregoing, all as may be amended from time to time, in each case to the extent that the subject provisions of the NHL Constitution and Agreements (x) relate to MSG's ownership of the Rangers and (y) are generally applicable to all Member Clubs (collectively, the "NHL Constitution and Agreements");

-5-

(ii)    For so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties from all Losses arising out of or relating to its former ownership interest in MSG (but subject to the limitations set forth in the proviso of paragraph 13(a)), each Transaction Party agrees not to take or support any positions or actions which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements or which may have a material adverse impact on the NHL or its Member Clubs, except that the NBC Parties shall not be in violation of the NHL Constitution and Agreements or of this provision because of any action taken or statement made by any of them or any of their affiliates or subsidiaries to the extent such action is taken or statement is made in such entity's journalistic capacity, or because of any statement by any person having responsibilities for its broadcast or cable operations in connection with active and current negotiations for the rights to broadcast or cablecast NHL games; and

(iii)    For so long as it owns a direct or indirect ownership interest in MSG, and should it cease to hold such interest, subject to execution and delivery of documents in form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties from all Losses arising out of or relating to its former ownership interest in MSG, each Transaction Party (other than the NBC Parties) agrees not to challenge or support any challenge to, at any time or in any forum, and the NBC Parties agree not to challenge or support through administrative or legal proceedings any challenge to, at any time or in any legal, judicial, administrative or arbitral forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements.

(b)    Without modifying the foregoing and pursuant to Article 3.5 of the NHL Constitution, each Transaction Party (except the NBC Parties) agrees and represents to the NHL that the transactions contemplated by the Transaction Documents shall not, except as contemplated by the Transaction Documents, materially adversely affect the Franchise (as hereinafter defined) or the operation or financial condition of the Rangers and shall not in any way impair or adversely affect any debts, liabilities or obligations of the Rangers or MSG to any other person, including, without limitation, to the NHL, its Member Clubs or any related or affiliated entity of the NHL or of any of its Member Clubs, including, without limitation, player contracts or deferred compensation to players and other personnel.

(c)    Notwithstanding the provisions of paragraph 3(a)(i), except as expressly as provided in this Consent Agreement, if GE or any of its Related Parties (together, the "GE Entities") shall take any action that constitutes a violation of the NHL Constitution and Agreements, the NHL's sole recourse under the NHL Constitution and Agreements and this Consent Agreement shall be to take such action against MSG and the Franchise as it could take under the NHL Constitution and Agreements if any of those entities had committed such violation,

-6-

except that in the case of any violation that, if committed by the NBC Parties, MSG or the Franchise, could result in the involuntary termination of the Franchise or the interest in the Franchise of any of its direct or indirect owners pursuant to the NHL Constitution and Agreements (a "GE Termination Event"), the NHL also shall have the rights set forth in Section 6(d). The foregoing shall not, however, limit any rights the NHL might have at law, equity or otherwise against any GE Entities or any third party for any such act (other than rights arising solely under the NHL Constitution and Agreements and this Consent Agreement).

4.  Location and Territory of Franchise.

(a)  Except as set forth herein, each Transaction Party warrants and represents to the NHL that it has received no representation, commitment, promise or assurance with respect to any future transfer of ownership or change in location of the NHL franchise known as the New York Rangers (the "Franchise").

(b)  The Transaction Parties (other than the NBC Parties) warrant, represent and covenant to the NHL that, except for the Proposed Transactions, the acquisition or retention of an interest in the Rangers is for the purpose of operating the Franchise and hereby agree to so operate the Franchise and to play the Rangers' schedule of home games in the territory of the Franchise as provided for in the NHL Constitution and Agreements. The territorial definition of the Franchise shall be as provided for in the NHL Constitution and Agreements. The Transaction Parties and the Rangers hereby confirm and agree that the "Home Territory" and the "Sphere of Influence" of the Franchise is as described on Exhibit A hereto and each further represents and warrants that it has received no representation, commitment, promise, assurance or other indication of any kind whatsoever contrary thereto.

5.  Post Transaction Capital Structure and Other Conditions.  The NHL's consent granted in Paragraph 1 hereof is subject to (a) in the case of the ITT Transfer, the consummation of the ITT Transfer, (b) the ownership structure of the Transaction Parties upon consummation of the ITT Transfer and the NBC Transfer conforming to the provisions of paragraphs (e) and (h) of the "Background" Section hereof, (c) the Additional ITT Transfers being consummated strictly in accordance with the terms of the Aircraft Contribution Agreement and the ITT Transfer Agreement, as the case may be, (d) the Additional NBC Transfers being consummated strictly in accordance with the terms of the NBC Agreement and Rainbow's Certificate of Incorporation, as the case may be, and (e) upon the exercise by any of the Transaction Parties of any rights that cause or could cause an Additional ITT Transfer or Additional NBC Transfer to occur, MSG's promptly delivering to the NHL Commissioner (i) notice to that effect, (ii) copies of any documents relating to that Additional ITT Transfer or Additional NBC Transfer that have not previously been delivered, and (iii) a certificate as to such factual matters arising out of the transaction as the Commissioner shall reasonably request (including, for example, a certificate specifying the direct and indirect ownership interest of each Transaction Party in the Franchise and MSG after consummation of the transaction, and

-7-

confirming that the Additional ITT Transfer or Additional NBC Transfer has been consummated in accordance with the requirements of this Paragraph 5). Except as permitted under this Consent Agreement, the Lender Letter Agreement and the Toronto-Dominion Pledge Letter, none of the Transaction Parties has pledged the Franchise, their direct or indirect interest therein or any other hockey-related assets to secure any debt obligation, nor shall any of them grant such pledge without the NHL's prior written consent.

6.    <u>Ownership, Control, Change in Documents</u>.

(a)    The President of Eden as of the date hereof is Marc Lustgarten and he is responsible for and has the authority to manage the business and affairs of Eden and MSG, subject to certain prior approvals of the board of directors of Eden as required by law. The General Manager of the Rangers is Neil Smith, and Mr. Smith is responsible for and has the authority to manage the business and affairs of the Rangers, subject to certain prior approvals of the board of directors of MSG as required by law.

(b)    Notwithstanding any provision in any other agreement which may be to the contrary, the NHL and NHL Member Clubs may rely upon as binding upon the Rangers, MSG and Eden any action of Dolan or James Dolan with respect to any communication, agreement, understanding, action, consent or other transaction with or concerning the NHL, or its Member Clubs.

(c)    Each Transaction Party acknowledges and agrees that:

(i)    The ownership of the Franchise, any proposed transfer of the location of the Franchise and any proposed sale, pledge or other transfer of the assets of, or any direct or indirect ownership interest in, MSG are subject to the NHL Constitution and Agreements and this Consent Agreement. Without limiting the foregoing, subject to Sections 1, 5, 6(c)(iii)(D), and 6(d), any sale, pledge, or other transfer of the assets of, or a direct or indirect ownership interest in, the Transaction Parties shall be subject to and conditioned upon approval of the NHL pursuant to Article 3.5, unless otherwise provided in the NHL Constitution and Agreements, <u>provided</u>, that (A) it is acknowledged and agreed that shares of Cablevision common stock held by Family Trusts or members of Dolan's family shall be deemed to be held by Dolan for the purposes of this Consent Agreement and the NHL Constitution and Agreements and nothing herein or therein shall restrict transfers of such common stock between Dolan and such Family Trusts or such family members or among such Family Trusts or family members, (B) the conversion of the securities described on Schedule 4A hereto (the "Convertible Securities") into shares of common stock of Cablevision or the issuance of common stock of Cablevision otherwise in respect of the Convertible Securities has been approved by the NHL, (C) Dolan, members of his family and his Family Trusts may pledge stock of Cablevision owned by them as collateral for loans made to them, <u>provided</u> that, in the event that if after giving effect to the transfer of all of the stock subject to any such pledges Dolan, members of his family and Family Trusts would own in the aggregate

-8-

less than 51% of the voting power of Cablevision, then the pledgees with respect to all such pledges shall have executed and delivered to the NHL a letter agreement similar to the Lender Letter Agreement, (D) the sale, assignment or transfer of the stock of Cablevision shall not be deemed to be a transfer of a controlling interest in Cablevision for purposes of Article 3.5 of the Constitution to the extent that, following any such sale, assignment or transfer, Dolan and his family and Family Trusts have the right in the aggregate to elect a majority of the board of directors of Cablevision, (E) ITT may effect a "spin-off" (or other corporate reorganization), directly or indirectly through another wholly-owned subsidiary, of ITT Sheraton (each such spun-off or reorganized entity being a "Spun-off Subsidiary") without NHL consent if and only if (I) after the spin-off the ownership of common stock in such Spun-off Subsidiary is identical (except for changes in ownership by "public" shareholders or the grant or exercise of employee stock options or other similar rights granted to employees of such Spun-off Subsidiary and without giving effect to any when issued trading) to the ownership of common stock in ITT on the record date of the spin-off and (II) following the spin-off, ITT shall be released from its obligations under this Consent Agreement, provided that it executes and delivers documents in form reasonably satisfactory to the NHL releasing and indemnifying the Affiliated NHL Parties from all Losses arising out of or relating to its former ownership interest in MSG, and provided further that ITT shall continue to be an "affiliate" of such Spun-off Subsidiary to the extent ITT remains under common control with such Spun-off Subsidiary, and (F) the existing pledge of the stock of Rainbow Media by Cablevision in favor of Toronto-Dominion (Texas), Inc., as agent for certain lenders which have made senior bank facilities available to Rainbow Media, and any replacement, modification, substitution or extension of such pledge in connection with any refinancing or amendment of such credit facilities requires no further approval of the NHL other than in accordance with the terms of the Toronto-Dominion Pledge Letter.

