UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MADISON SQUARE GARDEN, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 CIV. 8455 (LAP) |
| | ) | |
| v. | ) | DEFENDANTS' ANSWER AND |
| | ) | NATIONAL HOCKEY |
| NATIONAL HOCKEY LEAGUE, NA- | ) | LEAGUE'S COUNTERCLAIMS |
| TIONAL HOCKEY LEAGUE ENTER- | ) | FOR: |
| PRISES, L.P., NATIONAL HOCKEY | ) | |
| LEAGUE INTERACTIVE CYBERENTER- | ) | 1. DECLARATORY RELIEF; |
| PRISES, L.L.C., NHL ENTERPRISES CAN- | ) | AND |
| ADA, L.P., and NHL ENTERPRISES, B.V., | ) | |
| | ) | 2. BREACH OF CONTRACT |
| Defendants. | ) | |
| | ) | ELECTRONICALLY FILED |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

| | |
|---|---|
| NATIONAL HOCKEY LEAGUE, | ) |
| | ) |
| Counter-claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| MADISON SQUARE GARDEN, L.P., | ) |
| | ) |
| Counter-defendant. | ) |
| | ) |
| | ) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANSWER OF DEFENDANTS NATIONAL HOCKEY LEAGUE, NHL ENTERPRISES, L.P.,
NHL INTERACTIVE CYBERENTERPRISES, L.L.C., NHL ENTERPRISES CANADA, L.P.,
AND NHL ENTERPRISES, B.V.**

Defendants National Hockey League (the "NHL"), NHL Enterprises, L.P. (incorrectly identified in the Complaint as National Hockey League Enterprises, L.P.) ("NHLE"), NHL Interactive CyberEnterprises, L.L.C. ("NHL ICE"), NHL Enterprises Canada, L.P. ("NHLE Canada"), and NHL Enterprises, B.V. ("NHLE International") (collectively "defendants"), by and through their attorneys, file this answer to the First Amended Complaint For Injunctive Relief ("Complaint") of plaintiff

Madison Square Garden, L.P. ("MSG").  Defendants answer the Complaint without waiving, and ex-pressly preserving, the grounds for dismissal raised in Defendants' Motion to Dismiss or in the Alternative for Partial Summary Judgment.

**RESPONSES**

1.      Defendants deny the allegations in paragraph 1 of the Complaint, except admit that MSG presently owns the New York Rangers (the "Rangers"), which is known as one of the "original six" Member Clubs of the NHL.

2.      Defendants deny the allegations in paragraph 2 of the Complaint, except admit that the NHL is a joint venture consisting of the thirty Member Clubs of the NHL, including the Rangers, and that the teams cooperate to schedule and produce ice hockey games and facilitate competition on the ice.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation that the Rangers is proud to be among the oldest members of the NHL.

3.      Defendants deny the allegations in paragraph 3 of the Complaint.

4.      Defendants deny the allegations in paragraph 4 of the Complaint, except admit that, in the spring of 2007, the Rangers installed its own "Internet store" to sell team merchandise on the Internet, inserted "virtual advertising and signage" into the broadcast of certain Rangers' games, and streamed live broadcasts of its games to Internet subscribers within its local broadcast territory, all in violation of League rules, admit that the League fined MSG $100,000 per day for the days MSG engaged in any one of these violations after the League delivered notice of the violations, and admit that the League collected the fine by withholding $200,000 from intra-League payments that would otherwise have been payable to MSG.

5.      Defendants deny the allegations in paragraph 5 of the Complaint, except admit that fans who visited newyorkrangers.com before the migration of the website to the common NHL technology platform were able to read the latest news about the Rangers and its players, watch video

clips of game highlights and historical Rangers footage at MSG's "Rangers on Demand " offering, purchase Rangers' merchandise, apparel and game tickets, and interact with the site by posting Rangers-themed personal photos, and affirmatively state that MSG has the ability to offer fans who visit the migrated Rangers' website these same features

      6.      Defendants deny the allegations in paragraph 6 of the Complaint, except admit that the NHL is a professional sports league and a legitimate joint venture of its Member Clubs, and affirmatively state that the NHL produces and markets a product – "NHL Hockey" – through such activities as the licensing of intellectual property rights, the sale of broadcast and cablecast rights and the sale of merchandise, none of which activities would currently exist but for the participation of the Member Clubs in the NHL joint venture.

      7.      Defendants deny the allegations in paragraph 7 of the Complaint, except admit that the NHL is a joint venture of its Member Clubs, and deny knowledge or information sufficient to form a belief as to what MSG seeks to establish through this Complaint.

      8.      Defendants deny the allegations in paragraph 8 of the Complaint, except admit that the NHL is a joint venture of thirty professional ice hockey Clubs operating throughout the United States and Canada that was created to produce a product – "NHL Hockey" – that no one Club could produce alone, and admit that, as a legitimate joint venture, the NHL is engaged in a variety of legitimate activities, including, among other things, negotiating labor agreements with the players, negotiating national television broadcasting arrangements, promulgating and enforcing agreed rules of play, and scheduling ice hockey contests, including playoff and championship competitions.

      9.      Defendants deny the allegations in paragraph 9 of the Complaint, except admit that each Member Club is independently owned and operated, and affirmatively state that such ownership and operation is subject to the Constitution and By-Laws of the NHL, as well as Resolutions of the Board of Governors and the interpretation thereof by the Commissioner of the NHL.

10.     Defendants deny the allegations in paragraph 10 of the Complaint.

11.     Defendants admit the allegations in paragraph 11 of the Complaint.

12.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint, except admit that MSG has spent significant sums to attract and pay players like Jaromir Jagr, Brendan Shanahan, Scott Gomez and Chris Drury.

13.     Defendants deny the allegations in paragraph 13 of the Complaint, except admit that the individual Member Clubs comprising the NHL, including the Rangers, have registered various copyrights, trademarks, trade dress and trade names in logos and designs relating to their teams, admit that the individual Member Clubs, including the Rangers, have undertaken substantial efforts over the years to develop and enhance the value of their marks and the image of their teams, and affirmatively state that, while reserving certain specified rights, the individual Member Clubs, including the Rangers, have agreed to license or assign their ownership rights in their marks to the League for purposes of best utilizing those rights for the benefit of the Member Clubs and the League as a whole.

