UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

MADISON SQUARE GARDEN, L.P.,     )
     )
     Plaintiff,     )     No. 07 CIV. 8455 (LAP)
     )
     v.     )     ECF Case
     )
NATIONAL HOCKEY LEAGUE, NATIONAL     )
HOCKEY LEAGUE ENTERPRISES, L.P., NHL     )
INTERACTIVE CYBERENTERPRISES, L.L.C.,     )
NHL ENTERPRISES CANADA, L.P., and NHL     )
ENTERPRISES, B.V.,     )
     )
     Defendants.     )
     )

---------------------------------------------------------------- x

NATIONAL HOCKEY LEAGUE,     )
     )
     Counter-claimant,     )
     )
     v.     )
     )
MADISON SQUARE GARDEN, L.P.,     )
     )
     Counter-defendant.     )
     )

---------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION TO DISMISS COUNTERCLAIMS

JONES DAY
222 East 41st Street
New York, NY  10017-6702
(212) 326-3939

*Attorneys for Plaintiff Madison
Square Garden, L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

I.   THE COUNTERCLAIMS FAIL BOTH BECAUSE THEY DEPEND UPON
     UNENFORCEABLE PROSPECTIVE RELEASES OF ANTITRUST CLAIMS
     AND BECAUSE THEY IMPERMISSIBLY SEEK THE COURT'S AID IN
     PENALIZING THE FILING OF A GOOD-FAITH ANTITRUST SUIT ...................... 4

     A.   The Counterclaims Are Based On Unenforceable Waivers Of The Right To
          Bring Antitrust Claims Based On Future Conduct ....................................... 5

     B.   The Counterclaims Also Fail Because They Impermissibly Enlist The Court's
          Aid In Retaliating For The Filing Of An Antitrust Action .......................... 9

          1.   Federal Statutory Schemes Are Construed To Bar Retaliation ................ 9

          2.   Claims Seeking To Penalize The Filing Of A Lawsuit Are Not
               Cognizable ............................................................................................. 11

          3.   The Anti-Retaliation Principle Has Repeatedly Been Applied In
               Antitrust Cases ...................................................................................... 12

          4.   This Established Case Law Requires Dismissal Of The NHL's
               Counterclaims ........................................................................................ 16

II.  DISMISSAL IS ALSO PROPER BECAUSE THERE HAS BEEN NO
     DECISION IN THE NHL'S FAVOR ON THE MERITS OF MSG'S
     ANTITRUST CLAIMS ................................................................................................ 18

CONCLUSION ................................................................................................................ 20

## TABLE OF AUTHORITIES

**Page**

### CASES

*A.C. Becken Co. v. Gemex Corp.*,
    272 F.2d 1 (7th Cir. 1959) ..........................................................................15

*Aetna Cas. & Sur. Co. v. Kellogg*,
    856 F. Supp. 25 (D.N.H. 1994)....................................................................19

*Agfa Corp. v. United Mktg. Group*,
    No. 02 Civ. 8468, 2003 WL 21555087 (S.D.N.Y. July 10, 2003) ....................12

*Airlines Reporting Corp. v. Belfon*,
    351 F. Supp. 2d 326 (D.V.I. 2004) ...............................................................19

*Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*,
    707 N.Y.S.2d 647 (App. Div. 2000)..............................................................12

*Ashmore v. Ne. Petroleum Div. of Cargill, Inc.*,
    843 F. Supp. 759 (D. Me. 1994) ...................................................................16

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983).....................................................................................13

*BE&K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002).....................................................................................11

*Bergen Drug Co. v. Parke, Davis & Co.*,
    307 F.2d 725 (3d Cir. 1962).....................................................................14, 16

*Boschette v. Buck*,
    916 F. Supp. 91 (D.P.R. 1996)......................................................................19

*Brooklyn Sav. Bank v. O'Neil*,
    324 U.S. 697 (1945).......................................................................................5

*Burlington N. & Santa Fe Ry. v. White*,
    548 U.S. 53 (2006).......................................................................................11

*CBOCS West, Inc. v. Humphries*,
    128 S. Ct. 1951 (2008)..................................................................................10

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989).......................................................................................13

## TABLE OF AUTHORITIES
### (continued)

Page

*Cellar Door Prods., Inc. of Mich. v. Kay*,
    897 F.2d 1375 (6th Cir. 1990) ...............................................................8

*Choudhury v. Polytechnic Inst. of N.Y.*,
    735 F.2d 38 (2d Cir. 1984)...........................................................10, 11

*Chrysler Corp. v. Fedders Corp.*,
    540 F. Supp. 706 (S.D.N.Y. 1982).............................................19, 20

*Dart Drug Corp. v. Parke, Davis & Co.*,
    344 F.2d 173 (D.C. Cir. 1965) ...........................................................14

*DeGaetano v. Smith Barney, Inc.*,
    983 F. Supp. 459 (S.D.N.Y. 1997)........................................................6

*Donahue v. Pendleton Woolen Mills, Inc.*,
    633 F. Supp. 1423 (S.D.N.Y. 1986).....................................................16

*EEOC v. Astra USA, Inc.*,
    94 F.3d 738 (1st Cir. 1996)..................................................................6

*EEOC v. Shell Oil Co.*,
    466 U.S. 54 (1984)...............................................................................6

*Fox Midwest Theatres, Inc. v. Means*,
    221 F.2d 173 (8th Cir. 1955) .........................................................7, 8

*Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*,
    386 F.2d 757 (6th Cir. 1967) ..............................................................7

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) .......................................................13, 14

*George W. Warner & Co. v. Black & Decker Mfg. Co.*,
    277 F.2d 787 (2d Cir. 1960)................................................................15

*Gomez-Perez v. Potter*,
    128 S. Ct. 1931 (2008)........................................................................10

*Hammes v. AAMCO Transmissions, Inc.*,
    33 F.3d 774 (7th Cir. 1994) ..........................................................15, 17

*Harris v. Steinem*,
    571 F.2d 119 (2d Cir. 1978)..........................................................2, 19

# TABLE OF AUTHORITIES
## (continued)

Page

*Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co.*,
    964 F. Supp. 624 (D. Conn. 1997) ...................................................................17

*House of Materials, Inc. v. Simplicity Pattern Co.*,
    298 F.2d 867 (2d Cir. 1962) .........................................................................14

*Hunt v. Mobil Oil Corp.*,
    654 F. Supp. 1487 (S.D.N.Y. 1987) ...............................................................7

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
    335 F.3d 303 (4th Cir. 2003) .......................................................................12

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ...........................................................................9, 10, 11

*Jacobson & Co. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977) .........................................................................15

*Kaiser Steel Corp. v. Mullins*,
    455 U.S. 72 (1982) ...........................................................................2, 5, 18

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955) .....................................................................................7, 8

*Little v. United Techs.*,
    103 F.3d 956 (11th Cir. 1997) ......................................................................10

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
    270 F. App'x 56 (2d Cir. 2008) ....................................................................17

*McMenemy v. City of Rochester*,
    241 F.3d 279 (2d Cir. 2001) .........................................................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) .........................................................................2, 4, 6, 13

*Mktg. Assistance Plan, Inc. v. Associated Milk Producers*,
    338 F. Supp. 1019 (S.D. Tex. 1972) .............................................................7, 8

*Morrone Co. v. Barbour*,
    241 F. Supp. 2d 683 (S.D. Miss. 2002) .......................................................17

*NLRB v. Local 46, Metallic Lathers Union*,
    149 F.3d 93 (2d Cir. 1998) ...........................................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) ........................................................................... 14

*Osborn v. Sinclair Ref. Co.*,
    324 F.2d 566 (4th Cir. 1963) ............................................................ 15

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ........................................................................... 13

*Phillips v. Crown Cent. Petroleum Corp.*,
    602 F.2d 616 (1979) .................................................................... 14, 15

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ............................................................... 11, 12, 17

*Ramirez v. Platt*,
    No. CV 87-4128, 1988 WL 127452 (E.D.N.Y. Nov. 28, 1988) ......... 19

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ........................................... 4, 7, 8, 13

*Roby v. Corp. of Lloyd's*,
    996 F.2d 1353 (2d Cir. 1993) ............................................................. 6

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
    40 F.3d 247 (7th Cir. 1995) ........................................................... 1, 7

*Shulman v. Miskell*,
    626 F.2d 173 (D.C. Cir. 1980) ........................................................ 19

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    128 S. Ct. 761 (2008) ........................................................................ 12

*Sullivan v. Little Hunting Park, Inc.*,
    396 U.S. 229 (1969) ..................................................................... 9, 14

*Supermarket Servs. Inc. v. Hartz Mtn. Corp.*,
    382 F. Supp. 1248 (S.D.N.Y. 1974) ................................................. 15

*Thomas James Assocs. v. Jameson*,
    102 F.3d 60 (2d Cir. 1996) ................................................................. 5

*Three Rivers Motors Co. v. Ford Motor Co.*,
    522 F.2d 885 (3d Cir. 1975) ............................................................... 7

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Town of Newton v. Rumery*,
480 U.S. 386 (1987)........................................................................................................5

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*,
858 F.2d 1075 (5th Cir. 1988) .........................................................................................12

*Vinci v. Waste Mgmt., Inc.*,
80 F.3d 1372 (9th Cir. 1996) ...........................................................................................16

*Westmoreland Asbestos Co. v. Johns-Mansville Corp.*,
39 F. Supp. 117 (S.D.N.Y. 1941).....................................................................................8

*Whelan v. Abell*,
48 F.3d 1247 (D.C. Cir. 1995) .........................................................................................12

## STATUTES & RULE

42 U.S.C. § 1981....................................................................................................10, 11

42 U.S.C. § 1982......................................................................................................9

Fed. R. Civ. P. 12(b)(6)..............................................................................................1

## MISCELLANEOUS

Stephen F. Ross, Antitrust Options to Redress Anticompetitive Restraints and
Monopolistic Practices by Professional Sports Leagues, 52 CASE W. RES. L. REV.
133 (2001)................................................................................................................18

## PRELIMINARY STATEMENT

MSG has filed an antitrust suit against Defendants.  Defendant National Hockey League

("NHL") now seeks to have this court authorize it to discipline MSG — and even eject it from

the League — because of this effort to enforce federal and state law.  The NHL does not allege

that MSG's claims were filed in bad faith, and it claims the right to penalize MSG even if it is

established that MSG's claims are meritorious and the NHL has violated the antitrust laws.  This

effort to retaliate against MSG for fulfilling the "private attorney general" role under the antitrust

laws fails, for multiple reasons, to state any legally cognizable claim.  Accordingly, the

counterclaims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

First, the NHL's asserted basis for disciplining MSG is that MSG purportedly agreed not

to file suit against the NHL.  But even if the terms of the agreements at issue could be construed

to apply here (as they cannot for reasons set forth in our opposition to the Defendants' Motion to

Dismiss), it is well-established law that prospective "no-suit agreement[s]" are unenforceable

against antitrust suits.  *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250

(7th Cir. 1995).  If such agreements were valid, cartels would obviously use them as "one of the

devices for shoring up [the] cartel," *id.*, as the NHL is attempting to do here, and courts therefore

have uniformly held such agreements void as against public policy.

