UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

MADISON SQUARE GARDEN, L.P.,      )
          )
          Plaintiff,      )      No. 07 CIV. 8455 (LAP)
          )
          v.      )      ECF Case
          )
NATIONAL HOCKEY LEAGUE, NATIONAL      )
HOCKEY LEAGUE ENTERPRISES, L.P., NHL      )
INTERACTIVE CYBERENTERPRISES, L.L.C.,      )
NHL ENTERPRISES CANADA, L.P., and NHL      )
ENTERPRISES, B.V.,      )
          )
          Defendants.      )
          )
          )

-------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

JONES DAY
222 East 41st St.
New York, NY  10017-6702
(212) 326-3939

*Attorneys for Plaintiff Madison Square Garden, L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM ........................................ 5

    A.    The Structure Of The League, And Competition Between The Teams ...................... 5

    B.    The Relevant Markets .................................................................................... 6

    C.    The NHL's Restrictions On Competition ......................................................... 7

        (1)    Licensing and Merchandising ........................................................... 7

        (2)    Broadcasting and Streaming ............................................................. 8

        (3)    New Media ...................................................................................... 9

        (4)    Advertising and Sponsorship ........................................................... 10

STANDARD OF REVIEW ................................................................................................. 11

I.     THE NHL'S CLAIM THAT ITS RESTRICTIONS ARE EXEMPT FROM
      ANTITRUST SCRUTINY BORDERS ON THE FRIVOLOUS ................................... 11

    A.    The Second Circuit And Other Courts Have Repeatedly Rejected Claims That
        Sports Leagues Are Single Entities ................................................................. 11

        (1)    The Single Entity Argument Is Foreclosed By Precedent ..................... 12

        (2)    Even Aside From Binding Precedent, The NHL's Request For
               Exemption From Section 1 Scrutiny Has No Merit ............................... 15

    B.    The Argument That *Dagher* Frees The NHL From The Obligation To Comply
        With The Antitrust Laws Is Also Without Merit ................................................ 20

    C.    The NHL's Claim That Joint Ventures' Restrictions On Competition By Their
        Members Are Exempt From Scrutiny Is Demonstrably Wrong .............................. 22

II.    THE NHL'S LEGAL ARGUMENTS REGARDING ANTITRUST INJURY
      ARE WITHOUT MERIT ....................................................................................... 25

III.   THE NHL'S OTHER PURPORTED BARS TO SCRUTINY OF ITS ACTIONS
      ARE WITHOUT MERIT ....................................................................................... 31

    A.    The Consent Agreement Cited By The NHL Cannot Insulate The NHL's
        Actions From Antitrust Scrutiny ..................................................................... 31

        (1)    The Consent Agreement Does Not Cover Conduct That Occurs
               Following The Date Of The Agreement ............................................... 32

        (2)    A Prospective Release Of The Right To Sue For An Injunction
               Against Antitrust Violations Would Be Unenforceable ........................... 33

    B.    MSG's Claims Are Not Barred By Laches ....................................................... 36

## <u>TABLE OF CONTENTS</u>
### (continued)

**Page**

C.    MSG's Claim Regarding Exclusive Broadcast Territories Is Not Barred By
      Judicial Estoppel ................................................................................................ 39

CONCLUSION ................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Page**

### CASES

*AXA Marine & Aviation Ins. (UK) Ltd.*,
    84 F.3d 622 (2d Cir. 1996)........................................................................39, 40

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) ...............................................................................15

*Am. Needle, Inc. v. New Orleans La. Saints*,
    496 F. Supp. 2d 941 (N.D. Ill. 2007) ..................................................................14

*Arizona v. Maricopa County Med. Soc'y*,
    457 U.S. 332 (1982)..............................................................................................20

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)..............................................................................5, 11, 26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)................................................................................37

*Bernstein v. Universal Pictures, Inc.*,
    517 F.2d 976 (2d Cir. 1975)................................................................................38

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) ................................................................................23

*Bolt v. Halifax Hosp. Med. Ctr.*,
    891 F.2d 810 (11th Cir. 1990) ............................................................................15

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979)...........................................................................................24, 31

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)..........................................................................15, 16

*Cellar Door Prods., Inc. v. Kay*,
    897 F.2d 1375 (6th Cir. 1990) ............................................................................33

*Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*,
    No. 05 Civ. 10711, 2006 WL 2020950 (S.D.N.Y. July 13, 2006) ....................25

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
    95 F.3d 593 (7th Cir. 1996) ................................................................................14

## TABLE OF AUTHORITIES
**(continued)**

Page

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    961 F.2d 667 (7th Cir. 1992) ....................................................................4, 19

*Citizen Publ'g Co. v. United States,*
    394 U.S. 131 (1969)....................................................................................22

*City of Mt. Pleasant v. Associated Elec. Coop., Inc.,*
    838 F.2d 268 (8th Cir. 1988) ...............................................................17, 18

*Clarett v. NFL,*
    369 F.3d 124 (2d Cir. 2004).......................................................................14

*Columbia Broad. Sys., Inc. v. Am. Society of Composers, Authors & Publishers,*
    620 F.2d 930 (2d Cir. 1980)........................................................................21

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,*
    111 F.3d 1427 (9th Cir. 1996) ....................................................................37

*Condit v. Dunne,*
    No. 06 Civ. 13126, 2008 WL 2676306 (S.D.N.Y. July 8, 2008) ....................11

*Conopco, Inc. v. Campbell Soup Co.,*
    95 F.3d 187 (2d Cir. 1996)..........................................................................38

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984)............................................................................ passim

*Daniel v. Am. Bd. of Emergency Med.,*
    428 F.3d 408 (2d Cir. 2005).....................................................................2, 25

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,*
    129 F.3d 240 (2d Cir. 1997)........................................................................31

*Erickson v. Pardus,*
    127 S.Ct. 2197 (2007)..................................................................................11

*Festa v. Local 3 Int'l Bhd. of Elec. Workers,*
    905 F.2d 35 (2d Cir. 1990)...........................................................................11

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) .......................................................................15

*Fitzpatrick v. Sony-BMG Music Entm't, Inc.,*
    No. 07-2933, 2008 WL 84541 (S.D.N.Y. Jan. 8, 2008) .........................38, 39

### TABLE OF AUTHORITIES
#### (continued)

**Page**

*Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*,
    88 F. Supp. 2d 188 (S.D.N.Y. 2000)......................................................................4, 39

*Fox Midwest Theatres, Inc. v. Means*,
    221 F.2d 173 (8th Cir. 1955) ........................................................................34, 35

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)..................................................................14, 16, 17

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ...........................................................15, 17, 18

*Gaines v. Carrollton Board of Trade, Inc.*,
    386 F.2d 757 (6th Cir. 1967) ......................................................................34

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
    744 F.2d 588 (7th Cir. 1984) ..................................................................19, 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)......................................................................................37

*Higgins v. N.Y. Stock Exch. Inc.*,
    942 F.2d 829 (2d Cir. 1991)........................................................................37

*Hunt v. Mobil Oil Corp.*,
    654 F. Supp. 1487 (S.D.N.Y. 1987)............................................................34

*Hunter Douglas, Inc. v. Comfortex Corp.*,
    No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) .................35

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
    449 F. Supp. 1158 (D. Hawaii 1978) ..............................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007)..............................................................26

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007)........................................................................11

*KFC Corp. v. Marion-Kay Co.*,
    620 F. Supp. 1160 (S.D. Ind. 1985) ..............................................................38

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Kaiser Steel Corp. v. Mullins*,
    455 U.S. 72 (1982)..........................................................................................34

*Kassner v. 2nd Avenue Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)....................................................................11, 26

*Kingray, Inc. v. NHL Enters., Inc.*,
    No. 00-CV-1544-L (BEN), slip op. (S.D. Cal. July 2, 2002) ....................29, 30

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997).........................................................................................36

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ..............................................................1, 4, 13

*Law v. Nat'l Collegiate Athletic Ass'n*,
    134 F.3d 1010 (10th Cir. 1998) .....................................................................24

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)...................................................................................32, 33

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    127 S. Ct. 2705 (2007).....................................................................................29

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
    243 F.3d 789 (4th Cir. 2001) ..........................................................................38

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    161 F.3d 443 (7th Cir. 1998) ..........................................................................36

*Major League Baseball v. Crist*,
    331 F.3d 1177 (11th Cir. 2003) ...................................................................1, 18

*McNeil v. NFL*,
    790 F. Supp. 871 (D. Minn. 1992)..................................................................18

*Mitchell v. Washingtonville Cent. Sch. Dist.*,
    190 F.3d 1 (2d Cir. 1999) ...............................................................................40

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985).........................................................................................34

*Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*,
    338 F. Supp. 1019 (S.D. Tex. 1972) ...................................................33, 34, 35

**TABLE OF AUTHORITIES**
(continued)

Page

*Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*,
    288 F.3d 491 (2d Cir. 2002), *vacated on other grounds*, 123 S. Ct. 1572 (2003)............40

*Murray-Gardner Mgmt., Inc. v. Iroquois Gas Transmission Sys., L.P.*,
    646 N.Y.S.2d 418 (N.Y. App. Div. 1996) ........................................................32

*N. Am. Soccer League v. NFL*,
    670 F.2d 1249 (2d Cir. 1982)....................................................................12, 13

*NCAA v. Board of Regents*,
    468 U.S. 85 (1984)......................................................................... *passim*

*NFL v. N. America Soccer League*,
    459 U.S. 1074 (1982) ..................................................................................14

*NHL Players' Ass'n v. Plymouth Whalers*,
    419 F.3d 462 (6th Cir. 2005) .......................................................................13

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006).......................................................25, 26

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990)......................................................................................23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968)...............................................................................34, 38

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
    351 F. Supp. 462 (E.D. Pa. 1972) ............................................................2, 6

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ......................................................................23

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ......................................................................21

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
    611 F. Supp. 211 (S.D.N.Y. 1985)...............................................................36

*Redel's Inc. v. Gen. Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ...................................................................33, 35

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.,*
  545 F.2d 18 (7th Cir. 1976) ...................................................................36

*Ross v. Bank of Am., N.A.,*
  524 F.3d 217 (2d Cir. 2008)...................................................................30

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
  792 F.2d 210 (D.C. Cir. 1986) ...............................................................23

*Sanjuan v. Am. Board of Psychiatry & Neurology, Inc.,*
  40 F.3d 247 (7th Cir. 1994) ..............................................................33, 34

*Schering-Plough Corp. v. FTC,*
  402 F.3d 1056 (11th Cir. 2005) .............................................................23

