# ANTITRUST OPTIONS TO REDRESS ANTICOMPETITIVE RESTRAINTS AND MONOPOLISTIC PRACTICES BY PROFESSIONAL SPORTS LEAGUES

### Stephen F. Ross[†]

## INTRODUCTION

The hallmark of an antitrust violation is an agreement which has the effect of raising price, lowering output, or rendering output unresponsive to consumer demand.[1] Owners of clubs comprising Major League Baseball ("MLB"), the National Football League ("NFL"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") engage in a variety of exploitive activities that consumers cannot avoid by substituting rival products.[2] The purpose of this Article is to analyze specific areas where these monopoly sports leagues harm a variety of groups, through the maintenance of a monopolistic structure that precludes competitive entry, or through specific restraints that have demonstrable anticompetitive effects. The analysis is designed to provide potential private and

---

[†] Professor of Law, University of Illinois. B.A., J.D., University of California (Berkeley). Thanks to Bert Foer, John Kwoka, and Stefan Szymanski for comments on an earlier draft. This Article was commissioned by the American Antitrust Institute for consideration of a task force on sports fan advocacy. It solely reflects my own views.

[1] See NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 107 (1984) ("A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of anti-trust law.").

[2] Of course, as with any product that is not one of life's necessities, demand will increase with quality and decrease with price. The lack of support for the cellar-dwelling Baltimore Orioles does not mean that watching situation comedies, reading a good book, going to a movie, or spending a quiet evening with a loved one becomes part of the same product market as Major League Baseball, even if many Oriole fans may see these activities as preferable this season. *Cf.* United States v. Corn Products, 234 F. 964, 975 (S.D.N.Y. 1916) (L. Hand, J.) (stating that this sort of monopoly "is therefore only a limited one, but within [these limits] it may be a true one"). Indeed, the very exploitation that is detailed in Part I, *infra*, provides strong evidence of market power; in the absence of such power, consumers would be expected to find a reasonable substitute rather than pay exorbitant tax subsidies to prevent or attract a franchise relocation, etc. *See also* United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 395 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal.").

133

governmental plaintiffs with theories of antitrust liability to support litigation to vindicate the interests of sports fans, as well as to provide the policy justification for appropriate legislative intervention.

To be sure, American sports fans are treated to a very high level of entertainment by the four leading sports leagues, and reap a tremendous amount of enjoyment from professional sports. Sports leagues, through agreement among owners, have developed a variety of efficient ways to deliver a more improved product to their fans. Because the goal of this Article is to provide a roadmap for those interested in stronger enforcement of the antitrust laws, it will not focus on these desirable aspects of league cooperation. As Judge Richard Posner has written, just because firms lawfully cooperate in some procompetitive fashion, it does not follow that "there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition."[3] This Article focuses on restraints in the latter category.

## I. OVERVIEW OF CONSUMER HARM

Sports leagues present special challenges for those interested in a sound, consumer-oriented approach to antitrust enforcement. As the Supreme Court has recognized, sports leagues operate in an industry where some agreements among competitors—perhaps even *all* the competitors—is necessary for there to be a product at all.[4] In addition to the need for joint action to produce a product, sports leagues have perhaps a unique interest in maintaining a significant degree of competitive balance among the teams within their venture. In conventional markets, both society and individual consumers prefer that firms strive independently (or in rival joint ventures) to produce the best possible product, and are willing to reward the most successful firm with the lion's share of the market; in network markets, consumers are primarily interested in patronizing the seller with the dominant market share. In contrast, courts seem to accept the economic premise that consumers as a whole are better off, and will show it through greater patronage of a sports league's product, when a championship race is characterized by real competition and each fan's team has a reasonable shot at contention.[5] Finally, as will be discussed in detail

---

[3] Gen. Leaseways Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594 (7th Cir. 1984).

[4] *See NCAA*, 468 U.S. at 101 ("What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed.").

[5] The Supreme Court held in *NCAA* that promotion of competitive balance was a legitimate goal that could potentially justify significant horizontal restraints on competition. *Id.* at 117. *See also* Mackey v. NFL, 543 F.2d 606, 621 (8th Cir. 1976) ("[T]he NFL has a strong and unique interest in maintaining competitive balance among its teams."); McNeil v. NFL, 1992-2 Trade Cas. (CCH) ¶ 69,982, at 68,771 (D. Minn. 1992) (stating that NFL teams must have "suf-

in this Article, to the extent that competition policymakers determine that special circumstances preclude the typical antitrust preference for fully-competing economic entities—that is to say, economically competing rival leagues—special antitrust review may be required of league regulations of access and intra-league competition within the resulting monopoly joint venture.[6]

This Article will focus on three discrete areas where market retribution will be insufficient to check competitive abuses, and where in fact the hallmarks of an antitrust violation exist. First, leagues have structured their operations to effectively preclude meaningful new entry, either by new leagues or by new teams joining the existing joint venture. The result is an artificial scarcity of franchises, resulting in lower output as well as higher prices that communities must pay in order to persuade a league to expand or an existing owner to relocate or remain in the community.[7]

The artificial scarcity harms consumers in a number of ways. Millions of sports fans in medium-sized cities and occasional major metropolitan areas are precluded from watching a local sports team at the major league level, although an unrestrained market might well

---

ficiently comparable playing strength that football fans will be in enough doubt about the probable outcome of each game and of the various division races that they will be interested in watching the games"); Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F. Supp. 462, 486 (E.D. Pa. 1972) (upholding labor restraints because of the "need for competitive balance within the league"). These judicial pronouncements find some support in the economic literature. Economists Roger Noll and Henry Demmert have independently demonstrated that attendance increases when championship races are closely contested. *See* HENRY G. DEMMERT, THE ECONOMICS OF PROFESSIONAL TEAM SPORTS 11 (1973); Roger Noll, *Attendance and Price Setting, in* GOVERNMENT AND THE SPORTS BUSINESS 115, 156-57 (Roger Noll ed., 1974). Other studies have been less conclusive. *See* Stefan Szymanski, *Income Inequality, Competitive Balance, and the Attractiveness of Team Sports: Some Evidence and a Natural Experiment from English Soccer*, 111 ECON. J. 69, 69 (2001) (concluding, with respect to English professional league soccer, that "match attendance appears unrelated to competitive balance"). In any event, competitive balance is only one feature that makes a professional sports league attractive to fans. For example, minor leagues with high rates of player turnover enjoy more long-term competitive balance than the major leagues, but have less spectator appeal. *See* MICHAEL J. TREBILCOCK, THE COMMON LAW OF RESTRAINT OF TRADE: A LEGAL AND ECONOMIC ANALYSIS 226 (1986). Amenities, ease of access to stadia, the availability of substitute forms of sporting or other entertainment, weather, and income also affect attendance. *See* Noll, *supra*, at 115-20.

[6] *Cf.* United States v. Terminal R.R. Ass'n, 224 U.S. 383 (1912) (holding that monopolistic control over the only two bridges and one ferry by which trains could cross the Mississippi River at St. Louis violates the Sherman Act and imposing highly regulatory conduct remedies and supervision by Interstate Commerce Commission). The Court, however, did not order divestiture in light of significant economies of scale. *See id.* at 411 (stressing the need to "preserve to the public a system of great public advantage").

[7] This Article does not address the very separate and controversial question of economic policy whether it is a sound fiscal investment for local governments to invest in the construction and operation of athletic stadia. Even if the presence of a major league sports club creates many economic benefits for a local community, these benefits form "consumer surplus" that competition ordinarily should be expected to compete away, for the benefit of local taxpayers. And if a city's political priorities preclude tax subsidies, league policies that mandate a relocation from such a city results in a real loss of output.

support such additional teams. Fans in major metropolitan areas often forego the convenience of a major league team closer to their home or office, and big-city fans are also artificially deprived in many cases of the opportunity for intra-sport competition between multiple teams in their area, although an unconstrained market would support these teams. (Chicagoans must suffer with the Bears and only the Bears, while London hosts six major league soccer teams.) In terms of wealth transfers, the most significant fact is that the artificial scarcity allows owners to threaten current cities with relocation, and to insist on major subsidies to stay (or to be lured away). Through 2006, more than $7 billion will be spent on new sports facilities, with most of the money coming from public sources. The average subsidy from a host city to its sports team will exceed $10 million a year.[8]

Second, unchecked by quality competition, leagues can pursue profits at the expense of a number of business practices that would render their product more responsive to consumer demand. Several leagues display a level of competitive imbalance among teams below the level that consumers prefer. Alternatives that would improve competitive balance would include different revenue sharing arrangements among member clubs, but these are rejected by the owners that control the league's policies, because many large-market owners find it in their individual self-interest to maintain a suboptimal level of competitive imbalance. Other alternatives would result in less restrictive labor markets. These too are resisted by owners, because the benefits in terms of increased responsiveness to consumer demand is swamped by the loss of monopsony power in the labor market.[9]

Freedom from competition also means that individual club owners can behave in notoriously inefficient ways, guaranteed a permanent place in a monopoly league and enjoying league policies dictated by a board on which they have an equal vote. In a conventional "franchise" operation (such as McDonald's or a car dealership, for example), the nationwide product is governed by an independent

---

[8]  *See* Roger G. Noll & Andrew Zimbalist, *Sports, Jobs, and Taxes; The Real Connection,* in SPORTS, JOBS, AND TAXES: THE IMPACT OF SPORTS TEAMS AND STADIUMS 494 (Roger G. Noll & Andrew Zimbalist eds., 1997).

[9]  For example, although competitive balance improved dramatically in the period immediately following Major League Baseball's reluctant relaxation of severe labor market rules that precluded any competition for player services, with attendance increasing almost 60%, nevertheless salaries increased by over 300%. The data is computed in Stephen F. Ross, *Monopoly Sports Leagues,* 67 MINN. L. REV. 645, 676 (1989). The rules were changed pursuant to the order of an arbitrator resolving a grievance filed by the players' union. *See* Twelve Clubs Comprising Nat'l League of Prof'l Baseball Clubs v. Major League Baseball Players Ass'n, 66 Lab. Arb. Rep. (BNA) 101, 118 (1975) (Seitz, Arb.) (sustaining the grievances of two baseball players whose clubs "had no right or power . . . to reserve their services for their exclusive use for any period beyond the 'renewal year' in the contracts which these players had theretofore signed with their clubs").

business entity who determines the scope of intra-brand protection, and invariably retains and exercises the power to revoke franchises where local operations are inefficiently run. In contrast, the exclusive geographic territories conferred by most sports leagues appear in league constitutions requiring super-majority votes to change, and even the most aggressive and innovative of league Commissioners would not dare offer more than advice or assistance for (or, at most, facilitate an attractive buy-out of) grossly inefficient management.[10]

The monopoly structure of leagues also deprives consumers of realistic options when, as is frequent in some sports, labor strife results in disruption of the provision of desired services. Consumer deprivation caused by labor unrest is normally not a subject of competition policy, where it results from the exercise of the workers' right to strike the manufacturer of a product that some consumers happen to prefer, or where it results from Congress' considered decision to permit multi-employer, industry-wide bargaining at the option of the bargaining parties. Often, however, workers do not engage in industry-wide bargaining, and consumers are protected by their ability to continue to patronize the rivals of those suffering industrial unrest. One of the benefits of competition policy would be to provide a market structure to provide this consumer protection.

Third, although new technology and an increasingly mobile society have dramatically increased the demand for telecasts of games from "out-of-market" teams (clubs not based in the area where the consumer lives), sports leagues have reacted with a series of restrictive agreements that preclude many consumers from viewing desired games. Exclusive broadcast territories prevent "exiles" from their hometowns from viewing desired games, or require that fans seeking to watch their favorite team acquire a blanket license for vastly more games than they desire to see or for which they desire to pay. Individual exclusive arrangements with certain satellite or cable providers may also force fans to either forego the ability to watch desired games or purchase prohibitively expensive and duplicative equipment of rival technologies.

