# THE ANTITRUST IMPLICATIONS OF PROFESSIONAL SPORTS' LEAGUE-WIDE LICENSING AND MERCHANDISING ARRANGEMENTS

Brandon L. Grusd[*]

### TABLE OF CONTENTS

I.   INTRODUCTION ................................................................. 2
II.  SELLING GOODWILL ........................................................ 5
III. LEAGUE-WIDE MERCHANDISING LICENSING ............... 8
IV.  ANTITRUST ANALYSIS ..................................................... 16
     A. Framework for Analysis .............................................. 16
     B. Baseball ....................................................................... 17
     C. Other Sports ................................................................ 21
     D. Characterization of Sports Leagues ............................. 22
     E. Section 1 Analysis ....................................................... 26
        1. Rule of Reason v. Per Se Scrutiny ........................... 26
        2. Pro-Competitive Arguments ..................................... 29
           a. Collateral or Ancillary Restraint Argument ......... 29
              i.   Collective Action Problem ............................ 30
              ii.  Fairer Revenue Distribution ......................... 31
              iii. Countering Free Riding ................................ 32
              iv.  Best Promoter of League ............................. 32
           b. Inherent Reasonableness .................................... 33
           c. Lack of Market Power ........................................ 35
        3. Anti-Competitive Effects ......................................... 35
           a. Output Restriction .............................................. 36
           b. Market Power ..................................................... 38
           c. Leagues' Arguments Are Unavailing ................... 38
              i.   Disincentive to Win ..................................... 39
              ii.  Exacerbates Free Riding .............................. 39
              iii. Inefficient Subsidies .................................... 40
              iv.  Individual Teams Are Better Promoters ........ 40
     F. Sports Broadcast Act Comparison ............................... 41
V.   CONCLUSION ................................................................. 42

[*] J.D. 1998, Harvard Law School; B.S. and B.A. 1995, Stanford University.

1

VOL.1:1        VIRGINIA JOURNAL OF SPORTS AND THE LAW        SPRING 1999

## I. INTRODUCTION

In January 1998, George Steinbrenner celebrated his twenty-fifth year as owner of the New York Yankees.[1]   During this past quarter-century, Steinbrenner has been at the center of some of baseball's most substantial controversies both on and off the playing field. He has been banned from baseball twice. The first ban came after Steinbrenner pled guilty to conspiring to make illegal campaign contributions to President Richard Nixon.[2] Steinbrenner was banned a second time after paying a known gambler, Howard Spira, $40,000 to surreptitiously investigate baseball player great Dave Winfield.[3] He has hired and fired managers seemingly on a whim,[4] suspended his most popular players,[5] and signed expensive and untried talent.[6] In no uncertain way, Steinbrenner has been intimately involved in running the Yankees' daily operations. Ironically, when Steinbrenner acquired the team from Columbia Broadcasting Systems on January 3, 1973 for $8.8 million he said, "We plan absent ownership."[7] Despite his controversial hands-on approach, Steinbrenner has shaped the Yankees into baseball's most successful[8] and profitable organization.[9]

Similar to Steinbrenner, Jerry Jones, owner of the National Football

---

1.    See Ross Newhan, Proud Owner of Yankees is Still a Hands-on Boss, L.A. Times, Apr. 2, 1998, at C1.

2.    Steinbrenner was banned from baseball from November 27, 1974, to March 1, 1976.  See Steve Zipay, Boss in Trouble / Suit May Lead to Ban, Newsweek, May 8, 1997, at A94.

3.    See Newhan, supra note 1, at C1.

4.    For example, Steinbrenner hired and fired Yankees manager Billy Martin five times, fired Yankees and baseball great Yogi Berra after only sixteen games into the 1985 season, and forced the resignation of manager Dick Howser even after winning 103 games and the Eastern title.  See George Steinbrenner Story, From Houk to Michael, N.Y. Times, Nov. 22, 1980, § 1, at 19.  See also Newhan, supra note 1, at C1.

5.    In 1991, Steinbrenner suspended the Yankees' best and most popular player, team captain Don Mattingly, for Mattingly's refusal to cut his hair.  See Murray Chass, Mattingly Flap: Hair Today, Gone Tomorrow?, N.Y. Times, Aug. 16, 1991, at B9.

6.    Last year, Steinbrenner traded away a promising young outfielder, Ruben Rivera, for an untested and inconsistent pitcher from Japan, Hideki Irabu, who has yet to perform up to his hype.  See Newhan, supra note 1. See also Ken Jurek, Tribe Talent Search Goes Global, Crain's Clev. Bus., Mar. 23, 1998, at T-15.

7.    Newhan, supra note 1. See also George Steinbrenner Story, From Houk to Michael, supra note 4.

8.    The Yankees have won three World Series titles, five American League pennants and more games than any other major league team during Steinbrenner's ownership.  See Newhan, supra note 1, at C1.

9.    According to one estimate, Steinbrenner's Yankees have a three year average net operating income of $23.7 million, the highest in professional baseball.  See Kurt Badenhausen, More Than A Game, Fin. World, June 17, 1997, at 40.

2

League's Dallas Cowboys, has been a controversial central figure in his team's operations. Relative to Steinbrenner, Jones is a newcomer to the ranks of sports franchise ownership, as he acquired the Dallas Cowboys and Texas Stadium for $140 million in 1989.[10] Like Steinbrenner, Jones has been in trouble with the law, having been investigated by the Internal Revenue Service for allegedly failing to pay $8.3 million dollars in taxes.[11] He has fired popular head coaches, such as Tom Landry[12] and Jimmy Johnson, and has hired controversial coaches such as Barry Switzer.[13] Additionally, Jones reportedly wants to be involved in the Cowboys' play-calling decisions on the field. Cowboy coaching legend Tom Landry commented, "With Jerry Jones, it's really difficult. He wants to run the whole show, including the usual coaching responsibilities."[14] Despite these difficulties, Jones has built the Cowboys into the most successful[15] and most profitable team in the league.[16]

George Steinbrenner and Jerry Jones have more in common than creating controversy and owning successful sports teams.[17] Steinbrenner and Jones have used their successes to enter into sponsorship contracts that threaten to undermine their respective leagues' entire revenue structures.[18] Neither owner

10. See Dan McGraw, The Very Lonesome Cowboy, U.S. News & World Rep., Sept. 26, 1994, at 74.

11. See Cowboys' Jones Fights IRS Over $8.3 Million-Report, Reuters N. Am. Wire, Jan. 29, 1997.

12. See Dave George, Saving Cowboys Not What Landry's Into These Days, Palm Beach Post, Jan. 18, 1998, at 1C.

13. Jones hired the now-fired Switzer after firing coach Jimmy Johnson, after Johnson led the Cowboys to two consecutive Super Bowl victories. See Kathy Orton, The NFL / Week 9, Wash. Post, Oct. 27, 1996, at D5.

14. See George, supra note 12, at 1C.

15. The Cowboys have won more Super Bowls (three) than any other team since Jones has been an owner in the National Football League. See Michael Silver, Special Delivery, Sports Illustrated, Feb. 7, 1996, at 25.

16. According to industry analysts, the Cowboys' three year average net operating income has been the highest in professional football at $26.3 million. See Badenhausen, supra note 9, at 42.

17. A noted sports psychologist, Jon Niednagel, has termed both Steinbrenner and Jones as Extroverted, Intuitive, Thinking, and Judging ("ENTJs"). Niednagel has been hired by teams such as football's Arizona Cardinals and basketball's Phoenix Suns and Orlando Magic. Aside from Steinbrenner and Jones, Niednagel has also categorized Tom Watson, Eric Lindros, and Vince Lombardi as ENTJs. Extroverts are stimulated by focusing on the external world of people and things. Intuitive people love creativity, cleverness, and complex interrelationships. Thinking people make detached, objective, and logical decisions. Judging people tend to have a sense of control over their environment. See Paul Coro, Head Games: Athletes' Brain Types are Quite Telling, Kansas City Star, Apr. 6, 1997, at C1.

18. Jones was the path breaker in this arena, signing lucrative endorsement arrangements with Nike, Pepsi, Dr. Pepper, and American Express in 1995. The league saw these contracts as threatening because they undermined its exclusive marketing arrangements with Coca-Cola and Visa, competitors

3

Case 1:07-cv-08455-LAP     Document 74-4     Filed 07/17/2008     Page 4 of 43

has stood idly by when league officials have taken action against them.[19] Instead, they have wielded the antitrust lawsuit sword to protect their sponsorship deals and sports dynasties.[20]

The actions of Steinbrenner and Jones have not only affected their own leagues, but have had far reaching repercussions on the other major professional sports leagues. This Note examines whether the major professional sports leagues (Major League Baseball, the National Football League, the National Basketball Association, and the National Hockey League) can prevent their team owners from entering extra-league merchandising and licensing contracts, or whether such league restrictions are invalid under the federal antitrust laws.[21]

First, Part II of this paper details the legal and economic framework that allows teams to harness their goodwill and sell it to consumers. Specifically, this section addresses how the intellectual property laws create a proprietary interest in certain tangible manifestations of goodwill (e.g., team logos, team names, and uniform designs) and how this proprietary interest is valuable to its owner.

Next, Part III describes and discusses the method by which professional sports leagues have implemented league-wide merchandising and licensing arrangements. This section addresses the contractual terms which restrict individual team sponsorship deals, and how this structure creates divergent incentives between certain types of teams (i.e., the incentives for some teams to cheat or act outside the league structure and the competing incentives for others not to).

Finally, Part IV analyzes the antitrust implications concerning league-wide merchandising arrangements. Moreover, Part IV argues that the league-wide

---

of Pepsi and American Express. See William J. Hoffman, Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown with the N.F.L.: National Football League Properties v. Dallas Cowboys Football Club, 7 Seton Hall J. Sport L. 255, 256 (1997). Likewise in 1997, Steinbrenner signed a maverick ten-year sponsorship contract worth $95 million with adidas, a sporting goods and apparel company, and direct competitor of exclusive league-wide licensee Russell Athletic. See Bill Madden, Shoe Drops: Suit on adidas Pact May Get Boss Banned, Daily News (N.Y.), May 8, 1997, at 88.

19. Steinbrenner was suspended from baseball's ruling executive council for filing a lawsuit against Major League Baseball regarding the New York Yankees' marketing deal with adidas. See Ronald Blum, Baseball Executive Council Suspends Steinbrenner, Daily Iowan, May 14, 1997, at 3B. The NFL filed a $300 million suit against Jones alleging breach of contract and Lanham Act violations. See National Football League Properties, Inc. v. Dallas Cowboys Football Club, No. 95 Civ. 7951 (S.D.N.Y. Sept. 18, 1995).

20. See generally Dallas Cowboys Football Club, Ltd. v. National Football League Trust, No. 95 Civ. 9426 (S.D.N.Y. filed Dec. 12, 1996); New York Yankees Partnership, v. Major League Baseball Enters., No. 97-1153-civ-T-25B (M.D. Fla. filed May 6, 1997).

21. For the purpose of this Note the use of any one of the words merchandising, marketing, licensing, or sponsorship or any derivation thereof is interchangeable unless specific differences are noted.

4

merchandising machinery is an unreasonable restraint on trade and invalid under the antitrust laws.

## II. SELLING GOODWILL

Sports merchandising is big business. In 1996, sales of licensed merchandise by Major League Baseball ("MLB"), the National Football League ("NFL"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") totaled approximately $8.8 billion.[22] Each league received approximately 8 percent of these gross sales. The enormous merchandise licensing revenues that each league receives is the product of the background legal rules concerning a team's intellectual property rights and the economics concerning the sale of such property rights.

