Dallas' Head Cowboy Emerges Victorious in a Licensing Showdown With the N.F.L.: *National Football League Properties v. Dallas Cowboys Football Club, et. al.*

## I. INTRODUCTION

Jerry Jones, the controversial owner of the Dallas Cowboys, always seems to be the center of attention at National Football League ("NFL")[1] owners' meetings. Two years ago, it was his well-publicized fight with Jimmy Johnson, the coach who had just led Jones' Cowboys to back-to-back Super Bowl victories.[2] The media spotlight was again pointed on Jones when, during a midday break at the September 1995 owners' meeting in Atlanta, he was served both his lunch *and* the legal papers in a $300 million federal lawsuit filed against him by National Football League Properties ("NFL Properties").[3]

---

1. The NFL is an unincorporated association of thirty professional football teams, each separately owned and operated through a distinct corporation or partnership. Alan J. Ostfield, *Seat License Revenue in the National Football League: Shareable or Not*, 5 SETON HALL J. SPORT L. 599 (1995).

2. Jerry Jones once stated that his most important decision as Cowboys' owner was his 1989 hiring of Jimmy Johnson. Frank Luksa, *Making Up Is Getting Harder To Do: Owner's Actions Leave Coach Bewildered, Hurt*, DALLAS MORNING NEWS, March 27, 1994, at 1B. It was thus a surprise when Jones announced at the 1994 owners' meeting in Florida that he wanted to fire Johnson. Frank Luksa, *Parting of the J's: Unlucky Successor Faces Frightening Task*, DALLAS MORNING NEWS, March 30, 1994 at 1B. In his public indictment of his head coach, Jones quipped that any of five hundred coaches could have led the 1993 Cowboys to the Super Bowl championship. *Id.* Jones' anger apparently manifested itself after Johnson allegedly snubbed the owner at a party. Luksa, *Making Up Is Getting Harder To Do: Owner's Actions Leave Coach Bewildered, Hurt, supra,* at 1B.

It was more than a perceived snub that led to Jimmy Johnson parting company with the Cowboys, however, for the egos of the two men clashed almost from the beginning of the coach's tenure in Dallas. In fact, Johnson may have sealed his fate prior to the final game of the 1993 regular season, when he admitted that he was interested in joining the expansion Jacksonville Jaguars. *Id.*

3. Rick Gosselin, *Jones Faces Skeptical Owners: He's Optimistic, Others Gloomy at First Meeting Since He Cut Deals*, DALLAS MORNING NEWS, September 20, 1995, at 1A.

In a retaliatory lawsuit, Jerry Jones charged the NFL with violating antitrust laws. *See* Dallas Cowboys Football Club, Ltd. v. National Football League Trust, et. al., 95 Civ. 9426 (SAS) (S.D.N.Y. 1996). Jones sought $750 million in damages and also asked the court to dismantle NFL Properties, which he termed an "unlawful cartel." John Helyar, *NFL Teams Tackle Changing Economy with Brash Plays: Dallas Cowboys*

255

What happened that would cause the NFL to file suit against one of its own? In short, Jones disregarded the fact that Coca-Cola is the official soft drink of the NFL,[4] Visa is the league's official credit card,[5] and Nike had not yet become a "Pro Line"[6] supplier of NFL uniforms and apparel. He entered into lucrative endorsement contracts with the Dr. Pepper Bottling Company of Texas ("Dr. Pepper"), the Pepsi-Cola Company ("Pepsi"), Nike, Inc. ("Nike") and American Express Travel Related Services, Inc. ("American Express") which threaten to undermine the rights of the NFL's official sponsors and appear to be deliberate attempts to circumvent league-wide licensing agreements which limit his ability to market the Cowboys. NFL executives and the vast majority of franchise owners feared that Jerry Jones' actions would endanger the very stability of the National Football League, which has long considered revenue sharing to be the most vital ingredient in the league's formula for success.

Also named as Defendants in the lawsuit were the Dallas Cowboys Football Club, Ltd. ("Cowboys")[7] and Texas Stadium Corporation ("TSC")[8]. Jones, who purchased the Cowboys for $140 million[9] in 1989, is both the sole general partner of the

---

*Hit League With Antitrust Lawsuit; Browns Run to Baltimore*, WALL ST. J., November 7, 1995, at B9.

  4.  Ed Werder, *Pepsi Challenge: Cowboys' Jones Signs Pact with Rival of Official NFL Sponsor Coca-Cola*, DALLAS MORNING NEWS, August 4, 1995, at 1A. *See also* Verified Complaint at 18, ¶ 25, National Football League Properties, Inc. v. Dallas Cowboys, Ltd., Texas Stadium Corporation, and Jerral W. Jones, No. 95 Civ. 7951 (SAS) (S.D.N.Y. September 18, 1995) [hereinafter Complaint].

  5.  *Cowboys Defy League Again*, WASH. POST, October 6, 1995, at C04. *See also* Complaint, *supra* note 4, at 28, ¶ 38.

  6.  Official uniform and apparel suppliers of the NFL are granted "PRO LINE" licenses, which "afford licensees exclusive rights to sell apparel and equipment bearing . . . Club Marks and NFL Marks. Another aspect of the PRO LINE licenses is the payment by the licensee of a television exposure fee." Complaint, *supra* note 4, at 23, ¶ 33. For a definition of "Club Marks" and "League Marks," *see infra* note 50, 51.

  Reebok, for example, is an NFL Pro Line licensee. Laura Castaneda, *The Just-Do-It Guys Tweak the Big Boys: Jerry Jones, Nike Make Good Match*, DALLAS MORNING NEWS, September 6, 1995, at 1D. Subsequent to the filing of NFL Properties' suit against Jones, Nike joined companies such as Reebok as a Pro Line supplier to the NFL. *See infra* note 98.

  7.  The Dallas Cowboys Football Club, Ltd., is a limited partnership which owns and operates the Dallas Cowboys. Complaint, *supra* note 4, at 2, ¶ 3.

  8.  Texas Stadium Corporation is the corporate entity which operates Texas Stadium, the home field of the Dallas Cowboys. *Id.* at 2, ¶ 4.

  9.  Werder, *supra* note 4, at 1A.

Cowboys and the sole shareholder of TSC.[10] Because TSC is not subject to the NFL's licensing agreements, Jones structured his deals so that TSC—not the Dallas Cowboys—is a party to the contracts at issue.

Given the NFL's strong commitment to its present licensing scheme, and its belief that Jerry Jones violated his contractual obligations under the league's licensing arrangement, the recent announcement that NFL Properties and Jones had dropped their lawsuits against each other came as a surprise.[11] The settlement allows Jones not only to keep his present sponsors, but also to sign new ones.[12] At this time it is still unclear why the NFL—which appeared to have a strong case against Jones—agreed to a settlement which apparently ratifies conduct which runs counter to the league's licensing structure and threatens to undermine NFL revenue sharing.

Part II of this article provides a brief introduction to revenue sharing in the National Football League and NFL Properties' role in that system. Part III details the NFL's Trust and License Agreements and the obligations and rights of Jones and the Cowboys under those agreements. After this essential information is set forth, Part IV will examine the contracts entered into by TSC. Part V looks at the allegations in the complaint, with special emphasis placed on the complaint's centerpiece allegations: violation of § 43(a) of the federal Lanham Act, and breach of the NFL's Trust and License Agreements. Finally, Part VI describes the dangers which Jerry Jones' economic philosophy poses to the National Football League.

## II.  Background: Revenue Sharing in the NFL

The National Football League established itself as a viable professional sports league during the late 1950s.[13] It was not

---

10. Complaint, *supra* note 4, at 3, ¶ 5.

11. *Jones and N.F.L. Proclaim Truce*, N.Y. Times, December 14, 1996, at 34. Though NFL Properties has dropped its lawsuit, Jones, the Cowboys and TSC are collectively referred to as the "Defendants" throughout this article.

12. *Id.*

13. Until the 1950s, the popularity of college football far exceeded that of the professional game. The 1958 NFL Championship between the New York Giants and the Baltimore Colts forever altered that perception. As John Steinbreder recalls in his book, *Giants: 70 Years of Championship Football*: "CBS had begun televising games the year before, and the title match-up was being seen by hundreds of thousands of people across

until the early 1960s, however, that the "modern" NFL was born. The 1961 agreement which marks the genesis of the modern NFL came about as a direct result of the threat posed by the upstart American Football League ("AFL")[14]. Upon the AFL's formation in 1960, its eight member franchises pooled their television rights and entered into a broadcasting contract with NBC.[15] Equal distribution of television revenue provided each AFL franchise with approximately $212,000 per year.[16]

Unlike their new rivals, NFL franchises had heretofore negotiated individual television contracts.[17] This arrangement resulted in a disparity in the revenue received by the big market and small market teams. For example, the Green Bay Packers, champions of the NFL's Western Division in 1961,

---

the country. Those who witnessed it were treated to a stirring overtime victory by the Colts in a contest that would become known as 'the greatest game ever played' and be credited with starting America's love affair with professional football." John Steinbreder, GIANTS: 70 YEARS OF CHAMPIONSHIP FOOTBALL xiv (1994).

14.   Between 1960 and 1966, the AFL and the NFL competed for players, popularity and survival itself. The new league established franchises in Boston, New York, Buffalo, Houston, Dallas, Denver, Los Angeles and Oakland. THE SPORTS ENCYCLOPEDIA: PRO FOOTBALL 24 [hereinafter SPORTS ENCYCLOPEDIA]. Three of those cities, New York, Dallas and Los Angeles, were also home to NFL franchises. *Id.*

In order to generate a following, the AFL implemented innovative rules which added a dimension of excitement that seemed to be lacking in NFL football. For example, the new league adopted a two point conversion rule (a rule which was only recently adopted by the NFL). *Id.* at 14. In addition, AFL teams favored wide-open, pass-oriented strategies which resulted in high-scoring games. *Id.* at 14.

The establishment of the AFL also led to a bidding war between the leagues and the defection of veteran players from the NFL. *Id.* at 14, 24. Joe Namath, the University of Alabama's star quarterback, became the most celebrated college player to spurn the NFL for the new league when he received a $225,000 signing bonus, plus annual salary of $25,000, to sign with the New York Jets in 1965. SPORTS ENCYCLOPEDIA, *supra*, at 14.

The bitter rivalry between the AFL and the NFL also manifested itself in court. In 1962, the AFL failed in having the NFL declared a monopoly in the areas of expansion, player signings and television contracts. *Id.* at 15.

The competition between the two leagues came to an abrupt and surprising end on June 8, 1966, when NFL Commissioner Pete Rozelle announced that a merger agreement had been reached. *Id.* at 15. The first championship game between the champions of the AFL and NFL was staged following the 1966 regular season. *Id.* By 1967, the AFL and NFL were holding a common draft and scheduling inter-league pre-season games. *Id.* The formal merger between the leagues took place on February 1, 1970. SPORTS ENCYCLOPEDIA, *supra*, at 187.

15.   Brett Goodman, *The Sports Broadcasting Act: As Anachronistic As the Dumont Network?*, 5 SETON HALL J. SPORT L. 469, 472 (1995).

