# Baseball Trademark Licensing and the Antitrust Exemption: An Analysis of *New York Yankees Partnership v. Major League Baseball Enterprises, Inc.*

*by* James D. Weinberger[*]

## INTRODUCTION

It is nearly axiomatic that professional sports play a prominent role in American culture. Baseball in particular has become an integral part of the American landscape, and has a storied place in this nation's history.[1] One of the most important factors shaping baseball's development has been its unique antitrust exemption, which was established in *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*, a 1922 opinion of the Supreme Court of the United States.[2] The inapplicability of the antitrust laws allows Major League Baseball (the present professional baseball organizing body) to operate with greater flexibility than other sports leagues. As an example, consider that football, basketball and hockey have had considerable problems with franchise relocation in times of financial trouble. Owners of teams that are losing money in certain areas will reach lucrative agreements with other cities in order to reestablish their teams in more profitable locations. If the leagues oppose such movement, the franchise owners can bring suit against them, alleging a conspiracy to restrain trade and monopolization under the antitrust laws. Faced with the threat of an antitrust lawsuit and a treble damage award of hundreds of millions of dollars, those professional sports leagues will not generally risk preventing team movement in this way. Major League Baseball, on the other hand, can thwart a rogue owner's attempt to move his or her franchise without fear of an antitrust lawsuit. This phenomenon has helped professional baseball evolve from an unorganized series of independent leagues in the early twentieth century into an association of thirty professional teams, each with its own web of minor-league affiliates, comprising in total a global, billion-dollar industry.

Today, one of the largest and most commercially visible sources of revenue in sports in general (and baseball in particular) is the merchandise that is associated with the various teams in each sport. Most sports leagues, including baseball leagues, have arranged to pool their merchandising resources, including team names, logos, and trademarks, and share the revenue brought in through sales and licensing. This Note concerns the current law in terms of the application of baseball's antitrust exemption to merchandising and licensing of intellectual property rights. In particular, this Note

---

[*]    B.A. 1996, Wesleyan University; J.D. (expected) 1999, Columbia University School of Law. Associate, Dewey Ballantine, LLP (starting Fall 1999). The author thanks Loren Weber, Robert-Paul Sagner and Steve Baglio for their help with this Note, and Erica for her love and support.
     Copyright © 1999 by James D. Weinberger.

    1.    *See generally* GEOFFREY C. WARD & KEN BURNS, BASEBALL: AN ILLUSTRATED HISTORY (1994).

    2.    259 U.S. 200 (1922).

75

focuses on the case of *New York Yankees Partnership v. Major League Baseball Enterprises, Inc.* The suit, filed in February of 1997 in the Federal District Court for the Middle District of Florida, concerned a $95 million, ten-year exclusive merchandising agreement made between the Yankees and the sports merchandising company Adidas early in that year. The contract allowed Adidas to promote and sell merchandise featuring the famous Yankee logo (the recognizable interlocking "N" and "Y") and advertise its products in Yankee Stadium and on television commercials and print ads.

Major League Baseball opposed the Adidas-Yankees deal because it violated the league's policy of having merchandising arrangements for all of the major league teams controlled by one unified body, Major League Baseball Properties. Before the litigation began, only four relatively small companies – New Era, Majestic Athletics, Starter, and ProPlayer – were permitted to sell any item to the public with a team trademark on it through the league's merchandising contracts. Major League Baseball pursues this marketing strategy via the 1995 Agency Agreement, which was established by a majority vote through the Major League Agreement, baseball's equivalent of a constitution. The *Yankees* lawsuit marked the first attempt by any team to challenge the joint marketing policy.

Before it was settled in the summer of 1998, the *Yankees* lawsuit presented important questions on the current scope of baseball's antitrust exemption; while the Supreme Court in 1974 stated that only Congress could abolish the exemption, there has been great tension between the various courts that have had the opportunity to hear cases involving baseball since the Court last ruled on the issue. In addition, new legislation leaves the question of the reach of the exemption in these areas to future collective bargaining agreements, or, alternatively, the courts. Under these circumstances, the *Yankees* case and the recent settlement take on great significance. The larger question of whether baseball's antitrust exemption applies to business practices of its marketing arm and to use of the trademarks of its teams is important because of the tremendous amounts of revenue involved for teams. It is this author's belief that the exemption does not apply to this area.

Part I of this Note deals with the three Supreme Court cases in which the antitrust exemption was established and solidified. Part II examines a series of recent cases that have dealt with the scope of the exemption and frames the current law surrounding that scope. Part III looks at the complaint in the *Yankees* case, and provides an analysis of the possibilities resulting from its adjudication. This analysis leads to the thesis of this Note: the *Yankees* case, had it gone to trial, would have resulted in a holding that baseball's exemption does not apply to business dealings involving the league's licensing of team trademarks and the lucrative marketing opportunities presented by those practices. A discussion of the settlement of the *Yankees* decision in the summer of 1998 supports this contention.

## I. THE BUSINESS OF BASEBALL:
## THE ORIGINS OF THE ANTITRUST EXEMPTION

Professional baseball's antitrust exemption came about as a result of a judicial decision that reflected a desire by a majority of the Supreme Court to keep America's "National Pastime" free from the substantial economic constraints created by the federal antitrust laws.[3] The Court created the exemption in 1922, holding that baseball was exempt from the federal antitrust laws because it was not part of "interstate commerce" and thus not subject to federal regulation.[4] The reasoning behind the decision, however, while consistent with the Supreme Court antitrust decisions made during the 1920's,[5] was suspect from the moment of its inception. While it seemed correct to allow baseball to promulgate certain rules and regulations in order to enable its teams to play baseball games without fear of federal antitrust suits brought by teams from competing leagues, it was difficult to see how "the business of giving exhibitions of base ball [sic]," as it was characterized by the *Federal Baseball* Court, was not part of interstate commerce.

The underlying weakness of the decision created confusion when the Supreme Court was asked to revisit the question of whether baseball had to answer to claims under the federal antitrust laws. The Court in *Toolson v. New York Yankees, Inc.* affirmed *Federal Baseball* "[w]ithout re-examination of the underlying issues."[6] Nearly twenty years later, in *Flood v. Kuhn*, the Supreme Court abandoned the interstate commerce rationale altogether, and held that baseball was exempt from the antitrust laws for policy reasons.[7] In finding that the commerce discussed in *Federal Baseball* was in fact part of interstate commerce, the Court nonetheless upheld the exemption. The Court noted that Justice Holmes's opinion in *Federal Baseball*, however poorly reasoned, had been around since 1922, and that Congress had never

---

3.    The federal antitrust laws, the Sherman Act of 1890, read, in relevant part:

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

§ 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. §§ 1-2 (1997).

4.    *Federal Baseball*, 259 U.S. 200.

5.    Joseph J. McMahon, Jr. & John P. Rossi, *A History and Analysis of Baseball's Three Antitrust Exemptions*, 2 VILL. SPORTS & ENT. L.F. 213, 236-37 (1995).

6.    346 U.S. 356, 357 (1953).

7.    407 U.S. 258, 284 (1972).

addressed it. If some change was desired, the Court stated, it was Congress's sole right to do so. As such, the *Flood* Court's dicta put the burden of altering the "aberration" of the baseball antitrust exemption on Congress.[8] These three cases, which forged and solidified professional baseball's status as exempt from the antitrust laws, are the basis for the confusion surrounding the dispute in the *Yankees* case.

## A. *FEDERAL BASEBALL CLUB OF BALTIMORE, INC. V. NATIONAL LEAGUE OF PROFESSIONAL BASEBALL CLUBS*

In the first two decades of the 1900's, the National League of Professional Baseball Clubs ("National League") and the American League of Professional Baseball Clubs ("American League" – together, the "major leagues" or "Major League Baseball"), had established themselves as predominant among several competing baseball leagues.[9] The two leagues had distinguished themselves from their competitors, in part, by devising a system by which teams could retain their players from year to year without fear of being outbid by other teams within the league. This scheme, known as the reserve system, allowed teams to "reserve" a number of players on their league team and from their minor league affiliates at the end of each season. Under the system, players on one team's reserve list would not be offered contracts by other league teams. Competitor leagues, such as the Federal League of Professional Baseball Clubs (formed in 1913), ran their games without a reserve system in an apparent attempt to lure players from the National and American Leagues.[10]

However, like many other competitors of the two dominant leagues, the Federal League ran into financial trouble. An antitrust action brought by the Federal League against the National and American Leagues in 1915 was settled in 1917. In this settlement, the Major Leagues agreed to pay the Federal League to dissolve its teams.[11] All Federal League teams except for the Baltimore, Maryland, club agreed to join in this settlement. The Baltimore team continued in its pursuit of antitrust damages under sections one and two of the Sherman Act.[12]

In a very brief and conclusory opinion, Justice Holmes, writing for a unanimous court, noted the Baltimore club's allegation that the "defendants destroyed the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League . . . ."[13] He then turned to the decision of the Court of Appeals to dismiss the case and proceeded to make a "summary statement of the nature of the business involved":

> The business is giving exhibitions of base ball [sic], which are purely state affairs. It is true that in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States.

