# ANTITRUST AND INEFFICIENT JOINT VENTURES: WHY SPORTS LEAGUES SHOULD LOOK MORE LIKE MCDONALD'S AND LESS LIKE THE UNITED NATIONS

STEPHEN F. ROSS AND STEFAN SZYMANSKI[*]

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 214

II. THE PROBLEM WITH VERTICAL INTEGRATION IN DOMINANT SPORTS
    LEAGUE JOINT VENTURES ................................................ 222
        A. Optimal Number and Location of Franchises ................ 226
        B. Sale of Broadcast Rights ........................................ 229
        C. Licensing, Merchandise and Sponsorships .................. 230
        D. Accountability of Club Executives ............................ 231
        E. Competition for Players ......................................... 232
        F. Summary of Economic Comparisons Between Club-Run
           and Vertically Separate Leagues ............................ 236

III. ANTITRUST TREATMENT OF SPORTS LEAGUES: SINGLE ENTITIES
    CONTRACTING WITH CLUBS VERSUS CLUB-RUN LEAGUES ............... 237
        A. Sale of Broadcast Rights ........................................ 239
        B. Franchise Entry and Relocation ............................... 240
        C. Labor Restraints ................................................. 241
        D. Policies Concerning Ownership ................................ 243

IV. WHY CURRENT OWNERS MAY BE UNWILLING TO RESTRUCTURE
    EVEN IF IT IS EFFICIENT TO DO SO .................................... 245
        A. Why Leagues Have Not Done This Already if It is Such
           a Good Idea .................................................... 246
        B. Transaction Costs Inhibit Efficient Restructuring .......... 249

V. INVOLUNTARY RESTRUCTURING: MANDATORY DIVESTITURE UNDER
    ANTITRUST LAW .......................................................... 252

VI. CONCLUSION ............................................................... 258

[*] Professor of Law, University of Illinois, B.A., J.D., University of California (Berkeley), and Professor of Economics, Tanaka Business School, Imperial College (London), B.A., University of Oxford, M.Sc., Ph.D., University of London, respectively. The authors thank Lee Fennell, Clark Griffith, Herb Hovenkamp, Leo Kahane, Kit Kinports, Andy Leipold, David Meyer, Matt Mitten, Roger Noll, Jim Pfander, Gary Roberts, Richard Storrow, Charles Tabb, and Andy Zimbalist for helpful insights in developing this article.

*Antitrust law generally favors joint ventures that allow separate firms to integrate economic functions while continuing to compete as independent entities. In evaluating the risks to competition that joint ventures could pose, insufficient attention has been paid to the risk that joint ventures with market power may be structured so that the parties, acting in their independent self-interest, will prevent the venture from providing innovative goods and services responsive to consumer demand. In these cases, it may be better if a single firm provided services rather than having them provided jointly.*

*We illustrate this problem by challenging the conventional wisdom that sports leagues must be organized and run by clubs participating in the sporting competition. The fastest-growing competition in the United States is organized by NASCAR, a distinct business entity that is not controlled by the drivers who participate in stock car races. We suggest that the club-run sports leagues in the major North American sports impose significant costs on sports fans in a variety of markets. If, instead, relevant rules were decided by an independent Board of Directors of "NFL, Inc.," "MLB, LLC," or the like, we suggest that franchise allocation, broadcast rights, effective club management, marketing and sponsorship, and labor markets would be regulated more efficiently and more responsively to consumer demand.*

*Our analysis blames significant transactions costs for the inability of club owners who run leagues to reach efficient, consumer-responsive results. These same transaction costs may prevent an efficient restructuring of sports leagues. Thus, we apply conventional antitrust doctrine in innovative ways to argue that courts could view the current structure as an unlawful refusal of club owners to participate in a sporting competition that they themselves cannot control, which we argue unreasonably restrain trades and unlawfully maintains monopoly power.*

## I. INTRODUCTION

For some time now, antitrust law has generally looked kindly upon joint ventures—when separate firms combine to perform some kind of economic activity.[1] The law has strived mightily to distinguish joint ventures from cartels, the latter being condemned as involving agreements to restrain trade and serving no other legitimate purpose.[2] It would be difficult to find those

---

1. *See* Robert Pitofsky, *A Framework for Antitrust Analysis of Joint Ventures*, 74 GEO. L.J. 1605, 1606-7 (1986); Joseph F. Brodley, *Joint Ventures and Antitrust Policy*, 95 HARV. L. REV. 1521, 1525 (1982).

2. *See, e.g.,* ROBERT PITOFSKY, ET AL., TRADE REGULATION: CASES AND MATERIALS 378 (5th ed. 2003) ("[A] joint venture carries the positive connotation of cooperation among firms, usually accompanied by some actual integration of managerial or production resources, to achieve some

who would not prefer a joint venture of firms that combine for limited purposes, even if they comprise most of the firms in the market, to a merger that eliminated all competition between the formerly separate firms.[3]

To be sure, courts and commentators have recognized that some joint venture agreements can have significant anticompetitive effects, and antitrust law should intervene to protect the market and consumers from such effects. The leading commentaries synthesize the cases and the literature to focus on whether a joint venture could harm competition by (1) reducing potential rivalry between the parties to the venture, (2) facilitating collusion relating to other aspects of competition between the parties, or (3) excluding or hampering rivals to the venture parties in their access to an essential product or service necessary to compete.[4]  Much less attention has been paid to another important risk of joint ventures that do not face vigorous rivalry in the marketplace—that the venture is structured so that the parties, acting in their independent self-interest, will prevent the venture from providing innovative goods and services responsive to consumer demand.  In such cases, consumers and society may be better served if a single firm provided certain services instead of having them provided jointly.  For example, a baseball competition would be organized by Major League Baseball, Inc. rather than participating clubs; a commodities exchange would be organized by Chicago Board of Trade, LLC rather than by participating brokers; an oil field would be operated by a single company rather than jointly by mineral rights owners.

To be sure, Judge Richard Posner has sagely cautioned that "[i]t does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition."[5] Yet in *National Collegiate Athletic Ass'n v. Board of Regents*,[6] the Supreme Court appears (albeit in dicta) to have overlooked the significant antitrust risks from the parties' conscious decision to operate a member-run venture; instead, the Court assumed that this choice was an indispensable part of the parties' pro-competitive cooperation.  Speaking for the Court, Justice John Paul Stevens declared that the marketing of contests between competing clubs or teams "would be completely ineffective if there were no rules *on which the competitors agreed* to create and define the competition to be marketed" and

---

useful business objective more efficiently than either (or any) could alone.  It is thus distinguished from a cartel or price-fixing arrangement, for example.").

3.  SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 963 (10th Cir. 1994).

4.  *See* Pitofsky, *supra* note 1, at 1608; Brodley, *supra* note 1, at 1530-32.  *See also* Herbert Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy*, 1995 COLUM. BUS. L. REV. 1, 4.

5.  Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594 (7th Cir. 1984).

6.  468 U.S. 85 (1984) [hereinafter *NCAA Case*].

that agreements among rival firms were "essential if the product is to be available at all."[7]

As a matter of antitrust doctrine, the Court's precise holding was that the degree of cooperation among those who jointly organize and participate in sporting competitions is sufficiently extensive that their agreements should not be formulaically condemned as per se illegal.[8]  Thus, the Court's embrace of the conventional wisdom that it is *essential* to permit collusion among clubs who compete both on the field/court/ice in a sporting competition, and off the field/court/ice for talent and revenue, was not required for the Court's holding.

