Labor relations executives from The League will be able to agree on a collective bargain with the union to implement the most efficient and revenue maximizing structure for labor market competition, without the additional need to ensure that the agreement makes a super-majority of clubs better off. They will be able to offer the union incentives to agree to such a structure, or to minimize any departures from this ideal competition design.[75] Relatedly, The League will present a united front that avoids costly misjudgments concerning the resolve of management as well as the need to craft a proposal acceptable to a minority of "hard line" owners. Helpfully to the union (and to fans seeking to avoid industrial disruption), assuming a mature well-run league that can attract competitive levels of investment,[76] The League has no particular incentive to reduce competition player services in ways that the union is likely to oppose solely give owners "cost certainty" to shield them from the risk that bad personnel decisions will require increased spending because of their club's poor record in prior seasons. We note that in the one major North American league not run by clubs, NASCAR, there are no serious restraints on the compensation provided by participating racing teams for drivers, crew chiefs, or other skilled personnel.[77] Although the actual effect on player salaries is uncertain and subject to collective bargaining, we predict that The League would likely recognize that competition in the marketplace is usually the best means of allocating resources (here, players) among teams.

F.    *Summary of Economic Comparisons Between Club-run and Vertically Separate Leagues*

The industrial organization of a sports competition is a complex endeavor, requiring those who develop the product for sale to fans to account for many different considerations.    More franchises increase national television audiences and attract new fans, while modestly diluting playing talent and reducing the number of games between highly attractive clubs.  More telecasts

---

75.  To the extent that across-the-board salary caps improved competitive balance to such an extent that overall league revenues were really maximized, The League and the union can be expected to reach an agreement.  However, salary caps often reduce consumer appeal by prohibiting inferior clubs from quickly improving by increasing payroll through the infusion of new talent. Stephen F. Ross, *The Misunderstood Alliance Between Sports Fans, Players, and the Antitrust Laws*, 1997 U. ILL. L. REV. 519, 567-77.  Moreover, the need for salary caps to address revenue disparities among clubs is reduced where The League is setting the prize.

76.  A fledgling or flailing league that requires additional incentives to attract investors to operate clubs may find cost certainty to be a legitimate priority. Indeed, this was the basis on which the NBA persuaded the players' union to agree to a salary cap in return for a guaranteed share of hopefully-growing revenues in 1982.  *See Interview with David Stern, NBA Commissioner*, ANTITRUST, Summer 1987, at 27.

77.  Scott Warfield, *NASCAR Rules*, SPORTS BUS. J., May 23, 1994, at 20.

or webcasts increase revenues from rights purchasers and sponsors, but may affect live gate or ratings from other telecasts currently under contract. Merchandise often is sold because of league rather than club popularity and can often be efficiently sold collectively, yet individual club initiatives might allow for localized opportunities that league marketers will miss. Determining an optimal level of competitive balance and devising a mechanism to efficiently allocate players among clubs to maximize consumer appeal is enormously difficult. These trade-offs are challenging enough for skilled professionals to accomplish. However, executives of club-run leagues must not only develop a business model that optimizes these trade-offs in a way that maximizes profits for the sport; they must also obtain approval from owners whose votes are cast based on their own long-term, short-term, or other strategic interests. Although in theory side payments can be made to any owners adversely affected by a model that maximizes league profits, the difficulty in agreeing on these payments can lead to inefficient rules that reduce consumer appeal as well as league-wide profits. These problems are exacerbated in cases where a super-majority of individual clubs must approve any proposal.

Our predictions about how The League might implement its authority to maximize profits and consumer appeal are primarily illustrative. What is critical is that The League, unlike the clubs acting collectively, has the incentive to determine efficiently how sporting competitions are conducted and the business of sport is run.

### III. ANTITRUST TREATMENT OF SPORTS LEAGUES: SINGLE ENTITIES CONTRACTING WITH CLUBS VERSUS CLUB-RUN LEAGUES

Contracts in restraint of trade violate section 1 of the Sherman Act.[78] The Supreme Court held almost a century ago, however, that the statute's broad language precluded only agreements that unreasonably restrain trade.[79] More recently, in the *NCAA Case*,[80] the Court provided guidelines to determining unreasonableness in the sports context. Because of the cooperation among clubs required to organize a sporting competition, agreements among participating clubs are evaluated under the rule of reason. According to the *NCAA Case*, a "hallmark antitrust violation" occurs when these agreements result in higher prices, lower output, or output unresponsive to consumer

---

78. Section 1 of the Sherman Act, 15 U.S.C. §1 (2000), declares unlawful every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

79. Standard Oil Co. v. United States, 221 U.S. 1 (1911).

80. 468 U.S. 85 (1984).

demand compared to what would "otherwise be,"[81] even where some agreements among the defendant-rivals are considered necessary for the product to exist at all.[82]

Although this reasonableness inquiry does not apply to  intra-firm agreements within a single business entity,[83]  courts have overwhelmingly rejected efforts by club-run leagues to be treated as single entities.[84] Indeed, one of the principal doctrinal insights to be gleaned from Part II of this Article is that the significant economic difference in the way that a club-run league operates, compared to a league controlled by a single entity acting as "residual claimant" for profits not distributed to clubs, provides a persuasive justification for continued close scrutiny of the former.[85]  While Part II demonstrated the economic advantages of organizing a sporting competition through a single business entity, The League, this Part suggests that there are significant legal advantages to organizing a vertically-separate business entity

---

81. *Id.* at 107.

82. *Id.* at 101.

83. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984).

84. Earlier cases are catalogued in Stephen F. Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues*, 52 CASE W. RES. L. REV. 133, 146 n.35 (2001). For academic commentary in favor and opposed to the single entity defense as applied to club-run leagues, see Ross, *supra* note 75, at 549 n.136. *Cf.* Fraser v. Major League Soccer, L.L.C., 284 F.3d 47 (1st Cir. 2002) (the district court's rejection of an antitrust claim based on the single entity argument was criticized and the result affirmed on other grounds.)

85. *See* Chicago Prof'l Sports Ltd. v. Nat'l Basketball Ass'n, 95 F.3d 593, 603 (7th Cir. 1996) (Cudahy, J., concurring) (sports leagues can make inefficient decisions where individual teams can gain at the expense of the league).

Even Professor Gary Roberts, the principal academic advocate for treating club-run leagues as single entities, has recognized that:

> there is a legitimate concern that the structure of a league, unlike that of other business organizations, may cause, albeit infrequently, individual club economic interest to be contrary to the interests of the league as a whole. While it is unusual for partnerships or corporations to be organized such that a proposal enhancing the efficiency or profitability of the firm as a whole is contrary to the economic interest of any partner or shareholder, the universal sports league practice of allocating all or most of the nontelevision, game-generated revenues to the home club makes the potential more likely in some sports league contexts.

Gary R. Roberts, *Sports Leagues and the Sherman Act: the Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry*, 32 UCLA L. REV. 219, 295 (1984). Our principal difference is with Roberts' belief that "in the overwhelming majority of instances, the interests of the league will coincide with those of individual clubs." *Id.* at 295 n.261. Rather, we have identified a wide variety of areas where we believe that club-run leagues will behave differently than a league controlled separately. In suggesting that club-run leagues enjoy single-entity status unless a plaintiff shows that a minority of clubs actually vetoed a proposal that would benefit the league and the majority of clubs. *Id.* at 296. Roberts also ignores the distinct possibility that a majority of club owners will engage, over time, in a tacit agreement to adhere to policies that benefit each of them as club owners even if the league as a whole will suffer, or the alternative scenario where the majority agree not to pursue an efficient innovation because of an inability to agree on the distribution of profits.

as an independent organizer of sporting competitions. As explained below, The League would enjoy much greater flexibility than a club-run league in (1) the sale of broadcast rights, (2) decisions relating to entry and franchise relocation, (3) the creation of balance-enhancing or otherwise efficient rules governing clubs' competition for the services of players, and (4) the implementation of regulations relating to the structure of club ownership.

