# Why the "Single Entity" Defense Can Never Apply to NFL Clubs: A Primer on Property-Rights Theory in Professional Sports

Marc Edelman[*]

Over the past two decades, the National Football League ("NFL") has become one of America's most profitable collection of businesses.[1] During this period the sum of NFL-club revenues has expanded from just under $970 million per year in 1989 to over $6.5 billion in 2008.[2] NFL franchise values have also skyrocketed, with many clubs now valued at over $700 million per year.[3]

---

A PDF version of this article is available online at http://law.fordham.edu/publications/article.ihtml?pubID=200&id=2758. Visit http://www.iplj.net for access to the complete Journal archive.

[*]    Marc Edelman, Esq. (MarcEdelman@aol.com) is a Sports Law professor at both New York Law School and Seton Hall University, as well as a Sports Law and Economics professor at Manhattanville College. Mr. Edelman earned his B.S. in Economics from the Wharton School (University of Pennsylvania) and his J.D./M.A. from the University of Michigan.

[1]    *See* Don Walker, *Longtime NFL Insider Goodell will Replace Tagliabue*, MILWAUKEE J. SENTINEL, Aug. 9, 2006, at C-Sports ("[Roger] Goodell is taking over an operation to be the best-run and most-popular sport in the country"), *available at* 2006 WLNR 13770189; *see also* Kevin Paul Dupont, *For Sports Franchises, the Loss Column Grows*, THE BOSTON GLOBE, Jan. 14, 2003, at A1 (discussing how the NFL is the only American professional sports league without imminent fiscal concerns); Tom Lowry, *The NFL Machine*, BUS. WK., Jan. 27, 2003, at 87–94; Manny Topol, *A Super Commish*, NEWSDAY, Jan. 26, 2003, at F6 (discussing the superior business performance of the NFL).

[2]    *See* Walker, *supra* note 1; *see generally* Lowry, *supra* note 1, at 89 (estimating NFL revenue at $4.8 billion in 2004).

[3]    Walker, *supra* note 1.

Clubs in the other three premier American sports leagues—Major League Baseball ("MLB"), the National Basketball Association ("NBA") and the National Hockey League ("NHL")—have also experienced strong revenue growth during this period, with the average rate-of-return for premier American sports clubs outpacing the overall U.S. stock market.[4] This strong growth rate is based in part upon premier sports clubs' unique property-rights structure, which allocates certain property rights at the league level, rather than at the club level.[5]

In July 2007, the Northern District of Illinois ruled in *American Needle Inc. v. New Orleans Saints* that based on this unique property-rights structure, NFL clubs are exempt from certain aspects of § 1 of the Sherman Act, because "the NFL and the teams act as a single entity in their licensing and intellectual property."[6] Since this ruling, other premier sports leagues have more broadly proclaimed that "professional sports leagues are best considered 'single entities' under the antitrust laws" when assessing the leagues' business practices.[7]

---

[4] *See* Richard G. Sheehan, *Keeping Score: The Economics of Big-Time Sports*, *in* THE BUS. OF SPORTS 47, 47–49 (Scott R. Rosner & Kenneth L. Shropshire eds., 2004); *see also* RODNEY D. FORT, SPORTS ECONOMICS 6 (Prentice Hall 2d. ed. 2006) (during the 1990s, club sale prices provided between 10.7 and 17.7 return on investment, depending upon sport); Lowry, *supra* note 1, at 87–93; Topol, *supra* note 1, at F6; Walker, *supra* note 2. For articles specifically related to MLB, see Chris Isidore, *Baseball Close to Catching NFL as Top $ Sport*, CNNMONEY.COM (Oct. 25, 2007), *available at* http://money.cnn.com/2007/10/25/commentary/sportsbiz (explaining that Major League Baseball's sales will surpass $6 billion for the first time in 2008, doubling the amount from 2000, and that "[b]aseball's sales have increased 50 percent from 2004 and have doubled since 2000"); *More Revenue for Major League Baseball*, STREET & SMITH'S SPORTS BUS. J., Oct. 29, 2006, at 6 (discussing importance of MLB revenues exceeding $6 billion for the first time); Andrew Zimbalist, *Baseball's Fortunes are Soaring in More Ways than One*, STREET & SMITH'S SPORTS BUS. J., Oct. 15, 2007, at 34.

[5] *See generally* MICHAEL LEEDS & PETER VON ALLMEN, THE ECONOMICS OF SPORTS §§ 3.1–3.4 (2002).

[6] 496 F. Supp. 2d 941, 943 (N.D. Ill. 2007). Unusually, the court in *American Needle* based much of its holding on a single recent law review note. *See id.* (citing Nathaniel Grow, *There's No "I" in 'League': Professional Sports Leagues and the Single Entity Defense*, 105 MICH. L. REV. 183 (2006)). Further, the law review note relies on a dubious presumption that "there is minimal or nonexistent competition between franchises in a professional sports league." Grow, at 193.

[7] Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, Madison Square Garden, L.P. v. NHL, at 1 (Oct. 13, 2007) (No. 07 Civ. 8455 (LAP)). The Southern District of New York has since rejected this

As a matter of law and economics, courts should not find that premier American sports clubs are "single entities," exempt from § 1 of the Sherman Act.[8]   The Supreme Court defines "single entities" as 100%, wholly-owned companies,"[9] or, at a minimum, companies with "complete unity of interest."[10]   Leagues in the premier American sports are not 100% wholly-owned companies, nor do their constituent clubs have *complete* unity of interest. Therefore, as many courts have already concluded, these clubs are fully capable of conspiring with one another.[11]

---

argument. *See* Madison Square Garden, L.P. v. NHL, No. 07 Civ. 8455 (LAP), 2007 WL 3254421, slip op. at *1 (S.D.N.Y. Nov. 2, 2007) ("The NHL is an unincorporated association of thirty Member Clubs organized as a joint venture.") (citation omitted).

[8]   Section 1 of the Sherman Act states that "[e]very contract, combination . . . or conspiracy, in the restraint of trade . . . is declared to be illegal." 26 Stat. 209 (1890) (codified as amended at 15 U.S.C. §§ 1–7 (2000)).   However, the Supreme Court has interpreted this statute to only illegalize those agreements that unreasonably restrain trade. Standard Oil v. U.S., 221 U.S. 1, 51 (1911).   Classification as a "single entity" means immunity under § 1 of the Sherman Act because it is impossible for an entity to collude with itself. Chi. Prof'l Sports Ltd. P'ship v. NBA (*Chicago Bulls II*), 95 F.3d 593, 601 (7th Cir. 1996) (Cudahy, J. concurring).

[9]   Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).   "We limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act." *Id.* at 767.

[10]   *Id.* (internal citations omitted).   The Court then goes on to define "complete unity of interest" as occurring where the parties "objectives are common, not disparate," as well as where the conduct "deprives the marketplace of the independent centers of decisionmaking that competition assumes." *Id.* at 769, 771.

[11]   Many courts have rejected the single-entity defense in the scope of premier American sports leagues. *See, e.g.,* St. Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851 (8th Cir. 1998); Sullivan v. NFL, 34 F.3d 1091 (1st Cir. 1994); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381 (9th Cir. 1984); Mid-South Grizzlies v. NFL, 720 F.2d 772 (3d. Cir. 1983); N. Am. Soccer League v. NFL, 670 F.2d 1249 (2d Cir. 1982); Shaw v. Dallas Cowboys Football Club, Ltd., No. 97 Civ 5184, 1998 WL 419765 (E.D. Pa. June 23, 1998); McNeil v. NFL, 790 F. Supp. 871 (D. Minn. 1992); *see generally Chicago Bulls II*, 95 F.3d at 599 ("Whether the NBA itself is more like a single firm . . . or like a joint venture . . . is a tough question under *Copperweld*); Chi. Prof'l Sports Ltd. P'ship v. NBA (*Chicago Bulls I*), 961 F.2d 667, 673 (7th Cir. 1992) ("For now we treat the NBA as a joint venture, just as the parties do in the bulk of their arguments"); MICHAEL J. COZZILLIO ET. AL, SPORTS LAW: CASES AND MATERIALS 11 (2d ed. 2007) ("Others perceive sports leagues and sports associations as types of joint ventures in which the parties operate as a collective but retain considerable individual entrepreneurial control."); *cf.* Marc Edelman, *Single Entity Ruling: 'Needle' in Haystack*, N.Y.L.J. 4, 12 (Jan. 2, 2008) (discussing the *American Needle* ruling as an anomaly) [hereinafter Edelman, *Single Entity Ruling*].

This article argues that as a matter of law and economics, clubs in the four premier American sports leagues lack sufficient unity of interest for any court to classify them as "single entities." Part I of this article discusses the contemporary law-and-economics theory underlying the allocation of private and common property. Part II explains the three different property-rights systems that have emerged in American professional sports: (1) the pure private-property system (no unity of interest); (2) the pure common-property system (complete unity of interest); and (3) the mixed-mode system (partial unity of interest). Part III describes the contractual underpinnings of the mixed-mode property system, as that system applies to the four premier American sports leagues. Part IV analyzes the allocation of property rights in the mixed-mode system and explains why sports clubs operating in that system cannot form a "single-entity" league.

## I.  PRIVATE AND COMMON PROPERTY THEORY

The central tenet of capitalism is personal ownership of property.[12] Yet, even within capitalism, property owners often debate how to best allocate personal property rights.[13]  In a capitalist system, most property rights are held in private–either by an individual, a family, or a company.  Yet, other property rights are held in common: for example, by communes, kibbutzim, or cooperatives.

Supporters of private property rights point to the 1833 pamphlet by mathematician William Forster Lloyd, which explains

---

[12]  Property is a mixture of rights to use and exclude others from using. *Chicago Bulls I*, 961 F.2d at 670.  The alternative to personal ownership is state ownership. *See* Harold Demsetz, *Toward a Theory of Property Rights*, *in* PERSPECTIVES ON PROPERTY LAW 135, 141 (Robert C. Ellickson, Carol M. Rose & Bruce A. Ackerman eds., 3d ed. 2002).  In a personal ownership system, "[a]n owner of property rights possesses the consent of fellowmen to allow him to act in [a] particular way[]." *Id.* at 136.
[13]  A number of authors have pointed out there really are three different kinds of personal property-private property, communal or jointly owned property, and "open access." *See* James M. Acheson, *The Lobster Gangs of Maine*, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 129, 133.

the failings of the common property system.[14]  In his pamphlet, Lloyd explains that common property rights lead to overuse when too many owners have access to a given resource and nobody has the right to exclude others.[15]

Lloyd's theory was later adopted by Garrett Hardin in his well-known 1968 article, *The Tragedy of the Commons*.[16]  In that article, Hardin explains the tragedy of common property in terms of the perverse incentive to overuse.[17]  The incentive to overuse, according to Hardin, comes from the notion that each user reaps the full economic benefit from additional use; however, each user only suffers a fraction of the associated cost.[18]

Similar to the "tragedy of the commons," common-property systems may also lead to the opposite problem, referred to by

---

[14]  *See, e.g.*, Garrett Hardin, *The Tragedy of the Commons, in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 119, 120.

[15]  *See id.; see also* Michael A. Heller & Rebecca S. Eisenberg, *Can Patents Deter Innovation? The Anticommons in Biomedical Research, in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 159, 160.

