# New York Law Journal

Select '**Print**' in your browser menu to print this document.

**©2008 New York Law Journal Online**
Page printed from: http://www.nylj.com

Back to Article

## Single-Entity Sports Ruling: 'Needle' in a Haystack

Marc Edelman
01-02-2008

In the well-publicized July 11, 2007 opinion *American Needle v. New Orleans Saints,* the U.S. District Court for the Northern District of Illinois ruled that in the market for licensing team trademarks, the National Football League (NFL) is a single entity, exempt from §1 of the Sherman Act.[1]

In a vacuum, this opinion seems to support a broad-based antitrust exemption for the business practices of sports leagues. However, when read in conjunction with existing case law, the *American Needle* holding is as thin as a needle in a haystack. The opinion is not supported by previous case law, nor has it been followed by subsequent cases. Therefore, the *American Needle* holding is unlikely to impact future sports-antitrust cases, save perhaps the rare U.S. Court of Appeals for the Seventh Circuit case that involves licensing.

**Antitrust Basics**

Section 1 of the Sherman Act states that any "contract, combination . . . or conspiracy in the restraint of trade or commerce . . . is declared to be illegal."[2] Although §1 prohibits concerted anticompetitive behavior, it does not regulate unilateral action, which is instead governed exclusively by §2.

The outer boundaries to §1 of the Sherman Act were last addressed by the Supreme Court in the 1984 case *Copperweld Corp. v. Independence Tube Corp.*[3] In that case, a plaintiff tubing company sued its competitor, as well as its competitor's wholly owned subsidiaries, for conspiring to restrain trade in the market for structural steel tubing. The Supreme Court found in that case that there was no antitrust violation because, as a matter of law, the defending parties "must be viewed as that of a single enterprise for purposes of §1."[4] In other words, a corporate parent and its wholly owned subsidiary cannot, as a matter of

law, violate §1 of the Sherman Act because they have "complete unity of interest."[5]

Since the Supreme Court's ruling in *Copperweld,* courts have disagreed about how broadly to interpret that ruling. One Ninth Circuit court has held that "only corporations which are owned 100 percent in common, or a de minimis amount less than 100 percent, are covered by the *Copperweld* rule."[6] Meanwhile, other courts have found that economic realities, rather than any particular ownership percentage, determine the scope of the single-entity exemption.

**The Sports-Law Haystack**

Over the past 25 years, most courts have rejected applying the single-entity defense to sports leagues. The U.S. Court of Appeals for the Second Circuit was among the first to consider the single-entity status of a sports league in the seminal 1982 case *North American Soccer v. Nat'l Football League.*[7] There, plaintiff team owners in the North American Soccer League brought a lawsuit against the individual team owners of the National Football League (NFL), contending that the NFL teams' agreement to prevent owners from purchasing shares of teams in different sports leagues violated §1 of the Sherman Act.

Although the district court initially ruled in favor of upholding the NFL ownership policy, the Court of Appeals reversed, finding that the NFL's cross-ownership ban violated antitrust law's rule of reason, and that the cross-ownership rule was unprotected by the single-entity defense. In rejecting application of the single-entity defense, the Court of Appeals explained that the NFL is best defined not as a single entity, but rather as a collection of "individually owned separate football teams," which derive separate revenues from sources including "local TV and radio, parking and concessions."[8] The court went on to explain that "[t]o tolerate such a [single-entity] loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects . . . . The sound and more just procedure is to judge the legality of such restraints according to the well-recognized standards of our antitrust laws rather than permit their exception."[9]

Since the Second Circuit's decision in *North American Soccer,* most courts have similarly rejected applying the single-entity defense to sports leagues. The U.S. Court of Appeals for the Third Circuit, for example, was the next to reject the single-entity defense in the case *Mid-South Grizzlies v. Nat'l Football League.*[10] *Mid-South Grizzlies* emerged from a challenge to the NFL's team entry rules, filed by a football team that had played in a defunct league and thereafter sought to join the NFL. That team had contended that the NFL's limited entry rule amounted to a group boycott in violation of §1 of the Sherman Act.

