**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
of Law

**Volume XI**
**Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application


ASPEN
PUBLISHERS

1185 Avenue of the Americas, New York, NY 10036
www.aspenpublishers.com

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

© 2005 Aspen Publishers, Inc.
A Wolters Kluwer Company
*www.aspenpublishers.com*

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 646-728-3048.

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 0-56706-602-X (Set)
0-7355-5028-X (Vol. XI)

1 2 3 4 5 6 7 8 9 0

**1901d. Output.** As ¶a develops, when measurement is possible, a useful criterion for determining whether the naturally anticipated effects of an agreement are anti- or procompetitive is output. While the term "output" might seem clear enough, several things must be explained. *First*, in cases that do not involve exclusionary conduct, the output in question is that of the agreement's participants as a collective. If this collective dominates a relevant market or if nonparticipants in the agreement in question voluntarily limit their output as well, the impact may be reduced marketwide output. But the question of impact on marketwide output is fundamentally a question about power, not about the inherent tendencies of the agreement itself. As a basic proposition, a restraint that increases the output of participants and does not anticompetitively exclude rivals cannot reduce marketwide output and must therefore be regarded as procompetitive.

If a horizontal restraint involves exclusion, the restraint may actually *increase* the output of the participants in the restraint while it reduces marketwide output. For example, a cartel coupled with a concerted refusal to deal with rivals might use the concerted refusal to increase its own market share but collusion to reduce marketwide output. Perhaps before the agreement the four colluders had an 80 percent market share and produced ten units each. After the agreement takes effect and excludes rivals, the colluders have a 100 percent market share and produce eleven units each. In this case the colluders' output has gone up (from 40 to 44) but marketwide output has gone down (from 50 to 44).

When we say that naked price fixing is a per se offense we mean both (a) that naked price fixing has an inherent tendency to reduce the collective output of the participants in the price-fixing conspiracy; and (b) because the agreement is believed to have nearly no potential for offsetting virtue, antitrust can condemn it without any inquiry into whether overall market output has been reduced. By contrast, once the court has decided that a horizontal restraint threatening reduced output must be analyzed under the rule of reason, the plaintiff must show both (a) that the natural tendency of the restraint is to reduce the output of the participants; and (b) that the participants collectively have sufficient power that their own output reduction will effect an output reduction across the entire relevant market.

*Second,* relevant output can be measured by a number of means. The most obvious is the number of units sold. Perhaps

the second most obvious is the quality of the units.[9] If macaroni manufacturers agree with one another to substitute 50 percent inferior farina wheat when making their product, rather than using 100 percent durum semolina wheat, this agreement may have little impact on the number of pounds of macaroni that they sell.[10] But in this case the agreement to make a product of inferior quality would count as the output reduction. In all events, the relevant output consists of not merely the naked product itself, but all information, amenities, and other features that a firm produces. For example, automobile dealers compete with one another not only by pricing cars but also by having longer showroom hours, more effective advertising, better service departments, and the like.[11] An agreement restraining advertising or limiting showroom hours is an "output reduction" just as certainly as is an agreement increasing the price of the cars.[12]

Further, any agreement reasonably calculated to yield higher prices is presumptively an agreement to reduce output. That is, we generally assume that demand curves slope downward at every point, which entails that a price increase always accompanies an output reduction.

We add "presumptively" because some quality-improving agreements at least arguably increase price. For example, if wood products manufacturers come up with a standard for "Grade A" plywood that it have no knots, this agreement might be of great value to plywood purchasers even though the price of Grade A

---

9. See *Continental Airlines, Inc. v. United Air Lines, Inc.*, 126 F. Supp. 2d 962, 2001 WL 25507 (E.D. Va. 2001), vacated on other grounds, 277 F.3d 499 (4th Cir. 2002) (airlines' agreement that effectively limited the size of carry-on bags at airport should be counted as a type of output reduction) (to the extent it is relevant, H.H. was consulted by the defendant).

10. See *National Macaroni Mfrs. Assn.*, 65 F.T.C. 583 (1964), enforced, 345 F.2d 421 (7th Cir. 1965), discussed in ¶2014. Whether the agreement affects the number of units sold depends in part on whether the price falls as quality falls.

11. Cf. *Detroit Auto Dealers Assn.*, 111 F.T.C. 417, 494-499 (1989), aff'd, 955 F.2d 457, 471 (6th Cir. 1992), cert. denied, 506 U.S. 973 (1992) (condemning agreement among auto dealers limiting showroom hours). See ¶2023.

