ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie Professor of Law*
University of Iowa

2007 Supplement

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application


Wolters Kluwer
Law & Business

AUSTIN   BOSTON   CHICAGO   NEW YORK   THE NETHERLAND

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted
by a Committee of the American Bar Association
and a Committee of Publishers and Associations

© 2007 Aspen Publishers. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 212-771-0803.

Printed in the United States of America

ISBN 978-0-7355-6766-5

1 2 3 4 5 6 7 8 9 0

**The following are examples of suggested citation forms:**

**To cite the main text and the Supplement:**

Volume I: 1 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶220 (3d ed. 2007)

Volume IA: 1A Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶243 (3d ed. 2007 and Supp. 2007)

Volume II: 2 Phillip Areeda, Herbert Hovenkamp & Roger Blair, Antitrust Law ¶305 (2d ed. 2000)

Volume IIA: 2A Phillip Areeda, Herbert Hovenkamp & John Solow, Antitrust Law ¶523 (2d ed. 2002)

Volume III: 3 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶720 (2d ed. 2002 and Supp. 2005)

Volume IV: 4 Phillip Areeda, Herbert Hovenkamp & J. Solow, Antitrust Law ¶910 (2d ed. 2006)

Volume V: 5 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶1101 (2d ed. 2003)

Volume X: 10 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶1740 (2d ed. 2004)

Volume XI: 11 Herbert Hovenkamp, Antitrust Law ¶1801 (2d ed. 2005)

"procompetitive" justification PolyGram offers is "nothing less than a frontal assault on the basic policy of the Sherman Act."[15]

As the court elaborated:

> To take the Commission's example, if General Motors were vigorously to advertise the release of a new model SUV, other SUV manufacturers would no doubt reap some of the benefit of GM's efforts. FTC Op. at 43. But that would not mean General Motors and its competitors could lawfully agree to restrict prices and advertising on existing SUV models in return for General Motors giving its rivals a share of its profit on the new model. Nor would an agreement to restrain prices and advertising on existing SUVs be lawful if General Motors were to release the new model SUV as a joint venture with one of its competitors. A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise that introduces the new product, regardless whether that enterprise is a joint venture or a solo undertaking. And it simply does not matter whether the new SUV would have been profitable absent the restraint; if the only way a new product can profitably be introduced is to restrain the legitimate competition of older products, then one must seriously wonder whether consumers are genuinely benefitted by the new product.[16]

With that, the court affirmed the decision's finding of illegality.

### ¶2132    Market Creation; Joint Price Making

In *Dagher* the Ninth Circuit held that a joint venture in the producing, refining, and marketing of gasoline did not justify an agreement among the participants that fixed gasoline prices. The venture itself produced significant cost savings in production and marketing.[1] Under the venture arrangement, the defendants Shell and Texaco jointly assumed developmental risks and pooled resources. However, they

> continued to operate as distinct corporations. Each retained its own trademarks and kept control over its own brands pursuant to

---

15. 416 F.3d at 38, quoting *Engineers*, note 4, 435 U.S. at 695.
16. 416 F.3d at 38, citing the Commission's opinion.
¶2132 n.1.  *Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108, 1111 (9th Cir. 2004), rev'd 547 U.S. 1 (2006).

separate Brand Management Protocols, each of which prohibited the joint ventures from giving preferential treatment to either brand. Under the joint venture agreements, Equilon and Motiva market Shell and Texaco gasoline under licensing agreements governing both the sale of the products and the use of the Shell and Texaco trademarks. Each company maintained its ability to return to individual sales and marketing—the joint ventures contain provisions allowing for dissolution at any time by mutual consent or, after five years' time, by unilateral dissolution with two years' advance notice.[2]

The court held that the price-fixing agreement could be a naked restraint notwithstanding that the underlying production and distribution joint venture was procompetitive.[3] As the court analyzed,

