**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
of Law

**Volume XII**
**Second Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ΛSPEN**
**PUBLISHERS**

OCT - 8

1185 Avenue of the Americas, New York, NY 10036
www.aspenpublishers.com

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

© 2005 Aspen Publishers, Inc.
A Wolters Kluwer Company
*www.aspenpublishers.com*

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 646-728-3048.

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 0-56706-602-X (Set)
0-7355-5029-8 (Vol. XII)

1 2 3 4 5 6 7 8 9 0

alternative ways to compete, all such agreements may be thought to improve product quality. Once the cartel member is restrained from competing on price, it competes by adding more to the product or service, thus inducing customers to come to that member rather than to a fellow cartel member.

*Fourth,* whether or not it is true in each individual case, antitrust must generally assume that markets are functioning well. If a market functions so poorly that essential product quality can be established only through the very blunt instrument of regulating the price, then market forces in that market are not working as they should be. Such a case requires intervention by the legislature, not the antitrust tribunal.

### ¶2023. Agreements Pertaining to Advertising and Related Dissemination of Product Information

**2023a.  Introduction.**  Horizontal agreements relating to advertising fall into two broad classifications. First are agreements limiting the amount or nature of advertising (¶b). Second are agreements for producing joint advertising, which we discuss briefly in ¶c. Many agreements in the latter class do not qualify as naked restraints at all unless they also involve price fixing.[1] The few discussed here deal with situations where the advertising in issue seems not to have been ancillary to any coordination of production or distribution. Finally, ¶d considers agreements to suppress truthful information.

**2023b.  Agreements restricting advertising.**  *1. Generally.* Agreements restricting advertising are a form of output restriction in the production of information useful to consumers.[2] Possible harmful effects fall into two categories. First, under appropriate structural conditions they can facilitate collusion by eliminating various conditions under which competition can occur. For example, once cartel members or participants in an oligopoly have fixed a price, individual members have an incentive to compete on various nonprice terms, such as offering free delivery, stocking, extended warranties, or other collateral services. By restricting

¶2023.  n.1.  Advertising agreements that are ancillary to other productive activity are discussed in ¶2137.

2.  In *California Dental Assn. v. FTC (CDA),* 526 U.S. 756, 776 (1999), the Supreme Court doubted this proposition with respect to the facts of that case but did not question the general proposition that agreements restraining advertising limit a firm's useful output. See ¶2008.

advertising the cartel or oligopoly can make it significantly more difficult for individual firms to communicate these additional services to consumers, thus stabilizing the cartel or oligopoly.

Second, like in the case of bans on competitive bidding,[3] advertising restrictions increase consumer search costs by hindering consumers in obtaining important information about the various alternatives available from sellers.[4] Even in a competitively structured market, increased consumer search costs can yield higher pricing. For example, if dentists are forbidden by agreement from advertising their prices, then patients must visit each dentist individually to compare prices — something that a patient with a bad toothache will be disinclined to do. The result insulates dentists from price competition even if the dentists' market is competitively structured in that numerous dentists serve the community and are within the patient's reasonable transportation range. In extreme cases of high search costs, a dentist could charge the monopoly price and receive a random distribution of local customers, because for each one the cost of seeking price comparisons is greater than the cost of simply paying what the first dentist charges.[5] In CDA[6] the Supreme Court majority seemed quite unconcerned about these factors, accepting at face value the defendant's argument that the dangers of consumer confusion from price or quality advertising were so severe that patients would be better off if there were no such advertising at all.[7] The restrictions effectively eliminated all quality advertising and most price advertising.

