**Phillip E. Areeda**
*Late Langdell Professsor of Law*
Harvard University

**Roger D. Blair**
*Huber Hurst*
*Professor of Economics*
University of Florida

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

# Volume II
## Second Edition

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application



**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

Copyright © 2000 by the President and Fellows of Harvard College

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to make copies of any part of this publication should be mailed to:

> Permissions
> Aspen Law & Business
> 1185 Avenue of the Americas
> New York, NY 10036

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 1-56706-602-X (Set)
0-7355-1672-3 (Vol. 2)

Second Edition

1  2  3  4  5  6  7  8  9

members. It keeps selling at agreed-upon prices until 1996, when a consumer files suit. Some courts conclude that each sale itself is an independent act sufficient to toll the statute.[27] Indeed, some courts do not start the statute's final run until bid-rigging conspirators have received the last payment on their successful but illegal bid, reasoning that the "scope and purpose of the conspiracy included the receipt of payments awarded pursuant to collusive, noncompetitive bids,"[28] or that receiving payment "reflected the inflated and anticompetitive price for the work" and was thus "necessary to the successful consummation of the bid-rigging conspiracy."[29] That the bid payments were received by an individual coconspirator rather than the group did not disturb either court,[30] for a conspiracy lasts until its objectives "succeed or are abandoned," and receiving payments clearly indicates the former.[31]

Even here, however, the courts tend to start the statute of limitation running once the cartel becomes publicly known—for example, when one of its members is caught or convicted.[32] This is consistent with the observation made previously that courts interpret the statute of limitation much less favorably to the plaintiff with actual or objective knowledge of the offense.

*320c3.    Vertical agreements and refusals to deal; Robinson-Patman violations.*    When the object of the agreement is something less than a naked cartel, the courts are more divided. A few decisions permit mere payments to keep the claim alive,[33] but other courts have seen

27.  E.g., *Columbia Steel Casting Co. v. Portland General Electric Co.*, 103 F.3d 1446 (9th Cir.), amended on reh'g, 111 F.3d 1427 (9th Cir. 1996) (where a utility agreed with another utility to stop competing in the plaintiff's market in 1972 but then refused the plaintiff's request for service in 1990, the statute of limitation began to run with the 1990 refusal, not with the 1972 agreement; even assuming that the 1972 agreement was the unlawful territorial division being challenged, the 1990 refusal was an "overt act" restarting the statute).

28.  *United States v. Northern Improvement Co.*, 814 F.2d 540, 542-543 (8th Cir.), cert. denied, 484 U.S. 851 (1987).

29.  *United States v. A-A-A Elec. Co.*, 788 F.2d 242, 245 (4th Cir. 1986).

30.  788 F.2d at 245; 814 F.2d at 543. Accord *United States v. District of Columbia*, 788 F.2d 239 (4th Cir. 1986); *United States v. Girard*, 744 F.2d 1170, 1173-1174 (5th Cir. 1984).

31.  *United States v. Dynalectric Co.*, 859 F.2d 1559, 1563 (11th Cir. 1988), cert. denied, 490 U.S. 1006 (1989); *United States v. Evans & Assoc. Constr. Co.*, 839 F.2d 656 (10th Cir.), aff'd on reh'g, 857 F.2d 720 (10th Cir. 1988) (last payment within limitations period though bid-rigged contract awarded seven years before suit); *United States v. Inryco*, 642 F.2d 290 (9th Cir. 1981).

32.  See, e.g., *Morton's Market v. Gustafson's Dairy*, 198 F.3d 823 (11th Cir. 1999) (fact question as to whether plaintiffs had notice of existence of a conspiracy).

