**PUBLICLY FILED (REDACTED)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
MADISON SQUARE GARDEN, L.P.,    )    No. 07 Civ. 8455 (LAP)
    )
        Plaintiff,    )
    )
       -against-    )
    )
NATIONAL HOCKEY LEAGUE,    )
NATIONAL HOCKEY LEAGUE    )
ENTERPRISES, L.P., NATIONAL    )
HOCKEY LEAGUE INTERACTIVE    )
CYBERENTERPRISES, L.L.C., NHL    )
ENTERPRISES CANADA, L.P., and NHL    )
ENTERPRISES, B.V.,    )
    )
        Defendants.    )
-------------------------------------------------- x

**DECLARATION OF JERRY A. HAUSMAN**

JERRY A. HAUSMAN declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

## I. Qualifications

1. I am the MacDonald Professor of Economics at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts. I graduated from Brown University in 1968. I received a D.Phil. (Ph.D) in economics from Oxford University in 1973 where I was a Marshall Scholar. I have been at MIT since completing my D.Phil. My academic specialties are econometrics, the application of statistical methods to economic data, and applied microeconomics, the study of behavior by firms and by consumers. I teach a graduate course in applied industrial organization, which is the study of how markets operate.[1]

2. I have been an associate editor of *Econometrica*, the leading economics journal, and the *Rand (Bell) Journal of Economics*, the leading journal of applied microeconomics. In December 1985, I received the John Bates Clark Award of the American Economic Association, awarded every other year for the most "significant contributions to economics" by an economist under the age of 40. In 1980, I was awarded the Frisch Medal of the Econometric Society. I have been a member of numerous government advisory committees for both the U.S. government and the Commonwealth of Massachusetts. I have published over 150 academic research papers in leading economic journals including the *American Economic Review*, *Econometrica*, and the *Rand (Bell) Journal of Economics*.

3. I have extensive experience analyzing antitrust and industrial organization issues. I have published a number of papers in this area. I also have extensive experience in antitrust litigation matters. I have testified as an expert witness in a number of antitrust proceedings in the U.S., Canada, New Zealand, Australia, and the European Union. I have testified in three previous cases involving sports and antitrust: *Chicago Professional Sports Limited Partnership v. National Basketball Association, Adidas America,*

---

[1] A copy of my curriculum vitae is attached to the Appendix Volume I as Exhibit 1.

*Inc. v. NCAA*, and *Worldwide Basketball and Sport Tours, Inc. v. NCAA*. I have submitted reports and been deposed in other cases involving sports economics. I have been an Advisory Editor of the *Journal of Sports Economics* since 1999. I have published peer reviewed articles on professional sports, *e.g.*, J. Hausman and G. Leonard, "Superstars in the National Basketball Association: Economic Value and Policy," *Journal of Labor Economics*, 15(4), 586-624, 1997. I have previous experience in doing economic analysis and consulting for professional hockey. I served as the economic advisor to the NHL Players Union in 1994 during their contract negotiations with the NHL.

## II.    Assignment and Summary of Conclusions

4.    Counsel for Madison Square Garden, L.P. ("Rangers") has asked me to provide an economic analysis of certain issues raised by the Defendants' Motion to Dismiss. I have not responded to all of the matters raised by the Motion to Dismiss, nor have I addressed all of the economic issues raised by the complaint and as to which I would testify if called as a witness at trial. Instead, I have limited my analysis to the following areas and have come to the following conclusions. My conclusions are not final since discovery is not complete. However, I have a reasonable basis to find the following:

- Although cooperation among NHL teams in certain activities is necessary to the success of the NHL. NHL teams compete in other activities, and this competition benefits consumers.

- The NHL teams are separate and independent businesses that compete with each other. As part of the competitive process, teams make investments that create value for themselves, other NHL teams, and the NHL as a whole.

- The 30 separate and independent clubs that have formed the NHL should not be viewed as a "single entity." The NHL Member Clubs are horizontal competitors, and restraints on horizontal competition typically decrease competition.

- The NHL Member Clubs' restrictions challenged in this case have restrained competition in properly defined relevant markets. Live men's major league professional hockey is a relevant market in various geographic markets.

- The NHL possesses market power in a relevant market of live men's major league professional hockey and related relevant markets.

- The NHL Member Clubs' restrictions have led to a reduction in output in relevant markets, which demonstrates an anticompetitive effect. A decrease in output indicates that either prices are higher or quality is lower, both of which are anticompetitive and harm consumers.

- There is no procompetitive justification for the NHL Member Clubs' restrictions that could not be achieved through less restrictive alternatives. For example, the benefits of bundled licensing through the NHL could be achieved without the NHL Member Clubs imposing exclusive restrictions on the teams. Any potential benefits of competitive balance can be achieved (and, in fact, have been addressed) through collective bargaining agreement provisions such as revenue sharing and a salary cap.

- The NHL Member Clubs' restrictions challenged in this case harm the competitive process and injure consumers as well as the Rangers. The harm alleged by MSG in this case is therefore antitrust injury.

- The Defendants' comparison of the NHL Member Clubs' conduct in this case to the termination of a distribution relationship is incorrect because the conduct at issue in this case is a restriction on horizontal competition, and it is not a vertical restraint. The Defendants' reliance on *Kingray* is also economically incorrect, and fails to recognize the distinction between horizontal and vertical restraints.[2]

---

[2] Copies of the documents upon which I rely are contained in Volumes I-IV of the Appendix to my declaration.

