UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADISON SQUARE GARDEN, L.P.,                    )
                                                )
                          Plaintiff,            )    No. 07 CIV. 8455 (LAP)
                                                )
            v.                                  )    ELECTRONICALLY FILED
                                                )
NATIONAL HOCKEY LEAGUE,                         )
NATIONAL HOCKEY LEAGUE                          )
ENTERPRISES, L.P., NHL INTERACTIVE             )
CYBERENTERPRISES, LLC, NHL                      )
ENTERPRISES CANADA, L.P., and NHL              )
ENTERPRISES, B.V.,                              )
                                                )
                          Defendants.           )
                                                )
-------------------------------------------- )
NATIONAL HOCKEY LEAGUE,                         )
                                                )
                          Counter-claimant,     )
                                                )
            v.                                  )
                                                )
MADISON SQUARE GARDEN, L.P.,                    )
                                                )
                          Counter-defendant. )
                                                )
                                                )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

Shepard Goldfein
James A. Keyte
Paul M. Eckles
Matthew M. Martino
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522

*Attorneys for Defendants National Hockey
    League et al.*

Dated:  July 29, 2008

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.     THERE IS A SUBSTANTIAL DISPUTE BETWEEN THE PARTIES AS TO THE
       NHL'S RIGHTS UNDER THE MSG CONSENT AGREEMENTS ............................... 3

II.    MSG'S MERITS-RELATED ARGUMENTS ARE AT BEST AFFIRMATIVE
       DEFENSES AND SHOULD BE REJECTED AS GROUNDS FOR DISMISSAL .......... 5

       A.     MSG Ignores the Law Addressing the Use of Antitrust Laws as  an
              Affirmative Defense ......................................................................... 6

              1.     The *Kelly v. Kosuga* Doctrine .................................................. 6

              2.     The Part and Parcel Doctrine .................................................... 9

       B.     The NHL's Counterclaims Are Not Based on a Release of Future  Antitrust
              Violations ...................................................................................... 12

       C.     MSG's Remaining Arguments Are Red Herrings ................................. 16

              1.     MSG Does Not Have a Federal Constitutional Right to Challenge
                     League Rules ......................................................................... 16

              2.     MSG's Noerr-Pennington Arguments Are Wholly Inapposite and
                     Provide No Basis for Dismissal of the NHL's Counterclaims ................. 19

## TABLE OF AUTHORITIES

### CASES

Butler v. USA Volleyball, 673 N.E.2d 1063 (Ill. App. Ct. 1996) ............................................. 17

Cellar Door Prods., Inc. of Mich. V. Kay, 897 F.2d 1375 (6th Cir. 1990) ............................... 13

Charles O. Finley & Co. v. Kuhn, 569 F.2d 527 (7th Cir. 1978) .............................................. 17

Fox Midwest Theaters, Inc. v. Means, 221 F.2d 173 (8th Cir. 1955) ....................................... 13

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL
    31246922 (E.D. Pa. Aug. 9, 2002) .............................................................................. 10, 14

Gaines v. Carrollton Tobacco Board of Trade, Inc., 386 F.2d 757 (6th Cir. 1967) ................... 13

General Leaseways, Inc. v. National Truck Leasing Association,
    744 F.2d 588 (7th Cir. 1984) ............................................................................................. 18

Harding v. United States Figure Skating Association, 851 F. Supp. 1476
    (D. Or. 1994) ....................................................................................................................... 17

Hunt v. Mobil Oil Corp., 654 F. Supp. 1487 (S.D.N.Y. 1987) .......................................... 12, 13

Hunter Douglas, Inc. v. Comfortex Corp., No. 98-CV-0479 (LEK/DNH),
    1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ................................................. 14

Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295 (5th Cir. 1983) .............................. 15

International Test Balance, Inc. v. Associated Air & Balance Council,
    14 F. Supp. 2d 1033 (N.D. Ill. 1998) ................................................................................ 19

Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438 (2d Cir. 1977) .............................. 18, 19

Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982) ................................................................. 14

Kelly v. Kosuga, 358 U.S. 516 (1959) ...................................................................................... 6

Kensington International Ltd. v. Republic of Congo, No. 03 Civ. 4578 (LAP),
    2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007) ..................................................................... 3

La Societe Nationale pour la Recherche, la Production, le Transport, la Transformation et
    la Commercialisation des Hydrocarbures v. Shaheen
    Natural Resources Co., 585 F. Supp. 57 (S.D.N.Y. 1983) .................................................. 6

Lawlor v. Nat'l Screen Service Corp., 349 U.S. 322 (1955) .................................................... 13

Legion Insurance Co. v. Wisconsin-California Forest Products, No. CIV. S-00-2289
    WBS/PAN, 2001 WL 35809244 (E.D. Cal. Feb. 6, 2001)................................... 3

MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 161 F.3d 443
    (7th Cir. 1998).......................................................................... 14

Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F. Supp. 1019
    (S.D. Tex. 1972)......................................................................... 13

National Basketball Association v. SDC Basketball Club, Inc., 815 F.2d 562
    (9th Cir. 1987)......................................................................... 3, 4

Oregon v. Heavy Vehicle Electronic License Plate, Inc., 157 F. Supp. 2d 1158
    (D. Or . 2001)............................................................................. 3

Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,
    508 U.S. 49 (1993)....................................................................... 20

Radio Corp. of America v. Raytheon Manufacturing Co., 296 U.S. 459 (1935)...................... 10

Redel's Inc. v. General Electric Co., 498 F.2d 95 (5th Cir. 1974)............................. 13

S.E. Rondon Co. v. Atlantic Richfield Co., 288 F. Supp. 879 (C.D. Cal. 1968)................. 10

Sanjuan v. America Board of Psychiatry & Neurology, Inc., 40 F.3d 247 (7th Cir. 1994)....... 13

Supermarket Services, Inc. v. Hartz Mountain Corp., 382 F. Supp. 1248
    (S.D.N.Y. 1974)...................................................................... 18, 19

Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir. 1975)....................... 13

Universal Studios, Inc. v. Viacom, Inc., 705 A.2d 579 (Del. Ch. 1997)...................... 7, 8

VKK Corp. v. National Football League, 55 F. Supp. 2d 196 (S.D.N.Y. 1999)................. 10, 11

VKK Corp. v. National Football League,
    244 F.3d 114 (2d Cir. 2001).......................................... 9, 10, 11, 13, 14, 15

Viacom International, Inc. v. Tandem Products, Inc.,
    526 F.2d 593 (2d Cir. 1975).............................................................. 6

Vogel v. America Society of Appraisers, 744 F.2d 598 (7th Cir. 1984)......................... 17

Westmoreland Asbestos Co. v. Johns-Mansville Corp., 39 F. Supp. 117
    (S.D.N.Y. 1941)......................................................................... 13

iii

## PRELIMINARY STATEMENT

Although MSG's motion to dismiss would suggest that the NHL's counterclaims raise complicated federal Constitutional issues, in fact there is nothing either complicated or controversial about the NHL's claims.  The NHL's counterclaims are based on the following allegations (which must be accepted as true for purposes of MSG's motion):  MSG agreed to be bound by the NHL Constitution and properly enacted Resolutions of the NHL Board of Governors.  MSG executed Consent Agreements in which it agreed, among other things, not to challenge League rules and procedures, including specifically the League's territorial restrictions placed on each Club granted a franchise by the League.[1]  MSG agreed to internal League procedures to redress the potential breach of its obligations under the Consent Agreements.

MSG has attacked longstanding League policies in existence prior to Cablevision's acquisition of MSG relating to broadcasting, licensing, and advertising that go to the core of the League's economic structure, all in breach of its obligations under the NHL Constitution and Consent Agreements.  Finally, MSG has disputed the NHL's right to invoke the parties' agreed upon disciplinary procedures to redress those breaches.  Based on these allegations, the NHL seeks a declaration of its rights under the parties' contracts.  That the NHL has presented a substantial dispute between the parties – the only issue presently before the Court – is self-evident.

While styled as a "motion to dismiss," MSG's motion does not even purport to address whether the NHL has stated a claim.  MSG does not address the pleading requirements for a declaratory relief claim.  And MSG does not dispute that the parties have an actual dispute as to the NHL's rights under the contracts.  MSG instead attempts to address the merits of not only the

---

[1]     This memorandum uses the term "League" interchangeably with the "NHL Board of Governors," which is composed of representatives of each NHL Member Club.

declaratory relief claim, but also the potential disciplinary proceeding: MSG argues that the NHL should not be allowed to terminate its membership in the NHL in response to MSG's filing the instant lawsuit. MSG offers a panoply of inapplicable public policy arguments that borrow from anti-discrimination and First Amendment case law. Whatever relevance MSG's theories have as to the merits of the parties' dispute – and there is none – for purposes of MSG's motion to dismiss all that they do is confirm that at best MSG is asserting affirmative defenses and that the parties have a substantial dispute regarding the League's right to initiate disciplinary proceedings.

Even if the Court were to consider the ultimate merits of the NHL's counterclaims, MSG's arguments lack merit. MSG wants to have its cake and eat it too: offer certain commitments to obtain membership in the League; accept the benefits of being a League member; invoke the very provisions at issue for its own benefit (MSG has no problem with enforcing territorial restrictions when other Clubs want to exploit the New York area); then renege on its commitments; attack those same practices, including the very economic structure of the League; and sue its fellow partners in the joint venture – all with impunity. The law is not so kind. MSG ignores black letter law prohibiting parties to a contract from accepting the benefits of the contract and then attempting to use the antitrust laws as an affirmative defense to avoid their concomitant obligations. It is understandable that MSG wishes to present its challenges to League rules. But in this case, those challenges are made long after MSG has received the benefits of League membership based on the acceptance of those rules (and, in any event, its claims are non-meritorious, as the Court has already found is likely the case as to the website migration issue). Under such circumstances, the League has the right to take action in response to MSG's breach of its contractual obligations. MSG does not cite any authority whatsoever that would preclude the NHL from exercising its contractual rights to discipline a member for breaching its agreement to abide by prior League practices or for bringing unfounded challenges to League rules.

## ARGUMENT

**I.    THERE IS A SUBSTANTIAL DISPUTE BETWEEN THE PARTIES AS TO THE NHL'S RIGHTS UNDER THE MSG CONSENT AGREEMENTS**

MSG ignores the fact that the only issue presently before the Court is whether the NHL has stated a claim for declaratory relief. Indeed, none of the 63 cases MSG cites in its motion addresses a declaratory relief claim. On a motion to dismiss a declaratory relief claim, the only issue for the court to consider is whether the plaintiff adequately alleged the existence of a substantial dispute between the parties; the merits of the underlying dispute are irrelevant and cannot form a basis for dismissal. See, e.g., Kensington International Ltd. v. Republic of Congo, No. 03 Civ. 4578 (LAP), 2007 WL 1032269, at *17-18 (S.D.N.Y. Mar. 30, 2007) (denying motion to dismiss declaratory judgment action because plaintiff adequately alleged an active, actual controversy between the parties); Oregon v. Heavy Vehicle Electronic License Plate, Inc., 157 F. Supp. 2d 1158, 1168 (D. Ore. 2001) ("What [defendant] asserts is the very issue that Oregon wishes to have the court examine. It would be premature to consider the merits of [defendant's] assertions in the context of a Motion to Dismiss.").[2]

The Ninth Circuit's decision in National Basketball Ass'n v. SDC Basketball Club, Inc., 815 F.2d 562 (9th Cir. 1987), is instructive. The Ninth Circuit addressed whether another sports league had stated a viable claim for declaratory relief in connection with its contemplated sanctioning of a club for refusing to abide by the league's territorial restrictions. See id. at 563-64. In 1984, the San Diego Clippers moved to Los Angeles without securing league approval or

---

[2]    See also Legion Ins. Co. v. Wisconsin-California Forest Prods., No. CIV. S-00-2289 WBS/PAN, 2001 WL 35809244, at *3 (E.D. Cal. Feb. 6, 2001) ("[w]hat [defendant] argues is that it is entitled to a dismissal for all of the same reasons that [plaintiff] claims it is entitled to a declaratory judgment in its favor . . . [Defendant] is in effect asking the court to decide the merits of [plaintiff's] declaratory action in order to dismiss [defendant]. It would be premature for the court to resolve the merits of this action on this motion.").

otherwise complying with the NBA's procedures relating to the movement of franchises.  Id. at 564. The NBA sought a "declaratory judgment that it may restrain the movement of its franchise, the Los Angeles Clippers . . . and that it may impose a charge upon them for the Clippers' unilateral usurpation of the 'franchise opportunity' available in the Los Angeles market."  Id. at 563.  The Clippers argued that the NBA's territorial restrictions violated the antitrust laws and that the antitrust laws precluded the League from even considering the imposition of sanctions.  See id. at 564-69.  The Ninth Circuit held that "[d]eclaratory judgment actions are justiciable if 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  Id. at 565 (citation omitted).  The Ninth Circuit reversed the trial court's grant of summary judgment in favor of the Clippers and held that the NBA had pled a proper claim for declaratory relief.  Id. at 566.

