UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MADISON SQUARE GARDEN, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 CIV. 8455 (LAP) |
| | ) | |
| v. | ) | ELECTRONICALLY FILED |
| | ) | |
| NATIONAL HOCKEY LEAGUE, | ) | |
| NATIONAL HOCKEY LEAGUE | ) | |
| ENTERPRISES, L.P., NHL INTERACTIVE | ) | |
| CYBERENTERPRISES, LLC, NHL | ) | |
| ENTERPRISES CANADA, L.P., and NHL | ) | |
| ENTERPRISES, B.V., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

| | | |
|---|---|---|
| NATIONAL HOCKEY LEAGUE, | ) | |
| | ) | |
| Counter-claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MADISON SQUARE GARDEN, L.P., | ) | |
| | ) | |
| Counter-defendant. | ) | |
| | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Shepard Goldfein
James A. Keyte
Paul M. Eckles
Matthew M. Martino
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

Dated:  August 6, 2008

*Attorneys for Defendants National Hockey League et al.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT..........................................................................................................2

I.  MSG'S CLAIMS HAVE ALL BEEN RELEASED, ARE UNTIMELY, OR HAVE
    ALREADY BEEN REJECTED BY THE COURT ...........................................................2

    A.  MSG's Release Arguments Ignore the Parties' Intent and Binding Precedent ........2

    B.  MSG's Laches Arguments Avoid the Issues ...........................................................5

    C.  This Court's Conclusion That a Venture Can Prohibit Its Partners from
        Competing Against the Venture Applies to the Entire Complaint .........................7

II. NHL DECISIONS ABOUT HOW TO MARKET AND SELL ITS COLLECTIVE
    PRODUCTS DO NOT CONSTITUTE RESTRAINTS OF TRADE...............................9

    A.  The NHL and Its Member Clubs Are Not Separate Antitrust Entities When
        Deciding How to Market and Sell What They Jointly Create...............................9

        1.  NASL Did Not Decide the Specific Single-Entity Question at Issue .......10

        2.  Bulls II and American Needle Are the Only Cases to Apply
            Copperweld to the Collective Marketing and Sales Decisions of
            Sports Leagues .....................................................................................11

        3.  Under Copperweld's Principles the NHL Functions as a Single Entity
            in the Context of the Restraints Alleged in This Case...............................12

            (a)  Single Source of Economic Power ...............................................12

            (b)  Functioning as a Single Enterprise ..............................................13

            (c)  Ultimate Control .......................................................................14

        4.  MSG's Allegations Regarding the Formation and Scope of the NHL
            Joint Venture Preclude Section 1 Scrutiny Under Dagher ......................14

    B.  MSG Admits That It Is Bound by the NHL Constitution, Which Outlines the
        "Core" Activities of the NHL Joint Venture ......................................................16

III. MSG HAS FAILED TO ADEQUATELY PLEAD AN ANTITRUST CLAIM..............17

    A.  MSG's Allegations of Antitrust Injury Fail Under Twombly...............................17

B.      MSG Should Be Judicially Estopped from Attacking the League's Territorial Restrictions ..................................................................................................18

C.      MSG Offers No Argument Why This Court Should Not Take Judicial Notice of Several Factual Averments from <u>Kingray</u> That Alone Warrant Dismissal.......20

## TABLE OF AUTHORITIES

### CASES

AD/SAT, a Division of Skylight, Inc. v. Associated Press, 181 F.3d 216 (2d Cir. 1999)............10

Alaska Rent-a-Car, Inc. v. Cendant Corp., No. 3:03-cv-00029-TMB, 2007 WL 2206784
   (D. Alaska July 27, 2007)................................................................................13

American Needle, Inc. v. New Orleans, Louisana Saints , 496 F. Supp. 2d 941
   (N.D. Ill. 2007)....................................................................... 11, 13, 15

Aurora Enterprises, Inc. v. NBC, Inc., 688 F.2d 689 (9th Cir. 1982)............................................6

Balaklaw v. Lovell, 822 F. Supp. 892 (N.D.N.Y 1993), aff'd, 14 F.3d 793
   (2d Cir. 1994)..............................................................................12, 14

Bano v. Union Carbide Corp., 273 F.3d 120 (2d Cir. 2001) ........................................................5

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) .....................................17, 18

Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc., 996 F.2d 537
   (1993) ......................................................................................11

Carell v. Shubert Organization, Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000)................................18

Chicago Professional Sports Limited Partnership v. National Basketball Association,
   95 F.3d 593 (7th Cir. 1996)......................................................11, 12, 13, 15, 17

Citizen Publishing Co. v. United States, 394 U.S. 131 (1969)....................................................15

Columbia Broadcasting System, Inc. v. America Society of Composers, Authors &
   Publishers, 620 F.2d 930 (2d Cir. 1980) ............................................................15

Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187 (2d Cir. 1996)............................................5, 6

Copperweld Corp v. Independence Tube Corp., 467 U.S. 752 (1984)....................................9, 14

Danjaq LLC v. Sony Corp., 263 F.3d 942 (9th Cir. 2001)............................................................6

Faulkner v. Beer, 463 F.3d 130 (2d Cir. 2006)..........................................................................13

Fraser v. Major League Soccer, L.L.C., 384 F.3d 47 (1st Cir. 2002) ..........................................14

Freeman v. San Diego Association of Realtors, 322 F.3d 1133 (9th Cir. 2003).........................11

Friedl v. City of New York, 210 F.3d 79 (2d Cir. 2000) ............................................................13

General Leaseways, Inc. v. National Truck Leasing Association, 744 F.2d 588
    (7th Cir. 1984) ........................................................................................................11

Helfand v. Gerson, 105 F.3d 530 (9th Cir. 1997)........................................................20

Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813 (7th Cir. 1999) ..................................6

Hunter Douglas, Inc. v. Comfortex Corp., No. 98-CV-0479 (LEK/DNH),
    1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999)....................................4

ITT Corp. v. GTE Corp., 518 F.2d 913 (9th Cir. 1975)..................................................6

Jasper v. Sony Music Entertainment, 378 F. Supp. 2d 334 (S.D.N.Y. 2005) .............19

Jones v. Ceramco, Inc., 387 F. Supp. 940 (E.D.N.Y.), aff'd mem., 526 F.2d 585
    (2d Cir. 1975) ........................................................................................................6

K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d 123
    (2d Cir. 1995) ......................................................................................................18

Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045
    (5th Cir. 1982) ......................................................................................................6

Los Angeles Memorial Coliseum Commission v. National Football League, 726 F.2d 1381
    (9th Cir. 1984) ....................................................................................................10

Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F. Supp. 1019
    (S.D. Tex. 1972) ....................................................................................................4

MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 161 F.3d 443 (7th Cir. 1998)..........4

National Collegiate Athletic Association v. Board of Regents of University of Oklahoma,
    468 U.S. 85 (1984)..........................................................................................11, 15

National Football League v. North American Soccer League, 459 U.S. 1074 (1982) .................10

New Hampshire v. Maine, 532 U.S. 742 (2001) ........................................................18

Newmont Mines Ltd. v. Hanover Insurance Co., 784 F.2d 127 (2d Cir. 1986)............................3

NicSand, Inc. v. 3M Co., 507 F.3d 442 (6th Cir. 2007)..............................................18

Non-Commercial Partnership Hockey Club Lokomotiv Yaroslavl v. NHL, No. 06 Civ. 9421
    (S.D.N.Y. Nov. 15, 2006) ....................................................................................17

North American Soccer League v. National Football League, 670 F.2d 1249
    (2d Cir. 1982) ..................................................................................................9, 10

Paycom Billing Services, Inc. v. Mastercard International, Inc., 467 F.3d 283
    (2d Cir. 2006) ............................................................................................................18

Perma Life Mufflers v. International Parts Corp., 392 U.S. 134 (1968).....................................10

Perry v. Rado, 504 F. Supp. 2d 1043 (E.D. Wash. 2007) ............................................................18

Polygram Holding, Inc. v. Federal Trade Commission, 416 F.3d 29 (D.C. Cir. 2005)...............15

Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117
    (2d Cir. 2007) ............................................................................................................17

Record Club of America, Inc. v. United Artists Records, Inc., 611 F. Supp. 211
    (S.D.N.Y. 1985)...........................................................................................................4

Santana Products Inc. v. Bobrick Washroom Equipment, Inc., 401 F.3d 123 (3d Cir. 2005) ........6

Seabury Management, Inc. v. Professional Golfers' Association of America, Inc.,
    878 F. Supp. 771 (D. Md. 1994), aff'd in part, rev'd in part on other grounds,
    52 F.3d 322 (4th Cir. 1995)......................................................................................14

Solow Building Co. v. Nine West Group, Inc., No. 00 Civ. 7685 (DC), 2001 WL 736794
    (S.D.N.Y. June 29, 2001), aff'd, 48 F. App'x 15 (2d Cir. 2002) .........................................6

Sullivan v. National Football League, 34 F.3d 1091 (1st Cir. 1994)...........................................10

Texaco Inc. v. Dagher, 547 U.S. 1 (2006).................................................................... 8, 14, 15, 16

Timken Roller Bearing Co. v. United States, 341 U.S. 593 (1951)..............................................10

United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898),
    aff'd in part, modified in part on other grounds, 175 U.S. 211 (1899) ...........................7, 8

United States v. Penn-Olin Chemical Co., 378 U.S. 158 (1964).....................................................7

United States v. Topco Associates, Inc., 405 U.S. 596 (1972).....................................................15

United States v. VISA U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003).................................................11

Universal Studios, Inc. v. Viacom, 705 A.2d 579 (Del. Ch. 1997) ........................................5, 7, 8

Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398
    (2004).......................................................................................................................8

VKK Corp. v. National Football League, 244 F.3d 114 (2d Cir. 2001) ....................................3, 4

Volvo North America Corp. v. Men's International Professional Tennis Council,
    857 F.2d 55 (2d Cir. 1988)......................................................................................10

<u>Williams v. I.B. Fischer Nevada</u>, 999 F.2d 445 (9th Cir. 1993)................................................13

## OTHER AUTHORITIES

7 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> (2d ed. 2003)...................................17

18B Charles Allen Wright et al., <u>Federal Practice and Procedure</u> (2d ed. 2002) ........................20

Gary R. Roberts, <u>The Evolving Confusion of Professional Sports Antitrust, the Rule of
        Reason, and the Doctrine of Ancillary Restraints</u>, 61 S. Cal. L. Rev. 943 (1988)...............8

Nathaniel Grow, Note, <u>There's No "I" in "League": Professional Sports Leagues and the
        Single Entity Defense,</u> 105 Mich. L. Rev. 183 (2006) .....................................................10

## PRELIMINARY STATEMENT

MSG's opposition brief confirms that, as to each of the issues raised in its Amended Complaint ("Complaint"), its claims have been released, are untimely, or have already been rejected by this Court.  Thus, by issue:

- The Releases.  The releases MSG executed between 1995 and 2005 bar all claims that could have been asserted at the time of execution of the last release (i.e., all but the website migration claim).  Because MSG does not dispute that the challenged practices have not materially changed since 2005, this Court may grant summary judgment on those claims.

- Laches.  MSG does not dispute that it could have brought its claims several years ago.  MSG provides no explanation why it delayed bringing suit; accordingly, laches bars all but the website migration claim.

- Venture "Exclusivity."  In assessing the website migration claims, this Court has already observed that the "parents" of a legitimate joint venture may agree "not to compete in the market in which the joint venture operates."  The only issue on this motion is whether the Court can find, as a matter of law, that the NHL may preclude "competition" from its Member Clubs in the other areas where the venture operates.  Contrary to MSG's mischaracterization of the law, it has long been recognized that a joint venture may prohibit its members from competing with the venture in its own alleged markets.

