USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/10/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
MADISON SQUARE GARDEN, L.P.,           :    07 CV 8455 (LAP)
                                       :
          Plaintiff,                   :
                                       :         OPINION
     vs.                               :
                                       :
NATIONAL HOCKEY LEAGUE, NATIONAL       :
HOCKEY LEAGUE ENTERPRISES, L.P.,       :
NATIONAL HOCKEY LEAGUE INTERACTIVE     :
CYBERENTERPRISES, L.L.C., NHL          :
ENTERPRISES, L.L.C., NHL               :
ENTERPRISES CANADA, L.P., and NHL      :
ENTERPRISES, B.V.,                     :
                                       :
          Defendants.                  :
------------------------------------X

LORETTA A. PRESKA, United States District Judge:

On November 2, 2007, this Court denied Plaintiff Madison

Square Garden L.P.'s ("MSG") motion for a preliminary injunction

on antitrust grounds against Defendants' (collectively "NHL" or

the "League") implementation of their New Media Strategy, which

required, inter alia, the migration of the MSG-owned New York

Rangers' website to a League-operated server. See Madison Square

Garden, L.P. v. NHL, No. 07 Civ. 8455, 2007 WL 3254421 (S.D.N.Y.

Nov. 2, 2007) ("MSG I"), aff'd 270 Fed. Appx. 56 (2d Cir. Mar.

19, 2008). In denying the motion, the Court found that MSG

failed to demonstrate a likelihood of success on the merits

because the migration requirement and prohibition against

operating a separate team website (1) did not constitute a

"naked restraint" and (2) survived preliminary scrutiny under a

full rule of reason analysis. See MSG I, 2007 WL 3254421 at
*6-*9.

Before the Court now is a motion by the NHL to dismiss or
in the alternative for partial summary judgment.[1]  For the
reasons discussed below, the motion is granted in part and
denied in part.

## BACKGROUND

While the motion for preliminary injunctive relief focused
exclusively on the League's New Media Policy,[2] the Complaint in
this case challenges a far broader swath of the League's
restrictions on Member Clubs' operations as unreasonable
restraints of trade under the Sherman Act, 15 U.S.C. § 1.

## A. League Organization

The NHL is an unincorporated association of thirty Member
Clubs organized as a joint venture. (See Amended Complaint
("Compl.") ¶ 2.)  The Member Clubs are separately owned and
operated entities with separate assets, stadium rights,
employees, and ownership rights in various copyrights,
trademarks, trade dress, and trade names in team logos and
designs. (Id. ¶ 13.)  Yet as the Court recognized on the motion

---

[1] MSG has separately moved to dismiss the NHL's counterclaim.
That question is reserved and will be addressed in a separate
order.

[2] For a recitation of the events giving rise to the
implementation of the New Media Strategy, see MSG I 2007 WL
3254421 at *1-*5.

2

for a preliminary injunction, all members of the League have signed and ratified the NHL Constitution and By-laws, and, as such, the clubs' internal affairs are subject to the provisions of those agreements. See MSG I 2007 WL 3254421 at *1-*5.  And the League Commissioner has the power to interpret the provisions of the Constitution, By-Laws, League rules and resolutions; he also has "full and complete authority" to discipline Member Clubs for violations of League rules. Id.  MSG does not dispute that it is required to comply with the joint decisions of the Member Clubs regarding the alleged restraints at issue in the case. (Compl. ¶¶ 17, 41.)  MSG even acknowledges that, pursuant to the terms of its contract with the League and other Member Clubs, it may be expelled from the League for violating League rules. (Id.)

Nevertheless, MSG argues that the control exercised by the League goes too far, alleging that the NHL Member Clubs, "acting collusively as the League and through the Commissioner," have taken steps to eliminate, restrict and prevent off-ice competition between and among the member clubs . . . in ways that are not necessary to the purpose of the NHL joint venture." (Id. ¶ 3.)

B.   Allegations Relating to Four Areas

MSG's allegations center around League restraints on (1) merchandizing and licensing, (2) broadcasting and streaming, (3)

3

new media, and (4) advertising and sponsorship. The Complaint alleges that the NHL has market power in these areas because major league men's professional ice hockey has unique characteristics that set it apart from other sports or leisure activities. (Compl. ¶ 29.) At competitive prices, the rights to license or use the marks of the NHL and NHL clubs, the rights to broadcast or otherwise distribute NHL games, and the rights to sell advertising rights at or involving NHL venues are not reasonably interchangeable with any substitutes. (Id. ¶ 31.) Consequently, the Complaint alleges that major league men's professional ice hockey products and services are a distinct market, in various local and national geographic areas, over which the NHL has market power. (Id. ¶ 32.)

## 1. Merchandizing and Licensing

Prior to MSG's acquisition of the Rangers, the NHL clubs agreed to give the exclusive right to control the individual clubs' marks and licensing opportunities to the League for virtually all commercial purposes. (Id. ¶ 38.) As a result of acquiring the Rangers, MSG is a "partner and beneficiary" of the NHL, NHLE, NHL ICE, NHLE Canada and NHLE International--all entities that the Member Clubs created to license League and team marks. (See id. ¶¶ 22-28.)