     (ii)  No Transaction Document (including, without limitation, the ITT Transfer Agreement, the NBC Agreement, the SportsChannel Contribution Agreement, the Aircraft Contribution Agreement, the Agreement of Limited Partnership of MSG and the respective Certificates of Incorporation and Bylaws of Garden Holdings, Rainbow Garden, Eden, ITT MSG and Rainbow Media) shall be rescinded, canceled, terminated or amended in any respect which may or will change the terms of the Additional ITT Transfers, materially affect the conditions, obligations or duties set forth in this Consent Agreement or under the NHL Constitution and Agreements or adversely affect the interests of the NHL without the prior written approval of the NHL. The NHL shall be promptly notified in writing, pursuant to paragraph 14 (c) hereof, of any proposed change, whether or not the NHL has consent rights with respect to the change.

     (iii)  Without limiting the provisions of subsection (i) above, and except as specifically set forth in (i) above or (d) below or as otherwise consented to herein, each Transaction Party acknowledges and agrees that each of the below listed actions are subject to the approval of the NHL and, accordingly, any such actions taken but not approved by the NHL shall

-9-

subject the Transaction Parties and the Franchise to all remedies and rights which may be enforced by the NHL or its Member Clubs:

(A)     MSG to change its status as a Delaware limited partnership or Garden Holdings, Rainbow Garden, Eden, ITT MSG or Rainbow Media to change their respective statuses as Delaware corporations;

(B)     MSG, Garden Holdings, Rainbow Garden, Eden, ITT MSG or Rainbow Media to liquidate or dissolve or transfer a substantial part of its assets to another entity, if such assets include an interest in the Franchise;

(C)     a change in the general partner of MSG or a change in control of MSG, whether or not presently provided in the Agreement of Limited Partnership of MSG;

(D)     except as set forth in Section 6(c)(i), 6(d) or as may otherwise be specifically authorized by this Consent Agreement, any transaction that will result in a change, directly or indirectly, in the ownership of any of MSG, Garden Holdings, ITT MSG, Eden, Rainbow Garden, Rainbow Media, Cablevision, ITT, or any of the NBC Parties, to the extent such change would constitute a transfer of a membership or ownership interest in a Member Club under Article 3.5 of the NHL Constitution; provided, however, that the foregoing shall not apply to any reorganization or transfer of any of the NBC Parties if, following such reorganization or transfer GE continues to own, directly or indirectly, all of the ownership and voting interests in the reorganized or transferred entity and GE causes such reorganized or transferred entity to agree to be an "NBC Party" for purposes of the Consent Agreement. The parties acknowledge and agree that any transfer of a direct ownership interest in ITT, Cablevision or, subject to Section 6(d), the NBC Parties, is subject to compliance with the NHL Constitution and Agreements and that to the extent required by the NHL Constitution and Agreements they shall use reasonable efforts to obtain the NHL's prior approval of such transactions whenever practicable; provided, however, that, notwithstanding anything to the contrary contained in this Consent Agreement, any such transfer effectuated

-10-

without the NHL's prior written consent (if such consent is required under the NHL Constitution and Agreements) and for which such consent is not granted within 30 days after such transfer by the NHL, will subject MSG and the Franchise, as the NHL's sole remedy against the Transaction Parties, to any and all rights and remedies that the NHL may have against MSG and/or the Franchise in connection with a material breach by any Transaction Party of the NHL Constitution and Agreements, including without limitation, those enumerated in Section 14(h) below, except that in the case of a transfer with respect to the NBC Parties the NHL shall have the rights set forth in Section 6(d).   The Transaction Parties agree to be bound by any decision of the NHL and its Member Clubs, and any actions taken by the NHL or its Member Clubs, in connection with the exercise of the NHL's rights and remedies as contemplated by this Section or Section 6(d) in respect of such decision not to approve any person or entity to whom any direct ownership interest in ITT, Cablevision or the NBC Parties is transferred without the NHL's written consent (if such consent is required under the NHL Constitution and Agreements) (a "Transferee") as a holder of an ownership interest in a Member Club.  The Affiliated NHL Parties shall be entitled to indemnification in accordance with Section 13 hereof with respect to all Losses arising out of any claim by a Transferee, any Transaction Party or any affiliate of a Transaction Party with respect to the NHL's and its Member Clubs' decision not to approve such Transferee as a holder of an ownership interest in a Member Club or any actions taken by the NHL or its Member Clubs in connection with the exercise of its remedies contemplated by this Section or in Section 6(d) in respect of such decision not to approve such Transferee.  The parties hereto agree that the failure to obtain the approval of the NHL and/or its Member Clubs for any transfer described in this paragraph or in Section 6(d) will not in and of itself affect the ability of the transferor to convey good title to the shares transferred. The NHL further agrees that it shall not seek to enjoin any sale of stock of Cablevision, ITT, any Spun-off Subsidiary or any of the NBC Parties, provided that the NHL may seek injunctive or other relief to prevent such

-11-

transferee from exercising dominion or control directly or indirectly over MSG or the assets of the Rangers.

(iv)    The foregoing covenants apply and shall be enforceable notwithstanding any provision of any document or instrument to the contrary.

(d)    Notwithstanding anything to the contrary in this Consent Agreement, upon the occurrence of (A) a GE Termination Event, (B) any action by any of the NBC Parties that, under the NHL Constitution and Agreements, would permit the termination of the direct or indirect interest of that NBC Party in the Franchise (an "NBC Termination Event"), or (C) any sale or transfer of the shares of any of the NBC Parties in violation of the NHL Constitution and Agreements (an "NBC Transfer Violation"), the following shall apply:

(i)    If NBC Cable then holds shares of common stock of Rainbow that are registered under section 12(g) of the Securities Exchange Act of 1934, as amended ("Section 12(g)"), the NHL shall have the right, exercisable upon notice to NBC Cable, to require NBC Cable to reduce its interest in Rainbow to less than 5% of all issued and outstanding shares of common stock of Rainbow.  Upon receipt of such notice NBC Cable shall comply with its terms during the immediately succeeding 365 days, except that such period shall be extended to the extent necessary to enable NBC Cable to comply with any volume restrictions on sales of its Rainbow Shares imposed by applicable securities laws or any sales restrictions imposed by the customary provisions of any applicable underwriting agreement or any other regulatory requirement.  Once reduced, none of the NBC Parties, GE, or any of their respective Related Parties, or any transferee pursuant to an NBC Transfer Violation (an "NBC Transferee"), shall increase their aggregate direct or indirect interest in Rainbow to 5% or more without the prior approval of the NHL.

(ii)    If NBC Cable then holds shares of common stock of Rainbow that have not been registered under Section 12(g), the NHL shall have the right, exercisable by notice to the Transaction Parties other than the ITT Parties (the "NBC-Rainbow Parties"), to require that NBC Cable, Rainbow, any NBC Transferee and, to the extent applicable, the other NBC-Rainbow Parties, promptly take all steps necessary to cause those shares to be exchanged during the succeeding period of one hundred eighty (180) days either (i) for shares of preferred stock of Rainbow in accordance with exercise of the Put Option (the "PIK Preferred Shares"), or (ii) for unsecured debt instruments of Rainbow or Cablevision having a maturity date, interest rate and other terms and conditions substantially similar to those contemplated by the PIK Preferred Shares (the "Unsecured Debt Requirement").  The one hundred eighty (180) day period contemplated by the preceding sentence shall be extended to the extent necessary to comply with any governmental or judicial order or regulatory requirement (provided that the NBC Parties have taken reasonable steps to comply promptly with such regulatory requirement).

-12-

        (iii)     If NBC Cable (or any NBC Transferee) then holds PIK Preferred Shares, the NHL shall have the right, exercisable by notice to the NBC-Rainbow Parties, to require that NBC Cable, Rainbow, any NBC Transferee and, to the extent applicable, the other NBC-Rainbow Parties, promptly take all steps necessary to comply with the Unsecured Debt Requirement.