14.     Defendants deny the allegations in paragraph 14 of the Complaint, and affirmatively state that the value of the brands and marks of each of the Member Clubs, including the Rangers, is derived from each Club's membership in the NHL and the collective activities of the Member Clubs as determined by the Board of Governors pursuant to the NHL Constitution and By-Laws and other governing rules, and that such value is not derived solely from the efforts of any single Member Club acting alone.

15.     Defendants deny the allegations in paragraph 15 of the Complaint.

16.     Defendants deny the allegations in paragraph 16 of the Complaint, including each of its subparts, and affirmatively state that, pursuant to the NHL Constitution and By-Laws and Resolutions of the Board of Governors of the NHL:  (i) the NHL has the right to develop and exploit the Internet on behalf of the League and its Member Clubs; (ii) the NHL has the right to limit the sale

of apparel, merchandise, and memorabilia both within and beyond each Member Club's local area, as well as through online team stores; (iii) the NHL has the right to restrict the use of virtual signage and advertising that can be electronically inserted during telecasts of a Member Club's games; (iv) the NHL has certain rights to control broadcasting and other distribution rights (including international rights) inside and outside each Member Club's local area; and (v) one of the many core activities of a professional sports league is to develop and negotiate national television arrangements.

17.    Defendants deny the allegations in paragraph 17 of the Complaint, except admit that MSG is subject to the NHL's Constitution and By-Laws, admit that the League rules require MSG to comply with the joint decisions of the Member Clubs and with the decisions of the Commissioner, admit that the Constitution and By-Laws confer upon the Commissioner the power to fine Member Clubs for non-compliance with the Constitution, By-Laws, Resolutions of the Board of Governors and other rules promulgated thereunder, admit that the NHL Constitution permits the involuntary termina-tion of a Member Club (or its ownership entity) that violates League rules and that such a termination could prevent a terminated Member Club from continuing to provide NHL Hockey, admit that the Deputy Commissioner sent a letter to MSG on April 18, 2007, fining MSG $100,000 per day for MSG's "clear and blatant" violation of the NHL's rules, and admit that the Deputy Commissioner sent MSG a letter dated September 20, 2007, notifying MSG that it would be fined for its non-compliance with League rules relating to the migration of the Rangers' website to the NHL's common technology platform.

18.    Defendants deny the allegations in paragraph 18 of the Complaint, except admit that MSG seeks no money damages, and deny knowledge or information sufficient to form a belief as to what MSG's goal is in pursuing this lawsuit.

19.    Defendants deny the allegations in paragraph 19 of the Complaint, except admit that MSG purports to bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, for

Case 1:07-cv-08455-LAP     Document 69     Filed 06/18/2008     Page 6 of 33


alleged violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and New York General Business Law § 340, and that MSG purports to base this Court's jurisdiction over the claims on 28 U.S.C. §§ 1331, 1337 and 1367 and the doctrine of pendent jurisdiction.

20.     Defendants deny the allegations in paragraph 20 of the Complaint, except admit that the NHL, NHLE, and NHL ICE transact business, maintain their principal offices and are found in this district, and admit that MSG purports to base venue in this district on 28 U.S.C. § 1391 and 15 U.S.C. § 22.

21.     Defendants deny the allegations in paragraph 21 of the Complaint.

22.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint, except admit that MSG owns the New York Rangers NHL Hockey Franchise and that the Rangers is a Member Club of the NHL.

23.     Defendants deny the allegations in paragraph 23 of the Complaint, except admit that the NHL transacts business in the Southern District of New York, and affirmatively state that the NHL recently moved its headquarters to 1185 Avenue of the Americas, New York, New York 10036.

24.     Defendants deny the allegations in paragraph 24 of the Complaint, except admit that each of the Member Clubs is separately and independently owned.

25.     Defendants deny the allegations in paragraph 25 of the Complaint, except admit that NHLE is a Delaware limited partnership, the beneficial owners of which are the thirty Member Clubs or entities under their control, and transacts business in the Southern District of New York, and affirmatively state that NHLE recently moved its principal place of business to 1185 Avenue of the Americas, New York, New York 10036.

26.     Defendants deny the allegations in paragraph 26 of the Complaint, except admit that NHL ICE is a Delaware limited liability company, is a subsidiary of NHLE, and transacts busi-

ness in the Southern District of New York, and affirmatively state that NHL ICE recently moved its principal place of business to 1185 Avenue of the Americas, New York, New York 10036.

27.     Defendants deny the allegations in paragraph 27 of the Complaint, except admit that NHLE Canada is owned equally, directly or indirectly, by the owners of the thirty Member Clubs that constitute the NHL, admit that NHLE Canada primarily conducts trade or commerce in Canada relating to the business of its owners, and affirmatively state that NHLE Canada is an Ontario limited partnership with its principal place of business in Ontario, Canada.

28.     Defendants deny the allegations in paragraph 28 of the Complaint, except admit that NHLE International is a Netherlands private limited liability company with its principal place of business in The Netherlands, admit that NHLE International primarily conducts trade or commerce outside North America, and affirmatively state that NHLE International is a subsidiary of NHLE.

29.     Defendants deny the allegations in paragraph 29 of the Complaint.

30.     Defendants deny the allegations in paragraph 30 of the Complaint, including each of its subparts.

31.     Defendants deny the allegations in paragraph 31 of the Complaint.

32.     Defendants deny the allegations in paragraph 32 of the Complaint.

33.     Defendants deny the allegations in paragraph 33 of the Complaint.

34.     Defendants deny the allegations in paragraph 34 of the Complaint.

35.     Defendants deny the allegations in paragraph 35 of the Complaint, except admit that, fully consistent with the antitrust laws, the Rangers and other NHL Member Clubs must cooperate, among other things, to schedule, produce, market and promote "NHL Hockey" and its related products.

36.     Defendants deny the allegations set forth in the first sentence of paragraph 36 of the Complaint and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36.

37.     Defendants deny the allegations in paragraph 37 of the Complaint.

38.     Defendants deny the allegations in paragraph 38 of the Complaint, and affirmatively state that, pursuant to a series of agreements among the Member Clubs of the NHL, including the Rangers, beginning in the 1980s or earlier and renewed several times since then, defendants have obtained various rights to use for commercial and promotional purposes the individual Member Clubs' marks, primarily for national, as distinct from local, and international licensing opportunities.