Second, the NHL's attempt to enlist this Court's aid in disciplining MSG runs aground on

well-established anti-retaliation principles.  Courts consistently have both recognized the

impermissibility of penalizing a plaintiff for alleging a federal statutory violation, and afforded

the targets of such retaliation a variety of forms of relief, including damages, injunctive relief,

and a refusal to entertain lawsuits in furtherance of such retaliation.  These principles are

particularly applicable — and have been applied — in the antitrust context, where protecting the

role of private plaintiffs as "private attorney[s]-general," *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) (citation and internal quotation marks omitted), is critical to the statutory enforcement scheme. Since the NHL makes it clear that its counterclaim is intended to retaliate against MSG for filing this antitrust suit — and the NHL does not and cannot allege that the suit is a "sham" — the NHL may not invoke this Court's processes to facilitate its retaliation.

Finally, the NHL's counterclaims fail to state a claim, because it is inconceivable that MSG may be disciplined for bringing claims that have merit; any agreement not to challenge unlawful conduct in court would itself be an unlawful agreement in restraint of trade, and "illegal promises will not be enforced" by the federal courts. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982). Thus, at best for the NHL, its counterclaims depend on this Court's ruling on the merits of MSG's claims. Moreover, the Second Circuit has warned that courts should not entertain counterclaims "that will ordinarily not arise if plaintiff wins the main action," and whose dismissal will "avoid[] . . . the dangerous potentialities of counterclaims in the nature of malicious prosecutions as a defensive strat[a]gem." *Harris v. Steinem*, 571 F.2d 119, 125 (2d Cir. 1978) (citation, internal quotation marks, and parentheses omitted). Accordingly, the NHL's counterclaims should, at the very least, be dismissed as premature.

## BACKGROUND

In this lawsuit, MSG seeks only injunctive relief against a ongoing series of anti-competitive restraints adopted by the member clubs of the NHL; it seeks no damages for past harm. Without alleging that MSG's claims are shams, the NHL seeks to penalize MSG for the mere act of filing this suit — threatening sanctions that include terminating MSG's membership in the League, Counterclaim, Ex. A, at 2 — on the ground that the suit purportedly violates contracts between MSG and the NHL.

In particular, the NHL's counterclaims allege that the acquirers of MSG agreed in 1995 "not to challenge . . . any aspect of the NHL Constitution and Agreements, except insofar as an appeal right is provided in the NHL Constitution and Agreements," ¶ 12, and to "release and discharge the NHL . . . from any and all claims . . . which . . . exist as of the date of execution" of the contract, ¶ 13.  The NHL further alleges that MSG "reaffirmed those covenants" in a series of agreements, the last of which was entered in 2005, ¶ 15, and that the 2005 agreement stipulated that MSG would "be bound by and comply with" the NHL's Constitution, by-laws, governing documents, and rules, ¶ 17, "including those adopted in the future, even if MSG voted against such resolutions," ¶ 19.

According to the NHL, MSG breached these agreements by filing this lawsuit, which "challenges rules and policies" that it purportedly agreed not to challenge.  ¶ 26; *see also* ¶ 33 (alleging that, "in filing the First Amended Complaint, which challenges [rules and arrangements] that were in place at the time MSG executed its Consent Agreements, MSG has breached its contractual obligations to the League").  The NHL alleges that most of the conduct challenged by MSG began before 2005, and that "many [challenged practices] were in place by 1995." ¶ 18; *see also* ¶ 30.  Although the Complaint seeks only prospective injunctive relief, the NHL claims that MSG's suit is precluded by the 2005 agreement, *see* ¶ 19, and that MSG's filing of antitrust claims entitles the NHL "to institute disciplinary proceedings against MSG."  ¶ 33.

The NHL's first counterclaim requests a two-part declaration:  first, that the NHL has the contractual right to determine breaches pursuant to its disciplinary procedures; and second, that it "has the contractual right to commence and proceed with disciplinary proceedings against MSG." ¶ 38.  The NHL asserts that the absence of such a declaration would "seriously

jeopardize[]" the NHL's "ability to enforce its rules and procedures," and would irreparably injure "the financial well-being of the entire League." ¶ 39.

The NHL's second counterclaim, alleged as a fallback "in the event that the Court declines to enter the declaratory relief sought" in the first counterclaim, ¶ 42, similarly alleges that, "[i]n filing" the Complaint, "MSG has breached covenants set forth in its Consent Agreements." ¶ 44. This counterclaim seeks damages predicated on the NHL's "be[ing] forced to advance [legal] fees and expenses," and on having its "ability to market and exploit various rights on a collective basis" "call[ed] into question." ¶ 45.

## ARGUMENT

### I.    THE COUNTERCLAIMS FAIL BOTH BECAUSE THEY DEPEND UPON UNENFORCEABLE PROSPECTIVE RELEASES OF ANTITRUST CLAIMS AND BECAUSE THEY IMPERMISSIBLY SEEK THE COURT'S AID IN PENALIZING THE FILING OF A GOOD-FAITH ANTITRUST SUIT.