*Seabury Mgmt., Inc. v. Prof'l Golfers Ass'n of Am., Inc.,*
  878 F. Supp. 771 (D. Md. 1994), *aff'd in part, rev'd in part on other grounds*, 52
  F.3d 322 (4th Cir. 1995) ........................................................................17

*Sullivan v. NFL,*
  34 F.3d 1091 (1st Cir. 1994)............................................................13, 15

*Texaco Inc. v. Dagher,*
  547 U.S. 1 (2006)....................................................................... *passim*

*Three Rivers Motor Co. v. Ford Motor Co.,*
  522 F.2d 885 (3d Cir. 1975)............................................................34, 36

*U.S. Fid. & Guar. Co. v. Treadwell Corp.,*
  58 F. Supp. 2d 77 (S.D.N.Y. 1999)........................................................40

*United States v. Addyston Pipe & Steel Co.,*
  85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899) .....................................23

*United States v. NFL,*
  116 F. Supp. 319 (E.D. Pa. 1953) ....................................................1, 8, 27

*United States v. N. Improvement Co.,*
  814 F.2d 540 (8th Cir. 1987) .................................................................37

*United States v. Penn-Olin Chem. Co.,*
  378 U.S. 158 (1964)...............................................................................24

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)..........................................................................................22

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003)............................................................... *passim*

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)........................................................................13, 25

*Westmoreland Asbestos Co. v. Johns-Manville Corp.*,
  39 F. Supp. 117 (S.D.N.Y. 1941)........................................................33, 34, 35

*Willsea v. Theis*,
  No. 98 Civ. 6773, 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) .......................36

*In re WorldCom, Inc. Sec. Litig.*,
  308 F. Supp. 2d 236 (S.D.N.Y. 2004)............................................................40

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007)......................................................25, 26

*Zenith Radio Corp v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971).......................................................................................37

## STATUTES

Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.* ..........................................8

## MISCELLANEOUS

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW (2d ed. 2004) .................... *passim*

Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, 239 N.Y.L.J. 4 (Jan. 2, 2008).........14

Marc Edelman, *Why the Single Entity Defense Can Never Apply to NFL Clubs: A Primer
  on Property-Rights Theory in Professional Sports*, 18 FORDHAM INTELL. PROP.
  MEDIA & ENTM'T L.J. 891 ................................................................................13

Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide
  Licensing And Merchandising Arrangements*, 1 VA. J. SPORTS & LAW 1
  (1999) .............................................................................................1, 8, 27, 35

**TABLE OF AUTHORITIES**
(continued)

Page

William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997) ........................................4

Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues,* 52 CASE W. RES. L. REV. 133 (2001) ........................................................................................ *passim*

Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213 (2006) ........................................5, 11, 15

James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999).................................................4

## PRELIMINARY STATEMENT

There is no "sports league" or "joint venture" exemption from the antitrust laws. Sports leagues, like other collective efforts, produce benefits that cannot be achieved by firms acting alone. But such concerted action is not invariably beneficial: when it exceeds its proper scope, it causes harm that is "well documented" — *i.e.,* "welfare losses stemming from the potentially anticompetitive agreements among professional sports clubs." *Major League Baseball v. Crist*, 331 F.3d 1177, 1188 (11th Cir. 2003). Accordingly, the courts require scrutiny of *all* agreements restricting competition between participants in joint ventures — including sports leagues.

To be sure, some such agreements easily pass muster — on-field/ice rules, for example — but only because their obvious pro-competitive benefits easily outweigh any anticompetitive effects. MSG, however, is not challenging the validity of the NHL joint venture, or rules governing on-ice competition. MSG challenges only specific horizontal agreements that go far beyond what is reasonably necessary to operating a professional hockey league — agreements that severely restrict individual team competition, and consumer choice, in areas such as broadcasting and licensing. Such agreements are at the opposite pole from on-ice or on-field rules: they are not necessary to the operation of a sports league, have rarely been upheld, and have long been regarded as suspect. *See, e.g., L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381 (9th Cir. 1984) (upholding challenge to NFL rule creating exclusive territories); *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953) (limits on team broadcasts of games unlawful).[1]

MSG's First Amended Complaint ("Complaint") is extraordinary only in that sports league members have rarely been willing to challenge their leagues' actions; from the standpoint

---

[1] *See also, e.g.,* Stephen F. Ross, *Antitrust Options To Redress Anticompetitive Restraints And Monopolistic Practices By Professional Sports Leagues*, 52 CASE W. RES. L. REV. 133, 143-44 (2001) (restrictions on out-of-market broadcasting unlawful); Brandon L. Grusd, *The Antitrust Implications of Professional Sports' League-Wide Licensing And Merchandising Arrangements*, 1 VA. J. SPORTS & LAW 1 (1999) (exclusive league-wide merchandising and licensing arrangements unlawful).

of antitrust law, MSG's challenge to these agreements breaks no new ground. The complaint rests on four fundamental, but unexceptional, propositions:

(1)    Exclusivity requirements imposed by joint ventures like the NHL are not simply a matter of contract law or venture internal rules, but instead are highly suspect agreements under the antitrust laws. Indeed, agreements among joint venturers not to compete individually, "[f]ar from being 'presumptively legal' . . . are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003) (citing three sports league antitrust cases);

(2)    There are distinct, hockey-specific relevant markets — both local and national — in which the NHL has market power, as other courts have repeatedly held with respect to various sports leagues, including the NHL itself. *See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F. Supp. 462, 501-02 (E.D. Pa. 1972); Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 140 n.16 (citing cases);

(3)    The restraints at issue here necessarily harm competition, raise prices, and reduce consumer options in those markets. Because this conduct also harms the Rangers, who are foreclosed from competing, MSG is a proper "private attorney general" under the antitrust laws. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005) (suit by member of alleged cartel challenging restraints necessarily establishes antitrust injury); and

(4)    The NHL cannot carry the heavy burden of justifying these anticompetitive effects — particularly on a motion to dismiss. The restraints are not reasonably necessary (*i.e.*, "ancillary") to achieving any pro-competitive purpose, let alone one that outweighs the harms they create. *See, e.g.*, *Visa U.S.A.*, 344 F.3d at 238, 243 (restraint must be "reasonably necessary" and its benefits must outweigh its "anticompetitive effects"). Simply repeating that

no team can play hockey on its own does not suffice, much less provide a blanket justification for decisions by the NHL's member clubs, in whatever area, to cease competing independently.

The NHL's motion makes little effort to defend these anticompetitive agreements on their merits.  Instead, the NHL seeks a way to avoid that challenge entirely.  But its various attempts to evade antitrust scrutiny of its members' actions are uniformly without merit.

In particular, the NHL's long-discredited claim that it is a "single entity" under *Copperweld*, and therefore exempt from compliance with Section 1 of the Sherman Act, has been overwhelmingly rejected by the courts, including the Second Circuit.  Precedent aside, the NHL fails to identify any benefit that this exemption would offer to offset the consumer harm caused by immunizing anticompetitive league practices.

Likewise, the NHL's attempt to construe *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), as giving NHL clubs *carte blanche* to agree not to compete with each other in any area in which the League operates misreads *Dagher*, is contrary to binding Second Circuit law, *see Visa U.S.A.*, 344 F.3d at 242, and would overturn more than a century of settled joint venture case law. [2]

The NHL's various attempts to avoid scrutiny by attacking MSG as a plaintiff are also without merit.  *First*, the claim that eliminating independent competition — and thereby producing higher prices, reduced output, and fewer consumer options in hockey-specific markets — does not establish antitrust injury is demonstrably wrong.  *Second*, the contention that a combination of competitors can insulate itself from antitrust scrutiny by entering into agreements not to sue is untenable — and, in any event, the agreements on which the NHL relies do not even purport to release claims based on ongoing or prospective antitrust violations.  *Third*, the NHL's

_____

[2] As explained in detail *infra, Dagher* only determined how, not whether, the antitrust laws would be applied to a *fully integrated* joint venture's own activities.  The NHL is not such an integrated joint venture; in addition, the claims here relate to restrictions on the independent activities of venture participants, not the activities of the joint venture itself; and, in any event, *Dagher* holds only that the Rule of Reason, not the *per se* rule, should be used in applying the antitrust laws to the challenged conduct.

invocation of judicial estoppel based on its prior litigation of a completely different claim misrepresents the other lawsuit, and misstates judicial estoppel doctrine. *Fourth*, the NHL cannot invoke laches against a suit to enjoin its continuing antitrust violations, let alone on a motion to dismiss.

Finally, the NHL's *ad hominem* attempt to avoid the merits by describing this suit as the "specious tactic" of a "disgruntled owner," is pointless. Most antitrust plaintiffs have their own motives for going to court; indeed, Congress sought to stimulate such motives by offering treble damages. And, in the sports league context, it is almost by definition owners whom others might regard as "disgruntled" who are most likely to overcome pressures to conform, and thus carry out the "private attorney general" role that is critical to the American antitrust system. In the NHL itself, MSG is aware of numerous owners who have objected strongly to anti-competitive practices, but have been unwilling to pursue antitrust litigation. In the rare instances when a "disgruntled" owner has dared to challenge league practices or rules in court, the leagues have been unable to establish their legality.[3]

This record of lack of success may explain why the NHL seeks an exemption from antitrust scrutiny. But the NHL's various arguments for escaping such scrutiny are all contrary to well-settled law, and the NHL's motion should therefore be denied.

---

[3] Al Davis's challenge to an NFL exclusive territory rule was successful, *L.A. Mem'l Coliseum Comm'n*, 726 F.2d 1381, as was Jerry Reinsdorf's challenge to the NBA's limits on superstation broadcasts, *Chicago Prof. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ("*Bulls I*"). And Jerry Jones and George Steinbrenner settled on favorable terms with the NFL and Major League Baseball, respectively. *See* William J. Hoffman, *Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club*, 7 SETON HALL J. SPORT L. 255 (1997); James D. Weinberger, *Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*, 23 COLUM.-VLA J.L. & ARTS 75 (1999).

## MSG'S ALLEGATIONS, AND THE CASE SUPPORTING THEM

### A.    The Structure Of The League, And Competition Between The Teams

The NHL is a joint venture created to schedule and produce ice hockey games. Complaint ¶ 2.  It facilitates "on ice" activities by, among other things, setting the rules of play, organizing the season, and handling administrative responsibilities.  *Id.* ¶ 8.  It is thus a joint venture producing a product: major league men's professional ice hockey competition.  *Id.* ¶ 6.