Ordinary sports fans make up the greatest number of victims of anticompetitive practices by sports leagues. Many fans are precluded from attending high-caliber professional sporting contests in their local areas because of the artificial scarcity of teams; other fans have no choice but to endure inferior quality teams caused by local mismanagement; yet others who have moved from the city where they were raised cannot obtain affordable opportunities to watch their favorite teams play. But there are many other victims as well. Many taxpay-

---

[10]   Cf. United States v. Gen. Motors Corp., 384 U.S. 127, 140 (1966) (contrasting the unilateral decisions of a corporation in dealing with its franchisees with the agreement among franchisees on how the corporation should deal with other franchisees).

ers who are not sports fans must pay, or forego city services that would otherwise be funded, because state and local governments provide massive subsidies to retain or attract artificially-scarce franchises. Local governments and local officials similarly cannot efficiently order local priorities because they must face the market power of monopolistic leagues. Various firms that could be engaged as intermediaries in an unrestricted broadcast market are precluded from doing so. Finally, although their interests are often protected by the countervailing power of their unions, players face monopsonistic restraints in the labor market.

One of the purposes of this Article is to provide an analysis for attorneys representing sports fans or taxpayers (via class actions), state and local governments, intermediate broadcast providers, and players, in determining whether to use the antitrust laws[11] to redress the competitive harms identified below. Recognizing the legal, economic, and political difficulties with structural remedies, Part II of this Article considers the efficacy of a host of conduct remedies and then in Part III notes some of the benefits and problems of structural remedies.

## II. APPROPRIATE AREAS OF ANTITRUST INTERVENTION: CONDUCT REMEDIES

As will be detailed in Part III, many of the harms caused by monopoly sports leagues may be inevitable results of the exercise of monopoly power, and the only effective remedies are structural ones that remove the power of clubs to exploit their economic victims. But specific conduct remedies are also available under section 1 of the

---

[11] This Article focuses exclusively on federal antitrust laws. There is some precedent for the proposition that state antitrust laws cannot apply to any league practice that must be uniform across the country. *See, e.g.,* Flood v. Kuhn, 443 F.2d 264, 268 (2d Cir. 1971) (rejecting state-law challenge to league-wide restraints on players because state regulation would require compliance with the strictest antitrust standard imposed among the states in which baseball does business), *aff'd,* 407 U.S. 258, 284 (stressing uniformity "in any regulation of baseball *and its reserve system*" although silent about the application of state antitrust laws to other aspects of baseball); Partee v. San Diego Chargers Football Co., 668 P.2d 674, 678 (Cal. 1983) (en banc) (stating that state antitrust regulation is not applicable to professional football). These concerns may not be relevant where the courts apply state law in conformity with federal statutory interpretation. Commerce Clause concerns are only implicated where national uniformity is required and different states might impose different legal standards on an interstate sports league. Arguably, however, a decision by state courts applying state law consistently with the Sherman Act would be reviewable by the United States Supreme Court, thus providing the single authority and national uniformity that obviates any Commerce Clause concerns. *See, e.g.,* Delaware v. Prouse, 440 U.S. 648, 653-54 (1979) (holding that the Supreme Court has authority to review Delaware Supreme Court decision applying provision of state constitution, where Delaware courts interpret state constitutional provision to be substantially similar to federal constitution, and where Delaware Supreme Court decision was based on federal precedents). Significantly, this pathbreaking opinion in federal-jurisdiction was decided seven years after *Flood.*

Sherman Act.[12] The North American monopoly sports leagues are not organized as single firms. Rather, each of the leagues is organized akin to a joint venture—the league consists of member clubs, each of which is individually owned and operated by owners. Moreover, although clubs are sometimes loosely referred to as "franchises," neither George Steinbrenner nor Mario Lemieux should be confused with the operator of the local McDonald's or 7-11 store. Club owners do not take their orders from executives at some separate organization called "Major League Baseball" or the "National Hockey League"—they *are* the league, constituting the governing board and setting league policy.[13] How league revenues are shared, who can join the league, who can be an owner, and all other policies are determined by the owners. Because sports leagues are not independent corporate entities, owners act in their own perceived self-interest.

This structure can be a blessing or a curse for fans. In some areas, such as expansion, a single corporation running a league could potentially be beneficial, for a league would be expected to expand as long as marginal revenue from expansion was positive. Joint ventures, in contrast, will only expand as long as *average* revenue is positive.[14] The NBA's well-publicized fight with the Chicago Bulls over the number of times Michael Jordan could be shown on television[15] reflected the inability of the venturers to agree on how to share revenue, an inability solved if the league were centrally owned. On the other hand, intra-league competition among clubs can, in some circumstances, provide benefits to consumers and lessen the monopoly power of the entire league. Moreover, competition rather than centralized agreement is often a more efficient way to secure the proper allocation of goods and services.

In at least four specific instances, owners in one or more leagues have entered into agreements that restrain this intra-league competition, to the detriment of competition and consumers. Central to this analysis, of course, is the fact that "market retribution will [not] be swift" if owners harm consumers—whether through strategic

---

[12]   15 U.S.C. § 1 (2001).

[13]   *Cf.* United States v. Sealy, Inc., 388 U.S. 350, 354 (1967) (corporation formed by competing manufacturers was their instrumentality, not the principal).

[14]   This point is elaborated in Stefan Szymanski & Stephen F. Ross, Open Competition in League Sports 8 (Sept. 2000) (unpublished manuscript, on file with the Social Science Research Network) ("[W]hile a single entity league would ordinarily be expected to expand franchises until . . . marginal revenue equals zero, the objective of teams in the leagues will be to choose the number of franchises . . . to maximize average revenue per club."), *at* http://papers.ssrn.com/pape.tar?abstract_id=243756

[15]   *See* Chicago Prof'l Sports Ltd. P'ship v. NBA, 95 F.3d 593 (7th Cir. 1996).

efforts to increase profits or due to ineptitude—because of the lack of product market rivals to whom consumers can turn.[16]

## A. NFL Revenue Sharing

All leagues share a significant amount of revenue among member teams. Most of these revenue sharing agreements enhance the ability of all teams in the league to compete effectively against each other in athletic competition, and thereby promote the long-term stability and attractiveness of the league itself.[17] Club owners divide revenues from league-wide television contracts on a per-team basis; many leagues substantially share revenues from the live gate, from royalties for the use of team logos, uniforms, etc., and most recently regarding the revenues derived from the internet. No league, however, requires its members to share revenues resulting from lucrative stadium deals. This problem is most egregious in the NFL, where stadium revenues remain the only principal source of unshared revenue.

Potential plaintiffs could challenge the entire system of NFL rules, arguing that the scheme unreasonably restrains and artificially channels competition among NFL owners away from an exciting product on the field and toward exploitation of local taxpayers. Taken in isolation, many of the league's individual revenue-sharing rules are probably reasonable. Television and live gate revenues often depend more on the size of the market than on the quality of the team or its management; sharing these revenues is thus fairer to both owners and fans of small market teams. Sharing also enhances the overall quality of the NFL by promoting competitive balance among clubs, by making it easier for small market teams to periodically contend for the championship (most recently demonstrated by the success of the Green Bay Packers and the Jacksonville Jaguars). However,

---

[16] *See* Valley Liquors, Inc. v. Redfield Imports, Ltd., 678 F.2d 742, 745 (7th Cir. 1982) (referring to analysis of market power by Posner, J.). For a general discussion of this point, see *supra* note 2. A variety of courts have concluded that the sports leagues that are the topic of this Article are sufficiently different from other forms of entertainment so that the dominant league exercises market power. The authoritative Supreme Court case on point is Int'l Boxing Co. v. United States, 358 U.S. 242, 251 (1959), holding that world championship bouts were in a separate market from other major professional boxing. This reasoning supports the lower court cases as well as a finding of MLB's market power. *See, e.g.*, Fishman v. Wirtz, 807 F.2d 520, 531 (7th Cir. 1986) (relevant product market is live professional basketball); Los Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1393 (9th Cir. 1984) (relevant product market is NFL football); USFL v. NFL, 644 F. Supp. 1040, 1056 (S.D.N.Y. 1986) (relevant product market is professional football), *aff'd*, 842 F.2d 1335 (2d Cir. 1988); Mid-South Grizzlies v. NFL, 550 F. Supp. 558, 571, n.33 (E.D. Pa. 1983) (same), *aff'd*, 720 F.2d 772 (3d Cir. 1983); Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (relevant product market is major league hockey).

[17] *Cf.* NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 118 (1984); United States v. NFL, 116 F. Supp. 319, 323 (E.D. Pa. 1953) (stating that stronger teams do not try to drive out weaker teams because both teams would fail).

taken together with the lack of sharing of stadium subsidies, the NFL's revenue sharing scheme may have, overall, a negative effect on incentives to efficiency—increasing live gate income, broadcast ratings, or popularity of team jackets and other paraphernalia—while maximizing incentives to inefficient conduct: threats to relocate solely to exploit local taxpayers.[18]

The potential for lucrative, unshared stadium subsidies may also act as a curb on the willingness of clubs to expand the league. This has the effect of raising the price localities must pay in terms of stadium subsidies, reducing the number of franchises in the league, and locating the franchises in a manner that may well be unresponsive to consumer preference.[19] Thus, these rules, together, fall within the Supreme Court's definition of unreasonable trade restraints in the sports area.[20] Browns/Ravens owner Art Modell would probably not have moved from Cleveland to Maryland if he personally would pocket only 1/30 of the subsidy. Less clear, he might not have moved even if he were able to keep the subsidy but would have to substitute the revenues from Baltimore's television market for the revenues from Cleveland's television market. The current situation exists only because tax subsidies are not shared, while other revenues are.

### B. Exclusive Broadcast Territories

The landmark district court decision in *United States v. NFL*,[21] established the framework for antitrust analysis of agreements among member clubs to limit competition among themselves for the broadcasting of their games into other geographic markets. First, the court found that agreements to limit the freedom of clubs to sell the rights to the telecasting of their games in markets outside the locality in which they compete constituted restraints of trade: "When a football team agrees to restrict the projection of its game in the home areas of other teams it thereby cuts itself off from this part of its potential market."[22] Second, though, foreshadowing the same conclusion by the U.S. Supreme Court over thirty years later in the *NCAA* case, the court concluded that the rule of reason was the appropriate mode of

---

[18] Recent financial data demonstrate the extent to which stadium deals, rather than offering a quality on-field product, determines an NFL club's profitability. *See* Alan Abrahamson & Sam Farmer, *New Stadiums Revealed as Mother's Milk of the NFL*, L.A. TIMES, May 13, 2001, at 1.

[19] For example, consider the lack of a franchise in Los Angeles, and the removal of a franchise from Cleveland despite enormous television ratings there, ratings that did not inure to the financial benefit of the Cleveland club.

[20] *See NCAA*, 468 U.S. at 108 ("A restraint that has the effect of reducing the importance of consumer preference in setting price and output" is inconsistent with the purpose of antitrust law).

[21] 116 F. Supp. 319 (E.D. Pa. 1953).

[22] *Id.* at 322.

antitrust analysis, even though the challenged restraints facially appeared to constitute a horizontal market division. This was due to professional sports teams' "unique" interdependence on each other. The court concluded that "it is both wise and essential that rules be passed to help the weaker clubs in their competition with the stronger ones and to keep the League in fairly even balance."[23]  Third, the court conducted a fact-sensitive rule of reason, finding that where a fledgling league, with many franchises bordering on viability, depended on each of its clubs attracting a minimum number of fans to their gate, the league could reasonably limit simultaneous broadcasts that could interfere with that essential revenue stream necessary for the continuing viability of the teams.  Thus, a "black-out" to protect live gate sales was upheld.

On the other hand, the court found that the principal purpose and effect of similar rules to prevent competition solely between rival television or radio broadcasts was not essential for the viability of the league, and served primarily to boost the profits (from exclusive rights sales) of the member clubs.  Thus, a division of territories to protect and enhance the value of the television and radio rights for each member team was found to be unreasonable.[24]

In the early 1960s, the maverick American Football League sought to challenge the dominant NFL by developing an innovative marketing scheme whereby the rights to all their games would be sold to a single network, who would then choose which games to show in each local market.  The NFL responded in kind, but the trial judge in *United States v. NFL* found that the package sale was inconsistent with the court's order in the prior case; the NFL took its case to Congress, which then passed the Sports Broadcasting Act granting an antitrust exemption for the sale of "all or any part of the rights of such league's member clubs in the sponsored telecasting of the games."[25] Although the value of this Act remains controversial,[26] it is a limited

---

[23]  *Id.* at 323.