In the sports merchandising business, the property that is of value to a team is "the series of trademarks and trade names that distinguish [a particular team] from its competition and set products originating from and associated with [a particular team] apart in the marketplace."[23] In more familiar terms, these properties are the teams' logos and names (e.g., the stylized "NY" on the hat of Yankees players, or the name "Yankees" as seen on the uniform), which are used to sell team merchandise and promote team allegiances.[24]

The goodwill value of these logos is extracted by the owner through the sale of the property or, more commonly, by licensing the use of it to others through sponsorship and merchandising agreements.[25] Merchandise licensing agreements entitle the licensee to manufacture goods with the logos, trademarks, and trade names of the team. The licensor (i.e., the team)[26] receives a royalty

---

22. The break down is as follows: the National Basketball Association $3.1 billion, the National Football League generated $3 billion, Major League Baseball $1.7 billion, and the National Hockey League $1 billion. Debra Sparks, Why Nike and Reebok Need the Sports Leagues, Fin. World, June 17, 1997, at 54.

23. New York Yankees Partnership, No. 97-1153-civ-T-25B.

24. See Steven N. Geise, A Whole New Ballgame: The Application of Trademark Law to Sports Mark Litigation, 5 Seton Hall J. Sport L. 553, 555 (1995).

25. Each team would have the right to profit from its own logo by directly manufacturing and distributing merchandise with the team's logo. However, this is impractical because a team's business is putting on sporting events, not manufacturing apparel. Accordingly, a team can license the use of its logos to other companies, such as sports apparel manufacturers. In this way, a team can gain profits from indirect exploitation of their logos. See Julie A. Garcia, The Future of Sports Merchandising Licensing, 18 Hastings Comm. & Ent. L.J. 219 (1995).

26. More commonly, however, it is a league body, such as NFL Properties or MLB Enterprises, that receives these royalties and fees.

5

upon each sale of the licensed product. The licensee (e.g., Reebok, Champion, adidas) enters into these agreements on the belief that the team's goodwill will enhance the appeal and perceived value of the licensee's goods.[27] In addition, sponsorship agreements typically allow licensees to use the sporting event as a means for advertising and promotion.[28] Again, licensees believe that the goodwill the fans and consumers associate with a particular team will carry over to the sponsor's products or services.[29] This belief is not unfounded, as evidenced by the recent controversial sponsorship contract between the Yankees and adidas. The March 1997 deal states that adidas is to pay the Yankees $92 million over ten years in exchange for the ability to advertise adidas products on certain Yankees' stadium objects and uniforms.[30] The resulting carryover of goodwill has helped adidas' net North American sales jump 66% to $1.7 billion.[31]

An individual team's ability to profit from its logo in the aforementioned manner would be lost without the protections granted by intellectual property laws,[32] which reward the creator of the intangible property (i.e. the logo or team name) with a limited monopoly.[33] This limited monopoly creates incentives for persons to produce works of intangible property[34] by adding value to the property that the owner would have been otherwise unable to capture.[35] The law

---

[27]. See Anne M. Wall, Sports Marketing and the Law: Protecting Proprietary Interests in Sports Entertainment Events, 7 Marq. Sports L. J. 77, 159 (1996).

[28]. See id.

[29]. The belief is that someone who likes the Yankees will like adidas for sponsoring the Yankees.

[30]. See Terry Lefton, Best and Worst Sports Marketing Moves of 1997, Sport, Jan. 1, 1998, at 35.

[31]. See adidas Bucks Trend with Strong Profits, Portland Oregonian, Mar. 7, 1998, at E1.

[32]. See Balaram Gupta, Names and Logos: Protection Under Intellectual Property Laws and Consequences, 2 Sports Law. J. 245, 246 (1995).

[33]. See Wall, supra note 27, at 116.

[34]. Without such protection, other people could use the Yankees logo without compensating the Yankees. The Yankees, knowing that they have no protection under the law, would never spend the time and money in the first place to develop their logo. This free-rider problem would harm all consumers since the logo would never be invented in the first place. See Brandon Grusd, Contracting Beyond Copyright: ProCD v. Zeidenberg, 10 Harv. J.L. & Tech. 353, 363 (1997) (discussing this problem as it relates to copyright protection for computer software databases).

[35]. This added value is the monopoly profit the owners receive from the sale or licensing of their property. Once created, the marginal cost of producing another good embodying the intellectual property is very small (close to zero). For example, once the logo of the Yankees has been designed, the marginal cost of putting the logo on an additional hat is low. However, unlike under a perfectly competitive market where price equals marginal cost, the price under the intellectual property laws is greater than marginal cost. This added price represents monopoly rents. See Paul Samuelson & William Nordhaus, Economics 579 (13th ed. 1989).

6

creates the value of these trademarks and trade names[36] by designating the owners of such logos as the exclusive owners.[37] In the trademark setting, one commentator has stated, "[Such exclusivity] encourages businesses to invest in symbolic representation of their goods and services by prohibiting competitors from using the same symbol on their wares."[38] This symbolic representation of the goods and services embodies the goodwill built by the team.

The notion of a monopoly in this setting is different from that implied in typical situations. Under typical circumstances, the term monopoly signifies the existence of only one seller of goods. Here, the granting of a limited monopoly is designed to foster competition by encouraging investment in innovation and by affording the creators a reasonable length of time to profit from their creations.[39] While in the typical monopoly situation, the very meaning of monopoly implies the absence of competitors (both of the exact good sold and of close substitutes), the limited monopoly granted by intellectual property laws creates many different "monopolists" competing with each other.[40] However, this competition is along the lines of differentiated products, as exemplified by Coca-Cola and Pepsi.[41]

An example will elucidate the mechanism by which the limited monopoly created by the intellectual property laws promotes competition. In the sports merchandising market, the Yankees have a limited monopoly in their logo in that no other team or business can use the Yankees logo to sell merchandise. The Yankees, however, only have a monopoly in Yankees merchandise (e.g. baseball caps) and do not have a monopoly in types of merchandise.[42] Thus, if the Yankees raise their cap prices too high, consumers would purchase cheaper caps from other teams instead of the Yankees' caps.[43] Other teams would also enter

---

36. The protection for a team's logos and names comes primarily from federal law. The Federal Trademark Act of 1946, popularly called the Lanham Act, is the body of law dealing with defining trademarks and the rights its owners have. In part, the Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof (1) used by a person, or (2) which a person has a bona fide intention to use in commerce . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (1998).

37. See Wall, supra note 27, at 116.

38. Gupta, supra note 32.

39. See Wall, supra note 27, at 116.

40. See Samuelson & Nordhaus, supra note 35, at 611.

41. See Hal Varian, Intermediate microeconomics: A Modern Approach 418 (2d ed. 1990).

42. The other teams, such as the Los Angeles Dodgers, Anaheim Angels, St. Louis Cardinals, etc., also have limited monopolies in their logos and names.

43. Of course, this example is a simplified version of real world phenomena in that some consumers, due to their allegiance to the Yankees, would continue buying the higher priced Yankees cap (i.e., they

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

the market, driving the price of the Yankees' cap further down.[44]    The competition between teams in the sports merchandise market would drive the economic profit received by each team from their marks to zero.[45]

The above example demonstrates the mechanism by which a limited monopoly promotes competition. The true structure and state of this competition in the merchandise licensing realm of professional league sports are the focus of the next section.

### III. LEAGUE-WIDE MERCHANDISING LICENSING

While the major professional sports leagues vary in how they collect merchandise and sponsorship licensing revenues, each league utilizes a similar organizational structure to negotiate merchandising and licensing agreements with third parties, such as Nike or Reebok.  Rather than having its teams negotiate separately with different companies, each league has created an entity to act as the teams' exclusive negotiating agent.[46]  Within such a structure, each NFL, NHL, NBA, and MLB team is owned and operated independently, and remains individually responsible for its own profits, losses, and capital expenditures.[47]  The details of two of the leagues' marketing arms (NFL Properties and MLB Properties) are elaborated below.

In 1984, the MLB teams established MLB Properties, a subsidiary of MLB Enterprises.  Via an agency agreement, MLB Properties controls (1) marketing and licensing of the marks of all (at that time) twenty-six teams, (2) the marks of the league and its events and (3) the marks of the American and National

would never consider buying a Dodgers cap or any other team's cap).  However, this simplified version is not inaccurate because at the margin consumers would purchase the cheaper Dodgers substitute cap.

44.    Nevertheless, the price at which caps are sold is still above the marginal cost of producing a cap. This means that, even though economic profits are reduced to zero compared to the ideal of the perfectly competitive market, output is reduced and prices are too high.  See Samuelson & Nordhaus, supra note 35, at 612.

45.    A distinction must be made between economic profit and accounting profit.  Economic profit is "the difference between sales revenue and the full opportunity cost of the resources involved in producing the goods," while accounting profit is the "total revenue minus costs properly charged against the goods sold."  Id. at 980.

46.    See Garcia, supra note 25, at 222.

47.    While each team is individually responsible for its finances, a portion of the revenues each team receives comes from revenue sharing agreements.  Thus, in effect, each team has a stake in the profits and losses of the others.  See id. at 224.

8

Leagues.[48] This agreement includes a provision whereby a three-fourths vote of the teams is required to bind all teams.[49] Furthermore, the agreement mandates that MLB Properties must act as the exclusive negotiating agent with respect to the marks for teams newly admitted to the league. The geographic coverage of the agency agreement extends beyond the North American market to the entire world.[50] Individual teams retain certain rights to license and exploit their marks for limited purposes within limited geographic areas.[51] These retained rights are generally limited to the promotion of the teams' baseball games through local advertising, team programs, and other team publications.

The MLB agency agreement was renewed and amended on January 1, 1991 and again on December 1, 1995.[52] The latest agreement designates MLB Properties as the exclusive agent for the marketing and licensing of the marks of all the league teams. For example, MLB Properties entered into a contract with Pepsi that made Pepsi the official soft drink of MLB and gave Pepsi exclusive rights to use MLB's marks in advertising, merchandising, packaging and promotions.[53] Similarly, MLB Enterprises may sign a deal with MBNA (the producer of MasterCard) whereby MBNA will produce MLB MasterCards (a credit card with the consumer's favorite team's logo on it).[54] The diagram below illustrates these arrangements [see Figure 1].

Furthermore, the agency agreement dictates that MLB Properties is to distribute domestic promotional and retail licensing income in equal amounts to each team, regardless of the actual income generated by a particular team's marks.[55] International promotional and retail licensing income, and income

48. The generic term "marks" refers to the logos and names used by the various teams and leagues, such as the Yankees logo as seen on the Yankees hat, or the silhouetted batter logo and All-Star Game logo. The teams also set up MLB Properties Canada to effectuate this agency agreement with those Canadian teams in the league. See New York Yankees Partnership, No. 97-1153-civ-T-25B.

49. MLB rules state that all teams are bound by the provisions of the agency agreement, whether or not an individual team has signed the agreement. See id.

50. See id.

51. See id.

52. See id.

53. See Pepsi, Baseball -2:Pepsi to Be Baseball's Official Drink, Dow Jones News Service, Mar. 19, 1997, at 10:11:00.

54. See Antoinette Coulton, Visa About to Strike Big-League Sponsorship Deal Series, Am. Banker, Mar. 24, 1997, at 20; see also <http://www.webapply.com/mlb98_espn> (a web site where one can apply for such a card).

55. This income is that money received only after MLB Properties subtracts its commission (30% of income under $50 million and 15% of income greater than $50 million), fees, and expenses. See New York Yankees Partnership, No. 97-1153-civ-T-25B.

9

VOL.1:1     VIRGINIA JOURNAL OF SPORTS AND THE LAW     SPRING 1999

from other sources are not distributed to any team.[56]  In addition to its role as the exclusive agent for negotiating these licensing deals, MLB Properties also enforces and protects all team and league marks.[57] MLB Properties subtracts



**Figure 1**

fees for this service from the gross income received before distributing it to the teams.

Similarly, NFL teams have created NFL Properties to act as the exclusive agent for negotiating and entering merchandise licensing and sponsorship agreements.  This arrangement was organized in 1981, when twenty-six of the

56.    See id.
57.    See Uri Berliner, Padremania Paying Off: T-shirts, Caps and Trinkets Pour Out in Champs' Honor, San Diego Union-Trib., Oct. 2, 1996, at C1.