16.   *Id.* at 472.

17.   "11 of the league's 14 teams had signed individual contracts with CBS, two teams had done the same with NBC, and the Cleveland Browns had founded its own network." *Id.* at 472, n.12.

earned only $120,000.[18]  The Washington Redskins, on the other hand, finished last in the Central Division yet brought in $250,000.[19]

In response to both the AFL's success in negotiating a league-wide television contract and the revenue disparity which resulted from the NFL's system of individual television deals, NFL franchise owners agreed to pool their television rights and share in the resulting revenues.[20]  This about-face can largely be attributed to the efforts of then-NFL commissioner Pete Rozelle, who convinced the owners that the success of their teams depended on the well-being of each NFL franchise.[21]

The new league-wide television arrangement not only gave Rozelle great leverage when negotiating with the networks, but also ensured that any revenue generated from such a deal would be distributed *equally* among the member clubs of the National Football League.[22]  Armed with the authority to negotiate on behalf of the entire league, Rozelle contracted with CBS for a $4.6 million deal that would produce annual revenue of $332,000 per team.[23]

---

18.  *Id.*

19.  *Id.* at 472.

20.  *Id.*

21.  Roger Thurow and John Helyar, *Line of Scrimmage: Jerry Jones Thinks NFL Revenue Sharing is a Bit Socialistic; Like Gorbachev, He Stumps for Big Reforms; Foes Divine a Greedy Motive; Dallas Cowboys in Siberia?*, WALL ST. J., September 28, 1995, at A1. Among the owners who were convinced that the very survival of their franchises depended upon the success of their competitors were George Halas of the Chicago Bears, the Mara family of the New York Giants and Dan Reeves of the Los Angeles Rams. These owners—whose franchises were located in three of the largest television markets in the nation—gave up tens of millions of dollars so that the NFL would not be bogged down by small-market expansion teams such as the Dallas Cowboys. Michael Wilbon, *NFL Trying to Keep Up With the Jones'*, WASH. POST, September 6, 1995, at B04. In order to head off the establishment of AFL franchises in heretofore virgin football territory, the NFL expanded into Dallas in 1960 and Minnesota in 1961. SPORTS ENCYCLOPEDIA, *supra* note 14, at 14. This effort was aided when the owners of the financially-strapped Chicago Cardinals decided to relocate their franchise to St. Louis. *Id.*

22.  Thurow and Helyar, *supra* note 21, at A1.

23.  Goodman, *supra* note 15, at 472.  The NFL-CBS deal had far-reaching implications. Soon after the deal was struck, federal district court judge Alan K. Grim held that the agreement violated his earlier ruling in *United States v. National Football League*, 116 F.Supp. 319 (E.D. Penn. 1953) [hereinafter NFL I]. Goodman, *supra* note 15, at 472. *See also* United States v. National Football League, 196 F.Supp. 445 (E.D. Penn. 1961) [hereinafter NFL II]. In NFL I, Grim had held that an "NFL restriction that prevented the telecasting of outside games into the home territories of other teams on the days when those other teams were playing in their home stadia was not illegal under the

260        *Seton Hall Journal of Sport Law*        [Vol. 7

The philosophy of cooperation which led to the television agreement also resulted in the creation of NFL Properties—the league's marketing arm—in 1963.[24] NFL Properties was created for the express purpose of "exploit[ing] the various trademark, trade name, and service mark rights of the NFL and the NFL's member clubs . . . *for the benefit of all of the member clubs*."[25] It is a close corporation whose shares are held in *equal* number by the member franchises of the NFL.[26] The establishment of NFL Properties marked the first effort by a professional sport to centralize licensing rights and negotiate their sale on behalf of the entire league.[27]

Today, NFL Properties is the largest marketing arm of any major league sport,[28] annually distributing to each NFL franchise approximately $3.5 million.[29] In 1994 alone, NFL

---

Sherman Antitrust Act." Goodman, *supra* note 15, at 471. In NFL II, Grim ruled that the CBS contract unfairly restricted the rights of the individual clubs because it gave the network "the right to determine, entirely within its own discretion without consulting the Commissioner or any club . . . which games shall be telecast and where such games be televised." *Id.* at 472.

Congress quickly jumped into the fray on the side of the NFL. In 1961, it enacted the Sports Broadcasting Act, which provides that:

> The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs. . . 15 U.S.C. § 1291 (1961).

The Sports Broadcasting Act exempts from federal antitrust law an agreement among the franchises of a professional sports league to pool their individual television rights and sell them as a single package. Goodman, *supra* note 15, at 472. For the purpose of selling pooled broadcast rights, professional sports leagues are essentially afforded single entity status, thus avoiding judicial scrutiny under § 1 of the Sherman Antitrust Act. David M. Van Glish, *The Future of Sports Broadcasting and Pay-Per-View: An Antitrust Analysis*, 1 SPORTS LAW. J. 79, 80 (1994). Congress enacted the Sports Broadcasting Act in the hopes of "assur[ing] the weaker clubs . . . continuing television income and television coverage on a basis of substantial equality with the stronger clubs" and avoiding the possible "danger that the structure of the league would become impaired and its continued operation imperiled" should the NFL be forced to comply with Judge Grim's decision. Goodman, *supra* note 15, at 473.

24.  John Helyar, *Dallas Cowboys Deal with Nike Sparks Confrontation with NFL Commissioner*, WALL ST. J., September 7, 1995, at B6.

25.  Complaint, *supra* note 4, at 2, ¶ 2. (emphasis added)

26.  *Id.* NFL Properties is organized under California law. *Id.*

27.  Helyar, *supra* note 24, at B6.

28.  *Id.*

29.  This amount, however, accounts for only about 5% of a team's revenues. On

Properties enjoyed a net profit of $100 million.[30]

The financial success and tremendous popularity of the National Football League can, to a large extent, be attributed to the philosophy of off-the-field cooperation embodied in the practice of revenue sharing. In addition to equally shared television and licensing revenue, the NFL has the most generous apportionment of gate receipts of any major league sport.[31] Today, each NFL franchise derives up to 95% of its revenue from shared resources.[32] The salary cap,[33] the college draft,[34] and

---

average, each franchise receives $40 million as its share of the league television contracts, and $20 million from gate receipts. Richard Alm, *Jones vs. the NFL: The League's Marketing Arm is Small Potatoes in the Big Picture, but it's the Center of a Controversy*, DALLAS MORNING NEWS, October 17, 1995, at 1D.

30. Complaint, *supra* note 4, at 11, ¶ 18.

31. NFL home teams receive 60% of gate receipts, while the away team takes 40%. Thurow and Helyar, *supra* note 21, at A1. *See also* Professional Sports Antitrust Immunity: Hearings on S.2784 and S.2821 Before the Senate Comm. on the Judiciary, 97th Cong., 2d Sess. 34 (1982) (statement of P. Rozelle, NFL Commissioner) [hereinafter Rozelle Testimony].

32. Julie A. Garcia, *The Future of Sports Merchandise Licensing*, 18 HASTINGS COMM. & ENT. L.J. 219, 226 (1995).

33. The 1993 collective bargaining agreement between the NFL and the National Football League Players' Association ("NFLPA") instituted a salary cap in the league. Robert A. McCormick, *Interference on Both Sides: The Case Against the NFL-NFLPA Contract*, 53 WASH. & LEE L. REV. 397, 398 (1996). The salary cap is yet another attempt by the NFL owners to achieve on-the-field parity, for it limits the amount of money each franchise can spend on players' salaries in a given season. Based on league revenues from the previous season, the 1994 salary cap was $34 million per team. By 1995, the cap jumped to $37.1 million. Leonard Shapiro, *Cowboys Pull Sanders Out of Their Cap: With a Little Sleight of Hand, Dallas Banks on Owner's Creative Accounting*, WASH. POST, September 18, 1995, at C1.

The NFL's salary cap has been described as a "hard cap" because it can not be exceeded under any circumstance. Alan M. Levine, *Hard or Soft Cap: The Optimal Player Mobility Restrictions for the Professional Sports Leagues*, 6 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 179, 182 (1995). The National Basketball Association ("NBA"), by contrast, has implemented a "soft cap." *Id.* While it too sets a maximum dollar amount on team salaries, the NBA's cap permits teams to exceed the cap in specific situations. *Id.* For example, NBA teams can re-sign their veteran players without regard to salary cap implications. *Id.* at 227.

The salary cap has had a tremendous impact on NFL players, including established veterans. Franchises have been rewarding their star players with multi-million dollar contracts while the rank and file of the NFL fight for what is left. *Id.* at 228. But even a superstar is likely to be cut when his salary takes up too much cap room. Levine, *supra*, at 228. Such was the fate of former New York Giants quarterback Phil Simms, who was unceremoniously cut prior to the 1994 season. *Id.*

34. The draft is the method by which NFL teams select college football players. Levine, *supra* note 33, at 204. The 1993 NFL collective bargaining agreement provides for a seven round draft. *Id.* Each round consists of as many selections as there are teams. *Id.* For a further explanation of the NFL draft, *see id.*

free agency[35] are additional examples of a league determined to ensure parity among its franchises.[36]

Fourteen years ago, Pete Rozelle sat before the Senate Judiciary Committee[37] to explain why revenue sharing "is the key to maintaining geographic and competitive balance in professional football."[38] According to Rozelle, revenue sharing "ensure[s] that each club, irrespective of the size of its community, stadium, or television market, has a comparable opportunity to field a championship team."[39] Revenue sharing also encourages geographic balance, for without it, small market

---

35.   The 1993 collective bargaining agreement also brought free agency to the NFL. Levine, *supra* note 33, at 206. A veteran player becomes an unrestricted free agent after having completed four or more "Accrued Seasons" in a capped year. *Id.* The agreement provides that "[a] player receives an 'Accrued Season' for every season that he was or should have been on full pay status for six or more games during the regular season." *Id.* at n.186. Following the completion of a minimum of four Accrued Seasons, an unrestricted free agent is free to sign a contract with any team; in addition, neither the player nor the acquiring team is penalized for the signing. *Id.* at 206. (The so-called "Rozelle Rule" had formerly mandated that a team could not sign a player from another team, even if the player had played out his contract with his former team, unless satisfactory compensation was provided to the other team. *Id.* at 188, n. 57.) The 1993 agreement also designates certain players as restricted free agents. Levine, *supra* note 33, at 206. A restricted free agent is defined as a player who has accumulated three or more Accrued Seasons, less than four of which were in a capped year. *Id.* While a restricted free agent is able to negotiate with any team, his prior team has a right to match any offer that comes his way. *Id.* For a more detailed explanation of the NFL's free agency rules, *see id.* at 206-07.

36.   Complaint, *supra* note 4, at 4, ¶ 9.

37.   The Judiciary Committee was at the time considering two proposed bills, S.2784, the "Major League Sports Community Protection Act," and S.2821, the "Professional Football Stabilization Act." *See* Rozelle Testimony, *supra* note 31.