---

8.    *Id.* at 282.
9.    *See* McMahon & Rossi, *supra* note 5, at 223-34.
10.    *Id.* at 233.
11.    *Id.* at 234.
12.    15 U.S.C. §§ 1-2 (1997). *See* complete text *supra* note 3.
13.    Federal Baseball Club of Baltimore, Inc. v. National League of Prof'l Baseball Clubs, 259 U.S. 200, 207 (1922).

> But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business . . . [T]he transport is a mere incident, not the essential thing.[14]

With this broad language, the Supreme Court affirmed the dismissal by the Court of Appeals of the lawsuit, and created an antitrust exemption for the major leagues that would go unchallenged in the Supreme Court for more than thirty years.

One should note, however, the ambiguities created by this apparently succinct "summary statement" and the problems it presents to the Supreme Court's Commerce Clause analysis.[15] Holmes argues that the League's need to "induce free persons to cross state lines"[16] did not constitute interstate commerce. The Court's characterization of baseball players under contract as "free" is questionable. Players can and could always choose whether or not they want to play organized baseball; however, once they make that decision, players are subject to a great number of financial and geographical restrictions. In 1922, when *Federal Baseball* was before the Court, players on major league teams did not have a wide range of choices concerning where and on what terms they could play. In an era when the reserve system ruled and players could not become free agents when their contracts expired, players were pieces of larger puzzle – when the whole moved, they had to move with it.

### B. *TOOLSON V. NEW YORK YANKEES, INC.*

The Court revisited the *Federal Baseball* decision in a 1953 case involving a direct challenge to the reserve clause.[17] Toolson, a minor-league player, sued the New York Yankees for an antitrust violation after being placed on an ineligible-to-play list for refusing to report to an assignment. In a 7-2 decision, the Court refused to consider the merits of Toolson's case, relying on *Federal Baseball*. Noting that "Congress has had the ruling [of *Federal Baseball*] under consideration but has not seen fit to bring such business under these laws by legislation having prospective effect," the Court affirmed *Federal Baseball* "so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."[18]

The *Toolson* dissent exposed the weakness of the *Federal Baseball* Court's interstate commerce analysis by listing six attributes of professional baseball's

---

14.    *Id.* at 208-09.

15.    *Id.* at 208. Under *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194 (1824), Congress could regulate all "commerce which concerns more States than one," even matters occurring within a state, so long as the activity had some commercial connection with another state; *see also* Houston, E. & W. Texas Railway Co. v. United States, 234 U.S. 342 (1914) (upholding Interstate Commerce Commission's right to regulate railroad rates totally within Texas because they had a close and substantial relation to interstate traffic); *but see* United States v. E.C. Knight Co., 156 U.S. 1 (1895) (holding that Congress could not forbid a monopoly in sugar manufacture and that a direct logical relationship with commerce was necessary in order for Congress to be able to apply the antitrust laws).

16.    *Federal Baseball*, 259 U.S. at 209.

17.    Toolson v. New York Yankees, Inc., 346 U.S. 356 (1953).

18.    *Id.* at 357.

organization; these are (1) the capital investments in the exhibition of games, (2) professional baseball's large financial role in interstate transactions, (3) professional baseball's purchase of materials in interstate commerce, (3) the crossing of state lines that occurs in attendance of games, (4) radio and television activities, (5) advertising and sponsorships, and (6) professional baseball's integrated and organized farm system (which reached across international boundaries). The dissent argued that these points are evidence of professional baseball's substantial role in, rather than its absence from, interstate commerce.[19] The dissent, like the majority, cited Congress's silence since *Federal Baseball* – but the dissent argued that Congress's failure to create a statutory exemption for baseball from the antitrust laws meant that no such exemption exists.[20]

The *Toolson* majority's break from *Federal Baseball* is unsettling. The *Federal Baseball* Court held that the "business is giving exhibitions of base ball, which are purely state affairs."[21] The *Toolson* Court interpreted this language to mean that the "business of baseball" (meaning something more than the business of putting on baseball games, perhaps) is exempt from the federal antitrust laws. The Court's language presents two problems. First, the Court did not explain what, if any, expanded scope it was granting to baseball's antitrust exemption by using different language to describe the characteristics of the exemption itself. Second, assuming arguendo that *Toolson* represents an expanded scope, the Court did not explain why the scope was to be broadened. It is worth noting that the opinion does not once mention the phrase "interstate commerce"; if interstate commerce was not the basis of the expanded exemption, the Court did not say why or what was the basis was instead. These same problems would appear again when the Court considered the exemption for a third time in the 1971 case of *Flood v. Kuhn*.[22]

## C. *FLOOD V. KUHN*

Curt Flood's dispute with baseball's status quo arose when he was traded to the Philadelphia Phillies from the St. Louis Cardinals after his contract with the latter team expired in October, 1969. Under the reserve system, the Cardinals "reserved" Flood as one of their players and then exchanged him for another player who had been "reserved" by the Phillies. Flood, having neither a valid contract nor a desire to play for the Phillies, asked Commissioner of Major League Baseball Bowie Kuhn to make him a free agent so that he might sign with whatever team he wanted. Kuhn denied the request. Flood sued the Commissioner, the two league presidents, and the 24 member clubs, alleging, among other claims, that baseball's reserve system was

---

19.    *Id.* at 357-58 (Burton, J., dissenting).
20.    *Id.* at 364-65.
21.    259 U.S. at 208.
22.    407 U.S. 258 (1972). In the years between *Toolson* and *Flood*, the Supreme Court considered the effect of the federal antitrust laws on the performance of local theater run by a large organization, *United States v. Shubert*, 348 U.S. 222 (1955); boxing, *United States v. International Boxing Club of New York, Inc.*, 348 U.S. 236 (1955); football, *Radovich v. National Football League*, 352 U.S. 445 (1957); and basketball, *Haywood v. National Basketball Ass'n*, 401 U.S. 1204 (1971). In each case, the Court found that the antitrust laws applied.

a violation of the federal antitrust laws.[23] At trial, the Southern District of New York dismissed Flood's complaint. The Second Circuit affirmed. The Supreme Court "granted certiorari in order to look once again at this troublesome and unusual situation."[24] The Court's analysis altered the original holding in *Federal Baseball* and the apparent (but unexplained) extension of that holding in *Toolson*; the inconsistency of the three opinions has helped create the circumstances surrounding the current controversy presented by the *Yankees* case.

Following a brief discussion of the history of baseball's exemption, the Court provided a succinct statement of its findings:

> 1. Professional baseball is a business and it is engaged in interstate commerce.
> 2. With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball.
> 3. . . . It is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of *stare decisis*, and one that has survived the Court's expanding concept of interstate commerce. It rests on a recognition and acceptance of baseball's unique characteristics and needs.
> 4. Other professional sports operating interstate . . . are not so exempt.[25]

The Court also noted that if Congress felt that the decision in *Federal Baseball* was incorrect, the burden was upon the legislature to act on those convictions: "the remedy, if any is indicated, is for congressional, and not judicial, action."[26] As such, the Court declared emphatically that Flood was not entitled to become a free agent.