It is our thesis that this conventional wisdom is wrong.  Entertainment in the form of competitive sports leagues can be produced through a structure in which coordination of the particulars of the competition (playing rules, distribution of revenues, terms for competition for players' services) is provided by a separate entity that is distinct from the clubs participating in the competition.  In the United States, the fastest growing sports competition exists among stock car drivers, who not only compete in individual races but whose success in races over the course of a season determines the winner of the lucrative Nextel Cup.  Here, the competition organizer is not a venture of competing drivers, but rather a separate, for-profit entity, the National Association for Stock Car Auto Racing (NASCAR), controlled by the family of Bill France, who founded the competition.[9]  NASCAR, and not the participating drivers, determines the rules of competition and the location of premier races.  Moreover, when the National Basketball Association (NBA) created a women's league, they did so by explicitly giving majority control of the Women's National Basketball Association (WNBA) board of directors to owners and league executives who did *not* operate clubs in the new competition.[10]  Elsewhere, Australian antitrust law has recognized that leagues and clubs are not inherently one and the same, the former competing in a

---

7. *Id.* at 101 (emphasis added) (quoting ROBERT H. BORK, THE ANTITRUST PARADOX 278 (1978)).  A sports league is a leading example of a business activity that "can only be carried out jointly." 468 U.S. at 101.

8. *Id.* at 103. Because of the procompetitive potential of the challenged joint selling arrangement as well as the plaintiffs' concession that the great majority of the NCAA's rules enhanced competition, a judgment about the competitive significance of the restraint required a fuller consideration of the defendants' justifications.

9. *See* Koszela v. Nat'l Ass'n of Stock Car Auto Racing, 646 F.2d 749, 750 (2d Cir. 1981) (stating that anyone wishing to participate in stock car racing must "join" NASCAR; however, this does not give right to participate in control of organization but merely to participate in its sanctioned events); Michael A. Cokley, *In the Fast Lane to Big Bucks: The Growth of NASCAR*, 8 SPORTS LAW. J. 67, 70-71 (2001).

10. *See* Larry Lebowitz, *Leagues are Forming as 'Single Entities' Where Decision and Profits are Shared by All Owners*, FT. LAUDERDALE SUN-SENTINEL, Apr. 20, 1997, at 1F.

distinct market for "competition organizing services."[11]

Properly recognizing that the decision to form a joint venture is a conscious rejection of alternative forms of inter-firm organization, such as merger or contract, Professor Joseph Brodley has observed that firms would not need to form joint ventures if significant transactions costs did not prevent them from reaching agreement with those with whom they need to cooperate to conduct their business.[12] Thus, for example, McDonald's Corporation is vertically separate from its franchised restaurant outlets, who do business pursuant to a detailed franchise agreement.[13] Although joint ventures allow for the reduction of transactions costs without the disadvantages of mergers, the problem of serving multiple masters raises potential problems.[14]

The traditional structure of club-run leagues imposes significant costs on consumers/sports fans in a variety of markets where sports leagues operate. Consider the following:

- Why would Major League Baseball (MLB) for years deny a team to fans in the national capital area, largely because a single owner of a neighboring franchise objected?

- Why would the NBA try to limit the number of times that the Michael Jordan-led Chicago Bulls could be shown on a national superstation, when the Bulls were willing to pay the league all revenues attributable to showing the game outside of Chicago?

- In light of the recognized interdependence of sports franchises, why do leagues tolerate years of gross mismanagement by particular owners, subjecting local fans to years of unnecessary mediocrity that would never be tolerated in a competitive business

---

11. In *News Ltd. v. Australian Rugby League*, 139 A.L.R. 193, 338 (Full Fed. Ct. 1996), the court recognized a market for "competition organizing services" where two rival leagues sold these services and clubs participating in competitions were buyers. *See also* S. Sydney Dist. Rugby League Football Club Ltd. v. News Ltd., 200 A.L.R. 157 (H.C. 2003) (holding wher a merged league excluded the plaintiff from the receipt of competition organizing services, but exclusion did not meet specific standards for per se illegality under the Australian Trade Practices Act).

Indeed, the evolution of a national rugby league competition in Australia demonstrates the distinct functions of clubs and leagues. The traditional competition was organized by the Australian Rugby League, an entity controlled by a board of directors representing clubs participating at the top level of competition as well as a variety of other clubs and individuals involved in the sport; the courts determined that clubs competed among themselves for the right to participate in the annual top-tier competition. *News Ltd.*, 139 A.L.R. at 318 ("the clubs were not members of the League"); *Id.* at 338-42 (detailing competition for competition organizing services).

12. Brodley, *supra* note 1, at 1527.

13. *See, e.g.,* Marane, Inc. v. McDonald's Corp., 755 F.2d 106 (7th Cir. 1985). In rejecting antitrust and tort claims by former franchisee, court describes initial grant of franchise by defendant to plaintiff and its termination under terms of the agreement.

14. Brodley, *supra* note 1, at 1528-29.

environment?

- Why do North American sports leagues centralize virtually all aspect of the marketing of team merchandise (other than retail sales), when individual owners want to pursue innovative ideas to add revenue (and in contrast, the top English soccer league seems unable to offer any significant collaborative effort in merchandising)?
- Why do sports leagues subject fans to the risk or reality of strikes and lockouts, and impose competitive restraints that actually harm competitive balance, in order to lower team payroll costs? (For example, although significantly increased in the seven years after the lifetime "reserve clause" was abolished in baseball in 1976, and competitive balance had actually improved during that time period, owners were not happy because salaries more than tripled![15])

The reason for these woes, in our view, is that club-run leagues forego attractive business opportunities because they are unable to overcome the significant transactions costs involved in agreeing on how to distribute the proceeds from the opportunity. Contrary to conventional wisdom, club owners need not insist on collectively controlling the sporting competition in which they participate. If, like NASCAR, relevant rules were decided by an independent Board of Directors of "NFL, Inc.," "MLB, LLC," or the like, we suggest that (a) franchises will be more likely to be located in a manner responsive to consumer demand; (b) broadcast rights will be sold in a manner to maximize overall revenues, which often means increased viewership; (c) incompetent ownership would be more likely to be replaced; (d) marketing and sponsorship opportunities would be divided between the league and local clubs based on which entity can most efficiently sell rights and products; (e) collective bargaining agreements will be easier to reach (no approval of a super-majority of owners) and more likely to be designed in a manner to enhance the consumer appeal of the sport.

Although reorganizing sports leagues from an inefficient joint venture structure to one featuring a single firm organizing a competition among participating clubs would increase efficiency, benefit fans, and increase total profitability, there are significant reasons why sports league owners may not support such a change. All of the problems identified above exist only because transactions costs prevent agreement on side payments that would make all concerned better off. Absent transactions costs, MLB would have

---

15. Stephen F. Ross, *Monopoly Sports Leagues*, 73 MINN. L. REV. 643, 676 (1989).

expanded years ago into Washington, D.C. and provided a lump-sum compensation for the Baltimore Orioles; Michael Jordan's exposure to a national television audience would have been maximized with proceeds shared between his team and the NBA; incompetent owners would have been paid off to either sell their team or place club operations in skilled hands; clubs with new ideas for marketing or sponsorship revenue would pursue them with an agreed-upon share of proceeds going to the league; players, leagues and clubs would easily agree on a scheme to maximize revenue and then share it among league stakeholders. Suppose, echoing this Article, an investment banker were to present a league with a proposal to acquire all assets necessary to organize the competition from the clubs. Even if the offer exceeded the aggregate value of all clubs, owners may well be unable to agree on how to divide the proceeds. Indeed, news reports have concluded that the biggest obstacle to the National Hockey League (NHL) owners' consideration of a $3.5 billion offer from investment bankers for all league assets is "disagreements among owners over how much their individual franchises are worth".[16]

Antitrust law provides a remedy for these transaction cost problems. Despite a historic preference for joint ventures as a means to maintain the independence of separate firms, courts have long implicitly recognized that joint ventures may act in ways that are less efficient than a single firm. Thus, the competing pipe manufacturers found to have engaged in per se illegal price fixing in the landmark 1899 *Addyston Pipe* decision were allowed to merge into a single entity.[17] The Supreme Court has held that an agreement by rivals not to compete in each other's geographic markets is illegal, even though an agreement by a supplier firm that its retailers would not compete might not be.[18] Consistent with the analysis presented in this Article, the Court also rejected the proposition that there is no difference between a joint venture's decision to bar intra-brand competition in a local area and the decision of a major national supermarket chain to only have one of its stores in the area.[19]

---

16. *See, e.g.,* Stefan Fatsis & Dennis K. Berman, *Puck Plan: NHL Explores Sale To Cure a Troubled Sport,* WALL ST. J., Mar. 4, 2005, at B1.