## A.    Sale of Broadcast Rights

Under the common law, the home team has the right to telecast a ball game.[86] Thus, any rights sales by a club-run league constitutes an agreement among competing clubs to jointly sell valuable rights, which is subject to rule of reason analysis under the *NCAA Case* standard. Any sale that demonstrably raises prices, reduces viewership, or renders output unresponsive to consumer demand would be unlawful.[87]

Where sports competitions are organized by The League, we envision that the clubs' common law television rights would be transferred to the League as part of the franchise agreement. The franchise agreement's provision initially granting all rights to The League would be scrutinized under the *NCAA Case* test. However, in light of the significant pro-competitive benefits to vesting control of broadcast revenues in The League, this transfer should be upheld as reasonable because it is likely to enhance viewership and the overall appeal of the sport. Allowing The League to distribute all broadcast rights avoids the significant collective action problems when clubs individually sell rights and then—to pursue legitimate goals like competitive balance—agree among themselves as to how revenue is shared. Moreover, centralized rights sales' provide The League with a critical base of revenue that can be used to achieve the level of competitive balance designed to maximize consumer appeal, through outright redistribution or through competitive prizes.[88] Once the

---

86. Pittsburgh Athletic Co. v. KQV Broad. Co., 24 F. Supp. 490 (W.D. Pa. 1938).

87. *NCAA Case*, 468 U.S. at 107 (1984). *See also* Stephen F. Ross, *An Antitrust Analysis of Sports League Contracts with Cable Networks*, 39 EMORY L.J. 463 (1990). A major exception is if a league sells a package of games to a free-to-air television network. Congress has passed a specific and limited exemption from antitrust scrutiny for such sales. Sports Broadcasting Act, Pub. L. No. 87-331, 75 Stat. 732 (1961), *codified at* 15 U.S.C. §§ 1291-94 (2000).

88. *See supra* text accompanying notes 73-74. The downside to this legal advantage that The League would have over club-run leagues is that the ongoing evolution of the market for pay television could lead The League to shift many games now shown on free-to-air television to a more expensive medium. Shifts away from free-to-air are becoming more prevalent in club-run leagues, *see* ZIMBALIST, *supra* note 63, ch. 7, but may be inhibited by the inability of clubs to agree on how to divide the proceeds from collective rights sales to pay programmers. While an agreement among rivals to collectively shift the sale of their rights to more expensive tiers may constitute an unreasonable restraint of trade, Ross, *supra* note 87, at 481, the unilateral sale by The League to a

initial common law rights have been vested in The League, all subsequent rights sales to programmers or networks would no longer be viewed as a collective sale for purposes of the Sherman Act. Thus, absent a demonstrable anticompetitive effect in another market (for example, if a contract with a dominant purchaser had the effect of foreclosing competition from other broadcast companies, harming competition in the broadcast market),[89] The League would be free to do as it chose.

## B. Franchise Entry and Relocation

The specter of antitrust liability poses perhaps the greatest concern for club-run leagues with regard to franchise entry and relocation. The collective refusal of current clubs to permit new entry or to approve a relocation opens club-run leagues to lawsuits challenging these decisions as unreasonable trade restraints among competitors.[90] As the Supreme Court noted in the *NCAA Case*, horizontal restraints among competitors are generally treated with suspicion under the antitrust laws.[91] In contrast, there will be minimal antitrust

---

satellite or pay programmer would not. We do not believe that this concern outweighs the benefits in allowing The League to control broadcast rights, but if this shift is socially undesirable Congress can follow the pattern of many other developed countries that have enacted "Listed Events" legislation that specifies that key events (championships, late playoffs, a game of the week) must be on free-to-air television. *See, e.g.,* Broadcasting Act, 1996, ch. 55, §§ 97-105 (Eng.); Broadcasting Services Act, 1992, (Austl.) (authorizing minister to list events required to be available on free-to-air television).

89. *See, e.g.,* Henderson Broad. Corp. v. Houston Sports Ass'n, 541 F. Supp. 263 (S.D. Tex. 1982) (plaintiff claimed exclusive contract monopolized competition for radio in Houston-Galveston area). *See also* MONOPOLIES AND MERGER COMMISSION, BRITISH SKY BROADCASTING GROUP PLC AND MANCHESTER UNITED PLC: A REPORT ON THE PROPOSED MERGER (Apr. 9, 1999), *available at* http://www.competition-commission.org.uk/rep_pub/reports/1999/426sky.htm (blocking acquisition of leading British soccer team by leading pay television programmer in part based on concerns that acquisition would distort competition for lucrative soccer television rights between acquiring firm and its rivals).

90. *See, e.g.,* St. Louis Convention & Visitors Comm'n v. Nat'l Football League, 154 F.3d 851 (8th Cir. 1998) (league requirement that Rams pay a fee for permission to relocate to St. Louis was reasonable; allegations that league agreed that Rams would be only team to negotiate with St. Louis unproven); Nat'l Basketball Ass'n v. San Diego Clippers Basketball Club, 815 F.2d 562 (9th Cir. 1987) (league relocation rules are not per se illegal but must be evaluated on a case by case basis); *Los Angeles Mem'l Coliseum Comm'n*, 726 F.2d 1381 (affirming jury verdict that NFL refusal to allow Oakland Raiders relocation to Los Angeles was unreasonable effort to protect Los Angeles Rams franchise from intra-league competition); San Francisco Seals v. Nat'l Hockey League, 379 F. Supp. 966 (C.D. Cal. 1974) (no claim of any injury to competition from bar on relocation of franchise to Vancouver); State v. Milwaukee Braves, 1966 Trade Cas. ¶ 71,738 (Wis. Cir. Ct., Milwaukee Co.) (National League's approval of Braves' relocation to Atlanta and refusal to expand to Milwaukee constituted monopolization in violation of state antitrust statute), *rev'd on other grounds,* 144 N.W.2d 1 (Wis. 1966) (application of state antitrust statute to league rules requiring uniformity constituted an unconstitutional burden on interstate commerce).

91. *NCAA Case,* 468 U.S. at 100.

Case 1:07-cv-08455-LAP    Document 74-8    Filed 07/17/2008    Page 6 of 24

scrutiny of The League's entry and relocation decisions.

Even for club-run leagues, courts are generally deferential on questions of entry,[92] and there is even less risk if, as we predict, The League will allow entry where market dynamics so indicate.[93] As a matter of legal doctrine, while the NFL's refusal to allow the Oakland Raiders to move to Los Angeles was viewed as a restraint among competitors, any decision by The League would be considered a vertical restraint and a plaintiff would have a heavy burden under the rule of reason to show that The League's interest was not the same as fans. As noted earlier, decisions by a single firm as to where to sell its product raises fewer competitive problems and warrants less antitrust scrutiny than a collective decision by rivals.[94] As a matter of substance, it is unlikely that The League would block a relocation that enhanced overall fan appeal simply because of increased intra-league competition might result; at the same time, relocations that reduce fan appeal by trampling on fan loyalty (such as the Cleveland Browns' relocation to Baltimore or the Baltimore Colts' relocation to Indianapolis) would be less likely to be permitted by The League on business grounds, and The League's commissioner would not have the same antitrust worries that the NFL Commissioner now faces.

## C. Labor Restraints

In most instances, labor restraints no longer present significant antitrust concerns to any league, club-run or not. The Supreme Court has held that any restraints primarily affecting the labor market that occur in an industry where there is ongoing collective bargaining between management and a is immune from worker challenges under a judicially-created exemption to the antitrust

---

92. In *Mid-South Grizzlies v. Nat'l Football League*, 720 F.2d 772 (3d Cir. 1983), the court rejected an antitrust suit by a would-be entrant to the NFL. The court reasoned that, unlike the *Raiders* case, there was no serious claim that a Memphis entrant into the league was rejected by an inefficient monopoly venture in order to protect an existing rival (the closest other franchise, the then-St. Louis Cardinals, was over 250 miles away), and that leaving markets such as Memphis open actually encouraged new inter-league rivalry by promoting entry.