[16]  *See generally* Hardin, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12.

[17]  *See generally id.*

[18]  Hardin explains:

> As a rational being, each herdsman seeks to maximize his gain. Explicitly or implicitly, more or less consciously, he asks, "What is the utility to *me* of adding one more animal to my herd?"  This utility has one negative and one positive component.
>
> 1.  The positive component is a function of the increment of one animal.  Since the herdsman receives all the proceeds from the sale of the additional animal, the positive utility is nearly +1.
>
> 2.  The negative component is a function of the additional overgrazing created by one more animal.  Since, however, the effects of overgrazing are shared by all the herdsmen, the negative utility for any particular decision-making herdsman is only a fraction of -1.
>
> 3.  Adding together the component partial utilities, the rational herdsman concludes that the only sensible course for him to pursue is to add another animal to his herd.  And another; and another . . . .  But this is the conclusion reached by each and every rational herdsman sharing a commons.  Therein is the tragedy.  Each man is locked into a system that compels him to increase his herd without limit—in a world that is limited.

*Id.* at 120.  In another renowned article, Harold Demsetz explains the same common property problem as a difficulty ensuring that a transaction's beneficiary also bears the transaction's cost. *See* Demsetz, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 141.

Michael Heller as "the tragedy of the anticommons."[19]   In this tragedy, a resource is prone to under-use because multiple owners each have a right to exclude others.[20]   Hence, no common owner reaps any benefit.[21]

Despite these "tragedies," many property-law scholars remain enthusiastic about the prospects of common property systems as enhancing group performance.[22]   For example, James Acheson, in his article *The Lobster Gangs of Maine*, points to specific profit-enhancing mechanisms of the Maine lobstermen's common property system.[23]   According to Acheson, under the Maine arrangement, individual lobstermen choose to join "harbor gangs," which share common property amongst themselves.[24]   For these "harbor gangs," the value added by working collectively is that members obtain valuable information about fishing locations and innovations from one another.[25]   Members also assist one another in times of emergency at sea.[26]

Today, property scholars continue to debate the conditions for successful common property systems, recognizing that identical arrangements do not best allocate property rights in all circumstances.   Ellickson, for example, has repeatedly suggested that common ownership succeeds when business endeavors are risky because common ownership allows pooling and sharing of risk.[27]   Meanwhile, in the 1992 article *Common Property, Collective Action and Community*, authors Sara Singleton and Michael Taylor suggest that common-property ownership succeeds

---

[19]   Michael Heller, *The Tragedy of the Anticommons*, 111 HARV. L. REV. 621, 642 (1998); *see also* HELLER & EISENBERG, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 160–61.

[20]   *See* Heller & Eisenberg, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 161.

[21]   *See id.*   An example of this tragedy occurred in post-Soviet economies, where storefronts remained empty as salesmen continued to sell goods on the street because the right to use storefronts was held in common by all citizens. *See id.*

[22]   *See infra* notes 24–27 and accompanying text.

[23]   *See* Acheson, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 129–34.

[24]   *See id.* at 133.

[25]   *Id.* at 130.

[26]   *Id.*

[27]   Robert C. Ellickson, *Property in Land*, *in* PERSPECTIVES OF PROPERTY LAW, *supra* note 12, at 146, 156.

where there is appropriate restraint or regulation of use.[28] According to Singleton and Taylor, proper restraint or regulation could occur where four communal factors co-exist: shared beliefs among owners; an ownership set that is more-or-less stable; owners that expect to continue interacting; and direct, multiplex communication.[29]   Conversely, factors adverse to common property arrangements include differences amongst property owners in wealth, income, race, ethnicity, religion, or class.[30] Based on certain differences amongst these factors, in the context of American professional sports, property-rights holders have considered a wide array of allocation alternatives along the private-versus-common property spectrum.

## II. THE THREE PROPERTY SYSTEMS IN AMERICAN SPORTS

From a general business perspective, there are three ways that American professional sports could allocate property rights: (1) the club-based private property system (no unity of interest); (2) the league-based common property system (complete unity of interest); and (3) the mixed-mode property system (partial unity of interest).

### A. Rise and Fall of the Club-Based Private Property System

The first system used to allocate property rights in American sports was the club-based private property system.[31]  During this early period, which lasted until the mid-1870s, all clubs were privately owned, privately operated, and minimally cooperative with one another.[32]  Sports clubs played each other exclusively on

---

[28]  *See* Sara Singleton & Michael Taylor, *Common Property, Collective Action and Community*, 4 J. THEORETICAL POL. 309, 310 (1992).

[29]  *See id.* at 315.

[30]  *See id.* at 316.

[31]  *See* Symposium, *Panel III: Restructuring Professional Sports Leagues*, 12 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 413, 419 (2002) [hereinafter *Panel III*] ("[O]riginally sports in America, especially the team sports, started off as individual clubs.") (citing Gregor Lentze, *The Legal Concept of Professional Sports Leagues: The Commissioner and an Alternate Approach from a Corporate Perspective*, 6 MARQ. SPORTS L.J. 65, 66 (1995)); *see also* LEEDS & VON ALLMEN, *supra* note 5, at 93.

[32]  *See generally* LEEDS & VON ALLMEN, *supra* note 5, at 93.

an informal basis, and visiting games occurred during long road trips known as "grand tour[s]."[33]

Baseball was the most popular sport during this era, featuring over 300 independent clubs. The nation's best clubs drew large crowds, as fans expected to see which undefeated clubs would remain undefeated.[34] During this era, players formed organizations such as the National Association of Base Ball Players ("NABBP"), which purported to standardize on-the-field rules.[35] These associations, however, neither enforced off-the-field rules nor crowned a league champion.[36]

Within a short time, it became obvious that there were many problems with the club-based private property system. For example, because independent clubs contracted to play games against rivals without any centralized oversight, each club played a different length schedule, against a different set of opponents.[37] As a result, when a club such as the Cincinnati Red Stockings finished its 1869 season with the remarkable record of 56 wins, 0 losses and one tie, fans were left wondering if that club was really amongst the best, or whether the club merely chose not compete against high-caliber competition.[38]

One of the main impediments to fielding more baseball contests during this era involved high transaction costs.[39] In addition to causing scheduling problems, high transaction costs caused high club turnover, disagreement amongst clubs about how to allocate game proceeds, a lacking of competitive balance, and a rampant gambling problem among players and managers.[40]

Due to the severity of these problems, by the 1870s, the club-based private property system, which featured entirely private property rights, was in a decline.[41] A major blow to the system

---

[33] *See* GERALD W. SCULLY, THE MARKET STRUCTURE OF SPORTS 5 (1995).
[34] *See* LEEDS & VON ALLMEN, *supra* note 5, at 93.
[35] *See* SCULLY, *supra* note 33, at 5.
[36] *See id.* at 5–6.
[37] *See id.* at 6.
[38] LEEDS & VON ALLMEN, *supra* note 5, at 93.
[39] *See* SCULLY, *supra* note 33, at 6.
[40] *See id.* at 7.
[41] *See id.* at 6–7.

came in 1876, when Chicago baseball promoter William Hubert launched what most regarded as a superior baseball product: National League baseball.[42] Although the National League did not initially reallocate many property rights, the emergence of even a basic league structure encouraged clubs to cooperate with one another.[43] For example, one of the National League's first accomplishments was to establish a standardized playing schedule.[44] The National League also implemented a three-person panel to resolve a narrow range of disputes amongst club owners.[45]

Then, in 1920 (seventeen years after the National League unofficially merged with the American League),[46] the National and American Leagues jointly named Judge Kenesaw Mountain Landis as Major League Baseball's first commissioner.[47] By creating the position of commissioner, ordained with broad authority to investigate alleged wrongdoing and to punish any conduct suspected as "detrimental to the best interests of the national game of baseball," Major League Baseball began to usher in a new system of sports, marked by some central coordination of property rights.[48] Nevertheless, it is important to remember that "it was the leagues that were created to direct the success of the individual [clubs]," and not the other way around.[49]

---

[42]    *See id.*; *see also* Marc Edelman, *Can Antitrust Law Save the Minnesota Twins? Why Commissioner Selig's Contraction Plan was Never a Sure Deal*, 10 SPORTS LAW J. 45, 47 (2003) [hereinafter Edelman, *Minnesota Twins*].

[43]    *See* SCULLY, *supra* note 33, at 7–8, 12.

[44]    *Cf.* LEEDS & VON ALLMEN, *supra* note 5, at 93.

[45]    ANDREW ZIMBALIST, BEST INTERESTS OF BASEBALL? THE REVOLUTIONARY REIGN OF BUD SELIG 22 (2006).

[46]    *See* Edelman, *Minnesota Twins*, *supra* note 42, at 47.

[47]    Jason M. Pollack, *Take My Arbitrator, Please: Commissioner "Best Interests" Disciplinary Authority in Professional Sports*, 67 FORDHAM L. REV. 1645, 1646 (1999).

[48]    *Id.* (citing Major League Agreement §2(a)–(b), at 1 (1921)).

[49]    *Panel III*, *supra* note 31, at 420 (quoting Kenneth Shropshire); *see also* L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1389 (9th Cir. 1984) ("Even though the individual clubs often act for the common good of the NFL, we must not lose sight of the purpose of the NFL as stated in Article I of its constitution, which is to 'promote and foster the primary business of League members.'"); Daniel S. Mason, *Revenue Sharing and Agency Problems in Professional Team Sport: The Case of the National Football League*, *in* THE BUSINESS OF SPORTS, *supra* note 4, 54, 55 ("[T]eams collectively hire a commissioner to oversee League operations and to temper any disputes that may arise among League stakeholders.").

## B. Rise and Fall of the League-Based Common Property System

On the opposite end of the spectrum, another property rights system that emerged in American sports was the league-based common property system, which began in the 1990s with the aid of sophisticated lawyers.[50]  The league-based common property system consists of a centrally-held league that holds all property rights collectively.[51]

The most important example of this common property system is the original model for Major League Soccer ("MLS"), which was created in the early 1990s by then Latham & Watkins LLP attorney Alan Rothenberg.[52]  Mr. Rothenberg envisioned MLS to serve as a "single entity" league for purposes of an antitrust advantage.[53]  At least in the business sector, this model seemed to meet the Sherman Act's test for "complete unity of interest."[54]

The MLS model, as envisioned by Rothenberg, was intended to serve as a league composed of "investor-operators" (rather than club owners) financing and operating an entire soccer entity under a single voice.[55]  These investors, according to Rothenberg's original plan, were to own shares of the league entity and sit on a Board of Directors.[56]  The Board of Directors would then elect

---

[50]  *See* COZZILLIO ET AL., *supra* note 11, at 26; PAUL C. WEILER & GARY R. ROBERTS, SPORTS AND THE LAW: TEXT, CASES AND PROBLEMS 214–15, 566 (3d ed. 2004).

[51]  *See* Lacie Kaiser, *The Flight from Single-Entity Structured Leagues*, 2 DEPAUL J. OF SPORTS L. & CONTEMP. PROBS. 1, 1 (2004) (explaining that centrally-held leagues have "tried to centralize and control their respective sports by having the league own all teams, hold all player and coaching contracts and pay those salaries, and maintain sponsorship deals and broadcasting rights.").