The Third Circuit in *Mid-South Grizzlies,* although upholding the NFL entry rule under antitrust law's rule of reason, rejected the NFL's alternative argument that the league was

an exempt single entity. The court explained that any purported single-entity defense was inappropriate, even though NFL teams shared substantial revenues with one another, given that "within certain geographic submarkets league members compete with one another for ticket buyers, for local broadcast revenue, and for sale of concession items like food and beverages and team paraphernalia."[11]

Eleven years later in *Sullivan v. Nat'l Football League,* the U.S. Court of Appeals for the First Circuit again rejected application of the single-entity defense based on the failure of a sports league to achieve complete "unity of interest." According to the court in *Sullivan,* because sports teams "compete in several ways off the field," these teams "pursue diverse interests and thus are not a single enterprise."[12] In a similar vein, the Ninth Circuit in *Los Angeles Mem'l Coliseum Com'n v. Nat'l Football League* had rejected applying the single-entity defense to sports leagues because "[e]ven though the individual clubs often act for the common good of [the league], a court "must not lose sight of the purpose of the [league], which is to promote and foster the primary business of [l]eague members."[13]

### 'American Needle'

While the First, Second, Third and Ninth circuits have each rejected applying the single-entity defense to traditionally structured sports leagues, the U.S. District Court for the Northern District of Illinois recently rendered an opposite holding in the case *American Needle*. In that case, the plaintiff, American Needle, which had for many years designed, manufactured and sold headwear containing the NFL logo, was denied the right to extend its license because NFL teams had signed a new exclusive agreement with one of American Needle's competitors. American Needle argued that this new, exclusive licensing agreement unfairly eliminated it from the market to sell NFL paraphernalia in violation of §1 of the Sherman Act.

In defending against these claims, each of the NFL teams in *American Needle* argued not only that the practice of collectively licensing NFL logos was reasonable, but also that this practice was entirely immune from antitrust scrutiny under *Copperweld's* single-entity exception. Ultimately, the Northern District of Illinois ruled in favor of the NFL based on this latter argument, finding that because NFL clubs had collectively licensed their trademark rights for over 40 years, these clubs lacked the "sudden joining of independent economic sources of economic power" that was needed to defeat single-entity status.[14] In other words, the court found with respect to trademark licensing that the NFL's conduct was unilateral.

The *American Needle* decision is questionable on three grounds. First, in rejecting the substantial weight of existing case law, the Northern District of Illinois states only that "[w]e reach [our] conclusion while recognizing that others may well disagree," providing no insight into just how broadly the court intended to apply its ruling.[15] Second, the *American Needle* decision implies that because NFL clubs had been merchandising their trademarks collectively for a long period of time, the league had evolved into a single

entity - a dubious presumption given that §1 violations often involve longstanding anticompetitive practices. Finally, the *American Needle* court noted that "supposed efficiencies in economic arrangements are more the stuff of the rule of reason than of distinguishing between single entities and joint ventures."[16] Yet, for some inexplicable reason, the court in its holding swapped the rule-of-reason for the single-entity defense, even though this holding was based largely on alleged efficiencies.

## After 'American Needle'

Professional sports leagues had clearly hoped that the *American Needle* decision would mark the start of a countermovement exempting sports leagues from §1 of the Sherman Act. However, since *American Needle,* little has changed in this regard. In the only relevant decision since *American Needle,* the Southern District of New York in *Madison Square Garden LP v. Nat'l Hockey League* entirely rejected the single-entity defense in favor of more traditional analysis.