12. This is the economic approach developed in George J. Stigler, The Economics of Information, 69 J. Pol. Econ. 213 (1961). A statement in the Supreme Court's *California Dental* decision suggests that the Supreme Court adopts a different approach. In dealing with a horizontal agreement limiting dentists' advertising, the Court concluded that our description of the agreement as an output restriction was "puzzling" and said that "the relevant output for antitrust purposes here is presumably not information or advertising, but dental services themselves." *California Dental Assn. v. FTC*, 526 U.S. 756, 776 (1999). The Court then added that "[t]he question is not whether the universe of possible advertisements has been limited (as assuredly it has), but whether the limitation on advertisements obviously tends to limit the total delivery of dental services." But the Court was not seeking to define output in economic terms as the total of goods and services offered by an unrestrained firm. Rather, it was asking whether the effect of limiting supposedly misleading advertising "obviously tends to limit the total delivery of dental services."

plywood rises. Perhaps in the former regime each manufacturer made up its own standard, and many manufacturers used the term "Grade A" to denote inferior, more knotty plywood that qualifies only as "Grade B" under the new designation. Because the result of the standardization agreement is to take the inferior plywood out of the mix, the average price of the newly designated "Grade A" plywood rises. Nevertheless, the grading scale as a whole makes customer purchasing much easier by eliminating their need to make inquiry into each manufacturer's grading scheme. Whether the overall impact of the restraint is to reduce output is to be addressed under the rule of reason.

*Third*, in most cases, and in virtually all per se cases, the impact on output is assessed by inference from the nature of the agreement and surrounding circumstances rather than by actual empirical measurement. For example, in *Engineers* the Supreme Court condemned an ethical canon under which the members of a professional association of engineers agreed not to bid against one another for engineering jobs.[13] It was unnecessary to consider empirically whether the impact of this agreement over the years had actually been to reduce the collective output of the engineers who participated in the agreement. Indeed, reliable proof of that fact might have been impossible to produce.[14] Or in *Broadcast Music*, where the Supreme Court approved a blanket licensing arrangement

---

Truthful advertising is clearly part of a seller's output, but the Court believed that false or misleading advertising might not be, because it might actually reduce the overall demand for dental services. One could say the same thing about the agreement to use inferior wheat in *Macaroni*, note 10, or the agreement restraining showroom hours in *Detroit Auto Dealers*, note 11. By using the poorer wheat the manufacturers might be able to charge a lower price. *California Dental* was in fact a decision about competitors setting industry standards for advertising. The issue was not whether advertising is part of a dentist's output but rather whether the quality of that output could be regulated in the way that the defendant was regulating it. On horizontal agreements setting industry standards, see Ch. 22C.

13. *National Socy. of Professional Engineers v. United States*, 435 U.S. 679 (1978). See ¶2021c2.

14. An economist or statistician might be able to use regression analysis to estimate the impact of a restraint, but in order to do so reliably he would need some basis for comparison sufficiently similar to the market covered by the restraint to warrant an inference that the differences were not the result of other factors. For example, if the restraint came into existence in 1970 and was still in effect at the time of litigation, the economist might measure engineering output before and after 1970, but changes in the amount of construction and the use of engineers and their supply could make any conclusions unreliable. Alternatively, and perhaps more promising in cases where it could be used, if only a limited portion of professional engineers joined the association and participated in the restraint, the economist could compare the effect on output of the participants against any changes in output by nonparticipants. Suppose the following facts: (a) a constant 30 percent of engineers are in the association over the entire relevant time period, and association and nonassociation engineers are generally regarded as competitors; (b) the restraint against competitive bidding covering members of the association came into existence in 1970; (c) thereafter, output by association engineers increased at a rate of 3 percent per year while that of nonassociation

involving price fixing among the holders of performance rights to music, no actual measurement of impact on output was necessary.[15] Even though this case was decided under the rule of reason, which is said to require an assessment of competitive effects, the dramatic reduction in transaction costs occasioned by blanket licensing as opposed to individual per use negotiations was enough to create a strong inference that the overall effect of the arrangement was to increase rather than decrease the collective output of participants.[16] At the same time, however, in cases of ambiguity about likely effects, empirical evidence of actual effects on output may be used, as the Supreme Court held in *Dentists*.[17]

**1901e. Boycott; concerted refusal to deal.** A "boycott," or concerted refusal to deal, literally refers to any situation where two or more firms agree not to deal with some other party or to restrict the terms under which they will deal.[18] Concerted refusals to deal can be "naked" in the sense that the refusal does not accompany any coordination of production or distribution and is designed merely to facilitate collusion; or the refusals can be "ancillary," such as when a joint venture limits its membership or a production joint venture designates its suppliers, thus excluding others.