> In granting the defendants' summary judgment motion, the district court ruled that "a reasonable trier of fact could not find that the Defendants formed Equilon and Motiva [the challenged joint ventures] merely to achieve an ulterior anticompetitive purpose or that the ventures are patently anticompetitive." Even were that true, the district court stopped short of completing the requisite inquiry. The proper inquiry for a *per se* analysis of price fixing is not simply whether the joint venture itself is anticompetitive. Nor is the relevant question simply whether the defendants intended to destroy competition. Rather, if the answer to those questions is in the negative, we must then decide whether the defendants' conduct—setting one, unified price for both the Texaco and Shell brands of gasoline instead of setting each brand's price independently on the basis of normal market factors—is reasonably necessary to further the legitimate aims of the joint venture.[4]

Looking at the present venture, the court observed:

> [W]e find it significant that the defendants here did not simply consolidate the pricing decisions within the joint ventures—they *unified* the pricing of the two brands from the time the alliance was formed by designating one individual in each joint venture to set a single price for both brands. Normally, a business determines the prices it will charge for its various products by considering numerous factors, just a few of which include the costs of

---

2. Id. at 1112.
3. Id. at 1118, citing ¶1908 in the previous edition.
4. Id. at 1120 (internal citations omitted).

production and marketing and the contours of the relevant product markets. In this case, the defendants have stressed that, in addition to the differences in the product themselves, the gasolines marketed under the Texaco and Shell labels have different reputations and consumer bases. It thus seems likely that independent price analyses would result, at least in some circumstances, in the rational decision to sell the different brands at different prices. Instead, the defendants chose to fix those prices uniformly.[5]

Further,

> [t]he defendants have thus far failed to offer any explanation of how their unified pricing of the distinct Texaco and Shell brands of gasoline served to further the ventures' legitimate efforts to produce better products or capitalize on efficiencies. Nor does the record contain facts sufficient to warrant our drawing any such inference. To the contrary, the record before us reveals that the alliance never considered unified pricing to be relevant to product improvement or efficiency gains. As one oil company executive explained, all of the anticipated cost savings, which were calculated prior to formation of the joint ventures, had "nothing to do with pricing." The absence of persuasive evidence showing a procompetitive justification for initiating the price-fixing scheme, when viewed along with the plaintiffs' evidence showing anticompetitive effects, convinces us that the plaintiffs have made a sufficient showing as to the applicability of the *per se* rule.[6]

The defendants offered two justifications. One was that intraventure price fixing was necessary if the defendants were to avoid liability under the Robinson-Patman Act.[7] The court responded essentially that to the extent that Shell and Texaco were distinct brands they would be priced to different groups of customers and to meet different competitive conditions. A weightier argument seems to be that the Robinson-Patman Act does not apply when two different firms charge different prices for their product.[8]

---

5. Id. at 1122.
6. Ibid.
7. Ibid.
8. See ¶¶2311-2312.

Second, the defendants argued that a joint venture must have authority to set the price of its output. The court replied:

> If that were true, any number of companies could create joint ventures as fronts for price-fixing. The simple answer is that the Supreme Court has declined to immunize joint ventures from per se antitrust scrutiny.[9]

A dissenter emphasized that the joint venture was in fact engaging in a great deal of joint production, including the creation and operation of jointly owned production facilities, pipelines, and the like:

> In this case, nothing more radical is afoot than the fact that an entity, which now owns all of the production, transportation, research, storage, sales and distribution facilities for engaging in the gasoline business, also prices its own products. It decided to price them the same, as any other entity could. What could be more integral to the running of a business than setting a price for its goods and services? I am at a loss for an answer to that question, and nothing written about this case to date imparts additional wisdom or better information.[10]

In a joint venture situation such as *GM-Toyota*[11] the venture produced a single undifferentiated product whose price probably had to be set in common for all output. The Ninth Circuit majority apparently believed that if the venturers had placed the GM trademarks on half the output and the Toyota marks on the other half, then each firm must set the price of its own trademarked products separately. In the actual case, while the two firms produced gasoline jointly, they retained all of their separate intellectual property rights and marketed them through distinct channels. For the majority, this made price fixing unnecessary to the operation of the venture — at least, no good explanation was given why it was necessary. As the majority noted,

---

9. *Dagher*, 369 F.3d at 1124, citing *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23 (1979); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951); *NCAA v. Board of Regents*, 468 U.S. 85, 109 (1984); *Citizen Publishing Co. v. United States*, 394 U.S. 131, 135 (1969); and ¶1908 in the previous edition.
10. *Dagher*, 369 F.3d at 1127.
11. *General Motors Corp.*, 103 F.T.C. 374 (1984), vacated, 116 F.T.C. 1276 (1993), discussed in ¶2132 of the main text.