When markets are so complex that consumers lack good information about price and quality, the consumers generally benefit from the competitive amount of information, provided that individual instances of false or misleading claims are effectively disciplined by public authorities, by the market, or by the sellers themselves.[8] The dental association's restraints on price advertising had been interpreted to forbid dentists from advertising "reasonable" or "affordable" prices unless they provided complete documentation of the fees themselves for all procedures and the

---

3.  See ¶2022e.
4.  See *Bates v. State Bar of Ariz.*, 433 U.S. 350, 377-378 (1977) (noting that limits on price advertising increase consumer search costs).
5.  See ¶2021c.
6.  See note 2.
7.  For further discussion, see ¶2008.
8.  See George J. Stigler, The Economics of Information, 69 J. Pol. Econ. 213 (1961); Richard A. Posner, Antitrust Law 30 (2d ed. 2001).

amount of any discount offered to various groups.[9] The Association even disciplined a dentist for advertising "reasonable fees quoted in advance" without listing those fees in the advertisement itself.[10] When the Association disciplined a dentist for using such a statement in his advertising, it apparently made no attempt to determine whether the statement was false but merely whether it violated guidelines requiring all advertising of fees as "reasonable" to spell out in detail what all the fees were.[11] As a result, dentists were effectively prohibited from making such claims altogether.[12]

To be sure, the dentists may believe that price competition will be bad for the dental services market because it will induce dentists to cut corners and serve patients inadequately, but the Supreme Court dispensed with these arguments in the *Engineers* case,[13] and they apply equally here.

On the other hand, restrictions on advertising may be beneficial to competition when they eliminate only false or deceptive advertising, which does not produce useful information for consumers and may cause rivals at least short-run injury.

*2023b2.    Policy concerns.*    Truthful advertising is an important part of the output of any firm, and in many markets it is essential to effective distribution.[14] For example, the distribution of Ford automobiles requires not only transportation, dealerships, and warranty service, but also advertising that communicates information about the comparative qualities, pricing, and availability of

---

9. Cf. *Morales v. TWA, Inc.*, 504 U.S. 374, 388 (1992) ("[r]equiring too much information in advertisements can have the paradoxical effect of stifling the information that consumers receive"; holding that state statutes providing aggressive restraints on airline advertising were preempted by federal legislation).

10. See 128 F.3d at 724. However, a dissenter in the FTC vigorously disputed these fact findings and concluded that most instances of overly aggressive enforcement of advertising claims either (a) dated from the early 1980s, or (b) were the product of over-zealous local societies rather than the CDA itself. Of course, in the latter case the CDA might, depending on the circumstances, be liable for failing to clarify its position or rein in the excesses of its local chapters.

11. Thus, dentists were disciplined for offering discounts if they did not specify the undiscounted price of every service to which the discount might apply. See 526 U.S. at 783, and see 121 F.T.C. 190, 302 (1996) (dentist disciplined for offering "20% off to new patients with this ad").

12. "… [T]he record bears out the conclusion that dentists do not advertise across-the-board discounts that include a complete itemization of the regular fee for each discounted service." Cf. *Massachusetts Bd. of Registration in Optometry*, 110 F.T.C. 549, 606-608 (1988) (striking down restrictions on discount advertising by optometrists).

13. See ¶2022e, discussing *National Socy. of Professional Engrs. v. United States*, 435 U.S. 679 (1978).

14. See, e.g., *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (truthful advertising informs consumers about "who is producing and selling what product, for what reason, and at what price"). See also *Bates*, note 4, 433 U.S. at 364.

Fords. As a result, an agreement among rivals restricting advertising is an output restriction agreement just as certainly as an agreement restricting the number of automobiles produced, the number of dealerships, the length of a warranty, the quality of the automobile itself, or any of the other attributes of automobile manufacturing and selling. As such, an agreement among competitors that they will not advertise at all, that they will not advertise in each other's territories,[15] or that they will restrict the content of their advertising even if it is truthful is ordinarily illegal per se.[16]

Although misleading or deceptive advertising is socially harmful, its regulation should lie primarily with public enforcers in the various levels and departments of government, not with the regulated firms themselves. For example, false and misleading advertising is within the jurisdiction of the Federal Trade Commission as well as numerous state and even some local consumer protection agencies. As a result, firms who are injured by the false and misleading advertising of a rival may ordinarily report violations and in some cases even seek redress themselves through public agencies or the judicial process. The same thing generally applies to consumers victimized by a seller's false advertising claims.