33.  See, e.g., *Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299 (9th Cir. 1986), cert. denied, 479 U.S. 886 (1986) (limitation period begins anew each time defendant souvenir vendors competing with the plaintiff made payments to defendant tour operators implementing alleged conspiracy to deny trade to the plaintiff); *National Souvenir Center v. Historic Figures*, 728 F.2d 503 (D.C. Cir. 1984) (statute's final run does not start until expiration of long-term lease requiring plaintiff museum operator to pay for defendant's wax figures, whether used or not, thus discouraging use of rival products and thereby allegedly implementing the defendant's attempt to monopolize the market for such figures). Cf. *Weber v. Consumer's Digest*,

such tolling as unjustified. These courts have held that the mere receipt of franchise or lease payments under an agreement alleged to contain unlawful tying did not restart the limitations period without proof that the defendant had continuing power to force acceptance of the tie. One decision distinguished the "active enforcement of an illegal tying contract" from "the passive receipt of profits." Only the former is a sufficiently "overt act" to re-start the statute, because lease payments alone did not show that the defendant had the "ability to enforce the tie absent voluntary cooperation" by the plaintiff — that is, the defendant had the market power that would make the alleged tie illegal.[34] Of course, if monopoly power continued, an illegal lease-only policy created a cause of action every time the monopolist re-leased and impliedly refused to sell.[35] Once again, however, each new refusal to lease when accompanied by monopoly power would have to be counted as a new violation, whether or not the defendant had previously refused. Another distinguishing feature between the cartel and the unlawful tie or exclusive dealing is that the likely plaintiff has almost immediate knowledge of its existence.

The best solution to the problem of long-term contracts that are unlawful, if at all, from the beginning but also known to the plaintiff, is to use the statute of limitation to bar the tardy damage action but give flexibility in equity to permit the injunction against continued enforcement. To illustrate, suppose that the defendant imposes a 20-year requirements contract on the plaintiff that was challengeable as exclusive dealing from its inception. The purchaser who suffers injury but delays its damage action for six years has lost its opportunity to collect damages, but the public as well as the purchaser still profit from the termination of an anticompetitive arrangement. The court should permit an action declaring the contract unlawful and unenforceable.[36]

The cases involving refusals to deal often make "finality" decisive. Suppose, for example, that a dealer is terminated in 1990 be-

---

440 F.2d 729 (7th Cir. 1971) (suit to enforce allegedly unlawful noncompetition agreement is overt act starting statute).

34. *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989). Apparently contra: *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029 (5th Cir. 1977) (cause of action accrues each time defendant collected rent for facilities leased to condominium on alleged tie that firmly bound plaintiffs from the day they purchased their condos).

35. *Hanover Shoe*, note 5, 392 U.S. at 502 n.15.

36. We would do the same thing in a case like *Weber*, note 33, which permitted the antitrust claimant to challenge an old restrictive covenant as unlawful when the promisee brought suit on the covenant. If the limitation period had expired before the suit was brought, the appropriate resolution would be to permit the restraint of trade issue as a defense to enforcement but not as a basis for damages.

cause the manufacturer has designated a different dealer as its sole
outlet in that city.[37] In 1993 the dealer requests reinstatement but is
summarily denied, the manufacturer citing the exclusive outlet
arrangement. Is the dealer's 1995 antitrust suit challenging the ex-
clusive contract time-barred, or was it revitalized by the 1993 re-
fusal?

In some cases, of course, a single refusal is all that ever occurs,
and the statute runs from that instant. But in many cases the refusal
is ongoing, represented either by repeated refusals to deal with the
plaintiff or repeated assertions of a company policy.

An illegal unilateral refusal to deal, following a termination of
prior dealings or otherwise, creates a cause of action when it oc-
curs[38] or when it becomes final.[39] Plaintiffs are not generally allowed
to restart the limitation period perpetually merely by repeated re-
quests that the defendant refuses. Thus the limitation period con-
tinues running notwithstanding a terminated dealer's new request
for supplies.[40] Most courts see no continuing violation when the ini-
tial refusal to deal is "irrevocable, immutable, permanent and
final."[41] These courts emphasize that the plaintiff's injury resulted
from the initial refusal.[42] Hence, general inquiries by third-party