III.   **Economic Analysis**

   A.   **NHL Teams Cooperate In Certain Activities But Compete In Others**

5.   It is useful, from an economic perspective, in considering the function of the NHL to distinguish between "on-ice" and "off-the-ice" activities. Teams in the league need to cooperate on certain issues related to "on-ice" activities. The NHL facilitates and governs these activities by, among other things, setting the rules of play for ice hockey contests, organizing the season and playoffs, and handling administrative responsibilities. Cooperation may also be necessary for certain "off-the-ice" activities, such as the negotiation of collective bargaining agreements and national television contracts.

6.   There are many off-the-ice activities, however, where cooperation is not necessary to the success of the NHL, and where teams either do or should compete with one another. Examples of such activities include obtaining players, selling tickets, selling in-arena advertising, selling merchandise and obtaining television viewers. Competition in these activities is especially likely to benefit consumers in geographic areas with more than one hockey team. For example, in the New York metropolitan area the Rangers compete with (at least) the New York Islanders and the New Jersey Devils.

REDACTED

3

7.   The clubs that formed the NHL need to cooperate in certain on ice activities, as described above. From an economic perspective, however, consumers benefit (*i.e.*, their economic welfare is enhanced) and competition increases when the clubs continue to compete in off-the-ice activities that are not necessary to the success of the league itself. That competition is no different than the competition in commercial activities that takes place among other firms every day in the marketplace, all of which leads to lower

REDACTED

_____

³ Exhibit 8 at NHL-0339624-0339695 [OUTSIDE COUNSEL EYES ONLY]; Exhibits 91-93 [CONFIDENTIAL].

4

prices or higher quality products or services, which in turn leads to increased consumer choices, all of which benefit consumers.

8.  For example, Verizon Wireless, AT&T, Sprint, and T-Mobile all sell cellular telephone service in the New York metropolitan area. They cooperate in certain activities (*e.g.*, the sharing of cellular towers and the setting of standards for cellular technology), but they compete on price and in offering the best reception, the fewest dropped calls, the best mobile Internet experience, and other features. As a result of this competition, consumers benefit from lower prices and higher quality cellular service.

9.  One can think about the NHL as a production joint venture among competing firms, who may agree to cooperate in order to produce a product or service that any one of the participants in the joint venture might not be able to produce on its own or that can be produced most efficiently through the joint venture. The fact that it may be pro-competitive to allow the firms jointly to produce a product or service under those circumstances does not mean that the firms should be allowed to eliminate competition among themselves in other activities. Thus, one ordinarily would not find it in the interest of consumers to allow the participants in such a venture to purchase the output of that venture and thereafter agree with each other to fix the prices of that output or allocate territories among themselves in the sale of that output. Indeed, to permit those competing firms to eliminate competition among themselves because they had come together to produce a new product or service (or an existing product or service more efficiently) would lead to higher prices, reduced output and fewer consumer choices, all of which would be contrary to consumer welfare.

## B. NHL Teams Are Separate And Independent Business Entities

10. My investigation to date leads me to conclude that the clubs that have formed the NHL have retained their identities as separate and independent businesses. Specifically, they have not integrated their respective operations. The clubs instead have retained their independence and autonomy in running their day-to-day businesses. As separate and independent businesses, the teams compete with each other in off-the-ice activities. For example, among other activities, the teams compete for players and fans, they determine their own marketing and promotional strategies, and they set their own ticket prices.

## REDACTED

11. Off the ice, the Member Clubs also compete with each other to retain existing fans and to attract new fans, or customers. Fans (customers) purchase tickets to their favorite teams' games, and they also purchase their favorite teams' merchandise and other products. In addition, the Member Clubs compete to attract fans to watch broadcasts of their favorite teams' games, and their success in attracting fans to their broadcasts, in turn, plays a role in competition among the clubs in the sale of advertising during those broadcasts.

12. The greater the geographic area where a team can broadcast its games the more fans and potential fans (customers) that team can reach. The existence of this competition and potential competition is evident in many documents already produced by the NHL.

## REDACTED

---

[1] Exhibit 9 at NHL-0007131 [CONFIDENTIAL].

REDACTED

[6] The existence of such broadcast competition between and among individual clubs is the reason why the NHL Member Clubs have decided to avoid such disputes by allocating the entire United States and Canada into 30 exclusive territories among the Member Clubs, thereby preventing such competition.

13.

REDACTED

---

[5] Exhibit 10 at NHL-0021079-0021080 [OUTSIDE COUNSEL EYES ONLY].
[6] *Id.*
*See, e.g.,* Exhibit 11 at NHL-0009446-48 [OUTSIDE COUNSEL EYES ONLY]; Exhibit 12 at NHL-0046879-0046881 [OUTSIDE COUNSEL EYES ONLY].
[7] *E.g.,* Exhibit 13 at NHL-0026147-0026203 [HIGHLY CONFIDENTIAL].
[8] *Id.* at NHL-0026195 [HIGHLY CONFIDENTIAL].
[9] *Id.* at 0026197 [HIGHLY CONFIDENTIAL].

14.

# REDACTED

15. The NHL Member Clubs not only compete as separate and independent
    businesses, but that competition has led to wide differences in their
    respective franchise values.  Estimates of franchise values as of 2006 show
    that the most valuable club in the NHL (Toronto) was over two and a half
    times as valuable as the League's least valuable team (Washington).[11]
    Those same estimates show that the Rangers are the League's second most
    valuable team.