        In this case, the only issue properly raised by MSG's motion would be whether the NHL has alleged a substantial controversy between the parties.  As in SDC Basketball, the NHL, a sports league, claims that it has the right to discipline the Rangers, a member club, and the Rangers disputes that right and claims that even the consideration of sanctions would violate the antitrust laws.  As a result, there can be no serious dispute that the parties have a substantial controversy appropriate for declaratory relief.  Indeed, the dispute in this case is more concrete than the one in SDC Basketball because the NHL has specifically alleged that one or more persons authorized to initiate disciplinary proceedings is prepared to do so if the requested relief is granted.  Ironically, MSG's vigorous contention of the NHL's right to initiate disciplinary proceedings actually confirms that there is a justiciable controversy between the parties.[3]

---

[3]     MSG relies on malicious prosecution law in arguing that the NHL's counterclaims fail because the NHL cannot discipline MSG before there has been a final adverse determination on MSG's underlying antitrust claims.  (MTD at 18-20.)  However, the NHL has alleged that MSG has

*(cont'd)*

**II.    MSG'S MERITS-RELATED ARGUMENTS ARE AT BEST AFFIRMATIVE
         DEFENSES AND SHOULD BE REJECTED AS GROUNDS FOR DISMISSAL**

As demonstrated above, because the NHL has indisputably stated a claim, there is
no need even to consider MSG's merits arguments, including its purported defenses.  However,
even if the Court were to consider MSG's arguments, they fail as a matter of law and are best
affirmative defenses.  MSG's motion is premised on the theory that the antitrust laws provide an
affirmative defense to the NHL's counterclaims.  Although this is MSG's primary argument, MSG
does not even acknowledge the body of case law that actually addresses under what circumstances
the antitrust laws may be used as an affirmative defense to a contract claim.  Instead, MSG devotes
much of its motion to stale and inapposite authority relating to such things as racial discrimination
and First Amendment rights.  See infra pp. 16-20.  As demonstrated below, there is a reason that
MSG has chosen to borrow public policy principles from other areas of the law in a misplaced
effort to support its motion:  the Supreme Court has held that the use of the antitrust laws as an
affirmative defense to a contract claim is disfavored, and the limited context in which MSG could
assert its arguments clearly does not apply in this case.

_____
*(cont'd from previous page)*
breached its agreements to abide by NHL rules and practices predating MSG's Consent Agreement,
and MSG does not deny those facts.  Because MSG disputes the NHL's right to initiate proceedings,
the parties have a ripe and justiciable controversy.  When and if the Board of Governors
determines to proceed upon a complaint before it, how the Board might view MSG's actions and
what sanctions it may decide might be appropriate could be impacted by how this litigation unfolds
and what determinations the Court makes regarding MSG's own claims.  And while disciplinary
proceedings under the NHL Constitution and By-Laws and pursuant to the Consent Agreements
are not conditioned on any judicial determination, certainly the Board can initiate proceedings after
a ruling by this Court on the NHL's motion to dismiss rejecting at least some of MSG's claims.  In
any event, the Court need not embroil itself in these timing issues because all that is at issue on
MSG's motion is whether the NHL has alleged a claim for relief.

**A.    MSG Ignores the Law Addressing the Use of Antitrust Laws as an Affirmative Defense**

**1.    The *Kelly v. Kosuga* Doctrine**

In Kelly v. Kosuga, 358 U.S. 516, 518 (1959), the Supreme Court considered under what circumstances defendants may rely upon the antitrust laws as a defense to a contract action. The Supreme Court explained that the defense of antitrust illegality "has not met with much favor in this Court." Id. In Kelly, the plaintiff sought to recover the contract price of onions sold and delivered, and the Court rejected the defendant's answer that the contract was made as part of a scheme to control the futures market and was hence unenforceable for public policy reasons. See id. at 516-18, 521. The Supreme Court instead found that the sale of onions was "an intelligible economic transaction in itself" and was collateral to any agreement in restraint of trade. Id. at 521. The Court explained that enforcing the contract at issue would not "make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act," id. at 520, and held that courts should be guided by the overriding general policy "'of preventing people from getting other people's property for nothing when they purport to be buying it.'" Id. at 520-21 (citation omitted).

In applying Kelly, courts have been guided by the principle of preventing contracting parties from accepting the benefits of a contract and then relying on purported antitrust concerns to evade their concomitant obligations. See, e.g., Viacom Int'l, Inc. v. Tandem Prods., Inc., 526 F.2d 593, 599 (2d Cir. 1975) ("It seems apparent that the overriding consideration which has persuaded the Supreme Court is its concern that the successful interposition of antitrust defenses is too likely to enrich parties who reap the benefits of a contract and then seek to avoid the corresponding burdens.").[4] The antitrust laws may be relied upon as an affirmative defense

---

[4]    See also La Societe Nationale pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocarbures v. Shaheen Natural Res. Co., 585 F. Supp. 57, 63 (S.D.N.Y. 1983) (citing potential for defendant to "reap the benefits" of contract and

*(cont'd)*

only where enforcing the contract would effectively make the court a party to an illegal transaction, circumstances clearly not present here.

Universal Studios, Inc. v. Viacom Inc., 705 A.2d 579 (Del. Chan. 1997), is instructive. The Delaware Chancery Court applied the Kelly doctrine in the context of a joint venture member who sought to invoke the antitrust laws to evade its obligations under the parties' joint venture agreement. The parties had formed a joint venture known as the "USA Networks." Id. at 582. The joint venture agreement, which was based on New York law, "included a non-compete provision prohibiting the participants from engaging in this same business[.]'" Id. at 583 (alteration in original). After the venture had been formed, Paramount bought into the venture and was later acquired by Viacom. Id. at 583-85. However, Viacom owned other cable networks, which put it in breach of the parties' agreement not to compete with the joint venture. This led to disputes with the other members of the joint venture and ultimately to a lawsuit against Viacom for breach of the non-compete clause. See id. at 585-88. In its defense, Viacom argued that the non-compete clause was "an illegal restraint on competition," id. at 596, and that its enforcement would effectively compel Viacom's termination from the venture at "a price well below fair market value." Id. at 598 n. 120.

In considering Viacom's attempt to use the antitrust laws as an affirmative defense, the court noted the potential unfairness of allowing Viacom to use the antitrust laws to escape its obligations after having already profited from the economic structure of the venture. Id. at 597. The court had little trouble concluding that Viacom should not be allowed to raise what were, at

_____
*(cont'd from previous page)*
"avoid the corresponding burdens" as critical factor in rejection of antitrust illegality defense), aff'd, 733 F.2d 260 (2d Cir. 1984).

best, rule of reason challenges to the terms of the agreement as an affirmative defense to an action

for breach of the joint venture agreement:

> This does not, however, fully answer the question, because the defense may
> nevertheless be upheld where the contract is "intrinsically illegal," or where
> "enforcement would result in compelling performance of the precise conduct made
> unlawful by the anti-trust laws." I note initially, that I do not find [the non-compete
> provision] to be violative per se, and thus consider the provision under the "rule of
> reason" analysis. . . .
>
> The only anti-competitive effect of [the non-compete provision] is that it restricts
> Viacom's ability to compete as it wishes. Viacom would prefer to continue to
> operate its MTV Networks (and develop new channels) and continue its one-half
> ownership in the USA Networks. [The non-compete provision] flatly prohibits this
> conduct. This does not make the [provision] anti-competitive – much less violative
> of the antitrust laws. While it may be true that Viacom is an important force in the
> cable television and related industries, this does not mean that the antitrust laws, or
> public policy, require it to be able to operate as it wishes and without regard to
> agreements by which it is bound.
>
> . . . .
>
> As a matter of policy, leaders in industry must be encouraged to pool their resources
> without fear that they run the risk of having the conditions changed when they no
> longer serve the purposes of their coventurers. It may well be true that one or the
> other or all of the coventurers will eventually determine the rules of the game ought
> to be changed. At such time, the parties must operate within their previously agreed
> guidelines or otherwise by mutual agreement. A court of equity will not step in to
> alter the playing field to the distinct disadvantage of one over the other.

Id. at 597-99.

       The same principles apply in this case. As MSG has conceded and the Court has

already found, the NHL is a legitimate joint venture and there is no intrinsic illegality in the NHL

Constitution and Bylaws or the Consent Agreements. As in Universal Studios, this case involves a

member of a joint venture that has accepted and profited from the basic economic structure of the

venture, including the specific provisions at issue. (Since purchasing the Rangers franchise in

1995, MSG has sought, inter alia, to protect and profit from its territorial rights set forth in the

NHL Constitution, including securing payments from another Club, the New Jersey Devils, for the

invasion of those rights, which MSG itself characterized as "invaluable." (Counterclaims ¶¶ 20-25,

27.))  MSG did not become concerned with the alleged antitrust implications of the League's preexisting rules and procedures until it decided that it would like to compete against the venture and infringe upon the territories of other members in violation of the NHL Constitution and its Consent Agreement.  As in Universal Studios, MSG should not be allowed to rely upon what are, at best, rule of reason challenges to the parties' agreement as a defense to an action for breach of the agreement, even if enforcement of the agreement could conceivably result in its termination. MSG should not be permitted – especially on a motion to dismiss – to use this Court to rewrite the parties' agreement to evade the consequences of its own contractual breaches.

## 2.    The Part and Parcel Doctrine

MSG's reliance on racial discrimination and First Amendment case law seemingly would suggest that courts have never addressed whether the antitrust laws may be invoked as a defense to a release or a covenant not to sue.  In fact, however, there is an entire body of law specifically addressing application of the Kelly doctrine to "releases," which has become known as the "part and parcel" doctrine.  While courts have recognized the theoretical possibility that the antitrust laws could provide a defense to a release "if 'the release itself was an integral part of a scheme to violate the antitrust laws,'" VKK Corp. v. National Football League, 244 F.3d 114, 125 (2d Cir. 2001) (citation omitted), such that enforcement of the release would make the court a party to the purported antitrust violation, no circuit court has ever encountered a set of facts justifying application of the doctrine.  See id. at 126 ("No United States Court of Appeal has ever applied the part and parcel theory to invalidate a release.  Indeed, at least one circuit has expressed grave doubt as to the very existence of the doctrine.").[5]

---

[5]    The genesis of the "part and parcel" theory appears to be dictum from a case refusing to reach the argument that a release "was so connected with the unlawful combination and monopoly

*(cont'd)*

In order for the doctrine to apply, the "release must be 'an object of the combination or conspiracy' or 'an integral part of the scheme in restraint of trade.' '[I]f the release is merely an outgrowth, rather than a cause of the violation,' it is not part and parcel of the antitrust conspiracy." Id. at 125 (alteration in original; citations omitted); see also Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL 31246922, at *3 (E.D. Pa. Aug. 9, 2002) (rejecting part and parcel argument because plaintiff's allegations failed to "establish that the release itself was an integral part of the allegedly illegal antitrust activity. The plaintiff does not explain how the release was integral to the [scheme], nor does the plaintiff argue that the alleged conspiracy could not have proceeded without the release."); S.E. Rondon Co. v. Atlantic Richfield Co., 288 F. Supp. 879, 881-82 (C.D. Cal. 1968) (rejecting part and parcel argument and granting summary judgment based on release because "[e]ven if the release was demanded and obtained . . . with the specific intent and purpose of preventing Plaintiffs from filing an antitrust action, that fact would not invalidate the release").