MSG's response is equally void of any binding authority or sound reasoning as to why – for the particular restraints at issue – the NHL and its Member Clubs should be required to justify the "necessity" of each and every business decision the League makes on a daily basis:

- Copperweld.  Contrary to MSG's assertion, the NHL is not seeking broad antitrust immunity.  The NHL and its Member Clubs should be viewed as a single entity as a matter of law when collectively deciding how to sell the output (telecasts, sponsorships, advertising, licensing of intellectual property, merchandising and use of various forms of new media) that only the venture can create.  The NHL here functions as a single entity under standards set forth in the Supreme Court's Copperweld decision and its only relevant progeny.

- Dagher / "Core" Activities.  On the face of the Complaint, the "core" activities of the NHL venture include exclusive broadcast territories and collective decision-making for the marketing and sale of NHL hockey and hockey-related products.  Here, however, MSG seeks to relegate the NHL and all professional sports leagues to only scheduling games, negotiating national broadcast contracts and collectively bargaining on behalf of the teams.  In Dagher, the Supreme Court cautioned antitrust courts against just such second-guessing of a legitimate joint venture's basic business decisions.

1

Finally, if the Court needs to reach the reasonableness of the particular venture restraints at issue, it should find that they are reasonable as a matter of law (as MSG has argued in the past):

- <u>Antitrust Injury.</u>  MSG has not adequately pled injury to the various alleged markets overall; rather it has merely pled injury to itself.  MSG's bald and conclusory allegations that output would be higher and prices lower absent the alleged restraints are legally insufficient to support MSG's allegations of antitrust injury.

- <u>Judicial Estoppel.</u>  MSG cannot deny that it benefited from the dismissal of <u>Kingray</u>, a case in which MSG persuaded the court that, <u>inter alia</u>, the NHL's exclusive broadcast territories did not violate the antitrust laws.  MSG's antitrust injury allegations in this case are directly contrary to those decided in its favor in <u>Kingray</u>.  Both Supreme Court and Second Circuit authority make clear that this Court has the discretion to apply judicial estoppel in these circumstances.

- <u>Judicial Notice.</u>  MSG does not dispute – indeed, literally ignores – this Court's power to take judicial notice of the critical contrary factual averments MSG made in <u>Kingray</u>, including that the NHL competes in a broad sports and entertainment market in which the NHL lacks market power, that exclusive broadcast territories cannot injure competition and that exclusive broadcast territories are reasonable as a matter of law.

In sum, MSG touts itself as the "Al Davis" of the NHL, seeking to enjoin the NHL's purported "cartel" activity.  However, no court has ever permitted a disgruntled owner to invoke the antitrust laws effectively to dismantle the collective process by which virtually every professional sports league decides how best to market and sell its jointly-created products.

## <u>ARGUMENT</u>

## I.    <u>MSG'S CLAIMS HAVE ALL BEEN RELEASED, ARE UNTIMELY, OR HAVE ALREADY BEEN REJECTED BY THE COURT</u>

### A.    <u>MSG's Release Arguments Ignore the Parties' Intent and Binding Precedent</u>

MSG does not dispute that it executed the releases in question or that releases may bar antitrust claims.  MSG instead argues that the releases were not intended to apply to its present challenges and that they cannot as a matter of public policy bar its claims.  MSG's contract interpretation theory is frivolous.  The League requires new owners to execute releases when they join the League and again whenever there is a change in the team's ownership.  The transparent, and

2

indeed only, conceivable purpose of the releases is to preclude new owners from filing claims after they join the League challenging pre-existing League policies. Yet MSG argues that the releases only bar claims based on the League's past use of such policies (i.e., before the new owner was even a member of the League), and that new owners may (immediately after executing the release) file antitrust claims challenging the League's continued adherence to such pre-existing policies. MSG's position is absurd. See Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986) ("The cardinal principle . . . is that the intentions of the parties should control . . . absurd results should be avoided [and] the meaning of particular language . . . should be examined 'in light of the business purposes sought to be achieved by the parties.'"). The language that MSG cites[1] simply confirms that the release was drafted in the broadest possible terms, consistent with the principle that parties can release all claims that "exist" as of the date of the release's execution, but not potential future antitrust claims (i.e., new claims based on new policies, rather than the mere continuation of past policies).

MSG's argument that a release cannot apply to ongoing practices also fails. In VKK Corp. v. National Football League, 244 F.3d 114, 119 (2d Cir. 2001), the Second Circuit held that a release by the owner of the New England Patriots barred antitrust challenges against the NFL, including for practices that continued after the date of the release. While Victor Kiam owned the Patriots, the league opposed his potential relocation of the team. When Kiam subsequently sought to sell his interest in the team, the league required him (and the prospective new owner) to sign a release. Kiam later sued the league, claiming that the release was "part and parcel" of a continuing league conspiracy to prevent franchise relocation. The Second Circuit held that the release was

---

[1]     The relevant excerpt: ". . . exist as of the date of execution of this Consent Agreement by reason of any act, omission, transaction or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement." (Goldfein Decl. Ex. 20 at 9.)

enforceable and barred Kiam's antitrust claims, including for practices alleged to have continued after the release was executed:

> It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution. Such a release would seem always to protect the ongoing conspiracy because it always prevents the releasor from beginning litigation that would establish the scheme's illegality. We do not think that the part and parcel doctrine can be read so broadly as thus to render void all releases relating to conspiracies alleged to continue post-release.

Id. at 126. Similarly, in Hunter Douglas, Inc. v. Comfortex Corp., No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at *19-21 (N.D.N.Y. Mar. 11, 1999), the court held that a release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed [a release]." The court rejected the same public policy argument that MSG makes in this case and concluded that the release barred any claim that had "accrued" as of the date of the release. Id. at *22 n.10.[2]

Conversely, MSG relies on authority standing for the proposition that, if after settling a dispute and obtaining a release, a defendant resumes engaging in obviously illegal conduct, the prior release will not provide a defense to a new claim challenging such conduct. See, e.g., Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F. Supp. 1019, 1022-23 (S.D. Tex. 1972) (release could "not bar the assertion … of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants"). But this is not such a case. Public policy does not bar the application of a release to a claim challenging the propriety of long-standing,

---

[2]    See also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 161 F.3d 443, 448 (7th Cir. 1998) (acknowledging that "a new, post-release agreement" in restraint of trade could be actionable, but rejecting the argument that mere "continued adherence" to an alleged pre-release restraint of trade could give rise to a viable claim); Record Club of Am., Inc. v. United Artists Records, Inc., 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (release barred claim alleging "illegal conduct extending past the date of the release" because "plaintiff's cause of action arose before the release was signed").

contractually agreed to practices that continue after the release that would, at best, give rise to rule of reason claims and which the plaintiff had originated, participated in, and profited from. <u>See</u> <u>Universal Studios, Inc. v. Viacom, Inc.</u>, 705 A.2d 579, 597-99 (Del. Ch. 1997).[3]

Like Kiam's argument in <u>VKK Corp.</u>, MSG's argument collapses under its own weight. If MSG's theory were correct, parties could never settle disputes about the legality of ongoing practices without the defendant agreeing to abandon those practices – otherwise, they would always remain subject to repeat lawsuits. Under MSG's theory, it could settle this case today, stipulate that the NHL may continue the practices at issue, provide a release and a covenant not to sue, and then file a new action next week challenging the same practices. MSG's argument itself conflicts with public policy, which favors the ability of parties to settle their disputes. <u>See</u> <u>Bano v. Union Carbide</u> <u>Corp.</u>, 273 F.3d 120, 129-30 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages settlement of disputes."). Because MSG does not claim that there have been material changes to the policies at issue (except the website migration requirement) since its execution of the 2005 release, its claims are barred as a matter of law.

## B. MSG's Laches Arguments Avoid the Issues

MSG does not dispute that for all but the website migration requirement the Member Clubs have operated for years under the policies at issue. Indeed, many of the policies predate MSG's acquisition of the Rangers in 1994, and some – such as the territorial restrictions on broadcasting – were essential organic covenants to the League's very formation. MSG instead argues that laches should not apply because the alleged restraints are continuing in nature. (MSG Opp. at 36-38.)[4]

---

[3]     The NHL respectfully refers the Court to its Opposition to MSG's Motion to Dismiss at 10-17, for additional exposition of the release issues.

[4]     To assess whether laches may apply, courts "borrow" the analogous statute of limitations period. <u>See</u> <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 191 (2d Cir. 1996). If the claim falls outside the analogous limitations period (i.e., would be time-barred at law), then a presumption

*(cont'd)*

Contrary to MSG's bald assertion, laches can bar claims challenging continuing conduct. See, e.g., Conopco, 95 F.3d at 191-93 (applying laches to bar claims involving ongoing false advertisements); Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999) ("Without the availability of the application of laches to a claim arising from a continuing wrong, a party could, theoretically, delay filing suit indefinitely."); Danjaq LLC v. Sony Corp., 263 F.3d 942, 953 (9th Cir. 2001) (observing that an exception to laches for continuing conduct "would effectively swallow the rule . . . and render [laches] a spineless defense").[5]

In sum, the policies at issue (except the website migration requirement) were all put in place well outside the relevant limitations period (i.e., before September 28, 2003), and MSG's challenge to those policies is barred by laches.[6]

_____

*(cont'd from previous page)*
arises that laches bars those claims. Id. To rebut this presumption, the plaintiff must show that the delay was excusable and caused defendant no prejudice, which MSG has not. See Santana Prods. Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 139 (3d Cir. 2005).

[5]    MSG's related argument that laches does not apply to injunction claims (MSG Opp. at 38) is nonsensical. Laches applies to equitable claims, including those for injunctive relief (which, by definition, involve continuing conduct). See Conopco, 95 F.3d at 192-93 (applying laches to bar injunctive relief claims); Danjaq, 263 F.3d at 960 ("Laches may bar prospective injunctive relief.").

[6]    MSG also argues that laches determinations are inappropriate on a motion to dismiss, and that laches cannot be applied to antitrust claims. (MSG Opp. at 38-39 & n.18.) MSG is wrong. Courts routinely resolve laches on a motion to dismiss where, as is the case here, the grounds are apparent on the face of the complaint. E.g., Solow Bldg. Co. v. Nine West Group, Inc., No. 00 Civ. 7685 (DC), 2001 WL 736794 (S.D.N.Y. June 29, 2001), aff'd, 48 F. App'x 15 (2d Cir. 2002); Jones v. Ceramco, Inc., 387 F. Supp. 940 (E.D.N.Y.), aff'd mem., 526 F.2d 585 (2d Cir. 1975). Likewise, courts have applied the doctrine to bar antitrust claims. See, e.g., Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045 (5th Cir. 1982) (antitrust claim seeking a permanent injunction barred by laches); Aurora Enters., Inc. v. NBC, Inc., 688 F.2d 689 (9th Cir. 1982) (where statute of limitations barred antitrust damages claim, laches also barred antitrust claim for equitable relief); ITT Corp. v. GTE Corp., 518 F.2d 913, 927 (9th Cir. 1975), overruled on other grounds by California v. Am. Stores Co., 495 U.S. 271 (1990) (expressly applying laches to bar antitrust claim).