4

In 1994, again before MSG's purchase of the Rangers, the

NHL Board of Governors resolved that each Club would grant the

League exclusive marketing rights as follows:

> RESOLVED, that each Member Club hereby grants to the League
> the exclusive worldwide right to use or license its team's
> trademarks, including the team's logos, symbols, emblems,
> designs, uniforms (including a picture of a player in the team's
> uniform) and other identifying indicia (collectively,
> "Trademarks"):  (i) in connection with the advertising,
> merchandising, promotion, manufacture, sale and distribution of
> products and services ("Commercial Purposes") of any nature; and
> (ii) to promote or generate interest in the NHL and, collectively
> its Member Clubs ("Promotional Purposes"), provided that each
> Member Club retains the non-exclusive right to: (w) perform under
> its existing local licensing contracts in accordance with their
> provisions during their defined terms, without permitting (to the
> extent possible) any renewal or extension thereof unless that
> agreement is limited in scope consistent with the terms of this
> Resolution; (x) use, within its home arena and its Team stores
> located within a 75-mile radius of its home arena, it own
> Trademarks in connection with the normal operation and promotion
> of the team and for Commercial Purposes; (y) publish and
> distribute direct-mail catalogues outside the local territories,
> provided that 65 percent of the products offered in the direct-
> mail solicitation are produced by NHLE licensees; and (z) solely
> for purposes of this Resolution and without effect upon or
> expansion of a Club's broadcasting rights, use its own Trademarks
> outside of its home arena for team-specific Promotional Purposes
> within its local broadcast territory; and provided, further, that
> the reservation of local rights granted to the Member Clubs in
> this Resolution excludes jersey or sweater replicas, hockey
> trading cards and outerwear (exclusive of hats), and provided,
> further, that a Member Club's rights to use its Trademarks as
> specified above may in turn be licensed by the Member Club to
> third parties (e.g., sponsors and licensees) for uses consistent
> with this Resolution . . . .

(Goldfein Decl. Ex. 8.)[3]  License Agreements executed in 1996 and

2006 continued this grant of rights from the Clubs to the League

in substantively the same form. (Id. ¶¶ 38-39.)

---

[3] "Goldfein Decl." refers to the declaration of Shepherd Goldfein, sworn to on
June 2, 2008. Because MSG incorporates the NHL Constitution, By-laws and
League Rules into its Amended Complaint, the NHL Constitution, By-laws and
Resolutions may be relied on by the Court in deciding the present motion.
See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is

(continued on next page)

5

MSG objects to this arrangement because it eliminates each club's ability to compete to sell, among other things, clothing and other products containing a player's name, number, or image. (Id. ¶ 40A.)  In particular, it objects to its inability to market Rangers products outside the team's home arena (id. ¶ 40B) and on the internet other than through the NHL-controlled store (id.).  The upshot of this, from an antitrust perspective, is that individual clubs like the Rangers are precluded from seeking out lower-cost or higher-quality manufacturing arrangements than those entered into by the League and from offering consumers merchandise options not offered by the League.  In addition, because of the absence of reasonably interchangeable alternatives to NHL-themed merchandise, the Complaint alleges that restrictions on competition necessarily result in higher prices, lower quality, and reduced responsiveness to consumer preferences. (Compl. ¶¶ 16A.)

2.  Broadcasting and Streaming

MSG also objects to the League's allocation of broadcasting territories, specifically the League's prohibition on each club's transmitting its games, on television or over the internet, outside defined territories. (Id. ¶¶ 16C, 40C.)  These

(cont'd from previous page)

deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.") (internal citations omitted).

6

restrictions are found in Article IV of the NHL Constitution,

which addresses certain territorial rights of the League and

Member Clubs:

> 4.1. Definitions. For the purposes of this Article: . . . .
> (c) "Home territory" . . . means . . . exclusive territorial
> rights in the city in which it is located and within fifty miles
> of that city's corporate limits."
> . . . .
> 4.2. Territorial Rights of League. The League shall have
> exclusive control of the playing of hockey games by Member Clubs
> in the home territory of each member, subject to the rights
> hereinafter granted to members. . . .
>
> 4.3. Territorial Rights of Members. Each member shall have
> exclusive control of the playing of hockey games within its home
> territory including . . . the playing in such home territory of
> hockey games by any teams . . . or by other members of the
> League. . . .
>
> 4.4. Property Rights of Home Club. Each member hereby
> irrevocably conveys . . . all the right, title and interest . . .
> to each hockey game . . . as a visiting club and in the news of
> said game . . . to the member in whose home territory said game
> is played.

(Goldfein Decl. Ex. 5.)

From time to time, the Member Clubs have redefined certain

features of these broadcast territories. For example, as early

as 1984, the Clubs outlined by Board Resolution how they would

define each Club's "Home Territory" and "Sphere of Influence"

for purposes of determining where Member Clubs could broadcast

their games through various means and technologies. (See id. Ex.

6.) Since the Modified Member Club Agreement of March 7, 1988

(id. Ex. 7), the Member Clubs have been limited to distributing

their home and away games within their respective exclusive

broadcast territories. However, the Clubs never changed the

7

League's basic exclusive territories and the right to broadcast their home games.

MSG alleges that because these agreements allow cable distribution of only a limited number of games in some portions of the area--on a fee-for-subscriber basis centrally determined by the League--and prevent the club from distributing games on the internet (Compl. ¶ 40C), the necessary effect of these agreements to restrict competition, in the market for professional ice hockey broadcasts, is higher prices and reduced consumer welfare. (Compl. ¶ 31.)