        (iv)     If the NHL shall take any action under clauses (i) - (iii) above, it also shall have the right to require that (x) any member of the board of directors of Rainbow, Cablevision or any other entity having a direct or indirect interest in the Rangers or MSG who was nominated or elected by any of the NBC Parties or their Related Parties (or any NBC Transferee) recuse himself or herself from all matters relating to the Rangers and any of the Affiliated NHL Parties, and (y) subject to the next sentence, the applicable NBC-Rainbow Parties provide reasonable evidence that the provisions of this Section 6(d) have been complied with. If the NHL shall take any action under clauses (i)-(iii) above, the Transaction Parties shall have the right, exercisable by notice to the NHL by each of the Transaction Parties (other than the ITT Parties) given in the thirty (30) day period following the NHL's taking of such action (and in lieu of taking the action required by the NHL under clauses (i) - (iii)), to cause the Rangers NHL franchise and all NHL-related assets customarily held by entities holding NHL memberships to be transferred to an entity wholly-owned, directly or indirectly, by Cablevision and any other persons or entities who previously had been approved by the NHL as owners of the Rangers NHL franchise (provided that such persons or entities do not increase their respective interests in the new entity beyond those in effect prior to the transfer) and in which none of the NBC Parties has any direct or indirect financial interest. Such transfer shall be consummated in the period of one hundred eighty (180) days following the taking of action by the NHL under clauses (i)-(iii) above, subject to such extensions as may be necessary to comply with any governmental or judicial order. Following completion of such transfer, the Transaction Parties shall provide the NHL with reasonable evidence that the provisions of the preceding sentence have been complied with.

        (v)     In the case of an NBC Termination Event, the NHL shall have the right to impose a fine or penalty on the NBC Parties or the Rangers or MSG in lieu of exercising its rights under this Section 6(d).

        (vi)     The NBC Parties shall not, and shall cause GE not to, consummate any transaction that would constitute an NBC Transfer Violation without disclosing to the prospective NBC Transferee the provisions of this Consent Agreement and causing the prospective NBC Transferee to take such shares subject to its terms. Without limiting the generality of Section 6(c), (x) the NHL shall not be entitled to seek injunctive relief to prevent any such transaction (but shall be entitled to seek an injunction against an exercise of control by the prospective NBC Transferee over the Rangers), (y) the NHL shall not apply the NHL Constitution and Agreements to limit the right of the transferor of such shares to convey good title in the shares to the prospective NBC Transferee, and (z) the provisions of this Section 6(d) shall not relieve any of the NBC Parties (or GE) from its obligation, promptly after announcement of any such transaction,

-13-

to commence the process of seeking prior NHL approval of any transfers of shares in any of the NBC Parties whenever applicable and to provide the Affiliated NHL Parties with releases and indemnities reasonably satisfactory to the NHL with respect to claims or Losses (as defined below) arising from the transfer and their former ownership of an interest in the Rangers.

(vii)    Without limiting any other obligations it may have under this Consent Agreement, each of the NBC-Rainbow Parties shall comply with all requirements of the NHL imposed pursuant to and consistent with this Section 6(d).

(e)    Each of the Transaction Parties (other than Cablevision, ITT, Rainbow Media, any Spun-off Subsidiary, the NBC Parties and GE) agrees that its stock or partnership certificate or other document evidencing ownership in such entity, if any, will bear a legend substantially as follows:

"The transfer, pledge or other disposition of [this limited partnership interest] [the stock reflected by this certificate] is subject to the approval and consent of the National Hockey League pursuant to the NHL Constitution and Bylaws and a certain Consent Agreement dated June ____, 1997 with the NHL."

7.    Working Capital, Guaranties and Capital Contributions.

(a)    MSG agrees that at all times it shall pay in the ordinary course and in a timely fashion all of the Operating Expenses and shall maintain Net Working Capital solely for the use in the operations of the Franchise in an amount equal to not less than $15.0 million. The obligation of MSG to maintain the Net Working Capital for each annual period shall be deemed to be satisfied so long as:

(i)    MSG has entered into a working capital line of credit with a commercial bank making available to MSG an amount at all times equal to or exceeding the required amount of Net Working Capital; provided, that, except as set forth in subparagraph (b) below, such line of credit is not terminable by such bank absent an event of default during each of the respective annual periods that the Net Working Capital is being determined (i.e., the annual periods being from the date of signing to December 31, 1997 and thereafter from each January 1 through the following December 31), or

(ii)    MSG has agreed in writing to make a line of credit available to the Rangers in an available amount at all times equal to or exceeding the required amount of Net Working Capital; provided, that, any such line of credit shall be on terms satisfactory to the NHL; provided, further, that if MSG makes any such line of credit available, it shall be obligated at all times to keep an amount available to be drawn under the Credit Facility, or a substitute credit facility, for on-lending to the Rangers, which is sufficient to maintain a minimum of $15.0 million Net Working Capital in the Rangers.

-14-

(b)    For purposes of this Consent Agreement, "Net Working Capital" means (i) the amount of current assets as determined in accordance with generally accepted accounting principles in effect from time to time in the United States ("GAAP") and the unused portion of any line of credit entered into by MSG in accordance with paragraph (a) (i) or paragraph (a)(ii) above (provided that, with respect to paragraph (a) (i) above, such line of credit is not terminable during the forthcoming NHL season for which Net Working Capital is being determined and, with respect to paragraph (a) (ii) above, neither the intercompany line of credit nor MSG's line of credit is terminable during the forthcoming NHL season for which Net Working Capital is being determined), less (ii) current liabilities as determined in accordance with GAAP. The computation and determination of Net Working Capital shall not take into account as an asset any monies, deposits or receipts with respect to advance ticket sales or, as a liability, a reserve or equivalent account in respect of such advance ticket sales. All other current assets and current liabilities, determined in accordance with GAAP, shall be taken into account in making such working capital computation. Notwithstanding anything contained in this Consent Agreement to the contrary, for purposes of this paragraph (b) and paragraph (a) of this section 7, a line of credit shall not be deemed to be terminable in the annual period or the forthcoming season if its term is to expire prior to the start of the NHL regular season, provided that MSG has received a written commitment letter from a bank satisfactory to the NHL at least 30 days prior to the expiration of the then existing line of credit to extend or replace the line of credit through, at least, the next following 12-month period from the expiration date and provided further that the NHL receives notification that the replacement line of credit has in fact been timely issued and is available to MSG.

(c)    For purposes of this Consent Agreement, "Operating Expenses" includes all expenses incurred in the operation of the Franchise; all obligations incurred by the Rangers in the operation of any minor league club; dues and assessments payable to the NHL; any sum required to cure defaults in the payment of salaries, bonuses, deferred compensation, or other sums due to any player on the NHL reserve list of the Franchise and any sums required to take all necessary steps so that, at the close of the applicable NHL season, the Franchise shall hold valid, enforceable and transferable player contracts for all of its players that were under contract during the prior season, except as may be changed in connection with trades and transfers in the ordinary course of business; the payment of salary, bonus, pension contribution and other compensation earned by any and all such players, including but not limited to, withholding taxes and unemployment taxes payable with respect to such compensation, and the payment of premiums on insurance to cover in the customary manner the appropriate compensation which may be due or become due to such players in the event the player becomes disabled and unable to perform his duties in the course of his employment pursuant to the collective bargaining agreement between the NHL and the National Hockey League Players' Association then in effect, or any applicable collective bargaining agreement with a minor league's players' association.

(d)    Notwithstanding anything to the contrary contained in this Consent Agreement or in any other document or agreement:

-15-

        (i)     Cablevision agrees to and does hereby guaranty, to and for the benefit of the NHL, to provide to the Rangers or MSG as the case may be from time to time such amounts as from time to time may be necessary for MSG to fully and punctually pay, perform and discharge, all Operating Expenses in the ordinary course and in a timely fashion.

        (ii)    In the event that the NHL shall have the exclusive and unrestricted right under Paragraph 7(b) of the Lender Letter Agreement to select the purchaser to whom the Club Collateral (as defined in the Lender Letter Agreement) shall be sold pursuant to such Paragraph, Cablevision hereby agrees, upon the request of the NHL, to purchase the Club Collateral from MSG at the purchase price specified in Paragraph 7 (b) (iii) (A) of the Lender Letter Agreement (and upon such other reasonable terms and conditions as may be agreed to by Cablevision and the NHL), which purchase price shall be paid to the Collateral Agent in cash at closing (in full release of the lien of the Collateral Agent on the Club Collateral), all in accordance with the applicable terms and conditions of Paragraph 7 of the Lender Letter Agreement and to assume all Operating Expenses. This provision is intended to be a "last resort" provision and does not, and shall not be deemed to, give Cablevision any right of first refusal in the event the NHL has located another purchaser.