39.     Defendants deny the allegations in paragraph 39 of the Complaint, except admit that, in June 2006, and over the objection of MSG, the Member Clubs renewed and extended until 2016 the license agreements that grant to the NHL various rights to use the individual Member Clubs' marks.

40.     Defendants deny the allegations in paragraph 40 of the Complaint, including each of its subparts, and affirmatively state that, pursuant to the Internet Regulations, which are promulgated by the NHL under authority from the Board of Governors, (i) some restrictions are placed on the format of Member Clubs' websites and (ii) the League sells certain limited advertising inventory on the Member Clubs' websites.  Defendants further affirmatively state that, pursuant to the NHL Constitution and certain decisions of the Board of Governors, defendants (i) possess the exclusive worldwide right to license Member Club marks for use on team jerseys, authentic team practice wear, and outerwear, (ii) possess the right to license team apparel and merchandise for sale outside of team stores located within a team's local territory, (iii) possess certain rights to control the broadcasting, rebroadcasting and other distribution of games, game highlights, and game footage in media such as cable and satellite television, radio, video-on-demand, the internet, and handheld technologies, and (iv)

possess the exclusive right to market for commercial purposes highlights and footage of NHL games, while, for example, allowing Member Clubs to use game highlights and rebroadcasting of games on their websites, with certain limitations, (v) have generally prohibited Member Clubs from broadcasting or otherwise distributing live telecasts of NHL games through other outlets while the NHL's broadcasters are providing national coverage of the same NHL game, (vi) have regulated the size and space of advertising on dasherboards and in the ice during games, (vii) have prohibited Member Clubs from using virtual advertising signage that can be electronically inserted during telecasts of an NHL game, (viii) have required Member Clubs to ensure that 65% of the products offered through a Member Club's catalog must be produced by NHL-licensed national licensees, and (ix) have required Member Clubs to comply with certain restrictions with respect to the sale of team merchandise online. Finally, defendants affirmatively state that the NHL offers to each Member Club a package of League-sponsored same-day, out-of-town highlights of other NHL games for display in their respective home arenas if the Member Club wishes to do so.

      41.    Defendants deny the allegations in paragraph 41 of the Complaint, except admit that the Commissioner of the NHL has the authority to sanction Member Clubs for engaging in activities in violation of League rules, and admit that, pursuant to the NHL Constitution and By-Laws, MSG could be subject to sanctions up to and including expulsion from the NHL for violation of League rules.

      42.    Defendants deny the allegations in paragraph 42 of the Complaint.

      43.    Defendants deny the allegations in paragraph 43 of the Complaint, including each of its subparts.

      44.    Defendants deny the allegations in paragraph 44 of the Complaint.

      45.    Defendants deny the allegations in paragraph 45 of the Complaint.

      46.    Defendants deny the allegations in paragraph 46 of the Complaint.

47.    Defendants deny the allegations in paragraph 47 of the Complaint, including each of its subparts.

48.    Defendants incorporate their answers to paragraphs 1 through 47, above.

49.    Defendants deny the allegations in paragraph 49 of the Complaint.

50.    Defendants deny the allegations in paragraph 50 of the Complaint.

51.    Defendants deny the allegations in paragraph 51 of the Complaint.

52.    Defendants incorporate their answers to paragraphs 1 through 51, above.

53.    Defendants deny the allegations in paragraph 53 of the Complaint.

## GENERAL DENIAL

Unless specifically admitted herein, Defendants deny the truth of each and every allegation set forth in MSG's Complaint and specifically deny that MSG is entitled to any relief against Defendants.

## AFFIRMATIVE DEFENSES

MSG's claims are barred by the following defenses.  Defendants plead each of these defenses to preserve their rights, and in doing so do not agree or concede that they bear the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.  To the contrary, several of these defenses negate elements of MSG's affirmative claims, as to which MSG bears the burden of proof.

## FIRST AFFIRMATIVE DEFENSE

Defendants, including specifically the NHL and its Member Clubs, are not capable of contracting, conspiring, or combining with one another within the meaning of the antitrust laws because they are a single economic entity, at least with respect to the conduct challenged in the Complaint.

## SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim for relief under the doctrine established by the United States Supreme Court's decision in *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). Specifically, the conduct alleged constitutes decisions made regarding the core activities of a legitimate joint venture which are not restraints of trade in the antitrust sense.

## THIRD AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## FOURTH AFFIRMATIVE DEFENSE

The restraints challenged by the complaint are reasonable ancillary restraints to a legitimate joint venture.

## FIFTH AFFIRMATIVE DEFENSE

MSG's claims are barred as a matter of law because MSG's allegations demonstrate that it is seeking to compete with a joint venture of which it is a member and free ride on the product created by the venture that would not exist but for the existence of the venture.

## SIXTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the doctrine of waiver.

## SEVENTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the doctrine of laches.

## EIGHTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the doctrine of estoppel.

## NINTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the doctrine of consent.

### TENTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the Rangers' active and knowing acquiescence, equal involvement and participation in the creation and origination of the restraints of trade alleged in the Complaint.

### ELEVENTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, because MSG has affirmatively released any and all claims it has against the Defendants.

### TWELFTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the Consent Agreements it has entered with the League.

### THIRTEENTH AFFIRMATIVE DEFENSE

MSG's claims are barred, in whole or in part, by the doctrine of judicial estoppel.

### FOURTEENTH AFFIRMATIVE DEFENSE

MSG's claims against NHLE Canada fail for lack of personal jurisdiction.

### FIFTEENTH AFFIRMATIVE DEFENSE

MSG's claims against NHLE Canada fail for lack of subject matter jurisdiction.

### SIXTEENTH AFFIRMATIVE DEFENSE

MSG's claims against NHLE International fail for lack of personal jurisdiction.

### SEVENTEENTH AFFIRMATIVE DEFENSE

MSG's claims against NHLE International fail for lack of subject matter jurisdiction.