Two well-established principles require dismissal of the NHL's attempt to penalize MSG for filing antitrust claims. First, agreements purporting to waive or release antitrust claims arising from future conduct are void, because of the threat they pose to an antitrust enforcement scheme that depends on private lawsuits. "The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy." *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974); *accord Mitsubishi Motors*, 473 U.S. at 637 n.19.

Second, the facially retaliatory nature of the counterclaims also forecloses them under case law prohibiting such retaliation. In antitrust cases, as in many other areas, courts have recognized the need to protect resort to the courts by private plaintiffs without fear of retaliation. They have, accordingly, permitted claims for damages stemming from retaliation; enjoined retaliatory exercises of contractual rights; and in some cases allowed employees' claims for

retaliation based on a refusal to go along with antitrust violations.  MSG does not currently seek

damages or an injunction against further retaliation, but merely dismissal of claims seeking to

facilitate retaliation.  Under these authorities, too, the NHL's counterclaims must be dismissed.

### A.    The Counterclaims Are Based On Unenforceable Waivers Of The Right To Bring Antitrust Claims Based On Future Conduct.

Both of the NHL's counterclaims rest on the flawed theory that MSG's filing of this

lawsuit breached contractual provisions precluding it from doing so.  As shown in MSG's

opposition to the Defendants' Motion to Dismiss, the NHL's cited contractual provisions, by

their own terms, do not apply to the claims that MSG has raised in its Complaint.  *See* Mem. in

Opp., Part III(A)(1).  Even if they did purport to apply, however, the case law makes clear that

enforcement of a contract not to sue for ongoing antitrust violations would violate long-

established public policy.

Courts are "not . . . timid in voiding agreements which tend to injure the public good or

contravene some established interest of society."  *Thomas James Assocs. v. Jameson*, 102 F.3d

60, 66 (2d Cir. 1996) (holding void as against public policy a waiver of the right to arbitrate

certain claims) (citation and internal quotation marks omitted); *see also, e.g.*, *Town of Newton v.

Rumery*, 480 U.S. 386, 392 (1987) (noting that "a promise is unenforceable if the interest in its

enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the

agreement").  In particular, the Supreme Court has held both that contracts that violate the

antitrust laws are void as against public policy, *see, e.g.*, *Kaiser Steel*, 455 U.S. at 77 (refusing to

enforce contract that violates the antitrust laws), and that contracts purporting to waive or release

claims are unenforceable where their enforcement would contravene public policy, *see, e.g.*,

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945) ("[A] statutory right conferred on a

private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy.").

In particular, a contractual waiver is unenforceable if it waives "a critical component of Congress's comprehensive statutory scheme for uncovering, redressing, and deterring unlawful" practices. *DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 465 (S.D.N.Y. 1997). The same is true of agreements that would prevent persons from reporting violations of law to public agencies, because "it is crucial that the [agency's] ability to investigate charges . . . not be impaired." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 69 (1984); *see also EEOC v. Astra USA, Inc.*, 94 F.3d 738, 742-45 (1st Cir. 1996) (noting that, "if victims of or witnesses to sexual harassment are unable to approach the EEOC or even to answer its questions, the investigatory powers that Congress conferred would be sharply curtailed and the efficacy of investigations would be severely hampered").

The courts routinely apply these principles to foreclose the prospective release or waiver of the right to bring antitrust lawsuits. For example, *Mitsubishi Motors*, while generally approving agreements to arbitrate antitrust claims, warned "that in the event [a contract governing the forum and choice of law] operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." 473 U.S. at 637 n.19. This stems from the fact that "private actions under the Sherman Act serve primarily a deterrent purpose," and a prospective waiver of such remedies would "circumvent[] the strong and expansive public policy in deterring . . . violations." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1364 (2d Cir. 1993).

Thus, court after court has held that "[t]he prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy."

*Redel's*, 498 F.2d at 99.  *Accord*, *e.g., Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (noting that releases may "not seek to waive damages from future violations of antitrust laws"); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) (finding it "clear" that a release "calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds"); *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987) (applying "'the public policy exception'" to "antitrust claims that arose *after*" release was executed, such that "*future* antitrust claims" were "not *subject to the covenant* not to sue").

These cases recognize that private no-suit agreements cannot be the last word, because the antitrust laws are designed "to protect the public *from* how private producers regulate their affairs," and "[a] no-suit agreement may be one of the devices for shoring up a cartel."  *Sanjuan*, 40 F.3d at 250.  In other words, "the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well.  Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract in restraint of trade."  *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (internal quotation marks omitted).  *Accord*, *e.g.*, *Mktg. Assistance Plan, Inc. v. Associated Milk Producers*, 338 F. Supp. 1019, 1022 (S.D. Tex. 1972) (noting that a prospective waiver would "serve as a license to engage in unlawful monopoly activities against the releasors.  Such an absolution would violate public policy.").

This rule against the prospective release or waiver of the right to bring antitrust lawsuits applies so long as there is actionable conduct subsequent to the release — even if the actionable conduct is a continuation of conduct that began before the date of the release.  In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court found, for purposes of

*res judicata*, that a plaintiff's two lawsuits did not involve the same conduct — even though the earlier "complaint sought . . . injunctive relief which, if granted, would have prevented the illegal acts" challenged in the second action — because the "conduct presently complained of was all subsequent to the [prior] judgment." *Id.* at 324-29. *Accord*, *e.g.*, *Cellar Door Prods., Inc. of Mich. v. Kay*, 897 F.2d 1375, 1376-78 (6th Cir. 1990) (new cause of action "[e]ach time the [allegedly anticompetitive] arrangement precluded [the plaintiff] from competitively bidding for an event").