The NHL clubs are not simply an extension of the League; rather, the NHL is an artificial creation of its member clubs and subject to their collective control.  *Id.* ¶ 9.  The clubs are separately owned and operated entities that have retained their autonomy in running their day-to-day businesses.  *Id.* ¶¶ 7, 35.  They have separate assets, stadium rights, employees, and ownership rights in various copyrights, trademarks, trade dress, and trade names (collectively, "marks") in team logos and designs.  *Id.* ¶ 13.  Moreover, the clubs vary in their ability to generate attendance (both for home and road games), sell merchandise, and market broadcasting rights, and team valuations reflect those differences.  *See* Declaration of Jerry A. Hausman, July 17, 2008 ("Hausman Decl.") ¶¶ 15-17.[4]  Ultimate authority over the League rests with the NHL Board of Governors, which is controlled by the votes of the individual clubs, each of which has its own interests.  Complaint ¶ 9.  Accordingly, the teams control the league, not the other way around.  *See* Hausman Decl. ¶ 21.[5]

The NHL clubs compete vigorously off the ice in all of the ways they have not collectively agreed to prohibit:  they independently set ticket prices; compete for players and

---

[4]  Professor Hausman's affidavit is not submitted not as a means of supplementing the complaint, but rather for the sole purpose of illustrating, pursuant to *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), that the allegations in the Amended Complaint, as pled, form the basis of a more than plausible antitrust claim.

[5]  Collective control by clubs acting in their own interests produces "significant economic difference[s]" — including different, and less efficient, decisionmaking incentives— "compared to a league controlled by a single entity."  Stephen F. Ross & Stefan Szymanski, *Antitrust and Inefficient Joint Ventures: Why Sports Leagues Should Look More Like McDonald's and Less Like the United Nations*, 16 MARQ. SPORTS L. REV. 213, 238 (2006); *see id.* at 222-37.

coaches; create and manage marketing and promotional programs, including the sale of advertising; and develop, license, and market their respective trademarks.  Complaint ¶ 2.  For example, there is fierce competition between the three New York metropolitan area clubs to attract fans and sponsors, and to sell merchandise.  *See* Hausman Decl. ¶¶ 35-39.  Individual clubs, including the Rangers, have undertaken substantial efforts over the years to enhance the value of their marks and the images of their teams as they compete with each other for fan interest both locally and nationally.  Complaint ¶ 13.

As a result of MSG's substantial investments in developing and marketing the Rangers franchise, the Rangers' following extends well beyond the New York area.  *Id.* ¶ 12.  MSG's aggressive efforts have created and increased consumer demand for products and services, including information, merchandise, apparel, and memorabilia containing the Rangers logo, as well as consumer demand for the opportunity to view Rangers games and highlights.  *Id.* ¶ 14.

### B.    The Relevant Markets

Major league men's professional ice hockey has unique characteristics that set it apart from other sports or leisure activities.  Complaint ¶ 29.  At competitive prices, the rights to license or use the marks of the NHL and NHL clubs, the rights to broadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving NHL venues are not reasonably interchangeable with any substitutes.  *Id.* ¶ 31.  As a result — and as numerous courts have found regarding the NHL and other major sports leagues, *see, e.g., Philadelphia World Hockey Club,* 351 F. Supp. at 501-02; *see also* cases cited in Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 140 n.16 — major league men's professional ice hockey products and services are a distinct market, in various local and national geographic areas, over which the NHL has market power.  Complaint ¶ 32; *see* Hausman Decl. ¶¶ 30-45.

For example, the NHL clubs have agreed to ban out-of-market broadcasting of a team's games, which gives the NHL Center Ice cable package substantial pricing power.  For fans of NHL hockey, other forms of entertainment are not reasonably interchangeable, leading such consumers to pay higher prices for the Center Ice package — and/or to purchase the entire Center Ice package rather than individual games or the games of a single team — than they would if individual clubs were not foreclosed from offering their own games as a competing alternative.  *See* Hausman Decl. ¶¶ 36, 44, 48; Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.

### C.    The NHL's Restrictions On Competition

The NHL clubs, acting through the League, have agreed to limit off-the-ice competition among the clubs, and between the NHL itself and the clubs, in numerous ways that are not reasonably necessary to any efficiency produced by the NHL joint venture.  Complaint ¶ 3.

### (1)    Licensing and Merchandising.

The NHL clubs have agreed to give the purported "exclusive" right to control the individual clubs' marks and licensing opportunities, for virtually all commercial purposes, to the League.  *Id.* ¶ 38.  This eliminates each club's ability to compete to sell, among other things, clothing and other products containing a player's name, number, or image.  *Id.* ¶ 40A.  In addition, the clubs have agreed to require that 65% of the products offered through team catalogs be produced by licensees selected by the League and have effectively prohibited teams from selling locally-licensed products outside of the team's home arena.  *Id.* ¶ 40B.  They have also prevented teams from selling team merchandise on the internet other than through an NHL-controlled store.  *Id.*

As a result, individual clubs like the Rangers are precluded from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League, and from

offering consumers merchandise options not offered by the League.  In addition, because of the absence of reasonably interchangeable alternatives to NHL-themed merchandise, the restrictions on competition necessarily result in higher prices, lower quality, and reduced responsiveness to consumer preferences.  *See, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 38 ("[I]t appears that each league has sufficient market power to adversely affect the market."); Hausman Decl. ¶¶ 4, 44-47, 58.

### (2)     Broadcasting and Streaming.

Longstanding precedent holds that a sports league's allocation of broadcasting territories violates the Sherman Act, *United States v. NFL*, 116 F. Supp. 319 — precedent that prompted the Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291 *et seq.*, which provides limited antitrust immunity for certain over-the-air broadcasting agreements.[6]  Yet the NHL member teams have agreed to prohibit each club from transmitting its games, on television or over the Internet, outside defined territories.  Complaint ¶¶ 16C, 40C.  The only alternative provided for fans is the Center Ice cable package — a package of *all* non-local NHL games.  *Id.* ¶ 40C.  Even within each club's area, these agreements allow cable distribution of only a limited number of games in some portions of the area — on a fee-for-subscriber basis centrally determined by the League — and prevent the club from distributing games on the internet.  *Id.* ¶ 40C.  The agreements also limit the ability of teams to license rebroadcasts of their games, permitting them only within 48 hours of game endings and prohibiting teams from licensing the rebroadcasts of historic games. *Id.*

The necessary effect of these agreements to restrict competition, in the distinct market for professional ice hockey broadcasts, is higher prices and reduced consumer welfare.  "If

---

[6] Although the SBA creates a limited exception to the rule of *United States v. NFL*, there is no contention that the NHL rules challenged here fall within the protection of the SBA.

consumers were able to contract for out-of-market games on a per-team basis, for example, there would still be a market for the league's blanket license, but the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost."  Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.

### (3)    New Media.

The NHL member clubs have centralized control of various "new media" activities and agreed to ban the individual clubs from competing independently in this area.  *Id.* ¶ 16D.  As one prominent example, the NHL member teams have agreed to require each team to place individual team websites under centralized control on a central server.  They have also agreed to reduce competition in the sale of Internet advertising by giving the League control of the sale of banner ads at the top of, and in the primary box of, team websites.  *Id.* ¶ 40E.  The teams are limited to providing "local content," and a limited amount of advertising, for inclusion on those sites — subject to strict rules governing design and placement of content — and the sites include new non-local content that was not previously present.  *Id.*  Concurrently, the NHL clubs have prohibited teams from launching independent sites to compete with the NHL-controlled sites.  *Id.*

The result of these new rules is a reduction in output in the distinct markets in which the NHL has market power.  For example, by banning independent websites, the NHL teams have necessarily restrained the number of competing sites, and output, at a minimum, includes "the number of units" available to consumers and advertisers.  XI  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1901d, at 205-06 (2d ed. 2004).  In addition, the NHL's common template qualitatively restricts output, in that restraining any of the relevant features of a product "is an 'output reduction,' just as certainly as is an agreement increasing . . . price."  *Id*. Indeed, the NHL itself views the website changes as affecting consumers, in that they are

designed to ensure that — instead of the varied and largely "provincial" websites that consumers demanded, and the unrestrained market produced — all team websites "articulate a single NHL brand persona and voice." Declaration of John Collins in Support for Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ¶ 7 & Ex. A at 21 (Oct. 11, 2007).

### (4)    Advertising and Sponsorship.

The clubs have agreed to give the League the right to enter into advertising or sponsorship arrangements that automatically preempt individual clubs from selling advertising or sponsorships. *Id.* ¶ 16B. For example, teams are restrained in selling advertising space in the ice or on dasherboards, *i.e.*, the low partitions erected around the ice itself, because the League regulates the size and number of the boards and is given the most desirable space during national broadcasts. *Id.* ¶ 40D. Moreover, the NHL clubs have prohibited teams from using virtual signage that can be electronically superimposed during game telecasts. *Id.* These rules eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans. *See* Hausman Decl. ¶¶ 14, 47.

In sum, numerous horizontal restrictions on member team competition have caused higher prices and lower output, and have precluded teams from increasing consumer options, for NHL-related products and services. *See* Complaint ¶ 43. Absent the exclusive agreements and other restraints, NHL teams would compete in these areas to a much greater extent. *Id.* Indeed, until it was fined by the NHL, MSG had operated its own team website, and had made Rangers-branded merchandise available through the website. *Id.* ¶ 4. MSG had also sold virtual advertising on MSG's television broadcasts of Rangers home games, and made Rangers games available to local cable subscribers through broadband Internet distribution limited to the Rangers' local area. *Id.*

## STANDARD OF REVIEW

In addressing a motion to dismiss, the court must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). "'The court's function . . . is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *Condit v. Dunne*, No. 06 Civ. 13126, 2008 WL 2676306, at *2 (S.D.N.Y. July 8, 2008) (quoting *Festa v. Local 3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990)) (ellipsis in original). Accordingly, the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007) (quoting *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (in turn citing *Twombly v. Bell Atlantic Corp.*, 127 S.Ct. 1955, 1964 (2007) (omission in original))).