[24]  *See id.* at 326-27 (finding unreasonable (1) "the restriction on telecasting outside games in home territories when the home teams are playing away games and telecasting them in their home territories" and (2) "the restriction of the broadcasting by radio of outside games in home territories on days when the home teams are playing at home and on days when the home teams are playing away games and are either televising or broadcasting them in their home territories").

[25]  15 U.S.C. § 1291 (2001).

[26]  As a matter of antitrust analysis, it is surely correct that the package sale of all rights raises different issues than the horizontal market division condemned in *United States. v. NFL.* Once the court rejected any necessity for the horizontal market division because of the unique needs of a fledgling league, the conclusion was clear that their principal effect was to reduce output and raise price.  A package sale may or may not have the same effect.  One can imagine factual circumstances where a package sale enhances output, because absent the package a major network will not be willing to broadcast league games.  Relatedly, a package sale might be essential to induce a network to invest in quality-enhancing technology in the production of the telecast.  Alternatively, one can imagine an extremely popular league whose member clubs

exemption, permitting leagues to restrict competition for sales only regarding collective sales to a television network. Thus, the NBA's effort to limit the then-popular Chicago Bulls from broadcasting on a superstation was found to fall outside the Act's exemption.[27] Moreover, the Act's legislative history makes it clear that the phrase "sponsored telecasting" was understood to limit the Act's scope to over-the-air television.[28]

Notwithstanding the unassailed half-century old holding in *United States. v. NFL* and the limited nature of the Sports Broadcasting Act exemption, every major league (other than the NFL, which continues to sell virtually all its rights pursuant to the Act's exemption) engages in the very restraints on competition that the court held to be unreasonable. Each league engages in broadcast restraints that significantly limit the ability of fans to watch games of teams other than those located in the geographic market where they happen to reside. Recently, the advent of satellite telecasting has permitted even greater access to "out-of-market" games. Leagues have indeed responded, each with a product that allows fans, for a significant fee, to obtain via a satellite receiver a large percentage of the total games played in the league. But that collective sale is an *exclusive* license; fans enjoy no competition for out-of-market games, and must indeed obtain this entire license regardless of whether they are fanatics interested in watching 1,000 games a year or merely dedicated expatriate fans of a single team.

Just recently, Major League Baseball extended this scheme to audio webcasting. As audio technology advanced it was possible during the 2000 baseball season to obtain live play-by-play of the local radio broadcasts of almost all Major League Baseball teams. Beginning this year, all rights have been exclusively granted to www.mlb.com, who sells the package for $9.95.

Given the likelihood of demand for a single "blanket license" for all or a large number of the league's televised games, and the recognized convenience to consumers of such a license, the package sale of a *non-exclusive* license would not appear to raise any serious antitrust problems. If consumers were able to contract for out-of-market

---

would have no difficulty selling broadcast rights to the vast majority of their games through individual negotiation, so that the effect of the package sale is output reducing.

[27] *See* Chicago Prof'l Sports Ltd. P'ship v. NBA, 961 F.2d 667, 671 (7th Cir. 1992), *vacated by* 95 F.3d 593 (7th Cir. 1996) ("[T]he Sports Broadcasting Act applies only when the league has 'transferred' a right to 'sponsored telecasting'. Neither the NBA's contract with NBC nor its contract with Turner Network Television transfers to the network a right to limit the broadcasting of other contests.").

[28] *See Telecasting of Professional Sports Contests: Hearings on H.R. 8757 Before the Subcomm. on Antitrust (Subcomm. No. 5) of the House Comm. on the Judiciary*, 87th Cong., 36 (1961) (testimony of NFL Commissioner Pete Rozelle, the principal outside witness supporting the legislation).

games on a per-team basis, for example, there would still be a market for the league's blanket license, but the price would be lower, and many consumers who are primarily interested in watching the games of a single out-of-market team would be able to obtain the desired product at vastly reduced cost.

The exclusive broadcast territories agreed to by MLB, the NHL, and the NBA are neither necessary to promote competitive balance among member teams nor to prevent any efficiency-deterring free riding. The only way in which a club's sale of their games into another geographic market could harm competitive balance would be if the additional revenue generated from these out-of-market rights fees would enable the teams to acquire enough talent to enable them to dominate the league. This scenario is implausible for a number of reasons. There is no evidence that these fees would be significant enough to affect competitive balance. More important, there is no reason why the leagues could not share these revenues, as Major League Baseball has with teams whose games are carried nationwide via locally-based superstations.[29]

As to free riding, the claim would have to be made that allowing intra-league competition for broadcast rights would so lessen the financial incentives or rewards for current teams as to reduce the quality or output of the overall league product. As the district judge held in the *Bulls* litigation, "[m]aximizing revenues and 'protecting the value' of individual team or NBA contracts are not legitimate justifications by themselves for restraining trade by limiting output."[30] The Supreme Court made clear in *Fashion Originators Guild of America v. Federal Trade Commission*,[31] for example, that rivals may not restrain trade in order to create an economic incentive for improving the quality or innovativeness of their products.[32] Thus, these exclusive territorial schemes seem highly vulnerable to antitrust attack.

---

[29] *Cf.* NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 120 (1984) (rejecting NCAA's competitive balance justification in part because of NCAA's ability to promote competitive balance by other means and absence of broadcast restrictions for college basketball).

[30] Chicago Prof'l Sports Ltd. P'ship v. NBA, 754 F. Supp. 1336, 1359 (N.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992), *vacated by* 95 F.3d 593 (7th Cir. 1996).

[31] 312 U.S. 457 (1941).

[32] *See id.* at 467-68. In *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir. 1981), the court held that the common law bar on contracts in restraint of trade did not proscribe a standard non-competition clause accompanying the sale of a company. Before enforcing the clause, however, the court carefully considered the reasonableness of the covenant, and expressly rejected the contention that "the payment of money could somehow justify an anti-competitive covenant." *Id.* at 266 (quoting plaintiff's argument). Yet this is precisely the implication of an argument that the payment of money, in the form of higher rights fees, is what makes an output-reducing market division restriction ancillary to some legitimate purpose.

### C. Rules Barring Public Ownership of Franchises

The interdependence of major league clubs on each other justifies rules requiring league approval of those who seek to possess ownership rights in the teams. Rules that ensure that teams are not owned by people who would compromise the integrity and public attractiveness of the sport, and that facilitate the selection of owners who are likely to efficiently market and operate their local franchise, are likely to increase output and make the output more responsive to consumer demand.

None of these legitimate concerns are implicated, however, in the rules or practices of each league that prohibit government ownership of franchises (or, in the case of the NFL, prohibit any widespread participation by the public as shareholders in a team.) Absent these rules, local governments might obtain equity and shareholder rights in franchises that are receiving substantial public investments or subsidies. This equity interest would both lower the amount of taxpayer exploitation (in light of escalating franchise values, the tax subsidy would be offset by the capital gain accruing to local governments who received stock in return) as well as inhibit the ability of teams to exploit taxpayers in the future—since significant stock holdings would be in the possession of those opposed to such a move.

In *Sullivan v. NFL*,[33] the First Circuit suggested that rules that limit competition in the market for control of franchises can constitute unlawful trade restraints. That case did not present the issue directly raised here. On the one hand, the league defended its rule against clubs publicly offering any of their stock as part of the league's overall policy of ensuring that each member of its joint venture was efficiently running its franchise with the best long-term interests of the sport at heart. However, the validity of this alleged purpose is severely undermined because the NFL had repeatedly let the plaintiff's family mismanage (both financially and athletically) the league's only franchise in New England without taking any steps to replace them. The league's course of behavior suggested that its ownership rules are less designed to achieve efficient stewardship of local franchises, and more designed to protect existing owners (who, after all, established the rules) from competition—either yardstick competition from more efficiently-run corporate-owned clubs, or competition within a market for corporate control for continued stewardship of their team. On the other hand, the plaintiff in the case was not really seeking to vindicate the ability of consumers or taxpayers to invest in an NFL team with its consequent privileges of participation in corporate governance; rather, he was seeking to recover from financial and operational mis-

---

[33]  34 F.3d 1091 (1st Cir. 1994).

management by raising additional capital from those who would be minority shareholders with little say in the club.

The court's recognition of the principle that there is a relevant market for the sale of ownership shares in sports league teams does, however, provide the basis for a more sophisticated challenge to the league rules. The rules not only limit the ability of member teams to sell stock to the public or to governmental units if they so desired (an output restriction), but also have anticompetitive effects in the product market by precluding an efficient means by which stadia and public infrastructure can be constructed at public expense with compensation via equity. Under *NCAA*, these effects would appear sufficient to place the burden on the leagues to demonstrate why their rules are on balance output-enhancing, a burden the leagues are unlikely to be able to carry.[34]

### D. The Single-Entity Defense

Leagues hope to preclude the challenges outlined above by seeking to persuade courts that the member clubs have formed together in a "single entity," like a corporation and its wholly owned subsidiary, that is legally incapable of conspiring with itself. Such an argument, if successful, would allow any section 1 claim to be summarily dismissed, but this argument has been rejected by the vast majority of courts to consider the issue,[35] and several of the more favorable opinions appear to confuse the single entity defense with the argument that the challenged conduct was not unreasonable.[36] More

---

[34] *See generally* Lynn Reynolds Hartel, Comment, *Community-based Ownership of a National Football League Franchise: The Answer to Relocation and Taxpayer Financing of NFL Teams*, 18 LOY. L.A. ENT. L. REV. 589, 592 (1998) (proposing community-based public ownership to purchase NFL teams and prevent them from relocating).

[35] *See, e.g.*, Los Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1388-89 (9th Cir. 1984) [hereinafter *Raiders*] (finding NFL teams do not operate as a single entity because "NFL policies are not set by one individual or parent corporation, but by separate teams acting jointly"); N. Am. Soccer League v. NFL, 670 F.2d 1249, 1257 (2d Cir. 1982) ("[T]he theory that a combination of actors can gain exemption from §1 of the Sherman Act by acting as a 'joint venture' has been rejected by the Supreme Court"); Shaw v. Dallas Cowboys Football Club Ltd., 1998-2 Trade Cas. (CCH) ¶ 72,216, at 82,397 (E.D. Pa. 1998) (requiring people to buy NFL Sunday Ticket to view games of their choice resulted from agreement among rival clubs and not from decision of NFL as single entity), *aff'd on other grounds*, 172 F.3d 299 (3d Cir. 1999); Murray v. NFL, 1996-2 Trade Cas. (CCH) ¶ 71, 479, at 77,521 (E.D. Pa. 1996) ("Action taken by the NFL, as a group, to reduce competition . . . may constitute concerted action for the purpose of establishing and antitrust violation."); Chicago Prof'l Sports Ltd. P'ship v. NBA, 874 F. Supp. 844, 849 (N.D. Ill. 1995), *vacated by* 95 F.3d 593 (7th Cir. 1996) (rejecting single entity defense because professional teams operate independently of the league). The district court judge in the *Rams* litigation also rejected the argument, but the Eighth Circuit did not need to rule on the question to affirm the judgment in favor of the league. *See* St. Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851, 864 n.9 (8th Cir. 1998).

[36] *See, e.g.*, NASL v. NFL, 459 U.S. 1074 (1982) (Rehnquist, J., dissenting from denial of certiorari) (characterizing the NFL as a single entity because the challenged conduct was a lawful ancillary restraint); San Francisco Seals v. NHL, 379 F. Supp. 966, 968-71 (C.D. Cal. 1974)

recently, leagues have reason to be encouraged by Judge Frank Easterbrook's decision in *Chicago Professional Sports Ltd. v. NBA,* (*Bulls II*)[37] remanding a challenge to output restraints adopted by the NBA for the district court to reconsider the applicability of the single entity defense. The case was subsequently settled.

Although the league's view might well prevail, it probably will not. Strong arguments can be mustered against the logic of *Bulls II*.[38] If the decision suggests that whenever firms combine to achieve efficiencies, any joint decision should be exempt from rule of reason scrutiny, this seems inconsistent with the teaching of Judge Easterbrook's mentor, Judge Richard Posner, who wrote that it "does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition."[39] If the decision suggests that a sports league venture is the economic equivalent of a single corporation like General Motors and McDonald's,[40] this ignores the fundamental difference between corporate decisions made by a Board of Directors responsible for the welfare of the entire firm and decisions by those anxious only to maximize their own profits. Finally, challenges to anticompetitive joint decisions, if well-pleaded, can demonstrate that the league structure does not constitute a legitimate single entity. Inefficient joint decisions include: (1) protecting individual owners against intra-league competition; (2) skewing competition among clubs toward taxpayer exploitation; (3) locating franchises in order to maximize individual club profits; or (4) locating franchises because of bargaining difficulties among self-interested club owners.[41]  Realistically, in light of the strong arguments against single entity status, it is unlikely that a judge, persuaded that a league is harming the public, is going find the behavior immune from antitrust analysis under the single entity doctrine.