10

then twenty-eight teams entered a Trust Agreement.[58]  Under this agreement, the teams transferred the exclusive commercial rights of their marks to the trustees of the NFL Trust.[59]  The NFL Trust then entered into a licensing agreement with NFL Properties, whereby NFL Properties would act as the exclusive licensee of all the NFL and team marks.  NFL Properties negotiates with third-party companies such as Pepsi, Nike, and Reebok.  The income derived from these licensing deals is passed on to the NFL Trust and then to the teams on an equal share basis, regardless of the amount earned by any particular team's marks.[60]

As in MLB, each NFL team retains some control over the licensing of its marks.  The rights retained by each team include: (1) the exclusive right to use its team marks in connection with the presentation of a football game; (2) the nonexclusive right to use its team marks in local advertising to promote football games; (3) the nonexclusive right to allow third parties to use its team marks in advertisements in local sections of the team's program; and (4) the nonexclusive right to use its marks in its own publications.[61]  The diagram below illustrates these arrangements [see Figure 2, below].

Within this organizational framework, NFL Properties has entered contracts with companies such as Coca-Cola, Visa USA, and Sprint.[62]  The Coca-Cola, Visa USA, and Sprint contracts are worth $14 million, $8 million, and $24 million a year, respectively.[63]  According to industry analysts, the NFL and the other professional sports leagues are able to enter such lucrative contracts because sporting events "achieve a broad penetration of the adult male market that advertisers want to reach."[64]

Like the NFL and MLB, the NHL and the NBA have a single entity that acts as the exclusive agent for each league and its teams in conducting merchandise licensing and sponsorship negotiations.  For example, NBA Properties acts as the league's licensing arm.[65]  Through NBA Properties, the league controls the trademarks and logos of all the teams outside each team's own area.  In addition, all twenty-seven teams have granted NBA Properties the exclusive right to

58.   As in the baseball setting, a less than unanimous vote will bind all teams including those dissenters to the agreement.  See New York Yankees Partnership, No. 97-1153-civ-T-25B.
59.   See Hoffman, supra note 18, at 264-65.
60.   See id. at 265-66.
61.   See id. at 266.
62.   Id. at 256; see also Nikhil Deogun & Stefan Fatsis, Coca-Cola Balks at NFL Prices, Wall St. J., Jan. 26, 1998, at B1.
63.   Deogun & Fatsis, supra note 62, at B1.
64.   Id.
65.   See Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n, 754 F. Supp. 1336, 1339 (N.D. Ill. 1991).

11

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999



**Figure 2**

12

license and use their marks internationally. Income collected from such deals is pooled and shared evenly among the teams.[66]

NHL Enterprises is that league's marketing division. As in the other three leagues, all teams have granted NHL Enterprises the exclusive right to license and use their marks.[67] In exchange, all twenty-six teams receive an equal share of income from those marketing, licensing, and sponsorship deals. Like in the other leagues, NHL teams retain limited rights to sell and license their marks. NHL teams are allowed to license their own marks within a seventy-five mile radius of their respective arenas.[68]

The overall effect of these league-wide structures is to reduce the level of competition in the merchandise license and sponsorship markets between teams within the same league. Competition between leagues in the merchandising market still exists, but the concentration of economic actors in sports merchandising has been increased. As a result, the aforementioned league structures are prototypical examples of collusion.[69] As defined by economists, collusion occurs when firms of a particular industry jointly determine their output to maximize total industry profits.[70] The firms then divide these profits between the members of the collusive enterprise, or cartel.[71] In a cartel setting, the price at which the product is sold is greater than that found in perfectly competitive market or that found in the monopolistic competition model discussed earlier.[72] Additionally, total output is below that found in the

---

[66]. See id. at 1340.

[67]. See Garcia, supra note 25, at 228; Robyn Norwood, League's Arrangement Gives the Whole Store to Disney Marketing: Company Is Given Unprecedented Allowances and Veto Power over Duck's Merchandise, L.A. Times, June 8, 1993, at C6.

[68]. There is one exception to this rule. Only Disney is allowed to produce Mighty Duck products and sell them in the over 200 Disney Stores worldwide without paying licensing fees. Disney is the entertainment giant and owner of the Anaheim Mighty Ducks hockey team. Not only does Disney retain greater rights than the other NHL teams, but it also has a veto power, whereby Disney can nix licensees' product ideas that it does not like. As Ken Wilson, vice president for sales and marketing for Disney Sports Enterprises, said, "[The NHL Enterprises and Disney] agreement, because they recognize our consumer product experience, is to allow [Disney] veto power on items [Disney] do[esn't] think are in the Disney image." In return for Disney's sweetheart deal, the NHL will receive "favors from Disney as payment-in-kind." Norwood, supra note 67, at C6.

[69]. A pejorative implication is not meant by the word "collusion."

[70]. See Varian, supra note 41, at 454.

[71]. See id. No implication concerning the legal outcome of antitrust treatment is intended in this analysis, including whether the leagues should be treated as single entities or joint ventures. See infra Part IV. The purpose of this analysis is simply to demonstrate the economic effect of league-wide schemes.

[72]. See Samuelson & Nordhaus, supra note 35, at 608.

13

VOL. 1:1    VIRGINIA JOURNAL OF SPORTS AND THE LAW    SPRING 1999

perfectly competitive or monopolistic competitive markets.[73] The effect of such collusion is very much the same as found under a pure monopoly. As two leading economists have remarked, "When oligopolists can collude completely and maximize their joint profits, taking into account their mutual interdependence, the price and quantity will be close to that of a single monopolist."[74]

It is helpful to consider the mechanism of the cartel behavior in terms of the monopolistic competition example involving the Yankees discussed in Part II. In the monopolistic competition model, each team has an individual incentive to enter the merchandise market. As noted earlier, eventually this entry would drive economic profits to zero. However, in the cartel model, all team marks are controlled exclusively by MLB Properties, which sets a price and restricts output to maximize the collective profits of all the teams.[75] Whereas in the monopolistic competition model, consumers (either the end purchasers of the merchandise or the licensee-manufacturers) could purchase the cheaper Dodgers cap, in the cartel example, all caps are priced at the same high level.[76] The profit derived from this cartel pricing represents monopoly profits for the league.

The cartel described above is inherently unstable because each team will find it profitable to increase its own output.[77] For example, successful teams like the Yankees would find it in their interests to increase their market share by licensing their logos to a greater number of third parties than the league would allow. In fact, as evidenced by George Steinbrenner's $95 million deal with adidas, such cheating is precisely what has happened.[78]

The incentives to cheat in the sports setting are even greater than those described for the stylized cartel model. This is because teams like the Yankees receive only 1/30[th] of the pooled licensing income, but the Yankees' marks generate more than 1/30[th] of the income. The same problem exists in football. In 1994, Jerry Jones' Cowboys lead the NFL with 30% of the merchandise sales, yet Jones only received 3.6% (1/28[th]) of the income.[79] In response, Jones "cheated" on the NFL merchandise licensing structure by signing deals with Nike and Pepsi.[80] Cheating of this type can lead to the unraveling of the entire

73. See id.
74. Id.
75. See Samuelson & Nordhaus, supra note 35, at 608.
76. This example is stylized in that MLB Properties, while having a monopoly on all the teams' baseball marks, would still face competition in the merchandise market from the other sports leagues.
77. See Varian, supra note 41, at 455-56.
78. See Madden, supra note 18, at 88.
79. See McGraw, supra note 10, at 74.
80. See Hoffman, supra note 18, at 256.

14

SPRING 1999     ANTITRUST IMPLICATIONS OF LEAGUE-WIDE LICENSING AGREEMENT     VOL.1:1

cartel.[81]  As an increasing number of teams find it in their best interests to cheat, the entire league-wide merchandising system may fail.[82]

Even if cheating does not cause the cartel to unravel, it may undermine its effectiveness to extract monopoly profits.  Some commentators have pointed to the rather recent failure of MLB to sign a deal with Nike and Reebok as evidence of the negative effect Steinbrenner's adidas deal has had on MLB Properties.  In this example, MLB owners turned down a $350 million dollar deal offered by Nike and Reebok.[83]  Owners complained that the sum was "paltry."[84]  It is also reported that Nike had misgivings about even offering that sum in light of the Yankees adidas deal.[85]  Likewise, the NFL has had problems renewing their licensing deal with Coca-Cola, as Coca-Cola balked at a six-year $210 million sponsorship deal.[86]  Coca-Cola's reluctance to renew stems from Jerry Jones' side deal with Pepsi, which diminishes the value of the collective NFL package for Coca-Cola.[87]  These examples suggest that the theoretical economic

[81].  See Samuelson & Nordhaus, supra note 35, at 608.

[82].  In the traditional cartel example, the products sold by firms are identical.  Cheating occurs primarily because firms can realize excess profits by selling more than their allotment under collusion (i.e., they can gain a greater market share).  However, as other firms realize that this first firm will cheat, they will try to cheat beforehand to gain the excess profits before the other firms start to do so.  Unless an adequate enforcement mechanism exists to prevent this cheating, the entire collusive enterprise will fall apart and drive down prices and profits.  See Varian, supra note 41, at 456.  In the sports setting, the incentive for this type of cheating is present.  However, a distinct kind of cheating is also available as the products are differentiated (while oil is oil, and grain is grain, a Yankees cap is not a Dodgers cap).  Incentives to cheat arise because some products sell more than others.  Accordingly, in the baseball setting, while each team receives only one-thirtieth of the income from the cartel, a particular team's product may actually account for more than one-thirtieth of the income (i.e., sales of Yankees merchandise may be 10% of the total, while sales of Expos merchandise only 1%).  Cheating occurs here, because the Yankees view the cartel as "unfair."  Thus, the Yankees decide to find deals outside of the league to capitalize on their greater than one-thirtieth contribution to sales.  Conversely, teams such as the Expos benefit from the arrangement because they contribute less than other teams.  As Los Angeles Dodgers executive vice president Fred Claire remarked, "Obviously, if individual deals were to be made, we would stand to benefit much more than most." Ken Daley, Short Hops, Dallas Morning News, Mar. 9, 1997, at 14B.

[83].  See Steve Zipay & Jon Heyman, All Eyes on Deal Between Yanks, adidas, Newsday, Mar. 4, 1997, at A64.

[84].  See Jeff Manning, adidas Teams Up with N.Y. Yankees on 10-year Marketing Arrangement, Portland Oregonian, Mar. 4, 1997, at A1.

[85].  See, e.g., Jeff Jensen, MLB Faces Opening Day Marketing Woes, Advertising Age, Mar. 10, 1997, at 1.  (According to a Nike executive, Nike would not have gone through with its baseball deal anyway unless Greg Murphy, who was CEO of MLB Enterprises as that time, could ensure that local teams would not ambush the Nike deal.)

[86].  See Deogun & Fatsis, supra note 62, at B1.

[87].  The value of being the official sponsor of the National Football League is decreased when a rival

HeinOnline -- 1 Va. J. Sports & L. 15 1999

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

mechanism outlined above accurately describes a real world phenomena.

While such cheating may undermine the effectiveness of the league-wide merchandising cartel, it does not necessarily lead to its complete failure. Although Steinbrenner and Jones have cheated, their cheating has not gone unpunished by their respective leagues. MLB has thrown Steinbrenner off its ruling executive committee for his cheating,[88] and the NFL has sued Jones for trademark infringement.[89]  At the same time such league policing of cartel members helps reduce cheating, it raises antitrust concerns.[90]  The next section discusses whether league-wide licensing rules fall under a joint venture/cartel label or a single-entity label, and gives a complete antitrust analysis of league-wide licensing structures.

## IV. ANTITRUST ANALYSIS

### A. Framework for Analysis

The purpose of antitrust laws is to "prevent and control combinations made with a view to prevent competition, or for the restraint of trade, or to increase profits of the producer at the cost of the consumer."[91]  The determination of whether league-wide merchandising structures violate federal antitrust laws is crucial to the sports merchandising business, and more importantly, to the entire structure of professional sports.  The outcome of the antitrust question may change the entire business of professional sports.