38.   *Id.* at 27. The Commissioner also attested to several other beneficial results of revenue sharing. For example, revenue sharing provides the "temporarily 'down' squads" with the resources necessary to "escape the downward spirals which could otherwise jeopardize their very existence." *Id.* at 61. In addition, revenue sharing benefits players because the steady increase in the number of NFL franchises—made possible through the sharing of revenue—has opened up more employment opportunities for players. *Id.* For excellent discussions of the arguments both for and against revenue sharing, *see* Garcia, *supra* note 32. *See also* Jeffrey A. Rosenthal, *The Football Answer to the Baseball Problem: Can Revenue Sharing Work?*, 5 SETON HALL J. SPORT L. 419 (1995).

39.   Rozelle Testimony, *supra* note 31, at 61. In support of his contention, the Commissioner pointed to the fact that:

> [s]ince 1970, all but two teams have qualified for postseason playoffs, and the 16 Super Bowls to date have resulted in nine different League champions. Indeed, of the 32 participants in those 16 Super Bowl games, only three (the New York Jets, Philadelphia Eagles, and Los Angeles Rams) have come from the nation's five largest metropolitan areas.

*Id.*

franchises "could be forced to either discontinue operations, move to a larger community, or field a consistently weak playing squad."[40]

In his prepared statement, Commissioner Rozelle reminded the Judiciary Committee of its own comments recognizing the desirability of competitive and geographic balance, and congressional studies indicating that "revenue sharing is perhaps the single most effective means of preserving balanced competition within a sports league."[41] The 1964 Judiciary Committee study to which Rozelle referred expressly recognized:

> the public interest in teams which are as competitively equal as possible, and the *responsibility of the "league"* of teams in maintaining both competitive and geographic balance. Without competitive and geographic balance, the leagues and their weak teams are unable to attract and hold the public interest which is necessary for their survival.[42]

Over the past thirty five years, the NFL has demonstrated that it can best meet its "responsibility" through the equal distribution of shared revenue.

Although franchise owners undoubtedly dream of fielding a team which racks up win after win and makes an annual appearance in the Super Bowl[43], they know that the league—and, consequently, their own team—would not survive in an uncompetitive environment. While the league does have its share of perennial contenders[44] and perennial losers[45], it also produces the Cinderella teams[46] and legendary games[47] which

---

40. *Id.*

41. *Id.* at 62.

42. *Id.* (emphasis added)

43. The "Super Bowl" is the NFL's annual championship game between the champions of the league's two conferences, the American Football Conference and the National Football Conference.

44. Over the years, a number of franchises have established themselves as "dynasties" by winning several championships. The San Francisco 49ers have been the premiere example of consistency in the NFL, winning five Super Bowl championships since the 1981 season. *See* SPORTS ENCYCLOPEDIA, *supra* note 14, at 435, 497, 585, 605, 715. In that span, the team has had only one season in which it won less than ten games. Other dynasties include Vince Lombardi's Packers of the 1960s, the Pittsburgh Steelers of the 1970s, and the Dallas Cowboys, who won two Super Bowls in the 1970s and three more in the 1990s. *Id.*

45. Perhaps the best example of futility in the NFL is the Tampa Bay Buccaneers, who entered the league as an expansion team in 1976. *Id.* at 306. Only once have the Buccaneers reached a conference championship. In contrast to the 49ers, the Buccaneers have made a habit of *losing* ten games a season.

46. For example, the 1995 Indianapolis Colts—a team with low expectations coming

maintain the vitality and excitement of NFL football.

Revenue sharing has ensured that *all* NFL franchises—even those in the smaller markets—have the resources to field a competitive team.[48] As Baltimore Ravens owner Art Modell has stated, "The strength of the league has been that we take care of our competitors to keep them viable and fiscally sound. Once you erode that philosophy, you're in trouble."[49]

### III.   THE TRUST AND LICENSE AGREEMENTS

In 1982, NFL franchise owners reaffirmed their commitment to league parity by strengthening the already established practice of revenue sharing. This was accomplished by the implementation of two agreements affecting the marketing of NFL and team logos: the Trust and License Agreements.

In order to enhance the ability of NFL Properties to market Club[50] and League[51] Marks, twenty six of the NFL's then twenty eight franchises entered into a Trust Agreement on October 1, 1982. Under this agreement, the team owners, as settlors of the NFL Trust[52], transferred the *exclusive* commercial

---

into the season—came within a dropped pass of a Super Bowl showdown with the Dallas Cowboys. Though the franchise amassed a rich and storied history during its years in Baltimore, it has most often struggled since moving to Indianapolis in 1984. *Id.* at 486. After sneaking into the 1995-96 playoffs with a 9-7 record, the Colts soundly defeated the San Diego Chargers—the previous season's Super Bowl runner-up —and shocked the 13-3 Kansas City Chiefs before losing to the Pittsburgh Steelers in the American Football Conference Championship Game. *See Id.* at 732, 734, 736.

47.   One of the more memorable games in NFL history is the 1992 playoff showdown between the Buffalo Bills and the Houston Oilers. Houston jumped out to a 32 point third quarter lead before Buffalo rallied for a 48-31 victory led by back-up quarterback Frank Reich. SPORTS ENCYCLOPEDIA, *supra* note 14, at 658, 666. Though this type of comeback is rare, many an NFL contest has come down to a last second field goal or "Hail Mary" pass.

48.   Complaint, *supra* note 4, at 4, ¶ 10.

49.   Helyar, *supra* note 24, at B6. (emphasis added)

50.   The NFL License Agreement defines Club Marks as the "various trademarks, service marks, and trade names, including team names, helmet designs, insignia, uniforms, colors, identifying slogans, and other identifications, in their present form and in such other or additional forms as may be adopted by Settlors in the future." License Agreement of the National Football League (1982) [hereinafter License Agreement].

51.   The License Agreement defines League Marks as "including, but not limited to 'National Football League,' 'NFL,' the emblem commonly known as the 'NFL Shield,' 'American Football Conference,' 'AFC,' 'National Football Conference,' 'NFC,' 'Super Bowl,' 'Pro Bowl,' 'NFL Super Pro Club,' in their present form and in such other or additional forms as may be adopted by the NFL in the future." License Agreement, *supra* note 50, at art. II.

52.   The Trust Agreement states that the "Trust is a New York Trust and all ques-

rights to their Club Marks to the trustees[53] of the NFL Trust.[54]

The trustees, however, were not charged with the duty of marketing these lucrative rights. Pursuant to the Trust Agreement, they were instructed to enter into a licensing agreement with NFL Properties, which would act as the *exclusive* licensee of all NFL and Club marks.[55] The role of the trustees was to consist primarily of the holding of the marks and the receipt and distribution of any income derived from the licensing efforts of NFL Properties.[56]

The benefits of the Trust Agreement were twofold. First, the league now had a long-term agreement which provided for the continued centralization of licensing rights into the next century.[57] Second, although some portion of the revenue generated by NFL Properties would be used for charitable and educational purposes,[58] the franchises of the National Football League would each be guaranteed an *equal* share of licensing

---

tions pertaining to its validity, construction and administration shall be determined in accordance with the laws thereof." Trust Agreement of the National Football League at 15, art. 7.06 (1982) [hereinafter Trust Agreement].

53. Among the original trustees of the NFL Trust were then-commissioner Pete Rozelle and several franchise owners, including William H. Sullivan, Jr. of the New England Patriots. Trust Agreement, *supra* note 52, at 1. Although the Trust Agreement originally provided for seven trustees, one of whom shall be NFL commissioner, the number of trustees was later changed to eight. Third Amendment to Trust Agreement.

54. Complaint, *supra* note 4, at 7, ¶ 14.

55. The Trust Agreement states that "[t]he Trustees shall not actively license such trademarks or trade names but shall enter into a long-term *exclusive* licensing agreement with National Football League Properties, Inc. . . ." Trust Agreement, *supra* note 52, at 2, art. 1.02. (emphasis added).

The Agreement further states that "The Trustees shall grant to NFLP, for a reasonable consideration and upon reasonable terms and conditions, the *exclusive* right, throughout the world, to use and grant licenses for the use of the trademarks, trade names, and other rights received by the Trustees hereunder . . . ." *Id.* at 9, art. 3.02. (emphasis added).

56. *Id.* at 2, art. 1.02.

57. "This trust shall be terminated upon the first to occur of any of the following . . . *the expiration of the term of this Trust on March 31, 2004.*" Second Amendment to NFL Trust Agreement at art.I.

58. While the Trust Agreement states that its "purpose . . . is to dedicate the licensing income of the Member Clubs of the NFL to charitable and educational purposes, including the support of NFL Charities," it also goes on to say that its other purposes are to "promote or enhance the public image of the National Football League or the *interests* of its Member Clubs." Trust Agreement, *supra* note 52, at 2, art. 1.01. (emphasis added) The Trust Agreement later states that "[n]othing in this Agreement shall be construed to prevent the trustees from applying all or any portion of the annual income of the Trust directly to or for the benefit of the NFL or its Member Clubs, provided such distributions are made for one or more of the purposes specified herein." *Id.* at 11, art. 5.01.

revenues.[59]

The Dallas Cowboys were one of the twenty six settlors of the Trust Agreement. Upon entering into the agreement, the Cowboys affirmed "that the most effective means of achieving . . . widespread promotional exposure [of the NFL and its franchises], is through a *unified* program of promotional activities involving the Marks of the NFL and all of its Clubs."[60] The Cowboys, therefore, granted to the Trustees of the NFL Trust the *exclusive* right to use Cowboys Club Marks[61] for commercial purposes.[62]

Like all other settlors, the Cowboys did retain some control over the licensing of their Club Marks. These rights include:

> . . . the exclusive right to use Club Marks in connection with the presentation of football exhibitions and the non-exclusive right to (i) use Club Marks in local advertising of Club to promote said football exhibitions, (ii) authorize third parties to utilize Club Marks in advertisements run by those third parties in local sections of Club's home game program and in their Club publications, and (iii) use Club marks in Club's own publications. [63]

---

59.  Complaint, *supra* note 4, at 7, ¶ 13. For example, in 1989, Jerry Jones' first year as owner of the Cowboys, the team finished 1-15 and accounted for only 3.4% of all revenues generated by NFL Properties. Christine Brennan, *The Head Cowboy Tries to Ride Alone: Dallas' Jerry Jones Bucks NFL owners to Cut His Own Deals*, WASH. POST, September 17, 1995, at A1. The following year, sales of merchandise bearing Cowboys team marks accounted for a paltry 2% of NFL Properties' revenue. *Id. See also* Wilbon, *supra* note 21, at B04. In both of those years, however, the Dallas Cowboys Football Club, as an equal shareholder of NFL Properties, received the same amount of revenue money as did every other franchise, including those accounting for more sales. Many team owners are quick to point out the hypocrisy of Jones, who gladly accepted his equal share of licensing revenue when the Cowboys were experiencing hard times.

60.  Schedule G to Trust Agreement of October 1, 1982 at 1, ¶ 3. (1983) [hereinafter Schedule G]. (emphasis added)

61.  "Club Marks" are defined in Schedule G to include "the trademarks, service marks, and trade names used in connection therewith, including team names, helmet designs, insignia, uniforms, colors, and identifying slogans, in their present form and in such other or additional forms as may be adopted by Club in the future . . ." Schedule G, *supra* note 60, at 1, ¶ 2.