Separate dissents were written by Justice Douglas and by Justice Marshall, both of which were joined by Justice Brennan. In a footnote, Justice Douglas lamented that he had joined the Court's opinion in *Toolson*, and "would now correct what [he] believe[d] to be its fundamental error."[27] Justice Marshall would have corrected this "difficult" situation as the court found itself "torn between the principle of *stare decisis* and the knowledge that the decisions in [*Federal Baseball* and *Toolson*] are totally at odds with more recent and better reasoned cases."[28] Justice Marshall also criticized the conclusion of the *Toolson* and *Flood* Courts that Congress's silence was tantamount to its acquiescence to an antitrust exemption for baseball, but noted that revocation of the exemption would not necessarily mean that Flood would prevail on the merits of his case. Justice Marshall cited the existence of the then relatively new Major League Baseball Players Association – the recently formed players' union – in support of the likelihood that a collective bargaining agreement, for example, would preempt the antitrust laws.[29]

---

23.  407 U.S. at 265.
24.  *Id.* at 269.
25.  *Id.* at 282-83.
26.  *Id.* at 285.
27.  *Id.* at 286 n.1 (Douglas, J., dissenting).
28.  *Id.* at 290 (Marshall, J., dissenting).
29.  *Id.* at 292-95. Free agency has in fact become a major element of professional baseball with the advent of the Players Association and its growth into a strong labor union.

*Flood* presents a neat capsule of the history and status of baseball's antitrust exemption. It states emphatically that baseball has some exemption from the federal antitrust laws, and goes on to provide that the exemption will not be judicially overturned. If any change is to be made in the current status of the exemption, *Flood* leaves it for Congress to decide. However, little else was clear following the decision. What remains especially murky is the exemption's scope. The majority opinion discusses the fact that the *reserve system* enjoys exemption from antitrust laws; there is no mention of *Federal Baseball's* "business [of] giving exhibitions of base ball"[30] and *Toolson's* seemingly broader "business of baseball."[31] The flurry of antitrust challenges that followed *Flood* beginning in the 1980's demonstrated the inherent weakness of the theory that baseball's exemption was all-encompassing. At the same time, however, great judicial deference was given to the Supreme Court's instruction that only Congress could change the current situation. These two opposing factors – the inherent ambiguity of the scope of the exemption and the judicial decree first put forth in *Toolson* and reiterated in *Flood* that only Congress could alter the status quo – shaped the baseball antitrust cases in the 1980's and 1990's, leading to the confusion and anticipation surrounding the *Yankees* lawsuit and its subsequent settlement.

## II. THE SUBSEQUENT CASE LAW AND LEGISLATIVE DEVELOPMENTS

As stated above, the years following *Flood* saw an outburst of cases dealing almost exclusively with the scope of the antitrust exemption. These cases can be divided into two basic types. The first class of decisions, based on *Charles O. Finley & Co. v. Kuhn*,[32] are those that have contended that the scope of baseball's antitrust exemption went beyond the reserve clause into what the *Toolson* court called the "business of baseball." Cases that fall into this category include *Professional Baseball Schools & Clubs, Inc. v. Kuhn*,[33] *McCoy v. Major League Baseball*,[34] and *New Orleans Pelicans Baseball, Inc. v. National Association of Professional Baseball Leagues, Inc.*[35] These cases confirm the existence of the exemption, and affirm that it extends into the daily operations of the business of baseball. These holdings, however, are limited. In a footnote in *Finley*, the Seventh Circuit recognized that "this exemption does not apply wholesale to all cases which may have some attenuated relation to the business of baseball."[36]

The other group of post-*Flood* decisions has attempted to exploit the *Finley* footnote, along with the inherent ambiguities of the *Federal Baseball-Toolson-Flood*

---

30.     Federal Baseball Club of Baltimore, Inc. v. National League of Prof'l Baseball Clubs, 259 U.S. 200, 208 (1922).

31.     Toolson v. New York Yankees, Inc., 346 U.S. 356, 357 (1953).

32.     569 F.2d 527 (7th Cir. 1978).

33.     693 F.2d 1085 (11th Cir. 1982).

34.     911 F. Supp. 454 (W.D. Wash. 1995).

35.     Civ. A. No. 93-253, 1994 WL 631144 (E.D. La. Mar. 1, 1994).

36.     569 F.2d at 541 n.51 (citing Twin City Sportservice, Inc. v. Charles O. Finley & Co., 365 F. Supp. 235 (N.D. Cal. 1972), *rev'd on other grounds*, 512 F.2d 1264 (9th Cir. 1975)).

triumvirate, to narrow the scope of the exemption. These opinions can be split into two distinct groups: those that have merely stated that the exemption does not reach the purported anticompetitive activity alleged by the various plaintiffs, and those, such as *Piazza v. Major League Baseball*, that have gone so far as to hold that the exemption does not extend beyond the reserve system.[37] Although the reasoning behind some of these cases (especially *Piazza*) has been challenged, they nonetheless raise serious questions as to how far the exemption reaches. Specifically, the issue whether or not the exemption reaches the arrangements made between the teams concerning intellectual property marketing and licensing has become more and more clouded with the announcement of the each of the decisions discussed below. If the *Yankees* lawsuit was to survive the initial antitrust barrier, it would have had to rest on an analysis derived from this second group of cases.

### A. THE "BUSINESS OF BASEBALL" CASES: *CHARLES O. FINLEY & CO. V. KUHN* AND ITS PROGENY

The facts surrounding the *Finley* case are widely known and, at the time of the decision in the summer of 1976, had a dramatic effect on the baseball season itself. On June 15, 1976, Charles O. Finley, the notoriously thrifty owner of the Oakland Athletics, sold the contractual rights of Vida Blue and Rollie Fingers, two star pitchers, to the New York Yankees and the Boston Red Sox, respectively, for cash, in an attempt to reduce his team's salaries.[38] After Commissioner Kuhn voided the "trades" on authority of the "best interests of baseball" clause of the Major League Agreement (that is, he refused to let the trades render the Athletics noncompetitive because of budgetary constraints imposed by the team's owner), Finley brought an antitrust suit in the Northern District of Illinois. That court held that the Commissioner's actions were exempt from the antitrust laws under *Flood*. The Seventh Circuit affirmed.[39]

In coming to its conclusion that the Commissioner was "contractually authorized to disapprove player assignments which he [found] to be 'not in the best interests of baseball' where neither moral turpitude nor violation of a Major League Rule is involved,"[40] the Seventh Circuit considered the antitrust exemption in light of the *Federal Baseball-Toolson-Flood* triumvirate and *Radovich*.[41] The court held that the scope of baseball's antitrust exemption extended beyond the reserve clause – despite

---

37. 831 F. Supp. 420 (E.D. Pa. 1993).

38. 569 F.2d at 531. Both players were going to become free agents at the end of the 1976 season. Despite the substantive holding in *Flood*, free agency became a way of life in baseball in December of 1975, when, under an arbitration mandated by a collective bargaining agreement, a panel held that two players challenging their clubs and requesting that they be made free agents should be allowed to do so. The *Finley* court, *id.* at 531 n.1, notes that the District Court for the Western District of Missouri enforced the panel's decision in *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n*, 409 F. Supp. 233 (W.D. Mo.), *aff'd*, 532 F.2d 615 (8th Cir. 1976).

39. 569 F.2d at 531.

40. *Id.* at 530.

41. For a discussion of *Radovich* and the other non-baseball cases holding the antitrust laws applicable to sports and other forms of mass entertainment, see *supra* note 22.

exact language to the contrary in *Flood*.[42] The Seventh Circuit stated that it was "clear from the entire opinions in the three baseball cases, as well as from *Radovich*, that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."[43]

The court's statement was not without a caveat, however. In a footnote immediately following the statement that the scope of the exemption reached the business of baseball, the court noted that the exemption might not apply if a case had only some attenuated relation to the business of baseball.[44] The court cited *Twin City Sportservice, Inc. v. Charles O. Finley & Co.* to support this proposition.[45] That case involved an antitrust counterclaim by Finley in an action brought by a concession company, which had a contract with the previous owners of the Oakland Athletics before Finley bought the team, for breach of the original contract.[46]

The *Finley* court's broad proposition that the antitrust exemption extended beyond the reserve clause to the business of baseball, however, has been upheld in a variety of courts and cases. In *McCoy v. Major League Baseball*, the Federal District Court of the Western District of Washington invoked the exemption and dismissed a class-action antitrust suit brought by fans and local merchants for the actions of Major League Baseball that led to the 1994 player strike.[47] Furthermore, the Eastern District of Louisiana adopted *Finley* in rejecting an antitrust claim brought by a group who failed in its attempt to purchase a minor league baseball club and move it to New Orleans.[48]

Despite these endorsements of *Finley*, confusion as to the scope of the exemption remained. Many potential cases challenging the scope of the exemption were never brought because of the *Flood* Court's edict that if the exemption was to be altered it was Congress's role to do so.[49] This has only added to the problem. Significantly, a series of cases that *have* been brought, beginning with *Henderson Broadcasting*,[50] have limited the scope of the exemption based on an interpretation of *Flood* that has diverged somewhat from *Finley* and its progeny. These cases present serious questions as to whether the District Court in the *Yankees* case would have found that baseball's trademark and licensing practices fall within the antitrust exemption.