17. *See* John Shepard Wiley Jr., *Antitrust and Core Theory,* 54 U. CHI. L. REV. 556, 564 (1987) (citing the discussion by George Bittlingmayer, *Price-Fixing and the* Addyston Pipe *Case,* 5 RES. L. & ECON. 57, 90 (1983), of *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir. 1898), *aff'd,* 175 U.S. 211 (1899), and its aftermath, including the defendants' merger into the United States Cast Iron and Foundry Company).

18. United States v. Gen. Motors Corp., 384 U.S. 127, 140 (1965) (distinguishing joint action by rival dealers to exclude rivals from action General Motors might take unilaterally pursuant to franchise agreements). This distinction was reaffirmed in *Cont'l T. V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59 n.28 (1977).

19. *See* United States v. Topco Assocs., Inc., 405 U.S. 596 (1972) and *id.,* 405 U.S. at 623 n.11 (Burger, C.J., dissenting). One of us has previously detailed an application of our theory that single

The logical implication of these decisions, we suggest, is that antitrust doctrine needs to look more critically at joint ventures that possess economic power to determine whether consumer welfare is being harmed by a structure that inhibits efficient business opportunities. Our principal application of this argument is that the best way to organize and market a sporting competition is to separate the entity (we call it "The League") that organizes a sporting competition, and the clubs participating in the competition, where responsibilities are assigned in well-drafted franchise agreements between The League and each club.

In light of the importance of sporting competitions to millions of sports fans, determining the proper legal response to the choices about industry structure made by participants in major North American sports leagues has independent significance. We offer this analysis as part of a larger project on the structure of sports leagues in the United States.[20]  More concretely, the issues raised by this Article also have immediate implications for non-sports industries.  Currently, a variety of stock and commodity exchanges are exploring whether their control by member-brokers may lead to inefficiencies that would be avoided by placing ownership in an independent, for-profit entity.[21]  The development of antitrust and intellectual property doctrines relating to technology standards may be influenced by insights that help identify when collectively-determined standards may be inefficient.[22] Efficient operation of an oil field is likely to be impaired where mineral rights are vested in different owners, and public policy that facilitates the field's unitary operation by a single operator on behalf of all owners may be welfare-enhancing.[23]  Where beneficial ownership of assets is divided between a life estate and a remainder interest, trust instruments may overcome transaction costs that prevent parties with conflicting interests from agreeing on an

---

firms are likely to make more efficient decisions about where to permit intra-brand competition, in the context of the *Topco* case. *See* STEPHEN F. ROSS, PRINCIPLES OF ANTITRUST LAW 152 (1993).

20.  We are currently researching a book-length comparative review of the structure of a variety of sports around the world and the appropriate governmental/regulatory response to problems raised by these structures.  The general topic is one we have tackled before. *See, e.g.,* Stefan Szymanski, *The Economic Design of Sporting Contests,* 56 J. ECON. LIT. 1137 (2003); Stephen F. Ross & Stefan Szymanski, *Open Competition in League Sports,* 2002 WIS. L. REV. 625.

21. *See, e.g.,* Roberta S. Karmel, *Turning Seats Into Shares: Causes and Implications of Demutualization of Stock and Futures Exchanges,* 53 HASTINGS L.J. 367 (2002).

22. *See, e.g.,* Mark A. Lemley, *Antitrust and the Internet Standardization Problem,* 28 CONN. L. REV. 1041 (1996).

23.  For a helpful discussion, see Gary D. Libecap, *Contracting for Property Rights,* in PROPERTY RIGHTS: COOPERATION, CONFLICT, AND LAW 156-65 (Terry L. Anderson & Fred S. McChesney eds., 2003).

efficient utilization of the assets.[24]

This Article critically analyzes the legal and economic implications of the prevailing choice of sports league design and suggests an alternative more likely to promote efficiency and to avoid cartel-like inefficiencies. Our central theme is that even a single-firm monopoly may be more efficient than a joint venture when bargaining costs prevent participants, keen to pursue their own self-interest at the expense of the group's profits or consumer appeal, from agreeing on efficient, welfare-enhancing strategies that even a monopolist would adopt. Part II details our concern that bargaining costs among league members lead to inefficiencies in the determination of the number and location of franchises, the sale of broadcast, marketing, and sponsorship rights, the effective oversight of club management, and the efficient allocation of players among teams. If these key decisions were instead made by an economic entity independent of the participating clubs, a more efficient organization and marketing of the competition is likely to result. Part III notes the significant legal advantages that a vertically separate league would enjoy in operating more flexibly than club-run leagues. Part IV examines obstacles to the proposed restructuring. The same transactions costs that preclude efficiencies among club-run leagues may also inhibit the member clubs' willingness to adopt a more efficient structure. Specifically, owners may well reject a profitable restructuring because of an inability to agree on how to distribute the gains. Thus, Part V argues that proper application of antitrust principles justifies the involuntary restructuring of sports leagues along the lines discussed in this Article.

To be sure, when a joint venture faces significant inter-brand competition, it can be expected to strive mightily to overcome any transaction costs that cause it to operate inefficiently. If it fails to do so, "market retribution will be swift."[25] But we assume for purposes of this Article that the major North American sports leagues face neither product market competition nor a viable entry threat sufficient to force them to avoid the inefficient practices we discuss herein.[26] Thus, this Article accepts the continuing ability of leagues to

---

24. *Compare* Brokaw v. Fairchild, 237 N.Y.S. 6 (N.Y. Sup. Ct. 1929) (inflexible law of waste governing relationship between life tenant and remaindermen prevented efficient use of real property), *aff'd*, 177 N.E. 186, 1931 N.Y. LEXIS 1272 (1931), *with* Baker v. Weedon, 262 So.2d 641 (Miss. 1972) (court employs its equity powers in the best interests of both the life tenant and the remaindermen). Recent changes in the Uniform Principle and Income Act recognize the need to place greater discretion in the hands of a single entity capable of efficiently utilizing assets to craft a portfolio that maximizes total return on investment. *See* JESSE H. DUKEMINIER, ET AL., WILLS, TRUSTS AND ESTATES 828 (7th ed. 2005).

25. Valley Liquors, Inc. v. Renfield Importers., Ltd., 678 F.2d 742, 745 (7th Cir. 1982).

26. At the same time, we assume that each league's insulation from rivalry is not subject to imminent threat from antitrust intervention. One of us has previously suggested that the government

exercise market power, but suggests ways to facilitate greater efficiencies within that context.[27] In short, we suggest that both profitability and the provision of services responsive to consumer demand would improve if sports leagues looked more like McDonald's and less like the United Nations.