93. *See supra* text accompanying notes 46-50.

94. *Compare Cont'l T.V., Inc. v. GTE Sylvania*, 433 U.S. 36 (1977) [hereinafter *Sylvania*] ("vertical" territorial restraint imposed by television manufacturer on locations where its product could be sold at retail subject to rule of reason) *with Gen. Motors Corp.*, 384 U.S. 127 ("horizontal" territorial restraint imposed by auto manufacturer at behest of organized group of retailers held illegal *per se) and* United States v. Sealy, Inc., 388 U.S. 350 (1967) (territorial restraint imposed by trademark owner on licensees considered "horizontal" where licensees controlled the corporation owning the trademark). This distinction was reaffirmed in *Sylvania.*, 433 U.S. at 58 n.28.
Even if The League did not permit efficient entry in order to add to its monopoly profits, this conduct by a single dominant firm would not violate the Sherman Act. The League's liability as a single firm for monopolization is discussed *infra* at note 105.

laws.[95] However, in the context of club-run leagues, players retain the option of decertifying their union as their bargaining representative, ceasing collective bargaining, and filing an antitrust suit to challenge jointly-adopted labor market rules, alleging that clubs competing among themselves for players' services were illegally restraining trade.[96] The League would face no such threat if it centrally controlled all labor relations.[97]

As with the initial grant of television rights in the franchise agreement, the provisions granting The League central control over player assignment would initially be subject to Sherman Act scrutiny. To be sure, if the result was a centralized allocation of players among teams, eliminating any competition for players' services, this decisions would raise serious risks of antitrust liability. However, for the same reason that the most brilliant planners that Lenin could assemble were unable to centrally plan an economy, we believe that a centralized labor market is unlikely to maximize fan appeal. Whereas a club-run league may not care about maximizing fan appeal if the harm is outweighed by significant savings on salaries, The League's management will not be spending any money on player salaries: the club-franchisees will be. Just as NASCAR has no reason to limit the salaries participating racing teams pay their drivers,[98] The League is likely to create rules designed to optimally allocate players among teams via a generally free labor market.[99] For these reasons, perhaps the best solution for The League would be to assure players of their fair share of the benefits from this competition through a collective bargaining agreement, thus minimizing an antitrust challenge to the initial grant of control to The League. Indeed, the ability of The League's organizers to attract capital and investment is probably enhanced by initially securing a long-term collective bargaining agreement with the union.[100] Moreover, such

---

95. Brown v. Pro Football, Inc., 518 U.S. 231 (1996).

96. Indeed, this is exactly what the NFL players did over a decade ago. *See, e.g.,* Powell v. Nat'l Football League, 764 F. Supp. 1351, 1359 (D. Minn. 1991).

97. Although centrally-controlled labor relations were subjected to close antitrust review in *Fraser*, 284 F.3d 47, the league was not found to be independent of rival clubs but rather was controlled by the club owners. *Id.* at 57, 57 n.5.

98. *See supra* note 77.

99. *See supra* text accompanying notes 70-77.

100. One way for current owners to profit from the restructuring we propose would be to create The League as a separate business entity and sell stock in that entity, either as an initial public offering or as a private sale to selected investors. The value of that sale would be maximized by creating The League prior to issuance of public stock, establishing a highly regarded Board of Directors and executive team, and securing a collective bargaining agreement with players. *Cf.* Taylor Milk Co. v. Int'l Brotherhood of Teamsters, 248 F.3d 239 (3d Cir. 2001) (describing merger where acquiring firm desired to have new collective bargaining arrangement secured before closing deal).

bargaining may well be necessary under federal labor law, to the extent that the restructuring of a league would be considered to have such a significant effect on player wages and working conditions as to constitute a mandatory subject of bargaining.[101]

### D.    *Policies Concerning Ownership*

Finally, leagues have faced antitrust litigation concerning the creation or application of policies concerning ownership. For example, applying the rule of reason under Section 1, courts have found the National Football League's rule against corporate ownership of its clubs to unreasonably shield owners from competition from more efficiently-structured entities,[102] while the NBA's rejection of a particular buyer was upheld.[103] Antitrust liability for ownership rules are more likely when a league is club-run: plaintiffs will allege that club owners are trying to hamper rival clubs by precluding more efficient ways of organization or of obtaining capital. If The League unilaterally imposed its own rules on franchisees, it would be difficult to construct a theory of competitive harm.

Any league can persuasively argue that the overall league appeal can be affected by the ownership structure of participating clubs. Club-run leagues face a disadvantage in devising optimal policies however, because it is in the interest of each owner to tacitly agree that virtually any high bidder seeking to purchase a club from an existing owner should be able to do so, even if such an owner would not be an effective steward of the sports in their local market. Alternatively, a club-run league may prefer a less-effective steward precisely because a rival bidder may increase competition in various markets in which owners compete.[104] In contrast, The League would be much more likely to

---

101.  *Cf. Mackey*, 543 F.2d at 615 (league rules restricting inter-club competition for players affects salaries so that they constituted mandatory subject of bargaining under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (2000)). If the restructuring is the result of legislation or court order, the fact of restructuring would not, of course, be a mandatory subject of bargaining. Obviously, The League would then need to enter into a new collective bargaining agreement with the players.

102.  Sullivan v. Nat'l Football League, 34 F.3d 1091 (1st Cir. 1994).

103.  Levin v. Nat'l Basketball Ass'n, 385 F. Supp. 149 (S.D.N.Y. 1974).

104.  Some have suggested that the recent highly-leveraged sale of the Los Angeles Dodgers was approved, notwithstanding a fiscally-superior offer in the wings from a wealthy local philanthropist, because other owners wanted a major-market team to be saddled with less aggressive ownership. Thomas S. Mulligan, *McCourt Teams Up on Land Use*, L. A. TIMES, Mar. 17, 2005, D1 (purchase featuring little cash and unusual seller financing raised questions about whether buyer's pockets were deep enough to keep the Dodgers competitive). The jury in *Sullivan* was persuaded that the fear of competition from clubs owned by publicly traded corporations was more important to league owners than the chance to maximize their franchise resale opportunities. 34 F.3d at 1100.

prevent clubs from being operated by those whose ownership structure was inimical to the league's best interests.

In sum, an independent entity organizing a popular sporting competition is likely to enjoy significant legal advantages over traditional club-run leagues.[105]

---

105. Because The League would likely be the dominant provider of competition organizing services in each sport, it would potentially remain liable for attempted or actual monopolization under Section 2 of the Sherman Act, 15 U.S.C. §2. Courts have generally found that the dominant league in a major sport possesses monopoly power. *See, e.g.*, Ross, *supra* note 84, at 140 n.16 (citing cases). However, The League's liability would be no greater than that faced by club-run leagues today. Antitrust law does not forbid the exercise of monopoly power, only its illegal maintenance. *See* United States Football League v. Nat'l Football League, 842 F.2d 1335, 1361 (2d Cir. 1988) (upholding jury verdict that a monopolist "is free to set as its legitimate goal the maximization of its own profits so long as it does not exercise its power to maintain that power"). To prove illegal monopoly maintenance, a plaintiff must establish not only that rules are exclusionary, but also that they are unnecessarily so – that is, that they are inefficient. Rules designed to promote consumer appeal or to achieve efficiencies are lawful. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985).

Like current club-run leagues, The League could not engage in blatantly anticompetitive acts without violating §2, nor could it foreclose rival leagues from essential inputs; thus, The League could neither tie up every television network (this was a principal, albeit unproven, theory in *United States Football League*, 842 F.2d 1335), nor structure its player contracts so that in any given year it would not be feasible for a rival to have access to a sufficient number of players to viably compete. *See* Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F. Supp. 462, 508 (E.D. Pa. 1972) (provisions reserving all major and minor league players to NHL clubs or affiliates for three years constituted monopolization by precluding rival league from entry.)