[52]  WEILER & ROBERTS, *supra* note 50, at 566; *see also* Alan I. Rothenberg—Profile, FORBES, http://www.forbes.com/finance/mktguideapps/personinfo/FromPersonIdPerson Tearsheet.jhtml?passedPersonId=939747 (last visited Jan. 28, 2008).

[53]  *See* WEILER & ROBERTS, *supra* note 50, at 214, 566.

[54]  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984); *see* WEILER & ROBERTS, *supra* note 50, at 214.

[55]  WEILER & ROBERTS, *supra* note 50, at 214. These club operators, who make the day-to-day business decisions for a single club, were awarded with a pro rata share of overall league profits, rather than with the profits of that specific club. *See id.* at 566.

[56]  *Id.*; *see also* Kaiser, *supra* note 51, at 8–9 ("In 1995, Major League Soccer (MLS) began its first season formed as a limited liability company under Delaware law.  At first, a board of governors of the MLS had centralized control over the league and all of its teams.  The board was to run all of the teams; handle all player contracts and allocation;

officers to run all of the clubs' business operations in a unified manner, centrally–setting prices for tickets, concessions, and broadcasting, as well as hiring and assigning personnel.[57] According to Rothenberg's original plan, once the league paid its corporate taxes, the remaining revenues would be reinvested into the league, and any profits the league earned would be distributed equally to league shareholders in the form of dividends.[58] Thus, all owners would earn an equal return per share, irrespective of each clubs' on-the-field performance—a factor completely unifying all shareholders' interests.[59]

At first glance, Rothenberg's proposed common-property system should have attracted strong investor interest. The purported financial advantages of the MLS's common property system were based upon reducing shareholder risk. Specifically, the league structure, as proposed by Rothenberg, would have enjoyed lower operating expenses than other sports structures based on the need for fewer front-office functional and administrative employees.[60]

Nevertheless, MLS's pure common-property system never came into fruition, as most prospective shareholders were disinterested in the proposed league structure.[61] As a general matter, wealthy investors did not want to become "faceless investors" in a sports corporation.[62] Rather, they wanted the

---

employ all coaches, general managers, and staff; and set prices for concessions, broadcasts, merchandise, and tickets.").

[57] WEILER & ROBERTS, *supra* note 50, at 566.

[58] *See id.* The MLS quickly abandoned this purely common-property model in favor of an organization involving investor-operators, which played some role in determining the day-to-day business decisions of a specific club and maintained some of the relevant profits. *Id.* at 566–67.

[59] *See generally id.* at 566.

[60] *See id.; see also* COZZILLIO ET AL., *supra* note 11, at 27 ("Beyond the advantages of substantially reduced antitrust exposure and liability, the [common-property] league should yield cost savings associated with reduced competition. . . . There also may be . . . cost savings as a result of [the common-property league] being responsible for the business operations of all the teams in the league.").

[61] *See* COZZILLIO ET AL., *supra* note 11, at 17 ("On one hand, it is unlikely that most team owners would be willing to trade their individual operating autonomy and the historical, well-nurtured inter-franchise rivalries."); WEILER & ROBERTS, *supra* note 50, at 566.

[62] WEILER & ROBERTS, *supra* note 50, at 566.

chance to win championships.[63]   Because the pure common-property system did not produce champion owners, few were interested in investing in MLS.[64]

Because of difficulty initially finding investors, MLS eventually abandoned its pure common-property structure and turned to a mixed-mode model.[65]   Ultimately, MLS chose a property-rights system more to the liking of potential investors, but where "'complete unity of interest[]'"[66] became "doubtful."[67]   In other words, the "single entity" structure was cast aside.[68]

Since then, only a few start-up sports businesses have attempted to revive the pure common-property system.  In 2000-2001, World Wrestling Entertainment ("WWE") attempted to form a common-property league when it launched a new professional football league called the XFL, of which 75 percent of the league was owned by the publicly-traded WWE; however, the XFL folded

---

[63]   *See id.; see also Panel III, supra* note 31, at 424 ("Most problematic for the single-entity structure is figuring out how to tell the large-ego set of owners that this league is going to be a little bit different and that as a single entity, one of the owners, like George Steinbrenner or Jerry Buss, will not have the opportunity to be out front in the same manner that previous leagues have had individual owners out front.") (quoting Kenneth Shropshire).

[64]   *See* COZZILLIO ET AL., *supra* note 11, at 22 ("By permitting individual owners to run the local business operations of their teams, the major sports leagues have been able to attract wealthy entrepreneurs who are capable of operating their individual teams, while, at the same time, providing experience, oversight, and expertise to the overall league operations.") (citations omitted); WEILER & ROBERTS, *supra* note 50, at 567 (explaining that "in the end, MLS had to make a radical change to give [potential owner Robert] Kraft, for example, special status as 'investor operator' of the New England Revolution, wielding much the same control over this club as his Patriots.").

[65]   *See* WEILER & ROBERTS, *supra* note 50, at 566–67.

[66]   Fraser v. Major League Soccer, 284 F.3d 47, 57 (1st Cir. 2002) (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984)).

[67]   *Fraser,* 284 F.3d at 58–59 ("To sum up, the present case is not *Copperweld* but presents a more doubtful situation; MLS and its operator/investors comprise a hybrid arrangement, somewhere between a single company (with or without wholly owned subsidiaries) and a cooperative arrangement between existing competitors. . . . The case for expanding *Copperweld* is debatable and, more so, the case for applying the single entity label to MLS."); *see also Copperweld,* 467 U.S. at 771.

[68]   *See* Kaiser, *supra* note 51, at 1–2 (explaining that the MLS has since "moved towards the more traditional structure of individually owned teams with a league office to oversee those teams").

after just one season.[69] Also in 2001, the Major Indoor Soccer League ("MISL") launched itself as a single-entity indoor soccer league based on a system of common property rights.[70] The MISL has proven more successful than the XFL, having just recently signed a multiyear television deal with the Fox Soccer Channel.[71] Only time will tell if the MISL keeps its single-entity structure.[72]

## C. *Mixed-Mode Property System: A Superior Sports Alternative*

Given that the private-property system has led to sub-optimally low levels of cooperation, and the common-property system has struggled to lure investors, most sports businesses have converged upon a middle-ground solution that includes both private and commonly-held property rights.[73]   This new approach, in economics terms, is best described as a "mixed-mode" system. [74] It is a middle-ground system of allocating property rights, and it is

---

[69]   *See* Langdon Brockinton, *Selling Market on New Property a Challenge; XFL Half Way There*, STREET & SMITH'S SPORTS BUS. J., Dec. 4, 2000, at 3; *see also* Marc Edelman, *Fan Ownership can Give UFL a Leg up on Building Loyalty*, STREET & SMITH'S SPORTS BUS. J., Aug. 27, 2007, at 28 [hereinafter Edelman, *Fan Ownership*]; Jon Show, *WWE Busy Scripting its Next Moves*, STREET & SMITH'S SPORTS BUS. J., Oct. 9, 2006, at 28.

[70]   *See One on One with Steve Ryan, Major Indoor Soccer League Commissioner*, STREET & SMITH'S SPORTS BUS. J., Feb. 9, 2004, at 42; David Sweet, *TV Deal Key to Indoor Soccer Goal of Becoming Fifth Major League*, STREET & SMITH'S SPORTS BUS. J., Mar. 18, 2002, at 22.

[71]   *See* Colin Stephenson, *Indoor Soccer Team Set to Play in Prudential Center*, THE STAR-LEDGER, June 20, 2007, at 59, *available at* 2007 WLNR 11564594 ("Asked why he chose to add a soccer team to the 17,500-seat arena's list of tenants, [New Jersey Devils owner Jeff] Vanderbeek said he thinks the league's financial model [a single-entity ownership structure with a $350,000 salary cap per team] will make it possible to turn a profit. He also said he simply liked the game, and thought it would be a good fit for the area."); *see also Dancy Named Sharks Head Coach*, ORLANDO BUS. J., Sept. 25, 2007, *available at* 2007 WLNR 18790693; Terry Lefton, *Puma to Make Balls for MISL*, STREET & SMITH'S SPORTS BUS. J., Oct. 9, 2006, at 8; *Major Indoor Soccer League*, HOOVERS COMPANY IN-DEPTH REPS., Mar. 28, 2007, *available at* 2007 WLNR 5843454; *MISL Signs TV Deal*, STREET & SMITH'S SPORTS BUS. J., Oct. 15, 2007, at 7.

[72]   The author of this article was affiliated with the MISL during the summer of 2001.

[73]   COZZILLIO ET AL., *supra* note 11, at 11 (stating that sports leagues operate as a joint venture but retain considerable individual control).

[74]   *See* Richard C. Levin et al., *The Report of the Independent Members of the Commissioner's Blue Ribbon Panel on Baseball Economics*, *in* THE BUSINESS OF SPORTS, *supra* note 4, 62, 64 ("[S]ports leagues are blends of cooperation and competition—cooperation for the sake of producing satisfactory competitiveness.").

the system currently in place by all four of the premier American sports leagues.[75]

From a strategic perspective, a mixed-mode property system is composed of individual club owners that recognize some cooperation amongst clubs is needed to produce a saleable output.[76] For example, all clubs in the mixed-mode system accept the need to maintain at least one viable opponent,[77] and all clubs want to maintain at least minimal leveling of on-the-field competition.[78] In addition, although each club in the mixed-mode system generally prefers to win, no club wants to always beat its opponents.[79] This is a critical distinction, as clubs in the mixed-mode system understand that fans do not want to attend a seemingly pre-determined contest.[80]

At the same time, however, clubs in the mixed-mode system still seek to maintain some independent property rights apart from any central planning.[81] Because the interests of individual clubs

---

[75] *See* COZZILLIO ET AL., *supra* note 11, at 19–25. For this reason, one of the leading treatises on sports law refers to the mixed-mode property system simply as the "traditional model." *Id.*

[76] PAUL DOWNWARD & ALISTAIR DAWSON, THE ECONOMICS OF PROFESSIONAL CLUB SPORTS 20 (2000); *see also* COZZILLIO ET AL., *supra* note 11, at 11 ("Unlike individual sports events, which may survive on their own, teams in most league sports, excepting, of course, barnstorming operations such as the Harlem Globetrotters, need a league or some sort of contractual relationship with other teams to exist.").

[77] *E.g.*, N. Am. Soccer League v. NFL, 670 F.2d 1249, 1251 (2d Cir. 1982) ("No single owner could engage in professional football for profit without at least one other competing team."); *see also* DOWNWARD & DAWSON, *supra* note 76, at 20.

[78] *See* DOWNWARD & DAWSON, *supra* note 77, at 21 (citation omitted).

[79] *See id.* at 20; *see also* COZZILLIO ET AL., *supra* note 11, at 11 ("One aspect of this business cooperation is an effort to control the economic competition among the teams to ensure that there will be some degree of parity.").

[80] *See* COZZILLIO ET AL., *supra* note 11, at 11; DOWNWARD & DAWSON, *supra* note 76, at 25; *see generally* John Lombardo, *XFL Revamps Strategy as Ratings Dive*, STREET & SMITH'S SPORTS BUS. J., Mar. 5, 2001, at 4 (explaining that unlike in World Wrestling Entertainment, the owners of the XFL cannot script game action).