The *Madison Square Garden* case arose from a series of facts related to the National Hockey League (NHL) New Media Strategy, which was approved by a supermajority of NHL teams, despite strong opposition by certain member clubs. On Sept. 28, 2007, Madison Square Garden LP (MSG), the parent company for the New York Rangers hockey team, filed suit seeking to obtain a preliminary injunction against enforcement of the New Media Strategy, including preventing mandatory transfer of team Web sites onto an NHL-operated server. In its complaint, MSG contended "the NHL has become an illegal cartel . . . by seeking to control the competitive activities of independent teams."[17]

In response to MSG's complaint, the NHL responded by filing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, which attempted to defend the league's New Media Strategy on two different grounds, first, based on the New Media Strategy's allegedly procompetitive effects under the rule-of-reason, and, alternatively, based on the league's purported single-entity defense. With respect to the purported single-entity defense, the NHL alleged that "sports leagues are best considered 'single entities' under the antitrust laws when assessing the collective exploitation of . . . entertainment value," a principle derived from a broad application of *American Needle*.[18]

Upon review, the Southern District of New York denied MSG's request for a preliminary injunction, finding that the NHL's collective New Media Strategy was likely procompetitive under the rule of reason. Nevertheless, the court rejected applying the single-entity defense to the NHL, finding that the NHL was best defined as "an unincorporated association of thirty Member Clubs *organized as a joint venture*."[19] In reaching this conclusion with respect to the NHL, the court reaffirmed the Second Circuit's earlier holding in *North American Soccer*, as well as the longstanding views of the First, Third and Ninth circuits, that traditionally structured sports leagues are not single entitites.

## Future: 'Needle' and Haystack

Although *Madison Square Garden* does not resolve the split in the circuits regarding whether the single-entity defense could ever apply to traditionally structures sports leagues, the *Madison Square Garden* decision nevertheless indicates that *American Needle* has not altered the Second Circuit's longstanding view that traditional sports leagues are not single entities, irrespective of the specific market affected. This clarification is especially important because a plaintiff bringing an antitrust suit against a traditional sports league generally has its choice among circuits in which to file.

For a potential antitrust plaintiff, this means that the opportunity to bring a §1 Sherman Act claim against a traditionally structured sports league remains fully viable even despite the *American Needle* holding. Meanwhile, for a traditionally structured sports league, it indicates the need to remain vigilant in preventing anticompetitive agreements among teams.

**Marc Edelman** *is a professor of sports law at New York Law School, Seton Hall University, and Manhattanville College. He can be reached at* Marc@MarcEdelman.com.

**Endnotes:**

1. 496 F.Supp.2d 941, 943 (N.D. Ill. 2007).

2. 26 Stat. 209 (1890).

3. 467 U.S. 752 (1984).

4. 467 U.S. at 771.

5. 467 U.S. at 771.

6. *Aspen Title & Escrow Inc. v. Jeld-Wen, Inc.,* 677 F.Supp. 1477, 1486 (D. Or. 1987).

7. 670 F.2d 1249 (2d Cir. 1982).

8. 670 F.2d at 1251, 1252.

9. 670 F.2d at 1257.

10. 720 F.3d 772 (3d Cir. 1983).

11. 720 F.3d at 787.

12. *Sullivan,* 34 F.3d at 1099.

13. 726 F.2d at 1389 (internal quotations omitted).

14. *American Needle,* 496 F.Supp.2d 941 at 943.

15. *American Needle,* 496 F.Supp.2d at 944.

16. *American Needle,* 946 F.Supp.2d at 944.

17. Complaint, *Madison Square Garden, L.P. v. Nat'l Hockey League,* Case 1:07-CV_08455-LAP, Sept. 28, 2007 at ¶8.

18. Defendants' Memorandum of Law In Opposition to Plaintiff's Motion for Preliminary Injunction, *Madison Square Garden, L.P. v. Nat'l Hockey League,* Case 1:07-CV_08455-LAP, Oct. 12, 2007, at 12-13.

19. Memorandum of Order, *Madison Square Garden, L.P. v. National Hockey League,* Case 1:07-CV_08455-LAP, Nov. 2, 2007, at 2 (emphasis added).