The antitrust courts have used the terms "boycott" or "concerted refusal to deal" broadly to speak of concerted refusals directed at rivals or potential rivals or suppliers, or against customers. However, we will generally use these terms only to refer to concerted refusals directed at rivals or potential rivals, at suppliers, and at customers only when the purpose is to force the customers to cut off dealings with a rival. As an example of the latter, we will use the term "boycott" to describe the situation where cartel

---

engineers increased at a rate of 5 percent per year; (d) no other factors appear to account for the difference in growth rate. This evidence warrants an inference that the restraint had a tendency to reduce output.

15.  *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979).
16.  See id. at 23 n.40:

> Moreover, because of the nature of the product—a composition can be simultaneously "consumed" by many users—composers have numerous markets and numerous incentives to produce, so the blanket license is unlikely to cause decreased output, one of the normal undesirable effects of a cartel. And since popular songs get an increased share of ASCAP's revenue distributions, composers compete even within the blanket license in terms of productivity and consumer satisfaction.

See also *Polk Bros., Inc. v. Forest City Enters.*, 776 F2d 185, 188-189 (7th Cir. 1985) (likely effect of noncompetition covenant attending joint development of building was to increase output).

17.  *FTC v. Indiana Fedn. of Dentists*, 476 U.S. 447, 460-461 (1986), citing ¶1511 in the previous edition.
18.  Concerted refusals to deal are the subject of Ch. 22.

employment relationship is over rather than as a condition of employment.[71]

In all cases the relevant question concerning sequence is whether the objectively intended consequence of the restraint were to increase output by facilitating an output-increasing transaction, rather than to reduce output. This requirement is not met when the restraint is tacked on after the underlying agreement has already been completed. Nor, as a general proposition, is it met when the restraint preceded the property transfer by a significant time period.

To these rules we would generally not permit exceptions, even for the noncompetition covenant contained in the settlement of a legal dispute. For example, suppose that *A* sells *B* his dental practice and *A* subsequently reenters dentistry in the same town, depriving *B* of the many patients who return to *A*. Although the underlying transfer contained no noncompetition covenant, *B* files a state law claim of tortious interference or unfair competition. The parties then agree out of court on a cash settlement in return for an express promise by *A* not to reenter the dentistry market.

At this point the ancillarity question might be thought to be whether *A*'s promise not to compete was in fact a "part" of the sale of his dentistry practice to *B*, a question to which state tort law might have some relevance. But (a) the outcome of the state tort dispute cannot govern the antitrust rule; and (b) for antitrust, the relevant question is whether the objectively determined intent of the parties was that the restraint in question was necessary to make the business transfer work at all. In answering this second question, the most obvious piece of relevant information is that the sale itself did not contain the noncompetition promise.

**1908h. Exclusivity.** While some exclusive arrangements are procompetitive, exclusivity is often a danger signal requiring a hard look at the challenged restraint. By contrast, nonexclusivity often signals that a restraint poses no significant anticompetitive threat, particularly when the number of participants is large and the opportunities for cartel cheating are fairly obvious. As a result, a "quick look" finding nonexclusivity can often lead to an early dismissal of an antitrust complaint.

---

71. Ibid. The court also concluded that the "infinite duration" of the agreement made it unlawful — although this would ordinarily be a criterion to be applied under the rule of reason. See id.

The rationale is that an anticompetitive restraint must succeed in reducing market output. But if nonexclusivity entails that the arrangement in question has no significant prospect of reducing market output, then further inquiry is unnecessary. For example, suppose that 500 physicians, who form a significant share of the physicians in a town, organize a health maintenance organization (HMO) by horizontal agreement and offer to cover all of a family's future medical needs for $400 per month. Such a restraint poses complex problems of evaluation. On the one hand, it might create significant opportunities for price fixing; on the other, the prepricing, organizational, technology and information sharing, and risk-assumption or insurance features of such an arrangement promise significant cost savings as well as other consumer benefits.

But suppose the arrangement also makes clear that all participating physicians are free both to offer this HMO plan and to continue to see unlimited non-HMO patients on standard fee-for-service contracts, by arrangement with third-party insurers, or even by participation in other HMO plans. This nonexclusivity provision removes virtually all of our concerns about significant long-lasting anticompetitive effects of the HMO plan. Assuming that the HMO's managers did decide to raise prices above the alternative arrangements existing before the HMO came into existence, these alternatives always remain, and participating (as well as nonparticipating) physicians are free to see unlimited patients under them. To be sure, the physicians may also have a secret agreement not to see patients outside the HMO or to charge such patients at least as much as HMO patients are charged, but absent any evidence of such a clandestine arrangement, the agreement that exists appears to be competitive.