Texaco and Shell maintained each brand as a distinct product—each brand has its own unique chemical composition (the gasoline is differentiated by separate packages of "additives"), trademark, and marketing strategy—and competed for customers "at the pump." The companies, and the joint ventures, continued to target each brand at a different customer base—"Texaco customers tend to be more blue-collared and rural than Shell customers, who are more affluent and urban."[12]

Of course, some significance must be attached to the scope of the venture in relation to the final product. In this case the parties produced finished gasoline in the venture, and the individual members applied their own separate intellectual property. But suppose that the venture produced only a smaller input into the finished product. For example, suppose that GM and Toyota formed a joint venture for the production of hybrid automobile engines, but then placed the engines in separate automobile designs that each produced. Antitrust policy would not permit the two firms to fix the price of the finished automobiles, at least not without a showing that such price fixing was essential to the operation of an efficient venture. As the majority saw it, the parties produced only a "portion" of the product jointly, but were attempting to eliminate competition in the entirety. As the dissenter saw it, the "portion" covered by the venture was virtually everything except the branding and some chemical additives added by each partner. As a result, no additional competition could be eliminated through price fixing of the finished product.

The Supreme Court unanimously reversed in a very brief opinion, holding that the price setting of two venturers who have integrated nearly all of their production:

> amounts to little more than price setting by a single entity—albeit within the context of a joint venture—and not a pricing agreement between competing entities with respect to their competing products.[13]

---

12. *Dagher*, 369 F.3d at 1112.
13. *Texaco, Inc. v. Dagher*, 126 S. Ct. 1276 (2006) (to the extent it is relevant H.H. was consulted by the plaintiff following the Ninth Circuit's decision). The opinion was written by Justice Thomas. Justice Alito, who was not yet sworn in when the case was argued, did not participate.

Further,

> Throughout Equilon's [the joint venture's] existence, Texaco and Shell Oil shared in the profits of Equilon's activities in their role as investors, not competitors. When "persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market."[14]

The Court noted that the plaintiffs had conceded that there would not be per se liability if the two participants had sold their gasoline under a single brand.[15] Selling under two different brands made little economic difference. The Court observed that:

> As a single entity, a joint venture, like any other firm, must have the discretion to determine the prices of the products that it sells, including the discretion to sell a product under two different brands at a single, unified price. If Equilon's price unification policy is anticompetitive, then respondents should have challenged it pursuant to the rule of reason. But it would be inconsistent with this Court's antitrust precedents to condemn the internal pricing decisions of a legitimate joint venture as *per se* unlawful.[16]

And, "for the same reasons," a quick look approach would be inappropriate.[17]

The Court also concluded that the "ancillary restraints doctrine," under which the rule of reason is ordinarily applied to joint ventures, did not apply here:

> That doctrine governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities.[18] Under the doctrine, courts must determine whether the nonventure restriction is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid. We agree with petitioners that the ancillary restraints doctrine has no application here, where the business practice being challenged involves the core activity of the joint

---

14. Id. at 1280, quoting *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 356 (1982).
15. *Dagher*, 126 S. Ct. at 1280.
16. Ibid
17. Id. at 1280 n.3. On the "quick look," see ¶¶1508-1511, 1911.
18. Citing *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 113-115 (1984); *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135-136 (1969).

venture itself — namely, the pricing of the very goods produced and sold by Equilon. And even if we were to invoke the doctrine in these cases, Equilon's pricing policy is clearly ancillary to the sale of its own products.[19]

Thus the lower court should have required a full rule of reason analysis.