Thus, one must be wary of purely private agreements restraining advertising on the theory that rivals or consumers need additional protection from false or misleading claims. This is particularly so when the substantive restraint goes beyond that which a government agency would enforce, and even more so when the rule is coupled with the power to discipline a member or remove the member from the association for engaging in advertising that crosses the line. Such an agreement is a limitation on output and could be just as anticompetitive as an agreement among firms policing pricing practices and disciplining members whose prices

---

15. See *Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995) (agreement between lawyers that they would not advertise in one another's territories illegal per se).

16. See, e.g., *AMA*, 94 F.T.C. 701, 1005 (1979), aff'd as modified, 638 F.2d 443 (2d Cir. 1980), aff'd by an equally divided Court, 455 U.S. 676 (1982) (general ban on advertising restraints, but Association may continue to penalize false and deceptive advertising); *Massachusetts Bd.*, note 12, 110 F.T.C. at 605 (striking down ban on all advertising, even if truthful). See also the following consent decrees: *American Inst. of Certified Pub. Accountants*, 113 F.T.C. 698 (1990) (prohibiting ban on truthful advertising); *Oklahoma Optometric Assn.*, 106 F.T.C. 556 (1985) (similar); *Association of Indep. Dentists*, 100 F.T.C. 518 (1982) (similar).

See also *International Assn. of Conference Interpreters*, 5 Trade Reg. Rep. ¶24,235 (F.T.C. 1997) (restrictions permitting members to advertise that they are interpreters but forbidding them from comparing themselves with others occasionally enforced so as to prohibit comparative price advertising; rule of reason applied and these charges dismissed for lack of finding of power or anticompetitive effects).

are too low. While many producer associations may have good intentions, they also have interests that do not always coincide with the public interest or the interests of consumers, and they may not stand to benefit from aggressive competition. Further, the relationship between price advertising and low prices seems relatively well established.[17]

The remaining discussion is divided into three parts: horizontal restrictions on truthful price advertising (¶b3), restrictions on truthful advertising about things other than price (¶b4), and "overbroad" restrictions purporting to limit only untruthful or deceptive advertising (¶b5).

2023b3.  *Restrictions on price advertising, even if truthful.*  A naked or nearly naked agreement prohibiting rivals from advertising truthful and nonmisleading information about their prices is unlawful per se.[18] The same thing applies to an agreement not to engage in truthful price advertising in one another's geographic territories,[19] agreements not to engage in truthful advertising comparing prices, promising the "lowest" price, offering to meet the lowest price of any rival, and the like.[20] In many markets price is the most important avenue down which competition moves, and in nearly every market it is at least very important.

---

17.  *Bates*, note 4, 433 U.S. at 377 (prices sometimes "dramatically lower" when price advertising is permitted).

18.  In addition to previously cited cases, see *Federation of Prescription Serv., Inc. v. American Pharm. Assn.*, 484 F. Supp. 1195, 1207 (D.D.C. 1980), aff'd in part and rev'd in part, 663 F.2d 253 (D.C. Cir. 1981), cert. denied, 455 U.S. 928 (1982) (condemning pharmacy association's efforts to limit mail order pharmaceutical companies by banning advertising); *United States v. Gasoline Retailers Assn.*, 285 F.2d 688, 691 (7th Cir. 1961) (criminal case; per se unlawful for gasoline retailers to agree not to advertise their gasoline prices except by posting prices directly on the pump); *Massachusetts Bd.*, note 12, 110 F.T.C. at 605 (unlawful for optometrists' association to prohibit truthful advertising of pricing or discounts, quality claims, or association with a particular optical establishment); *United States v. House of Seagram*, 1965 Trade Cas. ¶71,517 at 81,275 (S.D. Fla. 1965). See also the following consent decrees: *Arizona Auto. Dealers Assn.*, 5 Trade Reg. Rep. ¶23,560 (F.T.C. 1994) (consent decree; automobile dealers agree to refrain from advertising that they will meet or beat competitors' price or that their prices are lower than anyone else's); *Personal Protective Armor Ass'n.*, 5 Trade Reg. Rep. ¶23,521 (F.T.C. 1994) (consent decree); *Commercial Assns. Inst.*, 5 Trade Reg. Rep. ¶23,561 (F.T.C. 1994) (consent decree); *United States v. Greater Des Moines Hosp. Assn.*, 57 Fed. Reg. 45,401 (S.D. Ia. 1992) (consent decree banning restrictions on hospital advertising); *Association of Indep. Dentists*, 100 F.T.C. 518 (1982) (consent decree; dentists agree to ban all, even truthful, advertising); *United States v. American Pharm. Assn.*, 1981-2 Trade Cas. ¶64168 (W.D. Mich. 1981).