37. On sole outlets, see ¶¶1650-1655.
38. E.g., *Garelick v. Goerlich's*, 323 F.2d 854 (6th Cir. 1963) (manufacturer sent letter ter-
minating distributor; later refused to return distributor's calls and refused reinstatement;
statute ran from sending of initial letter); *Saunders v. National Basketball Assn.*, 348 F. Supp. 649
(N.D. Ill. 1972) (NBA initially refused to draft plaintiff eight years prior to filing and consis-
tently refused to draft him thereafter; statute ran from initial refusal); *Norman Tobacco & Candy
Co. v. Gillette Safety Razor Co.*, 197 F. Supp. 333 (N.D. Ala. 1960), aff'd, 295 F.2d 362 (5th Cir.
1961) (first refusal to sell to wholesaler starts statute).
39. On finality, see *Adelman v. Mercy Catholic Medical Center*, 1996-2 Trade Cas. ¶71,628
(E.D. Pa.) (statute of limitation on physician's denial of staff privileges began to run when the
hospital's board of directors affirmed the medical board's recommendation, thus making the
decision final within the institution).
40. *David Orgell v. Geary's Stores*, 640 F.2d 936 (9th Cir.), cert. denied, 454 U.S. 816
(1981), citing an earlier edition of this Paragraph.
41. *Multidistrict Vehicle Air Pollution v. General Motors Corp.*, 591 F.2d 68, 72 (9th Cir.),
cert. denied, 444 U.S. 900 (1979). See also *Kaw Valley Elec. Coop. v. Kansas Elec. Power*, 872 F.2d
931, 934 (10th Cir. 1989) (refusal to share electric power confirmed in formal resolution by de-
fendant's board of trustees was final). But see *DXS*, note 19 (defendant's representations to
service customers that their warranties would be voided if they used ISO's repair services rep-
resented part of a continuing *Kodak* style antitrust violation, thus delaying the accrual of the
cause of action)
Contra, *Bonnolo Rubbish Removal v. Town of Franklin*, 886 F. Supp. 955 (D. Mass. 1995)
(dicta; in challenge to allegedly anticompetitive municipal trash hauling ordinance, statute of
limitation began to run not when the allegedly anticompetitive ordinance was passed, but on
the last date that the plaintiff had been forced to patronize undesired facilities under the force
of the statute; but by this reasoning there would be no statute of limitation on a challenge to
a statute, which was obviously known to the injured plaintiff).
42. In *Barnosky Oils v. Union Oil Co.*, 665 F.2d 74 (6th Cir. 1981), the defendant al-
legedly forced plaintiff distributor to agree not to sell to price-cutting retailer and continued
to insist on compliance with that agreement although plaintiff made no requests within last
four years); *SJ Advanced Tech. & Mfg. Corp. v. Edward Junkunc*, 627 F. Supp. 572 (N.D. Ill. 1986)

brokers in behalf of the plaintiff, with whom the defendant had earlier refused to deal, do not restart the limitation period.[43]

An occasional court rejects the general rule,[44] but most courts restarting the statute after a new refusal to deal point to special circumstances,[45] such as a "genuine" subsequent request by one having "reason to believe the original [refusal to deal] decision . . . did not still stand."[46] We dispute decisions restarting the statute any time the plaintiff remains in the business and tolling it only for plaintiffs completely excluded from the market by the refusal.[47] More than almost any other plaintiff, the victim of a direct refusal to deal knows immediately that a refusal has occurred. Particularly when the legal status of the conduct is ambiguous, as it is in nearly all cases involving unilateral refusals to deal, such plaintiffs should have every incentive to bring their suit in a timely fashion, thus minimizing the social damage of any antitrust violation that is subsequently found.

Several courts have held that where the refusal to deal with the plaintiff implements an illegal contract granting exclusive privileges to the plaintiff's rivals, each refusal implementing the illegal contract restarts the limitation period.[48] Courts restarting the statute empha-

---

(defendant's continued refusal to deal with those who deal with plaintiff insufficient to restart the statute).