# REDACTED

16. The Defendants claim that "the NHL enterprise is the <u>one and only</u> source of
    any value or 'economic power' that comes with MSG's (and every other
    Club's) franchise and exclusive territory in the League."[15]  That claim,
    however, is inconsistent with the fact (described above) that different teams
    have different values.  That is, if the Defendants were correct that all value

---

[10] *E.g.,* Exhibit 14 at NHL-0037166 [CONFIDENTIAL]; Exhibit 15 at NHL-0038265-69
[CONFIDENTIAL].
[11] Exhibit 2 at p. 2.
[12] Exhibit 16 at NHL-0459967 [OUTSIDE COUNSEL EYES ONLY].
[13] Exhibit 16:                                                                    OUTSIDE
COUNSEL EYES ONLY]; Exhibit 17 NHL-0033612-13 [HIGHLY CONFIDENTIAL].
[14] Exhibit 18 at NHL-0018238-0018243 [HIGHLY CONFIDENTIAL].
[15] Motion to Dismiss, p. 17.

flowed exclusively from the NHL, then we should not observe such large value differences among teams that cannot be explained by straightforward economic differences such as population differences or income differences in metropolitan areas. In this regard, it is particularly important to note that differences in values across teams are not driven solely by market size. For example, the Rangers, Devils, and Islanders all compete in a local geographic market defined as the New York metropolitan area, but their estimated franchise values still differ greatly.[16]

17.

# REDACTED

[17]

18. That individual teams are a source of economic value is also evident from the fact that other teams and the League as a whole also benefit from the investments undertaken by teams such as the Rangers. A number of NHL Member Clubs, for example, charge higher ticket prices for "premium" home games when their team is playing a popular team such as the Rangers. Thus, the Buffalo Sabres use a variable pricing system where they base ticket prices for individual games on "the opponent, time of the year, day of the week, rivalries, and games against all-star players."[18] A ticket to a Sabres home game against the Maple Leafs (one of the League's most popular teams, located about a two to two-and-a-half hour away drive) will cost more than a ticket to a Carolina Hurricanes game.[19] During the 2007-08 season the Vancouver Canucks charged premium prices for 12 home games, including the only home game they played against the Rangers that season.[20] The Florida Panthers recently announced plans in the upcoming season to charge higher prices for tickets to 8 to 12 "high demand" games,

---

[16] Exhibit 2 p. 2.
[17] Exhibit 19 at MSG-0124484-0124601 [CONFIDENTIAL].
[18] Exhibit 3.
[19] *Id.*
[20] Exhibit 4.

which the Panthers "expect[ ] to include opponents such as the Rangers and Canadiens."[21]  Playing against popular teams also creates value for other teams and the League by leading to higher television ratings

REDACTED

[24]

[25]  This phenomenon is not unique to the NHL, of course.  It is well known that MLB's post-season ratings are higher when the Yankees or the Red Sox are in the World Series as opposed to the Cleveland Indians or the Minnesota Twins.[26]

20.        REDACTED

.[27]  The value of the Center Ice package derives significantly from the activities of the individual clubs, who hire announcers and cameramen

---

[21] Exhibit 5.
[22] Exhibit 20 at NHL-0023494 [CONFIDENTIAL].
[23] Exhibit 16 at NHL- 0459968 [OUTSIDE COUNSEL EYES ONLY].
[24] Exhibit 21 at NHL-0001893-94 [CONFIDENTIAL].
[25]

REDACTED                [OUTSIDE COUNSEL EYES ONLY].

[26] Exhibit 6.
[27] See, e.g., Exhibit 23 at NHL-0038496 [CONFIDENTIAL].

and otherwise engage in all of the work (for example, developing exciting camera angles and instant replay features) that is required to put together the broadcasts, in an effort to attract fans to view their teams' games. The NHL then aggregates the broadcasts that otherwise have been produced by the individual clubs, and makes them available (including local commercials) in a package for sale to cable or satellite subscribers.

## C. The Clubs That Have Formed The NHL Are Not A "Single Entity"

21. The NHL Defendants' claim that the 30 separate and independent clubs that have formed the NHL should be viewed as a "single entity" whose collective restraints are immune from the antitrust laws is incorrect.[28] As I discuss above, the 30 clubs that have formed the NHL do not function as a single entity. Nor do they have the same values or even values that derive solely from the League. Rather, the clubs pursue separate and independent interests and engage in commercial activities in competition with each other, leading to businesses that have separate and varying degrees of economic value as a result (at least in part) of their independent competitive efforts.

."[29] It is the teams, not the League, moreover, that are in the best position to understand and satisfy consumer preferences and demand in their respective local markets.

# REDACTED

.30

31
.

---

[28] Motion to Dismiss, p. 13.
[29] Exhibit 24 at NHL-0023421 [CONFIDENTIAL].
[30] Exhibit 25 at NHL-0055990 [CONFIDENTIAL].
[31] ;
        (Exhibit 10 at NHL-0021079-80) [OUTSIDE COUNSEL EYES ONLY].
            (Exhibit 11 at NHL-0009446-47) [OUTSIDE COUNSEL EYES ONLY],
                    (Exhibit 12 at NHL-0046879-881) [OUTSIDE COUNSEL EYES
ONLY].

22. To an economist a single economic entity would act jointly to maximize profits among all the NHL teams. Thus, I would expect investments and contracts (*e.g.*, with players) to be jointly undertaken with all teams exposed to the financial risks associated with each member team's commitments. A single entity would adopt this mode of operation because it would be the economically efficient structure. The 30 separate teams that form the NHL do not operate in this manner, as I explained above, because individual teams sign their own contracts and determine their own investments. Nor are all revenues or all financial risks shared. Indeed, a large majority of the average team's revenue (over 90%) is generated locally as a result of the individual teams' local activities and investments, and very limited sharing of local revenues occurs. Thus, I conclude that the NHL is not a single economic entity.

23. The fact that a single NHL team such as the Rangers could not offer "NHL hockey" in the absence of the NHL is not relevant to whether the NHL Member Clubs should be considered a single entity, any more than any other competitors should be allowed to eliminate competition among themselves, to the detriment of consumers, simply because, for example, they have jointly developed a standard that facilitates competition between them. For example, in many high technology products (for example, DVDs), a group of companies pool their technology to establish a technology standard and to offer a superior product compared to what any single company could offer alone. The companies that have cooperated to that limited extent nonetheless continue to compete in manufacturing and selling the product with competition on price and other features in addition to the common features covered by the standard.