The Second Circuit addressed the doctrine in a factual setting similar to this case in VKK Corp., 244 F.3d 114. The issue in VKK Corp. was whether a release provided by an NFL owner barred an antitrust challenge to the NFL's rules relating to territorial restrictions. Victor Kiam acquired a majority interest in the New England Patriots in 1988. At that time, he signed a consent agreement promising to comply with "all NFL rules and policies as now in effect or as hereafter amended." VKK Corp. v. Nat'l Football League, 55 F. Supp. 2d 196, 200 (S.D.N.Y. 1999). During his ownership, the team experienced "substantial financial difficulties" stemming from its stadium facilities and lease in New England, and Kiam explored the possibility of

_____
(cont'd from previous page)
as to be inoperative at law." Radio Corp. of America v. Raytheon Mfg. Co., 296 U.S. 459, 462-63 (1935).

relocating the team to Jacksonville.  <u>VKK Corp.</u>, 244 F.3d at 119.  However, the League opposed the team's potential relocation, and Kiam ultimately agreed to sell his interest in the Patriots.  <u>VKK Corp.</u>, 55 F. Supp. 2d at 202-04.  The NFL membership approved Kiam's proposed sale contingent upon final approval by the Commissioner of all documentation relating to the transfer, which included a release.  <u>Id.</u> at 204.

Kiam later sued the NFL alleging defendants conspired to prevent him from moving the franchise in violation of the antitrust laws.  <u>Id.</u> at 197, 206.  Kiam further alleged that the release he was required to execute was "part and parcel" of an antitrust conspiracy to prevent franchise relocation.  <u>Id.</u> at 206.  Judge Pollack rejected Kiam's argument, recognizing that if accepted it would swallow the general rule that releases are presumptively valid.  <u>See id.</u> at 208 ("[E]very release is designed to prevent litigation, and releases are often sought in order to limit particular classes of liability.  It goes too far to argue that a policy of obtaining releases transforms an otherwise valid release into a legal nullity.").  The Second Circuit affirmed, holding that the "asserted consequences of Kiam's signing of the Release [were] insufficient to render the Release an integral part of the alleged conspiracy . . . While the Release might have been useful to the alleged conspirators in fending off such a challenge from VKK, the alleged conspiracy could plainly have proceeded without it.  It was therefore not an integral part of a scheme to violate the antitrust laws."  <u>VKK Corp.</u>, 244 F.3d at 126.

In this case, in order to prevail on its motion, MSG would need to show not only that "part and parcel" is a viable doctrine, but that, accepting the truth of the NHL's allegations, the doctrine applies in this context as a matter of law.  MSG has not even attempted to make such a showing.  MSG admits that the NHL is a lawful joint venture.  MSG does not contend that either the NHL Constitution or the Consent Agreements that MSG executed are unlawful agreements.  The Consent Agreements including the releases were executed long after the League had adopted

11

the policies and practices that are at issue in the NHL's counterclaims. And while the releases and covenants were presumably sought to fend off potential challenges to League rules, they were clearly not essential to the purported conspiracy. As a result, not only has MSG failed to meet its burden on its motion to dismiss, based on the undisputed facts it is clear that the doctrine could not possibly apply to the releases and covenants MSG executed in 2005.

### B.   The NHL's Counterclaims Are Not Based on a Release of Future Antitrust Violations

MSG does not dispute that releases can bar antitrust claims. Instead, MSG's primary argument is that releases cannot apply to "future" antitrust violations. (Memorandum of Law in Support of Plaintiff's Motion to Dismiss Counterclaims ("MTD") at 5-9.) MSG's argument is misplaced for several independent reasons.

First, MSG's motion is based on Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requires that the Court accept as true the allegations in the complaint sought to be dismissed and draw all inferences in favor of the non-moving party. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1969 (2007). However, while MSG's motion must accept the truth of the NHL's allegations in its counterclaims, it plainly does not. MSG instead assumes the truth of its own allegations, basing its argument on the assertion that the NHL's counterclaims relate to anticompetitive conduct since the execution of MSG's most recent Consent Agreement. MSG ignores that the NHL alleges that it is seeking declaratory relief based on MSG's challenge to practices that were adopted prior to Cablevision's acquisition of MSG and MSG's execution of the most recent Consent Agreement and release. Indeed, MSG's cited cases all stand for the unremarkable proposition that releases cannot bar antitrust claims that "arise" after the execution of the release. See, e.g., Hunt v. Mobil Oil Corp., 654 F. Supp. 1487, 1516 (S.D.N.Y. 1987) ("[T]he Hunts' antitrust claims [with respect to practices] that arose prior to the execution of the [parties'

12

agreement] were <u>past</u> antitrust claims which <u>were subject to the covenant</u> not to sue and gave rise

to liability under the covenant for damages, including attorneys' fees, in defending against those

claims; and . . . the Hunts' antitrust claims [as to new practices] that arose <u>after</u> [the parties'

agreement], were <u>future</u> antitrust claims and hence not <u>subject to the covenant</u> not to sue . . . .'");

<u>Redel's Inc. v. Gen. Elec. Co.</u>, 498 F.2d 95, 98-100 (5th Cir. 1974) (construing release to bar

"[l]iabilities arising from facts occurring prior to [the date of the release]").[6]

        MSG does not cite any cases addressing the application of releases to practices that

were put in place <u>before</u> but continued after execution of a release.[7]  MSG again ignores that the

Second Circuit addressed this precise issue in <u>VKK Corp.</u>, 244 F.3d 114.  <u>VKK Corp.</u> addressed

the NFL's territorial restrictions, which remained in place <u>after</u> the execution of the release.  In his

---

[6]     The other authority on which MSG relies likewise falls within this paradigm.  <u>See</u> <u>Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.</u>, 40 F.3d 247, 249-50 (7th Cir. 1994) (prospective waiver of right to challenge future decision by board of examiners relating to board certification was unenforceable); <u>Three Rivers Motors Co. v. Ford Motor Co.</u>, 522 F.2d 885, 887, 896-97 & n.27 (3d Cir. 1975) (reversing denial of motion to dismiss based on a release and noting "there is nothing in the public policy behind antitrust laws that prohibits general releases encompassing antitrust claims, provided that the release does not seek to waive damages from future violations of antitrust laws"); <u>Gaines v. Carrollton Tobacco Bd. of Trade, Inc.</u>, 386 F.2d 757, 759 (6th Cir. 1967) (not addressing a release; simply reciting hornbook principle that "an agreement, if executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds"); <u>Fox Midwest Theaters, Inc. v. Means</u>, 221 F.2d 173, 180-81 (8th Cir. 1955) (addressing whether parol evidence had been properly admitted to aid in interpretation of settlement agreement and noting in passing that "[a]ny contractual provision which could be argued to absolve one party from liability for future violations of the anti-trust statutes against another would to that extent be void as against public policy"); <u>Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc.</u>, 338 F. Supp. 1019, 1022 (S.D. Tex. 1972) (release could not cover "disputes which had not yet arisen"); <u>Westmoreland Asbestos Co. v. Johns-Mansville Corp.</u>, 39 F. Supp. 117, 119 (S.D.N.Y. 1941) ("contemplation of future wrongs was not within the minds of the parties").

[7]     Indeed, neither of the cases on which MSG relies in support of its baseless proposition that a release is invalid "even if the actionable conduct is a continuation of conduct that began before the date of the release" (MTD at 7) involved a release at all.  <u>See</u> <u>Lawlor v. Nat'l Screen Service Corp.</u>, 349 U.S. 322 (1955); <u>Cellar Door Prods., Inc. of Mich. V. Kay</u>, 897 F.2d 1375 (6th Cir. 1990).

appeal to the Second Circuit, Victor Kiam made the same "continuing violation" argument that

MSG makes in this case. Thus, in his appellate brief, Kiam argued:

> Most releases do not affect the likelihood of further antitrust violations; they merely
> represent the resolution of past conduct. In the language of the cases, they are
> "outgrowths" of a past restraint of trade, and not the "cause" of some further
> restraint. In some situations, admittedly rare, however, a release substantially
> contributes to a <u>continuing restraint of trade</u>. In those situations, a different rule has
> applied and must apply. Just as courts will not enforce agreements that compel
> conduct the Sherman Act forbids, <u>see</u> <u>Kaiser Steel Corp. v. Mullins</u>, 455 U.S. 72
> (1982), likewise they will not assist antitrust conspirators in coercing their victims
> to surrender claims in a manner that substantially contributes to the <u>continuation of
> the conspirators' unlawful conduct.</u>

> Reply Brief of Plaintiffs-Appellants VKK Corp., et al., at *7-8 (Ex. A hereto)

(emphasis added).[8] The Second Circuit squarely rejected Kiam's "continuing violation" theory:

> VKK's argument also proves too much. It is not uncommon, we assume, for a
> release to prevent the releasor from bringing suit against the releasee for engaging
> in a conspiracy that is later alleged to have continued after the release's execution.
> Such a release would seem always to protect the ongoing conspiracy because it
> always prevents the releasor from beginning litigation that would establish the
> scheme's illegality. We do not think that the part and parcel doctrine can be read so
> broadly as thus to render void all releases relating to conspiracies alleged to
> continue post-release.

<u>VKK Corp.</u>, 244 F.3d at 126.[9]

---

[8]    Thus, like MSG here, Kiam attempted to rely in part on <u>Kaiser Steel</u> and the general
proposition that courts will not enforce contracts that themselves violate the antitrust laws.
However, this argument clearly was unpersuasive to the Second Circuit, which held that the release
was not part and parcel of an antitrust conspiracy and therefore properly barred the antitrust action.

[9]    Other courts to consider this issue have reached the same conclusion. In <u>Hunter Douglas,
Inc. v. Comfortex Corp.</u>, No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at *19-21
(N.D.N.Y. Mar. 11, 1999), the court held that a release barred a claim challenging ongoing
practices that had "not been altered materially since the parties executed [a release]." Contrary to
MSG's argument in its summary judgment opposition, the court expressly considered and rejected
the same public policy argument that MSG makes in this case, concluding that the release barred
any claim that had "accrued" as of the date of the release. <u>Id.</u> at *22 n. 10. Similarly, in <u>MCM
Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.</u>, 161 F.3d 443, 448-49 (7th Cir. 1998), the
Seventh Circuit acknowledged that "a new, post-Release agreement" in restraint of trade could be
actionable, but squarely rejected the argument that mere "continued adherence" to a purported pre-
release restraint of trade gave rise to a viable claim. <u>See also</u> <u>Fresh Made</u>, 2002 WL 31246922, at
*3 ("'[T]he part and parcel doctrine [cannot] be read so broadly as . . . to render void all releases

*(cont'd)*

Like Kiam's argument in <u>VKK Corp.</u>, MSG's argument collapses under its own weight. If MSG's theory was correct, parties could never settle disputes about the legality of ongoing practices without the defendant agreeing to abandon those practices – otherwise, they would always remain subject to repeat lawsuits.   Under MSG's theory, it could settle this case today; stipulate that the NHL may continue the practices at issue; provide a release and a covenant not to sue – and then file a new action next week challenging the same practices.  MSG's argument itself conflicts with public policy, which favors the ability of parties to settle their disputes.  <u>See Ingram Corp. v. J. Ray McDermott & Co.</u>, 698 F.2d 1295, 1316 (5th Cir. 1983) ("[T]here is a significant public policy interest in permitting parties to enter into negotiations to settle their differences, even when these include possible antitrust claims.").