C.    **This Court's Conclusion That a Venture Can Prohibit Its Partners from Competing Against the Venture Applies to the Entire Complaint**

In challenging the NHL's alleged "exclusive" arrangements in marketing and selling NHL products, MSG attempts to resurrect the same argument this Court already rejected in assessing the NHL's website migration requirement:  that internal restraints on venture partners are permissible only to the extent necessary for the product to be available at all.  As this Court observed, MSG's argument is directly contrary to "those cases upholding agreements among parents of a joint venture not to compete in the market in which the joint venture operates."  (Nov. 2, 2007 Opinion at 7.) Because the NHL operates in all of the alleged markets where MSG now seeks to compete against the NHL, the Court need do nothing more than reject MSG's "necessity" argument in the other contexts that the Complaint challenges.

That a venture can prohibit its parents from competing against the venture has been hornbook law since Judge Taft's opinion over a hundred years ago in United States v. Addyston Pipe & Steel Co.:

> [W]hen two men become partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital, enterprise, and energy to carry on a successful business, and one useful to the community.  Restrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union, and were to be encouraged. . . . This was not reducing competition, but was only securing the seller against an increase of competition of his own creating.

85 F. 271, 280-81 (6th Cir. 1898) (emphasis added), aff'd in part, modified in part on other grounds, 175 U.S. 211 (1899).  Over sixty years later, in United States v. Penn-Olin Chem. Co., 378 U.S. 158, 168 (1964), the Supreme Court accepted the axiomatic character of this principle when it observed that, of course "the parents would not compete with their progeny."[7]

---

[7]    See also Universal Studios, 705 A.2d at 599 ("Viacom would prefer to continue to operate its MTV Networks . . . and continue its one-half ownership in the USA Networks.  [The non-

*(cont'd)*

It is only when a venture imposes a restraint on a member that exceeds the scope of the venture's underlying business – i.e., a restraint on a member's conduct outside of the venture – that a court should assess the "reasonable necessity" of the restraint.  See Addyston Pipe, 85 F. at 281-83; Roberts, supra, at 993-98.  Indeed, all the cases cited by MSG examine restraints on conduct outside the scope of the venture, and thus properly apply traditional ancillary restraints analysis.

Far from being "revolutionary" (MSG Opp. at 23), the same attorneys who here represent MSG successfully persuaded the Supreme Court in Texaco Inc. v. Dagher, 547 U.S. 1 (2006), to accept the principle that the ancillary restraints doctrine does not apply at all to inside venture restraints.  (See Ex. A (Reply Br. for Petitioner Texaco, 2005 WL 3464475, at *6) ("'[A]ncillary restraint' analysis only applies to agreements that themselves restrain competition outside of the joint venture, and that therefore must themselves be separately justified.").)

To decide otherwise would seriously undermine the rationale for joint ventures in the first place and frustrate the very point of antitrust law – to spur industry and innovation:

> As a matter of policy, leaders in industry must be encouraged to pool their resources without fear that they run the risk of having the conditions changed when they no longer serve the purposes of their coventurers. . . .  A court of equity will not step in to alter the playing field to the distinct advantage of one over the other.

Universal Studios, 705 A.2d at 599; cf. Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 414 (2004) (cautioning against any construction of antitrust law that may "'chill

_____

(cont'd from previous page)
compete provision] flatly prohibits this conduct.  This does not make the [non-complete provision] anti-competitive – much less violative of the antitrust laws.  While it may be true that Viacom is an important force in the cable television and related industries, this does not mean that the antitrust laws, or public policy, require it to be able to operate as it wishes and without regard to agreements by which it is bound."); Gary R. Roberts, The Evolving Confusion of Professional Sports Antitrust, the Rule of Reason, and the Doctrine of Ancillary Restraints, 61 S. Cal. L. Rev. 943, 994-95, 1009, 1015 (1988) (restrictions prohibiting competition against the venture are not only per se lawful under Addyston Pipe, but at common law were compelled by the fiduciary obligations of each venture partner).

the very conduct the antitrust laws are designed to protect'").  Accordingly, this Court should dismiss the Complaint in its entirety because the alleged restraints on MSG's "competition" against the NHL venture are reasonable as a matter of law.

## II.    NHL DECISIONS ABOUT HOW TO MARKET AND SELL ITS COLLECTIVE PRODUCTS DO NOT CONSTITUTE RESTRAINTS OF TRADE

Whether viewed as a "single entity" or a joint venture, the Supreme Court has made clear that the regular business decisions of entities such as the NHL about how the entity produces, markets and sells its own products are beyond the purview of Section 1.

### A.    The NHL and Its Member Clubs Are Not Separate Entities When Deciding How to Market and Sell What They Jointly Create

As demonstrated in the NHL's moving brief, MSG has pled facts that enable this Court to conclude as a matter of law that the NHL and its Member Clubs should be treated as a single entity with respect to the Member Clubs' collective decisions regarding how to market and sell what the venture creates.  In its opposition brief, MSG does not dispute any of the facts underlying the NHL's motion, most of which are taken directly from MSG's Complaint.[8]

MSG instead raises two legal points:  first, MSG claims that the Second Circuit already decided this issue in North American Soccer League v. National Football League, 670 F.2d 1249 (2d Cir. 1982) ("NASL"); second, it claims that Copperweld Corp v. Independence Tube Corp., 467 U.S. 752 (1984), is limited to its facts or, at most, applies only to enterprises that have a "complete unity of interest."  MSG is wrong on both accounts.

---

[8]    For example, MSG does not dispute that the products at issue can only be made by the NHL enterprise (Am. Compl. ¶¶ 6, 8); that the Rangers and other NHL franchises are created and granted by the League (see NHL Br. at 11); that, since the NHL's creation, the NHL enterprise as a whole has owned the rights to all games except as granted to the teams by the Constitution and By-Laws and Resolution of the Board of Governors, has set the broadcast territories for its Clubs, and has controlled the exploitation of the venture's output, including League and Club-related intellectual property (see id. at 7-9); and that the NHL can indeed assert full control over the Rangers should its owners fail to act in the enterprise's best interest.  (Am. Compl. ¶¶ 17, 41.)

### 1.    NASL Did Not Decide the Specific Single-Entity Question at Issue

MSG does not argue that the Second Circuit has addressed the single-entity issue in the context of a sports league's collective decisions about how to market and sell the products it creates.[9]  NASL involved a ban on NFL members owning teams in other sports leagues.  Moreover, contrary to MSG's assertion, NASL, as a pre-Copperweld case, relied on intra-enterprise conspiracy cases in assessing the NFL's cross-ownership rule.[10]  Likewise, the Second Circuit's decision in Volvo North America Corp. v. Men's International Professional Tennis Council, 857 F.2d 55 (2d Cir. 1988), did not involve a sports league; nor did it "hold" that members of sports leagues are distinct economic competitors for all purposes.  See also Nathaniel Grow, Note, There's No "I" in "League":  Professional Sports Leagues and the Single Entity Defense, 105 Mich. L. Rev. 183, 187 (2006) (observing that the Second, Ninth, and D.C. Circuits have yet to re-examine the single-entity issue with respect to sports leagues since Copperweld).  Accordingly, contrary to MSG's transparent plea, Copperweld's application to the challenged practices is a matter of first impression in the Second Circuit.  See AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 232-33 (2d Cir. 1999) (observing that since not all trade association activity is "concerted action" under Section 1, courts must carefully analyze the particular conduct in question).

---

[9]    Further, none of the sports cases cited by MSG addressed the single-entity issue in the context of collective marketing and sales decisions (e.g. broadcasting, intellectual property, merchandising, sponsorships and advertising).  See, e.g., Sullivan v. NFL, 34 F.3d 1091 (1st Cir. 1994) (prohibition on public ownership of teams); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381 (9th Cir. 1984) (franchise relocation rules).

[10]    See NASL, 670 F.2d at 1257 (citing Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134 (1968), and Timken Roller Bearing Co. v. United States, 341 U.S. 593 (1951)).  Thus, it was in the context of this now defunct intra-enterprise thinking that the Second Circuit placed any value on "competition" between the teams.  Further, contrary to MSG's assertion, Justice Rehnquist did in fact state that the NFL should be viewed as a single "unit" that competes against other forms of entertainment.  NFL v. NASL, 459 U.S. 1074, 1077 (1982) (Rehnquist, J., dissenting).

**2.**    **Bulls II** and **American Needle** Are the Only Cases to Apply **Copperweld** to the Collective Marketing and Sales Decisions of Sports Leagues

MSG does not dispute that Chicago Professional Sports Limited Partnership v. National Basketball Association, 95 F.3d 593 (7th Cir. 1996) ("Bulls II"), and American Needle, Inc. v. New Orleans, Louisiana Saints, 496 F. Supp. 2d 941 (N.D. Ill. 2007), are the only two cases to assess the single-entity issue in the context of a sports league's collective output decisions.  Nor, strikingly, does MSG even attempt to contest the reasoning of these cases.  This is understandable as Judge Easterbrook's reasoning in Bulls II, which addressed the broadcasting rights of NBA teams outside of their local territories, makes perfect sense and is directly applicable here:

> [T]he . . . antitrust law permits, indeed encourages, cooperation inside a business organization the better to facilitate competition between that organization and other producers.  To say that participants in an organization may cooperate is to say that they may control what they make and how they sell it . . . .

95 F.3d at 598 (emphasis added).  Further, MSG essentially concedes that American Needle is on point in treating the NFL as a single entity with respect to the collective licensing of team intellectual property.  496 F. Supp. 2d. at 943-44.[11]

MSG's "distinction" of these cases is that Bulls II ultimately did not decide the single-entity issue (which the NHL already noted in its moving brief), that the First Circuit chose not to follow

---

[11]    Unlike teams in a professional sports league, the entities in all of the single-entity cases cited by MSG were indisputably self-sufficient, independent competitors in their own right.  See e.g., Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537 (2d Cir. 1993) (independent, private practice doctors); Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133 (9th Cir. 2003) (competing real estate associations).  Likewise, in United States v. VISA U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003), and General Leaseways, Inc. v. National Truck Leasing Association, 744 F.2d 588 (7th Cir. 1984), the venture members were themselves independent competitors – something that cannot be said of NHL Member Clubs with respect to the restraints at issue here.  The same holds true for National Collegiate Athletic Association v. Board of Regents of University of Oklahoma, 468 U.S. 85 (1984) ("NCAA").  As the court in Bulls II observed, in stark contrast to NCAA colleges and universities (that can and do determine their own competitive paths), "the NBA makes professional basketball; only it can make 'NBA Basketball' games; and unlike the NCAA the NBA also 'makes' teams."  95 F.3d at 598-99 ("[A] league with one team would be like one hand clapping.").

Bulls II in a player restraint case (not relevant here), and that American Needle is somehow an "aberration" even though Bulls II and American Needle are the only cases addressing a league's collective output decisions.  (See MSG Opp. at 14.)  In short, the powerful and directly applicable reasoning of Copperweld, as exemplified by Bulls II and American Needle, stands substantively unopposed by MSG.[12]

### 3.    Under Copperweld's Principles the NHL Functions as a Single Entity in the Context of the Restraints Alleged in This Case

MSG mischaracterizes the breadth and impact of Copperweld and its rationale.  Contrary to MSG's suggestion, Copperweld has not been limited to the parent-subsidiary relationship.  See, e.g., Balaklaw, 822 F. Supp. 892.  Indeed, as cited in the NHL's moving brief, many courts have applied single-entity analysis to business conduct outside of the parent-subsidiary context.  Yet, rather than posing any argument as to why Copperweld should not apply here, MSG feebly attempts to deflect the direct application of Copperweld's principles to the facts alleged in this case.