### 3. New Media

In MSG I the Court detailed the events giving rise to MSG's challenge to the League's New Media Policy. See MSG I at *1-*5. MSG maintains its challenge to the New Media policy's ban on Member Clubs' operating team websites independent of the League server. In its view, the League's desire to have uniformity constitutes a form of "output reduction" because it reduces the number of websites available to consumers. (Compl. ¶ 16D.)

The League derives its authority for the policy from a 1996 Resolution of the NHL Board of Governors in which the Member Clubs agreed that the League would exploit, on behalf of all Clubs, the distribution of League and Club intellectual property rights over the internet and through similar new media.

(Goldfein Decl. Ex. 9.) The Resolutions included conveyance of any related intellectual property rights of the Clubs:

> [T]he Member Clubs individually confirm the grant to the League . . . of the exclusive worldwide right to use or license all of its intellectual property rights . . . for all purposes relating to the further development of a presence for the League and the Member Clubs on the Internet's World Wide Web and the exploitation of any and all opportunities utilizing comparable computer and telecast technology, including, without limitation, any network-centric, on-line or other interactive technologies . . . .

(Id.) They also granted the Commissioner broad discretion to carry out the League's objectives relating to exploitation of new media, including the authority to make directives regarding the very rights (e.g., advertising, merchandising) that are the subject of this case. (Id.) In June 2000, the Board unanimously adopted a Resolution reaffirming and ratifying that the rights to exploit the internet are held by the League and that the Commissioner has the power "to promulgate such rules and regulations and take such acts he deem[s] appropriate, including with respect to what rights might, at any particular time, be exercised by the Clubs." (Id. Ex. 10.) And finally, on October 25, 2000, the Commissioner promulgated the NHL Internet Regulations (id. Ex. 11), which have been amended on an ongoing basis.

## 4. Advertising and Sponsorships

The final area subject to the Complaint includes various rules governing advertising and sponsorships. The Member Clubs have operated under in-arena advertising rules--approved by

9

Resolutions of the Board of Governors--in various forms since the late 1970s. (Goldfein Decl. Ex. 12.) These rules include the Board Advertising Regulations (id. Ex. 13), which are applicable to the dasherboards around the ice surface. Further, in September 1991, the Board of Governors resolved that the same advertising restrictions that applied to dasherboards would apply to in-ice advertising as well (Id. Ex. 16). Subsequently, specific In-Ice Logo Guidelines were approved by Resolution on March 14, 1997. (Id. Exs. 17, 18.) In addition, on March 24, 1994, the Board of Governors resolved that no Club or Club broadcaster may use virtual signage or advertising. (Id. Ex. 19.) The Complaint alleges that these restraints also eliminate competition that would otherwise exist for businesses seeking to advertise or promote to the distinct demographic of NHL hockey fans. (Compl. ¶¶ 16B, 31.)

## C. The Consent Agreement & Releases

At the time the Rangers Club was purchased in 1995--and again most recently in 2005--MSG entered into a Consent Agreement with the NHL in which it agreed, inter alia, to be bound by the NHL Constitution, By-laws, and all League Rules and Regulations (Goldfein Decl. Ex. 20, § 3(a); Ex. 28, § 3(a)), and to honor the League's territorial allocations and restrictions (id. Ex. 28, § 4(b)), including as they relate to MSG's cable

operations (id. § 9(a)(ii)). The Consent Agreements also
contained a "Release and Limitation of Liability." (Id. Ex. 20,
§ 10(a); Ex. 28, § 13(a).) Specifically, the 2005 Agreement
provided:

> As partial consideration for the NHL providing the consents
> contained herein, each of the Transaction Parties . . . hereby
> forever releases and discharges the NHL, each of the other NHL
> Entities, [and] all of the Member Clubs . . . from any and all
> claims, demands, causes of action, and liabilities of any kind
> whatsoever (upon any legal or equitable theory, whether
> contractual, common-law, statutory, decisional, Canadian, United
> States, state, provincial, local or otherwise) . . . , which, to
> the best knowledge of such Transaction Party, exist as of the
> date of execution of this Consent Agreement by reason of any act,
> omission, transaction or occurrence taken or occurring at any
> time up to and including the date of the execution of this
> Consent Agreement, relating to, or arising from, any hockey
> operations or any NHL activity, including without limitation, the
> performance, presentation or exploitation of any hockey game or
> hockey exhibition or in respect of the Proposed Transactions . .
> . .

(Id. Ex. 20, § 10(a).) Whether the Consent Agreement and

Release bar the instant suit is a subject of the pending motion.

## DISCUSSION

Resolution of this motion to dismiss requires identifying

what portion, if any, of the Complaint survives the release

entered into by MSG and/or the doctrine of laches. Concluding

that only those claims relating to New Media do so, the Court

denies the motion to dismiss on the ground that the League is a

"single entity" for antitrust purposes. The motion, therefore,

is granted in part and denied in part.[4]

---

[4] In considering the motion to dismiss, I have considered the
following documents: the NHL's Memorandum of Law in Support of

(continued on next page)

## I.    Applicable Legal Standard

In addressing a motion to dismiss, the court must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007). "'The court's function . . . is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" Condit v. Dunne, No. 06 Civ. 13126, 2008 WL 2676306, at *2 (S.D.N.Y. July 8, 2008) (quoting Festa v. Local 3 Int'l Bhd. of Elec. Workers, 905 F.2d 35, 37 (2d Cir. 1990)) (ellipsis in original). Accordingly, the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007) (quoting Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (in turn citing Twombly v. Bell Atlantic Corp., 127 S.Ct. 1955, 1964 (2007) (omission in original)).