        (e)    The Transaction Parties acknowledge and agree that the NHL is a third party beneficiary of the agreements set forth in Section 7(d) and that the NHL's provision of the consent contained herein has been conditioned upon the provision of such agreements. The NHL shall have the right to require that the agreements set forth in Section 7(d) hereof be enforced in accordance with their terms.

        (f)    The Transaction Parties (other than GE and the NBC Parties) shall furnish to the NHL, within 90 days of the end of each fiscal year of the Rangers, true and complete financial statements for the Rangers, consistent with past practice. The Transaction Parties (other than GE and the NBC Parties) will give the NHL access, at the NHL's request on reasonable notice, to MSG's books and records pertaining or relevant to the Rangers in order to verify the accuracy of the foregoing financial statements or any other financial information provided to the NHL.

        (g)    In addition to the financial statements described above, each Transaction Party shall deliver to the NHL such other publicly available financial information with respect to it as the NHL may reasonably request from time to time.

        (h)    MSG, upon the NHL's request, shall (a) promptly deliver to the NHL a confirmation, in such form and substance as the NHL may reasonably request, that MSG then currently maintains the required level of Net Working Capital and (b) provide the NHL (or its representatives) access to MSG's books and records pertaining or relevant to the Rangers in order that the NHL may confirm the same is true and correct. The NHL agrees, on behalf of itself and all of its officers and agents, to hold all information furnished by the Transaction Parties to

-16-

the NHL confidential and not to disclose any of such information to any person or entity without the prior written consent of MSG, except as otherwise disclosed pursuant to prior practice or as generally applicable to all Member Clubs.

8.    Representations and Warranties.  Each Transaction Party hereby severally represents and warrants as of the date hereof to the NHL as follows:

(a)    If it is a corporation, it is a corporation duly organized, validly existing and in good standing under the laws of the state of its existence, and has the power and authority to own, operate and lease its properties and to carry on its business.  MSG is a limited partnership validly existing and in good standing under the laws of the state of its existence, and has the power and authority to own, operate and lease its properties and to carry on its business.

(b)    Such Transaction Party has the power and authority to execute and deliver this Consent Agreement and to perform its obligations hereunder.

(c)    The execution, delivery and performance of this Consent Agreement constitutes a valid and binding obligation of such Transaction Party enforceable against it in accordance with its terms.

(d)    Except for any liens, security interests, pledges, charges, encumbrances or claims of liability to which the Lender Letter Agreement and the Toronto-Dominion Pledge Letter apply, and except as set forth on schedule 8 hereto, the ownership interests in such Transaction Party described in paragraphs (e) and (h) of the "Background" Section hereof are validly issued and fully paid and are held free and clear of any liens, security interests, pledges, charges, encumbrances or claims of liability.  Except as otherwise permitted hereunder, and except as set forth on schedule 8 hereto, such Transaction Party presently has no intention of selling directly any part of its interest in the Rangers, or any of the assets of the Rangers, and, except for the Convertible Securities and as provided in the Transaction Documents, there are no options, warrants, put or call rights or any other rights of acquisition or conversion that would entitle any person or entity to acquire any of its direct or indirect interest, whether equity or otherwise, in the Rangers.  The ownership structure of such Transaction Party conforms to the provision of paragraphs (d) and (g) of the Background Section hereof.

(e)    All balance sheets, income statements and other financial statements heretofore furnished by such Transaction Party to the NHL in connection with the application for this consent have been prepared in accordance with GAAP and were prepared in good faith and are complete.

(f)    There is no action, suit, or proceeding pending against the Rangers or such Transaction Party which involves the likelihood of any adverse judgment or liability not fully covered by insurance or with respect to which adequate reserves have not been established

-17-

in accordance with GAAP and which may result in a material adverse change in the business, properties or assets or in the condition, financial or otherwise, of such Transaction Party or which may prevent or impede the consummation of the transactions contemplated by this Consent Agreement. There is no order, writ, injunction or decree that has been issued by, or, to the knowledge of such Transaction Party, requested by, any court or governmental agency which does or may result in any material adverse change in the business, properties or assets or in the condition financial or otherwise, of such Transaction Party or which may prevent or impede the consummation of this Consent Agreement.

(g)     To the best of the knowledge and belief of such Transaction Party, and except as set forth on schedule 8 hereto, MSG and Eden each has complied in all material respects with all material laws, regulations and orders, federal or otherwise.

(h)     All material consents, waivers, approvals, orders and authorizations of any persons or entities or governmental or regulatory authorities (or registrations, declarations, filings or recordings with any such authorities) that are required in connection with the Proposed Transactions (other than the contribution of the aircraft pursuant to the Aircraft Contribution Agreement) have been obtained (or made) and are in full force and effect.

(i)     Such Transaction Party has performed in all material respects all obligations required to be performed by such Transaction Party to date with respect to the transactions contemplated by this Consent Agreement and, except as disclosed in any schedules hereto, such Transaction Party is not in default under any material contract, agreement, lease, or other instrument relating to the same to which such Transaction Party is a party or by which such Transaction Party is bound. True and correct copies of all documents described or referred to herein or in any Schedule attached hereto as well as a related agreement dated today to which the NBC Parties and Cablevision are parties, have heretofore been delivered or made available to the NHL or will be made available upon request and will be signed by an officer of Eden for identification upon request of the NHL. The Transaction Documents constitute all of the material documents relating to the Proposed Transactions or the ownership, control, financing or management of MSG, Eden, Rainbow Garden, Rainbow Media or the Franchise.

(j)     The execution and delivery of this Consent Agreement, and compliance with the terms hereof by such Transaction Party, will not conflict with, or result in the breach of, any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any of such Transaction Party's properties or assets (except as contemplated or disclosed herein or the Schedules hereto) pursuant to any indenture, mortgage, lease, agreement or other instrument to which such Transaction Party is a party or by which such Transaction Party is bound.

-18-

9.    Cable Agreements.

(a)    Although MSG is considering numerous alternatives with respect to the MSG Network (including with respect to the level of carriage on cable television systems, e.g. basic, premium) MSG has no current intention and has made no decisions relating to the implementation of cablecasting Rangers games on a premium cable service, except to the extent consistent with current practice.

(b)    At all times, the Transaction Parties (other than the NBC Parties, unless they then have the right to telecast Rangers games) shall cause feeds with respect to the Rangers to be made available on the terms and conditions and in accordance with the NHL Constitution and Agreements.

10.    Confirmation of Agreements.    The parties (other than GE and the NBC Parties) confirm that the agreement dated February 27, 1995 between ITT and the NHL relating to certain gaming activities, the letter from Richard Ward of ITT to the NHL dated January 24, 1995 (together, the "Gaming Letters"), the agreements executed by the Family Trusts in favor of the NHL on March 10, 1995 (the "Trust Agreements"), and the Consent Agreement dated March 10, 1995 between the NHL and certain of the Transaction Parties (the "Original Consent Agreement") remain in full force and effect, except that (a) Sections 3, 4, 5, 6, 7 (subject to clause (ii) below), 9, 10, 11 and 12 of the Original Consent Agreement are superseded by the terms of this Consent Agreement and (ii) Sections 7(c), 7(d)(i) and 7(e) of the Original Consent Agreement shall remain in full force and effect; provided that the liability of ITT for any item of Operating Expense under Section 7(d)(i) of the Original Consent Agreement shall not exceed 150% of the product of its then current direct and indirect percentage ownership in MSG (expressed as a fraction), times the item of Operating Expense.    By way of example only, if the Rangers have unpaid Operating Expenses of $100,000 in any fiscal period, and ITT has a direct percentage interest in MSG of 10%, ITT's maximum liability shall be $15,000 with respect to such Operating Expenses.

11.    Distributions.    Notwithstanding anything set forth in any Transaction Document or any other agreement, there will be no payment or distribution to the partners of MSG in any year, other than payments of interest and required payments of principal to non-Transaction Parties, if such payment or distribution would reduce the amount of the Net Working Capital below that required to be maintained by MSG as set forth in this Consent Agreement.

12.    Financing Statements.    The Rangers and the Transaction Parties (other than GE, NBC Holdings and NBC) agree to execute any and all financing statements requested by the NHL which the NHL reasonably deems necessary to notify creditors of the Rangers and the Transaction Parties of the existence of Article III of the NHL Constitution and Agreements and this Consent Agreement, provided that with respect to any financing statement filed against ITT,

-19-

Cablevision, Rainbow Media or NBC Cable, such financing statement shall be subject to the consent of their secured lenders, which will not be unreasonably withheld.