## ADDITIONAL DEFENSES

Defendants have insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  Defendants reserve the right to amend this Answer to add, delete, or modify additional defenses based on legal theories that may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of MSG's positions in this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for relief as follows:

1.  That the Complaint be dismissed with prejudice;

2.  That MSG take nothing by reason of the Complaint and that judgment be entered in Defendants' favor;

3.  That Defendants recover their costs and attorneys' fees; and

4.  That this Court award such other and further relief as it deems just and proper.

## COUNTERCLAIMS

Defendant National Hockey League ("NHL" or "League"), by and through its attorneys, files these Counterclaims against Madison Square Garden, L.P. ("MSG"), and alleges as follows:

## SUMMARY

1.    The subject matter of these Counterclaims involves counter-defendant Madison Square Garden, L.P.'s breach of contractual commitments to the League and its refusal to recognize the League's contractually agreed-upon internal procedures to address such breaches.

2.    The NHL Constitution requires prospective franchise owners to obtain League approval in order to become a member of the League.  The process ensures that prospective owners understand how the League is organized and operated and that they accept and agree to those basic parameters before becoming a member of the League.   Pursuant to the procedures set forth in the

NHL Constitution, when Cablevision (and other entities) sought to acquire Madison Square Garden, including the Rangers, in 1994, it applied to the League for approval. In exchange for the League's consent, Cablevision and MSG Holdings, L.P. (the predecessor in interest to Madison Square Garden, L.P.) made certain covenants and agreed to certain terms and conditions, as set forth in a Consent Agreement entered into with the NHL. Among those covenants and conditions were several provisions that relate to the basic operation of the League and its economic framework, including specifically the territorial rights of individual clubs.

3.    In the Consent Agreement by and between MSG Holdings, L.P. and the NHL, MSG agreed that it would (i) be bound by and comply with the NHL Constitution, including specifically the provisions relating to territorial rights; (ii) not take any actions which may be inconsistent with the NHL Constitution; (iii) release any and all claims against the League that existed as of the date of the execution of the Consent Agreement; and (iv) not initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution or any other League rules or policies that were in effect as of the date of execution of the Consent Agreement. Since acquiring the Rangers and becoming a member of the League, MSG has reaffirmed those covenants and commitments on several occasions, including most recently in another Consent Agreement executed in April 2005.

4.    In its First Amended Complaint, MSG alleges that the League's rules and practices relating to the broadcasting of NHL games, including the territorial rights of NHL Member Clubs, the licensing of intellectual property, in-arena advertising, and exploitation of the internet, constitute illegal restraints of trade. In challenging those rules and practices, almost all of which were in place at the time that MSG executed one or more of its Consent Agreements, MSG has breached the covenants set forth in its agreements with the League. Pursuant to the Consent Agreements and the NHL Constitution, the League has the right to discipline MSG for its breach of those agreements. However, MSG

maintains that the League does not have the right to discipline it, and in its First Amended Complaint seeks injunctive relief precluding the League from taking any action against MSG in response to MSG's prosecution of this lawsuit. As a result, the parties have an actual and justiciable controversy regarding the League's right to initiate and conduct internal League disciplinary proceedings against MSG.

5.    By these Counterclaims, the NHL seeks a judicial declaration confirming that (a) the determination of whether a Club has breached commitments to the League and the appropriate discipline for such a breach are committed by contract to internal League determination, and (b) the League has the contractual right to commence and proceed with disciplinary proceedings against MSG pursuant to the rules and procedures set forth in the NHL Constitution.

## JURISDICTION AND VENUE

6.    This action is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and presents a case of actual controversy within the jurisdiction of this Court.

7.    This Court has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367.

8.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

9.    The National Hockey League is a joint venture composed of thirty (30) Member Clubs, including the Rangers, engaged in the production and marketing of professional hockey entertainment, commonly known as "NHL Hockey." NHL teams are located in a diverse group of cities throughout the United States and Canada. The NHL League Office headquarters is located at 1185 Avenue of the Americas, New York, New York.

10.    Counter-defendant MSG is a Delaware limited partnership.  Its principal offices are located at Two Pennsylvania Plaza, New York, New York.  MSG owns the New York Rangers, one of the thirty (30) Member Clubs in the NHL.  MSG also owns Madison Square Garden, as well as two programming services, MSG Network and FSN New York (recently re-branded as MSG+) which license the right to distribute Rangers games, as well as games of the New York Islanders, New Jersey Devils and Buffalo Sabres NHL hockey Clubs.

## MSG'S AGREEMENTS AND COVENANTS

11.    The NHL Constitution requires that new members be approved by an affirmative vote of three-fourths of the League membership.  In 1994, Cablevision Systems Corporation ("Cablevision"), Rainbow Programming Holdings, Inc. ("Rainbow"), which was a subsidiary of Cablevision, and ITT Corporation ("ITT") reached an agreement to purchase Madison Square Garden Corporation, which owned the Rangers, from Paramount Communications Realty Corporation.  Cablevision, Rainbow and ITT applied to the League for approval of their acquisition of the team.  The League approved a transaction in which a new entity, MSG Holdings, L.P., acquired the Rangers.  MSG Holdings was in turn owned by various wholly-owned subsidiaries of Cablevision and ITT.  In exchange for the League's consent to the acquisition, MSG Holdings, L.P., as well as each of the Cablevision and ITT entities with an ownership interest in MSG Holdings, L.P., agreed to certain terms, conditions and covenants.  The agreement between the League, on the one hand, and MSG Holdings, L.P., MSG Eden Corp., ITT MSG Inc., ITT Eden Corp., Garden L.P. Holding Corp., Rainbow Garden Corporation, ITT Corporation, Rainbow Programming Holding Inc. and Cablevision Systems Corp., on the other hand, was memorialized in a Consent Agreement executed in March 1995.

12.    In the Consent Agreement, the acquiring parties made several covenants relating to the basic legal and economic structure of the League.  The covenants and conditions were de-

16

signed to confirm that they understood how the League was structured and operated; that they accepted and agreed to that framework; and that they agreed not to challenge any rules or practices in effect at that time.  Specifically, they agreed:

> (i) "to be bound by and comply with (A) the NHL Constitution, including, without limitation . . . Articles 3.9 through 3.12 (concerning involuntary termination by the NHL and disposition of the Franchise), and Article 4 (concerning territorial rights), (B) the NHL Bylaws, . . . (C) all other NHL rules, regulations, policies and resolutions . . . and (E) the NHL Commissioner's interpretation of any of the foregoing, all as may be amended from time to time (collectively, the 'NHL Constitution and Agreements')";

> (ii) "<u>not to take</u> or support <u>any positions or actions</u> which may be inconsistent with any NHL obligations or the NHL Constitution and Agreements <u>or</u> which may have a <u>material adverse impact</u> on the NHL or its Member Clubs,"; and,

> (iii) "not to challenge or support any challenge to, at any time or in any forum, any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements."