The lower federal courts have therefore repeatedly held that releases are unenforceable against suits based on such ongoing conduct. *Fox Midwest Theatres* found a release unenforceable "against continued . . . combinational or conspiratorial acts . . . , such as [the plaintiffs] had charged [the defendants] with having previously engaged in." 221 F.2d at 179-80. And *Westmoreland Asbestos Co. v. Johns-Mansville Corp.*, 39 F. Supp. 117 (S.D.N.Y. 1941), held that the plaintiffs could not be bound by a release of the "oppressions and wrongdoing of" the defendant, even though the violations had "continued unabated" since the time of the release. *Id.* at 119. *See also*, *e.g.*, *Redel's*, 498 F.2d at 98-99 (1969 release unenforceable with respect to subsequent violations, even though plaintiff asserted "claims of unlawful price discrimination occurring from 1965 through 1971"); *Mktg. Assistance Plan*, 338 F. Supp. at 1022-23 (holding that release could not "bar the assertion . . . of any post-release causes of action[ ]" challenging "renewed monopolistic activities by the defendants").

This case law requires dismissal of the NHL's counterclaims, which are squarely premised on MSG's purported prospective release of antitrust claims. The first counterclaim seeks a declaration that the NHL can sanction MSG for bringing this lawsuit, because the parties' consent agreements allegedly prohibit MSG from seeking the relief requested in this case,

Counterclaim ¶ 33, and the second counterclaim seeks damages based upon the same alleged breach, Counterclaim ¶ 44. Yet MSG's lawsuit seeks only injunctive relief against *current*, ongoing conduct. As such, to the extent that MSG's suit contravenes any agreements between the parties (which it does not, as demonstrated in MSG's opposition to the Defendants' Motion to Dismiss), those agreements, and the counterclaims based on them, are invalid as violations of public policy.

**B.      The Counterclaims Also Fail Because They Impermissibly Enlist The Court's Aid In Retaliating For The Filing Of An Antitrust Action.**

The NHL's attempt to penalize MSG for pursuing federal antitrust claims is, on its face, impermissible retaliation. Such retaliation violates the strong public policy favoring private antitrust suits, and — at a minimum — may not be facilitated by the courts. For this reason, too, the counterclaims fail to state a claim.

**1.      Federal Statutory Schemes Are Construed To Bar Retaliation.**

As discussed below with respect to the antitrust laws, the federal courts have consistently construed federal statutory schemes to bar retaliation against attempts to enforce the provisions of the statutes. The seminal case is *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969), which involved a plaintiff expelled from a corporation because he objected to its racial discrimination. In *Sullivan*, despite the absence of any specific retaliation provision in the relevant statute, 42 U.S.C. § 1982, the Supreme Court "interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176 (2005). It accordingly "upheld Sullivan's cause of action . . . for '[retaliation] for the advocacy of [the black person's] cause.'" *Id.* (quoting *Sullivan*, 396 U.S. at 237; bracketed alterations in *Jackson*).

The Supreme Court has applied this principle to authorize retaliation causes of action under myriad other statutory schemes. In *Jackson*, the Court recognized an implied right under Title IX to sue for "[r]etaliation against a person because that person has complained of sex discrimination." *Id*. at 173. The Court also has held that 42 U.S.C. § 1981's general ban on racial discrimination in contracts authorizes retaliation claims, *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951 (2008); *see also id*. at 1958 (noting that § 1981, like § 1982 and Title IX, is a "broadly worded civil rights statute"), as does the ban on age discrimination in the federal-sector provision of the Age Discrimination in Employment Act, *Gomez-Perez v. Potter*, 128 S. Ct. 1931 (2008).

Moreover, because of the need to avoid "'chill[ing] the legitimate assertion'" of federal statutory rights, *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997) (citation omitted), retaliation is actionable even when the underlying claim does not succeed on the merits. *See Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 43 (2d Cir. 1984) (retaliation violates § 1981 "regardless of the merits of [employee's] initial claim"); *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001) (underlying claim need only be based on a "good faith, reasonable belief" in order to trigger protection from retaliation under Title VII); *Jackson*, 544 U.S. at 187 (Thomas, J., dissenting) ("[A] retaliation claimant need not prove that the complained-of sex discrimination happened. . . . [N]o Court of Appeals requires a complainant to show more than that he had a reasonable, good-faith belief that discrimination occurred to prevail on a retaliation claim.").

As the Second Circuit explained in *Choudhury*, permitting plaintiffs to be sanctioned for the filing of a legitimate federal statutory claim would significantly deter legitimate suits, encourage violations of the statute, and undermine the statutory enforcement scheme:

> Were we to protect retaliatory conduct, we would in effect be
> discouraging the filing of meritorious civil rights suits and
> sanctioning further discrimination against those persons willing to
> risk their employer's vengeance by filing suits.
>
> We are unwilling to give impetus to the perpetuation of racial
> discrimination, by permitting an employer, with impunity, to
> penalize its employee for asserting rights under § 1981. . . .
>
> A retaliation claim is cognizable under § 1981 to make that section
> an available and effective remedy for racially motivated
> employment discrimination. The remedy would be impaired for all
> employees if any employee could be disadvantaged because he
> sought or secured relief from discriminatory treatment . . . .