## ARGUMENT

## I.    THE NHL'S CLAIM THAT ITS RESTRICTIONS ARE EXEMPT FROM ANTITRUST SCRUTINY BORDERS ON THE FRIVOLOUS.

### A.    The Second Circuit And Other Courts Have Repeatedly Rejected Claims That Sports Leagues Are Single Entities.

The NHL initially argues that the challenged restraints are exempt from Section 1 antitrust scrutiny as actions of a "single entity." Memorandum of Law in Support of Defendants' Motion to Dismiss ("MTD") at 13-25 (June 2, 2008). This long-discredited argument has been "overwhelmingly rejected," in the Second Circuit and elsewhere. Ross & Szymanski, *Antitrust and Inefficient Joint Ventures*, 16 MARQ. SPORTS L. REV. at 238 (citing cases). It is particularly ill-suited to the NHL, which is an especially *non*-unitary enterprise — both in an absolute sense, and as compared with other major sports leagues — with over 90% of its revenues generated at the local level and a fan base that the NHL itself describes as uniquely "tribal." *See* Complaint ¶ 40E; Hausman Decl. ¶¶ 22, 27.

Moreover, this precedent aside, treating the NHL as a single entity would expand

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), far outside its recognized

bounds, and turn it into a license to sports leagues to fix ticket prices, collude on player salaries,

and harm consumer welfare in other ways that are currently — and rightly — forbidden by the

antitrust laws.  The NHL offers no explanation of how consumers and competition would be

helped, rather than harmed, by granting such an immunity.

### (1)    The Single Entity Argument Is Foreclosed By Precedent.

The Second Circuit's decision in *N. Am. Soccer League v. NFL*, 670 F.2d 1249 (2d Cir.

1982) ("*NASL*"), decisively rejected the argument that a sports league with separately-owned

teams is a single entity, reasoning that such a "loophole" would "permit league members to

escape antitrust responsibility for any restraint . . . that would benefit their league . . . even

though the benefit would be outweighed by its anticompetitive effects."  *Id.* at 1257.  The court

also noted that a single-entity characterization could not be accurate where "the financial

performance of each team, while related to that of the others, does not . . . necessarily rise or fall

with that of the others."  *Id.* at 1252.

The NHL attempts to limit this holding to "non-venture activities," MTD at 14, but *NASL*

does not distinguish between venture and non-venture activities, and, indeed, stated that there

would be *more* reason to allow the NFL's cross-ownership ban — a clear "non-venture activity"

— than rules involving "playing sites, which affect competition between member teams."  670

F.2d at 1257.[7]  Similarly, the NHL claims that *NASL* relied on an "intra-enterprise" theory later

---

[7] Even if *NASL* were limited to non-venture activities, moreover, it would avail the NHL nothing.  The NHL uses the phrase "non-venture activities" to mean a narrow category of activities entirely outside the area in which the joint venture does business.  Joint venture case law, however, uses the phrase to cover *all* individual activities by members of a venture, *including* those within the sphere of the venture's activities.  For example, *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006), cites, as its initial example of "restrictions imposed . . . on nonventure activities" the restrictions at issue in *NCAA* on universities' broadcasts of their college football games.  *Id.* at 7.  Under this standard definition, all of the restraints challenged by MSG are restraints on non-venture activities.

rejected by the Supreme Court in *Copperweld*. *See* MTD at 13-14. However, *NASL* never mentioned or relied upon any such theory.

Moreover, the Second Circuit expressly reaffirmed *NASL* after *Copperweld*. *See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 71 (2d Cir. 1988) ("Courts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act."). While the NHL claims that "*Volvo* did not involve the collective output of the interdependent members of a sports-league venture," *Volvo* itself suggests no such limitation on its holding. And, more recently, *Visa U.S.A* cited three sports league cases as examples of the proper application of antitrust restrictions on joint ventures. 344 F.3d at 242.

Courts outside the Second Circuit have likewise overwhelmingly held, post-*Copperweld*, that sports leagues are not single entities, but rather are subject to the same scrutiny as other joint ventures. *See, e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984) (sports league, like other joint ventures, has "no immunity from the antitrust laws"); *NHL Players' Ass'n v. Plymouth Whalers*, 419 F.3d 462, 469-70 (6th Cir. 2005) (relying on *NASL* in holding that the Ontario Hockey League was not a single entity); *Sullivan v. NFL*, 34 F.3d 1091, 1099 (1st Cir. 1994) (NFL not a single entity); *L.A. Mem'l Coliseum Comm'n*, 726 F.2d at 1388-90 (same); *see also* Marc Edelman, *Why the Single Entity Defense Can Never Apply to NFL Clubs: A Primer on Property-Rights Theory in Professional Sports*, 18 FORDHAM INTELL. PROP. MEDIA & ENTM'T L.J. 891, 893 n.11 ("Many courts have rejected the single-entity defense in the scope of premier American sports leagues.").[8]

---

[8] *L.A. Mem'l Coliseum Comm'n* was decided before *Copperweld*, but a petition for certiorari was pending when *Copperweld* was decided. Instead of vacating and remanding, as the Court normally would have done had *Copperweld* cast any doubt on the holding, the Court denied the petition. 469 U.S. 990 (1984).

The NHL makes no effort to distinguish these or the many other cases rejecting sports leagues' "single entity" arguments. The only circuit court case it cites, *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593 (7th Cir. 1996) ("*Bulls II*"), actually *rejected* the NBA's argument that "it necessarily is one [entity], for every purpose," 95 F.3d at 599, and ultimately did not decide any single-entity issue, *id.* at 600.[9] In any event, *Bulls II* cannot overcome binding Second Circuit authority. *Cf. Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 55-56 & n.3 (1st Cir. 2002) (First Circuit refuses to follow *Bulls II* because its "approach has not been adopted in this circuit"). The same is true of *American Needle, Inc. v. New Orleans Louisiana Saints*, 496 F. Supp. 2d 941 (N.D. Ill. 2007), which is in any event a recognized aberration. *See* Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, 239 N.Y.L.J. 4 (Jan. 2, 2008) ("The opinion is not supported by previous case law, nor has it been followed by subsequent cases.").

Indeed, if sports leagues were thought to be single entities, there would be no need for a Sports Broadcasting Act or a baseball antitrust exemption, as the conduct protected by those exemptions would be immune from legal challenge as the conduct of a single entity. *See also, e.g.*, *Clarett v. NFL*, 369 F.3d 124 (2d Cir. 2004) (rejecting claim against the NFL under the labor exemption to the antitrust laws — an analysis that would have been unnecessary if sports leagues were immune from antitrust scrutiny).

In short, the NHL's argument that it is exempt from Sherman Act Section 1 scrutiny is accurate only as a description of the NHL's cavalier attitude toward compliance with the antitrust laws. As a description of the governing law, it bears no relationship to reality.

_____

[9] Similarly, Justice Rehnquist's dissent from denial of certiorari in *NASL* did not, as the NHL claims, argue that the NFL is a single entity, *see* MTD at 14 n.7, but rather that the league policy was valid under a rule-of-reason analysis. *NFL v. N. Am. Soccer League*, 459 U.S. 1074 (1982) (Rehnquist, J., dissenting from denial of certiorari).

### (2)    Even Aside From Binding Precedent, The NHL's Request For Exemption From Section 1 Scrutiny Has No Merit

Arguments for treating sports leagues as single entities have been roundly rejected for good reason:  they go far beyond the holding and reasoning of *Copperweld*, and have little to recommend them from the standpoint of antitrust policy.

The NHL's depiction of *Copperweld* as creating an open-ended analysis by which joint ventures can be deemed single entities finds no support in *Copperweld*.  *Copperweld* was expressly limited to the "narrow issue" of "whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act."  467 U.S. at 767.  Its reasoning was equally narrow, driven by Congress's "purposeful choice to accord different treatment to unilateral and concerted conduct."  *Id.* at 775.  Accordingly, the Supreme Court's emphasis of the fact that a "parent and its wholly owned subsidiary have a complete unity of interest,"  467 U.S. at 771, was not, as the NHL claims, merely descriptive.  Rather, it was the critical factor making the actions of a parent and wholly-owned subsidiary "unilateral" rather than "concerted."

Recognizing the importance of such a complete unity of economic interests, the Second Circuit has held that a physicians' independent practice association was not a "single entity" under *Copperweld* because its members retained "separate economic interests."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 544-45 (2d Cir. 1993).  Other courts have similarly recognized *Copperweld*'s limitation to situations where there is a "complete unity of interest."  *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003) (Kozinski, J.); *Sullivan*, 34 F.3d at 1099.[10]

---

[10] *See also Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 146 (4th Cir. 1990) (reasoning that *Copperweld* "recommended that courts consider whether affiliated corporate entities have a complete unity of interest"); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819 (11th Cir. 1990) (finding no single entity where each doctor on a hospital's staff "practices medicine in his individual capacity" and thus "is a separate economic entity potentially in competition with other physicians"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541-42 n.19 (7th Cir. 1986) (rejecting a single-entity defense because the corporations "lacked the 'complete unity of

Here, the NHL's teams plainly have "separate economic interests," *Capital Imaging*, 996 F.2d at 544.  The NHL claims that the Board of Governors is a single decisionmaking entity that is equivalent to a single organization.  MTD at 18.  However, the Board of Governors is composed of the owner or a representative of each club, and these members bring the clubs' distinct interests to bear on the Board's decisions.  *See* Hausman Decl. ¶ 24.  This creates collective, not unilateral, action, and the decisions that result are different from — and less efficient than — the decisions of a unitary entity.  *See* Ross & Szymanski, *Antitrust and Inefficient Joint Ventures*, 16 MARQ. SPORTS L. REV. at 222-38.  In contrast to a parent and subsidiary, whose "actions are guided or determined not by two separate corporate consciousnesses, but one," *Copperweld*, 467 U.S. at 771, Board of Governors decisions are guided by the separate consciousnesses of the 30 NHL clubs.  *See* Hausman Decl. ¶ 24.

Indeed, *NCAA*, which was decided shortly after *Copperweld*, dealt with a decisionmaking body that, like the NHL Board of Governors, was "ultimately controlled by the vote of member institutions."  468 U.S. at 99.  Rather than treat the decisions of this body as those of a single entity, the Supreme Court made clear that any restraint imposed by such a member-controlled body is a "horizontal restraint—an agreement among competitors on the way in which they will compete with one another."  *Id.*

The member clubs' control of the Board of Governors is also fatal to the NHL's argument that "the NHL and its Member Clubs" can "assert full control over MSG," just as in *Copperweld* "'the parent [could] assert full control'" over its subsidiary.  MTD at 20 (quoting *Copperweld*, 461 U.S. at 772).  As Judge Boudin explained in *Fraser v. Major League Soccer,*

_____

(continued…)

interest' necessary to find them to be a 'single enterprise for purposes of section 1'" (quoting *Copperweld*, 467 U.S. at 771)).