---

(finding no claim of any injury to competition from bar on relocation of franchise to Vancouver).

[37] 95 F.3d 593 (7th Cir. 1996) [hereinafter *Bulls II*].

[38] I have elsewhere examined this in detail. *See* Stephen F. Ross, *The Misunderstood Alliance Between Sports Fans, Players, and the Antitrust Laws,* 1997 U. ILL. L. REV. 519, 549-55. For a compendium of other articles on this issue, *see id.* at 549 n.136.

[39] Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594 (7th Cir. 1984).

[40] *See Bulls II,* 95 F.3d at 598, 600 (discussing sports leagues as analogous to either "a system of franchises" or a "corporate holding company").

[41] *See id.* at 603 (Cudahy, J., concurring) (stating that "a sports league, no matter what its ownership structure, can make inefficient decisions only if the individual teams have some chance of economic gain at the expense of the league").

### E. Analysis of Other Possible Challenges to Intra-League Competition

In addition to these three viable section 1 challenges to specific anticompetitive practices, discussion of three other challenges that have attracted the attention of courts and commentators is warranted. As explained below, however, there are significant doctrinal or theoretical difficulties with each of these problems.

### 1. Restricting Competition in a "Stadium Market"

To date, courts have recognized two scenarios where a league's refusal to permit a franchise to relocate could constitute an unreasonable agreement in restraint of trade. In the *Raiders* case,[42] the court of appeals upheld a jury verdict based on evidence that the league's refusal to allow the Raiders to relocate from Oakland to Los Angeles was not based on any harm to the league or its ability to offer "the most marketable product attainable," but rather "to allow the owners to extract excess profits."[43] In particular, the court focused on evidence that the relocation was motivated by the owners' desire to protect the Los Angeles Rams from intra-metropolitan competition from the Raiders. In *Rams*,[44] the court suggested that the league would violate section 1 if the rest of the clubs had agreed that the Rams could negotiate a move from Anaheim to St. Louis and that, pending these negotiations, no other team would seek to relocate to St. Louis. Such an agreement would bear a strong resemblance to the agreement to avoid competitive bidding struck down in *National Society of Professional Engineers v. United States*.[45] Although that case involved a trade association and not a sports joint venture, there is nothing about sports leagues' unique needs that requires a league to limit bidding for a relocation to a single team. However, the court in the *Rams* case found no evidence that such an agreement existed, and rejected the argument that such an agreement could be inferred from the process

---

[42] Los Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381 (9th Cir. 1984).

[43] *Id.* at 1392. Specifically, the plaintiffs presented evidence found credible by a jury that (1) the Los Angeles market could easily support both the Raiders and the Los Angeles Rams; (2) the NFL had failed to show any harm to the league, in terms of network television exposure, regional balance, or travel costs, as justification for refusing to permit the relocation; (3) the NFL rules permitting eight owners to veto the move, combined with evidence that the Rams strongly objected, supported the conclusion that the leagues' motivation was to protect the Rams from competition rather than to enhance the quality or marketability of NFL football; and (4) the league's most persuasive argument —that it had a legitimate interest in recognizing the loyalty of Oakland fans—was undercut by its lack of any criteria for evaluating relocations and significant evidence that, in other cases, the league was willing to overlook fan loyalty in order to permit teams to credibly threaten to move unless they received public stadium subsidies.

[44] St. Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851 (8th Cir. 1998).

[45] 435 U.S. 679 (1978) (holding that canon of ethics prohibiting members of trade organization from submitting competitive bids violated the Sherman Act).

that the NFL has established in requiring prior approval for relocation. That process was similar to procedures courts had previously upheld that required clubs seeking to relocate to obtain prior league approval based on a variety of factors.[46]

In the aforementioned *Raiders* case, the court of appeals upheld a jury verdict in favor of both the Raiders club and the L.A. Coliseum. As to the latter, the jury found that the NFL's refusal to permit the relocation from Oakland to Los Angeles unreasonably restrained trade among stadia offering their facilities to NFL teams in the United States.[47] This has led some to believe that the *Raiders* case is not limited to refusals to permit relocation where the league's claimed justifications were unpersuasive and the refusal protected an existing team from intra-league rivalry.[48] The *Raiders* opinion, however, seems to require some showing that the refusal to relocate allows the owners the ability to extract excess profits. Thus, a situation in which a sports league, having decided to limit the number of franchises, adopts rules that actually *prevent* individual owners from extracting excess profits through bidding among stadium authorities, would seem to fall into the category of permissible collective action. Attorneys representing the leagues could then draw appropriate analogies between these policies and maximum price-fixing restraints, now looked upon more benignly by the Supreme Court.[49]

To show an unreasonable restraint in the stadium market, therefore, a plaintiff would have to show that the restraint allowed the owners excess profits, such as the *Raiders I* finding that the Rams were shielded from intra-city competition, or the unproven allegation in *Rams* that clubs limited have-not cities' options to bidding for only one team at a time; or in some other concrete way. Even if league rules have the effect of reducing the number of relocations, a challenge to a reasonably tailored rule designed to promote fan loyalty and efficient club management would have to prove that the rules actually barred efficient, procompetitive relocations, and that this was not outweighed by the benefit from prohibiting inefficient, monopoly-

---

[46] *See, e.g.,* NBA v. San Diego Clippers Basketball Club, 815 F.2d 562 (9th Cir. 1987) (reversing the district court's grant of summary judgment for the Clippers that the NBA rule requiring league prior approval for franchise relocation was an antitrust violation).

[47] *See Los Angeles Mem'l Coliseum,* 726 F.2d at 1393.

[48] *See, e.g.,* Robert C. Heintel, Note, *The Need for an Alternative to Antitrust Regulation of the National Football League,* 46 CASE W. RES. L. REV. 1033, 1062 n.165 (1996) (citing press reports of congressional testimony from Commissioners Pete Rozelle and Paul Tagliabue). *See generally* Gary R. Roberts, *Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry,* 32 UCLA L. REV. 219, 286 (1984) (speculating that when each team is viewed as competing in a stadium market, "the court opened a conceptual Pandora's box that threatens the league's ability to function at all").

[49] *See* State Oil Co. v. Khan, 522 U.S. 3, 15-16 (1997) (observing legitimate reasons why defendant, having conferred some economic power on retailer by limiting rivals, would want to limit a retailer's ability to exploit that power).

exploiting franchise moves.  Leagues can develop anti-relocation policies that seek to constrain the ability of owners to use leverage to exploit local taxpayers, such as rules prohibiting relocations where the current fans are loyal and supportive (in ways, such as television ratings and live gate sales, other than willingness to provide public subsidies), and rules that require a showing that the new location's desirability is based on higher demand of fans, as opposed to a more lucrative stadium deal.

### 2. *Use of Section 1 to Regulate Entry into the League*

There are considerable conceptual and remedial problems with any finding that a sports league's refusal to expand to permit a *particular* franchise to enter its joint venture constitutes an unreasonable restraint of trade.  A more plausible challenge relates to the *structure* of monopoly sports leagues that permit them to limit access and is discussed below in Part III.

*Mid-South Grizzlies v. NFL*[50] rejected a claim by the owner of the Memphis franchise in the defunct World Football League that the NFL violated the antitrust laws by refusing to admit the club to its league.  The court found that the NFL had not acquired or maintained its monopoly power unlawfully[51] and that the refusal to expand to Memphis did not contribute to its maintenance of monopoly power.  The court noted that the exclusion was actually procompetitive, by leaving the Memphis area available as the base for a lucrative franchise in a new league that could compete with the NFL.[52]  Nor did the individual NFL owners lessen competition among themselves by refusing to expand, since Memphis was not in a position to provide meaningful intra-league competition with another club.

One potential, but probably unavailing, line of attack on a sports league's refusal to expand would be through the essential facilities doctrine.[53]  The doctrine holds that rivals who operate a common facility that cannot be duplicated must grant reasonable access to the facility to excluded competitors.  For example, in *Hecht v. Pro-Football, Inc.*,[54] the court found that use of RFK Stadium was essential to permit a rival league franchise to compete with NFL's Washington franchise.

---

[50]  720 F.2d 772 (3d Cir. 1983).

[51]  This case came before the determination that the NFL had unlawfully maintained monopoly power through illegal tactics directed at a subsequent rival league. *See* USFL v. NFL, 842 F.2d 1335 (2d Cir. 1988), discussed *infra* notes 94-95 and accompanying text.

[52]  *See Mid-South Grizzlies*, 720 F.2d at 786.

[53]  *See* Thomas A. Piraino, Jr., *An Antitrust Rationale for the Expansion of Professional Sports Leagues*, 57 OHIO ST. L.J. 1677, 1692-96 (1996) (citing lower federal court cases where the courts have adopted the essential facilities doctrine).

[54]  570 F.2d 982, 992 n.36 (D.C. Cir. 1977) (citing LAWRENCE A. SULLIVAN, ANTITRUST 131 (1977)).

There are several problems with successfully persuading a court to apply this theory to expansion. Factually, it would require a showing that creation of a new league is not feasible. Especially given the antitrust preference for competing leagues, courts are going to be somewhat reluctant to throw in the towel (since any firm seeking to participate in the professional sports market will prefer to join the incumbent league rather than compete). It would also require a showing that the sharing is not impractical and will not inhibit the league's ability to serve its current fans adequately.[55] Granting extremely open access to the current major sports leagues might or might not be better for fans and local taxpayers (on the margin, the benefit of a new team to fans in an unserved area almost always exceeds the harm to teams in existing areas from having to spread player talent over a larger number of teams), but requiring the NFL to add a team in Memphis seems qualitatively distinct from requiring the NFL to allow a rival league's team to play in RFK Stadium when the Redskins are on the road. Moreover, it should be noted that the theory is not universally accepted among commentators and that the Supreme Court has never applied it in a context where the defendant's provision of access to rivals was not to be supervised by a regulatory agency.[56]

Although Supreme Court precedents do not preclude an argument that *Mid-South Grizzlies* was incorrectly decided, an expansion of existing precedent is unlikely in light of the apparent remedial problems with mandatory expansion. Even assuming that the Grizzlies could have established that the NFL was violating the antitrust laws by refusing to expand, why should the expansion necessarily have been to Memphis? The trial court's opinion in *State v. Milwaukee Braves*[57] is a sufficient negative example to demonstrate why courts are unlikely to adopt this approach. Presiding over a trial brought after the Braves relocated to Atlanta, the court acted like a public utility regulator in determining that baseball could profitably expand, that Milwaukee could support a baseball team, and that baseball must replace the Braves in Milwaukee (without considering whether other markets might be more deserving of the limited number of additional baseball teams that the court found the market would support).

---

[55] *See id.* at 992-93 ("[T]he antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately.").

[56] Although some believe that *Associated Press v. United States*, 326 U.S. 1 (1945), was an essential facilities case, the challenge was not to a generic refusal of a cooperative news service to expand, but to a specific by-law that permitted a member to exclude local rivals. For academic criticism of the essential facilities doctrine, see, e.g., Herbert Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy*, 1995 COLUM. BUS. L. REV. 1, 110.

[57] 1966 Trade Cas. (CCH) ¶ 71,738 (Wis. Cir. Ct., Milwaukee Co.), *rev'd on other grounds*, 144 N.W.2d 1 (Wis. 1966).