The antitrust laws are primarily concerned with two types of activities.  The first type involves interactions between two or more parties, while the second type concerns the actions of a single party.[92]  Specifically, the first type of activity is covered by Section 1 of the Sherman Antitrust Act which in relevant part states, "Every contract, combination in the form of trust or otherwise, or

---

sponsors one of the league's teams.

88.  See Blum, supra note 19, at B1.

89.  See National Football League Properties, Inc. v. Dallas Cowboys Football Club, 922 F. Supp. 849 (S.D.N.Y. 1996).

90.  In fact, Steinbrenner and Jones sued their respective leagues alleging that league-wide merchandise-licensing arrangements violate antitrust laws.  See, e.g., Dominic Bencivenga, Steinbrenner's Gamble: Suit Challenges Reach of Antitrust Exemption, N.Y.L.J., May 22, 1997, at 5; NFL and Dallas Cowboys Drop Suits Arising From Sponsorship Dispute, Andrews Sports & Ent. Litig. Rep., Jan. 1997, at 11.

91.  Senator Sherman, 12 Cong. Rec. 2457 (1890).

92.  See 15 U.S.C.A. §§ 1-2 (West 1998).

16

conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."[93] The second type is covered by Section 2 of the Sherman Act, which in relevant part reads "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or foreign nations . . . shall be punished."[94]

In order to prove a violation of either section of the Sherman Act, three elements must be present: (1) the joint or unilateral activity complained of does in fact restrain interstate trade or commerce; (2) the activity is unreasonable; and (3) the activity is not exempt from the antitrust laws.[95] Due to some rather peculiar rulings by the U.S. Supreme Court regarding the application of the antitrust laws to professional baseball, it is instructive to begin this analysis by examining whether each league is exempt from the antitrust laws.[96]

### B. Baseball

The United States Supreme Court has established professional baseball's antitrust exemption in a trilogy of cases. Whether this exemption applies to baseball's merchandise licensing structure is an open question. The first of the three Supreme Court Cases, *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*,[97] was decided in 1922. In this case, a team from a rival league to MLB brought suit alleging that MLB member teams had conspired to monopolize the business of baseball "by buying up some of the constituent [Federal League] clubs and in one way or another inducing all those clubs except the plaintiff to leave their League . . . ."[98] Perhaps due to a less expansive view of interstate commerce at the time, the Court found that the

93. Id. § 1.

94. Id. § 2.

95. See Michael Jay Kaplan, Annotation, Application of Federal Antitrust Laws to Professional Sports, 18 A.L.R. Fed. 489, 495 (1974, current through Oct. 1997 Supp.). These elements also assume that the activity occurs in interstate commerce. While it is seemingly apparent that professional sports and the business of professional sports occurs in interstate commerce in 1922, the Supreme Court found that baseball was not involved in interstate commerce and accordingly that federal antitrust laws did not apply to MLB. See Federal Baseball Club of Baltimore v. National League of Prof'l Baseball Clubs, 259 U.S. 200, 208 (1922). But see Flood v. Kuhn, 407 U.S. 258 (1972) (putting this notion to rest).

96. Obviously, if the antitrust laws do not apply generally to professional sports, or to particular sports leagues, the rest of the antitrust inquiry is a moot question.

97. *Federal Baseball Club*, 259 U.S. at 200.

98. Id. at 207.

17

business of giving baseball exhibitions was purely a state affair and did not involve interstate commerce.[99] Justice Holmes writing for the Court opined:

> It is true that in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. . . . [T]he transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade of commerce in the commonly accepted use of those words. As it is put by the defendants, personal effort, not related to production, is not a subject of commerce. That which in its consummation is not commerce does not become commerce among the States because the transportation that we have mentioned takes place.[100]

This antitrust exemption based on baseball's lack of sufficient involvement in interstate commerce did not remain free from attack. In 1953, the Supreme Court heard *Toolson v. New York Yankees, Inc.*, in which George Toolson brought suit against the Yankees.[101] Toolson was under contract with the Yankees' farm club in Newark, when he was assigned to Binghamton.[102] Toolson refused to report to Binghamton, and the Yankees placed him on the ineligible list in accordance with league rules, effectively precluding him from playing on any other team.[103] Toolson argued that these actions, which were part of baseball's reserve system, violated antitrust laws.[104] In a per curiam decision, the Supreme Court, without reexamining the underlying issue, reaffirmed the existence of baseball's antitrust exemption.[105] The Court, citing *Federal Baseball Club*, based its judgment on (1) the fact that Congress was aware of the *Federal Baseball Club* decision yet failed to act in regard to it; (2) baseball's development over the past thirty years, which was based on a reliance that it was not subject to the antitrust laws; (3) a concern that overturning *Federal Baseball Club* will have an unwanted "retrospective effect" on baseball; and (4) if evils exist in baseball, the Congress and not the courts should deal with

---

99.   Id. at 208.
100.   Id. at 208-09.
101.   Toolson v. New York Yankees, Inc., 101 F. Supp. 93 (S.D. Cal. 1951), *aff'd*, 200 F.2d 198 (9th Cir. 1952), *aff'd, per curiam* 346 U.S. 356 (1953).
102.   *Toolson*, 101 F. Supp. at 93.
103.   Id.
104.   Id.
105.   *Toolson*, 346 U.S. at 356.

them.[106]

In 1972, the Supreme Court issued its final ruling in the baseball antitrust exemption cases.[107] In this case, Curt Flood sued MLB, arguing that the reserve system violated federal antitrust laws, and that accordingly, he should be made a free agent.[108] The Supreme Court, in holding that baseball was still exempt from the federal antitrust laws concluded: (1) professional baseball is a business engaged in interstate commerce; (2) however, baseball is an exception and an anomaly to the antitrust rules with its reserve system exempt from federal antitrust laws; (3) the *Federal Baseball Club* and *Toolson* cases are aberrations confined to baseball and these cases should be given the full entitlement to *stare decisis*; (4) the Congress has acquiesced to baseball's antitrust exemption; and (5) since confusion would result from overturning *Federal Baseball Club*, any change to be made should come from Congress and not the courts.[109]

It is within the framework of these cases that the merchandising arrangement must be examined. The primary question to be answered is: Does the antitrust exemption apply to the business of baseball, which would arguably include the merchandising arrangement, or only the reserve system?[110]

The Supreme Court has not yet answered this question. Confusion in this arena remains partly due to: (1) the Court's rather quizzical and unusually specious jurisprudence in regard to baseball, and (2) its failure to delineate the precise contours of the exemption. For example, in *Radovich v. National Football League*, the Supreme Court, in dictum, remarked that the "*business of baseball* [was] outside the scope of the [Sherman] Act."[111] Later in *Flood*, however, the Supreme Court stated, "*[w]ith its reserve system enjoying exemption* from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly."[112]

So far, delineating the contours of the baseball exemption has been left to the lower courts.[113] Two decisions of importance are *Piazza v. Major League*

---

106. Id. at 357. In a rather scathing dissent, Justices Burton and Reed argued that the business of baseball was involved in interstate commerce and that Congress had not enacted an express exemption to professional baseball from the antitrust laws. Id. at 360-65.

107. *Flood*, 407 U.S. at 258.

108. Id.

109. Id. at 282-84.

110. For a discussion of the potential effects of removing baseball's antitrust exemption, see Andrew Zimbalist, Baseball Economics and Antitrust Immunity, 4 Seton Hall J. Sports L. 287 (1994).

111. See Radovich v. National Football League, 352 U.S. 445 (1957) (emphasis added).

112. *Flood*, 407 U.S. at 282-83 (emphasis added).

113. See Thomas C. Picher, Baseball's Antitrust Exemption Repealed: An Analysis of the Effect on Salary Cap and Salary Taxation Provisions, 7 Seton Hall J. Sports L. 5, 19-20 (1997).

19

VOL. 1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

*Baseball*[114] and *Butterworth v. National League of Professional Baseball Clubs.*[115] Both cases confine the scope of the baseball exemption to the player reserve system.[116]

In *Piazza*, a Florida investment group sought to purchase and relocate the San Francisco Giants to Florida, and sued MLB. The investor group argued that MLB had

> monopolized the market for Major League Baseball teams and that Baseball ha[d] placed direct and indirect restraints on the purchase, sale, transfer, relocation of, and competition for such teams . . . . [and] that these actions . . . unlawfully restrained and impeded plaintiffs' opportunities to engage in the business of Major League Baseball."[117]

MLB argued that they were exempt from the application of the antitrust laws and that therefore the suit should be dismissed.[118] The district court, after discussing *Federal Baseball Club*, *Toolson*, and *Flood* at length, found that "the antitrust exemption created by *Federal Baseball* is limited to baseball's reserve system."[119] Likewise, the *Butterworth* decision, which also arose from the failed effort of investors to bring the San Francisco Giants to Florida, limits the application of the antitrust exemption to the player reserve system.[120]

While the *Piazza* and *Butterworth* cases deal with franchise relocation, their narrowing of the antitrust exemption to only the player reserve system suggests that the antitrust laws may also apply to any activity of baseball not dealing with the reserve system, such as merchandise licensing arrangements.[121]

The lower courts, however, have not been unanimous in circumscribing the baseball antitrust exemption. For instance, in *McCoy v. Major League Baseball*,[122] the district court rejected the *Piazza* and *Butterworth* holdings, stating: "This Court rejects the reasoning and results of *Piazza* and *Butterworth*. As *Butterworth* recognized, the great weight of authority recognizes that the

---

114. 831 F. Supp. 420 (E.D. Pa. 1993).

115. 622 So.2d 177 (Fla. Dist. Ct. App. 1993).

116. See id.; see also *Piazza*, 831 F. Supp. at 420.

117. *Piazza*, 831 F. Supp. at 424.

118. Id. at 439-40.

119. Id. at 438.

120. *Butterworth*, 644 So.2d at 1022. ("We answer the certified question in the negative and quash the decision below because we find that baseball's antitrust exemption extends only to the reserve system.") For a more detailed discussion of these two cases, see, e.g., Picher, supra note 113, at 19-24.

121. The court did not find that MLB had violated the antitrust laws, simply that the antitrust laws were applicable to this aspect of MLB's business. *Piazza*, 831 F. Supp. at 440-41.

122. McCoy v. Major League Baseball, 911 F. Supp. 454 (W.D. Wash. 1995).

20

scope of the antitrust exemption covers the business of baseball."[123]

Since the lower courts are not unanimous as to the proper scope of baseball's antitrust exemption, the final determination is left to Congress or a more proactive, less awestruck and less nostalgic Supreme Court.[124] Nevertheless, a plausible argument can be made based on *Piazza* and *Butterworth* that the antitrust exemption does not apply to baseball's merchandising arrangements. Furthermore, even if the antitrust exemption does currently apply to all aspects of baseball, it is likely that at some point in the near future the scope of the baseball's antitrust exemption will be limited by Congress.[125] Accordingly, it is instructive to treat baseball as subject to the antitrust laws.

### C. Other Sports

The Supreme Court has not applied baseball's antitrust exemption to other sports, nor does it appear likely that the Court will extend the exception in the future.[126] In *Flood*, while exempting baseball's reserve system from the antitrust laws, the Supreme Court concluded in dicta that "[o]ther professional

---

123. Id. at 457. *McCoy* involved an antitrust suit brought by a group of owners of businesses located near baseball stadiums and a group of fans. These plaintiffs alleged that they suffered injury arising from MLB's alleged unfair labor practices during the player strike of 1994-95. Id. at 454-56. The court was deciding simply whether MLB's judicially granted antitrust exemption applied in this case and whether plaintiffs suffered the type of antitrust injury required to have standing. The court also held that aside from baseball being exempt from the application of the antitrust laws, the plaintiffs in this case did not have standing. Id.