62.  The document states that "Club hereby grants to Trustees, in accordance with this Trust Agreement, for as long as Club holds its NFL franchise, the exclusive right to use the Club Marks for commercial purposes. Club, as a Settlor, intends and understands that Trustees will enter into an agreement with National Football League Properties, Inc. . . . for the exclusive right to use the Club Marks for said commercial purposes, including but not limited to those set forth as follows: (A) *Licensing* - The exclusive right to license the use of Club Marks on all types of articles of merchandise and in connection with all types of advertising and promotional programs; (B) *Game Program Publishing* . . ., (C) *Other Publishing* . . . ." Schedule G, *supra* note 60, at 4, ¶ 4.

63.  *Id.* at 3, ¶ 5.

The limited licensing right retained by NFL franchises is clearly distinct from the broad powers granted to NFL Properties.

The Trustees performed their first official duty when they entered into a licensing agreement[64] with NFL Properties on October 1, 1982.[65] NFL Properties was granted the *exclusive*[66] right to sublicense all Club and League Marks in Article I of the License Agreement, which authorizes the corporation to "license the use of the Trust Property on all types of articles of merchandise and in connection with all types of advertising and promotional programs."[67]

Upon purchasing the Cowboys in 1989, Jerry Jones assumed all of his predecessor's obligations under the License Agreement and, as a condition precedent to his purchase, committed himself to participating as a shareholder of NFL Properties and as a grantor of the NFL Trust.[68]

## IV.  THE CONTRACTS

Between June and October of 1995, the Cowboys organization, through TSC and its marketing arm, Pro Silver Star, Ltd. ("Silver Star"),[69] entered into a series of highly publicized and

---

64. Because it is a part of the same unified plan, the License Agreement, like the Trust Agreement, is to be construed in accordance with New York law. License Agreement, *supra* note 50, at art. XVII. It will terminate on the same date as the Trust Agreement. First Amendment to License Agreement at 2, art. V (1986).

65. In executing this document, the Trustees acknowledged that they were charged by the Settlors with one preeminent duty —to make money. According to the License Agreement, "Trustees have been directed by the Settlors to *earn income* by licensing said Trust Property to [NFL Properties] and to protect and enhance the value of the Trust Property through the association of professional football with products, promotions, and publications of acceptable quality and character." License Agreement, *supra* note 50. (emphasis added)

66. "[NFL Properties] acknowledges the importance of such activities and the value of the goodwill associated with the Trust Property and desires to acquire the *exclusive* right from Trustees to sublicense third parties to use the Trust Property in connection with the sale of merchandise and in promotional and publishing programs." *Id.* (emphasis added)

67. *Id.* at art.I. This article also discusses NFL Properties' exclusive right to "Game Program Publishing" and "Other Publishing." *Id.*

68. Complaint, *supra* note 4, at 8, ¶ 14.

69. Pro Silver Star is the marketing agent of both TSC and the Dallas Cowboys. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint at 7, National Football League Properties, Inc. v. Dallas Cowboys Football Club, Ltd., Texas Stadium Corporation, and Jerral W. Jones, No. 95 Civ. 7951 (SAS) (October 23, 1995) [hereinafter Defendants' Memo]; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint at 3, National Football League Properties,

*Seton Hall Journal of Sport Law*      [Vol. 7

controversial contracts with Dr. Pepper, Pepsi, Nike and American Express.[70] The Dallas Cowboys Football Club—a settlor of the NFL Trust subject to the terms and conditions set forth in the Trust and License Agreements—is not a party to any of these contracts.

TSC's agreement with Dr. Pepper grants the soft drink company certain "sponsorship benefits" in exchange for the payment of an annual fee.[71] These benefits include "Stadium Sponsorship Rights," designating Dr. Pepper as an "Official Sponsor of Texas Stadium" and giving Dr. Pepper the right to use the Texas Stadium name and logo in its local advertising and promotional campaigns;[72] "Stadium Signage Rights," which allot to Dr. Pepper certain designated points within Texas Stadium where it can hang signs and other promotional banners;[73] "Local Advertising Rights," consisting of advertising space in various Dallas area magazines and television programs associated with the Cowboys, the team's coaches, and Jerry Jones himself;[74] and, lastly, "Stadium Pouring Rights," enabling Dr. Pepper to sell its soft drinks at concession stands located within Texas Stadium.[75] According to the Defendants, the contract between TSC and Dr. Pepper authorizes the latter to use the marks of Texas Stadium and *not*, as NFL Properties contended, Club and NFL Marks.[76]

Soon after the deal with Dr. Pepper was struck, a ten year, $40 million[77] contract between TSC and Pepsi[78] was an-

---

Inc. v. Dallas Cowboys Football Club, Ltd., Texas Stadium Corporation, and Jerral W. Jones, No. 95 Civil 7951 (SAS) (December 5, 1995) [hereinafter Plaintiffs' Memo].

70.  Defendants' Memo, *supra* note 69, at 7.

71.  *Id.*

72.  *Id.*

73.  *Id.* at 8.

74.  *Id.*

75.  Defendants' Memo, *supra* note 69, at 8.

76.  *Id.*

77.  Stadium "pouring rights" typically cost about $250,000 per year, the approximate amount of money Coca-Cola had been paying for the right to dispense its soft drinks at Texas Stadium. Robert Frank, *PepsiCo Snags Right to Pour its Drinks at Texas Stadium: Firm Pays Up to $30 Million to Oust Rival Coca-Cola, Official Sponsor for NFL*, WALL ST. J., August 4, 1995, at B10.

78.  Pepsi is apparently attempting to carve out its own niche in the Coca-Cola dominated world of sports. Earlier in 1995, the company paid approximately $68 million to rename the arena of the NBA's Denver Nuggets the "Pepsi Center." Frank, *supra* note 77, at B10.

In addition, Pepsi has been entering into endorsement contracts with prominent professional athletes, including Dallas Cowboy defensive back (and part-time wide re-

nounced to the public.[79] Similar in many respects to the arrangement between TSC and Dr. Pepper, this contract likewise entitles Pepsi to "Stadium Sponsorship Rights",[80] "Stadium Signage Rights," "Stadium Pouring Rights," and "Local Advertising Rights."[81]

The Defendants denied that the contract grants Pepsi the right to use Club and NFL Marks.[82] In support of their position, they pointed to a side agreement between Pepsi, Silver Star and TSC which specifies that the only marks licensed to Pepsi are the marks of Texas Stadium.[83] According to the Defendants, the express language of the Pepsi contract states that all rights to Cowboys Club Marks are "presently held by NFL Properties, Inc."[84] They further claimed that the contract gives Pepsi an option to license the rights to Club Marks only if Silver Star obtains those rights upon expiration of the Trust and License Agreements.[85]

Jerry Jones announced TSC's next contract in grand fashion when he escorted Phil Knight—founder and C.E.O. of Nike[86]— onto the sidelines of Giants Stadium during a nation-

---

ceiver) Deion Sanders. Robert Fachet, *Fanfare: Football*, WASH. POST, November 2, 1995, at D02.

It is now becoming increasingly difficult to keep track of exactly who is endorsing what: Coca-Cola is the official soft drink of the NFL, while Pepsi is a sponsor of Texas Stadium (i.e., Cowboys); meanwhile, Sanders endorses Pepsi, but teammates Troy Aikman and Emmitt Smith have endorsement contracts with Coca-Cola. *See, respectively*, Richard Alm, *Marketing Plays: Aikman Signs Up with Coca-Cola's Team*, DALLAS MORNING NEWS, August 12, 1995, at 1F; Carlos Tejada, *New Scrimmage at Texas Stadium: What Do real Cowboys Drink?*, WALL ST. J., September 5, 1995, at B1. Those who listen to quarterback Aikman, however, know that "real 'Cowboys' always drink Coca-Cola." Tejada, *supra*, at B1.

79. Werder, *supra* note 4, at 1A.

80. The Stadium Sponsorship Rights granted to Pepsi "cover[ ] portions of a five-state area." Defendants' Memo, *supra* note 69, at 8.

81. *Id.* at 8-9.

82. *Id.* at 9.

83. *Id.* However, one of the two versions of the Texas Stadium logo contains the phrase "Home of *America's* Favorite Team." *Id.* (emphasis added)

84. Defendants' Memo, *supra* note 69, at 9.

85. *Id.*

86. Nike, Inc. is the world's largest manufacturer of athletic footwear. Castaneda, *supra* note 6, at 1D. In 1995, it accounted for 23.8% of worldwide sales ($1.1 billion domestic; $2 billion foreign). *Id.* Main rival Reebok was second, claiming 20.4% of the world's market ($1 billion domestic; $1.5 billion foreign). *Id.*

Today, Nike advertisements are omnipresent. Phil Knight has been more than willing to spend the millions of dollars necessary to sustain a seemingly never-ending media blitz. In 1993 alone, Nike spent $281 million on advertising. *Id.* In contrast, Reebok spent a comparatively low $80 million on advertising in 1994. *Id.*

ally-televised Monday Night Football Game between the Cow-boys and the New York Giants.[87] From the moment they emerged from the tunnel and onto the playing field, it was ap-parent that a new alliance had been forged in the world of sports: both men prominently displayed the signature Nike logo—the swoosh[88]— on their clothing.

While its seven[89] year deal with TSC purportedly grants Nike the same sponsorship benefits[90] accorded to Dr. Pepper and Pepsi,[91] it also provides Nike with a unique vehicle through which to showcase its products. The contract calls for a tent to be erected on property adjacent to Texas Stadium on the day of each Cowboys home game; in this tent, Nike mer-chandise is to be promoted and sold to the fans present at the stadium.[92] In exchange for these sponsorship benefits and pro-motional rights, Nike not only obligated itself to pay a certain fee to TSC, but also agreed to supply Cowboys players, coaches, and staff with apparel and uniforms manufactured by Nike.[93]

The Defendants contended that the Nike contract is care-fully crafted so as not to give Nike the right to use Club or NFL

---

Nike's resources have enabled the company to sign endorsement contracts with a multitude of prominent athletes and teams, including Dallas' own Deion Sanders. An-netta Miller, *Just Doing It: Nike Sponsorship Gives It Controversial Influence Over Sports*, NEWSWEEK, October 2, 1995, at 64. Other stars in the Nike fold include Michael Jordan, Charles Barkley, and tennis champions Pete Sampras, Andre Agassi and Monica Seles. In 1995, more than 250 NFL players and 15 of the top 25 NCAA men's basketball teams had endorsement deals with Nike. *Id.*

87. J.A. Andade, *Maverick Jones Bucks NFL: Nike Deal Overrides League, Puts Cowboys Owner on the Hot Seat*, WASH. POST, September 6, 1995, at B4.

88. The "Swoosh" is Nike's term for the symbol of winged victory that is displayed on all Nike products. Miller, *supra* note 86, at 64.