---

42.    569 F.2d at 541 (quoting Flood v. Kuhn, 407 U.S. 258, 282, 284 (1972)).

43.    *Id.* at 541.

44.    *Id.* at 541 n.51.

45.    365 F. Supp. 235 (N.D. Cal. 1972), *rev'd on other grounds*, 512 F.2d 1264 (9th Cir. 1975).

46.    *Id.* By analogy, a court could say that licensing has an attenuated relationship to the business of baseball and is thus outside the scope of the exemption.

47.    911 F. Supp. 454 (W.D. Wash. 1995).

48.    New Orleans Pelicans Baseball, Inc. v. National Ass'n of Prof'l Baseball Leagues, Inc., Civ. A. No. 93-253, 1994 WL 631144, at *9 (E.D. La. Mar 1, 1994).

49.    Flood v. Kuhn, 407 U.S. 258, 285 (1972).

50.    Henderson Broad. Corp. v. Houston Sports Ass'n, Inc., 541 F. Supp. 263 (S.D. Tex. 1982).

## B. THE LIMITED SCOPE CASES

### 1. *Henderson Broadcasting Corp. v. Houston Sports Association, Inc.* and *Postema v. National League of Professional Baseball Clubs*

The first post-*Flood* case purporting to limit the scope of the antitrust exemption was *Henderson Broadcasting*. In *Henderson*, the plaintiff radio broadcaster sued the owner of the Houston Astros, charging him with violations of the Sherman Act and state antitrust laws, breach of contract, and interference with business relationships; the complaint alleged that the Astros conspired with a co-defendant radio station to push the plaintiff's station out of the local market for broadcasting.[51] In denying the defendant's *in limine* motion to dismiss, the court held that a baseball team owner was not free from suit under the baseball exemption to the antitrust laws in a dispute over broadcasting rights, because the suit involved a business enterprise that "was related to but separate and distinct from baseball."[52]

In coming to this conclusion, the court cited *Gardella v. Chandler*, a pre-*Toolson* decision by the Court of Appeals for the Second Circuit in which Judges Frank and Hand distinguished disputes over radio broadcasting from that which took place in *Federal Baseball*.[53] In *Gardella*, Judge Frank had written that "the interstate communication by radio and television is in no way a means, incidental or otherwise, of performing the intra-state activities (the local playings of the games)."[54] The *Henderson* court similarly reasoned that "although the exhibition of baseball is now a big business 'packaged with beer, broadcasting, and other industries' . . . [r]adio broadcasting is not a part of the sport in the way in which players, umpires, the league structure and the reserve system are."[55]

The *Henderson* court applied the rationale of the Supreme Court triumvirate of cases and moved away from *Finley* by placing a more restricted boundary on the exemption than had the Seventh Circuit in that case. *Henderson* includes in its interpretation of the "business of baseball" the reserve system and matters relating to league structure, but not broadcasting contracts. This reading is based directly on the language from the footnote in *Finley*. Furthermore, instead of placing a burden on potential plaintiffs to show that their activity fell outside of that area, as in *Finley*, the Southern District of Texas in *Henderson* placed the burden of proof upon Major League Baseball to show that the specific activity it claimed to be within the scope of the exemption was in fact within those boundaries.

The next case to limit the scope of the antitrust exemption as put forth in *Flood* and narrowed in *Henderson* was *Postema v. National League of Professional Baseball Clubs*.[56] Pamela Postema was a minor league umpire who had her employment terminated by the minor league clubs when the American and National

---

51.    *Id.* at 264.
52.    *Id.* at 265.
53.    172 F.2d 402 (2d Cir. 1949).
54.    *Id.* at 411.
55.    541 F. Supp. at 269 (quoting *Kuhn*, 407 U.S. at 287 (Douglas, J., dissenting)).
56.    799 F. Supp. 1475 (S.D.N.Y. 1992), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993).

Leagues failed to express interest in having her call games at the major league level.[57] Postema sued both the National and American Leagues, as well as their minor league affiliates, for violation of Title VII of the Civil Rights Act of 1964 and its 1991 amendments, violation of state human rights laws, and common-law restraint of trade after she was fired. In their analysis of her restraint of trade claim, the clubs argued that the federal antitrust exemption preempted Postema's claims.[58] In response, the court stated that

> although the baseball exemption does immunize baseball from antitrust challenges to its league structure and its reserve system, the exemption does not provide baseball with blanket immunity for anti-competitive behavior in every context in which it operates. The Court must therefore determine whether baseball's employment relations with its umpires are "central enough to baseball to be encompassed in the baseball exemption."[59]

The court held that the exemption did not apply because the clubs had "not shown any reason why the baseball exemption should apply to baseball's employment relations with its umpires."[60]

This holding followed the *Henderson* analysis. Instead of requiring the plaintiff to show that the antitrust exemption did not apply, the leagues were being asked to provide a reason why the exemption *did* apply to the "business" in practice. As in *Henderson*, however, the court offered no concrete standard. These two cases reflect a common judicial technique: while failing to provide a litmus test by which potential litigants can measure their actions, they each drew distinctions that make it easier for parties to see where the "line" should be drawn in future instances. *Henderson* said that allegations of antitrust violation surrounding radio (and probably television) broadcasting contracts with the major league clubs were not within the exemption; *Postema* said the same for employee relations with umpires. The next major case to address the scope of the exemption, however, sharply diverged from these; in fact, it drew a distinction that probably reaches too far to be considered useful for future litigants.

## 2. *Piazza v. Major League Baseball*

In August of 1992, an investment group in Tampa Bay, Florida, announced an "agreement in principle" to purchase the struggling San Francisco Giants baseball

---

57.     *Id.* at 1479.
58.     *Id.* at 1486. The *Postema* court cited *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989), for the Supreme Court's test to see whether federal law preempts state law. Three situations allow for this occurrence: "(1) where there is an express statement by Congress indicating an intention that state law be preempted; or (2) even in the absence of such a statement, where Congress intends that federal law occupy a given field; or (3) where state law conflicts with federal law." 799 F. Supp. at 1488. The *Postema* court went on to state that only the third possibility existed in the case at bar. *Id.*
59.     799 F. Supp. at 1489 (citing *Henderson*, 541 F. Supp. at 265).
60.     *Id.*

team and move it to Tampa.[61] Pursuant to the Major League Agreement, the National League had to approve any sale or relocation by vote; the league teams voted 9 to 4 to keep the Giants in San Francisco. And while the league instructed the Tampa investors to freeze their activities relating to the sale while the specifics of the deal were examined by league officers, another investment group (one that promised to keep the Giants in San Francisco) appeared on the scene and negotiated a deal with the current Giants ownership for the sale of the team.