## II. THE PROBLEM WITH VERTICAL INTEGRATION IN DOMINANT SPORTS LEAGUE JOINT VENTURES

In this section, we adopt the approach of Australian courts[28] and think of a sports league as product created by the combination of upstream competition organizing services and downstream clubs participating in the competition. Upstream services are those which enable the competition to take place, but do not necessarily have to be provided for by the competitors themselves. Sports leagues have conventionally recognized that the function of enforcing league rules is best done by investing broad authority with regard to "integrity of the game" issues in an independent entity—the league commissioner.[29] At the same time, common sense suggests that certain functions are best fulfilled by participating clubs, including organizing the team, training the players, organizing spectator services in the form of seating and ticketing, providing refreshments and other stadium amenities, and similar activities. The focus of this Article is the myriad activities that traditionally have not been performed by a commissioner or by individual clubs, but rather by a governing body composed of a representative from each club, with a super-majority required for major changes or initiatives.[30] These services include the determination of

---

intervene to require a divestiture of monopoly sports leagues into competing entities. Ross, *supra* note 15, 733-53. We have also discussed ways that league power could be restrained through intervention to facilitate new club entry. Ross and Szymanski, *supra* note 20, 639.

The focus of this article is on promoting efficiency and not reducing the market power of dominant sports leagues. Economic reasoning suggests that these other proposals would be likely to have a greater effect in enhancing overall welfare and in reducing wealth transfers from consumers to sports fans. There are costs and risks of any reform proposal, and we believe even a "second-best" alternative that significantly improves the efficiency of an important industry merits serious consideration.

27. Although more than one vertically-separated leagues are possible, we assume that the ability of any dominant sports league to exercise market power makes it unlikely that multiple leagues will develop absent antitrust intervention.

28. *See supra* note 11.

29. *See, e.g.*, Milwaukee Am. Ass'n v. Landis, 49 F.2d 298, 299 (N.D. Ill. 1931). With regard to enforcing baseball's code, the parties clear intent was "to endow the commissioner with all the attributes of a benevolent but absolute despot and all the disciplinary powers of the proverbial *pater familias*." *Id.* at 299.

30. *See, e.g.*, Chicago Nat'l League Ball Club v. Vincent, No. 92 C 4398 (N.D. Ill. 1992), *excerpted in* PAUL C. WEILER & GARY R. ROBERTS, SPORTS AND THE LAW 28-32 (3d ed. 2004) (holding Commissioner's broad power did not extend to alignment of clubs within league divisions,

the number of teams admitted to the league, the determination of player contract and trading rules, stadium facility standards, the sale of broadcasting rights, the extent of revenue sharing, and the allocation of shared revenues.

The decision to have these important business decisions be determined jointly by the participating clubs—to have, in our parlance, a "club-run league"—is, in economic terms, a conscious decision to vertically integrate. That is, clubs have decided to provide their own competition organizing services, rather than allow a separate entity, like NASCAR, run the competition. Economic theory supports the argument that decisions made by a club-controlled body subject to super-majority voting requirements are unlikely to be optimal. In any partnership where profits are shared, the marginal benefit to each partner accruing through the sharing arrangement is smaller than the total benefit, and therefore no partner has the incentive to vote in ways which maximize total payoffs.[31] Efficient allocation of resources requires the services of a "residual claimant," a separate economic actor who has the incentive to make optimal decisions, pay each member of the "team" their opportunity cost, and then retain the surplus.[32]

Sports leagues' unique features make the absence of a residual claimant (i.e., an independent competition organizer) particularly problematic. In order to preserve the integrity of the competition, an actual or potential competition organizer possesses a unique disincentive to integrate forward into the operation of participating clubs—NASCAR cannot own all the participating race car teams. (As a European court noted, the integrity of the competition is impaired if even a few of the teams are owned by the same corporation.[33]) Club-run leagues will necessarily make decisions about how to organize the league that limit the extent of economic competition; these decisions may simultaneously enhance the overall quality of league play (acceptable under antitrust law) and simply increase profits (unacceptable under antitrust law).[34]

---

based on specific provisions of the league Constitution limiting power in that manner), *decision withdrawn and vacated at request of the court,* 1992 U.S. Dist. LEXIS 11033 (July 23, 1992) (following settlement by parties).

31. *See, e.g.,* Bengt Holmstrom, *Moral Hazard in Teams,* 13 BELL J. ECON. 324 (1982); Armen Alchian & Harold Demsetz, *Production, Information Costs and Economic Organization,* 62 AM. ECON. REV. 777 (1972).

32. Holmstrom, *supra* note 31, at 327 (Theorem 2).

33. AEK Athens and Slavia Prague v. Union des Associations Europeenes de Football, CAS 98/200 (Aug. 20, 1999), *reprinted in* XXV YEARBOOK OF COMMERCIAL ARBITRATION 393, 395-97 (2000).

34. Antitrust decisions generally treat restraints imposed by pressure from downstream firms more harshly. *See, e.g., Gen. Motors Corp.,* 384 U.S. 127 (agreement imposed on GM by a conspiracy of dealers held illegal *per se*); Cont'l T.V., Inc. v. G.T.E. Sylvania, Inc., 694 F.2d 1132, 1137 (9th Cir. 1982) (under rule of reason, significant that vertical restraint imposed by manufacturer

Moreover, unlike a more typical vertical integration of a single upstream firm and a single downstream firm, the "backward integration" of clubs into competition organizing services cannot resolve many of the problems that economists have identified when economic functions are performed by contract rather than integration, such as double marginalization,[35] free riding,[36] opportunistic behavior,[37] and costly contracting.[38]  Because vertical integration

---

and not at the request of other dealers).  However, intra-league sports restraints are often tolerated because of the clubs' unique interdependence.  *See, e.g., NCAA Case*, 468 U.S. at 103 (most agreements enhance competition); *id.* at 117 (acknowledging that rules that promote competitive balance can enhance public interest and thus be procompetitive); United States v. Nat'l Football League, 116 F.Supp. 319 (E.D. Pa. 1953) (interdependence of strong and weak football teams justified protections to preserve viability of weak teams).

Tribunals around the world that have invalidated sports league restraints have acknowledged that some restraints were necessary but the challenged one was overly restrictive.  *See, e.g.*, Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1369 (9th Cir. 1986) (league oversight of franchise relocation permissible but rejection of specific proposed relocation found unreasonable); Mackey v. Nat'l Football League, 543 F.2d 606 (8th Cir. 1976) (restraints on competition for players to promote competitive balance permissible but existing plan overbroad); *Nat'l Football League*, 116 F. Supp. 319 (restraints on competition in sale of broadcast rights permissible to protect live gate but not to facilitate higher returns in rights sales); Union Royale Belge des Sociétes de Football Association v. Bosman, [1996] 1 C.M.L.R. 645 (E.C.J.) (restraint on movement of players throughout Europe could be subject to reasonable restraints to promote competitive balance and to recoup investment in players but mandatory payment of transfer fee unreasonable); Buckley v. Tutty, 125 C.L.R. 353 (H.C. 1971) (some restraints on competition for player services in Australian rugby league permissible but complete ban unreasonable); Eastham v. Newcastle United Football Club, [1963] 3 All E.R. 139 (Ch.) (same re English soccer).

    35.  Double marginalization occurs in some cases where both firms have market power, because the downstream firm's effort to achieve its own monopoly price will result in the price to consumers being higher than is optimal for profit maximizing by both parties.  JEAN TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 174-76 (1988).  For example, where a league adopts a revenue sharing plan that requires one-third of revenues from live gate be shared with the league as a whole, the result will be higher ticket prices for fans than if (a) all ticket revenues went to the league or (b) no revenue was shared.