Likewise, The League might be required, in the interest of maintaining the potential threat of competition, to permit clubs to retain control of their trademarks. Allowing clubs to keep their trademarks (subject to a limited assignment to The League for licensing purposes that now occurs) if they choose to join another league would enhance the opportunity for rivalry in competition-organizing services and the possibility of The League's displacement by a more efficient rival. In similar fashion, although franchise agreements can reasonably be set for a sufficient duration to allow for long-term planning, unduly long franchise agreements could operate to monopolize if they precluded any ability to lure existing clubs to a new league. *See* XI HERBERT HOVENKAMP, ANTITRUST LAW ¶1802g (1998).

Because even in natural monopoly markets antitrust laws favors competition for the monopoly, it could be argued that the best way to promote competition in the market for competition organizing services is to prohibit The League's control of player contracts. If players were contracted to individual clubs, then a new entrant could compete by simply attracting the club owner, rather than develop a league of minimum viable scale by individually signing players. We do not believe that The League's control of players – assuming that after any given season a reasonable number of player contracts will expire – is sufficiently anticompetitive to constitute monopolization. There are significant efficiencies in allowing The League negotiate as a single entity with the players' union to devise an optimal scheme to allocate players among clubs participating in its competition. Collective action problems make such an agreement with club employers more difficult. Moreover, The League might allocate a player to a particular club precisely because this allocation is efficient in the context of the club's participation in the competition organized by The League. If The League feared that an individual club might take all its players and participate in another competition, The League might allocate players differently, and less optimally in the short-run. Foregoing clear benefits to The League's competition in the short-run, because of the possibility that entry into the presumptively natural monopoly market for competition organizing would be marginally facilitated if clubs

The competition is more likely to be designed to enhance consumer appeal and operated in a manner to maximize overall profits. Because The League's business decisions will either be unilateral or "vertical" agreements with independent clubs, The League will enjoy significant legal flexibility to make decisions that would otherwise risk serious antitrust liability. The result should be greater profitability as well as greater responsiveness to consumers.

## IV. WHY CURRENT OWNERS MAY BE UNWILLING TO RESTRUCTURE EVEN IF IT IS EFFICIENT TO DO SO

In a well-functioning market, no one would design a league that resulted in a sub-optimal number and location of franchises, a sub-optimal exploitation of broadcast rights, inefficient marketing of sponsorship and licensing, labor markets that are neither cost-minimizing nor efficient in allocating players among clubs, and lack of effective oversight of each club's stewardship of its valuable franchise. Absent transaction costs, of course, the assignment of rights to club owners would not affect the ultimate structure of a league: where a revenue-enhancing alternative is available, side payments can be made to assure the desired result.[106] However, where transaction costs are significant, the allocation of control rights to club owners can significantly affect the distribution of resources.[107]

Unlike most other businesses that could profitably restructure, neither actual or potential rivals, nor a market for corporate control, constrains individual club owners' pursuit of their own interests at the expense of an

---

employed players, would not seem to be reasonable.

At the same time, the Sherman Act should properly constrain clubs' ability to jointly negotiate with The League and rival competition organizers. If a rival can organize a competition more efficiently than The League, it is free to bid for individual teams to compete in its competition. A rival league could conceivably pursue a strategy of attracting clubs by offering them greater power and authority, similar to that now enjoyed in club-run leagues, and that such competition will result in a structure no different than currently exists. We believe that such a strategy is unlikely to succeed. Precisely because club-run structures are less efficient, it is difficult to see how a new entrant could make an offer sufficient to attract so many clubs that The League would not remain viable. To use two simple examples, if a new entrant made an offer aimed at attracting small-market clubs, The League would remain viable on a smaller basis focusing on its large markets; if a new entrant made an offer aimed at the top clubs in major cities, The League with its preexisting brand loyalty and infrastructure could add additional franchises in these major markets, which are likely to be capable of supporting additional teams. If we assume that The League will remain as a viable entrant in the market, then clubs considering jumping to a rival will have to weigh the more attractive package offered against the lost profits because of the usually fierce inter-league rivalry that will follow. On the other hand, a rival that develops a model that really is more efficient than The League's should be able to attract almost all the clubs through individual negotiations.

106. *See* Ronald H. Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1 (1960).

107. *See* COOTER & ULEN, *supra* note 45 at 111-12.

efficient league operation. The same transactions costs that prevent current leagues from achieving efficient results may prevent current club owners from voluntarily embracing an efficient re-structuring of the league in which their club competes. Although a solid promise of cash today and the opportunity to share in the gains from an even more profitable business operation in the future provides a significant incentive for parties to overcome transactions costs, the existence of such costs means that the inability of a league to restructure does not necessarily mean that the current system is efficient.

This part explores why vertically separate leagues have not been established already if, as we claim, the idea is so efficient. Then, this part details the transactions costs that must be overcome to achieve restructuring on a voluntary basis.

### A.    *Why Leagues Have Not Done This Already if It is Such a Good Idea*

Each major North American professional team sports league has always been vertically integrated.    We do not believe, however, that vertical integration is inherently required in order to maximize consumer appeal or efficiently operate a team sport competition. Rather, vertical integration is the result in part of the dynamic economics of fledgling sports leagues that lack market power, and in part due to historic accident.

Vertical integration was a necessity when the first club-run league—baseball's National League—was created in 1876.[108] This model emerged as a consequence of two factors. First, interest in the rapidly growing sport was being undermined by the free-for-all existing in baseball at the time, characterized by (a) barnstorming teams attracting support as long as they were winning and then collapsing when they lost, (b) team owners dissipating profits in competing to hire the best talent, and (c) opportunities for gambling that led to significant match fixing. Second, almost all the revenues associated with baseball in the late 19th century were generated locally by clubs, principally through sales of admission tickets.[109]    The founders of the significantly named "National League of Professional Baseball Clubs" set out to create a new kind of equilibrium: a league with stable membership. The new arrangement[110] invested members with a stake in its long-term success (to

---

108. The authoritative work on the origins of baseball, from which the textual narrative is derived, is HAROLD SEYMOUR, BASEBALL: THE EARLY YEARS 77-85 (1960).

109. *Id.* at 75-85.

110. To bring this about, the league's principal founder, William A. Hulbert of the Chicago Baseball Club (now the White Sox), assembled a talented team by raiding other clubs and then secured an agreement from leading clubs in a geographically-balanced group of eight cities from Boston to St. Louis. *Id.*, at 77-80.

combat short-run incentives for match fixing), granted exclusive territories guaranteeing a local monopoly (providing an incentive to invest in the local market), and established a reserve clause to eliminate competition for players (ensuring that the income stream from matches accrued principally to the owners). The extraordinary success of this model made it the basis for not only the national pastime, but also for the other North American team sports.

Although the founders of the National League deemed it natural to integrate governance functions with the supply of matches, this was not really necessary but rather a direct consequence of the lack of any alternative credible supplier of these services in 1876. In England, by contrast, the Football Association (FA), established in 1863, had successfully standardized rules and maintained oversight of the development of English soccer and had also developed two important forms of competition in its own right: the FA Cup, a knock-out competition including all members, and international representative football.[111] Thus, when leading English soccer clubs found the same need as American baseball teams for a fixed and reliable playing schedule and therefore created the Football League in 1888, they did not fully integrate the competition. Although in part this may have been due to the desire to continue participating in the FA Cup, the founders also believed that it would be both in their interests and in the wider interests of soccer to maintain an independent governing body at the head of the sport.[112] The English governance model has been adopted globally in soccer.[113]

Whether an organization created for other purposes exists to develop a league competition may be a historic accident, but where a sport is just developing in the relevant market, or where a new entrant is organized to

---

111. The early history of the game is recounted in GEOFFREY GREEN, SOCCER, THE WORLD GAME: A POPULAR HISTORY ch. 3 (1956).

112. In the words of William McGregor, founder of the Football League:

The League should never aspire to be a legislating body . . . by the very nature things the League must be a selfish body. Its interests are wholly bound up in the welfare of its affiliated clubs, and what happens outside is, in a sense, of secondary importance only . . . the League has its work to do; the [Football] Association has its work to do and there need be no clashing.