[81] *See Chicago Bulls II*, 95 F.3d 593, 597 (7th Cir. 1996) ("The teams are not the league's subsidiaries; they have separate ownership."); COZZILLIO ET AL., *supra* note 11, at 11 ("In some respects these leagues and associations are not unlike large cartels (such as OPEC), having a common goal and objective that is best obtained through collective efforts, yet resulting in individual gains not necessarily shared with other members of the cartel.") (citations omitted); *see also* Complaint for Injunction Relief at ¶ 12 Madison Square Garden, L.P. v. NHL, No. 07 Civ. 8455 (Sept. 28, 2007) ("Over the years, MSG has developed, reinforced and encouraged fan interest in the Rangers, making substantial

are not identically aligned, clubs in larger markets generally prefer to keep more private property;[82] whereas clubs in the smaller markets generally prefer more collectivization.[83] Nevertheless, all clubs in the mixed-mode system recognize an ultimate need to balance these two preferences.

As a result, a dimorphic property-rights structure emerges in the mixed-mode commons, equipped with tightened controls on clubs in comparison to the private-property model, as well as a greater emphasis on controls that are enforced by the clubs acting jointly.[84] This innovative structure is facilitated by the National Labor Relations Board ("NLRB") mandate that the league overall serve as the exclusive bargaining unit for the purposes of collective bargaining.[85]

## III. CONTRACTUAL UNDERPINNINGS OF THE MIXED-MODE PROPERTY SYSTEM

The relationship between clubs in the mixed-mode property system is set forth by two important agreements: (1) the league constitution (or league agreement), which sets forth the

---

investments in the Rangers franchise as it seeks to *compete with other NHL teams*, including but not limited to the two other NHL teams in the New York metropolitan area.") (emphasis added).

[82]    *See* DOWNWARD & DAWSON, *supra* note 76, at 37–38; *see also* Ken Rosenthal, *Angelos' Game Plan Puts Owners in the Ballpark*, THE BALTIMORE SUN, July 28, 1994, at 1C (explaining that Peter "Angelos [owner of MLB's Baltimore Orioles] opposes revenue sharing because it would shift some of the Orioles' profits to teams generating less revenues—in effect, penalizing his club for achieving financial success"); Vito Stellino, *Cowboys' Jones Wins Again; Revenue Sharing Remains Unchanged*, THE BALTIMORE SUN, Feb. 10, 1996, at 10C (discussing the NFL's Dallas Cowboys' opposition to significant revenue sharing).

[83]    *See* DOWNWARD & DAWSON, *supra* note 75, at 37–38; *see also* Jack O'Connell, *Following his Lead: Selig has Skippered Sport through Changes, Strike*, THE HARTFORD COURANT, Mar. 31, 2002, at L2.

[84]    *See generally* COZZILLIO ET AL., *supra* note 11, at 11–12, 23 (discussing these compromises and the increased economic interdependence of clubs in the modern model); *cf.* L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1389 (9th Cir. 1984) ("NFL policies are not set by one individual or parent corporation, but by the separate teams acting jointly.").

[85]    *See, e.g.*, N. Am. Soccer League v. NLRB, 613 F.2d 1379 (5th Cir. 1980) (holding that the NLRB did not err in determining that the appropriate bargaining unit was the league overall).

relationship between individual clubs, and (2) the collective bargaining agreement, which sets forth the relationship between clubs and the players union.[86] Pursuant to these two contracts, clubs in the mixed-mode system hire a league commissioner to oversee and coordinate certain collective behavior among the clubs, as well as institute detailed rules governing the entry and exit of clubs from the league.[87]

## A.  The Commissioner

The league commissioner is a central administrator whose broad-based responsibility in overseeing the behavior of independent competitors serves as "an 'exception,' an 'anomaly,' and an 'aberration'"[88] within the more generalized world of American business.[89]    In pro sports, the commissioner is responsible for overseeing the collective conduct of sports clubs; yet, according to most courts, the commissioner is autonomous, rather than an agent of any given club.[90]

The commissioner has great power to help align the financial interests of individual clubs by enforcing general financial rules,

---

[86]    *See* COZZILLIO ET AL., *supra* note 11, at 11 ("Most leagues are coalesced by some type of multi-team agreement in which each member agrees to observe a common set of by-laws and/or constitutional provisions.  In essence, the wax that binds the members is a form of contract in which all teams agree to defer to the rules of the league as a whole."); *see also L.A. Mem'l Coliseum Comm'n*, 726 F.2d at 1387 ("How the NFL is organized and the nature and extent of cooperation among the member clubs is a matter of record; the NFL Constitution and Bylaws contain the agreement.").

[87]    *See* Pollack, *supra* note 47, at 1647–49, 1676; *see generally* COZZILIO ET AL., *supra* note 11, at 11 (explaining the role of league bylaws).

[88]    Finley & Co. v. Kuhn, 569 F.2d 527, 536 (7th Cir. 1978) (citing Flood v. Kuhn 407 U.S. 258, 282 (1972)).

[89]    *Id.* at 537 (7th Cir. 1978) ("In no other . . . business is there quite the same system, created for quite the same reasons and with quite the same underlying policies."); *see generally* Pollack, *supra* note 47, at 1647–48.

[90]    *See, e.g.*, Rose v. Giamatti, 721 F. Supp. 906, 919 (1989) ("Whatever other activity the Commissioner may be authorized to perform as an agent on behalf of Major League Baseball, it is clear that with regard to disciplinary matters, the major league baseball clubs have made the Commissioner totally independent of their control.  Under the Major League Agreement, the Commissioner's status with respect to disciplinary matters is analogous to that of an independent contractor . . . independent of any control by the members of Major League Baseball."). *But cf.* Prof'l Hockey Corp. v. World Hockey Ass'n, 143 Cal. App. 3d 410, 415–16 (1983) (applying a fiduciary duty to club owners that sit on the Board of Trustees of a league).

such as asset-to-liability rules.[91]  The commissioner also plays an important role in helping to unify sports clubs regarding non-financial issues.[92]  For example, early in the history of the mixed-mode system, the commissioner helped to implement standardized rules to promote player safety and welfare, such as the requirement that baseball, football, and now hockey players wear helmets.[93]  More recently, the commissioner has helped to establish standardized drug-testing policies, as well as other general rules related to player and club decorum.[94]

## B.  *Limited Entry of New Clubs*

In terms of defining the rules of new membership, the mixed-mode property system allows only a limited number of new clubs to join each league—a feature that requires individual club voting to determine potential league expansion.[95]  From an economics perspective, admitting new clubs into an established league has both a positive and negative effects on existing members.[96]  For existing clubs, the advantage of new entry is that the new entrants must pay an admission fee to each of the existing clubs.[97]  The amount of this fee may include a substantial premium above the current estimated mean franchise value.  For example, in 2000, the Houston Texans paid $700 million to join the NFL, even though the highest sale price of an existing NFL franchise at that time was just $635 million.[98]

---

[91]  For example, in 1982, MLB clubs owners introduced the "60/40 rule," which states that a MLB club must maintain a ratio of assets and liabilities of at least 60 to 40; the MLB commissioner is responsible for enforcing that rule. Andrew Zimbalist, *MLB's Debt Rule Reveals More Smoke and Mirrors*, STREET & SMITH'S SPORTS BUS. J., May 3, 2004, at 27; MLB CONST., art. XI, § 1 (amend. 2005) (addressing Fiscal Responsibility [hereinafter MLB CONST.].

[92]  *See generally* WEILER & ROBERTS, *supra* note 50, at 30–32.

[93]  *See* LEEDS & VON ALLMEN, *supra* note 5, at 96.

[94]  *See generally* WEILER & ROBERTS, *supra* note 50, at 49–51.

[95]  *See generally* L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1389 (9th Cir. 1984) (explaining these type of league policies are not set by one parent club but rather "by the separate teams acting jointly").

[96]  LEEDS & VON ALLMEN, *supra* note 5, at 102–03.

[97]  *Id.* at 103.

[98]  *See* John McClain, *Capers Likely Texans' Choice: First Coach could be Named Soon*, THE HOUSTON CHRONICLE, Jan. 18, 2001, at 1; *see also* FORT, *supra* note 4, at 7

The negative aspect of new entry is that new entry leads to the need to allocate risk among more parties.[99] Also, in leagues that share significant revenues, entrance of new, financially unstable clubs could seriously undermine the stability of the league as a whole.[100]

Because the mixed-mode system is really nothing more than a loosely-aligned union of clubs, entry of any new club into an existing league requires the vote of existing club owners. MLB, for example, requires "[t]he vote of three-fourths of the Major League Clubs . . . for the approval of . . . expansion by the addition of a new Club or Clubs."[101] Although in most other contexts MLB votes are decided by a mere majority, MLB enforces a heightened voting standard in the context of entry, because MLB clubs recognize the need to be extra careful; this ensures new clubs are reputable.[102]

When clubs vote on entry, existing clubs consider various factors about who to select as new ownership. Clubs always seek to exclude buyers that lack financial resources to amply invest in

---

(mentioning that the New York Jets set an NFL record price when the club was sold in 2000 for $635 million).

[99] *Cf.* COZZILLIO ET AL., *supra* note 11, at 24.

[100] *See id.* ("A collateral business concern faced . . . concerns the situation of a member club whose owner is in severe financial distress, whether that distress is caused by the club's performance or unrelated financial problems. The business of the team may be severely disrupted as the owner seeks a solution to his or her financial problems."); Richard Alm, *Big Chill Ahead in the NHL?*, THE DALLAS MORNING NEWS, Feb. 1, 2003, at 1B; *see generally* Mid-South Grizzlies v. NFL, 720 F.2d 772 (3rd. Cir. 1983) (Memphis Grizzlies football franchise in the defunct World Football League unsuccessfully sued for entrance into the NFL). Note, however, that other, less legitimate reasons for steep entry fees may stem from purported advantages to keeping the number of teams in the league below the market rate to ensure premium pricing on franchise sales, as well a local government funding for new stadiums. *See* Marc Edelman, *How to Curb Professional Sports' Bargaining Power Vis-à-Vis the American City*, VA. SPORTS & ENT. L.J. 280, 290 (2003) ("Modern sports leagues maintain excessive demand by keeping a supply of viable host cities on hold so that current host cities, absent long-term agreements with teams, are always in the position of having to accept a team owners' demands or else risk losing that team.") (internal citations omitted) [hereinafter Edelman, *Curb Bargaining Power*].

[101] MLB CONST., art. V, § 2(b)–2(b)(1).

[102] *See* COZZILLIO ET AL., *supra* note 11, at 24 ("[E]very member club may be adversely affected by commercial and public relations errors committed by a single member club.").

their clubs, as well as buyers with controversial character traits.[103] On occasion, leagues have also sought to exclude sales to prospective owners for less socially acceptable reasons, such as their ethnicity or sociopolitical views.[104]

Finally, of note, among the four premier American sports leagues, NFL clubs impose the strictest restrictions on potential new ownership. In addition to excluding certain prospective owners based on financial resources and character traits, the NFL also seeks to prevent the sale of clubs to corporate buyers and public buyers (with a special exception for the Green Bay Packers).[105] The NFL also has sought to forbid any ownership structure where the primary investor in a club would own less than 51% of that club, as well as any cross-ownership arrangement where the primary investor would own an interest in another sports team.[106] This last league rule has been found unlawful in at least one instance; however, it has not been removed from the league bylaws.[107]

## C. Potential for Exit of Existing Clubs

Beyond governing entry, mixed-mode sports leagues also establish rules governing club exit.[108] One way that leagues govern exit is by requiring an affirmative vote among clubs before

---

[103] *Cf.* Piazza and Tirendi v. MLB, 831 F.Supp. 420, 422 (E.D. Pa. 1993).