The Tenth Circuit noted the relevance of exclusivity in its *NCAA* opinion, distinguishing the exclusive arrangement condemned in that case from the nonexclusive arrangement challenged in *BMI*:

> Not only does this restraint [NCAA] inhibit the freedom of the individual schools, it also poses a greater risk of cartelization than was present in *Broadcast Music*. There, the right of the copyright holders to sell outside the blanket licensing arrangement ensured the presence of potential competition to inhibit the exercise of market power by the performing rights societies. Here, every producer of commercially salable intercollegiate football is bound to sell through the television plan only.[72]

72. *NCAA*, note 5; 707 F.2d at 1156.

Likewise, in *Polygram*[73] the FTC was led to condemn a joint production venture for a music recording after observing that the venture agreement also required the two participants to limit their nonventure output of the recordings of the same performers.

As a general matter, the individual members of a cartel are strongly tempted to cheat by making surreptitious sales. The larger the cartel, the stronger this temptation.[74] Thus, for example, in order to profit, the cartel of bathroom pottery producers must be able to reduce marketwide output of pottery from, say, 1,000 units per year to 600 units, which they accomplish by assigning each cartel member some share of the 600-unit output. But if each member is free to make unlimited "non-cartel" sales in the same market, such an output reduction can never be achieved. Thus, once we know that the 400 physicians participating in the HMO are free to make unlimited non-HMO sales, then the HMO cannot reasonably be described as a price-increasing cartel unless we also discover that something else restrains the ability of the participants to increase their output without limit.

In "public" joint ventures with numerous members, non-exclusivity suggests strongly that supracompetitive pricing is not a likely result. For example, the licensors of broadcast rights in *BMI* numbered in excess of 30,000,[75] and each licensor gave the defendants a nonexclusive license entitling the licensor to make unlimited sales outside the venture. There is no effective way such a venture could reduce market output. The same point applied in the *Maricopa* case, where the Supreme Court condemned as maximum price fixing an agreement among 1,750 physicians to promote themselves as a Plan promising in advance not to charge more than certain rates for certain procedures.[76] But the Plan was non-exclusive, which meant that any physician could continue to see as many non-Plan patients as she wished to see, and presumably was free to join one or several alternative PPOs, HMOs, or other prepaid health plan. In that case, the Maricopa Plan's participants could not succeed in reducing marketwide output of physicisans' services. As soon as the Plan operated so as to increase price above prevailing

---

73. Note 19.
74. See ¶2002d.
75. See *BMI*, note 10, at 5, noting that ASCAP had 22,000 members and BMI had 10,000 publisher members and 20,000 artist members. Of course, some or perhaps most participants could have been members in both organizations, but that would not change the point being made here.
76. *Arizona v. Maricopa County Med. Socy.*, 457 U.S. 332 (1982).

market levels, individual participants would be tempted to capture additional revenues by seeing patients outside the Plan at lower rates.[77]

In sum, nonexclusivity that is effective in fact indicates that a venture does not expect to earn its profits from reduced market-wide output and the corresponding price increase. Such a restraint is therefore likely to be ancillary rather than naked.

# 19C

# Horizontal Restraints: General Rules for Determining Legality

## ¶1909. Introduction

**1909a. Tripartite analysis.** Horizontal restraints are subjected to three modes of analysis, depending on how the restraints are characterized. At one extreme, "naked" restraints are said to be illegal per se, which means that they can be condemned without elaborate inquiry into intent, power, or effects in the specific case and defenses are limited.[1] Although the case law has recognized one exception to this per se rule for naked restraints — naked restraints created as part of certain network joint ventures — we

---

77. Of course, the 1,750 physicians operated in different specialties, and perhaps a few specialties, such as neurosurgery, had only two or three members. In that case the Plan could more plausibly have facilitated collusion among that specialty. See also *Continental Airlines v. United Airlines*, 277 F.3d 499 (4th Cir. 2002), which applied a full rule of reason analysis to an agreement among airlines regulating the size of the template through which carry-on baggage must pass. While all baggage had to pass through checkpoints with templates, individual airlines were permitted to issue medallions that permitted passengers to bypass the templates or have an employee present to lift the template out of the way. The court emphasized that as a result it was likely that nearly all passengers with oversize bags that a carrier wished to admit were in fact admitted:

> ... [T]he district court ... failed to recognize that the parties genuinely disputed whether, given the lifting and medallion alternatives, the template program actually restrained trade, i.e., whether the program actually restricted Continental's carry-on service.

*Continental* at 515 (to the extent it is relevant, H.H. was consulted by a defendant on the appeal).

¶1909. n.1. See ¶1910.