## Analysis

The Supreme Court's precise holding is difficult to dispute. The Court quoted the Ninth Circuit dissent:

> In this case, nothing more radical is afoot than the fact that an entity, which now owns all of the production, transportation, research, storage, sales and distribution facilities for engaging in the gasoline business, also prices its own products. It decided to price them the same, as any other entity could. What could be more integral to the running of a business than setting a price for its goods and services?[20]

Thus *Dagher* clearly stands for the proposition that when firms participate in a traditional production joint venture that produces an essentially undifferentiated product, the venture cannot be condemned simply because it sells its output at the same price, even if part of the output is allocated to one joint venture participant, part to another, and so on. Such an agreement must be analyzed under antitrust's rule of reason.

But the opinion is so brief that it leaves many unanswered questions.[21] For example, the Court spoke of "joint ventures" very broadly. But many ventures differ greatly from the traditional production venture at issue here. For example, suppose the members of a board of realtors jointly produce a multiple listing

---

19. *Dagher*, 126 S. Ct. at 1281.
20. Ibid., quoting 369 F.3d, at 1127 (Judge Fernandez, dissenting).
21. Some statements appear not to mean precisely what they say. For example, the Court cited *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997), for the proposition that "vertical price fixing arrangements are subject to the rule of reason, not *per se* liability." Clearly the Court meant to say that vertical *maximum* price-fixing arrangements are governed by the rule of reason. The rule in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), governing minimum resale price maintenance remains good law. See ¶¶1620, 1635.

service and in the process fix the price of real estate commissions.[22] Many "open membership" joint ventures are historically designed to permit firms to integrate some parts of their operations, while leaving them free to compete in other parts, particularly pricing. Literally, under the Court's ruling the real estate board would be able to fix commission rates if the sale of homes is the "core" output of the venture and the firms are doing no more than setting their prices. We would not draw that conclusion. Read sensibly, the decision must be limited to traditional production joint ventures with a fixed membership, and where the product of the venture is sufficiently undifferentiated that separate price setting is impractical.

Even here, distinctions will have to be drawn that appear to deviate from the Supreme Court's language. For example, suppose that a group of furniture manufacturers cooperatively build and operate a "furniture mall," where customers can compare and purchase the offerings of different sellers. In this case, where the products are differentiated price fixing is not essential to the operation of the venture and permitting it could serve as a front for anticompetitive collusion. Nevertheless, the "core" output of the furniture mall is furniture sold at retail, and it would seem to be covered by the literal language of the Supreme Court's decision.

The Court assumed that every venture has some readily recognized "core activity," and that its rule applies to that activity but not to other activity. For example, it did not purport to overrule NCAA,[23] and indeed cited it with approval, even though that decision condemned an output limitation restricting the televising of football games. The NCAA organizes the production of collegiate football, which is sold to consumers through live attendance tickets or via television production. The *Dagher* Court must have assumed that the "core" business activity of the NCAA is the sale of live game tickets, not televised games. In all events, in *NCAA* the Supreme Court characterized the televised game restraint as "naked," which it seems to be, whether or not the sale of televised games is at the venture's core. What mattered was

---

22. E.g., *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232 (1980) (challenge to real estate broker commission fixing); *Freeman v. San Diego Assn. of Realtors*, 322 F.3d 1133, 1144-1146 (9th Cir. 2003) (price fixing of realtor services); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), cert. denied, 535 U.S. 987 (2002) (alleged boycott facilitating price fixing). Cf. *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982) (applying per se rule to maximum price fixing among physicians engaged in joint distribution venture).
23. *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85 (1984).

not whether the activity lay at the core, but whether the restraint was necessary to the proper functioning of the venture.