19.  Cf. *Blackburn*, note 15.

20.  Cf. *Denny's Marina v. Renfro Prods., Inc.*, 8 F.3d 1217, 1219 (7th Cir. 1993) (marine dealers' exclusion of dealer from trade show because of its "meet or beat" any price advertising illegal per se).

The courts have generally agreed. Although historically there may have been an exception or at least a softening of the per se rule for the learned professions,[21] today it seems clear that no professional immunity as such exists.[22] Rather, the Supreme Court has adopted a rule of reason analysis for restraints in complex markets showing an extreme imbalance of information as between suppliers and customers.[23]

2023b4.   *Restrictions on nonprice advertising, even if truthful; vertical restraints distinguished.*   While courts and the FTC have readily condemned naked restraints on truthful price advertising, they have had somewhat more difficulty with advertising about topics other than price, such as quality, nonprice terms of sale, and the like. The source of the difficulty is not obvious. Agreements about nonprice terms refer to the output of a firm and can facilitate collusion just as much as price terms. Indeed, in oligopoly markets, agreements about price terms are often unnecessary because the structure of the market ensures that the firms will lead and follow on matters of price. But the agreement on nonprice terms is essential for eliminating the alternative avenues of competition that are most likely to occur in relatively concentrated markets. As a result, agreements eliminating advertising of such things as product quality, length or comprehensiveness of warranty, free delivery, or collateral services can harm competition just as much as agreements restraining advertising about price.

A few courts appear to have been confused about the difference between horizontal and vertical agreements. Purely vertical agreements about "price" terms are said to be unlawful per se,[24] while agreements about nonprice terms receive rule of reason treatment.[25] But no such difference governs agreements among rivals, where "output" governs the nature and extent of competition at least as much as "price."

21.   See *AMA,* note 16, 94 F.T.C. at 1003-1004 (refusing to apply per se rule because doubtful about its application to learned professions). But see *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 779-780 (1975) (noting and rejecting historical tendency of courts to regard activities of the learned professions as not part of "trade or commerce," and thus as not reachable by the Sherman Act).

22.   See ¶2008; and see, e.g., *Arizona v. Maricopa County Med. Socy.,* 457 U.S. 332,. 348-349 (1982) (applying per se rule to physicians; rejecting learned profession exception); *FTC v. Superior Court Trial Lawyers Assn.,* 493 U.S. 411 (1990) (applying per se rule to lawyer price fixing; no discussion of learned profession immunity).

23.   See the ¶2008 discussion of the Supreme Court's decision in *CDA,* note 2, as well as our critique.

24.   See Ch. 16B (per se rule against minimum resale price maintenance).

25.   See Ch. 16D.

The distinction between vertical and horizontal restraints on advertising is critical, however. Vertical restraints on dealer advertising are common, including among other things geographic limitations and restrictions prohibiting dealers from making invidious comparisons with other dealers of the same manufacturer.[26] As a general proposition a manufacturer or upstream firm does not impose vertical restraints on its dealers if it believes those restraints will reduce aggregate output or facilitate the exercise of dealer power.[27]

One good way to analyze the problem is to consider how a single firm would manage the advertising of its own, wholly owned dealerships. Generally, it would not profit by expensive overlaps in geographic advertising designed to transfer customers from one dealership to the next, and it would almost certainly not profit from advertising by one dealership criticizing the services offered by a sibling dealership. As a general matter, the franchisor or other upstream firm has the same incentives vis-à-vis independent franchisees or other downstream dealers as does the single firm.

But this is not generally the case with respect to firms whose only market relationship is horizontal and who are not engaged in other significant integration of output or distribution. In such cases agreements not to advertise in overlapping territories or not to make invidious comparisons with competitors are simply a way of limiting competition by forcing customers to incur the higher costs of making suitable comparisons on their own.