43.   *Lomar*, note 19, 824 F.2d at 586-587.

44.   *Poster Exchange*, note 23, 517 F.2d at 129; *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1187 (5th Cir. 1988) (a new "specific act or word of refusal" restarts limitation period). Believing the general rule inapplicable to monopolization cases, *Poster Exchange* asked the lower court to determine whether any "specific act or word" of refusal occurred within four years before suit. However, the policy of repose behind the rule seems equally applicable to all offenses.

45.   E.g., *Braun v. Berenson*, 432 F.2d, 538, 543 (5th Cir. 1970) (defendant-lessor's repeated refusal to lease new or additional space to plaintiff store owner creates new cause of action because store space is available not continuously but "only periodically and under uniquely different circumstances"); *Century Hardware Corp. v. Powernail Co.*, 282 F. Supp. 223 (E.D. Wis. 1968).

46.   *Midwestern Waffles v. Waffle House*, 734 F.2d 705, 715 (11th Cir. 1984) (request known to be futile would not create new injury). The court's emphasis on new injury implies, contrary to other language in the opinion, that the suit would be based on the new refusal, not the original refusal. See also *LaSalvia v. United Dairymen of Ariz.*, 804 F.2d 1113 (9th Cir. 1986), cert. denied, 482 U.S. 928 (1987) (subsequent refusal to deal starts statute of limitation anew if it causes additional injury); *Vincent v. Reynolds Memorial Hosp.*, 881 F.2d 1070 (4th Cir. 1989) (hospital's repeated denials of staff privileges to plaintiff physician constituted a continuing violation); *Red Lion Medical Safety v. Ohmeda*, 63 F. Supp. 2d 1218 (E.D. Cal. 1999) (even though defendant's policy of refusing to sell parts was in place for some ten years prior to the filing of suit, it was a continuing violation; suggesting that a refusal to deal becomes a final act only when it "completely and permanently" excludes the plaintiff); *Telecomm Technical Services v. Siemens Rolm Communications*, 66 F. Supp. 2d 1306 (N.D. Ga. 1998) (manufacturer's refusal to sell replacement parts to ISOs not time-barred even though more than four years prior to filing where manufacturer had led ISOs to believe that it would reconsider its position and might change its mind); *Western Shoe Gallery v. Duty Free Shoppers*, 593 F. Supp. 348 (N.D. Cal. 1984) (recurring boycotts restart statute).

47.   See, e.g., *Red Lion*, note 46; *Telecomm Tech.*, note 46.

48.   *Driscoll v. City of New York*, 650 F. Supp. 1522 (S.D.N.Y. 1987) (denial of pier privileges in 1982 pursuant to a 1965 exclusive lease starts limitations period); *KFC Corp. v. Marion-*

size the defendant's continuing operation under an illegal contract as creating a continuing cause of action.[49]

Restarting the statute seems unwise in the case of the long-term contract whose existence was known to the plaintiff from its inception. For example, most exclusive dealing arrangements are efficient, and long-term arrangements are conducive to stability in business relationships. In that case a person who both knows of the contract and feels the injury should bring its damages action within four years of the contract's formation. In any event, one must distinguish between terminated dealers and newcomers. Suppose that a supplier requires tying of its products and refuses to sell to a dealer unwilling to accept the tied product. Under many of the decisions that second dealer would have only four years to bring its suit after the termination became final. However, a newcomer wishing to be a dealer in the manufacturer's good would have no occasion for asserting an antitrust claim until a request to distribute the tying good but not the tied good was made.