24. Nor is it relevant that the NHL Member Clubs act through their Board of Governors.[32] The members of the Board include representatives from the 30 separate clubs, who necessarily bring each of their clubs' distinct economic interests to bear on the Board's decisions.

---

[32] Motion to Dismiss, p. 18.

25. Fundamental economics recognizes that restraints on horizontal competition between competing firms often harms or has the potential to harm consumer welfare, and it is for this reason that the antitrust laws typically condemn such restraints in the absence of proof that such restraints lead to increased overall competition and increased consumer welfare. Thus, it makes no economic sense to argue (as the League does) that the NHL Member Clubs act as a single entity when the control to which the Defendants point consists of the anticompetitive agreements themselves.

26. In this regard, it is important to remember the nature of this competition between and among the 30 clubs. The 30 hockey clubs that have formed the NHL compete at the horizontal level, much like Verizon Wireless and AT&T (or any other firms in a horizontal relationship) compete. For example, as my investigation has confirmed so far, and as I explain further below, NHL clubs such as the Rangers, Islanders and Devils offer their own hockey teams (brands) in competition with each other in various markets. Restraints between those clubs (just like restraints between cellular companies such as Verizon Wireless and AT&T) are viewed as horizontal restraints, and they are the sort of restraints that lie at the very heart of the policies of the Sherman Act. Economics demonstrates that restraints among horizontal competitors typically decrease competition when the competitors are offering differentiated products (*e.g.*, different brands of products). Horizontal restraints are different than the sort of vertical restraints between a supplier and a customer (such as a restraint between Anheuser Busch and one of its local Budweiser distributors) that typically affect only that single supplier's brand and, therefore, that often increase consumer welfare, for example, by enhancing the distribution of that supplier's product or service.

27. My investigation to date leads me to conclude that, especially among all of the other major sports leagues, the case for any "unity of interest" among Member Clubs in the NHL is particularly weak. This is because, as I previously stated, revenues are dominantly generated at the local, as opposed to national, level.

REDACTED

[33]

# REDACTED

[34] This local focus creates a strong economic incentive for teams to invest in their local operations to build fan interest and loyalty. Another feature of the NHL that creates divergence of interests between teams is the "tribal" (team-based) nature of hockey fans, which is discussed in more detail below.

28. The Defendants in their Motion to Dismiss rely on the Supreme Court's recent *Dagher* decision to support their argument that the NHL Member Clubs should be treated as a single entity.[35] However, the NHL Member Clubs are in a different economic position than the entities in the *Dagher* case. The *Dagher* entities had fully integrated themselves, combining all of their assets and sharing all of their profits and losses. In the area defined by the *Dagher* venture, the entities retained no assets with which to compete.



[36] For example, aside from CBA-defined minimal local revenue sharing, teams retain all of their local revenues.

29. The NHL Defendants' claim that "there is nothing more 'core' to the NHL venture (and all professional sports leagues) than the basic economic structure of the League, including exclusive territories for teams around the country," is incorrect.[37] What is necessary for the functioning of the League, as I explained above, is the ability of the Member Clubs to coordinate on activities such as rules of play and scheduling of games. As I explain further below, the NHL Member Clubs' restrictions such as

---

[33] Exhibit 26 [CONFIDENTIAL].
[34] *Exhibit 27 [CONFIDENTIAL].*
[35] Motion to Dismiss, p. 22.
[36] *See, e.g.,* Exhibit 28 NHL-0463724
[CONFIDENTIAL].
[37] Motion to Dismiss, p. 26.

REDACTED

exclusive territories are not "core" (in the sense of being necessary) today, particularly given the growth of the game and the changes in technology that have occurred in recent years. The placement of three competing teams in the New York metropolitan area demonstrates that territorial exclusivity is not "core" to the NHL venture. Indeed, all of the major professional sports leagues in the U.S. have local areas that support multiple teams. Outside of the U.S. there are successful professional sports leagues with even less territorial exclusivity. For example, in the English Premier League (soccer), one of the most successful sports leagues in the world, there are five teams in London. In general, territorial rights differ across sports leagues and in some cases territorial rights do not exist. Thus, exclusive territories for teams are not "core" (or necessary) to the success of the NHL or professional sports leagues in general. Instead, the purpose of territorial exclusivity appears to be to eliminate horizontal competition between the individual NHL Member Clubs. When territorial rights are disputed (as discussed in the examples above) or when clubs share the same territory, clubs compete for viewers and fans as do the Rangers, Islanders, and Devils.

**D. The NHL Member Clubs' Restrictions Have Restrained Competition in Properly Defined Relevant Markets**

30. Based on my review of the evidence in this case to date, I find that there is a plausible basis for concluding that the NHL Member Clubs' restrictions challenged in this case have restrained competition in properly defined relevant markets. The standard approach to market definition is the "hypothetical monopolist" test described in the Department of Justice and Federal Trade Commission 1992 *Horizontal Merger Guidelines*. According to this test, a product market is a product or group of products such that a hypothetical monopolist of that product or group of products would be able profitably to impose a small but significant price increase. It is important to note that a product or group of products that constitute a relevant market may still face competition from other products. For the purposes of market

definition, what is important is whether those other products provide a sufficient competitive constraint on the pricing of the products or group of products constituting the relevant market. In particular, although a price increase (or quality decrease) by a hypothetical monopolist of products in the relevant market may cause some consumers to switch to other products, unless sufficient numbers of consumer switch such that the price increase is unprofitable, the products controlled by the hypothetical monopolist constitute a relevant market.