Allowing parties to amicably settle disputes regarding the legality of ongoing practices does not insulate those practices from legal challenge.  A release or covenant not to sue would not prevent other potential plaintiffs, including consumers and the government, from challenging those same practices.  <u>See, e.g.</u>, <u>VKK Corp.</u>, 244 F.3d at 122 ("Although a release from a private antitrust action forecloses that action, it does not immunize the released party from liability under federal antitrust laws for its acts – government enforcement of those laws remains possible."); <u>Ingram Corp.</u>, 698 F.2d at 1316 ("Enforcement of a release which covers antitrust claims does not implicate or derogate from the remedial provisions of the federal antitrust laws.  Indeed, they remain unaffected by our decision. . . .  We preempt no government prosecution under the antitrust laws.").

_____
*(cont'd from previous page)*
relating to conspiracies alleged to continue post-release.'") (second alteration and ellipsis in original) (quoting <u>VKK Corp.</u>, 244 F.3d at 126).

15

C.    **MSG's Remaining Arguments Are Red Herrings**

MSG again argues the ultimate merits of the NHL's counterclaims in asserting that the claims should be dismissed as impermissible attempts to retaliate against and penalize the filing of MSG's antitrust lawsuit.  MSG relies on inapplicable anti-retaliation principles and irrelevant Noerr-Pennington considerations.  Neither argument is of any aid to MSG's efforts to avoid its contractual commitments to the NHL, and neither serves as a legitimate basis on which the NHL's counterclaims should be dismissed for failure to state a claim.

1.    **MSG Does Not Have a Federal Constitutional Right to Challenge League Rules**

MSG contends that any disciplinary proceedings conducted by the NHL with respect to MSG's breach of its contractual commitments would constitute retaliation against MSG for the filing of a "legitimate federal statutory claim."  (MTD at 10.)  Such a result, argues MSG, would be against public policy, requiring dismissal of the NHL's counterclaims.  MSG relies on a series of cases interpreting anti-discrimination statutes to include the prohibition of retaliation for attempts to enforce the provisions of those statutes.  (MTD at 9-11.)  However, that the U.S. Constitution, courts, and Congress have recognized the overriding "federal interest" (MTD at 9) in protecting fundamental rights to be free from racial, sex, age or other forms of discrimination and have concomitantly endeavored to encourage the enforcement of those rights by construing civil rights statutes to bar retaliation is of no relevance here (i.e., owning a hockey team is not a fundamental right guaranteed by the U.S. Constitution) and certainly has no bearing on whether the NHL has adequately stated a claim.  These cases are distinguishable on their face and add nothing to MSG's motion to dismiss.

Nor can MSG succeed on its motion to dismiss by arguing that one of the authorized sanctions in the NHL Constitution (i.e., termination) would be inappropriate.  First, and

16

importantly, termination of membership is only one of a number of options available to the NHL

Board of Governors (see Counterclaims ¶ 32).  Further, even if the NHL's internal disciplinary

proceedings were to result in termination of MSG – which, again, is an issue that the Court need

not reach at this stage of the proceedings – that outcome would be a proper and lawful remedy that

was expressly contemplated by the agreements entered into by MSG when it purchased the

Rangers.  (See Counterclaims ¶ 31.)  See also Vogel v. American Soc'y of Appraisers, 744 F.2d

598, 600 (7th Cir. 1984) (recognizing that expulsion of noncomplying member is "the normal

method by which a private association enforces its rules").  Finally, MSG's attempts to convince

this Court – on a motion to dismiss, no less – to nullify the NHL's dispute resolution procedures are

unavailing as it is well-established that courts should generally refrain from interfering with the

internal disciplinary proceedings of a private association.  See, e.g., Charles O. Finley & Co. v.

Kuhn, 569 F.2d 527, 539 & n.44 (7th Cir. 1978) (affirming dismissal of claim by major league

baseball team against commissioner of baseball based on alleged arbitrary and capricious conduct

in the interpretation and enforcement of internal baseball rules and procedures because "'[w]hether

[the commissioner] was right or wrong is beyond the competence and the jurisdiction of this court

to decide'").[10]

In an effort to bolster its policy-based retaliation argument for dismissal of the

counterclaims, MSG cites a number of cases in which courts have preliminarily enjoined the

termination of an association member, distributor, or customer pending the outcome of an antitrust

litigation.  (MTD at 13-15.)  MSG contends that these cases have applied anti-retaliation principles

---

[10]    Accord Harding v. United States Figure Skating Ass'n, 851 F. Supp. 1476, 1479 (D. Or. 1994) ("The courts should rightly hesitate before intervening in disciplinary hearings held by private associations, including the defendant United States Figure Skating Association."); Butler v. USA Volleyball, 673 N.E.2d 1063, 1066 (Ill. App. Ct. 1996) ("Courts are reluctant to interfere with the disciplinary decisions of voluntary associations.").

in preventing terminations, which, it argues, would discourage the filing of antitrust lawsuits. However, even if the Court were to address the ultimate merits of the NHL's counterclaims and the defenses that MSG now asserts – which, again, is inappropriate in the context of a motion to dismiss – the cases cited by MSG are readily distinguishable.

First, the cases cited by MSG primarily concerned the propriety of a preliminary injunction to preserve the status quo (i.e., prevent termination or expulsion) pending the outcome of an antitrust lawsuit. Thus, not only did each case involve a different procedural litigation posture than at issue here, and thus a different standard of review (i.e., preliminary injunction to enjoin termination pending conclusion of litigation), and a different factual context (i.e., the association had already initiated expulsion proceedings), but the merits of those cases were very different than those in the instant litigation. Indeed, in each of those cases, the court found substantial or sufficiently serious questions going to the merits of the lawsuit. See, e.g., Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 595-96 (7th Cir. 1984); Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 440-41 (2d Cir. 1977); Supermarket Servs., Inc. v. Hartz Mountain Corp., 382 F. Supp. 1248, 1255-56 (S.D.N.Y. 1974). Here, by contrast, this Court has already concluded – at least with respect to the website migration allegations that were before it on MSG's motion for preliminary injunction – that MSG is unlikely to succeed on the merits, and the Second Circuit has expressly affirmed that holding.[11]

Moreover, unlike here, none of the "retaliation" cases on which MSG relies involved the breach of a covenant not to sue or a release of claims. The NHL's counterclaims are

---

[11]    Indeed, the NHL did not file its Counterclaims until after this Court's decision on MSG's motion for preliminary injunction, until after that decision was affirmed by the Second Circuit, and until after MSG filed the Amended Complaint attacking the NHL-foundational exclusive territorial rights of each Member Club, at which time the NHL's views on MSG's challenge to League rules were clarified and in the case of the website migration (at least preliminarily) vindicated.

based on MSG's challenge to the NHL's rules and practices – almost all of which were in place at the time that MSG executed one or more of its Consent Agreements – in breach of its Consent Agreement and its refusal to recognize the League's contractually agreed-upon internal procedures to address such breaches.  (Counterclaims ¶¶ 18, 26-30, 31-35.)  Therefore, the NHL's internal disciplinary procedures would not constitute an attempt to "retaliate" against MSG at all; rather, they would entail the critical enforcement of the NHL's contractual right to conduct disciplinary proceedings, pursuant to the rules and procedures set forth in the NHL Constitution, to consider whether MSG has breached its commitments to the League and if so, what, if any, sanctions should be levied.  (See id. ¶¶ 31-38.)  Indeed, if the NHL were not permitted to enforce its rules and conduct its internal disciplinary procedures, Member Clubs would be encouraged to disregard those rules and breach their contractual commitments to the NHL.  See, e.g., Int'l Test Balance, Inc. v. Associated Air & Balance Council, 14 F. Supp. 2d 1033, 1046 (N.D. Ill. 1998) (acknowledging that preventing association from enforcing its bylaws by expelling member for noncompliance "would only encourage members to ignore the association's standards").[12]

### 2.    MSG's Noerr-Pennington Arguments Are Wholly Inapposite and Provide No Basis for Dismissal of the NHL's Counterclaims

MSG also resorts to a convoluted argument based on Noerr-Pennington principles. The thrust of MSG's argument is that the NHL's counterclaims seek to penalize the filing of MSG's earlier suit against the NHL, without alleging that that suit was a "sham."  (MTD at 11-12, 16-17.) MSG's argument ignores both the relevant law and facts.

---

[12]    Additionally, in a number of the cases cited by MSG, termination of the association member or distributor may have reduced the total number of market participants, increasing the prospect of anticompetitive conduct as a result.  See, e.g., Jacobson & Co., 548 F.2d at 443-45; Supermarket Servs., 382 F. Supp. at 1256-57.  Conversely, here, even if the NHL Board of Governors determined to terminate MSG's membership in the League, the end result would be the sale of the Club to a new owner (see Counterclaims ¶ 32), not a reduction in the number of teams playing hockey in the League.

Each case cited by MSG in support of this argument entailed an antitrust challenge to a prior governmental petition that was rejected based on the <u>Noerr-Pennington</u> doctrine, which confers immunity upon legitimate efforts to petition the government, including through the litigation process. <u>See</u> <u>Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 56-61 (1993). Indeed, the "sham" standard cited by MSG (MTD at 12) provides that in order to be successful in such a challenge, the antitrust plaintiff must prove that the original action constituted the use of the governmental process as an "anticompetitive weapon." <u>Id.</u> at 60-61. <u>Noerr-Pennington</u> would only have relevance here if the NHL was accusing MSG of violating the antitrust laws. But the NHL is <u>not</u> challenging MSG's lawsuit against the NHL as anticompetitive or otherwise violative of the antitrust laws. Instead, the NHL merely seeks a declaration from the Court confirming that pursuant to its agreements with MSG, the NHL is entitled to commence disciplinary proceedings against MSG for breach of its contractual commitments. Thus, MSG's assertion that the NHL's counterclaims fail to state a claim because the NHL has not alleged that MSG's suit is a sham under the standard enunciated in <u>Professional Real Estate Investors</u> is nonsensical.

Finally, to the extent that MSG is attempting to invoke <u>Noerr-Pennington</u> principles to assert that the enforcement of the covenant not to sue and/or the releases it entered into with the NHL would impermissibly stifle its First Amendment right to petition the government, such argument in likewise unavailing. Courts have routinely upheld similar releases and covenants not to sue (including those involving antitrust claims), which by definition restrain a party's ability to petition courts for redress. <u>Supra</u> pp. 9-15. There is no authority for the proposition that covenants not to sue or releases may apply only to "sham" litigations.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Plaintiff's Motion to Dismiss Counterclaims be denied.

Dated:  July 29, 2008                                    Respectfully submitted,


                                                          _s/ Shepard Goldfein_____
                                                          Shepard Goldfein
                                                          James A. Keyte
                                                          Paul M. Eckles
                                                          Matthew M. Martino
                                                          SKADDEN, ARPS, SLATE,
                                                              MEAGHER & FLOM LLP
                                                          Four Times Square
                                                          New York, New York 10036-6522
                                                          Telephone:  (212) 735-3000
                                                          Facsimile:  (212) 735-2000

                                                          *Attorneys for Defendants National Hockey
                                                              League et al.*

# EXHIBIT A

Westlaw.

1999 WL 33612654 (C.A.2)                                                    Page 1


For Opinion See <u>244 F.3d 114</u>

United States Court of Appeals,Second Circuit.
VKK CORPORATION, VKK Patriots, Inc. and Victor K. Kiam, II,
Plaintiffs-Counter-Defendants-Appellants,
v.
NATIONAL FOOTBALL LEAGUE, B & B Holdings, Inc., The Five Smiths, Inc., Buffalo Bills,
Inc., The Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns
Football Co., Dallas Cowboys Football, Inc., PDB Sports Inc., The Detroit Lions, Inc.,
The Green Bay Packers, Inc., Houston Oilers, Inc., Indianapolis Colts, Inc., Kansas City
Chiefs Football Club Inc., Miami Dolphins, Ltd, Minnesota Vikings Football Club, Inc.,
New York Football Giants, Inc., New York Jets Football Club, Inc., Pittsburgh Steelers
Sports Inc., San Diego Chargers Football Co., Seattle Seahawks Inc., Tampa Bay Area NFL
Football, Inc., Pro-Football, Inc. and Touchdown Jacksonville, Ltd.,
Defendants-Counter-Claimants-Appellees,
Touchdown Jacksonville, Inc., Defendant-Appellee.
No. 99-7876
December 13, 1999.