### (a)    Single Source of Economic Power

For example, it is indisputable on the face of the Complaint that no NHL Club can create NHL hockey or its related products without the NHL enterprise.  There is no joining of independent sources of economic power because no single team can produce NHL Hockey.  MSG cannot deny this stark economic reality, but nevertheless offers the lengthy expert declaration of Dr. Hausman,

---

[12]    Contrary to MSG's suggestion, the Second Circuit has never pronounced that Copperweld's "unity of interest" language is a standard – let alone the sole one under Copperweld.  As Judge Easterbrook observed, any such literal "standard" would be "silly" as nearly all single firms have some level of divergent interests within their ranks.  See Bulls II, 95 F.3d at 598 ("Copperweld does not hold that only conflict-free enterprises may be treated as single entities.").  Indeed, courts within the Second Circuit have found that the single-entity question may turn on the "organizational structure" of an enterprise, including considerations of where ultimate decision-making authority and control reside.  See, e.g., Balaklaw v. Lovell, 822 F. Supp. 892, 899-902 (N.D.N.Y 1993), aff'd, 14 F.3d 793 (2d Cir. 1994) (hospital staff of independent practitioners constituted single entity because Board of Trustees established general institutional policies, approved staff bylaws, and made "ultimate decisions regarding [staff] membership, clinical privileges, and services rendered").

as well as ninety-four exhibits, to show that NHL teams have different franchise values, and that the NHL is called upon to resolve disputes among the Clubs. The Declaration, of course, should be stricken as improper on a motion to dismiss,[13] but it is irrelevant in any event: whatever any team's "value" may be in its local market, the sole <u>source</u> of that value is the joint NHL enterprise. <u>See</u> <u>Bulls II</u>, 95 F.3d at 599.

**(b)    Functioning as a Single Enterprise**

Likewise, MSG does not dispute that, since its inception, the NHL has functioned as a single enterprise in deciding how to sell NHL hockey and related intellectual property. (<u>See</u> NHL Br. at 15-18.) Indeed, in the NHL Constitution, the NHL enterprise has defined the limited territorial rights of the Clubs, including, <u>inter alia</u>, those for broadcasting, and reserved all other rights to the League – conduct that warrants single-entity treatment even more so than that in the franchise cases to which MSG did not respond. <u>See</u> <u>Alaska Rent-a-Car, Inc. v. Cendant Corp.</u>, No. 3:03-cv-00029-TMB, 2007 WL 2206784 (D. Alaska July 27, 2007) (treating franchisor and all franchisees as single entity with respect to territorial restrictions); <u>Williams v. I.B. Fischer Nevada</u>, 999 F.2d 445 (9th Cir. 1993) (same). The Complaint also admits that the NHL has for decades functioned as a single enterprise in deciding how to market and sell its intellectual property and merchandising. (Am. Compl. ¶ 38.) <u>See, e.g.</u>, <u>American Needle</u>, 496 F. Supp. 2d at 943-44 (holding that NFL is single entity when deciding how to market and sell its intellectual property).

---

[13]    "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." <u>Faulkner v. Beer</u>, 463 F.3d 130, 134 (2d Cir. 2006). When presented with documents outside the complaint the court is free to ignore them. <u>Friedl v. City of New York</u>, 210 F.3d 79, 83 (2d Cir. 2000). Accordingly, although the NHL believes that Dr. Hausman's declaration actually supports the NHL's proposed application of the single-entity doctrine in this case, the NHL respectfully requests that the Court exclude the Declaration. Conversely, if this Court decides to consider the Declaration and convert the NHL's motion into one for summary judgment, then the NHL respectfully requests an opportunity to respond. <u>See</u> <u>Friedl</u>, 210 F.3d at 83.

(c)    **Ultimate Control**

Finally, MSG concedes that the NHL single enterprise may exercise complete control over the Rangers franchise if MSG fails to act in accordance with enterprise rules.  (Am. Compl. ¶¶ 17, 41.)  See Copperweld, 467 U.S. at 771-72; Seabury Mgmt., Inc. v. Prof'l Golfers' Ass'n of Am., Inc., 878 F. Supp. 771 (D. Md. 1994), aff'd in part, rev'd in part on other grounds, 52 F.3d 322 (4th Cir. 1995).[14]  Again, MSG responds only with an irrelevant player restraint case, see Fraser v. Major League Soccer, L.L.C., 384 F.3d 47 (1st Cir. 2002), and Dr. Hausman, who baldly and erroneously asserts that the extent of control recently exercised by the NHL leaves teams with the "ability to compete."  Again, MSG (and Dr. Hausman) miss the relevant legal principle.  It is the "ability" to assert full control if need be – which MSG concedes is the case here – that is dispositive.  See Copperweld, 467 U.S. at 771-72, Seabury, 878 F. Supp. at 778; Balaklaw, 822 F. Supp. at 901-02.

### 4.    MSG's Allegations Regarding the Formation and Scope of the NHL Joint Venture Preclude Section 1 Scrutiny Under Dagher

The Supreme Court's decision in Dagher, 547 U.S. 1, provides additional authority for this Court to treat the NHL as a single entity with respect to the challenged restraints.  While not deciding the single-entity question, the Court examined when Section 1 should apply to the operations of a legitimate joint venture.

MSG discounts Dagher as applying only if the entities "combine all their relevant assets" into a fully integrated joint venture.  (MSG Opp. at 20.)  This interpretation, however, ignores the Court's actual reasoning, which focused not on the degree of integration among the members, but rather on whether its members competed in the relevant market or "instead participated in that

---

[14]    MSG's attempt to distinguish Seabury is off point.  Although PGA sections differ from teams within a sports league, "each section maintains its own revenues, has its own by-laws, elects its own officers and often conducts programs intended to benefit members of that section only," Seabury, 878 F. Supp. at 778, facts that are comparable to those that MSG has alleged regarding NHL Clubs.

market jointly." Dagher, 547 U.S. at 5-6 (the challenged pricing restraint "amounts to little more than price setting by a single entity – albeit within the context of a joint venture – and not a pricing agreement between competing entities with respect to their competing products").[15]

The Supreme Court's reasoning applies with even greater force to the marketing and sales decisions of the NHL.  Unlike the Equilon joint venture – which eliminated the pre-existing competition between Texaco and Shell for the sale of gasoline – the Member Clubs were never (and could not have been) independent economic competitors with respect to the marketing and sale of broadcasting rights, intellectual property licensing rights, advertising and sponsorships, or the new media business of NHL Hockey or hockey-related products.  MSG does not challenge the formation of the NHL as a legitimate joint venture producing what no one Club can produce alone.  Consequently, all of the Member Clubs' intellectual property rights and hockey-related products necessarily originate solely from the joint enterprise.  See Bulls II, 95 F.3d at 599 ("NBA Basketball is one product from a single source even though the Chicago Bulls and Seattle Supersonics are highly distinguishable, just as General Motors is a single firm even though a Corvette differs from a Chevrolet.").[16]

Here, the NHL Member Clubs have never been and can never be "competing entities with respect to their competing products" because without pre-venture competition among the members

---

[15]    In any event, because the Member Clubs have decided to delegate their collective licensing operations to NHL Enterprises, "they have so integrated their operations that they should be deemed to be a single entity" for this purpose.  American Needle, 496 F. Supp. 2d at 943 (citing Dagher, 547 U.S. at 6) (emphasis added).

[16]    All of the cases cited by MSG against this Dagher rationale involve entities that competed (or would have competed) prior to venture formation and alleged restraints on these members' ability to independently compete with one another after joining the joint venture.  See NCAA, 468 U.S. 85; United States v. Topco Assocs., Inc., 405 U.S. 596 (1972); Citizen Publ'g Co. v. United States, 394 U.S. 131 (1969); Polygram Holding, Inc. v. FTC, 416 F.3d 29 (D.C. Cir. 2005); CBS, Inc. v. Am. Soc'y of Composers, Authors & Publishers, 620 F.2d 930 (2d Cir. 1980).

in the relevant economic areas there can be no competition after venture formation.  Accordingly, Section 1 scrutiny of the NHL venture's internal decision-making is inappropriate under <u>Dagher</u>.

### B.    MSG Admits That It Is Bound by the NHL Constitution, Which Outlines the "Core" Activities of the NHL Joint Venture

<u>Dagher</u> held that, if Section 1 applies, it is inappropriate to analyze the "core" activities of a legitimate joint venture under the ancillary restraints doctrine.  547 U.S. at 7-8.  The doctrine only applies to restraints on "nonventure" activities, which are valid if "ancillary to the legitimate and competitive purposes of the business association."  <u>Id.</u> at 7.  The logical corollary of this holding is that restraints on "core" activities of a legitimate joint venture are valid as a matter of law.  Indeed, the Supreme Court noted that the joint venture's retail pricing of gasoline was a core activity of the venture and not price fixing "in the antitrust sense."  <u>Id.</u> at 6.

MSG does not dispute this legal point.  MSG instead attempts to avoid application of <u>Dagher</u> by recasting the alleged restraints in this case as outside the "core" activity of the NHL joint venture.  However, MSG nowhere challenges the formation or legitimacy of the NHL joint venture and admits that it is bound by the NHL Constitution.  (Am. Compl. ¶¶ 6, 8, 17.)  The Constitution not only defines the territorial rights through which the NHL Member Clubs have organized themselves, but also details the broad "Purposes and Objects" of the NHL joint venture, including "[t]o perpetuate hockey as one of the national games of the United States and Canada" and "[t]he promotion of the common interests of the members of the League."  (Goldfein Decl. Exs. 4, 5.)  The NHL Constitution makes clear that the Member Clubs have no property rights to conduct any venture activities outside of their home territories, except as expressly permitted by the Constitution and By-Laws or Resolution of the Board of Governors.  On the face of MSG's Complaint, it is clear

that the fundamental economic structuring of the League into exclusive territories is "integral to the running of [the NHL] business." (MSG Opp. at 21.)[17]

Moreover, the NHL's objectives necessarily include the sale of NHL hockey and hockey-related products (e.g., the marketing and sale of NHL games and merchandise) among the "core" activity of the joint venture (see NHL Br. at 25-27); it could not be any other way, as these products can only be created collectively by the Member Clubs.[18] How the Member Clubs have decided to divide the rights and revenues related to the products they jointly create is not subject to the ancillary restraints doctrine and is not a restraint "in the antitrust sense." Indeed, the central tenet of Dagher is that courts should not second-guess internal business decisions of legitimate joint ventures. Cf. Non-Commercial P'ship Hockey Club Lokomotiv Yaroslavl v. NHL, No. 06 Civ. 9421 (LAP) (S.D.N.Y. Nov. 15, 2006); 7 Areeda & Hovenkamp, Antitrust Law ¶ 1478b1, at 320.

## III.    MSG HAS FAILED TO ADEQUATELY PLEAD AN ANTITRUST CLAIM

### A.    MSG's Allegations of Antitrust Injury Fail Under Twombly

An antitrust claimant must plead "allegations plausibly suggesting (not merely consistent with)" antitrust injury to survive a motion to dismiss. See Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1966 (2007); Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 125-27 (2d Cir. 2007) (extending Twombly to antitrust injury pleading requirement). Prior proceedings in this case indicate that MSG's allegations of antitrust injury are only conclusory. In denying MSG's preliminary injunction motion, this Court found that MSG had improperly focused on "the harm

---

[17]    MSG concedes that the negotiation of a national television contract is a "core" activity of professional sports leagues (see Am. Compl. ¶ 16C) but fails to explain why the negotiation of other national contracts, such as satellite distribution or sponsorships, are not also "core" activities.

[18]    For this same reason, MSG's hypothetical proposal of what would have been "core" activity in NCAA is unpersuasive, as it ignores not only the organic agreement that created and governs the NHL (by which MSG admits that it is bound), but also the economic interdependence of the Member Clubs in producing what only the joint venture can create. See Bulls II, 95 F.3d at 598.