---

(cont'd from previous page)

Defendants' Motion to Dismiss or in the Alternative For Partial Summary Judgment ("NHL Mem."), dated June 2, 2008; MSG's Memorandum of Law in Opposition to Defendants' Motion to Dismiss or in the Alternative for Partial Summary Judgment ("MSG Opp."), dated July 17, 2008; and the NHL's Reply Memorandum of Law in Support of Defendants' Motion to Dismiss or in the Alternative for Partial Summary Judgement ("NHL Reply Mem."), dated August 6, 2008.

## II.   The 2005 Release

The League contends that the bulk of the allegations in this case (i.e., MSG's allegations relating to exclusive broadcasting territories, merchandizing and licensing, and advertising) are barred by the 2005 Consent Agreements and Release of Liability (the "Release"). As noted above, the Release provided that MSG "forever releases and discharges" the League "from any and all claims . . . upon any legal or equitable theory" which "exist as of the date of execution . . . relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game . . . ." (Goldfein Decl. Ex. 20, § 10(a).) MSG nevertheless argues that either (1) the release does not apply to its claims because they are based on "current conduct, not historical conduct" (MSG Opp. at 32-33), or (2) the release is unenforceable as against public policy because it operates as a prospective waiver of the right to sue for subsequent antitrust violations (MSG Opp. at 33-36).

### 1.   The Language of the Release Encompasses MSG's Claims

MSG's argument based on the Release language fails. The plain meaning of the terms of the agreement shows that its intended purpose was to foreclose a challenge to policies existing at the time of the release, hence the release of claims "relating to, or arising from, any hockey operations or any

13

[ongoing] NHL activity." (Goldfein Decl. Ex. 20, § 10(a) (emphasis added).) While MSG characterizes its claims as being based on post-Release conduct, the Complaint itself belies this position; it contains no allegations of post-2005 conduct apart from (1) the enforcement of pre-existing policies and (2) the 2006 extension of the licensing agreement that had been in place since 1994, which reaffirmed each Member Club's assignment of the right to "use or license its team's trademarks" to the League. (See Compl. ¶ 39; Goldfein Decl. Ex. 8.) Because this very antitrust "claim" "exist[ed]" at the time of the release, and because the only allegations in the Complaint demonstrate that the League continued its enforcement of pre-existing policies, cf. Willsea v. Theis, No. 98 Civ. 6774, 1999 WL 595629, at *12 (S.D.N.Y. Aug. 6, 1999), the Court has little trouble concluding that the Release evidences that the "parties had in mind a general settlement of all accounts up to that time," Three Rivers Motor Co. v. Ford Motor Co., 522 F.2d 885, 896 (3d Cir. 1975). See also Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986) ("The cardinal principle . . . is that the intentions of the parties should control . . . . [A]bsurd results should be avoided. . . [and] the meaning of particular language . . . should be examined 'in light of the business purposes sought to be achieved by the parties . . . .'") (citations omitted).

14

2. Whether Enforcement of the Release Violates Public
   Policy

Whether the enforcement of the release would violate public policy is a more difficult question. On the one hand, because "[a] no suit agreement may be one of the devices for shoring up a cartel," see Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 250 (7th Cir. 1994), the Supreme Court has indicated that it would condemn as against public policy an agreement that "operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19 (1985). On the other hand, despite a strong public interest in private antitrust enforcement, "this interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation." Three Rivers Motor Co., 522 F.2d at 891-92 (citations omitted); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 347 (1971) (holding that the scope of a release of antitrust claims is determined by the intent of the parties); Richard's Lumber & Supply Co. v. U.S. Gypsum Co., 545 F.2d 18, 20 (7th Cir. 1976) ("A general release . . . is not ordinarily contrary to public policy simply because it involves antitrust claims.").

Applying these well-settled principles to this case is complicated by the fact that MSG's challenge is to NHL policies,

i.e., restraints that form part of the structure of the joint venture and, indeed, in some cases, are built into the NHL Constitution. The Release is neither purely prospective (for this reason, the Release does not bar MSG's challenge to the New Media policy); nor is it purely retrospective in the sense that the League policies would continue to have effect after the Release's execution.