13.    Release and Limitation of Liability.

(a)    As partial consideration for the NHL providing the consents contained herein, each of the Transaction Parties on their own behalf and on behalf of their successors and assigns (and, in the case of the NBC Parties, on behalf of the GE Entities), but not on behalf of any other affiliate or subsidiary or in its capacity as a partner, shareholder or agent of any such affiliate or subsidiary, hereby forever release and discharge the NHL, NHL Enterprises, L.P., NHL Enterprises Canada, L.P., NHL Enterprises, Inc., National Hockey League Enterprises Canada, Inc. (collectively, excluding the NHL, "NHL Enterprises"), all of the NHL's Member Clubs (except the Rangers) and each of their successors and assigns and any of their respective past, present or future owners, directors, officers, agents, trustees or employees in their respective capacities as such (collectively, "Affiliated NHL Parties") from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), which, to the best knowledge of such Transaction Party and MSG, exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions; provided that nothing in this paragraph shall be construed or interpreted as a release and discharge by any of the Transaction Parties (or of the GE Entities) of (i) any claims, demands, causes of action or liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), relating to the matters described on Schedule 13, or (ii) any amounts due to any of the Transaction Parties (or of the GE Entities) from any Affiliated NHL Parties in the ordinary course, or any amounts due or claims under agreements executed prior to the date hereof (including, but not limited to, in respect of player transactions); provided, however, that in the case of the release by the NBC Parties on behalf of the GE Entities (but not on behalf of themselves), the release also shall not apply to claims in the ordinary course.  To the extent any Affiliated NHL Party asserts a claim against any Transaction Party (or any of the GE Entities) then the release contained in this paragraph shall not prohibit such Transaction Party (or such GE Entity) from asserting a defense or counterclaim to that claim.

(b)    The Transaction Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Transaction Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof.

-20-

(c)     Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement, the Transaction Parties (other than GE, the NBC Parties and the ITT Parties) hereby jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all losses, obligations, claims, liabilities, fines, penalties, damages, costs and expenses (including without limitation, reasonable costs of investigation and settlement and attorneys' fees, including in actions with Affiliated NHL Parties) incurred or required to be paid by an Affiliated NHL Party (collectively, "Losses") arising out of, attributable to or relating to legal actions against any Affiliated NHL Party (other than any action by any Transaction Party against any Affiliated NHL Party) with respect to (i) any liability or obligation of the Transaction Parties (other than GE, the NBC Parties and the ITT Parties) under this Consent Agreement or any liability or obligation of Dolan under the letter agreement executed by him on this date, and (ii) any wrongful or allegedly wrongful act or omission of the Transaction Parties (other than GE, the NBC Parties and the ITT Parties), or any liability or obligation to the Affiliated NHL Parties of MSG· (or any of its direct or indirect owners, partners, shareholders, directors, officers, employees, representatives or agents in their respective capacities as such), provided that no Affiliated NHL Party other than the NHL or NHL Enterprises shall be entitled to indemnification under clause (ii) unless the Commissioner determines that such indemnification is reasonable and appropriate. The NHL agrees (i) that it will give the indemnifying parties under this paragraph notice of any claim as to which it reasonably expects to seek indemnification under this paragraph, and (ii) that those indemnifying parties will be consulted on a reasonable basis concerning the defense, settlement, or other response to any claim for which indemnification is sought. The indemnifying parties under this paragraph agree that they shall have no right to control the defense or other response to such a claim and that they will fully cooperate with the NHL, its designated counsel and other representatives. No claim against either an individual Member Club or which is based primarily on an act or omission of the Rangers for which indemnification is sought under this paragraph will be settled without the consent of the indemnifying parties, such consent not to be unreasonably withheld.

(d)     Without limiting any other rights the NHL may have, and without limiting any party's affirmative obligation to pay the amounts referenced in this Consent Agreement:

(i)     the Transaction Parties (other than the NBC Parties) jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to the transactions contemplated in the Transaction Documents relating to the ITT Transfer or the Additional ITT Transfers;

(ii)     subject to the provisions of this Consent Agreement, the ITT Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to any liability or obligation to the Affiliated NHL Parties (including, without limiting, all obligations set forth in

-21-

this Consent Agreement), or any wrongful act or omission, of any of the ITT Parties, or any of their respective subsidiaries or affiliates, and any of their respective owners, shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such;

(iii)     the Transaction Parties (other than the ITT Parties) jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to the transactions contemplated in the Transaction Documents relating to the NBC Transfer and the Additional NBC Transfers; and

(iv)     Subject to the provisions of this Consent Agreement, the NBC Parties jointly and severally agree to indemnify and hold harmless the Affiliated NHL Parties from and against any and all Losses arising out of, attributable to or relating to (x) any liability or obligation to the Affiliated NHL Parties (including, without limiting, all obligations set forth in this Consent Agreement), or to any wrongful act or omission, of any of the NBC Parties, or any of their respective subsidiaries or controlled affiliates, and any of their respective direct shareholders, officers, directors, employees, agents and representatives, in their respective capacities as such, (y) any claims brought by any of the GE Entities in violation of the releases contained in Section 13, and (z) any claim against any Affiliated NHL Parties as a result of any NBC Transfer Violation or any exercise by the NHL of its rights under Section 6(d).

(e)     Nothing contained in this Consent Agreement shall be, or be construed or deemed to be, a subordination by the NHL of the NHL's rights (i) to receive payments on account of indebtedness or liabilities now or hereafter owing to it by the Rangers or any other entity or (ii) to defer or off-set any distribution to the Rangers.  Nothing in this Consent Agreement shall be construed in any respect as a guaranty or indemnity by the NHL, or any of its Member Clubs, of any debts, liabilities or obligations whatsoever of the Rangers, any Transaction Party or any other party.

(f)     Notwithstanding anything to the contrary contained in this Section 13, no Member Club shall be entitled to indemnification pursuant to clause 13 (c) (ii) (B) unless the Commissioner determines that it would be reasonable and appropriate for the Member Club to be indemnified under the circumstances.

(g)     Any NHL Affiliated Party claiming a right of indemnity hereunder shall give the indemnifying party prompt notice of the claim, action, suit, proceeding or circumstance giving rise to the potential Losses and shall afford the indemnifying party the opportunity to participate in the defense of such claim, action, suit or proceeding; provided, however, that the failure of any NHL Affiliated Party to give such prompt notice shall not affect its right to receive indemnification under the Consent Agreement except to the extent that indemnifying party is materially and adversely affected by the failure.

14.     Additional Provisions.

-22-

(a)     The Transaction Parties agree, in accordance with the third paragraph of Article 3.5 of the NHL Constitution, that all legal fees and costs incurred by the NHL with respect to the transactions contemplated by this Consent Agreement shall be charged to the Franchise and shall be the obligation thereof.

(b)     This Consent Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including but not limited to, any corporation or other business entity into which any party shall be merged, consolidated or amalgamated or to which substantially all of the assets of a party shall be transferred.  This Consent Agreement may not be assigned except as set forth herein or with the written consent of the NHL.  The parties herein agree that the NHL Constitution and Agreements shall be applicable to each Transaction Party and to each Transaction Party's affiliates and subsidiaries, as appropriate, and, in the case of the NBC Parties, subject to Section 3(a)(ii) above, and, shall be (1) limited to hockey related matters and the application and interpretation of the NHL Constitution and Agreements, (2) limited to any such affiliate or subsidiary which is controlled directly or indirectly by such Transaction Party, (3) in the case of matters relating to the production, telecasting or other related exploitation of hockey games, as set forth in any television rights agreement to which any such affiliate or subsidiary is a party, including, without limitation, any provisions in any such agreement regarding compliance with the NHL Constitution and Agreements and (4) subject to any fiduciary duties or obligations required by law or contract of such Transaction Party.  Any dispute between the parties hereunder relating to the subject matter hereof (but, with respect to the NBC Parties, excluding any future television rights agreement) which is subject to Section 6.3 of the NHL Constitution shall be resolved in accordance with Section 6.3 of the NHL Constitution and the Commissioner of the NHL shall have full and exclusive jurisdiction and authority to arbitrate and resolve such dispute unless the NHL shall have waived the application of Section 6.3 of the NHL Constitution to any future agreement or relationship in a writing that refers to that provision.  Notwithstanding anything to the contrary contained in any Transaction Document, MSG shall have the right (i) to amend, modify, rescind or restate all governing, constitutive, operating and other agreements or documents relating to the NHL or NHL Enterprises and any of their subsidiaries or affiliates, whether now existing or formed in the future, and to liquidate, dissolve or merge any of those entities, (ii) to vote in favor of any of the actions set forth in clause (i), and (iii) to invest or acquire an interest in any entity in which NHL Member Clubs generally are investing or acquiring interests.  Notwithstanding anything to the contrary in this Consent Agreement, any entity engaged in financial services (such as GE Capital and its Related Parties) that forms a part of GE or that is a Related Party of GE (x) shall not be considered to have violated the NHL Constitution and Agreements by virtue of making a loan to any person or entity that holds a direct or indirect interest in an NHL member club other than MSG if such loan is not secured by such direct or indirect interest in (or any assets of) that other member club, unless the direct or indirect interest of such person or entity in the member club constitutes a substantial part of its total assets and the NHL has so advised GE prior to the loan being made, (y) shall not be considered in violation of the NHL Constitution and Agreements, as a result of its customary consumer lending, consumer leasing and other consumer credit

-23-

activities to persons associated with the NHL, and (z) shall not be considered in violation of the NHL Constitution and Agreements by virtue of any current or future equipment leasing or conditional sales transaction that is on customary terms and in which it may have a purchase money security interest in specified equipment or tangible property, or by virtue of acquiring participating in loans in which unrelated financial institutions serve as the lead lender and, if applicable, collateral agent. The preceding sentence shall not, however, be construed to modify or limit in any respect any obligation that any other member club or owner of a member club may have under the NHL Constitution and Agreements with respect to such transactions. The NBC Parties shall not be responsible under the NHL Constitution and Agreements, for any investment activities of General Electric Investment Corporation or General Electric Investment Management Incorporated, which the NBC Parties hereby represent and warrant are primarily engaged in the investment of pension funds on behalf of current and former employees of GE and its Related Parties and other third party clients.