(Section 3(a)) (emphasis added).

13.    The acquiring parties also expressly agreed to a release and covenant not to sue covering any potential claims relating to any practices that were in place up to the date of execution of the Consent Agreement:

> <u>Release and Limitation of Liability</u>

> (a) "As partial consideration for the NHL providing the consents contained herein, each of the Acquiring Parties . . . hereby forever release and discharge the NHL, NHL Enterprises, Inc., all of the NHL's Member Clubs (except the Rangers) . . . from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, decisional, Canadian, United States, state, provincial, local or otherwise), which, to the best of knowledge of MSG Holdings or MSG, in the case of the release by MSG Holdings . . . <u>exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement</u>, relating to, or arising from,

any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition or in respect of the Proposed Transactions . . . "

(b) "The Acquiring Parties hereby agree, based upon facts known to, or facts that reasonably should have been known to, the Acquiring Parties on the date hereof, not to initiate a judicial or other proceeding against the NHL challenging any provision of the NHL Constitution and Agreements as in effect and interpreted on the date hereof as they may apply to acts or omissions up to and including the date hereof."

(Section 13) (emphasis added).

14.    The territorial rights of the League and Member Clubs are among the specifically enumerated rights as to which the acquiring parties agreed (i) to comply; (ii) not to take an inconsistent position; (iii) not to challenge; and (iv) to release the NHL from any claims or liability in law and equity.  Those rights are set forth in Article IV of the Constitution – which is specifically referenced in the Consent Agreement – and were clarified in a series of resolutions that pre-date the Consent Agreement.  (See Consent Agreement, Section 4(b).)  The acquiring parties also expressly agreed to terms relating to the broadcasting of Rangers' games on cable television.  (See Consent Agreement, Section 9.)

15.    Since entering the League, the owners of the Rangers have repeatedly reaffirmed those covenants in connection with subsequent transactions affecting ownership interests in the Club.  In exchange for the League's consent to the transactions, the owners of the Rangers, including the legal entity that currently directly owns the Rangers, Plaintiff Madison Square Garden, L.P., executed several additional Consent Agreements, including as recently as April 2005.  Those Consent Agreements included similar covenants, conditions, and releases as were included in the Consent Agreement executed in 1995.

16.    The April 2005 Consent Agreement also confirms that the prior Consent

Agreements remain in full force and effect:

> 8. "Confirmation of Agreements. The Transaction Parties and the NHL
> confirm that the Consent Agreement dated as of June 17, 1997 (the
> "1997 Agreement"), the Consent Agreement dated as of March 29, 2001
> (the "2001 Agreement"), the Consent Agreement dated as of December
> 5, 2002 (the "2002 Agreement") and any other Consent Agreement at
> any time executed by any of the Transaction Parties with the NHL . . .
> have not been amended or modified by this Consent Agreement and re-
> main in full force and effect. . . . "

17.    In the April 2005 Consent Agreement, MSG also specifically agreed to the or-

ganization and operation of the various NHL affiliates that have been formed in connection with many

of the practices at issue in this case. MSG agreed "that it shall . . . be bound by and comply with: (A)

the NHL Constitution, (B) the NHL By-Laws, (C) the governing documents of each of the NHL, NHL

Enterprises L.P., NHL Enterprises Canada, L.P. NHL Enterprises Inc., National Hockey League En-

terprises Canada, Inc., Intra-Continental Ensurers, Limited, any entity that may be formed by the NHL

member clubs . . . generally after the date of this Consent Agreement, and each of their respective af-

filiates and subsidiaries (together with the NHL, the "NHL Entities"), (D) the rules, regulations,

memoranda, resolutions, policies, procedures, interpretations and directives of the governing body of

each of the NHL Entities . . . and the NHL Commissioner  . . . "  (Section 3(a)(i).)


18.    Almost all of the League's current rules, practices and resolutions relating to

broadcasting, intellectual property, advertising and the internet were in place by 2005 when MSG exe-

cuted its most recent Consent Agreement, and many were in place by 1995 when MSG joined the

League. For example, prior to execution of its most recent Consent Agreement, the following rules,

resolutions, and practices were in place:


A.    Broadcasting. As early as 1984, the Clubs outlined how they would de-

fine each Club's "Home Territory" and "Sphere of Influence" for purposes of determining

19

where Member Clubs could broadcast their games through various means and technologies. In 1988, the Clubs entered a Modified Member Club Agreement, in which the Clubs agreed to maintain the then-existing Broadcast Regulations indefinitely, terminable by a majority vote of the Clubs. The Modified Member Club Agreement also codified each Club's "outer market" territory for local broadcast purposes. Since the Modified Member Club Agreement, the Member Clubs have been limited to distributing their home and away games to within their respective exclusive broadcast territories.

B.      Intellectual Property. In 1994, the Clubs unanimously agreed to assign to the League (with defined exceptions) all intellectual property rights any Club may have had at that time. A license agreement entered by the Clubs in 1996 continued this grant of rights from the Clubs to the League in substantively the same form.

C.      Internet / New Media. In 1996, pursuant to Resolutions of the NHL Board of Governors, the Member Clubs agreed that the League would exploit, on behalf of all Clubs, the distribution of League and Club rights over the Internet and through similar new media on a worldwide basis. The Resolutions specifically included conveyance of the intellectual property rights of the Clubs. The Resolutions also granted the Commissioner broad discretion to carry out the League's objectives relating to exploitation of new media, including the authority to make directives regarding the very rights (e.g., advertising, merchandising) that are the subject of MSG's Amended Complaint. In June 2000, the Board unanimously adopted a Resolution reaffirming and ratifying that, because the Internet is a worldwide medium, the rights to exploit the Internet are held by the League, and that the Commissioner has the power "to promulgate such rules and regulations and take such acts as he deem[s] appropriate, including with respect to what rights might, at any particular time, be exercised by the Clubs." In October 2000, pursuant to the authority that he had previously been given, the Commissioner

promulgated Internet Regulations that govern the Clubs' new media activities. Those Regulations were amended in October and November 2001.