735 F.2d at 43 (internal citations and quotation marks omitted).

Indeed, the federal interest in preventing such retaliation is so strong that actionable retaliation is not limited to retaliation against the person who allegedly suffered the underlying statutory violation. *See, e.g.*, *Jackson*, 544 U.S. at 176. Nor is it limited to retaliation in the area that the substantive law regulates (such as terms and conditions of employment), because such a limitation "would not deter the many forms that effective retaliation can take," and thus "would fail to fully achieve" the key purpose of "[m]aintaining unfettered access to statutory remedial mechanisms." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63-64 (2006) (Title VII) (alteration in original; citation and internal quotation marks omitted).

### 2. Claims Seeking To Penalize The Filing Of A Lawsuit Are Not Cognizable.

Separate and apart from the case law construing federal statutes to bar retaliation, claims seeking to penalize the filing of an earlier suit — or to penalize efforts to invoke other governmental processes — generally are not cognizable, unless the initial suit was a "sham." *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002). Although this principle originated in the *Noerr-Pennington* doctrine of antitrust immunity (under which an antitrust

claim cannot be based on efforts to invoke governmental processes), it is rooted in the First Amendment and has been recognized as a principle of general applicability.

The Fifth Circuit, for example, has barred retaliatory state-law claims that were based on the defendant's attempt to petition city officials in *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1084-85 (5th Cir. 1988).  New York similarly, in *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 707 N.Y.S.2d 647, 652-53 (App. Div. 2000), rejected retaliatory state-law claims by an extension of *Noerr-Pennington* immunity.  *See also IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312-13 (4th Cir. 2003); *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995) (recognizing that *Noerr-Pennington* could prohibit state-law tort claims); *Agfa Corp. v. United Mktg. Group*, No. 02 Civ. 8468, 2003 WL 21555087, at *2 (S.D.N.Y. July 10, 2003) (same).

The exception for "sham" suits, moreover, is a narrow one.  It applies only if the original action both was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and subjectively "attempt[ed] to interfere *directly* with the business relationships of a competitor, through the use of governmental *process* — as opposed to the *outcome* of that process — as an anticompetitive weapon."  *Prof'l Real Estate Investors*, 508 U.S. at 60-61 (brackets, citations, and internal quotation marks omitted).

### 3.    The Anti-Retaliation Principle Has Repeatedly Been Applied In Antitrust Cases.

Because of the special importance of private lawsuits to Congress's antitrust enforcement scheme, as well as the courts' broad common lawmaking power under the antitrust statutes, *see, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 772 (2008) (referring to antitrust as an illustrative area of "broad judicial authority to define substantive

standards of conduct and liability"), these principles precluding retaliation apply with full if not heightened force in the context of antitrust claims.

The importance of private antitrust suits is beyond debate, because such suits "play[] a central role in enforcing [the antitrust] regime." *Mitsubishi Motors*, 473 U.S. at 635. As a result, the "broad purposes of the federal antitrust laws" — "deterring anticompetitive conduct and ensuring the compensation of victims of that conduct" — require courts to ensure "that at least some party have sufficient incentive to bring suit." *California v. ARC Am. Corp.*, 490 U.S. 93, 102 & n.6 (1989); *see generally Redel's*, 498 F.2d at 100. The Supreme Court has therefore referred to antitrust plaintiffs as "private attorney[s] general," particularly those plaintiffs "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *E.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983).

The strong policy favoring such suits can trump even "respect [for] the amicable settlement and release of antitrust claims by the parties themselves." *Redel's*, 498 F.2d at 100. It likewise trumps the application of ordinary defenses, such as *in pari delicto*, where they may unduly interfere with the policy of encouraging private antitrust lawsuits. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138 (1968) (finding it "inappropriat[e]" to "invok[e] broad common-law barriers to relief where a private suit serves important public purposes"). And, as pertinent here, the courts have observed that retaliation — or the prospect of retaliation — in its various forms undercuts the antitrust laws by playing an important role in enforcing cartel discipline or otherwise furthering an actual or alleged antitrust violation. As Judge Posner noted in *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588 (7th Cir. 1984), in affirming a preliminary injunction against a national association's effort to

expel a dissenting member:  In the absence of judicial relief blocking such retaliation, the association would "be able with relative impunity . . . to use expulsion as a sanction against any member who refuses to abide by its anticompetitive restrictions." *Id.* at 597; *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293-98 (1985) (discussing group boycotts in case where plaintiff was expelled from cooperative, and recognizing potential relevance of retaliatory motive for expulsion).

Accordingly, courts have prohibited retaliation in multiple antitrust contexts, and in a variety of ways.  Even before the heightened judicial disfavor toward retaliation initiated by *Sullivan* and similar cases in the late 1960s, courts recognized the power to enjoin retaliation for bringing antitrust claims.  In *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725 (3d Cir. 1962), for example, the Third Circuit ordered the granting of a preliminary injunction against termination of a business relationship "because of the filing of the main [antitrust] action.  True enough, the defendant can choose customers, but it should not be permitted to do so in order to stifle the main action, especially where it is apparent that such conduct will further the monopoly which plaintiff alleges. . . ." *Id.* at 727; *see also Dart Drug Corp. v. Parke, Davis & Co.*, 344 F.2d 173, 186 n.6 (D.C. Cir. 1965) (similarly recognizing authority to enjoin retaliatory action); *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871-72 (2d Cir. 1962) (same).