*L.L.C.*, horizontal control by a group of competitors is critically different from the vertical

parent-subsidiary control in *Copperweld*:

> [T]he operator/investors are not mere servants of MLS; effectively, they control it, having the majority of votes on the managing board. The problem is especially serious where, as here, the stockholders are themselves potential competitors with MLS and with each other. Here, . . . [MLS] (arguably) [serves] as a nominally vertical device for producing horizontal coordination, *i.e.*, limiting competition among operator/investors.
>
>   From the standpoint of antitrust policy, this prospect of horizontal coordination among the operator/investors through a common entity is a distinct concern. Whatever efficiencies may be thought likely where a single entrepreneur makes decisions for a corporate entity (or set of connected entities), the presumption is relaxed—and may in some contexts be reversed—where separate entrepreneurial interests can collaborate; the fixing of above market prices by sellers is the paradigm.

284 F.3d at 57; *see also Visa U.S.A.*, 344 F.3d at 243 (citing *Fraser* for this distinction between

vertical and horizontal control).  Accordingly, the NHL's attempted analogy is completely

inapposite.  In addition, the *extent* of control here falls far short of *Copperweld*, because NHL

teams retain the ability to compete against each other for fans, players and revenue, and there is

no suggestion that the Board of Governors could simply opt to seize total control of teams'

operations and assets.[11]  *See* Hausman Decl. ¶¶ 6, 10-14, 21-22.

Furthermore, as Judge Kozinski has observed, *Copperweld* is inapplicable to entities that

are actual or *potential* competitors, because "[a]bsence of actual competition may simply be a

manifestation of the anticompetitive agreement itself."  *Freeman*, 322 F.3d at 1149.  For

example, *City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268 (8th Cir.

1988) — on which the NHL relies, *see* MTD at 16-17 — emphasized, in finding a single entity,

---

[11] Similarly, the NHL's reliance on *Seabury Mgmt., Inc. v. Prof'l Golfers Ass'n of Am., Inc.*, 878 F. Supp. 771 (D. Md. 1994), *aff'd in part, rev'd in part on other grounds*, 52 F.3d 322 (4th Cir. 1995), is misplaced.  *See* MTD at 21.  The restriction there was on the PGA's regional sections, not on the individual competing members, and "the PGA and its member sections function as a single economic unit."  *Id.* at 777.  The PGA had total control over its regional sections, which could not compete with each other as the NHL teams do here.

that there was no evidence that defendants were "actual or potential competitors."  838 F.2d at 276; *see also Freeman*, 322 F.3d at 1148 (noting that this fact was critical in *Mt. Pleasant*); *McNeil v. NFL*, 790 F. Supp. 871, 878-79 & n.8 (D. Minn. 1992) (holding, after *Mt. Pleasant*, that NFL is not a single entity).  Here, even aside from the actual competition among NHL teams, they are clearly potential competitors in all the areas in which they have agreed to eliminate competition.

Tellingly, other than its specious analogy to *Copperweld*, the NHL offers no coherent rationale for single-entity treatment.  In particular, the NHL points to no substantial benefit that would offset the "well documented" consumer "welfare losses stemming from the potentially anticompetitive agreements among professional sports clubs."  *Major League Baseball v. Crist*, 331 F.3d 1177, 1188 (11th Cir. 2003).

To be sure, the NHL does argue that, because no team can "create NHL hockey by itself," "the NHL enterprise is the <u>one and only source</u> of any value" related to professional hockey products and services.  MTD at 17 (emphasis in original).  But this argument is flawed both factually and legally.  Factually, the argument ignores that the teams' own investments contribute substantial value, and that the extent of that value is different for different teams — for example, many clubs charge higher ticket prices for "premium" games when playing a popular team such as the Rangers.  *See* Hausman Decl. ¶ 18.  In addition, the notion that all value flows exclusively from the League is inconsistent with the vastly different franchise values of the various teams.  *See id.* ¶ 16.  It is also inconsistent with the history of sports leagues, which shows that leagues and league membership are not fixed — and that teams have moved from one league to another while retaining considerable franchise value.[12]

---

[12] At a minimum, the NHL's dubious and contested "sole source of value" theory cannot be adopted for purposes of a motion to dismiss.

More fundamentally, the NHL's argument is contrary to established law, which makes clear that teams' inability to produce games on their own is irrelevant. For example, the college teams in *NCAA* could not produce "NCAA football" or NCAA football broadcasts on their own, yet this did not allow NCAA members to restrict competition without antitrust scrutiny. Nor does the NHL offer any reason why its "sole source of value" theory is relevant from an antitrust standpoint: it changes neither the reality that the 30 NHL clubs have individual economic interests, nor the fundamental antitrust principle disfavoring collusion among potential competitors. As Judge Posner has noted, "[i]t does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984); *see also* Hausman Decl. ¶ 23.

Finally, the NHL errs in arguing for single-entity treatment on the ground that the teams have agreed to centralize control over areas such as marketing. *See* MTD at 18-19. This reasoning would turn the very essence of an antitrust violation — an agreement not to compete — into a justification for eliminating antitrust scrutiny. This is precisely the opposite of what antitrust law seeks to accomplish. *See Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992) ("*Bulls I*") ("Agreements limiting to whom, and how much, a firm may sell are the defining characteristics of cartels and may not be invoked as justifications of a cutback in output.") (emphasis omitted). While the NHL cites *Copperweld* for this argument, *see* MTD at 20-21, there was no such issue in *Copperweld* because "[w]ith or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder." 467 U.S. at 771. Here, in contrast, there *would* be vigorous independent competition but for the challenged agreements.

In sum, the NHL's single-entity argument is supported by neither precedent nor policy.

**B.     The Argument That *Dagher* Frees The NHL From The Obligation To Comply With The Antitrust Laws Is Also Without Merit.**

The NHL's attempt to use *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), to bolster its single-entity argument, *see* MTD at 22-25, thoroughly misapprehends *Dagher*.

To begin with, the NHL's claim that *Dagher* described "the circumstances under which Section 1 should not apply to the ongoing operations of legitimate joint ventures," MTD at 22, is incorrect. *Dagher* stated that "we need not address" any such issue, 547 U.S. at 7 n.2. Rather, *Dagher* held only that *per se* (and quick-look) analysis would not apply to the joint venture at issue, while suggesting that "respondents should have challenged [the practice at issue] pursuant to the rule of reason." *Id.* at 7. Indeed, *Dagher*'s question presented began with: "whether it is *per se* illegal under § 1 of the Sherman Act . . . ." *Id.* at 3.

Moreover, *Dagher* concerned only fully integrated joint ventures in which the participants combine *all* their relevant assets into a single corporate entity through which they share all profits and losses. *See id.* at 4, 6. The Court emphasized the close analogy between such a venture and a single firm, reasoning that "[w]hen 'persons who would otherwise be competitors *pool their capital and share the risks of loss as well as the opportunities for profit* ... such joint ventures [are] regarded as a single firm competing with other sellers in the market.'" *Id.* at 6 (emphasis added; ellipsis in original) (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 356 (1982)). Indeed, the question presented expressly concerned an "economically integrated joint venture." *Id.* at 3. Sports leagues, with their independently-operating clubs — which do not share all profits and losses — bear no resemblance to such fully integrated ventures.

The NHL contends that such integration is unnecessary where the participants cannot produce the product on their own, MTD at 24, but *Dagher* never suggests any application

- 20 -

beyond fully integrated joint ventures. Such an extension would make no sense: complete integration is the only factor cited by the Court as justifying an analogy to "a single firm competing with other sellers." 547 U.S. at 6. Accordingly, as the leading antitrust treatise rightly cautions, "one should not overread the opinion" beyond its unique facts. *See* VII AREEDA & HOVENKAMP, ANTITRUST LAW (2007 App.) ¶ 2132, at 469.

The NHL also overlooks another critical limit on *Dagher*'s holding: its limitation to "the *core* activity of *the joint venture itself*." 547 U.S. at 7 (emphasis added). The Court drew a sharp distinction between antitrust challenges to "restrictions . . . on nonventure activities" — *i.e.*, restrictions imposed by a venture on the independent activities of its members, like those challenged in *NCAA*, *see id.* — and challenges to the "activity of the joint venture *itself*," such as the price-setting by the venture entity in *Dagher*. *Id.* (emphasis added). *Dagher* simply has no application to a venture's restrictions on the separate activities of its members. *See also, e.g.*, *Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005) (holding unlawful agreement not to advertise venturers' individual products in competition with the joint product); *Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers, Authors & Publishers*, 620 F.2d 930, 935-36 (2d Cir. 1980) (blanket license lawful only if no restraint on sales by individual members).[13]

Moreover, *Dagher* is in any event further limited to "core" activities. *Id.* In *Dagher*, setting a price for the venture's product was "integral to the running of a business." 547 U.S. at 8. It is hardly "integral" to a hockey league, however, to control licensing, merchandising, advertising, broadcasting, and new media centrally — let alone for its members to agree not to compete in those areas. Indeed, there are leagues, such as the English Premier League, that are highly successful without features the NHL claims to be "core." *See* Hausman Decl. ¶ 29. Nor

---

[13] This point (and the other limitations on *Dagher*'s holding addressed in the text) is fatal both to the NHL's claim that *Dagher* supports its single entity argument and to the equally misconceived claim, MTD at 25-27, that restraints on independent competition by member clubs can be exempted from scrutiny under *Dagher* as the "core activities of the venture itself."

does the NHL provide any support for its expansive definition of "core," MTD at 27, in either *Dagher* or any normal understanding of the word "core." Indeed, under the NHL's theory, the broadcast restrictions in *NCAA* would have been a "core" element of the venture and would have been exempt from Section 1. Yet there is no hint in *Dagher* that the Court intended to overrule *NCAA* and several other cases — all cited positively in *Dagher* — requiring scrutiny of restraints imposed by a joint venture. *See* 547 U.S. at 5-7 (citing *NCAA*, *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), and *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969)); *see also* AREEDA & HOVENKAMP, *supra*, ¶ 2132, at 468-69.

Finally, *Dagher* has no relevance where the challenged restraint eliminates competition that would otherwise exist. In *Dagher*, the two participants merged all of their gas-selling operations into the joint-venture entity. Thus, the pricing policy was "not a pricing agreement between competing entities with respect to their competing products," and no competition was restricted. 547 U.S. at 6. In contrast, since the colleges in *NCAA* did "compete against each other to attract television revenues, not to mention fans and athletes," 468 U.S. at 99, the restraint on broadcasting of games was unlawful. Here, the NHL teams clearly *would* compete but for the challenged restraints; those restraints must therefore be subject to antitrust scrutiny.