152        CASE WESTERN RESERVE LAW REVIEW        [Vol. 52:133

### 3. Labor Market Restraints

For most industries, a consumer-oriented antitrust policy is either unconcerned or turns a blind eye toward labor restraints. Most restraints emanate from the agreement among workers to limit competition among themselves; when workers succeed and their efforts are included in collective bargaining agreements with management (especially multi-employer agreements with management representing companies who hold a dominant share of relevant output markets), the result may have little effect on consumers, or may have a significantly adverse affect (if higher wages are passed on in the form of higher prices). The sports industry is unusual, in that its labor disputes are characterized by efforts by workers to promote competition and efforts by management to restrain it. More to the point, labor disputes in sports raise the scenario of management efforts to actually reduce the quality of their product through an inefficient allocation of labor, because the benefits that would accrue from a more attractive product are swamped by the costs of competition in the labor market. For example, rules that limit the ability of veteran players to obtain competing bids for their services or to impose a payroll cap on individual teams make it more difficult for inferior teams to quickly improve. The rules not only directly harm fans of these lousy teams, but—to the extent that next season's heightened competition between this year's champions and a re-created contender is generally exciting—for fans in general.[58] Although team owners and their defenders claim that these rules are designed to promote competitive balance and thus make the season more attractive to fans, these rules would have that effect only if they restrained teams that would otherwise be inclined to support high payrolls *and* were successful in the prior

---

[58] The fans' interest in the efficient allocation of players that a free labor market permits is *not* counter-balanced by an interest in holding down salaries because of a beneficial effect on ticket prices. High salaries do *not* cause high ticket prices; it is high ticket prices that permit owners to pay high salaries. Although the need to generate revenues to support a competitive team may explain the need for new stadia that permit revenue-generating luxury boxes and corporate suites, the ticket prices charged for ordinary seats is entirely a function of consumer demand for those seats. Most games are not sell-outs; owners choose a revenue-maximizing ticket price based on market demand. If payroll were cut in half tomorrow, there is no reason why an owner would cut ticket prices; conversely, if payroll were to increase by 50% tomorrow, owners would not be able to make up the revenue by raising ticket prices—if they could raise ticket prices without losing revenue, they already would have done so. *Cf.* Donald Turner, *Antitrust Policy and the Cellophane Case*, 70 HARV. L. REV. 281 (1956) (reviewing the antitrust implications of *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)). Ticket prices do correlate with salaries in one particular respect, but this is one consistent with the antitrust policy of having output be responsive to consumer demand. To the extent that a club's investment in a higher payroll results in a demonstrably improved club, consumer demand for tickets is likely to increase, which would allow clubs to increase prices. *Cf.* Red Smith, *The Prophet of Doom is Heard Again*, N.Y. TIMES, Dec. 14, 1980, §5, at 3 (describing how the Phillies immediately recouped an $800,000 salary paid to Pete Rose through an equivalent increase in advertising rates and a significant increase in season ticket sales).

year.[59] But these rules equally affect the New York Yankees and the Baltimore Orioles, the Colorado Avalanche and the New York Rangers, the Philadelphia 76ers and the Chicago Bulls. As a separate matter, management efforts to restrain labor market competition is of particular concern to consumers when—as has happened in the last eight disputes in Major League Baseball—the labor dispute spills into disruption of a championship season.

Ordinarily, industrial disputes are the domain of labor policy, not antitrust. Sports are extraordinary, because (a) the monopolistic structure of the industry deprives fans of any meaningful alternative when their sport is disrupted and (b) the monopsonistic structure of the industry's labor market means that antitrust intervention to prevent unreasonable restraints of trade would actually prove effective in limiting disruptions. Nevertheless, any labor restraint that is incorporated into a collective bargaining agreement with a union is exempt from antitrust challenge.[60] From sports fans' perspective, this doctrine probably makes sense; whatever benefit fans would get indirectly from a less restrictive labor market pales in comparison to the benefit of industrial peace and avoidance of work stoppages, benefits that are facilitated by permitting player unions and management to reach agreements with the assurance that the agreements will not be subject to antitrust scrutiny. In addition, however, the Supreme Court held in *Brown v. Pro Football, Inc.*,[61] that as long as a collective bargaining relationship exists, owners are constrained only by federal labor law in their ability to impose labor restraints that may have significant anticompetitive effects. The holding was based on the "nonstatutory labor exemption," a judicially-created exemption to the antitrust laws necessary to accommodate both policies concerning collective bargaining contained in federal labor law, as well as the policies promoting organization of workers into unions reflected in section 6 of the Clayton Act.[62]

---

[59] In the first case to analyze the unique nature of sports leagues, the court approved rules "to help the *weaker* clubs in their competition with the *stronger* ones," not to constrain the clubs with the highest payrolls. United States v. NFL, 116 F. Supp. 319, 323 (E.D. Pa. 1953) (emphasis added).

[60] *See, e.g.*, Wood v. NBA, 809 F.2d 954 (2d Cir. 1987) (exempting provisions governing a salary cap, the college draft, and the prohibition of player corporations); McCourt v. California Sports, Inc., 600 F.2d 1193 (6th Cir. 1979) (exempting the NHL's reserve system); Mackey v. NFL, 543 F.2d 606 (8th Cir. 1976) (exempting the NFL's Rozelle Rule because not the subject of bona fide good faith bargaining).

[61] 518 U.S. 231 (1996).

[62] As the Court explained in *Connell Const. Co. v. Plumbers & Steamfitters Loc. U. No. 100*, 421 U.S. 616, 621-22 (1975):

The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 38 Stat. 731 and 738, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-La Guardia Act, 47 Stat. 70, 71, and 73, 29 U.S.C. §§ 104, 105, and 113. These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing

*Brown* does not completely foreclose an attack on a sports league labor restraint brought by consumers or a government antitrust agency on their behalf. The Supreme Court's prior pathmarking plurality decision in *Jewel Tea* emphasized the need to accommodate both labor and antitrust policies in formulating the non-statutory labor exemption.[63] Balancing these interests to preclude a worker who has chosen to collectively bargain with fellow workers from then invoking the antitrust mandate of free competition when collective bargaining has not proven advantageous is far different from precluding a consumer with no role in collective bargaining from establishing that a labor restraint has a direct effect on the quality of output.

Nonetheless, language in this recent decision presents some formidable obstacles to governmental or consumer plaintiffs. The majority characterized the issue as whether "application [of the non-statutory exemption] is necessary to make the statutorily authorized collective-bargaining process work as Congress intended,"[64] and then answered the question in the affirmative. Although the decision can be distinguished from a consumer suit by a jurist who finds criticism of the Court's holding to be persuasive,[65] this hurdle will be difficult to surmount.

### F. Conclusion as to Conduct Restraints

The foregoing analysis suggests that several anticompetitive practices engaged in by the major North American sports leagues may be vulnerable to antitrust challenge by governmental or private plaintiffs. If reforms were required in revenue sharing rules (in the NFL), broadcast territorial restrictions, and prohibitions on public or governmental stock ownership, fans and taxpayers would see an increase in output and a decrease in price. Litigation challenging these prac-

---

and boycotts, from the operation of the antitrust laws. *See* United States v. Hutcheson, 312 U.S. 219 (1941). They do not exempt concerted action or agreements between unions and nonlabor parties. Mine Workers v. Pennington, 381 U.S. 657, 662 (1965). The Court has recognized, however, that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited, non-statutory exemption from antitrust sanctions. Meat Cutters v. Jewel Tea Co., 381 U.S. 676 (1965).

[63] *See Meat Cutters*, 381 US. at 689-90 (White, J., plurality opinion). Justice White noted that the "crucial determinant" was the agreement's "relative impact on the product market and the interest of union members." *Id.* at 690 n.5.

[64] *Brown*, 518 U.S. at 237.

[65] *See, e.g.*, Stephen F. Ross and Robert B. Lucke, *Why Highly Paid Athletes Deserve More Antitrust Protection than Ordinary Factory Workers*, 42 ANTITRUST BULL. 641, 642-43 (1997) (criticizing the *Brown* decision as improperly accommodating antitrust and labor policies in a manner inconsistent with prior precedents).

tices therefore deserves serious consideration by antitrust enforcers and the plaintiffs' bar.

Ultimately, however, fans remain subject to significant exploitation by sports leagues because of the absence of reasonable substitute products. Eliminating various forms of restraints on intra-league competition cannot remove the inevitable disincentive for sports leagues to expand to an optimal number of franchises. As noted in the prior section, precedents appear to make it very difficult to challenge league labor market restraints, even when these restraints *reduce* competitive balance and present a less attractive product on the field in order to lower costs and boost profits. The quest for monopsony power in the labor market also enhances the likelihood of profoundly anti-consumer work stoppages engineered by owners. Conduct restraints also fail to address the lack of a marketplace correction for owners who inefficiently manage their clubs, or efficiently choose a profit-maximizing strategy of holding down costs and providing a suboptimal product—such as the Montreal Expos' practice of spending less on players than it received in revenue sharing, or the perennial lack of success of the Chicago Cubs, secure in the knowledge that their place in a monopoly league is guaranteed. To address any of these issues, structural changes need to be considered.

## III. APPROPRIATE AREAS OF ANTITRUST INTERVENTION: STRUCTURAL REMEDIES

The fundamental cause of consumer exploitation in the sports industry is the monopoly power possessed by the clubs in each sports league. Barriers to entry make new entry a plausible but unrealistic option.[66] This part of the Article analyzes structural changes that would lessen clubs' monopoly power. The Article considers two alternative structural remedies: (1) the reorganization of existing monopoly leagues into competing joint ventures with narrow limits on permissible inter-league cooperation, or (2) the requirement that the leagues develop a system permitting reasonable entry of new teams into their joint venture. As to the latter proposal, the most feasible and likely means of compliance with such a requirement would be to adopt the international system of promotion to and relegation from the major leagues based on on-field performance. As to each alternative, the remedy is briefly described, the economic benefits are con-

---

[66] *See, e.g.,* Roger G. Noll, *Major League Team Sports, in* THE STRUCTURE OF AMERICAN INDUSTRY 378, 379 (W. Adams ed., 5th ed. 1977) (stating that the "possibility of a new league being organized is not a tight check on the monopolistic position of teams and leagues" because of problems achieving minimal viable scale, obtaining quality players, and other start-up costs); Thomas A. Piraino, *A Proposal for the Antitrust Regulation of Professional Sports,* 79 B.U. L. REV. 889, 896-98 (1998) (describing the high barriers to entry and stating "the owners of professional sports franchises collectively hold monopoly power within each sport.").

sidered, and the legal arguments necessary to persuade a court to implement such a remedy are analyzed.

## A. Divestiture[67]

The typical antitrust remedy for monopolization is divestiture. In theory, a divestiture has the salutary benefits of restoring competition to the relevant market and sparing courts the need to engage in ongoing judicial supervision of an industry.[68]  In the sports context, a divestiture would require at a minimum that there be 2-3 rival leagues in each sport.  These entities would be permitted (and perhaps, at the outset, required) to agree with each other on a championship game, international development of the sport, or other matters where industry-wide cooperation is procompetitive.  However, absolutely no inter-league collusion would be tolerated concerning the number and location of franchises within each league, television contracts, or labor rules.[69]

### 1. Economic Benefits of Divestiture

The divestiture remedy would likely be effective in significantly alleviating the consumer harms outlined in Part I of this Article.  Leagues would not be able to maintain a sub-optimal number of franchises—if the National Football League failed to expand into a

---

[67] The following summarizes and updates the analysis detailed in Ross, *supra* note 9.

[68] Remedies in Sherman Act cases should end the unlawful conduct, prevent its recurrence, and undo its anticompetitive consequences. *See, e.g.*, National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697 (1978) (affirming an injunction prohibiting the professional society from issuing any policy or guideline that competitive bidding is unethical); United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 326 (1961) (stating that divestiture is the most drastic but most effective remedy); Int'l Salt Co. v. United States, 332 U.S. 392, 401 (1947) (noting the purpose of civil remedies is to "pry open to competition a market that has been closed by defendants' illegal restraints"). Divestiture is "simple, relatively easy to administer, and sure." *du Pont*, 366 U.S. at 330-31. Divestiture has long been used to remedy monopolization violations of section 2. *See, e.g.*, United States v. United Shoe Mach. Corp., 391 U.S. 244 (1968); United States v. Crescent Amusement Co., 323 U.S. 173 (1944); United States v. Am. Tobacco Co., 221 U.S. 106, 187-88 (1911); Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 79 (1911).  In *Crescent Amusement*, for example, the Supreme Court upheld a divestiture when an exercise of power by a combination violated the Sherman Act and its continued existence created a "tempting opportunity" for further anticompetitive conduct. 323 U.S. at 189. As the Supreme Court has explained, a divestiture should "(1) put 'an end to the combination or conspiracy when that is itself the violation'; (2) deprive 'the antitrust defendants of the benefits of their conspiracy'; and (3) 'break up or render impotent the monopoly power which violates the Act.'" Int'l Boxing Club of N.Y., Inc. v. United States, 358 U.S. 242, 253 (1959) (quoting Schine Chain Theatres v. United States, 334 U.S. 110, 128-29 (1948)).