124. In reading *Flood*, it is easy to notice the resounding admiration of baseball and baseball players that the Supreme Court Justices undoubtedly possessed. The Supreme Court quotes the following from the district court judge's opinion:

> Baseball has been the national pastime for over one hundred years and enjoys a unique place in our American heritage. Major league professional baseball is avidly followed by millions of fans, looked upon with fervor and pride and provides a special source of inspiration and competitive team spirit especially for the young. Baseball's status in the life of the nation is so pervasive that it would not strain credulity to say the Court can take judicial notice that baseball is everybody's business. To put it mildly and with restraint, it would be unfortunate indeed if a fine sport and profession, which brings surcease from daily travail and an escape from the ordinary to most inhabitants of this land, were to suffer in the least because of undue concentration by any one or any group on commercial and profit considerations. The game is on higher ground; it behooves every one to keep it there.

*Flood*, 407 U.S. at 266-67 (citing *Flood*, 309 F. Supp. at 797). See also Picher, supra note 113, at 18 nn.82-85, and accompanying text.

125. See Picher, supra note 113, at 24-29.

126. See, e.g., Kaplan, supra note 95, § 5.

21

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

sports operating interstate—football, boxing, basketball, and, presumably hockey and golf—are not so exempt."[127] Further, the Supreme Court specifically held that antitrust laws apply to professional football in *Radovich v. National Football League*.[128] In so holding, the Court reasoned that "the volume of interstate business involved in organized professional football places it within the provisions of the [Clayton and Sherman] Act[s]."[129] Similarly, in *Haywood v. National Basketball Ass'n.*, Justice Douglas, as Circuit Justice, ruled that basketball does not enjoy exemption from the antitrust laws.[130] No Supreme Court decision specifically addresses professional hockey, but based on the *Flood* dicta, and the few lower court decisions, professional hockey is also likely to be subject to the antitrust laws.[131] As the district court in *Boston Professional Hockey Ass'n. v. Cheevers* concluded,

> while not conclusive, [it] appears to this court to make it highly probable and well-nigh a certainty, that all professional sports operating interstate eventually will be ruled by the Supreme Court to be subject to the federal antitrust statutes. Indeed, because of its peculiarly international character, involving several teams in Canada as well as teams in the United States, professional hockey would seem to be the leading candidate for a ruling that it is subject to federal antitrust laws.[132]

Based on these decisions, there is little question that the antitrust laws apply to the other sports leagues, and at least a plausible argument that in merchandising, the laws also apply to baseball.

### D. Characterization of Sports Leagues

If, in fact, no exemption from the antitrust laws exists for other sports (other than a partial exemption for baseball), elements two and three can be addressed (i.e., whether the joint or unilateral activity complained of does in fact restrain

---

127. *Flood*, 407 U.S. at 282-83.

128. See *Radovich*, 353 U.S. at 452. See also North Am. Soccer League v. National Football League, 670 F.2d 1249, 1261 (2d Cir.), *cert. denied*, 459 U.S. 1074 (1982) (recognizing that football is subject to the antitrust laws).

129. *Radovich*, 352 U.S. at 452.

130. Haywood v. National Basketball Ass'n, 401 U.S. 1204, 1205 (1971) (dealing with the legitimacy of basketball's college draft).

131. See Boston Prof'l Hockey v. Cheevers, 348 F. Supp. 261 (D. Mass. 1972), *remanded on other grounds*, 472 F.2d 127 (1st Cir. 1972).

132. Id. at 265.

22

interstate trade or commerce and whether this restraint is unreasonable).[133]  In doing so, it is instructive to characterize the nature of the professional sports league.  Such a characterization is important in order to determine whether Section 1 of the Sherman Act (dealing with joint actions) or Section 2 of the Act (dealing with unilateral action) is the appropriate governing law.

Courts and commentators have found it difficult to characterize sports leagues in a consistent manner.[134]  While many highly regarded commentators have argued that sports leagues should be treated as single entities,[135] most courts have characterized sports leagues as joint ventures subject to Section 1 scrutiny.[136]  The difficulty in characterizing sports leagues may be explained by the fact that, while they produce a single product (e.g., professional football games), leagues are comprised of separate and individually owned teams.

Typically, when separate and individually owned entities enter into an agreement that has an effect on competition, Section 1 of the Sherman Act regulates the transaction.[137]  Initially, many sports league actions appear similar to horizontal agreements (i.e., agreements between economic competitors) usually involved in a typical Section 1 case.  For example, separate teams enter into agreements with each other, such as setting salary caps, which have perceived anti-competitive effects.

---

133.  See Kaplan, supra note 95, and accompanying text.

134.  See WGN v. National Basketball Ass'n, 95 F.3d 593, 600 (7th Cir. 1996) ("Sports are sufficiently diverse that it is essential to investigate their organization . . . one league at a time.") Despite this statement, due to the incredible similarity among the various sports leagues' merchandising structures, a general characterization of sports leagues will be used here.  Thus, it is assumed throughout the following analysis that the outcome of the characterization issue does not depend on which league is being discussed.  See supra Part III.

135.  See, e.g., Gary R. Roberts, The Antitrust Status of Sports Leagues Revisited, 64 Tul. L. Rev. 117 (1989) [hereinafter Revisited]; Gary R. Roberts, Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intra-league Rivalry, 32 UCLA L. Rev. 219 (1984) [hereinafter Use and Abuse]; Myron C. Grauer, Recognition of the National Football League as a Single Entity Under Section 1 of the Sherman Act: Implications of the Consumer Welfare Model, 82 Mich. L. Rev. 1 (1983); see also Chicago Prof'l Sports Ltd. Partnership, 95 F.3d at 597-98.

136.  See, e.g., National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. 85 (1984); Sullivan v. National Football League, 34 F.3d 1091 (1st Cir. 1994); North Am. Soccer League v. National Football League, 670 F.2d 1249 (2d Cir.), cert. denied, 459 U.S. 1074 (1982); Los Angeles Mem'l Coliseum Comm'n v. National Football League, 726 F.2d 1381, 1387-90 (9th Cir.), cert. denied, 469 U.S. 990 (1984).

137.  See Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332 (1982) (maximum prices set by group of doctors per se illegal); National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978) (professional society agreement among members prohibiting competitive bidding found to violate § 1); United States v. Sealy, Inc., 388 U.S. 350 (1967) (agreement among various mattress manufacturers to divide market among them found to violate § 1).

23

Sports leagues, however, present a far more complex case than the typical horizontal agreement. First, unlike in most horizontal agreements where an entity can produce output without its competitors, the sports teams cannot produce games without entering into agreements with other teams.[138] In addition, according to Professor Gary Roberts, the league product consists of more than just the playing of isolated games, whereby all that is required is that two teams must agree to certain rules of that game and the distribution of revenues from that game.[139] Roberts argues that the product the league teams produce is the system of interrelated games that culminates in a championship.[140] According to Roberts, such a league product is a "far more attractive product than any individual... game or games."[141] As Professor Roberts aptly states, "[t]he league thus becomes the lowest indivisible economic unit, or firm, capable of producing the league product."[142] Under this mode of analysis, courts should treat leagues and those actors (i.e., the players, owners and teams) within them like single firms, despite the fact that the organization is decentralized in that teams are separately owned and operated.[143]

Proponents of this single entity view argue that a sports league most closely resembles the corporation in *Copperweld Corp. v. Independence Tube Corp.*[144] In *Copperweld*, the Supreme Court overruled the intra-enterprise conspiracy doctrine which stated that members of the same firm could conspire with each other for the purposes of Section 1 of the Sherman Act.[145] Under the facts of the case, the *Copperweld* Court decided that a parent company and its wholly owned subsidiary could not conspire with each other in violation of Section 1.[146] The Court emphasized that the parent-subsidiary arrangement was that of one economic actor.[147]   Some courts and commentators have coupled the *Copperweld* analysis with the idea that sports leagues act as single economic actors when producing the sports league product to conclude that sports leagues fall outside the scope of Section 1.[148]

---

138.  See Roberts, Revisited, supra note 135, at 120.
139.  Id.
140.  Id.
141.  Roberts, Use and Abuse, supra note 139, at 229.
142.  Id. at 231.
143.  Id. at 231-38.
144.  Copperweld Corp. v. Independence Tube Corp, 467 U.S. 752, 777 (1984).
145.  Id. at 759-66.
146.  Id. at 771-74.
147.  Id.
148.  See Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n, 95 F.3d 593, 598-99 (7th Cir. 1996) (citing *Copperweld* to argue that a sports league can be viewed as a single firm since it produces a single product and does "not deprive the market of individual centers of decision making").

24

Even if courts should treat leagues as one entity when producing games, the question remains whether the league-wide merchandise licensing structure described above in Part III should be characterized as a joint venture or as a single-entity. The remainder of this section will explore the reasons why merchandise licensing should be characterized as a joint venture subject to scrutiny under Section 1 of the Sherman Act.

The characterization question boils down to "whether member clubs of a sports league have legitimate economic interests of their own, independent of the league and each other."[149] If member clubs do not have independent economic interests, as Professor Roberts argues, then the internal league rules and decisions should be per se legal (i.e., no antitrust scrutiny).[150] If, however, individual clubs have individual economic interests, then league rules should be subject to Section 1 scrutiny.[151]

Using this methodology to analyze the sports merchandise licensing structure, the question is whether teams have an individual economic interest apart from the league.[152] It appears clear that they do not have such an individual interest. Unlike in the production of the league product (i.e., the games, championship, etc.) where teams have a unified interest, in the merchandise licensing market teams have divergent interests. Each team individually seeks to sell more of its merchandise than the other teams. While the value of a team's logo depends in part on the league, the independent efforts of the owner to differentiate his team and the team logo play a more significant role in determining price.[153]

Several other factors also distinguish the merchandise licensing market from that of the league product. For instance, while the league product cannot be produced without cooperation, each team's logo can be individually produced. Even if baseball is never played again, George Steinbrenner could license the Yankees' marks. While the value of these marks may fall without the Yankees being a part of professional baseball, it is nevertheless possible to produce the marks outside of the league setting.

Furthermore, the league structure positions teams to compete against each

---

149.  Roberts, Revisited, supra note 135, at 127.

150.  Id.

151.  Id.

152.  Commentators such as Professor Roberts would argue that the individual teams have no independent economic interest. Roberts has claimed that "because every game played within the league structure is an integral part of the league product that is jointly owned by every member team, no team has any legitimate right unilaterally to make any decision relating to any aspect of the production and *marketing* of the joint venture product." Id. at 144 (emphasis added).

153.  See Wall, supra note 27, at 117.

other in the merchandising market. As described in Part III, all teams have limited rights under their respective league agency agreements to sell and license merchandise in a home territory. This structure inherently leads to competition. Teams capture all the value of merchandise with their mark that sells in the limited home territory. As a result, they will strive to capture the market by selling more of their merchandise than that of other teams. This desire to sell more of one's own marks is the essence of competition, i.e., marketing and selling one's product so that consumers will purchase one's own product and not a competitor's.

As competitors, the teams in the merchandising field should be characterized as part of a joint venture subject to scrutiny under Section 1 of the Sherman Act. As Circuit Judge Cudahy of the Seventh Circuit Court of Appeals remarked in his concurring opinion *WGN v. National Basketball Ass'n*:

> With efficiency the sole criterion, a joint venture warrants scrutiny for at least two reasons — (1) the venture could possess market power with respect to the jointly produced product (essentially act like a single firm with monopoly power) or (2) the fact that the venturers remain competitors in other arenas might distort the way the joint product is managed or allow the venturers to use the joint product as a smoke-screen behind which to cut deal to reduce competition in the other arenas.[154]

In the merchandising arena, the teams remain actual competitors, and therefore, judges should scrutinize any rule governing the merchandising arena under Section 1.