89. Andade, *supra* note 87, at B4.

90. Except, of course, pouring rights.

91. Defendants' Memo, *supra* note 69, at 9.

92. *Id.* at 10. The deal additionally calls for the joint development of a theme park adjacent to Texas Stadium. According to Nike spokesman Tom Feuer, the park will be entirely devoted to football, and will feature sports memorabilia, a theater and virtual reality rides.

In commenting upon the increasingly blurred line between sports and entertain-ment—and Nike's role in that blurring—Jim Andrews, the vice president of a Chicago sports marketing firm, said that Nike is "definitely looking to extend [its] reach. [It] want[s] to get involved in sports and entertainment. One of the visions Phil Knight has is that there isn't a lot of difference between the two." Castaneda, *supra* note 6, at D1.

93. Defendants' Memo, *supra* note 69, at 9. These articles were to be worn at prac-tices, games, and various other team functions.

marks.[94] According to the Defendants, the agreement explic-
itly provides that "neither The Dallas Cowboys nor Silver Star
nor Jones has the right to authorize NIKE to use the marks of
the Dallas Cowboys for commercial purposes."[95] The contract
instead urges Nike to become an official licensee[96] of the NFL
by entering into an agreement with NFL Properties.[97] Fur-
thermore, it allegedly provides that the Nike name and logo
will not appear on the team's uniforms or sideline apparel un-
til Nike attains Pro Line status.[98]

Finally, on October 5, 1995—after NFL Properties had al-
ready filed suit in U.S. District Court—TSC announced yet an-
other sponsorship contract, this time with American Express.[99]
Like the previous contracts, American Express' sponsorship
benefits include stadium signage and local advertising
rights.[100] The stadium sponsorship rights confer upon Ameri-
can Express the right to refer to itself as the "Official Charge
Card of Texas Stadium," and the right to use the Texas Sta-
dium Marks in its products and advertisements.[101] One of the
most valuable rights for which American Express contracted is
the right to sell tickets[102] to Cowboys home games and other
stadium events.[103]

---

94. *Id.* at 10.
95. *Id.*
96. A "Pro Line" merchandise supplier.
97. Defendants' Memo, *supra* note 69, at 10.
98. *Id.* In October of 1995 (after NFL Properties had already filed suit), Nike suc-
ceeded in becoming an official uniform and apparel supplier to the NFL. In order to
obtain a Pro Line license, the company agreed to pay the league $200 million over a five
year period. *Nike to Put Its Mark on the NFL Uniform*, WALL ST. J., October 10, 1995, at
B10. In commenting upon the deal, NFL Properties president Sara Levinson stated that
"this is in the best interest of the 30 owners." Richard Sandomir, *Nike Signs NFL Licens-
ing Deal*, DALLAS MORNING NEWS, October 9, 1995, at 7B.
   It is interesting to note that on August 18, 1995, Phil Knight sent a letter to Com-
missioner Tagliabue in which he allegedly asked for a break in negotiations until after
the Labor Day holiday. Of course, it was on Labor Day that the TSC/Nike deal was
announced. According to Levinson, however, negotiations between Nike and NFL
Properties continued through that period. *Nike to Put Its Mark on the NFL Uniform*,
WALL ST. J., October 10, 1995, at 7B.
99. *Cowboys Defy League Again*, WASH. POST, October 6, 1995, at C4.
100. Defendants' Memo, *supra* note 69, at 11.
101. *Id.*
102. American Express credit cards are now the only card accepted for Cowboys sea-
son ticket purchases. *Cowboys Owner Sets Pact with American Express*, WALL ST. J.,
October 9, 1995, at A4.
103. Defendants' Memo, *supra* note 69, at 11.

272          *Seton Hall Journal of Sport Law*          [Vol. 7

## V.  THE SUIT

NFL Properties responded to the contracts by filing suit against Jones, the Cowboys, and TSC in the United States District Court for the Southern District of New York. Filed on September 18, 1995, the complaint alleged that the Defendants "have engaged in an unlawful plan and scheme, in violation of contractual and fiduciary obligations, to misappropriate for themselves valuable business opportunities and revenues that rightfully belong to . . . NFL Properties."[104]

The centerpiece allegations of the complaint were Counts I and II, which, respectively, accused the Defendants of violating the federal Lanham Act and breaching express provisions of the Trust and License Agreements. NFL Properties also alleged that the Defendants breached the implied covenant of good faith dealing in contract;[105] breached the Cowboys' obligations as a settlor of the NFL Trust and as a licensor of the team's marks;[106] breached their fiduciary duty to the other member clubs of the NFL;[107] unjustly enriched themselves by entering into the deals;[108] misappropriated property rights belonging to NFL Properties;[109] and tortiously interfered with the property rights granted by NFL Properties to its licensees.[110]

### A.  The Lanham Act:

NFL Properties contended that the contracts at issue violate § 43(a) of the Lanham Act.[111] This section protects both

---

104.  Complaint, *supra* note 4, at 1, ¶ 1.

105.  *Id.* at 35, Count III. Count III was eventually dismissed as being duplicative of the breach of contract claim. National Football League Properties, Inc. v. Dallas Cowboys Football Club, Ltd., Texas Stadium Corporation, and Jerral W. Jones, 922 F.Supp. 849, 855 (S.D.N.Y. 1996).

106.  Complaint, *supra* note 4, at 36, Count IV. Count IV was also dismissed. *See National Football League Properties*, 922 F.Supp. at 855-56.

107.  Complaint, *supra* note 4, at 37, Count V.

108.  *Id.* at 38, Count VI.

109.  *Id.* at 40, Count VII.

110.  *Id.* at 40, Count VIII.

111.  Complaint, *supra* note 4, at 31-33, ¶ 46-51. §43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a). Although a party may claim an exclusive right to a trademark under common law or state law, federal trademark protection is contained in the Trademark Act of 1946, commonly known as the Lanham Act.

The Lanham Act provides for the federal registration of trademarks which are used in commerce, or which are intended for use in commerce. *See* 15 U.S.C. § 1051. A "trademark" is defined under the Act as

registered and unregistered trademarks by allowing a trademark holder to bring a civil action against a person[112] who uses the mark in a manner which is likely to cause confusion as to the origin, sponsorship or approval of goods or services.[113]

---

any word, name, symbol, or device, or any combination thereof - (1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127.
    The Lanham Act also defines several other types of "marks," including "service marks," "certification marks" and "collective marks." A service mark is similar to a trademark, the difference being that it distinguishes the services of a person from the services of others; a certification mark is a mark used by someone other than the owner, or a mark whose owner intends to permit someone to use in commerce in order to certify characteristics such as origin, material or quality; a collective mark, simply, is a trademark or service mark used by the members of an association or group. *Id.* When the Lanham Act refers to a "mark," it is referring to trademarks, service marks, certification marks and collective marks. *Id.*
    "[T]wo federal causes of action are provided for by the Lanham Act." Steven N. Geise, *A Whole New Ballgame*, 5 Seton Hall J. Sport L. 553, 557 (1995). § 32 of the Lanham Act provides that the holder of a federally registered trademark may bring a civil action for trademark infringement. 15 U.S.C. § 114. The other remedy contained in the Lanham Act is § 43.
    112.   Under the Lanham Act, "person" is defined as "a firm, corporation, union, association, or other organization capable of suing or being sued in a court of law." 15 U.S.C. § 1127.
    113.  § 43(a) provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a).
    It should be noted that an anti-dilution provision has recently been added to the statute. § 43(c) provides that:

[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . .

15 U.S.C. § 1125(c).
    The statute then list a number of factors to be considered in determining whether or not a mark is distinctive and famous. *Id.* A successful § 43(c) action will normally

The likelihood of consumer confusion is the sine qua non of a § 43(a) action.[114] As this standard suggests, a plaintiff need not demonstrate *actual* confusion in order to prevail.[115] This principle has become black letter law due to the difficulties inherent in actually proving consumer confusion and the language of § 43(a) itself, which only requires a likelihood of confusion.[116]

It is somewhat ironic that two of the leading cases addressing the issue of consumer confusion involved Nike and the Dallas Cowboys organization. In *Nike, Inc. v. "Just Did It" Enterprises*,[117] the Seventh Circuit stated that a § 43(a) claim only requires "a valid trademark and a likelihood of confusion on the part of the public."[118] In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,[119] the Second Circuit said that "[t]he public's belief that [a] mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."[120]

In denying the Cowboys Motion to Dismiss Count I of the complaint,[121] federal district court judge Shira Scheindlin re-

---

entitle a plaintiff to injunctive relief, unless a willful intent to trade on an owner's reputation or cause dilution is established. *Id.* Note also that federal registration is not a prerequisite for a § 43(a) claim. *See, e.g.,* Marcia B. Paul, *Basic Principles of Section 43(a) and Unfair Competition,* 419 PLI/PAT 81, 122-23 (1995).

114.  *Id.* at 121. The standard test employed by a court in determining the likelihood of confusion is the balancing test developed by Judge Friendly in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961). *See infra.*

115.  Paul, *supra* note 113, at 121.

116.  Lois Sportswear v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986).

117.  6 F.3d 1225 (7th Cir. 1993). (enjoining defendant's use of an alleged parody of the Nike name and logo)

118.  Nike, 6 F.3d at 1227.

119.  604 F.2d 200 (2d Cir. 1979) (enjoining the distribution and exhibition of a pornographic film which caused confusion as to the relationship between the plaintiffs and the film) The plaintiffs here alleged that the defendants infringed upon their trademark uniform in the film "Debbie Does Dallas," in which actresses engaged in sexual acts while clad or partially clad in a uniform similar to that worn by the Dallas Cowboys Cheerleaders. *Id.* at 203. After finding that the plaintiffs did have a valid trademark in their uniform, the Second Circuit held that there was a likelihood that the public would associate the cheerleaders with the film. According to the court, "the uniform depicted . . . unquestionably brings to mind the Dallas Cowboys Cheerleaders. Indeed, it is hard to believe that anyone who had seen defendant's sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders." *Id.* at 205

120.  *Id.* at 204.

121.  The Defendants filed a motion to dismiss the complaint on October 23, 1995. The essence of their argument was that NFL Properties' claim is proven false by the very documents on which it relies. *See* Defendants' Memo, *supra* note 69, at 2.

jected the contention that the Lanham Act claim should be dismissed under New York law. Judge Scheindlin distinguished NFL Properties' claim from prior decisions of the Southern District which suggested "that an exclusive licensee of the right to distribute goods bearing a certain trademark cannot bring an action under § 43(a) of the Lanham Act against the trademark owner in violation of the licensing agreement."[122]

Judge Scheindlin recognized that, unlike the plaintiffs in these prior cases,[123] NFL Properties' interest in the marks is not in selling the goods, but in authorizing their corporate sponsorship.[124] "The quality, source, or genuineness of Pepsi or NIKE shoes, for example, are primarily reflected by their respective marks regardless of whether they are sponsored by the Cowboys or the NFL."[125] Since neither NFL Properties nor the Dallas Cowboys sells or manufactures goods, focusing on the source of the goods would be inappropriate.[126]

The sponsorship context thus calls for the court to focus its attention "on the nature of Defendant's activities regarding marks which [NFL Properties] has the exclusive right to commercially exploit."[127] Because its complaint alleged public confusion regarding "sponsorship or approval" of the contracts at issue, NFL Properties sufficiently stated a cause of action

---

122.  *National Football League Properties*, 922 F.Supp. at 854.