The Tampa Bay investors, led by Vincent Piazza (father of Mets catcher Mike Piazza), brought suit against Major League Baseball, alleging that the league frustrated their efforts to purchase the team.[62] Their suit accused the league of "infringing upon their rights under the United States Constitution and violating federal antitrust laws and several state laws in the process."[63] Major League Baseball responded by claiming that the Eastern District of Pennsylvania "lacks subject matter jurisdiction over plaintiffs' federal and state claims and that plaintiffs' federal claims fail to state a cause of action . . . With regard to plaintiffs' federal antitrust claims, defendants also claim[ed] exemption from antitrust liability under [*Federal Baseball*] and its progeny."[64]

The court granted defendants' motion concerning the direct constitutional claims, but upheld the validity of the plaintiffs' antitrust claims, holding "that the exemption created by *Federal Baseball* is inapplicable here because it is limited to baseball's 'reserve system'."[65] This was a marked departure from the previous post-*Flood* antitrust cases that diverged from the *Finley* "business of baseball" interpretation of the exemption; instead of performing an analysis like that in *Henderson* and *Postema* to see if the challenged activity was central enough to baseball's league structure or the reserve system to come within the antitrust exemption, the district judge in *Piazza* issued a blanket statement as to the nature of the exemption in all situations. The judge's rationale was a very literal reading of the *Flood* Court's interpretation of the exemption and a heavy reliance on its references to the reserve system.[66] Rejecting Major League Baseball's reliance on *Finley*, the *Piazza* court argued that the principle of stare decisis required the District Court to restrain itself from looking beyond the facts in *Federal Baseball, Toolson* and *Flood* in its reading of the scope of the

---

61.    *See* Latour Rey Lafferty, *The Tampa Bay Giants and the Continuing Vitality of Major League Baseball's Antitrust Exemption: A Review of* Piazza v. Major League Baseball, 831 F. Supp. 420 (E.D. Pa. 1993), 21 FLA. ST. U. L. REV. 1271 (1994).

62.    Piazza v. Major League Baseball, 831 F. Supp. 420, 421 (E.D. Pa. 1993).

63.    *Id.* Specifically, the plaintiffs alleged that while the League was purporting to investigate their deal with the Giants, several owners who opposed the Giants's move to Florida helped to orchestrate the deal with investors who would keep the team in San Francisco. They also claimed that they were told that some individuals within the league structure felt that there were questionable issues surrounding the background of the Tampa investors, although Major League Baseball never endorsed such a statement and the individual later admitted that there were no such problems. *See* Lafferty, *supra* note 61, at 1272 n.8.

64.    831 F. Supp. at 421.

65.    *Id.*

66.    *Id.* at 435-36.

exemption.[67] The court argued that since no general rule concerning the exemption flowed from *Flood*, the Supreme Court effectively created a system of "result stare decisis" rather than the conventional "rule stare decisis" for cases involving baseball's antitrust exemption.[68] In dicta, the district judge argued that even if he had made the decision under the premise of *Finley* and no other case, the exemption would not apply because the challenged activity fell outside of the two established boundaries of the scope of the exemption: "(1) the reserve system and (2) matters of league structure."[69]

The result in *Piazza* is highly suspect. Although the dicta at the end of the opinion states the correct analysis under *Finley*, it seems as though the location and sale of franchises that might affect that location are absolutely central to the business of baseball and the league structure. Relocation drastically affects division alignment and scheduling, stadium leases, and most importantly, the consumers of the game: the fans. Furthermore, the *Piazza* court's holding that the exemption does not extend beyond the reserve clause seems very narrow, despite the fact that *Butterworth v. National League of Professional Baseball Clubs*,[70] a case related to *Piazza* brought by Florida's attorney general against Major League Baseball in the Florida Supreme Court, affirmed the principles espoused in *Piazza*. A more recent case, *Minnesota Twins Partnership v. Minnesota*,[71] did the same. However, as the Court in *Butterworth* acknowledged, "the *Piazza* court is the only federal court to have interpreted baseball's antitrust exemption so narrowly," and "*Piazza* is against the great weight of federal cases regarding the scope of the exemption."[72] The lone dissenter in *Butterworth* argued that the scope was not as narrow as the *Butterworth* majority and the *Piazza* court both felt it was; he applied a line of reasoning more akin to that used in *Henderson* and *Postema*, and would have found that the challenged activity was fundamentally within the composition of the leagues.[73]

### C. THE CURT FLOOD ACT OF 1998: CONGRESS TAKES A STEP

In the fall of 1998, Congress finally reacted to years of baseball-related litigation and uncertainty surrounding the antitrust exemption with the passage of the Curt

---

67.    *Id.* at 437-38 (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 947 F.2d 682, 691-92 (3d Cir. 1991), *aff'd in part and rev'd in part on other grounds*, 505 U.S. 833 (1992), in support of the proposition that when the Supreme Court fails to create a usable rule in a particular series of cases, "result stare decisis" rather than "rule stare decisis" is to be applied).

68.    *Id.* at 438.

69.    *Id.* at 440 (citing Professional Baseball Schools & Clubs, Inc. v. Kuhn, 693 F.2d 1085 (11th Cir. 1982); Postema v. National League of Prof'l Baseball Clubs, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992); Henderson Broad. Corp. v. Houston Sports Ass'n, Inc., 541 F. Supp. 263, 269 (S.D. Tex. 1982); State v. Milwaukee Braves, Inc., 144 N.W.2d 1, 15 (1966)).

70.    644 So.2d 1021 (Fla. 1994).

71.    1998-1 Trade Cas. (CCH) ¶ 72,136 (Minn. April 20, 1998).

72.    644 So.2d at 1024-25.

73.    *Id.* at 1026 (McDonald, S.J., dissenting) ("One area of business activity which has clearly and consistently been considered exempt is the matter of the structure of the league.").

Flood Act of 1998 ("CFA").[74] The legislation, presented to the Senate Judiciary Committee by Senators Hatch, Leahy, Thurmond and Moynihan in January, 1997, proposed to clarify the current status of the antitrust exemption for Major League Baseball. The motivation for the bill, beyond a desire to prevent unnecessary litigation and further confusion as to the scope of the exemption, was derived from a provision in the most recent collective bargaining agreement made between the players and the owners of the major-league teams. In that agreement, the players and owners agreed that

> [t]he Clubs and the Association [the players' union] will jointly request and cooperate in lobbying Congress to pass a law that will clarify that Major League Baseball players are covered under the antitrust laws (i.e., that Major League Players have the same rights under the antitrust laws as do other professional athletes, e.g., football and basketball players), along with a provision that makes it clear that passage of that bill does not change the application of the antitrust laws in any other context or with respect to any other person or entity.[75]

This clause marks the first collective attempt on the part of the players and the owners to pursue some sort of clarifying legislation surrounding the exemption.[76]

Section 3(a) of the CFA amends the antitrust laws by stating that

> the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players to play baseball at the major league level are subject to the antitrust laws to the same extent such conduct, acts, practices, or agreements would be subject to the antitrust laws if engaged in by persons in any other professional sports business affecting interstate commerce.[77]

Section 3(a) is then qualified by § 3(b), which states that no court is to rely on § 3(a) as "a basis for changing the application of the antitrust laws . . . other than [that] set forth in subsection (a)."[78] Section 3(b) does not purport to create a cause of action under the antitrust laws unless that cause of action relates to employment of major league baseball players.[79] To clarify this point, § 3(c) of the CFA stipulates that the legislation only creates a cause of action for a major-league baseball player to sue (that is, minor leaguers do not enjoy the same rights). This section also notes that if a nonstatutory labor exemption from the antitrust laws is in effect because a valid collective bargaining agreement is in place, the antitrust laws will not apply.

Subsection (b) then lists several practices to which the legislation will not apply. Specifically, section 3(b)(3), added as a last-minute amendment to the bill, states that the CFA does not have any effect on the antitrust laws with respect to

---

74.    Curt Flood Act of 1998, Pub. L. No. 105-297, 112 Stat. 2824 (Oct. 27, 1998); *see Congress Votes Baseball Bill*, N.Y. TIMES, Oct. 8, 1998, at D4.
75.    Basic Agreement, March 1997, article XXVIII (copy on file with author).
76.    S. REP. NO. 105-118, at 3 (1997).
77.    Curt Flood Act § 3(a).
78.    *Id.* § 3(b).
79.    *Id.*

any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting franchise expansion, location or relocation, franchise ownership issues, including ownership transfers, the relationship between the Office of the Commissioner and franchise owners, the marketing or sales of the entertainment product of organized professional baseball and the licensing of intellectual property rights owned or held by organized professional baseball teams individually or collectively.[80]

With respect to the *Yankees* case and the recent settlement, the CFA does not address the current status of the exemption as it applies to intellectual property licensing, except that it purports to maintain the status quo. One of two scenarios can be inferred from this language: Congress either (1) believes that licensing activity is fully within the exemption or (2) is following its past practices by refusing to make a statement on the issue one way or the other, leaving the question to the courts, the League, and the players' union. The former contention can be supported by the argument that many of the items listed in § 3(b)(3) are clearly within the exemption; the relationship between the office of the Commissioner and franchise owners is an example. The legislative history of the bill, however, supports the latter conclusion.