    36.  Free riding problems occur when firms under-invest in promoting a product because of a desire to free-ride on promotional efforts of others.  *Id.* at 185.  For example, teams could spend less on payroll, or avoid costly public relations activities like community outreach, confident that the general appeal of their club is significantly affected by the general goodwill generated by the efforts of league officials and other clubs.

    37.  In some contexts, a club-run league may be thought to be less likely to engage in opportunistic behavior vis-a-vis the downstream clubs that control it.  However, where opportunistic behavior can be directed at a minority of clubs, the majority could well vote to engage in such behavior.  Certainly, individual clubs have ample incentive to engage in such behavior vis-a-vis their league "partners" in a club-run league.  A franchise agreement between a vertically separate competition organizers and club/franchisees can be designed to eliminate foreseeable opportunistic behavior, so it is difficult to conclude that club-run leagues offer significant advantages in this regard.

    38.  Any significant policy requires league officials to navigate a costly minefield to get the requisite approval of a majority or super-majority of owners interested primarily in their own club's profitability.  NASCAR can easily negotiate a new enhanced broadcast rights deal featuring greater national telecasting of its races; and opportunity for MLB to sign a lucrative national rights contract

appears less likely to achieve these predicted efficiencies in the sports context, and because of the particular potential for vertical integration to cause a welfare-reducing relaxation in inter-club competition, the general Chicago School presumption that vertical integration is efficient[39] is particularly unwarranted with regard to sports leagues.

In this part, we seek to demonstrate that significant inefficiencies in the operation of club-run leagues result from the tendency of these leagues to put the interests of individual clubs above the interest of the league as a whole, and that substantial transaction costs prevent optimal results. Not only does this reduce the potential profits available to providers of sports entertainment, but—because sports leagues lack effective product market competition—this results in output that is reduced and unresponsive to consumer demand compared to that which would be provided by a sports league owned by an entity separate from participating clubs.

Consider the alternative of a vertically separate entity (The League) that would organize the competition and determine which functions are best carried out at the club or league level. This new entity would then contract with separate firms (the clubs) as franchisees, granting clubs the right to participate in the competition that The League will organize. Franchise agreements would set forth conditions for termination, rules of the game, revenue streams that would be retained by the franchisees, and revenue streams that would be reallocated by The League back to franchisees (as revenue sharing or as prizes for competitive success). Thus, well-drafted franchise agreements would assign to The League those marketing activities that can most be efficiently performed centrally, while preserving incentives for club innovation in any markets where such innovation is foreseeable. Our analysis of five important sports markets concludes that, in comparison with The League, collective action problems are likely to lead club-run leagues to adopt practices that result in a smaller "pie," because of the clubs' inability to agree on how to share the proceeds of profit-enhancing initiatives. As a result, club-run monopoly leagues are likely to produce (a) fewer franchises, (b) fewer opportunities for broadcasting or web-casting of games, (c) less effective licensing of merchandise, (d) greater tolerance for inefficient front-office management, and (e) a less efficient allocation of players among teams. As a result, consumers will benefit from receiving an entertainment product delivered more efficiently and responsively to their demand, and investors

---

reducing the number of games available for sale by each club would require complex negotiations among owners.

39. *See, e.g.,* ROBERT H. BORK, ANTITRUST PARADOX 225-31 (1978). This approach and the competing theories discussed in text are outlined in JEAN TIROLE, *supra* note 35, 90-106.

should also see profits increase from these realized efficiencies.

### A.   *Optimal Number and Location of Franchises*

Sports leagues that do not face competition from close substitutes will artificially suppress the number of franchises in the league.[40] Club-run leagues will necessarily reduce output by even more than a profit-maximizing single-firm monopolist would, and will avoid placing franchises in locations that, while more efficient, may hurt individual club owners' interests.

The optimal number of clubs within a league typically depends on the revenue expected from creating additional clubs, the additional costs associated with additional clubs, and any lost revenue that arises because of reduced demand for games involving existing clubs.[41] An additional club is likely to increase revenue because new fans will be attracted. At the same time, costs increase due to the overhead involved in supplying an additional team to the league, and any increase in operating costs due to an increase in the number of players hired and greater competition for services of players. Revenues to existing clubs may potentially fall, because either (a) fans will substitute watching games involving the new club for those involving an existing club, (b) the total quality of the league may be diminished by the addition of a club (e.g., because talent becomes spread too thinly and the overall quality of each game declines),[42] or (c) the number of games between popular teams is reduced by the need for these teams to also play against expansion clubs (i.e., to make room for games with the Tampa Bay Devil Rays, the New York Yankees play fewer games against the Boston Red Sox).

A league designed to maximize overall profits will increase the number of clubs, as long as the revenues from expansion outweigh increased costs plus lost revenues to existing clubs. A club-run league, however, will not expand unless a super-majority of clubs are compensated for any lost revenue, even though the league as a whole might benefit from expansion.[43] To illustrate,

---

40. *See* Roger G. Noll & Andrew Zimbalist, *Build the Stadium–Create the Jobs!, in* SPORTS, JOBS, AND TAXES 1-54 (Roger G. Noll & Andrew Zimbalist eds., 1997); Ross, *supra* note 15, at 656.

41. This Article assumes the existence of a monopoly league facing no serious threat of entry, whose teams cover the geographic breadth of the relevant market. Strategic considerations may cause a league to expand to forestall entry. Operational considerations may cause a league to decline to expand to new geographic areas if travel costs significantly increase.

42. We suspect—in the context of a modest expansion — that the "dilution" effect of league expansion is overstated—in market terms—by the general sports media. Consumers most sensitive to perceiving the reduced quality of play that comes from expansion are likely to be "hard core" fans who are not likely to significantly reduce their patronage of their favorite sports teams, much as they might like to complain about it over a beer in their favorite drinking establishment.

43. For a mathematical demonstration, see Ross and Szymanski, *supra* note 20, at 630-31 n.21.

any expansion in the National Football League (NFL) will modestly expand television ratings, and each club's pro-rata share of broadcast revenues is likely to shrink, even if the expansion would be profitable from a league perspective. Because each club's representative votes for the amount of expansion that maximizes *its own club's* profits, there will be fewer clubs in club-run leagues.

Depending on its strategic goals, The League might continue the practice of reaping significant monopoly profits by reducing the number of clubs and demanding public subsidies for stadia, which could be recovered by The League in the form of an entry fee. Alternatively, The League might subsidize franchisees located in under-developed areas to promote the sport and deter potential entry. Still, club-run leagues are likely to under-expand to a greater degree, as part of explicit or implicit agreements to protect local markets from competition. Many suggested, for example, that MLB's reluctance to expand to the Washington, D.C. area for many years was solely due to vigorous opposition from the Baltimore Orioles.[44]  Of course, if transactions costs were zero, the members of the league would be able to agree to a set of side payments that ensured efficient expansion, because the precise cost to the Orioles from expansion could be quickly ascertained and an agreed-upon lump-sum payment would remove any objections.  However, because transactions costs are not zero, efficient contracting often fails to occur.[45]

In contrast, The League would have an incentive to draw up franchise agreements that preserve the flexibility to add or relocate teams when the trade-off is favorable. We would expect that, like any other franchisor, The League would determine the number and location of franchises authorized to participate in the competition. In light of the dynamic nature of demand for a sport, we predict that The League would follow the now-typical franchisor practice of granting non-perpetual franchises, with specified terms for non-renewal,[46] and flexible provisions rather than guarantees of geographic

There is a close analogy between a sports league and a labor-managed firm that will choose to produce less output than a profit maximizing firm. Benjamin Ward, *The Firm in Illyria: Market Syndicalism*, 48 AM. ECON. REV. 566 (1958).