SIMON INGLIS, ENGLISH LEAGUE FOOTBALL AND THE MEN WHO MADE IT 11 (1988). *See also* GREEN, *supra* note 111, at 62 ("The FA on the one hand [is] the monarchy as it were, with its watchful care and authority over the whole of English football: on the other hand [there is] the Football League, with its narrower horizons, existing under the licence of the FA.")

113. Each country's domestic competition operates under the aegis of a national association modeled on the FA; an association of associations governs each continent. For example, Europe's governing body is the Union of European Football Associations (UEFA). See *UEFA Welcome Page*, UEFA.COM, http://www.uefa.com/ (last visited Mar. 7, 2006). An international federation, the The Fédération Internationale de Football Association (FIFA) is the world governing body. See *FIFA Welcome Page*, FIFA.COM, http://www.fifa.com/en/organisation/index.html (last visited Mar. 7, 2006).

challenge an established incumbent league, vertical integration can be extremely important. There is unlikely to be a credible supplier of competition-organizing services to clubs who might join such a league, and club owners may be reluctant to participate in such a risky venture without some role in controlling the fortunes of the new competition.[114] However, today's owner of the Chicago White Sox would not find, as his predecessor William Hulbert did, that there is no one willing and able to provide competition-organizing services. The explosion in revenues from broadcasting, merchandising, and sponsorships creates huge incentives for vertically separate firms to perform these services. Unlike those seeking to organize Major League Soccer,[115] and like NASCAR's owners, competition organizers would likely find many interested in participating in the dominant professional baseball competition in the United States, even if they lacked the ability to control the league. Once a league becomes sufficiently dominant so that vertical integration is no longer necessary to attract potential franchisees, it may well retain its traditional structure simply because the potential gains from an efficient restructuring are not large enough to justify the trouble. It is only recently that the revenues (primarily from broadcasting) have exploded to such a degree that the sort of restructuring proposed in this Article is worth the significant transaction costs involved in bringing it about.

Recent developments suggest a growing industry recognition of the benefits of vertical separation. Preventing owners from engaging in self-aggrandizing opportunistic behavior is seen as a serious problem: according to one sports executive, "if [NFL Commissioner] Paul Tagliabue could convert the NFL to a single entity, he'd do it tomorrow."[116] Although not formally as separated as The League we suggest in this Article, the WNBA is run by a Board of Directors with each club participating pursuant to an operating agreement that designates revenues and costs for which the club is responsible. While four of the nine directors come from the group of NBA owners who operate WNBA teams, the other five include four owners without WNBA franchises and the NBA Commissioner. The Board of WNBA, LLC is ultimately responsible to the WNBA's sole owner, a corporation named NBA Development, that in turn is owned by the twenty-nine NBA owners. Thus,

---

114. Recently, the commercial power of English football clubs has expanded dramatically, resulting in greater deference to club interests by the FA resulting in some of the same problems that exist in North America. *See, e.g,* JOHN WILLIAMS, IS IT ALL OVER? CAN FOOTBALL SURVIVE THE PREMIER LEAGUE 53-60 (1999). This is due in large measure to the perceived threat of the top clubs to secede from the FA and organize their own competition. We discuss why we believe a concerted secession from a competition by the leading teams should violate the Sherman Act, *supra* note 105.

115. *See* WEILER & ROBERTS, *supra* note 30, at 495-97.

116. *See* Lebowitz, *supra* note 10, at 1F.

while some of the problems that plague club-run leagues could rear their head, the benefits of negotiating broadcast rights and sponsorship deals without the fear that clubs may undercut rights sold by the league is a major advantage, according to the WNBA's former chief executive.[117]   As a result, while some club-run league constitutions have express terms to make clear the reality that club owners vote the interests of their own club rather than the league as a whole,[118] a WNBA owner serving on the WNBA board who put his club's interests ahead of the league's would arguably breach his fiduciary duty.

Just recently, two investment banking houses presented the NHL with an offer to acquire the entire league.[119]   Although the initial proposal, unlike the proposal for The League contained in this Article, would retain the vertical integration of competition organizing and club participation by having a single entity own both the league and all clubs, its structure is designed to take advantages of the efficiencies here.

Finally, the strongest demonstration of the viability of vertical separation in sports leagues is the tremendous success and growth of NASCAR. Historically, this centrally-run giant was developed out of a chaotic industry where independent tracks set their own rules for the competition.[120]  Of course, if today NASCAR were sold to a consortium of competing drivers, who agreed to henceforth operate the circuit by super-majority vote, and to limit entry to current Nextel Cup drivers and any qualified driver who bought the rights to participate, there would be a public uproar as well as an antitrust challenge, and properly so.

### B.   *Transaction Costs Inhibit Efficient Restructuring*

Corporate finance experts can offer myriad ways to implement the creation of The League as a separate business entity and the assignment of rights necessary for The League to organize a sports competition efficiently.

---

117.  *Id.* (citing Commissioner Val Ackerman). At the same time, several leagues that have adopted a "single entity" approach by completely integrating all competition organizing and club participation services (so the league owns all the franchises) have found the approach wanting. *See id.* (indoor lacrosse league needed to modify single-entity to attract local investors); WEILER & ROBERTS, *supra* note 30, at 496 (Major League Soccer could not find investors absent ability to have local rights).

118.  *See, e.g.*, NATIONAL FOOTBALL LEAGUE CONST., Art. II, §2.1(a) (purpose of NFL is to "foster the primary business of League members, each member beidng an owner of a professional football club"), *excerpted in* PAUL C. WEILER & GARY R. ROBERTS, STATUTORY AND DOCUMENTARY SUPPLEMENT TO SPORTS AND THE LAW 42 (2d. ed. 1998).

119.  *See, e.g.*, Stefan Fatsis & Dennis K. Berman, *Puck Plan: NHL Explores Sale To Cure a Troubled Sport*, WALL ST. J., Mar. 4, 2005, at B1.

120.  *See NASCAR History*, http://www.nascar-info.net/nascar_history_1.html (last visited Jan. 20, 2006).

To create a separate business entity through a voluntary transaction will require organizers to overcome substantial transaction costs. Whether the organizers are current league owners or officials[121] or outside investors,[122] securing consent of a requisite super-majority of league owners to change the league constitution would involve the difficult task of distributing the proceeds among the current owners.

This is the very problem that causes current leagues to operate inefficiently. Owners will forego potential pareto-optimal opportunities because of an inability to agree on how to divide the spoils. To illustrate, suppose that the current aggregate value of all MLB franchises were $9 billion,[123] and that a vertical separation would result in efficiencies sufficient to increase the combined value of MLB and club assets to $10 billion. The

---

121. To illustrate, current owners could create The League as a separate corporate entity ("NHL, Inc.") with a relatively small percentage of outstanding shares created as voting stock and most of the shares retained by club owners as preferred non-voting stock. The return on an initial public offering of voting stock would be maximized if The League had a high-profile board of directors independent of current club owners, and if it had already entered into a new collective bargaining agreement with the players and standard franchise agreements with existing clubs. Under this scheme, current owners would profit by receiving cash from the proceeds of the offering and by realizing potential capital gains from the appreciation of their preferred shares. Owners would retain ownership in their clubs, although obviously the franchise value of the clubs would be substantially reduced under this restructuring. Although reaping the benefits of vertical separation requires that club owners' investment in The League be non-voting, to facilitate the marketability of the preferred stock it can be made immediately convertible to voting stock if acquired by anyone not involved with club operations. Thus, once the market price had been established after the initial public offering, club owners could gradually sell off their non-voting stock and thus capture almost all of the surplus from the restructuring. Alternatively, in light of the continuing growth of the value of sports franchises, club owners could hold onto their stock, which, along with the value of their franchise (which has tripled in the last decade, *see* Rodney Fort, *Major League Baseball Team Values*, http://www.rodneyfort.com/SportsData/BizFrame.htm (last visited Mar. 14, 2006)), could continue to appreciate. We thank Professor Cynthia Williams and investment analyst R. J. Bukovac for assistance regarding the mechanics of the restructuring.