[104] In the early 1990s, two prospective buyers of the San Francisco Giants contended that the MLB denied their bid to purchase a baseball club based on their Italian-American heritage. *See id.* at 422–23. Similarly, world-famous baseball owner Bill Veeck contends that in 1944 he was denied the opportunity to purchase the Philadelphia Phillies baseball club because he intended to break the race barrier in baseball, stocking the club entirely with African-American players. BILL VEECK & ED LINN, VEECK AS IN WRECK 171–72 (Univ. Chi. Press 2001).

[105] *See* Packers.com, Team: Executive Committee, http://www.packers.com/team/executive_committee (last visited Feb. 7, 2008) ("[T]he Green Bay Packers are a team and an organization unique in both structure and accomplishment. They represent—from an organizational standpoint—the only publicly owned franchise in the 32-team NFL."); *see also* Daniel Kaplan, *Fight League Going Public in Reverse Merger,* STREET & SMITH'S SPORTS BUS. J., Sept. 18, 2006, at 6 (referring to the Green Bay Packers as the only publicly owned sports club).

[106] *See* COZZILLO ET AL., *supra* note 11, at 16; Mason, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 57.

[107] *See* N. Am. Soccer League v. NFL, 670 F.2d 1249, 1262 (2d Cir. 1981).

[108] *See infra* notes 109–15 and accompanying text.

any club may be sold, as well as requiring a vote before any club may relocate or disband.[109]  For example, the MLB Constitution states that "[a] Major League Club may withdraw from [MLB] only with the approval of three-fourths of all Major League Clubs, subject to such terms and conditions as the Commissioner may require."[110]  According to at least one court opinion, however, sports clubs, despite contrary wording in certain league agreements, always have the right to secede.[111]

In addition to "voluntary exit," leagues also retain the contractual right to terminate a club's membership involuntarily if a club violates an important league rule.  The MLB Constitution, for example, includes a separate section pertaining to "involuntary termination," which allows "with the approval of three-fourths of all Major League Clubs" for MLB to terminate the membership of any other club.[112]  Pursuant to the MLB Constitution, there are twelve types of wrongful conduct that would allow MLB clubs to involuntarily terminate another club, including the following examples: "allow[ing] gambling of any kind upon its grounds,"[113] "fail[ing] or refus[ing] to comply with any requirement of the Commissioner,"[114] and "[f]ail[ing] or refus[ing] to fulfill [their] contractual obligations."[115]

Given the possibility of clubs involuntarily terminating one another, as well as the possibility of clubs seceding, the mixed-mode system operates very differently from the league-based common property system.  Because clubs retain at least a limited right to leave the league, as well as a right to require others to leave, club interests are not intertwined with one another in any complete way.

---

[109]  *See, e.g.,* Jon Morgan, *Modell Agrees to Sell Ravens,* BALTIMORE SUN, Dec. 20, 1999, at 1A; MLB CONST., art. V, § 2(b)(2), (3), (8).

[110]  MLB CONST., art. VIII, § 3.

[111]  *Chicago Bulls II,* 95 F.3d 593, 599 (7th Cir. 1996) ("Yet, the 29 clubs, unlike GM's plants, have the right to secede . . . and rearrange into two or three leagues.").

[112]  MLB CONST., art. VIII, § 4.

[113]  *Id.* § 4(c).

[114]  *Id.* § 4(f).

[115]  *Id.* § 4(j).

## IV. Allocating Property Rights in the Mixed-Mode System

Based upon the contractual underpinnings of the mixed-mode system, the clubs in this system choose to share certain property rights at the league level, while maintaining other property rights privately at the club level.[116]  Sports clubs balance between these two interests along five different revenue streams: (1) individual gate receipts and other fan-related revenues; (2) corporate proceeds; (3) broadcast revenues; (4) licensing/merchandising fees; and (5) Internet/new media revenues.[117]

### A.  *Mixed-Mode Allocation of Gate Receipts and Other Stadium Revenues*

The property right to gate receipts and other fan-related revenues (e.g., parking and concession sales) is the right to the money fans pay to attend a sporting event.  Mathematically, gate receipts are equal to game attendance multiplied by average ticket price.[118]  In today's economy, gate receipts represent slightly less than 40 percent of overall sports league revenues.[119]

Historically, gate receipts have been allocated in various ways, even within a single league structure.[120]  For example, when the National League was founded in 1876, home clubs retained all of

---

[116]   *See* Levin et al., *in* The Business of Sports, *supra* note 4, at 67–68 (discussing the sources of revenue).

[117]   Leeds & von Allmen, *supra* note 5, at 73 (mentioning all of the revenue streams except for Internet/new media).

[118]   Quantitatively the simplest equation for calculating gate revenues is $Rg = p*q$, where $Rg$ represents "gate revenues," $p$ represents "average price per ticket" and $q$ represents "quantity of tickets sold." *Id.* at 75.  However, the true cost of "gate receipts" also includes the cost of parking. *See Bring $12 to Park, or Buy in Advance,* Street & Smith's Sports Bus. J., Apr. 10, 2006, at 22 (discussing the decision of MLB's Atlanta Braves to increase the cost of parking to $12 per car).

[119]   According to *Financial World,* for the 1996 season, gate receipts on average represented 39.93% of a sports clubs' revenue in the four premier American sports leagues. Leeds & von Allmen, *supra* note 5, at 74 (citing Michael K. Ozanian, *Scoreboard Valuation,* Financial World, June 17, 1997 at 46–50).  Meanwhile, more recently, a *Sports Business Journal* article reported that for the 2005 season, MLB clubs earned $1.8 billion of their $4.8 billion in revenues from gate receipts (37.5% of total revenues). Eric Fisher, *MLB Season Preview: Bud Selig Leads MLB's Revenue Rally,* Street & Smith's Sports Bus. J., Apr. 3, 2006, at 1, 23–27.

[120]   *See infra* notes 121–27 and accompanying text.

their gate receipts as a form of private property.[121]  A few years later, NL clubs agreed to reallocate gate receipts, granting only 70 percent of these proceeds to the home club, and allocating 30 percent to the visiting club.[122]  By 1950, National League clubs had again voted to change how it allocated gate receipts, this time with the home club's revenue increased to 86 percent and the visiting club's revenue reduced to 14 percent.[123]  This approach increased the home club's incentive to attract new fans and improve the condition of its ballpark.[124]  Today, MLB still considers gate receipts as a form of local revenue; however, 34 percent of gate receipts are now shared equally amongst all clubs.[125]

Other sports leagues have chosen to implement different allocations of gate receipts.  The NFL, for example, traditionally allocates gate receipts more evenly, with approximately 60 percent designated for the home club and approximately 40 percent placed in a "visitor's" pool, which is split equally among all clubs.[126]  Meanwhile, the NBA and NHL clubs allocate regular-season gate receipts as entirely private property, belonging completely to the home club.[127]

Although each of the premier American sports leagues allocate gate receipts in a somewhat different manner, the way in which each of these leagues allocate gate receipts indicates lack of

---

[121]  *See generally* SCULLY, *supra* note 33, at 11.

[122]  *See id.*  With the implementation of revenue sharing of gate receipts, the new gate revenue equation for a respective club became: $Rg = \acute{a} * Rh + (1 - \acute{a}) * Ra$, where Rg represents gate revenues, Rh represents average revenue from home games, Ra represents average revenue from away games and á represents the revenue share retained by the home club. *See* LEEDS & VON ALLMEN, *supra* note 5, at 75.

[123]  *See* SCULLY, *supra* note 33, at 11.

[124]  *See id.*

[125]  *See* MAJOR LEAGUE BASEBALL BASIC AGREEMENT, art. XXIV (2003–06) (The Revenue Sharing Plan).

[126]  *See* Mid-South Grizzlies v. NFL, 720 F.2d 772, 776 (3d Cir. 1983); N. Am. Soccer League v. NFL, 670 F.2d 1249, 1252 (2d Cir. 1982); LEEDS & VON ALLMEN, *supra* note 5, at 80; Lowry, *supra* note 1, at 111.

[127]  *See* DOWNWARD & DAWSON, *supra* note 76, at 48; Mason, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 57; Sheehan, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 48. Nevertheless, in both the NBA and NHL, gate receipts from post-season games are shared amongst clubs. *See* John Lombardo, *Leagues Cut into Clubs' Final Revenues*, STREET & SMITH'S SPORTS BUS. J., June 12, 2006, at 3.

"complete unity of interest" amongst clubs in this area of operation.[128] For example, in the NFL, even though the New York Giants football club earns money when consumers attended any NFL game, the New York Giants earn even more money when consumers attend New York Giants games rather than the games of a rival club (for example, the New York Jets, or even a club in a different city).[129] As a result, even though each sports club has a strong interest in promoting the overall league, each club has an even greater interest in first promoting itself, even at the expense of rival league-members.[130]

### B.  Mixed-Mode Allocation of Corporate Proceeds

A second stream of sports rights are corporate proceeds. Corporate proceeds include local sponsorship agreements (including naming rights agreements) and luxury suites.

### 1.  Local Sponsorship/Naming Rights Agreements

Local sponsorship and naming rights agreements are long-term corporate arrangements under which a sports club promises to name either a stadium/arena or a specific part of a stadium/arena after a sponsoring company, or where a club agrees to help market a particular product more generally.[131]  Local sponsorship and

---

[128]  Copperweld Corp v. Independent Tube Corp., 467 U.S. 752, 771 (1984).

[129]  For discussion of clubs in the same league competing against one another for gate receipts when those clubs are in close proximity to one another, see *N. Am. Soccer League*, 670 F.2d at 1258 (mentioning this competition between NFL clubs for fans at least where there are two or more teams located within a home territory) and *Mid-South Grizzlies*, 720 F.2d at 787 (noting that "[c]onceivably within certain geographic submarkets two league members compete with one another for ticket buyers."). For discussion of fans purchasing tickets for a sporting contest located outside of their particular geographic region, signaling perhaps a wider competition amongst sports clubs for gate receipts, see *Growing Pains for Online Ticketing*, STREET & SMITH'S SPORTS BUS. J., Oct. 29, 2007, at 6 (quoting online ticketing company Paciolan's CEO Dave Butler about the importance of online ticketing options to meet more than just the needs of "a very limited geographic area.").

[130]  *See generally* Sullivan v. NFL, 34 F.3d 1091, 1098 (1st Cir. 1994) (describing intra-league competition within finite geographic markets); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1390 (9th Cir. 1984) (mentioning independent NFL management policies exist at the club level regarding "ticket prices"); *Mid-South Grizzlies*, 720 F.2d at 787 (describing intra-league competition within finite geographic markets).