The Court also gave "ancillary restraints" a peculiar and unprecedented definition which is likely to produce further controversy. According to the Court the ancillary restraints doctrine "governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, *on nonventure activities*."[24] Read literally the Court appeared to leave a large area of per se liability for restraints that (1) operate on the participants' intra-venture activity but (2) are not part of the core. Such restraints would not qualify as "ancillary," but neither would they be protected by the Court's rule limiting liability for a venture's core activities. While restraints on non-venture business can certainly be ancillary to the venture's activities,[25] many restraints properly considered under the ancillary restraints doctrine are more obviously characterized as within the venture's activities. The *NCAA* case, which the Supreme Court cited for this proposition, is a good example.[26] The restraint there was on the collective output of televised football games. And *Citizen Publishing*, which the Supreme Court also cited, condemned a newspaper joint operating arrangement in which the two newspapers' principal non-editorial activities were consolidated.[27] Once again, we would not characterize a restraint as "naked" rather than ancillary simply because it did not govern the venture's core activities. Indeed, often it is activities *other* than the setting of the price and output of

---

24. *Dagher*, 126 S. Ct. at 1280 (emphasis added).
25. See ¶2213.
26. *NCAA*, note 23 at 113-115. But cf. the Second Circuit's decision in *PolyGram Holding, Inc. v. FTC*, 416 F.3d 29, (D.C. Cir. 2005), which involved two joint ventures' restraint on non-venture business. That decision also applied the ancillary restraints doctrine. See ¶2131c in this Supplement.
27. *Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969). The Court did not discuss ancillary restraints.
  Another problematic decision is *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), which applied the per se rule to a market division agreement among joint venturers developing, producing, and selling a common brand. Clearly the individual members were not setting a common price. But the restraint in question was clearly one on the business of the venture, not on non-venture business. See *Topco*, 405 U.S. at 601, which described the restraint as an agreement that "each co-conspirator or member firm will sell Topco-controlled brands only within the marketing territory allocated to it, and will refrain from selling Topco-controlled brands outside such marketing territory." See also the district court's opinion, 319 F. Supp. 1031, 1043; and ¶2134c2 (territorial division covered only the sale of the shared Topco brand, not of the firm's separate products that did not bear that brand).

the venture's principal product that are in need of coordination and that pose the smaller threat to competition.[28]

Once again, we would not read too much into the decision's dicta. The decision is sound for what it says: when a (1) fixed membership joint venture (2) actually produces (3) an undifferentiated product for redistribution to its owners, the sale of that very product from the venture back to its individual members for distribution is essentially a unilateral act, or at least one to which the ancillary restraints doctrine necessarily applies.

Beyond that, one should not overread the opinion. Joint ventures are as diverse as contract law permits, and one of the principal values of joint ventures as a merger alternative is that they permit competing firms to merge parts of their activities while remaining competitors in other parts. This particular joint venture came very close to being a full merger of the two firms with respect to their gasoline production in the distribution market in question. Other ventures integrate far less.

### ¶2133  Ancillary Maximum Price-Fixing Agreements

**2133a. Introduction.** In *Wallace* the Seventh Circuit held that no unlawful price fix or trade restraint resulted from administration of the Free Software Foundation's General Public License (GPL).[1] Under this license agreement participants were free to use any version of the defendants' software operating system and even make changes to the software, provided that any product that resulted was freely licensed to others at a price of zero. The fact that the various licensors and licensees who participated in the GPL could be characterized as "conspirators" was not helpful. Although the participants in the GPL were involved in agreements with one another,

---

28. E.g., *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) (market division agreement found to be ancillary); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986), cert. denied, 479 U.S. 1033 (1987) (restraint on individual venturers' use of venture's intellectual property); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1199 (W.D.N.C. 1988), aff'd mem., 912 F.2d 463 (4th Cir. 1990), cert. denied, 498 U.S. 1110 (1991) (bottlers' joint operation of bottle manufacturing plant and purchase of bottles). See also *All Care Nursing Serv. v. High Tech Staffing Servs.*, 135 F.3d 740 (11th Cir 1998), cert. denied, 526 U.S. 1016 (1999) (defendant's collective agreement for hiring of nurses).

¶2133 n.1.  *Wallace v. IBM Corp.*, 467 F.3d 1104 (7th Cir. 2006). The court also rejected a claim that the license arrangement constituted predatory pricing. See ¶726.