Presumptively, agreements to which the manufacturer, franchisor, or other upstream firm is a party should be characterized as vertical and subjected to rule of reason treatment. By contrast, agreements *among* the dealers or franchisees of a single manufacturer or other supplier and to which the upstream firm is not a party are clearly horizontal.

*2023b5.   Overbroad restrictions limiting untruthful or deceptive advertising.*   While consumers have a strong interest in advertising, they certainly do not benefit from false or misleading advertising. Further, while numerous federal and state statutes condemn false and misleading advertising, these statutes may not be sufficiently broad or aggressive to reach the manifold varieties of misleading advertising. Still further, since the statutes are usually of general application, they may not reach certain individual markets with

26.  See ¶1609a.
27.  See ¶1611.

sufficient specificity. As a result, there may be some value in more market-specific, specialized advertising rules that apply only to a given industry or profession. Further, those best equipped to distinguish the truthful from the false or misleading may be participants in the market in question.

These considerations may justify sellers operating in relatively specialized areas to make rules governing false and misleading advertising, normally enforced through trade or professional associations. At the same time, however, market participants have a dual set of incentives that may distort their judgment about what constitutes false or misleading advertising. On the one hand, as market participants they profit when consumer confidence in their market is increased, and insistence on truthful advertising serves to increase such confidence. Thus, it can be said that sellers in a market profit from strict rules prohibiting false and misleading advertising that serves to undermine consumer confidence. But sellers can also profit from restraints limiting competition among them, and limits on aggressive advertising of price or product or comparative advertising of competitive offerings can greatly hinder consumers in making competitive judgments.

Thus, while the sellers in a market can be expected to be enthusiastic about limiting "deceptive" advertising, they are often inclined to be overly enthusiastic and to brand as deceptive that which is merely aggressive.[28] So if professional associations are to have rules limiting false or misleading advertising, these rules and their enforcement must be scrutinized under the antitrust laws to ensure that the line is properly maintained between what is actually false or misleading, thus undermining consumer confidence, and what properly informs consumers about competitive offerings, enabling consumers to seek out alternatives with confidence.

While we believe the Supreme Court in *CDA* was too sanguine about permitting competitors to limit their own advertising, the decision in any event applies only in markets that display an unusual imbalance between the information held by suppliers and that held by customers.[29] If the country's manufacturers of ordinary products, such as furniture or appliances, should agree to refrain from

---

28. This is our reading of the facts of the *CDA* case, note 2; however, the Supreme Court majority did not seem overly concerned about the dangers of leaving competitors in control of their profession's advertising. See also Posner, note 8, at 30, which agrees with our position.

29. See ¶2008b, c.

making any quality claims in their advertising, their agreement would be adjudged unlawful per se.[30] Such an agreement would be a naked restriction on the output of information that consumers deem useful. Although such information can sometimes be misleading,[31] we would not leave to the firms themselves such unbridled discretion to deal with potentially misleading advertising by eliminating all quality claims whatsoever.

    *2023b6.    Relevance of state legislation or its absence.*    The learned professions are heavily regulated by state law, which ordinarily establishes licensing requirements and, in many cases, rules of professional conduct. At the same time, antitrust analysis generally proceeds on the assumptions that markets are sufficiently similar to one another that its more generalized rules apply to all. If a market is subject to significant "market failure" requiring price regulation or government-supervised output restrictions, that task befalls Congress, state legislatures, or local government. Congress always has the power to "repeal" the federal antitrust laws selectively,[32] and state and local government can achieve essentially the same result by qualifying their legislation under antitrust's "state action" immunity.[33] Thus, for example, the Supreme Court held in *Bates*[34] that restrictions on lawyer advertising promulgated by a state bar association were lawful under the Sherman Act when compelled by the state's supreme court.