The cause of action from an unlawful termination of relations usually accrues at the time that a cancellation notice destroys or significantly reduces the value of a franchise contract.[50] However, some courts have reasoned that a mere notice of cancellation lacks legal significance until the would-be buyer places an order that the supplier refuses.[51] Although no categorical rule can properly govern every case, the key date is that on which the defendant's act causes sufficiently measurable injury. Thus once the plaintiff has been destroyed by an illegal act, the limitation period begins running, even though the defendant continues in its refusal to deal.[52] Although a

*Kay Co.*, 620 F. Supp. 1160 (S.D. Ind. 1985) (action on long-term exclusive dealing contract not time-barred when contract remains in force; repeated refusals amount to continuing violation); *Woolen v. Surtran Taxicabs*, 461 F. Supp. 1025 (N.D. Tex. 1978) (statute restarts every time rival taxicabs denied passengers because of municipality's illegal award of taxicab monopoly).

49.  E.g., *Twin City Sportservice v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975); *Baker v. F. & F. Investment*, 420 F.2d 1191 (7th Cir.), cert. denied, 400 U.S. 821 (1970); *Material Handling Indus. v. Eaton Corp.*, 391 F. Supp. 977 (E.D. Va. 1975).

50.  E.g., *Emich Motors Corp. v. GM*, 229 F.2d 714 (7th Cir. 1956) (contract between automobile manufacturer and dealer provided that dealer's right to receive new cars would terminate on receipt of first notice of intention to cancel).

51.  *Pioneer Co. v. Talon*, 462 F.2d 1106 (8th Cir. 1972) (plaintiff had no formal contract with manufacturer or his distributor, but merely placed orders on an individual basis); *2361 State Corp. v. Sealy*, 402 F.2d 370 (7th Cir. 1968).

52.  *Hennegan*, note 33, at 1300-1301 (subsequent operation of illegal conspiracy restarts statute only if plaintiff remains in business and continues to be injured). See also *Yeager v. Waste Management*, 1995-1 Trade Cas. ¶70,881 (N.D. Ohio 1994) (when alleged conspiracy of rivals to exclude plaintiff from market eventually forced sale of plaintiff's business, the sale itself could be the last event starting limitation period, even though the last act of any defendant had been earlier; a subsequent decision found the action barred, however, because even the sale had occurred more than four years prior to filing date. 1995-1 Trade Cas. ¶70,882 (N.D. Ohio 1994).

destroyed plaintiff might subsequently have reentered the business in the absence of the continuing violation, its damages would then be based not on its destruction more than four years earlier but on the profits that reentry would have generated.[53]

Many of the cases distinguish between the injuries that result from the mere imposition of an unlawful arrangement and the injuries that result from discipline for violating the arrangement. For example, suppose a franchisor unlawfully requires franchisees to take a tied product as a condition of obtaining its franchise. One franchise continues under this arrangement for many years, then stops taking the franchisor's tied product and is terminated as a result. The statute of limitation on the termination ordinarily begins to run when the termination occurs, notwithstanding that the unlawful rule leading up to the termination was in place for many years before.[54]

While the cases are not consistent, they are significantly more likely to restart the statute when the action complained of is conspiratorial rather than unilateral. For example, if a group of physicians act anticompetitively by repeatedly denying the plaintiff staff privileges at their hospital,[55] each new meeting is an unlawful act whether or not prior meetings were also unlawful.

Because the Robinson-Patman Act requires actual sales,[56] cases generally start the statute of limitation from the date of the last discriminatory transaction.[57] Both the high- and the low-priced sales are necessary to create a price "discrimination" under the statute, so there is no violation until the last sale has occurred. One qualification is that for long-term contracts setting the discriminatory prices the contract date rather than the sale date governs.[58] Suppose that a manufacturer enters ten-year contracts to sell widgets to *A* at a 10 percent discount from the list price and to competing dealer *B* at a 20 percent discount from list. Sales pursuant to these contracts create an ongoing discrimination, but in each case the discrimination

---

53. *Fitzgerald v. General Dairies*, 590 F.2d 874, 875 (10th Cir. 1979). Such a plaintiff must prove, of course, sufficient preparation for reentry. See ¶349 (2d).