31. I have found significant evidence to support the conclusion that live men's major league professional hockey is a relevant market in various geographic markets. At the most basic level, the only other major professional sport with a season during the winter (and hence hockey's closest potential competitor) is basketball.

38

32

REDACTED

---

38

[39] Exhibit 33 at NHL-0021411 [CONFIDENTIAL].
[40] Exhibit 31 at NHL-0023177-180 [CONFIDENTIAL]; Exhibit 34 at NHL-0035908-909 [CONFIDENTIAL]; Exhibit 35 at NHL-0173546 [CONFIDENTIAL]; Exhibit 36 at NHL-0225927 [HIGHLY CONFIDENTIAL]; Exhibit 37 at NHL-0527125 [OUTSIDE COUNSEL EYES ONLY]; Exhibit 38 at NHL-0623153-167 [CONFIDENTIAL]; Exhibit 39 at NHL-0686692-707 [CONFIDENTIAL]; Exhibit 30 at NHL-0026735-740 [CONFIDENTIAL]; Exhibit 40 at NHL-0769041 [HIGHLY CONFIDENTIAL].
[41] Exhibit 35 at NHL-0173546 [CONFIDENTIAL].

# REDACTED

33. A key factor that differentiates the NHL is the "tribal" nature of its fans, which means that NHL fans are more loyal to their teams than they are to the league as a whole. As Defendants' expert Professor Fisher has previously stated, "[s]urvey data indicate that ice hockey fans are more 'tribal' than fans of other major sports. They tend to be fans of their local or favorite team more so than fans of the sport."[43]

# REDACTED

.48

---

[42] Exhibit 39 at NHL-0686691 [CONFIDENTIAL].
[43] Declaration of Franklin M. Fisher, October 11, 2007, ¶61.
[44] Exhibit 41 at NHL-0459834 [HIGHLY CONFIDENTIAL].
[45] Exhibit 42 at NHL0440037 [CONFIDENTIAL]; Exhibit 43 at NHL-0066174 [CONFIDENTIAL]; *see also* Exhibit 44 at NHL-0017738 (

[CONFIDENTIAL].
[46] Exhibit 42 at NHL0440038 [CONFIDENTIAL].  **REDACTED**
[47] *Id.* at NHL0440041 [CONFIDENTIAL].
[48] *Id.* at NHL0440040 [CONFIDENTIAL].

34.

# REDACTED

49

35. In the New York metropolitan area, I find significant evidence that the Rangers, Islanders, and Devils (and possibly the Philadelphia Flyers) compete in a local market for hockey fans, where these teams are their closest and most direct competitors.[50]

# REDACTED

gross ticket price at all.[51]  This price pattern demonstrates NBA ticket prices do not constrain NHL ticket prices in the New York metropolitan area.[52]

36. Surveys and focus groups conducted by the Rangers during the 2004/05 NHL lockout are also consistent with the NBA not providing a competitive

53

# REDACTED

54

---

[49] Exhibit 45 at NHL-0446480-0446481 [CONFIDENTIAL].
[50] *See* Exhibit 7a.
[51] Exhibit 46 [CONFIDENTIAL].
[52] From standard microeconomic analysis of a multiproduct firm, this conclusion is not affected by the fact that MSG owns both the Rangers and the Knicks.
[53] Exhibit 47 at MSG0058817 [CONFIDENTIAL].
[54] Exhibit 48 [CONFIDENTIAL].

..55

37.

REDACTED

38.

39.

59

40. Based on the evidence that I have examined to date, and using the market

definition approach from the *Horizontal Merger Guidelines* (as discussed

above), I find that a separate geographical market exists for live men's

major league professional ice hockey in the New York metropolitan area. A

---

55 *Id.* at p. 72.
56 Exhibit 49 [HIGHLY CONFIDENTIAL].
57 Exhibit 50 at MSG-0307205 [HIGHLY CONFIDENTIAL].
58 Exhibit 51 at NHL-0062004-05 [HIGHLY CONFIDENTIAL]; *see also* Exhibit – at NHL-0339647-
0339695                                         [OUTSIDE COUNSEL EYES
ONLY].
59 Exhibit 13 at NH REDACTED FIDENTIAL].

hypothetical monopolist of such hockey in the New York metropolitan area
could profitably increase ticket prices or decrease quality.

41. I also find that a separate market exists for local professional sports
television advertising in the New York metropolitan area.  Although the
NBA competes with the NHL at some level, advertising on local NBA
telecasts does not constrain NHL local advertising prices.

# REDACTED

For example, between the
2002-03 and 2003-04 seasons the Rangers increased their average
advertising price by 37% while at the same time the advertising price for the
Knicks fell by 48%.  Thus, given the lack of constraint by local NBA
telecasts in the New York metropolitan area, and based on the evidence that
I have reviewed so far, either men's major league professional ice hockey
has market power in the professional sports advertising market or a separate
market exists for such hockey advertising.[60]

# REDACTED

.61

42. Due to the existence of a distinct group of hockey fans (and advertisers who
desire to reach those fans), several additional relevant markets also exist.
These relevant markets include local markets for the sale of sponsorships
and in-arena advertising by hockey teams, for the sale of hockey
merchandise and licensing, and for the broadcasting of hockey games (either
over television or streamed over the Internet).

43. In addition to the relevant markets that are local in scope, I find significant
evidence that relevant markets for men's major league professional ice

---

[60] Market definitions are often not precise.  In this situation either definition leads to the conclusion that
market power exists.
[61] Exhibit 33 at NHL-0021404 [CONFIDENTIAL].