On Appeal from the United States District Court for the Southern District of New York

Reply Brief of Plaintiffs-Appellants VKK Corporation, et al.
<u>Robert M. Heller</u>, (RMH1297), Kramer, Levin, Naftalis & Frankel LLP, 919 Third Avenue,
New York, New York 10022, (212) 715-9100<u>Steven R. Kuney</u>, (SRK5369), <u>Mark S. Levinstein</u>,
Williams & Connolly, 725 12th Street, N.W., Washington, D.C. 20005, (202)
434-5012Attorneys for Plaintiffs-Appellants, VKK Corporation, et al.

**\*i** TABLE OF CONTENTS

I. Defendants Have Provided No Basis for Summary Judgment on Plaintiffs' Part and Parcel
Challenge to the Release ... 2

 A. The Part and Parcel Doctrine Exists ... 2

 B. The Dismissal of the Part and Parcel Claim Cannot be Sustained Based on the Court's
Factual Findings ... 3

 C. The Part and Parcel Doctrine Does Not Render All Antitrust Releases Unenforceable ...
5

II. Plaintiffs Did Not Ratify the Release as a Matter of Law ... 8

III. Prejudicial Errors in the Jury Instructions Warrant a New Trial on Duress ... 11

 A. Plaintiffs Preserved Their Objections ... 11

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33612654 (C.A.2)                                                                                              Page 2

B. Wrongful Threat ... 12

C. Causation ... 15

IV. The District Court's Evidentiary Rulings Warrant Reversal ... 17

A. Fact Testimony on the Key Issues Was Improperly Excluded ... 17

B. There Was No Basis for the Total Exclusion of Mr. Monheit ... 17

C. The Court's Repeated Questioning and Partisan Comments Were Improper ... 18

D. The Court's Evidentiary Errors Were Not Harmless ... 20

V. Plaintiffs' Lack-of-Consideration Challenge Should Not Have Been Rejected on Summary Judgment ... 21

VI. TJ, Ltd. Was Not Covered By the Release ... 24

VII. The Amendment to Add TJ, Inc. as a Defendant Relates Back to the Filing of the Original Complaint ... 24

*ii VIII. There Was No Basis for Summary Judgment on the Issue of Concerted Action ... 27

*iii TABLE OF AUTHORITIES

**FEDERAL CASES**

Anderson v. Branen, 17 F.3d 552 (2d Cir. 1994)... 11, 12

Carter v. Twentieth Century-Fox Film Corp., 127 F. Supp. 675 (W.D. Mo. 1955)... 6

Carvel Corp. v. Diversified Management Group, 930 F.2d 228 (2d Cir. 1991)... 13

Citibank, N.A. v. Real Coffee Trading Co., N.V., 566 F. Supp. 1158 (S.D.N.Y. 1983)... 9

deCiutiis v. Nynex Corp., No. 95 Civ. 9745 (PKL), 1996 WL 512150 (S.D.N.Y. Sept. 9, 1996)... 13

DiRose v. PK Management Corp., 691 F.2d 628 (2d Cir. 1982)... 10

Fredericks v. Goldschmidt, No. 89 Civ. 5661 (WK), 1991 WL 18159 (S.D.N.Y. Feb. 5, 1991)... 9

Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183 (7th Cir. 1993)... 20

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc., 748 F.2d 1071 (5th Cir. 1984)... 22

Gorman v. Earmark, Inc., 968 F. Supp. 58 (D. Conn. 1997)... 22

**\*iv** Harless v. Research Institute of Am., 1 F. Supp:2d 235 (S.D.N.Y. 1998)... 21

Hotel Constructors, Inc. v. Seagrave Corp., 574 F. Supp. 384 (S.D.N.Y. 1983)... 9

Industrial Recyling Sys., Inc. v. Ahneman Assocs., PC., 892 F. Supp. 547 (S.D.N.Y. 1995)... 8

Ingrain Corp. v. J. Ray McDermott & Co., 698 F.2d 1295 (5th Cir. 1983)... 3

International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc., 544 F.2d 105 (2d Cir. 1976)... 10

Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982)... 7

Kilkenny v. Arco Marine, Inc., 800 F.2d 853 (9th Cir. 1986)... 25, 26

Kovian v. Fulton County Nat'l Bank and Trust Co., 857 F. Supp. 1032 (N.D.N.Y. 1994)... 9

Loan v. ITT Industries, Inc., No. 98 CIV 6946 (SAS), 1999 WL 151100 (S.D.N.Y. Mar. 19, 1999)... 13

Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113 (2d Cir. 1977)... 21, 23

Malek v. Federal Ins. Co., 994 F.2d 49 (2d Cir. 1993)... 20

Maynard v. Durham & S. Ry. Co., 365 U.S. 160 (1961)... 21, 22

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984)... 28

**\*v** Nationwide Mut. Fire Ins. Co. v. Ford Motor Co., 174 F.3d 801 (6th Cir. 1999)... 19

Olin Corp. v. Consolidated Alum. Corp., 5 F.3d 10 (2d Cir. 1993)... 9, 22

Olin Corp. v. Consolidated Alum. Corp., 807 F. Supp. 1133 (S.D.N.Y. 1992), aff'd in relevant part, vacated on other grounds, 5 F.3d 10 (2d Cir. 1993)... 22

Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171 (2d Cir. 1992)... 11

Pauling v. News Syndicate Co., 335 F.2d 659 (2d Cir. 1964)... 12

Phoenix Assoc. III v. Stone, 60 F.3d 95 (2d Cir. 1995)... 20

Pickwick Commun., Inc. v. Weinberg, No. 91 Civ. 1642 (AGS), 1994 U.S. Dist. LEXIS 15680 (S.D.N.Y. Nov. 3, 1994), aff'd without op., 89 F.3d 825 (2d Cir. 1995)... 10

Potts v. Allis-Chalmers Corp., 118 F.R.D. 597 (N.D. Ind. 1987)... 26

Radio Corp. of Am. v. Raytheon Mfg. Co., 296 U.S. 459 (1935)... 2

Rivas v. Brattesani, 94 F.3d 802 (2d Cir. 1996)... 18, 19

St. Louis Convention & Visitors Comm'n v. NFL, 46 F.Supp.2d 1058 (E.D. Mo. 1997)... 6

In re Schick, 235 B.R. 318 (Bankr. S.D.N.Y. 1999)... 13

Scientific Holding Co. v. Plessey Inc., 510 F.2d 15 (2d Cir. 1974)... 10

*vi Shah v. Pan Am. World Servs., Inc., 148 F.3d 84 (2d Cir. 1998), cert. denied, 119 S.Ct. 1033 and 1034 (1999)... 20

Taxin v. Food Fair Stores, Inc., 287 F.2d 448 (3d Cir. 1961)... 3

Traffic Scan Network v. Winston, 1993-2 Trad. Cas. (CCH)   70,414 (E.D. La. 1993) ... 6

Traffic Scan Network v. Winston, 1995-1 Trad. Cas. (CCH)   71,044 (E.D. La. 1995) ... 7

Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570 (2d Cir. 1994)... 13

Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984)... 13

United States Football League v. National Football League, 842 F.2d 1335 (2d Cir. 1988)... 6

United States v. Little Lake Misere Land Co., 412 U.S. 580 (1973)... 23

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998)... 19

U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986 (11th Cir. 1993)... 21

US West Fin. Serv., Inc. v. Tollman, 786 F. Supp. 333 (S.D.N.Y. 1992)... 9

Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077 (1st Cir. 1990)... 21

Wolcott v. Ginsburg, 697 F. Supp. 540 (D.D.C. 1988)... 22

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*vii☐STATE CASES**

Dalton v. Educational Testing Serv., 87 N.Y.2d 384 (1995)☐... 12, 13

Hanna v. Florence Iron Co., 222 N.Y. 290 (1918)☐... 24

**RULES**

Fed. R. Civ. P. 15(c)☐... 25

Fed. R. Civ. E 51 ... 11

**MISCELLANEOUS**

Black's Law Dictionary 1431 (6th ed. 1990) ... 24

66 Am.Jur.2d *Release*☐7 8 (1973)☐... 22

**\*1** Defendants would have this Court believe that Mr. Kiam and the Patriots were prospering in Foxboro and that Mr. Kiam's complaint was merely that defendants prevented him from making the Patriots "even more profitable" by relocating to Jacksonville. Def. Br. at 9. That claim shamelessly distorts reality - a reality thoroughly documented in the contemporaneous memoranda of NFL President Neil Austrian.

Mr. Austrian recognized in 1991 that Mr. Kiam could not raise the money to cover the enormous debts that would soon come due, JA 1959, and in fact predicted that Mr. Kiam would lose his majority ownership of the Patriots. JA 1924. By early 1992, Mr. Austrian warned that, because of the financial "pressure" faced by Mr. Kiam, the "Patriots situation will have to be resolved quickly unless we decide to allow the banks, and possibly the courts, to become the final arbiter." JA 1965. See also JA 1963-64. Jay Moyer, the NFL's counsel, recognized that in May 1992 the alternative for Mr. Kiam to selling the Patriots was "total chaos." JA 2008, 1439-40.

Equally misleading is defendants' assertion (at 4) that "numerous drafts" of the release "were exchanged…[o]ver a seven-week period." Mr. Kiam testified that he first learned of the demand for the release in early May 1992, only a few days before he was required to sign it. JA 410. Although defendants claim **\*2** to have sent plaintiffs a draft document in March, there was no "exchange" until just before Mr. Kiam had to sign. JA 2015-19. Even this last-minute exchange was a futile exercise, since the NFL refused to compromise on the key terms of the release, including the release of antitrust claims. JA 513, 1280-82, 1300, 1135, 2020.

These and other misstatements cannot undo the factual underpinnings of plaintiffs' claims. Accordingly, this reply focuses on some of the key legal issues raised by this appeal.

**I. Defendants Have Provided No Basis for Summary Judgment on Plaintiffs' Part and Parcel Challenge to the Release**

**A. The Part and Parcel Doctrine Exists**

Defendants' first argument (at 14-16) is that this doctrine simply does not exist: in the world defendants seek, an antitrust release is enforceable even if it is part and parcel of a conspiracy in restraint of trade. The cases say no such thing.

Defendants contend (at 15-16) that, "[i]n the last 65 years, the Courts of Appeals have unanimously rejected the notion that the Raytheon dictum creates a loophole that would prevent enforcement of an otherwise valid release." The first cases cited for that extraordinary statement (a) do not mention Radio Corp. of Am. v. Raytheon Mfg. Co., 296 U.S. 459 (1935), at all, and (b) define the circumstances in which a release could be rendered unenforceable by its relationship to the underlying restraint of trade. For example, defendants cite *3 Taxin v. Food Fair Stores, Inc., 287 F.2d 448, 451 (3d Cir. 1961), for the proposition that no part and parcel doctrine exists, even though two pages later (at 17), they note that Taxin says that a release is unenforceable if it bears a "special or unusual relation…to the general conspiracy."[FN1] Defendants' other cases (at 15) are even less helpful, since they are not even antitrust cases.

> FN1. See also Ingram Corp. v. J. Ray McDermott & Co., 698 F.2d 1295, 1315 (5th Cir. 1983).

There is no basis for writing the part and parcel doctrine out of the law of antitrust.