17

MSG perceives to a competitor, <u>viz.</u> itself," and that MSG had "shown no harm whatsoever to <u>consumers</u>." (Nov. 2, 2007 Opinion at 22, 25.) MSG's Complaint fails to cure this basic deficiency. MSG still focuses on harm to itself as a competitor, and simply adds the bald conclusion that the "restraints" at issue lead to higher prices and decreased output. (<u>See</u> Am. Compl. ¶¶ 40B, 43A-D.)

MSG's allegations ignore the fact that a "formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 127 S. Ct. at 1966; <u>see also</u> <u>NicSand, Inc. v. 3M Co.</u>, 507 F.3d 442, 456 (6th Cir. 2007) (absent such a requirement, "every competitor could proceed to discovery (and avoid showing a true antitrust injury) by asserting an unelaborated claim that it provides better service than its competitors"); <u>K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 128 (2d Cir. 1995) (plaintiff must plead specific facts demonstrating the restraint's anticompetitive effect in the alleged relevant market); <u>Carell v. Shubert Org., Inc.</u>, 104 F. Supp. 2d 236, 266-67 (S.D.N.Y. 2000) (same). Allegations of harm to a plaintiff alone are insufficient as a matter of law. <u>See, e.g.</u>, <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006); <u>Carell</u>, 104 F. Supp. 2d at 266; <u>Perry v. Rado</u>, 504 F. Supp. 2d 1043, 1047 (E.D. Wash. 2007). Yet, apart from its conclusory allegations, MSG identifies no harm to anyone other than itself.

### B.    MSG Should Be Judicially Estopped from Attacking the League's Territorial Restrictions

MSG does not dispute that this Court has broad discretion to protect the integrity of the judicial process by prohibiting parties from deliberately changing their positions, theories, arguments, or claims according to the exigencies of the moment. <u>See</u> <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-51 (2001) (judicial estoppel applies where 1) a party's position is clearly inconsistent with its earlier position, and 2) the party succeeded in persuading a court to accept its earlier position). MSG instead argues that the NHL has misstated what occurred in <u>Kingray</u>, and that the positions defendants prevailed upon in <u>Kingray</u> were "legal" rather than "factual" positions. MSG's arguments should be rejected.

First, Kingray itself stemmed from the League's decision to preclude individual teams from competing with the joint venture with respect to the broadcasting of out-of-market games.  The court noted that "[e]ach team has agreed with the other teams and with the NHL not to compete in the sale of rights for the live video telecasting of regular season games."  (Goldfein Decl. Ex. 2 at 2.) NHL teams sell all out-of-market games on a joint basis as part of the DirecTV Center Ice package. The Kingray plaintiffs, who were consumers, complained that the non-compete agreement forced them to purchase the entire package of games without an option to purchase games a la carte (e.g., they could not purchase the games of their team of choice separate from others).  In response, the defendants, including MSG, argued that the non-compete agreement was lawful.  (Id. at 11.)  The court adopted the defendants' position:

> Plaintiffs have not cited, nor is the Court aware of, any authority indicating that when a defendant offers a new product in a competitive manner (e.g., all out-of-market games via NHL Center Ice), a party can allege a Section 1 violation on the basis that the product is not being offered in the manner the Plaintiffs would prefer (out-of-market games in a non-bundled format).

(Id. at 13.)

Here, MSG challenges these same territorial restrictions.[19]  MSG does not even attempt to reconcile its current position with its position in Kingray.  Based on the finding in Kingray that Center Ice and the Clubs' exclusive broadcast territories do not violate the antitrust laws, this Court may invoke judicial estoppel – that the finding purportedly was not essential to the outcome of the case is immaterial.  See Jasper v. Sony Music Entm't, 378 F. Supp. 2d 334, 345 (S.D.N.Y. 2005) (invoking judicial estoppel based on finding in prior case even though earlier, inconsistent position had not resulted in a favorable verdict).

---

[19]    MSG alleges that:  (i) the Member Clubs have allocated exclusive broadcast territories to the Clubs into which other Clubs may not broadcast (Am. Compl. ¶¶ 16C, 40C), and (ii) "[t]he League keeps for itself the right to broadcast games into territories allocated to individual clubs, but the League exercises that right by selling only cable packages of all NHL games" (id. ¶ 40C).

Second, MSG's attempt to recast its <u>Kingray</u> position as a "legal argument" is specious.  The allegations in MSG's answer were averments of fact, which provided the foundation for its legal argument that the NHL's exclusive broadcast territories did not reduce output.  Regardless of how MSG characterizes its prior position, it is estopped from now taking a contrary position:  "legal positions are advanced in litigation with respect to specific fact situations, and most assertedly inconsistent positions are likely to involve some elements of both law and fact.  Little would be left of judicial estoppel if any trace of law were to defeat preclusion."  18B Charles Allen Wright et al., <u>Federal Practice and Procedure</u> § 4477 (2d ed. 2002).[20]

### C.    MSG Offers No Argument Why This Court Should Not Take Judicial Notice of Several Factual Averments from Kingray That Alone Warrant Dismissal

As noted in the NHL's moving brief, MSG made the following averments in its <u>Kingray</u> answer and affirmative defenses:

- the NHL's exclusive broadcast territories are "reasonably ancillary to a lawful joint venture and hence . . . lawful under federal . . . antitrust laws" (Goldfein Decl. Ex. 3, ¶ 79);

- the NHL's exclusive broadcast territories cannot cause "injury to competition" (<u>id.</u> ¶ 88);

- the NHL competes "with other sports and entertainment alternatives" (<u>id.</u> ¶ 79); and

- the NHL and the named Clubs "lack sufficient economic power in any properly defined market to enable them to restrain trade in any such market." (<u>id.</u> ¶ 85.)

MSG does not deny taking any of these positions.  With no opposition from MSG, the NHL again respectfully requests that this Court take judicial notice of MSG's positions that exclusive broadcast territories are reasonable as a matter of law, exist in a broad market in which the NHL has no market power, and cannot harm competition – sufficient grounds alone to dismiss the Complaint.

---

[20]    <u>See also</u> <u>Helfand v. Gerson</u>, 105 F.3d 530, 535 (9th Cir. 1997) ("[T]he greater weight of federal authority . . . supports the position that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion.").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss or in the Alternative for Partial Summary Judgment be granted.

Dated: August 6, 2008                                    Respectfully submitted,


                                                          _s/ Shepard Goldfein_____
                                                          Shepard Goldfein
                                                          James A. Keyte
                                                          Paul M. Eckles
                                                          Matthew M. Martino
                                                          SKADDEN, ARPS, SLATE,
                                                             MEAGHER & FLOM LLP
                                                          Four Times Square
                                                          New York, New York 10036-6522
                                                          Telephone:  (212) 735-3000
                                                          Facsimile:  (212) 735-2000

                                                          *Attorneys for Defendants National Hockey*
                                                          *   League et al.*

# EXHIBIT A

2005 WL 3464475 (U.S.)                                                                                 Page 1
(Cite as: 2005 WL 3464475)

For Opinion See 126 S.Ct. 1276, 126 S.Ct. 822, 126 S.Ct. 822, 126 S.Ct. 413, 125 S.Ct. 2957, 125 S.Ct. 2958, 125 S.Ct. 1372, 125 S.Ct. 1372

U.S.,2005.
Supreme Court of the United States.
TEXACO INC., Petitioner,
v.
Fouad N. DAGHER, et al., Respondents.
SHELL OIL COMPANY, Petitioner,
v.
Fouad N. DAGHER, et al., Respondents.
Nos. 04-805, 04-814.
December 15, 2005.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

Reply Brief for Petitioner Texaco Inc.
Joe Sims Glen D. Nager Louis K. Fisher Jones Day 51 Louisiana Avenue, N.W.Washington, D.C. 20001(202) 879-3939 Robert A. Mittelstaedt Craig E. Stewart (Counsel of Record) Martha Boersch Jones Day 555 California Street, 26th Floor San Francisco, CA 94104(415) 626-3939 Counsel for Petitioner Texaco Inc.

West Headnotes

**Antitrust and Trade Regulation 29T ⊗925**

29T Antitrust and Trade Regulation
   29TXIII Antitrust Law and Joint Ventures
      29Tk925 k. In General. Most Cited Cases
      (Formerly 265k17(1.12))
Is it per se illegal concerted action under Section 1 of the Sherman Act for an economically integrated joint venture to set the selling price of its own products? Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

*i TABLE OF CONTENTS

REPLY BRIEF FOR PETITIONER TEXACO INC. ... 1

I. RESPONDENTS ERR IN SUGGESTING THAT THE PRICING OF JOINT VENTURE OUTPUT BY THE VENTURE OR ITS OWNERS IS PER SE ILLEGAL. ... 2

A. The Per Se Rule Does Not Apply To Pricing Of A Jointly Owned Product As To Which Competition Has Validly Been Ended. ... 2

B. Respondents Err In Suggesting That "Ancillary Restraint" Jurisprudence Requires Joint Venturers To Prove The "Necessity" Of Pricing Decisions About Their Jointly Owned Products. ... 6

II. PRICING OF A JOINT VENTURE'S OWN OUTPUT BY THE VENTURE OR ITS OWNERS IN A MARKET IN WHICH THE OWNERS DO NOT COMPETE IS NOT CONCERTED ACTION SUBJECT TO SECTION 1. ... 9

A. This Court Has Not Applied Section 1 To A Joint Venture's Operation In A Market In Which Its Owners Do Not Compete. ... 10

B. Applying Section 1 To A Venture's Ongoing Operational Decisions Would Frustrate, Not Further, Sound Antitrust Enforcement. ... 11

*ii III. NEITHER THE COMPETITION BETWEEN SHELL AND TEXACO IN OTHER MARKETS NOR THE POTENTIAL UNWINDING OF THE VENTURE, NOR THE NON-COMPETE AGREEMENTS, JUSTIFY APPLYING EITHER SECTION 1 OR THE PER SE RULE TO THE PRICING OF EQUILON'S PRODUCTS. ... 13

IV. THE ALTERNATIVE "QUICK LOOK" ARGUMENTS OF RESPONDENTS AND THEIR AMICI ARE MERITLESS. ... 17

A. Equilon's Operation Was Not Obviously Anticompetitive. ... 17

B. Respondents Have Not Shown Any Actual Anticompetitive Effects. ... 20

CONCLUSION ... 20

*iii TABLE OF AUTHORITIES

Cases

Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332 (1982) ... 4, 10

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3464475 (U.S.)                                                                    Page 2
**(Cite as: 2005 WL 3464475)**

*Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1 (1979) ... passim

*Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717 (1988) ... 17

*Cal. Dental Ass'n v. FTC,* 526 U.S. 756 (1999) ... 17, 20

*Citizen Publishing Co. v. United States,* 394 U.S. 131 (1969) ... 2, 3

*Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984) ... 11, 12, 15, 16

*FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447 (1986) ... 10

*Knowles v. Iowa,* 525 U.S. 113 (1998) ... 10

*Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679 (1978) ... 10

*NCAA v. Board of Regents,* 468 U.S. 85 (1984) ... 3, 10

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284 (1985) ... 10

*Polk Bros., Inc. v. Forest City Enters.,* 776 F.2d 185 (7th Cir. 1985) ... 9

*Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210 (D.C. Cir. 1986) ... 6

**\*iv** *Timken Roller Bearing Co. v. United States,* 341 U.S. 593 (1951) ... 4, 10

*Town of Concord v. Boston Edison Co.,* 915 F.2d 17 (1st Cir. 1990) ... 12

*United States v. Trenton Potteries Co.,* 273 U.S. 392 (1927) ... 4

Statutes

15 U.S.C. § 1 ... passim

15 U.S.C. § 18 ... 12

Rules

Supreme Court Rule 15.2 ... 10

Other Authorities

FTC, *Analysis to Aid Public Comment,* 62 Fed. Reg. 67,868 (Dec. 30, 1997) ... 18