Determining whether the Release should be enforced requires examining the circumstances presented by this case. See Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 421 (1959) ("Cases are not decided, nor the law appropriately understood, apart from an informed and particularized insight into the factual circumstances of the controversy under litigation"). This principle has "particular force when the courts are asked to strike down on grounds of public policy a contractual arrangement on its face consensual." Id.; see also 17A C.J.S. Contracts § 218 (2008) ("There is no absolute rule by which to determine what contracts are against public policy, but each case must be determined from all the circumstances thereof, the courts declaring a contract void for such reason only where it is clearly contrary to the public interests, contravenes some established interest of society, or is against good morals"). The following considerations persuade

16

the Court that enforcement of the release in question would not be "clearly contrary" to the public interest:

First, there is no suggestion that the NHL is anything other than a legitimate joint venture. MSG's challenge is to the reasonableness of the restraints imposed by the venture, i.e., to these particular policies, not to the League's existence as such. (See Compl. ¶ 2.) To be sure, this does not end the antitrust inquiry; the Court must still "determine whether the nonventure restriction is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid." Texaco Inc. v. Dagher, 547 U.S. 1, 7 (2006). Here, the venture's undisputed legitimacy diminishes the public policy concerns compared to those in the case of a Section 1 conspiracy whose very existence is unlawful, as in the case of a monopoly or price-fixing conspiracy. See, e.g., Redel's Inc. v. Gen. Elec. Co., 498 F.2d 95, 99 (5th Cir. 1974) (general release not given prospective effect where plaintiff asserted "numerous claims of unlawful price discrimination"); Mktg. Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F. Supp. 1019, 1021-23 (S.D. Tex. 1972) (release could "not bar the assertion . . . of any post-release causes of actions" challenging "renewed monopolistic activities by the defendants" but also noting that "[n]o one would reasonably expect the

consequences of pre-release conduct to cease as of the day of the release, and such damages must certainly have been contemplated by the parties").

Second, MSG's argument is at odds with the language in a similar case decided by the Court of Appeals and well-settled principles favoring settlement as a matter of public policy. MSG concedes that the logical corollary of its position regarding the Release being "prospective" in nature is that parties can never settle antitrust claims predicated on "ongoing violations" even if they are based on "the same kind of acts repeated in the subsequent period." (Aug. 15. Tr. at 41-42 ("Tr.").)[5] Yet the Court of Appeals has observed that:

> It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution. Such a release would seem always to protect the ongoing conspiracy because it always prevents the releasor from beginning litigation that would establish the scheme's illegality. We do not think that the part and parcel doctrine can be read so broadly as thus to render void all releases relating to conspiracies alleged to continue post-release.

VKK Corp. v. NFL, 244 F.3d 114, 126 (2d Cir. 2001). While MSG correctly distinguishes VKK--which would otherwise be controlling--by disclaiming any reliance on the "part-and-parcel doctrine" relied on by the plaintiff in that case, (see Tr. at 30-31), the Court's rationale for rejecting the doctrine was

---

[5] See also Tr. at 45. (MR. NAGER: That is the classic advice we give our clients, that the settlement agreement does not protect you from anything that happens tomorrow. // THE COURT: Even if it is the same conduct? // MR. NAGER: Even if it is the same conduct.)

18

predicated on the enforceability (or at the bare minimum, the presumptive legality of) of releases of "conspiracies alleged to continue post-release"--like the one at issue in this case. Thus while this case falls outside the holding of VKK, albeit barely, the Court of Appeals' rationale still undercuts MSG's argument. Even putting VKK to one side, it is well settled that public policy favors the settlement of disputes. See Bano v. Union Carbide Corp., 273 F.3d 120, 129-30 (2d Cir. 2001). The "leading antitrust treatise" (MSG Opp. at 38) has observed that repose is "especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations . . . ." II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320a, at 282 (3d ed. 2004 & 2007 Supp.). Therefore even if the Court found that public policy counseled in favor of invalidating this Release on antitrust grounds, competing policy considerations favor its enforcement.

Third, the Court finds considerable support in the caselaw for the distinction relied upon here, namely that the public policy considerations differ when the only "prospective" application of the release in question is the continued adherence to a pre-release restraint. See MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 161 F.3d 443, 448 (7th Cir.

1998) (taking a functional approach to the question of
enforceability, the Court found the conduct "clearly based" on
pre-release conduct and thus enforced the release, while
acknowledging that "new, post-release agreement" in restraint of
trade may actionable, but mere "continued adherence" to an
alleged pre-release restraint of trade could not give rise to a
viable claim);[6] Hunter Douglas, Inc. v. Comfortex Corp., No. 98-
CV-0479, 1999 U.S. Dist. LEXIS 10906, at *19-21 (N.D.N.Y. Mar.
11, 1999) (release barred a claim challenging ongoing practices
that had "not been altered materially since the parties executed
[a release]") (emphasis added); Record Club of Am., Inc. v.
United Artists Records, Inc., 611 F. Supp. 211, 217 n.8
(S.D.N.Y. 1985) (enforcing a release of an antitrust claim
because "all of the harm alleged flows from and is related to
the terms of conditions [of the release]" and was merely the
"continuing effect" of pre-release conduct") (emphasis added).
MSG attempts to distinguish these cases because the plaintiffs
were not seeking injunctive relief (MSG Opp. at 36 n.17) but it
provides no reason why the remedy sought by a plaintiff should
have any bearing on the question of whether a defendant's

---

[6] The MCM Court, it should be noted, did not take up the question
of whether an "affirmation" of a pre-release agreement might
constitute a "new, post-Release" agreement, see 161 F.3d at 448
(emphasis added), and so it is cited here for the more limited
purpose of discrediting MSG's argument that antitrust claims can
never be released when they are predicated on alleged ongoing
violations.

continued adherence to pre-release restraints is actionable when styled as an "ongoing violation."  Indeed the very availability of the doctrine of laches to defeat claims for injunctive relief, see Antitrust Law ¶ 320g, at 325-26 ("[T]he doctrine of laches can bar an equity action where the plaintiff's unjustifiable delay in suing prejudices defendant") (discussed further infra), suggests that public policy concerns about the prospective application of releases can be outweighed in appropriate cases because, as MSG itself recognizes, "[a] prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm," (MSG Opp. at 38) (citing Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001)).