    (c)  All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date of dispatch thereof, if in writing and delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows;

| | |
|---|---|
| If to the NHL: | National Hockey League<br>1251 Avenue of the Americas<br>New York, New York  10020-1198<br>Attention:  General Counsel |
| | with a copy to: |
| | Proskauer Rose LLP<br>1585 Broadway<br>New York, NY 10036<br>Attention:  Joseph M. Leccese, Esq. |
| If to MSG or Eden: | Two Penn Plaza<br>14th Floor<br>New York, New York  10121<br>Attention:  General Counsel |
| If to ITT, ITT MSG<br>or ITT Eden: | 1330 Avenue of the Americas<br>New York, New York  10019<br>Attention:  General Counsel |

-24-

| | |
|---|---|
| If to Rainbow Media, Rainbow Garden or Garden Holdings: | 150 Crossways Park West Woodbury, New York 11797 Attention: General counsel |
| If to Cablevision: | One Media Crossways Woodbury, New York 11797 Attention: General Counsel |
| If to any of the NBC Parties: | c/o National Broadcasting Company, Inc. 30 Rockefeller Plaza New York, New York 10122 Att: President, NBC Cable and Business Development |
| with a copy to: | Stephen Stander, Esq. National Broadcasting Company, Inc. 30 Rockefeller Plaza New York, New York 10122 |

or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

(d)     This Consent Agreement, the Lender Letter Agreement and the exhibits and schedules annexed hereto and made a part hereof contain the entire agreement among the parties hereto with respect to the Proposed Transactions and, subject to Section 10, supersede all prior agreements or understandings among the parties hereto relating to the subject matter hereof (other than the Resolution). This Consent Agreement shall not be modified, supplemented, or terminated orally, and shall be governed by the laws of the State of New York, without reference to the conflicts of law provisions thereof. It is acknowledged and agreed that the NHL will suffer immediate and irreparable harm in the event of a breach of this agreement by any other party hereto of any of its or his obligations hereunder and will not have an adequate remedy at law, and therefore, the NHL shall in addition to any other remedy available to it at law or in equity, except as otherwise provided herein, be entitled to temporary, preliminary and permanent injunctive relief (except as provided in Section 6(c)(iii)(D)) and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any other security. The Transaction Parties also acknowledge and agree that to the extent permitted by the NHL Constitution and Agreements and this Consent Agreement, certain actions of only one or more of the Transaction Parties or their respective affiliates or subsidiaries may result in the exercise of rights and remedies against MSG or the Franchise, including, but not limited to, the involuntary termination of the Franchise. This agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule or construction shall be applied as against any

-25-

party hereto that would result in the resolution of an ambiguity contained herein against the drafting party solely by reason of such party being the drafting party.

(e)    This Consent Agreement may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

(f)    No failure on the part of any party to exercise, and no delay of exercising, any right, power or remedy shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.

(g)    Except for the provisions of Section 7, the representations, covenants and agreements contained in this Consent Agreement shall be construed as several covenants between, as applicable, each of the parties hereto other than the NHL, on the one hand, and the NHL, on the other hand, and not as covenants between any of such parties other than the NHL between each other.    Accordingly, except for the provisions of Section 7, any of such representations, covenants and agreements, and any of the transactions referred to in such representations, covenants and agreements, may be waived, amended, consented to or otherwise approved by the NHL, on the one hand, and the particular party other than the NHL to which such representations, covenants, agreements or transactions apply, on the other hand, without the consent or approval of any other party.  By way of illustration and not limitation, changes in any party's direct or indirect ownership of the Rangers or in the ownership of any party may, for all purposes of this Consent Agreement, be consented to by such party and the NHL without the consent of any other party.

(h)    The parties hereto acknowledge and agree that the failure by any of the Transaction Parties or Dolan to comply in a material respect with any of the provisions of this Consent Agreement, either of the Gaming Letters, the Lender Letter Agreement, the Original Consent Agreement (except to the extent superseded hereby) or the letter agreement executed on this date by Dolan shall constitute a material breach of this Consent Agreement which entitles the NHL to take action permitted by the NHL Constitution and/or this Consent Agreement (subject, in each case, to the terms of this Consent Agreement).  Said action includes, in addition to any and all other rights to which the NHL shall be entitled to under this Consent Agreement or otherwise, the right of the NHL to commence termination proceedings under Article III of the NHL Constitution and except as provided in Section 6(c)(iii)(D) and Section 6(d) such other remedies as may be provided by law or in equity for the breach of a material obligation; provided that, if in the judgment of the NHL, which shall not be exercised in an arbitrary or capricious way, a breach that occurs is one which may be cured by a Transaction Party, the NHL shall not commence termination proceedings under Article III of the NHL Constitution, or permit any such termination proceedings commenced by any other person to be concluded, unless it shall have first given to such Transaction Party notice of and such opportunity to cure the default as the NHL

-26-

deems appropriate under the circumstances in its judgment, which shall not be exercised in an arbitrary or capricious manner. No party hereto shall attempt to prevent the NHL's exercise of such rights on the basis that the NHL cannot exercise dominion or control over its allocable share of the rights or assets that are the subject of the NHL's actions because it was not the breaching party.

(i)    All of the parties to this Consent Agreement acknowledge and agree that the NHL has reviewed the Transaction Documents that have been supplied to it for certain limited purposes only and that the NHL is not charged with knowledge of, or deemed to have any independent obligations under, any of the Transaction Documents. For greater certainty and clarity, notwithstanding anything contained in any Transaction Document, whether to the contrary or otherwise, in the event of any conflict or ambiguity between any term or provision contained in this Consent Agreement and any Transaction Document, the terms of this Consent Agreement shall control. The Acquiring Parties agree that any violation of the NHL Constitution and Agreements by Dolan shall be deemed for all purposes of this Consent Agreement to be a violation by Dolan, Cablevision, Rainbow Media, Garden Holdings, Rainbow Garden and MSG of the NHL Constitution and Agreements which shall entitle the NHL to exercise all rights and remedies in respect thereof against Dolan, Cablevision, Rainbow Media, Garden Holdings, Rainbow Garden and MSG under this Consent Agreement and the NHL Constitution and Agreements as the NHL may have under this Consent Agreement and NHL Constitution and Agreements, including a requirement that Garden Holdings, Rainbow Garden, Eden and MSG divest themselves all of their ownership interests in the Franchise at the direction of the Commissioner.

(j)    The headings in the sections of this Consent Agreement are inserted for convenience of reference only and shall not constitute a part thereof.

M 17 97 10:12 FR PROSKAUER ROSE LLP 22   2129692937 TO 115007*8#7892050 P.05

-27-

IN WITNESS WHEREOF, this Consent Agreement has been executed this 17ᵗʰ day of June, 1997.


NATIONAL HOCKEY LEAGUE

By: _David Z_____
    Name:  David Zimmerman
    Title:   Vice President, General Counsel


MSG EDEN CORPORATION                    MADISON SQUARE GARDEN, L.P.

By:_____                    By:  MSG EDEN CORPORATION,
    Name:                                    its general partner
    Title:

                                        By:_____
                                            Name:
                                            Title:


ITT MSG INC.                            ITT EDEN CORPORATION

By:_____                    By:_____
    Name:                                   Name:
    Title:                                  Title:


ITT CORPORATION                         GARDEN L.P. HOLDING CORP.

By:_____                    By:_____
    Name:
    Title:

212-465-6332  MUNOZ                                        16r r00    JUN 1r '9r  11:00

-27-

IN WITNESS WHEREOF, this Consent Agreement has been executed this 17ᵗʰ day
of June, 1997.