D.    <u>In-Arena Advertising</u>.    The Member Clubs have operated under in-arena advertising rules – approved by Resolutions of the Board of Governors – in various forms since the late 1970s. The Board Advertising Regulations – applicable to the dasherboards around the ice surface – were promulgated long before MSG joined the League and were amended on December 9, 1993, June 26, 1996 and September 14, 2006. In September 1991, the Board of Governors resolved that the same advertising restrictions would apply to in-ice advertising as applied to dasherboards. Subsequently, specific In-ice Logo Guidelines were approved by Resolution on March 14, 1997. In addition, on March 24, 1994, the Board of Governors resolved that no Club or Club broadcaster may use virtual signage or advertising.

19.    The only rule or policy as to which there arguably has been a material change since MSG executed its most recent Consent Agreement is the website migration plan that was the subject of MSG's preliminary injunction motion. However, in the 2005 Consent Agreement, MSG agreed to be bound and not to challenge all rules, regulations, policies, procedures, and interpretations, including those adopted in the future, even if MSG voted against such resolutions.

**MSG'S EFFORTS TO ENFORCE AND PROFIT FROM ITS
TERRITORIAL RIGHTS IN THE NHL CONSTITUTION**

20.    The Rangers franchise has benefited from its membership in the NHL and its location in the largest city in North America, including the territorial rights it has been afforded under the NHL Constitution. Its territorial rights have provided it an economic advantage over other teams in the League in generating revenue, including revenue from ticket sales, merchandise sales, and local radio and television.

21

21.     Contrary to the suggestion in its First Amended Complaint that it has objected to any limits on competition between individual Member Clubs within the NHL, the Rangers franchise has, in fact, sought to protect and profit from its territorial rights set forth in the NHL Constitution.

22.     When the NHL franchise known as the Colorado Rockies sought to relocate to New Jersey in 1982, the Rangers franchise invoked its territorial rights under the NHL Constitution and sought compensation from the Colorado Rockies in exchange for the Rangers' consent to the relocation of the Rockies franchise.  The Rangers negotiated an agreement pursuant to which the Colorado Rockies, which are now known as the New Jersey Devils, were required to pay the Rangers (i) $4 million for invading the Rangers' territorial rights, and (ii) up to an additional $5 million of the Devils' anticipated radio and television revenues for invading the Rangers' local broadcasting territory.

23.     When the Devils franchise did not generate as much radio and television revenue as it had anticipated when it entered its agreement with the Rangers, the Devils sought to have a portion of the $5 million fee canceled.  In response, in 1995, the Rangers' current ownership – Plaintiff Madison Square Garden, L.P. – sought the League's assistance to enforce the terms of the 1982 agreement.

24.     On October 24, 1995, MSG sent a letter to the League requesting that Commissioner Bettman issue a ruling requiring the Devils to comply with their prior agreement to compensate the Rangers franchise for the invasion of its home territory.  In the letter, MSG summarized the pertinent history:

> "The original transaction between the Devils and Rangers was consummated in June, 1982.  At that time, the Rangers agreed to share its invaluable territorial rights and permit Dr. McMullen and his partners to move the Colorado Rockies.  To pay for this valuable right, the Devils agreed to give the Rangers 20% of its electronic media revenues in connection with the exploitation of its own hockey games as well as in connection with the League's exploitation of all Member Clubs' games.

22

That obligation was capped at $5,000,000. The Devils also agreed – as a separate and distinct obligation – to pay the Rangers $4,000,000 over 10 years, pursuant to a negotiable Promissory Note."

25.    During those proceedings, MSG never took the position that its "invaluable territorial rights" were unenforceable or the product of an illegal restraint of trade. Nor did MSG argue that NHL teams are horizontal competitors within the meaning of the antitrust laws, or that teams should be allowed to broadcast their games anywhere in the country irrespective of the territorial rights set forth in the NHL Constitution. To the contrary, MSG vigorously sought to protect its rights; extracted millions of dollars from one of its partners for infringing upon the Rangers' territorial rights; and sought the League's assistance in enforcing those rights.

## MSG'S BREACH OF ITS COVENANTS TO THE LEAGUE

26.    In its First Amended Complaint, MSG challenges rules and policies that were in place at the time that MSG had executed one or more Consent Agreements. Again, MSG contractually agreed (i) to comply with the NHL Constitution; (ii) not to take or support any positions inconsistent with the NHL Constitution or any League rules or procedures; (iii) to release any and all claims against the League; and (iv) not to initiate a judicial or other proceeding against the NHL challenging the NHL Constitution or any League rules or procedures.

27.    At the time MSG executed the 2005 Consent Agreement, MSG was well aware of the League's rules and practices relating to territorial rights. In addition to securing payment from the Devils for the invasion of the Rangers' territorial rights, MSG has been a party to litigation in which the League and Member Clubs, including MSG, have successfully defended the League's territorial rights and broadcast arrangements against legal challenges from third-parties.

Case 1:07-cv-08455-LAP    Document 69    Filed 06/18/2008    Page 24 of 33

28.     Despite its repeated contractual commitments to the League, MSG now alleges that the antitrust laws give it the unfettered right to broadcast Rangers games, anywhere, any time and through any means – including in other Clubs' home territories:

- "In particular, the NHL member clubs, acting collusively as the League and through the Commissioner, claim the right to control jointly all broadcasting and other distribution rights, both inside and outside each club's local area, as well as internationally. <u>In asserting this control, the League has acknowledged that it has allocated the geography of virtually all of North America among various member clubs. By doing so, the League has illegally eliminated the ability of a club to broadcast its games into areas allocated to the other clubs</u>. . . ." (FAC ¶16c)

- "In a fully competitive marketplace, the Rangers could and would compete to an even greater extent . . . by increasing the opportunity to view Rangers games throughout the country, whether through cable, satellite or on the internet . . . " (FAC ¶37)

- "[D]efendants have unreasonably restrained the broadcasting and other distribution rights of individual clubs by allocating the geography of virtually all of North America among the members clubs and prohibiting each club from transmitting its games, on television or over the internet, into territories allocated to other clubs or outside North America. The League keeps for itself the right to broadcast games into territories allocated to individual clubs, but the League exercises that right by selling only cable packages of all NHL games. . . ." (FAC ¶40c)

- "MSG [is] unable to distribute Ranger games, game highlights and game footage through cable, satellite, internet and otherwise in ways it believes are best suited to reaching the Ranger fan base throughout the country and abroad. . . ." (FAC ¶47D)

29.     MSG seeks injunctive relief "prohibiting defendants from imposing or enforcing any restriction" on MSG's broadcasting of Rangers games. (Prayer for Relief.)