More recently, in *General Leaseways*, the Seventh Circuit, as noted, preliminary enjoined the plaintiff's expulsion from a truck-leasing association.  744 F.2d at 591.  Similarly, the Fourth Circuit in *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616 (1979), upheld an injunction granting gasoline dealers new leases with the defendant wholesaler, and enjoining the wholesaler "from refusing to renew the leases at the end of the 3-year term for any retaliatory reason related to the plaintiffs' success in the litigation or for any other reason prohibited by the antitrust laws."

*Id*. at 629.  And, in *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977), the Second Circuit affirmed a preliminary injunction in favor of a contractor who alleged that a supplier had terminated its distributorship "in retaliation for Jacobson's refusal to adhere to" allegedly unlawful restrictions.  *Id*. at 440, 444; *see also Supermarket Servs. Inc. v. Hartz Mtn. Corp.*, 382 F. Supp. 1248 (S.D.N.Y. 1974) (granting preliminary injunction barring termination of distributorship in retaliation for violating alleged territorial and customer limitations).

Courts also have recognized the availability of damages awards stemming from retaliatory conduct in antitrust cases.  For example, in *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994) (Posner, J.), the Seventh Circuit held that "[l]osses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws," because otherwise "an effective deterrent to successful cartelization would be eliminated."  *Id*. at 783 (upholding claim that plaintiff was "ejected" from common advertising pool "in order to prevent it from, or punish it for," trying to "compete by underselling the other dealers"); *see also George W. Warner & Co. v. Black & Decker Mfg. Co.*, 277 F.2d 787 (2d Cir. 1960) (upholding claim for treble damages and injunction against manufacturer for terminating distributor for refusing to adhere to prices fixed by manufacturer). In *Osborn v. Sinclair Refining Co.*, 324 F.2d 566 (4th Cir. 1963), the Fourth Circuit held that "damages may be recovered for a refusal to deal in furtherance of an arrangement condemned by the antitrust laws, whatever form of trade restraint the arrangement takes."  *Id.* at 574-75.  The district court's contrary holding, the court of appeals explained, "would in large measure frustrate . . . . the effectiveness of the section 4 treble-damage suit as an enforcement measure." *Id*. at 572; *see also A.C. Becken Co. v. Gemex Corp.*, 272 F.2d 1 (7th Cir. 1959) (directing

judgment and award of damages for termination of distributorship in retaliation for refusing to join price-fixing agreement).

Some courts, including this one, have even recognized antitrust standing under certain circumstances for employees who face retaliation for opposing their employer's antitrust violations. These cases aim to encourage plaintiffs who know of and have "the greatest incentive to challenge the antitrust violation" to bring suit to enforce the antitrust laws. *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996); *see also, e.g., Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1430-39 (S.D.N.Y. 1986); *Ashmore v. Ne. Petroleum Div. of Cargill, Inc.*, 843 F. Supp. 759, 762-72 (D. Me. 1994).

In sum, the courts have consistently acted to prevent retaliation from undermining the strong public policy in favor of private enforcement of the antitrust laws.

### 4.    This Established Case Law Requires Dismissal Of The NHL's Counterclaims.

Under the foregoing case law, the NHL's counterclaims fail as a matter of law. The retaliation at issue is a sanction for bringing a pending antitrust claim, contravening even the most basic and earliest-recognized prohibitions against retaliation. *See, e.g., Bergen Drug Co.*, 307 F.2d at 727. Moreover, because the counterclaims depend on enlisting the Court's assistance, preventing this form of retaliation requires none of the affirmative relief (such as injunctions or damages) that courts have invoked against other forms of retaliation. For the same reason, they fall squarely within the line of cases derived from *Noerr-Pennington*, in which the courts have refused to entertain claims seeking to penalize the filing of non-sham lawsuits. Finally, the NHL's retaliation is particularly contrary to antitrust policy because it seeks to further the very conduct that is the subject of the antitrust claim challenging it, by attempting to impose disciplinary sanctions against MSG for challenging those practices. *See, e.g., Hammes*,

33 F.3d at 783 (noting that antitrust law protects against retaliation so as to ensure "an effective deterrent to successful cartelization").

Under such circumstances — where anti-retaliation principles intersect with *Noerr-Pennington* considerations — a claim cannot be cognizable unless, at a minimum, the *Noerr-Pennington* sham standard can be satisfied.  *See, e.g., Morrone Co. v. Barbour*, 241 F. Supp. 2d 683, 689-90 (S.D. Miss. 2002) (requiring showing of sham under *Noerr-Pennington* standard for counterclaim to premise liability on the filing of antitrust claims).

Here, that standard clearly cannot be satisfied.  The NHL has not alleged that MSG's antitrust suit is a sham, nor could it.  The counterclaims make no suggestion of either objective unreasonableness or a motivation to use the court system — rather than the outcome of the suit — to interfere with the NHL's business practices, much less any allegation of "facts which, when proven, [could] show that" MSG's claims were "baseless."  *Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co.*, 964 F. Supp. 624, 628 (D. Conn. 1997); *see also Prof'l Real Estate Investors*, 508 U.S. at 60-61 (discussing criteria for sham standard).  Nor did this Court or the Second Circuit, in considering MSG's motion for a preliminary injunction, suggest that this stringent standard could conceivably be satisfied.  To the contrary, the Second Circuit explained that "there will certainly be substantive issues for the district court to address on the merits — for example, how the antitrust laws apply to the NHL as a sports league, and what the relevant market is in this case."  *Madison Square Garden, L.P.  v. Nat'l Hockey League*, 270 F. App'x 56, 59 (2008).