### C. The NHL's Claim That Joint Ventures' Restrictions On Competition By Their Members Are Exempt From Scrutiny Is Demonstrably Wrong.

The NHL offers yet another attempt to eliminate antitrust scrutiny, arguing that it is "hornbook law" that the NHL, as a joint venture, "may preclude . . . 'competition' from its individual members." MTD at 27-28. This argument, too, is squarely contrary to binding case law: the Second Circuit has emphasized that agreements among joint venturers not to compete with the venture, "[f]ar from being 'presumptively legal' . . . are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *Visa U.S.A.*, 344 F.3d at 242. Such

restraints on individual venturers are lawful only if they are "ancillary," *i.e.*, "reasonably necessary" to the efficiencies of the venture. *See, e.g.*, *id.* at 238 (restraint is invalid if plaintiff can show that it "is not reasonably necessary to achieve the defendants' procompetitive justifications"); *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1072 (11th Cir. 2005) (likewise citing "reasonably necessary" standard applicable to ancillary restraints).

Indeed, the NHL's own cases decisively refute the NHL's revolutionary claim that joint venture members may freely agree not to compete with the venture. *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899), expressly holds that, before such an agreement can be upheld, "the court must find that the restraints attempted thereby are *reasonably necessary* . . . to the legitimate ends of the existing partnership." *Id.* at 281 (emphasis added). The case further says that a permissible restraint is one that is "ancillary to the main and lawful purpose of the contract, and . . . necessary to the protection of the covenantee in the carrying out of that main purpose." *Id.* at 283.

Likewise, *Polk Brothers, Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985), upheld a "limited agreement not to sell certain competing products" only because "it was an ancillary restraint" in that it "'contribute[d] to the success of a cooperative venture that promises greater productivity and output.'" *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (quoting *Polk Bros.*, 776 F.2d at 189) (brackets in original). Interpreting *Polk Brothers*, the Seventh Circuit later specified that such an agreement could *not* be upheld if it "was not a necessary condition for the increased competition." *Id.* And *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986), upheld the restraint at issue on the ground that it was "reasonably necessary to the business [the venture] is authorized to conduct." *Id.* at 227.[14]

_____

[14] The NHL claims that *Addyston Pipe* falls under an exception "where the members have competed in the relevant market on their own prior to a venture formation that itself creates market power," MTD at 27 n.12, but *Addyston Pipe* mentions no such limitation on its holding. Such a limitation would make no sense — antitrust law

Numerous other cases, not cited by the NHL, also reject the view that a joint venture's restraints on its members are not subject to antitrust scrutiny. Indeed, "[e]nsuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures." *NCAA*, 468 U.S. at 114 n.54; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23-24 (1979) (permissibility of joint licensing arrangement was contingent on allowing members to compete individually); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998) (the only cognizable rationales for NCAA actions that court would recognize "are those necessary to produce competitive intercollegiate sports"); *Gen. Leaseways,* 744 F.2d at 595 (invalidating a restraint because "the organic connection between the restraint and the cooperative needs of the enterprise that would allow us to call the restraint a merely ancillary one is missing"); XI AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 1908h, at 275 ("[E]xclusivity [of a joint venture] is often a danger signal requiring a hard look at the challenged restraint.").

The NHL fails to discuss the above cases. Instead, the NHL quotes *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 168 (1964), for the proposition that "'parents [of a joint venture] would not compete with their progeny [the venture itself].'" MTD at 27. However, this statement was merely descriptive; no question as to the lawfulness of an agreement not to compete with the venture was at issue. *See* 378 U.S. at 168. Rather, in *Penn-Olin*, it was the initial acquisition itself that was under review.

The NHL also seeks support in a further misrepresentation of *Dagher*, portraying *Dagher* as holding that a restraint on non-venture conduct is lawful so long as it is "related to the

---

(continued…)

does not focus solely on pre-existing, as opposed to potential, competition, *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) — and in any event the NHL makes no attempt to distinguish the numerous other cases applying the ancillary restraint doctrine without reference to any such limitation.

'legitimate and competitive purposes of the business association.'"  MTD at 25 (quoting *Dagher*, 547 U.S. at 7).  This argument, however, is based entirely on a cropped quotation and a misleading paraphrase.  Far from saying that a restraint need only be "related to" the legitimate purposes of the venture to be valid, what *Dagher actually* says is that the restraint must be "*ancillary* to the legitimate and competitive purposes" of the venture.  547 U.S. at 7 (emphasis added).  In short, *Dagher* reaffirms the longstanding requirement that restraints on joint venture members must qualify as ancillary — *i.e.*, reasonably necessary — to be valid.

## II.   THE NHL'S LEGAL ARGUMENTS REGARDING ANTITRUST INJURY ARE WITHOUT MERIT.

The NHL's sole attempt to address the merits of MSG's claims is its argument that MSG has not sufficiently alleged antitrust injury.  MTD at 28-33.  However, this argument, too, is incompatible with binding precedent:  the Second Circuit has squarely held that an alleged cartel member's challenge to restraints imposed by the cartel necessarily satisfies the antitrust injury requirement.  "If . . . a cartel-member plaintiff seeks to remove the restraint so he may be 'free to compete—such that the member's interest coincides with the public interest in vigorous competition—' he satisfies the antitrust injury requirement."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005) (quoting *Volvo N. Amer. Corp.*, 857 F.2d at 67-70); *see also N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (applying this case law in holding the antitrust injury requirement satisfied).  This rule is as it should be, because horizontal restraints on competition inherently tend to raise prices and reduce output — the essence of antitrust injury.  *E.g., Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 381-83 (S.D.N.Y. 2007).[15]

---

[15] "Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Xerox*, 511 F. Supp. 2d at 380 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  To allege antitrust injury, "antitrust plaintiffs must assert harm to competition as a whole, by alleging adverse effects on the price, quality, or output of the relevant good or service."

Moreover, this precedent aside, the Complaint's allegations are more than sufficient under the governing standard on a motion to dismiss, which requires the court to "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner*, 496 F.3d at 237. This standard "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Courts have consistently recognized the sufficiency of antitrust injury allegations similar to those made here. *See, e.g.*, *Xerox*, 511 F. Supp. 2d at 382 ("MS claims to have been injured by being excluded from selling to certain retail outlets. . . . [MS's loss of business] is sufficient if it stems from conduct that prevents potential customers from obtaining a desired product."); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) (antitrust-injury requirement satisfied by allegation that "'but for' Intel's anticompetitive conduct, Intel's prices would have been lower," and defendant's argument that its actions did not raise prices inappropriate on motion to dismiss); *N.Y. Medscan LLC*, 430 F. Supp. 2d at 147.

Here, the Complaint alleges ample facts with respect to each of the challenged restraints to more than plausibly establish the antitrust injury element of MSG's claim.

**Licensing and Merchandising**. The NHL member clubs have adopted restraints precluding individual clubs like the Rangers from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League, and from offering consumers different merchandise options or lower prices than those of the League. Complaint ¶¶ 38, 40A, 40B, 40C. Such restrictions, in a market without reasonably interchangeable substitutes for

---

(continued…)

*Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*, No. 05 Civ. 10711, 2006 WL 2020950, at *3 (S.D.N.Y. July 13, 2006) (internal quotation marks omitted). For example, where the complaint "alleg[es] that defendants' illegal conduct has harmed plaintiffs in their business and has decreased the price, quality, and output" of the relevant product, the antitrust injury requirement is satisfied. *N.Y. Medscan LLC*, 430 F. Supp. 2d at 147.

products related to professional ice hockey, inherently tend to lead to higher prices, reduced output, and lower quality — the most basic forms of antitrust injury. *See, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 36 (describing anticompetitive effects of exclusive sports league licensing and merchandising arrangements); Hausman Decl. ¶¶ 7, 44-46, 61.

**Broadcasting and Streaming.**  The restraints adopted by the NHL clubs prohibit each club from transmitting its games, on television or over the Internet, into territories allocated to other clubs or outside North America.  Complaint ¶¶ 16C, 40C.  Although many out-of-market fans who wish to see a team's games can do so by purchasing the NHL's Center Ice blanket license, they are deprived of alternatives that could be offered by individual clubs — such as the ability to purchase single games or the games of a single team — and of the lower prices that would result from such competition with the Center Ice package.  These consumer welfare losses clearly constitute antitrust injury; indeed, the serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation.  *United States v. NFL*, 116 F. Supp. 319 (E.D. Pa. 1953); *see also* Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 141-42; Hausman Decl. ¶¶ 12, 29, 48-57.

**New Media.**  The NHL clubs have given exclusive control of various "new media" activities to the League, and agreed to ban most competition from individual clubs.  Complaint ¶ 16D.  Even where individual clubs have retained some role — contributing content to League-controlled team sites on a common website platform — those sites are substantially restricted. The common platform website (1) imposes prominently placed League-centered content that was not previously part of the Rangers' site; (2) moves team-centered content to less favorable locations on the website; (3) requires that all websites follow a common "template" in their design; and (4) gives the NHL the ability, through its control of the server, to make further

changes at any time. The clubs have also agreed to prohibit teams from operating additional websites in competition with the common platform sites. The NHL itself views these changes as affecting consumers, in that they are designed to ensure that—instead of the varied and largely "provincial" websites that consumers demanded, and the unrestrained market produced—"tribal" competition is displaced by a League-centered focus that de-emphasizes competition among the individual clubs. *Id.* ¶¶ 16D, 40E. The teams have also agreed to reduce competition in website advertising, by designating the most valuable advertising space on each site for the League. *Id.*

The member clubs' agreement to ban additional, independent websites that would compete with the common platform websites necessarily restricts output. At a minimum, output includes "the number of units" available to consumers and advertisers — such as the number of competing websites. XI AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 1901d, at 205-06. In addition, "the relevant output consists of not merely the naked product itself, but all information, amenities, and other features" associated with it. *Id.* at 206. An agreement restraining any of the relevant features of a potentially competitive product "is an 'output reduction,' just as certainly as is an agreement increasing . . . price." *Id.*; *see also Visa U.S.A.*, 344 F.3d at 240 (exclusionary rules had harmed competition by reducing "available card features"). Here, the restraint limits both the number and type of websites available to consumers and advertisers; it also limits the use of websites to compete for advertising, ticket sales, and other commerce. It thus necessarily works a restriction of output. *See* Hausman Decl. ¶ 47.