[69] A complex and difficult question arises as to whether player unions could choose to engage in post-divestiture multi-employer bargaining and whether such a choice would be exempted from antitrust scrutiny under the labor exemption.  Representatives of the Major League Baseball Players Association, however, have suggested in the past that it would be extremely unlikely that they would agree to multi-employer bargaining with competing leagues. In any event, this Article focuses on the imposition of collusive labor market restraints that do not arise in the context of multi-employer bargaining permissible under federal labor law.

viable local market, the American Football League would certainly do so. Although clubs may be able to capitalize on "brand loyalty" to obtain some stadium subsidies from the local government in their current location, their ability to use the threat of relocation will be significantly blunted in three related respects. First, most truly viable open markets will disappear as rival leagues expand. Second, in open markets realistically capable of supporting only one major league club, the willingness of taxpayers to provide subsidies to attract a major league term will be significantly diminished as rival leagues compete to become *the* new entrant in the market.[70] Third, the home crowd will be less willing to provide subsidies to keep their current team if they know that (a) there is no rival city keen to subsidize a relocation and (b) if the home team moves, an expansion team from another league may well be forthcoming.[71]

Although the significant brand loyalty developed by existing clubs means that entry is not costless and risk-free, the ability of club owners to engage in business practices that increase profits at the expense of responsiveness to consumer demand would be significantly inhibited by the ability of rival leagues to add franchises to compete with established clubs—most likely by directly competing with established clubs in large metropolitan areas (*e.g.*, a new team in Brooklyn or the San Fernando Valley) or indirectly competing by adding a new club in the same region (*e.g.*, a team in Columbus if Cincinnati or Cleveland were faltering), and even in extreme situations by directly competing in small markets for the eventual natural monopoly in that local market.[72] If one league becomes significantly imbalanced, so that certain teams do not have a "regularly recurring reasonable hope of reaching post-season play,"[73] rival leagues can exploit this imbalance—both by entering new clubs in local markets of the cellar-dwellers, and by reaping larger television ratings nationwide for their more-exciting championship seasons. If one league persists in tolerating inefficient management in a significant market so that its product is degraded,[74] this creates opportunities for rival leagues. Of

---

[70] The saga of the Houston Oilers/Tennessee Titans illustrates this point. The Oilers were founded in 1959 as part of the maverick American Football League. At the same time, the incumbent NFL had awarded one of its own franchises to Houston. The market was insufficient to support two teams, so the Oilers prevailed by offering to spend money to refurbish a local stadium (the NFL franchise went to Minnesota). Four decades later, with no rival league to engage in bidding, the same team owner relocated the franchise to Tennessee for nearly $250 million in subsidies. *See* HOUSTON POST, Oct. 30, 1959, §5, at 2; Gordon Forbes, *Oilers Ready to Pull Trigger on Move*, USA TODAY, Nov. 2, 1995, at 4C.

[71] For this reason, at least three leagues might be preferable.

[72] *Cf.* Union Leader Corp. v. Newspapers of New England Inc., 284 F.2d 582, 584 n.4 (1st Cir. 1960) (stating that even in natural monopoly markets, the public has an interest in competition, "even though that competition be an elimination bout").

[73] The phrasing is from a recent report of outside experts commissioned by Major League Baseball owners. Richard C. Levin et al., The Report of the Independent Members of the Commissioner's Blue Ribbon Panel on Baseball Economics 5, *at* http://www.mlb.com/mlb/downloads/blue_ribbon.pdf (July 2000).

product is degraded,[74] this creates opportunities for rival leagues. Of course, constant entry and re-shuffling of major leagues is not the most likely scenario—rather, the threat of entry is likely to impel existing clubs in a reorganized structure of competing leagues to conform their business practices to consumer demand.

Rival leagues would dramatically increase competition, and prevent further consumer exploitation, in the broadcasting market.[75] Absent inter-league collusion, each league would face considerable pressure to appeal to out-of-market fans by providing attractive packages of games without regard to territorial exclusivity. Each league would face considerable competitive pressure to maintain their broadcasts on over-the-air television, a matter of concern in light of the proliferation of games now solely available on a pay-per-view basis in Europe,[76] and suggestions by astute observers that the future for American sports lies in that direction.[77]

Rival leagues would also significantly inhibit consumer victimization through labor stoppages. Player unions would likely find it in their interest to individually bargain with each league and, if at a labor impasse, to strike one league while continuing to play for the other leagues. This tactic would make it more likely for compromises to be reached; even if season-disrupting strikes were to occur, fans of struck or locked-out clubs would at least have the benefit of being able to watch telecasts from other major leagues.

### 2. *Legal Theories to Support a Divestiture Remedy*

Although divestiture would provide significant benefits to consumers, and thus would make sound competition policy to be effectuated through specific legislation,[78] plaintiffs would probably need to

---

[74] Unlike typical "franchises," because sports leagues are run by the club owners and not a single independent entity, club owners face no threat of expulsion from the league for mismanagement and even voluntary central-league efforts to remove an owner only occur in the most egregious cases, such as Cincinnati Reds owner Marge Schott's erratic personal behavior (including blatantly racist comments) or Philadelphia Eagles owner Leonard Tose's significant non-sports gambling debts. Only a league run by club owners in their own interests would tolerate the continuing ineptitude of Los Angeles Clippers' owner Donald Sterling. *See, e.g.*, Richard Hoffer, *The Loss Generation*, SPORTS ILLUSTRATED, April 17, 2000, at 58 ("[The Clippers'] helplessness, so practiced and so dependable, is clearly the work of just one man—we're thinking of Donald Sterling here.").

[75] At least for baseball, football, and basketball. Hockey ratings may be too small in the United States to benefit from inter-league competition, although such competition would clearly benefit consumers for the other reasons detailed in this part, and, although beyond the scope of this article, benefit Canadian consumers.

[76] *See* Stefan Szymanski, Sport and Broadcasting 11 (Oct. 2000) (mimeograph, on file Imperial College Management School).

[77] This was one of the major insights made by former baseball commissioner Francis (Fay) Vincent at a recent symposium on contemporary issues facing baseball at Cardozo Law School.

[78] *See* Ross, *supra* note 9.

prove willful monopolization or conspiracy to monopolize in violation of the Sherman Act to secure a court-ordered divestiture. Governmental or private plaintiffs can muster some strong arguments to demonstrate monopolization, although substantial obstacles exist to such a finding.

### (a) Major League Baseball

The history of baseball provides strong evidence that Major League Baseball both unlawfully conspired to restrain trade, and willfully acquired and maintained monopoly power, in violation of the Sherman Act. As the nineteenth century closed, the National League was recognized as the sole "major" league of baseball, created as the first closed league with fixed schedules and contracts. In 1901, they faced their first serious rival as Ban Johnson transformed the minor Western League into a major American League and began competing for players and consumer patronage. Vigorous rivalry was ended in 1903 through a "Peace Agreement" that gave the American League co-equal status and collusively ended all rivalry between the leagues.[79] In 1914, an innovative Federal League was created, designed to take advantage of severely exploitive labor restraints agreed to by National and American League owners and to attract fans through new stadia (including what is now known as Wrigley Field in Chicago). The league was crushed, however, first by a series of predatory tactics, and finally (when federal judge Kenesaw Mountain Landis simply refused to grant any relief in an antitrust suit filed against the National and American Leagues) by a settlement.[80] After World War II, clubs in the Mexican League began to compete in the labor market, with some speculation that if successful the league might locate additional clubs in the United States; this competition was also crushed through an agreement among National and American League owners to blacklist any player who jumped to the rival league.[81] The last serious potential entrant who sought to compete with the National and American Leagues was the legendary Branch Rickey, who developed a Continental League in the late 1950s. His efforts to compete were shackled by a sudden decision of the established leagues to expand for the first time ever, into four of the eight markets where Rickey planned to establish clubs, as well as by the established leagues' maintenance of agreements with minor league

---

[79] *See* THE BASEBALL ENCYCLOPEDIA 15 (Macmillan, 10th ed. 1996).

[80] *See* Lionel S. Sobel, PROFESSIONAL SPORTS & THE LAW 4 (1977) ("The so-called 'Peace Agreement' was in reality a death certificate, for it provided that the American and National Leagues were to pay the owners of Federal League teams $600,000 to dissolve it."). For a complete discussion of the rise and fall of the Federal League, see *id.* at 1-7.

[81] *See id.* at 7-19.

clubs that unlawfully foreclosed any new entrant from attracting sufficient players to compete meaningfully.[82]

Under established antitrust precedents, each of these acts constitutes Sherman Act violations. Even before passage of the strengthened anti-merger provisions of section 7 of the Clayton Act, it was illegal to agree to merge a market's two firms into a single monopolist.[83] Maintaining a monopoly through business practices whose profitability depends on successfully excluding rivals is the essence of willful monopolization in violation of section 2.[84] Entering into exclusive agreements that prevent entrants from obtaining inputs (in this case labor) necessary to compete constitutes an unreasonable restraint of trade under §1 and monopolization under section 2.[85]

The major legal obstacle to relief is the Supreme Court's 1972 decision in *Flood v. Kuhn*,[86] which rejected an antitrust challenge to baseball's traditional reserve clause limiting competition for players' services. The five-justice majority justified its decision by referring to baseball's "unique characteristics and needs" and Congress' "positive inaction" in failing to legislatively overturn two previous decisions holding baseball exempt from the Sherman Act.[87] The case for why the Supreme Court should reconsider this decision in a properly pleaded case has been detailed elsewhere[88] and will only be summarized here. In short, *Flood* was a context-specific case where the majority concluded (1) that the reserve clause was a special characteristic essential to the continuation of our National Pastime, (2) that the antitrust laws as they were interpreted as of the early 1970s would have condemned this essential labor restraint as per se illegal, and (3) that Congress shared the justices' views on these matters. In light of recent standards the Court has established for reconsidering statutory interpretation precedents that experience has shown to be inconsistent

---

[82] *See* Ross, *supra* note 9, at 719-21.

[83] *See* N. Securities Co. v. United States, 193 U.S. 197 (1904) (prohibiting the merger of the Great Northern and Northern Pacific Railway companies, which had competing and substantially parallel lines from the Great Lakes and the Mississippi River to the Pacific ocean at Puget Sound).

[84] The Supreme Court has said that a defendant's conduct is characterized as illegally predatory when it attempts "to exclude rivals on some basis other than efficiency." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) (citing ROBERT H. BORK, ANTITRUST PARADOX 138 (1978)). Absent natural monopoly markets, conduct that is only profitable if monopoly profits can be recouped is not efficient.

[85] *See* United States v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945) (providing a classic example where Aluminum Co. (ALCOA) formed contracts to deny its rivals the use of water). In the sports context, the use of contracts to preclude rivals from access to players was expressly enjoined in *Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F. Supp. 462 (E.D. Pa. 1972).

[86] 407 U.S. 258 (1972).

[87] *Id.* at 282-84.

[88] *See* Stephen F. Ross, *Reconsidering* Flood v. Kuhn, 12 U. MIAMI ENT. & SPORTS L. REV. 169 (1995).

with social welfare,[89] plaintiffs could establish that (1) since 1973 it
has become clear that a reserve clause is not essential for the con-
tinuation of our National Pastime, (2) in light of the *NCAA* decision,
the antitrust laws will be interpreted in a flexible manner to permit
any procompetitive agreements that clubs owners need to promote
their product, and (3) Congress has no "positive" view on the con-
tinuation of the antitrust exemption.[90]

Plaintiffs wishing to pursue a claim against Major League
Baseball would be well advised to carefully craft a complaint that
provides a judge with as many damaging factual allegations against
Major League Baseball as possible, so that judges reviewing a motion
to dismiss the claim under Federal Rule 12(b)(6) for failure to state a
claim, in light of *Flood*, will have to accept these facts as given.
Plaintiffs should also rely upon the procedural precedent in *Flood*
itself, where the district judge, prior to reaffirming baseball's exemp-
tion, recognized that the continued vitality of the exemption was fact-
based and thus a full trial was required.[91]

---

[89]  *See, e.g.,* Patterson v. McLean Credit Union, 491 U.S. 164, 174 (1989).