### E. Section 1 Analysis

#### 1. Rule of Reason v. Per Se Scrutiny

As described above, Section 1 of the Sherman Act deals with those arrangements between parties that have an anti-competitive effect. In general, the courts have followed one of two tests. The first is a bright-line test known as the "per se rule," which does not inquire into the specifics of the alleged restraint.[155] Rather, the courts resort to this per se rule in order to provide businesses with clear guidelines as to what conduct is legal, thereby deterring

---

154.  *WGN v. National Basketball Ass'n*, 95 F.3d at 603 (Cudahy, J., concurring).

155.  See, e.g., United States v. Addyston Pipe & Steel Co., 85 Fed. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).

26

conduct known to affect competition adversely.[156]  In addition, this bright-line rule dispenses with the need for courts and regulatory bodies to engage in costly and time consuming case-by-case evaluations of the alleged anti-competitive conduct.  As the Supreme Court stated in *Northern Pacific Railway Co. v. U.S.*:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation* into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements.[157]

Obviously, these bright-line rules pose problems in that agreements that may appear to fit the typology of being per se illegal may actually prove to have pro-competitive effects (overinclusiveness), and certain agreements which on their face do not fit the per se rule may actually have anti-competitive effects (underinclusiveness).[158]

The second type of analysis of Section 1 of the Sherman Act claims recognizes that per se rules have the potential for being either overinclusive or underinclusive.  Courts recognizing this fact have developed the "rule of reason."[159]  This test takes into account those factors the per se rule does not consider.  For example, the rule of reason considers the arrangement's purpose, the market power of the parties, and the actual effects of the parties' acts.

The per se approach and the rule of reason approach are, however, endpoints on a continuum of tools the courts have used to evaluate Section 1 claims.  For example, in *Broadcast Music, Inc. v. Columbia Broadcasting System*, the

---

156. See Ernest Gellhorn and William E. Kovacic, Antitrust Law and Economics in a Nutshell 165 (4th ed. 1994).

157. Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958) (emphasis added) (citations omitted).

158. See William H. Page, The Chicago School and the Evolution of Antitrust: Characterization, Antitrust Injury, and Evidentiary Sufficiency, 75 Va. L. Rev. 1221, 1265-1271 (1989).

159. See Chicago Bd. of Trade v. United States, 246 U.S. 231, 239 (1918).

27

VOL. 1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

Supreme Court opted for a modified rule of reason approach.[160]  This approach examines alleged anti-competitive agreements with varying levels of scrutiny depending on the nature of the conduct.[161]

Using this background, the league-wide merchandising structure can be analyzed.  The first step of this analysis is to look at the arrangements and see if they are so anti-competitive on their face that courts should declare them per se illegal.  Courts have been reluctant to use the per se analysis when deciding sports related antitrust cases.  For example, in *NCAA v. Board of Regents,* the Supreme Court stated:

> Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an "illegal per se" approach because the probability that these practices are anticompetitive is so high. . . .  Nevertheless, we have decided that it would be inappropriate to apply a per se rule to this case. . . . [W]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all.[162]

While this case dealt with collegiate sports, courts have applied the same reasoning to professional sports leagues.[163]  For example, in *North American Soccer League v. National Football League,* the Second Circuit stated, "[b]ecause agreements between members of a joint venture can under some circumstances have legitimate purposes as well as anticompetitive effects, they are subject to scrutiny under the rules of reason."[164]  Furthermore, in *Mackey v. National Football League,* the Eighth Circuit concluded that "the unique nature of the business of professional football renders it inappropriate to mechanically apply per se illegality rules."[165]

---

160.    Broadcast Music, Inc. v. Columbia Broad. Sys., 441 U.S. 1, 23 (1979) [hereinafter BMI].

161.    See Gellhorn & Kovacic, supra note 156, at 193.

162.    NCAA v. Board of Regents, 468 U.S. 85, 100-101 (1984).

163.    See Smith v. Pro Football, Inc., 593 F.2d 1173 (D.C. Cir. 1978) (refraining from a per se approach in a challenge to the NFL player draft); United States Football League v. National Football League, 842 F.2d 1335 (2d Cir. 1988) (using a rule of reason analysis).  See also Phillip E. Areeda, Antitrust Law P 1478d, at 359 (1986) (noting that courts "have not woodenly applied the per se prohibitions developed for ordinary business situations" to sports leagues).

164.    *North Am. Soccer League,* 670 F.2d at 1259.

165.    *Mackey,* 543 F.2d 606, 619 (8th Cir. 1976), *cert. denied,* 434 U.S. 801 (1977).  See also WGN v. National Basketball Ass'n, 961 F.2d 667, 673 (7th Cir. 1992) (stating "[i]f the NBA is a joint venture, then the Rule of Reason supplies the framework for antitrust analysis"); National Basketball Ass'n v. SDC Basketball Club, 815 F.2d 562, 563 (9th Cir. 1987) (holding that "[p]ossible antitrust violations within the league thus properly are tested by 'rule of reason' antitrust analysis"); Neeld v. National Hockey League, 594 F.2d 1297, 1299 (9th Cir. 1979) (stating that "[n]ot all concerted action is judged by the rule of per se illegality").

28

The reluctance of courts to use the per se illegality test in the sports setting rests on the premise that the league must combine (i.e., have some agreements) to produce the league product. If courts applied the per se test, then either all league agreements would be invalid, in which case consumers would be without any league product, or all league agreements would be valid, in which case anti-competitive agreements would persist. The concerns over which league agreements are anti-competitive and which promote competition lead courts to the use of the rule of reason approach.

Having determined that the rule of reason approach is the proper analytical device to use, the key determination is whether the league-wide merchandising structure is on the balance anti-competitive or pro-competitive.[166] It is my contention that on balance, the league-wide merchandising structure is anti-competitive.

### 2. Pro-Competitive Arguments

The leagues would argue that the restriction on the ability of individual teams to enter into licensing and merchandising arrangements outside the league-wide merchandising structure is a collateral or ancillary restraint which increases the efficiency of the production of the league product (here defined as the system of interrelated games leading to a championships). The leagues may also claim that even if the league-wide merchandising structure is not necessary for efficient production of the league product it is nevertheless reasonable.[167] Finally, the leagues would argue that they individually lack market power, and therefore any alleged restraint cannot have an effect on competition in the underlying market.

### a. Collateral or Ancillary Restraint Argument

The league would argue that restraints on an individual teams' ability to sell their marks is necessary to promote the league product in the market of sports entertainment events, or alternatively, in the broader market of entertainment

---

166. See *Chicago Bd. of Trade*, 246 U.S. at 238.

167. The distinction between these two arguments is that in the first case, the leagues' argument is based on the proposition that merchandising arrangements help the league produce better and more games. The second argument is that even if the merchandising arrangements have no efficiency impact on the joint venture of producing games, the arrangements allow the leagues to better compete in the sports merchandising market. The following may illustrate this point more clearly. Let *A* be the joint venture set up to produce the league product, let *B* be the joint venture set up to sell league-wide merchandise licensing rights. *A* and *B* are separate joint ventures comprised of the same members. League argument one says that *B* makes *A* more efficient. Argument two says *B* is reasonable regardless of its impact on *A*. Perhaps, because *B* reduces the costs of enforcement of the league and team marks, *B* allows the creation of a new product, such as a league-wide licensed mark.

29

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

events. The league would support this claim by reasoning that having a single entity to market the league product promotes competition by strengthening the league's brand name. The ability of the sports league to compete effectively in the entertainment market is based on the league's ability to provide an exciting game. This in turn depends on a competitive balance between individual teams.[168] According to two leading sport economists, James Quirk and Rodney Fort:

> One of the key ingredients of the demand by fans for team sports is the excitement generated because of the uncertainty of outcome of league games . . . . In order to maintain fan interest, a sports league has to ensure that teams do not get too strong or too weak relative to one another so that uncertainty of outcome is preserved. . . . [Otherwise] the weaker franchise dries up and ultimately fan interest even [in] the strong franchise dries up.[169]

Fans also offer more support when they can "identify with a local or favorite team and have the best quality of play."[170] According to the league, the best way to further these goals is to have a league-wide merchandising plan.

The league-wide merchandising plan furthers these goals in four ways: (i) it prevents collective action problems; (ii) it better distributes revenues in accordance with a team's contribution to the league; (iii) it prevents free rider problems; and (iv) it prevents the devaluation of the league identity and league goodwill.

*i. Collective Action Problem*

A collective action problem remains, however, as long as each team has an incentive to make a profit by dominating the competition on the playing field.[171] Any particular team's dominance necessarily increases the overall disparity between the level of competitiveness between all teams.[172] As noted by economists, as the disparity in league-wide competition widens, the value of the

---

168. See *Chicago Prof'l Sports Ltd. Partnership*, 95 F.3d at 604 (Cudahy, J., concurring) ("The NBA's justification for its restriction of Bulls broadcast centers on the need to maintain a competitive balance among teams.").

169. James Quirk & Rodney D. Fort, Pay Dirt: The Business of Professional Team Sports 243 (1992).

170. *Chicago Prof'l Sports Ltd. Partnership*, 95 F.3d at 603 (Cudahy, J., concurring). See also Quirk & Fort, supra note 169, at 243.

171. See K.B., Winners: It (Usually) Pays to be the Best, Fin. World, Jun. 17, 1997, at 43.

172. Because there is a finite amount of talent that would make a dominant team, as one team acquires the better talent, the other teams lose it. This increases the gap between good teams and bad teams.

30

HeinOnline -- 1 Va. J. Sports & L. 30 1999

league product decreases. Thus, if teams were left to their individual action, each team would seek to increase its well-being at the expense of the whole.[173] The league-wide merchandising structure prevents a team from gaining more revenue than others, without which the team cannot acquire more of the exceptional players and therefore lower the value of the league product.

### ii. More Fair Revenue Distribution

Along these lines, the league-wide merchandising plan distributes revenues in a manner more consistent with each team's contributions to the league product. Such a distribution prevents teams from accumulating excessive wealth with which to poison the commons in the manner described above. The preceding argument assumes that all teams contribute equally to the league product.[174] Since the value of the individual team marks depends to a large extent on the goodwill and value of the league product, which is created by all the teams, all teams should share in the value of other teams' marks. However, dominant large market teams, if allowed to negotiate individual licensing arrangements, would extract a disproportionately large amount of the league product's goodwill value.

Conversely, small market teams, who contribute just as much to the league product as large market teams, would receive a disproportionately small value. Franchises in larger metropolitan areas should not be allowed to extract value based on this demographic advantage because they provide no more of the league product than others located in smaller markets. The league structure acts to distribute to these smaller market teams the value they would receive if they could extract their true contributions to the league product. This system enables

---

173.  In effect, the incentives without a league structure creates a situation like Garret Hardin's Tragedy of the Commons. Here the commons is the finite number of exceptional players. Acquiring such players makes a team more dominant and thus more profitable. At the same time, acquiring more of these players decreases the league's overall competitive balance. The individual team, however, realizes only the benefit and none of the immediate costs. See Garrett Hardin, The Tragedy of the Commons, 162 Sci. 1243, 1244 (1968). Hardin describes the "tragedy of the commons" by using the situation of a common pasture which is shared by multiple herdsmen. In determining how many animals each herdsmen will let graze on the commons, each herdsman considers the positive utility of the profit the herdsman will earn from the sale of the additional animal, and ignores the negative utility represented by the additional overgrazing caused by one more animal. Since the overgrazing is shared by all the herdsmen sharing the commons, but the profit is enjoyed solely by the single herdsman, he will in every case conclude that his best course is to maximize his own gain by adding another animal. Unfortunately, in a world of finite pasture resources, this course of action will result in the ruin of the commons.

174.  See Roberts, Revisited, supra note 134, at 135-36.

31

Vol. 1:1     Virginia Journal of Sports and the Law     Spring 1999

smaller market teams to survive.[175] The league-wide structure in effect corrects the market failure by distributing revenues in accordance with the actual contribution every team makes to the league product.