123.  The cases specifically referred to by Judge Scheindlin are L.G.B. v. Gitano Group, Inc., 769 F.Supp. 1243 (S.D.N.Y. 1991); Ballet Makers, Inc. v. United States Shoe Corp., 633 F.Supp. 1328 (S.D.N.Y. 1986); and Silverstar Enters., Inc. v. Aday, 537 F.Supp. 236 (S.D.N.Y. 1982). According to Judge Scheindlin, these cases stand for the proposition that "where the trademark owner, who is the source of the goods, authorizes the use of the mark for 'genuine' goods, there can be no likelihood of confusion as to the source of the goods and, consequently, the quality of the goods." *National Football League Properties*, 922 F.Supp at 855.

124.  *National Football League Properties*, 922 F.Supp. at 855.

125.  *Id.* This does not mean, however, that a licensor has no concern with the quality of goods. In fact,

> [t]he principal responsibility of a licensor is to maintain adequate control over the quality of the uses of the mark. A license which expressly fails to provide for quality control by a trademark licensor is referred to as a 'naked license.' Such naked licensing could be viewed as a deceptive use of a mark, or may result in the cessation of the mark's ability to identify source; in either event, all rights in the mark could be lost. This loss of rights is referred to as 'abandonment,' which also can result in the cancellation of a federal registration.

Steven M. Weinberg, *The Basics of the Law and Business of Licensing*, 445 PLI/PAT 7, 14 (1996).

126.  *National Football League Properties*, 922 F.Supp. at 855.

127.  *Id.*

under the broad language of § 43(a).[128]

Judge Scheindlin's decision not to dismiss National Football League Properties' § 43(a) claim followed the reasoning employed in another recent case from the Southern District involving a claim of false sponsorship. In *Mastercard International, Inc. v. Sprint Communications Co.*,[129] the court enjoined Sprint from using the mark of the World Cup Soccer Tournament "on any card issued in connection with the payment for its services or in any other manner that conflicts with the exclusive rights granted to Mastercard."[130] In so holding, the District Court explicitly recognized an exclusive licensee's right to bring a false sponsorship suit under § 43(a).[131] This right is derived from the statute itself[132] and from decisions of the Second Circuit holding that the statutory term "false description or representation" encompasses "false sponsorship."[133]

Although the Defendants denied that the Dr. Pepper, Pepsi, Nike and American Express contracts infringe upon any Club or League Marks, the very nature of their activities indicates

---

128. *Id.*
129. No 94 Civ. 1051 (JSM), 1994 WL 97097 (S.D.N.Y.), aff'd, 23 F.3d 397 (2d Cir. 1994).
130. *Mastercard International*, 1994 WL 97097, at *4. The "exclusive rights" referred to by the court extended from a 1991 agreement entered into by Mastercard and ISL Football AG, which granted Mastercard the right to be called an official sponsor of the 1994 World Cup championship and the *exclusive* right to use the tournament marks on "[a]ll card-based payment and account access devices . . . " *Id.* at *1.
   Approximately two months after entering into this agreement with Mastercard, ISL entered into another marketing contract, this time with World Cup 1994, Inc., the Local Organizing Committee (LOC) for the 1994 games. *Id.* This agreement permitted the LOC to designate certain corporations as "official partners" of the 1994 World Cup. *Id.* Official partners were entitled to use the World Cup mark on their products.
   Of particular importance to the dispute were provisions in the agreement between ISL and the LOC which expressly provided that "the OFFICIAL PARTNERS shall not have the right to use the marks on any card-based payment and account access devices" and that "LOC shall not grant . . . rights to OFFICIAL PARTNERS . . . which will infringe upon the rights of OFFICIAL SPONSORS." *Id.*
   The District Court determined that Sprint's credit card—though lacking a magnetic stripe allowing it to be inserted into an automatic debiting machine—nevertheless constituted a type of "card-based payment and account access" device as contemplated by ISL and Mastercard. *Mastercard International*, 1994 WL 97097, at *2.
131. *Id.* at *3.
132. Recall that § 43(a) gives standing to "any person who . . . is likely to be damaged by" a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact." *See supra* note 113.
133. *Mastercard International*, 1994 WL 97097, at *3.

that NFL Properties would have likely prevailed in its § 43(a) claim. In a recent decision,[134] the Second Circuit clearly held that a plaintiff is not precluded from demonstrating that a party's *actual conduct* contradicts the express language of a written contract.[135] This is true even where the plaintiff has attached the actual contract to its complaint.[136] Thus, NFL Properties could have asked "'what have the Cowboys actually *done?*' and 'how have those acts been *perceived* by the public?'"[137]

NFL Properties referred to the contracts as "*sham* documents"[138] and to TSC as a "'stand-in' licensor"[139] for the Dallas Cowboys. When one looks beyond the actual language of the contracts, and focuses upon the actions of Jerry Jones and the entire Cowboys organization, it appears that this very well might be the case.

First, the *licensing of the Texas Stadium mark* creates the impression that the Dallas Cowboys have sponsored or approved the contracts. NFL Properties contended that Pepsi was granted the right to refer to itself as the "'official cola' of 'Texas Stadium, home of the *Dallas Cowboys.*'"[140] The name "Dallas Cowboys" is unquestionably a Club Mark whose use is subject to the terms and conditions set forth in the License Agreement.

NFL Properties also alleged that the Texas Stadium mark licensed to American Express contains the Cowboys "Star"[141] logo. Because the NFL's licensing agreements include helmet design, team logos and other insignia in the definition of "Club Mark,"[142] the Defendants are not free to license the Cowboys' Star. Thus, it appears that NFL Properties was probably correct when it stated that the star logo is "indisputably a Cow-

---

134.   Gant v. Wallingford Bd. of Educ., 69 F.3d 669 (2d Cir. 1995).

135.   *See National Football League Properties*, 922 F.Supp at 853; Plaintiff's Memo, *supra* note 69, at 17.

136.   Plaintiffs' Memo, *supra* note 69, at 17.

137.   *Id.*

138.   *Id.* at 2.

139.   *Id.* at 3.

140.   Complaint, *supra* note 4, at 21, ¶ 31(a).  (emphasis added)

141.   "The Texas Stadium logo American Express is licensed to use features a picture of the stadium, with the words 'Texas Stadium' beneath it.  The star is superimposed on the letter 'D' in the word 'stadium.'" *National Football League Properties*, 922 F.Supp. at 853.

142.   *See supra* note 50, 61.

boys Mark that is *exclusively* for NFL Properties to license."[143]

One of the Defendants' own admissions indicates another use of a Cowboys Club Mark that may be wrongful, unauthorized and intentionally misleading. According to the Defendants, one of the two versions of the Texas Stadium logo contains the phrase "Home of America's Favorite Team."[144] "America's Favorite Team" is an obvious reference to the popular moniker of the Cowboys—"America's Team"—by which the general public came to identify the franchise during the 1970s. Because the definition of Club Marks encompasses the "identifying slogans" of an NFL franchise,[145] it appears that the Defendants may have made unauthorized use of the phrase "America's Favorite Team."

Second, Jones' well-choreographed *public appearances* appear to be part of an attempt to convince the public of an affiliation between the Cowboys and TSC's licensees. At the August 3, 1995 press conference announcing the Pepsi deal, Jones appeared before the media in a shirt emblazoned with a Cowboys Club Mark and a pair of boots bearing the Pepsi logo.[146] This image was displayed in a photograph subsequently printed in the *New York Times*[147] and, undoubtedly, many other newspapers.

This spectacle pales, however, in comparison to an event calculated to receive maximum public exposure: Jones' and Knight's stroll onto the Giants Stadium sideline during a nationally-televised game. Before approximately 80,000 stadium spectators and millions of television viewers, the swoosh-wearing Jones and his companions—including Nike promoter Monica Seles—conveyed the strong impression "of a new relationship between NIKE and the Cowboys, quite apart from anything having to do with Texas Stadium."[148]

Third, the *public statements* of Jones and his associates ap-

---

143. Plaintiffs' Memo, *supra* note 69, at 15. (emphasis added)

144. *See supra* note 83. Though the Defendants discussed this phrase in the context of the Pepsi deal, it appears that the mark bearing the phrase was licensed to each of the contracting parties.

145. *See supra* note 50, 61.

146. Complaint, *supra* note 4, at 21, ¶ 31(d).

147. *Id.*

148. Complaint, *supra* note 4, at 24, ¶ 36(a). In fact, if the contract was between TSC and Nike, why was it announced at the New Jersey Meadowlands, and not Texas Stadium? *Id.* at 24, ¶ 36(b).

pear to be deliberate attempts to confuse the public as to the Cowboys' sponsorship of TSC's licensees. Subsequent to the announcement of the Pepsi deal, Jerry Jones publicly stated that any prospective sponsor of the Dallas Cowboys should come to Dallas and not the New York offices of NFL Properties.[149] Perhaps the remark which most accurately characterizes the true nature of the Pepsi deal—in fact, each of the contracts—is a statement by Jones in which he unequivocally announces that:

> Our organization is the same people who make all the decisions with the football team and make them over at the stadium. *So what is being said in a way that everybody knows is that we sell Pepsi, we promote Pepsi, and we drink Pepsi, in this entire organization — the Cowboys, the Stadium, everybody.*[150]

According to Jones himself, then, it is the intention of the Defendants to convince the public that the Cowboys sponsor or approve the contracts at issue.

Finally, the same intention to deliberately confuse the public appears to be present in a *written statement* announcing the Nike deal. For some inexplicable reason, a joint press release was issued by Nike and the *Cowboys*, not TSC.[151] Its headline read *"Cowboys* owner bucks NFL again."[152] In addition, Phil Knight was quoted in the press release as characterizing the agreement as one with the Dallas Cowboys.[153] According to Knight, the "agreement *with the Dallas Cowboys* allows us the opportunity to pursue our desire to be associated with one of the most popular football teams in America while we continue our efforts to work with NFL Properties in an official capacity."[154]

Because the available evidence seems to indicate that the Defendants violated § 43(a) of the Lanham Act, application of the eight factor balancing test developed by Judge Friendly in

---

149. "I really do want anyone to know that if you're going to market or be a sponsor of the Dallas Cowboys/Texas Stadium, *I want you to come to Dallas, not to Park Avenue* [the offices of NFL Properties]." *Id.* at 22, ¶ 32(c). Here, Jones does damage to his own cause by not distinguishing between the team and the stadium, mentioning them instead in the same breath.

150. *Id.* at 21, ¶ 31(d).

151. *Id.* at 25, ¶ 36(c).