The Congressional Record from July 31, the day the bill passed the Senate, reveals a discussion between Senator Wellstone and Senator Hatch, the author of the bill. Senator Wellstone was worried that the Act would have an effect on a potential antitrust-related action between the Minnesota Twins and the Attorney General of the State of Minnesota, Hubert Humphrey III.[81] The relevant portion of this debate follows:

> Mr. WELLSTONE. . . . It is my understanding that S. 53 [the CFA] will have no impact on this investigation or any litigation arising out of the investigation.

> Mr. HATCH. That is correct. The bill simply makes it clear that major league baseball players have the same rights under the antitrust laws as do other professional athletes. The bill does not change current law in any other context or with respect to any other person or entity.

> Mr. WELLSTONE. Thank you for that clarification. I also note that several lower courts have recently found that baseball currently enjoys only a narrow exemption from antitrust laws and that this exemption applies only to the reserve system. For example, the Florida Supreme Court in [*Butterworth*], the U.S. District Court in Pennsylvania in [*Piazza*], and a Minnesota State court in a case involving the Twins have all held the baseball exemption from antitrust laws is now limited only to the reserve system. It is my understanding that S. 53 will have no effect on the courts' ultimate resolution of the scope of the antitrust exemption on matters beyond those related to owner-player relations at the major league level.

> Mr. HATCH. That is correct. . . .

---

80.    *Id.* § 3(b)(3).
81.    144 CONG. REC. S9621 (daily ed. July 31, 1998).

Mr. LEAHY. I concur with the statement of [Senator Hatch]. . . .[82]

This discussion suggests that the CFA does not purport to define the scope of the exemption – its only function is to create a cause of action under the antitrust laws for major-league baseball players in employment-related matters. Therefore, the legal questions presented by the *Yankees* case remain unanswered: either the leagues or the courts are left to create policy in the area of intellectual property licensing and marketing in baseball. Because the CFA does not address the scope of the exemption beyond enumerating a specific cause of action for players, the case law is still relevant and controlling to that determination.

### D. SYNTHESIS: THE STATE OF THE EXEMPTION

The case law subsequent to the *Flood* decision presents a fairly jumbled set of possibilities that leave the scope of baseball's antitrust exemption up in the air. The CFA only adds to the confusion because it does not adequately address unclear areas which the exemption might or might not cover. A few basic principles, however, can be drawn out of these cases and the CFA:

- The exemption does exist and applies to the "business of baseball."

- The "business of baseball" definitely includes the reserve system and matters relating to league structure.

- The exemption does not apply to a discrimination suit brought by an umpire, or to an allegation of unfair competition in radio broadcasting contracts between a local station and a league member baseball team.

- It is not entirely clear whether matters surrounding franchise sale and relocation fall within the exemption. *Piazza* is clear in holding that the exemption does not reach such matters, and *Butterworth* affirms the principle, but several federal courts have specifically stated that *Piazza* is not good law.[83]

- The developing trend in the various federal courts that have examined the exemption post-*Flood* (with the exception of *Finley*) has been to place upon Major League Baseball the burden of demonstrating that the exemption applies to the challenged activity, rather than placing upon plaintiffs the burden of showing that the exemption does not apply.

---

82.    *Id.*
83.    *See* McCoy v. Major League Baseball, 911 F. Supp. 454, 457 (W.D. Wash. 1995) (rejecting the reasoning and results of *Piazza*); New Orleans Pelicans Baseball, Inc. v. National Ass'n of Prof'l Baseball Leagues, Inc., Civ. A. No. 93-253, 1994 WL 631144, at *9 (E.D. La. Mar. 1, 1994) (rejecting the "cramped view" of *Piazza*).

- The exemption does not apply to employment-related antitrust claims which could be brought by players of major league teams against the league.

It is on these "guiding" principles that baseball's antitrust exemption rests, albeit tenuously. The competing cases imply that *Piazza* reduces the exemption to a point that the Supreme Court would not tolerate, but that case has settled and no appeal will follow. Other than that, baseball attorneys and potential plaintiffs are left to guess on which side of the fuzzy line certain activities lie. When the Yankees and Adidas agreed to engage in a joint marketing partnership contrary to Major League Baseball's policy of marketing all of the baseball-related intellectual properties as one entity, it became clear that facts had arisen which were closer to the hidden line than any antitrust challenge involving baseball to date.

### III. A CHALLENGE TO THE EXEMPTION: THE YANKEES AND ADIDAS TAKE ON MAJOR LEAGUE BASEBALL

#### A. BACKGROUND AND THE COMPLAINT

Surprisingly, none of the major sports leagues, including baseball, historically took steps to enforce the protection of team logos. It was only in the 1970's, when league management realized the tremendous potential revenues that come with aggressive merchandising and licensing of team logos and uniforms, that the leagues first began to go after potential infringing parties.[84] In the mid-1980's, baseball's major-league owners agreed to pursue a joint marketing strategy. A new company, Major League Baseball Properties ("MLB Properties"), was to take on all merchandising, marketing, and licensing responsibility for all of the major-league teams. In order to promote the quality of the marks and the goods to be sold, the company operated as a single unit, placing no higher value on one team's marks over another. Thus revenues from merchandising and licensing were shared equally. This served a secondary purpose of equalizing some portion of the financial differences between "large market" teams like the Yankees, the Los Angeles Dodgers, and the Atlanta Braves, and "small market" teams like the Montreal Expos, the Minnesota Twins, and the Pittsburgh Pirates. The role of MLB Properties has been affirmed by a three-fourths majority of the owners in several agreements between them, the most recent being the Agency Agreement of 1995.

In the years since the creation of the forged marketing alliance, free agency became more popular as a form of player acquisition than the amateur draft and trades. Salaries rose with this trend, and owners of the top teams craved additional sources of revenue to make their teams more competitive on the field. No owner took steps more drastic than those taken by Yankee owner George Steinbrenner, when he an-

---

84.    The first sports league to use the courts to protect fraudulent reproduction of team logos was the National Hockey League, when it sued a company which was producing team emblems and selling them to T-shirt and cap manufacturers. *See* Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004 (5th Cir. 1975).

nounced that he had formed his own marketing agreement with Adidas in the spring of 1997.[85]

Before the official signing of the deal between Adidas and the Yankees, MLB Properties informed Steinbrenner that the contract had to be approved by the League before it could come into effect; he was told that the contract as it stood did not contain sufficiently specific proposals as to the team's desired activity with Adidas.[86] When Steinbrenner signed the contract anyway, he was immediately threatened by the baseball owners with expulsion from their Executive Committee. After he was in fact suspended by that group, Steinbrenner and Adidas commenced suit in the Middle District of Florida.

After stating the requisite relevant geographical and product markets and noting that the defendants' conduct took place in interstate commerce, the Yankees's complaint made several important allegations.[87] First, it provided a brief description of the relationship and the "conflicts of interest" that have arisen over the years between the "successful" clubs and the "unsuccessful" clubs.[88] The Complaint then described the role of MLB Properties, characterizing its actions since its inception in 1984 as those of a "cartel organized at the behest of a large group of the less successful Major League Clubs"; these teams, the Complaint alleged, "induced and coerced" the more successful clubs to join by creating the provision allowing for establishment of agency agreements extending MLB Properties's power by vote of only three-fourths of the clubs.[89] The Yankees have not signed onto any of these Agency Agreements, because they believed that they could market their own trademarks for more profit for the team than would be earned by MLB Properties. The Complaint also argued that the equal distribution of MLB Properties profits to all of the clubs, regardless of the amount of revenue each specific team trademark

---

85. Steinbrenner's actions, however, were not without precedent. In 1996, Dallas Cowboys owner Jerry Jones signed agreements linking Nike and Pepsi to his team after the National Football League had already established similar sport-wide associations with Reebok and Coca-Cola. Jones sued the league when they attempted to block the deal. The Jones case can be distinguished from the *Yankees* case because football has no antitrust exemption. However, the similarity in fact patterns provides a useful analogy. The case is proceeding in the Southern District of New York. *See* Dallas Cowboys Football Club, Ltd. v. National Football League Trust, No. 95 Civ. 9426, 1996 WL 601705 (S.D.N.Y. Oct. 18, 1996).