44. Mark Asher, *Expos' Relocation In 2004 Is '50-50'*, WASH. POST, Apr. 16, 2003, at D7.  A jury similarly found that the National Football League had blocked the relocation of the Oakland Raiders to Los Angeles principally to protect the incumbent Los Angeles Rams from competition. Los Angeles Mem'l Coliseum Comm'n v. National Football League, 726 F.2d 1381 (9th Cir. 1984).

45. ROBERT COOTER & THOMAS ULEN, LAW AND ECONOMICS 85, 111-12 (3d ed. 2000).

46. *See* Andrew A. Caffey, et al., *Structuring the Franchise Relationship, in* FUNDAMENTALS OF FRANCHISING 47, 61 (Rupert M. Barkoff & Andrew C. Selden eds., 1997).
In the food service industry, newer companies may grant greater protection for franchisees than well established firms. For example, neither Taco Bell nor Subway grants any exclusive territories, while the newer Jimmy John's firm states that it "usually" will not grant competing franchises and allows

exclusivity.[47]

To illustrate, suppose that reliable market research were to demonstrate that overall baseball profits would increase if the Montreal Expos were relocated to the Washington, D.C. area and two expansion teams were added in suburban New Jersey and Connecticut:[48] that is, the sum of increased revenues from entry fees paid by new owners to the league, live gate and stadium related revenue at these three new locations, and increased revenues from broadcasting, licensing, and merchandise, exceeds lost revenue from Montreal-based sources, marginally lost revenue from the New York and Baltimore teams in close proximity, and increased costs of operating two new teams. The League would be expected to proceed with the expansion after compensating existing clubs for losses pursuant to carefully drafted provisions of the franchise agreement. However, under current rules the rest of the clubs would not agree unless the expansion fees exceeded the reduction in their pro-rata proportion of shared revenues from 1/30 to 1/32. Moreover, the New York Mets, the New York Yankees and the Baltimore Orioles could plausibly lobby a significant minority of owners to block the expansion out of fear that future expansion or relocation might be adverse to their interests. Thus, although absent product market competition, The League will still have an incentive to reduce the number of franchises below the optimal number in order to obtain stadium subsidies.[49] We predict that it would likely increase the number from that which prevails in most club-run leagues.[50]

---

franchisees to purchase "development territories." *See* World Franchising, *Franchise Directory*, http://www.worldfranchising.com/ (last visited Mar. 6, 2006). Unlike food service, of course, preserving the integrity of on-field competition would not allow the NFL, for example, to give the Chicago Bears the right to own a second franchise in Chicago if market circumstances warranted.

47. For truly national leagues unconcerned by the threat of entry, our prior research suggests that overall consumer appeal would be maximized by the creation of a multi-tiered competition, with entry into the major league the result of promotion from a lower tier and league size maintained by the relegation of unsuccessful clubs into lower-tiered competition. *See* Ross and Szymanski, *supra* note 20.

48. Although this assumption is purely illustrative, we note that this would give the New York metropolitan area four of thirty-two major league teams. In the English Premier League, by contrast, where market forces determine entry into the top-tier league (because good teams are promoted from lower tiers and bad teams are relegated), between five and six London-based clubs regularly participate in the twenty team elite competition.

49. Ross, *supra* note 15, at 649-66.

50. It is theoretically possible (and plausible within the context of the NHL) that a club-run league may have over-expanded due to misplaced optimism about the ability of a sport to expand into untraditional areas of fan support. A club-run league may be reluctant to contract, because owners would not want to risk having their colleagues vote to eliminate *them*, and because clubs could not agree on compensation for excluded clubs. The League is more likely to reach an efficient result, taking into consideration the likelihood that accommodations with the players' union to preserve major league jobs may lead to the preservation of these clubs.

### B. Sale of Broadcast Rights

Transactions costs also inhibit club-run leagues from maximizing profits from the sale of broadcast and internet rights. Owners have passed up profitable opportunities because, unable to agree among themselves on how to divide the proceeds, a requisite super-majority cannot agree to proceed with a valuable rights sale. In the English Premier (soccer) League, for example, rights have traditionally been sold collectively. In reviewing a government challenge to an agreement to sell television rights for only sixty of the league's 380 possible games, a tribunal found that the league's limitation on television sales actually reduced revenues.[51] However, the clubs could not agree on how to share revenue gained from additional sales, whether negotiated individually or collectively.[52] Unlike English soccer, television rights to NBA games not collectively sold by the league may be sold by each club within a team's assigned territory. However, the NBA sought to prevent the then-popular Chicago Bulls, featuring superstar Michael Jordan, from carrying their games on a leading Chicago free-to-air channel (WGN) that was shown outside of Chicago as a "superstation" by cable and satellite distributors, although the trial court found no evidence of substantial injury to the ratings or the value of broadcast rights elsewhere.[53] The league could have permitted the Bulls games to be shown on WGN and taxed the Bulls for any excess profits,[54] but the owners were unable to agree on a formula for doing so.

Club sales of broadcast rights involve significant externalities. Clubs do not operate in completely independent broadcast markets. All broadcast revenues are partly attributable to individual team effort and partly due to the league's overall appeal. Some out-of-market sales may harm other clubs' ratings,[55] while other sales may not.[56] Competition can be distorted because of

---

51. In re Football Ass'n Premier League Ltd., 1996 No. 1, ¶313 (E&W) (Restrictive Practices Court, 28 July 1999), (noting that Sky Sports, the holder of the rights to broadcast sixty matches per season, had manifested a willingness to purchase ninety matches, but was turned down).

52. Stefan Szymanski & Stephen F. Ross, *Necessary Restraints and Inefficient Monopoly Sports Leagues*, 1 INT'L SPORTS L. REV. 27 (2000).

53. Chicago Prof'l Sports Ltd. v. Nat'l Basketball Ass'n, 874 F.Supp. 844, 861 (N.D. Ill. 1995), *vacated and remanded on other grounds*, 95 F.3d 593 (7th Cir. 1996).

54. Chicago Prof'l Sports Ltd. v. Nat'l Basketball Ass'n, 961 F. 2d 667, 675 (7th Cir. 1992).

55. *See, e.g.,* Richard Sandomir, *Just How Super Are These Stations,* N.Y. TIMES, Sept. 1, 1992, at B13. Neilsen ratings dropped 30% for Cardinals games broadcast in St. Louis on same night as Cubs games broadcast on WGN superstation and 20% for games broadcast on same night as Braves games on WTBS, while ESPN ratings were 69% higher when not competing against any other games.

56. The *Chicago Bulls* litigation, which produced numerous trial court opinions and two opinions from the court of appeals, can perhaps be explained by the significant discrepancy between the NBA's position that the Bulls' superstation telecasts significantly affected other rights sales and evidence put forth by the Bulls that it did not.

revenue disparities based not on performance but on the relative size of local media markets.[57]  These issues would be internalized if all television revenues flowed to The League as the residual claimant.  Because different packages of rights can be sold at different prices (enabling rights sellers to price discriminate between different buyers), The League would have little incentive to reduce output.  Currently, most clubs sell local broadcast rights to two or three programmers, so the need to identify the best local broadcaster is not a task that The League's officials will find difficult (and, indeed, since the vast majority of local cable rights in the United States are currently purchased by a handful of companies,[58] there may be efficiencies in a single negotiation).[59]  The result, we predict, would be increased output in terms of number of games, and a greater responsiveness of output to consumer demand.