122. If the initiative came from outside the league, a more effective approach would probably be for a relatively small group of investors to form a new entity, The League, which would initially be closely owned, combining those with sizable assets with those knowledgeable about the sports business. The League would then tender an offer to acquire those rights necessary to organize the competition from current club owners. If an initial offer was not accepted by the three-quarter super-majority required by most league constitutions, then The League's organizers could enter into separate negotiations with individual club owners in an effort to find the sufficient number to effectuate the purchase. Once the tender was accepted, The League could then enter into franchise agreements with clubs, and a collective bargaining agreement with the union. With the new structure in place, the owners could then turn to public equity markets, both to realize a gain on their successful organizational efforts and also to refinance debt or personal assets required to provide the initial cash payments to current owners.

123. According to Forbes magazine, in 2004 the average franchise value was $295 million, or a combined total of $8.85 billion. *See MLB Valuations* (Apr. 26, 2004), *available at* http://www.forbes.com/free_forbes/2004/0426/066tab.html.

current thirty owners would then realize an average profit (realized either in cash or through increased valuation of preferred stock in The League) of $33.3 million. Even George Steinbrenner would likely approve the concept if, say, $400 million of the $1 billion increase went to the New York Yankees. Of course, the owner of the Kansas City Royals would initially insist on a pro-rata distribution, which would never be accepted. Given the potential revenue growth from an efficient restructuring, perhaps a skilled investment banking firm would be able to overcome these obstacles and secure agreement to proceed with a lucrative initial public offering. Yet, on the other hand, if owners cannot agree on how to distribute the small amounts available from increased sale of rights to out-of-market broadcasts,[124] one cannot be too sanguine about the likelihood of voluntary restructuring.

Another reason why owners may choose not to voluntarily restructure is ego. Most owners have already succeeded in other businesses and are personally wealthy. Although they would likely retain the perquisites of ownership of a club/franchisee in a competition organized by The League (owners' box, accepting the presentation of the champions' trophy), they would have to give up the power to make the rules and instead would have to accept directives from others. Even if this Article is correct that restructuring leads to substantial efficiencies, ($1 billion in our illustration for an average payout of $33 million), those efficiencies may be insufficient when their value is divided among the owners.

Ultimately, the most important reason why club owners may choose not to surrender control of their club-run leagues to a more efficient centralized operation is that they do not have to.[125] Sports leagues do not face significant competition from actual or potential product market rivals.[126] As a result, market retribution will not be swift[127] should owners fail to achieve efficient

---

124. *See* cases cited *supra* notes 53-54 and accompanying text.

125. *Cf.* SATURDAY NIGHT LIVE: THE FIRST 20 YEARS (Michael Cader ed. 1994) (famous line by telephone operator "Ernestine" popularized by Lily Tomlin: "Next time you complain about your phone service, why don't you try using two Dixie cups with a string. We don't care. We don't have to. (snort) We're the Phone Company.") The idea that firms with monopoly power have the luxury to conduct their affairs inefficiently is widely supported. *See, e.g.,* United States v. Aluminum Co. of America, 148 F.2d 416, 427 (2d Cir. 1945). Monopoly power "deadens initiative, discourages thrift and depresses energy . . . immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress" and competition "is necessary to counteract an inevitable disposition to let well enough alone." Aluminum Co., 148 F.2d at 427; Hicks, *supra* note 72, at 8 ("best of all monopoly profits is a quiet life").

126. *See supra* note 105.

127. *Cf. Valley Liquors, Inc.,* 678 F.2d at 745 (noting swift market retribution as a characteristic of firms lacking market power).

252        *MARQUETTE SPORTS LAW REVIEW*        [Vol. 16:2

results.[128] Even club-run leagues might face pressure for greater efficiency, if a market for corporate control existed so that outsiders who believe that the business can be operated more profitably can acquire the firm's assets.[129] But sports clubs are not publicly traded in North America, and even where a club is a subsidiary of a publicly traded corporation, the parent often has sufficient strategic interests that efficient operation of the league is not a principal concern.[130] Thus, a series of hostile takeovers of clubs is not a feasible option.[131]

Part II of this Article lays out the argument why club-run leagues have incentives to perform inefficiently in the market vis-a-vis vertically separate leagues. This part has suggested that, while there may be growing industry recognition of the problems with club-run leagues, the transactions costs involved in dividing up the proceeds of a restructuring in a manner satisfactory to a super-majority of club owners may be too great to permit this development. If that is the case, legal intervention to effectuate an involuntary restructuring may be required. This option is considered below.

## V.  INVOLUNTARY RESTRUCTURING: MANDATORY DIVESTITURE UNDER ANTITRUST LAW

Government intervention is welfare-enhancing if it can reliably require an industry restructuring to eliminate collective action problems that cause inefficient and exploitive output reductions not likely to be subject to market correction. There are several ways that this welfare-enhancing restructuring could be required. Congress could mandate restructuring through legislation enacted pursuant to its power to regulate interstate commerce.[132] Perhaps

---

128. The inefficiencies engaged in by monopoly sports leagues, and an explanation for how competition would eliminate these inefficiencies, is discussed in Ross, *supra* note 15.

129. *See generally* WILLIAM A. KLEIN & JOHN C. COFFEE, JR., BUSINESS ORGANIZATION AND FINANCE: LEGAL AND ECONOMIC PRINCIPLES 191-94 (8th ed. 2002).

130. For a more detailed discussion of this point, see Ross, *supra* note 84, at 145-46.

131. Moreover, because of the strong public aversion to having different clubs owned by a single firm, the outside investors cannot realistically pursue a strategy of buying up individual teams until they can persuade the club-run league to restructure.

132. The Supreme Court's decision in *Flood v. Kuhn*, 407 U.S. 258 (1972), makes clear that all sports, including baseball, constitute interstate commerce subject to congressional regulation. Congress could enact special regulatory legislation prohibiting clubs from maintaining a voting interest in the operation of any league that does not face significant competition from rival leagues in the same sport. This regulatory legislation could legalize conduct that was efficient and enhanced consumer appeal while specifically prohibiting anticompetitive conduct by The League, clubs, or rivals. This would be analogous to the detailed provisions of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), regulating the break-up of AT&T, which prohibited the "Baby Bells" (the local phone monopolies) from entering the market for long-distance phone calls

more controversially, Congress could use its eminent domain power to acquire from current club owners the property rights necessary to operate The League.[133] This part focuses on another alternative. By applying conventional antitrust principles in the unique context of sports, we justify structural antitrust relief mandating the divestiture by clubs of the competition-organizing function of a league.[134]

As noted above, the *NCAA Case* holds that club owners may not enter into agreements that result in higher prices, lower output, or output unresponsive to consumer demand compared to what would "otherwise be."[135] In this regard, one of Judge Richard Posner's most profound antitrust insights is particularly relevant: "[i]t does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition."[136]

We suggest that the relevant anticompetitive agreement is the agreement among competing clubs to arrogate to themselves control of the organization of their sport's dominant competition. The economic analysis set forth in this Article demonstrates that compared to what would "otherwise be" – a sporting competition organized by a separate entity – the vertical integration between competition-organizing and competition-participating raises prices, lowers output, and renders output unresponsive to consumer demand.

---

unless the local telephone market was open to competition. *See* 47 U.S.C. § 271 (2000).

133. A full analysis of this issue is beyond the scope of this Article. In *Berman v. Parker*, 348 U.S. 26 (1954), the Supreme Court held that the power of eminent domain can be used not only to acquire property for future public ownership, but also for resale to a private party, where that sale would serve a public purpose. This holding was recently reaffirmed in *Kelo v. City of New London*, 125 S. Ct. 2655 (2005). In authorizing the use of eminent domain to acquire land for stadium construction, courts have recognized that the operation of professional sports competitions for the benefit of local fans constitutes a public purpose. *See, e.g.,* City of Los Angeles v. Superior Court, 333 P.2d 745 (Cal. 1959) (upholding use of eminent domain to construct a major league baseball stadium). A leading example of the use of federal eminent domain power to remedy inefficiencies caused by transactions costs is described in *Mfrs. Aircraft Ass'n v. United States*, 77 Ct. Cl. 481 (1933). The decision details the government's actions just prior to World War I to pay royalties to the Wright Brothers and other holders of conflicting patents regarding aircraft construction based on a conclusion that "various companies were threatening all other airplane and seaplane manufacturing companies with suits for infringements of patents, resulting in a general demoralization of the entire trade." *Id.* at 484.