[131]  *See generally* LEEDS & VON ALLMEN, *supra* note 5 at 81.

naming rights have become especially popular in recent years among certain types of companies (banks, utilities and packaged goods companies), which seek to build brand equity amongst sports fans by associating themselves with a given team.[132] While minor-league stadium naming rights may sell for as little as $2 million per year, and simple sponsorship agreements may sell for even less,[133] the market price for naming rights in premier American sports stadiums is substantially higher and rising exponentially.[134]  For example, just four years ago, the most lucrative naming rights agreement was the Fed Ex sponsorship agreement of the Washington Redskins football stadium, which Fed Ex signed for a 29-year period at a price of $200 million ($6.9 million per year).[135]  In 2007, however, MLB's New York Mets signed a 20-year $400 million naming rights agreement with Citigroup, granting Citigroup naming rights to the New York Mets' new stadium ($20.0 million per year); the NBA's New Jersey Nets signed a similar agreement with the London-based financial institution Barklays PLC for naming rights to the Nets' new Brooklyn, NY arena ($20.0 million per year).[136]

     As with gate receipts, in the context of local sponsorship and naming rights agreements, individual clubs lack "complete unity of interest."[137]  The market for both sponsorships and stadium naming rights is national (if not international), and clubs actively compete against one another to obtain the most profitable of these agreements.[138]  Because clubs almost always keep as private

---

[132] *See* Jon Morgan, *Familiar Names Popping Up on Stadiums*, THE BALTIMORE SUN, Feb. 17, 2003, at 1D.

[133] Examples of simple sponsorship rights include for example Anheuser-Busch's agreement to sponsor the Arizona Cardinals football stadium, under which Anheuser-Busch gets permanent electronic signs in the stadium, and Heinz's agreement where it pays to place two 35 foot-long ketchup bottle icons on the scoreboard. *See, e.g.*, Terry Lefton, *Anheuser-Busch Takes Big Role in Cardinals' New Football Stadium*, STREET & SMITH'S SPORTS BUS. J., Mar. 20, 2006, at 9.

[134] *See* LEEDS & VON ALLMEN, *supra* note 5, at 81.

[135] *Id.*

[136] Terry Lefton, *CAA Hired to Land Sponsors for the Yankees*, STREET & SMITH'S SPORTS BUS. J., Oct. 1, 2007, at 1; John Lombardo, *Barklays-Nets: A Brand Grows in Brooklyn*, STREET & SMITH'S SPORTS BUS. J., Jan. 22, 2007, at 1.

[137] Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).

[138] *See, e.g.*, Eric Fisher, *Mets Ask $10M a Year to Name New Ballpark*, STREET & SMITH'S SPORTS BUS. J., Apr. 10, 2006, at 4 (discussing how Mets owner Jeff Wilpon

property the profit they derive from these agreements, clubs compete vigorously, sometimes even against clubs within their league. The competition is especially intense for full stadium/arena naming rights because corporations generally do not purchase naming rights for more than one stadium/arena.

### 2. Luxury Suites

Luxury suites, meanwhile, provide corporate fans with a premium game experience.[139] Equipped with food, televisions, and premium services, luxury suites allow clubs to receive up-front revenues from corporate clients on an annual basis, irrespective of the clubs' on-the-field performance.[140] Clubs are increasingly demanding that cities provide them with new stadiums/arenas, equipped with 50 to 100 luxury suites.[141] These suites are in turn sold to corporate clients for upwards of $100,000 per season.[142] For example, at San Diego's PETCO Park, Padres management initially sold luxury suites to corporate sponsors at a one-time $90,000 membership fee, plus $160,000 in annual rent.[143] Meanwhile, at the Staples Center, which hosts the NBA's Los

---

believes that if the Yankees were to sell naming rights, the Mets and Yankees would be in competition for sponsors); Don Muret, *Naming Rights Shoppers Want to Know Where A's Park Will Be*, STREET & SMITH'S SPORTS BUS. J., Oct. 9, 2006, at 14 (explaining that the city and exact location of a new ballpark affects how much a corporation is willing to pay to put its name on a specific stadium, and implying that individual clubs compete with one another to reach naming rights agreements with those major corporations).

[139] LEEDS & VON ALLMEN, *supra* note 5, at 81. When a club sells a luxury box, it first assigns a gate value to the luxury box ticket and treats that portion of the proceeds as part of gate revenues. *Id.* After subtracting out the gate value, the remainder value of the luxury box ticket is what is considered as the revenues derived from the luxury box. *Id.*

[140] *See generally id.*

[141] *See* Edelman, *Curb Bargaining Power*, *supra* note 100, at 280–82 (2003). Cities that provide stadiums to clubs, however, sometimes then share the revenue derived from those boxes; for example, the New York Mets share 50 percent of the revenue from Shea Stadium's luxury boxes with the city. *See* Eric Fisher, *supra* note 138, at 4.

[142] *See* John Lombardo, *Knicks' Premium Seats Carry Steepest Price*, STREET & SMITH'S SPORTS BUS. J., Oct. 29, 2007, at 4 [hereinafter *Knicks*]; John Lombardo, *Pistons Selling Newest Suites at Lower Prices*, STREET & SMITH'S SPORTS BUS. J., Mar. 6, 2006, at 4 [hereinafter *Pistons*]; Don Muret, *AEG Print Ads Tout Staples Premium Seats*, STREET & SMITH'S SPORTS BUS. J., Oct. 15, 2007, at 5.

[143] *See* Jonathan Heller, *San Diego Baseball Team Markets Ballpark Luxury*, SAN DIEGO UNION TRIB., Dec. 13, 2002, *available at* http://findarticles.com/p/articles/mi_hb5553/is_200212/ai_n21722523.

Angeles Lakers and Los Angeles Clippers, luxury suites sell for an annual price of up to $400,000 per year,[144] and at Madison Square Garden, which hosts the NBA's New York Knicks and the NHL's New York Rangers, "VIP boxes," which are similar to luxury suites, sell for up to $800,000 per year.[145]

Revenues from luxury suites in all four premier American sports leagues remain primarily private property, indicating interests amongst the clubs to compete against one another in the sale of these boxes.[146] The competition amongst clubs for luxury boxes is very similar to that for gate receipts, except luxury box competition is arguably even more intense because individual clubs keep all (rather than part) of their luxury suite revenues.[147] This again indicates lack of any "complete unity of interest."[148]

## C. *Mixed-Mode Allocation of Television/Radio Broadcast Revenues*

A third important property right is television/radio broadcast revenues.[149] On a league-wide basis, television broadcast revenues range from as high as $2.4 billion per year in the NFL to

---

[144] *See* Don Muret, *supra* note 142, at 5.

[145] *See Knicks, supra* note 142, at 4.

[146] *See* COZZILLIO ET AL., *supra* note, 11 at 13.

[147] *See* L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1390 (9th Cir. 1984) (mentioning independent NFL management policies exist at the club level regarding "luxury box seats"); *cf.* Mid-South Grizzlies v. NFL, 720 F.2d 772, 776 (3d Cir. 1983) (discussing competition amongst sports clubs for certain local revenues).

[148] Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).

[149] *See generally* LEEDS & VON ALLMEN, *supra* note 4, at 77. Radio broadcast rights represent only a small percentage of total broadcast dollars. *See* PHIL SCHAAF, SPORTS MARKETING: IT'S NOT JUST A GAME ANYMORE 203–04 (1995). Radio broadcast fees, which are not addressed further in this article, are usually negotiated on the club level. *See generally id.* Amongst MLB clubs, the New York Yankees and Boston Red Sox have the most lucrative radio agreements, valued at $10–$12 million per year. *See* Andy Grossman, *Red Sox Seek MLB's Largest Radio Rights Deal*, STREET & SMITH'S SPORTS BUS. J., Mar. 13, 2006, at 7. But in the NFL, as of 1994, the Chicago Bears had the most lucrative radio rights deal at $4.5 million/year. *Id.* (citation omitted). In addition, many sports clubs are buying radio stations to avoid what they consider unprofitable radio deals. *See id.* at 7; Andy Grossman, *Radio Executives Worry Over Trend of Sports Teams Buying Stations*, STREET & SMITH'S SPORTS BUS. J., Feb. 20, 2006, at 13. This mimics a longer-standing trend amongst a growing number of sports clubs to start their own cable television networks.

substantially less in other leagues, such as the NHL.[150]  These revenues are composed of both national and local payments.  In each of the four premier American sports leagues, local broadcast revenues are regarded as private property; whereas, national broadcast revenues are held in common and allocated evenly amongst the clubs.

Each of the four premier American sports leagues has adopted a different mix between nationally-broadcasted and locally-available games.  At one extreme, in the NFL, clubs sell *all* non-preseason television rights on a collectivized, national basis.[151]  At the other extreme, leagues such as MLB and the NHL permit individual clubs to negotiate the sale of most games to local networks.[152]

In the early days of television, member clubs in each of the four premier American leagues were undecided about whether to collectivize any broadcast rights, with some large market clubs seeming to prefer signing only local television contracts.[153]  The movement in favor of collectivizing at least some television rights began with the NBA packaging and selling of broadcast rights.[154]  MLB then followed with "Game of the Week,"[155] and by 1961

---

[150]  *See* FORT, *supra* note 4, at 79–81; LEEDS & VON ALLMEN, *supra* note 5, at 77; Andy Bernstein, *Networks Talk Tough on MLB TV Package*, STREET & SMITH'S SPORTS BUS. J., Apr. 10, 2006, at 3.  On average, the revenue in MLB, the NBA, the NHL and the NFL from various media sources surpassed gate revenues in 1997, accounting for 39 percent of total club revenues. *See Sports Club Valuations*, FORBES, Dec. 13, 1998 at 132; *see also* COZZILLIO ET AL., *supra* note 11, at 11; DOWNWARD & DAWSON, *supra* note 76, at 37.  In 2006, total MLB common media revenues, just from national broadcasts, was estimated at $814 million, with 51.2% of this national broadcast revenue coming from broadcast television contracts and 36.5% coming from a cable television contracts. *See* Eric Fisher, *supra* note 119, at 1, 23–27.

[151]  DENNIS R. HOWARD & JOHN L. CROMPTON, FINANCING SPORT 401 (2d ed. 2004).

[152]  *See FSN Hooks Marlins for All Telecasts*, STREET & SMITH'S SPORTS BUS. J., Feb. 27, 2006, at 7 (stating that the Florida Marlins sell 150 of their 162 baseball games through a local contract); *see also* COZZILLIO ET AL., *supra* note 11, at 13.

[153]  *See* Mason, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 56.

[154]  SCULLY, *supra* note 33, at 26; *see generally* Gary R. Roberts, *The Legality of the Exclusive Collective Sale of Intellectual Property Rights by Sports Leagues*, 3 VA. SPORTS & ENT. L.J. 53, 55 (2001).