    In the absence of such legislation, the inference must be that the professional association at issue has not succeeded in convincing state legislators that the challenged restrictions should be a part of the state's legislative program. At that point, it is inappropriate to try to convince a federal antitrust tribunal that a market is sufficiently idiosyncratic to justify "self-regulation" of a sort that would be impermissible in other markets. As a result, we would not treat horizontal restrictions on advertising in the learned professions in

---

    30.  Cf. *Detroit Auto Dealers Assn.*, 111 F.T.C. 417, 494-499 (1989), aff'd, 955 F.2d 457, 471 (6th Cir. 1992), cert. denied, 506 U.S. 973 (1992), where the FTC applied the per se rule to an agreement among automobile dealers limiting showroom hours; while the Sixth Circuit applied the rule of reason, it also condemned the restraint.

    31.  For example, advertising "discounts" can be deceptive if the advertiser merely inflates the base price from which the discount is taken, and the FTC has condemned firms for that practice. *Encyclopedia Britannica*, 100 F.T.C. 500, 505 (1982) (order modifying consent order); *Diener's*, 81 F.T.C. 945, 976-978, 980-981 (1972), modified, 494 F.2d 1132 (D.C. Cir. 1974); *Paul Bruseloff*, 82 F.T.C. 1090, 1095-1096 (1973) (consent).

    32.  See Ch. 2C.

    33.  See Ch. 2B-3.

    34.  See note 4.

a significantly different manner than such restrictions are treated in the general run of markets.[35]

**2023c. Joint advertising without other integration of production or output.** *1. Generally.* By contrast to agreements limiting advertising, agreements to advertise jointly are a form of joint production, and joint production generally enjoys a presumption of efficiency gains sufficient to evoke rule of reason treatment, particularly when the joint advertising is part of a larger joint venture organizing the defendants' production or distribution.[36]

Nonetheless, in many markets advertising is the principal way that statements about price and product quality are communicated, and the concerns for collusion are significant, particularly if the only significant aspect of the firms' production that is subject to coordination is the advertising itself. The concerns run from very high when the advertising in question sets a price or output term, to very low when the advertising appears to provide no opportunity whatsoever for setting price or reducing output.

To begin with an easy example, suppose that the only three sellers of RAM memory chips agree to run joint advertisements stating that they are offering chips for $100 per unit. The firms are not producing jointly or integrating any other part of their distribution. The ad is nothing more than naked price fixing and should be condemned as illegal per se.[37] By contrast, an

---

35. But see the qualifications in ¶2008.

36. On joint arrangements for distribution and sales generally, see ¶2137.

37. See *United States v. Serta Assocs.*, 296 F. Supp. 1121, 1125-1126 (N.D. Ill. 1968), aff'd per curiam, 393 U.S. 534 (1969) (joint price advertising and agreement to limit comparative advertising among Serta mattress dealers unlawful per se). Cf. *United States v. Petty*, 1994-2 Trade Cas. ¶70,797 (C.D. Ill.) (consent decree governing defendants' agreements to engage in joint advertising for waste disposal services; under the decree no defendant could disclose its rate to a rival until after the rate had been disclosed to the public, and no joint advertising could state prices); *United States v. Pittsburgh Area Pontiac Dealers, Inc.*, 1978-2 Trade Cas. ¶62,233 (W.D. Pa. 1978) (consent decree prohibiting defendants from "adopting, participating in or adhering to any plan, practice or program, the purpose or effect of which is to advertise the sale price of a Pontiac automobile or fix the advertised price of a Pontiac automobile"; permitting joint advertising, including a "suggested" retail price provided that it is labeled as such, or to advertise "average" prices). See also *Pontiac Dealers Advertising Assn.*, 1980-1 Trade Cas. ¶63,011 (Mass. Super. Ct. 1979) (similar to previous; state law). Cf. *Arizona v. Cook Paint & Varnish Co.*, 391 F. Supp. 962, 966 n.2 (D. Ariz. 1975), aff'd, 541 F.2d 226 (9th Cir. 1976) (not a Sherman Act price-fixing violation for firms to agree with each other to misrepresent the flame-resistance qualities of their product, even though the impact of the agreement may have been to increase its price).

However, joint price advertising may be permissible in situations where joint production entails joint sales. See United States Dept. of Justice, Business Review Letter to Newspaper Assn. of Am. (Dec. 10, 1993) (not challenging newspaper joint venture marketing advertising space at an announced price where joint provision and billing for such advertising was more efficient than requiring each newspaper to do so individually). See generally ¶2137.