54. E.g., *Los Angeles Police Dept. v. General Electric Corp.*, 1994-2 Trade Cas. ¶70,775 (N.D. Ill.) (dealer could challenge its recent termination flowing from unlawful tying arrangement created beyond limitation period).

55. E.g., *Vincent*, note 46.

56. See ¶2312.

57. See, e.g., *National Distillers and Chemical Corp. v. Brad's Mach. Products*, 666 F.2d 492 (11th Cir. 1982); *Hoover Color Corp. v. Bayer Corp.*, 24 F. Supp. 2d 571, 573 & n.3 (W.D. Va. 1998) (limiting damages to sales within four years prior to filing). See also *Olympia Co. v. Celotex Corp.*, 597 F. Supp. 285, 295 (E.D. La. 1984), aff'd, 771 F.2d 888 (5th Cir. 1985), cert. denied, 493 U.S. 818 (1989) (dicta); *Chatham Brass Co. v. Honeywell*, 512 F. Supp. 108 (S.D.N.Y. 1981).

58. The contracting date also generally governs the determination of whether two sales are sufficiently contemporaneous for purposes of the Act. See ¶2313.

"relates back" to the date the contracts were formed when the decision to discriminate was implemented. On roughly analogous facts the *Grand Rapids Plastics* court barred an action filed more than four years after the contracts were formed.[59] The subsequent sales under the contracts were not "new and independent" acts; they were merely "a reaffirmation of a previous act"—namely the formation of the discriminatory contracts.

320c4.   *Monopolization; single versus ongoing exclusionary practices.*   By contrast to the above situations, consider discrete or ongoing exclusionary practices said to constitute unlawful monopolization or attempt to monopolize. If monopolization is successful, the resulting higher prices could last for many years, although in other cases the monopolization may be of short duration. In the typical attempt case the monopoly never materializes or is short-lived. Once the monopoly has been attained, the monopolist's setting of its own prices is a unilateral act, and even the monopolist is free to set its own prices.[60] In both monopolization and attempt cases the exclusionary practices could consist of a single act, such as the monopoly created by a wrongful patent infringement suit[61] or a finite period of predatory pricing.[62] Or the practice could be something that is ongoing, such as the continuous or repeated refusal to sell aftermarket parts to rivals[63] or the repeated insistence on renting but not selling one's equipment.[64]

The courts consistently hold that if the monopoly is created by a single identifiable act and is not perpetuated by an ongoing policy, the statute of limitation runs from the commission of the act, notwithstanding that high prices may last indefinitely into the future. Thus, for example, the limitation period for monopolization by a wrongfully filed lawsuit runs from either the date the suit is filed or the date that the suit's defendant receives the process. That date is not continued by subsequent pleadings, motions, trial, and the like.[65] The "initiation of a lawsuit is the final, immutable act of en-

---

59.   *Grand Rapids Plastics*, note 21.
60.   See ¶720 (rev. ed.).
61.   See ¶709 (rev. ed.).
62.   See Ch. 7C (rev. ed.).
63.   *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).
64.   E.g., *Hanover Shoe*, note 5; *United Shoe Machinery*, note 6.
65.   *Pace*, note 22. See also *Al George v. Envirotech Corp.*, 939 F.2d 1271 (5th Cir. 1991) (last overt act on allegedly wrongful patent infringement suit was the filing of the suit itself); *Chest Hill Co. v. Guttman*, 1981-2 Trade Cas. ¶64,417 (S.D. Ohio) (same). See also *B.V. Optische Industrie de Oude Delft v. Hologic*, 909 F. Supp. 162 (S.D.N.Y. 1995) (limitation period on allegedly improperly brought patent infringement suit began to run when process was served and the duty to defend thus arose, not when the complaint itself was filed); *Northern Trust Co. v. Ralston Purina Co.*, 1995-1 Trade Cas. ¶70,874 (N.D. Ill.) (statute of limitation on claim of fraudulently brought patent infringement suit began to run when the infringement suit was settled,