REDACTED

44. That in some broader sense men's major league professional ice hockey may
    compete with other professional sports does not change the fact that there is
    a relevant market for such professional hockey, and that allowing the clubs
    providing such hockey to agree to restrain competition among themselves
    would reduce consumer welfare.  As explained above, I have found
    sufficient evidence that a hypothetical monopolist that controlled, for
    example, live men's major league professional hockey in the New York
    metropolitan area would likely be able to profitably increase hockey ticket
    prices or reduce quality to the detriment of consumer welfare.  As I have
    explained above, that live professional ice hockey in the New York
    metropolitan area is a relevant market does not mean that this product does
    not face any competition from other sports or forms of entertainment, but
    only that substitution to these other products is insufficient to make a price
    increase (or quality decrease) unprofitable.

REDACTED

---

[62] Exhibit 52 at NHL-0529736 [HIGHLY CONFIDENTIAL], Exhibit 13 at NHL-0026195-98 [HIGHLY
CONFIDENTIAL], Exhibit 53 at NHL-0026490, NHL-0026493-94
              [CONFIDENTIAL], Exhibit 54 at NHL-0025580-82

        [CONFIDENTIAL].
[63] Exhibit 42 at NHL-0440050.                REDACTED

### E.  The NHL Member Clubs Possess Market Power

45. Market power is the ability to profitably raise price above the competitive level for a sustained period of time or to exclude competitors, and may be shown using either indirect evidence that allows an inference of market power or direct evidence that a firm is able to raise price or exclude competitors.  If an entity possesses market power, its policies may effectively restrict competition and harm consumers.  The NHL is the only provider of men's major league professional ice hockey in all of the relevant markets discussed above, and has not faced competition in these markets since the World Hockey Association folded almost 30 years ago.  Since no threat from potential entrants exists, the NHL Member Clubs collectively possess market power in the relevant markets (at a minimum) of live men's major league professional ice hockey.  As the pricing evidence described above demonstrates, the NHL Member Clubs collectively also possess market power in the market for local professional sports advertising. Further investigation is required regarding market power in the national markets.

46. The NHL Member Clubs have restrained competition in the relevant markets that I have described above in various ways, leading to higher prices, reduced output, and reduced consumer welfare.  The effect of a restriction on output provides a competitive test:  if a restriction leads to less output in a relevant market, then the restriction is anticompetitive.

47. The restrictions on competition imposed by the NHL Member Clubs include the following:

   a.  Licensing:  The NHL Member Clubs assert the exclusive right to license team marks for use on popular products such as team jerseys, practice wear, and winter outerwear.

   b.  Merchandising:  The NHL Member Clubs assert the right to control the sale of team apparel and merchandise in various ways, including a requirement that at least 65% of the products offered through team catalogs must be produced by NHL-selected licensees, and an effective

prohibition on teams offering any licensed products for sale outside of a 75-mile radius of the team's home arena. The NHL Member Clubs also prevent teams from selling team merchandise on the internet other than through an NHL-controlled store.

c. Broadcasting/streaming: The NHL Member Clubs allocate almost all of North America into exclusive territories for each team, and prohibit each team from transmitting its games (on television or over the internet) into territories allocated to other teams. A team's distribution of its games within its territory is also limited by NHL-imposed blackouts (for games shown by the NHL Member Clubs' national broadcaster) and restrictions on the ability to distribute games on the team's website or through video-on-demand.

d. Advertising and sponsorships: The NHL Member Clubs place restrictions on each team's ability to sell in-arena and "in-ice" advertising, and also prohibit teams from selling electronically imposed "virtual signage" for local game broadcasts.

e. Website: The NHL Member Clubs control the design and operation of team websites, restrict the products and services that can be offered on those websites, and control a percentage of the advertising space on each team website. By doing so, the NHL Member Clubs collectively restrain individual teams in their efforts to use websites to compete with each other.

48. The NHL Member Clubs' restraints have led to a reduction of output in the relevant markets, which as I have described above demonstrates an anticompetitive effect. One example of the reduction in output caused by

## REDACTED

---

[64] Exhibit 55 at NHL-0446474-NHL-0446485

CONFIDENTIAL].                    REDACTED            [HIGHLY

REDACTED

49.

REDACTED

---

[65] Exhibit 56 [CONFIDENTIAL].
[66] Exhibit 57 at NHL-0196675 [HIGHLY CONFIDENTIAL].

b.

REDACTED

c.

---

[67] Exhibit 58 at NHL-0047264 [HIGHLY CONFIDENTIAL].
[68] Exhibit 59 at MSG-0304603-0304606 [CONFIDENTIAL].
[69] Exhibit 60 at NHL-0223240 [HIGHLY CONFIDENTIAL].
[70] Exhibit 61 at NHL-0021245-246 [OUTSIDE COUNSEL EYES ONLY].
[71] Exhibit 62 at NHL-0047275 [HIGHLY CONFIDENTIAL].
[72] Exhibit 63 at NHL-0051930-932 [HIGHLY CONFIDENTIAL].
[73] Exhibit 64 at NHL-0245219 [HIGHLY CONFIDENTIAL].
[74] Exhibit 65 at NHL-0230139 [HIGHLY CONFIDENTIAL].
[75] Exhibit 66 at NHL-0852085 [CONFIDENTIAL].

d.

# REDACTED

e.

f.

---

[76] Exhibit 67 at NHL-0046985 [HIGHLY CONFIDENTIAL].
[77] Exhibit 68 at NHL-0046946-947 [OUTSIDE COUNSEL EYES ONLY].
[78] Exhibit 69 at NHL-0021306 [OUTSIDE COUNSEL EYES ONLY].
[79] Exhibit 70 at NHL-0021270-272 [OUTSIDE COUNSEL EYES ONLY].
[80] Exhibit 71 at NHL-0021110-111 [OUTSIDE COUNSEL EYES ONLY]. Exhibit 72 at NHL-0020997-998 [OUTSIDE COUNSEL EYES ONLY]. Exhibit 73 at NHL-0047294 [OUTSIDE COUNSEL EYES ONLY].
[81] Exhibit 71 at NHL-0021110 [OUTSIDE COUNSEL EYES ONLY].
[82] Exhibit 74 at MSG-0142466-0142467 [CONFIDENTIAL].

g.

h.

i.

j.