## B. The Dismissal of the Part and Parcel Claim Cannot be Sustained Based on the Court's Factual Findings

Defendants' effort to stand behind the court's factual "findings" on the part and parcel challenge is an utter failure. First, it is evident that these "undisputed facts" are not undisputed – which by itself is enough to preclude summary judgment.[FN2]

> FN2. For example, defendants argue (at 18) that the release cannot be part and parcel of their antitrust violation because it came after Mr. Kiam "had already agreed to sell the Patriots." The duress trial was conducted on the premise that the Commissioner would not consent to the transfer, and as a result the transaction would not close, unless and until Mr. Kiam signed the release. JA 1548. See also Pltf. Br. at 27 (evidence that release policy related to relocation).

Second, and at least as fundamentally, these supposedly undisputed facts completely mischaracterize the relationship between the release and the *4 conspiracy. The summary judgment depended on a key disputed proposition: that defendants' restraint of trade ended before the release was demanded. This "finding" ignores critical facts that plaintiffs presented (at 24-25), including (a) defendants' perceived lack of any need for a separate release until Mr. Kiam sold the team because they believed the Constitution and Bylaws functioned as a release as long as he remained an owner, (b) the ongoing nature of the conspiracy, as to later owners in New England and other franchises generally, and (c) the fact that the terms of the release helped sustain the conspiracy by providing an incentive for defendants to keep the next owner in New England. This conspiracy was not completed before Mr. Kiam was forced to sign the release.

Also flawed is defendants' suggestion (at 18) that forcing Mr. Kiam to sign a release could have no impact on relocation by anyone else. First, this ignores the express language in the release linking whether Mr. Kiam could sue to whether defendants allowed the next

*owner* to relocate. Second, historically, litigation defeat suffered by these defendants over one franchise relocation has opened the door for others to move. JA 2550. Third, even under the rule of reason, Mr. Kiam's proving the anticompetitive consequences of defendants' frustrating his relocation would substantially increase the likelihood of successful follow-on litigation by (a) other New England owners, and (b) any other owners whose moves might be blocked under similar circumstances.

**\*5 C. The Part and Parcel Doctrine Does Not Render All Antitrust Releases Unenforceable**

Defendants incorrectly suggest (at 18-19) that plaintiffs' position is that any release that avoids litigation is subject to attack as part and parcel of an antitrust violation. Plaintiffs have never suggested that the doctrine is infinitely elastic - on the contrary, as the cases make clear, the special circumstances necessary for its application will rarely be met.

First, for a release to be voided because it facilitates a continuing restraint of trade, the conspiracy at issue must be ongoing.[FN3] Second, eliminating the threat of successful litigation by the releasor must be an important ingredient to the conspirators' willingness to continue their restraint of trade and thus must help pave the way for further anticompetitive conduct. Finally, the release must be obtained through the exercise of market or monopoly power - *i.e.*, there must be "anticompetitive forcing" or coercion in the sense recognized by antitrust law.

> FN3. This requirement alone rules out the settlements of most antitrust cases, since the challenged schemes typically end well before the cases are even filed, let alone settled.

The most common scenario involves a scheme to monopolize in which the would-be monopolist destroys its smaller competitors by predatory conduct, pushing one victim after another into a fire sale of its remaining assets. The wrong-doer would likely be the only buyer in sight, because its **\*6** monopolization deters other possible entrants. If the would-be monopolist can extract a release when purchasing each victim's assets and thereby continues its predatory acquisition of monopoly power, such a release will not be enforced.[FN4]

> FN4. *See*, *e.g.*, *Carter v. Twentieth Century-Fox Film Corp.*, 127 F. Supp. 675 (W.D. Mo. 1955); *Traffic Scan Network v. Winston*, 1993-2 Trad. Cas. (CCH)  70,414 (E.D. La. 1993).

The facts here vary this classic template only slightly. The acquisition of monopoly power by these defendants is established.[FN5] Their ongoing scheme involves the continuing use of this power to suppress competition for franchise relocation. The importance of preventing litigation by the recurrent victims of their conduct has been admitted, including in sworn congressional testimony in defendants' failed effort to obtain legislative immunity. *See* Pltf. Br. at 26-27 & n.6. And the application of pressure to obtain this release is manifest.

> FN5. *See* *United States Football League v. National Football League*, 842 F.2d 1335, 1341 (2d Cir. 1988).

Although the NFL defendants have been involved more than once in litigation over the part and parcel doctrine, see St. Louis Convention & Visitors Comm'n v. NFL, 46 F.Supp.2d 1058 (E.D. Mo. 1997), their unique experience in that regard can only be explained by the depth of their determination to use their monopoly power to block competition for franchise relocation, notwithstanding the **7** strictures of the Sherman Act. For most releasees, the circumstances in which the doctrine could conceivably apply will be rare.

Finally, there is no basis for defendants' prediction (at 191) that this legal doctrine threatens to require full-scale litigation on the merits of every antitrust case that is released. Given the doctrine's stringent requirements, most part and parcel challenges will be rejected summarily. And overcoming a release on part and parcel grounds hardly ensures a full trial on the merits, since many plaintiffs will founder on other grounds.[FN6]

> FN6. See, e.g., Traffic Scan Network v. Winston, 1995-1 Trad. Cas. (CCH) 71,044 (E.D. La. 1995).

Most releases do not affect the likelihood of further antitrust violations; they merely represent the resolution of past conduct. In the language of the cases, they are "outgrowths" of a past restraint of trade, and not the "cause" of some further restraint. In some situations, admittedly rare, however, a release substantially contributes to a continuing restraint of trade. In those situations, a different rule has applied and must apply. Just as courts will not enforce agreements that compel conduct the Sherman Act forbids, see Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982), likewise they will not assist antitrust conspirators in coercing their victims to surrender claims in a manner that substantially contributes **8** to the continuation of the conspirators' unlawful conduct. That is precisely what happened here.

## II. Plaintiffs Did Not Ratify the Release as a Matter of Law

In the hope of avoiding focus on the duress trial, defendants revive their 1995 summary judgment argument that plaintiffs waived their economic duress challenge by waiting too long to sue. The same factual disputes that precluded summary judgment make this issue unsuitable for first-instance appellate resolution.

Defendants' argument rests upon a fundamental misconception about the law of waiver and ratification. Several cases cited by defendants have found, on the facts presented, that a party's delay in disaffirming a release barred that party's assertion of duress. Some of those cases involved a shorter time lag than involved here. But no case announces a rule of law - as rigid as a statute of limitations, only shorter - that a release must always be disaffirmed within a specified amount of time, regardless of the circumstances.

Instead, the cases establish that a party cannot raise a claim of duress to challenge an agreement that the party has *ratified*: "[t]he test for determining whether a party ratified a contract through acquiescence is whether the party claiming duress acted reasonably under the circumstances in asserting the claim." **9** Industrial Recyling Sys., Inc. v. Ahneman Assocs., P.C., 892 F. Supp. 547, 551 (S.D.N.Y. 1995). Accord, e.g., US West Fin. Serv., Inc. v. Tollman, 786 F. Supp. 333, 340 (S.D.N.Y. 1992); Citibank, N.A. v. Real Coffee Trading Co., N.V., 566 F. Supp. 1158, 1163 (S.D.N.Y. 1983).[FN7]

> FN7. Contrary to defendants' argument (at 20-21 n.6), plaintiffs have never

suggested "the creation of uniform federal common law" on the issue of ratification. The New York cases and the federal cases cited herein are consistent as to ratification, so any "choice" of law is of solely academic interest. See Olin Corp. v. Consolidated Alum. Corp., 5 F.3d 10, 14 (2d Cir. 1993).

The reasonableness of plaintiffs' actions here presents a question of fact to be decided based on all the circumstances, and not a question of law decided by resort to an invariable rule, See Kovian v. Fulton County Nat'l Bank and Trust Co., 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994) ("court can not hold as a matter of law that plaintiffs intended to ratify the release by retaining its benefits, no matter how long plaintiffs waited before bringing the instant action"); Hotel Constructors, Inc. v. Seagrave Corp., 574 F. Supp. 384, 392 (S.D.N.Y. 1983) ("Whether the claim was asserted timely or waived by delay depends…on all the attendant circumstances"). While the cases speak of a need for "prompt" action, "[t]he issue of 'promptness' in this context appears consistently to be analyzed under a 'reasonableness' standard." Fredericks v. Goldschmidt, No. 89 Civ. 5661 (WK), 1991 WL 18159, at *5 (S.D.N.Y. Feb. 5, 1991).

Plaintiffs have met their burden of establishing a genuine issue as to the reasonableness of their actions. Plaintiffs were not in a continuing business **10** relationship with defendants after they signed the release - indeed, the release was the price plaintiffs paid to end their relationship. Because plaintiffs obtained no benefit from defendants in the period after they signed the release, defendants' cases are off-point. See, e.g., International Halliwell Mines, Ltd. v. Continental Copper & Steel Indus., Inc., 544 F.2d 105, 107-08 (2d Cir. 1976) (plaintiff accepted loan guarantee and extension of payment on mortgage from defendant); Scientific Holding Co. v. Plessey Inc., 510 F.2d 15, 26 (2d Cir. 1974) (party stood silent while other party "was investing substantial amounts in [the business] relying in part on" the agreement); Pickwick Commun., Inc. v. Weinberg, No. 91 Civ. 1642 (AGS), 1994 U.S. Dist. LEXIS 15680, at *23, *36 (S.D.N.Y. Nov. 3, 1994) (party "continued to release CDs made from the Catalogue and derived revenues from such sales"), aff'd without op., 89 F.3d 825 (2d Cir. 1995).[FN8]

> FN8. In DiRose v. PK Management Corp., 691 F.2d 628, 630 (2d Cir. 1982), also cited by defendants, plaintiff continued in business using stock he had purchased from defendant in the transaction that included the release, and repudiated the release only after "[t]hings did not go well" in his business. Despite this continuing benefit to plaintiff, this Court declined to enter judgment as a matter of law on the ratification issue, suggesting that "a compelling reason" would excuse plaintiff's delay. Id. at 634.

Further proof of the reasonableness of Mr. Kiam's actions is that the timing of his disaffirmance of the release related to his learning additional facts regarding defendants' unlawful conduct. A newspaper article that Mr. Kiam saw in late 1993 describing the agreement between the NFL and the Jacksonville group **11** confirmed the suspicions that had impelled him to resist the release. JA 2278-80, 2284. Armed with that additional information, he retained counsel and filed this suit as soon as the necessary legal resources could be mobilized. JA 432.[FN9]

> FN9. Moreover, plaintiffs strenuously objected before they signed the release, making it clear that they were signing under protest. See, e.g., JA 413-14, 1039-42, 1408-09.

**III. Prejudicial Errors in the Jury Instructions Warrant a New Trial on Duress**

## A. Plaintiffs Preserved Their Objections

Defendants misconstrue <u>Federal Rule of Civil Procedure 51</u> when they charge that plaintiffs waived their claims of error. "The purpose of [Rule 51] is to require the parties to give the trial court an adequate opportunity to cure any error in the instructions before the jury deliberates." <u>Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 177 (2d Cir. 1992)</u>. There is no waiver where, as here, a "party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing." <u>Anderson v. Branen, 17 F.3d 552, 556-57 (2d Cir.), reh'g denied, 27 F.3d 29 (2d Cir. 1994)</u>.

The court was repeatedly made aware of plaintiffs' objections and requests, beginning with plaintiffs' proposed instructions. JA 12-13, 290-305. The court's proposed charge rejected every aspect of plaintiffs' requests and adopted defendants' duress instructions *in toto*. At the charging conference, plaintiffs **\*12** communicated their objections to the proposed charge. JA 1451-55 (wrongful threat); 1458-65, 1468-69 (causation); 1466-68 (delay). The court instructed plaintiffs to follow up with written proposed language. JA 1455-56. Plaintiffs promptly did so, also renewing their request that the court issue their proposed instructions on wrongful threat, causation, and ratification. JA 2119-32.