U.S. General Accounting Office, *Motor Fuels: California Gasoline Price Behavior* (April 2000) ... 20

VII Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003) ... 12, 13, 16

W. Stephen Smith, *Can a Fully Integrated Joint Venture Be Per Se Unlawful,* 19 Antitrust 52 (Spring 2005) ... 16

XI Herbert Hovenkamp, *Antitrust Law* (2d ed. 1998) ... 20

**\*1** REPLY BRIEF FOR PETITIONER TEXACO INC.

In our opening brief (at 11-26), petitioner Texaco demonstrated that the Ninth Circuit erred in treating the pricing of Equilon's gasoline as concerted action subject to Section 1 of the Sherman Act. When a joint venture or its owners set the price of the venture's own output in a market in which the owners no longer compete, that conduct is necessarily single firm conduct, and cannot properly be treated as an ongoing daily conspiracy. Pricing decisions for such jointly produced output do not deprive the economy of independent decisionmakers or increase any market power. Once the venture itself is validly formed (and the Ninth Circuit here did not question the validity of the formation of this joint venture, which indisputably achieved substantial real efficiencies and was extensively reviewed and found valid by federal and state regulators), the venture is entitled to operate its business as would any other entity, without its every production or marketing decision being second-guessed under the antitrust laws as supposedly unreasonable or unnecessary. This Court's decisions recognize as much, and respected commentators agree.

As we further demonstrated in our opening brief (at 26-37), even if Section 1 review is available in these circumstances, *per se* condemnation of the joint venture's operation is plainly improper. *Per se* treatment is reserved for those few agreements that experience has taught are plainly anticompetitive and economically unwarranted because they directly eliminate otherwise existing competition without offsetting economic benefit. Here, Equilon's pricing decisions did not eliminate competition, because they were made with respect to Equilon's own gasoline as to which the venture's valid formation had already ended competition. Subjecting such decisions to *per se*

illegality would effectively prohibit the formation of production and marketing ventures such as this one and deprive the economy of beneficial collaborative activities that this Court and others have recognized produce real consumer benefits.

**\*2** None of the arguments that respondents or their amici advance in their opposing briefs casts any doubt on these points of law. Indeed, recognizing the indefensibility of the Ninth Circuit's ruling, respondents and their amici advance several arguments that abandon the Ninth Circuit's reasoning and ask the Court to affirm on other grounds. The new arguments, however, are no more valid than the old ones.

## I. RESPONDENTS ERR IN SUGGESTING THAT THE PRICING OF JOINT VENTURE OUTPUT BY THE VENTURE OR ITS OWNERS IS *PER SE* ILLEGAL.

### A. The *Per Se* Rule Does Not Apply To Pricing Of A Jointly Owned Product As To Which Competition Has Validly Been Ended.

Respondents begin their argument in favor of application of the *per se* rule by suggesting (Resp. Br. 18-20) that this Court's decision in *Citizen Publishing Co. v. United States,* 394 U.S. 131 (1969), forecloses any other analysis of the matter. *Citizen Publishing* obviously does not do so.

In *Citizen Publishing,* the newspapers' venture had neither fully combined the operations of its owners nor eliminated competition between them in the relevant market. Rather, the newspapers had retained their separate news and editorial departments and, in setting their advertising and subscription rates, the newspapers were not setting the price for a jointly produced product (but were agreeing on prices for their separate products as to which they remained in competition). In contrast, here, Texaco and Shell fully combined their respective refining and marketing assets in the relevant markets and themselves exited from competition in these markets; in setting the price of Equilon's production, they were thus no longer acting as separate competitors but rather as joint owners of a single entity. Moreover, unlike this case (in which the Ninth Circuit did not question the legitimacy of the integration of Shell's and Texaco's operations), *Citizen Publishing* ruled that the newspapers could not have validly **\*3** integrated their operations. 394 U.S. at 134-35. Thus, *Citizen Publishing* is not only not controlling, it has very little application here, since it dealt with the fundamentally

distinct situation in which two competitors have fixed the prices of products that they have not, and could not validly have, jointly produced.

There is also a historical, and resulting doctrinal, reason that *Citizen Publishing* is unhelpful to the analysis here. That decision was rendered in an era in which the Court took a very different approach to antitrust issues generally and to the analysis of joint ventures in particular. Of special significance, *Citizen Publishing* was decided before the Court's rulings in cases such as *Broadcast Music, Inc. v. CBS, Inc.,* 441 U.S. 1 (1979) ( "*BMI*"), and *NCAA v. Board of Regents,* 468 U.S. 85 (1984), where the Court adopted a much more nuanced approach to restraints associated with joint ventures. In *BMI*, for example, the venture had set the price for the venture's blanket license. But this Court rejected the *per se* rule as inappropriate, even though (unlike here) the venture participants remained competitors in the same market. That result applies *a fortiori* here, where the pricing decision did not fix the price of any products that remained in competition. Yet respondents would have the Court read *Citizen Publishing* without regard to either later cases such as *BMI* or the Court's evolving approach to joint ventures and related antitrust issues.

Respondents complain (Resp. Br. 19, 33) that this case involves a "price-fixing" agreement that "was secret" and that *per se* treatment is required because they challenge a "direct restraint on price." But this complaint rests on the very "overly simplistic" literalism that this Court rejected in *BMI,* 441 U.S. at 9. The question is not whether a price has been jointly set. The question is whether setting the price has restrained competition that would otherwise exist. Here, no such restraint existed because competition between the two companies had already been ended in this market by virtue of Equilon's formation and the complete, efficiency-**\*4** enhancing integration of Shell's and Texaco's gasoline businesses in the United States. Respondents do not, and cannot, cite any authority for applying the *per se* rule where the agreement at issue is between the owners of jointly produced products as to which competition has validly been ended. In such circumstances, the rationale for *per se* illegality - *i.e.,* that the restraint at issue is one that "always or almost always tend[s] to restrict competition and decrease output," *BMI,* 441 U.S. at 19-20 - is inapplicable.

The linchpin of this Court's cases applying the *per se* rule against price-fixing agreements is the "absence of competition secured by the agreement." *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397 (1927); *see id.* ("The aim and result of every price-fixing agreement, if effective, is the elimination of one form

2005 WL 3464475 (U.S.)
(Cite as: 2005 WL 3464475)

of competition."). Here, the decision by Equilon (or its owners) as to the price for Equilon's gasoline did not secure the absence of competition. It was simply the pricing of products that were already jointly owned and thus not in competition. There is no basis for subjecting them to Section 1 scrutiny at all, much less for condemning them as *per se* illegal.

Respondents thus also err in suggesting (Resp. Br. 33-44), that *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332 (1982), and *Timken Roller Bearing Co. v. United States,* 341 U.S. 593 (1951), support application here of the *per se* rule. In *Maricopa County,* the pricing decisions were held to be *per se* unlawful because the doctors in issue there had *not* validly ended relevant competition by forming a cooperative enterprise in which they "pool[ed] their capital and share[d] the risks of loss as well as the opportunities for profit." 457 U.S. at 356. Had they done so, as Shell and Texaco did here, the Court recognized that a decision among them setting the price for their joint product "would be perfectly proper." *Id.* at 357. And, like the doctors in *Maricopa County,* the corporations in *Timken* had not integrated their operations into a new venture, but had simply reached horizontal agreements regarding the prices of their separately produced *5 and competing products. Respondents thus do not and cannot gain support from either decision.

Respondents' reliance on *BMI* is similarly misplaced. The fact that the copyright holders there continued to sell individual licenses was relevant because, absent the availability of such individual licenses, the challenged blanket licenses would have been the exclusive means of purchasing virtually any copyrighted work. See *BMI,* 441 U.S. at 5 ("[a]lmost every domestic copyrighted composition is in the repertory" of the defendants). Equilon enjoyed no such control over domestic gasoline, but faced numerous, significant competitors. That was the reason, in combination with the efficiencies that Equilon's formation would create, that the FTC permitted Equilon to be formed to produce and market gasoline. And, once validly formed, Equilon and its owners were entitled to set a price for its products on the same basis that BMI and ASCAP were allowed to set the price for their joint products. Indeed, whereas rule of reason analysis was appropriate in *BMI,* because the copyright holders remained in competition in the market, here Section 1 scrutiny is not appropriate at all, because Shell and Texaco no longer compete in the relevant market.

Respondents emphasize (Resp. Br. 35-36) that the blanket licenses in *BMI* were a "new product" that

individual copyright holders could not have produced on their own. But procompetitive, efficiency-creating ventures are not limited to those that create new products. As in this case, joint ventures can create efficiencies in producing and marketing existing products by eliminating redundancies, creating economies of scale, and sharing risk. See Tex. Br. 25 n.13. Even the Ninth Circuit recognized that "[t]here is a voluminous record documenting the economic justifications for creating the joint ventures" here. Pet. App. 4a. That being the case, no basis exists for Section 1 scrutiny of - much less for condemning as *per se* illegal - the operation of Equilon's validly formed business. As *BMI* itself stated, "[w]hen two partners set the price of their goods or services *6 they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act." 441 U.S. at 9.

B. Respondents Err in Suggesting That "Ancillary Restraint" Jurisprudence Requires Joint Venturers To Prove The "Necessity" Of Pricing Decisions About Their Jointly Owned Products.

Finding no support for their argument in this Court's *per se* rule jurisprudence, respondents next erroneously seek refuge in the so-called "ancillary restraint" jurisprudence. Specifically, respondents argue (Resp. Br. 38-41) that, under "ancillary restraint" cases, *per se* treatment is proper unless defendants can prove that charging the same price for the Shell and Texaco brands was "necessary" to the venture's success. As demonstrated in our opening brief (at 32-37), however, that argument is fundamentally flawed.

Among other things, respondents proceed from the mistaken premise that setting a price for Equilon's gasoline is an "ancillary" restraint that must be separately justified. As the United States explains (U.S. Br. 22-28), "ancillary restraint" analysis only applies to agreements that themselves restrain competition outside of the joint venture, and that therefore must themselves be separately justified. See *Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210, 224 (D.C. Cir. 1986) (describing an ancillary restraint as "an agreement eliminating competition"). When the alleged agreement does not impose any additional limitation on competition that would exist absent that agreement, no basis exists for requiring separate justification. Rather, it is the agreement that eliminated competition in the first place that is subject to antitrust scrutiny and that must be justified. In this case, that agreement was Equilon's formation as both a production and a marketing venture. The decision as to how that venture's products would be priced is simply the operation of that venture;

2005 WL 3464475 (U.S.)                                                                                           Page 5
**(Cite as: 2005 WL 3464475)**

it is not an additional restraint that can be said to restrain competition in the market and to require scrutiny as an "ancillary restraint."

**\*7** Contrary to respondents' assertion, this is exactly the approach followed in *BMI*. The Court there did not analyze the pricing of the blanket license as an ancillary restraint. The setting of a price for the license did not create any additional elimination of competition separate from the creation of the blanket license itself. The setting of price was simply the "necessary consequence" of creating the blanket license, 441 U.S. at 21 - just as the necessary consequence of forming a venture to both produce and sell gasoline is that a price must be established for that gasoline.