Finally, the cases on which MSG relies to support its public policy argument which do not involve conduct by the defendant that is by its very nature unlawful (and thus not even subject to the ancillary restraints doctrine) involve either releases that purport to bar claims based on future violations, i.e., truly "new and distinctive incidents", see Havercombe v. Dep't of Educ., 250 F.3d 1, 6 (1st Cir. 2001), or subsequent conduct by the defendant that goes beyond what was released in the first instance.  As an example of the latter, in Lawlor v. Nat'l Screen Serv. Corp., the plaintiffs alleged that movie producers conspired to establish a monopoly through a system of

exclusive licenses for advertising posters and other "standard accessories" accompanying films. 349 U.S. 322, 324 (1955). After settling the initial lawsuit, the plaintiffs alleged that (1) five other producers joined the conspiracy after the settlement, (2) the exclusive licensee intentionally made "slow and erratic deliveries" of advertising materials, and that (3) the licensee also used "tie-in sales and other means of exploiting monopoly power." Id. at 325. The Court of Appeals upheld the district court's grant of summary judgment predicated on a finding that the new action was based on "essentially" the "same course of wrongful conduct" and that summary judgment was proper because the new complaint was "in substance . . . the same [as the old]." Id. at 327. Though the case is slightly different because the defense was res judicata, the Court's reasons for reversal are instructive. In reversing, the Supreme Court relied on the fact that the new action was based on new types of antitrust violations and that there was a "substantial change in the scope of the defendants' alleged monopoly" since the execution of the release. Id. at 328. Thus the Court concluded that while the previous settlement "precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." Id. (emphasis added).

22

The other cases cited by MSG are distinguishable for these or similar reasons. See Westmoreland Asbestos Co. v. Johns-Manville Corp., 39 F. Supp. 117 (S.D.N.Y. 1941) ("contemplation of future wrongs was not within the minds of the parties"); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247 (7th Cir. 1994) (prospective waiver of right to challenge future decision by board of examiners relating to board certification was unenforceable); Three Rivers Motor Co. v. Ford Motor Co., 522 F.2d 885, 896 n. 27 (3d Cir. 1975) (upholding the validity of a release because the release did not "seek to waive damages from future violations of antitrust laws") (emphasis added); Gaines v. Carrollton Bd. of Trade, Inc., 386 F.2d 757 (6th Cir. 1967) (not addressing a release and simply reciting principle that "an agreement, if executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds"); Fox Midwest Theatres, Inc. v. Means, 221 F.2d 173, 180 (8th Cir. 1955) (plaintiff alleged a breach of the settlement agreement of a previously filed antitrust case, with the Court interpreting the agreement in light of the principle that "[a]ny contractual provision which could be argued to absolve one party from liability for future violations of the anti-trust statutes against another would to that extent be void as against public policy") (emphasis added); Hunt v. Mobil Oil Corp., 654 F. Supp.

1487, 1516 (S.D.N.Y. 1987) ("new practices" constituted "future
violations" and thus not subject to covenant not to sue).

     For these reasons, the Court concludes that the enforcement
of the 2005 release is not "clearly contrary" to the public
interest.  Therefore, the NHL's motion for partial summary
judgment is granted in this respect.

III. Alternatively the Suit is Barred by the Doctrine of Laches

     As an alternative basis for dismissing the allegations in
the Complaint unrelated to New Media, the Court finds that they
are barred by the doctrine of laches.  "The defense of laches
requires proof of (1) lack of diligence by the party against
whom the defense is asserted, and (2) prejudice to the party
asserting the defense." Kansas v. Colorado, 514 U.S. 673, 687
(1995).  Laches may be decided on the pleadings if unreasonable
delay and prejudice are clear on the face of the complaint. See
Solow Bldg. Co. v. Nine W. Group, Inc., No. 00 Civ. 7685, 2001
WL 736794, at *6, *8 (S.D.N.Y. June 29, 2001), aff'd 48 Fed.
App'x 15 (2d Cir. 2002).

     While strictly speaking the statute of limitations does not
apply to claims for injunctive relief, where the conduct forming
the basis for the Complaint occurs outside of the analogous
statute of limitations period, the doctrine of laches
presumptively bars a plaintiff's claims absent a showing that

24

delay was excusable and caused no prejudice to the defendant. See Conopco v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996). The statute of limitations for private antitrust actions is four years. See 15 U.S.C. §§ 15(a), 15(b). Because MSG filed this Complaint on September 28, 2007, any claim arising before September 28, 2003 is presumptively barred by laches. Only if MSG is correct, then, in characterizing its allegations unrelated to New Media as constituting "continuing violations" of the antitrust laws can the claims overcome the presumption of laches.

The Supreme Court has held that "[I]n the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again.'" Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997). The continuing violation doctrine, however, is an exception to the general rule that a cause of action accrues "the date on which the wrongdoer commits an act that injures the business of another." Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004).