NATIONAL HOCKEY LEAGUE

By:_____
      Name.  David Zimmerman
      Title:    Vice President, General Counsel


MSG EDEN CORPORATION                          MADISON SQUARE GARDEN, L.P.

By: _____                  By: MSG EDEN CORPORATION,
      Name:                                          its general partner
      Title:
                                             By: _____
                                                   Name:
                                                   Title:


ITT MSG INC.                                  ITT EDEN CORPORATION


By:_____                   By:_____
      Name:                                        Name:
      Title:                                       Title:


ITT CORPORATION                              GARDEN L.P. HOLDING CORP.


By: _____                  By: _____
      Name:                                        Vice   Chairman
      Title:

-27-

IN WITNESS WHEREOF, this Consent Agreement has been executed this 17th day of June, 1997.

NATIONAL HOCKEY LEAGUE

By: _____
    Name:  David Zimmerman
    Title:   Vice President, General Counsel


MSG EDEN CORPORATION

By: _____
    Name:
    Title:


MADISON SQUARE GARDEN, L.P.

By:  MSG EDEN CORPORATION,
     its general partner

By: _____
    Name:
    Title:


ITT MSG INC.

By: _____
    Name:
    Title:


ITT EDEN CORPORATION

By: _____
    Name:
    Title:


ITT CORPORATION

By: _____
    Name:
    Title:


GARDEN L.P. HOLDING CORP.

By: _____


D435/54115-007 NYLIB2/281140 v13                08/16/97 07:53 PM (10511)

-28-

ITT SHERATON CORPORATION

By: _____
    Name:
    Title:

RAINBOW GARDEN CORP.                    RAINBOW MEDIA HOLDINGS, INC.


By: _____            By: _____
    Name:                                  Name:
    Title:                                 Title:


CABLEVISION SYSTEMS CORPORATION


By: _____
    Name:
    Title:


NATIONAL BROADCASTING                   NATIONAL BROADCASTING COMPANY
COMPANY INC.                            HOLDINGS, INC.


By: _____            By: _____
    Name:                                  Name:
    Title:                                 Title:


NBC CABLE HOLDING, INC.


By: _____
    Name:
    Title:


0436/54115-007 NYLIB2/261140 v13                    08/16/97 07:53 PM [10511]

212-465-6332  MUNOZ                                      16Y PO7   JUN 17 '97  11:08

-28-

ITT SHERATON CORPORATION

By: _____ — _____
        Name:
        Title:


RAINBOW GARDEN CORP.                    RAINBOW MEDIA HOLDINGS, INC.

By: _____                   By: _____
        Name:  Vice  Chairman                   Name:  Vice  Chairman
        Title:                                  Title:


CABLEVISION SYSTEMS CORPORATION

By: _____
        Name:  Vice  Chairman
        Title:


NATIONAL BROADCASTING                    NATIONAL BROADCASTING COMPANY
COMPANY INC.                             HOLDINGS, INC.


By: _____                    By: _____
        Name:                                    Name:
        Title:                                   Title:


NBC CABLE HOLDING, INC.


By: _____
        Name:
        Title:

-28-

ITT SHERATON CORPORATION

By:_____
       Name:
       Title:


RAINBOW GARDEN CORP.                    RAINBOW MEDIA HOLDINGS, INC.


By:_____     By:_____
       Name:                                   Name:
       Title:                                   Title:


CABLEVISION SYSTEMS CORPORATION


By:_____
       Name:
       Title:


NATIONAL BROADCASTING                   NATIONAL BROADCASTING COMPANY
COMPANY INC.                            HOLDINGS, INC.

By:_____     By:_____
       Name:                                   Name:
       Title:                                   Title:


NBC CABLE HOLDING, INC.

By:_____
       Name:
       Title:

## SCHEDULES

     The schedules attached hereto are furnished (and have been accepted) subject to the express understanding that no consent has been given to any transaction or right described herein (including, but not limited to, Cablevision's proposed transaction with TCI), except as expressly set forth in the consent agreement to which they are appended.

# NHL Consent Agreement

## SCHEDULE 1A

- SportsChannel New York Holding Partnership ("SCNYHP")
  150 Crossways Park West
  Woodbury, New York 11797

  SCNYHP will, following the Contribution of SCNY to MSG under the SportsChannel Contribution Agreement, hold a 0.7% limited partnership interest in MSG.

- SportsChannel Associates Holding Corporation ("SCAHC")
  150 Crossways Park West
  Woodbury, New York 11797

  SCAHC will, following the Contribution of SCNY to MSG under the SportsChannel Contribution Agreement, hold a 0.7% limited partnership interest in MSG.

- Rainbow Program Enterprises L.P. ("RPE")
  150 Crossways Park West
  Woodbury, New York 11797

  RPE holds a 33.5% general partnership interest in SCNYHP.

- Cablevision Programming Incorporated ("CPI")
  150 Crossways Park West
  Woodbury, New York 11797

  CPI holds a 30% limited partnership interest in RPE.

- Rainbow Media Holdings, Inc. ("RMHI")
  150 Crossways Park West
  Woodbury, New York 11797

  RMHI holds (i) a 5% general partnership interest in RPE, (ii) a 62.785% limited partnership interest in RPE, (iii) all of the issued and outstanding shares of CPI, (iv) all of the issued and outstanding shares of SCAHC, (v) a 66.5% general partnership interest in SCNYHP, (vi) all of the issued and outstanding shares of RGC, (vii) all of the issued and outstanding shares of GHC.

  RMHI's direct and indirect (through CPI) interest in RPE consists of a 5% general partnership interest and a 92.985% limited partnership interest. The remaining 2.015% limited partnership interest in RPE is held as follows: 1.60355% by Communications Resources Co.; .3120% by

  Programming Capital Co.; and 0.09945% by Network Capital Company. These three interests would constitute in the aggregate an indirect .014105% interest in MSG.

2

NHL Schedule 1A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

      After giving effect to the ▮▮▮▮ ITT Transfer▮▮▮▮.
▮▮▮▮▮▮▮, ITT owns 100% of the common stock of ITT
Sheraton, ITT Sheraton owns 100% of the common stock of ITT
MSG and ITT Eden and ITT MSG owns an approximately [10.2]%
limited partnership interest in MSG.

ON CRAVATH,SWAINE&MOORE 43                    06.16.1997  19:03                    P.04

3

NHL Schedule 2A items

        ITT has been informed that FMR Corp.,
82 Devonshire Street, Boston, Massachusetts 02109
beneficially owned, as of December 31, 1996, approximately
11.3% of the outstanding shares of the common stock of ITT.

        ITT has been informed that Bankers Trust New York
Corporation, 280 Park Avenue, New York, New York 10017
beneficially owned, through its wholly owned subsidiaries,
as of December 31, 1996, approximately 6.6% of the
outstanding shares of the common stock of ITT.

**NHL Consent Agreement**

## SCHEDULE 3A

- ◆ Partnership Interest Transfer Agreement among ITT Corporation, ITT Eden Corporation, ITT MSG Inc., Cablevision Systems Corporation, Rainbow Media Holdings, Inc., Rainbow Garden L.P. Holding Corp., MSG Eden Corporation and Madison Square Garden, L.P., dated as of April 15, 1997.

- ◆ Amended and Restated Agreement of Limited Partnership of Madison Square Garden, L.P. among MSG Eden Corporation, ITT MSG Inc. and Garden L.P. Holdings Corp., dated as of April 15, 1997.

- ◆ SportsChannel Contribution Agreement among Rainbow Media Holdings, Inc., Garden L.P. Holding Corp., Rainbow Garden Corporation, SportsChannel New York Holding Partnership, SportsChannel Associate Holding Corporation, MSG Eden Corporation, ITT MSG, Inc., ITT Eden Corporation and Madison Square Garden, L.P., dated as of April 15, 1997.

- ◆ Aircraft Contribution Agreement among Garden L.P. Holding Corp., MSG Eden Corporation, ITT MSG, Inc., ITT Flight Operations, Inc. and Madison Square Garden, L.P., dated as of April 15, 1997.

- ◆ Agreement among ITT Corporation, ITT Eden Corporation, ITT MSG, Inc., Cablevision Systems Corporation, Rainbow Garden Corp., Garden L.P. Holding Corp., MSG Eden Corporation, and Madison Square Garden, L.P., dated as of April 15, 1997.

- ◆ Letter Agreement for NBC Transaction dated July 10, 1996, with amendments.

- ◆ Rainbow Media Holdings, Inc.
     Certificate of Amendment of Certificate of Incorporation
     By-Laws
     Plan and Agreement of Merger of Rainbow Programming Holdings, Inc.