30.     MSG also challenges the League's rules, resolutions, and practices relating to intellectual property, including the licensing of individual NHL club marks, in-arena advertising, and exploitation of the internet. MSG freely admits that it is challenging rules and resolutions that pre-date when it joined the League:

"Pursuant to a series of agreements beginning in the 1980s, and renewed several times since then, defendants purported to obtain the 'exclusive' right to control for virtually all commercial purposes the individual clubs' marks and licensing opportunities. Defendants have exercised and enforced those rights in ways that have significantly restrained the competitive activities of the member clubs on a continuous basis since then." (FAC ¶38)

## THE NATURE OF THE PARTIES' DISPUTE

31.    In the Consent Agreements it executed, MSG expressly agreed to an internal disciplinary procedure in the event it was ever alleged to have breached their terms. Section 14(h) of the 1995 Consent Agreement states:

"The parties hereto acknowledge and agree that the failure of [MSG] to comply with any of the provisions of this Consent Agreement . . . shall constitute a material breach of this Consent Agreement which entitles the NHL to take action permitted by the NHL Constitution and/or this Agreement. Said action includes . . . the right of the NHL to commence termination proceedings under Article III of the NHL Constitution . . . "

The 2005 Consent Agreement contains an identical provision.

32.    Article III of the NHL Constitution lays out the grounds for discipline of a Member Club, potential sanctions, and the procedures to be followed. Article 3.9(b) identifies the grounds for discipline, including violation of the NHL Constitution or the failure or refusal to fulfill contractual obligation in such a way as to affect adversely the League. Article 3.10 explains the disciplinary procedure. Any member of the League or the Commissioner may prefer charges that a Member Club violated Article 3.9(b). The Member Club that is charged is entitled to a hearing, including the right to appear in person and by counsel and to present evidence in its defense. The affirmative vote of three-fourths of the members of the League present and voting is required to sustain any charge. The membership also votes upon the appropriate corrective action, bearing in mind the gravity of the charge, any extenuating circumstances, and the best interest of hockey and the League. Potential corrective actions include (i) suspension or termination of membership in the League and sale

of the Club to a new owner; (ii) the imposition of an award as compensation for damages sustained by reason of any violation; and (iii) any other direction, order or relief, which may be appropriate in the circumstances, such as the suspension or expulsion of individuals involved in the management of the Club. An affirmative vote of three-fourths of the members present and voting is also required for the imposition of any disciplinary action. Article 3.13 prohibits each member of the League from resisting or attempting to prevent by court proceedings its termination in the League.

33.     As set forth above, in filing the First Amended Complaint, which challenges the League's territorial rights as well as other rules, regulations, policies and resolutions that were in place at the time MSG executed its Consent Agreements, MSG has breached its contractual obligations to the League. Under the NHL Constitution, and pursuant to the terms of the Consent Agreements, the Commissioner and individual Member Clubs have the right to institute disciplinary proceedings against MSG. The questions of whether MSG has breached its covenants and, if so, the appropriate discipline for any breaches are to be determined by the League's Board of Governors pursuant to the procedures set forth in the NHL Constitution. MSG's agreement to have internal League disputes resolved through the League's internal procedures constitutes an enforceable contractual right of the League.

34.     Pursuant to Article 3.10 of the NHL Constitution, any Member Club or the NHL Commissioner may prefer disciplinary charges against a Member Club. One or more individuals authorized to prefer charges are prepared, if the declaratory relief sought in this Counterclaim is granted, to prefer charges against MSG in a form substantially the same as set forth in the notice attached hereto as Exhibit A.

35.     MSG disputes the NHL's contractual rights under the Consent Agreements and the NHL Constitution to institute disciplinary proceedings against MSG. Specifically, in the First

Amended Complaint, MSG seeks injunctive relief "[p]rohibiting defendants from sanctioning, penaliz-ing, or otherwise taking adverse action against the Rangers or any individuals or entities affiliated with the Rangers for the filing and prosecution of this lawsuit or any actions related thereto, or for failing to comply with any illegal NHL rules or practices."

## FIRST COUNTERCLAIM
## FOR DECLARATORY RELIEF

36.    Paragraphs 1 through 35 of these Counterclaims are hereby incorporated by ref-erence.

37.    As described above, an actual and justiciable controversy has arisen and now exists between the NHL and MSG concerning the League's right to initiate and conduct internal League disciplinary proceedings against MSG.

38.    The NHL hereby seeks a judicial declaration that (a) the determination of whether a Club has breached commitments to the League and the appropriate discipline for such a breach have been committed by contract to collective, internal League resolution pursuant to proce-dures set forth in the NHL Constitution, and (b) the League has the contractual right to commence and proceed with disciplinary proceedings against MSG pursuant to the rules and procedures set forth in the NHL Constitution.

39.    Without a determination by this Court that the NHL is entitled to enforce, and MSG is obligated to comply with, the League's internal rules and procedures regarding the discipline of Members Clubs for breaches of their covenants to the League, the NHL's present and future ability to enforce its rules and procedures will be seriously jeopardized and the financial well-being of the entire League and all of its members may be irreparably harmed.

## SECOND COUNTERCLAIM
## FOR BREACH OF CONTRACT

40.     Paragraphs 1 through 39 of these Counterclaims are hereby incorporated by reference.

41.     The NHL maintains that the subject matter of this Counterclaim, namely the interpretation and enforcement of the NHL Constitution and related resolutions and the discipline of a Member Club for the breach of covenants set forth in its Consent Agreements, including the imposition of damages stemming from such breaches, are matters that must be resolved pursuant to internal League procedures.

42.     The NHL asserts this Counterclaim for breach of contract solely to protect its legal rights in the event that the Court declines to enter the declaratory relief sought by the NHL, and because this Counterclaim arguably constitutes a compulsory counterclaim to MSG's claim for relief.

43.     The NHL Constitution and the Consent Agreements that MSG executed constitute binding contracts between the League and MSG.