Indeed, as MSG has demonstrated in its Opposition to Defendants' Motion to Dismiss, and as the reasoning of commentators addressing these issues confirms, MSG's antitrust suit is not even remotely unreasonable, whether on the merits of its underlying complaint or in its view

that the contractual provisions on which the NHL relies do not bar that complaint.  *See, e.g.*, Stephen F. Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues*, 52 Case W. Res. L. Rev. 133, 143-44 (2001) (discussing the anticompetitive effect of exclusive broadcast territories).  Accordingly, the NHL's counterclaims, as an overt effort at unlawful retaliation, should be dismissed with prejudice.

## II.    DISMISSAL IS ALSO PROPER BECAUSE THERE HAS BEEN NO DECISION IN THE NHL'S FAVOR ON THE MERITS OF MSG'S ANTITRUST CLAIMS.

Even apart from the foregoing grounds for dismissal, the counterclaims fail because there has been no final adverse determination on MSG's underlying antitrust claims.  If MSG prevails on its antitrust claims, the NHL plainly cannot discipline MSG, or compel it to pay damages, for filing those claims.  And where counterclaims depend upon, or challenge, the claims asserted in the main action, it is well settled that such counterclaims should be dismissed.

This conclusion rests on two simple and well established principles.  First, contracts cannot be enforced to the extent that their performance would be in furtherance of unlawful conduct.  *See, e.g.*, *Kaiser Steel Corp.*, 455 U.S. at 77 (holding that "our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law," such as antitrust law); *NLRB v. Local 46, Metallic Lathers Union*, 149 F.3d 93, 108 (2d Cir. 1998) ("The law leaves knowing parties to an illegal agreement where it finds them and gives no relief.") (Brieant, J., concurring).  A contract that barred the filing of a lawsuit to halt an actual antitrust violation would itself be an unlawful agreement in restraint of trade, and therefore unenforceable.

Second, counterclaims that turn on the merits of claims asserted in the main action that has not been finally adjudicated do not state a cognizable claim.  Indeed, the Second Circuit has

expressly warned against entertaining counterclaims "that will ordinarily not arise if plaintiff wins the main action," and whose dismissal will "avoid[] . . . the dangerous potentialities of counterclaims in the nature of malicious prosecutions as a defensive strat[a]gem." *Harris*, 571 F.2d at 125 (citation, internal quotation marks, and parentheses omitted). As this Court reaffirmed in *Chrysler Corp. v. Fedders Corp.*, 540 F. Supp. 706 (S.D.N.Y. 1982), in *Harris*, "the Second Circuit warned against . . . claims which will most likely disappear if the plaintiff wins, which can be sued upon separately in state court if the defendant wins, and which present a dangerous potential for use as a defensive stratagem." *Id.* at 713 n.2.

Courts therefore routinely dismiss counterclaims that seek relief based upon, or premise liability on, the primary claims in a case that has not been finally adjudicated. The D.C. Circuit has explained in an analogous context that "[a]t common law and in jurisdictions everywhere in the United States[,] termination of the underlying criminal or civil proceeding in favor of the defendant is an essential element of a malicious prosecution action." *Shulman v. Miskell*, 626 F.2d 173, 174 (D.C. Cir. 1980) (footnote omitted). Accordingly, "a malicious prosecution claim . . . may not be asserted as a counterclaim in the original action," *Ramirez v. Platt*, No. CV 87-4128, 1988 WL 127452, at *4 (E.D.N.Y. Nov. 28, 1988), and such a counterclaim is properly dismissed. *See Airlines Reporting Corp. v. Belfon*, 351 F. Supp. 2d 326, 328 (D.V.I. 2004) (dismissing counterclaim "brought in the same lawsuit that it alleges is wrongfully instituted"); *Boschette v. Buck*, 916 F. Supp. 91, 100 (D.P.R. 1996) (malicious prosecution counterclaim "is premature as a matter of law until the underlying suit on which it is based is fully and finally adjudicated in favor of the claimant"); *Aetna Cas. & Sur. Co. v. Kellogg*, 856 F. Supp. 25, 29 (D.N.H. 1994) (same).

The counterclaims asserted here should be therefore be dismissed, as claims "which will most likely disappear if the plaintiff wins." *Chrysler Corp.*, 540 F. Supp. at 713 n.2.  Like malicious prosecution counterclaims, the NHL's counterclaims necessarily presuppose an adjudication of MSG's primary claims that has not occurred.  Accordingly, even apart from the defects outlined in Part I above, the NHL's counterclaims should be dismissed.

## CONCLUSION

For the reasons stated above, MSG respectfully requests that this Court dismiss the counterclaims with prejudice.

July 17, 2008                                          JONES DAY


                                                      By:   /s/ Robert W. Gaffey
                                                         Meir Feder  (MF-2574)
                                                         Thomas F. Cullen, Jr. (pro hac vice)
                                                         Robert W. Gaffey  (RG-4004)
                                                         222 East 41st Street
                                                         New York, NY  10017-6702
                                                         Telephone:  (212) 326-3939
                                                         Facsimile:  (212) 755-7306

OF COUNSEL:

Joe Sims
Glen D. Nager
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212