**Advertising and Sponsorship.** The NHL clubs have agreed to League-wide advertising and sponsorship arrangements that automatically preempt individual clubs' abilities to sell such arrangements, even in the clubs' home arenas. Complaint ¶ 16B. Moreover, they have agreed to prohibit virtual signage that can be electronically superimposed during telecasts of a club's

games. *Id.* ¶ 40D. It is fundamental that "[a]greements restricting advertising are a form of output restriction in the production of information useful to consumers." XII AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 2023b, at 184. Moreover, these rules eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans. *See* Hausman Decl. ¶¶ 14, 42, 47.

The NHL's arguments as to why the Complaint's allegations purportedly fail to allege antitrust injury are uniformly specious. *First*, the NHL points to language in the Complaint about harm to MSG, and argues that harm to a competitor does not establish antitrust injury in the absence of harm to competition. MTD at 29-30. But there is no inconsistency between alleging harm to MSG *and* harm to competition and consumers, and — as described above — that is precisely what the Complaint does.

*Second*, the NHL cites case law for the proposition that a potential distributor's complaints about a manufacturer's exclusive dealing relationship do not establish an antitrust claim. MTD at 30-31. But those cases are completely inapposite, as they deal with the vastly different category of *vertical* restraints — which generally do not reduce output, and are far less suspect than horizontal restraints. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2714, 2717 (2007). It is beyond dispute that sports league restraints are horizontal. *See, e.g.*, *NCAA*, 468 U.S. at 99.

*Third*, the NHL cites, and badly misconstrues, *Kingray, Inc. v. NHL Enterprises, Inc.*, No. 00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002) (Goldfein Decl., Ex. 2). Contrary to the NHL's suggestion that *Kingray* found that the NHL clubs' horizontal allocation of broadcasting territories caused no harm to competition, the court in fact expressly refused to address such a claim. Slip op., at 13, 15-17. Specifically, the court held that the plaintiff, as an indirect

purchaser, had no standing to raise — and it would therefore not address — the claim that absent the territorial allocation, "rival teams would compete with one another and offer their out-of-market game broadcasts to consumers, placing downward pressure on the price of Center Ice and result in increased output and greater choice for consumers." *Id.* at 15.  Accordingly, *Kingray* addressed only the much narrower claimed *vertical* restraint that "Center Ice *itself* reduces output," *id.* at 13 (emphasis added) — *i.e.*, that the mere act of offering a cable package reduces output, even in the absence of any restraints on individual clubs preventing them from competing with the package.  That is not the claim made here.

In any event, the proposition the NHL seeks to draw from *Kingray* — that the horizontal allocation of broadcasting territories causes no consumer harm, because Center Ice gives consumers "the ability to watch virtually every NHL game," MTD at 32, is untenable.  Even if consumers can "watch virtually every NHL game" by purchasing the Center Ice package, the clubs' horizontal elimination of competition against that package — given the distinct market for professional ice hockey broadcasts — produces higher prices and reduced consumer welfare.  As one commentator has noted, "[i]f consumers were able to contract for out-of-market games on a per-team basis [as an alternative to blanket licenses like Center Ice] . . . the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost."  Ross, *Antitrust Options*, 52 CASE W. RES. L. REV. at 143-44.  This is the essence of antitrust injury.  *See, e.g., Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223 (2d Cir. 2008) ("A valid antitrust injury would be an injury to the consumers whose power of choice was impaired as a result of Defendants' conduct.").

Indeed, the NHL's position is directly contrary to *BMI*, in which the Supreme Court stressed that the permissibility of a blanket licensing arrangement was contingent on allowing individual members to compete individually. *Broad. Music*, 441 U.S. at 23-24; *see also NCAA*, 468 U.S. at 114 (freedom to compete individually essential to *BMI*'s holding). Under the NHL's approach, the Court should have deemed such individual competition superfluous, because music licensees could obtain any song by purchasing the blanket license — just as NHL fans can "watch virtually every NHL game" if they purchase the Center Ice blanket license. Needless to say, neither the Supreme Court nor any other court has adopted this view.

*Finally*, the NHL cites *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2d Cir. 1997), which is also an inapposite vertical restraint case. In that case, as in the NHL's distributorship cases, output was not reduced because there no was horizontal restraint, only a vertical restraint that allowed "the continuing presence of [the product] in the market—in whatever number consumers demand." *Id.*

In sum, the Complaint easily satisfies the antitrust injury requirement.

## III. THE NHL'S OTHER PURPORTED BARS TO SCRUTINY OF ITS ACTIONS ARE WITHOUT MERIT.

### A. The Consent Agreement Cited By The NHL Cannot Insulate The NHL's Actions From Antitrust Scrutiny.

The NHL makes the extraordinary argument that its members' cartel-like behavior is immunized from scrutiny by the members' agreements not to challenge the cartel's unlawful behavior. In particular, the NHL contends, citing a 2005 Consent Agreement — and similar agreements on which it does not specifically rely — that MSG agreed to the anti-competitive agreements and released its right to seek injunctive relief against ongoing unlawful conduct, except the clubs' new website rules. MTD at 33-35. This argument fails for two reasons: The

Consent Agreement, by its plain terms, does not cover claims based on continued violations of the law after the Agreement. And any release of such claims would clearly be unenforceable.

### (1) The Consent Agreement Does Not Cover Conduct That Occurs Following The Date Of The Agreement.

*First*, the Consent Agreement does not release claims for violations that occur after the Agreement. The Agreement designates New York law as the governing law, and in New York "releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims unless they are specifically embraced within the release or fall within the fair import of its terms." *Murray-Gardner Mgmt., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 646 N.Y.S.2d 418, 419 (N.Y. App. Div. 1996). Here, the release in the 2005 Consent Agreement expressly *excluded* claims based on future anti-competitive conduct.

MSG's claims challenge ongoing conduct. The Agreement, by contrast, releases only claims that relate to NHL hockey and "exist as of the date of execution of this Consent Agreement *by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement*." § 10(a) (emphasis added). Because the NHL clubs' ongoing, *post*-Agreement conduct is more than sufficient to give rise to each of MSG's claims — and, indeed, the essence of injunctive claims is *current* conduct, not historical conduct — such claims necessarily were not released.

This understanding is, moreover, consistent with well-established antitrust law. In *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955), the plaintiffs' initial suit was dismissed with prejudice when the parties settled. *See id.* at 324. In a new antitrust suit based on similar alleged violations, the Supreme Court rejected a res judicata defense that, like the NHL's contention here, was premised on the fact that "both suits involved 'essentially the same course of wrongful conduct.'" *Id.* at 326. This "conclusion [was] unaffected by the circumstance that

the [prior] complaint sought … injunctive relief which, if granted, would have prevented the illegal acts now complained of." *Id.* at 328.  The court emphasized that the defendants' position "would in effect confer on them a partial immunity from civil liability for future violations," a result "consistent with neither the antitrust laws nor the doctrine of res judicata." *Id.* at 329; *see also Cellar Door Prods., Inc. v. Kay*, 897 F.2d 1375, 1376-78 (6th Cir. 1990).

Notably, the NHL cites only snippets of language from the Agreement in support of its argument, and makes no attempt to reconcile the language with its argument.  Instead, the NHL cites a handful of cases with different release language, none of which required that the claim exist by reason of an "act … taken … up to … the date of the execution of [the] Agreement."  In fact, in cases with language similar to the language at issue here, courts have consistently held that the release does not bar future injunctive claims.  *See, e.g.*, *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 98-99 (5th Cir. 1974); *Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1021-23 (S.D. Tex. 1972); *Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 39 F. Supp. 117, 119 (S.D.N.Y. 1941).

### (2)     A Prospective Release Of The Right To Sue For An Injunction Against Antitrust Violations Would Be Unenforceable

*Second*, even if MSG *had* purported to release its claims for injunctive relief against future anti-competitive acts, such a release would be unenforceable as contrary to public policy.  Although the NHL notes that a party may release antitrust claims for past or current conduct, MTD at 34, it neglects to mention that a party cannot prospectively release its right to bring suit against *subsequent* antitrust violations.  *See, e.g.*, *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994) ("A no-suit agreement may be one of the devices for shoring up a cartel. … We therefore conclude that plaintiffs' release does not prevent them from making an antitrust claim in court."); *Redel's*, 498 F.2d at 99 (reasoning that such an agreement

deprives the public of the protection of private antitrust suits, and thereby is itself a contract in restraint of trade); *see also Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975); *Gaines v. Carrollton Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987); *Mktg. Assistance Plan*, 338 F. Supp. at 1022; *Westmoreland Asbestos Co.*, 39 F. Supp. at 119.

Indeed, the Supreme Court has stated that it would "condemn[] . . . as against public policy" an agreement that "operated . . . as a prospective waiver of a party's right to purse statutory remedies for antitrust violations." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Moreover, agreements to violate the antitrust laws are unenforceable, *see Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 81-82 (1982), and — if MSG's claims have merit — a no-suit agreement to protect the NHL members' other unlawful agreements is itself unlawful.

This strong public policy is further reflected in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968), which held that the "doctrine of *in pari delicto*" — which generally bars relief for wrongdoing when the plaintiff is involved in the wrongdoing — "is not to be recognized as a defense to an antitrust action." *Id.* at 138, 140. The Court reasoned that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Id.* at 139. If the parties to anti-competitive agreements could release future antitrust claims against each other, cartels could easily eliminate this deterrent. *See Sanjuan*, 40 F.3d at 250.

This point has particular force regarding sports leagues, where numerous other factors deter antitrust suits by league members. The result of these deterrents is that questionable agreements long ripe for antitrust scrutiny have gone unchallenged, *see, e.g.*, Grusd, *Antitrust Implications*, 1 VA. J. SPORTS & LAW at 26-41 (exclusive licensing), as owners have rarely been willing to invoke such scrutiny. The enforcement of cartel agreements "releasing" the right to bring antitrust claims would eliminate even this check on cartel behavior.

The NHL suggests that this policy does not apply to claims based on post-release conduct that started before the release. MTD at 34. However, numerous cases are to the contrary. *See, e.g.*, *Fox Midwest Theatres*, 221 F.2d at 179-80 (release unenforceable even "against any continued . . . combinational or conspiratorial acts . . . , such as [the plaintiffs] had charged [the defendants] with having previously engaged in"); *see also Redel's*, 498 F.2d at 98, 99 (1969 release would not be enforced with respect to subsequent acts, even though plaintiff asserted "numerous claims of unlawful price discrimination occurring from 1965 through 1971"); *Mktg. Assistance Plan*, 338 F. Supp. at 1022-23 (release could "not bar the assertion … of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants"); *Westmoreland Asbestos Co.*, 39 F. Supp. at 119 (plaintiffs not bound by release of "oppressions and wrongdoings" that had "continued unabated" since the release).