[90]  Several years ago, legislation reported by the House Judiciary Committee concerning
player restraints was accompanied by a report that sharply criticized baseball's exempt status
and emphasized that the failure to propose broader legislation was due to the press of legislative
business and was not an endorsement of judicial precedents. H. R. REP. No. 103-871, at 14-15
(1994). Although this legislation was not acted upon by the Senate, Congress subsequently did
enact the Curt Flood Act of 1998, providing without changing the antitrust laws in any other
way, that agreements among owners relating to major league baseball players are subject to
antitrust scrutiny. 105 Pub. L. No. 297, 112 Stat. 2824 (1998). When the Curt Flood Act was
being considered, sponsors of the legislation also made clear that the legislation had no effect,
one way or the other, on the applicability of a judicial exemption for franchise relocation deci-
sions. *See* 144 CONG. REC. S 9621-01 (daily ed. July 31, 1998) (remarks of Senators Hatch,
Leahy, and Wellstone). These sponsors' statements are particularly reliable indicators of con-
gressional intent. Not only do these statements match the best reading of the text of the statute
(Section 27 of which provides that "[N]o court shall rely on the enactment of this section as a
basis for changing the application of the antitrust laws to any conduct . . . other than [labor
restraints]"), but the statements took place in the context of Senate consideration of the legisla-
tion under unanimous consent procedures. Senator Wellstone was concerned about pending
litigation brought by the Minnesota Attorney General against baseball. *See* Minn. Twins P'ship
v. Minn., 592 N.W.2d 847 (Minn. 1999), *cert. denied*, 528 U.S. 1013 (1999) (finding that the
Minnesota Twins' attempts to relocate the team was exempt from state and federal antitrust
laws). Had he not received assurances that the ordinary meaning of the text did not prejudice
this case, his objection to further proceeding would have killed the legislation.

[91]  *See* Flood v. Kuhn, 312 F. Supp. 404, 406 (S.D.N.Y. 1970) ("To obtain a clear view,
the proper judicial course requires . . . full consideration of all the facts best adduced at trial.").

In addition to the perceived need to protect an essential characteristic of baseball neces-
sary for the sport's continued existence, *Flood* also expressed a concern that courts are ill-
equipped to apply antitrust laws to baseball, because overturning baseball's exemption may
arguably subject owners unfairly to treble damage liability for conduct they assumed to be law-
ful, and that the more open procedures giving all interested parties the ability to participate, such
as those provided through congressional hearings, provides a superior means of determining the
public interest in baseball regulation. *Flood*, 407 U.S. at 279 (citing Radovich v. NFL, 352 U.S.
445, 450-52 (1957)). It is not clear whether these concerns are independent of, or simply sup-
plementary to, the Court's primary concerns with protecting baseball's unique and essential
characteristics from the rigid review of contemporary antitrust doctrine. For example, the Court

### (b) National Football League

Although the NFL is subject to the antitrust laws,[92] securing a divestiture order raises its own special problems. The NFL initially established itself as the single major football league, and then fended off a challenge after World War II by the rival All-American Football Conference ("AAFC"). Many believe that the AAFC caused its own demise by permitting the Cleveland Browns to dominate the league. The NFL faced a more serious rival with the entry of the American Football League in 1960, and returned to monopoly power in 1966 following a merger with the rival league. Such a merger, of course, would violate section 1 of the Sherman Act, except that Congress expressly exempted the merger from the antitrust laws by adding an amendment to pending tax legislation permitting mergers of any two football leagues organized as "business leagues" under the relevant provision of the Internal Revenue Code, where the effect (because of promised expansion) would be to increase the number of teams in the sport.[93]

Two subsequent rivals, the World and United States Football Leagues, also proved unsuccessful. In *USFL v. NFL*,[94] the court affirmed a jury's conclusion that the NFL had maintained its power through unlawful tactics aimed at its upstart rival. Although injunctive relief in that case was denied because the jury was also persuaded that the upstart league had committed so many economic blunders that its damages were only one dollar, the Second Circuit also concluded that "Congress has authorized the NFL's single-league structure."[95] This *dicta* was based on a facial reading of the text of the statute, which provides an exemption for the merger between *any* two football leagues who are organized consistent with certain provisions of the Internal Revenue Code. Although a judge could order the NFL

---

had little difficulty in acting to overturn its exemption for insurance in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), despite even more severe retroactivity problems raised by the government's decision to proceed via criminal indictment. If these concerns were overriding, however, pursuing a divestiture order from the Federal Trade Commission would be a viable option. A finding that baseball's owners have engaged in unfair methods of competition in violation of section 5 of the FTC Act would not subject them to treble damage liability, and the FTC has the flexibility in the pre-complaint stage to use hearings and a wide variety of procedures to accommodate all parties.

[92]    *See* Radovich v. NFL, 352 U.S. 445, 451-52 (1957) (deciding not to exempt the NFL from antitrust laws because the Court did not intend to extend exemptions broadly and because "the volume of interstate business involved in organized professional football places it within the provisions of the Act").

[93]    *See* Pub. L. No. 89-800, § 6(b)(1), 80 Stat. 1515 (1966) (codified at 15 U.S.C. §1291) ("[Antitrust] laws shall not apply to a joint agreement by which the member clubs of two or more professional football leagues, which . . . combine their operations in expanded single league so exempt from income tax, if such agreement increases rather than decreases the number of professional football clubs so operating.").

[94]    842 F.2d 1335 (2d Cir. 1988).

[95]    *Id.* at 1379.

to re-organize itself in a manner so that it could not take advantage of this special provision, this special congressional statute might be considered fatal to a claim of divestiture, no matter how outrageous the NFL's conduct in maintaining a monopoly.

### (c) National Basketball Association and National Hockey League

These two leagues are discussed together because the analysis applicable to both leagues are similar—their liability is based on the willful maintenance of monopoly power through exclusionary conduct in fending off the rival American Basketball Association ("ABA") and World Hockey Association ("WHA") by engaging in a bidding war for players predicated on the maintenance of monopoly power. Although this conduct occurred several decades ago, there is no statute of limitations on suits for injunctive relief.[96] Plaintiffs pursuing this theory would demonstrate that the established leagues matched salary offers made by a new league, for whom a few top stars were more valuable because of their ability to demonstrate the new league's viability, even though the salaries were not anticipated to permit profitable operations.[97] An established firm expecting to compete over the long term would not normally try to match a rival determined to pay unremunerative salaries. Eventually, the rival would either go out of business, or, once their credibility had been established in the market, cease bidding sums that couldn't be recouped. As two economists examining the issue for the U.S. Senate at the time of a proposed merger of the NBA and its ABA rival explained:

> By offering to pay higher salaries, the NBA could force the ABA to assume a payroll that precluded a chance for profit, or could relegate the league to minor league status. Some players might even be offered more than their expected contribution to team revenues—just as in the days of predatory price cutting some goods were sold at prices below cost—since high salaries would lead to higher future profits if they contributed to the financial demise of the competition.[98]

---

[96]  *Cf.* United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586 (1957) (action filed in 1949 challenging stock interest in General Motors Corporation acquired in 1917-1919).

[97]  In economic terms, the argument is that, in order to establish legitimacy as a major league, the marginal revenue product of top players was higher for ABA and WHA teams than for their established NBA and NHL counterparts. If the evidence does indeed establish that NBA and NHL clubs were losing money, this would suggest that they were paying salaries in excess of marginal revenue product, which is the buyer-side of equivalent of P<MC, the hallmark of predation. I thank Steven Salop for helpful comments in this regard.

[98]  *Professional Basketball: Hearing Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary on S. 2373,* 92d Cong., 2d Sess. 368 (1972) (testimony of Roger Noll and Benjamin Okner).

Because the NBA and NHL conduct seems premised on their expectation of an ability to recoup monopoly profits later, a practice of paying salaries that bore no relationship to revenues arguably constitutes monopolization.[99] The systematic and predatory spending by a monopoly joint venture, described above, is distinguishable from the garden variety hiring of talent that may create monopoly power in a particular localized market. In the latter case, concerns about how truly "unique" talented employees are, and the desire to allow an individual to work where they please, may well trump antitrust concerns.[100] Rather, this case more closely resembles the exclusionary practice of raising rivals costs—the strategy of sacrificing short-term profits (in this case through higher payrolls) in order to impose higher costs on rivals, so that the rivals' ability to effectively compete is significantly impaired.[101]

A city or consumer group, using the initial experience with the AFL as an example, could argue today that, had the NBA and NHL not engaged in strategic and exclusionary spending, the rival league would have survived and would be in competition for stadium rentals and franchise relocation. Because the plaintiff suffered injury resulting from the league's willful maintenance of monopoly power, relief under section 2 is a plausible strategy.

### 3. Conclusion As to Divestitures

The creation through divestiture of rival leagues would prevent monopolist club owners from engaging in many of the business practices that exploit consumers and taxpayers. The price of maintaining a local club (through stadium subsidies) would go down, the number of franchises would increase, the quality of competition would not be diminished by efforts to monopsonize the labor market, and the number of games telecast via over-the-air television would increase. Strong legal arguments can be made that each monopoly league has engaged in willful monopolization in violation of the Sherman Act,

---

[99] At the time the WHA sought to enter the market, the NHL was also engaged in illegal monopolization through the structure of its contracts with players. However, their enforcement of these contracts was preliminarily enjoined. *See* Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F. Supp. 462 (E.D. Pa. 1972). The WHA was able to obtain many talented players. Eventually, the WHA went out of business, like the ABA.

[100] *Cf.* 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW § 702b, at 142 (1996) ("[Talent] should flow to occupations in which it can be used most profitably, and we greatly value the individual's freedom to enjoy whatever employment opportunities the market offers.").

[101] *See* Thomas Krattenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Cost to Achieve Power Over Price*, 96 YALE L.J. 209, 214 (1986) (analyzing how "firms can attain monopoly by making arrangements with suppliers [in the sports context, this would be players] that place their competitors at a cost disadvantage [in some cases] sufficient to allow the defendant firm to exercise monopoly power").

warranting the judicial relief of divestiture. However, there are substantial obstacles, especially in the case of Major League Baseball with precedents recognizing a judicially-created antitrust exemption, and the National Football League, with its special merger-authorizing statute. Thus, antitrust enforcers and consumer advocates may want to consider legislative advocacy to achieve divestiture as another viable approach to protecting consumers.

In addition to these legal obstacles, there also remains an obstacle of conceptual inertia—the reluctance of judges and policymakers to enact a structural reform for which there is no clear precedent. As has been detailed elsewhere,[102] the historical fact that competing leagues have never existed for any extended period of time can be best explained by the success of dominant leagues in the use of predatory tactics. Thus, to suggest that competition can't work in sports is arguably like suggesting that, had the Justice Department never broken up Standard Oil, that competition was unworkable in the oil industry simply because John D. Rockefeller and his successors were able to crush all new entrants. Nor is the unarguable public quest for a single "champion" at the end of the season sufficient ground to reject rival leagues, for a well-crafted divestiture order can easily accommodate this concern by permitting inter-league cooperation on a World Series, Super Bowl, or playoff to determine the year's possessor of the Stanley Cup.[103] However, recognizing the potential legal and political difficulties with a divestiture, another important structural reform is considered below.

## B. Open Competition in League Sports[104]

North American sports leagues are closed: membership of the league is controlled by existing members, who typically only grant the right of entry in exchange for a substantial fee. This structure is not inevitable; indeed, it is not common in most of the world. Elsewhere, sports leagues are typically open: membership of the league is contingent on success, and every year the worst performing teams are relegated to the next lowest division and replaced by the best performing teams from that division. Another form of structural relief likely to reduce monopolistic exploitation and increase consumer welfare would be to require a system of promotion and relegation in North American sports leagues.

---

[102] *See* Ross, *supra* note 9, at 717-33.

[103] Allowing all major league clubs in a post-divestiture regime of rival leagues to still compete for a national championship should be adequate to resolve concerns that network externalities inevitably make larger sports leagues more attractive. *Cf.* Piraino, *supra* note 53, at 1692-96 (discussing the essential facilities doctrine).

[104] This portion of the Article sketches the argument in favor of this structural reform detailed in Szymanski & Ross, *supra* note 14.