### iii.  Counteracting the Free Rider Problem

The league-wide plan also promotes fan loyalty better than a system that allows individual teams to negotiate licensing agreements.  If teams negotiated their own contracts, some teams would extract a disproportionately large amount of the league product's value.  Small market teams would realize that they contribute equally to the venture yet receive less than an equal share back, and thus would not find it in their interest to spend the extra effort to promote games.  These smaller teams would attempt to free ride off the efforts of larger market teams by not investing in game promotion.  Without advertising, fans for these smaller market teams will lose faith in their teams and the league.  Thus, free riding diminishes a component of the value and competitiveness of the overall league product, as this value is partly comprised of a fan's ability to associate with a particular team.  In order to prevent free-riding and promote the league in a way that garners fan loyalty, the league structure must continue to prevent individual licensing.[176]

### iv.  Best Promoter of League

The sum of these arguments, according to the leagues, justifies their restraints on merchandising.  Only the league, because of its unique position, can maximize the value of the league product.  By controlling licensing, the league can ensure that merchandising companies promote the league as a whole.

If consumers see that a second rate merchandise company sponsors the league or sells league merchandise, then their impression of the league product will drop.  Unfortunately, individual clubs may have an incentive to sign agreements with these second rate manufacturers (perhaps because the first rate manufacturers will not find it in their interest to sponsor a small market team).[177]  However, in doing so, these teams lessen the value of the league product, thus decreasing its competitive edge in the market for entertainment

---

175.   See Jeffrey A. Rosenthal, The Football Answer to the Baseball Problem: Can Revenue Sharing Work?, 5 Seton Hall J. Sports L. 419, 428-432 (1995).

176.   See id.

177.   See, e.g., Rachel Spevack, Sports Brands, Pro Leagues - A Marriage Made to Sell: Mixing Of Strong Logos Will be a Major Direction at Super Show, Daily News Rec., Feb. 3, 1997, at 20 (quoting Sal LaRocca, vice-president, apparel, NBA Properties, "Certainly, we feel that we have a very strong brand in the marketplace and that marrying our brand with other strong brands will make our business that much more impactful.").

32

events. The only way to curtail this problem is to allow the restraints imposed by the league-wide licensing plan.

Based on the preceding reasons, the leagues would argue that the league structure, which proscribes individual teams from entering into merchandise licensing agreements, cures market failures (the collective action and free rider problems) and acts to promote the league product. This benefits consumers, who value a competitive league higher than a noncompetitive one. Furthermore, it promotes competition in both the broad entertainment market, and the more narrow sports entertainment market by producing the most valuable product possible.

### b. Inherent Reasonableness

Sports leagues would argue that even if courts find that the league system does not promote competition, the merchandising joint venture has pro-competitive effects in the sports merchandising market.[178]

This argument parallels arguments made in *BMI*[179] and *Fleer Corporation v. Topps Chewing Gum, Inc.*[180] In *BMI*, a group of owners of musical compositions split into two competing groups: the American Society of Composers, Authors, and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI"). These two organizations (1) enforce the copyrights held by the owners of musical compositions; and (2) make it easier for composers to negotiate licensing agreements with performers.[181] BMI and ASCAP sell blanket licenses to certain users that allow the users to perform the entire repertory of compositions as often as they wish.[182] In return, the users pay a specified fee or a royalty based on their advertising revenue.[183] When Columbia Broadcasting System's ("CBS") efforts to pay for a license on a per use basis were thwarted by ASCAP and BMI, however, CBS filed suit alleging that the blanket contract was a per se violation of Section 1 of the Sherman Act.[184] As mentioned supra, the *BMI* Court opted for a modified rule of reason approach.[185] The Court recognized that the blanket license merged the prices of differing compositions into a single fee, but the Court concluded that this pricing was not overtly anti-

---

178. See supra note 167 and accompanying text.
179. *BMI*, 441 U.S. 1 (1979).
180. Fleer Corp. v. Topps Chewing Gum, Inc., 658 F.2d 139 (3d Cir. 1981).
181. See *BMI*, 441 U.S. at 4-5.
182. See id. at 5-6.
183. See id.
184. Id. at 18.
185. Id. at 19.

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

competitive.[186]  The Court justified this holding by arguing that (1) the blanket license lowers the costs of monitoring and enforcement; (2) the blanket license lowers the cost of negotiation for licenses; (3) the blanket license is a different product that many consumers prefer; and (4) individuals are not precluded from obtaining licenses from individual composers.[187]

Likewise, in *Fleer*, a main issue under consideration was the Section 1 liability of the Major League Baseball Players Association ("MLBPA").[188] Fleer, a baseball card manufacturer, alleged that the MLBPA violated Section 1 by refusing to sell them the use of baseball players' likenesses for use on baseball cards.[189]  Fleer alleged that this refusal was an unlawful group boycott and therefore an illegal restraint of trade.[190]  The Third Circuit held that "[f]ar from being a restraint on trade, the [MLBPA's] commercial authorization agreement is pro-competitive."[191]   The Court also found that the MLBPA's licensing program (1) helped "set up a wide variety of baseball novelty items" and (2) reduced negotiating costs.[192]  The Court upheld the MLBPA's licensing program even though the license it sold to Fleer's rival was exclusive.  Thus, unlike the *BMI* case where users could negotiate individually with performers outside of the blanket license, even if Fleer wanted to negotiate with the individual players outside of the MLBPA, they could not.[193]

Against this background law, leagues would argue that the merchandising structure is as reasonable as those found in *BMI* and *Fleer*.  Leagues could support this position with several arguments.  First, the merchandising joint venture lowers costs of enforcement of the various team and league marks. Rather than each team monitoring infringement and use of its mark with the resulting duplicative efforts, the league would function as a central clearinghouse efficiently monitoring infringement and use.     Second, a centralized merchandising structure reduces negotiating costs.  Merchandising companies would prefer to negotiate one time with a central clearinghouse, rather than negotiate individually with each team.  Third, selling the team and league marks promotes competition because it creates new products.  Much like the *BMI* blanket license and the MLBPA group license, leagues can sell a league-wide license which enables companies to create new league products more cheaply

186.   Id. at 23-24.
187.   Id. at 20-23.
188.   658 F.2d at 140.
189.   Id.
190.   Id.
191.   Id. at 151.
192.   Id.
193.   See id.

34

and effectively. Thus, according to the leagues, courts should find that the league-wide merchandising plan fosters competition and is not an unreasonable restraint on trade.

### c. Lack of Market Power

"Substantial market power is an indispensable ingredient of every claim under the full rule of reason."[194] This rule states a necessary condition required for the court to find a violation of Section 1 of the Sherman Act under the rule of reason.[195] The leagues would argue that even if the league-wide merchandising plan has no pro-competitive benefits, the leagues lack market power. If this is true, the league-wide plan cannot, as a matter of economic logic, adversely impact the market.

The determination of market power is difficult.[196] First, it is necessary to characterize the scope of the market. Is the market the sports merchandising market, sports entertainment market, or the even larger general entertainment market? Sports leagues, no doubt, would argue that the market's scope should include the entire entertainment market because sports compete with other forms of entertainment.

The leagues would argue that, even if the merchandising restrictions failed to increase efficiency, the restrictions would have no impact on the market, as consumers would turn to other entertainment avenues (e.g. another sport, movies, television, plays, concerts, books, etc.). Likewise, the leagues would argue that the restraint has no impact on the overall merchandise licensing market. If the league-wide plan did not stimulate competition, merchandise manufacturers would turn to other types of companies to purchase licenses (e.g., licensing an actor's likeness to put on merchandise). Based on this reasoning, the leagues would argue that the league-wide merchandising plan cannot have an effect on the market. Therefore, courts should not find the league-wide plan to be an unreasonable restraint on trade.

### 3. Anti-Competitive Effects

Individual teams do not have a unitary interest in breaking up the league-wide merchandising plan. Those teams that would be able to extract a larger

---

194. *Chicago Prof'l Sports Ltd. Partnership*, 95 F.3d at 600.

195. But see North Am. Soccer League v. National Football League, 670 F.2d at 1259-60 ( 2d Cir. 1982) (neglecting to address market power as a threshold question in their rule of reason analysis).

196. To accurately define a market, it is necessary to apply sophisticated and complicated econometric models, measuring consumer behavior, cross elasticities of demand, and numerous other factors. Even then this analysis is not precise, as certain assumptions need to be made regarding what data needs to be included in the analysis. This type of analysis is beyond the scope of this paper.

piece of the league product's value, like the Yankees, want to individually enter into licensing agreements with merchandisers. Small market teams who could not extract a high value, would side with the league. Such smaller market teams benefit because of the revenue sharing provisions in the league-wide plan. This section, therefore, discusses the arguments of those teams that would be able to extract the larger value.

These teams, such as the Yankees and Cowboys, would argue that the league-wide plan unreasonably restrains trade. Some companies who have been unable to negotiate desirable licensing deals would also support this position. For shorthand, these boycotted companies and teams that seek the right to negotiate individual contracts will be referred to as the "Individual Team."[197] The Individual Team would argue that the league-wide merchandising plan operates as an unjustifiable restriction on the output of sports-related merchandise.

*a. Output Restriction*

The league-wide merchandising plan creates a cartel which reduces the number of licenses given. The basic premise to this argument follows from the economic model explained above in Part III. To recap briefly: without the league-wide plan, teams will compete with each other for sponsorships and licenses. To the extent that team marks are substitutes, this competition will cause the price of all marks to be less than if no competition existed. Furthermore, such competition leads to more of the product (mark licenses) being sold.[198] When a league acts as the exclusive agent of team marks, however, competition in the marketplace stops as teams are forbidden from competing with each other for sponsorships and licensing deals. Instead, the league controls the marks exclusively. This unitary control of marks creates a monopoly-like situation, increasing the price charged for all league marks and reducing the number of licenses given.[199] Moreover, the Individual Team would argue that unlike *BMI* and *Fleer*, the sports league merchandising structure does not reduce enforcement costs or transaction costs.

In the *BMI* case, the blanket license covered over 8000 different composers and millions of compositions.[200] In *Fleer*, the MLBPA represented more than 500 players.[201] Given these high numbers, it is reasonable to assume that there

---

197.  This term excludes those teams that would want to keep the league-wide merchandising plan in place.
198.  See supra Part III and text accompanying notes 69-78.
199.  See supra Part III and text accompanying notes 69-78.
200.  See *BMI*, 441 U.S. at 20.
201.  See *Fleer*, 658 F.2d at 141.

HeinOnline -- 1 Va. J. Sports & L. 36 1999

are substantial cost savings from having a licensing clearinghouse. In the league-wide merchandising context, with at most thirty teams, the cost savings are not as apparent.

In addition to differences regarding the number of bargaining parties, the baseball card and music composition markets differ from the sports merchandising market in several important ways. For example, in order to sell baseball cards, a company must have a license to use the likeness of each of the players, or the baseball card collector will not value the product. In the music composition market, most users "want unplanned, rapid, and indemnified access to any and all of the repertory of compositions."[202] Without a blanket license that covers all the compositions, it would be cost prohibitive to secure individual licenses from all the composers. Thus, in both the *BMI* setting and *Fleer* setting, the joint venture creates a new and valuable product.

In the sports merchandising market, not all merchandise manufacturers want to purchase the entire league's inventory of marks. In fact, it appears that many local sponsors and retailers would prefer to negotiate individually with their local team(s). Since these local consumers of league marks are more knowledgeable about their local team(s) and the local demographics, they would have an advantage negotiating with the local team. These companies are better able to supply a product that consumers in their locale want. If forced to deal with the league-wide entity, local consumers end up purchasing marks that they do not want, and cannot use effectively. For instance, a New York company may want to sponsor the Yankees but not the Marlins, knowing nothing about Florida nor having any business there. A league-wide license is useless for local companies whose customers are located within one state. Under the league-wide system, local companies must overpay for the only mark that they want, or forego licensing any mark. As one industry analyst remarked, "[m]ore retailers are segmenting themselves and are interested in teams in their own backyards."[203] The league-wide plan, however, essentially precludes these retailers from obtaining licenses, leading one local San Diego retailer to remark when referring to his inability to procure a license to the San Diego Padres marks, that "We can't touch the Padre stuff."[204] Thus, rather than creating (as in *BMI* and *Fleer*) a new and competitive product, the league-wide merchandising plan actually has created an inefficient exclusionary product.