152. Wilbon, *supra* note 21, at B04. (emphasis added)

153. Complaint, *supra* note 4, at 25, ¶ 36(d).

154. *Id.*

*Polaroid Corp. v. Polarad Electronics Corp.*[155] is warranted. The *Polaroid* test is the standard test used to determine whether a likelihood of consumer confusion is in fact present. It is composed of eight factors, none of which is in itself determinative: (1) the strength of the mark; (2) the degree of similarity of the marks; (3) the proximity of the products; (4) bridging the gap (that is, ability of the trademark holder to enter the market of the alleged infringer); (5) actual confusion; (6) junior user's good faith in adopting the mark; (7) the quality of the respective goods; and (8) the sophistication of the buyer.[156] Several of the *Polaroid* factors appear to strengthen NFL Properties' § 43(a) claim.[157]

The first factor—the strength of the mark—would have weighed heavily in NFL Properties' favor. The Cowboys are one of the premiere franchises in all of sport. Their name, logo and team slogan are recognized by sports fans and non-sports fans alike.

The second factor—the degree of similarity of the marks—also favored NFL Properties. The Defendants have not licensed marks which are merely similar in appearance to Cowboys Club Marks. They have attempted to make use of the very *same* marks conveyed to NFL Properties in the License Agreement.

Factor three—proximity of the products—likewise strengthened NFL Properties' claim. The contracts entered into by TSC license Cowboys Club Marks to corporations who are in direct competition with the official licensees of the NFL.

The sixth *Polaroid* factor—good faith use of the mark—severely damaged the Defendants' position. Jones was certainly well-aware of the NFL's licensing scheme when he purchased the Cowboys. His structuring of the sponsorship deals through TSC, and his subsequent attempts to convince the public of the Cowboys' affiliation with these sponsors, may be characterized

---

155.  287 F.2d 492 (2d Cir. 1961).

156.  *Polaroid Corp.*, 287 F.2d at 495.

157.  Factors Four, Five and Seven are largely irrelevant for the present analysis. First, "bridging the gap" is not an issue since the dispute involves products which already are in the same market. Second, while actual confusion will certainly assist NFL Properties' cause, no proof of actual confusion has been offered. As noted above, however, actual confusion is not required in a § 43(a) claim. Third, as Judge Scheindlin stated, quality of goods is not an issue.

as a bad faith attempt to circumvent obligations freely and willingly entered into.

Finally, the eighth factor—the sophistication of the buyer—favored NFL Properties. The average consumer has not read the Trust and License Agreement. He is not likely to be familiar with the extent of revenue sharing in the NFL, NFL Properties role in the revenue-sharing system, and the obligations of the member clubs of the league. He only knows what he sees—an apparent affiliation between the Cowboys and Dr. Pepper, Pepsi, Nike and American Express.

### B.   *Breach of Contract Claim:*

Count II of the complaint, alleging that the Defendants expressly breached the terms of the league's Trust and License Agreements, also withstood the Defendants' Motion to Dismiss. Perhaps the most significant factor which warranted a finding of breach of contract is Jones' control of both the Dallas Cowboys and TSC. The apparent use of TSC as a "stand-in" licensor does not, however, free Jones and the Cowboys of their obligations under the league-wide agreements.

First, the contracts appear to license Club Marks which are under the exclusive control of NFL Properties. As discussed above, one of the Texas Stadium logos contains the phrase "Home of America's Favorite Team."[158] Moreover, NFL Properties contended that the logo licensed to American Express contains the Cowboys' signature "Star" logo.[159] As Judge Scheindlin recognized, "the use of either of these logos would violate the Trust and License Agreements."[160]

Second, had the conduct alleged in the Lanham Act count been deemed to have been part of "a concerted campaign to create the impression that companies such as NIKE and Pepsi were sponsors of the Dallas Cowboys organization,"[161] then

---

158.  *See supra* note 83.
159.  However, "Defendants assert[ed] that: 1) the star that appears on the logo is not similar to the star that appears on the Dallas Cowboys' helmets; and 2) a star is so generic a symbol (especially in Texas, which is known as the 'Lone Star' state) that nobody would associate it exclusively with the Dallas Cowboys." *National Football League Properties*, 922 F.Supp. at 853. As Judge Scheindlin logically recognized, how could the Defendants have argued that the star is generic when they are attempting to use it in conjunction with a picture of Texas Stadium? *Id.*
160.  *Id.*
161.  *Id.*

this conduct may also have been violative of the Trust and License Agreements. According to Judge Scheindlin, "[a]t a minimum, alleging such conduct is sufficient to state a claim for breach of implied duty of good faith, which constitutes a breach of contract under New York law."[162]

Third, the Cowboys may have misappropriated Club and League Marks in the solicitation materials sent to the Dr. Pepper Corporation.[163] NFL Properties alleged that these materials made impermissible use of the Cowboys' "Star" logo and the NFL's "Shield" logo.[164] At oral argument, Defendants' counsel even conceded that these marks were used in the solicitation materials sent to Dr. Pepper, and that use of the marks was "'[a]bsolutely inappropriate' and 'probably violated their obligations . . . .'"[165] Judge Scheindlin concluded that "[b]ecause the Trust and License Agreements give Plaintiff the exclusive right to use the Marks for commercial purposes, Defendants may have breached these agreements by using these marks in a solicitation booklet."[166]

## VI.    THE SIGNING BONUS AND THE CONTINUING NEED FOR FISCAL EQUALITY IN THE NFL

While the NFL appeared to have a strong case against Jerry Jones, it instead opted to settle the dispute by welcoming Jones back into the NFL fold. The settlement agreement worked out by the parties not only allows Jones to retain his present sponsors, but also affirms his right to sign new ones.[167]

---

162. *Id.* at 854.
163. Complaint, *supra* note 4, at 20, ¶ 29. In addition to misappropriating Club and League Marks in the Dr. Pepper solicitation materials, NFL Properties also charged that "the proposal to Dr. Pepper was to enter into a 'Dallas Cowboys and Dr. Pepper Joint Venture'; to afford Dr. Pepper a '[s]ponsorship with the *Dallas Cowboys* through an identification with the most visible real estate property in Texas, Texas Stadium." *Id.* This appears to have been the Defendants' intention in entering into each of the contracts at issue.
164. *Id.*
165. *National Football League Properties,* 922 F.Supp. at 854. "[C]ounsel argued that it was a single isolated incident and constituted an innocent mistake." *Id.*
166. *Id.*
167. *Jones and NFL Proclaim Truce,* N.Y. TIMES, *supra* note 11, at 34. It has been reported that the NFL agreed to these terms because Jones' lawyers had collected dozens of examples of other franchises who were linked in their programs and advertising to companies not among the NFL's official sponsors. Richard Alm, *Jones, NFL End Dispute Over Corporate Sponsors: Both Pledge Cooperation in Future Marketing,* DALLAS MORNING NEWS, December 14, 1996, at 1A.

In addition, Jones will return to his seat on the league's governing board, and will also be a member of a strategic planning committee charged with evaluating the NFL's marketing issues.[168]

Now that the legal issues have been resolved, the business issues must be tackled. The fundamental question thus becomes whether the NFL's current marketing scheme should be replaced by a system in which each franchise has exclusive authority to license its Club Marks.

The main argument advanced by Jerry Jones is that a franchise owner who has invested millions of dollars in his team should be able to maximize his licensing revenues instead of "settling" for his cut of the NFL Properties' pie. He has been quick to point out that some of the newer owners can have as much as $300 million to $400 million invested in their teams and stadia.[169] Jones firmly believes that an owner with so much at stake has a strong incentive to aggressively market his team. According to Jones,

> As a proud NFL owner who has committed huge financial resources to become part of this league, people like me should be the leading voice in this marketing area.[170]
>
> A man with $200 million at stake will do more for his team than they will at the central office in New York. We have the most respected, sexy, credible entities in America and we should concentrate on coaching each other to maximize selling ourselves.[171]

Jones views the NFL's newer owners as his allies,[172] and expects his ideas to gain widespread acceptance as NFL

---

A sports lawyer commenting upon the settlement pointed to Ericsson Stadium, the home of the Carolina Panthers named for a Swedish telecommunications company. *Id.* He stated that the Panthers' game program and advertising closely linked the team to Ericsson, a company which is not an official sponsor of the NFL (Sprint is the league's official telecommunications company). *Id.* It should be noted that such conduct *may* fall within the licensing rights reserved by NFL franchises. *See supra* part III. It is unclear whether the franchises allegedly pointed to by Jones' attorneys mounted aggressive campaigns linking the sponsors of their stadia to their teams, as Jones apparently did.

168. Alm, *supra* note 167, at 1A.

169. Castaneda, *supra* note 6, at 1D.

170. Ed Werder, *Jones Says Tagliabue Off-Target*, Dallas Morning News, August 13, 1995, at 1B.

171. Thurow and Helyar, *supra* note 21, at A1.

172. The lone franchise owner who came to the defense of Jones was the New England Patriots' Robert Kraft, who purchased his team in 1994 for $162 million. According to Kraft, "When you've got $18 million to $20 million [in annual debt service], that's something the old owners don't have. You have to go out and market and sell to get that

franchises change hands.[173]

At first blush, Jones' plan appears very reasonable. He proposes to tinker with only five percent of the revenue shared in the NFL.[174] Moreover, common arguments against revenue sharing are that it reduces competition and lessens the incentive to earn a profit.[175] A franchise which receives most of its income from shared revenue does not have an economic incentive to field a winning team.[176] Win or lose, that team will still profit from its portion of shared revenue.[177] Without the economic incentive to win, player salaries will also be reduced as owners refuse to pay players their true market value.[178]

Despite these arguments, an end to the NFL's unified licensing scheme may very well be disastrous to the league. This is particularly true in the era of the salary cap.

While the salary cap sets a yearly limit on a team's salary, a common loophole has become the payment of large signing bonuses to star players or prized free agents. A team is thus able to keep its payroll below the cap because the signing bo-

---

knocked down. I believe in the strength of the cooperative, but it needs to be amended." *Id.*

Soon after the Cowboys-Pepsi deal was struck, Kraft—who purchased the Patriots' stadium along with the team— entered into his own agreement with Pepsi. Richard Alm, *Patriots Owner Joins Jones on Pepsi Team*, DALLAS MORNING NEWS, August 15, 1995, at 3B. A compromise agreement proposed by Kraft was not well-received by NFL owners. *Sports Illustrated*'s Peter King summarized Kraft's plan as follows: "Kraft would permit each team to market its own logo, while keeping 50% of the proceeds and depositing the other half in a league pool. Each team would be assigned a merchandising quota, based on market size, that would have to be reached before a team could then dip into the league pool for its one-thirtieth share of the proceeds." Peter King, *The Kraft Compromise*, SPORTS ILLUSTRATED, October 2, 1995, at 71. Jerry Jones' reacted favorably to the plan, except that he proposed a 60%-40% split. *Id.*

It is not surprising that Jones found an ally in Bob Kraft. The two men are among the few NFL owners who actually control their own stadiums. In most cases, NFL teams are just tenants. Alm, *supra* note 29, at 1D. NFL franchise owners are thus apprehensive of a fellow owner's ability to generate extra revenue through his stadium. A number of owners are nevertheless looking to renegotiate their stadium leases in order to be able to do the same. *Id.*

173.   Richard Alm, *Keeping Up with the Jones Vision*, DALLAS MORNING NEWS, December 3, 1995, at 1A. Jones "expects half the NFL teams to change hands in the next decade or so." *Id.*

174.   Werder, *supra* note 170, at 1B. Recall that 95% of the revenue shared by NFL franchises comes from television contracts and gate receipts. *Id.*

175.   Garcia, *supra* note 32, at 231.

176.   *Id.* at 232.