86. Dominic Bencivenga, *Steinbrenner's Gamble: Suit Challenges Reach of Antitrust Exemption* (May 22, 1997) <http://www.ljx.com/practice/sports/0522steinbr.html>.

87. The Complaint identified several defendants, including Major League Baseball Enterprises (the legal entity encompassing Major League Baseball Properties), the Executive Council, and the 29 major league teams other than the Yankees. *See* Complaint, New York Yankees Partnership v. Major League Baseball Enters., Inc., 97-1153-CIV-T-2513 (M.D. Fla. filed May 19, 1997) ("the Complaint"), ¶¶ 88-92 (copy on file with author).

88. *Id.* ¶¶ 93-99. This description is rather skewed as it paints the Yankees as the single most dominant and important team in baseball. While the Yankees have won more World Series championships than any other professional team, the Complaint glorifies the Yankees in an attempt to separate their merchandising power from the other, "unsuccessful teams." The Complaint also aims a petty insult at one particular defendant, Bud Selig, who is currently the interim commissioner of baseball and the owner of the Milwaukee Brewers, by characterizing the Brewers as an "unsuccessful" team. *Id.* ¶ 95.

89. *Id.* ¶¶ 102-03.

generates, deprives the individual clubs of incentives to "promote and protect their own Club's marks" and creates an "incentive for free riding."[90]

The Complaint alleged that there is no business justification for the existence of such a marketing arrangement. It argued that the system, under the guise of fostering competition among the teams, creates a disincentive for the weaker teams to compete because they are guaranteed a disproportionate amount of marketing revenue.[91] The Complaint next alleged that because retail manufacturers generally prefer to bind themselves to a few teams, the arrangement devalues the potential licensing product of the individual teams.[92] As an example, the Yankees document Adidas's earlier failed attempts to enter into the market for selling baseball-related goods and the actions taken by MLB Properties to block Adidas's deal with the Yankees.[93] The Yankees sought relief on fourteen different counts, including violations of sections 1 and 2 of the Sherman Antitrust Act and analogous Florida antitrust statutes, tortious contractual interference, breach of fiduciary duty, and misappropriation of trade secrets pursuant to Florida law.[94]

### B. BREAKING THE ANTITRUST BARRIER

The prior baseball cases have shown that no court would consider any of these allegations unless it decided that the antitrust exemption did not apply to the specific facts of the case. The pressing issue therefore becomes whether or not marketing agreements between individual baseball teams and commercial merchandisers are beyond the scope of the exemption such that a federal district court will hear the merits of the case.

Initially, Major League Baseball argued that under the Major League Agreement, the Yankees as a member club cannot sue the League; under the Agreement, the Yankees must submit disputes for resolution by either the Executive Council or the Commissioner. However, the Yankees's twofold response to this argument is persuasive and (before the settlement) was expected to survive motion: (1) the Executive Council, having already suspended Yankee owner George Steinbrenner, cannot fairly resolve any dispute involving his actions, especially those that affect the council members, and (2) as baseball has no permanent Commissioner, the Yankees must seek judicial resolution of their dispute.[95] The next step in the proceeding, if the court were to follow *Flood*, would have been for the league to show that the challenged activities (that is, the alleged cartel-like role of MLB Properties and the alleged coercion by MLB Properties to force the Yankees to participate in joint

---

90.   *Id.* ¶¶ 112-13. The Yankees also argued that MLB Properties has treated the team harshly because of their opposition to the role of the marketing arm. *Id.* ¶ 116. No specific instances are noted.

91.   *Id.* ¶ 118.

92.   *Id.* ¶ 119.

93.   *See id.* ¶¶ 120-48.

94.   *See id.* ¶¶ 153-259.

95.   *See* Greater Miami Baseball Club Ltd. Partnership v. Selig, 171 F.R.D. 73 (S.D.N.Y. 1997) (holding that acting commissioner was not a substitute for a full-time commissioner under the Major League Agreement). Ironically, professional baseball *won* the *Miami* case by making such an argument – an argument which could now be used against it.

marketing) fell within a category that is "central enough to the business of baseball" that it should be included in the scope of the exemption.

League attorneys in the *Yankees* case surely would have argued that because revenues from merchandising efforts of MLB Properties are among the only shared financial resources of the major league teams, MLB Properties is indispensable to league structure; therefore, following this analysis it is clearly exempted even under those cases which put the most restrictive boundaries around the exemption. However, unlike basketball and football, baseball's revenue sharing structure is virtually limited to merchandising – a source of income that can be a relatively small portion of total team revenues (especially for the teams with large television contracts like the Yankees).[96] While it can be argued that the small market teams will not be able to compete without shared merchandising revenues, many other sources of potential revenue-equalizing mechanisms (such as a salary cap) have been off-limits to the owners due to player opposition and lack of unity among the owners.

Second, it is not clear what kind of a response the league would have been able to offer to the Yankees's contention that "there is a distinction between the teams' baseball activities, which are exempt from anti-trust laws, and the teams' financial activities," which they claim are not within the scope of the exemption.[97] This argument has support from *Henderson*, which held that antitrust claims regarding a single team's radio broadcasting contract did not fall within the exemption.[98] Additionally, although the far-reaching statements of the *Piazza* court color its ultimate conclusions, the court held that the exemption does not extend to dealings with the relocation and sale of franchises. Therefore, it would be logical to assume that an individual team's decision to market its trademarks, made independently of the Agency Agreement for which it had not voted, is a purely financial decision with only "some attenuated relation to the business of baseball" (i.e., the reserve clause and league structure).[99]

As noted above, what is unique about the *Yankees* case is that the facts presented came closer to defining the scope of baseball's antitrust exemption than any of the

---

96.    The three other major sports leagues have implemented revenue sharing mechanisms in order to deal with the problems that go with the unequal distribution of team income. Both the National Basketball Association and the National Football League and their respective players' unions have implemented salary caps, which effectively "even the playing field" among the teams which otherwise have unequal sources of revenue. Baseball players have expressed opposition to a salary cap because it puts an artificial limit on their salaries.

The National Hockey League does not have a salary cap. Instead, it has chosen to implement a system of free agency that places certain players in different groupings, with more "value" being assigned to players in the statistical upper echelon of the league and who are at the optimum age for players. If a team signs a free agent in this group, the league compensates the original team of the player by awarding either draft picks or players of "equal" value of the player's new team to the player's old team. This forces potential signing teams to consider that important prospects may be lost if a high profile free agent is signed, and maintains competitive balance among the teams. In effect, this system has kept major stars either playing with their original teams or resulted in trades to teams that can afford to pay higher salaries for players or draft picks.

97.    Larry Dougherty, *Steinbrenner Wants Suit to Stay in Tampa Court*, ST. PETERSBURG TIMES, Aug. 1, 1997, at 1B.

98.    Henderson Broad. Corp. v. Houston Sports Ass'n, Inc., 541 F. Supp. 263 (S.D. Tex. 1982).

99.    Charles O. Finley & Co. v. Kuhn, 569 F.2d 527, 541 n.51 (7th Cir. 1978).

earlier exemption-scope cases. Furthermore, unlike any of its predecessors, the *Yankees* case, because of Adidas's involvement, involved dealings between a baseball team and a non-baseball industry with more global reach than any other activity previously challenged. The attempted trades in *Finley*, the local broadcasting contract in *Henderson*, and the allegation of discrimination in *Postema* all had limited reach beyond the specific case. However, attempted blockage of the Yankees/Adidas agreement had a substantial effect on an *involved* third party. In dismissing local businesses' complaint against baseball for lack of standing, the *McCoy* court held that the "antitrust laws were not intended to apply to 'ripple effect' injury sustained by third parties."[100] But, as was noted in *Postema*, "courts have applied the antitrust laws to agreements between baseball entities and third parties without even discussing the possibility that the antitrust exemption might apply."[101]

This last point is a key one. Considering the effects of a forced revocation of the Yankees-Adidas deal not only on the Yankees but on Adidas, the third largest sports merchandising company in the world, restraining teams from making their own marketing deals has too direct an impact (that is, not just a "ripple effect") on an industry outside of baseball to allow inclusion into the scope of the exemption. The original justifications in *Flood* for the perpetuation of the exemption simply do not support regulation of this sort; as noted before, baseball did not enforce unauthorized use of its trademarks until *after* that case was decided. And while, hypothetically, allowing teams to make their own marketing agreements may have indirect relation to on-field performance through a reduction of the current value of the "weaker" team trademarks, this relation seems at least as attenuated to the validity of a concession contract and the revenues brought in to a specific team in that manner.[102] If any set of facts supports an argument that the exemption did not apply, the *Yankees* case presents them all, from both a judicial and a policy standpoint.