### C.  Licensing, Merchandise and Sponsorships

The design and licensing of professional sports merchandise—jerseys, hats, jackets, etc.—would appear to include some functions most efficiently done on a league-wide basis and others best done by individual clubs.  There are obvious economies of scale in granting licenses for a particular item to one or a few manufacturers.  At the same time, merchandise design and local promotion would also appear to be essential in maximizing a product's appeal.  Economists suggest that decisionmaking in this context should be left to those who have the best information.[60]  Thus, one would expect that an efficient league would divide merchandising responsibility and income, "selling" those parts of the merchandising activities that the teams understand best back to them.  Yet, virtually all licensing in North America is done centrally, while soccer clubs in the English Premier League offer little cooperative licensing of merchandise.[61]  Revenue sharing could address any problems with individual

---

57. Although the ability to recoup quality investments through higher fees is lost if The League captured all broadcast revenue for local broadcast rights, The League can create appropriate incentives through the prize mechanism we discuss at text accompanying note 66 *infra*.

58. *See* R. Thomas Umstead, *Going to the Net Isn't Always Easy; Sports Teams' Start-Up Cable Channels Face Hurdles*, MULTICHANNEL NEWS, Apr. 29, 2002, at 36 (three networks controlled twenty-seven local markets).

59. In contrast, there may be marketing efficiencies in allowing clubs to sell radio rights for play-by-play of their games, building a network with a flagship local station and various other stations in smaller towns where demand warrants.

60. *See, e.g.,* Sanford Grossman and Oliver Hart, *The Costs and Benefits of Ownership: A Theory of Lateral and Vertical Integration*, 94 J. POL. ECON. 691 (1986).

61. For example, the league website, www.premierleague.com, features a "Shop" page that simply provides links to each club's "team shop."  *F.A. Premier League Welcome Page*, http://www.premierleague.com (last visited Mar. 6, 2006).  In contrast, www.mlb.com directs the consumer to a fully-integrated website where each club's products are available.  *MLB Welcome*

club promotional activities that might free-ride on league promotion efforts or distort competitive balance, assuming that clubs could agree on the appropriate sharing formula. The inability to reach agreement has led to disputes and litigation in the United States,[62] and the lack of any central licensing in England. Thus, collective action problems on both sides of the Atlantic seem to explain the unwillingness of club-run sports leagues to achieve a balance of cooperation and local promotion that The League could achieve.

### D.    *Accountability of Club Executives*

Profit-maximization at the club level requires considerable business acumen in varied tasks. The owner must assemble a staff to effectively deal with stadium utilization issues (including either construction or rental of facilities and management and marketing of luxury suites), marketing and promotion of local live gate, local broadcast rights, and sponsorships, not to mention the organization of on-field playing talent. Because each club's success is tied to some degree to the success of fellow owners, it is critical that the league hold each owner accountable for the stewardship of her franchise. However, in a club-run league, the club owners rarely hold a fellow owner accountable for the poor stewardship of a club. Indeed, although league officials may have privately orchestrated some ownership transfers to bring in new management, we are unaware of any cases where a league has disciplined owners for mismanagement. Despite their inter-dependence, owners would rather allow their joint venturers to modestly reduce their own profits rather than allow themselves to be judged. It is clear that incentives for efficient management are significantly reduced when we consider that owners do not face vigorous competition from substitute products, and that many clubs are owned by wealthy entrepreneurs, or corporations investing in clubs to pursue strategic advantages with affiliated businesses,[63] who are not likely to be subject through a market for corporate control to a hostile take-over by investors who believe they can improve corporate management. In a true franchise relationship that would exist between The League and club franchisees, we would not expect The League to grant a perpetual franchise, and the franchise agreement can specify standards that franchisees must

---

*Page*, http://www.mlb.com (last visited Mar. 6, 2006).

62. For example, the New York Yankees were anxious to enter into a lucrative shoe contract while Major League Baseball was taking years to collectively sell this sponsorship opportunity. The lawsuit is described in Joshua Hamilton, Comment, *Congress in Relief: The Economic Importance of Revoking Baseball's Antitrust Exemption*, 38 SANTA CLARA L. REV. 1223, 1235 (1998).

63. *See* ANDREW ZIMBALIST, MAY THE BEST TEAM WIN 55-74 (2003).

achieve.[64]

### E.   Competition for Players

Like all for-profit organizations, professional sports leagues seek to maximize revenues and minimize costs. With regard to structuring the market for players, this requires a series of extremely complex trade-offs. Collective action problems severely impede the ability of club-run leagues to achieve an efficient structure for labor market competition.

As applied to labor markets, revenues are maximized when the market is structured to present fans with a level of absolute quality and competitive balance that will have the greatest appeal. Costs are minimized in complex negotiations with well-organized players' unions, often incorporating revenue sharing and other agreements that significantly affect labor market competition. Determining the optimal structure is quite a tricky business.[65] A league that simply uses its muscle to negotiate the lowest cost agreement with the players' union may produce a structure that results in too much competitive imbalance (driving down overall fan interest) or a league with too much parity (losing revenues otherwise available to large market or popular teams).

The most efficient way to structure a labor market would be to calibrate the appropriate economic reward for clubs that win (in the terminology of the relevant economic literature, adjusting the "prize").[66] This calibration can be

---

64. It is unlikely that The League (or its shareholders) will be content to allow revenues to suffer because of chronically poor stewardship of any of The League's valuable franchises. Even when a commissioner tries to get an under-performing owner to sell, the result can be complicated litigation on peripheral issues. Accountability would significantly increase if a clearly drafted franchise agreement set forth minimum goals for a club. *See* Caffey, et al., *supra* note 46, at 47, 61.

65. Economists and judges have long accepted that labor relations in sports raise unique issues because, unlike other industries, a competitive balance among clubs in a league makes the product more attractive. *See, e.g., Nat'l Football League,* 116 F. Supp. 319; Walter C. Neale, *The Peculiar Economics of Professional Sport,* 78 Q. J. ECON. 1 (1964). The different markets in which clubs operate, and the tendency for successful teams to generate more income, suggests that a completely unrestrained labor market will result in reduced consumer appeal. *See, e.g.,* PAUL WEILER, LEVELING THE PLAYING FIELD 189 (2000) (noting the "externality" that all other clubs suffer if dominant team signs star); Ross, *supra* note 15, at 687-88 (same). *But see* Szymanski, *supra* note 20. Literature review finds mixed support for hypothesis that promoting contest or seasonal uncertainty – i.e., competitive balance – increases popularity.

66. A sports league fits naturally into models of economic contests. The original notion of an economic contest was developed in Gordon Tullock, *Efficient Rent Seeking,* in TOWARD A THEORY OF RENT SEEKING SOCIETY 97 (James Buchanan, Gordon Tullock, & Robert Tollison, eds., 1980) (suggesting that competition for political favors could be characterized as rent-seeking contests, where different lobbyists invest (e.g., time, effort, bribes) in winning a prize (e.g., the location of a new public facility such as a military base)). This model has since been applied to a number of contexts, including labor market tournaments (contests between workers for promotion), *see* Edward

complicated, for if the prize is set too high, clubs potentially may bid themselves into bankruptcy; if the prize is based on localized revenues, teams with built-in advantages (such as large market size or a traditionally large fan base) may become so strong as to reduce the overall appeal of the league. If the prize for winning is too small, clubs lack the incentive to improve the absolute or relative quality of their rosters. Handouts to poor team owners will simply make those poor team owners richer without necessarily increasing investment in success on the field. The critical insight of contest theory is that equality of outcomes will be promoted if every contestant has an equal probability of winning the prize for a given level of effort (equality of opportunity). To optimize the investment, then, requires careful selection of the prize.