134. Major antitrust suits seeking divestitures are expensive. Although a consumer class action by a private attorney is plausible, because of the difficulty of establishing consumer damages such a lawsuit is unlikely. Such litigation would most likely be brought by a federal antitrust agency, or a collection of state attorneys general, or by a private investor or a minority of league owners interested in using the litigation as a vehicle to force owners to overcome the transactions costs identified above to effectuate a reorganization.

135. 468 U.S. at 107.

136. *Gen. Leaseways, Inc.*, 744 F.2d at 594.

As noted above, club-run leagues distort competition in a number of relevant markets.[137] They are likely to set the number of teams participating in the competition at a sub-optimal level, fail to fully exploit the sale of broadcast or internet rights, and inefficiently market licensed merchandise, all of which result in reduced output that is unresponsive to demand. Compared to an entity solely concerned about the interests of the league as a whole, club-run leagues are more likely to allocate labor resources inefficiently,[138] and tolerate operational mismanagement of clubs,[139] which also results in output being unresponsive to consumer demand. As in the *NCAA Case* case, these are all hallmarks of antitrust violations.[140] The central thesis of an excellent book on the success of the National Football League is that its growth was the result of Commissioner Pete Rozelle's heroic efforts to persuade owners to engage in "League Think"—i.e., to put the interests of the league over the interests of their clubs.[141] Implicit in this analysis is the conclusion that, absent Rozelle's vision and talent, the NFL would not efficiently act to maximize league value or consumer appeal. If these leagues feared the swift retribution of the marketplace for these errors, they would not tolerate these inefficiencies.[142]

Of course, the claims made in this Article are subject to proof in a court of law. Evidence that the efficiency gains we discuss are insubstantial, or that club-run leagues possess efficient properties that our analysis has failed to account for, would obviously favor a judgment for the defendant owners; evidence that the gains are substantial and that transactions costs explain the owners' unwillingness to voluntarily restructure would obviously favor the plaintiffs.

In a related antitrust area—the analysis of territorial market division arrangements—the Supreme Court has carefully and expressly differentiated between schemes imposed by a vertically separate manufacturer and those

---

137. *See supra* Part II.

138. For example, baseball fans have just witnessed the first collective bargaining agreement in thirty years that did not require industrial disruption to be achieved. For a detailed chronicle of the difficulties in securing workable collective bargains in light of management's obligation to secure agreement from owners acting in their own club's interests, see JOHN HELYAR, LORDS OF THE REALM (1994).

139. The National Basketball Association has done nothing to restrain the complete mismanagement of one of their two franchises in the huge Los Angeles market. *See, e.g.,* Richard Hoffer, *The Loss Generation,* SPORTS ILLUSTRATED, Apr. 17, 2000 at 58 ("[The Clippers'] helplessness, so practiced and so dependable, is clearly the work of just one man--we're thinking of Donald Sterling here.").

140. 468 U.S. at 107.

141. *See* DAVID HARRIS, THE LEAGUE: THE RISE AND DECLINE OF THE NFL (1986).

142. *Cf. Valley Liquors, Inc.,* 678 F.2d at 745 (noting this characteristic exists where firms lack market power).

agreed to by downstream competitors. This distinction supports mandatory vertical separation in the sports industry. The Court recognizes that vertical restraints insulating a reseller from intrabrand competition have complex effects, simultaneously shielding the firm from potentially beneficial rivalry from sellers of the same product, while creating desirable incentives for promotion, quality assurance, or other investment that might otherwise be subject to free riding by rivals, potentially enhancing the brand's consumer appeal and thus promoting interbrand competition.[143] When imposed by an upstream seller in the independent exercise of its own business judgment, the Court concluded that such a seller was sufficiently likely to balance intrabrand harm and interbrand benefit to reach a socially-optimal result that case-by-case antitrust scrutiny under the rule of reason was appropriate.[144] In contrast, an intrabrand restraint that is the result of horizontal agreement among downstream rivals carries too much risk that the restraint is intended to benefit the rivals' interest in reduced competition, and thus remains *per se* illegal.[145] The Court likewise condemned a venture that jointly promoted a single trademark and divided markets for the manufacture and sale of the trademarked product by separate firms, basing its decision on the critical fact that the so-called "principal" (the corporate entity that owned the national trademark) was controlled by the so-called "agents" (the individual manufacturing firms).[146] These precedents demonstrate why antitrust is so hostile to cartel behavior, in contrast to that of a fully-integrated firm. For the latter, the whole is greater than the sum of the parts. As to the former, activity will only occur if supported by a majority of the parts. These precedents therefore support the conclusion that an agreement to organize a vertically integrated club-run league with the anti-competitive effects noted in this Article constitutes an unreasonable restraint of trade in violation of Section 1.

Section 2's condemnation of monopolization provides an additional basis for a judicially-ordered restructuring of sports leagues. Leading precedents establish that competitors may not control a key upstream input where such control allows the maintenance of a monopoly and does not reflect efficiencies. Although to date the courts have not required that the upstream

---

143. *Sylvania,* 433 U.S. at 51-52.

144. *Id.* at 54-56.

145. *Id.* at 57 n.27, citing *Topco Assocs.,* 405 U.S. at 608.

146. *Sealy, Inc.,* 388 U.S. 350. The decision in *Fraser,* 284 F.3d 47, further supports the distinction between a separate entity organizing a competition and a club-run league. The court refused to accept the claim that a league consisting of rival owners who simultaneously invested in the league and their own clubs was an entity akin to a corporation (indeed, akin to The League that is envisioned by this Article). Citing *Sealy,* the court of appeals emphasized that, unlike a single entity, the league was controlled by these rivals. *Id.* at 57, 57 n.5.

input (in this case competition-organizing services) be provided by an independent firm, we believe that such a remedy is justified here by the unique features of sports leagues. Two of the leading cases help illustrate this point.

In *United States v. Terminal Railroad Ass'n*,[147] the Court held that the Sherman Act barred a consortium of rival railroads from acquiring the only three means by which railroads could cross the Mississippi River at St. Louis and using crossing charges to disadvantage non-owner rivals. Because of the significant efficiencies in joint operation of the three previously-independent crossing points, the Court declined to order a horizontal divestiture. Instead, the Court required open access to the venture.[148] Similarly, in *Associated Press v. United States*,[149] the Court invalidated a by-law provision that allowed AP members to veto new members within their territories. The veto was effective even if the additional members might provide stories of value to the rest of the membership. This by-law demonstrated the inefficient divergence of the interests of AP members and the entity as a whole.[150] Here, the remedy permitted presumably independent non-rivals to determine membership decisions.[151]

Where a monopoly bottleneck exists, the ability of the bottlenecked function to be captured by an open-access cooperative among buyers may, in some cases, actually have the potential to eliminate the distortion caused by monopoly profits. For example, in *Terminal Railroad*, if the company that operated the river bridges had been owned by all railroads, it would have no

---

147.  224 U.S. 383 (1912)

148.  One possible objection to any antitrust relief when firms collectively control an input essential to participating in the market is that such relief may lessen incentives for investment at either level. Where the remedy is designed to preclude monopoly profits that arise from a natural monopoly that is natural, as opposed to one resulting from "superior skill, foresight, and industry," *cf. Aluminum Co. of America*, 148 F.2d at 430, incentive problems should not deter antitrust relief. Stephen G. Breyer, *Antitrust, Deregulation, and the Newly Liberated Marketplace*, 75 CAL. L. REV. 1005, 1033-34 (1987). In the case of developing sports, perhaps the only firms interested in investing in a new league would be those interested in operating clubs, and so a club-run league may well be efficient for sports that lack market power. Once a sport obtains market power, however, there should be no shortage of investors for a entity capable of organizing the competition (The League). The principle that restraints may be justified for new entrants but not after the firm has established market power has strong support in antitrust precedents. *See, e.g.*, Jefferson Parish Hosp. Dist. v. Hyde, 466 U.S. 2, 23 (1984) (citing United States v. Jerrold Elecs. Corp., 187 F. Supp. 545 (E.D. Pa. 1960), *aff'd per curiam*, 365 U.S. 567 (1961)) (tied sale to ensure new entrant's reputation for quality would be maintained was reasonable, but after firm was established no longer necessary). Similarly, non-competition agreements are reasonable for a limited time until the promisee has been able to establish itself in the marketplace. RESTATEMENT (SECOND) OF CONTRACTS §§186-88 (1982).