[155]  Roberts, *supra* note 153, at 55 (explaining that "except for the one league-sold game each week, the individual teams were not precluded from selling rights to all of the other games. Thus, there was a pooling of rights for and exclusive collective selling of that one weekly game, but the rights sold were not exclusive for all league games").

both the American Football League and the NFL had national broadcast contracts.[156] Then, in 1964, the NFL agreed to sell its pooled broadcast rights to Columbia Broadcast System ("CBS") in a deal that generated over $1,000,000 in revenue per club—more money than any club had ever earned by selling its rights individually.[157]

The economic explanation for why individual clubs earned more money from collectively selling broadcast rights is based on a "pooling effect," which means that by pooling broadcasts, leagues eliminate interclub competition for broadcast rights, driving up the price for television stations to purchase these rights.[158] Stated otherwise, "[i]n negotiating pooled television rights . . . the League was able to keep bidding high for contracts with broadcasting and other companies, while eliminating the potential for clubs to compete against one another."[159] In doing so, some have argued that pooling has even allowed sports clubs to compete more effectively for the overall television programming dollar.[160]

Today, collectively selling at least some sports broadcast rights has become the industry standard based on the belief that collectivizing certain broadcast rights benefits all clubs, irrespective of market size,[161] and based on a limited exemption from antitrust law for joint conduct in this area, which is known as the Sports Broadcasting Act of 1961.[162]

---

[156] SCULLY, *supra* note 33, at 27.

[157] Mason, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 56.

[158] COZZILLIO ET AL., *supra* note 11, at 12–13; SCULLY, *supra* note 33, at 27.

[159] Mason, *in* THE BUSINESS OF SPORTS, *supra* note 4, at 56.

[160] *See, e.g., Chicago Bulls I*, 961 F.2d 667, 673 (7th Cir. 1992) ("As the NBA points out, sports is a small fraction of all entertainment on TV, and basketball a small fraction of sports televising.").

[161] *See generally* LEEDS & VON ALLMEN, *supra* note 5, at 83–84. *But see* FORT, *supra* note 4, at 82–83 (noting the one exception might be New York markets where the New York Yankees (MLB) slightly out-earned the New York Giants and Jets (NFL) in media revenues based on the Yankees' ability to capitalize on baseball's structure that allows for more local media in the broadcast mix).

[162] *See* Sports Broadcasting Act, 15 U.S.C. § 1291 (2000) ("The antitrust laws . . . shall not apply to any joint agreement by or among persons engaging in or conducting the organized profession team sports . . . by which any league of clubs . . . sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games . . . engaged in or conducted by such clubs."); *see also*

Nevertheless, the divergent interests of individual clubs in allocating broadcasting rights has often led to infighting about how many games to broadcast on national-versus-local television, as well as how to define local broadcast markets.[163]    Divergent interests have even led to issues about whether clubs may extend their local broadcast signals into competitor markets.[164]    For example, shortly after the Chicago Bulls basketball club began to broadcast their local games on WGN, a super station with broadcast signals extending throughout the entire United States, six years of litigation ensued between the Bulls and the rest of the NBA clubs over the legitimacy of the Bulls' broadcasting practices.[165]    In this particular context, the Bulls' interests were completely disjointed from those of most NBA clubs, as the Bulls' incentive was to maximize its personal broadcast revenue and national fan base; on the other hand, the remaining NBA clubs were concerned that the Bulls' approach would devalue their broadcasting revenues and comparative fan bases.[166]

---

COZZILLIO ET AL., *supra* note 11, at 13 ("Congress, through the Sports Broadcasting Act of 1961 and 1966, acceded to the NFL's request and granted certain sports leagues a limited antitrust exemption for purposes of negotiating league-wide, across-the-board sponsored television broadcasting packages."); *Chicago Bulls I*, 961 F.2d at 671 ("The Sports Broadcasting Act is special interest legislation, a single-industry exception to a law designed for the protection of the public.").

[163] *See* L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1390 (9th Cir. 1984) ("In certain areas of the country where two teams operate in close proximity, there is also competition for . . . local television and local radio revenues."); *Team-By-Team Business Previews*, STREET & SMITH'S SPORTS BUS. J., Oct. 23, 2006, at 35 (explaining the desire of the NBA's Dallas Mavericks basketball team to broadcast games in competition with the NBA's San Antonio Spurs and Dallas Mavericks).

[164] *See* Sullivan v. NFL, 34 F.3d 1091, 1098 (1st Cir. 1994) (finding that NFL clubs compete for "local broadcast revenues").

[165] *See Chicago Bulls II*, 95 F.3d 593, 599 (7th Cir. 1996); *Chicago Bulls I*, 961 F.2d at 669.

[166] *Chicago Bulls I*, 961 F.2d at 669 (explaining that the national broadcast of 30 Chicago Bulls television games on the WGN superstation "is a boon . . . to the Bulls owners . . . [b]ut it is a bane to the other clubs, which would prefer to have fans watch their contests rather than tune in the Bulls, who, thanks to Michael Jordan and Scottie Pippen . . . are the winningest and most popular team in the NBA.").
It is interesting to note that in both *Chicago Bulls I* and *Chicago Bulls II* the defendant NBA clubs sought to invoke the single entity defense; however, the facts in *Chicago Bulls I* and *Chicago Bulls II* are almost opposite of *Copperweld* because the defendants in the Chicago Bulls cases alleged that the plaintiff was also part of the single entity.    It is entirely nonsensical to conclude that a plaintiff and the defendants in a single lawsuit

Further, the different perspectives amongst these clubs were not grounded in mere philosophical ideology, but rather were based on differences in disparate economic incentives.[167] This again signals a lack of "complete unity of interest."[168]

### D. Mixed-Mode Allocation of Licensing/Merchandising Fees

Licensing/merchandising fees, the fourth important revenue stream, are fees from "reproducing an image, or portion thereof [of] any copyrighted property for a fee to the rights holder."[169] Currently, each of the four premier sports leagues allocate licensing/merchandising revenue by collectivizing individual club trademark rights into a trust and then licensing those trademark rights collectively through separately-formed "properties" arms.[170]

In 1963 the NFL became the first collection of sports clubs to allocate licensing/merchandising rights in this manner when it created NFL Properties as a joint venture to act on behalf of each of the individual NFL clubs.[171] By creating NFL Properties, the NFL now requires that any commercial enterprise, seeking to use any, or all, or some of the NFL club trademarks, license these trademark rights collectively from NFL Properties, rather than individually from specific football clubs.[172]

In recent years, licensing trademarks has become big business, as the properties arms of MLB, the NBA, the NFL, and the NHL

---

could combine to form a single entity, given that a party would never seek to sue itself; such a ruling "flies in the face of reason." Village of Key Bicayne v. Tesaurus Holdings, Inc., 761 So. 2d 397, 398 (Fla. App. 2000).

[167] *Cf.* Mid-South Grizzlies v. NFL, 720 F.2d 772, 776 (3d Cir. 1983) (mentioning conceivable competition amongst clubs for certain local broadcast revenues); Eric Fisher, *Is Liberty Media Right Fit for Braves?*, STREET & SMITH'S SPORTS BUS. J., May 1, 2006, at 3 (providing one of many examples of media conglomerate ownership of sports clubs).

[168] Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).

[169] SCHAAF, *supra* note 149, at 235.

[170] *See generally id.* at 236.

[171] *See* American Needle, Inc. v. New Orleans Saints, 496 F. Supp. 2d 941, 942 (N.D. Ill. 2007) (decision questionable on its merits); *see also* Roberts, *supra* note 153, at 59 (explaining that the precise legal steps of this transaction involved NFL clubs first establishing a subsidiary corporation called "NFL Properties, Inc.," and then all of the NFL member clubs transferring virtually exclusive rights in their trademarks and logos of the teams to an "NFL Trust" which NFL Properties managed).

[172] Roberts, *supra* note 154, at 59.

HeinOnline -- 18 Fordham Intell. Prop. Media & Ent. L.J. 920 2007-2008

have generated substantial revenues.[173]  By operating licensing departments collectively, properties arms of sports leagues build economies of scale in licensing/merchandising and avoid duplication of sales-staff resources.[174]  Additionally, clubs that collectivize their trademarks enjoy a purported increase in profits based on the "pooling effect," because would-be buyers of trademark licenses, which include both apparel companies and league-wide sponsors, cannot pit one club against another. Consequently, clubs are able to better compete to sell licenses against other forms of entertainment.[175]

Nevertheless, the broad-based practice of collectivizing certain licensing/merchandising rights is not firmly entrenched in the structure of the mixed-mode system, but rather serves merely as a loosely-bound feature of the system.  For example, in the NHL, despite clubs sharing equally in the revenues derived from licensing club trademarks to apparel manufacturers, the Atlanta Thrashers forego about $75,000 annually in private concession-stand revenue by not allowing their concessionaires to sell licensed apparel of rival NHL clubs in their stadium.[176]  In addition, some of the sports' owners that had purchased their clubs before the

---

[173]  *See id.* at 59; SCHAAF, *supra* note 149, at 236 (stating the four premier sports merchandise sellers in gross sales dollars are Major League Baseball Properties ($3.5 billion in gross sales in 1993), NFL Properties ($3.0 billion in gross sales in 1994), NBA Properties ($2.5 billion in gross sales in 1993) and NHL Properties ($1.0 billion in gross sales in 1993.)).

[174]  *See* Roberts, *supra* note 154, at 66 (explaining that collectivized selling of licensing rights "[r]elieves each team of the burden of having to employ a staff of people with the legal and business expertise to negotiate, draft, and implement [agreements]" and "can be done more cheaply and efficiently by a central league staff of such experts with substantial experience in this area").

[175]  *See* Levin et al., *in* THE BUSINESS OF SPORTS, *supra* note 4, at 65 ("Competition for the sports entertainment dollar, and for the sport fan's attention, is increasingly intense."); *cf.* Broad. Music Inc. v. CBS, Inc., 441 U.S. 1 (1979) (finding cooperation amongst competitors in arranging blanket licensing of certain copyrighted songs might be pro-competitive within the scope of the greater entertainment market).

[176]  *See Thrashers Offer to Swap Jerseys*, STREET & SMITH'S SPORTS BUS. J., Jan. 30, 2006, at 30; *see also* John Lombardo, *supra* note 127, at 3 (explaining that even though licensing rights are shared equally amongst NHL clubs, during the regular season individual clubs keep concession revenues as private property, even where these revenues involve the resale of licensed jerseys).

forming of properties arms periodically attempt to reassert personal property rights over their marks.[177]

In the past fifteen years, two sports clubs—the NFL's Dallas Cowboys and MLB's New York Yankees—have litigated against the full collectivization of club marks.[178] Presumably, at the time of conflict, either club could have threatened to leave their respective league and reclaim their club marks as entirely private property. However, no club could really make good on such a threat without a guarantee that other clubs would follow.

Although both the Cowboys and Yankees eventually settled their disputes, in each instance these disputes in-and-of themselves amplify the strain of interests, as well as the lack of "complete unity," that persists even in the licensing/merchandising area of sports business.[179]

### E.    Mixed-Mode Allocation of Internet/New Media Revenues

Finally, the newest form of property rights in professional sports involves Internet/new media rights, which includes the potential right to broadcast sports contests digitally over broadband, the right to sell sports-related videos online, and the right to control the trade names associated with Internet properties.[180]    The number of American households with broadband Internet access has risen from under 10 million in the year 2000 to over 70 million today.[181]    As a result, according to

---

[177]  *See* COZZILLIO ET AL., *supra* note 11, at 15 ("Certain team owners may believe that they can generate more revenue from local sponsors of their team . . . marks and logos than their *pro rata* share of the revenue generated by an exclusive central league marketing organization.").

[178]  Dallas Cowboys owner Jerry Jones prepared to challenge in court the NFL Trust and the NFL's pooling of all league and team marks and logos as a violation of antitrust laws. *Id.* George Steinbrenner planned to do the same against MLB. *Id.* (citation omitted).