# REDACTED

k.

l.

m.

---

[83] Exhibit 75 at NHL-0203511-512 [HIGHLY CONFIDENTIAL].
[84] Exhibit 76 at NHL-0052239 [HIGHLY CONFIDENTIAL].
[85] Exhibit 77 at NHL-0208514 [HIGHLY CONFIDENTIAL].
[86] Exhibit 78 at NHL-0045579 [HIGHLY CONFIDENTIAL].
[87] Exhibit 79 at NHL-0045260 [HIGHLY CONFIDENTIAL].
[88] Exhibit 80 at NHL-0203384 [HIGHLY CONFIDENTIAL].
[89] Exhibit 81 at NHL-0203382 [HIGHLY CONFIDENTIAL]; Exhibit 82 NHL-0203383 [HIGHLY CONFIDENTIAL].

n.

o.

**REDACTED**

p.

q.

r.

50. As an example of the anticompetitive impact of the NHL Member Clubs'

restrictions, I consider further the NHL Member Clubs' restrictions on

[90] Exhibit 83 at NHL-0228108-109 [HIGHLY CONFIDENTIAL].
[91] Exhibit 84 at NHL-0228054-55 [HIGHLY CONFIDENTIAL].
[92] Exhibit 85 at NHL-0053565-66 [HIGHLY CONFIDENTIAL].
[93] Exhibit 86 at NHL-0046656-57 [HIGHLY CONFIDENTIAL].
[94] Exhibit 87 at NHL-0030764 [HIGHLY CONFIDENTIAL].
[95] Exhibit 88 at NHL-0229695-96 [HIGHLY CONFIDENTIAL].
[96] Exhibit 89 at NHL-0343451 [HIGHLY CONFIDENTIAL].

streaming games over the Internet.  As I previously explained,

REDACTED

.[97]  In the absence of the challenged restraints, a team (for
example, the Rangers) would seek to stream its telecast in competition with
the NHL's Center Ice package, which is offered on cable TV and direct
broadcast satellite for a subscription price of $169, or in competition with
the broadcasts of other teams.  The NHL itself recognizes that, if teams were
allowed to broadcast or stream outside their local territories, they would
compete with the NHL's Center Ice package.

§

REDACTED

52. The NHL Member Clubs' restriction on streaming means that displaced fans
of teams such as the Rangers cannot always view the Rangers' feed of
Rangers' games, because the Center Ice package typically only provides a
single feed of each game.[100]  Thus this NHL Member Club restriction
reduces consumer choice and quality of product in an economically
meaningful way.

53. It is important to note that although the Rangers' streamed telecast (if
allowed) would be showing the same game as these competing options, it
would not be the same product, especially if the game is only available

---

[97]
[98] Exhibit 90 NHL-0021067-68 [OUTSIDE COUNSEL EYES ONLY].
[99] Exhibit 24 at NHL-0023427 [CONFIDENTIAL].
[100] DirecTV (but not cable providers) offers both feeds of a game "whenever possible"
(http://www.directv.com/DTVAPP/global/contentPageNR.jsp?assetId=1100047).  However, DirecTV is
not available to all households (e.g., if the line-of-sight to the satellite is blocked by buildings or trees, or
due to restrictions in apartment buildings).

through the other team's broadcast, because the Rangers' feed would include all of the features developed by the Rangers to appeal to their fans and increase excitement in the Rangers, including the Rangers' announcers, as well as investments made by the Rangers in cameras and instant-replay features. The importance of announcers to a hockey telecast is demonstrated by the fact that teams send their own announcers and producers to away games that they televise. If fans did not prefer their "own" announcers, teams could save money and attract the same number of viewers by using the home team's feed and announcers. Similarly, MSG Networks, which broadcast the games of the Rangers, Islanders, and Devils, broadcasts both local feeds of the same game when two of those three teams play each other. Thus, the observed market outcome is that fans prefer their own teams' announcers. REDACTED [101]

54. There is an adverse effect even if Center Ice is, in fact, distributing the Rangers' feed of a Rangers game. This is because the NHL Center Ice feed typically would not include the Rangers' pre-game and post-game features. Instead, the Center Ice feed usually starts with the dropping of the puck at the beginning of the game and ends shortly after the last buzzer sounds. The ability to view these pre-game and post-game features benefits fans by giving them additional viewing options, and benefits individual teams by allowing them to build fan interest and loyalty.

55. If streaming were allowed output (viewership) would increase, because displaced fans would have access to a more preferred product – a telecast with their preferred announcers. This output restriction demonstrates the anticompetitive effect of current restrictions. Furthermore, teams such as the Rangers could also increase consumer welfare by offering games to displaced fans in competition with the NHL Center Ice package at a lower price than is currently available. The Rangers' streamed games would be a

---

[101] Exhibit 45 at NHL-0446477, 481 [CONFIDENTIAL].

higher quality (and probably lower priced) product than the NHL's Center Ice package, and would provide more choice to consumers. Higher quality and lower price would lead to higher demand and greater output which demonstrates that the current restriction on streaming is anti-competitive.