Having heard plaintiffs' oral objections and having received two separate sets of written requests, the court nevertheless issued a charge rejecting the requested instructions. This is precisely a case "where the judge, having focussed on the point, charged the opposite of what had been requested, so that objection would have been a useless formality." <u>Pauling v. News Syndicate Co., 335 F.2d 659, 669 (2d Cir. 1964)</u>. <u>See</u> <u>also</u> <u>Anderson, 17 F.3d at 556-57</u> (no waiver on nearly identical facts).

## Wrongful Threat

Defendants insist that no instruction on the breach of the duty of good faith as a form of wrongfulness was warranted because their discretion over team transfers is unbounded. This argument is unavailing. The duty of good faith does not negate the express terms of a contract; it implies "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." <u>Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389 (1995)</u> (citations omitted). "Among the reasonable expectations in any **\*13** contract is an implied obligation that the parties will exercise their rights under the agreement in good faith." <u>Loan v. ITT Industries, Inc.</u>, No. 98 CIV 6946 (SAS), <u>82064, 1999 WL 151100, at \*4 (S.D.N.Y. Mar. 19, 1999)</u>. "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." <u>Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994)</u>. <u>Accord Carvel Corp. v. Diversified Management Group, 930 F.2d 228, 232 (2d Cir. 1991)</u>; <u>Tymshare, Inc. v. Covell, 727 F.2d 1145, 1153054 (D.C. Cir. 1984)</u> (Scalia, J); <u>deCiutiis v. Nynex Corp.</u>, No. 95 Cir. 9745 <u>(PKL), 1996 WL 512150, at \*3 (S.D.N.Y. Sept. 9, 1996)</u>; <u>In re Schick, 235 B.R. 318, 326-29 (Bankr. S.D.N.Y. 1999)</u>; <u>Dalton, 87 N.Y.2d at 389</u>.[FN10]

> FN10. Because the duty of good faith serves the parties' reasonable expectations, it is not implied where, as in defendants' cases (at 29), the parties clearly intended that one party would have unrestricted power over certain terms of the contract. <u>See</u> <u>Tymshare, 727 F.2d at 1153.</u> The NFL's transfer provisions confer no such blanket power upon defendants, and certainly not with regard to selling owners.

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

JA 1846 (decision "based upon…good faith assessment of…proposed ownership").

Defendants exercised their discretion in bad faith and inconsistently with Mr. Kiam's reasonable expectations by blocking his sale unless he signed a release. First, the source of defendants' authority over team transfers - Section 3.5 of the Constitution and Bylaws, JA 1826-27 - instructs that to obtain NFL "approval" of a proposed sale, an owner must obtain the "affirmative vote of not **14** less than three-fourths" of the members. Mr. Kiam complied with that rule and obtained the *unanimous* approval of the members. JA 1992, 410-11.

Second, the "no release, no sale" demand was not authorized by the fact that the owners' vote was subject to the Commissioner's approval of "documentation related to the transfer." Plaintiffs' evidence showed that defendants' approval power was intended to enable defendants to screen prospective purchasers, finding an acceptable purchaser, not to strong-arm current members attempting to sell. JA 699-705, 1288-93. Reading the transfer provisions makes it clear that the "documentation" contemplated is paperwork related to the purchaser and the buy-sell agreement. See JA 1826-27, 1846-49. As the procedures expressly provide, "[t]he ultimate decision" on a proposed transfer "will be based on the membership's good faith assessment of whether the proposed ownership is likely to result in a successful club operation…" JA 1846.

Thus, it most certainly would not have been within Mr. Kiam's reasonable expectations that, after following the transfer procedures, finding an acceptable purchaser, and obtaining his fellow owners' unanimous approval, defendants could still prohibit him from selling on a ground wholly unrelated to the suitability of the purchaser or the transaction.[FN11] Plaintiffs were entitled to their **15** requested charge on defendants' breach of their obligation of good faith. See Pltf. Br. at 32.[FN12]

> FN11. The very existence of this so-called "release policy" was a matter of much dispute. See Pltf. Br. at 31. Even if defendants were acting in accord with some belatedly-enacted "policy," whether this was a good-faith exercise of defendants' approval power was still a factual question for a properly instructed jury. See Pltf. Br. at 32.

> FN12. The court's passing reference to "good faith and fair. dealing," JA 1549, did not constitute an adequate charge as it did not explain what the duty is, how it can be violated, or the fact that a threat that breaches this duty is wrongful for purposes of economic duress. See JA 2120-21, 2124, 2126-28.

### C. Causation

Plaintiffs put on proof that defendants played a significant role in creating the financial circumstances that necessitated their sale of the Patriots and ultimately signing of the release.[FN13] Defendants cannot justify the numerous errors that deprived plaintiffs of the right to have that evidence fairly considered.

> FN13. Mr. Kiam would not have purchased the notoriously money-losing Patriots if he had not been assured by then-Commissioner Rozelle that, as an "escape hatch," he would be permitted to move the team if necessary. When plaintiffs tried to invoke this escape hatch, defendants secretly interfered with and prevented their move, dooming plaintiffs' continued ownership of the team. See Pltf. Br. at 8-12.

First, defendants inaccurately characterize plaintiffs' causation proof as a mere failure to rescue and argue (at 32 n.13) that they had no such duty. This is no case of a mere failure to rescue a "stranger"; defendants' interference involved affirmative, harmful conduct that prevented a team owner from exercising his contractual right to have a relocation proposal fairly weighed by his fellow owners.

**\*16** Defendants cannot deny that the court's definition of causation - "[t]o 'cause' a condition, as used here, means to be an important contributing factor *if there was no legal right to act as they did*," JA 1550 (emphasis added) - burdened plaintiffs with proving something that they were expressly precluded from proving. See Pltf. Br. at 34-35.[FN14] Instead, they respond with a straw-man allegation (at 33-34) that plaintiffs' objection is to the court's use of "important" instead of "substantial."

> FN14. The court clearly intended to preclude consideration of interference with relocation, which the court seemed to believe was necessarily lawful. See, e.g., JA 1465 (charging conference) (Plaintiffs: "if the league interfered with the Patriots' efforts to relocate, then that is a cause of plaintiffs' financial distress. The Court: How can you say that? They *could* interfere.") (emphasis added); JA 2141-42 (April 22, 1999 hearing) (Plaintiffs: "the league has already lost the case on [whether interference with franchise relocation was unlawful]. The Court: If they lost the case, it was certainly defended very poorly.")

Defendants also defend the instruction that removed from the jury's hands the disputed factual issue of whether defendants' interference with relocation was a significant factor contributing to plaintiffs' financial problems. See Pltf. Br. at 36. Defendants feebly respond (at 35) that this part of the charge "merely instructed the jury that [proof of the interference] was not sufficient to support a finding of economic duress." The charge improperly instructed that plaintiffs' causation proof could not support a finding of *causation*.

### \*17 IV. The District Court's Evidentiary Rulings Warrant Reversal

#### A. Fact Testimony on the Key Issues Was Improperly Excluded

Notwithstanding their promise (at 23) to show that the "district court's decisions were demonstrably correct," defendants do not even take issue with most of plaintiffs' claims of evidentiary error. When they do, their arguments expose the flaws in the court's rulings.

For example, defendants argue (at 38) that the court's exclusions on the issue of voluntariness were proper because they were based on the parol-evidence rule, rather than the "underlying admissibility" of such testimony. This ignores the fact that it is exactly these parol-evidence rulings that plaintiffs challenge. See Pltf. Br. at 39. Moreover, this error was compounded by the court's asking Mr. Kiam whether he understood English and whether the release was written in English. JA 422-23. This clearly told the jury that it should not credit any testimony that the release was signed involuntarily.

#### B. There Was No Basis for the Total Exclusion of Mr. Monheit

Defendants' attempt to justify (at 40) the total exclusion of Barry Monheit, plaintiffs' financial expert, rests on the claim that Mr. Monheit "was to opine that Kiam was under

economic duress (the ultimate issue to be determined by the jury)." Defendants' citations
for this assertion (JA 2094 and 2109) are pages from Mr. Monheit's report, and nowhere
in either cited page - or anywhere **18 else in the report - does the word "duress" even
appear. JA 2092-2111. The first page of CX1, which defendants also cite, shows that Mr.
Monheit clearly was not opining as to "whether the NFL somehow forced Mr. Kiam to sign
the release." JA 2055. See JA 2321-22 (whether his financial opinions "meet [] your
definition of legal duress" was a question he could not answer).[FN15]

> FN15. Contrary to defendants' assertion (at 42 n.20), Mr. Monheit also made it clear
> that he was not opining as to whether Mr. Kiam had a "litigation alternative to
> signing the release." JA 2324.

It was an abuse of discretion to exclude Mr. Monheit's testimony based upon matters that
were clearly outside the scope of the opinions he intended to offer.[FN16]

> FN16. Defendants' counsel eventually badgered Mr. Monheit into discussing his
> concept of economic duress, but at no time did Mr. Monheit purport to opine on that
> issue. Near the end of the deposition Mr. Monheit reiterated that "I don't know
> what economic duress is on a legal basis." JA 2346.

**C. The Court's Repeated Questioning and Partisan Comments Were Improper**

A trial judge's questions "may not…convey the court's view about the merits of a party's
claim."Rivas v. Brattesani, 94 F.3d 802, 807 (2d Cir. 1996) (quotation omitted). "More
common than outright bias…is the appearance of partiality that arises when a judge
intervenes continually on the side of one of the **19 parties."Nationwide Mut. Fire Ins.
Co. v. Ford Motor Co., 174 F.3d 801, 808 (6th Cir. 1999). Regrettably, that is what happened
here. See Pltf. Br. at 43-46.[FN17]

> FN17. Defendants' reliance on the court's boilerplate "curative" instruction (at
> 46) contradicts this Court's holding that once the line is crossed, "[n]o curative
> instruction…could undo the cumulative prejudicial effect of the court's various
> inappropriate comments in the presence of the jury."Rivas, 94 F.3d at 808. Moreover,
> defendants' waiver argument (at 43) ignores that the lack of objection during trial
> merely makes the standard of review plain error. United States v. Salameh, 152 F.3d
> 88, 128 (2d Cir. 1998).

Even a cursory review of the transcript here reveals the problem. Of the more than twenty
excerpts involving the court's questioning of witnesses that defendants pointed to (at
43-45), only two involved questions to a defense witness. Defendants' citations show the
court repeatedly interrupting plaintiffs' direct examination with lines of questioning
only suited for cross-examination - a situation fraught with the appearance of partiality.
See Pltf. Br. at 43-45.

Defendants badly mistate plaintiffs' brief in charging (at 46) that plaintiffs
misleadingly complained about the court's invitation to "defendants' counsel to move to
strike certain testimony," by not informing this Court that the court denied that motion
by defendants. Plaintiffs' complaint (at 45) was not aimed at the court's invitation to
strike, but rather at its statement following this invitation: "I think the situation
is now so clear to everybody here that he [Kiam] had a choice." The ruling on the motion
did not undo the court's announcing that "everybody" knew that plaintiffs had failed to
prove an essential element of their **20 claim. This Court has stated that it "will reverse

on the basis of a judge's improper remarks if the judge expresses [his] opinion on an ultimate issue of fact in front of the jury." Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 98 (2d Cir. 1998) (alteration in original and quotation omitted), cert. denied, 119 S.Ct. 1033 and 1034 (1999).

### D. The Court's Evidentiary Errors Were Not Harmless

Ultimately, defendants' response is that everything the court did in terms of excluding and commenting on the evidence is harmless because some evidence of the critical issues of voluntariness and alternatives made its way into the record.[FN18] But the "cumulative effect" of the court's erroneous rulings as to fact and expert testimony, combined with its partisan questioning of witnesses and adverse comments on key elements of plaintiffs' claim, was not harmless. Phoenix Assoc. III v. Stone, 60 F.3d 95, 105 (2d Cir. 1995). See also Malek v. Federal Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993). "Collectively,…[these errors] presented the jury such a skewed picture that the verdict is unreliable and must be set aside." Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 188 (7th Cir. 1993).