There is an important difference between *BMI* and this case - but it is a difference that further defeats respondents' argument. In *BMI*, the venture members each continued to produce and own their own copyrighted works and "retain[ed] the rights individually to license" those works. 441 U.S. at 11. In contrast, here, Shell and Texaco entirely exited the relevant market and were no longer in competition with each other or with Equilon; and the challenged action - the joint setting of a unified price for the joint venture's gasoline production - concerns the operations of the joint venture itself, not "ancillary" actions of the joint venture partners. Thus, whereas rule of reason analysis remained to be applied to the restraint at issue in *BMI*, here no Section 1 scrutiny is appropriate at all, much less *per se* analysis.

Applying ancillary restraint analysis to a venture's operation of its own business would work a fundamental shift in antitrust jurisprudence. When two companies form a venture that integrates some aspect of their operations, the courts do not condemn that integration as *per se* illegal if the companies cannot show that the integration was "necessary" or that the companies could not function without it. Instead, the courts evaluate the integration under the rule of reason, with the burden on the plaintiff to initially prove that the integration will have anticompetitive effects. It is only if such anticompetitive effects are shown that the courts inquire into whether the benefits of the venture outweigh those effects and whether particular aspects of the venture are **\*8** necessary to achieving those benefits. Respondents' approach would fundamentally alter the established inquiry.

Respondents complain (Resp. Br. 12, 16) that "no efficiencies, cost savings, or competitive benefits" resulted from the alleged price fixing and that the venture "could have functioned … perfectly well" without it. But respondents cite no authority for the proposition that joint venturers must show that the particular manner in which the venture conducts its business is "necessary." As discussed in our opening brief (at 36), any such standard would wreak havoc on joint ventures, because it would be virtually impossible to show that charging one price is any more "necessary" than charging any other price - or that selecting one output level, or one particular supplier, is any more "necessary" than selecting a different one. Respondents have no answer for this point. Nor do they suggest any reason why Equilon's pricing would be any less subject to *per se* condemnation under their approach if Equilon had adopted a different pricing strategy. To the contrary, their argument that no cost savings resulted from charging the same price would apply equally to any pricing strategy that Equilon might have adopted. Rather, under respondents' approach, the only apparent means by which petitioners could have avoided *per se* condemnation would have been to remove the pricing function from Equilon and effectively unwind the entity as a marketing venture. If this approach were accepted, not only would Section 1 scrutiny be applied where none is justified, the governing rule of reason standard for evaluating a venture's formation would also effectively be supplanted with a *per se* rule of illegality for marketing of a joint venture's products.

Respondents quote the Ninth Circuit's suggestion that the result might be different if petitioners had merged their brands into "one collective brand." Resp. Br. 49 (quoting Pet. App. 27a). But this assertion only confirms the irrationality of respondents' position - and its lack of connection to any valid antitrust policy. If competition were **\*9** thwarted by selling gasoline under two brands at the same price, it would be equally thwarted by selling gasoline under a single brand at a single price. Either way, petitioners would be agreeing on the price of gasoline that was sold. Despite respondents' disclaimer, there is no logical stopping point for their argument. It would unavoidably preclude joint ventures from setting selling prices for their own products, and thus effectively ban beneficial, efficiency-enhancing collaborations that are vital to the economy. *See Polk Bros., Inc. v. Forest City Enters.,* 776 F.2d 185, 188 (7th Cir. 1985) ("The war of all against all is not a good model for any economy. Antitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt at every moment.").

2005 WL 3464475 (U.S.)                                             Page 6
**(Cite as: 2005 WL 3464475)**

II. PRICING OF A JOINT VENTURE'S OWN OUTPUT BY THE VENTURE OR ITS OWNERS IN A MARKET IN WHICH THE OWNERS DO NOT COMPETE IS NOT CONCERTED ACTION SUBJECT TO SECTION 1.

As part of their erroneous effort to apply the *per se* rule to the pricing of a joint venture's output by the venture or its owners, respondents urge (Resp. Br. 22-31) that joint ventures like Equilon are really not single entities and thus should not be treated as such for antitrust purposes. This argument is also flawed at every turn.[FN1]

> FN1. Contrary to respondents' assertion, petitioners argued in the court below that Section 1 should not be applied here (*e.g.*, Appellees' Brief, filed January 30, 2003, at 18, 21; Petition for Rehearing, filed January 22, 2004, at 2, 14), and the court of appeals ruled on the issue (Pet. App. 19a-20a n.11). Indeed, the applicability of Section 1 is precisely the issue that divided the majority and the dissent below. *Compare* Pet. App. 6a & n.4, 19a n.11 (majority op.) (finding concerted action), *with id.* at 31a (Fernandez, J., dissenting) (concluding that Equilon should be viewed as "a separate entity"). Petitioners also made this argument in the petitions for certiorari (Texaco Pet. 10-13, 18-22; Shell Pet. 15-16), and respondents did not assert in their opposition that the argument had not been presented below. Any contention that petitioners' argument is not properly before this Court is thus erroneous and has been waived. *See, e.g.*, Sup. Ct. R. 15.2; *Knowles v. Iowa,* 525 U.S. 113, 116 n.2 (1998).

**\*10** A. This Court Has Not Applied Section 1 To A Joint Venture's Operation In A Market In Which Its Owners Do Not Compete.

Respondents point out that this Court has a "long history of applying the antitrust laws to joint ventures." Resp. Br. 23. That is of course true, and the antitrust laws have been applied to this venture--*i.e.*, when the FTC and the states reviewed its formation and found it to be permissible. But the antitrust laws have not been applied to regulate the pricing decisions or other operational activities of joint ventures - at least not in the manner respondents urge here.

The Court's joint venture cases have involved either scrutiny of the venture's formation, *e.g.*, *Timken,* 341 U.S. 593, or scrutiny of a restraint on non-venture

conduct or conduct in a market in which the venture owners remained in competition. *E.g.*, *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447 (1986); *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 295 (1985); *NCAA,* 468 U.S. 85; *Maricopa County,* 457 U.S. 332; *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679 (1978). None of these circumstances is at issue in this case.

All that is at issue here is an integrated joint venture's operation of its own business in a market in which the venture owners no longer compete. None of this Court's precedents has applied Section 1 in this context. Indeed, the Court concluded just the opposite in *Maricopa County,* where it observed that a joint venture consisting of companies that have "pool[ed] their capital and share[d] the risks of loss as well as the opportunities for profit … is regarded as a single firm competing with other sellers in the **\*11** market," with the result that "a price-fixing agreement among the [partners] would be perfectly proper." 457 U.S. at 356-57.

Contrary to respondents' argument (Resp. Br. 22), this is not a matter of according joint ventures "special antitrust status." Rather, it is simply applying to joint ventures the same Section 1 standards that apply to all firms. Section 1 applies only to conduct that involves "a sudden joining of two independent sources of economic power previously pursuing separate interests" - a "merging[] of resources" that "increases the economic power moving in one particular direction." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 771 (1984). When two firms have already combined their businesses and no longer compete in the relevant market, a decision about the prices the new entity will charge for its products is not a "merging of resources" and has no effect on economic power. It is merely the operation of the new entity's validly formed business. While Section 1 applies to the formation of the joint venture, it does not apply to the ongoing operation of the entity once formed.

B. Applying Section 1 To A Venture's Ongoing Operational Decisions Would Frustrate, Not Further, Sound Antitrust Enforcement.

In response, respondents assert (Resp. Br. 29) that "sound public policy" supports applying Section 1 here. But they have no coherent response to the point that subjecting a joint venture's ongoing daily operations to separate antitrust scrutiny would be completely unworkable. While they assert (*id.* at 28) that identifying which joint venture activities should be treated as concerted action and which should not

2005 WL 3464475 (U.S.)                                                                         Page 7
**(Cite as: 2005 WL 3464475)**

would be more difficult than just calling everything concerted action, the distinction in the Sherman Act between concerted action and single firm conduct is well-established and exists for an important reason: business decisions that do not restrain otherwise existing competition do not **\*12** threaten competition, which is best served by allowing businesses to operate without fear of their "every action [being subjected] to judicial scrutiny for reasonableness." _Copperweld,_ 467 U.S. at 775. _See_ VII Phillip E. Areeda & Herbert Hovenkamp, _Antitrust Law_ ¶ 1462, at 192 (2d ed. 2003) ("[S]ubjecting virtually every decision made within a single firm to Sherman Act § 1 scrutiny would not only overtax the limits of our antitrust enforcement institutions, it would also involve judges and commissioners with the daily business decisions of every firm.").

Contrary to respondents' argument (Resp. Br. 30), recognizing that Section 1 does not apply to a joint venture's conduct of its own business does not mean that antitrust enforcers must "anticipate every conceivable restraint in which the venture could engage post-formation." _Id._ If the venture participants later change the scope of their venture, or adopt new restrictions on their non-venture conduct, such decisions would be subject to Section 1 scrutiny on the same basis as the original formation decisions. But there is no need for separate Section 1 scrutiny of the ongoing operation of the business that the venture was formed to conduct - nor for antitrust regulators to try to predict the specific pricing strategy that the joint venture may adopt or the output decisions that it may make. The protection against any anticompetitive consequences flowing from such pricing or output decisions is not ongoing scrutiny of those individual decisions for "reasonableness." _Town of Concord v. Boston Edison Co._, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, J.) ("antitrust courts normally avoid direct price administration"). Rather, the protection against any such anticompetitive consequences is the rigorous evaluation of market conditions in which the business will operate that is part of a traditional rule of reason assessment of the permissibility of the joint venture in the first place. Here, the FTC and the states performed just such a rigorous evaluation when, applying the standards of Section 1 of the Sherman Act and Section 7 of the Clayton Act, they examined the **\*13** markets in which Equilon would operate and concluded that (with certain divestitures) Equilon would lack the ability to engage in supracompetitive pricing. _VII Antitrust Law_ ¶ 1464, at 214 ("legal permission for a particular merger under the rather stringent prophylactic standards of Clayton Act § 7 necessarily expresses the judgment that the merger presents an insufficient anticompetitive threat to warrant

condemnation"), _see_ U.S. Br. 17 (confirming that, in reviewing Equilon's formation, the "FTC applied the antitrust enforcement standards that the Justice Department and the FTC apply to mergers").

The lack of merit in respondents' position is perhaps best illustrated by their assertion that, if petitioners had wanted to avoid lawsuits like this one, "they could have merged, as they well knew." Resp. Br. 31. Respondents thus concede that it would have been perfectly lawful for a merged company to decide to charge the same price for Shell- and Texaco-branded gasoline. The competitive consequences of that situation, however, would be no different from what actually occurred here - except that a complete merger would have eliminated competition between Shell and Texaco to an even greater degree by extending to other markets beyond just domestic gasoline. The antitrust laws do not and should not prefer mergers to joint ventures; and they certainly should not be construed to provide unnecessary incentives for the elimination of competition where economic benefits do not warrant it.

### III. NEITHER THE COMPETITION BETWEEN SHELL AND TEXACO IN OTHER MARKETS NOR THE POTENTIAL UNWINDING OF THE VENTURE, NOR THE NON-COMPETE AGREEMENTS, JUSTIFY APPLYING EITHER SECTION 1 OR THE _PER SE_ RULE TO THE PRICING OF EQUILON'S PRODUCTS.

In arguing for the application of both Section 1 and the _per se_ rule, respondents point out (Resp. Br. 24-27, 31-32) **\*14** that Shell and Texaco did not end competition between themselves in other markets, that the venture could be unreasonable, and that Shell and Texaco entered into non-compete agreements with respect to the market in which Equilon was to operate. From these facts, respondents assert (Resp. Br. 32) that the pricing of Equilon's own products might facilitate "collusion and pricing uniformity" regarding Shell's and Texaco's non-venture products or their own gasoline upon the venture's termination, or otherwise justify application of Section 1 and the _per se_ rule to the pricing of Equilon's products. This argument is also unsound.