Not every act qualifies as an "overt act" under Klehr. In order to restart the statute of limitations, the act (1) must be a new and independent act that is not merely a reaffirmation of

a previous act; and (2) it must inflict new and accumulating injury on the plaintiff. DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467-68 (6th Cir. 1996)(internal quotations omitted). The League actions that MSG argues qualify as "overt acts" are the 2006 renewal of the licensing agreements and the League's enforcement of those policies. (MSG Opp. at 37(citing Compl. ¶¶ 4-5, 17, 39).) Pinpointing exactly what qualifies as a "mere affirmation" of a previous act has been the source of some difficulty for the courts. See Pace Industries, Inc. v. Three Phoenix Co., 813 F.2d 234, 237-240 (9th Cir. 1987); Antitrust Law ¶ 320c, at 288 (describing the distinction as "hardly decisive in closes cases"). Under any meaningful definition of "reaffirmation," though, a "renewal" of policies in existence since 2004 qualifies. (See Compl. ¶ 39.) The Complaint does not allege any substantive change in the rights the Member Clubs' ownership over their trademarks and other intellectually property; and indeed the Resolution only "confirmed" that the right to exploit this property belonged to the League. (Goldfein Decl. Ex. 9.) The allegations in the Complaint, therefore, do not plausibly allege any "new and independent acts" that inflicted "new and accumulating injury" on MSG. For this reason, the Court finds that it is clear on the face of the Complaint that MSG did not pursue any of its

claims, apart from those relating to New Media, with diligence.[7]
See also Conopco 95 F.3d at 191-93 (applying laches to bar
claims involving ongoing false advertisements); Hot Wax, Inc. v.
Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999) ("Without
the availability of the application of laches to a claim arising
from a continuing wrong, a party could, theoretically, delay
filing suit indefinitely.")

Finding inexcusable delay, the burden is "on the
complainant to [allege] . . . the circumstances making it
inequitable to apply laches in [its] case." Conopco, 95 F.3d at
191.  MSG has neither alleged nor offered evidence suggesting
that laches should not apply.  Therefore, the Court finds that
the doctrine of laches bars the bulk of this suit.


IV.   Whether the League Constitutes a "Single Entity" For
      Antitrust Purposes When Imposing the Disputed Restraints

The question then becomes whether the League's New Media
policies, including the prohibition on teams' operating separate
websites, are themselves sufficient to state an antitrust claim.

---

[7] The authors of Antitrust Law have observed that "the more
recent decisions have paid increased attention to what the
plaintiff knew or should have known when the initial act
constituting the violation occurred." ¶ 320c1, at 288-89. This
consideration would clearly weigh in favor of the League because
the policies being challenged have been in existence for well
over ten years.  The Court notes, however, that in Klehr the
Supreme Court indicated that a plaintiff's knowledge ought not
play in a role in determining whether there is a continuing
violation. 521 U.S. at 189.

The League argues that the Complaint does not adequately allege "antitrust injury" and thus MSG does not have standing to pursue the claim. Alternatively, it argues that the NHL constitutes a "single entity when deciding how to make and sell what only the venture can create." (NHL Mem. at 13.)

## 1.   The Complaint Adequately Alleges Antitrust Injury

In order to have standing to pursue a private antitrust claim, a plaintiff must show more than injury-in-fact. See Ross v. Bank of America, 524 F.3d 217, 225 (2d Cir. 2008) ("It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury.") (citation omitted). A plaintiff must also plead antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). The rationale for requiring antitrust injury in order to have standing is that "the antitrust laws were enacted for the protection of competition, not competitors." Id. (citations and internal quotations omitted). Therefore a plaintiff will not have standing when the "injury" alleged results from competition alone, without a showing of "anticompetitive effect either of

28

the violation or of anticompetitive acts made possible by the violation." Id.

The League argues that the allegations in the complaint "boil down to" allegations of harm to MSG itself as opposed to competition. (See NHL MTD Mem. at 29) (citing Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006).)) Undoubtedly many of the allegations in the Complaint focus on the harm suffered by MSG. (See Compl. ¶ 47D) ("MSG has been and will continue to be unable to distribute Rangers games, game highlights and game footage through cable, satellite, internet and otherwise in ways that it believes are best suited to reaching the Rangers fan base.") But the antitrust injury requirement does not turn on the subjective intent of the plaintiff. As long as "a cartel-member plaintiff seeks to remove [a] restraint so he may be free to compete--such that the member's interest coincides with the public interest in vigorous competition--he satisfies the antitrust injury requirement." Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 440 (2d Cir. 2005) (quoting Volvo N. Amer. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 67-70 (2d Cir. 1998)). The allegations in the Complaint, while they focus on harm to MSG, also plead harm to competition as a whole for new media. (See Compl. ¶¶ 16D, 40E). Because it is plausible that the New Media Policy's prohibition on independent websites constitutes a form

29

of output reduction, see United States v. Visa U.S.A., Inc., 344 F.3d 229, 240 (2d Cir. 2003), the Complaint adequately alleges antitrust injury and thus will not be dismissed in its entirety.