- ◆ Side Letter between CSC, CPI, RHC, RHP, RPE, RMHI and NBC dated March 31, 1997 (attaching Schedules A (Affiliate Transactions), B (Terminated Agreements) and C (Financial Exceptions) and Attachments A (Registration Rights), B (RMH Objective) and C (Certificate of Designations of Series A Redeemable Preferred Stock).

- ◆ Letter from NBC to Rainbow Media Holdings, Inc. re: Rainbow DBS Holdings, Inc. dated March 31, 1997.

ID:                                    JUN 18 97   12:00 No.010 P.11

## NHL Consent Agreement

## Schedule 4A

1.  Convertible Preferred Stock. In November 1995, the Company issued 13,800,000 depositary shares representing 1,380,000 shares of 8-1/2% Series I Cumulative Convertible Exchangeable Preferred Stock (the "Series I Preferred Stock") with an aggregate liquidation preference of $345,000,000. The depositary shares are convertible into shares of the Company's Class A Common Stock, at any time after January 8, 1996 at the option of the holder, at an initial conversion price of $67.44 per share of Class A Common Stock subject to adjustment under certain conditions. The Series I Preferred Stock is exchangeable into 8-1/2% convertible Subordinated Debentures due 2007, at the option of the Company, in whole but not in part, on or after January 1, 1998 at a rate of $25.00 principal amount of exchange debentures for each depositary share. The Series I Preferred Stock is redeemable at the option of the Company, in whole or in part, on November 1, 1999, November 1, 2000, and November 1, 2001 and thereafter at 102.8%, 101.4%, and 100.0%, respectively, of the principal amount plus accrued and unpaid dividends thereon.

    The holders of the Company's 8% Series C Cumulative Preferred Stock ("Series C Preferred Stock") may require the Company to redeem for cash at any time commencing December 31, 1997 all or a portion of the outstanding shares of the Series C Preferred Stock. The Company has the right, upon notice to the holders requesting redemption, to convert all or a part of such shares into shares of Class B Common Stock. If, in the future, holders require the Company to redeem their Series C Preferred Stock, it is the Company's intention to convert such shares into Class B Common Stock. The Company paid cash dividends on the Series C Preferred Stock during each of 1996 and 1995 of $885,000.

2.  Sutton Capital Subordinated Notes. On August 8, 1994, subsidiaries of Cablevision issued promissory notes totaling $151 million, due in 1998 and bearing interest at 6% until the third anniversary and 8% thereafter (increasing to 8% and 10% respectively, if interest is paid in shares of Cablevision's Class A Common Stock). Principal and interest on the notes is payable, at Cablevision's election, in cash or in shares of Cablevision's Class A Common Stock. In certain circumstances, Cablevision may extend the maturity date of the promissory notes until 2003 for certain additional consideration.

3.  <u>Cablevision of New York City</u>.  Charles F. Dolan holds a 1% limited partnership interest in the subsidiary of Cablevision that holds the New York City cable franchises and holds certain preferential rights therein that entitle him to an annual cash payment (the "Annual Payment") of 14% multiplied by the outstanding balance of his "Minimum Payment". The Minimum Payment is $40.0 million and is to be paid to Mr. Dolan prior to any distributions from CNYC LP to partners other than Mr. Dolan.  In addition, Mr. Dolan has the right, exercisable on December 31, 1997, and as of the earlier of (1) December 31, 2000 and (2) December 31 of the first year after 1997 during which CNYC achieves an aggregate of 400,000 subscribers, to require Cablevision to purchase (Mr. Dolan's "put") his interest in such subsidiary.  Cablevision has the right to require Mr. Dolan to sell his interest in such subsidiary to Cablevision (Cablevision's "call") during the three year period commencing one year after the expiration of Mr. Dolan's second put.  In the event of a put, Mr. Dolan will be entitled to receive from Cablevision the Minimum Payment, any accrued but unpaid Annual Payments, a guaranteed return on certain of his investments in such subsidiary and a Preferred Payment defined as a payment (not exceeding $150.0 million) equal to 40% of the Appraised Equity Value (as defined) of such subsidiary after making certain deductions including a deduction of a 25% compound annual return on approximately 85% of Cablevision's investments with respect to the construction of Phases III, IV and V of CNYC and 100% of certain of Cablevision's other investments in CNYC, including Mr. Dolan's annual Payment.  In the event Cablevision exercises its call, the purchase price will be computed on the same basis as for a put except that there will be no payment in respect of the Appraised Equity Value amount.  Cablevision has the right to make payment of the put or call exercise price in the form of shares of Cablevision's Class B Common Stock or, if Mr. Dolan so elects, Class A Common Stock, except that all Annual Payments must be paid in cash to the extent permitted under Cablevision's Credit Agreement.  Under the Credit Agreement, Cablevision is currently prohibited from paying the put or call exercise price in cash and, accordingly, without the consent of the bank lenders, would be required to pay it in shares of Cablevision's Common Stock.

4.  <u>Employee Stock Program</u>.  Under its employee stock programs, Cablevision has issued to employees options, restricted stock and bonus award shares with respect to its Class A Common Stock.

NIIL Consent Agreement
Schedule 4A    cont'd

5.    <u>Cablevision of Boston</u>.    In June 1994, Cablevision and Cablevision of Boston Limited Partnership ("Cablevision Boston") entered into an agreement which is designed to give Cablevision full ownership of Cablevision Boston.    The agreement provides for the acquisition by Cablevision of the interests of Cablevision Boston which it does not already own in a series of transactions. Cablevision and Cablevision Boston have filed with the Securities Exchange Commission a Consent Solicitation Statement/Prospectus with respect to the proposed transactions.    Each of the transactions is subject to a number of conditions, including the approval by the limited partners of Cablevision Boston who are unaffiliated with the general partners of Cablevision Boston. Consummation of the transactions would result in the limited partners in Cablevision Boston receiving Class A Common Stock of Cablevision with an expected aggregate market value of approximately $40 million.

6.    <u>Existing Pledges</u>.    Cablevisoin has pledged the capital stock of Rainbow Media to Toronto Dominion (Texas), Inc. as Administrative Agent, in support of Rainbow Media's senior credit facility.    Charles F. Dolan has pledged certain shares of Cablevision stock to various lenders in support of personal loans to himself and to members of his family.

7.    <u>TCI Transaction</u>.    Under the Contribution and Merger Agreement, dated as of June 6, 1997, among TCI Communications, Inc. ("TCI"), Cablevision Systems Corporation ("CSC"), CSC Parent Corporation ("Parent") and CSC Merger Corporation ("Merger Sub"), subject to the satisfaction of the conditions contained therein, (i) CSC will merge with and into Merger Sub with each share of CSC common stock being converted into a share of Parent common stock, and (ii) Parent will issue to TCI, approximately 12.2. million shares of Parent Class A Common Stock, representing 33% of the outstanding common shares of Parent.

8.    <u>ITT Transaction</u>.    Under the Partnership Interest Transfer Agreement, dated as of April 15, 1997, Cablevision has the right to satisfy ITT's "Put Option" (as defined therein) by delivery of CSC Class A Common Stock.

## Schedule 8 to Consent Agreement

1.    Restrictions imposed under the Constitutions, By-laws and related rules and agreements of the NBA and the NHL upon certain ownership interests in the Transaction Parties.

2.    Rights of TCI Communications, Inc. to acquire shares of CSC Parent Corporation under the Contribution and Merger Agreement, dated as of June 6, 1997, among TCI Communications, Inc., Cablevision Systems Corporation, CSC Parent Corporation and CSC Merger Corporation.

3.    MSG has received a letter from the Disability Rights Section of the Civil Rights Division of The Department of Justice, with respect to non-compliance with Title III of the Americans with Disabilities Act.

## SCHEDULE 13

1.  Any claims relating to concession agreements between Service America, Inc. and the NHL, any Member Club, or any related or affiliated entity of the NHL or any of its Member Clubs.

~~2.  Any claims arising out of any insurance or reinsurance policies of Employers Reinsurance Corporation, or any other insurance company which is a Related Party of GE, issued to the NHL, any Member Club, or any related or affiliated entity of the NHL or any of its Member Clubs.~~

# CLAIMS AND POTENTIAL CLAIMS
## AGAINST NHL AND NHL CLUBS

SCHEDULE 1

1.   Any claims arising out of or in connection with the Agreement dated May 5, 1972 between the New York Rangers and Nassau Sports (New York Islanders), as amended.

2.   Any claims arising out of or in connection with the Territorial and Broadcasting Rights Agreement with Meadowlanders (New Jersey Devils) dated as of June 19, 1982, and related documents, as amended.

3.   Any claims arising out of or in connection with the pension matters addressed in Bathgate v. National Hockey League Pension Society, et al. and any settlements arising out of that case.

4.   Any claims in connection with the case entitled Forbes v. Eagleson, et al.