44.     In filing its First Amended Complaint and seeking to invalidate provisions of the NHL Constitution and related League rules and policies that were in place before MSG executed its Consent Agreements, MSG has breached covenants set forth in its Consent Agreements, including the covenant not to challenge, at any time or in any forum, any aspect of the NHL Constitution, NHL rules, regulations, policies and resolutions.

45.     The NHL has been damaged by MSG's breach of its covenants.  Although under the NHL Constitution and By-Laws, MSG ultimately will be responsible for the legal fees and other expenses the League incurs in defending against MSG's complaint in this litigation, the NHL has been forced to advance such fees and expenses on MSG's behalf.  Further, by calling into question the

League's ability to market and exploit various rights on a collective basis, MSG has also damaged the League in its dealing with third-parties and the Member Clubs in their dealings with third-parties and/or prospective purchasers in an amount not presently known.

**WHEREFORE**, Counterclaimant NHL prays for judgment as follows:

(1)    A Judicial Declaration confirming that the Rangers and the other NHL Member Clubs have committed to internal League governance procedures and collective determination the proper discipline of Member Clubs for purported violations of their contractual obligations to the League and other Member Clubs;

(2)    A Judicial Declaration that the NHL may enforce its internal rules and proce-dures relating to the discipline of Member Clubs and initiate disciplinary proceedings against MSG in accord with the rules and procedures set forth in the NHL Constitution;

(3)    Damages in an amount to be determined;

(4)    Costs of suit incurred herein;

(5)    Such other and further relief in favor of Cross-Complainant NHL as the Court may deem just and proper.

Dated:  June 18, 2008                                        SKADDEN, ARPS, SLATE,
                                                                         MEAGHER & FLOM LLP


                                                        By:   s/ Shepard Goldfein
                                                            Shepard Goldfein
                                                            James A. Keyte
                                                            Paul M. Eckles
                                                            Peter S. Julian
                                                            Four Times Square
                                                            New York, New York 10036-6522
                                                            Telephone:  (212) 735-3000
                                                            Facsimile:  (212) 735-2000
                                                            *Attorneys for Defendants and Counter-*
                                                            *Claimant National Hockey League*

# EXHIBIT A

EXHIBIT A – PROPOSED NOTICE OF COMMENCEMENT OF DISCIPLINARY PRO-
CEEDINGS

June __, 2008

Mr. James Dolan
Madison Square Garden, L.P.
Two Penn Plaza, 14th Floor
New York, New York 10121

      Re:    <u>Commencement of Disciplinary Proceedings Against Madison Square Garden, L.P.</u>

Dear Mr. Dolan:

Pursuant to Article 3.10 of the NHL Constitution, I write to provide you notice of the com-
mencement of disciplinary proceedings against Madison Square Garden, L.P. ("MSG"), includ-
ing the charges against MSG to be heard during those proceedings.

When MSG was accepted as a member in this League, it agreed to abide by the NHL Constitu-
tion and related rules, policies and resolutions.  Specifically, in the Consent Agreement it exe-
cuted, MSG agreed:

> (i) "to be bound by and comply with (A) the NHL Constitution, in-
> cluding, without limitation . . . Articles 3.9 through 3.12 (concern-
> ing involuntary termination by the NHL and disposition of the
> Franchise), and Article 4 (concerning territorial rights), (B) the
> NHL Bylaws, . . . (C) all other NHL rules, regulations, policies and
> resolutions . . . and (E) the NHL Commissioner's interpretation of
> any of the foregoing, all as may be amended from time to time
> (collectively, the 'NHL Constitution and Agreements')";

> (ii) "<u>not to take</u> or support <u>any positions or actions</u> which may be
> inconsistent with any NHL obligations or the NHL Constitution
> and Agreements <u>or</u> which may have a material adverse impact on
> the NHL or its Member Clubs,"; and,

> (iii) "<u>not to challenge</u> or support any challenge to, at any time or in
> any forum, any aspect of the NHL Constitution and Agreements,
> except insofar as an appeal right is provided in the NHL Constitu-
> tion and Agreements."

1

(Section 3(a).) MSG reaffirmed those basic covenants in subsequent Consent Agreements, including as recently as April 2005.

In seeking a judicial declaration that several League rules and practices are unlawful under the antitrust laws, MSG has materially breached those covenants. As a result, MSG is hereby charged with breaching the terms of its Consent Agreements. Specifically, in prosecuting its lawsuit in federal court and seeking to invalidate League rules and practices relating to territorial rights, marketing and licensing of intellectual property, in-arena advertising, and exploitation of the internet that pre-date its execution of the Consent Agreements, MSG has breached Section 3(a)(i)-(iii) of those agreements. In the Consent Agreements, MSG also expressly acknowledged and agreed that breach of the covenants set forth in those agreements would entitle the League "to commence termination proceedings under Article III of the NHL Constitution." MSG is also charged with violating Articles 3.9(b)(i) (addressing violations of the NHL Constitution or other League rules) and 3.9(b)(iii) (addressing failures or refusals to fulfill contractual obligations) of the NHL Constitution.

The disciplinary proceedings will be conducted pursuant to the procedures set forth in Article 3.10 of the NHL Constitution. The Chairman of the Board of Governors will preside over the proceedings, and MSG will be entitled to all of the procedural safeguards set forth in the NHL Constitution, including the right to appear in person and by counsel and to present evidence in its defense. An affirmative vote of three-fourths of the members present and voting will be required to sustain any charge.

If any charges are sustained, the Board of Governors will also consider and vote upon appropriate sanctions. Pursuant to Article 3.10(e) of the NHL Constitution, upon the affirmative vote of three-fourths of the members present and voting, potential corrective actions include:

(i)     suspension or termination of the membership of such member;

(ii)    the imposition of an award, which may be made payable in whole or in part to the League and/or to any other member or members as compensation for damages sustained by reason of any violation found to have been committed by the member charged; and

(iii)   any other direction, order or relief which may be appropriate in the circumstances.

Any decision of the League made in accordance with the procedures set forth in the NHL Constitution will be final and binding. (Article 3.10(g).) You should also be aware that Article 3.13 of the NHL Constitution prohibits each member of the League from resisting or attempting to prevent by court proceedings its termination in the League.

You will be notified of the time and place of the hearing as soon as it has been set.

Sincerely,

[Commissioner]

and/or

[One or More Charging Members]