Against this weight of authority, the NHL cites only one case to the contrary, *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906, *16-22 & n.10 (N.D.N.Y. Mar. 11, 1999), which does not account for the harm to the public when plaintiffs release their right to enjoin ongoing antitrust violations. The rest of the NHL's case law does not support the argument at all. Three of the cases involve claims that related

*exclusively* to pre-release conduct.[16]  And three other cases — all from district courts — barred

only claims for damages, not injunctive relief.[17]  Even if defendants could be shielded from

damages based on continuing conduct, it would be far more harmful to the public interest to

shield such defendants from injunctive relief.  In sum, the vast majority of the case law —

including all Supreme Court and Circuit authority — rejects the enforceability of agreements to

bar claims for injunctive relief against ongoing antitrust violations.

### B.    MSG's Claims Are Not Barred By Laches.

The NHL also contends that laches bars most of MSG's claims.  *See* MTD at 35-37.

However, laches does not apply to claims, like the ones here, against continuing antitrust

violations, and the NHL cites no precedent to the contrary.  In any event, the NHL cannot

establish this defense on a motion to dismiss.

To begin with, the NHL's laches argument relies on a presumption derived from the

applicability of the statute of limitations, but the statute of limitations does not apply where, as

here, there is a continuing violation.  "[I]n the case of a 'continuing violation,' say, a price-fixing

conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each

overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff,

'starts the statutory period running again.'"  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)

---

[16] *See Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976) (claim for damages based on defendant's "allegedly illegal conduct from 1968 to 1972," with release entered into in 1973); *Three Rivers Motors Co.*, 522 F.2d at 887-88 (claim for damages based on alleged price-fixing arrangement that existed when plaintiff owned a franchise; release entered into when plaintiff sold franchise); *Ruffo v. Gulf Oil Corp.*, No. 74 C 1615, 1978 WL 1327, at *1 (E.D.N.Y. Mar. 13, 1978) (claim based on defendant's alleged anti-competitive behavior while the plaintiff leased a gas station; release entered into when he terminated the lease).

[17] *See Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 213-14, 217 n.8 (S.D.N.Y. 1985) (antitrust complaint seeking damages, but no injunctive relief); *Willsea v. Theis*, No. 98 Civ. 6773, 1999 WL 595629, at *11, *12 & n.15 (S.D.N.Y. Aug. 6, 1999) (plaintiff's Sherman Act claim "seeks only monetary damages at law"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 446 (7th Cir. 1998) (noting that injunctive relief had become moot).  Moreover, *Record Club of America* never passed on a public policy challenge to the release's application to damages for post-release conduct because the plaintiff never raised that objection.  *See* 611 F. Supp. at 215-17.  And *Willsea* expressly left open the question whether the plaintiff could have sought injunctive relief against the alleged monopolistic conduct.  *See* 1999 WL 595629, at *11, *12 n.15. Finally, *MCM Partners, Inc.* distinguished a situation where — as in this case — the facts "would establish a new agreement or even an affirmation of the [pre-release] agreement."  *See id.*

(quoting II AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 338b, at 145). The Second Circuit has

stated that "in 'the context of a continuing conspiracy to violate the antitrust laws. . . . each time

a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the

damages caused by that act.'" *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d

Cir. 1979) (quoting *Zenith Radio Corp v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971));

*accord Higgins v. N.Y. Stock Exch. Inc.*, 942 F.2d 829, 832 (2d Cir. 1991).

    The NHL argues that MSG is challenging old agreements, MTD at 36, but the Complaint

is plainly directed at ongoing actions that are *currently* violating the antitrust laws. The statute

of limitations does not apply to such actions *regardless* of whether they reflect a prior policy or

agreement. For example, an ongoing refusal to deal "constitute[s] a continuing violation of the

Sherman Act" and is not barred by the statute of limitations, even where the policy began

decades earlier. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 501 n.15 (1968);

*see also, e.g.*, *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427 (9th Cir.

1996) (refusal to deal, in accordance with prior agreement between competitors, restarted the

statute of limitations); *United States v. N. Improvement Co.*, 814 F.2d 540, 542-43 (8th Cir.

1987) (statute of limitations resets until bid-rigging conspirators have received the last payment

on their successful but illegal bid).

    Here, the Complaint alleges recent overt acts, such as the clubs' purported extension of

exclusive licensing agreements in 2006, and the actual and threatened imposition of fines to

penalize MSG's attempts to compete independently despite the challenged restraints. *E.g.*,

Complaint ¶¶ 4-5, 17, 39. The continuing nature of the violations is also clear from the relief

sought, which is prospective injunctive relief to bar ongoing violations. *See* Complaint Part VI;

*see also, e.g.*, *id.* ¶¶ 16, 40 (describing ongoing violations); *id.* ¶ 18 (describing these as

"continuing violations").  "A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm.  Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches."  *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001).  Only one of the cases cited by the NHL concerns an injunction, *see Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir. 1996), and there the court found that the challenged action was within the limitations period (though laches was found in other grounds).[18]  The leading antitrust treatise also recognizes that with regard to "long-term contracts that are unlawful, if at all, from the beginning" there should be "flexibility in equity to permit the injunction against continued enforcement."  II AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 320c3, at 213.

Since the NHL's laches argument is based entirely on a purported presumption arising from application of the limitations period, *see* MTD at 36, the continuing nature of the violations means it cannot succeed.  In any event, the continuing nature of the violation applies equally to laches as it does to the statute of limitations.  *See, e.g.*, *KFC Corp. v. Marion-Kay Co.*, 620 F. Supp. 1160, 1168 (S.D. Ind. 1985) ("[F]or the same reasons[] this case is not barred by the statute of limitations, it is also not barred by laches."); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 449 F. Supp. 1158, 1171 (D. Hawaii 1978) (similar).

Finally, a motion to dismiss on laches grounds is only allowed "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid" the defense.  *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07-2933, 2008 WL 84541, at *3 (S.D.N.Y. Jan. 8, 2008).  To establish the defense, the delay must be

---

[18] Also, *Conopco* was not an antitrust case, and in the antitrust context the Supreme Court has recognized "the inappropriateness of invoking broad common-law barriers to relief [since the] private suit serves important public purposes."  *Perma Life Mufflers*, 392 U.S. at 138.  *Conopco* itself notes that "the public good is of paramount importance when considering the equitable defense of laches."  95 F.3d at 193; *cf. Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 981 (2d Cir. 1975) ("[I]t is highly unlikely that estoppel can be readily allowed to defeat antitrust claims.").

unreasonable and cause prejudice to the defendant, *see id.* at \*2 (quoting *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998)), and here it is not "clear from the face of the complaint" that any delay in filing suit was unreasonable or that the NHL was prejudiced by the delay.  Indeed, the Complaint describes the escalation of the NHL's actions in restricting competition, including an agreement and policy pronouncement in 2006 and fines in 2007, Complaint ¶¶ 9, 17, 39, which would justify any initial delay.  *See, e.g.*, *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 197-98 (S.D.N.Y. 2000).

For all of these reasons, the NHL's laches argument cannot be sustained.

### C.    MSG's Claim Regarding Exclusive Broadcast Territories Is Not Barred By Judicial Estoppel.

The NHL argues that judicial estoppel bars MSG from challenging exclusive broadcast territories because "MSG" — in reality, a group of defendants led by the NHL — purportedly argued otherwise in *Kingray*.  MTD at 37-38.  This argument fails because it rests on an seriously inaccurate portrayal of the *Kingray* litigation.  In addition, judicial estoppel requires a showing that "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent *factual* position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."  *AXA Marine & Aviation Ins. (UK) Ltd.*, 84 F.3d 622, 628 (2d Cir. 1996) (emphasis added).  The NHL satisfies neither requirement.

*First*, the NHL's contention that the *Kingray* defendants "sought and obtained a ruling, as a matter of law, that these very exclusive broadcast territories could not violate Section 1," MTD at 38, is simply false.  As explained earlier, *Kingray* expressly refused to address such a claim because it agreed with the defendants' argument that the plaintiff lacked standing to assert it.  *See* p. 29, *supra*.  There is no tenable reading of *Kingray* that even arguably supports the NHL's

characterization of it.  Accordingly, there can be no argument that MSG's claim in this case is inconsistent with either the NHL's arguments in *Kingray* or with the *Kingray* court's ruling.

*Second*, and in any event, legal arguments are not subject to judicial estoppel.  As noted above, the standard requires "an inconsistent factual position."  *AXA Marine*, 84 F.3d at 628. Accordingly, "legal conclusions are not 'inconsistent factual positions' as would ordinarily justify judicial estoppel."  *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n*, 288 F.3d 491, 504 (2d Cir. 2002), *vacated on other grounds*, 123 S. Ct. 1572 (2003).  Judicial estoppel for non-factual arguments has therefore repeatedly been denied.  *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 248 (S.D.N.Y. 2004) (judicial estoppel inapplicable because party had "not taken inconsistent factual positions" and "their argument" in the other court "was not a factual assertion, it was an argument"); *U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 93 (S.D.N.Y. 1999) (judicial estoppel "inapplicable" because "whatever inconsistency" there was related to issues of "law, not fact").[19]

Here, there is no doubt that the NHL seeks estoppel based on a legal argument, because it argues that MSG — in reality, a group of defendants led by the NHL — "sought and obtained a ruling, as a matter of law, that these very exclusive broadcast territories could not violate Section 1."  MTD at 38.  For this reason, too, the NHL's judicial estoppel argument is without basis.

## CONCLUSION

For the reasons stated above, MSG respectfully requests that this Court deny the defendants' motion.

---

[19] Even the case cited by the NHL for the judicial estoppel standard, *Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 6-7 (2d Cir. 1999), makes clear that "[j]udicial estoppel prevents a party from asserting a *factual* position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding."  *Id.* at 6 (emphasis added) (internal quotation marks omitted).

July 17, 2008                                    JONES DAY


                                    By:   /s/ Robert W. Gaffey
                                       Meir Feder  (MF-2574)
                                       Thomas F. Cullen, Jr. (*pro hac vice*)
                                       Robert W. Gaffey  (RG-4004)
                                       222 East 41st Street
                                       New York, NY  10017-6702
                                       Telephone:  (212) 326-3939
                                       Facsimile:  (212) 755-7306


OF COUNSEL:

Joe Sims
Glen D. Nager
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212