*1. Description of the Legal Remedy*

Procedurally, the incumbent leagues should be given the initial opportunity to present a plan that maximizes their legitimate efficient goals while complying with a requirement that grants new entrants reasonable access to the major leagues. Such access must allow a new entrant who makes skillful business and sport-related decisions to be in a position to viably compete in the top-tier league within two years.[105] Although an antitrust tribunal should not (absent an unwillingness of the defendant leagues to cooperate) mandate the form that reasonable access should take, it is likely that sports leagues would select a model roughly maintaining the existing major league as the top-tier league and adding one or two junior leagues, the lowest tier featuring easy entry. The creation of a junior league without significant obstacles to entry, combined with the ability to gain promotion to higher-tier leagues based on success, is the most efficient way to determine the clubs that should constitute the top-tier in the sport. In order to meet the standard of meaningful entry within two years, reasonably open entry must be available no lower than a "third division" within the sport.[106]

Although continuing supervision of the operation of a promotion and relegation system will be minimal, antitrust tribunals will need to ensure that incumbent clubs are not able to maintain economic power through unduly restrictive criteria for club ownership or stadium size. In addition, standard application of the antitrust proscriptions on foreclosing agreements are necessary to ensure that new clubs can obtain necessary personnel and have access to markets in order to make their entry timely, likely, and effective.

*2. Economic Effects of Open Competition*

Open competition would significantly inhibit the ability of club owners to exploit fans and taxpayers through threats of relocation. The ability to enter would also benefit millions of fans in markets now not served by major league clubs, or under-served by limits on the number of teams in the league. It would increase the quality of competition for sports fans in several respects. First, it would in-

---

[105] The time period is borrowed from the government's definition of open entry in its Horizontal Merger Guidelines. *See* DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES § 3.2 (1992) (rev. ed. 1997).

[106] The specific definition of open entry will need to be specified for each sport. In general, it should be designed to attract sufficient viable entry to create the realistic potential of preventing the monopolistic practices of the established teams. In baseball, for example, a club that sought entry into the open division by a fixed date in the fall (to allow sufficient time for scheduling the season) might be admitted on a showing that they have secured a stadium with a minimum seating capacity of 15,000 and have the financial resources to ensure operations, including a player payroll of $10 million per year, for at least three years.

crease the incentive for current major league clubs to invest in quality player talent, in order to avoid relegation. Second, it would provide a new aspect of each competitive season, as fans not only follow close races among the league leaders but races among the lesser teams in the league to avoid relegation. Third, it would provide fans with an entirely new level of competition, clearly superior to minor league sport as played in North America today—a competition inferior to major league play, but where clubs vie for promotion to the major leagues, which itself will create tremendous fan interest.

Although this structure will not provide all the economic benefits of divestiture, it can facilitate the erosion of monopoly power in other areas as well. The ability to enter markets now protected by exclusive territorial agreements can erode the significant monopoly power that clubs enjoy—especially clubs in major metropolitan markets. Although brand loyalty will allow the New York Yankees to reap significant profits, for example, they will be inhibited from shifting telecasts to premium cable or pay-per-view if new clubs are begun in Brooklyn, New Jersey, and Connecticut, especially if any of these new clubs are promoted to the major leagues.

### 3. Legal Theory

The best argument to secure a remedial order requiring an open-league structure for North American sports leagues is to establish that the current agreement among club owners to operate their leagues with a closed structure is in itself an agreement that unreasonably restrains trade in violation of section 1 of the Sherman Act. The agreement to operate as a closed league forecloses competition in two important respects. First, existing clubs have agreed to exclude potential rivals for stadium subsidies and other benefits now obtained through relocation. Second, because in an open-league structure all teams would compete each year against each other to remain in the major league, the decision to operate as a closed league constitutes an agreement to foreclose competition among existing clubs.

Admittedly, because this precise challenge has never been considered in the United States, there are no American precedents directly on point. Obviously, an agreement among firms that have never competed against each other in a relevant market not to do so in the future is as much a horizontal agreement in restraint of trade as an agreement by current rivals to cease competition.[107] Moreover, the Australian courts have found that their statutory prohibition against anticompetitive agreements among competitors was violated by

---

[107]  *See* Palmer v. BRG of Ga., Inc., 498 U.S. 46 (1990) (holding that agreement between competing providers of bar review courses violated the Sherman Act).

agreements to restrain competition among clubs to remain in a top-tier league.[108]

Although plaintiffs can establish that the agreement to maintain a closed league structure is an agreement among rivals to eliminate competition among themselves and with potential rivals, this is only the beginning of the inquiry. *NCAA* recognizes that the nature of sports leagues requires a more careful analysis of the restraints, so some form of a rule of reason analysis is required here. The test is whether output is lower, prices are higher, and demand less responsive to consumer preferences than would otherwise be the case.[109]

The economic analysis set forth above demonstrates that the operation of a closed-league structure does indeed have these anti-competitive effects. In an open league structure, the output for each sport would increase in quality and quantity, as many new franchises would form with the hope of potential promotion to the major leagues. The price that consumers and taxpayers pay in the form of tax subsidies will decline, for these subsidies will not be necessary to attract or retain sports franchises when a reasonable substitute can be built from scratch. In major metropolitan markets, ticket prices may even be constrained by the alternative of attendance at a junior league game; in any event, consumer choice is widened by giving fans the option of paying less money to attend such a game, which is likely to be of significantly higher quality than a current minor league game.

A few legal obstacles do indeed remain. First, a challenge to Major League Baseball would need to overcome *Flood v. Kuhn*.[110] In addition to the general arguments discussed above that justify reconsidering that precedent, it can be further distinguished in this particular context. As noted above, one of the key elements in Justice Blackmun's rationale for applying earlier exempting precedents to Curt Flood's challenge to the reserve clause was Blackmun's perception that Congress shared his view that the reserve clause was essential to the National Pastime. In contrast to Flood's challenge to labor market restraints, a challenge to the closed-league structure of Major League Baseball is primarily directed to restraints that affect franchise relocation, and there is no comparable evidence of congressional support for immunizing franchise relocation decisions from antitrust scrutiny. The principal evidence of congressional endorsement of the reserve clause relied upon in *Flood* was the Report of the Subcommit-

---

[108] *See* News Ltd. v. Australian Rugby League (1996) 139 A.L.R. 193, 338-39 ("[A]t least some of the clubs which had executed the commitment agreements were in competition or likely to be in competition with each other to retain their position within the national competition.").

[109] *See* NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 107 (1984) ("The anticompetitive consequences of this arrangement are apparent" because "[p]rice is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference.").

[110] 407 U.S. 258 (1972). *See supra* text accompanying notes 86-91.

tee on Study of Monopoly Power of the House Committee on the Judiciary (the "1952 Report").[111] That report, in addition to endorsing "some sort of reserve clause," rejected the idea of completely immunizing baseball from the Sherman Act, expressly citing restrictions on the relocation of baseball franchises as one area where immunity would be inappropriate.[112] In addition, after extensive hearings, Congress has refused fervent pleas by the National Football League to exempt its relocation decisions from the Sherman Act.[113]

Another preliminary defense that would doubtless be raised is the claim, discussed above, that leagues constitute a single entity incapable of agreeing to restrain trade under section 1. In addition to the reasons summarized above for why most courts have rejected this claim,[114] in this context the argument is not over whether the leagues as presently constituted are a single entity, but whether the independent clubs' agreement to *form* such an entity is unreasonable. A merger creates a single-entity, but the agreement to merge is subject to section 1 scrutiny. The agreement to organize the industry with a closed-league structure likewise is an agreement subject to section 1.[115]

On the merits of the challenge to the closed-league structure, the best argument that club owners can offer to respond to the strong evidence that their agreement raises price, lessens output, and renders

---

[111] H.R. REP. NO. 2002, at 229 (1952), *cited in Flood*, 407 U.S. at 272.

[112] *Id.* at 229-30.

[113] Many of these legislative proposals are summarized in Charles Gray, Comment, *Keeping the Home Team at Home*, 74 CAL. L. REV. 1329 (1986).

[114] *See supra* text accompanying notes 35-41.

[115] Admittedly, the district court opinion in *Fraser v. Major League Soccer*, 97 F. Supp. 2d 130, 139-42 (D. Mass. 2000) is to the contrary on this point. Having found that MLS was organized differently from the conventional major leagues and was in fact a single entity for purposes of labor restraints, the district judge also rejected the plaintiffs' claims that the decision to organize MLS as a single entity lessened competition in violation of §1 of the Sherman Act and section 7 of the Clayton Act. Because the decision to organize as a single entity did not reduce competition in existing markets, the court concluded there was no antitrust violation. This reasoning would appear to conflict with the Supreme Court's decision in *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990). Nor is the principal precedent relied upon by the district judge really on point. *See* SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir. 1981). In that case, the court held that Xerox did not violate section 7 by acquiring patents for plain paper copying, because at the time of the merger the market didn't exist. Absent the merger, the assets necessary to develop photocopying machines would have been held by a single firm, while after the merger the assets are held by a single firm. In contrast, the claim here and in *Fraser* is that absent the agreement, the league would have organized in a manner that would permit more competition. This single incorrect decision, currently on appeal, should not pose an insurmountable obstacle to the open competition claim discussed in text, especially since the opinion itself suggests that conventionally organized leagues are not single entities. *See Fraser*, 97 F. Supp. 2d at 137 (distinguishing benefits and drawbacks of ownership in Major League Soccer from that of ownership in "plural entity" leagues); *id.* at 142 (analyzing choice to operate different from previous sports leagues). In relying heavily on the organization of the league as a limited liability corporation under Delaware law, *Fraser* impliedly relies on the notion that controlling shareholders have a fiduciary duty to act on behalf of the entire corporation. *Id.* at 134-35, 137 n.9. In contrast, conventional league owners act in their own clubs' self-interest.

output unresponsive to consumer demand, is to argue that requiring an open-league structure is tantamount to compulsory access to their joint venture, and such access is often disfavored because of concerns that new entrants will free ride on the prior investment of the existing members of the venture, with consequent adverse effects on the incentive of firms to invest in the venture. As the Supreme Court emphasized in *NCAA*, the focus must remain on the effects of any restraint, or what would occur absent a restraint, on price and output. Because the institution of open competition will lead to efficient output increases through increased investment, it is difficult to see how a free rider defense would be valid in this context. Finally, to the extent that a portion of the prior investment by clubs in the major leagues can be considered as capital specific to membership in the league, a reasonable fee might be imposed upon clubs being promoted to the major league, to be paid out to those clubs being demoted (similar to capital fees paid by attorneys or accountants upon admission to and exit from partnership at their firms).

## CONCLUSION: WHERE TO GO FROM HERE

This Article has outlined a variety of ways that current agreements among owners of the major North American sports leagues appear to violate the antitrust laws. Although the validity of these claims will be strongly contested, the Article is intended to stimulate serious consideration of these claims on behalf of private plaintiffs and governmental entities.

In terms of dollars lost through wealth transfers, local governments are probably the major victims of sports leagues' anticompetitive practices. Challenging NFL rules that facilitate the exploitation of local governments and bringing actions to secure structural relief may prove to be sound investments by local governments, especially if costs could be shared through coordinated litigation. Consumers are most directly exploited today by anticompetitive broadcast market restrictions. Challenges to these restraints are perhaps the most feasible for private attorneys who specialize in consumer class action litigation. Local businesses that would benefit from a new major league franchise in their city might also be willing to finance litigation seeking injunctive relief that would facilitate new entry. Finally, the benefits to the public interest and to the political career of a state attorney general who manages to secure a franchise for her state —either through the forces of competition following structural or conduct relief, or via settlement after presenting a viable claim sketched here— cannot be underestimated.

Of course, any remedy that could be lawfully imposed by a federal judge as relief for a proven antitrust violation may be legislatively imposed by Congress. In particular, we believe that our pro-

posal for open competition—the system of promotion and relegation to the major leagues—deserves serious legislative consideration. Although it would face opposition from monopoly sports league owners and some risk-averse fans fearful that their team might be relegated, the proposal is one that would benefit millions of sports fans across the country, as well as even greater millions of taxpayers forced to subsidize games they don't even enjoy.   If grass roots support can be organized, perhaps by consumer advocacy groups, perhaps by local officials anxious to end their exploitation by club owners, the political strength may match the merit of the proposal in advancing the public interest.