202.  See *BMI*, 441 U.S. at 20.

203.  Judy Cocoran, Retail Exposure Called Key to Sports Licensing, Industry Experts Explain Strategy 33 (July 8, 1996) (quoting industry expert Brian B. Hakan).

204.  Berliner, supra note 57, at C1 (quoting Pam Smith, office manager of the retail store James Gang, in Ocean Beach, California).

### b. Market Power

The Individual Team argument assumes that leagues enjoys market power. To support this assumption, the Individual Team would claim that the relevant market scope is limited to the market for a particular sport's licensed merchandise and sponsorship. For example, in the football setting, the Individual Team would argue that the relevant market is the football merchandise licensing and sponsorship market.[205] Even if the market definition expanded, that does not preclude a finding that the individual sports league lacks market power. As the Seventh Circuit remarked in *Chicago Professional Sports Ltd.*, "If [a sports team] assembled for advertisers an audience that was uniquely homogenous, or had especially high willingness to buy, then it might have market power even if it represented a small portion of air time."[206]

The appeal for merchandise manufacturers, like Nike and Reebok, and sponsors, such as VISA or AMEX, is the fact that sports leagues provide a population that has a high willingness to buy.[207] Commentators on sports economics have remarked, "Sports have always enjoyed certain advantages over other types of programming. Major sporting events still pull in large numbers. Ratings are generally predictable. And the demographics are attractive. For example, pro basketball draws hordes of young men while golf attracts the affluent."[208] Further, according to other industry analysts, "the NFL operates from strength with its sponsors, as with the TV networks, largely because the sport achieves broad penetration of the adult male market that advertisers want to reach."[209] The same is true for the other leagues. Thus, it appears that each league has sufficient market power to adversely impact the market.

### c. Leagues' Arguments Are Unavailing

The Individual Team argues that the league-wide merchandising structure lacks a substantial connection to the attainment the leagues' legitimate goal. The leagues' goal is the production of an interrelated series of competitive games (the league product). The league-wide merchandising plan works against this goal by creating incentives that diminish the level of competitiveness. When games are less competitive, the value of the league product decreases, and most teams make less money.

---

205. See, e.g., NCAA v. Bd. of Regents, 468 U.S. 85, 100-101 (1984).
206. See *Chicago Prof'l Ltd. Partnership*, 95 F.3d at 601.
207. John F. Geer, Jr., FOX's Law, Fin. World, June 17, 1997, at 52.
208. Id.
209. Deogun & Fatsis, supra note 62, at B1, B9.

38

The league plan fails to increase competitiveness in four ways: (1) sharing merchandise revenue creates disincentives for owners to pay to create competitive teams; (2) instead of eliminating the free-rider problem, the league plan exacerbates it; (3) the league plan provides no incentive for those teams who are inefficient and lower the value of the league product to exit the market; and (4) the teams would promote the league product better individually than they do when acting through the league.

### i. Disincentive to Win

The problem with the league-wide restraints on individual merchandise licensing deals is that they create a disincentive to win.[210] Under the league-wide plan, revenues from merchandising sales are shared equally among all teams. Without such a plan, teams would seek to maximize the value of their franchises because on-the-field performance would correlate with financial success.[211] Under league sharing arrangements, teams do not reap the full value of their on-the-field success. Instead, each team receives only $1/n^{th}$ (where n is equal to the number of teams in the league) of the income generated. This creates an incentive for every team to lower its costs because all costs accrue to the team, while the team receives only $1/n^{th}$ of the income it generates. Accordingly, teams would seek to sign cheaper, less competitive players. This would in turn would lead to less competitive teams. Since consumers value a high level of competition in addition to a certain parity of competition, the league-wide structure actually harms consumers. Without the league plan, each team would get all the benefits of its actions and all the losses. Teams would then seek to enter into lucrative endorsement deals, so as to purchase the better players. This type of bidding in the free market would make each team and the league as a whole more competitive.

### ii. Exacerbates Free Riding

The revenue sharing aspect of the league plan also exacerbates free-riding by smaller market teams. In the merchandising market, consumers buy a disproportionately large amount of merchandise licensed with the marks of popular or larger market teams. Nevertheless, all teams share equally in this income regardless of the amount of merchandise that was actually sold with any particular team's logo. Under this system, smaller market teams have no incentive to market their merchandise or the league product because they receive, for example, 95% of their merchandise and sponsorship revenue from

---

210.   See, e.g., Rosenthal, supra note 175, at 433-34.
211.   See K.B., supra note 171, at 14.

the other teams. Thus rather than curing the free rider problem, the league plan exacerbates it. If, however, teams were free to enter the market individually and license their logos and get sponsorship deals, this free rider problem would disappear. This free market approach is better for the league product because in competition for merchandising revenues and sponsorships, all teams would have the incentive to promote their team and league.

Evidence of the free rider problem abounds. For instance, one day before the opening of baseball season, the Cincinnati Reds, a small market team, traded ace starter Dave Burba for a minor league player. Reds' General Manager, Jim Bowden, explained, "we're a small-market team now . . . and we'll be waiting for Mr. Steinbrenner's revenue-sharing check in the fall."[212] This example is common among these small market teams. As this evidence shows, the league-wide plan actually creates disparity in competitiveness among teams, decreasing the league's overall value to consumers.

### iii.  Inefficient Subsidies

The league-wide plan creates a system that subsidizes inefficient teams by re-distributing revenue. This allows teams that contribute less to the league product to survive.[213] There is no reason to assume that the current number of teams in each league is efficient. As Judge Cudahy stated, "However, one can speculate that, since sports viewing has become more of a television activity than an "in the flesh" activity, these fans might prefer to have a league composed of fewer [and] better teams."[214] The league might be better off without teams that cannot survive without subsidies.

### iv.  Individual Teams Are Better Promoters

Individual teams are better able to assess their local demographics, consumers, and sponsorship bases. This informational advantage is useful when teams are seeking sponsors or seeking to license their marks. The league cannot have better information about the local team than that local team. The informational cost for the league to investigate the markets of each individual team is greater than having the respective teams investigate their local markets. In part, it is this informational cost that makes the decentralized handling of team

212.  Bill Madden, One Sorry Circus in Cincinnati, N.Y. Daily News, Apr. 5, 1998, at 106.

213.  The league's argument that each team contributes equally to the league product seems rather simplistic in light of the differences among teams. That is, regardless of the reason, some teams contribute more to the league product than others. Teams such as the New York Yankees and Los Angeles Dodgers have a history which engenders more fan support than other teams, not to mention that these teams are located in larger metropolitan areas.

214.  Chicago Prof'l Sports Ltd., 95 F.3d at 604 (Cudahy, J., concurring).

40

finances, player signings, and management more efficient than a singular entity. It is rather ironic that in these other areas the league has chosen to use a decentralized approach, but in the merchandising realm they have not, in spite of the advantages local teams would have in this area. In summary, the league's restriction adversely impacts the merchandising market itself and fails to stimulate competition in league games.

### F.  Sports Broadcast Act Comparison

On balance, the league's arguments are unconvincing. First, each league has market power. Basic economic theory demonstrates that such market power decreases the output of team marks and increases prices. Second, justification along the lines of *BMI* and *Fleer* seem unavailing as the transaction cost savings are not significant and the "new product" seems to be an exclusionary one. Third, the league-wide merchandising agreements do not have a pro-competitive effect on the league product (i.e., the league games, etc.).

Instead, the league structure promotes free-riding and decreases incentives to win. Furthermore, the league-wide merchandising plan that seeks to subsidize small market teams is not necessary for the league to survive. Perhaps if small market teams were cut loose and left to contend with market forces, stronger, more competitive teams and leagues would emerge.

Moreover, when one compares Congress' response to league-wide licensing plans in the television broadcast market to that of the merchandising context, it seems apparent that league-wide plans are per se illegal, but for explicit legislation to the contrary.[215] In the sports television broadcasting market, much like in the sports merchandise licensing market, individual teams pool their rights and sell them.[216] However, unlike in the merchandise market, Congress has in the sports television broadcast market explicitly exempted such pooling arrangements among individual teams from antitrust liability.[217] In what is commonly called the Sports Broadcast Act ("SBA"), Congress has legislated that:

> the antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports . . . by which any league of clubs participating in professional [sports] sells or otherwise transfers all or any part of the rights of such

215.    See Sports Broadcast Act, 15 U.S.C.S. § 1291 (1998).
216.    See Phillip M. Cox, II, Note: Flag on the Play? The Siphoning Effect on Sports Television, 47 Fed. Com. L.J. 571, 573 (1995).
217.    See 15 U.S.C.S. § 1291 (1998).

41

VOL.1:1          VIRGINIA JOURNAL OF SPORTS AND THE LAW          SPRING 1999

league's member clubs in the sponsored telecasting of the games.[218]

This piece of legislation had the effect of overruling *United States v. National Football League*.[219] In that case, the court found that NFL rules which restricted the area into which teams could broadcast their games violated the antitrust laws.[220] Moreover, the court found that the arrangement by which the individual football teams pooled their rights and sold them to CBS violated the antitrust laws.[221]  The facts of this case closely parallel those of the merchandising context.

While *United States v. National Football League* was effectively overruled by the SBA, Congress has not enacted legislation exempting the pooling of merchandise rights from the antitrust laws.  Accordingly, should the aforementioned case be applied to the merchandising context, sports leagues would be found in violation of the antitrust laws.

## V. CONCLUSION

In the 1990 Academy Award winning movie *Field of Dreams*, Terrence Mann, played by James Earl Jones, remarks:

> The one constant through all the years, Ray, has been baseball. America has rolled by like an army of steamrollers. It's been erased like a blackboard, rebuilt, and erased again. But baseball has marked the time. This field, this game, is a part of our past, Ray. It reminds us of all that once was good, and that could be again. Oh people will come, Ray. People will most definitely come.[222]

Terrence Mann's statement symbolizes the sentimentality people have for sports. However, it is precisely this romanticized view of sports that is to blame for the perpetuation of obstacles to efficiency.  We have seen the Supreme Court continue to uphold baseball's antitrust exemption based on this nostalgia, despite any economic or valid legal reason.[223]

Likewise, we have seen the leagues argue that their current systems, created primarily through historical accident, are efficient. However, the league's

---

218.  Id.

219.  See, e.g., Robert Alan Garret and Philip R. Hochberg, Sports Broadcasting and the Law, 59 Ind. L.J. 155, 187 (1984).

220.  United States v. National Football League, 196 F. Supp. 445, 447 (E.D. Pa. 1961).

221.  Id.

222.  Field of Dreams (Gordon Company 1989).

223.  See Flood v. Kuhn, 407 U.S. 258 (1972).

42

arguments do not demonstrate their efficiency. They assume efficiency based on the fact that the league merchandising structure has existed for such a long time. Meanwhile, the leagues subsidize teams that are not competitive economically or on the field. The leagues justify their rules with the somewhat circular argument that it is good for the league to have these teams around because they have existed for some time. This sentimental logic is not supported by economic logic.

Instead, this sentimental logic impedes the league's overall profitability. This inefficiency poses a threat to the market and can be avoided through proper and judicious use of antitrust enforcement. Such antitrust decisions may change the structure of the leagues, but a change that leads to cheaper prices for consumers, increased output, and a more valuable product is a change for the better.[224]

---

224. The antitrust suit filed by the Yankees and adidas against MLB was settled on May 1, 1998. The settlement called for, inter alia, that Steinbrenner be restored to baseball's Executive Council and that adidas be signed to a national footwear licensing and advertising agreement. In addition, the settlement allows adidas to use MLB uniforms to promote their products worldwide. See Steve Zipay, Yankees, adidas Settlement Winners, Newsday (New York, NY), May 1, 1998, A96.

43