177.   *Id.*

178.   *Id.*

nus is pro-rated over the term of the contract.[179]

The signing bonus has been used with increasing frequency in recent years. In 1995 alone, NFL teams paid approximately $400 million in signing bonuses.[180] Naturally, it is the cash rich teams who have the big advantage in the payment of these bonuses.[181] It should thus come as no surprise that the signing bonus has become a favorite tool of Jerry Jones.

Jones' 1995 signing of free agent Deion Sanders is a prime example of how a team with an infusion of cash can afford a highly-priced, highly-skilled player and still remain under the salary cap. The day before signing Sanders, the Cowboys found themselves only $155,000 under the cap.[182] That did not stop Jones, however, from signing Sanders to a seven year, $35.28 million contract.[183]

How did Jones accomplish this feat? First, his star quarterback, Troy Aikman, agreed to a reduction in his 1995 base salary. Aikman received the difference in the form of a signing bonus.[184] Second, Sanders was paid a signing bonus of $12,999,999.[185]

Jerry Jones has stated that the salary cap makes it essential that he have the ready cash necessary to pay the signing bonuses which soften the impact of lucrative player contracts.[186] His independent licensing ventures have provided the Cowboys with such a cash influx, enabling Jones to continue his lavish spending on players such as Sanders.[187] Was

---

179. Shapiro, *supra* note 33, at C01. Typically, a player paid a signing bonus receives a relatively small base salary at the beginning of the contract term. Base salary increases as the contract reaches its end. *Id.*

180. Thurow and Helyar, *supra* note 21, at A1.

181. *Id.*

182. Shapiro, *supra* note 33, at C01.

183. David Aldridge, *Fallout from Sanders's Signing*, WASH. POST, September 13, 1995, at C06. The Sanders contract called for base salaries of the league minimum $178,000 in years one, two and three. *Id.* Sanders' base salary would then leap to $5.25 million in year four, $6.5 million in year five and $5 million in years six and seven (if the contract is not voided). *Id.* The NFL immediately objected to the deal, arguing that the signing bonus should be spread over four years instead of seven, given a perceived likelihood that Sanders would be cut after four years. Dave Sell, *NFL Looks to Put a Cap on Deion's Dallas Deal*, WASH. POST, October 25, 1995, at C05.

184. Shapiro, *supra* note 33, at C01.

185. Sell, *supra* note 183, at C05.

186. Werder, *supra* note 170, at 1B.

187. Another emerging concern is the possibility that corporate money may be used to induce a player to sign with a particular team. An unsubstantiated rumor circulating around NFL circles during the 1994 season alleged that Sega, a video game company

it simply coincidental, then, that NFL Properties commenced its lawsuit just days after the signing of Sanders?

Officials from various NFL franchises have expressed the opinion that the purpose of the salary cap is defeated when a cash rich team uses its resources on large signing bonuses. Jeff Diamond, the Minnesota Vikings' vice president for administration and team operation has said that using a huge signing bonus to lure a player such as Deion Sanders is "something very few teams can do because of revenue and cash flow."[188] He added that "[t]here's just no way that [the Vikings] could finance a deal like [Sanders's] because of our cash flow situation. We think it's unfair to a certain extent. . . . Only two or three teams in the league can do it."[189] An AFC team executive who wished to remain anonymous did not mince words when he called the Sanders signing "disgraceful" and the salary cap "virtually meaningless" in light of signing bonuses.[190]

Independent team licensing may also spell the end of the NFL's national television contracts. As stated by the Ravens' Modell, "NFL licensing is the basis for many national advertising campaigns. And these ad campaigns are ultimately the basis for our TV revenues."[191] Modell justifiably fears that if Jones has his way, advertisers will join up with a particular team and buy only that team's television market.[192] "Eventually, that will break up our national TV contracts in favor of individual TV networks for each team."[193] If that happens, it

---

based in northern California, offered Deion Sanders $1 million if he signed with the San Francisco 49ers, but only $500 thousand if he decided to play elsewhere. Wilbon, *supra* note 21, at B04. Sanders did in fact decide to sign with San Francisco.

Even more disconcerting is the possibility that a team and a corporation might act in concert to induce a signing. Jones, for example, was certain that it was the 49ers who put Sega up to their offer. *Id.* After the Cowboys' signing of Sanders, Denver Broncos owner Pat Bowlen commented that the use of corporate sponsors to circumvent the cap "is a very dangerous area for a team to get involved in." Ed Werder, *NFL Declares Cowboys-Nike Deal Apparent Rules Violation*, DALLAS MORNING NEWS, September 6, 1995, at 8B. According to Bowlen, "there's always the potential that [Jones] could go to Nike and say 'I want to be able to tell Deion you're going to double his endorsement contract if he's a Cowboy.'" *Id.*

188.  Shapiro, *supra* note 33, at C01.

189.  *Id.*

190.  *Id.*

191.  Dan McGraw, *The Very Lonesome Cowboy Jerry Jones Refuses to Join the NFL's Corporate Huddle*, U.S. NEWS & WORLD REPORT, September 26, 1994, at 7475.

192.  *Id.*

193.  *Id.*

*Comment*

will be 1961 all over again.[194]

Franchise stability, competitive balance and geographic balance may all be eroded if independent team licensing comes to fruition. NFL Properties president Sara Levinson[195] has predicted that sponsors will "cherry-pick," and the money will go to only three or four teams.[196] After all, a team such as the Green Bay Packers—despite its storied history and recent resurgence—will never be able to compete in the licensing arena with the New Yorks and Chicagos of the league. Corporate sponsors, like college football players in the pre-draft era,[197] will flock to the NFL's big market teams. When cherry-picking occurs, the discrepancy in the talent fielded by the big market and small market franchises will turn football fans away from the NFL.[198] Every franchise will suffer.

Ultimately, perhaps some good has come of the NFL's showdown with Jerry Jones. NFL Properties seems to have taken a cue from Jones, and is beginning to market the league like never before. Levinson's aggressive new strategy seems to have been taken straight from the pages of the Cowboys promotional playbook itself.[199]

---

194. For a discussion of individual team television contracts and the resulting disparity in revenues received, *see supra* part II.

195. Before taking the helm at NFL Properties two years ago, Levinson was president of MTV. David M. Halbfinger, *A League of Her Own: Merchandising Chief Puts NFL Ahead of the Game*, DALLAS MORNING NEWS, September 7, 1996, at 1F. This is but a further indication of the blurring line between entertainment and professional sports.

196. Alm, *supra* note 29, at 1D.

197. In explaining the rationale behind the draft, Pete Rozelle stated that the NFL was:

> up to 28 teams . . . in the late twenties and it had gone down to 12 teams in the early thirties, which was when the league decided they had to do something and they set up the draft principle on taking players in order, the weaker teams from the previous year picking first and the better teams later. And it was the only way they could do it because *all of the players wanted to play with Chicago, the [Washington] Redskins or the [New York] Giants*, and the other teams were not doing well because those three dominated, so they folded. And only the introduction of the draft, I believe, in 1933 kept it going.

Rozelle Testimony, *supra* note 31, at 45. (emphasis added)

198. Minnesota Vikings president and CEO Roger Headrick has stated that "We aren't the same as Ford competing with General Motors. We are thirty teams that depend upon each other. Jerry Jones can't create a TV audience without another team. And you can't beat teams 58-0 for very long and keep a TV audience." Brennan, *supra* note 59, at A01.

199. *See* Halbfinger, *supra* note 195, at 1F. NFL Properties is in the midst of unveiling a record number of promotions. *Id.* In addition to placing NFL logos on 1.4 billion bottles and cans, Coke is spending $45 million on a "watch and win" sweepstakes

Just a few short weeks ago, a settlement agreement between Jerry Jones and the NFL seemed as unlikely as two second year expansion teams qualifying for the post-season playoffs.[200] Commissioner Paul Tagliabue appeared firmly committed to opposing Jones' corporate sponsorships when he stated that:

> It's not about soda pop and cola and shoes and logos and do-rags and that stuff. The National Football League has some very clear-cut ways of doing business, which has distinguished it from all other leagues and made it as great as it is. That has included selling the television nationally on behalf of the league and sharing the revenue. That has included having a national relationship with television advertisers. It's included revenue-sharing at the gate. It has included a collective bargaining agreement that's working. That's what's at issue here - not whether $5 million comes from here or $2 million from there. It's a philosophy and a commitment to do business in a certain way, which has been very successful. If you have a successful philosophy that has worked for seventy-five years, you hold it pretty sacred. That's what this is about.[201]

Statements such as this by Commissioner Tagliabue and other NFL executives and team owners seemed to indicate that Jerry Jones was in for a long fight.

## VII.  CONCLUSION

NFL Properties appeared to have a strong case against

---

called the "Red Zone." *Id.* Foot Locker and Nissan are promoting the "Drive to the Superbowl" contest, the winner of which will be awarded a Nissan Pathfinder and a trip to the big game. *Id.* The Tom Cruise film "Jerry Maguire," in which Cruise plays a football agent, will also showcase the logos of the NFL and its licensee Reebok. *Id.*

NFL Properties has also begun its own promotional campaign aimed at football's various audiences. The "Play Football" campaign is targeted at children, and culminates with a contest whose grand prize is a back yard game of flag football with an NFL quarterback. Halbfinger, *supra* note 195, at 1F. In addition, the "Pledge Allegiance" campaign is directed at the hardcore fan, while "Feel the Power" is targeted to passive fans, including women. *Id.* Jim Connelly, vice president of NFL Properties, has a particularly Jonesesque scenario in mind for the future: "The coach will do an interview at halftime on the network, then he'll turn to the QVC [home shopping] camera and say, 'You can get this jacket for $50 - till they run out. Then buy it at J.C. Penney.' It'll be seamless." *Id.*

200.  The Jacksonville Jaguars and the Carolina Panthers emerged as two of the biggest stories of the 1996 NFL season, as both qualified for the playoffs in only their second year of existence. Jacksonville finished the regular season with a record of 9-7, while Carolina capped a remarkable 12-4 campaign by edging out the mighty San Francisco 49ers for the NFC West crown.

201.  Rick Gosselin, *Jones Faces Skeptical Owners*, DALLAS MORNING NEWS, September 20, 1995, at 1A.

Jerry Jones, as Jones' own words and actions seemed to contradict every assertion by the Defendants that the contracts at issue did not violate either the league's licensing agreements or §43(a) of the Lanham Act. NFL Properties apparently came to the conclusion, however, that it would rather have Jerry Jones on its own marketing team than wage a long and bitter legal battle against him. If one thing is certain anymore, it is that the NFL will not abandon its present licensing scheme and its commitment to shared revenue as quickly as it dropped its lawsuit against Jerry Jones.

*William J. Hoffman*