## C. SETTLEMENT

On April 30, 1998, the Yankees, Adidas, and Major League Baseball announced a settlement of their lawsuit.[103] Not all of the details were announced publicly, but a joint press release provided several important details:

---

100.  McCoy v. Major League Baseball, 911 F. Supp. 454, 458 (W.D. Wash. 1995).

101.  Postema v. National League of Prof'l Baseball Clubs, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992) (citing Fleer Corp. v. Topps Chewing Gum, Inc., 658 F.2d 139 (3d Cir. 1981) (contract between players' association and baseball card manufacturer)); Nishimura v. Dolan, 599 F. Supp. 484 (E.D.N.Y. 1984) (contract between cable company and New York baseball teams); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 365 F. Supp. 235 (N.D. Cal. 1972) (contract between Oakland Athletics and concessionaire), rev'd on other grounds, 512 F.2d 1264 (9th Cir. 1975).

102.  See Twin City Sportservice, 365 F. Supp. 235.

103.  Steve Zipay, Yankees, Adidas Settlement Winners, NEWSDAY, May 1, 1998, at A96; Michael Hiestand, Yankees, Adidas Drop Lawsuit About Logos, USA TODAY, May 1, 1998, at 4C; Ken Davidoff, Yanks' Shoe Firm Deal Okd, N.Y. DAILY NEWS, May 1, 1998, at 110; Jack O'Connell, Adidas Lawsuit Dropped, HARTFORD COURANT, May 1, 1998, at C5.

- The marketing agreement between the Yankees and Adidas would be allowed to stand;

- The Yankees would pay Major League Baseball's legal costs, which amounted to nearly $500,000;

- Yankee owner George Steinbrenner would be reinstated to the league owners' executive council; and

- Adidas would be incorporated into the Major League Baseball marketing scheme as a business partner, although it would not have the right to display its logo on official uniforms and jackets.[104]

On the same day, the League made several announcements regarding marketing and licensing.[105] It extended the contracts of its exclusive outfitters for on-field apparel: Russell Athletic for uniforms, Majestic Athletic for batting practice jerseys, Starter for outerwear, and New Era for caps. Of more significance, however, was the announcement that Nike and Reebok, in addition to Adidas, would be brought into the marketing scheme, giving them the ability to use team uniforms in advertising in the United States and the not-yet-tapped overseas markets.

Although neither Steinbrenner nor his attorney were available for comment on the settlement, one anonymous team employee said that the resolution was "a slam dunk" for the team; in his view, the Yankees did not concede any aspects of their original agreement with Adidas.[106] On the league side, Paul Beeston, President of Major League Baseball, said: "We are gratified our disputes with Adidas and the Yankees are behind us and that the integrity of our marketing operations has been retained. We are also extremely excited to embark upon a partnership with Adidas and look forward to the continued growth and energizing of the game with such a dynamic international partner."[107] Beeston added that "[a]t the Club level, *the structure of the Yankees/Adidas relationship can serve as the prototype for all teams going forward.*"[108] The league's drastic turnaround caused by the threat of the *Yankees* case is nothing short of remarkable. The league moved from hotly contesting an agreement in and out of court to endorsing it publicly by suggesting that other clubs seeking to raise revenue should look to it as an example.

There are several possible reasons for this significant shift in policy. Perhaps League officials felt that the lawsuit was a bona fide threat to the antitrust exemption. The exemption is the single best obstacle to League problems of team movement, sudden ownership changes and similar issues that plague the three other major professional sports leagues. The League might have simply felt that it could not risk

---

104.  *MLB, Yankees, Adidas Settle Suit* (Apr. 30, 1998) <http://www.majorleaguebaseball.com/news/adidas.sml>.
105.  *MLB, Yankees, Adidas Settle Suit, supra* note 104.
106.  Ken Davidoff, BERGEN RECORD, May 1, 1998, at S2.
107.  *MLB, Yankees, Adidas Settle Suit, supra* note 104.
108.  *Id.* (emphasis added).

trying to persuade a judge that the Yankees-Adidas agreement fell within the scope of the exemption, forcing the court to make a narrow ruling. Second, the settlement could reflect ownership's concession to its past inability to successfully garner support for consensus-based revenue sharing. Nike and Reebok were brought into the Major League Baseball marketing system to prevent other teams from making contracts of the type made between the Yankees and Adidas. While Beeston praised the agreement as a model for the future, he must have known that Nike, Reebok, and Adidas constitute a vast majority of the merchandising market; there are no other large companies known to this author that could offer such a large sum as Adidas did to any single team. And although no public announcements were made, it would be surprising if Nike or Reebok could make separate team agreements under their new relationships with the league.

## CONCLUSION

In this strange way, then, it appears that the goals of the antitrust laws have been served – multiple competitors have all been brought within baseball's marketing fold – despite the fact that no ruling on the applicability of the exemption to intellectual property licensing was ever made in court. On a superficial level, then, fear of the application of the antitrust laws has allowed the goals of the Sherman Act to be advanced. This may be the case, but the reality of the settlement and Beeston's endorsement of the agreement are probably acknowledgments by ownership that the league cannot survive without the large market teams being fiscally profitable and in the spotlight, regardless of whether they have the freedom to market their trademarks. This reality brings us back to the point made earlier: despite the apparent consensus about the new direction and openness of baseball's marketing arrangements, the divergence between the small and large market teams will continue to widen until the difference is so great as to permanently damage the way teams compete on the field. This will create friction between fans and teams that will be virtually impossible to ease, thus creating a far more challenging problem for baseball to deal with than merchandising logos on team jerseys. The Curt Flood Act of 1998, which promises clarity on employment-related matters, does not lend foreseeable help for the league in this area.

The *Yankees* case, along with the lawsuit filed by the Dallas Cowboys against the National Football League,[109] demonstrates a trend in sports that baseball and the other leagues will have to address at some point in the near future. As player salaries in all sports have risen dramatically over the past twenty years, teams continue to look for new sources of revenue to enable them to outbid their opponents for higher-quality players. In tapping into trademarks and merchandising with retail giants like Adidas and Nike (as in the *Cowboys* case), owners like George Steinbrenner and Jerry Jones have taken opportunistic steps to seize upon a tremendous source of revenue which they feel their respective leagues have failed to harness effectively. Furthermore, as is evident from the baseball clubs' recent difficulty in coming to what most perceive

---

109.   *See supra* note 85.

to be a necessary agreement about comprehensive realignment, the clubs have had problems negotiating among themselves in dealing with issues far more global than revenue-raising for individual teams.

Therefore, although an exclusive marketing deal may be good for Adidas, the Yankees, retailers, and consumers, and despite Beeston's public approval of the arrangement, it may prove terribly problematic for the internal mechanisms governing baseball in two distinct ways. First, its implied acknowledgment that the exemption is not available in intellectual property licensing leaves Major League Baseball open to antitrust claims if it opposes owners who make their own marketing deals. Second is the consequence of increased dissension and ill-will between the small-market and large-market clubs due to tremendous revenue differentials.

It is genuinely important for baseball to maintain the competitive balance of the teams insofar as such a balance is good for the league as a whole. The teams need to make money, or they will not survive. Competitive balance with financial instability does not make good business. Perhaps the return of a full-time independent commissioner might have helped to solve these problems and aid consensus-building among the ownership structure so that lawsuits would not be necessary for baseball to effectively harness large and vital sources of revenue. However, with the recent promotion of interim commissioner Bud Selig (a team owner) to permanent commissioner, this appears unlikely.[110] Baseball must come to some kind of revenue-sharing arrangement that is satisfactory to the owners, the players, and the fans, before the courts are forced to rule in a way that forecloses those opportunities in future agreements.

---

110.  *Selig Named 9th Commissioner* (July 9, 1998) <http://www.majorleaguebaseball.com/news/bud1.sml>.