Selecting the best plan, and then negotiating a deal with the players' union that minimizes costs as well as deviations from the ideal structure, is significantly distorted when the league is run by participating clubs. To determine how to structure a prize, a league needs to determine how much locally-generated revenue clubs will be permitted to keep, how much to share, and how centrally-generated revenue will be distributed. In a club-run league, however, each club is primarily concerned with whether a proposed prize structure will be in its own interests, not whether the structure will maximize overall fan appeal for the entire league through improved competitive balance and by increasing club incentives to improve performance within the competition. For example, wealthier clubs are likely to block sharing of locally-derived revenues like ticket sales, even if they were revenue-maximizing (and, by enhancing consumer appeal, welfare-enhancing).[67] Especially because most leagues require these arrangements to be approved by a super-majority, a minority of owners could veto a proposal that demonstrably increases fan appeal.[68] Similarly, the necessary trade-offs to secure union approval may not affect clubs equally. A trade-off may minimize

---

Lazear & Sherwin Rosen, *Rank Order Tournaments as Optimal Labor Contracts*, 89 J. POL. ECON. 841 (1981), patent races (R&D spending aimed at a monopoly rent granted by the patent), *see* Glenn Loury, *Market Structure and Innovation*, 93 Q. J. ECON. 385 (1979), and competition for research contracts, *see* Curtis Taylor, *Digging for Golden Carrots: An Analysis of Research Tournaments*, 85 AM. ECON. REV. 873 (1995).

67. *See* Stefan Szymanski & Tommaso M. Valetti, *Promotion and Relegation in Sporting Contests* (Imperial College Working Paper June 2003), *available at* http://www.nhh.no/omnhh/organisasjon/fag/sam/stabssem/2003/szymanski.pdf.

68. Clubs will often find it most profitable to minimize their investment in player talent and resulting roster quality, accomplished by creating a "prize structure" (i.e. revenue distribution) that minimizes the economic reward for winning. As Rosen and Sanderson observe, "All schemes used in the United States [major leagues] punish excellence in one way or another." Sherwin Rosen & Allen Sanderson, *Labour Markets in Professional Sports*, 111 ECON. J. 469, F47-F68 (2001).

overall labor costs while maximizing fan appeal, yet be contrary to the interests of a significant minority of clubs. Of course, skilled league executives may be able to overcome these objections by side payments to adversely affected clubs, but this process is not costless – especially because it is never precisely clear *how much* any club is adversely affected – and thus there is a substantial likelihood of sub-optimal behavior.[69]

The dynamics of collective bargaining present further problems for club-run leagues. A successful team with a strong fan base, an inferior large-market team, and a struggling small-market team will each have different incentives in labor negotiations: the effects of minimizing labor costs, restraining a club's ability to improve quickly, and losses caused by strikes or lockouts vary widely from team to team. Often, the most difficult task for league officials is securing owners' agreement on a bargaining offer.[70] The inability of club-controlled management negotiators to present a united front often makes it easier for union leaders to assume that management will not remain firm; in other cases, the union's perception that it needs to create a sufficiently credible threat of disruption to persuade the most militant minority of the owners to reach a compromise may result in miscalculations that also lead to inefficient labor disruptions.

Club owners—most of whom come to the sports having accumulated their wealth elsewhere—appear to be keen on attaining "cost certainty" with regard to the labor market. This seems to mean that they place a high value on avoidance of the economic consequences of making good or bad front-office player personnel decisions—even if the result is reduced fan appeal.[71] Avoiding the rigors of competition allows the owner the ability to enjoy the "quiet life,"[72] and increases the franchise's value, by making the club a potentially profitable investment for a wide variety of wealthy investors who would be unlikely to profitably operate a club where profitability turned on the owners' business acumen. From either an efficiency or consumer-welfare

---

69. For example, the Kansas City Royals will receive over $18 million from the league as part of new revenue sharing. If they wisely invest $10 million in increased payroll and the resulting improvement in the team's quality produces $12 million in additional revenue to the club, their revenue sharing transfers would be reduced by $9 million, resulting in a net loss to the club of over $3 million. This is illustrated in ZIMBALIST, *supra* note 63, at 103-07.

70. *See, e.g.,* Don Pierson, *Tagliabue Urges 'New' Tactics With Union,* CHI. TRIB., Mar. 22, 2005, at C4 (detailing obstacles to NFL owners' internal agreement).

71. *See generally* Stephen F. Ross, *The NHL Labour Dispute and the Common Law, the Competition Act, and Public Policy,* 37 U.B.C. L. REV. 343 (2004). *See also* Nat'l Basketball Ass'n v. Williams, 857 F. Supp. 1069, 1072 (S.D.N.Y. 1994) (NBA Deputy Commissioner justified salary cap in part on grounds of "cost certainty").

72. *See* John Hicks, *Annual Survey of Economic Theory: The Theory of Monopoly,* 3 ECONOMETRICA 1, 8 (1935) ("best of all monopoly profits is a quiet life").

HeinOnline -- 16 Marq. Sports L. Rev. 234 2005-2006

perspective, this emphasis on cost certainty is not desirable.

In our model, The League will select a prize structure designed to create incentives for clubs to succeed in a manner that creates the level of competitive balance that maximizes fan appeal, without driving teams into bankruptcy. The League will design its revenue sharing to induce clubs collectively to make an investment in talent equal to the aggregate return, measured by a league-awarded prize and any local revenues clubs are permitted to retain.[73] The more the league-awarded prize dominates the income stream of the teams, the more balanced the outcome of the contest is likely to be. If the only reward were a prize, every contestant would have an equal incentive to win. (Thus, if all baseball revenues were shared and the World Series champion received a $40 million prize, New York teams would have no long-term advantage over clubs from Pittsburgh or Kansas City.) Although the prize thus can correct for club dependence on local revenues, with their inevitable asymmetry, this need not imply that The League should aim to achieve a perfectly balanced contest. Because fans in each franchise location are unlikely to derive an equal amount of utility for a given level of success, and because in some instances competitions featuring dynastic teams increase fan appeal, a scheme is likely to maximize revenue and welfare if certain clubs (with a larger fan base, or where fans respond to wins by significantly greater attendance) won disproportionately, while all clubs had a reasonable opportunity to be competitive.[74] This is likely to reflect some mix of local revenue and prize money.

---

73. *See* Tullock, *supra* note 66.    The optimal contribution to effort depends on the "discriminatory power" of the contest: the degree of sensitivity of success to effort. If discriminatory power is high, it means that if one contestant supplies only a small amount of effort more than the others, then that contestant is highly likely to win; if discriminatory power is low, then a contestant has to put much more effort in than anyone else in order to achieve a high probability of winning. If discriminatory power is high then the optimal prize may be quite small, since even this small prize will elicit enormous effort to win. By contrast, if discriminatory power is low, then the prize will need to be quite high in order to extract effort.

74. A classic argument in this vein is RICHARD C. LEVIN, GEORGE J. MITCHELL, PAUL A. VOLCKER, & GEORGE F. WILL, THE REPORT OF THE INDEPENDENT MEMBERS OF THE COMMISSIONER'S BLUE RIBBON PANEL ON BASEBALL ECONOMICS (July 2000), http://www.mlb.com/mlb/downloads/blue_ribbon.pdf, attributing baseball's woes to an increasing disparity in local revenues among clubs, which the Report blames for an increasing inability of well-run "small market" clubs to have a "regularly recurring reasonable hope of reaching post-season play." *Id.* at 8.    The effect of asymmetric local revenue bases on local revenue should not be overstated, however.    Using the Report's data, among the top six clubs are teams located in the relatively small markets of Atlanta, Denver, and Phoenix, while Detroit and Montreal are in the bottom quartile; indeed, if half the population size for each club in metropolitan areas with two clubs are assigned to each team, the statistical correlation between media market rank and local revenue based on Report data is a modest 0.58. *Id.* Stephen F. Ross, *Light, Less-filling, It's Blue-ribbon!*, 23 CARDOZO L. REV. 1675, at 1685-86 & n.38.