149.  326 U.S. 1 (1945).

150.  Hovenkamp, *supra* note 4, at 37-44.

151.  Given the thousands of members of the association, the risk of reciprocal rejection of new entrants to protect local incumbents was apparently not given serious consideration.

incentive to charge monopoly prices to its own members.[152] Thus, vertical divestiture would actually have increased the potential for monopoly pricing. A requirement that an independent firm contract to purchase news stories from papers around the country and resell them elsewhere could have a similar effect. Moreover, complete vertical integration may be procompetitive in markets characterized by natural monopoly at several levels. Economic theory suggests that in this case of "serial monopoly," prices may be raised and welfare reduced as both monopolists seek to take monopoly profits.[153] Because it is often efficient to allow a vertical integration between the two serial monopolists, which will result in a single monopoly price,[154] open access regimes may not be welfare enhancing.[155]

Sports leagues, however, are different. Most significantly, because there is an optimal number of clubs in a top-tier league, leagues cannot really be subject to the open access regime contemplated by *Terminal Railroad*.[156] Nor can leagues avoid the serial monopoly problem discussed above simply by acquiring and operating all of the teams. Separately owned clubs form an important aspect of sport's consumer appeal.[157] Because of sports leagues' interdependence, a model where "downstream firms" (here the clubs) jointly operate the "upstream firm" (here the league), and then compete among themselves, will not work in live gate, stadium, and some television and

---

152. Hovenkamp, *supra* note 4, at 36.

153. Joseph J. Spengler, *Vertical Integration and Antitrust Policy*, 68 J. POL. ECON. 347 (1950).

154. David Reiffen & Andrew Kleit, Terminal Railroad *Revisited: Foreclosure of an Essential Facility or Simple Horizontal Monopoly?*, 33 J. L. & ECON. 419, 424 (1990). For a contrary view, see Richard D. Friedman, *Antitrust Analysis and Bilateral Monopoly*, 1986 WIS. L. REV. 873 (arguing that firms will agree on profit-maximizing output); Peter Carstensen, *Khaning the Court: How the Antitrust Establishment Obtained an Advisory Opinion Legalizing "Maximum" Price Fixing*, 34 U. TOL. L. REV. 241, 288 (2003) (noting that because monopoly pricing takes place on elastic portion of demand curve, bilateral monopolists will err on the side of lower prices and increased output). The latter two articles do not, however, discuss the serial monopoly problem in the context of joint venture of independent downstream monopolists and a collectively run upstream monopolist.

155. A sports illustration cited by Reiffen and Kleit, *supra* note 154, at 414, is *Fishman v. Wirtz*, 807 F.2d 520 (7th Cir. 1986), where they imply that the court erred in finding a Sherman Act violation in the refusal of the owner of Chicago Stadium, who was seeking to own the Chicago Bulls basketball team, to offer a stadium lease to a rival bidder. A rival bidder would have sought to exploit the Bulls' local monopoly while paying monopoly rents to the owner of the only suitable stadium. On the other hand, the refusal to permit rivals to gain access to the stadium precludes the sort of competition for the natural monopoly that antitrust law generally encourages. Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582, 590 n.4 (1st Cir. 1960). Which effect predominates requires a case-by-case analysis.

156. Ross and Szymanski, *supra* note 20, at 649-50 and nn. 109-110.

157. The Court of Arbitration for Sport recognized this justification in upholding a challenge to a European soccer regulation barring clubs from participating in the European club competition if owned by the same entity. *AEK Athens*, CAS 98/200.

licensing markets.[158] Hence, if we accept the assumption that each sport will continue to feature a single dominant competition,[159] the monopoly power in competition organizing will not be dissipated. The inefficient and exploitive effects of club-run monopolies can, however, be mitigated. In light of the demonstrated benefits of vertical separation, this novel remedy is justified in the specialized context of sports leagues.[160]

## VI. CONCLUSION

An inherent conflict exists when clubs participating in a sports league competition control the way in which the competition is organized. This conflict distorts the manner in which the league determines the number and location of franchises, how broadcast rights are sold, how merchandise, licensing, and sponsorships are marketed, how club executives are supervised, and how player talent is distributed among clubs. In each of these instances, any particular decision may make some clubs better off and some worse off, and transaction costs often prevent the most efficient result from being selected. Both profits and consumer welfare would increase if these decisions were made instead by a competition organizer independent of the clubs. Although owners and outside investors could capitalize the increased profitability of a vertically-separate league by voluntarily restructuring professional sports, the same transactions cost problem could prevent current owners from agreeing on how to divide the proceeds from such a restructuring, resulting in an inefficient *status quo*. To the extent that league owners refuse to voluntarily restructure the industry, we believe that a plaintiff could establish in antitrust litigation that the continuing agreement by clubs to run

---

158. *Cf. Gamco, Inc. v. Providence Fruit & Produce Bldg.*, 194 F.2d 484 (1st Cir. 1952) (requiring reasonable access to wholesale fruit facility advantageously located in railroad terminal was required under the assumption that rival fruit merchants would then compete with each other).

159. *See supra* note 26 and accompanying text.

160. Although there are strong arguments in favor of a finding that the maintenance of vertically-integrated, club-run leagues in the major North American sports violates the Sherman Act, there are significant obstacles to judicially-mandated vertical divestiture. Such an order requires a plaintiff to bear the expense and risk of a lawsuit. In the case of Major League Baseball, either a lower court would have to narrowly construe the judicially-created antitrust exemption for the National Pastime or the Supreme Court would have to expressly apply the antitrust laws to the sport. *See, e.g., Flood*, 407 U.S. at 283 (Congress', "positive inaction" in refusing to overrule precedents exempting baseball's reserve clause from antitrust scrutiny justified its continued application, although it was concededly an "anomaly"); *Butterworth v. Nat'l League*, 644 So. 2d 1021 (Fla. 1994) (baseball exemption applies only narrowly to the specific restraint at issue in *Flood*); *Henderson Broad. Corp.*, 541 F. Supp. at 268-69 (exemption only applies to baseball's "unique characteristics and needs"); *Major League Baseball v. Crist*, 331 F.3d 1177 (11th Cir. 2003) (exemption applies broadly to "business of baseball"). For these reasons, Congress may wish to consider legislative approaches that would achieve the same welfare-enhancing result.

their own competition constitutes both an illegal restraint of trade and monopolization in violation of the Sherman Act.

Although the operation of a sporting competition raises some unique issues, the organization of a sports league also provides an accessible illustration of a more common issue with regard to joint ventures. Cooperation among competing firms often yields substantial benefits. At the same time, when joint ventures do not face the discipline of the market – either because they enjoy market power or due to the absence of an effective market for corporate control – there is a substantial risk that transactions costs will result in the operation of jointly-held assets in an inefficient manner as those assets are controlled by member firms whose individual interests may differ from those of the collective whole. This Article sets forth an argument about how the Sherman Act – our nation's "magna carta of free enterprise"[161] – can be invoked in a tailored fashion to permit the economy to reap the benefits of collective action while mitigating the effects of market power.

---

161. *Topco Assocs.*, 405 U.S. 596, 611 (1972).