[179]  *N.F.L. Settles with Cowboys*, N.Y. TIMES, Dec. 14, 1996, at 32; *see also* Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984).

[180]  *See* Eric Fisher, *New Site First Step in NHL Digital Makeover*, STREET & SMITH'S SPORTS BUS. J., Sept. 18, 2006, at 1, 31; John Lombardo & Eric Fisher, *NBA Pumps Time, Cash into Web*, STREET & SMITH'S SPORTS BUS. J., Sept. 25, 2006, at 1, 60; *New Media Opens Door on New Revenues*, STREET & SMITH'S SPORTS BUS. J., May 1, 2006, at 20A (Sports Emmy Awards).

[181]  *See Predictions: What Lies Ahead on the Sports Media Landscape*, STREET & SMITH'S SPORTS BUS. J., Mar. 27, 2006, at 40 (Graph: Tracking Growth of Broadband

Sean McManus, president of CBS News and Sports, Internet/new media revenues are "[t]he fastest growing segment" of sports business.[182]  Specifically, for MLB, this business segment has grown from $36 million in revenues in 2001 to an estimated $300 million in 2006.[183]

As with all new forms of property rights, Internet/new media rights began in the dominion of individual clubs, with clubs hiring their own staff of Internet marketing experts to help build their respective brands.[184]  Recently, however, Internet/new media rights have begun to shift to common property.  In 1997, the NBA became the first premier American league to shift Internet/new media rights out of the realm of private property and into control by the commons.[185]  Three years later, in the year 2000, MLB and the NFL each adopted similar Internet/new media policies that shifted control over these property rights into the common sector.[186]  Very recently, the NHL attempted to implement a similar policy, with clubs voting 25-3 in favor of collectivizing Internet/new media rights (with one absence and one abstention).[187]

Nevertheless, there still is not "complete unity of interest" with respect to Internet/new media revenues.  For example, Madison

---

Households) (also noting the increase in U.S. households that subscribe to the Internet from just under 50 million in the year 2000 to over 75 million today).

[182] *New Media, supra* note 179.

[183] *See* Eric Fisher, *supra* note 119, at 1, 23–27.

[184] *See supra* notes 117–79 and accompanying text; *see also Rangers' David Looks to Past to Upgrade Team's Web Site*, STREET & SMITH'S SPORTS BUS. J., Oct. 16, 2006, at 12.

[185] WEILER & ROBERTS, *supra* note 50, at 677.

[186] *Id.*; *see also* Terry Lefton, *NFL Taking Internet In-House: With No Big Offer, League Thinks Long Term*, STREET & SMITH'S SPORTS BUS. J., Oct. 23, 2006, at 1; Terry Lefton & Eric Fisher, *NFL Takes Time to Study Net Rights*, STREET & SMITH'S SPORTS BUS. J., May 1, 2006, at 6.

[187] Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 1, Madison Square Garden, L.P. v. NHL, No. 07 Civ. 8455, 2007 WL 3254421 (S.D.N.Y 2007); *see also* Sara Stefanini, *In Sports, Off-Court Battles Range Over League Power*, COMPETITION 360, Oct. 26, 2007.  Even before the NHL passed this formal policy, the NFL in September 2006 announced a role-out of the new NHL.com site, which featured "a deep offering of video content, a sharply heightened emphasis on fantasy gaming and social networking, and a constant showcase of individual players." Fisher, *supra* note 179, at 1, 31.

Square Garden LP, the parent company of the New York Rangers, recently filed a lawsuit against the NHL, arguing that "by seeking to control the competitive [Internet/new media] activities of independent businesses in ways that are not necessary to the functioning of [the NHL] joint venture, the NHL has become an illegal cartel."[188]   The Rangers contended that "MSG today uses [the Rangers website] as a competitive tool to generate and maintain fan interest in the Rangers *in competition with other NHL teams.*"[189]

Although the Rangers were ultimately denied their motion for preliminary injunctions on other grounds,[190] to the extent that the Rangers seek to compete against other hockey clubs to build fan interest, there simply, by definition, cannot be "complete unity of interest" amongst NFL clubs.[191]

---

[188]   Complaint for Injunctive Relief at ¶ 6, Madison Square Garden, L.P. v. NHL, No. 07 Civ. 8455, 2007 WL 3254421 (S.D.N.Y. 2007).

[189]   *Id.* (emphasis added).

[190]   Madison Square Garden, L.P. v. NHL, No. 07 Civ. 8455 (LAP), 2007 WL 3254421, slip op. at *8 (S.D.N.Y. Nov. 2, 2007) (finding the claim likely failed under the Rule of Reason); *cf.* Standard Oil Co. v. U.S., 221 U.S. 1, 31 (1911) (explaining that joint ventures reviewed under the Rule of Reason are permitted under this standard where their pro-competitive benefits outweigh anticompetitive harm); E. THOMAS SULLIVAN & JEFFREY L. HARRISON, UNDERSTANDING ANTITRUST LAW AND ITS ECONOMIC IMPLICATIONS 150 (3d ed. 1998) ("Because joint ventures have the potential of producing benefits as well as costs, courts analyze them under the rule of reason, weighting the economic efficiencies against the actual costs of the venture."); *see also id.* at § 4.11.

[191]   Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984); *see also Madison Square Garden, L.P.*, 2007 WL 3254421, slip op. at *8 (finding the NHL operates as a "joint venture" and not a single entity).   It is important to note that, in *Madison Square Garden*, much as in *Chicago Bulls I* and *Chicago Bulls II,* the defending league has responded with the nonsensical argument that the club's suit fails based on the "single entity" defense.   As explained above, *see supra* note 166, the single-entity defense, even if otherwise appropriate, simply cannot apply where the plaintiff in a case is part of the unit that the defendants argue composes a single entity, because the mere fact that one member of the alleged single-entity unit is suing other members in itself indicates lack of "complete unity of interest." *Copperweld*, 467 U.S. at 771.   A truly independent party would never seek to sue itself; such an action "flies in the face of reason." Village of Key Bicayne v. Tesaurus Holdings, Inc., 761 So. 2d 397, 398 (Fla. App. 2000).

CONCLUSION

Over the past twenty years, most American courts have correctly concluded that premier American sports leagues are not "single entities" because clubs in these leagues maintain too many private property rights.[192]    Although one recent court has challenged this notion,[193] the overwhelming weight of evidence indicates that the refusal to grant a "single entity" exemption to premier American sports leagues is well justified.[194]

Upon reviewing the economic structure of the four premier sports leagues that operate in a mixed-mode system, there is little doubt that clubs in these leagues lack "complete unity of interest" in each of the following areas: (1) individual gate receipts (including other stadium revenues); (2) corporate proceeds; (3) broadcast revenues; (4) licensing/merchandising fees; and (5) Internet/new media revenues.[195]    Moreover, when looking at these leagues in the gestalt, none of them has anything close to the "complete unity of interest" needed to invoke a "single entity" defense.[196]

Presuming that federal courts continue to properly reject the "single-entity" defense in the realm of premier American sports, the business practices of each of the premier American sports leagues will remain subject to Section One of the Sherman Act, just like any other form of business joint venture.    In other words, beyond professional sports' limited antitrust exemptions under the Sports Broadcasting Act of 1961[197] and the Curt Flood Act of

---

[192]    *Copperweld*, 467 U.S. at 771.

[193]    *See generally* American Needle, Inc. v. New Orleans Saints, 496 F.Supp. 2d 941 (N.D. Ill. 2007).

[194]    Edelman, *Single Entity Ruling*, *supra* note 11, at 4, 12.

[195]    *Copperweld*, 467 U.S. at 771; *see also supra* notes 117–91 and accompanying text.

[196]    *Copperweld*, 467 U.S. at 771; *see also* Sullivan v. NFL, 34 F.3d, 1091, 1099 (1st Cir. 1994) ("NFL member clubs compete in several ways off the field which itself tends to show that the teams pursue diverse interests and thus are not single enterprises under §1."); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1390 (9th Cir. 1984) (referencing competition amongst clubs more generally for fan support).

[197]    Sports Broadcasting Act, 15 U.S.C. § 1291 (2000); *see also supra* note 162 and accompanying text.

1998,[198] premier American sports clubs would be allowed to reach agreements with one another only if courts find these agreements pro-competitive.[199]

Not only does denying the "single entity defense" conform to the Supreme Court's earlier holding in *Copperweld*, but this conclusion is sound public policy. In recent years, premier American sports clubs have become extraordinarily profitable based on their unique property rights system. It would be a twisted sense of irony if the unique property-rights system that has made professional sports so profitable also were to provide them with a loophole to avoid complying with antitrust principles.[200]

By rejecting the notion that premier American sports leagues are "single entities," federal courts importantly retain the ability to regulate premier American sports clubs under Section One of the Sherman Act. As a result, American consumers remain protected

---

[198]  15 U.S.C. § 26b (2000) (defining the status of baseball's limited exemption from antitrust law). The Congressional Record underlying the Curt Flood Act explains:

> It is the purpose of this legislation to state that [MLB] players are covered under the antitrust laws (i.e., that MLB players will have the same rights under the antitrust laws as do other professional athletes, e.g., football and basketball players), along with a provision that makes it clear that the passage of this Act does not change the application of the antitrust laws in any other context or with respect to any other person or entity.

Curt Flood Act of 1998 P.L. 105-297, §2, 112 Stat. 2824 (statement of Rep. Hyde). For further discussion of the Curt Flood Act, as well as the case law underlying baseball's historic antitrust exemption, see Edelman, *Minnesota Twins, supra* note 42, at 47–54, 59–62.

[199]  *See* SULLIVAN & HARRISON, *supra* note 189, at § 4.11 (explaining the Rule of Reason in the context of joint ventures); *see also* Standard Oil Co. v. U.S., 221 U.S. 1, 31 (1911).

[200]  *See* N. Am. Soccer League v. NFL, 670 F.2d 1249, 1257–58 (2d Cir. 1982) (rejecting the application of the single entity defense by explaining that "[t]o tolerate such a loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects. . . . The sound and more just procedure is to judge the legality of [restraints amongst sports clubs] according to well-recognized standards of our antitrust laws rather than permit their exemption on the ground that since they in some measure strengthen the league competitively as a 'single economic entity,' the combination's anticompetitive effects must be disregarded.").

HeinOnline -- 18 Fordham Intell. Prop. Media & Ent. L.J. 926 2007-2008

2008]     *PROPERTY-RIGHTS THEORY IN PROFESSIONAL SPORTS*     927

against the risks of anti-competitive conduct within the
professional sports industry.[201]

---

[201]   *See* SULLIVAN & HARRISON, *supra* note 189, at § 4.11 (explaining the Rule of Reason
in the context of joint ventures); *see also Standard Oil Co.*, 221 U.S. at 31; *L.A. Mem'l
Coliseum Comm'n*, 726 F.2d at 1390 ("Of course, the singular nature of the NFL will
need to be accounted for in discussing the reasonableness of the restriction . . . but it is
not enough to preclude § 1 scrutiny."); *N. Am. Soccer League*, 670 F.2d at 1257
(explaining that denying the single-entity defense requires that sports leagues' conduct
undergo review under the Rule of Reason).

*Notes & Observations*