56. An additional way in which streaming would benefit consumers is by providing them with additional choices. While the NHL Center Ice package includes all games (whether consumers are interested in them or not), with the ability to stream teams would likely sell access to individual games or packages of games. For example, the Rangers could sell a package of their games against other "Original Six" teams, or their games against other Eastern Conference teams. In that way, too, allowing streaming would lead to consumer benefits. In addition, the Center Ice package generally does not allow customers the choice of watching games in high definition ("HD"). The Rangers and other teams may be able to offer consumers this higher quality choice. Thus, HD feeds would provide a higher quality viewing experience for fans, and would likely lead to an increase in output (viewership).

57. The example of Internet streaming also demonstrates how technological change has changed the impact of NHL Member Clubs' restrictions. Previously, individual teams may have concluded that it was not economical for that team to broadcast its games outside its local market, perhaps because the available fan base in other areas for the team may not have justified it. With the development of streaming over the Internet, broadcasting is now economical on a national (or even international) basis, and no longer needs to be done on a market-by-market basis. With widespread broadband deployment the cost of broadcasting games out-of-market has fallen, and the restrictions are even more obviously a binding constraint on competition.

58. Restrictions on merchandising and licensing also decrease output and are anticompetitive. Price competition between sellers of merchandise would lower prices, and MSG as a competitor might have incentives to find better

supplier arrangements. In addition, local knowledge by each team of its fan base and their interests can lead to more focused merchandising and marketing efforts. Also, joint marketing and merchandising efforts with local firms often provide economic and business opportunities to sell more merchandise. League restrictions on these types of promotions lead to less efficient marketing efforts and lower output, which typically harms consumers.

## F. There is No Procompetitive Justification For The NHL Member Clubs' Restrictions That Could Not Be Achieved Through A Less Restrictive Alternative

59. There is no procompetitive justification for the NHL Member Clubs' restrictions that could not be achieved through a less restrictive alternative. The NHL Member Clubs' exclusive licensing restrictions are an example of such an unnecessary restriction. Consider a licensee that wishes to obtain a license to the marks of each NHL team. The transaction costs associated with obtaining a single aggregated license to all 30 teams' marks through the NHL will typically be lower than the costs of negotiating a license with all 30 teams separately. However, exclusivity is not required to obtain the benefits of a bundled license. The NHL Member Clubs could require teams to offer a license to their marks through the NHL, which the NHL could then license on a non-exclusive basis to licensees desiring such an option, but still allow each team to offer individual licenses to its own marks to licensees desiring that option. In such a situation licensees who desired a license to each team's marks could still obtain a single bundled license through the NHL, but licensees would also have the alternative of negotiating licenses with individual teams.

60. Another potential procompetitive justification for the NHL Member Clubs' restrictions is that they are necessary to maintain competitive balance. I first note that it is unclear that competitive balance is necessary for the success of the NHL. I have previously studied the NBA and found that popularity is

driven not by competitive balance but rather by superstar players such as Michael Jordan.[102] However, even assuming the League could prove that competitive balance is necessary for the success of the NHL (an unlikely outcome, in my view), there are other less restrictive ways of maintaining competitive balance. For example, the 2005 collective bargaining agreement that ended the 2004-05 NHL lockout includes at least two provisions that might be viewed as an effort to maintain competitive balance. The first provision is a revenue sharing requirement. Thus, even assuming (in the absence of the NHL Member Clubs' restrictions) that some teams might be viewed as having obtained disproportionate increases in revenue, the revenue sharing requirement would allow all teams to share in that increased revenue. The second provision is a salary cap, which (within its terms) would limit the ability of successful teams to use any perceived disproportionate increases in revenue (again, assuming the absence of the NHL Member Clubs' restrictions) to outspend other teams on players.

### G. The Harm Alleged By MSG Is Antitrust Injury

61. Contrary to the Defendants' claim, the harm alleged by MSG is not just harm to the Rangers but also harm to the competitive process and consumers, and is therefore antitrust injury. As is discussed above, the NHL Member Clubs' restrictions lead to a reduction in output, which indicates that they are anticompetitive. Reduced output is anticompetitive because it is equivalent to either higher prices or lower quality, both of which are anticompetitive and harm consumers. This reduced output creates antitrust injury. Antitrust injury affects both consumers and the Rangers. The Rangers output is also lower (for example, from their inability to stream games over the internet) and their profits are negatively affected by the NHL's anticompetitive restrictions.

62. The League is not only well-aware of the effect of its restraints, but in fact seeks to exploit those restraints.

---

[102] Exhibit 7.

# REDACTED

103

63. The Defendants' comparison of the NHL Member Clubs' conduct in this case to the termination of a distribution relationship is incorrect because the conduct at issue in this case is a restriction on horizontal competition, not a vertical restraint. The NHL Member Clubs' restrictions restrain competition between horizontal competitors offering different "brands" (*e.g.*, the Rangers and Islanders) that would lead to higher output. In contrast, a distribution arrangement is a vertical relationship where the distributors all sell the same brand (*e.g.*, Budweiser beer).

64. The Defendants' reliance on *Kingray* is also economically incorrect due to this distinction between horizontal competition and vertical restraints. At issue in *Kingray* was the claimed vertical restraint between the NHL teams and DirecTV (a distributor of the Center Ice package), which allegedly eliminated competition between different sources of the same game through the blackout provision. The court held that this vertical restraint led to no restraint in the distribution of any particular team's game because it was always available either on the local carrier or on DirecTV. Thus in *Kingray* the court viewed the restraint as not affecting which products were available to consumers, but only the distributors through which the products were available. Irrespective of whether the Court's conclusion in that case that the vertical restraint did not affect the availability of a particular teams' game was correct, the horizontal (not vertical) restrictions in this case do restrict the products and services available to consumers.

Dated: July 17, 2008

*Jerry A. Hausman*

---

[103] Exhibit 53 at NHL-0026490 [CONFIDENTIAL].