> FN18. Defendants claim that plaintiffs "declined the court's invitation to make a proffer." Def. Br. at 37. In fact, the court rejected plaintiffs' requests to make a proffer, see JA 610 ("Now, counsel for plaintiffs asked the court about proffers of proof…I am not going to accept the offers of proof."), inviting counsel to call witnesses if the record was not clear as to what had been excluded. JA 611-13.

**\*21 V. Plaintiffs' Lack-of-Consideration Challenge Should Not Have Been Rejected on Summary Judgment**

Defendants do not dispute that federal law governs the enforceability of the release as applied to plaintiffs' federal antitrust claims. Nor could they, given this Court's holding in Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113, 1115 (2d Cir. 1977), that "federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action."[FN19] Defendants contend (at 20-21 n.6), rather, that because the release provides that it shall be "construed and interpreted" in accordance with New York law, JA 2034, the governing federal law should incorporate New York law on the issue of its *enforceability* to bar plaintiffs' federal claims. This Court has already rejected that position. See Locafrance, 558 F.2d at 1115 n.3 (federal law governed enforceability of release even though "the parties agreed to construe the agreement in accordance with New York law").

> FN19. Accord, e.g., Maynard v. Durham & S. Ry. Co., 365 U.S. 160, 163 (1961) (FELA); U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 993 n.11 (11th Cir. 1993) (antitrust); Harless v. Research Institute of Am., 1 F. Supp.2d 235, 241 (S.D.N.Y. 1998) (ERISA).

Federal courts often incorporate state law into federal law. On the issue of contract interpretation, a federal court may find that state law offers a well-developed system of doctrine, while no comparably elaborated body of federal law exists. See, e.g., **\*22** Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. 1990). State law may be consistent with generally-accepted and traditional principles, leaving the court with no plausible necessity for crafting a new, federal rule. See, e.g., Olin Corp. v. Consolidated Alum. Corp., 807 F. Supp. 1133, 1140 (S.D.N.Y. 1992), aff'd in relevant part, vacated on other grounds, 5 F.3d 10, 15 (2d Cir. 1993). In such a case the court will apply state law, and whether in doing so the court labels it "state" or "federal"

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

has no practical consequence. See, e.g., Olin Corp., 5 F.3d at 14.

This case presents the polar opposite situation. Here, the state law at issue - requiring no consideration for a release - directly contradicts traditional contract law and represents, at best, a clearly minority rule.[FN20] Moreover, a distinct body of federal law exists and follows the traditional rule that consideration is required.[FN21]

> FN20. "Ordinarily, to be effective, a release must be based on a consideration of some sort." 66 Am.Jur.2d Release 7 8 (1973). See, e.g., Gorman v. Earmark, Inc., 968 F. Supp. 58, 65 (D. Conn. 1997) (Connecticut law); Wolcott v. Ginsburg, 697 F. Supp. 540, 544 & n.8 (D.D.C. 1988) (D.C. law).

> FN21. See, e.g., Maynard, 365 U.S. at 163; General Intermodal Logistics Corp. v. Mainstream Shipyards & Supply, Inc., 748 F.2d 1071, 1074-75 (5th Cir. 1984) (per curiam) (admiralty), and cases cited therein.

Defendants ask this Court to ignore existing federal common law in favor of an idiosyncratic state-law rule that poses serious risks to the preservation *23 of important federal rights. The Supreme Court long ago rejected such an approach:
The Court in the past has been careful to state that, even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law.

United States v. Little Lake Misere Land Co., 412 U.S. 580, 595-96 (1973) (emphasis added). As this Court admonished in Locafrance, "[f]ederal statutory rights could be easily defeated if state law could be used to control the incidents of those rights and the defenses to them." 558 F.2d at 1115 n.3.

Defendants do not respond to the argument that if the NFL was already obligated to permit plaintiffs to proceed with their sale of the Patriots even if they refused to sign a release, then granting plaintiffs permission to proceed could not constitute consideration. Defendants contend, instead, that they had an absolute legal right to forbid the sale unless plaintiffs agreed to release them.

The transfer provision cannot justify a categorical holding of unbounded discretion. Plaintiffs demonstrated that the provisions were intended to enable the NFL to satisfy concerns relating to a would-be new owner, and not to allow the NFL to extract concessions from an outgoing owner. JA 699-704, 1288-93. Moreover, defendants' argument contradicts Mr. Moyer's admission that "[t]here was no way we could compel [plaintiffs] to do it [sign the release]." JA *24 1405; see also JA 2009. The court was not free to brush aside this evidence and summarily resolve the consideration issue.

### VI. TJ, Ltd. Was Not Covered By the Release

Defendants argue (at 54) that the release covers TJ, Ltd. as a "successor" to the NFL and/or its member clubs. This "collective successor" theory finds no support in the recognized legal definition of the term "successor":
in the case of a corporation, another corporation which by a process of amalgamation, consolidation, or duly authorized legal succession has become invested with the rights and has assumed the burdens of the first corporation.

Hanna v. Florence Iron Co., 222 N.Y. 290, 300 (1918). See☐Black's Law Dictionary. 1431
(6th ed. 1990). There was no evidence presented that any such "duly authorized legal
succession" occurred between TJ, Ltd. and the NFL or any of its member clubs when TJ,
Ltd. was granted the right to establish a team.[FN22]

> FN22. Defendants argue (at 54 n.31) that "it would have been illogical, if not
> irrational" for the NFL to demand that plaintiffs release the League and the 28
> existing teams, but not "future" teams. The supposed logic of its lawyers'
> draftsmanship is beside the point. TJ, Ltd. was not sued because it later became
> a member club, but rather because of actions it and its predecessor in interest
> took during 1991 and 1992. See, e.g., JA 152, 178-80, 201-06.

**VII. The Amendment to Add TJ, Inc. as a Defendant Relates Back to the Filing of the Original
Complaint**

Plaintiffs' allegations in their original complaint named the wrong Jacksonville entity
as to the events in 1991. Pltf. Br. at 49. Because plaintiffs **\*25** justifiably believed
that they had discussed a possible relocation to Jacksonville with only one entity in
both 1991 and 1992,[FN23] their failure to name the predecessor entity, which turned out
to be the only entity in existence during part of those dealings, was the type of "mistake
in identity" that Rule 15(c) was designed to cure. See Pltf. Br. at 51.

> FN23. Plaintiffs knew that their discussions in spring 1991 with an entity named
> Touchdown Jacksonville! had ended abruptly, JA 2276-78, 2389, that a man named David
> Seldin had come to work for Touchdown Jacksonville! in summer or early fall 1991,
> and that they attempted to restart conversations with Touchdown Jacksonville!,
> through Mr. Seldin, in 1991 and in early 1992. JA 756-58, 2386-92. Finally,
> plaintiffs knew that an entity named Touchdown Jacksonville, Ltd. was awarded a
> NFL expansion franchise in November, 1993. JA 2703. Thus, plaintiffs sued the entity
> that had been awarded the expansion team, believing that it was the same entity
> that had conspired with the NFL in both 1991 and early 1992.

Defendants now suggest (at 50) that the delay in moving to amend the complaint after
plaintiffs were told about their mistake is evidence that the failure to sue TJ, Inc.
"was due to 'strategic reasons rather than…[a] mistake.'" It means no such thing.
Plaintiffs first became aware of the existence of TJ, Inc. as a result of defendants'
response to a motion more than two years after the filing of the original complaint. Def.
Br. at 50; JA 141-42. By that time, the statute had run, the court still had defendants'
original motion for summary judgment under consideration, and the case was in all respects
on hold.

The one case that defendants cite does nothing to support their position. In Kilkenny
v. Arco Marine, Inc., 800 F.2d 853 (9th Cir. 1986), **\*26** defendant, in answering the
complaint, informed plaintiff that defendant did not own the ship on which plaintiff's
decedent had worked. Id. at 855. Plaintiff then filed a second action naming the correct
parties, which action was later dismissed for lack of prosecution. Id. All of this occurred
within the appropriate statute of limitations. Id. at 855-57. Plaintiff did not attempt
to amend the original complaint to add the proper parties until well after the statute
of limitations had run, and the court denied relation back. Id. at 857-58. See also☐Potts
v. Allis-Chalmers Corp., 118 F.R.D. 597, 608-09 (N.D. Ind. 1987).

Unlike in <u>Kilkenny</u>, defendants here did not promptly inform plaintiffs of their mistake upon receiving the original complaint. Rather, defendants waited two years, until after the statute had run, to inform plaintiffs that TJ, Inc., and not TJ, Ltd., was the entity that "represent[ed] Jacksonville interests" in 1991. JA 142. Defendants have never disputed that they knew that TJ, Inc. was the party that had been involved in the 1991 discussions with the Patriots described in the complaint. <u>See</u> Pltf. Br. at 51-52. Defendants' delay in informing plaintiffs of their misidentification of the Jacksonville entity suggests that, at the time, defendants viewed the failure to name TJ, Inc. as a mistake – a mistake that they wanted to ensure was not corrected before the statute had run – and not a strategic decision as they now claim.

**\*27□VIII. There Was No Basis for Summary Judgment on the Issue of Concerted Action**

In rejecting the claim that the NFL defendants acted in concert with TJ, Inc., the court addressed only one piece of evidence: TJ, Inc.'s denial of concerted action. <u>See</u> Pltf. Br. at 53. Defendants do not even attempt to defend summary judgment on this basis, instead offering their own single point in support of the assertion that the evidence "compelled" (at 58) a finding of independent action.

Defendants claim (at 58-59) that TJ, Inc. broke off the negotiations because TJ, Inc. was interested only in owning the Patriots in Jacksonville, while Mr. Kiam was unwilling to sell the team. This post-hoc conjecture – testified to by no witness – as to why the negotiations between TJ, Inc. and the Patriots ended is seriously disputed,[FN24] but more fundamentally, it cannot overcome the evidence of concerted action that plaintiffs presented: <u>inter alia</u>, Mr. Weiss's memo showing that TJ, Inc. promised the NFL "to do what you tell us to do"; the direct evidence that the NFL told TJ, Inc. that it would suffer in the expansion process if it continued negotiating with the Patriots; TJ, Inc.'s sudden, unexplained termination of the negotiations after its conversations with the NFL; and TJ, Inc.'s efforts to **\*28** ensure that the NFL knew it had broken off those negotiations. <u>See</u> Pltf. Br. at 54-55. Plaintiffs amply fulfilled their burden under <u>Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984),</u> of presenting evidence "that tends to exclude the possibility of independent action."

> FN24. TJ, Inc. was interested in having the Patriots move to Jacksonville even if "[t]eam ownership would remain unchanged." JA 1898; <u>see also</u> JA 800-01, 816, 1895-1900.

Defendants' attempt to justify the concerted-action summary judgment in favor of TJ, Ltd. does similar violence to summary judgment standards. Defendants repeat (at 56) the court's mistaken finding that plaintiffs "stopped pursuing efforts to relocate the Patriots to Jacksonville" after May 1991, even though on the very next page, defendants point out that the Patriots talked to TJ, Ltd. in early 1992. <u>See also</u> Pltf. Br. at 59 n.21. These factual disputes should not have been resolved by summary judgment.

CONCLUSION

For the foregoing reasons, and those stated in plaintiffs' opening brief, plaintiffs respectfully request that the Court grant the relief outlined in that brief.

VKK CORPORATION, VKK Patriots, Inc. and Victor K. Kiam, II, Plaintiffs-Counter-Defendants-Appellants, v. NATIONAL FOOTBALL LEAGUE, B & B Holdings,

2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Inc., The Five Smiths, Inc., Buffalo Bills, Inc., The Chicago Bears Football Club, Inc.,
Cincinnati Bengals, Inc., Cleveland Browns Football Co., Dallas Cowboys Football, Inc.,
PDB Sports Inc., The Detroit Lions, Inc., The Green Bay Packers, Inc., Houston Oilers,
Inc., Indianapolis Colts, Inc., Kansas City Chiefs
1999 WL 33612654 (C.A.2)

END OF DOCUMENT