First, in advancing this argument, respondents abandon the Ninth Circuit's reasoning. The Ninth Circuit concluded that Section 1 applies here, not because of any competition between Shell and Texaco in other markets, but because Shell and Texaco supposedly "agreed in advance" of Equilon's actual formation on the pricing for the two brands. Pet. App. 19a n.11. For the reasons explained in our opening

2005 WL 3464475 (U.S.)
(Cite as: 2005 WL 3464475)

Page 8

brief (at 23-24), that ruling was erroneous; and, by now focusing on arguments about other markets and products or on the non-compete agreements, respondents are revealing that they understand they cannot defend that ruling.

Second, respondents presented no evidence that pricing decisions about domestic gasoline had any relation to, or any potential to affect, pricing of such disparate products as marine lubricants, sulfur, heavy fuel oils, coke or any of the other products Shell and Texaco sold outside the venture. Nor is there any evidence suggesting that pricing during the venture had any effect on - or potential to affect - post-venture gasoline pricing. On these and other issues, respondents and their amici argue as though the case had been dismissed on the pleadings, rather than the district court having granted summary judgment after full discovery on all liability issues. The question at this stage is not what respondents might have proved; rather, the question is what they in fact proved by sufficient evidence to withstand summary judgment.

*15 Third, even if there were evidence (or reason to believe) that pricing of the joint venture's products could affect pricing of non-venture products, that would not be a proper basis for applying Section 1 to the pricing of Equilon's products - and certainly not for condemning it as *per se* illegal. The alleged adverse effect on competition does not flow from any decision to charge any particular price; the supposed adverse effect would exist regardless of whether Equilon charged the same or differing prices for the two brands. Either way, Equilon or its owners would be establishing relative prices for the gasoline, which price would then (under respondents' theory) be a basis for "facilitating" similar pricing of other products. The issue, then, is not how Equilon priced its gasoline, but rather whether it was proper for Equilon (or its owners) to set any price at all for that gasoline - *i.e.*, whether Equilon could legitimately be formed as both a production *and* marketing venture. While that question may be subject to Section 1 scrutiny, the scrutiny is not of the propriety or "necessity" of any particular pricing decision (as respondents urge and the Ninth Circuit held). Nor would the question be evaluated under the *per se* rule. The inquiry would instead be a rule of reason inquiry into the propriety of Equilon's formation as a marketing venture, under which any anticompetitive effects must be proved (not conjectured) and carefully balanced against the procompetitive benefits created by the venture (which are unchallenged here). *Cf.* Copperweld, 467 U.S. at 768. That is precisely the inquiry that the FTC and four state attorneys general conducted at the time that Equilon was formed. Neither court below questioned

the validity of Equilon's formation as a marketing venture, and respondents expressly abandoned below any challenge under the rule of reason, whether to the venture's formation or otherwise.

Fourth, respondents also apparently still assert (Resp. Br. 33) that setting the same price for the two brands restrained competition between the brands while the venture was in existence. But that is the very intra-enterprise conspiracy *16 theory that this Court rejected in Copperweld. The competition with which Section 1 is concerned is competition between "independent sources of economic power," Copperweld, 467 U.S. at 771, not competition between brands under the exclusive control of a single entity. *See* U.S. Br. 14. Once the decision to combine the two brands under common ownership is found permissible, no legitimate antitrust purpose is served by subjecting the daily pricing behavior of the combined entity to continual scrutiny. If respondents' theory of competition and antitrust law were accepted, validly merging companies that wish to continue to use their existing brand names could always be required to maintain competition between those brands. That is not the law, nor should it be. *See* W. Stephen Smith, *Can a Fully Integrated Joint Venture Be Per Se Unlawful*, 19 Antitrust 52, 55 (Spring 2005) ("A decision by Equilon and Motiva to charge the same price for Shell and Texaco gasoline is no different than a decision by Hewlett-Packard to charge the same price for HP and Compaq brand computers.").

Fifth, the fact that Equilon could be terminated (and later was terminated as a joint venture when Texaco merged with Chevron) does not change this analysis. The expected duration of the venture is relevant in a rule of reason analysis of the venture's formation, since a venture scheduled to last only for a brief period might not be able to achieve real efficiencies that could outweigh any potential anticompetitive consequences. But if the venture is valid under the appropriate rule of reason analysis (both the FTC and the district court so found here, *see* U.S. Br. 14 n.8, Pet. App. 58a-59a, and respondents below abandoned any contrary claim), the fact that the venture may later be unwound does not justify any further Section 1 scrutiny - just as it would not justify further Section 1 scrutiny of the internal operation of a merged company (which can also be unwound). Once validly formed, joint ventures (and merged companies) must be free to conduct their validly formed businesses as would other entities. *See also* VII *Antitrust Law* ¶ 1475, at 304 *17 ("[O]nce antitrust law deems the creation of an organization to be lawful, it would be inconsistent to prevent it from functioning by

2005 WL 3464475 (U.S.)                                                                                                   Page 9
**(Cite as: 2005 WL 3464475)**

characterizing its normal operations as *per se* or otherwise unlawful conspiracies.").

Finally, contrary to respondents' argument, there is no legal basis for suggesting (Resp. Br. 24) that the non-compete agreements are themselves *per se* illegal. Shell and Texaco did not merely agree to not compete with each other while remaining independent participants in the relevant market without any integration. Instead, their non-compete agreements accompanied their valid efficiency-enhancing integration of all of their domestic gasoline refining and marketing assets. In such circumstances, non-compete agreements are both normal and the classic example of an ancillary agreement that is not illegal *per se* but instead evaluated under the rule of reason. *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 729 n.3 (1988) ("The classic 'ancillary' restraint is an agreement by the seller of a business not to compete within the market."). Respondents disclaimed any such challenge when they abandoned any rule of reason claim below. *See* Pet. App. 7a ("plaintiffs disclaimed any reliance on the traditional 'rule of reason' test").

## IV. THE ALTERNATIVE "QUICK LOOK" ARGUMENTS OF RESPONDENTS AND THEIR AMICI ARE MERITLESS.

Respondents and their amici alternatively assert that at least "quick look" analysis should be applied. Resp. Br. 41; AAI Br. 10-23. These arguments are similarly meritless.

### A. Equilon's Operation Was Not Obviously Anticompetitive.

"Quick look" treatment requires that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999). There must **\*18** be a "great likelihood of anticompetitive effects [that] can easily be ascertained." *Id.* Respondents do not and cannot come close to meeting that standard.

There is no reason to imagine here, much less any evidence, that the pricing of a joint venture's own product (whether at the same or different prices) will have any anticompetitive effect - let alone that there is a "great likelihood" of such an effect. The FTC reached just the opposite conclusion when, after an extensive investigation, it permitted the venture to be formed as a production and marketing venture conditioned on limited divestitures which "alleviate[d]

the alleged competitive concerns arising from the Joint Venture." FTC, *Analysis to Aid Public Comment,* 62 Fed. Reg. 67,868, 67,869 (Dec. 30, 1997). Since there is no basis for suggesting that the federal government's designated antitrust enforcement agency for this transaction (along with the attorneys general of four states) lacks a "rudimentary understanding of economics," it is hard to imagine a less likely candidate for "quick look" treatment than this joint venture.

Respondents' attempted analogy to Professor Areeda's hypothetical joint selling arrangement between GM and Ford, Resp. Br. 20-22, only confirms this point. Professor Areeda's argument was that the formation of such a venture would be unlawful because it would merely be a vehicle for establishing the price for separately produced and owned goods, without achieving any meaningful efficiencies. The hypothesized venture did not involve any integration or sharing of risk. Here, by contrast, Equilon was a full integration of Shell's and Texaco's production and marketing operations that was reviewed at length by federal and state regulators and found proper. "Quick look" is inapplicable.

Quick look liability is also improper even if, as the American Antitrust Institute ("AAI") urges, respondents could be thought to be challenging the Brand Management **\*19** Protocol, rather than the specific prices that Equilon charged. The AAI asserts that the Brand Management Protocol, which merely established the conditions under which the Shell and Texaco brands were licensed to Equilon, imposed an "unduly restrictive structure" on Equilon that impaired Equilon's "ability to compete in the market" by preventing it from pursuing a profit-maximizing strategy. AAI Br. 4, 16. There is of course no evidence that the Brand Management Protocol had anything to do with the decision about how Equilon's products would be priced or that, if it did, Equilon's pricing strategy was not in fact profit maximizing. But, even if there were such evidence, it would still not support a claim that the Brand Management Protocol or Equilon's pricing was anticompetitive, let alone so obviously anticompetitive that it could be condemned on a quick look basis without full analysis.

Numerous companies pursue business strategies that may not always maximize their profits. That does not mean that a company's operation is anticompetitive or that the strategy violates the antitrust laws. Nor, in the case of a joint venture, does it mean that the venture is invalid as not being sufficiently "efficient" or "vigorous" (AAI Br. 6, 12) in its behavior. Unless the venture possesses market power (and the FTC and

2005 WL 3464475 (U.S.)
**(Cite as: 2005 WL 3464475)**

Page 10

four state attorneys general concluded that, as formed, Equilon would not), any internal constraints on its operational decisions - whether "unduly restrictive" or otherwise not "profit-maximizing" - would at most harm only the venture, not competition. If respondents wished to argue otherwise, it was their burden to adduce evidence proving as much. They did not do so.

The AAI's unsupported speculation (AAI Br. 6, 17) that the Brand Management Protocol was adopted (and may have been applied) to protect the venture owners' interests outside the venture is similarly irrelevant. Even if that were true, there would be nothing obviously anticompetitive about venture owners acting to preserve the value of their assets outside the venture. To the contrary, it is just as likely that **20** doing so would have "a net procompetitive effect, or possibly no effect at all on competition." *Cal. Dental*, 526 U.S. at 771.

B. Respondents Have Not Shown Any Actual Anticompetitive Effects.

Finally, respondents err in suggesting (Resp. Br. 45) that "demonstrable anticompetitive market effects" exist here because gasoline prices rose in early 1999. They presented no evidence that the price increases had anything to do with Equilon or its pricing strategies. They assert only that crude oil prices were stable or dropping at that time. Even if that were true, however, gasoline prices are not merely the product of crude oil costs but are affected by numerous other variables, including consumer demand and refining and transportation constraints. Respondents have not attempted to control for these variables; and thus the inferences that they seek to draw are legally spurious ones. Indeed, federal investigators examining the 1999 West Coast price increases concluded that they were primarily the result of disruptions in supply caused by a refinery explosion in Northern California and subsequent outages in three other California refineries. *See* U.S. General Accounting Office, *Motor Fuels: California Gasoline Price Behavior*, at 12-13 (April 2000). In short, because there is no proof that the marketwide price increases were causally linked to the internal pricing decisions of a single actor in that market, the price increases to which respondents point are legally meaningless. *Cf.* XI H. Hovenkamp, *Antitrust Law* ¶ 1914, at 351 (2d ed. 1998) ("[I]n any case where proof of an output reduction substitutes for a showing of power, causation must be established. The mere fact that output declines after a restraint has been put in place does not mean that the restraint contributed in any way to the output reduction.").

CONCLUSION

The judgment of the Ninth Circuit should be reversed.

U.S.,2005.
Texaco Inc. v. Dagher
2005 WL 3464475 (U.S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.