## 2.   Whether The League Is Not a Single Entity Under Copperweld or Dagher

Section § 1 of the Sherman Act requires a multiplicity of actors to establish a "contract, combination . . . or conspiracy" that unreasonably restraints trade. See, e.g., Standard Oil Co. v. United States, 221 U.S. 1, 58 (1911).   The Supreme Court has found that because the Sherman Act contains a "basic distinction between concerted and independent action," the Act does not "reach conduct that is wholly unilateral." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 761 (1984) (internal quotation marks omitted).   The Court in Copperweld declined to take up the question of whether a parent corporation may conspire "with an affiliated corporation it does not completely own." Id. at 767.   The NHL argues that its logic suggests that the NHL should likewise be found to engage in "wholly unilateral" activity when "deciding how to make and sell what only the venture can create [i.e., NHL Hockey]" and that consequently, it is incapable of "conspiring" under the Sherman Act. (NHL MTD Mem. at 13-25.)

What is essentially the same argument has been rejected in a similar case by the Court of Appeals. See N. Am. Soccer League

30

v. NFL, 670 F.2d 1249, 1256 (2d Cir. 1982) ("NASL") ("The NFL
contends, and the district court held, that § 1 does not apply
for the reason that the NFL acted as a 'single economic entity'
and not as a combination or conspiracy within the meaning of
that law. We disagree.")  Most other Courts that have taken up
the issue have reached the same conclusion. See, e.g., Los
Angeles Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1388-89
(9th Cir. 1984); Fraser v. Major League Soccer, 284 F.3d 47 (1st
Cir. 2002); Sullivan v. NFL, 34 F.3d 1091 (1st Cir. 1994); St.
Louis Convention & Visitors Comm'n v. NFL, 154 F.3d 851 (8th
Cir. 1998); Smith v. Pro Football, Inc., 593 F.2d 1173 (D.C.
Cir. 1978).  There is authority to the contrary however.  In
Seabury Mgmt., Inc. v. Professional Golfers' Ass'n of America,
Inc., the Fourth Circuit, after examining the relationship
between the PGA and a regional golfers association stated that
"we are convinced that no reasonable trier of fact could have
found them to be separate entities." 52 F.3d 322, 1995 WL
241379, at *3 (4th Cir. 1995). In Chicago Professional Sports
Limited Partnership v. NBA, Judge Easterbrook, while
acknowledging that "[w]hether the NBA itself is more like a
single firm, which would be analyzed only under § 2 of the
Sherman Act, or like a joint venture, which would be subject to
the Rule of Reason under § 1, is a tough question under
Copperweld," ultimately concluded that "'NBA Basketball' is one

31

product from a single source." 95 F.3d 593, 599 (7th Cir. 1996).
Most recently, following Chicago Professional Sports Limited
Partnership, the Seventh Circuit found that the NFL functioned
as a single entity when collectively licensing its intellectual
property. See Am. Needle Inc. v. NFL, No. 07-4006, 2008 WL
3822782 (7th Cir. Aug. 18, 2008).

The Court need not--and will not--resolve the question at
this juncture. The arguments advanced by the NHL in favor of
single entity status require examining facts outside the
pleadings. For example, the League argues that, like in Chicago
Professional Sports, the NHL "has no existence independent of
sports" and that NHL hockey "is one product from a single
source." See id. at 600. But even in Chicago Professional
Sports, the Seventh Circuit held only that "we conclude that
when acting in the broadcast market the NBA is closer to a
single firm than to a group of independent firms." Id.
Similarly in Am. Needle, the District Court afforded single
entity status to the NHL on a motion for summary judgment, only
after determining (after discovery) that there were certain
"advantages of one-stop exploitation of the intellectual
properties of the 32 teams and of those common to the league in
a national market." Am. Needle, Inc. v. New Orleans Louisiana
Saints, 496 F. Supp. 2d 941, 944 (N.D. Ill. 2007).

At this early stage of litigation, there is no evidence in the record on the crucial question of market definition, let alone the inquiry into how the NHL actually operates as an economic actor in that market. See Chicago Professional Sports, 95 F.3d at 600 ("Sports are sufficiently diverse that it is essential to investigate their organization and ask Copperweld's functional question one league at a time-and perhaps one facet of a league at a time, for we do not rule out the possibility that an organization such as the NBA is best understood as one firm when selling broadcast rights to a network in competition with a thousand other producers of entertainment, but is best understood as a joint venture when curtailing competition for players who have few other market opportunities.")   Therefore the NHL's arguments in favor of dismissal cannot be resolved at the pleading stage, and the motion is denied.

To be sure, MSG faces a tall order in making its case. This Court has already observed that agreements among parents of a joint venture not to compete in the market in which a joint venture operates have generally been upheld. MSG I at *6 n.7; see also United States v. Addyston Pipe & Steel Co., 85 F. 271, 280-81 (6th Cir. 1898) (Taft, J.) (restrictions by parents were "of course, only ancillary to the main end of the union, and were to be encouraged") aff'd in part, modified in part on other grounds, 175 U.S. 211 (1899).   The reasonableness of the

33

restraint, however, is evaluated under the rule of reason. See
MSG I at *6 (observing that such agreements have typically been
viewed as reasonable ancillary restraints); Business Elecs.
Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 729 n. 3 (1988) (also
observing that agreements not to compete are "classic" ancillary
restraints).

CONCLUSION

For these reasons, the motion for partial summary judgment
(dkt. no. 63) is granted in part and denied in part.

SO ORDERED:

Dated:     New York, New York
           October 10, 2008

Loretta A. Presca

LORETTA A. PRESKA, U.S.D.J.